Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Emord & Associates, P.C.
3210 S. Gilbert Road, Suite 4
Chandler, AZ 85286
Phone: (602) 388-8899
Fax: (602) 393-4361
Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL IMMUNOGENICS CORP., a Florida corporation, | Case No. |
| Plaintiff, | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:** |
| v. | |

NEWPORT TRIAL GROUP, a California Corporation; SCOTT J. FERRELL, a California resident; RYAN M. FERRELL, an Arizona resident; JAMES B. HARDIN, a California resident; VICTORIA C. KNOWLES, a California resident; ANDREW LEE BASLOW, a California resident; ANDREW NILON, a California resident; SAM PFLEG, a California resident; MATTHEW DRONKERS, a California resident; TAYLOR DEMULDER, a Nevada resident; SAM SCHOONOVER, a California resident; GIOVANNI SANDOVAL, an Arizona resident; ISABELLA JANOVICK, a California resident; DAVID URZUA, a California resident; KALEB PATTERSON, a California resident; and DOES 1-

1. Malicious Prosecution;

2. Violation of the RICO Act (18 U.S.C. §§ 1961, 1962(c), 1964(c)) by:
   a. Wire Fraud (18 U.S.C. §§ 1343, 1349);
   b. Mail Fraud (18 U.S.C. §§ 1341, 1349);
   c. Extortion (18 U.S.C. § 1951);

3. Violation of the RICO Act (18 U.S.C. §§ 1961, 1962(a), 1964(c));

4. Violation of the RICO Act (18 U.S.C. §§ 1961, 1962(d), 1964(c)); and,

5. Unfair Competition (Cal. B&P Code §§ 17200, *et seq.*; Cal. B&P Code §§ 7520, *et seq.*).

<u>JURY TRIAL DEMANDED</u>

10, inclusive,

Defendants.

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1.     Plaintiff Natural Immunogenics, Corp. ("NIC" or "Plaintiff"), by and through undersigned counsel, files this Complaint for Damages and Injunctive Relief against the above-named Defendants.  This is an action for fraud, unfair competition, malicious prosecution, extortion, and other claims brought, in part, under the federal Racketeer Influenced Corrupt Organizations Act (RICO).  For at least the past five years, the Defendants have acted in concert and conspired to file state and federal lawsuits against corporate defendants across the country on false pretenses, seeking to extort large payouts in the form of legal fees, damage awards, legal costs, and/or settlements from those defendants.  The Defendant Newport Trial Group (NTG) and its above-named attorneys and agents worked in concert to operate an unlawful enterprise by paying individuals to assume the role of plaintiffs, who in fact had no bona fide basis for suit, and to initiate and maintain fabricated class action suits in order to extort money from those defendants.  NTG and its agents paid plaintiffs to sign false affidavits, pleadings, and legal filings in support of those actions.  NTG and its attorneys suborned perjury.  NTG and its attorneys relied on their employees or agents to recruit putative plaintiffs for hire, most often young individuals or recent college graduates in need of money and willing to participate in NTG's fraudulent scheme.  NTG and its attorneys filed demonstrably false statements in support of those fabricated cases, and collectively obtained tens of millions of dollars in settlement payments from those threatened with suits and defendants.

2.     Plaintiff Natural Immunogenics Corp. (NIC) suffered injury resulting from an NTG lawsuit purportedly sponsored by Andrew Nilon in March 2012.  That lawsuit was fraudulent.  NTG paid Andrew Nilon approximately $900 to

assume the role of plaintiff in litigation in which NTG fabricated charges against NIC.  On information and belief, Defendants NTG have unlawfully obtained more than three hundred million dollars through their lawsuits, much of which can be linked to NTG's scheme to fabricate lawsuits identified in this Complaint.  That fraudulent scheme violates federal and state laws.

3.    The facts underlying this suit define one of the largest frauds perpetrated by lawyers on the courts in American history.  This Court should therefore issue the relief requested in this Complaint to protect the integrity of the judicial system, to ensure that those attorneys, associates, and agents who abused the judicial process and engaged in tortious activity are made to account for their wrong-doing and ill-gotten gains, and to halt the abuses and damages stemming from their tortious and unlawful actions.

## I.    PARTIES

**The Plaintiff:**

4.    Plaintiff Natural Immunogenics Corp. ("NIC") is a corporation organized under the laws of Florida with its principal place of business in Sarasota, Florida.  NIC is a family-owned and operated company established in 1999.  It sells dietary supplements and homeopathic products, including a national line of colloidal silver products, which are marketed under the brand "Sovereign Silver."

5.    Defendant NTG sued NIC in March 2012 for false advertising, unfair competition, and violations of the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*  NTG certified a class action against NIC based on the allegations in its Complaint.  *See, e.g., Nilon v. Natural-Immunogenics Corp.*, No. 3:12-cv-930-LAB, Dkt. Nos. 1, 41 (S.D. Cal.).  That Complaint and the subsequent action were fraudulent.  The lead Plaintiff and class representative, Mr. Andrew Nilon, was paid approximately $900 by the Newport Trial Group to serve as a putative plaintiff and to support false allegations concocted by NTG against

Natural Immunogenics.  Mr. Nilon did not purchase Natural Immunogenic's product before suit was filed, rendering NTG's allegations in the Complaint fraudulent and fabricated.

6.     Natural Immunogenics endured more than three years of litigation based on NTG's fraudulent claims.  NIC suffered substantial harm to its reputation and goodwill stemming from NTG's false allegations and suffered financial losses resulting therefrom.

**The Defendants:**

7.     Defendant Newport Trial Group (NTG) is a professional corporation based in Newport Beach, California with its principal place of business at 4100 Newport Pl. Dr., No. 800, Newport Beach, California 92660.  NTG's principal business is the practice of law.  NTG has been prolific in its filing of class action litigation at the state and federal level, including the promulgation of hundreds of demand letters, threats, and suits against defendants located nationwide.  NTG has participated in a pattern of fraudulent litigation, and threats of litigation, in an unlawful scheme to defraud defendants nationwide.  NTG and its attorneys and associates have used their professional status to conceal this unlawful enterprise. NTG and its members have profited substantially from NTG's unlawful, fraudulent filings in state and federal court.

8.     Scott J. Ferrell is an individual and licensed California attorney residing in California.  He is the founding member of the Newport Trial Group and a practicing attorney with that firm.  Mr. Ferrell has designed, initiated, and pursued fraudulent legal claims in state and federal court.  Mr. Ferrell has hired, supervised, and worked with NTG employees (e.g., investigators, support staff, etc.) who have also acted unlawfully by soliciting and paying individuals to be plaintiffs in NTG's fraudulent lawsuits.  Mr. Ferrell has filed fraudulent documents in state and federal court and has suborned perjury.

9.      Ryan M. Ferrell, the brother of Scott J. Ferrell, is an individual and licensed California attorney residing in Maricopa County, Arizona.  He is a practicing attorney with the Newport Trial Group.  Mr. Ferrell has designed, initiated, and pursued fraudulent legal claims in state and federal court.  Mr. Ferrell has supervised and worked with NTG employees (e.g., investigators, support staff, etc.) who have also acted unlawfully by soliciting and paying individuals to be plaintiffs in NTG's fraudulent lawsuits.  Mr. Ferrell has filed fraudulent documents in state and federal court and has suborned perjury.

10.      James B. Hardin is an individual and licensed California attorney residing in California.  He is a practicing attorney now with the firm of Hardin & Associates in Newport Beach, California.  Mr. Hardin previously worked for the Newport Trial Group until 2015.  While at the Newport Trial Group, Mr. Hardin designed, initiated, and pursued fraudulent legal claims in state and federal court. Mr. Hardin supervised and worked with NTG employees (e.g., investigators, support staff, etc.) who also acted unlawfully by soliciting and paying individuals to be plaintiffs in NTG's fraudulent lawsuits.  Mr. Hardin has filed fraudulent documents in state and federal court and has suborned perjury.

11.      Victoria C. Knowles is an individual and licensed California attorney residing in California.  She is a practicing attorney with the Newport Trial Group. Ms. Knowles has designed, initiated, and pursued fraudulent legal claims in state and federal court.  She has supervised and worked with NTG employees (e.g., investigators, support staff, etc.) who have also acted unlawfully by soliciting and paying individuals to work as plaintiffs in NTG's fraudulent lawsuits.  Ms. Knowles has filed fraudulent documents in state and federal court and has suborned perjury.

12.      Andrew Lee Baslow is an individual residing in Orange County, California.  Mr. Baslow works for the Newport Trial Group as an investigator.  Mr. Baslow has filed declarations in federal district court wherein he presents evidence

through sworn affidavits and claims to be "an investigator for Newport Trial Group." *See, e.g., Neal v. NaturalCare, Inc.*, No. 12-cv-531 (C.D. Cal.), Dkt. 17-8; *Shin v. Digi-Key Corporation*, No. 12-cv-5415-PA (C.D. Cal.), Dkt. 11-3 ("I am an investigator for Newport Trial Group"); *Clark v. MyLife.com, Inc.*, No. 12-cv-6889 (C.D. Cal.), Dkt. 12-2 ("I am an investigator for Newport Trial Group").  Mr. Baslow is not licensed to be an investigator and has never been licensed under Cal. Bus. & Prof. Code § 7520 *et seq.*  On information and belief, Mr. Baslow's activities include those that do not qualify for the licensing exemptions in Cal. Bus. & Prof. Code § 7522.  On NTG's behalf, and under supervision of NTG attorneys, Mr. Baslow has solicited, recruited, and paid individuals to serve as plaintiffs in fictitious or fraudulent lawsuits.  Mr. Baslow has instructed those individuals to sign falsified documents in support of those fraudulent lawsuits.  Mr. Baslow has solicited and recruited at least eight fraudulent plaintiffs, and likely many more.  Mr. Baslow has suborned perjury.

13.     Andrew Nilon is an individual and resident of California.  Mr. Nilon, together with his close associates, joined with NTG to file fraudulent lawsuits beginning in 2012.  Mr. Nilon was paid by NTG and its agents to participate in fraudulent litigation.  He received approximately $900 in cash to sign legal documents (including statements under oath) that were materially false.  *See Nilon v. Natural-Immunogenics Corp.*, No. 3:12-cv-00930-LAB-BGS (C.D. Cal. 2012); *Nilon v. Chromadex, Inc.*, No. 56-2013-00436790-CU-MT-VTA (Sup. Ct. Ventura Cnty. 2013).  The cash paid to Mr. Nilon had no bearing on legal fees or recovery—NTG recovered no money and received no judgment in the various lawsuits.  Mr. Nilon has admitted in written communications that his legal claims were fraudulent, that he was paid by NTG to support fraudulent allegations, and that NTG coerced him into signing false affidavits solely for NTG's illicit purposes.  Mr. Nilon is close personal friends with Matthew Dronkers, Taylor Demulder, and Sam Pfleg, who also served as NTG "plaintiffs."  As with Nilon, so

too with Dronkers, Demulder, and Pfleg, each were paid to create, fabricate, or participate in similar fraudulent legal actions pursued by NTG. In 2012, Nilon, Dronkers, Demulder, and Pfleg started a business together known as the Electric Family, LLC.

14.   Sam Pfleg is an individual and resident of California. Mr. Pfleg, together with his close associates, joined with NTG to file fraudulent lawsuits beginning in 2012. Mr. Pfleg was paid by NTG and its agents to participate in fraudulent litigation. He received cash to sign legal documents (including statements under oath) that were materially false. *See Sam Pfleg v. Nature's Way Products, Inc.*, No. 37-2012-0051979-CU-MT-NC (Sup. Ct. San Diego Cnty. 2012). Mr. Pfleg is close personal friends with several other NTG "plaintiffs," all of whom were paid to create, fabricate, or participate in fraudulent legal actions. Those individuals include Matthew Dronkers, Taylor Demulder, and Andrew Nilon. In 2012, those individuals started a business together known as the Electric Family, LLC.

15.   Matthew Dronkers is an individual and resident of California. Mr. Dronkers, together with his close associates, joined with NTG to file fraudulent lawsuits beginning in 2012. Mr. Dronkers was paid by NTG and its agents to participate in fraudulent litigation. On information and belief, he received cash to sign legal documents (including statements under oath) that were materially false. Mr. Dronkers is close personal friends with several other NTG "plaintiffs," all of whom were paid to create, fabricate, or participate in fraudulent legal actions. Those individuals include Taylor Demulder, Sam Pfleg, and Andrew Nilon. In 2012, those individuals started a business together known as the Electric Family, LLC.

16.   Taylor Demulder is an individual and resident of Nevada. Mr. Demulder, together with his close associates, joined with NTG to file fraudulent lawsuits beginning in 2012. On information and belief, Mr. Demulder was paid by

NTG and its agents to participate in fraudulent litigation. He received cash to sign legal documents (including statements under oath) that were materially false. Mr. Demulder is close personal friends with several other NTG "plaintiffs," all of whom were paid to create, fabricate, or participate in fraudulent legal actions. Those individuals include Matthew Dronkers, Sam Pfleg, and Andrew Nilon. In 2012, those individuals started a business together known as the Electric Family, LLC. Mr. Demulder was separately sued in May 2013 by the Carter-Reed Company, LLC, for earlier pursuing an ostensibly false claim against Carter-Reed, which was filed and litigated by the Newport Trial Group. *See Carter-Reed Company, LLC v. Taylor Demulder*, No. 130903002 (Dist. Ct. Salt Lake Cnty. 2013).

17.     Sam Schoonover is an individual and resident of California. Mr. Schoonover, together with his close associates, joined with NTG to file fraudulent lawsuits beginning in 2012. Mr. Schoonover was paid by NTG and its agents to participate in fraudulent litigation. He received cash to sign legal documents (including statements under oath) that were materially false. *See Schoonover v. Himalaya Drug Co.*, No. 12-cv-1782 (S.D.Cal. July 19, 2012). Mr. Schoonover is close personal friends with several other NTG "plaintiffs," all of whom were paid to create, fabricate, or participate in fraudulent legal actions. Those individuals include Matthew Dronkers, Sam Pfleg, Andrew Nilon, and Taylor Demulder. Mr. Schoonover began working with and eventually became employed by Electric Family, LLC sometime after the company's organization in May 2012.

18.     Isabella Janovick is an individual and resident of California. Isabella Janovick joined with NTG to defraud charitable organizations through fraudulent litigation. Ms. Janovick filed a fraudulent lawsuit against the American Breast Cancer Foundation on November 8, 2013 in the U.S. District Court for the Southern District of California. *See Isabella Janovick*, No. 13-cv-02697-DMS (S.D. Cal. Nov. 8, 2013). Ms. Janovick alleged in her complaint that she donated

$100 to the American Breast Cancer Foundation in reliance on representations made on the foundation's website.  *Id.*  On information and belief, that allegation was false because NTG had pledged to Ms. Janovick the $100 for the sole purpose of buying a lawsuit against a charitable organization.  Ms. Janovick's husband, through NTG, also filed a fraudulent Complaint in federal court just one month prior.  *See Kyle Janovick v. Maximum Human Performance*, No. 13-cv-2129-LAB (S.D. Cal. Sept. 11, 2013).

19.    David Urzua is an individual and resident of California.  Mr. Urzua joined with NTG to defraud charitable organizations through fraudulent litigation. Mr. Urzua filed a fraudulent lawsuit against the National Veterans Services Fund on September 16, 2013 in the U.S. District Court for the Southern District of California.  *See David Uruza v. Nat'l Veterans Servs. Fund,* No. 3:13-cv-02217-MMA-KSD (S.D. Cal. Sep. 16, 2013).  Mr. Urzua alleged in his complaint that he donated $100 to the National Veterans Services Fund in reliance on representations made on the fund's website.  *Id.*  On information and belief, that allegation was false because NTG pledged to Mr. Urzua the $100 for the sole purpose of buying a lawsuit against a charitable organization.

20.    Kaleb Patterson is an individual and resident of California.  Mr. Patterson joined with NTG to defraud charitable organizations through fraudulent litigation.  Mr. Patterson filed a fraudulent lawsuit against the International Union of Police Associations on November 8, 2013 in the U.S. District Court for the Southern District of California.  *See Kaleb Patterson v. Int'l Union of Police Associations, AFL-CIO,* No. 3:13-cv-02698-JAH-JMA (S.D. Cal. Nov. 8, 2013). Mr. Patterson alleged in his complaint that he donated $100 to the International Union of Police Associations in reliance on representations made on the association's website.  *Id.*  On information and belief, that allegation was false because NTG pledged to Mr. Patterson the $100 for the sole purpose of buying a lawsuit against a charitable organization.

21.     Giovanni Sandoval is an individual and resident of Yuma County, Arizona.  On August 25, 2014, Mr. Sandoval entered as a plaintiff in an NTG initiated and prosecuted suit against Natural Immunogenics, substituting himself as the class representative in place of Mr. Andrew Nilon.  *See Nilon v. Natural-Immunogenics Corp.*, No. 12-cv-930-LAB (S.D. Cal.), Dkt. No. 63.  Mr. Sandoval filed a false Complaint wherein he claimed that his residence was in California when it was not.  *Id.*  Mr. Sandoval actually lived in Arizona, making him ineligible to serve as a class representative against Natural Immunogenics.  On information and belief, Mr. Sandoval never purchased or used the Natural Immunogenics' product.  On May 22, 2015, Judge Larry A. Burns of the Southern District of California dismissed Sandoval's claims against Natural Immunogenics with prejudice.  *See id.* at Dkt. 120 (finding that Mr. Sandoval was never an eligible member of the class).

22.     Defendants DOES 1-10 are presently unidentified or unknown individuals and/or entities who have facilitated, participated, or cooperated in the unlawful enterprise and scheme to defraud corporations nationwide through fraudulent legal claims (or threats of same).  The nature and identity of those defendants will become known through discovery.

## II.   JURISDICTION AND VENUE

23.     This Court has original subject matter jurisdiction over this action pursuant to the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964 (the "RICO Act" or "RICO").

24.     This Court also has original subject matter jurisdiction under 28 U.S.C. § 1332 because Plaintiff Natural Immunogenics is a resident of Florida, while no other named Defendant resides in Florida.  The matter in controversy is over $50 million and, thus, substantially exceeds $75,000.

25.     This Court has supplemental jurisdiction over all state claims pursuant to 28 U.S.C. § 1367(a).

26.     This Court has personal jurisdiction over all Defendants and venue is proper in this District because the majority of all named Defendants, except Ryan M. Ferrell, Giovanni Sandoval, Jr. and Taylor Demulder, are residents of the State of California.  This Court has personal jurisdiction over Defendant Ryan M. Ferrell because he is employed by Newport Trial Group, a law firm with its principal place of business in the state of California, and Mr. Ferrell regularly conducts business in the state of California. This Court has personal jurisdiction over Defendants Giovanni Sandoval, Jr. and Taylor Demulder because they filed fraudulent complaints and declarations in California District Court in exchange for monetary compensation provided by the Newport Trial Group, a California-based law firm.  This Court also has personal jurisdiction over Taylor Demulder because he was an officer in Electric Family, LLC which has its principal place of business in California.  Furthermore, the acts and practices of all Defendants described herein occurred in California and this Court has jurisdiction over the controversy which arises out of that conduct.

27.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Newport Trial Group, the central cog in the fraudulent scheme described herein, has its principal place of business within the Central District of California.

### III.    ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

28.     The Newport Trial Group ("NTG") is a law firm located in Newport Beach, California.  The firm was founded in 2010, after which it soon developed a history of questionable class action litigation.  NTG has docketed hundreds of class action complaints since it began operations.  It has sent hundreds of corporations (and potential defendants) demand letters containing threats of litigation.  Those demands have often resulted in lucrative pre-litigation payouts to NTG.

29.    To fuel its steady and profitable stream of class action litigation, the Newport Trial Group actively recruited, solicited, and paid individuals to front as plaintiffs in prospective NTG lawsuits.  The individuals who accepted payment often had little knowledge about NTG's case, rarely reviewed documents filed on their behalf, often did not purchase the products at issue, and collaborated with NTG to fabricate legal claims that would appear facially legitimate to corporate defendants and the courts.

30.    When making threats of litigation and when filing suit, NTG operated not as a law firm, representing the interests and defending the rights of bona fide plaintiffs in accordance with the law, but instead as an unlawful and corrupt enterprise, extorting money by targeting defendants and concocting charges against them through fabricated suits, building legal allegations through fraudulent plaintiffs, and concealing its fraudulent conduct through claims of legal privilege (including the attorney/client privilege) and refusals to participate in meaningful discovery.

31.    Plaintiff Natural Immunogenics ("NIC") suffered injury as a result of NTG's fraudulent practices beginning in 2012, when NTG filed a fraudulent lawsuit against NIC.  *See Nilon v. Natural-Immunogenics Corp.*, No. 3:12-cv-00930-LAB-BGS (S.D. Cal. 2012).  As described more fully herein, that law suit was contrived by NTG and supported by fraudulent allegations.  As also set forth more fully below, NTG has demonstrated a pattern and history of similar fraudulent lawsuits for the past five years and perhaps longer.

### A. <u>Newport Trial Group's  Fraudulent Law Suits</u>

32.    NTG began its unlawful and corrupt enterprise in 2010.  It started by developing a book of litigation built on *qui tam* lawsuits.  The applicable laws allowed NTG to file lawsuits without having a plaintiff who suffered "injury" under the law.

33.     NTG therefore located individuals willing to serve as named parties, and then pursued multiple lawsuits identifying them as plaintiffs—all without having to prove injury-in-fact.  The lax standing requirements in those lawsuits allowed NTG to pursue dozens of lawsuits in NTG's interest and to derive therefrom a substantial profit.

34.     In 2010, Newport Trial Group identified a business opportunity predicated on the lax standing requirements in federal False Patent Marking suits brought under 35 U.S.C. § 292.  Section 292(b) established standing to sue on behalf of *any* individual through a *qui tam* action, without having to establish an injury-in-fact.  Those broad standing rules allowed NTG to send legal demand letters seeking quick payouts without having to first secure new plaintiffs or business.  NTG filed multiple claims on behalf of the same group of plaintiffs.  For example, it filed at least ten (10) False Patent Marking cases for plaintiff Zachary Hallstrom and an additional four for plaintiff Michael Gonzales.[1]

35.     But, on September 16, 2011, Congress enacted the Leahy-Smith America Invents Act ("AIA").  To curtail litigation of the type described in paragraph 34 above, the AIA eliminated the *qui tam* provision of Section 292 and instead required plaintiffs to show a "competitive injury."  To continue the False Marking lawsuits, NTG would need to find legitimate plaintiffs who suffered a rare competitive injury in the market.  None of NTG's existing plaintiffs could meet

---

[1] *See, e.g., Hallstrom v. Aqua Flora, Inc.,* No. 2:10-cv-01459 (E.D. Cal. June 14, 2010); *Hallstrom v. Eagle Eye Optics, Inc.,* No. 5:10-cv-02864 (N.D. Cal. June 29, 2010); *Hallstrom v. Nutrex Corp.,* No. 8:10-cv-00704 (C.D. Cal. June 2, 2010); *Hallstrom v. Thermolife International, LLC,* No. 2:10-cv-02569 (E.D. Cal. Sept. 21, 2010); *Hallstrom v. Arthur Middleton Capital Holdings,* No. 3:10-cv-01177 (S.D. Cal. June 1, 2010);; *Gonzales v. Health Enterprises, Inc.,* No. 5:11-cv-00732 (C.D. Cal. May 9, 2011); *Gonzales v. Palo Alto Labs, Inc.,* No. 2:10-cv-07633 (N.D. Cal. June 3, 2010); *Gonzales v. Trimedica International, Inc.*, No. 2:10-cv-01360 (June 3, 2010).

that standard.  NTG then discontinued filing *qui tam* suits in favor of other causes of action.

36.     In 2012, Scott J. Ferrell and the Newport Trial Group pursued contrived patent litigation, commonly known as "patent trolling."  To pursue those cases, Attorney Scott J. Ferrell formed a Nevada Limited Liability Company named the "Tawnsaura Group" on June 14, 2012 for the express purpose of earning legal fees and settlement money in patent litigation.  *See* Exh. A.  Scott J. Ferrell was listed as the first corporate officer in corporate filings submitted by the Tawnsaura group.  He also represented the Tawnsaura group in subsequent patent litigation.

37.     The Tawnsaura Group was organized in Nevada on June 14, 2012.  It began filing lawsuits for patent infringement two months later.

38.     The Tawnsaura group acquired an ownership interest in patents related to two common dietary ingredients.  NTG then began prolific litigation against dietary supplement companies for patent infringement based on those two patents.[2]  The case theory was simple enough.  Tawnsaura had the rights to two questionable patents of dietary ingredient formulations—chemicals present in most known food sources.  That created a basis to allege that most food and dietary supplement companies were infringing Tawnsaura's shaky patents.  Upon information and belief, Scott J. Ferrell and Tawnsaura, through Newport Trial Group, sued at least 87 dietary supplement companies under the patents acquired by Ferrell (patents that were later invalidated on eminently foreseeable grounds).

---

[2] *See, e.g., The Tawnsaura Group, LLC v. Physician Formulas, Inc.,* No. 8:12-cv-01352 (C.D. Cal. filed on Aug. 21, 2012); *The Tawnsaura Group, LLC v. Maximum Human Performance, LLC, et al.,* No. 2:12-cv-07189 (C.D. Cal. filed on Aug. 21, 2012); *The Tawnsaura Group, LLC v. Beautyfit, Inc.,* No. 8:12-cv-01354 (C.D. Cal. filed on Aug. 21, 2012); *The Tawnsaura Group, LLC v. Gaspari Nutrition, Inc.*, No. 8:12-cv-01353 (C.D. Cal. filed on Aug. 21, 2012); *The Tawnsaura Group, LLC v. Serious Nutrition Solutions, LLC*, No. 8:12-cv-01396 (C.D. Cal. filed on Aug. 28, 2012).

39.     While most defendants in the Tawnsaura cases paid NTG and Ferrell to avoid litigation, the defendants in *Tawnsaura Group, LLC v. Maximum Human Performance, LLC*, reached a decision on the merits.  *See* No. 2:12-cv-07189 (C.D. Cal. filed Aug. 21, 2012).  The Court granted summary judgment in favor of all defendants on grounds that the two Tawnsaura patents were invalid and unenforceable.  *Id.* at Dkt. No. 281.  The court held that those patents involved "obvious" technology under 35 U.S.C. § 103, and failed to meet the utility and enablement requirements for patentability.  *Id.*  That ended NTG's patent-trolling enterprise.

40.     Meanwhile, NTG also began filing California State class action suits under the Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*), Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750, *et seq.*), and the False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, *et seq.*).  Those statutes eased the standards for class certification, allowing NTG to increase the size of potential settlements and demands in litigation.  Class litigation also invoked heightened protections for the claims of so-called class members who were technically represented *in absentia*, thus increasing the projected costs and burdens of litigation for defendants in NTG class action suits.  The Newport Trial Group's UCL/CLRA/FAL lawsuits were profitable, but, to maintain those actions, NTG had to find plaintiffs who could allege an actual and legally sufficient injury.

41.     To overcome that obstacle, NTG employed attorneys and agents, including Defendant Andrew Baslow, to recruit and pay individuals to act as plaintiffs in the firm's class action suits.  NTG paid those individuals to allege fabricated legal claims against corporate defendants with whom the plaintiffs had no prior connection.  The firm had pre-identified those targets for suit.  Nearly all of NTG's class representatives were young individuals in their early- or mid-twenties, in need of financial assistance, and who agreed to allow NTG to list them

as plaintiffs in exchange for cash payouts from NTG.  NTG's putative "plaintiffs" were often relatives, close friends, or associates of NTG staff and employees.

42.     On information and belief, discovery will establish that NTG lawsuits in addition to those referenced herein were fraudulent.

**B. Defendants Recruit Fraudulent Plaintiffs:  Nilon and His Associates**

43.     Defendant Andrew Nilon was one of NTG's fraudulent plaintiffs.  He filed a lawsuit against Plaintiff Natural Immunogenics in 2012.

44.     In 2012, Andrew Nilon had recently graduated from the Arizona State University (ASU), where he had attended school from 2007 through 2011.  During his time at ASU, Mr. Nilon became close friends with several other individuals, including Sam Pfleg, Taylor Demulder, and Matt Dronkers.

45.     After graduation from ASU, Mr. Nilon and Mr. Dronkers moved to a San Diego apartment in August 2011.  Several of Nilon's close friends, including Sam Pfleg, also moved to the San Diego area around August 2011.  Those individuals remained in contact and shared the same social circles.

46.     Nilon, Dronkers, Demulder and Pfleg were heavily indebted, possessing student loans and liabilities.  They also had limited job prospects.  By January 2012, they were impecunious.

47.     Nilon, Pfleg, and Dronkers met an individual named Sam Schoonover while living in San Diego.  In January 2012, Schoonover's girlfriend, Talee Rooney, informed Nilon, Pfleg, Dronkers, Demulder and Schoonover that she knew of a law firm that paid cash for easy work.  Rooney introduced Nilon and his associates to Andrew Baslow, then in the employ of NTG as "an investigator."  Rooney instructed Nilon, Pfleg, Dronkers, Demulder, and Schoonover to call Andrew Baslow to obtain employment.  Nilon received Baslow's contact information from Rooney and contacted Baslow at the Newport Trial Group.

48.     Mr. Baslow explained to Nilon and his associates that he, Baslow, was an employee of the Newport Trial Group.  Baslow explored Mr. Nilon's need for employment and then suggested that he and Nilon meet in person.  Several days later, Nilon met Baslow at a coffee shop located between Newport Beach and San Diego.  Andrew Baslow explained that NTG intended to file legal claims against companies that advertised products.  Baslow explained that NTG needed individuals to pursue its plan, and that Nilon could "sign up" if interested.  Baslow explained that if Nilon followed Baslow's instructions and signed paperwork given to Nilon by Baslow, NTG would then compensate Nilon.

49.     Baslow informed Nilon that NTG's lawsuits were already in progress or imminent and, so, Nilon would simply need to support those filings and would receive money in return.  According to Baslow, Nilon would only be required to sign paperwork that would later be provided by NTG, and potentially purchase products that were identified by Baslow.

50.     The Newport Trial Group, through Andrew Baslow, then paid Mr. Nilon approximately $900 in cash, which Nilon used to pay his rent.  Contrary to allegations in the NTG Complaint against the Natural Immunogenics Corporation, Nilon did not purchase or use the Sovereign Silver product before NTG filed a lawsuit on his behalf, yet Nilon's alleged purchase was the subject of the lawsuit filed by NTG against Natural Immunogenics Corporation in which Nilon was named as lead class plaintiff.  Nilon made no purchase of a Natural Immunogenics Corporation product based on any advertising claims.  NTG never recovered money or legal fees in its lawsuits brought on Nilon's behalf and, so, none of the money provided to Nilon involved proceeds from the lawsuits.

51.     Schoonover also met with Andrew Baslow.  Baslow offered Schoonover up to $1,500 to participate in NTG's scheme.  Baslow explained that Schoonover would need to have a company record him without providing a warning that the call was being recorded.  Baslow told Schoonover that his "boss"

knew exactly what Schoonover needed to say and how he could avoid being warned of the recording.  Schoonover agreed to join in NTG's scheme.  NTG eventually filed an action on Schoonover's behalf against the Himalaya Drug Company.  *Schoonover v. Himalaya Drug Co.*, No. 12-cv-1782 (S.D.Cal. July 19, 2012).

52.     Nilon's other associates also met with Andrew Baslow and also "signed up" in NTG's scheme.  Taylor Demulder, Sam Pfleg, and Matt Dronkers had substantively the same interaction with NTG and Andrew Baslow as Nilon and Schoonover did.  Each was only asked to cooperate with NTG and sign paperwork given to them by NTG to receive compensation from NTG.  As outlined below, NTG also named those individuals as class plaintiffs in separate lawsuits.  *See Demulder v. Carter-Reed Co., LLC*, No. 3:12-cv-0333-BTM (S.D. Cal., filed on September 13, 2012); *Dronkers v. Kiss My Face, LLC*, No. 3:12-01151-JAH (S.D. Cal., filed on May 11, 2012); *Pfleg v. Nature's Way, et al.*, No. 3:12-cv-01018-LAB (S.D. Cal., removed on April 25, 2012).

53.     Nilon, Demulder, Pfleg, and Dronkers remained friends throughout. Within several months after NTG filed fraudulent lawsuits naming them as class plaintiffs, they formally incorporated a business together in 2012 called Electric Family LLC, a Nevada entity (organized on May 1, 2012).  Electric Family was organized as a clothing/apparel company designed to promote positive community action.  The fraudulent lawsuits filed by NTG were inconsistent with the ethical principles of Electric Family, and those of certain founding members who came to appreciate that NTG had involved them in fraudulent activity.  In August 2015, Nilon gratuitously disclosed the specific circumstances of NTG's recruiting practices to multiple third parties orally and in writing.

## C. **NTG Created and Filed Fabricated Lawsuits on Behalf of Nilon and His Associates**

54.    On or about December 27, 2011, before Andrew Nilon or anyone else had committed to serve as an NTG plaintiff, NTG dispatched a demand letter to Natural Immunogenics threatening suit for false advertising allegedly on behalf of an identified plaintiff.  *See* Exh. B at 19-20.  NTG's letter dated December 27, 2011 stated that NTG was "writing on behalf of an individual California consumer" and that its "client relied on [Natural Immunogenics' promotional] assertions and did not experience any of the promised benefits."  *Id*.  The letter threatened legal action for false advertising claims.  *Id.*

55.    NTG's December 27, 2011 letter to NIC stated that "[i]n fact, [Natural Immunogenics'] product was completely worthless to **her.**"  *Id.* (emphasis added).  NTG's letter plainly referred to a female consumer.  No such female consumer existed at the time; indeed, *Mr.* Nilon had not yet agreed to the ruse.

56.    Nilon, like the other NTG plaintiffs referenced in this Complaint, never "relied" on the advertising claims that were the subject of litigation.  To the extent any of the NTG's plaintiffs herein identified ever purchased the products in question—and there is no evidence of such purchases—those individuals were instructed to buy the products by NTG, or purchased products after the lawsuits were filed, solely to cooperate with NTG's litigation needs.  Accordingly, the NTG lawsuits and demand letters were fraudulent and lacked a reasonable basis.

57.    Reasonable "reliance" is an essential element under the California Unfair Competition Law, the Consumer Legal Remedies Act, and the False Advertising Law.  *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1367 (2010) ("A misrepresentation is material for a plaintiff only if there is reliance – that is, without the misrepresentation, the plaintiff would not have acted as he did.") (internal quotations and citations omitted); *see also Buckland v. Threshold Enterprises, Ltd.*, 155 Cal. App. 4th 798, 808 (2007), *as modified* (Oct. 22, 2007) *disapproved of on other grounds by Kwikset Corp. v. Superior Court*, 51 Cal. 4th

310, 246 P.3d 877 (2011) (holding that a plaintiff may not purchase a lawsuit, but instead must actually "repose[] confidence in the *truth* of the relevant representation"). Therefore, without reliance on the advertising claims specifically, NTG's cases lacked a reasonable basis.

58.   The cases also lacked a reasonable or properly defined class under Rule 23 of the Federal Rules of Civil Procedure. If there was a proper "class" of consumers at issue, the scope should have been all California residents who were instructed to purchase the products in question by NTG and then paid by NTG for their participation in litigation. NTG's use of fraudulent plaintiffs therefore calls into question the propriety of prior class certifications.

59.   Several months later, after Nilon had been paid to serve as a plaintiff, NTG filed a Complaint in California State Court on behalf of "Andrew Nilon, individually, and on behalf of all others similarly situated." *See Nilon v. Natural-Immunogenics Corp.*, No. 12-cv-930 (S.D. Cal., March 5, 2012), Dkt. 1-1 (original state complaint). That Complaint falsely alleged that Mr. Nilon had:

> [P]urchased Sovereign Silver in [San Diego] County. [Mr. Nilon] relied on Defendant's representations regarding the efficacy of the Product, as detailed herein [the Complaint], and but for those representations, [Nilon] would not have purchased or paid as much for the product.

*Id.* at ¶ 5.

60.   In fact, Nilon never purchased or consumed Natural-Immunogenics' Sovereign Silver Product before NTG filed its lawsuit and, thus, he never relied on any representations regarding the efficacy of Natural Immunogenics Corporation's product.

61.   Nilon never met with an attorney at NTG before the firm filed a lawsuit on his behalf. Nilon never supplied evidence of his alleged "purchase" of the NIC Sovereign Silver product. Nilon never provided a narrative concerning his

use of the Sovereign Silver product, making the following allegations in the NTG
Complaint against Natural Immunogenics Corporation utterly false:

> Plaintiff purchased the products in reliance on Defendant's
> marketing claims with respect to efficacy.  Plaintiff used the
> Products as directed, but it did not work as advertised and was not
> of the quality and standard advertised by Defendant.

*See id.* at ¶ 27.

62.     Nilon's Complaint and each declaration he signed in the case were
prepared by agents of NTG and each contained representations of fact known by
NTG to be false.

63.     Nilon had not "relied on" Natural Immunogenics' advertising claims.
NTG had paid him to participate in the action, and NTG specified the product to
target in the complaint.

64.     After receiving the NTG Complaint, Natural Immunogenics
Corporation (NIC) hired counsel and prepared for litigation.  NIC incurred
substantial litigation costs and fees.  It suffered reputational harm and loss of
goodwill following several publications that reported on NTG's "false advertising"
allegations contained in NTG's complaint.

## D. Nilon Attempts to Withdraw from the Unlawful Scheme

65.     Around May 2012, Nilon feared repercussions from NTG's illegal
enterprise and objected to the arrangement he made with Baslow.  Nilon informed
Baslow that he no longer wanted to participate in the fraudulent lawsuit.

66.     In response, Baslow urged Nilon to allow NTG to continue
identifying Nilon as the class representative in the Natural Immunogenics
Corporation case.  Without Nilon's participation and without a replacement
plaintiff, NTG's case against Natural Immunogenics Corporation would certainly
have been dismissed.

67.     Beginning in April 2013, Natural Immunogenics Corporation attempted to take Nilon's deposition as the class representative in the pending litigation.[3]  Disenchanted with NTG's fraudulent action, Nilon refused to appear for deposition.  *See, e.g., Nilon v. NIC*, No. 12-cv-930 (S.D. Cal.), Dkt. 55 at 2.  Rather than dismiss its case or inform NIC that Nilon had lost interest, NTG told NIC's counsel that Nilon was simply unavailable at that time for the deposition. *Id.*

68.     NIC later served NTG with another Notice of Deposition for Nilon scheduled for May 22, 2013 at 10:00 AM.  *Id.*  On the very day of that scheduled deposition—May 22, 2013—NTG notified NIC's counsel by email that Nilon would not be produced for deposition, marking Nilon's second failure to appear.  NTG offered no explanation for the failure to appear.

69.     Despite Nilon's request to withdraw from the unlawful scheme, and his refusal to appear for deposition, NTG did not honor Nilon's request or notify Natural Immunogenics of Nilon's withdrawal.  Instead, on May 22, 2013, **the very same day** Nilon missed a noticed deposition in NTG's case against NIC, the Newport Trial Group filed another unrelated case in the Superior Court for Ventura County listing Andrew Nilon as the lead plaintiff in yet another class action lawsuit.  *See Andew Nilon v. Chromadex, Inc.*, No. 56-2013-00436790-CU (Sup. Ct. Ventura Cnty. May 22, 2013), attached as Exh. C.

70.     The facts alleged by NTG in that *Chromadex* Complaint were utterly false.  The Complaint alleged that:

> In February 2013 while located in California, [Nilon] called Defendant at (855) 777-0660 from a wireless telephone.  [Nilon] spoke to an employee of Defendant to inquire about a "BlueScience" product he had recently purchased and about the

---

[3] Natural Immunogenics Corporation was represented in litigation by the Law Offices of Carlos Negrete until February 2015.

possibility of receiving a discount on future purchases.

*Id.* (Exh. C, at ¶ 7). Those allegations, which mirrored many other NTG fraudulent Cal. Section 632.7 Complaints at the time, were fabricated by NTG for the purpose of extorting money from Chromadex. Andrew Nilon never purchased the "BlueScience" product. He never called the Chromadex phone number listed in the Complaint. Nilon never saw or approved of the allegations in NTG's Chromadex Complaint before the complaint was filed.

71.     When Nilon discovered NTG's second false Complaint listing him as lead plaintiff, a complaint which he had never authorized, he demanded that NTG withdraw him from the scheme. On May 22, 2013, Nilon demanded that NTG remove his name from the *Chromadex* lawsuit.

72.     On the next business day following NTG's submission of the *Chromadex* Complaint, May 23, 2013, NTG attorney Victoria C. Knowles moved to voluntarily dismiss NTG's Complaint against Chromadex. *See* Decl. of Victoria C. Knowles in Support of Request for Dismissal of Class Action Lawsuit Pursuant to CRC 3.770, *Nilon v. Chromadex, Inc.*, No. 56-2013-00436790-CU (Sup. Ct. Ventura Cnty., May 23, 2013), Exh. D. In her sworn declaration, Ms. Knowles justified NTG's decision to dismiss the complaint as follows: "Plaintiff no longer wishes to pursue this case." *Id.* In fact, Nilon never wished to pursue the case, and never authorized the filing of the Complaint in the first instance. The declaration was therefore misleading at best, drafted to avoid admission of the damning fact that the NTG Complaint was fraudulent *ab initio*.

73.     NTG dismissed its *Chromadex* lawsuit. It never refiled against Chromadex. But despite Nilon's demand to be removed from all NTG suits, NTG did not remove Nilon's name from the Natural Immunogenics Corporation matter because it did not then have another "plaintiff" to replace him. NTG's litigation against NIC continued.

74.     NIC again sought Nilon's deposition in matter No. 12-cv-930 (S.D. Cal.).  It served an additional two notices of deposition.  NTG failed to produce Nilon for deposition on February 7, 2014.  *See Nilon v. NIC*, No. 12-cv-930 (S.D. Cal.), Dkt. 55 at 2-3.  On April 29, 2014, NIC scheduled yet another deposition for May 16, 2014.  *Id.*  On May 13, 2014, NTG informed NIC by letter that Nilon would not be produced for deposition.  At no time did NTG inform NIC that Nilon had withdrawn from the suit.

75.     NTG never informed Natural Immunogenics that Nilon's unavailability stemmed from his desire to withdraw from NTG's unlawful scheme.

76.     On August 11, 2014, District Court Judge Burns (Southern District of California) sanctioned NTG for its failure to make Nilon available for depositions, noting that NTG's conduct "was clearly part of a pattern of unjustified cancellations over the course of an entire year."  *Id.* at Dkt. 59, at 2.  NTG was ordered to pay $5,000 in fees for that conduct.  *Id.*

77.     To preserve its lawsuit against Natural Immunogenics Corporation, NTG began a search for another individual willing to enroll in the NTG scheme. By July 2014, NTG had found Mr. Giovanni Sandoval to be a substitute plaintiff. NTG filed a Motion to Substitute its class representative, finally dismissing Nilon from the suit.  *See id.* at Dkt. 51-1.  But to justify Nilon's late departure from the case, and to defeat NIC's Opposition to that motion after two years of litigation, NTG propounded yet another falsehood concerning Nilon, alleging that he had a sick grandmother who required his attention and financial support.  *See id.* at Dkt. 51-2.  The declaration filed by NTG on Nilon's behalf explained that Nilon had:

> [R]elocated to Northern California in order to help both financially and with the physical care of my grandmother.  My grandmother's health has recently become very poor and she requires additional care that she is unable to provide for herself.

*See id.*, Dkt. 51-2 at ¶ 5.  Thus, according to NTG, Nilon "no longer [had] the time

or the energy to devote to this case and [he] wish[ed] to be removed from [his] position as class representative." *Id.* NTG therefore claimed that Nilon's absence from litigation was owed to a sick grandmother. Those representations were false and fabricated to cover the true reason for dismissal of Nilon, his objection to continued participation in NTG's fraudulent scheme, wherein Nilon was not a bona fide plaintiff but had been paid by NTG to sign onto a fraudulent class action lawsuit.

78.     Nilon's June 23, 2014 affidavit was utterly false and drafted by NTG aware of the falsehoods contained therein. Nilon's grandmother was not then sick and did not need his physical assistance or financial support. Nilon did not relocate to Northern California to care for his sick grandmother. He did not begin new employment to "be nearer to [his] grandmother."

79.     Mr. Baslow presented Nilon with the affidavit written by NTG. Baslow explained that to get out of the case Nilon had to sign the affidavit. Believing it the only way to get out of the lawsuit, Nilon signed the affidavit.

80.     The Court granted NTG's request to withdraw Andrew Nilon from the lawsuit on August 20, 2014. *See Nilon v. Natural-Immunogenics*, No. 12-cv-930 (S.D. Cal.), Dkt. 62. NTG's representation of Andrew Nilon effectively terminated by August 2014 (and likely before that date when Mr. Nilon broke off communication with NTG).

81.     On August 12, 2014, NTG then filed a motion to withdraw as Nilon's attorney. *See id.* at Dkt. 61. In a companion memorandum of points and authorities, backed by the sworn testimony of NTG attorney Ryan Ferrell, NTG explained that "despite repeated attempts to contact [Nilon], Plaintiff became unresponsive to his counsel." *Id.* at 61-1 (citing Ferrell Decl.). Mr. Ferrell claimed to have dispatched at least "3 letters" to Nilon at his last known address, and to have contacted Nilon repeatedly. *Id.* at 61-2 ¶ 6. Mr. Ferrell never corroborated those claims with documentary evidence.

### E.  **NTG Maintains The Nilon Case Through Another Fraudulent Plaintiff**

82.     To save its class action against Natural Immunogenics Corporation, NTG hired Giovanni Sandoval Jr. to serve as the new class representative (replacing Nilon).  Sandoval claimed that he, too, had purchased and used NIC's dietary supplement, and that it was ineffective for him.

83.     But Giovanni Sandoval was not a proper class plaintiff.  NTG stated in the amended complaint that Sandoval was a resident of San Diego County and, thus, an eligible class member.  *Id.* at Dkt. 63 ¶ 5.  In fact, Sandoval was not a resident of San Diego County.  He was a resident of Yuma, Arizona, meaning he could not serve as the class representative.

84.     Following Natural Immunogenics Corporation's presentation of proof of Sandoval's actual place of residence in Arizona, U.S. District Court Judge Larry Alan Burns held on May 12, 2015, that Mr. Sandoval was never a proper plaintiff, and that NTG had violated FRCP 11 by failing to conduct any meaningful background investigation of Sandoval.  Judge Burns stated that NTG's complaint contained "false statement[s]."  The Court explained that "[b]ut for [NTG's] false statement about Sandoval's residency, the Court would not have granted the motion for substitution" and the case would have ended with Andrew Nilon's departure.  *See Nilon v. NIC*, No. 12-cv-930, Dkt. 117 at 4-5 (S.D. Cal. May 12, 2015).[4]

85.     Judge Burns commented on NTG's conduct in context with the false statements:

> [T]his isn't an isolated occurrence—Plaintiff's counsel has displayed a cavalier attitude towards discovery obligations practically from the get-go.  Based on counsel's demonstrated

---

[4] NIC was later denied monetary relief on procedural grounds after briefing a sanctions motion before Magistrate Judge Skomal.  *See Nilon v. NIC*, No. 12-cv-930, Dkt. 122 (S.D. Cal. May 12, 2015).

shortcomings, it would be reasonable for the Court to dismiss this
case with prejudice.

*Id.* at 5.

86.     Sandoval's deposition testimony also revealed that he was not a
legitimate or credible plaintiff.  When considered in context with NTG's unlawful
recruitment practices, Sandoval appeared to have been led by NTG to testify
falsely in furtherance of NTG's unlawful scheme.

87.     Giovanni Sandoval was NTG's chosen replacement for Nilon.  He
was chosen to help NTG prolong litigation against NIC.  Sandoval was a career
criminal.  At age 28, he had been arrested at least fifteen times and served multiple,
prolonged periods of incarceration.  He testified falsely during his deposition,
particularly concerning his criminal record and his residence.  In an attempt to fit
within NTG's identified Rule 23 class, Sandoval testified that he was a California
resident when he was not.  He was actually a resident of Yuma, Arizona—a fact
known to NTG counsel who represented Sandoval at the deposition.

88.     NTG counsel attempted to mask Sandoval's true residence from NIC
and the Court.  Consistent with NTG's insistence that Sandoval was a San Diego
County resident, NIC scheduled Sandoval's deposition in Newport Beach,
California (more than five hours by car from Sandoval's actual residence).  NTG
counsel paid for Sandoval's hotel at the deposition to accommodate his travel from
Arizona to California to maintain the appearance of California residence.  NTG
counsel compelled NIC's attorneys, whose offices were near Phoenix, Arizona, to
travel to California *from Arizona* for the deposition when they could have simply
driven a short distance from NIC counsels' Arizona office to Yuma.  But
scheduling the deposition in Yuma would have raised suspicion that Sandoval was
not a resident of California and thus not a proper class plaintiff.  *See id.* at 4 (the
court later explained that "Public records verify this, showing that Sandoval fell
outside the class definition well before the class was certified.").

89.     NTG counsel refused repeatedly to produce Sandoval's full name and physical address despite the clear obligation to do so under Rule 26(a)(1) and despite repeated demands from NIC's counsel that NTG counsel do so. *Id.* (the Court later found that "Plaintiff never updated his Initial Disclosures in light of the substitution, and Sandoval was never named on any Fed. R. Civ. P. 26 disclosure."); *see also id.*, at Dkt. 119-1 ¶¶ 4-6.

90.     When pressed at his deposition, Sandoval testified that although he was a resident of California he had "forgotten" his California address. *See id.* at Dkt. 117, at 3.  He testified that he possessed a California driver's license, when in fact he did not, and he refused to provide any driver's license whatsoever when requested to do so at the deposition.  *Id.*

91.     Sandoval's testimony also included disingenuous statements concerning his alleged purchase and use of NIC's Sovereign Silver product.  He resided in Yuma, Arizona (not California) at the same time he claimed to have lived in California and purchased the product from a local California market.  Dkt. 113-3 at ¶¶ 16, 19–23; Exh. E (Sandoval Deposition Transcript) at 6:25–7:23.  Although he claimed to have purchased the product in California, he later testified that he kept the product packaging in Arizona.  Exh. E at 79:20–22.

92.     Sandoval's testimony was consistent with an individual who, like NTG's other "plaintiffs," became familiar with the product only for litigation purposes.  Sandoval testified that, before allegedly buying NIC's product, he had never before shopped at the Sprouts grocer where he claimed to have purchased the product.  *Id.* at 38:8–10.  He had never purchased that type of product before (or any nutritional supplement, for that matter).  *Id.* at 34:15–17.  He claimed to have paid cash for his purchase, but did not retain a receipt and never produced the product or receipt in litigation.  *Id.* at 42:5–13.  He had no reasoned explanation for why he chose Natural Immunogenics' product over other similar products on the same store shelf.  *Id.* at 45:1–9.  He had no explanation for why he allegedly

appeared in a Sprouts grocery store (where he never shopped); why he bought a type of product that had he had never purchased before (to wit, a dietary supplement for immune support); why he chose the NIC product from among other similar products on the shelf without having performed any background research or investigation of the product; and why he allegedly spent substantially more money on that purchase than he spent on any other grocery product.

93.     At deposition Sandoval repeatedly misnamed the Defendant's product.  *Id.* at 27:13–21.  He had no understanding or knowledge of the specific product or of dietary supplements in general.  *Id.* at 43:22–44:6.  He knew of no other person who had used the NIC product.  *Id.* at 46:15–17.  He had not researched or investigated the product before purchasing it.  *Id.* at 46:8–14. Sandoval, who claimed to make less than $20,000 annually and spent just $60 per week on food, claimed to have spent at least $15 for a short supply of the Natural Immunogenics' dietary supplement at a store he never before visited, for a product he did not understand or research, and at a location hours away from his residence in Arizona.  *Id.* at 26:17–27:4, 69:14–16, 77:15–24.[5]

94.     NTG improperly asserted the attorney/client privilege to preclude any investigation into Sandoval's role as a plaintiff.  For example, NIC counsel asked Mr. Sandoval at deposition if he had "produced any receipts for products to [his] counsel?"  NTG counsel Ryan Ferrell responded:  "Objection, privilege.  Do not answer."  *See* Exh. E at 20:9–21:6.

95.     Sandoval also testified inconsistently concerning the timing of his engagement by NTG counsel.  NTG counsel, Mr. Ryan Ferrell, again concealed the circumstances related to Sandoval's entrance as a plaintiff in the case.[6]  NIC

---

[5] When confronted with the fact that the NIC's product is the most expensive of the silver products sold, Sandoval claimed that price was unimportant to him. Exh. E at 58:7–14.

[6] NIC never had an opportunity to depose Nilon as he was not produced for deposition.

counsel had asked Sandoval to describe under oath how he became aware of the NTG case against NIC.  Mr. Ferrell responded:  "Objection, it's privileged, if it comes from counsel, don't answer."  Exh. E at 24:23—25:19.

96.     On information and belief, Sandoval was paid by the Newport Trial Group to serve as a plaintiff against NIC and to conform his fraudulent allegations against NIC to fit within NTG's statement of the case.  In fact, Sandoval repeatedly made false allegations under oath at his deposition.  When NIC brought that information before the Court, NTG blamed its client, stating that dismissal was proper because NTG had developed "concerns about [Sandoval's] credibility after his failure to accurately reflect his criminal record in his deposition."  *See Nilon v. NIC*, No. 12-930, Dkt. 123 at 21 n.8 (S.D. Cal. July 17, 2015) (quoting NTG's memorandum).

97.     The Court dismissed Sandoval's case against Natural Immunogenics Corporation with prejudice, thus ending that class action litigation.  *Id.* at Dkt. 120, at 1.

### F.  NTG's Similar Pattern of Misrepresentation in Other Cases

98.     The false representation of Sandoval's place of residence in the case against Natural Immunogenics Corporation is not an isolated event.  NTG has engaged in a pattern of falsely representing the residencies of its purported class action plaintiffs.  *See Demulder v. Carter-Reed Co., LLC*, No. 3:12-cv-0333-BTM (S.D. Cal., filed on September 13, 2012).  Defendant Taylor Demulder is one of Andrew Nilon's close associates.  Nilon and Demulder started a business together in 2012.  Both Demulder and Nilon served as hired plaintiffs for NTG (Nilon being the original plaintiff against NIC).

99.     With NTG's oversight, Demulder was named as a plaintiff in a lawsuit against the Carter-Reed Company, LLC on September 13, 2012, alleging therein that Carter-Reed had recorded Demulder during a customer service phone

call without first providing Demulder notice, an alleged violation of California Penal Code Section 630, *et seq.  See Demulder v. Carter-Reed Co.*, No. 3:12-cv-0333 (S.D. Cal.) at Dkt. 1.

100.   Those "Section 632.7" allegations were common at the time for NTG, as the law firm filed many such actions in 2012-2015, all asserting substantially the same facts.  The fraudulent *Chromadex* complaint filed by NTG on Andrew Nilon's behalf contained allegations that were nearly identical to those contained in Taylor Demulder's Section 632.7 Complaint.

101.   Those "Section 632.7" NTG Complaints were all nearly identical, with just the names and minor facts changed.  *See Nilon v. Chromadex, Inc.*, No. 56-203-436790 (Sup. Ct. Ventura Cnty.) (Exh. C); *see also David Gamez v. National Guardian Lif Ins. Co.*, No. 2:15-cv-5070 (C.D.Cal. July 6, 2015) (same Section 632.7 allegations); *Jasmine Gamez v. Americo Financial Life & Annuity Ins. Co.*, No. 2:15-cv-5071 C.D.Cal. July 6, 2015) (same Section 632.7 allegations); *Katie Ray v. Buy Insta Slim, Inc.*, No. BC549571 (Sup. Ct. Los Angeles Cnty. June 24, 2014) (same Section 632.7 allegations); *Stephen Ray v. Branders.com, Inc.*, No. BC529716 (Sup. Ct. Los Angeles Cnty. Dec. 6, 2013) (same 632.7 allegations); *Schoonover v. Himalaya Drug Co.*, No. 12-cv-1782 (S.D.Cal. July 19, 2012) (same Section 632.7 allegations); *Hurst v. Columbia Sportswear Co.*, No. BC529555 (Sup. Ct. Los Angeles Cnty. Dec. 5, 2013) (same Section 632.7 allegations); *George Gonzalez v. Mercer, LLC*, No. CIVDS1402062 (Sup. Ct. San Bernardino Cnty. Feb. 25, 2014) (same Section 632.7 allegations); *Julie Martinez v. Carmax, Inc.*, No. BC533870 (Sup. Ct. Los Angeles Cnty. Jan. 22, 2014) (same Section 632.7 allegations); *Maria Martinez v. Medtech Products, Inc.*, No. 2:14-cv-02624 (C.D.Cal. March 2014) (same Section 632.7 allegations).

102.   Demulder alleged that he had contacted Carter-Reed's customer service telephone number on September 6, 2012, and during that call Carter-Reed violated California Penal Code Section 632.7.  Just **seven days later**, on

September 13, 2012, Demulder's attorneys (including the Newport Trial Group) filed suit against Carter-Reed Co.  The timing between the alleged events and Demulder's Complaint strongly suggest that Demulder's phone call was solely designed by NTG to create standing for a legal action.[7]

103.  Demulder, like Sandoval, was not actually a resident of California when he filed his Complaint, but NTG falsely represented him to be a California resident in the complaint.  The Defendants in Carter-Reed demonstrated that Demulder had contacted the Defendant from a Nevada-based phone line traced back to Demulder's employer.  *See Demulder v. Carter-Reed*, No. 3:12-cv-02232-BTM-MDD (S.D. Cal. 2013), Dkt. 6 at 2-6.  To establish standing, NTG's Complaint represented that Demulder was a "California citizen and resident of San Diego County, California…"  *See Demulder v. Carter-Reed Co.*, No. 3:12-cv-0333 (S.D. Cal.) at Dkt. 1 ¶ 1.  In fact, Demulder's registered address at the time was in Nevada, and he worked for a company called Stryker Orthopedics with offices at 5905 Decatur Blvd., Suite 8, Las Vegas, Nevada.  *Id.* (Dkt. 6 at 4).  His residency precluded his ability to serve as a valid class representative.

104.  Corporate documents filed with the Nevada Secretary of State also show that Demulder served as a Manager with Electric Family LLC while in Nevada.  Nilon and Demulder are both founders of the Electric Family LLC

---

[7] For instance, assuming *arguendo* that Demulder's action was legitimate (it was not), he would have had to contact Carter-Reed on September 6, become aware of the recording violation under Section 632.7, discover that the violation was unlawful and actionable, contact an attorney, retain that attorney, and then have that law firm prepare and file a complaint on his behalf—all within one week. The facts and circumstances suggest that NTG put Demulder up to the phone call and then filed immediately after Demulder's confirmation of the result.  Pleadings filed by Carter-Reed describing the Demulder phone call describe an unidentified person heard coaching Demulder while he was on the phone with Carter-Reed's customer service.

business, along with Sam Pfleg, Matt Dronkers, and Steve Brudzewski (all participants in NTG fraudulent lawsuits).

105.   NTG's use of for-hire plaintiffs has caused substantial legal trouble for individuals named as plaintiffs in NTG's lawsuits.  False representations were contained in the Complaint which listed Demulder as lead class plaintiff.  Demulder used false information when contacting Carter-Reed.  As a result, Carter-Reed filed suit against Taylor Demulder in April 2013 for his part in NTG's unlawful scheme.  *See Carter-Reed Company, LLC v. Demulder*, No. 130903002 (Dist. Ct. Salt Lake Cnty., May 2013).  Carter-Reed alleged Wrongful Use of Civil Proceedings and Abuse of Process concerning Demulder's fraudulent lawsuit.  NTG represented Demulder and removed the matter to federal court.  After a dispute over jurisdictional issues, the matter was remanded to state court where NTG allowed Demulder to default rather than defend the action.

106.   In its action for abuse of process against Demulder, Carter-Reed explained that NTG's allegations contained material factual allegations that were utterly false.  Demulder had contacted Carter-Reed's customer service line solely to generate a lawsuit.  He had provided a false name to Carter-Reed during the phone call.  He had falsely stated in his Complaint that the operator never informed him of the recording when, in fact, the operator's first notification was a disclosure that the call would be recorded.  The Defendant produced an actual transcript of the conversation wherein the call center clearly identified that the call was recorded.  *Demulder v. Carter-Reed*, No. 3:12-cv-02232-BTM-MDD (S.D. Cal. 2013), Dkt. 6 at 2-6.  According to allegations that were not refuted in litigation, "the true purpose of Demulder's telephone call was not to obtain information about Carter-Reed's products but, instead, was to try to manufacture a basis for the putative class action lawsuit he subsequently filed against Carter-Reed, which lawsuit he hoped would cause Carter-Reed to pay him money instead of subjecting itself to the significant risks associated with class action litigation."  *See Carter-*

*Reed Co., LLC v. Demulder*, No. 130903002 (Utah Dist. Ct., Salt Lake Cnty.), at 2; *see also Carter-Reed Co. v. Demulder*, No. 13-1098 (D.Utah).

107.   Nilon and DeMulder were also close friends with Defendant Sam Pfleg, who had graduated from ASU with Mr. Nilon and moved to San Diego with Nilon in 2011.  Nilon and DeMulder were also close friends with Defendant Matt Dronkers, who had graduated from ASU with Mr. Nilon and had moved to San Diego with Nilon in 2011.  Nilon, Dronkers, DeMulder, and Pfleg started a clothing apparel business together in 2012 known as the Electric Family LLC.

108.   Defendants Pfleg and Dronkers also had the same interaction with Mr. Andrew Baslow—a representative of NTG—in which Baslow offered to pay Pfleg and Dronkers in exchange for their signatures on papers in support of NTG lawsuits, all without having suffered an injury or valid legal claim before NTG designed and filed those actions listing them as lead class plaintiffs.

109.   NTG filed Pfleg's case against Nature's Way Product, Inc. on March 16, 2012, the <u>very next day</u> after filing the Nilon lawsuit against Natural Immunogenics on March 15, 2012.  *See Pfleg v. Nature's Way Products, Inc.*, No. 37-2012-00051979-CU-MT (Sup. Ct. San Diego Cnty. Mar. 16, 2012).  In the Nature's Way Complaint, NTG alleged that Mr. Pfleg had "purchased several … products including Arnifolora Arnica Gel, Triflora Arthritis Gel, Florasone Cream, Aciatic Aid, B&T Nighttime Cough & Bronchial Syrup, and Cough & Bronchial Syrup in San Diego County."  Those allegations were false.

110.   Prior to filing that suit, NTG had contacted Nature's Way Products with a demand letter threatening legal action.  *See Pfleg v. Nature's Way Products, Inc.*, No. 3:12-cv-01018-LAB (S.D. Cal, removed on April 25, 2012), Dkt. 1-4 at 20.  NTG sent that demand for payment allegedly on behalf of a person victimized but, in fact, NTG had authored that letter before it had a purported plaintiff willing to join its unlawful scheme.  Like Mr. Nilon's demand letter, the NTG demand letter referenced a female—not Mr. Pfleg:  "Your misleading marketing and

advertising of this, and similar products caused our client to purchase this product but **she** did not experience any of the promised benefits.  In fact, the product was completely useless to **her**."  *Id.* (emphasis added).

111.   NTG also filed a Complaint on behalf of Nilon's friend Defendant Dronkers on May 10, 2012.  *See Dronkers v. Kiss My Face, LLC*, No. 12-cv-1151-JAH, Dkt. 1 (S.D. Cal. May 10, 2012).  As with the Nilon and Pfleg Complaints, NTG alleged that Dronkers had "purchased Kiss My Face products in early 2012" and "relied on Defendant's representations that the Kiss My Face personal care products he purchased were organic, … and but for those representations, Plaintiff would not have purchased or paid as much for such products."  *Id.* at 2.  Those allegations were utterly false.  Dronkers had been paid to support those statements which were fabricated by NTG.

112.   Sam Schoonover was a resident of San Diego in 2011-2012 who worked as an event promoter in the area.  He met Nilon, Pfleg, and Dronkers while in San Diego and was involved in similar social circles.  His work and interests overlapped Nilon's upstart clothing apparel business.  Schoonover later accepted a position in Nilon's Electric Family LLC business as the Director of Events, whereby he organized certain corporate events.  Schoonover also participated in the NTG scheme along with Dronkers, Nilon, Demulder, and Pfleg.  *See Schoonover v. Himalaya Drug Company*, No. 12-cv-1782-JLS (S.D. Cal. 2012).  NTG filed a complaint listing Schoonover as the lead plaintiff on July 19, 2012.  NTG alleged that Schoonover had called Himalaya to inquire about organic personal care products, and was then recorded without permission.  Schoonover was instructed by Baslow and NTG to contact Himalaya and compensated for his efforts.  Thus, Schoonover's complaint contained materially false statements of fact.

### G. Electric Family, LLC Members Benefitted from NTG's Fraudulent Scheme

113.   Defendant Electric Family was formed in May 2012.  At that time, the company was an undercapitalized and unprofitable startup managed by five recent college graduates.

114.   Electric Family had no formal headquarters or offices, but was instead operated and managed out of the residences of its managers, Andrew Nilon, Sam Pfleg, Taylor Demulder, Matthew Dronkers, and Steve Brudzewski.  Matthew Dronkers and Andrew Nilon performed their duties as managers from their joint residence in San Diego, CA.  Sam Pfleg, Taylor Demulder, and Steve Brudzewski performed their duties as managers from their joint residence in Las Vegas, NV.

115.   Upon information and belief, from 2012 to 2013, Electric Family's managers oversaw and conducted nearly every facet of the company's operations.  Generating cash and capital for the company's operations was of paramount importance to the company's survival.  Keeping the company's expenses low was of similar import.

116.   Also in 2012, the Electric Family group learned of NTG's fraudulent scheme and easy cash payments to for-hire plaintiffs.  Managers Andrew Nilon, Sam Pfleg, Taylor Demulder, and Matthew Dronkers all filed fraudulent complaints through NTG in the same six-month window from March through September of 2012 in exchange for cash.  NTG paid those corporate members between $900 and $1500 several months after each NTG Complaint was filed.  Some of those individuals were paid more than once by NTG for their services.  Those payments were not related to the outcome or settlement of the matters.

117.   Electric Family, LLC benefited directly and indirectly from the ill-gotten funds which its managers received for their participation in NTG's fraudulent scheme.

118.   Andrew Nilon used a portion of his NTG payment to pay rent for his apartment and Electric Family home-office.  Upon information and belief, Andrew

Nilon also used a portion of his NTG payment to perform various functions as manager of Electric Family.

119.   Taylor Demulder used a portion of his NTG payment to pay rent for his apartment and/or Electric Family home-office.

120.   Sam Pfleg used a portion of his NTG payment to pay rent for his apartment and/or other Electric Family home-office.

121.   Matthew Dronkers used a portion of his NTG payment to pay rent for his apartment and/or Electric Family home-office.

## H. NTG's Attempt to Defraud Charities

122.   On June 6, 2013 the Tampa Bay Times published an article titled "America's Worst Charities" which summarized the findings of the Tampa Bay Times, the California Center for Investigative Reporting, and CNN in a collaborative investigative piece.  The article identified the so-called "50 worst charities" according to the findings.[8]

123.   NTG became aware of the Times article shortly after its publication and then designed causes of action against the listed charities.  NTG then initiated a series of fraudulent class-action lawsuits against at least three of the charities alleging that they violated California's false advertising law, Business & Professions Code § 17500, and California's unfair competition law, Business & Professions Code § 17200.  *See David Urzua v. Nat'l Veterans Servs. Fund*, Case No. 3:13-cv-02217-MMA-KSD (S.D. Cal. Sep. 16, 2013); *Kaleb Patterson v. Int'l Union of Police Associations, AFL-CIO*, Case No. 3:13-cv-02698-JAH-JMA (S.D. Cal. Nov. 8, 2013); *Isabella Janovick v. Am. Breast Cancer Found., Inc.*, Case No.

---

[8]  Hundley, Kris, "America's Worst Charities," Tampa Bay Times. Available at http://www.tampabay.com/topics/specials/worst-charities1.page (last visited Nov. 30, 2015).

3:13-cv-02697-DMS-KSC (S.D. Cal. Nov. 8, 2013).  The allegations in all three lawsuits were nearly identical.

124.   The factual circumstances surrounding the NTG charity suits were highly suspicious.

125.   All three plaintiffs allegedly donated $100 to the respective defendant charities.  Those donations all occurred after the publication of the Times article.  Defendant Urzua donated exactly $100 to the defendant charity, National Veterans Services Fund, Inc. on July 29, 2013.  Defendant Janovick donated exactly $100 to the defendant charity, American Breast Cancer Foundation, Inc., just two days later on August 1, 2013.  Defendant Patterson donated exactly $100 to the defendant charity, International Union of Police Associations, AFL-CIO, two months later on October 1, 2013.

126.   All three complaints make substantially similar allegations and reference the Times article.  NTG filed the complaints on behalf of Janovick and Patterson on the exact same day, November 8, 2013.  NTG filed the complaint on behalf of Urzua less than two months prior.

127.   The three lawsuits against the National Veterans Services Fund, the International Union of Police Associations, and the American Breast Cancer Foundation, were premised on false statements of fact.  To have standing to bring those lawsuits, the plaintiffs needed to allege that they relied on representations made by the charities before deciding to make their donations.  To that end, all three lawsuits alleged that the "Plaintiff donated to Defendant [charity] after reviewing Defendant [charity]'s website, [] and relying on the representations contained therein."

128.   On information and belief, not one of the plaintiffs reviewed or relied on the defendants' websites before suit was filed.  Not one decided to make a donation based on the representations on those websites.

129.   On information and belief, each was a fraudulent plaintiff listed in the respective complaints by NTG solely to initiate a class action lawsuit against the defendant charities.  NTG recruited all three plaintiffs for that purpose.  NTG instructed those individuals to make donations in a specific dollar amount, and pledged to all three plaintiffs the $100 to make donations to the defendant charities for the sole purpose of obtaining standing to sue those charities.

130.   All three lawsuits were also based on untenable legal claims.  The core allegations in those three lawsuits were that the charities misrepresented to donors that donation proceeds would be used to help those in need, but instead that the donation proceeds were used to pay employee salaries, rent, overhead, and other necessary expenses.  Prior to filing those three lawsuits, however, the Supreme Court had expressly rejected those legal bases because "the bare failure to disclose the high cost of fundraising directly to potential donors does not suffice to establish fraud."  *See Urzua v. Nat'l Veterans Servs. Fund, Inc.*, Case No. 13-cv-2217-MMA (KSC) (Jan. 28, 2014) (Order Granting Motion to Dismiss and Strike) (quotations and citations omitted).  The District Court in *Urzua* therefore granted the National Veterans Services Fund's Motion to Dismiss and Strike with prejudice. *Id.*

131.   Almost immediately after the District Court in *Urzua* dismissed that action with prejudice, the plaintiffs and defendants in the remaining two cases entered into "settlement agreements," wherein the plaintiffs agreed to voluntarily dismiss their claims with prejudice in exchange for asking the defendants to pay their own litigation costs and fees.

132.   NTG's attempt to sue charities was part of its fraudulent scheme perpetuated by NTG that was intended to use the pressure of a lawsuit to force settlement on factually false and legally meritless claims.

## I. <u>NTG's History of Other Questionable Litigation</u>

133.   On information and belief, the Newport Trial Group and its attorneys, employees, and agents have an established pattern of fraudulent litigation through the use of NTG hired plaintiffs.  Just as they made false allegations against Natural Immunogenics Corporation and paid Defendants Nilon, Demulder, Pfleg, Dronkers, Schoonover, Urzua, Patterson, and Janovick to advance those allegations in litigation, so, too, they have compensated other individuals to serve as "plaintiffs" in other actions.

134.   Evidence suggests that NTG compensated other for-hire plaintiffs, witnesses, or litigants (other than compensation paid for success in litigation or settlement).  The evidence reveals that NTG's pay-to-play scheme was consistent with its prior conduct.

135.   In 2009, attorney Scott J. Ferrell filed a class action using Nicole Forlenza as the lead plaintiff.  Scott Ferrell—who would later start the Newport Trial Group—claimed in 2009 that Ms. Forlenza had purchased a dietary supplement that was ineffective for her.  *See Nicole Forlenza v. Dynakor Pharmacal, LLC, et al.*, No. 2:09-cv-03730-AG, Dkt. 1-2 (C.D. Cal. 2009).

136.   In exchange for her services as a plaintiff, the Newport Trial Group and Scott Ferrell later paid Ms. Forlenza $2,000 to cover her legal fees in an unrelated, personal bankruptcy matter.  *See* Exh. F (Bankruptcy Court Disclosure of Compensation, *In re Forlenza*, No. 8:10-bk-11410-TA (Bankr. C.D. Cal. 2010)).

137.   In 2014, NTG represented defendant Public Storage in a class action pending in the United States District Court for the Southern District of Florida. *See Bowe v. Public Storage*, No. 1:14-cv-21559-UU (S.D. Fla. 2014).  Plaintiff's counsel later moved to disqualify NTG, in part, for providing "financial inducement to at least one witness who provided favorable testimony…"  *See id.* at Dkt. 100, at 1.  Plaintiff's counsel produced evidence that NTG arranged to pay a

witness and member of the putative class in exchange for favorable testimony that would benefit NTG's client.  *Id.*

138.   In *Public Storage*, the plaintiffs had requested an evidentiary hearing to vet those significant concerns with NTG's conduct in litigation.  Plaintiffs had alleged that NTG sent "Wynn Ferrell—the father of lead counsel Scott Ferrell, who is apparently not a lawyer, paralegal or investigator employed by Newport Trial Group—across the country to solicit Public Storage customers to support the company's defense and opt out of [the] class action."  *Id.* at Dkt. 100, at 3.  NTG in *Public Storage* convinced at least one class member to sign a declaration that ostensibly supported Public Storage, despite prior statements demonstrating the individual's unhappiness with the service.  *Id.*  "The e-mail correspondence … reveal[ed] that [the witness] received a credit from Public Storage regarding rental fees" in exchange for his favorable affidavit.  *Id.*

139.   When confronted with those allegations, NTG promptly filed a motion to withdraw from the case.  The Court granted that request, thus mooting the plaintiff's allegations in the Motion to Disqualify.  NTG never provided an evidentiary rebuttal to those allegations.  The Court never had occasion to reach the issues raised concerning NTG's conduct.

140.   NTG has filed many suits for so-called "plaintiffs" who NTG compensated to serve as plaintiffs, and who were previously connected to NTG members, associates, or agents via social or family ties.  Those so-called "plaintiffs" were used by NTG because they were willing to participate in the unlawful scheme.  The public records reveal many such connections.  The circumstances surrounding those lawsuits are impossibly coincidental for any legitimate client or plaintiff.  When considered *in toto*, these connections undercut any suggestion that NTG's lawsuits were sourced from legitimate plaintiffs.  These appear consistent with the NTG unlawful enterprise of paying individuals to "sign

on" to be civil plaintiffs against companies with which they have had no prior dealings.

### J. NTG's Use of Andrew Baslow to Recruit Plaintiffs

141.   Andrew Baslow was NTG's agent for contacting and recruiting individuals who would later join NTG in its fraudulent scheme.  Baslow has filed declarations in federal court supporting NTG cases as NTG's "investigator."  *See Delarosa v. Boiron, Inc.,* No. 8:10-cv-01569, Dkt. No. 52-5 (C.D. Cal. filed on October 14, 2010); *see also Neal v. Naturalcare, Inc.,* No. 5:12-cv-00531, Dkt. No. 17-8 (C.D. Cal. filed on April 11, 2012); *Shin v. Digi-Key Corp.,* No. 2:12-cv-05415, Dkt. 11-3 (C.D. Cal. filed on June 21, 2012); *Clark v. MyLife.com, Inc.,* No. 2:12-cv-06889, Dkt. 12-2 (C.D. Cal filed on August 9, 2012).  Baslow has referred to himself as NTG's Director of Field Operations in other contexts.  As explained above, Andrew Baslow secured Nilon's, Pfleg's, Demulder's, Dronkers', and Schoonover's participation in NTG's fraudulent lawsuits.

142.   Andrew Baslow attended Chatsworth High School in Chatsworth, California where he played baseball.  Baslow later attended college at Cal. State Dominguez Hills, where he also played baseball for the school's team.  Baslow often relied on his friendships to recruit willing individuals.  He used high school friends and acquaintances to help sell other young adults into the idea of easy cash in exchange for fabricated allegations.  The names and identities of those individuals are presently unknown, but are expected to be revealed in discovery.

143.   Kasey Toven played baseball for Chatsworth High in 2006-2007 and was Andrew Baslow's teammate.  Baslow and Toven remained in contact after high school.  Baslow recruited Toven to serve as a hired plaintiff in a 2012 class action against True Power, LLC.  *See Toven v. True Power, LLC*, No. 37-2012-00093832-CU-MT (Sup. Ct. San Diego Cnty., Mar. 13, 2012).  On information and belief, NTG paid Toven for his participation in the lawsuit and used Toven's name

to file fraudulent legal claims.  NTG filed its Complaint on Toven's behalf on March 13, 2015, also within days of the Nilon and Pfleg complaints.

144.   Martin Conde played baseball with Andrew Baslow at Cal. State Dominguez Hills in 2008.  Conde was a catcher for the team when Baslow was also rostered.  Martin Conde remained in contact with Baslow after college. Baslow recruited Martin Conde to serve as a hired plaintiff in a matter filed by NTG on January 19, 2012.  *See Martin Conde v. Obesity Research Institute, LLC*, No. 12-cv-0413-RSWL (C.D. Cal., Jan. 19, 2012).  That lawsuit concerned a weight loss product.  NTG had alleged that Martin Conde would not have purchased the product "but for" Obesity Research's advertising claims.  On information and belief, that action was also fraudulent and Martin Conde was induced by Baslow and NTG to serve as the plaintiff.

145.   On April 23, 2014, NTG filed yet another lawsuit on behalf of Baslow's friend Martin Conde.  *See Martin Conde v. Bio-Engineered Supplements & Nutrition, Inc.*, No. 8:14-cv-00945, Dkt. No. 1 (C.D. Cal removed on June 19, 2014).  As in Martin's prior suit, NTG alleged that "but for [defendants'] representations, [Martin] would not have purchased or paid as much for the Product."  *Id*.  As in his previous lawsuit, that statement was false because Martin Conde, if he purchased the product at all, did so only to buy into a lawsuit and, therefore, he did not "rely" on the representations as alleged.  Martin Conde's second lawsuit was substantially more technical, alleging that "High Pressure Liquid Chromatography (HPLC)" testing showed no presence of certain dietary ingredients and, so, the target product was likely inefficacious.

146.   Just *eleven days* after filing Martin Conde's original lawsuit in January 2012, NTG filed a suit on behalf of Jimmy Conde, Martin's brother.  *See Jimmy Conde v. Therabiogen*, No. BC478051 (Sup. Ct. Los Angeles Cnty., Jan. 30, 2012).  NTG had alleged that Jimmy Conde suffered injury when he purchased a cold and cough remedy that failed to alleviate his symptoms.  On information and

belief, those allegations were false and fraudulent.  As with his brother, Martin, Andrew Baslow had directly or indirectly induced Jimmy Conde to serve as a plaintiff in exchange for compensation from NTG.  Moreover, Jimmy Conde entered the litigation with full knowledge of his brother's prior action, and did so with the intent to profit from the fabricated lawsuit just as his brother had profited before him.

147.    NTG later brought allegations on behalf of a third Conde brother, Jose Conde, in a lawsuit filed January 7, 2014.  *See Jose Conde v. Sensa Products, LLC*, No. 14-cv-0051-JLS (S.D. Cal. 2014).  As with Jimmy and Martin, NTG alleged that Jose Conde had purchased a weight loss product that was ineffectual.  On information and belief, those allegations were utterly false.  As in the case of his two brothers, Martin and Jimmy, Andrew Baslow of NTG had induced Jose Conde to serve as a plaintiff in exchange for compensation from NTG.  Moreover, Jose Conde entered the litigation with full knowledge of his two brothers' prior actions, and did so with the intent to profit from the fabricated lawsuit just as his two brothers had profited before him.

148.    Andrew Baslow even recruited his own wife (then his girlfriend) to advance a class action claim through NTG concerning deceptive charging practices at Automated Teller Machines.  *See Jamie Loop v. Hotel Palomar Los-Angeles*, No. SC118073 (Sup. Ct. Los Angeles, Aug. 14, 2012).

149.    NTG's pattern of related family member lawsuits extends beyond the Conde brothers.  The use of these lawsuits is particularly nefarious because the subsequent family members assuredly understood that any purchase of a product or cooperation with NTG is by design and intended solely to support NTG's manufactured litigation.

150.    NTG filed a lawsuit for Stephen Ray on December 6, 2013.  *See Stephen Ray v. Branders.com, Inc.*, No. BC529716 (Sup. Ct. Los Angeles Cnty., Dec. 6, 2013).  Stephen's sister, Katie Ray, filed her Complaint through the

Newport Trial Group approximately six months later on June 24, 2014.  *See Katie Ray v. Buy Insta Slim, Inc.*, No. BC549571 (Sup. Ct. Los Angeles Cnty., June 24, 2014).  The brother and sister combo were plaintiffs in nearly identical Complaints that alleged phone conversations recorded in violation of California Penal Code section 632.7.

151.   On September 11, 2013, NTG filed suit on behalf of Kyle Janovick.  *See Kyle Janovick v. Maximum Human Performance*, No. 12-cv-2129-LAB (S.D. Cal. 2013).  At the time, Kyle Janovick worked at a warehouse stocking surfboards and needed money.  In his Complaint, NTG alleged that Mr. Janovick suffered injury when he purchased a workout formula containing L-Arginine AKG.  NTG alleged that Janovick was wronged because "a laboratory analysis conducted utilizing state-of-the-art High Pressure Liquid Chromatography (HPLC) protocol shows that Dark Rage contains no AKG, and thus cannot provide the results promised."  *See id.*, Complaint at ¶ 1.  NTG never explained how Janovick came to initiate that highly technical claim for false advertising.

152.   About three months later, as described above, NTG filed suit on behalf of Kyle Janovick's wife, Defendant Isabella Janovick.  *See Isabella Janovick v. American Breast Cancer Foundation, Inc.*, No. 3:13-cv-02697-DMS (S.D. Cal., Jan. 2, 2014).  Ms. Janovick's fraudulent action is described in greater detail in paragraphs 122 through 132.

153.   NTG filed suit on behalf of Carl Winzen in 2009. *See Nicole Forlenza, et al. v. Dynakor Pharmacal, LLC, et al.*, No. 2:09-cv-03730-AG-SS (C.D. Cal. filed on May 26, 2009).  Then, on August 26, 2010, NTG filed another suit on behalf of Carl Winzen in California Superior Court, this time alleging violations of the CLRA and UCL.  *See Carl Winzen v. Experian Information Solutions, Inc., et al.*, No. 8:10-cv-1783-JVS-RZ (C.D. Cal. removed on Nov. 19, 2010).  That action was dismissed with prejudice after the parties entered into a confidential settlement agreement.  *Id.*, at Dkt. 34.

154.   The Court has condemned similar unethical conduct under similar circumstances, including cases wherein NTG was involved.  *See Moheb v. Nutramax Laboratories, Inc.*, No. 12-3633, 2012 WL 6951904, at * 5 (C.D. Cal. Sep. 4, 2012).  In *Moheb*, the Court denied the plaintiff's attempt to certify a class action because of the relationship between the Plaintiff and her lawyer.  In denying the motion to certify a class, the Court explained:

> Plaintiff became class representative in this action through her long-time friendship with the mother of one of her counsel, and that **counsel had been researching the possibility of a class action with respect to Cosamin prior to Plaintiff becoming a client**.  While Plaintiff denies that a conflict exists, it is the appearance of a conflict that is inescapable.  *See, e.g., Kayes v. Pacific Lumber Co.,* 51 F.3d 1449 1465 (9th Cir. 1995) (("[t]he 'appearance' of divided loyalties refers to differing and potentially conflicting interests and is not limited to instances manifesting such conflict."); *Bodner v. Oreck Direct, LLC,* 2007 WL 1223777, *3 (N.D. Cal. Apr.25, 2007) (denying motion for class certification where plaintiff's counsel admitted he had researched the functionality of the air purifier at issue and then went in search of a plaintiff and holding that "[t]o grant class certification in such circumstances would be to place this court's imprimatur on litigation practices which it **finds abhorrent and inconsistent with the standards of federal class action suits**").

*Moheb v. Nutramax Labs. Inc.*, No. CV 12-3633-JFW JCX, 2012 WL 6951904, at *5 (C.D. Cal. Sept. 4, 2012) (emphasis added).

155.   Accordingly, NTG was well aware that use of for-hire plaintiffs with substantial connections to the law firm rendered class litigation unlawful.  *See Buckland*, 155 Cal. App. 4th at 808 (holding that a plaintiff does not have standing where the plaintiff attempted to buy a lawsuit).  Yet NTG continued its unlawful scheme.  The *Moheb* court was highly critical of those "abhorrent" practices, and yet the Courts had no idea that NTG actually paid individuals to be plaintiffs and to fabricate testimony.

156.   In later efforts to conceal the more obvious connections between NTG and its plaintiffs, NTG adopted the practice of having Baslow informally pay unrelated individuals to participate in litigation.  NTG successfully maintained dozens of class actions that had been initiated, drafted, and conceived well before NTG's plaintiffs for pay ever spoke with NTG representatives.  Those purported "plaintiffs" suffered no economic or physical harm.  Rather, they "signed on" to be plaintiffs in complaints crafted by NTG in exchange for cash from NTG.

157.   NTG's plaintiffs-for-pay approach to litigation has been expressly condemned in California district court:

> It is clear from the record that plaintiff's counsel, and not plaintiff, is the driving force behind this action. Such a "cart before the horse" approach to litigation is not the proper mechanism for the vindication of legal rights…  That plaintiff's counsel constructed this lawsuit before it had a plaintiff cannot be denied…  Indeed, counsel himself admitted at the hearing that he or his firm had the research performed on the product at issue and had a theory about the product's deficiencies.  *Then*, armed with that information they went in search of a plaintiff, never mind the lack of a fitting plaintiff or lack of ethical scruples.  The instant action is nothing more than [counsel]… continuing its practice of selecting stand-in plaintiffs, even ones who are inappropriate… In short, the conduct in this action does not look good, does not sound good, and does not smell good.  In fact, it reeks.  The court will not participate in this scheme by certifying a class.

*Bodner*, 2007 WL 1223777, at *2-3 (emphasis in original).  Therefore, NTG has, at all times relevant to this Complaint, been aware that the use of a "stand-in" plaintiff who lacks knowledge of the claims, experience with the product, and whose individual experience does not form the basis for the complaint, renders class certification untenable.  Thus, NTG has, at all time relevant to this Complaint, understood that its method of operation produces inherently meritless class actions.

158.   Many such plaintiffs never actually purchased or used the products despite their sworn statements and pleadings to the contrary.  Most of the putative "plaintiffs" cannot provide evidence that they actually purchased the products at issue.  Some claim to have purchased the products in cash and have no receipts or packaging (thus, no proof that the products were purchased before litigation).

159.   Through the filing of numerous false complaints and the threat of even more settled before the filing of suits or shortly thereafter, NTG has received a windfall of tens of millions of dollars, largely from coercive settlements following NTG shakedowns.  Indeed, NTG claims to have collected more than $300 million.[9]

160.   The record reveals no instance in which NTG prosecuted one of its false advertising claims to a final judgment on the merits and prevailed.

161.   NTG also masked its unlawful scheme using the protections of the legal system, including the attorney-client privilege, which NTG wrongly asserted to conceal critical information concerning the circumstances by which NTG induced individuals to serve as plaintiffs.

162.   NTG has abused legal process as a means to intimidate, threaten, and cajole corporate defendants into paying lucrative sums in settlement of claims.

163.   Operating often through Defendant Andrew Baslow, NTG targeted for involvement as plaintiffs in its concocted suits those in dire need of money, including young adults in their early- to mid-twenties who had significant debts and limited job prospects.  NTG enlisted groups of connected individuals within certain social circles, like those in the Electric Family LLC, by encouraging their friends to participate as plaintiffs.

---

[9] *Newport Trial Group Homepage: About Newport Trial Group*, www.trialnewport.com (last visited November 30, 2015).  That seemingly impressive windfall is advertised on NTG's website as "record-setting" and "remarkable."  *Id.*

164.   NTG paid most of its participants in cash in an effort to avoid traceability.  However, bank records of deposits and withdrawals provide evidence of the unlawful scheme preserved in the institutional records.  Telephone and email records also reveal the interactions of the parties.  Testimony from whistleblowers will reveal the payments and fabrication of claims.

165.   NTG's prior plaintiffs have explained NTG's operations in written and verbal interactions with third parties.  NTG's former strawmen plaintiffs have provided voluntary, gratuitous accounts of NTG's unlawful scheme, by describing their interactions with Baslow in furtherance of the scheme and their receipt of cash in exchange for participation.

166.   NTG's use of those plaintiffs was marked by frequent reliance on non-attorney agents like Baslow.  For example, Nilon, Pfleg, and Dronkers never spoke with NTG counsel directly—and never met their NTG attorneys—yet NTG's counsel drafted fraudulent affidavits and complaints for their signatures.

167.   NTG used boilerplate complaints and allegations, and used the exact same expert opinions in case after case, changed only to substitute the names of defendants and the names of products.

168.   In several cases, for example, NTG attorneys Ryan and Scott Ferrell attempted to overcome problems in cases by having their brother, Brit Ferrell, submit expert opinion.  Brit Ferrell is an emergency room physician in Arizona and has participated in fraudulent suits with his brothers Ryan and Scott.  He authored expert reports in at least three NTG cases, which reports are substantively indistinguishable.  *See* Brit W. Ferrell Expert Report in *Nilon v. Natural-Immunogenics*, attached as Exh. G *and compare to Delarosa v. Boiron, Inc.,* No. 8:10-cv-01569-BRO-CW, Dkt. 152-55 (C.D. Cal. filed on Aug. 31, 2010) (revealing identical expert reports in all material respects and indicating that Brit Ferrell essentially used a "replace all" function to simply switch the names of products in his reports).  Those reports were substantially lacking in support

through citations or exhibits.  *Id*.  Moreover, Brit Ferrell was largely unqualified to opine as an expert in the sophisticated areas of nutritional science that were at issue.  *Id*.[10]

169.   NTG also involved Scott and Ryan Ferrell's father in the capacity of an unlicensed private investigator on several occasions in the *Public Storage* matter (and potentially other cases).  On information and belief, Wynn Ferrell had participated in other NTG matters, often filling the role of a "private investigator" despite having no private investigator license in California or elsewhere.

170.   Viewed in the context of a single case, NTG's tactics have evaded opponents who might not haves suspected that attorneys would create fraudulent litigation.  But in this matter, the testimony and documentary evidence will fully reveal NTG's use of paid plaintiffs in NTG fabricated legal controversies that were engineered by NTG for the profit of NTG and its members, associates, and agents. NTG paid plaintiffs to sign onto fraudulent complaints and support false affidavits and testimony.  NTG filed lawsuits sometimes without the knowledge of the plaintiffs it listed in complaints.  NTG filed lawsuits knowing that its purported plaintiffs could not support the legal claims advanced.  NTG's plaintiffs were given little information about the status of their cases once filed.  Unquestionably, NTG has operated a fraudulent, criminal enterprise under the RICO statute (18 U.S.C. §§ 1961, 1962, 1964(c)), and the California Unfair Competition Law (Cal. B&P Code §§ 17200, *et seq.*; Cal. B&P Code §§ 7520, *et seq.*).

171.   The fabrication of Nilon's action against Natural Immunogenics constitutes the tort of malicious prosecution.  NTG's continuation of Nilon's fraudulent action after he abandoned the unlawful scheme constituted malicious prosecution.

---

[10] Not only was Brit Ferrell biased through familial relations with NTG attorneys, but he was also in business with them at the time.  *See* Articles of Organization for BWF Enterprises, LLC, attached as Exh. H.

172.   The use of Giovanni Sandoval as a plaintiff constitutes a separate count for malicious prosecution, in part because Sandoval was never an eligible plaintiff and because he was hired to serve as a plaintiff solely to prolong NTG's fraudulent lawsuit against NIC.

173.   The use of hired plaintiffs violates countless professional rules and ethical standards, and constitutes fraud subject to the RICO Act.

## COUNT ONE

### Malicious Prosecution

174.   The allegations of paragraphs 1 through 173 are incorporated herein by reference.

175.   Defendants Newport Trial Group, Scott J. Ferrell, Ryan M. Ferrell, Victoria C. Knowles, James B. Hardin, Andrew Baslow, Andrew Nilon, and Giovanni Sandoval (collectively "NTG") are liable for malicious prosecution as described herein.

### Malicious Prosecution:  Andrew Nilon v. NIC

176.   NTG initiated a fraudulent action against Natural-Immunogenics Corporation (NIC) in San Diego County Superior Court on March 5, 2012, alleging violations of the Consumer Legal Remedies Act (CA Civ. Code §§ 1750, et seq.), California's False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, et seq.), and Unlawful, Fraudulent & Unfair Business Practices (Cal. Bus. & Prof. Code §§ 17200, et seq.).  *See Nilon v. Natural-Immunogenics Corp.*, No. 3:12-cv-930-LAB, Dkt. No. 1-1 (S.D. Cal.).

177.   NIC removed the case to the United States District Court for the Southern District of California on April 16, 2012.  *Id.* at Dkt. No. 1.

178.   More than three years after NTG filed its state court complaint against NIC, the case legally terminated in NIC's favor when Judge Burns vacated class certification and dismissed the action with prejudice on grounds that NTG

"repeatedly failed to nominate a proper class representative." *Id.* at Dkt. Nos. 117, 120, 121.

179.   Defendants lacked probable cause to bring the action initially and lacked probable cause to continue the action after substitution of a new class representative became necessary.

180.   NTG recruited the original plaintiff Andrew Nilon, paid him money to be the named plaintiff in the fraudulent lawsuit, and had him execute false affidavits and legal papers without having first purchased or used NIC's product, and/or relied on NIC's advertising claims as represented in the Complaint.

181.   Nilon's allegations against NIC were fabricated and false.  He served as a paid strawman so that NTG could assert fraudulent legal claims against NIC, all with the intent and goal of procuring money from NIC through settlement.

182.   NTG knew that Nilon could not serve as a valid plaintiff under the allegations in the original Complaint, in part, because at the time the Complaint was filed he (a) had not purchased and used the NIC product as alleged in the complaint and (b) had not relied on NIC's advertising to make a purchase. Because NTG paid Nilon to act as a plaintiff, it knew that he had not "relied" on NIC's advertising claims or suffered an injury in fact, meaning that Nilon could not meet two essential elements in NTG's case against NIC.

183.   With knowledge or reckless disregard of the truth, NTG submitted false statements in its Complaint to establish Nilon's standing to sue NIC.  It authored false statements for Andrew Nilon to sign, which were designated "under oath" and subject to perjury (thus exposing Nilon to potential liability without his knowledge) and thus suborning perjury.

184.   Certainly after Nilon missed four duly noticed depositions, NTG knew that it required a valid class representative if it intended to continue with the fraudulent lawsuit.

185.   NTG withdrew Nilon from the case by means of a false declaration that NTG drafted and subsequently filed a Motion to Substitute its Class Representative whom it represented to be a resident of San Diego County when he was not, and later filed a Second Amended Complaint.  *See Nilon v. NIC*, No. 3:12-cv-00930-LAB-BGS (C.D. Cal. 2012), Dkt. 51, 51-1, 63.  The motion and amended complaint contained materially false statements which NTG made knowingly, or at least recklessly, in order to prolong the fraudulent action, to wit, false statements concerning Giovanni Sandoval's residency.  *See* id.  Absent those false and fraudulent statements, NTG would not have been able to continue its action against NIC.  *Id.* at Dkt. 117 ("But for the SAC's false statement about Sandoval's residency, the Court would not have granted the motion for substitution.").

**Malicious Prosecution:  Giovanni Sandoval**

186.   After NTG became aware that its lawsuit would end unfavorably without Nilon's participation in the unlawful scheme, NTG sought out a replacement for Nilon.  NTG secured Giovanni Sandoval, a career criminal residing in Yuma, Arizona.

187.   NTG knew or should have known that Sandoval was not an appropriate member of the class.  The Rule 23 class (as defined by NTG in its own pleadings) would have excluded Sandoval.  District Court Judge Larry A. Burns held that Sandoval was never a legitimate member of the class.  *Id.* at 4 ("Public records verify … that Sandoval fell outside the class definition well before the class was certified").

188.   NTG was also aware that Sandoval had not purchased or used the product before he agreed to participate as a putative plaintiff in the action. Sandoval had never produced evidence that he purchased NIC's product.  *Id.* at 3 (finding that the "evidence indicates that Sandoval may have made several other false statements during his deposition testimony").

189.   NTG nonetheless proceeded with Sandoval, and held him out as a legitimate class representative.  NTG undertook efforts to conceal Sandoval's true residence to avoid premature dismissal of its lawsuit.

190.   NTG refused to supply Sandoval's address and full name despite four NIC demands for the information and despite having an affirmative obligation to do so under Federal Rule of Civil Procedure 26(a)(1).

191.   NTG had Sandoval travel from Arizona to California, and paid for his accommodations while in California, in an effort to deceive NIC and the court into believing that Sandoval actually resided in California.  NTG scheduled Sandoval's deposition in California even though all attorneys involved were from Arizona, and Sandoval himself resided in Arizona.

192.   As with the Nilon lawsuit, NTG's maintenance of its fraudulent claims through Sandoval—at a time when the lawsuit would have otherwise terminated—also comprises an additional and distinct instance of Malicious Prosecution.  NTG was at least reckless with regard to the veracity and plausibility of its legal claims.

193.   Because NTG maintained its action through knowingly false allegations and improper class representatives, NTG brought its original action with the understanding that its claims were invalid (i.e., with malice).

194.   NTG brought and maintained its fraudulent action against NIC for the purpose of extracting a settlement.  The action was brought as part of an unlawful business enterprise to extort funds from unsuspecting businesses through the threat and institution of legal proceedings that lacked a reasonable basis.  Thus, the action was not brought for the purpose of vindicating the rights of consumer plaintiffs, but was instead brought with malice for the sole purpose of generating revenue for NTG.

195.   As a direct and proximate result of NTG's intentional, knowing, or reckless malicious prosecution described in paragraphs 174 through 194 herein,

Plaintiff has been injured in its business and property.  Plaintiff NIC suffered the excessive and unjustified cost of three years of litigation, harm to NIC's reputation through the publication of false and fraudulent court papers, and decreased sales resulting from the loss of good will generated by the fraudulent lawsuit.

196.   WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants as follows:  actual damages, punitive damages, and attorneys' fees.

## COUNT TWO
### Violation of RICO Section 1962(c)
### (18 U.S.C. §§ 1962(c), 1964(c))

197.   The allegations of paragraphs 1 through 195 are incorporated herein by reference.

198.   The Defendants have engaged and /or continue to engage in the following acts which qualify as predicate acts under the RICO act:

### Predicate Acts: Mail Fraud
### (18 U.S.C. §§ 1341, 1349)

199.   The Defendants voluntarily and intentionally devised a scheme to defraud unsuspecting businesses through the fabrication of lawsuits, and the making of threats of suit, that lacked bona fide plaintiffs under the law.  They devised, conducted, and/or participated in a scheme to recruit young, financially bereft, and impressionable individuals to serve as plaintiffs in lawsuits, paid those individuals to be plaintiffs in said lawsuits, and obtained payments from unsuspecting businesses in the form of settlement money.  Defendants participated directly in that scheme, either by operating the scheme, or advancing unlawful claims alongside other defendants.  All defendants were aware of their role in the scheme to defraud businesses.  Those who served as strawmen plaintiffs

understood that their legal claims were fraudulent and that allegations contained in their complaints were materially false.

200.   To execute the fraudulent scheme, the Defendants sent fraudulent demand letters via mail or common carrier and email to the unsuspecting businesses, often before a valid plaintiff had been identified or obtained. Defendants instituted fraudulent legal actions when their demands for pre-litigation payment failed.  The demand letters sent to various businesses across state lines were legally baseless and designed to extort money from businesses in furtherance of the scheme.

201.   Defendants dispatched their demands for payment through the United States post, common carrier, and email and across state lines.  Defendants used interstate mails or common carrier to file or submit false statements to the courts for the purpose of furthering their unlawful scheme.

**Specific Acts of Mail Fraud:**

202.   Defendants NTG, Scott Ferrell, Ryan Ferrell, Victoria Knowles, and James Hardin devised and executed a fraudulent lawsuit in the case of *Nilon v. Natural-Immunogenics Corp.*, whereby NTG and its agent, Defendant Andrew Baslow, recruited Andrew Nilon with the knowledge of Scott Ferrell, Ryan Ferrell, Victoria Knowles, and James Hardin, to serve as a plaintiff for the purpose of obtaining settlement monies from NIC.  The fraudulent complaint against NIC was served on NIC, a corporation with its principal place of business in Florida, through the use of the interstate mails.  Defendants later filed a subsequently false complaint against Chromadex Inc. using Andrew Nilon again as a strawman plaintiff.  Both complaints involving Andrew Nilow were fabricated, false, and designed to extract money from the putative defendants in those cases.

203.   Defendants used the interstate mails to send fraudulent demand letters to their intended victims, Natural Immunogenics and Chromadex Inc., before filing

fraudulent lawsuits.  *See* Exh. B.  Defendants sent that demand for the purpose of extorting settlement monies from NIC and Chromadex Inc.

204.   Defendants NTG, Scott Ferrell, Ryan Ferrell, Victoria Knowles and James Hardin devised and executed fraudulent lawsuits in the cases of *Dronkers v. Kiss My Face, LLC*, *Schoonover v. Himalaya Drug Company*, *Demulder v. Carter-Reed Company, LLC*, and *Pfleg v. Nature's Way Products, Inc.*, whereby NTG and its agents, including Defendant Andrew Baslow, recruited Matt Dronkers, Sam Schoonover, Taylor Demulder, and Sam Pfleg with the knowledge of Scott Ferrell, Ryan Ferrell, Victoria Knowles, and James Hardin, to serve as plaintiffs for the purpose of obtaining settlement monies from Kiss My Face, LLC (located in New York), Himalaya Drug Company (located in Texas), Carter-Reed Company, LLC (located in Utah), and Nature's Way Products, Inc. (located in Utah).  The fraudulent complaints against these businesses were served through the use of the interstate mails.  Defendants further used the interstate mails to send fraudulent demand letters to their intended victims before filing the fraudulent lawsuits. Defendants sent those demand letters for the purpose of extorting settlement monies from the victim businesses.

205.   Defendants NTG, Scott Ferrell and Victoria Knowles devised and executed fraudulent lawsuits in the cases of *Urzua v. Nat'l Veterans Services Fund, Inc.*, *Patterson v. International Union of Police Associations, AFL-CIO*, and *Janovick v. American Breast Cancer Foundation, Inc.*, whereby NTG and its agents recruited Defendants David Urzua , Kaleb Patterson, and Isabella Janovick with the knowledge of Scott Ferrell, Ryan Ferrell, Victoria Knowles, and James Hardin, to serve as plaintiffs for the purpose of obtaining settlement monies from National Veterans Services Fund, Inc. (a Connecticut corporation), International Union of Police Associations (a Florida corporation), and the American Breast Cancer Foundation (a Maryland corporation).  The fraudulent complaints against these charitable organizations were served through the use of the interstate mails.

Defendants further used the interstate mails to send fraudulent demand letters to their intended victims before filing the fraudulent lawsuits.  Defendants sent those demand letters for the purpose of extorting settlement monies from the victim charities.

### Predicate Acts: Wire Fraud
### (18 U.S.C. §§ 1343, 1349)

206.   The allegations in paragraph 199 are incorporated herein by reference.

207.   To execute their unlawful and fraudulent scheme, the Defendants filed fraudulent pleadings and documents in federal court using the ECF/PACER electronic filing system.  Those electronically transmitted pleadings and documents instituted and perpetuated fraudulent lawsuits for the purpose of exacting settlement monies from the unsuspecting defendants.

208.   The Defendants used electronic, interstate instrumentalities to effect their unlawful fraudulent scheme as described in this Complaint, including the use of email correspondence and electronic filings in federal and state courts.

### Specific Acts of Wire Fraud:

209.   The allegations in paragraph 202 are incorporated herein by reference.

210.   After NTG recruited Nilon as a paid strawman plaintiff, the Defendants used the federal ECF/PACER electronic filing system to maintain and pursue the fraudulent lawsuit against Plaintiff NIC.

211.   Defendants electronically filed a fraudulent Motion to Certify Class on February 26, 2013 with the intent to further their unlawful scheme described in paragraphs 197 through 199 herein.  In that motion NTG falsely stated, *inter alia*, that "Plaintiff [Nilon] and class members have all suffered the same injury – they have lost money or property as a result of Defendant's unfair business practices and have purchased worthless products they would not have purchased but for those practices."  Dkt. 21-1, at 6.  In fact, Nilon never purchased the NIC product before filing his lawsuit, and never relied on NIC's advertising claims.  He was

therefore never in the same position as other California consumers.  He was in a class of his own (an unlawful class), which included those persons who had been paid by NTG to purchase NIC's product for litigation purposes.

212.   NTG electronically filed a fraudulent Declaration in Support of its Motion for Class Certification on February 26, 2013.  They filed that motion to further their unlawful scheme as described in paragraphs 197 through 199 herein. *See* Dkt. 21-2.  In that Declaration, purportedly sponsored by Andrew Nilon, NTG made knowingly false statements in each of the six enumerated paragraphs therein. *Id*.  In fact, Andrew Nilon did not draft that affidavit or its contents, and the allegations therein were false.

213.   Defendants electronically filed a fraudulent First Amended Complaint against NIC on October 15, 2013 with the intent to pursue their scheme described in paragraphs 197 through 199 herein.  *See Nilon v. NIC*, No. 12-930 (S.D.Cal.), Dkt. 34.  In that First Amended Complaint, the Defendants made knowingly false statements for the purpose of fraudulently obtaining settlement monies from NIC. *Id*.

214.   NTG electronically filed similarly fraudulent pleadings, motions and declarations through the ECF/PACER system with the intent to pursue the scheme described in paragraphs 197 through 199 herein.  Those electronically transmitted documents included a Motion to Substitute Class Representative supported by the fraudulent declarations of Mr. Nilon, Giovanni Sandoval, and Ryan M. Ferrell (*see* Dkt. 51); a Motion to Withdraw as Attorney for Andrew Nilon supported by fraudulent declaration (*see* Dkt. 61); and a Second Amended Complaint supported by fraudulent declarations (*see* Dkt. 63).

215.   Defendants NTG, Scott Ferrell, Ryan Ferrell, Victoria Knowles, and James B. Hardin electronically filed fraudulent pleadings, motions and declarations through the ECF/PACER system in the cases identified in paragraphs 204 through 205 herein with the intent to pursue the scheme described in paragraphs 197

through 199 herein.  The plaintiff Defendants in each of the cases identified in paragraphs 204 through 205 herein supported by false declaration the fraudulent complaints in those actions.  The Defendants made knowingly false statements in these documents for the purpose of fraudulently obtaining settlement monies from the victim businesses and charities.

216.   In each of the cases identified in paragraphs 209 through 215 herein, the Defendants conspired to, and did, electronically file fraudulent pleadings, papers, and declarations through the ECF/PACER system with intent to pursue the scheme described in paragraphs 197 through 199 herein.

217.   Upon information and belief, the fraudulent cases referenced in paragraph 215 herein did result in the receipt of fraudulently obtained settlement monies through the use of interstate wires.

218.   It was reasonably foreseeable that interstate wire communications would be used because NTG has offices in both California and Arizona.  To file documents through ECF/PACER in California District Courts, NTG attorneys working and residing in Arizona knew that interstate wires were necessary to effect the unlawful scheme.  Furthermore, service of electronically filed documents to the victim businesses and charities was made through wire communications, and those victims or their counsel of record were located in states other than California or Arizona.  Indeed, NTG's victims were located in jurisdictions nationwide.  Natural Immunogenics is a Florida corporation with its principal place of business in Florida.  Natural Immunogenics received mail and wire communications from NTG during NTG's attempt to defraud and extort NIC.

219.   Interstate wires were, in fact, used by Defendants when executing the fraudulent scheme described in paragraph 197 through 216 herein.  Defendants filed papers described in paragraph 210 through 216 using the ECF/PACER system.  In doing so, the Defendants transmitted information from Arizona to California and from California to Arizona through interstate wires.  Defendants

also transmitted correspondence and information necessary to the scheme between and among themselves.  Those wires travelled interstate and relied on interstate channels and instrumentalities.

220.   Defendants transmitted the wired information with the specific intent to perpetrate a fraudulent scheme and extract settlement and/or judgment monies from NIC.

## Predicate Act: Extortion
### (18 U.S.C. § 1951)

221.   The Defendants obstructed and/or affected commerce and affected the movement of commodities in commerce through extortion.

222.   Defendants' extortionate acts affected or obstructed commerce and the movement of commodities in each instance described in paragraphs 199 through 220 herein.  Defendants used the threat of fraudulent litigation to extract settlement monies from victims nationwide.

223.   The Defendants extracted settlement monies from unsuspecting businesses, with their consent, by inducing fear of economic loss through the threat of litigation or embarrassment resulting from same.

224.   Defendants, however, did not threaten legitimate litigation, or have a lawful right to make threats of litigation, in part, because they had no valid basis for suit absent viable plaintiffs.  Unbeknownst to NTG's victims, the threat of litigation was predicated on fictitious and fraudulent plaintiffs—individuals who were compensated by NTG to fabricate legal allegations.  Thus, monies were consensually extracted from NTG's victims under color of authority and fear.

225.   NTG's victims believed (erroneously) that NTG had a right to assert legal claims.  If NTG's victims had known of NTG's unlawful scheme, they would not have capitulated to NTG's demands or relinquished money.

226.   Many examples of fraudulent pleadings have been documented in this Complaint.  For instance, on July 19, 2012, through a fraudulent plaintiff, NTG

filed a Complaint with Jury Demand against the Himalaya Drug Company.  *See Schoonover v. Himalaya Drug Company*, No. 3-12-cv-01782-GPC (S.D. Cal., filed on Jul. 19, 2012).  Upon information and belief, through the threat of economic losses associated with that fraudulently instituted lawsuit, the Defendants extracted settlement monies from the Himalaya Drug Company.  Upon receipt of the extorted funds, the Defendants voluntarily dismissed the case on November 13, 2012, four months after initiating the suit.  *Id*. at Dkt. No. 11.

227.   On September 11, 2013, through a fraudulent plaintiff, NTG and Kyle Janovick filed a Complaint with Jury Demand against Maximum Human Performance, Inc.  *See Kyle Janovick v. Maximum Human Performance*, No. 13-cv-2129-LAB (S.D. Cal. Sept. 11, 2013).  Upon information and belief, through the threat of economic losses associated with that fraudulently instituted lawsuit, the Defendants extracted settlement monies from Maximum Human Performance, Inc.  Upon receipt of the extorted funds, the Defendants voluntarily dismissed the case on November 20, 2013, two months after initiating the suit.  *Id*. at Dkt. No. 10.

228.   On January 17, 2012, the Defendants, through a fraudulent plaintiff, Martin Conde, filed a Complaint with Jury Demand against Obesity Research Institute, LLC.  *See Martin Conde v. Obesity Research Institute, LLC*, No. 12-cv-413 (C.D. Cal. 2012).  Upon information and belief, through the threat of economic losses associated with that fraudulently instituted lawsuit, the Defendants extracted settlement monies from Obesity Research Institute, LLC.  Upon receipt of the extorted funds, the Defendants voluntarily dismissed the case on January 27, 2012, ten days after initiating the suit.  *Id*. at Dkt. No. 5.

229.   On May 22, 2013, the Defendants, through Defendant Andrew Nilon, a fraudulent plaintiff, filed a Complaint with Jury Demand against Chromadex, Inc.  *See* Exhibit C.  Even after the voluntary dismissal of that claim on May 23, 2013, the Defendants, through the threat of economic losses associated with the

refiling of that fraudulently conceived lawsuit, extracted settlement monies from Chromadex, Inc.

230.   Upon information and belief, and based on the allegations contained in paragraphs 197 through 229 herein, the Defendants extracted settlement monies through the extortion scheme described herein on more than twenty occasions over the course of more than four years from 2011 to present.

### Injury Stemming from Predicate Acts

### (18 U.S.C. § 1962(c))

231.   The Defendants are engaged in an enterprise in, and activities that affect, interstate commerce.  Defendants' fraudulent lawsuits affect corporate victims which are principally located within, and do business, in all fifty states. The Defendants are employed or associated with the unlawful enterprise described in this Complaint.

232.   Defendants agreed to conduct, and did conduct or participate in the enterprise's affairs through a pattern of racketeering activity.  That activity was intended to defraud Plaintiff and other similarly situated corporate victims. Defendant Newport Trial Group was established as a legitimate law firm, and operated to appear as a legitimate law firm, but in reality NTG became a pleading mill for fraudulent and unsupported lawsuits.  It operated in violation of legal ethics and standards of law.  Defendants Ryan M. Ferrell, Scott J. Ferrell, Victoria C. Knowles, and James B. Hardin (the "Attorneys") constructed and carried out the racketeering schemes knowingly and willfully.

233.   Those attorneys created, or directed others to create, fraudulent court papers and letters sent through the mails and wires for the purpose of defrauding unsuspecting businesses.  Those attorneys investigated and developed potential legal claims for which plaintiffs would later be recruited to execute the scheme. The attorneys instructed their agents to pay individuals for their participation as

putative plaintiffs in the fraudulent lawsuits or, at minimum, they were aware of the practice and pursued the fraudulent cases nonetheless.

234.   Defendant Andrew Baslow recruited fraudulent plaintiffs on behalf of those attorneys by promising remuneration for participation by the putative plaintiffs in litigation.  Once recruited, Defendants Giovanni Sandoval, Andrew Nilon, Sam Pfleg, Matthew Dronkers, Taylor Demulder, Sam Schoonover, Isabella Janovick, Kaleb Patterson, and David Urzua voluntarily and knowingly signed and executed false pleadings, papers, and declarations in support of the fraudulent scheme and in exchange for monetary payment.

235.   The NTG attorneys were at all times aware of Mr. Baslow's conduct, and benefited from his conduct in furtherance of their scheme.  NTG attorneys used their licenses, status as attorneys, and putative legal privileges to file fraudulent papers without suspicion of the courts or their victims.  Those attorneys used putative legal privileges to protect their strawmen plaintiffs, and to conceal evidence of the unlawful scheme from their victims.

236.   Perhaps most troubling, the NTG attorneys have exposed their strawmen plaintiffs to considerable personal liability including, for example, liability for perjury, abuse of process, and malicious prosecution.  They placed those individuals at risk without properly advising them of the consequences, and through the assurances of licensed legal counsel.  As referenced hereinabove at paragraph 16, one such individual, Taylor Demulder, has already been sued in his individual capacity for his role in an NTG fraudulent lawsuit against the Carter-Reed Company.

237.   The attorneys have also injured the legal profession as a whole by threatening and pursuing frivolous "shakedown" lawsuits against countless corporate victims.  NTG has violated countless ethical rules and rules of professional responsibility.

238.   NTG and its attorneys have accepted money from settlements and judgments extracted from corporate victims, all without having a legitimate basis to maintain lawsuits.  NTG's fraudulent allegations therefore created leverage against those corporate businesses, which was furthered and enforced by the NTG pattern of racketeering activity.

239.   Pursuant to and in furtherance of their fraudulent scheme, the Defendants committed multiple related acts of mail fraud, wire fraud, and extortion, the details of which are set forth in paragraphs 197 through 229 hereinabove.

240.   The acts of wire fraud, mail fraud, and extortion set forth in paragraphs 197 through 229 herein constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

241.   Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity set forth in paragraphs 197 through 229 hereinabove and in violation of 18 U.S.C. § 1962(c).

242.   As a direct and proximate result of the Defendants' racketeering activities and multiple violations of 18 U.S.C. § 1962(c), Plaintiff NIC has been injured in its business and property.  It has incurred excessive and unjustified costs of three years of fraudulent litigation; harm to its reputation through the publication and promotion of false and fraudulent court papers; and lost customers or prospective customers as a result of diminished goodwill and reputational harm.

243.   Defendants' conduct is unjustifiable, egregious, and in blatant disregard for the law.  The willful and intentionally fraudulent activity documented herein justifies punitive damages in an amount to be determined.

244.   WHEREFORE, Plaintiff requests that this Court enter judgment against the Defendants as follows: actual damages, treble damages, exemplary or punitive damages, and attorney fees.

## COUNT THREE

### Violation of RICO SECTION 1962(a)

### (18 U.S.C. §§ 1962(a), 1964(c))

245.   The allegations of paragraphs 1 through 230 are incorporated herein by reference.

246.   Defendants are engaged in an enterprise in, and activities that affect, interstate commerce.  The Defendants are employed or associated with the enterprise, and have participated in the unlawful enterprise with the common purpose of defrauding corporate victims nationwide.

247.   The Defendants used and invested income derived from their pattern of interstate racketeering activity.  Defendants used and invested income derived from the common unlawful enterprise, to wit, the scheme to file (or threaten to file) fraudulent lawsuits against corporate victims nationwide.  Defendants have coerced or procured settlement monies resulting from their fraudulent activities described in paragraphs 1 through 230 herein.  Defendants have used proceeds from their unlawful enterprise to pay other individuals in furtherance of their scheme, including the payment of cash in exchange for false and fraudulent legal allegations.  The Defendants have used proceeds from the unlawful enterprise to fund those lawsuits, including payments to putative plaintiffs for executing false papers and court documents (including affidavits) filed in federal and state proceedings.

248.   Specifically, in just one of many such instances, NTG paid Andrew Nilon approximately $900 to allege false claims against Natural Immunogenics concerning his alleged purchase and use of its dietary supplement product, Sovereign Silver.  On information and belief, the Defendants paid or pledged to pay Giovanni Sandoval to submit false claims against Natural Immunogenics concerning his alleged purchase and use of NIC's dietary supplement.  NTG paid Sam Pfleg between $900 and $1500 to assert false claims against Nature's Way

Products, Inc. concerning his alleged purchase and use of its homeopathic products, to wit:  Arniflora Arnica Gel, Triflora Arthritis Gel, Florasome Cream, Aciatic Aide, B&T Nighttime Cough & Bronchial Syrup, and Cough & Bronchial Syrup.  NTG paid Matthew Dronkers between $900 and $1500 to assert false claims against Kiss My Face, LLC concerning his alleged purchase and use of its personal care products.  NTG paid Taylor Demulder to contact the Carter-Reed Company, LLC for the purpose of establishing a fraudulent legal claim.  NTG paid Sam Schoonover between $900 and $1500 to assert false claims against the Himalaya Drug Company.  NTG compensated Nicole Forlenza for her role as a fraudulent plaintiff in a separate matter against the Carter-Reed Company in 2009.

249.   NTG has paid or otherwise compensated many similarly situated individuals solely to have them serve as fraudulent plaintiffs in NTG legal actions. Many of those individuals are closely connected with NTG's employees, staff, and agents.  Those individuals are often closely connected with each other, which is how NTG recruited.  NTG relied on those social connections to informally spread word of NTG's fraudulent scheme, and the promise of quick money for participants.

250.   Some of the other individuals potentially implicated in NTG's scheme include the following people, all of which have filed separate complaints through NTG (some have filed multiple complaints, and most were filed generally between 2011-2014):

    a.  David Gamez;

    b.  Jasmine Gamez;

    c.  Isabella Janovick;

    d.  Kyle Janovick;

    e.  Kasey Toven;

    f.  Katie Ray;

    g.  Stephen Ray;

h.  Martin Conde (2 complaints);

i.   Jose Conde;

j.   Jimmy Conde;

k.  Armando Gonzalez;

l.   George Gonzalez;

m.  Henry Gonzalez;

n.  Josephine Gonzalez;

o.  Rina Gonzalez;

p.  Michael Gonzalez (4 complaints);

q.  Edward Martinez;

r.   Gilbert Martinez;

s.   Julie Martinez (2 complaints);

t.   Maria Martinez; and

u.  Zachary Hallstrom (11 complaints, at least 2 Prop 65 notices).

On information and belief, discovery will reveal other instances of similarly fraudulent legal actions brought by putative plaintiffs having substantial connections to NTG or other such "plaintiffs."

251.   The racketeering activity described in paragraphs 197 through 250 above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

252.   As a direct and proximate result of the Defendants' racketeering activities in violation of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and property as described in paragraph 242 herein.

253.   Electric Family, LLC is an enterprise which affects interstate commerce.  Electric Family advertises and sells apparel through its internet store to individuals throughout the United States.  Defendants Sam Pfleg, Taylor Demulder, Matt Dronkers, and Andrew Nilon received income derived, directly or indirectly, from the pattern of racketeering activity identified in paragraph 251 and

used or invested part or all of that income in the operation or establishment of Electric Family, LLC.

254.   WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants as follows: actual damages, punitive or exemplary damages, treble damages, and attorneys' fees.

## COUNT FOUR

### Conspiracy to Violate RICO Section 1962(d)
### (18 U.S.C. §§ 1962(d), 1964(c))

255.   The allegations of paragraphs 197 through 253 are incorporated herein by reference.

256.   As alleged, *supra*, the Defendants agreed and conspired to violate 18 U.S.C. §§ 1962(a) and (c).  Specifically, Defendants agreed and conspired to systematically and continuously defraud corporate and individual victims through their unlawful use of the California State and Federal Court system, the protections of the attorney-client privilege, and the class certification process.  NTG and its attorneys developed a racketeering enterprise using the mails and wires to extort businesses through fraudulent litigation.  NTG and its attorneys relied on and entrusted Defendant Baslow (and other similar agents) to recruit fraudulent and ineligible plaintiffs so that NTG could continue to fuel its unlawful enterprise.  On information and belief, NTG entrusted additional agents, employees, or associates to similarly recruit fraudulent plaintiffs in other matters, the names of those accomplices will be determined in discovery.

257.   The Defendants voluntarily conspired to defraud corporate victims by drafting and submitting false statements under oath and in legal pleadings with the intent to obtain money through quick settlements.  Defendants reinvested proceeds from their unlawful scheme into additional shakedown lawsuits which had little chance of success.  NTG would commonly dismiss its fraudulent claims with

prejudice whenever opposing counsel learned of potential flaws, or after procuring settlements from counsel under false pretenses.

258.   The Defendants have intentionally conspired and agreed to directly or indirectly use or invest income derived from a pattern of racketeering activity in an interstate enterprise, and they conducted and participated in the conduct or affairs of the enterprise through a pattern of racketeering activity.  Defendants knew that their conduct described in paragraphs 197 through 253 herein was part of a pattern of racketeering activity and they agreed to the commission of those acts in furtherance of the scheme described above.  They entered into agreements, formal and informal, express and implied, to carry on the affairs of the scheme, and to take steps necessary to meet the unlawful scheme's objectives.  That conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

259.   Defendants at various times and places conspired to conduct and participate in the aforementioned RICO enterprise through a pattern of racketeering activity.

260.   During the ten (10) calendar years preceding this Complaint, all Defendants did cooperate jointly and severally in the commission of at least two (2) of the predicate acts that are listed hereinabove in Count Two.

261.   As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property as described in paragraph 242 herein.

262.   WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants as follows:  actual damages, treble damages, and attorneys' fees.

## COUNT FIVE

### California State Unfair Competition

### (California Business and Professions Code §§ 17200, *et seq.*)

263.   The allegations of paragraphs 1 through 261 are incorporated herein by reference.

264.   Defendants Newport Trial Group, Scott J. Ferrell, Ryan M. Ferrell, Victoria C. Knowles, James B. Hardin, and Andrew Baslow (collectively "NTG") are liable for violations of the California unfair competition laws.

265.   Plaintiff NIC brings this Count pursuant to the Unfair Competition Law at Business & Professional Code §§ 17200, *et seq.*  The Defendants' conduct described in Counts One, Two, Three, and Four constitutes unfair, unlawful and/or fraudulent business practices within the meaning of Business & Professional Code § 17200.

266.   Plaintiff NIC brings this Cause of Action on behalf of themselves and on behalf of the public as private attorneys general pursuant to Business & Professional Code § 17204.

267.   Pursuant to Business & Professional Code § 17203, NIC seeks from the Defendants restitution and disgorgement of all earnings, profits, compensation, benefits and other ill-gotten gains obtained by the Defendants as a result of the their conduct in violation of Business & Professional Code §§ 17200, *et seq.*

268.   Pursuant to Business & Professions Code § 17204, NIC seeks an order of this Court enjoining Defendants from continuing to engage in the acts as set forth in Counts One, Two, Three and Four, which acts constitute violations of Business & Professions Code § 17200 *et seq.* NIC and the public will be irreparably harmed if such an order is not granted.

1

**PRAYER FOR RELIEF:**

2       WHEREFORE, NIC prays for judgment in its favor and against Defendants

3  and requests that this Court award NIC the following:

4       A.     An award of exemplary or punitive damages under Cal. Civ. Code §

5  3294 and other applicable laws and statutes for Defendants' conduct undertaken

6  with intent to injure Plaintiff, or with a willful and conscious disregard of Plaintiff

7  Natural Immunogenics' rights.  This is an exceptional case that involves deliberate

8  abuse of the judicial system by those individuals entrusted most to uphold and

9  follow the law.  The Newport Trial Group (NTG) has advertised that its firm

10 recovered more than $300 million over the past half-decade from unsuspecting

11 victims, much of which was reaped from lawsuits designed by NTG and fabricated

12 through false strawman plaintiffs.  An award of punitive damages sufficient to

13 deter and prevent future conduct is appropriate in this case;

14      B.     An award of threefold damages sustained by Plaintiff pursuant to

15 RICO, 18 U.S.C. § 1964(c);

16      C.     A permanent injunction enjoining the Defendants, their officers,

17 shareholders, agents, servants, employees, attorneys, successors and assigns,

18 subsidiaries, affiliated companies or entities, all those in privity with same, and all

19 those in active concert or participation who receive actual notice of the judgment,

20 from providing or receiving any payment, compensation, remuneration or

21 otherwise in exchange for the provision of testimony, evidence, or statements for

22 use in litigation, other than such payments expressly permitted by law and

23 applicable rules of professional responsibility;

24      D.     A preliminary Order barring NTG and its attorneys from continuing to

25 furnish legal services or legal advice to the individually-named defendants during

26 the pendency of this litigation;

27      E.     An Order requiring the Defendants to file with this Court a

28 compliance plan under oath describing the method and manner in which

Defendants intend to comply with the injunction(s), including a description of any new operating procedures and policies, to be filed within 30 days after service of an injunction;

F.      An award of costs and reasonable attorney fees and expenses incurred by NIC in connection with this action pursuant to 18 U.S.C. § 1964(c), 15 U.S.C. §§ 1116-1117, Cal. Code Civ. Proc. § 1021.5, Cal. B&P Code § 14250;

G.      An accounting of all Defendants' profits, revenues, accounts, and proceeds received or obtained, directly or indirectly, or arising out of Defendants history of malicious prosecution, unfair competition, RICO violations, and all other allegations presented hereinabove, including a full accounting of all gross revenues derives from NTG's alleged "legal services" after January 1, 2009.

H.      General damages for loss of goodwill or harm to NIC's reputation stemming from the publication and dissemination of fraudulent allegations against NIC during the course of three years in litigation.

I.      Pre-judgment and post-judgment interest on the above damage awards;

J.      An order adjudging all Defendants jointly and severally liable, as the law allows, under each cause of action asserted by Natural Immunogenics Corp. and for all damages awarded against any Defendant;

K.      Such other relief as this Court may deem just.


DATED:  December 7, 2015

Respectfully submitted,


NATURAL-IMMUNOGENICS CORP.


By:    */s/ Peter A. Arhangelsky*
Peter A. Arhangelsky, Esq. (SBN 291325)

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 73 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jonathan W. Emord, Esq. (pro hac vice)[11]
Eric J. Awerbuch, Esq. (pro hac vice)
Joshua S. Furman, Esq. (pro hac vice)
Emord & Associates, P.C.
3210 S. Gilbert Road, Suite 4
Chandler, AZ 85286
Phone: (602) 388-8899
Fax: (602) 393-4361
E-mail: parhangelsky@emord.com
*Attorney for Plaintiff Natural Immunogenics
Corp.*

[11] Plaintiff's out-of-state counsel intend to promptly move for pro hac admission subject to Local Rules 83-2.