Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Joshua S. Furman, Esq. (pro hac vice)
jfurman@emord.com
Eric J. Awerbuch, Esq. (pro hac vice)
eawerbuch@emord.com
Emord & Associates, P.C.
3210 S. Gilbert Road, Suite 4
Chandler, AZ 85286
Phone: (602) 388-8899
Fax: (602) 393-4361
Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL-IMMUNOGENICS, a Florida corporation,<br><br>Plaintiff,<br><br>v.<br><br>NEWPORT TRIAL GROUP, et al.<br><br>Defendants. | Case No.: 8:15-cv-02034-JVS (JCG)<br><br>**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL - NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: [proposed] May 16, 2016<br>Time: 1:30 p.m.<br>Location: Courtroom 10<br>Judge: James V. Selna |

**NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

TO DEFENDANTS NEWPORT TRIAL GROUP, SCOTT J. FERRELL, RYAN FERRELL, AND DAVID REID AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 16, 2016 at or as soon thereafter as counsel may be heard in Courtroom 10C, United States District Court, Central District of California, located at 411 West Fourth Street, Room 1053, Santa Ana, CA 92701-4516,[1] Plaintiff through counsel will hereby move this Court pursuant to Rule 65 of the Federal Rules of Civil Procedure and Rule 65-1 of the Civil Local Rules for a temporary restraining order and/or preliminary injunction enjoining the above-named Defendants and their successors, agents, officers, servants, employees, attorneys and representatives and all persons acting in concert or participating with them, from disseminating intentionally false and defamatory information concerning Plaintiff, Plaintiffs' counsel, and Plaintiff's witnesses. Plaintiffs request that this Court enter an Order to Show Cause as to why the Court should not sanction counsel and refer the events documented in this Order to the State Bar of California for review and further proceedings.  Plaintiff requests the following order(s):

1. An Order prohibiting NTG and its agents from further disseminating the "Richard Martin" email and all content therein, including the draft Complaint, and to supply a copy of this Court's decision on this Motion to each individual who was supplied with the "Richard Martin" email;

---

[1] Given the urgent nature of this request and the need for NIC Counsel to travel from out-of-state, NIC hereby requests a telephonic hearing if the Court so pleases.

2. An Order prohibiting NTG and its agents from disseminating any other written or oral communication containing false and defamatory statements that impugn the character of NIC, its attorneys, or its witnesses or that is otherwise designed to obstruct justice or intimidate parties adverse to NTG, the attorneys who represent those parties, or the witnesses who testify in legal proceedings before this Court;

3. An Order referring a copy of the Court's decision on the motion for a temporary restraining order, and the pleadings reviewed as a basis for that decision, to Bar Counsel at the California State Bar with a recommendation from the Court that the Bar undertake an investigation to determine whether NTG attorneys involved in the drafting and dissemination of the "Richard Martin" email and its contents, including the draft complaint, should be subjected to discipline;

4. An Order permitting NIC leave to amend its operative complaint to include facts and circumstances described herein; and

5. An Order precluding NTG from employing the "Richard Martin" email and its contents, including the draft complaint, as a collateral legal challenge to this Court's authority that vexatiously increases the costs and burdens of this litigation.

The Motion will be (and is) made on the grounds that Plaintiff and its counsel will suffer irreparable injury unless Defendants' activities described herein are enjoined.  Plaintiff requests leave to amend its most recent Complaint (Dkt. 92) to include conduct described in this Motion.  Plaintiff further requests that the Court refer this issue to the State Bar of California for investigation into the ethical violations detailed *infra*.

# **TABLE OF CONTENTS**

I.    FACTS ...................................................................................- 1 -

   A.   Threats of False and Defamatory Statements About NIC, Its Counsel and
        a Material Witness ..............................................................- 1 -

   B.   The Circumstances and Metadata Reveal that the Defamatory Document
        Was Authored By the Newport Trial Group ...............................- 6 -

   C.   NTG Apparently Intends to Defame or Extort NIC's Counsel ................- 8 -

   D.   NTG's Conduct Is Criminal and Should be Included in this Case ..........- 9 -

   E.   NTG's Conduct May Have Violated Ethical Rules ..................- 10 -

II.   LEGAL STANDARD AND ARGUMENT ..........................................- 11 -

   A.   NIC Is Likely to Succeed on the Merits of New RICO Allegations
        Stemming from this New Conduct ..................................- 12 -

   B.   NIC Will Suffer Irreparable Harm Absent an Order from this Court ...- 14 -

   C.   The Balance of Equities Unquestionably Favors NIC.............................- 15 -

   D.   A TRO Furthers the Public Interest...............................................- 15 -

III.  CONCLUSION .....................................................................- 16 -

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127 (9th Cir.2011) ..... - 17 -

*Amoco Prod. Co. v. Vill. Of Gambell, Alaska*, 480 U.S. 531 (1987) ............ - 20 -

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ....................... - 18 -

*Confederated Tribes and Bands of Yakama Nation v. U.S. Fish and Wildlife Serv.*, 19 F. Supp. 3d 1114 (E.D. Wash. 2014) ............................... - 17 -

*Design Furnishings, Inc. v. Zen Path, LLC*, 2010 WL 4321568 (E.D. Cal. Oct. 21, 2010) ...................................................................... - 19 -

*Essex Ins. Co. v. Five Star Dye House, Inc.*, 137 P.3d 192 (Cal. 2006) ....... - 18 -

*Frontline Medical Assoc., Inc. v. Coventy Healthcare Workers Compensation, Inc.*, 620 F.2d 1109 (C.D. Cal. 2009) ................................... - 17 -

*Irwin v. United States*, 338 F.2d 770 (9th Cir. 1964) ................................... - 18 -

*Michaels v. Internet Entm't Grp., Inc.*, 5 F. Supp. 2d 823 (C.D. Cal. 1988) ........................................................................................ - 19 -

*Middlesex Cnty. Ethic Committee v. Garden State Bar Ass'n*, 457 U.S. 423 (1982) ......................................................................................... - 21 -

*Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037 (N.D. Cal. 2004) .................................................................................... - 19 -

*Rent-A-Center, Inc. v. Canyon Tevelision & Applicance Rental, Inc.*, 944 F.2d 597 (9th Cir. 1991) ..................................................................... - 19 -

*Stuhlbarg Int'l Sales Co. v. Jone D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) ................................................................................................ - 19 -

*United States v. Garlick*, 240 F.3d 789 (9th Cir. 2001) ............................... - 18 -

*United States v. Manibusan*, 117 F. App'x 531 (9th Cir. 2004) ................... - 18 -

**Statutes**

18 U.S.C. § 1343 ......................................................................................... - 17 -

18 U.S.C. § 1349 ......................................................................................... - 17 -

18 U.S.C. § 1503 ............................................................................ - 17 -

18 U.S.C. § 1512(c) ........................................................................ - 17 -

**Rules**

Cal. Rules of Prof. Conduct Rule 1-120.......................................... - 16 -

Cal. Rules of Prof. Conduct Rule 5-100.......................................... - 15 -

Cal. Rules of Prof. Conduct Rule 5-200.......................................... - 16 -

## <u>MEMORDANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION</u>

## I.   <u>FACTS</u>

### A. Threats of False and Defamatory Statements About NIC, Its Counsel and a Material Witness

On May 11, 2016 at 2:42 PM Pacific, four attorneys at Emord & Associates, P.C. (counsel to Plaintiff NIC in the above-captioned case) received an anonymous email from a "gmail" account purporting to be from a "Richard Martin" with the address:  rzmlegal@gmail.com.  *See* Exh. A.  Containing a threat of suit against NIC, the attorneys representing NIC, and a material witness for NIC in this case, the emailed content was an unlawful attempt to obstruct justice through intimidation of NIC, its counsel of record, and one of its material witnesses, as explained below.

The email address for "Richard Martin" is not registered with the PACER system or linked with any individual within the California legal profession.  The suspicious email contained no signature lines or contact information.  The address is not registered with the State Bar.  Emord & Associates, its attorneys, and Plaintiff NIC have never before received correspondence from a "Richard Martin" with that email address.  An examination of the document attached to that email reveals it to have been produced at the Newport Trial Group (NTG).  *See* Declaration of Peter A. Arhangelsky ("PAA Decl.") at ¶¶ 10-13.  The threatening document contained non-public information specific to the above-captioned litigation that could only have come from attorneys involved in NTG's defense.  The "Richard Martin" email and content therein, including the draft complaint, are thus an unlawful attempt to interfere with the administration of justice in this case by an attempted fraud, intimidation of counsel for NIC, or outright blackmail.  The email stated that:

1    "Scott Farrell (sic) is shopping this complaint and two others to
2    lawyers all over California."

3  Exh. A.

4        The email attached a PDF "Complaint" purporting to seek relief against NIC

5  and its attorneys for malicious prosecution and RICO counts based on the content

6  of the present litigation before this Court.  Scott Ferrell is Newport Trial Group's

7  founder and a partner at the firm.  He is also a defendant in this case accused of

8  fabricating lawsuits.  Ferrell's draft complaint purports to seek recovery for RICO

9  claims on behalf of "Isabella Janovick," an individual who is within the NTG

10 RICO enterprise, who had filed false claims in prior NTG cases, and who is likely

11 still a potential defendant in this case after discovery (e.g., one of the DOE

12 defendants named in NIC's RICO complaint still pending).

13       Ferrell's draft "complaint" endeavors to retaliate against NIC and its counsel

14 by threatening to intimidate, and impugn the reputations of, NIC, its counsel and a

15 material NIC witness, Private Investigator Clark Baker, through false statements

16 that are defamatory *per se*.

17       The draft "complaint" includes the following patently false representations

18 about NIC's counsel and agents:

19

20    1.  That Mr. Arhangelsky (NIC counsel in this case) has: ████████████

21 ████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████    " *See* Exh. B at 2 ¶ 5.

24 In fact, ██████████████████████████████████████████████

25 ██████████████ ; indeed, Mr. Arhangelsky does not solicit any specific

26 individual or company for legal work, as that is against Emord & Associates'

27 policies and the rules of legal ethics.  Moreover, Mr. Arhangelsky ████████████

28 ████████████████████████████████████████████████████████

---

NOTICE OF MOTION AND MOTION FOR TRO AND/OR PRELIMINARY INJUNCTION
- 2 -

██  The statements in the NTG document are baseless and communicated with malice, designed to impugn Mr. Arhangelsky's reputation in the legal community and dissuade him from pursuing the present legal action.  Mr. Ferrell has no legitimate basis to make those allegations ████████████████████ ██████████████████████████████████ ████████████████████.[2]  Mr. Ferrell designed his baseless character allegations—irrelevant to any legal issues in controversy—with an apparent intent to intimidate NIC's counsel, attempting to engender fear that the false yet scandalous charges would circulate among the bar and the public.

    2.  That Mr. Awerbuch (another counsel to NIC in this case) has: ████████████████████████████████████ ██████████████████████████  *See* Exh. B at 2 ¶ 6.

In fact, █████████████████████████████████ ████████████████  Mr. Awerbuch is one of the authors of the article and drafted a few of the subject article's paragraphs, which he contributed while a 1L law student. ████████████████████.  The statement in the NTG document is baseless and communicated with malice, designed to impugn Mr. Awerbuch's reputation in the legal community and dissuade him from pursuing the present legal action. ████████████████████ ████████████████████████████████  Mr. Ferrell designed the baseless character allegations against Mr. Awerbuch—which were irrelevant to any legal issues in controversy—with apparent intent to shock the conscience and intimidate NIC's counsel by threatening to expose harmful and damaging false information in public forums.

---

[2] ████████████████████████████████████ ███████████████████████████████

3.  That Mr. Furman (another counsel to NIC):  "represents a company named Lunada Biomedical, which previously filed a frivolous lawsuit against Newport Trial Group and was ordered to pay over $150,000.00 in attorneys' fees as a result."  *See* Exh. B at 3 ¶ 7

In fact, none of Emord & Associates' attorneys represented Lunada Biomedical in the cited action, decided before Mr. Furman was even employed by Emord as an attorney.  Not counsel to Lunada in the prior action (which was decided on appeal in October 2014),[3] Emord & Associates was hired in December 2014 to represent Lunada Biomedical in an entirely unrelated matter, as defense counsel in a matter brought by the Federal Trade Commission against Lunada. Lunada was represented by The Hicks Law Group (James B. Hicks) in the action cited by NTG.  The statement in the NTG document is thus baseless, but offered to further the false charge that Emord & Associates has filed frivolous claims.

4.  That Clark Baker (NIC's hired private investigator) ███████████████████████████ *See* Exh. B at 2 ¶ 8.

In fact, Baker, a private investigator who is a material witness for NIC in this case, ████████████████████████.  He and his attorneys did lose an anti-SLAPP motion in unrelated litigation, ██████████████████████ ████████████.  The statement in the NTG document is baseless, designed to impugn Mr. Baker's reputation in the legal community, and dissuade him from serving as a witness in this case.

5.  That NIC hired Clark Baker to fabricate claims against the Newport Trial Group and various plaintiffs through illegal means and for an improper purpose.  Exh. B at ¶¶ 38, 46-54.

---

[3] *Lunada Biomedical v. Nunez*, 230 Cal. App. 4th 459 (Oct. 9, 2014).

The charge of claim fabrication is baseless.  In fact, NIC paid a substantial portion of Baker's total receipts in exchange for his investigative services in the underlying *Nilon v. NIC* action.  Those services were necessitated by NTG's bad faith discovery tactics, including its refusal to disclose any information about the lead plaintiff (including name and address), such that Baker and NIC were required to perform exhaustive searches to determine if that plaintiff was legitimate (or even existed).  The remaining payments from NIC to Baker were in return for his good faith investigation into the suspicious litigation activity of NTG and in response to Nilon's voluntary phone call to Baker's web-host.  Baker never requested that any individual provide false testimony and only sought to obtain statements consistent with the truth.

The remainder of Ferrell's attack document purports to encourage the filing of a collateral legal challenge, outside the context of this litigation, against NIC, its attorneys, and agents ostensibly for bringing the instant lawsuit against the Newport Trial Group in the above-captioned case.  The document is a transparently retaliatory.

The document misstates procedure and facts related to this case, and ignores critical issues still pending before this Court.  For instance, Ferrell's "complaint" assumes that NIC abandoned its claims against Isabella Janovick because they lacked merit.  Not so.  Janovick was a significant part of the NTG RICO enterprise.  She served as an unlawful "tester" plaintiff for NTG in their fraudulent lawsuits against certain charities.  The circumstances of her charitable case were highly suspicious.  She had donated a standardized amount of money to a charity clearly on NTG's list of targets in an attempt to serve as an apparent tester plaintiff for NTG, she had donated within days of so-called NTG "plaintiffs" who also made standardized donations, and she filed suit within a relatively short window before filing suit.  NTG has admitted to using so-called "tester" plaintiffs in similar contexts (the use of whom is unlawful).  She filed during a time when NTG

repeatedly used other sham plaintiffs.  In short, she matched the description of NTG's sham plaintiffs.

NIC nonetheless reduced the scope of its RICO case in the Amended Complaint (Dkt. 92) solely to maintain a manageable approach to RICO litigation based on cases that were more representative of NIC's larger fraudulent scheme. Put simply, NIC's decision to remove Janovick and other defendants in no way reflected on their innocence, and they remain potential defendants in this case, depending on facts adduced in discovery.  *See* Dkt. 90 (Rule 26(f) Statement) (explaining that "NIC submits that the decision to narrow its RICO allegations will facilitate a more efficient discovery period").  NIC sent an email to NTG counsel on April 29 at 1:38 PM explaining that point, to which NIC received no response or objection:

> NIC intends to reduce the number of defendants in the Second Amended Complaint.  In an effort to narrow the scope of its RICO case, NIC has determined that Defendants Janovick, Urzua, and Patterson need not be included at this time.  NIC submits that the Order dismissing with leave was sufficient to dismiss those individuals from the matter, but to the extent those parties believe a stipulation or other filing is necessary, we can discuss before our May 10 deadline to amend.  NIC's decision to limit defendants is solely to focus the RICO claims at the pleadings stage, and has no bearing on whether all prior defendants were participants in a RICO enterprise.  We will reserve our right to amend the complaint as discovery unfolds.

**B. The Circumstances and Metadata Reveal that the Defamatory Document Was Authored by the Newport Trial Group**

The "Richard Martin" email sent to Emord & Associates explained that "Scott Farrell (sic) is shopping this complaint," indicating that the document originates with Scott Ferrell of NTG.  Ferrell's draft complaint references specific information from the above-captioned case provided to NTG that was not public

information, and was not filed to the docket.  For instance, his draft Complaint references emailed letters between counsel on December 11 and 15 that were not publicly filed in the matter.  Exh. B at 4 ¶¶ 19-21.  His complaint appears to have notes (citation blanks) seeking to have counsel insert information as needed wherever Mr. Ferrell had likely yet come into possession of the necessary information.[4]  The document includes false representations of fact concerning Mr. Baker's investigation of this instant matter and in other NTG cases.

Significantly, NTG prepared the pleading using a "Pleading Template" document in Microsoft Word2010 that it has used in numerous pleadings.  In its effort to disguise dissemination of the document as coming from the fictive "Richard Martin," NTG forgot to scrub metadata from its PDF-converted files, thus leaving the true "author" heading in place—the *exact same* template and metadata NTG has imprinted in its PDF filings in other cases.[5]  The author of the PDF is listed as:  "Call, Jensen & Ferrell," which was the name of Scott Ferrell's prior law firm.  The subject line in the document remains "KIC01-01," which is the *identical* subject used across most of NTG's prior pleadings in this instant and in other NTG cases.[6]

---

[4] Some of that information includes Janovick's lost attorney fees.  On information and belief, Janovick never incurred fees because Newport Trial Group selected and paid her counsel (Janovick's counsel was appointed by Ferrell long before Janovick became aware of the NIC lawsuit).  In defendants' Rule 26(f) report, they argued aggressively against NIC's request for retainer agreements and payment information (including Joint Defense Agreements) among the defendants that would evidence whether NTG paid Janovick's fees.  This Court should now compel production of that information, particularly if it might be necessary for NIC's defense of the threatened, collateral action.

[5] NIC has employed a computer forensics specialist whose investigation into the source of the email and document is ongoing.  At this time, that specialist has determined that the document was almost certainly authored by someone at the Newport Trial Group and that the email originated from California.  More information is forthcoming but is unavailable at this time.

[6] The redundancy is likely caused by NTG's use of one "pleading template" in Word2010 when preparing multiple files derived from that template.

The document was "created" (i.e., converted from Word to PDF) on May 11, 2016 at 10:14 AM, and then sent to NIC counsel about four hours later at 2:42 PM. Given the short timespan in between creation and dispatch, Ferrell seemingly sent the document directly to NIC through a pseudonym email account, or had an agent convey the document later that day.

The "Richard Martin" email account is a fictive name or account that is untethered to any legitimate commercial use or individual. The address (rzmlegal@gmail.com) was designed to appear as a legitimate individual in the "legal" sector, thus lending apparent legitimacy to the threat presented. After having sent the threat, the sender did not respond (or even open) reply email transmissions. The email contained no signature or identifying information. No individual by the name of Richard Martin or Richard Z. Martin is connected with the email account. The sender apparently took measures to conceal certain "header" coding within the email transmission to limit traceability.

## C. NTG Apparently Intends to Defame or Extort NIC's Counsel

This Court can infer NTG's purpose behind a document sent to NIC counsel which threatens the public filing of false and defamatory content against NIC, its counsel, and a material NIC witness, Private Investigator Clark Baker.

The allegations of ███████████████████ were transparently designed to intimidate NIC counsel, within 72 hours of this Court's May 9th hearing at which his Honor established a litigation calendar. Mr. Ferrell acted with malice, choosing falsehoods designed to impugn the character of NIC's attorneys to practice law and thereby intimidate them. The "Richard Martin" email explains that the document is being "shopped around" the California Bar in search of an attorney who would file the action, thus conveying to NIC, its counsel, and one of its material witnesses that the damage to reputation is occurring at present and may lead to the filing of the complaint and the corresponding need to defend against the

false charges.  Ironically the attempt to intimidate NIC, its counsel, and its material witness is precisely of the kind alleged by NIC against NTG in the action before this Court (wherein NTG filed false charges against corporate defendants in an unlawful attempt to extort settlement proceeds from them).

Mr. Ferrell has been accused of similar forms of misconduct to that present here.  *See Doe v. L.A. W. Travelodge, et al.*, No. 2:08-cv-08279-CBM, Dkt. 165 p. 9:22 – 11:7 (ordering Ferrell to take 20 hours of CLE's in civility and professionalism for his unprofessional behavior towards opposing counsel); *Bowe v. Public Storage*, No. 1:14-cv-21559-UU, Dkts. 100, 115, 131, 224 (S.D. Fla. April 30, 2014) (Ferrell, accused of undertaking conflicting representation, witness tampering, bribery and violating his duty of candor, withdraws as counsel prior to a hearing on the plaintiff's Motion to Disqualify); *Nilon v. NIC*, No. 3:12-cv-00930-LAB, Dkts. 55, 117 (S. D. Cal. 2012) (The court sanctioned Ferrell and found his role in discovery misconduct "deeply troubl[ing]" and later found that his conduct fell well short of Rule 11's mandate); Dkt. 30-10 (Transcript of Sanctions Hearing in *Morales v. Magna*) (The court found that Scott Ferrell made misleading and incorrect statements, describing his conduct as "troubl[ing]").  This Court should not allow repetition of this misconduct to continue or go without sanction.[7]

### D. NTG's Conduct Is Criminal and Should Be Included in this Case

NIC requests leave to amend its complaint once again to include the additional RICO predicates evinced by the "Richard Martin" email and its

---

[7] NIC must separately move this court for relief related to at least one other intentional falsehood submitted to this Court through an NTG-sponsored affidavit earlier in this case.  NIC has direct evidence that an NTG attorney submitted an affidavit that clearly contradicted one of his prior affidavits filed in another case. The affidavit here in this case was proffered by NTG to avoid liability during dispositive motions.  Per applicable rules, NIC is permitted to file that motion on or after Monday, May 13, 2016.

contents, including the draft Complaint (which reveal further evidence of obstruction of justice and wire fraud).

As discussed below, NIC would have a strong likelihood of success on the merits of those predicate acts.  It therefore requests, inter alia, that this Court issue a temporary or preliminary injunction barring NTG and its attorneys from disseminating demonstrably false information about NIC, NIC's attorneys, and NIC's witnesses to the California legal community.

## E. NTG's Conduct May Have Violated Ethical Rules

Cal. Rules of Prof. Conduct Rule 5-100 prohibits a licensed attorney from threatening "to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute."  That rule defines "administrative charges" as the "filing of a complaint with a federal, state, or local governmental entity which may order or recommend the loss or suspension of a license, or may impose or recommend the imposition of a fine, pecuniary sanction, or other sanction of a quasi-criminal nature…"  The rule contemplates that it shall be "applicable prior to the formal filing of a civil action."

When NTG dispatched its threatening email "shopping" a defamatory complaint, it violated Rule 5-100 because the false allegations in that document were designed to intimidate NIC and diminish the ability or willingness of NIC's counsel to represent NIC in this case and a material witness to testify.  Indeed, one of the false allegations in that document concerned NIC counsel's alleged failure to report information to the State Bar.  That statement, alone, implicates potential unethical conduct because (1) the charge is substantively baseless and (2) neither Ferrell nor NTG could have access to confidential information sent to the California State Bar by NIC counsel during the bar admission application process.

Rule 5-200(A) requires that counsel advance claims before any tribunal "only as are consistent with the truth."  Rule 1-120 precludes a member of the bar

from "knowingly assist[ing] in, solicit[ing], or induc[ing] any violation of these rules or the State Bar Act."  If Mr. Ferrell was "shopping" the complaint that contained materially injurious and defamatory falsehoods about NIC counsel, then he was concurrently soliciting, inducing, or assisting in the apparent violation of Rule 5-200.

Further discovery in this matter will yield evidence concerning the scope and breadth of NTG's use of the "Richard Martin" email.  At present, however, there is an immediate need for the Court to issue a temporary restraining order barring NTG from disseminating the "Richard Martin" email and its content, including the draft Complaint, and from disseminating any other information which threatens or coerces and impugns the reputation of NIC, its counsel, and its witnesses.  That type of information (███████████████████████████████████ ████████████████████████████████ is materially harmful to counsels' reputations in the legal community.

Given the ethical violations associated with Mr. Ferrell's conduct, NIC requests that the Court refer this issue to the State Bar of California for further investigation and disciplinary action.  Such a sanction is appropriate given the unethical conduct at issue.

## II.    LEGAL STANDARD AND ARGUMENT

The proponent of a temporary restraining order must "establish (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest." *Frontline Medical Assoc., Inc. v. Coventy Healthcare Workers Compensation, Inc.*, 620 F.2d 1109, 1110 (C.D. Cal. 2009).  "The Ninth Circuit uses a 'sliding scale' under which the temporary restraining order may be issued if there are serious questions going to the merits and the balance of hardships tips sharply in the

plaintiff's favor, along with satisfaction of the two other [] factors." *Confederated Tribes and Bands of Yakama Nation v. U.S. Fish and Wildlife Serv.*, 19 F. Supp. 3d 1114, 1119 (E.D. Wash. 2014) (citing *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir.2011) ("For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits.").

## A. NIC Is Likely to Succeed on the Merits of New RICO Allegations Stemming from this New Conduct

The conduct of Defendants in this instance constitute additional predicate acts of Obstruction of Justice (18 U.S.C. §§ 1503, 1512(c)) and Wire Fraud (18 U.S.C. §§ 1343, 1349).  NIC seeks leave to add these predicate acts to the present cause of action as they represent the continuing activity of the RICO enterprise which illegally abuses the legal system for its own benefit and profit.  The evidence supporting these additional predicate acts is overwhelming, even at this early stage and thus, NIC is likely to prove that the conduct described herein constitutes the predicate acts of obstruction and wire fraud.

*Obstruction of Justice*

Obstruction of justice occurs when one "corruptly or by threats of force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct or impede the due administration of justice." *See* 18 U.S.C. § 1503; *see also* 18 U.S.C. § 1512(c) (relating to obstruction by one who corruptly alters or conceals evidence in any official proceeding or "otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so."). The elements of obstruction of justice are met here whether Scott Ferrell, or his agent, sent the communication to NIC's counsel or a "good Samaritan" sent the communication warning NIC counsel of Ferrell's unlawful correspondence with others.

1

_Wire Fraud_

2

One commits wire fraud through the "use of the interstate wires" for the

3

purpose of executing or furthering a "scheme or artifice to defraud." *United States*

4

*v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001). A "scheme or artifice to defraud" is

5

a plan to "deprive another of honest services." *United States v. Manibusan*, 117 F.

6

App'x 531, 532 (9th Cir. 2004). "[A]ny mailing [or use of the wires] that is

7

incident to an essential part of the scheme satisfies the mailing [or use of the wires]

8

element, even if the mailing [or use of the wires] itself contain[s] no false

9

information." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008).

10

"One who acts with reckless indifference as to whether a representation is true or

11

false is chargeable as if he had knowledge of its falsity." *Irwin v. United States*,

12

338 F.2d 770, 774 (9th Cir. 1964). No showing of reliance is required to establish

13

that a person has violated 18 U.S.C. § 1962(c) through mail or wire fraud. *Phoenix*

14

*Bond*, 553 U.S. at 649.

15

Whether the email was sent by Scott Ferrell, NTG or an agent of same, or by

16

a "good Samaritan," the requisite elements of Wire Fraud can be established here.

17

First, Scott Ferrell has developed a scheme or artifice to defraud NIC. Ferrell's

18

intent is clear, he seeks to scare NIC out of this lawsuit through intimidation,

19

threats of defamation, and reputational injury predicated on false statements of

20

fact. NIC has a property interest in the potential recovery from this lawsuit and

21

Ferrell seeks to harm that interest. *Essex Ins. Co. v. Five Star Dye House, Inc.*, 137

22

P.3d 192, 195-96 (Cal. 2006) (A cause of action is an "intangible form[] of

23

property"). Second, the scheme involves the use of misrepresentation. The

24

document contains outright false statements of fact. Furthermore, if Ferrell did

25

send the document to NIC's counsel, then he sought to misrepresent his identity in

26

furtherance of the scheme to defraud. Third, fraudulent intent is clear because he

27

has made misrepresentations with no viable basis in fact, nor could he possess the

28

requisite knowledge to prove their truth, and he therefore acted with *at least*

reckless indifference to the truth or falsity of his statements.  Fourth, the interstate wires were used by Ferrell, or at his direction, to either send the email to NIC's Counsel or to "attorneys throughout California."  Thus, all the elements of wire fraud can be shown, and NIC's likelihood of success on the merits of its RICO cause of action is high.

### B. NIC Will Suffer Irreparable Harm Absent an Order of this Court

"[I]ntangible injuries that are incapable of measurement, like reputation, advertising efforts, or goodwill, may constitute irreparable harm."  *Design Furnishings, Inc. v. Zen Path, LLC*, 2010 WL 4321568, *4 (E.D. Cal. Oct. 21, 2010) (*citing Rent-A-Center, Inc. v. Canyon Tevelision & Applicance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)).  Those intangible injuries include a person's "property interest in his name and likeness [which] is unique, and cannot be adequately compensated by money damages."  *Michaels v. Internet Entm't Grp., Inc.*, 5 F. Supp. 2d 823, 838 (C.D. Cal. 1988) (collecting cases), or "[d]amage to a businesses' goodwill … because it is difficult to calculate."  *Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004).  "The threatened loss of prospective customers also constitutes irreparable harm."  *Design Furnishings,* 2010 WL 5418893 at *6 (*citing Stuhlbarg Int'l Sales Co. v. Jone D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)).

NIC, its counsel, and Clark Baker will all suffer injury to their reputation, goodwill, and may lose prospective customers as a result of the conduct at issue here.  The representations made in the document at issue attack directly █████.  Those allegations are totally false and extremely damaging to NIC's counsels' reputations and business.  *See* Cal. Civ.

Code § 45 (defining libel *per se* as any false written statement that "exposes any person to hatred, ridicule, or obloquy, or … has a tendency to injury him in his occupation"); *Burrill v. Nair*, 158 Cal. Rptr. 3d 332, 383 (Cal. Ct. App. 2013) (" █████████████████████████████████████████████████ █████████████████████████████████████████████████ ████████████████████████████"); *Ray v. Citizen-News Co.*, 57 P.2d 527, 529 (Cal. Dist. Ct. App. 1936) ███████████████████████████ ████████████████████████).

## C. The Balance of Equities Unquestionably Favors NIC

In determining whether to grant a preliminary injunction, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. Of Gambell, Alaska*, 480 U.S. 531, 542 (1987). There is no valid interest in the conduct at issue here. Mr. Ferrell and the Newport Trial Group have violated ethical rules, have sought to intimidate a party opponent through conduct outside of the present litigation, and have revealed an intent to solicit the filing of a suit outside of this court that calls into question issues before the Court. Such activity must be enjoined where it causes injury and prejudice, as it clearly does here. NIC, its counsel and Baker are at risk of serious reputational and professional injury from the assertion of baseless and defamatory allegations contained in the retaliatory complaint being "shopped" by Scott Ferrell. The risk of reputational harm to NIC's attorneys is significant and irreparable, which tilts the analysis sharply in NIC's favor here.

## D. A TRO Furthers the Public Interest

"The judiciary as well as the public is dependent upon professionally ethical conduct of attorneys and thus has a significant interest in assuring and maintaining

high standards of conduct of attorneys engaged in practice." *Middlesex Cnty. Ethic Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 434 (1982).  Preventing the continued violation of ethical rules by Scott Ferrell and the Newport Trial Group furthers the public interest by maintaining the standards of attorney conduct.  The acts described herein constitute gross violations of ethical and professionalism standards and must be enjoined for the public good.

### III.   <u>CONCLUSION</u>

The continued dissemination of the "Richard Martin" email and draft complaint by NTG, Ferrell and their agents will cause immediate and irreparable harm to NIC, its Counsel and Mr. Baker.  To redress that pressing grievance, NIC requests that the Court issue an immediate order that: (1) prohibits NTG and its agents from further disseminating the "Richard Martin" email and its contents, including the draft Complaint; (2) requires NTG to disclose every individual who has received the draft complaint or any other similar complaint and to supply each with a copy of the Court's order ruling on this motion; (3) prohibits NTG or its agents from continuing to publish defamatory statements that impugn the character of NIC, its attorneys, or its witnesses; (4) refers this Court's order on the motion and the pleadings upon which it is based to the State Bar of California with a recommendation that the Bar investigate potential ethical violations; (5) grant NIC leave to amend the complaint to include additional predicate acts related to the draft complaint and its dissemination; and (6) prohibit NTG from employing the draft complaint as a collateral challenge to the NIC suit before this Court.

DATED:  May 12, 2016

Respectfully submitted,

NATURAL-IMMUNOGENICS CORP.

By:    /s/ Peter A. Arhangelsky
Peter A. Arhangelsky, Esq. (SBN 291325)
E-mail: parhangelsky@emord.com
Emord & Associates, P.C.
3210 S. Gilbert Road, Suite 4
Chandler, AZ 85286
Phone: (602) 388-8899
Fax: (602) 393-4361

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NATURAL-IMMUNOGENICS CORP., | Case No. 8:15-cv-02034-JVS (JCG) |
| Plaintiff, | **[PROPOSED] TEMPORARY RESTRAINING ORDER** |
| v. | Judge:           Hon. James V. Selna |
| NEWPORT TRIAL GROUP, et al., | |
| Defendants. | Complaint Filed:  December 7, 2015 |
| | Trial Date:         December 5, 2017 |

[PROPOSED] TEMPORARY RESTRAINING ORDER

Plaintiff Natural-Immunogenics ("NIC") moves for the issuance of a Temporary Restraining Order enjoining Defendants Newport Trial Group, Scott Ferrell, Ryan Ferrell, David Reid, and Victoria Knowles ("Defendants") from disseminating defamatory statements and allegations related to NIC, its counsel, and its investigator, Clark Baker, including the "draft complaint" created by the Newport Trial Group that accompanied the "Richard Martin" email.  NIC also requested additional relief.  After considering Plaintiff NIC's Application for a Temporary Restraining Order and the supporting papers for same, the Court finds that unless the Court issues a temporary restraining order, Plaintiff NIC, NIC's counsel and NIC's investigator Clark Baker will suffer irreparable injury before the matter can be heard on formal notice.

**IT IS HEREBY ORDERED THAT**:

1. Defendants are enjoined from distributing, publishing, communicating or otherwise sharing any of the false and defamatory statements made regarding NIC's counsel, or NIC's witness Clark Baker, specifically the "Richard Martin" email and its contents, including the draft Complaint;

2. Defendants must identify to the Court each person who received a copy of the "Richard Martin" email and its content, including the draft Complaint and supply a copy of the Court's decision on NIC's motion to each person who received same;

3. The Court refers its Decision on this matter together with the pleadings associated with this dispute to the California State Bar with a recommendation that the Bar undertake an investigation to determine if the rules governing the practice of law in California have been violated;

[PROPOSED] TEMPORARY RESTRAINING ORDER

4.  The Court grants NIC leave to amend its complaint to add additional allegations and claims associated with the conduct at issue in this briefing;

5.  The Court prohibits the Defendants from using the "Richard Martin" email or its contents and attachments as a collateral challenge to this Court's authority.

So ordered this ___ day of May, 2016.

_____

James V. Selna

UNITED STATE DISTRICT JUDGE

[PROPOSED] TEMPORARY RESTRAINING ORDER

1
2
3
4
5
6
7
8
9
10
11

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

12
13

| | |
|---|---|
| NATURAL-IMMUNOGENICS CORP., | Case No. 8:15-cv-02034-JVS (JCG) |
| Plaintiff, | **[PROPOSED] ORDER TO SHOW CAUSE** |
| v. | Judge:          Hon. James V. Selna |
| NEWPORT TRIAL GROUP, et al., | |
| Defendants. | Complaint Filed:  December 7, 2015 |
| | Trial Date:         December 5, 2017 |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[PROPOSED] ORDER

After considering Plaintiff Natural-Immunogenics Corporation's Application for a Temporary Restraining Order and the supporting papers for same, the Court finds that this is a proper case for issuance of an order to show cause.

**IT IS HEREBY ORDERED** that Defendants Newport Trial Group, Scott Ferrell, Ryan Ferrell, Victoria Knowles, and David Reid ("Defendants") appear before this court at _____, on _____, 2016 in Courtroom 10C of the United States District Court, Central District of California, located at 411 West Fourth Street, Room 1053, Santa Ana, CA 92701-4516 to show cause why a preliminary injunction should not issue enjoining Defendants from engaging in the following acts or commanding the performance of the following acts marked with an "x" :

- o   Defendants are enjoined from distributing, publishing, communicating or otherwise sharing any of the false and defamatory statements made regarding NIC's counsel, or NIC's witness Clark Baker, specifically the "Richard Martin" email and its contents, including the information contained in paragraphs 5, 6 and 8 of the "draft complaint."

- o   Defendants must no later than twenty-four hours after issuance of this Order supply each person who received a copy of the "Richard Martin" email and its contents, including the draft complaint, a copy of the Court's Order;

- o   Referral of the pleadings associated with this dispute and this Court's decision regarding same to the California State Bar with a recommendation that the Bar undertake an investigation to determine if rules governing the practice of law have been violated;

- o   Granting NIC leave to amend its complaint to add additional allegations and claims associated with the conduct at issue; and,

- o   Prohibiting Defendants from employing the "Richard Martin" email or its contents and attachments as a collateral challenge to this Court's

[PROPOSED] ORDER

authority over the underlying case.

So ordered this ___ day of March, 2016.


_____

James V. Selna

UNITED STATE DISTRICT JUDGE

[PROPOSED] ORDER

Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Joshua S. Furmna, Esq. (pro hac vice)
jfurman@emord.com
Eric J. Awerbuch, Esq. (pro hac vice)
eawerbuch@emord.com
EMORD & ASSOCIATES, P.C.
3210 S. Gilbert Road, Suite 4
Chandler, AZ 85286
Phone: (602) 388-8899
Fax: (602) 393-4361
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL-IMMUNOGENICS CORP.,<br><br>                          Plaintiff,<br>   v.<br><br>NEWPORT TRIAL GROUP, *et al.*,<br><br>                          Defendants. | Case No. 8:15-cv-02034-JVS (JCG)<br><br>**DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Hearing Date:<br>Time:<br>Judge:  Hon. James V. Selna |

## DECLARATION OF PETER A. ARHANGELSKY

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

1.      I, Peter A. Arhangelsky, am over the age of 18 and competent to testify to the information below.

2.      I am an attorney with the law firm Emord & Associates, P.C.  I am counsel of record representing Natural-Immunogenics Corp. ("NIC") against Newport Trial Group ("NTG") in the above captioned matter.

3.      I make this declaration in support of Plaintiff's Motion for a Temporary Restraining Order.  I have personal knowledge of the following:

4.      On May 11, 2016 at 2:42 PM Pacific, I received an email from the email address:  rzmlegal@gmail.com.  The "sender" was listed as "Richard Martin."  The sender directed the email to Emord & Associates, P.C. attorneys Jonathan W. Emord, Peter A. Arhangelsky, Eric J. Awerbuch, and Joshua S. Furman.

5.      Emord & Associates has never received a prior message, phone call, email, or correspondence from someone purporting to be "Richard Martin" and having this same email address.

6.      Upon further investigation, we determined that "Richard Martin" and the email address rzmlegal@gmail.com are associated with a fictitious or dummy account not linked to any commercial entity or individual through internet research.  The email address has never appeared within court dockets or on social media.

7.      A true and correct copy of the email is attached hereto as **Exhibit A**.

8.      The "Richard Martin" email included a PDF attachment which is a draft legal complaint.  A true and correct copy of that attachment is attached hereto as **Exhibit B**.

9.      The email stated that the complaint would be sent to "lawyers all over California," thus threatening dissemination of the accusations contained in the complaint to many, if not all, members of the California bar.

10.      The document timestamp referenced a "Creation" date of May 11, 2016 at 10:14 AM.  A true, correct, and unaltered image of the PDF "metadata" or "properties" from the email attachment appears below.  That content is viewable by selecting "Properties" within the Adobe Acrobat Pro software under the "File" menu.  The

Declaration of Peter A. Arhangelsky
2

foregoing metadata comes directly from the source PDF file attached to the "Richard Martin" email (e.g., Janovick v NICEMordBaker.pdf), and is available through the "advanced metadata" display, which reveals the following information:



11.     Scott and Ryan Ferrell previously worked for "Call, Jensen, and Ferrell" before departing to create their own law firm, the Newport Trial Group (NTG), in or about 2010.  The metadata tags are identical to other pleadings filed by NTG in more

Declaration of Peter A. Arhangelsky
3

1    recent cases.  For example (and as just one of many examples), NTG filed a declaration

2    in support of pleadings in the matter of *Andrew Nilon v. Natural-Immunogenics*, No. 12-

3    cv-930 (S.D. Cal.), Dkt. No. 51-3 (Declaration of G. Sandoval).  The metadata

4    associated with that filing (below) is *identical* to the above metadata entries, thus

5    providing prima facie proof that the documents were authored by the same computer(s)

6    and individual(s) within NTG:

7

8    

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Peter A. Arhangelsky

4

Redacted Version of Document Proposed to Be Filed Under Seal

12.     The Ferrells (or NTG) neglected to scrub or update metadata when using their PDF conversion software over time.

13.     The Complaint contained certain information that could only have come from the NTG or counsel involved in this mater, *NIC v. NTG*, No. 16-cv-2034 (C.D. Cal.) because that information is nowhere else available.  The complaint includes references to correspondence exchanged between counsel for the parties that is not publicly filed to the docket or otherwise publicly available, including, e.g., correspondence between counsel in early December 2015.  Inclusion of that information indicates that the document was, or was caused to be, prepared and drafted by the NTG firm.

14.     The Complaint includes false representations of fact that impugn my character and fitness to practice law.

15.     ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████

16.     ████████████████████████████████
█████████████████████.

17.     I have been admitted to practice law in Arizona and in California.  I am admitted in good standing.  I have no history or record of discipline of any kind by those licensure bodies.

18.     Neither I nor any other attorney with Emord & Associates, P.C. has ever solicited legal work from any corporation or individual represented by the NTG.  Indeed, as a policy of the firm consistent with the rules of legal ethics, Emord & Associates does not and its individual attorneys do not contact individuals or corporations to request that the firm represent them, i.e., they do not "solicit" legal work.

Declaration of Peter A. Arhangelsky
5

19.     Distributed to the legal community and/or the public, the false allegations of misconduct quoted above from the complaint associate my name with vile conduct that impugns my character and reputation in the legal community and at large.  Any response filed by me, or any subsequent order finding those allegations to be baseless and malicious, may not similarly appear to those receiving the false and defamatory content, ███████████████████████████████████████████ ████████████████████████████████████████████ Accordingly, to help remedy the wrong committed, prompt action is needed to prevent further dissemination of the false statements and to require those who have received it to be notified of the falsity of the charges.

Executed on this 12th day of May, 2016.

/s/ Peter A. Arhangelsky
Peter A. Arhangelsky, Esq.
*Attorney for Plaintiff*

Declaration of Peter A. Arhangelsky
6

Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
EMORD & ASSOCIATES, P.C.
3210 S. Gilbert Road, Suite 4
Chandler, AZ 85286
Phone: (602) 388-8899
Fax: (602) 393-4361
*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NATURAL-IMMUNOGENICS CORP., <br><br> Plaintiff, <br><br> v. <br><br> NEWPORT TRIAL GROUP, *et al.*, <br><br> Defendants. | Case No. 8:15-cv-02034-JVS (JCG) <br><br> **DECLARATION OF ERIC J. AWERBUCH IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION** |

### DECLARATION OF ERIC J. AWERBUCH

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

1.  I, Eric J. Awerbuch, am over the age of 18 and competent to testify to the information below.

2.  I am an associate attorney with the law firm Emord & Associates, P.C., counsel of record representing Natural-Immunogenics Corp. ("NIC") against Newport Trial Group ("NTG") in the above captioned matter.

3.  I make this declaration in support of Plaintiff's Motion for a Temporary Restraining Order and/or Preliminary Injunction.

4.  On May 11, 2016 at 2:42 PM Pacific, I and three other attorneys at Emord & Associates, P.C. received an anonymous email from a "gmail" account purporting to

Declaration of Eric J. Awerbuch

be from a "Richard Martin" with the address: rzmlegal@gmail.com ( "the e-mail").  *See* Exh. 1.

5.      The email stated in entirety that "Scott Farrell (sic) is shopping this complaint and two others to lawyers all over California."  *See* Exh. 1.

6.      The email attached a PDF "Complaint" ("the Complaint) purporting to seek relief on behalf of Isabella Janovick, against Natural Immunogenic, Inc., Emord & Associates, P.C., Jonathan W. Emord, Peter A. Arhangelsky, Eric  J. Awerbuch, Joshua S. Furman, Clark Baker, and Does 1–25 for malicious prosecution and RICO counts based on the content of the present litigation before this Court.  *See* Exh. 2.

7.      The Complaint alleges that I ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████   *See* Exh. 2 at 2 ¶ 6.

8.      In 2011, as a first year law student, I co-authored an article ("the Article") entitled "Beyond the Standard of Care: A New Model to Judge Medical Negligence."  *See* Exh. 3.  I contributed to a few of the Article's paragraphs.

9.      In May, 2012, the Article was published in the peer-reviewed journal Clinical Orthopaedics and Related Research ("CORR").  *See* L.H. Brenner et al., *Beyond the Standard of Care: A New Model to Judge Medical Negligence*, 470(5) Clin. Orthop. Relat. Res. 1357–64 (May, 2012), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3314771/pdf/11999_2012_Article_2280. pdf .

10.     According to the publisher Springer, CORR "is a leading peer-reviewed journal devoted to the dissemination of new and important orthopaedic knowledge," "brings readers the latest clinical and basic research, along with columns, commentaries, and interviews with authors," and is "an international, well-read, and well-cited journal." *See* http://www.springer.com/medicine/orthopedics/journal/11999 (last visited May 12, 2016).

Declaration of Eric J. Awerbuch

Redacted Version of Document Proposed to Be Filed Under Seal

1    11.    

2

3

4

5

6    12.    I had never before received any correspondence from a "Richard Martin" or

7    from the e-mail address "RZMLegal@gmail.com."

8    13.    Attached as **Exhibit A** is a true and correct copy the e-mail I received from

9    "Richard Martin" on May 11, 2016.

10   14.    Attached as **Exhibit B** is a true and correct copy the Complaint which was

11   attached to "Richard Martin's" May 11, 2016 e-mail.

12   15.    Attached as **Exhibit C** is a true and correct copy the Article entitled *Beyond*

13   *the Standard of Care: A New Model to Judge Medical Negligence*.

14

15   Executed on this 12th day of May, 2016.

16

17                  */s/ Eric J. Awerbuch*

18                  Eric J. Awerbuch, Esq.
                    *Attorney for Plaintiff*
19

20

21

22

23

24

25

26

27

28

Declaration of Eric J. Awerbuch

Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Joshua S. Furman, Esq. (pro hac vice)
jfurman@emord.com
Eric J. Awerbuch, Esq. (pro hac vice)
eawerbuch@emord.com
EMORD & ASSOCIATES, P.C.
3210 S. Gilbert Road, Suite 4
Chandler, AZ 85286
Phone: (602) 388-8899
Fax: (602) 393-4361
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL-IMMUNOGENICS CORP.,<br><br>                              Plaintiff,<br>      v.<br><br>NEWPORT TRIAL GROUP, *et al.*,<br><br>                              Defendants. | Case No. 8:15-cv-02034-JVS (JCG)<br><br>**DECLARATION OF JOSHUA S. FURMAN IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Hearing Date:<br>Time:<br>Judge:  Hon. James V. Selna |

## DECLARATION OF JOSHUA S. FURMAN

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

1.    I, Joshua S. Furman, am over the age of 18 and competent to testify to the information below.

2.  I am an attorney with the law firm of Emord & Associates, P.C.  I am counsel of record in the above-captioned case.  I make this declaration based on my own personal knowledge.

3.  Neither I nor Emord & Associates was ever retained by Lunada Biomedical to perform legal work in relation to *Lunada Biomedical v. Nunez*, 230 Cal. App. 4th 459 (Oct. 9, 2014)) (on appeal from Los Angeles County Super. Ct. No. BC476870), Lunada's case against or involving the Newport Trial Group, and neither I nor Emord & Associates performed work for Lunada in that case.

4.  The law firm of Emord & Associates was not retained to perform legal work in relation to Lunada's case against or involving the Newport Trial Group.

5.  In October 2014, when the Lunada *appellate* decision (*Lunada Biomedical v. Nunez*, 230 Cal. App. 4th 459 (Oct. 9, 2014)), was published, I was not yet a licensed attorney.

6.  I have never been found to have filed or sponsored a frivolous legal pleading in any court or tribunal.

Executed on this 12th day of May, 2016.

  */s/ Joshua S. Furman*  
Joshua S. Furman  
*Attorney for Plaintiff NIC*

Declaration of Joshua S. Furman
2

# EXHIBIT A

Exhibit A
Page 1

Redacted Version of Document Proposed to Be Filed Under Seal

**Charles Markle**

| | |
|---|---|
| **From:** | Richard Martin <rzmlegal@gmail.com> |
| **Sent:** | Wednesday, May 11, 2016 2:42 PM |
| **To:** | jemord@emord.com |
| **Cc:** | parhangelsky@emord.com; jfurman@emord.com; eawerbuch@emord.com |
| **Subject:** | lawsuit |
| **Attachments:** | Janovick v NIC,Emord,Baker.pdf |

Scott Farrell is shopping this complaint and two others to lawyers all over California.

Redacted Version of Document Proposed to Be Filed Under Seal

# EXHIBIT B

Exhibit B
Page 3

Redacted Version of Document Proposed to Be Filed Under Seal

Redacted Version of Document Proposed to Be Filed Under Seal

Redacted Version of Document Proposed to Be Filed Under Seal

Redacted Version of Document Proposed to Be Filed Under Seal

Redacted Version of Document Proposed to Be Filed Under Seal



COMPLAINT
Redacted Version of Document Proposed to Be Filed Under Seal

Redacted Version of Document Proposed to Be Filed Under Seal

Redacted Version of Document Proposed to Be Filed Under Seal

Redacted Version of Document Proposed to Be Filed Under Seal



Redacted Version of Document Proposed to Be Filed Under Seal

Redacted Version of Document Proposed to Be Filed Under Seal

Exhibit B
Page 15
Redacted Version of Document Proposed to Be Filed Under Seal

# EXHIBIT C

Exhibit C
Page 16

Redacted Version of Document Proposed to Be Filed Under Seal

Clin Orthop Relat Res (2012) 470:1357–1364
DOI 10.1007/s11999-012-2280-0

**Clinical Orthopaedics and Related Research®**
A Publication of The Association of Bone and Joint Surgeons®

SYMPOSIUM: EVOLVING MEDICOLEGAL CONCEPTS

# Beyond the Standard of Care

## A New Model to Judge Medical Negligence

**Lawrence H. Brenner JD, Alison Tytell Brenner MPH, Eric J. Awerbuch BA, Daniel Horwitz MD**

Published online: 1 March 2012
© The Association of Bone and Joint Surgeons® 2012

**Abstract**

*Background*   The term "standard of care" has been used in law and medicine to determine whether medical care is negligent. However, the precise meaning of this concept is often unclear for both medical and legal professionals.

*Questions/purposes*   Our purposes are to (1) examine the limitations of using standard of care as a measure of negligence, (2) propose the use of the legal concepts of justification and excuse in developing a new model of examining medical conduct, and (3) outline the framework of this model.

*Methods*   We applied the principles of tort liability set forth in the clinical and legal literature to describe the difficulty in applying standard of care in medical negligence cases. Using the concepts of justification and excuse, we propose a judicial model that may promote fair and just jury verdicts in medical negligence cases.

*Results*   Contrary to conventional understanding, medical negligence is not simply nonconformity to norms. Two additional concepts of legal liability, ie, justification and excuse, must also be considered to properly judge medical conduct. Medical conduct is justified when the benefits outweigh the risks; the law sanctions the conduct and encourages future conduct under similar circumstances. Excuse, on the other hand, relieves a doctor of legal liability under specific circumstances even though his/her conduct was not justified.

*Conclusions*   Standard of care is an inaccurate measure of medical negligence because it is premised on the faulty notion of conformity to norms. An alternative judicial model to determine medical negligence would (1) eliminate standard of care in medical malpractice law, (2) reframe the court instruction to jurors, and (3) establish an ongoing consensus committee on orthopaedic principles of negligence.

Each author certifies that he or she, or a member of his or her immediate family, has no commercial associations (eg, consultancies, stock ownership, equity interest, patent/licensing arrangements, etc) that might pose a conflict of interest in connection with the submitted article.

All ICMJE Conflict of Interest Forms for authors and *Clinical Orthopaedics and Related Research* editors and board members are on file with the publication and can be viewed on request.

This work was performed at BalBrenner Law Firm, Oriental, NC, USA.

L. H. Brenner (✉)
Department of Orthopaedics and Rehabilitation,
Yale University, New Haven, CT, USA
e-mail: lbrenner@brennerandbrenner.com;
lb@lawrencebrennerlaw.com

L. H. Brenner
BalBrenner Law Firm, P.O. Box 576, Oriental, NC 28571, USA

A. T. Brenner
Department of Health Services, University of Washington,
Seattle, WA, USA

E. J. Awerbuch
Sandra Day O'Connor College of Law, Arizona State University,
Tempe, AZ, USA

D. Horwitz
Geisinger Clinic Health Systems, Danville, PA, USA

## Introduction

Medical liability lawsuits are civil actions designed to determine whether a doctor was professionally negligent and whether the negligence caused harm to the patient. Litigation determines whether losses suffered by a patient from a poor outcome should be shifted to the doctor in the

Springer

Exhibit C
Page 17

Redacted Version of Document Proposed to Be Filed Under Seal

form of a verdict that compensates the patient. The goal of a medical negligence trial is to reach a fair and just decision on whether a patient's losses from a medical injury should be redistributed to the doctor. To achieve fairness in medical negligence lawsuits, clear and well-defined criteria for determining medically negligent conduct are essential.

The criteria familiar to most orthopaedic surgeons for acceptable professional conduct relates to complying with a standard of care. Yet, as a measure for determining medical negligence, the standard of care may serve as nothing more than a medium for opposing expert witnesses to express their competing medical opinions. Conventionally, the concept of standard of care is often interpreted as a reference to customary norms. Standard of care is based on the following syllogism (defined as a form of deductive reasoning consisting of a major premise, a minor premise, and a conclusion):

> Major premise: I will not be held liable for malpractice if my professional conduct is reasonable, diligent, and prudent.
> Minor premise: The professional conduct of the majority of orthopaedic surgeons is the measure of reasonableness, diligence, and prudence.
> Conclusion: If I conduct myself in the same manner as the majority of orthopaedic surgeons, my professional conduct will be deemed reasonable, diligent, and prudent, and I will not be held liable for malpractice.

The weakness of the syllogism resides in the minor premise. The majority of orthopaedic surgeons in a given locality may or may not treat patients in a reasonable, diligent, and prudent manner. Similarly, surgeons who sometimes deviate from customary norms may not necessarily be unreasonable or careless. In fact, medical progress has often come from the practices of nonconforming doctors whose innovations derived from alternative ideas about the norms of medical practice.

The purposes of this article are to (1) examine the inherent limitations of using standard of care as a measure of negligence, (2) introduce the legal concepts of justification and excuse in judging medical conduct, and (3) propose specific elements of a new model by which the law could more accurately judge medical conduct and achieve fair, just, and accommodating outcomes.

## Search Strategy and Criteria

We identified articles and texts that discuss variations in medical practice as these relate to medical negligence in the LexisNexis legal database. LexisNexis is a database used by law professionals to identify legal cases, law review articles, texts, and related writings. Of the resources identified, we filtered selected works by using the keywords "fairness" and "utility." A similar search was made using general Internet search engines to include nonlegal writings that have addressed medical negligence. From a review of these sources, the material in this article was developed.

## Limitations in Using Standard of Care to Judge Medical Conduct

### Acceptable Medical Conduct

In the medical malpractice case of *Helling v Carey* [5], the Washington Supreme Court had to determine whether following a customary norm was the exclusive measure of acceptable medical conduct. The plaintiff in *Helling v Carey* was a 32-year-old woman who was not screened for glaucoma and subsequently became blind. According to the accepted standard of care, routine screening for glaucoma was not performed on patients younger than 40 years since the risk in that age group was only one in 25,000. In *Helling v Carey*, the plaintiff's attorney contended the customary practice was, in fact, unacceptable, and the defendant ophthalmologist was therefore negligent. The court agreed, quoting Justice Oliver Wendell Holmes: "What is usually done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it is usually complied with or not." Therefore, in *Helling v Carey*, despite the fact that the minor premise or common practice was adhered to by the defendant, the court concluded the defendant was negligent.

As *Helling v Carey* illustrated, the practical application of the standard of care as a measure of negligence is difficult, especially with a constantly changing knowledge base and best-practice recommendations. For example, if a single report of a new implant shows better results, is an orthopaedic surgeon compelled under the standard of care to start using that implant? Past experience would suggest early reports of great success are often followed by later failures, and one could easily argue the prudent surgeon should wait for incontrovertible evidence before changing current practice. If so, would prudent waiting for more data constitute the standard of care in using a new implant?

In her book *Overtreated* [1], author Shannon Brownlee addressed the work of scholar John Wennberg who in the year 2000 showed Medicare recipients living in areas with low per capita Medicare spending were healthier than their counterparts living in areas with high per capita Medicare spending. In fact, mortality rates were higher for patients living in areas with high per capita Medicare spending. Wennberg also found large geographic variations in the


Exhibit C
Page 18

Redacted Version of Document Proposed to Be Filed Under Seal

rates of elective surgeries and commented: "Orthopedic surgeons have a number of procedures they can become familiar with—knee replacements, hip repair, back surgery. They sub-specialize in certain procedures that they become comfortable with, and then hunt for opportunities to do those procedures… They look for patients who fit the paradigm, the kind of case they specialize in. They get known for a particular procedure: this orthopedist is a knee guy; this one does backs… Because they are orthopedists, they ignore other possible remedies" [1]. Brownlee added her thoughts: "… Such remedies include telling a patient with back pain to go home and take some pain medication and wait, or try moderate exercise and stretching, which may work as well or better than surgery for most patients. When your only tool is a hammer, everything looks like a nail" [1].

What the above commentary suggests is that there are inherent conflicts of interest in medicine that may lead to the development of customary norms that are not in the best interests of the patient. For example, direct-to-consumer marketing encourages patients to demand certain medications or procedures. Orthopaedic surgeons may contribute to this demand by promoting new technologies to gain a competitive advantage in the orthopaedic marketplace. These realities suggest a need to redefine negligence in a way that does not rely on customary norms since conflicts of interest or even caprice may affect how doctors customarily conduct their practices.

## The Concepts of Justification and Excuse

One approach to examining medical negligence is to consider two legal principles that can modulate legal liability, ie, justification and excuse [4]. There are important distinctions between justification and excuse, but differentiating them can still be difficult. As one legal scholar wrote, "Justifying and excusing claims bear different relationships to the rule of liability. To justify conduct is to say that in the future, conduct under similar circumstances will not be regarded as wrongful or illegal. Excusing conduct, however, leaves intact the imperative not to engage in the excused act" [4].

A medical management decision is said to be justified when the benefits of that decision outweigh the risks. To say a medical decision is justified means the law sanctions the decision and encourages future decisions under similar circumstances. Excuse, on the other hand, is a mechanism to relieve a doctor of legal liability even though the medical conduct was not justified. Excusable conduct is an exception that should not lead to legal liability even though it is not conduct that would be encouraged in the practice of medicine.

Justification is related to the risk-creating conduct of a doctor. Excuse relates to the predicament of the doctor. In other words, justification refers to "actions" and excuse focuses on the "actor." Justification is a utilitarian concept, based on the weighing of risks. If the benefits outweigh the risks, then the conduct is said to be justified and is not negligent, even if the patient is injured. For example, it may be justified to administer intravenous antibiotics to a patient with an infection (benefits outweigh risks) even though the patient could experience a serious adverse reaction to the antibiotic. Society would want to encourage doctors to use antibiotics similarly in the future, notwithstanding the fact that some patients will be injured from the antibiotics.

Another illustrative case of justified medical conduct is that of a hypothetical 80-year-old woman with multiple medical problems who presents with a displaced hip fracture. While undergoing a hip hemiarthroplasty, the patient suffers a massive myocardial infarction and cannot be resuscitated. Was the orthopaedic surgeon's decision to perform surgery justified, such that the patient's estate should be denied compensation despite the fatal complication? Would the decision to operate be one that society wants to encourage in similar, future situations? If so, then the actions of the surgeon are justified; while the outcome was poor, expedient hip hemiarthroplasty in the elderly patient with a displaced fracture is more likely than not to be beneficial.

In contrast, excuse is not related to utilitarian reasoning; instead, excuse examines the unique predicament of the decision maker whose conduct is in question. For example, after a serious accident, a patient is treated by a trauma team. Timely intervention saves the patient's life despite overwhelming odds. But the treating doctors fail to diagnose an undisplaced femoral neck fracture that subsequently becomes displaced, leading to avascular necrosis, pain, and an eventual hip arthroplasty. Timely diagnosis would have preserved the patient's own hip. This scenario cannot be defended on the theory of justified conduct since imaging studies would have identified the femoral neck fracture. Instead, the trauma team should be excused from liability because of the peculiar circumstances attendant to the case. It is unreasonable to expect a medical team faced with the predicament of saving a life over a limb not to prioritize life over all other considerations.

*Cordas v Peerless Transportation Company* is a legal case illustrating the application of excuse to tort law (the civil law that governs medical negligence) [2]. When armed robbers pointed a gun at a taxi driver's head, the driver jumped out of the cab, and the running cab struck pedestrians. The court considered the act of jumping out of the taxi unjustified; society does not want to encourage

⌕ Springer

Exhibit C
Page 19

Redacted Version of Document Proposed to Be Filed Under Seal

such conduct. "In the view of the crowd of pedestrians nearby, the driver clearly took a risk that generated a net danger to human life. It was thus an unreasonable, excessive and unjustified risk" [4]. The negligence question in this case was not whether the benefits of leaving his cab outweighed the risks (which they surely did not) but rather, "What can we fairly expect a person to do when he has a gun pointed at him?" [4]. By excusing the taxi driver's unjustified conduct, we are posing questions of fairness and justice based on the limitations of what we can fairly expect of individuals, given the circumstances and predicaments in which they find themselves. Applying the principles of *Cordas v Peerless Transportation Company* to medical negligence cases, there are times when, even though an orthopaedic surgeon's conduct may not be justified, it may still be excused.

### When to Excuse Medical Conduct

In diagnostic malpractice cases, the failure to make the proper diagnosis through a more detailed history, comprehensive physical examination, or additional diagnostic testing is almost always unjustified. The reason is, had the poor outcome from a missed diagnosis been considered by the doctor, the benefit to the patient resulting from a more complete diagnostic workup would most certainly outweigh the risk or loss to that patient. But we cannot fairly expect doctors to consider every diagnosis, no matter how remote or seemingly inconsistent with the patient's signs or symptoms. To be legally actionable, the misdiagnosis must be negligent. Deciding when otherwise negligent conduct is excusable requires more abstract reasoning because, in contrast to justification, excuse is not based on a simple utilitarian calculation.

One of the more controversial issues in malpractice law is whether a surgical mistake can be excused. This is particularly compelling in cases involving new medical technologies. A typical example relates to minimally invasive gall bladder removal. In its introductory phases, there were frequent injuries to the common bile duct during the learning curve. If the general surgeon during the learning curve divided a patient's common duct, should the surgeon's conduct be excused?

Surely, the mistakes made during the introduction of new technologies rarely involve justification since the complications result from a lack of familiarity rather than the benefits outweighing the risks. It may be impossible to determine whether new technologies are justified until enough data are collected to determine whether the benefits outweigh the risks.

Several recent examples of this dilemma exist in orthopaedic surgery. There has been increasing interest in the concept of treating open tibial shaft fractures using débridement, irrigation, and internal fixation with primary closure of the traumatic wounds [6]. An older generation of surgeons may argue traumatic wounds should never be closed primarily. Modern clinical practice may suggest orthopaedic surgeons can safely close wounds associated with open fractures when they believe it is appropriate [7]. Are these surgeons acting responsibly? Are their actions justified? What if a larger series in the future shows a higher nonunion rate related to infection; would their actions then be excusable in hindsight? The introduction and marketing appeal of metal-on-metal total hip bearings offers another instance of new technology in orthopaedic surgery [8]. The laboratory science and early clinical reports suggested improved longevity and wear patterns, and many surgeons adopted metal-on-metal bearings in young patients with THAs. This technology has now fallen out of favor due to adverse reactions and recalled products [3]. Should the surgeons who used this new technology, which was FDA approved, be held responsible in any way for the complications? Did the available literature justify the use of these new designs? Is it the surgeon's responsibility to ensure the literature is not biased or otherwise unreliable? Should the early adopters of new technology be held to a higher standard of reasonable prudence, even if other surgeons in their community are not? The answers are not easy, and the concept of standard of care does not provide much guidance in these instances.

Excuse can arise in academic centers due to the relationship between the residents and the attending doctors. Can we fairly expect a resident to act independently by refusing to follow the attending doctor's recommendation? Assume a hypothetical case in which an obese 13-year-old boy underwent a proximal tibial osteotomy for Blount's disease. Because rigid fixation could not be obtained, a supplementary circular cast was used. During the first postoperative night, the patient began to complain of severe pain in his leg. The resident administered pain medication and split the cast into two planes. Four hours later, the patient was still complaining of severe pain. Distal pulses became difficult to palpate. The resident wanted to remove the cast altogether, but the attending instructed the resident to leave the cast alone and to administer a larger dose of pain medication. The patient continued to complain of severe pain, and later that day, compartment syndrome was diagnosed, with an eventual poor outcome. Should the resident's conduct be excused since he was following the attending doctor's orders? Was the resident legally responsible for acting on his concern about the patient's condition, notwithstanding the instructions from the attending doctor? In this case, the concept of standard of care provides little guidance to judging conduct. Instead, we can view each actor's conduct as excusable or not under the attendant circumstances.

Exhibit C
Page 20

Redacted Version of Document Proposed to Be Filed Under Seal

## A New Model for Defining Medical Negligence

In light of the practical difficulties in judging medical conduct, as illustrated in the above examples, we propose a model for determining medical negligence based on justification and excuse, described above. Such a model would include the following elements: (1) eliminating standard of care as the benchmark for measuring medical negligence, (2) reframing court instruction to jurors, and (3) establishing an ongoing consensus committee on orthopaedic principles of negligence.

### Eliminate Standard of Care in Determining Medical Negligence

The concept of standard of care should be eliminated from the malpractice vocabulary for both procedural and substantive reasons. The procedural reasons pertain to common misconceptions about how jurors reach a verdict in medical negligence cases. One misconception is that jurors return a verdict of innocent or guilty in malpractice cases. Since malpractice is a part of civil law, rather than criminal law, jurors do not determine guilt versus innocence in a civil trial. In civil cases, it is a role of the jury to determine the facts or to decide which set of facts to believe. A jury verdict is an answer, or a series of answers, to questions. It is not uncommon in complex cases to ask the jury multiple questions.

In a medical negligence case, the jury is usually asked to answer the two-pronged question, "Do you find the defendant was negligent and the defendant's negligence proximately caused the plaintiff's injury?" If the jury returns a "yes" answer to this question, a further question may be "Did the plaintiff in any way contribute to his/her own injury?" This question relates to a legal concept called contributory negligence that may serve to mitigate the damages awarded. Importantly, the jury is never asked the question, "Did the defendant violate the prevailing standard of care, thereby proximately causing the plaintiff's injuries?"

The court does instruct the jury that a violation of the standard of care is a form of negligence, but that instruction does not alter the verdict form, which seeks the jury's answer to the question, "Was the defendant negligent?" Standard of care, which creates confusing issues on conformity to norms, should be eliminated as both a question to be asked of opposing experts and as a component of the court's instructions.

Expert witness would not be asked, "Did the defendant violate the standard of care?" Rather, they would be asked, "Do you have an opinion as to whether or not the defendant doctor was negligent?" The second question is more straightforward than the first, which introduces potentially misleading issues of geography, experience, resources, and other variables. By asking an expert whether the defendant was negligent, the query is broad enough to account for whether the defendant was a first-year resident, lived in a rural community, or injured a patient when the injury was inherently unavoidable. Further, the negligence question avoids the implied sanction of conformity and the implied suggestion that nonconformity is a form of poor patient care.

### Reframe the Court's Instruction to the Jury

It is a unique function of the American judicial system that judges are neutral and cannot express an opinion about the evidence. Instead, the judge decides what law applies to the case and instructs the jury about what law it needs to follow. The sole function of the jury is to make factual determinations and apply those factual determinations to the law as instructed. Most jury instructions today that relate to determining the standard of care in medical negligence cases derive from the 1898 legal case of *Pike v Honsinger* [10]. Applying the principles discussed in this article, it is time to reformulate jury instructions to avoid reliance on the faulty notion of conformity to norms. Instead, modified jury instructions could include the following content:

> Ladies and gentlemen, you have heard all the evidence and the arguments in this case. The plaintiff claims the defendant was negligent and, as a result of that negligence, the plaintiff is entitled to monetary damages. This is a civil case and not a criminal case. Nothing about this trial requires you to reach a determination about whether the defendant is a good or bad doctor, intended to harm his/her patient, or was motivated by malice.
>
> This trial is not about improving our healthcare system by finding for one party or another. Rather, it is litigation between private parties where your verdict is based solely on factual findings, which you will apply to the law as instructed, to reach a fair and just verdict.
>
> Since the plaintiff is seeking damages from the defendant, if your verdict is for the plaintiff, it will have the impact of redistributing losses that the plaintiff claims to have suffered to the defendant. If your verdict is for the defendant, then the plaintiff will have to bear the burden of his/her losses. This is referred to as distributive justice. It is important for you to understand the plaintiff is not entitled to recover damages simply because he or she is unhappy with the treatment provided by his/her physician or surgeon and its outcome.

⌂ Springer

Exhibit C
Page 21

Redacted Version of Document Proposed to Be Filed Under Seal

Under the law of this state, the redistribution of plaintiff's losses can only occur if the defendant physician/surgeon was negligent. In determining negligence, you should consider the risk-creating conduct of the defendant or the predicament of the defendant. By risk-creating conduct, the court is referring to whether or not the defendant's actions or inactions were justified. By justification, the court means was there reason for the defendant to believe his/her medical management was more likely to benefit the patient than harm the patient? The burden of proving the defendant's actions/inactions were not justified is on the patient.

Since medicine is complex, there are times when it is not easy for doctors to know with any certainty whether their decisions are more likely to benefit or harm the patient. If you find that to be the circumstances in this case, then the defendant has an obligation to inform the patient of all material uncertainties and alternative treatments. By material, the court means those uncertainties that impact a patient's medical treatment decision making. The burden of proving the defendant doctor failed to properly inform the patient is on the plaintiff.

In determining negligence, you are not limited to calculating whether the benefits outweighed the risks to the plaintiff in this case. You should also consider the predicament of the defendant doctor. This is known in law as excuse. An example of excuse would be an airplane crash where emergency room doctors are so overwhelmed with severely injured patients that they cannot provide the level or quality of care of normal circumstances. If the defendant doctor claims his/her conduct is to be excused, the burden of proof is on the plaintiff to establish the predicament of the defendant should not excuse him/her from liability.

The actual court instructions would be more expanded to include definitions of negligence and would address other areas such as judging the credibility of witnesses and understanding burden of proof. Nonetheless, reframing the instructions to include language such as that suggested above could orient the jury toward the principles of justification and excuse as methods for determining the presence or absence of medical negligence.

### Establish an Ongoing Consensus Committee on Orthopaedic Principles of Negligence

One of the criticisms of standard of care set forth in this article is that it is a vague and amorphous concept, providing no meaningful guidelines to jurors and contributing

to jury confusion and even anarchy if the jurors have deep-seated biases against one party or the other. It would be productive in achieving just malpractice verdicts if there were a consensus committee in the orthopaedic community that established principles of quality and safety to assist the jury in reaching factual conclusions about the presence or absence of negligence. Since every medical case is different, these consensus standards would only serve as guidelines, but these guidelines would have the potential to focus the jury's attention on the factual decision that it needs to make. This would eliminate the frequent complaint from both plaintiffs and defendants that experts are only advocates and that many verdicts are the by-product of emotion rather than reason. There are several examples of these consensus standards that can be developed.

In diagnostic orthopaedic malpractice cases, one consensus principle might be: "In performing a differential diagnosis, when there is evidence of a potential time-sensitive poor outcome, the orthopaedic surgeon must rule out the most serious condition first." If there were agreement by the consensus committee that this was a principle of quality that helped define negligence, it would allow the jury to focus on the central factual issue of the presence or absence of a "potentially time-sensitive poor outcome."

Within the context of complications of surgery, another principal of quality might be: "Orthopaedic surgeons cannot guarantee the outcome of their surgery because certain unfortunate results are unavoidable. These unfortunate results are known as complications. Unfortunate results can also be the result of negligence. In determining whether an unfortunate result is unavoidable or negligent, it is useful to know whether the orthopaedic surgeon was aware of the potential complication before commencing surgery and took action to reduce the likelihood of its occurrence." Such a principle would focus the jury's attention on the relevant factual issues such as whether the surgeon was aware of potential complications and took any actions to reduce the potential harm to the patients from those complications.

These consensus principles could be used in two different contexts and serve at least two useful purposes. First, they could be used by experts in their testimony as uncontroverted principles to be applied to their opinion and the basis for their opinion. Second, the establishment of a consensus quality/negligence committee would serve to refine principles of quality in the face of a dynamic environment in which orthopaedic surgeons practice medicine.

These consensus principles also have utility for orthopaedic surgeons and jurors. Orthopaedic surgeons who make themselves aware of these principles are more likely to have better patient outcomes and fewer malpractice lawsuits. Jurors who are made aware of these consensus principles are more likely to return verdicts that are fair and

Exhibit C
Page 22

Redacted Version of Document Proposed to Be Filed Under Seal

just because they would be grounded in definitions of negligence that are far more concrete than standard of care.

Validation of the Model

Peters [9] reported studies comparing panels of unbiased doctors' opinions on whether a medical malpractice lawsuit was frivolous or meritorious. The studies cited demonstrated a substantial difference between the medical panel conclusions and the jury verdicts, suggesting the current framework for determining negligence does not achieve just and fair results. To validate the proposed model, similar panels could be established and their findings compared and contrasted to a statistically large enough sample of mock trials. This could determine whether the proposed revisions to defining negligence would lead to more fair and just verdicts.

Discussion

Standard of care has been used in law and medicine to determine whether medical care is negligent. However, the precise meaning of this concept is often unclear for both medical and legal professionals. Our purposes were to (1) describe the inherent problems of using standard of care as a measure of negligence, (2) examine the role of justification and excuse in judging medical conduct, and (3) outline the framework of a new judicial model for determining medical malpractice with the goal of more fair, just, and accommodating outcomes.

The primary limitation of the present work is the difficulty in validating whether the proposed model will produce just legal decisions. Since no legislature or court has yet adopted the proposed model, its impact can only be measured through focus groups which, at best, simulate the presentation of cases in a courtroom environment. The rationale for this article is to establish alternative criteria for determining the legal standards by which judges and juries determine whether a doctor is negligent. This new model, if effective, will result in a less ambiguous measure of medical negligence with productive consequences for both physicians and patients.

The impetus for the proposed model is that the present method of determining medical negligence is flawed. The present system asks jurors with potentially no background in medicine to decide what must be acceptable medical conduct. Traditionally, jurors have had to make this decision by determining whether the doctor complied with or violated the standard of care. The criteria embodied in determining the standard of care are often confusing since the word standard implies a norm that is usually defined by professional customs. In other civil liability cases, conformity to a norm can be easily determined by the jury. For example, jurors have an easier time deciding whether an automobile driver violated the norm of failing to halt at a stop sign. But in medical negligence cases, no clear norms exist that allow a jury to easily determine negligence. Not only is there an array of opinion in the medical community over what is acceptable, but the concept of standard of care may mislead jurors into thinking, if most doctors perform medicine in an acceptable manner, the outcomes will be good. This may prejudice patients whose care is unacceptable, notwithstanding the fact that the standard of care was followed. It may also prejudice nonconforming doctors who are practicing in an acceptable, even laudable, way by implying care that falls in the minority view is unacceptable. It would be much easier for a jury to determine whether medical care was acceptable under circumstances where the doctor had a substantial basis for believing the management plan was more likely to introduce a benefit to the patient rather than harm. It would also allow jurors to look beyond a mere risk-benefit calculation and ask what can be fairly expected from a doctor in a certain set of circumstances.

In essence, when the only criterion to determine medical negligence is a standard of care, it is a practical equivalent for a jury presented with no rational criteria at all. The foundation of malpractice law must be an understandable and practically applicable negligent or nonnegligent model. This article sets forth a meaningful framework for that basis.

**Acknowledgments**   The authors acknowledge the editorial assistance of Steve C. Friedman, senior editor at the Department of Orthopaedic Surgery, University of Missouri, Columbia, MO, USA, in preparing and finalizing this paper.

**References**

1. Brownlee S. *Overtreated*: *Why Too Much Medicine Is Making Us Sicker and Poorer.* New York, NY: Bloomsbury Press; 2007: 41–42.
2. *Cordas v Peerless Transportation Company*, 27 NYS2d 198 (NY City Ct 1941).
3. Davies AP, Willert HG, Campbell PA, Learmonth ID, Case CP. An unusual lymphocytic perivascular infiltration in tissues around contemporary metal-on-metal joint replacements. *J Bone Joint Surg Am.* 2005;87:18–27.
4. Fletcher GP. Fairness and utility in tort theory. *Harvard Law Rev.* 1972;85:537–573.
5. *Helling v Carey*, 519 P2d 981 (Wash 1974).
6. Lee J, Dougherty P, Anderson R. Soft-tissue injury. In: Schmidt AH, Teague DC, eds. *Orthopaedic Knowledge Update: Trauma 4.* Rosemont, IL: American Academy of Orthopaedic Surgeons; 2010:51–59.
7. Melvin JS, Dombroski DG, Torbert JT, Kovach SJ, Esterhai JL, Mehta S. Open tibial shaft fractures: II. Definitive management and limb salvage. *J Am Acad Orthop Surg.* 2010;18:108–117.

&#8471; Springer

Exhibit C
Page 23

Redacted Version of Document Proposed to Be Filed Under Seal

8. Patel D, Parvizi J, Sharkey PF. Alternative bearing surface options for revision total hip arthroplasty. *Instr Course Lect.* 2011;60:257–267.

9. Peters PG Jr. Twenty years of evidence on the outcomes of malpractice claims. *Clin Orthop Relat Res.* 2009;467:352–357.

10. *Pike v Honsinger,* 49 NE 760 (NY 1898).

