**CALLAHAN & BLAINE, APLC**
Edward Susolik (SBN 151081)
Esusolik@callahan-law.com
David J. Darnell (SBN 210166)
Ddarnell@callahan-law.com
Stephanie A. Sperber (SBN 230006)
SSperber@callahan-law.com
3 Hutton Centre Drive, Ninth Floor
Santa Ana, California 92707
Telephone: (714) 241-4444
Facsimile: (714) 241-4445

Attorneys for NEWPORT TRIAL GROUP, SCOTT J. FERRELL, RYAN M. FERRELL, VICTORIA C. KNOWLES, DAVID REID and ANDREW LEE BASLOW

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

<table>
<tr><td>NATURAL IMMUNOGENICS CORP., a Florida corporation,<br><br>Plaintiff,<br><br>v.<br><br>NEWPORT TRIAL GROUP, et al.,<br><br>Defendants.</td><td>CASE NO.   8:15-cv-02034-JVS-JCG<br><br>**DECLARATION OF STEPHANIE A. SPERBER IN SUPPORT OF NTG DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT ON THE MALICIOUS PROSECUTION CLAIM**<br><br>Hearing Date:   April 3, 2017<br>Hearing Time:   1:30 p.m.<br>Judge:   Hon. James V. Selna</td></tr>
</table>

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

I, Stephanie A. Sperber, say:

1.     I am an attorney licensed to practice law in the State of California.  I am one of the lawyers responsible for representing Defendants Newport Trial Group, Scott Ferrell, Ryan Ferrell, Victoria Knowles, David Reid and Andrew Baslow **["NTG Defendants"]**, in this litigation.

2.     Attached to the "Request for Judicial Notice in Support of the NTG Defendants' Motion for Summary Adjudication," are true and correct copies of documents filed with the San Diego Superior Court in *Nilon v. Natural-Immunogenics Corp.,* Case No. CV-F-91-048 EDP, and, after removal, with the United States District Court, Southern District of California, in *Nilon v. Natural-Immunogenics Corp.*, Case No. 3:12-CV-00930-LAB (BGS).    Specifically,

A.     Attached as **Exhibit 1** to the Request for Judicial Notice is the "Class Action Complaint," filed on March 5, 2012, in *Nilon v. Natural-Immunogenics, Corp.*, California Superior Court, County of San Diego, Case No. CV-F-91-048 EDP;

B.     Attached as **Exhibit 2** to the Request for Judicial Notice is the "Motion for Class Certification," filed on or about February 26, 2013,  in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #21.

C.     Attached as **Exhibit 3** to the Request for Judicial Notice is the "Order Denying Motion For Class Certification Without Prejudice," filed on or about September 30, 2013, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #31.

D.     Attached as **Exhibit 4** to the Request for Judicial Notice is the "First Amended Class Action Complaint," filed October 15, 2013,  in *Nilon v.*

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1

*Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #34.

E. Attached as **Exhibit 5** to the Request for Judicial Notice is the "Order On Ni's Motion To Dismiss And Nilon's Motion For Class Certification," filed April 15, 2014, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #41.

F. Attached as **Exhibit 6** to the Request for Judicial Notice is the "Declaration of Carlos F. Negrete in Support of Defendant's Motion for Order Compelling Plaintiff to Attend and Testify at Deposition and Produce Documents and/or Things Described in the Second Amended Notice of Deposition, and Imposing Monetary Sanctions," filed June 30, 2014, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #49.

G. Attached as **Exhibit 7** to the Request for Judicial Notice is the ""Notice Of Motion And Motion To Substitute Class Representative And Modify Scheduling Order," filed July 9, 2014, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #51.

H. Attached as **Exhibit 8** to the Request for Judicial Notice is the "Order Granting in Part and Denying in Part Defendant's Motion to Compel," filed July 31, 2014, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #55.

I. Attached as **Exhibit 9** to the Request for Judicial Notice is the "Notice of Motion A [sic] To Withdraw As Counsel For Plaintiff Of Record Andrew Nilon," filed August 15, 2014, in *Nilon v. Natural-Immunogenics*

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

2

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

*Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #61.

J.     Attached as **Exhibit 10** to the Request for Judicial Notice is the "Order on Plaintiff's Motion to Substitute Class Representative," filed August 22, 2014, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #62.

K.     Attached as **Exhibit 11** to the Request for Judicial Notice is the "Order: (1) Granting Defendant's Ex Parte Request  For Modification Of Scheduling Order; and (2) Issuing First Amended Case Management Conference Order," filed September 11, 2014, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #65.

L.     Attached as **Exhibit 12** to the Request for Judicial Notice is the "Joint Statement Of Undisputed Facts," filed on or about April 27, 2015, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #110.

M.     Attached as **Exhibit 13** to the Request for Judicial Notice is the "Defendant's Application for Substitution of Counsel," filed February 11, 2015, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #85.

N.     Attached as **Exhibit 14** to the Request for Judicial Notice is the "Defendant's *Ex Parte* Application to Modify Rule 16(b) Scheduling Order and Leave to Take Plaintiff's Deposition," filed February 20, 2015, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #90.

3

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

O.    Attached as **Exhibit 15** to the Request for Judicial Notice is the "Defendant's Opposition to Plaintiff's *Ex Parte* Application to Strike Defendant's Application to Substitute Counsel," filed February 20, 2015, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #89.

P.    Attached as **Exhibit 16** to the Request for Judicial Notice is the "Plaintiff Giovanni Sandoval's *Ex Parte* Application to Strike Defendant's Application to Substitute Counsel," filed February 18, 2015, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #88.

Q.    Attached as **Exhibit 17** to the Request for Judicial Notice is the "Notice of Hearing and Defendant's Rule 56 Motion for Summary Judgment," filed April 20, 2015, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #95.

R.    Attached as **Exhibit 18** to the Request for Judicial Notice is the "Plaintiff Giovanni Sandoval's Opposition to Defendant's Motion for Summary Judgment," filed April 27, 2015, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #111.

S.    Attached as **Exhibit 19** to the Request for Judicial Notice is the "April 6, 2015 Order," filed April 6, 2015, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #97.

T.    Attached as **Exhibit 20** to the Request for Judicial Notice is the "Defendant's Reply in Support of Motion for Summary Judgment," filed May 4, 2015, in *Nilon v. Natural-Immunogenics Corp.*, United States District

4

Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #113.

U.      Attached as **Exhibit 21** to the Request for Judicial Notice is the "Order Tentatively Vacating Class Certification and Dismissing Case Without Prejudice," filed May 12, 2015, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #117.

V.      Attached as **Exhibit 22** to the Request for Judicial Notice is the "Defendant's Reply to Plaintiff's Response to Tentative Order Dismissing Case Without Prejudice and Request for Sanctions," filed May 18, 2015, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #119

W.      Attached as **Exhibit 23** to the Request for Judicial Notice is the "Plaintiff's Response re Tentative Decision Decertifying Class Action," filed May 15, 2015, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #118.

X.      Attached as **Exhibit 24** to the Request for Judicial Notice is the "Order of Dismissal," filed May 22, 2015, in *Nilon v. Natural-Immunogenics Corp.*, United States District Court, Southern District of California, Case No. 3:12-cv-00930-LAB-BGS, Dkt. #120.

3.      Attached as **Exhibit 25** below is a true and correct copy of Defendant's Notice of Deposition of Dr. Lynn R. Willis, served by mail on April 18, 2013 in the matter of *Nilon v. Natural-Immunogenics Corp.,* United States District Court, Southern District of California, Case No. 3:12-CV-00930-LAB (BGS).

DECLARATION OF STEPHANIE A. SPERBER IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

4.      Attached as **Exhibit 26** below is a true and correct copy of the condensed transcript of the Deposition of Dr. Lynn R. Willis, taken on May 2, 2013, in the matter of *Nilon v. Natural-Immunogenics Corp.,* United States District Court, Southern District of California, Case No. 3:12-CV-00930-LAB (BGS).

5.      Attached as **Exhibit 27** below is a true and correct copy of Defendant's Notice of Deposition of Ryan M. Ferrell, Esq., served by mail on May 23, 2013 in the matter of *Nilon v. Natural-Immunogenics Corp.,* United States District Court, Southern District of California, Case No. 3:12-CV-00930-LAB (BGS).

6.      Attached as **Exhibit 28** below is a true and correct copy of Defendant's Notice of Deposition of Scott J. Ferrell, Esq., served by mail on May 23, 2013 in the matter of *Nilon v. Natural-Immunogenics Corp.,* United States District Court, Southern District of California, Case No. 3:12-CV-00930-LAB (BGS).

7.      Attached as **Exhibit 29** below is a true and correct copy of Carlos Negrete's letter to Ryan J. Ferrell and Victoria Knowles re: *Andrew Nilon v. Natural Immunogenics*, dated October 20, 2014.

8.      Attached as **Exhibit 30** below is a true and correct copy of the condensed transcript of the Deposition of Giovanni Sandoval, Jr. taken on April 20, 2015, in the matter of *Nilon v. Natural-Immunogenics Corp.,* United States District Court, Southern District of California, Case No. 3:12-CV-00930-LAB (BGS).

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

6

DECLARATION OF STEPHANIE A. SPERBER IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 2nd day of March, 2017, at Santa Ana, California.

Stephanie A. Sperber

\\TRIALWORKS-SQL\TrialWorks\CaseFiles\600\Pleadings\Sperber Dec. ISO Summary Adjudication (MP Claim)-54631.docx

7

DECLARATION OF STEPHANIE A. SPERBER IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

# EXHIBIT 25

Carlos F. Negrete [SBN # 134658]
**LAW OFFICES OF CARLOS F. NEGRETE**
27422 Calle Arroyo
San Juan Capistrano, CA 92675-2747
Telephone: (949) 493-8115
Facsimile: (949) 493-8170
Email: cnegrete@negretelaw.com

*Attorneys for Defendant,*
NATURAL-IMMUNOGENICS CORP.



# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW NILON, individually and on behalf of all other similarly situated,<br><br>         Plaintiff(s),<br><br>vs.<br><br>NATURAL-IMMUNOGENICS CORP.,<br><br>         Defendant(s) | Case No. 3:12-cv-00930-L (BGS)<br><br>The Honorable Bernard G. Skomal<br>Courtroom 14<br><br>**DEFENDANT, NATURAL-IMMUNOGENICS CORP.'S NOTICE OF DEPOSITION OF DR. LYNN R. WILLIS**<br><br>Date:    May 2, 2013<br>Time:    10:00 a.m.<br>Location:  Maxene Weinberg Agency<br>              27281 Las Ramblas, Ste. 160<br>              Mission Viejo, CA 92691 |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

YOU ARE HEREBY NOTIFIED THAT pursuant to Federal Rule of Civil Procedure 30, Defendant NATURAL-IMMUNOGENICS CORP. (hereinafter "Deposing Party"), through its counsel of record, will take the oral deposition of DR. LYNN R. WILLIS (hereinafter "Deponent") under oath before a qualified notary public. The Deposition will take place on **May 2, 2013**, at Maxene Weinberg Agency, located at 27281 Las Ramblas, Suite 160, Mission Viejo, California 92691, commencing at 10:00 a.m. and continuing from day to day

1

thereafter until completed.

YOU ARE NOTIFIED that Deposing Party intends to cause the proceedings to be recorded both stenographically and by video tape and/or audio tape before a court reporter duly authorized to administer oaths in the State of California, and such proceedings will continue each day thereafter excluding weekends and holidays until completed, absent agreement to the contrary by the parties or their counsel. In the event that the deponent is an expert witness or a treating or consulting physician, the Deposing Party intends to make a video tape recording of the proceedings and reserves the right to use said video tape recording at trial in lieu of live testimony from the deponent in accordance with the provisions Federal Rule of Civil Procedure 30(b)(3)(A). However, Deposing Party reserves the right to proceed with the deposition to be recorded stenographically only.

YOU ARE FURTHER NOTIFIED that Deposing Party demands that Deponent produce at said deposition the items set out in **Exhibit A**, per the provisions of Federal Rule of Civil Procedure Rules 30(b)(2) and 45.

In the event that you intend to identify and produce more than one person who is going to testify as to the above-captioned matter, then it is requested that such persons be identified as least three (3) court days prior to the deposition.

If any party contends that an interpreter is required to translate deposition testimony, that party must give notice of the request for an interpreter, specifying the language and/or dialect, at least five (5) days before the deposition date.

Dated: April 18, 2013

                              Respectfully Submitted,


                              //s// Carlos F. Negrete_____
                              Carlos F. Negrete
                              Attorney for Defendant,
                              NATURAL-IMMUNOGENICS, CORP.

2

# EXHIBIT A

## SPECIALLY DEFINED TERMS

For purposes of the herein Document Requests, the following words and phrases have the following meanings:

1.    "YOU," "YOUR," and "Dr. Willis" as used herein shall mean Dr. Lynn R. Willis, and shall include all attorneys, accountants, consultants, expert witnesses, and authorized agents or other persons acting or purporting to act on YOUR behalf.

2.    "NATURAL-IMMUNOGENICS" refers to Defendant NATURAL-IMMUNOGENICS, CORP. and Propounding Party herein.

3.    "COMPLAINT" as used herein refers to the operative Complaint on file in this action and any amendments thereto.

4.    "DECLARATION" as used herein refers to YOUR declaration submitted in support of Plaintiff, ANDREW NILON's Motion for Class Certification filed on February 26, 2013.

5.    "DOCUMENTS" as used herein refers to any kind of "WRITING," "RECORDING," which further include as defined in *Federal Rules of Evidence* Code section 1001. "WRITING" and "RECORDING" mean handwriting, typewriting, printing, photostating, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored. (*FRE* Rule 1001.)  It specifically includes, but is not limited to all papers, books, tapes, documents, photographs, X-ray films, video tapes, motion pictures, computer printouts, computer disc packs, computer tapes and records of any kind or description (whether inscribed by hand or by mechanical, electrical, electronic, photographic, photo effect or other means). DOCUMENTS also includes electronic

3

*NOTICE OF DEPOSITION TO DR. LYNN R. WILLIS*

communications and electronically stored information.

6.   "COMMUNICATIONS" shall mean and include any form of correspondence, including but not limited to, face-to-face oral conversations, emails, telephone conversations, facsimiles, reports of or voicemail or other recordings of telephone or face-to-face conversations and letters.

7.   "RELATING TO,"shall mean and include, constitute, refer, reflect, regard, discuss, show, demonstrate, or be in any way logically or factually connected with the matter discussed or identified.

8.   The words "and" and "or" shall be read in the conjunctive and in the disjunctive wherever they appear, and neither of these words shall be interpreted to limit the scope of this Request.

9.   The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

10.   The singular form of any word shall be deemed to include the plural. The plural form of any word shall be deemed to include the singular.

11.   In any document or identification of any document or oral communication is withheld under a claim of privilege in response to a Request for Production of Documents, you should provide sufficient information to determine the identity of the document or oral communication, and state the basis for any asserted claim of privilege within ten (10) days from the date of service for your responses and objections to these Requests for Production of Documents. In particular, for each privileged document or communication, identify:

    a.   its date;

    b.   the name and title of its author(s);

    c.   the name and title of its recipients;

    d.   its subject matter;

    e.   its number of pages;

    f.   the nature of the privilege claimed and facts upon which you rely

4

*NOTICE OF DEPOSITION TO DR. LYNN R. WILLIS*

to support the claim of privilege.

12. "ELECTRONIC" means relating to technology having electrical, digital, magnetic, wireless, optical, electromagnetic, or similar capabilities.

13. "ELECTRONICALLY STORED INFORMATION" means information that is stored in an ELECTRONIC medium, including without limitation disks, including hard disks and floppy disks, CD-ROMs, DVDs, network servers, shared servers, computers, magnetic tape, back-up tape, voicemail, and PDAs, whether currently on your premises or otherwise (e.g., at an employee's home or remote office).

## DOCUMENT REQUESTS

**DOCUMENT REQUEST NO. 1:**

1. An accurate Curriculum Vitae ("CV").

2. A list of all published or co-published articles, books, treatises or literature which bears YOUR name as an author, co-author, contributor, or editor.

3. A list of any other cases in which YOU have testified as an expert at trial, or by written or oral deposition, or to which YOU submitted a declaration, within the preceding four years.

4. Each and every report prepared by YOU pertaining to the above-captioned matter.

5. The contents of YOUR file pertaining to the above-captioned matter, including all documents received by YOU from counsel for Plaintiff ANDREW NILON or any other class member of this action and any documents YOU have compiled independently from counsel.

6. True and correct copies of any document, test, chart, diagram, reports, articles, etc., which YOU relied on or are relying on in forming any of YOUR opinions.

7. Any and all literature upon which YOU relied or are relying in forming any of YOUR opinions.

5

Ex. 25
Page 13

8.    Any and all correspondence which was prepared, signed, sent, received, drafted, or delivered by YOU or any other person which pertains or refers to YOUR involvement in this action.

9.    Any and all billings, invoices, ledgers, statements for services or other records regarding YOUR compensation in this matter, and with respect to all work performed by YOU, and YOUR affiliated business or employer, in connection with YOUR retention in the above-captioned matter or any related litigation.

10.    Any WRITING (as described above), not otherwise specifically described above, that pertains in any way to (1) YOUR retention in the above-captioned matter; (2) YOUR communications in the above-captioned matter; (3) YOUR opinions in the above-captioned matter, or (4) the basis for YOUR opinions in the above-captioned matter.

11.    Any and all DOCUMENTS in YOUR possession pertaining to, concerning, or RELATING TO the Sovereign Silver products at issue.

12.    Any and all DOCUMENTS in YOUR possession pertaining to, concerning, or RELATING TO colloidal silver.

13.    Any and all DOCUMENTS in YOUR possession pertaining to, concerning, or RELATING TO NATURAL-IMMUNOGENICS.

14.    Any and all DOCUMENTS RELATING TO COMMUNICATIONS between YOU and any of the parties in this matter.

15.    Any and all DOCUMENTS RELATING TO COMMUNICATIONS between YOU and any person or entity concerning any of the issues related to this action.

16.    Any and all DOCUMENTS RELATING TO any payments, of any kind, between YOU and any of the parties to this action.

17.    Any and all DOCUMENTS that in any matter evidence or RELATE TO YOUR opinion about purported efficacy characteristics of the Sovereign Silver product line.

6

18. Any and all DOCUMENTS that in any manner evidence or RELATE TO YOUR opinion in YOUR DECLARATION that the clinical study referenced does not support the findings attributed to it, and is instead characterized by severe methodological deficiencies.

19. Any and all DOCUMENTS that in any manner evidence or RELATE TO YOUR opinion in YOUR DECLARATION that Defendant's product "is neither an essential mineral nor serves any known physiologic function in the human body[.]"

20. Any and all DOCUMENTS that in any manner evidence or RELATE TO YOUR opinion in YOUR DECLARATION that "there is no convincing clinical evidence that silver (as a colloidal suspension or as a solution of silver salts, administered by mouth) provides any medical benefits[.]"

21. Any and all DOCUMENTS that in any manner evidence or RELATE TO YOUR opinion in YOUR DECLARATION that "ample and convincing clinical evidence shows that the chronic ingestion of silver-containing products may cause permanent discoloration of the skin (argyria)."

22. Any and all DOCUMENTS that in any manner evidence or RELATE TO YOUR opinion in YOUR DECLARATION that "[t]he first of these statement renders moot the notion that silver should even be sold as a dietary supplement. The second statement speaks for itself, and the third statement underscores the established medical principle that where there is little to no likelihood that a remedy will produce beneficial effects, as the lack of clinical evidence suggests is the case with Sovereign Silver, any harmful risk, especially one that has been confirmed, such as argyria, is unacceptable."

23. Any and all DOCUMENTS that in any manner evidence or RELATE TO YOUR opinion that the articles listed in paragraph 35 of YOUR DECLARATION offer no mention of silver and/or offer no support or substantiation that Sovereign Silver provides "immune support."

7

NOTICE OF DEPOSITION TO DR. LYNN R. WILLIS

Ex. 25
Page 15

24. Any and all DOCUMENTS that in any manner evidence or RELATE TO YOUR opinion in YOUR DECLARATION that "[i]n the absence of any clinical or scientific evidence that supports this dosage regimen for Sovereign Silver, or assesses the regimen's safety, these recommendations seem aimed merely at increasing the rate at which Sovereign Silver is consumed."

25. Any and all DOCUMENTS that in any manner evidence or RELATE TO YOUR opinion in paragraph 39 of YOUR DECLARATION.

26. Any and all DOCUMENTS that in any manner evidence or RELATE TO YOUR opinion in YOUR DECLARATION that "if the silver contained in Sovereign Silver consisted principally of inorganic silver ions, I would expect that few, if any, silver ions would be absorbed from the gut after oral ingestion because as soon as positively charged silver ions contacted the negatively charged chloride ions in the stomach acid, they would form insoluble silver chloride, which should tend to remain in the gut and be eliminated in the feces."

27. Any and all DOCUMENTS that in any manner evidence or RELATE TO YOUR opinion in YOUR DECLARATION that "no evidence exists to establish that Sovereign Silver actually enhances immunity, the estimation of the safe and effective dosage for this application isn't really possible, even if bioavailability was 100%."

28. Any and all DOCUMENTS that in any manner evidence or RELATE TO YOUR opinion in paragraph 42 of YOUR DECLARATION that YOU are "not willing to accept the claim of "Easily Absorbed" (30.b. above) without a showing that the micrographs presented as evidence actually show nanoparticles and not silver chloride percipitates or other artifacts."

29. Any and all DOCUMENTS that in any manner evidence or RELATE TO YOUR opinion in paragraph 44 of YOUR DECLARATION regarding argyria.

30. Any and all DOCUMENTS that in any manner evidence or RELATE TO YOUR opinion in paragraph 45 of YOUR DECLARATION that "no underlying

8

data [is] presented concerning "without any side effects."

31.     Any and all DOCUMENTS that in any manner evidence or RELATE TO YOUR opinion in paragraph 47 of YOUR DECLARATION that Defendant's claims regarding Sovereign Silver are "false or misleading, or both."


**LAW OFFICES OF CARLOS F. NEGRETE**

Dated: April 18, 2013

//s// Carlos F. Negrete
**CARLOS F. NEGRETE**
Attorney for Defendant,
NATURAL-IMMUNOGENICS, CORP.

9

*NOTICE OF DEPOSITION TO DR. LYNN R. WILLIS*

## CERTIFICATE OF SERVICE

STATE OF CALIFORNIA   ]
                           ss.
COUNTY OF ORANGE     ]

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action and my business address is 27422 Calle Arroyo, San Juan Capistrano, California 92675.

On April 18, 2013, I served the foregoing document(s) described as:

### NOTICE OF DEPOSITION OF DR. LYNN R. WILLIS

on the interested parties in this action by submitting a true and correct copy of the above described documents as follows

[x]   (BY MAIL) I deposited the document by regular mail. I am readily familiar with this office's practice of collection and processing correspondence for mailing. Under that practice it would be deposited, through the office's office complex postal delivery box, with the U.S. Postal Service on the same day in a sealed envelope with postage thereon fully prepaid at San Juan Capistrano, California, in the ordinary course of business to the parties listed below. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit from mailing in this declaration.

[ ]   (BY U.S. POSTAL SERVICE EXPRESS MAIL) I deposited in a post office, mailbox, sub-post office, substation, mail chute or other like facility regularly maintained by the United States Postal Service for receipt of Express Mail a copy of the above-described documents, in a sealed envelope, with Express Mail postage fully prepaid and addressed to the parties listed below.

[ ]   (BY FACSIMILE) I caused all of the pages of the above-entitled document to be sent to the parties listed below, pursuant to California Rules of Court, Rule 2008 and California Code of Civil Procedure, Section 1013. The facsimile machine that I used complied with Rule 2003 and no error was reported by the machine. I caused the machine to print a transmission confirmation record of the transmission, a copy of which is attached hereto and made a part hereof as though set forth in full herein. The date, time, telephone number of the party served and final status of the transmission are set forth in the confirmation record.

[x]   (BY E-MAIL) I caused a copy of the above-listed document to be delivered via e-mail.

[ ]   (PERSONAL SERVICE) I caused a copy of the above listed document to be personally delivered to the party set forth below at the address set forth below.

I declare that I am employed in the office of a member of the bar of this court at whose direction this service was made.

### SEE ATTACHED SERVICE LIST

Executed on April 18, 2013, at San Juan Capistrano, California. I declare under penalty of perjury under the laws of the State of California and the Untied States of America that the above is true and correct.

//s// Jennifer L. Jerzy___
Jennifer L. Jerzy

*Andrew Nilon v. Natural-Immunogenics Corp.*
Case No: 3:12-cv-00930-L (BGS)

## SERVICE LIST

Scott J. Ferrell, Esq.
Ryan M. Ferrell, Esq.
**NEWPORT TRIAL GROUP**
4100 Newport Place, Suite 800
Newport Beach, CA 92660
Telephone: (949) 706-6464

  *Attorneys for Plaintiff*

# EXHIBIT 26

SUPERIOR COURT OF THE STATE OF CALIFORNIA

SOUTHERN DISTRICT OF CALIFORNIA

ANDREW NILON, individually and   )
on behalf of all other similarly  )
situated,   )
   )
        Plaintiff,   )
   )
     vs.   )  Case No.
   )  3:12-cv-00930-L (BGS)
NATURAL-IMMUNOGENICS CORP.,   )
   )
       Defendants.   )
_____)

DEPOSITION OF LYNN R. WILLIS, Ph.D.

Date and Time:  Thursday, May 2, 2013
              10:03 a.m. - 1:42 p.m.

Location:      27281 Las Ramblas
              Mission Viejo, California

Reporter:      Lexann Christy, CSR
              Certificate No. 7932

Page 2

SUPERIOR COURT OF THE STATE OF CALIFORNIA
SOUTHERN DISTRICT OF CALIFORNIA

ANDREW NILON, individually and    )
on behalf of all other similarly  )
situated,                         )
                                  )
          Plaintiff,              )
                                  )
     vs.                          ) Case No.
                                  ) 3:12-cv-00930-L (BGS)
NATURAL-IMMUNOGENICS CORP.,       )
                                  )
          Defendants.             )
_____)

          Deposition of LYNN R. WILLIS, Ph.D., taken before Lexann Christy, a Certified Shorthand Reporter for the State of California, with principal office in the County of Orange, commencing at 10:03 a.m., Thursday, May 2, 2013, at the office of Maxene Weinberg Agency, 27281 Las Ramblas, Suite 160, Mission Viejo, California.

Page 3

APPEARANCES OF COUNSEL:

For Plaintiff:

    NEWPORT TRIAL GROUP
    BY:  RYAN M. FERRELL, ESQ.
    4100 Newport Place Drive
    Suite 800
    Newport Beach, California 92660
    (949) 706-6464

For Defendants:

    LAW OFFICES OF CARLOS F. NEGRETE
    BY:  CARLOS F. NEGRETE, ESQ.
    27422 Calle Arroyo
    San Juan Capistrano, California 92691
    (800) 640-1949

Also Present:  Jennifer Jerzy
               Amy Shimoda

Page 4

I N D E X
WITNESS                    EXAMINATION
LYNN R. WILLIS, Ph.D.            PAGE
    MR. NEGRETE                   6


E X H I B I T S

EXHIBIT          DESCRIPTION          PAGE

Exhibit 1    Listing of Cases, 1 page      36

Exhibit 2    Email Chain Ending from Lynn
             Willis to Ryan Ferrell, dated
             1-19-13, 6 pages            37

Exhibit 3    Quackwatch - Colloidal Silver:
             Risk Without Benefit, 7 pages     42

Exhibit 4    Defendant Natural-Immunogenics
             Corp.'s Notice of Deposition
             of Dr. Lynn R. Willis, 11 pages   51

Exhibit 5    Declaration              52

Exhibit 6    Qualifications, 10 pages      53

Exhibit 7    Qualifications, 10 pages      53

Exhibit 8    Qualifications, 10 pages      53

Exhibit 9    Declaration of Dr. Lynn R.
             Willis in Support of Motion for
             Preliminary Injunction, 38 pages  60

Exhibit 10   Collection of Articles,
             135 pages                73

Page 5

I N D E X (CONTINUED)

EXHIBIT          DESCRIPTION          PAGE

Exhibit 11   Declaration of Dr. Lynn R.
             Willis in Support of Motion
             for Class Certification,
             11 pages                98

Exhibit 12   Curriculum Vitae, 29 pages     99

Exhibit 13   Document Requests, 3 pages    113

Exhibit 14   2-8-13 Letter from Ryan M.
             Ferrell to Lynn R. Willis, Ph.D.,
             1 page                 113

         INFORMATION REQUESTED
             (NONE)


         INSTRUCTIONS NOT TO ANSWER
             (NONE)

2 (Pages 2 to 5)

Maxene Weinberg Agency
(800) 640-1949

Page 6

MISSION VIEJO, CALIFORNIA, THURSDAY, MAY 2, 2013

10:03 a.m. - 1:42 p.m.

LYNN R. WILLIS, Ph.D.,

called as a witness by and on behalf of the Defendants, and having been first duly sworn by the Certified Shorthand Reporter, was examined and testified as follows:

EXAMINATION

BY MR. NEGRETE:

Q   Good morning, Doctor.

A   Good morning.

Q   I'm Carlos Negrete.  I'm the attorney for the defendant in this action.  Are you familiar with the action that you're here about?

A   Yes.

Q   I take it you understand that you are being brought here today by reason of a Notice of Deposition that has been served upon your counsel?

A   Yes.

Q   Have you ever attended a deposition before?

A   Yes.

Q   About how many times?

Maybe five -- well, five in the role that I've been playing in the last couple years, and then when I was in

Page 7

my career, I was deposed two or three times in civil and criminal cases.

MR. FERRELL:  Make sure to pause in between his question and your answer.  I don't think I'll have many objections today, but in case I do, that will make a clear record and the court reporter won't want to hurt us afterwards.

MR. NEGRETE:  Counsel, I will give the admonitions, this is my deposition, thank you.

Q   Before we get there, are you under any medication today?

A   No.

Q   Is there any reason why you can't give your best testimony?

A   No.

Q   You do realize that this deposition is taken under oath and that oath is the same oath you would take in a court of law?

A   I understand.

Q   And you also understand that even though this is an informal proceeding, I'm entitled to your best responses based upon your own personal knowledge and your testimony.

Do you understand that?

A   I do.

Page 8

Q   If I ask you a question that calls for an estimate, I'm not asking you to make a guess.

Do you know the distinction between an estimate and a guess?

A   Yes.

Q   Just in case, by way of example, if I asked you to estimate how wide this table is based upon your own personal knowledge and experience, you can tell me it's so many feet wide, but if I asked you how wide my desk is in my office, which I assume you haven't seen, it would be a guess.

You understand the difference?

A   Yes.

Q   As your counsel so generously noted at the beginning of the deposition, I would ask that you listen to my questions carefully and if there is any point, try to pause a bit so I can complete -- you don't have to pause, just wait until I complete my question in order to give an answer.

This is a federal deposition, so even though your counsel noted he can make objections, there's a certain amount of objections he can make in a federal deposition.

You are able to take certain breaks and we'll take breaks in between but, again, this being a federal

Page 9

deposition, that will be limited to certain breaks at periods of times.

Now, if you have any point where you don't understand my question, let me know that, rather than guessing at the answer.

Do you understand those things?

A   I do.

Q   So you don't see any reason why your depo can't go forward today?

A   No.

Q   Doctor, did you fly in for this deposition?

A   No.

Q   Do you live in California?

A   For the winters.

Q   Where do you live?

A   San Diego.

Q   What's the address?

A   3112 Meadow Grove Drive.

Q   In San Diego?

A   In San Diego.

Q   Do you know the zip code?

A   92110.

Q   Is that a home you own?

A   Yes.

Q   How long have you owned that home?

3 (Pages 6 to 9)

Ex. 26
Page 23

Page 10

A   Well, I inherited the house in 2001.

Q   Now, when you say you -- how long have you owned that home?

A   Well, I guess I owned it since I inherited it.

Q   You said you spent only the summers here?

A   The winters.

Q   The winters?

A   Yes.

Q   From what period to what period?

A   Usually from the first part of January to somewhere first of May to middle of June, just depends.

Q   Do you have a driver's license in California?

A   No.

Q   Do you have any licenses in California?

A   No -- well --

Q   Sorry, Doctor, we'll do that every now and then.

A   I have a pharmacy license, which is currently expired because I missed the renewal that I'm going to renew it, so I guess I could say I have a California license in pharmacy.

Q   You mean you're a pharmacist?

A   Yes.

Q   When did it expire?

A   It expired -- I believe it expired on the first part of April or so.  I don't remember exactly the date.

Page 11

Q   April of this year?

A   Of this year.  Just an oversight.  I didn't get my renewal sent in in time.

Q   Were you required to do continuing education?

A   No.  I have an inactive status on the license.

Q   How long has it been inactive?

A   I'm going to have to guess, but it's been inactive for probably at least 10 years.

Q   Did you ever practice in California?

A   Briefly when I graduated from pharmacy school, prior to going to graduate school, I was licensed to practice in 1966, and I worked as a licensed pharmacist for maybe a month in the summer of 1966 prior to my departure for graduate education.  I haven't practiced as a pharmacist since then.

I've just maintained the license active until the time that I decided that I didn't need to do all the continuing education anymore, and so I went inactive and kept the license just because I worked hard to get it.

Q   Where did you go to pharmacy school?

A   Oregon, Oregon State University.

Q   In Akron?

A   Oregon State University in Corvallis.

Q   Corvallis?

A   Yes.

Page 12

Q   Do you remember when you graduated?

A   1966.

Q   So it's your testimony that you practiced as a pharmacist for one month?

A   About that, yes.

Q   Then you went to school for your graduate school for pharmacology; is that correct?

A   Yes.

Q   Where did you go to school for pharmacology?

A   University of Iowa.

Q   Now, with respect to being a pharmacist, was that your only direct contact with consumers in retail?

A   Yes.

Q   Who did you work for?

A   The La Mesa Drug Company.  It was a Rexall drugstore in La Mesa outside of California.

Q   Any reason why you only worked for one month?

A   I went to graduate school.

Q   Now, when I asked you about the depositions, you had indicated in your role that you're playing here today.  Can you please explain what you mean by that?  When I asked you how many depositions you took --

A   Oh, yes, for the last two years or so I have been an expert witness on a number of cases similar to this one, most of which have been in association with the

Page 13

Newport Trial Group.

Q   Well, not most of them, it's all of them, isn't it?

A   No.

Q   Which ones aren't?

A   I have two cases that have just started, one out of a law firm in Montreal, Canada, and then there was one that was with -- I think the attorney's name is Isaac Miller.  This was a firm in Santa Monica, and those two cases were -- they called me, and this is not the Newport group.

Q   When you say similar to this one, what do you mean by that?

A   A dietary supplement, involves a dietary supplement -- they involve a dietary supplement.

Q   How many cases have you testified in that involved dietary supplements?

A   You mean testify in court?

Q   Let's start out with deposition.

A   Well, to the best of my recollection right now, I think I have been deposed four times.

Q   I notice you took a look at some notes.  What are the notes you're looking at?

A   This is one of the lists you asked for of cases I've been involved with.

4 (Pages 10 to 13)

Page 14

Q You brought all the documents we asked you for?
A Yes.
Q You brought your report file in this case?
A This is it.
Q All the documents that you have concerning this case are here today?
A Yes.
Q Okay. I'm sorry, you said four cases you were deposed on?
A I believe that's correct.
Q Are they in the United States?
A Yes.
Q Were they for the Newport Trial Group?
A Yes.
Q Now, apart from depositions, have you testified at any trial concerning dietary supplements?
A No.
Q Have you ever been -- now, let me broaden that, and I'm including both civil and criminal testimony -- have you testified at any trial for any civil or criminal matter?
A Yes.
Q Have you testified as to dietary supplements at any civil or criminal matter?
A No.

Page 15

Q You mentioned you had provided testimony for a deposition in a criminal matter?
A Yes.
Q Are you sure you mean deposition or court testimony?
A Court testimony. That did not involve a deposition.
Q Right, because generally --
A Murder trial.
Q What was the extent of your testimony?
A Well, it was a murder that had resulted from a drug overdose, and as a pharmacologist I had been asked to come and testify as to the pharmacology of the drug involved.
Q Was that a prescription drug?
A It was.
Q When was that?
A It was a long time ago. I can barely remember it.
Q Approximately.
A It was probably 30 years ago.
Q Do you remember the drug?
A No.
Q Was it a Class 3 drug?
A It was a Class 2 drug.

Page 16

Q So the extent of your testimony as it relates to nutritional supplements is only limited to four cases?
MR. FERRELL: Objection. Misstates the witness' testimony.
To the extent you can answer, go ahead.
MR. NEGRETE: Well, I'm asking that.
THE WITNESS: I think so. I'm just trying to remember.
BY MR. NEGRETE:
Q Do you have a problem with your memory?
A No.
Q Have you ever been diagnosed with Alzheimer's?
A No.
Q Do you know of any condition you may have that could affect your memory?
A No.
Q What is your date of birth?
A October 2nd, 1942.
Q That would make you 70 years old, correct?
A That's correct.
Q Let's go back to the similarities. You're saying they're similar.
Are you familiar with what DSHEA is?
A The Dietary Supplement Health and Education Act, yes.

Page 17

Q Do you think DSHEA has any relationship to Sovereign Silver?
MR. FERRELL: Objection. Calls for a legal conclusion.
To the extent you can answer, go ahead.
THE WITNESS: I think Sovereign Silver comes under the auspices of that law.
BY MR. NEGRETE:
Q Do you have an understanding of what DSHEA is?
MR. FERRELL: Same objection.
THE WITNESS: Yes.
BY MR. NEGRETE:
Q What is your understanding of what it is?
A It is a law that permits the sale -- the manufacture and sale of dietary supplements.
Q Again, going back to the similarity, when you say similar cases, do you mean these four cases that you testified to?
A Yes. I mean, those cases involved homeopathic products. This one is not a homeopathic product, the Sovereign Silver, but they're still not covered by the conventional Food and Drug Act. They're covered by DSHEA in this case and the aspect of the law that covers homeopathy for the other cases, but I still think of them as similar in the sense that we're talking about products

5 (Pages 14 to 17)

Ex. 26
Page 25

Page 18

for whom -- about which the knowledge of the efficacy and safety of the products is either unknown or questionable.

Q   Are you suggesting that products sold under DSHEA are maybe questionable?

A   Absolutely.

MR. FERRELL:  Objection.  Misstates the witness' testimony.

To the extent you can answer, go ahead.

THE WITNESS:  Absolutely.

BY MR. NEGRETE:

Q   Then why would DSHEA exist?

MR. FERRELL:  Objection.  Calls for a legal conclusion, harassment.  Go ahead.

THE WITNESS:  DSHEA exists because in 1992, '93, somewhere around there, the FDA was on the verge of preventing the sale of herbal remedies, nutritional supplements that were not covered under the Food, Drug and Cosmetic Act, and there was wide public uproar over that intention when it was made public.

And to my understanding is that the Dietary Supplement Health and Education Act was a direct result of that uproar from the public and is a compromise, at least this is my interpretation, a compromise view of substances that are not -- whose manufacturers do not wish to define them as therapeutic agents or drugs and they are, thus,

Page 19

defined as foods under the Dietary Supplement Health and Education Act and, as a consequence, even though they are -- they may be promoted illegally, but promoted and sold as therapeutic agents, there is no requirement in that law that I'm aware of that requires manufacturers prove efficacy or safety for these remedies.

That's why I consider this -- these products to be questionable until proven otherwise.

Q   You've worked for pharmaceuticals, haven't you?

A   For a firm?

Q   Pharmaceutical companies.

A   No.

Q   You never performed any work for a pharmaceutical company?

MR. FERRELL:  Objection.  Asked and answered.

Go ahead.

THE WITNESS:  Well, yes, I have done research that was in collaboration with Eli Lilly and Company.  I have reviewed the results of studies of drugs for a couple of companies so long ago I really don't remember the names of the companies, but I was asked to give an opinion of the data that had been generated by the developers of these drugs and did so, and they paid me for it, so if that's working for a pharmaceutical company, then, yeah, I have done that.

Page 20

BY MR. NEGRETE:

Q   Do you own any shares of stock in pharmaceutical companies?

A   No.

Q   Let's go back to this case.  Do you know who the plaintiff is in this case?

A   No.

Q   Do you know what his name is?

A   No.

Q   Now, with respect to -- do you know the product we're here to talk about it?

A   Sovereign Silver?

Q   Yes.  I'm asking you, do you know what it is?

A   Of course.

Q   Have you ever bought that product?

A   I did.

Q   Did you ever have it laboratory tested?

A   No.

Q   Did you ever review any tests of the product?

A   No -- well, I do have one document that I took from the website, the company's website, in which the silver content had been determined, and I've reviewed that document, but that's all I've done.

Q   Is it your understanding that Sovereign Silver is classified as a drug?

Page 21

MR. FERRELL:  Objection.  Calls for a legal conclusion.

To the extent you can answer, go ahead.

THE WITNESS:  No, under the Dietary Supplement and Health and Education Act it's not referred to as a drug.

BY MR. NEGRETE:

Q   Yes, but you would agree with me that under the Food, Drug and Cosmetic Act it would fall under the classification of a drug, I'm talking about Sovereign Silver?

MR. FERRELL:  Object.  Calls for a legal conclusion, but to the extent you can answer, go ahead.

THE WITNESS:  But it isn't.

BY MR. NEGRETE:

Q   That's what I'm confirming, you would agree with me, correct?

A   Agree with what?

Q   It isn't classified by the FDA as a drug.

MR. FERRELL:  Same objection.  Asked and answered.

Go ahead.

THE WITNESS:  I agree with you.

BY MR. NEGRETE:

Q   Have you ever worked with the FDA?

A   No.

Q   When I say FDA, you know I mean the Federal Drug

6 (Pages 18 to 21)

Ex. 26
Page 26

Page 22

Administration of the United States?

A   Yes.

Q   Have you ever provided consulting services for the FDA?

A   No.

Q   When I say "you," are you familiar with the FTC, Federal Trade Commission of the United States?

A   Sort of.

Q   Have you ever worked for the FTC?

A   No.

Q   You mentioned homeopathy.  Do you believe that Sovereign Silver is a homeopathic product?

A   No.

Q   You used the phrase in relationship to your testimony concerning DSHEA that some products are promoted illegally.  What do you mean by that ?

MR. FARRELL:  Objection.  Calls for a legal conclusion.

To the extent you can answer, go ahead.

THE WITNESS:  My understanding of that law is that it is illegal for a manufacturer or promoter of a dietary supplement to make any therapeutic claims about that product that could be constituted as a medical recommendation.

BY MR. NEGRETE:

Page 23

Q   What do you base that on?

MR. FERRELL:  Objection.  Calls for a legal conclusion.

THE WITNESS:  My understanding of that law --

MR. NEGRETE:  Counsel, this is a federal deposition.  Now, your right to object is limited.  If we have to get a Protective Order and call the judge, I will.

MR. FERRELL:  Okay.

MR. NEGRETE:  But you're trying to interfere with the deposition.

MR. FERRELL:  Not at all trying to interfere.  They're simply objections.

BY MR. NEGRETE:

Q   Now, let's go forward in this case trying to be as specific as possible, do you believe that Sovereign Silver is an illegal substance?

MR. FERRELL:  Objection.  Calls for a legal conclusion.

To the extent you can answer, go ahead.

THE WITNESS:  No.

BY MR. NEGRETE:

Q   Do you believe Sovereign Silver is illegal in any manner?

MR. FERRELL:  Same objection.

THE WITNESS:  No.

Page 24

BY MR. NEGRETE:

Q   Do you believe Sovereign Silver is illegally promoted?

MR. FERRELL:  Same objection.

THE WITNESS:  I wouldn't use the term "illegally."

BY MR. NEGRETE:

Q   Now, you mentioned -- I'm going back to similar cases because you talked about similar cases.  I believe some of your cases deal with homeopathic remedies.

Of the four, how many deal with homeopathic remedies, apart from this one?

A   All of them.

Q   So do you remember the names to those cases?

A   Well, Delarosa versus Boiron; Fernandez versus Boiron; Acuna versus Hylands; Sandoval versus Hylands.

Q   The first one was Delarosa.  What was the other one?

A   Delarosa versus Boiron.

Q   Have you met Ms. Delarosa?

A   No.

Q   Have you ever reviewed her charts?

A   No.

Q   Have you -- I don't know if it's a Mr. or Mrs. Fernandez, have you ever met Mr. or Mrs. Fernandez?

A   No.

Page 25

Q   Have you -- I don't know if it's a Mr. or Mrs. Acuna.  Do you know?

A   I have no idea.

Q   Have you met Mr. or Mrs. Acuna?

A   No.

Q   Have you met Mr. or Mrs. Sandoval?

A   No.

Q   Have you ever met Rachel Rosendez?

A   No.

Q   Do you know who Rachel Rosendez is?

A   No.

Q   Have you ever participated in a case concerning Rachel Rosendez versus Green Pharmaceuticals?

MR. FERRELL:  Objection.  Vague.

To the extent you can  answer, go ahead.

THE WITNESS:  I don't know.  I don't know these cases by these names.  I know these cases by the products that are involved.  That's the way I keep track of them.

BY MR. NEGRETE:

Q   Okay.  Have you provided any testimony in any case, whether be criminal or civil, involving colloidal silver?

A   No.

Q   Is it your understanding that Sovereign Silver is a colloidal silver product?

7 (Pages 22 to 25)

Page 26

A    That is my understanding.

Q    Have you written any abstracts on colloidal silver?

A    No.

Q    Published any articles or colloidal silver?

A    No.

Q    Have you had any -- have you performed any laboratory tests on any colloidal silver products?

A    No.

Q    Have you participated in any peer reviews on colloidal silver?

A    No.

Q    Have you received any particular training, educational, training on colloidal silver?

A    In colloidal silver, no.

Q    Do you believe that Sovereign Silver can cause injury?

A    Yes.

Q    Physical injury?

A    Argyria.

Q    Argyria, okay.

A    At least it has the potential.

Q    When you say "it has the potential," what do you base that on?

A    On my understanding that the chronic consumption

Page 27

of colloidal silver or any product containing silver, but colloidal silver products, can produce argyria.

Q    In this case do you have any information that leads you to believe that Sovereign Silver can cause argyria?

A    Only what I just said.

Q    Well, I just want to clarify that.

In this case with Sovereign Silver are you aware of any information --

A    No.

Q    -- or facts?

A    I was going to pause.

Q    Let's start over again.  In this case with respect to Sovereign Silver, do you have any information or evidence that the plaintiff suffered from argyria?

A    No.

Q    Did you research that at all with respect to this case?

A    With respect to that patient -- to the patient, no.

Q    So you're not opining as to argyria in this case, are you?

A    No.

Q    And you're not reaching any conclusion concerning the potential effects of argyria in this case,

Page 28

are you?

A    No.

Q    So in your Declaration when you refer to argyria, it's merely anecdotal?

MR. FERRELL:  Objection.  Misstates testimony.

Go ahead.

THE WITNESS:  Argyria is a documented side effect of the chronic use of silver products, and there are many cases that have been reported in the literature of argyria, so in that context I wouldn't say it was anecdotal, but it's -- it is a likelihood that argyria can be associated with a silver product.

BY MR. NEGRETE:

Q    Well, but I'm asking about this case, because you refer to it in your Declaration in this case.

In this case there is no relevance as to the plaintiff, is there, with respect to argyria?

A    Not to my knowledge.

Q    Now, do you know a gentleman by the name of Paul Karason?

A    No.

Q    Do you know what is referred to as the Blue Man Disease?

A    The Blue Man Disease?

Q    Yes.

Page 29

A    That's argyria.

Q    Now, was it your understanding that that was -- well, have you ever met anybody that had argyria?

A    No.

Q    You talk about these articles.  Did you bring any of those articles with you?

A    I did.

Q    Can you show it to me?

A    Sure.  I have a list of the references.

Q    You're familiar with silver salts, are you?

A    Silver salts?

Q    Yes.

A    Silver chloride, silver nitrate, yes.

Q    You're aware argyria more a result from use of silver nitrates, silver salts, are you not?

A    Colloidal silver salts, yes.  It is the silver ion that, I believe, is responsible for causing the argyria.

Q    How would you know that, just by these two articles?

A    No.  I learned about silver in pharmacy school. I learned about silver in my pharmacology training.

Q    Let's get more specific.  When you say you learned about it, this is, what, 40 years ago?

A    At least.

8 (Pages 26 to 29)

Page 30

Q   So since 40 years ago, have you continued any studies on silver?

A   Only in association with this case.

Q   So you waited 40 years or 50 years to find out more information, you just did it in preparation for this case?

A   Correct.

Q   Don't you think it would have been important if you're going to render an opinion about the harms of Sovereign Silver to at least talk to plaintiff in this case?

MR. FERRELL: Objection. Argumentative.

Go ahead.

THE WITNESS: Well, I have not been -- I'm still relatively new to this whole thing of being an expert witness, I would say, because I've been doing it for just two years. I've never had an attorney suggest to me that I should talk to the witness. I have always thought that my role in these cases has been to act as a scientist and as a pharmacologist and to render an opinion about the evidence that exists with regard to the efficaciousness or safety of the given products that are under consideration.

BY MR. NEGRETE:

Q   But you understand your Declarations, your under-oath Declarations, and your testimony could have an

Page 31

impact on a case such as this to potential defendant? You understand that?

MR. FERRELL: Objection. Argumentative, calls for a legal conclusion.

To the extent you can answer, go ahead.

THE WITNESS: I understand that.

BY MR. NEGRETE:

Q   Do you understand that your opinion can and as, a matter of fact, is being used in this case to try to certify a lawsuit against a defendant?

MR. FERRELL: Same objection.

BY MR. NEGRETE:

Q   Do you understand that?

MR. FERRELL: Same objection. Go ahead.

THE WITNESS: I understand that. I also understand I may not be the only expert in a particular case.

BY MR. NEGRETE:

Q   Do you know if you're the only expert in this case?

A   I don't know.

Q   Now, going back to that, if you're going to provide an opinion as to Sovereign Silver, don't you think it would have been important to test the product?

MR. FERRELL: Objection. Argumentative. Go ahead.

THE WITNESS: No. I thought it would be important

Page 32

that the manufacturer test the product.

BY MR. NEGRETE:

Q   Okay. Did you see -- do you know who the manufacturer is in this case?

A   Well, Natural-Immunogenics. That's all I know.

Q   Did you ask them for their tests?

A   I assumed that what they had on their website would refer me to any evidence that they had of to support the claims that they're making for the product.

Other manufacturers in other cases I've been involved with have done so, so I went with what I was given, and what I was given was a list of references that were said to support the notion that Sovereign Silver enhances immunity, and from the website I took the statement from Dr. Flavin that the product produces no side effects.

Q   Let's go back. So the answer is no, you didn't ask Natural-Immunogenics for any of their tests, did you?

A   I didn't ask them directly.

Q   Did you ask them indirectly?

A   I went to the website.

Q   That's all?

A   Yes.

Q   And you say "it was given to me." When you say "it was given to me," do you mean by Mr. Farrell?

Page 33

A   What was given to me?

Q   The information.

A   No, no, it was provided by the manufacturer on the website.

Q   You work for the Newport Trial Group, don't you?

A   If being an expert witness for Newport Trial Group is working for them, yes.

Q   But do you receive a regular paycheck from the Newport Trial Group?

A   No. I receive a paycheck if I'm doing a case for them.

Q   Because you retired in 2006; isn't that correct?

A   That's correct.

Q   You retired from what?

A   I was a professor at Indiana University School of Medicine.

Q   When was the first time you heard of Newport Trial Group?

A   When I received a -- I can't remember if it was an email or a phone call from Scott Farrell.

Q   Prior to this deposition, did you talk to anybody about the deposition?

A   Only Mr. Farrell.

Q   When you say "Mr. Farrell," there's two.

A   Ryan Farrell.

9 (Pages 30 to 33)

Page 34

Q   When did you talk to Mr. Farrell?

A   Well, I talked to him I guess it was in February when he asked me if I could handle this case.

Q   What did he tell you?

A   He said that he -- that they had -- I guess filing an action on a product called Sovereign Silver.

Q   Did you do any investigation into Sovereign Silver prior to the filing of the action?  You don't have to look to him.  I'm asking you.

A   I don't know when the action was filed.

MR. FERRELL:  Answer to the best of your ability.

THE WITNESS:  Yes, as soon as I was asked if I was interested, I went immediately to the website.  Mr. Farrell, Ryan Farrell, sent me the link to the website.

BY MR. NEGRETE:

Q   Do you have that email in there someplace?

A   I do.  There are the emails.

Q   Is this the first email you recall?

A   It goes by the date here.  Yes, that would be the first one.

Q   It shows a date, and I don't know where the string starts, but it says "Hi, Lynn," and it shows a date of January 18, 2013.

Do you believe that's the first contact you had

Page 35

with Mr. Farrell concerning this case?

A   There might have been a phone call prior to.

Q   Do you know how much prior to that there might have been a phone call?

A   Not much prior, if there was.  Usually I get a phone call, and that's followed up by an email.

Q   What do you mean usually you get a phone call?

A   From Ryan, if there's a case.

Q   How many cases do you have with Newport Trial Group?

A   I think at the moment -- well, there are several pending.  I've had several cases with them over two years.

Q   Several is how many?  You have a list.

A   I have the list.

Q   Anymore cases than what's on the list?

A   I don't know --

Q   Looking to him, he's not testifying.

A   This is not --

Q   You don't have to mark it up.

A   This is just for my reference.  This one is not, and I think the rest of them were over the course of the years.

Q   We're looking at a sheet where you have a list of lawsuits.

Who compiled this list?

Page 36

A   Mr. Farrell.

Q   When did he compile this list?

A   I don't know.

Q   When did you receive this list?

A   Well, I received it, I think, in an email yesterday.

Q   So let me understand this.  Mr. Farrell had to compile the list of lawsuits to let you know what cases you're on?

A   Well, the only other time this has come up in one of the depositions they, apparently, wanted the cases listed by name, and I didn't have that, because I had it all listed by just the product.

So Ryan said, "Let me put that all together for you," and that's why I have it that way.

Q   You don't have this case listed on this list.

A   That may be.

MR. NEGRETE:  We're going to mark this, if I may, as Exhibit 1 to this deposition.  I'll mark it on the back for now because we don't have copies.

MR. FERRELL:  Yes, we do.

MR. NEGRETE:  I'm going to mark the one you just put some checks on.

(Exhibit 1 was marked for identification.)

BY MR. NEGRETE:

Page 37

Q   So is it fair to say that prior to January -- I don't have that email here.  Do you have a copy of the email?

A   No.

MR. NEGRETE:  Then we're going to mark this as No. 2.

(Exhibit 2 was marked for identification.)

BY MR. NEGRETE:

Q   So is it fair to say that you had no discussions with either the plaintiff or the Newport Trial Group prior to January 18, 2013?

A   That's true.

Q   Were you ever provided with a copy of the Complaint in this case?

A   Yes.

Q   When?  It was after that?

A   Yeah, after that.

Q   What is the Oscillo case?

A   That is a one of the Boiron cases, and it's also -- no, it's the Boiron case.

Q   What does it have to do with this case?  Nothing?

A   Nothing.

Q   Now, you say here "I want to do a little reading on the subject before I commit to it.  I'll let you know in a few days."  What did you mean by that?

10 (Pages 34 to 37)

Page 38

A   I wanted to find out -- this is what I do with every case that is presented to me usually.  It was a product I never heard of.

Q   Was that the case here?

A   Of course.

Q   It was a product you never heard of?

A   Absolutely.

Q   You have an email here on No. 2 dated February 19, 2013 and you ask is Argentyn 23 part of Sovereign Silver.

A   That's correct.

Q   What are you referring to?

A   Another product that is sold by this company.

Q   Well, is that what you're referring to, Sovereign Silver?

A   I'm sorry?

Q   It wasn't Sovereign Silver you're referring to?

A   No.  When I went to the website, I found both of those products, and I didn't know if the lawsuit involved both products.

Q   But as far as you're concerned, Argentyn 23 is not part of the lawsuit?

A   Yes, that's correct.

Q   It looks like there's an email here, January 22, 2013, from you to Mr. Ryan Farrell.  You say here "(I

Page 39

don't think there's much clinical literature on the subject, but I'll have to look for it, particularly as it may apply to claims for Sovereign Silver).  The bottom line seems to be that the systematic use of CSP is potentially harmful (complete with person turning blue), and that there is no clinical evidence to support such use of silver.  Silver is effective as an antibacterial agent, but it's not first-line treatment for that application."

Let's break this down.  Did you find any clinical literature?

A   Yes.

Q   Is it what you showed me?

A   That's on argyria.

Q   Right.  What's the clinical literature?

A   Well, what I found were reviews of silver.  I found no clinical literature showing that there has been any efficacy of silver, either Sovereign Silver -- I found no studies of Sovereign Silver, in particular, and no studies of colloidal silver in general in the -- as an aid in the stimulation of immunity, of the immune response.

And I found statements in several reviews of the literature that basically said there is no recognized use in the United States, anyway, for the internal use of silver products.  Silver is used topically, for the most part, as an antibacterial in wounds, surgical wounds and

Page 40

the like.

Q   I'm confused.  Is there a use or isn't there a use?

A   Yes, there is a use.

Q   Isn't it true the government, in fact, uses colloidal silver?

A   I'm sorry?

Q   The government used colloidal silver isn't that true?

MR. FERRELL:  Objection.  Calls for speculation.

To the extent you can answer, go ahead.

THE WITNESS:  I don't know what you're talking about.

BY MR. NEGRETE:

Q   In the armed services --

MR. FERRELL:  Same objection.

BY MR. NEGRETE:

Q   -- for battlefield.

MR. FERRELL:  Same objection.

THE WITNESS:  I don't know that for a fact, but if you're talking about in the 40's and the '50s, I'm sure it did use it and, in fact, colloidal silver products were available over the counter for decades for the treatment of infections, prevention of infections, treatment of infections associated with wounds and the like.

BY MR. NEGRETE:

Page 41

Q   So colloidal silver can be effective?

MR. FERRELL:  Objection.  Misstates the testimony.

THE WITNESS:  Of course.  colloidal silver has a legitimate medical use.  It's now pretty much obsolete, as I understand it, but it is -- let me rephrase that.

There are uses to which silver is being put in the nanotechnology realm, in the conventional colloidal silver realm, but these are all for the management of wounds and prevention of infection, and so forth.

To my knowledge, colloidal silver products are not being used and are not being recommended for use to be taken internally for anything, especially for enhancement of immunity.

BY MR. NEGRETE:

Q   What articles did you find about that?

A   These.

Q   Now, with Sovereign Silver, did you review any tests as to its efficacy or safety?

A   I could find none.

Q   And you could find none also that indicated that it was not effective or safe; is that correct?

A   That's correct.  To my knowledge, there have been no studies of Sovereign Silver.

Q   I'm pulling out an article that I'm going to mark as No. 3.

11 (Pages 38 to 41)

Ex. 26
Page 31

Page 42

(Exhibit 3 was marked for identification.)

BY MR. NEGRETE:

Q   It's from quackwatch.org.

A   That's correct.

Q   Do you know who Stephen Barrett is?

A   Yes.

Q   You're on the advisory board to Quackwatch, aren't you?

A   No.

Q   You know your name is listed on the Quackwatch site as being advisor pharmacologist?

A   For the journal that they publish.

MR. FERRELL: Objection. Assumes facts not in evidence.

To the extent you can answer, go ahead.

THE WITNESS: Sorry?

MR. FERRELL: To the extent you can answer, go ahead.

THE WITNESS: Okay. They publish a journal. I can't even remember the name of the journal. My name was put on this. They asked me at one point would I like to be on the editorial board, and this was when I was quite enthusiastic about the subject of alternative medicine and the like as a younger man and I put my name on it and I expected to be reviewing pieces that were going to be in that journal and never did, so my involvement with that

Page 43

organization is zero. I believe that they are doing good things, but I have had no direct involvement with them

BY MR. NEGRETE:

Q   When you say "enthusiastic," do you mean as an advocate or critic of alternative medicine?

A   I wouldn't say as a critic, but as a skeptic.

Q   So your enthusiasm was your skepticism?

A   My enthusiasm drew out of it. My enthusiasm began to peak about the time the uproar occurred over the FDA's proposed actions with regard to herbal medicine and so on and then the enactment of the law. I consider that law to be quite deficient in what it should accomplish.

Q   We're talking about DSHEA?

A   Yes, I'm sorry.

Q   And we're talking about Stephen Barrett.

Now, have you ever met Stephen Barrett?

A   I have.

Q   On how many occasions?

A   Once.

Q   When?

A   I attended a meeting of the -- it's the organization.

Q   Quackwatch?

A   Quackwatch group.

Q   National Council Against Health Fraud?

Page 44

A   That's it. It was a national meeting. This would have been back in the '90s, and that's the only meeting I've ever attended of that group, but I met Dr. Barrett and a couple of the other folks involved in this.

Q   Is that when Renner was president?

A   Yes.

Q   Have you met Wallace Simpson?

A   Oh, yes.

Q   When is the last time you talked to Wallace Simpson?

A   Probably 20 years ago.

Q   Were you aware that Stephen Barrett purports to be an expert on supplements and alternative medicine?

MR. FERRELL: Objection. Calls for speculation, assumes facts not in evidence.

To the extent you can answer, go ahead.

THE WITNESS: I don't know that he purports to be such. He writes quite extensively on the subject. I believe he knows what he's talking about.

BY MR. NEGRETE:

Q   Why do you say that?

A   I have done my own bit of self-education on the subject of alternative medicine, and it turns out that a lot of my opinions and judgments are similar to Stephen

Page 45

Barrett's.

Q   That's not surprising, but let me ask you something.

Have you talked to Stephen Barrett in any aspect of this case?

A   Oh, no.

Q   Have you talked to Wallace Simpson about this case at all?

A   No.

Q   Have you talked to Steve Barrett about colloidal silver?

A   No.

Q   Now, do you know that Dr. Barrett had testified or tried to testify many years ago in a trial concerning homeopathic products and was disqualified as an expert?

MR. FERRELL: Objection.

BY MR. NEGRETE:

Q   Are you aware of that?

A   No.

MR. FERRELL: Objection. Assumes facts not in evidence, argumentative, calls for a legal conclusion.

THE WITNESS: No, I'm not aware of that.

BY MR. NEGRETE:

Q   Are you aware Dr. Barrett purports to try to provide expert testimony in cases --

12 (Pages 42 to 45)

Ex. 26
Page 32

Page 46

MR. FERRELL: Same objection.

BY MR. NEGRETE:

Q  -- much like yourself?

MR. FERRELL: Same objection.

THE WITNESS: Do you mean he offers himself in this regard?

BY MR. NEGRETE:

Q  Yes.

A  I'm not aware of that. I mean, I don't know. I don't offer myself. People come to me about these subjects.

Q  Well, but these people that come to you about alternative medicine is limited to the Newport Trial Group and the case in Canada, and I believe an attorney --

A  In Santa Monica.

Q  -- in Santa Monica. That's the people that come you to, right, that's it?

MR. FERRELL: Objection. Argumentative.

THE WITNESS: That's true.

BY MR. NEGRETE:

Q  How much have you been paid for this case?

A  I haven't been paid yet for this case.

Q  You weren't paid for the preparation of your report?

A  I don't think I received a check on this report.

Page 47

If I have, and I may have, it's $1,000.

Q  For the report?

A  Yes.

Q  Were you paid in any other cases that you are involved with the Newport Trial Group?

A  Yes.

Q  How much have you earned from the Newport Trial Group from the time you first became affiliated with them to the present date?

A  I did not understand.

Q  How much have you earned, been paid, from the Newport Trial Group from the first time you met them to the present date?

A  I believe in the first year, which would have been 2011, they paid me $6,500, and last year it was 14,500.

Q  What about this year?

A  This year, I think it's a thousand.

Q  Do you have an engagement letter with the Newport Trial Group?

A  I do.

Q  Do you have it with you?

A  I did not bring a copy with me. Sorry.

Q  I think you were asked to, but we can deal with that later. Certainly you'd be willing to provide a copy

Page 48

of that?

A  Oh, absolutely.

Q  Is it signed by you?

A  I think it is, yes. Yes, it is.

Q  And it's signed by somebody at the Newport Trial Group?

A  It is.

Q  Who would that be?

A  I'm having to remember, but I think it's Scott Farrell.

Q  What are the terms of your engagement? How are you paid is what I mean?

A  $1,000 per case.

Q  From start to finish?

A  Yes. We have sort of a -- we have a non-written agreement that if a case involves an inordinate amount of time in my estimation, then I can ask for some more funds. I've done that once.

Q  When was that, with Boiron?

A  No, it wasn't with Boiron. It might have been one of the Hylands cases. I don't remember.

Q  How much more did you ask for?

A  I think it was $2,500.

Q  Does your engagement include testimony at trial?

A  No.

Page 49

Q  Were you asked to testify at trial in this case?

A  In which case?

Q  This case, the one you're on here today.

A  No, I have not been asked to testify in trial. I didn't know there was a trial.

Q  Do you know who Linus Pauling is?

A  Oh, sure.

Q  Are you familiar with Linus Pauling's views on a supplement known as Vitamin C?

A  Yes.

MR. FERRELL: Objection. Calls for speculation.

To the extent you can answer, go ahead.

THE WITNESS: Yes, I'm aware of it.

BY MR. NEGRETE:

Q  Do you have an agreement with Linus Pauling as to his findings and studies of Vitamin C?

A  In what regard? If you're talking about cancer, I would not agree with Linus Pauling with regard to cancer.

Q  Why not?

A  Because the clinical evidence does not support it.

Q  Now, you're aware that Linus Pauling is a three-time Nobel prize winner?

A  Yes. Two, I believe.

13 (Pages 46 to 49)

Ex. 26
Page 33

Page 50

Q   I think it's two, you're right.

Do you believe you have a greater knowledge on the subject than he does?

MR. FERRELL: Objection. Argumentative. Go ahead.

THE WITNESS: No.

BY MR. NEGRETE:

Q   Now, do you know who Dr. Rentz, Eric Rentz?

A   No, I don't recognize the name.

Q   If I were to represent to you that Dr. Rentz is an expert for Natural-Immunogenics, would that refresh your recollection?

A   No.

MR. FERRELL: Objection. Assumes facts not in evidence.

To the extent you can answer, go ahead.

BY MR. NEGRETE:

Q   Were you provided with a copy of the Declaration of Dr. Eric Rentz in this case?

A   No.

Q   You referred to Dr. Flavin in this case. Do you know who Dr. Flavin is?

A   Only what I learned from the website.

Q   Were you provided with a copy of the Declaration of Dr. Flavin?

A   No.

Page 51

Q   Are you aware that Dr. Flavin provided a Declaration in this case?

A   No.

MR. FERRELL: Objection. Assumes facts not in evidence.

THE WITNESS: No, I was not.

BY MR. NEGRETE:

Q   What documents did you receive from the Newport Trial Group regarding this case? You showed me the link, and I'm not talking about emails.

A   Right.

Q   Apart from the emails.

A   I received a copy of the Complaint.

Q   And a copy of the Notice of Deposition?

A   And a copy of the Notice of Deposition, yes.

Q   Do you have the Notice of Deposition with you?

A   I do.

MR. NEGRETE: We'll mark your copy of the Notice of Deposition as 4.

(Exhibit 4 was marked for identification.)

BY MR. NEGRETE:

Q   When did you receive a copy of the Notice of Deposition?

A   Just a couple days ago.

Q   At the time you received it, you were living in

Page 52

San Diego; is that correct?

A   That's correct.

Q   Apart from the Notice of Deposition, I believe the Complaint, excluding the emails, did you receive any other documents from the Newport Trial Group?

A   No, only what was included with the Complaint, exhibits, I guess.

Q   Do you have a copy -- did you prepare a Declaration in this case?

A   Yes.

Q   Do you have a copy of it?

A   Sure.

Q   We're going to mark this as No. 5.

(Exhibit 5 was marked for identification.)

BY MR. NEGRETE:

Q   Who prepared this Declaration?

A   You mean who wrote it? I wrote it. Who put it in final form, somebody in Ryan Farrell's office.

Q   Do you have your draft of this Declaration?

A   I have several drafts.

MR. NEGRETE: I'm going to mark these consecutively, it seems like in order, as the first one is six, it says 2/23 a.m.

The next one I'm going to mark as 7. It says just 2/22.

Page 53

And the last one says "#1 2/22 2:15."

Some have a backside, but I think it's your good use of recycling?

A   Right. And you have them in reverse order the way you wrote it down. The numbers on the top are the dates.

MR. NEGRETE: I'm going to change that then.

THE WITNESS: No. 1 is No. 1, then 2 -- the second 2/22 is No. 2 and the 2/23 is --

MR. NEGRETE: I'm going to change that then.

No. 6 is No. 1. No. 7 stays the same and No. 8 changes to 2/23.

(Exhibits 6 through 8 were marked for . identification.)

BY MR. NEGRETE:

Q   Would that be the right chronology?

A   Yes.

Q   No. 6 on page 8 and 9 you make quite a bit of handwritten changes. Why would you do that if you wrote the Declaration?

A   Those are rough drafts. I'm not sure I follow you. That's the way I usually write things.

Q   How do you usually write things?

A   I mean, I go with a first draft. If I've written on a similar case, I may use some of what I had

14 (Pages 50 to 53)

Page 54

written in a previous Declaration and then edit that either to make it appropriate to the current case or in most cases what I'm doing is updating the information that I have. On Sovereign Silver I'm not sure. I haven't looked at those drafts since I did them in January, so I'm not sure what the scribblings were there, but Sovereign Silver, this was not something related to anything I had done before. May I see the one that has all the scribbling on it?

Q   Sure.

A   Right. This reflects the evolution of my thinking about how I'm framing the argument, how -- what points I really want to emphasize.

Q   Really? In that Declaration, if you hang onto it, the conclusion portion, there's nothing written.

A   Yeah, I don't write my conclusion until I've pretty well got it all done.

Q   But then who are you exchanging the drafts with?

A   Nobody. These are for me. This is how I write.

Q   Do you write from some sort of template?

A   I write to make things simple so that we've got a chronologically -- or -- what do I want to say -- the paragraphs are listed in the format that is on the final form on the legal document. I use that as my template.

Q   Well, I mean, do you use templates from other

Page 55

cases to base your declarations on?

A   I don't know what you mean.

Q   Have you used other -- the Declaration as an example, this one, the format of your Declaration from other cases with Newport Trial Group?

A   Well, the format is Qualifications, Basis for Opinions, Opinions, Product Description. If there's an issue with regard to safety, it will be formatted with regard to a section on safety, it will be formatted in regard to a section on efficacy. That's standard for me for the way I write these declarations.

Q   Standard since when?

A   Since I started doing it.

MR. FERRELL: Objection. Argumentative.

BY MR. NEGRETE:

Q   Since you started doing it a couple years ago?

A   Yeah.

Q   In ten cases?

A   Yeah, something like that.

Q   Hand that back to me.

A   (Witness complies.)

Q   Then when you're writing your drafts, do you have any dialogue with the Newport Trial Group regarding the draft? Are you submitting your drafts to the Newport Trial Group?

Page 56

A   No.

Q   Who is your main interface with the Newport Trial Group? Is it Ryan Farrell?

A   It has been,.

Q   Yes have you talked to Victoria Knowles about this case?

A   No.

Q   Have you talked to Scott Farrell about this case?

A   No.

Q   It was the engagement where you met Scott Farrell, right?

A   Two years ago.

Q   Were you part of an agency then, an expert agency? Do you know how they came to know about you?

A   Yes.

Q   How?

A   I had been asked by a reporter from abcnews.com for my opinion of a product for which a lawsuit had been filed -- against which a lawsuit had been filed. I'm on the list for abcnews.com as a result of my involvement in these kinds of things back when I was at the University.

I, among a whole bunch of us, are folks who get called for interviews and that sort of thing on things relating -- in my case relating to drugs.

Page 57

Q   Right.

A   And I had been asked by ABC News what I thought of this particular product, and I gave her my opinion. I had to go home and do a little reading about this product, but we talked, and I gave her my opinion. This report was published online, I guess, I'm not sure where it went, and a couple weeks later is when I heard from Scott Farrell.

It turned out Scott Farrell, it was his firm that filed the lawsuit against this particular product and he, apparently, liked what I had said about the product and asked me if I'd be interested in being an expert witness, and that's how it all started.

Q   The product was a pharmaceutical prescription product, wasn't it?

A   No.

Q   Do you recall what the product was?

A   Yes. This was -- I'm not sure I remember the name of the product, but it was a celebrity had been promoting it, Jillian Michaels, and it was a weight loss product.

Q   Was it Fen-Phen?

A   No. I would recognize it if I saw the name. I'm sorry, I can't come up with it.

Q   That was a couple years ago?

A   That was a couple years ago and, you know, the

15 (Pages 54 to 57)

Page 58

product was basically a laxative, and that's what I gave my opinion about.

Q   Did you have much more contact with Ryan Farrell since then?

A   You mean Scott Farrell?

Q   Scott Farrell.

A   I might have talked to him one additional time -- yes, I did, because I wasn't sure whether I wanted to become an expert witness, and I needed to find out what that entailed, and so I talked to colleagues of mine, I talked to my brother-in-law, who is an attorney, and just got a sense of what this might involve, and then I contacted Mr. Farrell again.

I don't remember whether I call him or he called me, and that's the only time I have spoken with him, other than when he was serving as the attorney at a deposition that I did for another case.

Q   Did you talk to Ryan Farrell within the past five days?

A   Yes.

Q   When was the last time?

A   We had a phone call maybe two days ago.

Q   Did you discuss the substance of what he believed would be asked today?

A   Mostly we talked about whether I would be asked

Page 59

at all, whether we would have a deposition.

Q   Once you got past that, did you talk about the substance of the deposition?

A   The form, the way it would go, yes.

Q   I don't know what that means. I'm talking about actually substantive questions that would be asked or issues that would be posed.

A   No, I don't recall -- are you saying you were going to ask me specifically about this, this and this?

Q   Okay, that's one example.

A   No, we didn't really talk about that.

Q   Did you talk about issues that are being contested?

A   I'm not sure what you mean there.

Q   Did you talk about colloidal silver?

A   No.

Q   Did you talk about Sovereign Silver?

A   No.

Q   Did you talk about the status of case?

A   Only that it's been going on for a long time.

Q   Was there any point where you talked to Ryan Farrell about some of your findings?

A   He read my Declaration.

Q   We marked your Declaration as Exhibit 5. I'm going to give you another Declaration which is going to be

Page 60

marked as Exhibit 9.

(Exhibit 9 was marked for identification.)

BY MR. NEGRETE:

Q   Are you familiar with that Declaration?

A   Yes.  I haven't looked at it for a while, but yes.

Q   Did you prepare it?

A   I did.

Q   You signed it?

A   I did.

Q   Under oath?

A   Of course.

Q   Now, if we look at Exhibit 9 and Exhibit No. 5, was Exhibit 9 used as a template for Exhibit No. 5?

A   Not directly.  I mean, there are similarities between all of my -- in terms of format between all of my Declarations.

Q   But I'm looking at the substance.  Don't you believe they are remarkably and substantially similar?

MR. FERRELL: Objection.  Argumentative, assumes facts not in evidence.

THE WITNESS: I don't know what you're driving at.

BY MR. NEGRETE:

Q   I'm driving at you do a made-to-order declaration that's essentially exactly alike.

Page 61

MR. FERRELL: Objection.  Argumentative. Carlos, please tone down the questions.

MR. NEGRETE: I know they're uncomfortable, Ryan.

MR. FERRELL: You don't have to badger the witness.

MR. NEGRETE: I'm not badgering the witness.  I know it will destroy your case.

MR. FERRELL: I'm happy to depose you if --

MR. NEGRETE: I know this is uncomfortable for you, Ryan.

MR. FERRELL: It's not in the least bit.  I prefer you not try to testify.

MR. NEGRETE: Your objection is improper.

MR. FERRELL: No.  Your question is improper.

MR. NEGRETE: Because it will destroy your case.

MR. FERRELL: No, Carl, ask fact questions.  You're not here to testify.

BY MR. NEGRETE:

Q   Dr. Willis, would you agree with me that the two Declarations are substantially similar, if not almost identical?

MR. FERRELL: Objection.  Argumentative.

BY MR. NEGRETE:

Q   Except for a different product?

MR. FERRELL: Objection.  Compound.

BY MR. NEGRETE:

16 (Pages 58 to 61)

**Q Let's start out with substantially similar?**
A No. Similar in the sense that if I was an author and had written several books, you'd find similarities in the way my books would appear.
My scientific papers I've written in my career are similar in that I use the same general format to set up what I was going to do in the study, what I did, what I found and what I think it means. This is the way I write these declarations. I'm not really following where you're trying to take this. These are not identical.
**Q What product is the Rosendez case concerning?**
A SnoreStop.
**Q We know the product here is Sovereign Silver, correct?**
A Correct.
**Q What is the similarity?**
A These are products that are sold under the auspices of DSHEA and the rules that regulate homeopathic products.
**Q That's it? Is that all?**
A Yeah, those are not for the same purposes. They're not being sold for the same purposes.
**Q But you earlier testified that Sovereign Silver is not a homeopathic product. Which way is it?**
MR. FERRELL: Objection. Misstates the witness'

testimony, assumes facts not in evidence.
If you can answer, go ahead.
THE WITNESS: It's not a homeopathic product.
BY MR. NEGRETE:
**Q So the statement you made was not true, they're not similar homeopathic products, are they?**
A I didn't say they were.
MR. FERRELL: Objection. Argumentative, misstates the witness' testimony.
THE WITNESS: I don't know what you're getting at.
MR. NEGRETE: I can see that.
**Q Going back to Exhibit No. 2, you write "The bottom line seems to be that the systemic use of CSP," -- CSP being colloidal silver, right?**
A Correct.
**Q -- "is potentially harmful (complete with a person turning blue)."**
**Now, in that statement at that point you say "seems to be." You don't really have complete information, did you?**
A No. I have done a quick search of the literature at that point.
**Q Now, you write "Silver is effective as an antibacterial agent," so you agree there is an efficacy to colloidal silver?**

MR. FERRELL: Objection. Misstates testimony.
THE WITNESS: Yes.
BY MR. NEGRETE:
**Q I notice there's what looks like a cover sheet that says "page 3 of 3" in Exhibit No. 2 to the lawsuit.**
**Did you receive anything more than the cover sheet?**
A This was the Complaint that was attached to the email.
**Q The cover page?**
A No. The whole thing was an attachment, the Complaint. I didn't bring a copy of it because I figured somebody's got it here.
**Q But your testimony is you received a whole copy of the Complaint?**
A Yes.
**Q Can you explain to me what pharmacology is?**
A Pharmacology is the study of drugs.
**Q That would be in a laboratory environment, would it?**
A Not necessarily. In my case, the bulk of my career has involved laboratory investigation of drugs, but there are pharmacologists who do -- who study drugs in human subjects.
**Q Do you consider yourself an academician or a**

**clinical scientist?**
A I'm not a clinical scientist. I define a clinical scientist as someone whose major emphasis is clinical research.
**Q You don't perform any clinical research, do you?**
A I don't. I don't perform any research now. I have been involved in clinical studies.
**Q I'm not asking if you've been involved in. Have you performed any clinical research with live human beings?**
A I have been involved as a participant in a study where we did research that involved live human beings.
**Q Have you ever performed any clinical research with respect to colloidal silver in live human beings?**
A No.
**Q Have you ever been involved in any laboratory investigations with regards to colloidal silver?**
A No.
**Q Then how do you believe you're qualified to testify in this case and render an opinion as to Sovereign Silver?**
MR. FERRELL: Objection. Compound, objection argumentative.
To the extent you can answer, go ahead.
THE WITNESS: I told Scott Farrell right at the

Page 66

get-go, right at the beginning of all of this involvement as an expert witness that I am not a clinician, I have not done clinical research, and more than likely would never have been involved in research on any of the products that he would be bringing me, assuming there would be more beyond the first one, and I was told and I believe and, in fact, this was borne out in early years before when my qualifications were challenged in one of the civil cases that I was involved with, and what I told him was that my expertise is in the evaluation of clinical and scientific literature purporting to demonstrate whether or not a particular drug or treatment is efficacious and/or safe.

And my training has been in scientific investigation. I'm qualified to read virtually any scientific paper and may have to do some homework on whatever it is covering, but I feel that I'm pretty much capable of evaluating the science that has gone into the study that resulted in that paper.

And my testimony and my Declarations all address those particular notions. It has nothing to do with whether I've had firsthand experience with any of these products.

**Q   And in this case you didn't have any firsthand experience with the product; isn't that true?**

A   Of course, that's true.

Page 67

**Q   If I'm understanding what you're saying is you're an expert in reading articles?**

MR. FERRELL: Objection. Misstates the witness' testimony.

If you can answer, go ahead.

THE WITNESS: That's not quite how I would put it. I would put it as I am an expert in the design and analysis of scientific experiments.

BY MR. NEGRETE:

**Q   From a reviewer's perspective, not necessarily hands-on; isn't that correct?**

A   That's correct. I've had plenty of hands-on experience.

**Q   Now, you said you told them, you mean you told Scott Farrell this?**

A   Yes.

**Q   Because you had concerns, isn't it correct, you had concerns about your ability to provide competent testimony with respect to products such as Sovereign Silver?**

MR. FERRELL: Objection. Speculative, calls for speculation, argumentative.

To the extent you can answer, go ahead.

THE WITNESS: No. I knew from experience I would be challenged because I'm not a physician and, in fact, I had

Page 68

been challenged in at least one of those cases, and my testimony was upheld or whatever they -- it was not thrown out. And I explain this to Scott, that this was my concern, and he told me that's not a problem.

BY MR. NEGRETE:

**Q   Do you remember the name of that case?**

A   No. I might be able to find it, but it goes way back.

**Q   How many -- way back before your relationship with Newport Trial Group?**

A   Oh, it goes back into the 1980s, probably.

**Q   Do you remember the type of product?**

A   It might have been the murder trial. There was another case, also a murder trial in which the drug, if you will, was table salt, sodium chloride. That was the first case in which I had ever testified and I was challenged there, but my testimony was upheld.

**Q   Have you ever been convicted of a felony?**

A   No.

**Q   Ever of a misdemeanor?**

A   No.

**Q   Have you ever been arrested?**

A   No.

**Q   Have you ever been a party to any civil lawsuit?**

A   No. Could I get a glass of water?

Page 69

**Q   Sure, absolutely. Isn't it true you were sued by a gentleman by the name of Mark Bland in Indiana?**

A   Oh, yes.

**Q   So you have been a party to a lawsuit?**

A   Yes, I have. In fact, I forgot about that. That was a case of a student who had cheated in my course.

**Q   He sued you?**

A   She. She sued me, she sued the University, she sued the dean of the medical school.

**Q   Her name was Mark?**

A   No. Mark Bland was the attorney, I think. Her name was -- I thought I would never forget that name. The neurons aren't functioning. Yes, I forgot about that.

MR. NEGRETE: Let's take a little break maybe 15 minutes or so and I'll keep on going straight.

(A recess was taken.)

BY MR. NEGRETE:

**Q   I notice you just had a telephone call with somebody during our break. Who were you talking to?**

A   The pastor at my church.

**Q   I hope my deposition isn't that bad.**

A   No. He called me.

**Q   Okay. You didn't discuss this case?**

A   No.

**Q   Going back to your Declaration in this case on**

18 (Pages 66 to 69)

Ex. 26
Page 38

Page 70

No. 5, I think your Declaration didn't include the exhibits, would that be correct?

A    The exhibits -- did you say did or did not?

Q    Did not, the one you gave me.

A    No, my copy doesn't have all the exhibits. I think they were -- Ryan told me what exhibits we were going to put in there, and those were the ones that go in.

Q    Well, then, the exhibits to your Declaration, they came from Mr. Farrell?

A    May I look at my Declaration?

Q    Absolutely.

A    I don't remember what exhibits we had here. Right. In this case the exhibits were the Sovereign Silver label, and I guess that's the only exhibit. That was -- I received initially a copy of that by email from Ryan, and then I purchased the product, so I had one of my own. That was the only exhibit, right?

Q    When did you purchase the product?

A    It would have been while I was writing the Declaration.

Q    That was about how long ago again?

A    That was back in January.

Q    Could it have been in February?

A    It could have been.

Page 71

Q    Where did you buy the product?

A    Where?

Q    Yes.

A    Sprouts.

Q    Did you just buy one?

A    Yes.

Q    That's February of 2013?

A    Yes.

Q    Had you ever purchased the product before then.

A    No.

Q    Have you ever heard of the product before then?

A    No.

Q    You need to wait until I finish.

A    Sorry.

Q    That's okay. So am correct that you wrote the Declaration and were you given guidance by Mr. Farrell as to what exhibits would be put in?

A    Only that I knew from past experience that we usually included a label.

Q    But when you signed the Declaration, did it include the exhibits?

A    It included the reference of the presence of the exhibit, and I assumed it would be included.

Q    I understand it included reference, but did you actually sign it with the exhibits attached?

Page 72

A    No.

Q    In this case as it relates to Sovereign Silver, what methodology did you use to reach the conclusion you state in your Declaration?

A    I searched the medical scientific literature for any indication that Sovereign Silver itself had been evaluated in a clinical study or any other kind of study, and I searched for an indication that any studies had been conducted with Sovereign Silver or silver, in general, with respect to enhancing immunity, and I also looked for indications that there had been reported side effects or even studies of side effects associated with silver.

Q    With respect to Mr. -- the plaintiff in this case, are you aware of any side effects that he may have had with respect to the use of Sovereign Silver?

A    No.

Q    Do you know at all what dosage the plaintiff used with respect to Sovereign Silver?

A    No.

Q    Do you have any information with regard to how he used the Sovereign Silver at all? I'm talking about the plaintiff.

A    No.

Q    In your Declaration in paragraph 22 you list several articles. It's A through N, as in Nancy.

Page 73

A    Correct.

Q    Are these all the articles that you reviewed?

A    No -- well, they are all the articles that I reviewed in preparation of the Declaration. Since writing the Declaration, I've looked at a few other articles, which I brought with me.

Q    Maybe you can give us all the articles.

A    Okay. Here are the articles that I -- that were not included in the Declaration, and then here are the rest of the articles that go with this pile. They were in alphabetical order. I can put them back in, if you like.

MR. NEGRETE: I'm going to mark all these collectively as I guess it's No. 10.

(Exhibit 10 was marked for identification.)

MR. NEGRETE: We'll get back to those.

Q    You state in paragraph 21 of your Declaration that you reviewed -- that your opinions and conclusions derive from the review of an entire body of evidence.

The body of evidence you're referring to is the articles you provided me?

A    In part. I mean, what I'm trying to relate here is the idea that my experience in evaluating the scientific literature extends beyond these pieces, but these are what are specific to this case.

Q    Well, is there anything else here that reflects

19 (Pages 70 to 73)

Page 74

the body of evidence, besides what you provided to me?

A    With respect to this case, no, that's all.

Q    You talk about based upon the scientific method, the process of formulating hypothesis and then conducting experiments to prove or falsify the hypothesis.

What is the hypothesis you're referring to in this case?

A    Well, the hypothesis is that there is evidence within -- there's evidence to be found in the literature that Sovereign Silver enhances immunity.  That would be one hypothesis.

Q    Is that hypothesis proven to be correct?

A    I don't think it is.  I can't say that it is false, because maybe I have not found the study that specifically speaks to the subject, but I looked pretty hard.

Q    You have "...and then conducting experiments to prove or falsify the hypothesis."

You didn't perform any experiments of Sovereign Silver, did you?

A    No.  This is sort of literary license.  I mean, the experiment is I went into the literature to find what was there.

Q    You say "The data and evidence upon which I relied are based upon empirical testing, the subject of

Page 75

extensive peer review and publication, subject to standards of protocol of operation, and are accepted by the scientific community."

What protocol of operation did you use in this case?

A    Well, due diligence in searching the literature, consulting as much as possible the peer-reviewed literature.  Some of this is not peer-reviewed, I think, some of it is opinion, but where I could find actual clinical trials or laboratory trials, then that's what I sought out.

Q    Right.  But I think you testified here you didn't find any clinical trials, did you?

A    No, I didn't.

Q    And you didn't find any peer-reviewed articles, did you?

A    No.  I found peer-reviewed articles that review the state of knowledge with respect to silver.

Q    Are they included here?

A    Yes.

Q    And the publications you're referring to are the publications you provided me?

A    Yes.

Q    Did you talk to any of the article -- any of the authors of any of the -- did you have any contact with the

Page 76

authors of the publications that you list in A through N?

A    No.

Q    Did you participate in the preparation of any articles that you list in paragraph 22?

A    No.

Q    Paragraph 23 you indicate "My assignment in this case was to objectively evaluate the claims of efficacy and safety for Sovereign Silver as noted in the Complaint."

Your evaluation of the efficacy and safety of Sovereign Silver was limited to review of the articles that you provided me; isn't that correct?

A    That's correct.

Q    Nothing beyond that?

A    Nothing beyond that.

Q    Are you familiar with the protocols used by the FDA to review the efficacy and safety of a product?

MR. FERRELL:  Objection.  Calls for a legal conclusion.

To the extent you can answer, go ahead.

THE WITNESS:  I am aware they have review boards for particular therapeutic categories and that they review the published and proprietary literature that a company would present in evidence that the product is effective.

BY MR. NEGRETE:

Page 77

Q    Did you follow the FDA standards in this case?

A    I don't know what the FDA standards are.  I followed what I believe to be standards of scientific investigation.

Q    Why did you buy the product?

A    I had this idea that -- I was puzzled over whether or not what we're dealing with in this product is ionic silver or elemental silver.

The implication from the website is that the nanoparticles that this is to contain, that this product contains, consist of elemental silver, and I thought, well, one way possible to check this out, although I kind of thought that the chances that my little experiment was going to work were not very large because there's not much of the silver in the product in the first place, but my intention was to bring it home and add a solution of sodium chloride to it.

If I could detect the presence of a white precipitate, that would indicate the presence of silver ions.  That experiment was not successful and I'm sure that -- well, it's either that it's elemental silver or there wasn't enough there for me to detect.  If I had my laboratory still in Indiana, I could have done a much more sophisticated assessment of that solution, but that's why I bought the product.

20 (Pages 74 to 77)

Ex. 26
Page 40

Page 78

Q   So how did you conduct the experiment?

A   I just set up some test tubes and put an aliquot of Sovereign Silver in one test tube, actually in three test tubes, and then I prepared a solution of sodium chloride, small amount of sodium chloride, table salt, and dissolved it and put that into three test tubes, and then I either added -- in one case I added a dropperfull -- several droppersfull of Sovereign Silver to one of the test tubes, several dropper fulls or an equal volume of water to another test tube, and I don't think I did anything to the third test tube, and then I did the reverse.

I had the water and -- or the sodium chloride solution over here and I added Sovereign Silver to the sodium chloride solution, and then swirled them, looked for the presence of a precipitate, didn't see one, wasn't surprised.

Q   Is there anyone else who participated in your experiment?

A   No.

Q   When was this experiment performed?

A   On the day I bought the product.

Q   Which, I believe, was in January?

A   January or February.

Q   Any reason why you didn't send it out to lab?

Page 79

A   No.  I would have -- I had the report that's in the pile there from Dr. Zhu that was on the website that indicated that this was -- I forget what it was -- 90 percent elemental and 10 percent ionized or something, and I thought, well, that's probably what it is.

Q   Well, you indicated earlier that you could have performed a more complete test had you had a lab?

A   Had I still been in my lab, yeah.

Q   What do you mean still in your lab?  What lab are you referring to?

A   My research laboratory at Indiana University.

Q   That was how long ago?

A   That was in '06.

Q   2006?

A   Actually, I wouldn't even need my lab.  I could have given it to one of my colleagues and they could have analyzed it.

Q   Why didn't you do it?

A   I didn't think it was worth doing.

Q   I'm sorry?

A   I didn't think it was worth doing.  I'm willing to accept that the report from Dr. Zhu was correct.

Q   Did you suggest to anybody at the Newport Trial Group that they send it out to lab for testing?

A   No.

Page 80

Q   How do you spell Dr. Zhu?

A   I believe that was Z-h-u.  It's one page.

Q   That's from the University of Miami?

A   Yes.

Q   I believe it has a date there of 2-21-13.  Does that refresh your recollection?

A   That's when I copied the paper.

Q   And did you testify that you agreed with the findings of Dr. Zhu?

A   Yes.

Q   Are you aware of any contraindications of Sovereign Silver with the plaintiff?

MR. FERRELL:  Objection.  Asked and answered.

MR. NEGRETE:  I thought I did.  I just don't remember.

MR. FERRELL:  To the extent you can answer it again, go ahead.

THE WITNESS:  No.

BY MR. NEGRETE:

Q   Do you have an understanding what immune support is?

A   I think in the context in which it's referred to in dietary supplements, it's related to fighting off the common cold.  In some cases maybe the implication is it would help to prevent cancer, just depends on who's making

Page 81

the claim, who's making the promotion.

Q   You don't find there's any claim of it preventing cancer in Sovereign Silver, do you?

A   No, certainly not.

Q   Did you find any claims with respect to Sovereign Silver?

A   Yeah, that it would provide immune support, boost immunity in dose-related fashion.

Q   What do you mean by dose --

A   The directions on the label say to take increased amounts of it for achieving different degrees of immune response.

Q   You might want to wait till I finish the question.

The question was what do you mean by "dose-related," and I think your answer is still the same; is that correct?

A   Well, to define dose-related in the pharmacological sense, it just means that the intensity of the response to a drug increases as the dosage increases.

Q   Are you familiar with the concept of like --

Are you familiar with the concept of like to like in terms of therapeutic and homeopathy?

A   You mean the principle of similarities?

Q   Yes.

21 (Pages 78 to 81)

Page 82

A   Yes, I'm familiar with it.

Q   **What is your understanding of that?**

A   That according to Dr. Heineman's theory of homeopathic medicine, a substance that produces a certain type of or spectrum of symptoms when taken in small or large doses will then be effective in treating a disease that is associated with the same symptoms.

Q   **Do you agree with Dr. Heniman's proposition?**

A   No.

Q   **So you disagree with the concept of like for like?**

A   I do.

Q   **Are you familiar with what vaccines do?**

A   That's a different horse entirely.

Q   **I'm asking you first are you familiar with the concept of what vaccines are?**

A   Yes, I rose to the bait. I'm sorry.

Q   **Well, aren't vaccines like for like?**

MR. FERRELL: Objection. Assumes facts not in evidence.

To the extent you can answer that, go ahead.

THE WITNESS: Vaccines themselves do not produce symptoms. Vaccines promote an immune response.

BY MR. NEGRETE:

Q   **Well, let's take the polio vaccine, for example.**

Page 83

**You inject into a live human being a small dose of actual polio, do you not?**

MR. FERRELL: Objection. Assumes facts not in evidence.

To the extent you can answer, go ahead.

THE WITNESS: It's an inactive virus.

BY MR. NEGRETE:

Q   **Correct. That would be correct?**

A   Uh-huh.

Q   **But it's a highly diluted form, is it not?**

A   It is.

Q   **And the same would be true with respect to flu vaccines, would it not?**

MR. FERRELL: Objection. Assumes facts not in evidence.

To the extent you can answer, go ahead.

THE WITNESS: That's true.

BY MR. NEGRETE:

Q   **Don't you believe that's very similar to homeopathic therapy?**

A   No.

MR. FERRELL: Objection. Argumentative, assumes facts not in evidence.

THE WITNESS: The homeopathic belief system is associated with the idea that homeopathic medicine

Page 84

activates healing processes within the body to eliminate a disease.

Vaccines are intended to promote an immune response to ward off a disease. Vaccines don't cure a disease, they prevent a disease.

BY MR. NEGRETE:

Q   **But isn't that what the suggestion would be with immune support?**

MR. FERRELL: Objection. Argumentative, assumes facts not in evidence.

To extent you can answer, go ahead.

THE WITNESS: Yeah, in theory, sure, I agree, that the idea of promoting an immune response makes sense, that if a vaccine promotes an immune response, that immune response can be demonstrated either in the prevention of the disease it's trying to prevent or, more appropriately, in an increase in detection of the components that contribute to the immune response.

BY MR. NEGRETE:

Q   **Wouldn't you agree that Sovereign Silver would be suggesting that colloidal silver would provide immune support in that context?**

A   Yes, that's precisely --

MR. FERRELL: Objection. Assumes facts not in evidence, misstates testimony.

Page 85

To the extent you can answer, go ahead.

THE WITNESS: Sorry, we're having a good discussion now.

Repeat the question, please. I lost my train of thought.

MR. NEGRETE: Would you mind.

(The record was read.)

THE WITNESS: Absolutely. That's what they're suggesting completely. All I'd like to see is there's evidence that's true.

BY MR. NEGRETE:

Q   **Have you ever seen anything to the contrary?**

A   That it's not true?

Q   **Right.**

A   I don't believe anybody has looked to see whether it's true or not.

Q   **And certainly you didn't?**

A   Certainly I didn't.

Q   **Now, isn't it correct that based upon what you're suggesting, that immune support can mean different things to different people?**

MR. FERRELL: Objection. Calls for speculation.

To the extent you can answer, go ahead.

THE WITNESS: Possibly, but to me the key people here are the FDA, what do they think of immune support and the

22 (Pages 82 to 85)

Maxene Weinberg Agency
(800) 640-1949

Ex. 26
Page 42

Page 86

scientific community.

BY MR. NEGRETE:

Q   You're not aware of the FDA challenging Sovereign Silver, are you?

MR. FERRELL:  Objection.  Calls for speculation and legal conclusion.

To the extent you can answer, go ahead.

THE WITNESS:  I'm not aware that they have.  I can think of reasons why they wouldn't.

BY MR. NEGRETE:

Q   You would agree with me that consumers would have different expectations of what Sovereign Silver would do?

MR. FERRELL:  Objection.  Calls for speculation.

To the extent you can answer, go ahead.

THE WITNESS:  I would say possibly.  I would say most consumers' conception of what the immune response is is based on what they heard and in the material they read on the subject of immune response.

BY MR. NEGRETE:

Q   Now, you've performed no surveys as to what the consumer's belief was on Sovereign Silver, did you?

A   No.

Q   Are you aware of the plaintiff's expectations of what immune support would mean?

Page 87

A   No.

Q   Other than the plaintiff, do you know of anybody else with respect to their expectations of what Sovereign Silver would provide?

MR. FERRELL:  Objection.  Incomplete hypothetical and calls for speculation.

To the extent you can answer, go ahead.

THE WITNESS:  No.

BY MR. NEGRETE:

Q   Are you aware of any other individuals besides the plaintiff that have made similar complaints -- when I say "complaints," I don't mean lawsuits, but criticisms of the phrase "immune support" as it relates to Sovereign Silver?

A   No.

Q   Do you believe -- going by the label of Sovereign Silver, do you believe that the phrase "immune support" is a clear statement?

A   No.

Q   The flip side of that, do you believe it's ambiguous?

A   Yes.

Q   So you would agree with me that based upon its ambiguity, different people could have different beliefs of what the phrase "immune support" means?

Page 88

MR. FERRELL:  Objection.  Calls for speculation socks.

THE WITNESS:  I would agree.

BY MR. NEGRETE:

Q   What was your expectation when you bought the product?

A   My expectation was that I would find a white milky precipitate when I added sodium chloride to the solution.

Q   And that's it?

A   I didn't buy it to use it.  I didn't buy it to expect it would have any effect on me.

Q   Have you ever used -- do you take supplements?

A   No.

Q   Have you ever?

A   Yes.

Q   What dietary supplements have you taken?

A   I have taken vitamins.  As a child I was given cod liver oil.

Q   I think we all have.  Let's go with cod liver oil.  Cod liver oil is a nutritional supplement, isn't it?

A   It is.

Q   Did you believe it was effective?

A   I didn't know one way or the other when I was a kid.

Page 89

Q   After you were a kid and after you became a researcher, did you take any supplements?

A   Well, I took vitamins from time to time, and I came to understand that cod liver oil is a source of Vitamin A.

Q   And what type of vitamins did you take in your later years?

A   Multi-vitamin.  I took Vitamin C, I took multi-vitamins.  That's it.

Q   Why did you take multi-vitamins?

A   Well, at the time that I was taking multi-vitamins, this would have been in the '60s, they were heavily promoted, and I may have had an inkling that maybe I needed them.  Now I have since revised that opinion.

Q   Is it your opinion that any supplement taken orally is ineffective?

A   No.

MR. FERRELL:  Objection.  Calls for speculation.

BY MR. NEGRETE:

Q   When you say you changed your opinion, what is now your opinion with respect to vitamins?

A   My opinion with respect to vitamins is that most people who eat a balanced, nutritional diet will get all of the vitamins that they -- essential vitamins that they

23 (Pages 86 to 89)

Page 90

need.

Q   Why would there be a distinction between food and supplements?

A   Most people are getting enough of the B complex vitamins, for example, in the food that they eat.  Any that they would take in addition through the purchase of a supplement is wasted money because the body knows how much of the B complex vitamins it requires and it excretes the rest of them in the urine.  That's one example.

Q   Now, this is a belief of yours, as opposed to something that you have actually had laboratory testing on; isn't that correct?

MR. FERRELL:  Objection.  Misstates testimony.

To the extent you can answer, go ahead.

THE WITNESS:  This is a belief that is based on my reading and study when I was a student of how vitamins work, how we know how much we need and which ones are safe, which ones are not safe in large doses.

BY MR. NEGRETE:

Q   Do you believe that Sovereign Silver should be banned?

A   No.

Q   Do you believe that it should be recalled?

A   No.

Q   Is your issue with Sovereign Silver only related

Page 91

to labeling?

MR. FERRELL:  Objection.  Assumes facts not in evidence.

To the extent you can answer, go ahead.

THE WITNESS:  To a large extent, as a scientist and someone who believes that consumers should be given accurate, complete information, I think proper labeling can solve a lot of problems I have with Sovereign Silver.

BY MR. NEGRETE:

Q   But you don't have any experience with labeling compliance as it relates to the FDA, do you?

MR. FERRELL:  Objection.  Calls for a legal conclusion.

To the extent you can answer, go ahead.

THE WITNESS:  No, I don't have any direct experience there.

BY MR. NEGRETE:

Q   Are you aware of any standard definition of immune support?

A   No.

Q   Are you familiar with Health Canada?

A   Only I know that -- only in that I know that Health Canada, I think I know, is equivalent of the FDA. I could be wrong.

Q   Have you ever consulted with Health Canada?

Page 92

A   No.

Q   Have you ever had any interaction with Health Canada?

A   No.

Q   Have you ever reviewed regulations that Health Canada has with respect to supplements?

A   Yes.

Q   How so?

A   I have read what they say about supplements.

Q   Have you been promised any sort of percentage or contingency fee as it relates to this case should there be a monetary compensation?

A   No.

Q   Apart from the amounts that you indicated that you get paid for providing your opinion and reports, do you have an expectation of any further compensation?

A   No.

Q   Apart from the cases with the Newport Trial Group -- let me ask you this:  Do you know if the case you have with the Santa Monica lawyer is a class action?

A   It is.

Q   Apart from that one and the ones with Newport Trial Group, do you have any other experience with class actions?

A   Yes.  The case involving Celsius Holdings --

Page 93

that was not --

MR. FERRELL:  I can't answer.

THE WITNESS:  I don't think that one was a Newport Trial Group.  It was people who -- it was a law firm who knew the folks at the Newport Trial Group, but I think they were independent.

BY MR. NEGRETE:

Q   You didn't participate at all in the preparation of the Complaint in this case, did you?

A   No.

Q   Other than your Declarations, you didn't participate in the preparation of any other legal documents, did you?

A   No.

Q   Have you ever provided testimony against any pharmaceutical manufacturer?

A   No.

Q   Is it your belief that if a substance or a drug is approved by the FDA, it guarantees it's safe?

MR. FERRELL:  Objection.  Calls for a legal conclusion.

To the extent you can answer, go ahead.

THE WITNESS:  No, there is no absolute.

BY MR. NEGRETE:

Q   Are you familiar with the term "complementary

24 (Pages 90 to 93)

Page 94

medicine"?

A   Yes.

Q   Sometimes referred to as CAM?

A   Yeah.

Q   You're familiar with the term "alternative therapy"?

A   Yes.

Q   Have you received any training in CAM?

A   No, I've received no training.

Q   Have you written any abstracts about complimentary medicine?

A   I've written no abstracts. I wrote an article that appeared in a local newsletter in Indiana on the subject of alternative medicine.

Q   What was that article?

A   It was talking about the potential for side effects associated with alternative medicine, mainly herbal remedies.

Q   When was this?

A   15 years ago maybe.

Q   What type of product?

A   No product -- herbal medicines. And I have written a newspaper column years ago in which I discussed alternative medicine in one sort of another.

Q   But your articles in both cases were critical of

Page 95

alternative medicine; isn't that correct?

A   Yes.

Q   Do you believe that Sovereign Silver has any potential of any renal harm or injury?

A   No, I don't believe that there is any documented toxicity associated with -- systemic toxicity associated with silver, other than argyria.

Q   More specifically, with respect to Sovereign Silver, that would be correct?

A   That would be correct, but I would add that I'm aware of no evidence that establishes that there is no problem.

Q   Are you familiar with materia medica?

A   Yes, I know what it is.

Q   What is your understanding of what it is?

A   It is a listing of -- it's old-time remedies that goes back in history, and there we find herbal remedies and homeopathic remedies.

Q   I take it you don't agree with Materia Medica?

A   I don't know what there is to agree with.

Q   Do you recognize it?

A   I know what it is.

Q   Knowing what it is, do you accept its proposition?

A   In the context of it relating to homeopathic

Page 96

efficacy, I find it highly questionable.

Q   Do you know what pharmacopeia is?

A   I do.

Q   What is your understanding of what Pharmacopeia is?

A   It is a listing of medicinal chemicals and the standards for -- which includes the, among other things, standards for the manufacturer of said chemicals.

Q   Do you agree with the context in which it's used?

MR. FERRELL: Objection. Calls for speculation, assumes facts not in evidence.

To the extent you can answer, go ahead.

THE WITNESS: Yes, it's a recognized standard.

BY MR. NEGRETE:

Q   Do you believe that Natural-Immunogenics or Sovereign Silver purports to claim that Sovereign Silver is an essential mineral of the human body?

MR. FERRELL: Objection. Assumes facts not in evidence.

To the extent you can answer, go ahead.

THE WITNESS: No.

BY MR. NEGRETE:

Q   Do you believe that Natural-Immunogenics or Sovereign Silver purports to provide any physiologic

Page 97

function?

A   Yes.

Q   What would that be?

A   Immune response.

Q   You don't have any opinion as to the proper dosing of colloidal silver, do you?

MR. FERRELL: Objection. Misstates testimony, assumes facts not in evidence.

To the extent you can answer, go ahead.

THE WITNESS: You mean with respect to its internal use?

BY MR. NEGRETE:

Q   Yes.

A   No.

Q   Now, you would agree with me that if colloidal silver was used in a proper and correct manner, you could avoid argyria all together?

A   Yes, although I would point out that if someone were to take a daily dose of the maximum dose that is recommended on the label, which would be 350 micrograms, that's at the recognized limit for daily intake of silver, and that number and the amount contained in that dosage of Sovereign Silver does not take into account the silver that is consumed in the water and just in dietary sources, which amounts to, as I understand, somewhere around 30, 40

25 (Pages 94 to 97)

Ex. 26
Page 45

Page 98

or 50 micrograms a day.

Q   Now, you would agree with me that the general health condition of a purchaser of Sovereign Silver could have an impact as to its efficacy and safety; is that correct?

MR. FERRELL:  Objection.  Incomplete hypothetical.

To the extent you can answer, go ahead.

THE WITNESS:  I don't know anything about its efficacy.  I can't really address that.

BY MR. NEGRETE:

Q   But you'd agree with me that the general -- well, so you have no opinion one way or the other whether the general health condition of a consumer purchasing the product would have an effect as to its efficacy or safety?

A   No.  I guess if we knew anything about the efficacy of the product, the extent to which it would be expected to be efficacious could be affected by the health status of the individual, similarly with regard to safety.

Q   I'm going to show you a document which we're going to mark as Exhibit 11.

(Exhibit 11 was marked for identification.)

BY MR. NEGRETE:

Q   This is a full set of your Declaration that was filed in this case, along with the exhibits.  You can take a couple minutes to read it.

Page 99

MR. FERRELL:  Is there a copy for me?

MR. NEGRETE:  I only have one, but I thought I did.

THE WITNESS:  Here are two Exhibit As.

MR. NEGRETE:  Let me get one back.

THE WITNESS:  And two Exhibit Bs.

MR. FERRELL:  So yes, you do?

MR. NEGRETE:  There you go.

MR. FERRELL:  Thank you.

BY MR. NEGRETE:

Q   Does this refresh your recollection as to the more complete Declaration?

A   Yes, sure.  I have a more current C.V. for you.

Q   Thank you.  That's actually what I was going to do.

A   It's different only here that it lists the Santa Monica group and the Montreal group.

MR. NEGRETE:  We're going to mark that as No. 12.

(Exhibit 12 was marked for identification.)

BY MR. NEGRETE:

Q   I'm going to trade you.

A   The whole packet?

Q   No, that's the wrong one.  Okay, this is the complete, if I can trade you there.

A   (Witness complies.)

Q   Turning to your C.V., you list about almost

Page 100

halfway down AIT Laboratories, Inc.

Was that your last place of employment besides the Newport Trial Group?

A   Yes.

Q   And --

A   I'm sorry, I was remiss in my updating.  That extended about halfway through 2011.

Q   What type of lab was that?

A   That is a forensic laboratory.  It does chemical analyses, drug testing analyses.

Q   Was that the colleagues that you were referring to that you could have sent this product to?

A   That's one of them.

Q   But you didn't do it?

A   No.

Q   Now, going to the second page, the grants and the contracts you received, now, were you the lead investigator with respect to the grants and the investigations?

A   Where it's listed as principal investigator, yes.

Q   And it seems like all of these are from pharmaceuticals, except for the NIH ones.

A   No.  American Heart Association is a non-profit, Kidney Foundation is a non-profit, NIH is the NIH.  Upjohn

Page 101

is a company.  Merrell Dow is a company.  American Diabetes is a non-profit.  Biomedical Research, that's within the University.  Eli Lilly and Wyeth are companies, and then the NIH.

Q   None of these relate to dietary supplements, do they?

A   No.  They all relate in one way or the other to kidney function primarily.

Q   With respect to your positions held, none of them relate to positions concerning dietary supplements, do they?

A   No.

Q   None of your honors and awards relate to dietary supplements, do they?

A   No, they do not.

Q   And also your research interests and experience doesn't relate to dietary supplements, does it?

A   Not directly.  I mean, I studied such things as Zinc, which is a dietary supplement, but I didn't study it as a dietary supplement.  I studied it as Zink.

Q   You have "Students Trained."  What is the purpose of having your trained students here?

A   Where are we?

Q   It's on the third page towards the middle.

A   Oh, Students Trained, these are graduate

26 (Pages 98 to 101)

Page 102

students.

Q   Any purpose of having them in your C.V.?

A   I was proud of what they did.

Q   On the fourth page you have University Service. Are any of the University Services there relating to dietary supplements?

A   No.

Q   Going to Medical School Service, were any of those that you list there related to dietary supplements?

A   I'm missing a page here -- oh, here, it's out of order.  No, nothing that I did in that context had anything to do with dietary supplements.

Q   With respect to professional activities, you have Research - Editorial Board.  Now, that's independent research of your own you're referring to, isn't it?

A   No, not necessarily.  That's relating to things that have to do with research.

Q   Well, the first one says "Editorial Board - The Scientific Review of Alternative Medicine."  What is that?

A   That's the publication of the National Council Against Health Fraud.

Q   Stephen Barrett's organization?

A   I don't know whether it's his specifically, but, yes, that's the one that we were talking about.

Q   That's not a medically recognized scientific

Page 103

review, is it?

MR. FERRELL:  Objection.  Assumes facts not in evidence, argumentative.  Go ahead.

THE WITNESS:  The journal?

BY MR. NEGRETE:

Q   Yes.

A   As I understand the journal, they make an effort to publish articles that meet standards for scientific validity and purpose as would any of the peer-reviewed journals, such as the ones I list that I was a referee -- for which I was a referee.

Q   None of these related to silver products, did they?

A   Not directly, no.

Q   Under Professional Activities, the Journalistic, are any of these relating to dietary supplements?

A   Sure.

Q   Which ones?

A   Well, these were the weekly columns that I mentioned earlier, and some of them addressed dietary supplements.

Q   Did any of them address colloidal silver?

A   I don't remember that we had one on colloidal silver.

Q   Right.  But I'm asking about these, you have

Page 104

Journalistic --

A   No.  I mean, in terms of the columns that I wrote and articles I wrote under this heading, I don't think silver was ever a subject of any of them.

Q   Now, you never taught any courses concerning in any manner colloidal silver, did you?

A   Well, I taught pharmacology, and colloidal silver had a role in modern pharmacology.

Q   But I'm asking you specifically with respect to the ones you list here, did any of them deal with colloidal silver?

A   No, we never discussed colloidal silver.

Q   Did you ever have any lectures, seminars --

A   Let me rephrase that.  The pharmacology course that we taught to the medical students had a variety of people who lectured, and I don't remember specifically, but it is possible that the individual who spoke about antibacterial agents mentioned colloidal silver.

Q   In terms of its effective use?

A   Sure, as a topical antibacterial lecture.

Q   You've never given any lectures, seminars symposiums about colloidal silver, have you?

A   I have not.

Q   I think we talked about earlier you have not had any publications concerning colloidal silver?

Page 105

A   That's correct.

Q   Do you know what hydrosol silver is?

A   That's what Sovereign Silver claims to be, a Hydrosol.

Q   Is there a distinction between hydrosol silver and colloidal silver that you're aware?

A   Not really that I'm aware of.  I know that the Sovereign Silver folks consider that their product is different from standard colloidal silver products because of the nanoparticles, but I confess I'm not quite clear on what a Hydrosol is in this context.

Q   Now, you never had any training as a medical doctor, did you?

A   No.

Q   Have you performed any research into silver hydrosol?

A   No.

Q   Now, you're not providing any opinion as to silver hydrosol, are you?

A   In the context of something that's called a hydrosol, no.

Q   Are you familiar with what silver sulfadiazine is?

A   That's a silver salt of an antibacterial agent.

Q   Are you providing any opinion in your

27 (Pages 102 to 105)

Ex. 26
Page 47

Page 106

**declarations or in this case considering silver sulfadiazine?**

A Sulfadiazine, no, I am not.

**Q Are you familiar with what SARS is, an acute respiratory syndrome?**

A Only very vaguely.

**Q Were you aware that colloidal silver was used to combat Sars?**

MR. FERRELL: Objection. Assumes facts not in evidence.

To the extent you can answer, go ahead.

THE WITNESS: No, I'm not aware of that.

BY MR. NEGRETE:

**Q For that matter, silver hydrosol?**

MR. FERRELL: Same objection.

BY MR. NEGRETE:

**Q I'm asking you the same question, are you aware whether it was used to treat Sars?**

A No.

**Q Do you know what adaptive immunity is? Have you ever heard that term?**

A I have heard the term. I only have what I assume it to be.

**Q What is that?**

A Which is the development of immunity associated

Page 107

with exposure to something that will generate the immune response.

**Q Are you familiar with what passive immunity is?**

A No, I couldn't define it. I know I've heard about it.

**Q Are you familiar with what trace minerals are?**

A Yes.

**Q And within the context of the immune body, what is your understanding of what trace minerals are?**

A Trace mineral is a mineral that the body requires in trace amounts, very small amounts, for particular biochemical functions, enzyme activities and the like.

**Q Do you think there's a relationship between colloidal silver and trace minerals?**

A In the context of defining a trace mineral as something that is essential to the function of the body, I'd say no. Silver can be defined as a trace mineral in the sense it exists in very small amounts in the environment and can be found in small amounts in the body, so in that sense it would fit the definition of a trace mineral.

**Q Do you know what homeopathic silver is?**

A That would be silver that has been very highly diluted.

Page 108

**Q Do you consider Sovereign Silver a homeopathic silver?**

A No.

**Q Do you know what bulk silver is?**

A I'm sorry?

**Q Bulk silver.**

A I don't know -- I know what the word "bulk" means, but I haven't heard it in the context of silver.

**Q Do you know what silver lactate is?**

A Well, only that this would be a salt lactic acid with silver.

**Q Are you aware of any publications with respect to silver by the United States Environmental Protection Agency, the EPA?**

A No. I have seen no -- I've seen reference to environmental opinions on silver maybe in one or two of the papers that I've given you, but I haven't consulted any of the literature that they cited.

**Q Do you know what silver nitrate is?**

A Yes.

**Q Do you believe that Sovereign Silver is a silver nitrate?**

A No.

**Q Do you know what a silver acetate is?**

A Well, I know what -- sure. I mean, I know that

Page 109

silver exists as an acetate.

**Q Do you believe that Sovereign Silver is a silver acetate?**

A Well, I don't know what is -- what constitutes the negatively charged particle that would be in Sovereign Silver. There has to be one, but I don't know what it is.

**Q Do you know in the articles that you provided with respect to argyria, whether they involve silver hydrosol?**

A No, I never heard the term or seen the term silver hydrosol until I looked at the Sovereign Silver literature. All of the cases of argyria probably involved, I don't know specifically which ones they were, but they would have had to involve ionic silver.

**Q In order for your premise to be correct?**

A Argyria is caused by ionized silver.

**Q Are you familiar with the National Institute of Health?**

A Sure.

**Q NIH?**

A Yes.

**Q Are you familiar with their position with respect to colloidal silver?**

A I don't know that I've seen an official statement from the NIH. I've seen it from the branch of

28 (Pages 106 to 109)

Ex. 26
Page 48

Page 110

the NIH that deals with complementary and alternative medicine. I'm familiar with their view.

Q Do you have any idea what this lawsuit seeks?

MR. FERRELL: Objection. Calls for a legal conclusion.

To the extent you can answer, go ahead.

THE WITNESS: Well, I mean, just my idea of what I think one of these lawsuits in general seeks, which is --

By MR. NEGRETE:

Q I'm asking not in general, this lawsuit.

A Well, I don't know specifically.

MR. FERRELL: Same objection.

THE WITNESS: I read the Complaint, and I don't quite -- you know, I don't pay a whole lot of attention to that part of it.

BY MR. NEGRETE:

Q Are you familiar with the term "Daubert," D-a-u-b-e-r-t, as it relates to expert testimony?

MR. FERRELL: Objection. Calls for a legal conclusion.

MR. FERRELL: To the extent you can answer, go ahead.

THE WITNESS: Yes, this has been explained to me by Ryan, but I couldn't tell you now what it means.

BY MR. NEGRETE:

Q So we're clear, professional licenses, you have

Page 111

the pharmacist license, and other than that, did you have any other professional licenses?

A No.

Q You regularly update your C.V.?

A Yes.

Q Do you keep the old drafts?

A I probably have some old drafts laying around in the computer, but as a rule, the one I update gets changed.

Q Do you use a laptop or desktop computer or both?

A Both.

Q This information, these documents, would you have it on your laptop or desktop?

A You mean all this stuff --

Q Yes?

A That's on my desktop.

Q Is that back in Indiana?

A No, it's here.

Q You brought it with you?

A No, I have one here.

Q Do you link -- do you have a computer back in Indiana?

A I do.

Q Do you link between the two computers?

A I do. And I have a laptop, and when we go back

Page 112

to Indiana, I will transfer all the documents new now to the laptop and I will incorporate them into the file. It's getting very confusing, but I have it there.

Q Do you know what type of operating system you use?

A It's Mac.

Q Do you have an email address?

A I do.

Q What is it?

A Willisl@iupui.edu.

Q Do you still use the University email?

A Yes, one of the perks of retirement.

Q What type of word processors do you use?

A Word.

Q You don't believe you've been called upon in this case to provide expert opinion as to toxicology, do you?

A No.

Q You mentioned your brother-in-law is an attorney?

A Yes. Well, he's retired now, but yes.

Q Did he have a specialty?

A I think he was a corporate lawyer. He didn't talk much about it.

Q He didn't have any involvement in this case, did

Page 113

he?

A Oh, no.

Q Did you prepare any statements or invoices for Newport Trial Group in this case?

A No. I have a list here that responds to all your requests.

Q Great. We'll put that in as number --

A Here is my letter of my interaction with this case. It should have been in that stack.

MR. NEGRETE: This will be 13.

(Exhibit 13 was marked for identification.)

MR. NEGRETE: This letter concerning your payment is 14.

(Exhibit 14 was marked for identification.)

BY MR. NEGRETE:

Q It seems like the one document you don't have is your engagement letter and, like I said, I'd ask you provide that to us.

A Okay.

Q So you're going to be in California until about when?

A Monday.

Q Then you go back to Indiana, correct?

A Yes.

MR. NEGRETE: Let's take a few minutes and see if I

29 (Pages 110 to 113)

Page 114

can't wrap this up and go from here.

(A recess was taken.)

BY MR. NEGRETE:

**Q   Doctor, now that we've gone through your testimony today, is there anything that you believe that you'd want to change about your declaration?**

A   No.

**Q   How long do you think you need to, through your counsel, get us back the engagement letter?**

A   I can -- if you'll take an email copy, I can send it to you today.

**Q   Great, you probably want to do that through Ryan.**

A   I'll send it to Ryan.

MR. NEGRETE:  At this point, unless something else comes out of the engagement letter, which I'm not too sure will, I'd propose that the original transcript of this deposition be going to Ryan -- your office?

MR. FERRELL:  Send it to your office.  It's your deposition.

MR. NEGRETE:  -- for correction.

MR. FERRELL:  Send it to your office, and you can forward it on to me or forward it directly to Lynn, either one.

MR. NEGRETE:  You get an opportunity to change

Page 115

anything about your deposition.  I would want to point out to you in the event you do change the transcript of the deposition, that can be pointed out at trial.

Do you understand that?

THE WITNESS:  Yes, I do.

MR. NEGRETE:  So you will be given a certain period of time to make corrections.

Do you think two weeks after you receive it will be enough.

THE WITNESS:  Oh, yes.

MR. FERRELL:  You're traveling, so with the mail you probably ought to do 21 days or 30 days.

THE WITNESS:  When would I expect it?

MR. NEGRETE:  Probably about a couple weeks, and then you get a couple weeks more.

THE WITNESS:  Yeah, we're leaving the country in the middle of June.  If it gets there in the middle of May, fine.

MR. NEGRETE:  That will be fine.  We'll get it to you, and then can you make any changes.  If you have any changes, email those changes back to me with a copy to your counsel.

And I propose that in the event that the original transcript is lost or destroyed for any reason or not signed, that a certified copy can be used in its place

Page 116

and stead for any and all purposes, and the court reporter be relieved of her duties under the California Civil Code of Procedure with respect to retention of the transcript.

MR. FERRELL:  So stipulated.

MR. NEGRETE:  Thank you very much for coming here today.

Whereupon, the proceedings concluded
at 1:42 p.m.)

* * *

Page 117

Declaration Under Penalty of Perjury

I, LYNN R. WILLIS, Ph.D., the witness herein, declare under penalty of perjury that I have read the foregoing transcript in its entirety; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this_____day
of_____, 20___, at _____
                (city)
_____.
    (state)

_____
                LYNN R. WILLIS, Ph.D.

30 (Pages 114 to 117)

Maxene Weinberg Agency
(800) 640-1949

Ex. 26
Page 50

STATE OF CALIFORNIA  )
                ) ss.
COUNTY OF ORANGE    )

    I, LEXANN CHRISTY, CSR No. 7932, in and for the state of California, do hereby certify:

    That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

    Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [  ] was [  ] was not requested.

    I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

    IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:_____

                _____
                LEXANN CHRISTY
                CSR NO. 7932

31 (Page 118)

Ex. 26
Page 51

# EXHIBIT 27

Carlos F. Negrete [SBN # 134658]
**LAW OFFICES OF CARLOS F. NEGRETE**
27422 Calle Arroyo
San Juan Capistrano, CA 92675-2747
Telephone:    (949) 493-8115
Facsimile:    (949) 493-8170
Email: cnegrete@negretelaw.com

*Attorneys for Defendant,*
NATURAL-IMMUNOGENICS CORP.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW NILON, individually and on behalf of all other similarly situated,<br><br>            Plaintiff(s),<br><br>vs.<br><br>NATURAL-IMMUNOGENICS CORP.,<br><br>            Defendant(s) | Case No. 3:12-cv-00930-LAB (BGS)<br><br>**NOTICE OF DEPOSITION OF RYAN M. FERRELL, ESQ.**<br><br>Date:     July 5, 2013<br>Time:     10:00 a.m.<br>Location:  Maxene Weinberg Agency<br>          27281 Las Ramblas, Ste. 160<br>          Mission Viejo, CA 92691 |

**TO:   ALL PARTIES AND/OR THEIR COUNSEL AND ALL INTERESTED PARTIES:**

YOU ARE HEREBY NOTIFIED THAT pursuant to Federal Rule of Civil Procedure 30, Defendant NATURAL-IMMUNOGENICS CORP. (hereinafter "Deposing Party"), through its counsel of record, will take the oral deposition of Plaintiff's counsel, RYAN M. FERRELL (hereinafter "Deponent") under oath before a qualified notary public.  The Deposition will take place on **July 5, 2013**, at

1

DEFENDANT'S NOTICE OF DEPOSITION OF RYAN M. FERRELL

Maxene Weinberg Agency, located at 27281 Las Ramblas, Suite 160, Mission Viejo, California 92691, commencing at 10:00 a.m. and continuing from day to day thereafter until completed.

YOU ARE NOTIFIED that the Deposing Party intends to cause the proceedings to be recorded both stenographically and by video tape and/or audio tape. And, in the event that the deponent is an expert witness or a treating or consulting physician, then the Deposing Party intends to make a video tape recording of the proceedings and reserves the right to use said video tape recording at trial in lieu of live testimony from the deponent in accordance with the provisions of FRCP Rule 30(b)(3). However, Deposing Party reserves the right to proceed with the deposition to be recorded stenographically only.

In the event that you intend to identify and produce more than one person who is going to testify as to the above-captioned matter, then it is requested that such persons be identified as least three (3) court days prior to the deposition.

If any party contends that an interpreter is required to translate deposition testimony, that party must give notice of the request for an interpreter, specifying the language and/or dialect, at least five (5) days before the deposition date.

Dated: May 23, 2013

Respectfully Submitted,

//s// Carlos F. Negrete
Carlos F. Negrete
Attorney for Defendant,
NATURAL-IMMUNOGENICS, CORP.

2

DEFENDANT'S NOTICE OF DEPOSITION OF RYAN M. FERRELL

## CERTIFICATE OF SERVICE

STATE OF CALIFORNIA   ]
                                      ss.
COUNTY OF ORANGE   ]

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action and my business address is 27422 Calle Arroyo, San Juan Capistrano, California  92675.

On May 23, 2013, I served the foregoing document(s) described as:

### NOTICE OF DEPOSITION OF RYAN M. FERRELL, ESQ.

on the interested parties in this action by submitting a true and correct copy of the above described documents as follows

[x]   (BY MAIL) I deposited the document by regular mail. I am readily familiar with this office's practice of collection and processing correspondence for mailing. Under that practice it would be deposited, through the office's office complex postal delivery box, with the U.S. Postal Service on the same day in a sealed envelope with postage thereon fully prepaid at San Juan Capistrano, California, in the ordinary course of business to the parties listed below. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit from mailing in this declaration.

[ ]   (BY U.S. POSTAL SERVICE EXPRESS MAIL) I deposited in a post office, mailbox, sub-post office, substation, mail chute or other like facility regularly maintained by the United States Postal Service for receipt of Express Mail a copy of the above-described documents, in a sealed envelope, with Express Mail postage fully prepaid and addressed to the parties listed below.

[ ]   (BY FACSIMILE) I caused all of the pages of the above-entitled document to be sent to the parties listed below, pursuant to California Rules of Court, Rule 2008 and California Code of Civil Procedure, Section 1013. The facsimile machine that I used complied with Rule 2003 and no error was reported by the machine. I caused the machine to print a transmission confirmation record of the transmission, a copy of which is attached hereto and made a part hereof as though set forth in full herein. The date, time, telephone number of the party served and final status of the transmission are set forth in the confirmation record.

[x]   (BY E-MAIL) I caused a copy of the above-listed document to be delivered via e-mail.
[ ]   (PERSONAL SERVICE) I caused a copy of the above listed document to be personally delivered to the party set forth below at the address set forth below.

I declare that I am employed in the office of a member of the bar of this court at whose direction this service was made.

Executed on May 23, 2013, at San Juan Capistrano, California. I declare under penalty of perjury under the laws of the State of California and the Untied States of America that the above is true and correct.

Jennifer L. Jerzy

## SERVICE LIST

Scott J. Ferrell, Esq.
Ryan M. Ferrell, Esq.
**NEWPORT TRIAL GROUP**
4100 Newport Place, Suite 800
Newport Beach, CA 92660
Telephone: (949) 706-6464

*Attorneys for Plaintiff*

4

DEFENDANT'S NOTICE OF DEPOSITION OF RYAN M. FERRELL

# EXHIBIT 28

Carlos F. Negrete [SBN # 134658]
**LAW OFFICES OF CARLOS F. NEGRETE**
27422 Calle Arroyo
San Juan Capistrano, CA 92675-2747
Telephone:  (949) 493-8115
Facsimile:  (949) 493-8170
Email: cnegrete@negretelaw.com

*Attorneys for Defendant,*
NATURAL-IMMUNOGENICS CORP.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW NILON, individually and on behalf of all other similarly situated,<br><br>　　　　Plaintiff(s),<br><br>vs.<br><br>NATURAL-IMMUNOGENICS CORP.,<br><br>　　　　Defendant(s) | Case No. 3:12-cv-00930-LAB (BGS)<br><br>**NOTICE OF DEPOSITION OF SCOTT J. FERRELL, ESQ.**<br><br>Date:　July 10, 2013<br>Time:　10:00 a.m.<br>Location:　Maxene Weinberg Agency<br>　　　　27281 Las Ramblas, Ste. 160<br>　　　　Mission Viejo, CA 92691 |

**TO:   ALL PARTIES AND/OR THEIR COUNSEL AND ALL INTERESTED PARTIES:**

　　YOU ARE HEREBY NOTIFIED THAT pursuant to Federal Rule of Civil Procedure 30, Defendant NATURAL-IMMUNOGENICS CORP. (hereinafter "Deposing Party"), through its counsel of record, will take the oral deposition of Plaintiff's counsel, SCOTT J. FERRELL (hereinafter "Deponent") under oath before a qualified notary public.  The Deposition will take place on **July 10, 2013,**

<div align="center">1</div>

DEFENDANTS' NOTICE OF DEPOSITION OF SCOTT J. FERRELL, ESQ.

at Maxene Weinberg Agency, located at 27281 Las Ramblas, Suite 160, Mission Viejo, California 92691, commencing at 10:00 a.m. and continuing from day to day thereafter until completed.

YOU ARE NOTIFIED that the Deposing Party intends to cause the proceedings to be recorded both stenographically and by video tape and/or audio tape. And, in the event that the deponent is an expert witness or a treating or consulting physician, then the Deposing Party intends to make a video tape recording of the proceedings and reserves the right to use said video tape recording at trial in lieu of live testimony from the deponent in accordance with the provisions of FRCP Rule 30(b)(3). However, Deposing Party reserves the right to proceed with the deposition to be recorded stenographically only.

In the event that you intend to identify and produce more than one person who is going to testify as to the above-captioned matter, then it is requested that such persons be identified as least three (3) court days prior to the deposition.

If any party contends that an interpreter is required to translate deposition testimony, that party must give notice of the request for an interpreter, specifying the language and/or dialect, at least five (5) days before the deposition date.

Dated: May 23, 2013

Respectfully Submitted,

//s// Carlos F. Negrete
Carlos F. Negrete
Attorney for Defendant,
NATURAL-IMMUNOGENICS, CORP.

2

DEFENDANTS' NOTICE OF DEPOSITION OF SCOTT J. FERRELL, ESQ.

## CERTIFICATE OF SERVICE

STATE OF CALIFORNIA    ]
                                          ss.
COUNTY OF ORANGE      ]

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action and my business address is 27422 Calle Arroyo, San Juan Capistrano, California 92675.

On May 23, 2013, I served the foregoing document(s) described as:

### NOTICE OF DEPOSITION OF SCOTT J. FERRELL, ESQ.

on the interested parties in this action by submitting a true and correct copy of the above described documents as follows

[x]    (BY MAIL) I deposited the document by regular mail. I am readily familiar with this office's practice of collection and processing correspondence for mailing. Under that practice it would be deposited, through the office's office complex postal delivery box, with the U.S. Postal Service on the same day in a sealed envelope with postage thereon fully prepaid at San Juan Capistrano, California, in the ordinary course of business to the parties listed below. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit from mailing in this declaration.

[ ]    (BY U.S. POSTAL SERVICE EXPRESS MAIL) I deposited in a post office, mailbox, sub-post office, substation, mail chute or other like facility regularly maintained by the United States Postal Service for receipt of Express Mail a copy of the above-described documents, in a sealed envelope, with Express Mail postage fully prepaid and addressed to the parties listed below.

[ ]    (BY FACSIMILE) I caused all of the pages of the above-entitled document to be sent to the parties listed below, pursuant to California Rules of Court, Rule 2008 and California Code of Civil Procedure, Section 1013. The facsimile machine that I used complied with Rule 2003 and no error was reported by the machine. I caused the machine to print a transmission confirmation record of the transmission, a copy of which is attached hereto and made a part hereof as though set forth in full herein. The date, time, telephone number of the party served and final status of the transmission are set forth in the confirmation record.

[x]    (BY E-MAIL) I caused a copy of the above-listed document to be delivered via e-mail.
[ ]    (PERSONAL SERVICE) I caused a copy of the above listed document to be personally delivered to the party set forth below at the address set forth below.

I declare that I am employed in the office of a member of the bar of this court at whose direction this service was made.

Executed on May 23, 2013, at San Juan Capistrano, California. I declare under penalty of perjury under the laws of the State of California and the Untied States of America that the above is true and correct.

Jennifer L. Jerzy

## **SERVICE LIST**

Scott J. Ferrell, Esq.
Ryan M. Ferrell, Esq.
**NEWPORT TRIAL GROUP**
4100 Newport Place, Suite 800
Newport Beach, CA 92660
Telephone: (949) 706-6464

*Attorneys for Plaintiff*

DEFENDANTS' NOTICE OF DEPOSITION OF SCOTT J. FERRELL, ESQ.

# EXHIBIT 29

LAW OFFICES OF

# CARLOS F. NEGRETE

ATTORNEYS AT LAW

27422 CALLE ARROYO
SAN JUAN CAPISTRANO, CALIFORNIA 92675-2747
Telephone  (949) 493-8115
Facsimile   (949) 493-8170

October 20, 2014

Via  Facsimile and US Maill

Ryan M. Ferrell, Esq.                                        (949) 706-6469
Victoria Knowles, Esq.
NEWPORT TRIAL GROUP
4100 Newport Place, Suite 800
Newport Beach, California 92660

Re:          *Andrew Nilon v. Natural-Immunogenics*

Dear Counsel,

Please be advised that we will need to reschedule the deposition of Giovanni Sandoval.  I am in a Federal Trial and am unavailable on the currently scheduled date of October 24, 2014.

Within the next five (5) days, I would appreciate your forwarding me several dates that your client is available for his deposition so that we can select a mutually agreeable date.

Thank you in advance for your anticipated cooperation.

Sincerely,

**LAW OFFICES OF CARLOS F. NEGRETE**

*Dictated but not read*

Carlos F. Negrete

CFN/.mks

Ex. 29
Page 63

# EXHIBIT 30

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT

OF CALIFORNIA

- - -

ORIGINAL

ANDREW NILON, INDIVIDUALLY               )
AND ON BEHALF OF ALL OTHERS              )
SIMILARLY-SITUATED,                      )
                                         )
              Plaintiff,                  )
                                         )
     vs.                                 ) No.:    3:12-CV-00930
                                         )         LAB (BGS)
                                         )
NATURAL-IMMUNOGENICS                     )
CORPORATION AND                          )
DOES 1 - 25, INCLUSIVE,                  )
                                         )
              Defendant.                  )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

DEPOSITION OF

GIOVANNI SANDOVAL, JUNIOR

NEWPORT BEACH, CALIFORNIA

APRIL 20, 2015

Atkinson-Baker, Inc.
Court Reporters
www.depo.com
(800) 288-3376

REPORTED BY:   ANGELIQUE MELODY FERRIO, CSR NO. 6979

FILE NO:       A90443B

1



IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT

OF CALIFORNIA

- - -

**ORIGINAL**

ANDREW NILON, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY-SITUATED,

Plaintiff,

vs.                    No.:   3:12-CV-00930
                               LAB (BGS)

NATURAL-IMMUNOGENICS
CORPORATION AND
DOES 1 - 25, INCLUSIVE,

Defendant.

DEPOSITION OF

GIOVANNI SANDOVAL, JUNIOR

NEWPORT BEACH, CALIFORNIA

APRIL 20, 2015

Atkinson-Baker, Inc.
Court Reporters
www.depo.com
(800) 288-3376

REPORTED BY:  ANGELIQUE MELODY FERRIO, CSR NO.  6979

FILE NO:   A90443B



APPEARANCES

FOR THE PLAINTIFF:

NEWPORT TRIAL GROUP
BY:  RYAN M. FERRELL, ESQ.
4100 Newport Place
Suite 800
Newport Beach, California 92660

FOR THE DEFENDANT:

EMORD & ASSOCIATES
BY:  PETER A. ARHANGELSKY, ESQ.
AND  JOSHUA FURMAN, ESQ.
3210 South Gilbert Road
Suite 4
Chandler, Arizona 85286

---

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT

OF CALIFORNIA

- - -

ANDREW NILON, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY-SITUATED,

Plaintiff,

vs.                    No.:   3:12-CV-00930
                               LAB (BGS)

NATURAL-IMMUNOGENICS
CORPORATION AND
DOES 1 - 25, INCLUSIVE,

Defendant.

Deposition of GIOVANNI SANDOVAL, JUNIOR, taken on behalf of the Defendant, at 4100 Newport Place Drive, Suite 800, Newport Beach, California, 92660, commencing at 9:50 a.m., Monday, April 20, 2015, before ANGELIQUE MELODY FERRIO, CSR No. 6979.

---

INDEX

WITNESS:  GIOVANNI SANDOVAL, JUNIOR

EXAMINATION:                                    PAGE

By Mr. Arhangelsky                              6

EXHIBITS

| NUMBER | DEFENDANTS' DESCRIPTION | PAGE |
| --- | --- | --- |
| A | Notice of Deposition of Class Plaintiff Giovanni Sandoval Dated April 7, 2015 Consisting of five pages | 18 |
| B | Colored Xeroxed Photograph Consisting of one page | 51 |
| C | Colored Xeroxed Photograph Consisting of one page | 53 |
| D | Declaration of Giovanni Sandoval Dated June 18, 2014 Consisting of four pages | 60 |

EXHIBITS CONTINUED:

E        Second Amended Class Action Complaint       66
         Dated August 25, 2014
         Consisting of 24 pages

F        Colored Xeroxed Photographs                 81
         Consisting of eight pages

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

PAGE     LINE

     (NONE)

INFORMATION TO BE SUPPLIED:

PAGE     LINE

     (NONE)

---

NEWPORT BEACH, CALIFORNIA, MONDAY, APRIL 20, 2015

9:50 A.M.

-oOo-

GIOVANNI SANDOVAL, JUNIOR,

having first been duly sworn, was

examined and testified as follows:

EXAMINATION

MR. ARHANGELSKY:  Okay.  We're here on the matter of Sandoval or Nilon versus Natural-Immunogenics Corporation.

Could I have counsel identify themselves for the record, please.

MR. FERRELL:  Sure.  I'm Ryan Ferrell on behalf of the Plaintiff, Giovanni Sandoval and the certified class in this action.

MR. ARHANGELSKY:  Peter Arhangelsky for Natural-Immunogenics.  And with me is Josh Furman.

BY MR. ARHANGELSKY:

Q.  Mr. Sandoval, can you state your full legal name for the record, please.

A.  Giovanni Sandoval, Junior.

Q.  What is your current address?

---

A.  2681 South Virginia Drive.

Q.  How far way is that from here?

A.  About two hours.

Q.  You said South Virginia Drive, what city is that?

A.  It's down in Yuma.

Q.  Yuma, Arizona?

A.  Arizona.

Q.  Did you drive here today?

A.  I drove here yesterday.

Q.  How long have you lived at that residence?

A.  I've barely been there, I'll say, a year.

Q.  One year, so, you moved there in April of 2014?

A.  Yeah, officially, yeah.  I've just kind of going back and forth from my job from San Diego to Arizona, but I officially moved all of my stuff over there about a year ago.

Q.  Okay.  So, before a year ago what was your address?

A.  In El Cajon, I forget the exact address, but it was on Jeffrey Street in El Cajon, California.

Q.  How long did you live there?

A.  Probably like, I want to say, five years.

Q.  Okay.  And is Sandoval the only name that you go by?

---

A.  Yes.

Q.  Sandoval, Junior?

A.  Yes.

Q.  And do you have any other surnames or family names?

A.  No.

Q.  And is Giovanni the only first name that you go by?

A.  Yes.

Q.  Okay.  Mr. Sandoval, have you ever been deposed before?

A.  No.

Q.  Do you understand that here today you're testifying as though you were in court subject to perjury under oath?

A.  Yes.

Q.  And do you have any questions concerning that oath?

A.  No.

Q.  I'll give you a few rules, some background, some rules because you've not been deposed before.  I'm going to ask you some questions here today and we're entitled to your answers.

If you don't understand a question, I'm going to ask that you let me know immediately and I'll clarify

the question.

If you don't let me know and you don't ask for clarification and you answer the question anyway, I'm going to assume that you understood the question; do you understand that; is that fair?

A. Yes.

Q. We need to make our court reporter's job easy today. And that means that we can't talk over each other. We need to have a clean transcript.

And so I'm going to also ask that you wait until I finish asking my question before you answer; do you understand that?

A. Yes.

Q. Likewise, I'll wait for you to finish your answer before I ask another question.

Your counsel may have objections. I would ask that you wait until he's finished making his objection before you attempt to answer so that, again, we don't have people talking on the record at the same time; do you understand that?

A. Yes.

Q. Is there any reason medically or otherwise that you can't testify truthfully today?

A. No.

Q. Have you taken any medications within the past

24 hours?

A. No.

Q. Do you take any medications at all?

A. No.

Q. Have you ever been prescribed any medications within the last several years?

MR. FERRELL: Objection, as to time. It's vague.

BY MR. ARHANGELSKY:

Q. Have you ever been prescribed any medications in the last four years?

A. Besides some Motrins or a pain pill, no.

Q. Was that a prescription medication?

A. Yeah, some Motrins. That messed up my arm. Yeah, I had messed up my arm. And they gave me, they prescribed me those, but that's about it.

Other than that, I don't take any medication or nothing.

Q. How old are you?

A. I'm 28.

Q. Are you married?

A. No.

Q. Do you have a girlfriend?

A. No.

Q. Do you have a significant other?

A. Yes.

Q. And who is that?

A. Her name is Juliana Ochoa.

Q. Can you spell that for the record, please.

A. Juliana Ochoa, J-u-l-i-a-n-a, O-c-h-o-a.

Q. And does she live with you?

A. Yes, she does.

Q. How long has she lived with you?

A. A year and a half.

Q. Did she live with you back in El Cajon?

A. Yes.

Q. So, 18 months?

A. I would say.

Q. All right. And how long have you been together with her?

A. Around that amount of time.

Q. Where were you born?

A. I was born in Watsonville, California by San Jose County.

Q. And what's your level of education?

A. I went up to eleventh grade.

Q. What high school was that?

A. El Cajon High School.

Q. Did you pursue a G.E.D.?

A. No, I did not.

Q. Did you achieve any additional classes after high school?

A. No.

Q. What level of education does your significant other have?

A. She graduated.

Q. From high school?

A. Yes.

Q. Does she have any college education?

A. No.

Q. Do you have any siblings?

A. Yes.

Q. What are their names?

A. I have two sisters. One of them her name is Alicia Sandoval. And I have another sister. Her name is Cynthia Sandoval. And I have a brother. His name is Michael Sandoval.

Q. Do you have any children?

A. Yes.

Q. What are their names?

A. My daughter, her name is Anniah Sandoval. And I have a son. His name is Aiden Isaiah Sandoval.

Q. How old are they?

A. My son is five. And my daughter is six and half, A-n-n-i-a-h, Anniah, Sandoval. My son is, his

name is Aiden, A-i-d-e-n, Isaiah, I-s-a-i-a-h, Sandoval.

Q. Where do you work right now?

A. It's called J.J.R.D. Investments. We do remodeling, apartments, houses.

Q. Construction work?

A. Yeah.

Q. How long have you had that position?

A. A little more than two years.

Q. Okay. And what are your responsibilities at that job?

A. Just keeping track making sure that everything gets done, you know. I'm in there putting my hands on as well.

Q. When you say putting your hands on, what do you mean?

A. I'm in there doing work in there as well.

Q. Do you have health insurance with that job?

A. No.

Q. And when was the last time that you saw a doctor?

A. For what, like just --

Q. A general physical, anything?

A. I had an eye examination not too long ago.

Q. Okay. And what about anything else, any other visits?

---

A. Yeah.

Q. And what were the circumstances surrounding that visit?

A. Um, just, I just seen him. And he was just -- I was just letting him know what was wrong, you know, and he just --

Q. Do you recall the name of that doctor?

A. No.

Q. Where was he located?

A. In one of the, one of the offices in Yuma.

Q. Which office?

A. I don't know the address. I'm new to there. I don't know exactly the whole streets like I do out here.

Q. Was he a licensed physician?

A. Yes, he was.

Q. He practiced under a medical group?

A. I'm pretty sure that he did.

Q. Was it in the hospital or a private location?

A. It was in like a health clinic.

Q. Okay. I think that you said that you don't recall when that was, but it would have been sometime after you moved to Yuma; is that right?

A. Yeah.

Q. Within the first couple of months after moving to Yuma?

---

MR. FERRELL: Objection, vague. To the extent that you can answer, go ahead.

THE WITNESS: Um, not really.

BY MR. ARHANGELSKY:

Q. Have you ever been to the emergency room?

A. Yes.

Q. When was that?

A. A few years ago, I cracked my head open and I had some staples in there.

Q. Was that a job-related accident?

A. No.

Q. Aside from that trip to the emergency room, can you recall the last time that you were at a physicians's office or a healthcare provider?

A. I don't remember.

Q. You said that you were prescribed Motrin at some point?

A. Yes.

Q. Who prescribed that?

A. One of the doctors out there.

Q. Out where?

A. In Yuma.

Q. And when was that?

A. I can't recall the exact date.

Q. So, you saw a doctor for that?

---

A. Within the first few months.

Q. Okay. What other jobs have you had since you were 18 years old?

A. Um, I worked at Vons in Spring Valley for a little bit.

And then after that, I just do drywall, you know, remodeling inside houses. I've always done that since I was young. Since I was 18.

Q. What is Vons?

A. It's a food store.

Q. Can you spell Vons?

A. V-o-n-s.

Q. And it's a food store and where is it located?

A. It's off of Jamacha Boulevard, Spring Valley, J-a-m-a-c-h-a.

Q. California?

A. Yes.

Q. What kind of food do they sell?

A. Just your regular grocery store.

Q. What was your job description there?

A. On that first I started off bagging groceries. And then I moved up to the meat department, cutting up the meat, packaging the meat.

Q. Have you had any jobs in the legal field?

A. No.

Q. Okay. Have you had any jobs in the healthcare field?

A. No.

Q. Mr. Sandoval, what did you do to prepare for this deposition today?

A. I ate a good breakfast.

Q. Did you review any information?

A. No.

Q. Did you review any documents?

A. Like when, today?

Q. In the last two weeks?

A. I spoke with my attorney a couple of times.

Q. Okay. So, several times you spoke with your attorney?

A. (Witness Nods).

Q. When was the first time that you spoke with your attorney?

A. Um --

MR. FERRELL: Objection as to time, vague, to but the extent that you can answer, go ahead.

BY MR. ARHANGELSKY:

Q. You can answer.

A. I forget the exact date. It was probably like a year ago. I don't know. I don't know the exact date.

Q. In preparation for this deposition, did you

17

speak with anybody else other than your attorney?

A. No, I did not.

Q. In this case in general, have you spoken with anybody other than your attorney about your role as a Plaintiff?

A. No.

MR. ARHANGELSKY: Okay. Josh, give me document one, please.

(Deposition Exhibit A was marked for identification and is attached hereto.)

BY MR. ARHANGELSKY:

Q. So, this is a document that we've marked as Exhibit A.

A. Okay.

MR. ARHANGELSKY: And for the record, we have copies for you for all the others. This is the Notice of Deposition. That's it.

MR. FERRELL: That's fine.

BY MR. ARHANGELSKY:

Q. I've put a document in front of you marked as Exhibit A.

Have you seen this document before?

18

A. Yes.

Q. When did you see this document?

A. My attorney has shown it to me.

Q. When did he show it to you?

A. One of the times that I spoke with him, that I met up with him, but I don't know the exact date, though.

Q. Let me direct your attention to -- first, what is this document?

A. Um --

MR. FERRELL: Objection, calls for a legal conclusion. To the extent that you can answer as a lay person, go ahead.

THE WITNESS: Notice of Deposition.

BY MR. ARHANGELSKY:

Q. Let me direct your attention to page two and ask you to just review what starts as a list of requests for documents.

Have you reviewed that list before?

A. Yes, I have.

Q. And have you brought any of those documents that are requested there with you today to this deposition?

A. No.

Q. Have you been asked at any point in this case

19

to produce documents to your counsel?

A. No.

Q. Have you produced any documents to your counsel in this case?

MR. FERRELL: Objection, vague as to "produced". I assume that you mean given. As a lay person, he won't understand the term "produced".

BY MR. ARHANGELSKY:

Q. Did you understand the question that I asked you?

A. Yes. I'm pretty sure that I have.

Q. You've given documents to your counsel.

Can you describe what documents that you've provided to your counsel?

MR. FERRELL: Objection, privilege. Don't answer that.

MR. ARHANGELSKY: I'm entitled to understand what documents that he looked at to --

MR. FERRELL: You're not entitled to understand any of our communications.

MR. ARHANGELSKY: I'm not asking for privileged communications, but I'm asking for him to identify information that he has provided without identifying the substantive matter. I haven't asked him for the substantive matter of the communications.

20

MR. FERRELL: Absolutely not, Counsel.

BY MR. ARHANGELSKY:

Q. Have you produced any receipts for products to your counsel?

MR. FERRELL: Objection, privilege. Do not answer.

BY MR. ARHANGELSKY:

Q. Did you retain copies of receipts for any product purchases that are related this case?

A. I have, but I don't know what I did with them. I don't really save receipts.

Q. So, you don't have those with you?

A. Not the receipts.

Q. You wouldn't be able to produce those if you had to?

A. No. I don't know what happened to it. I think that I threw them away.

Q. Did you bring any documents with you to this office today?

A. No, I did not.

Q. Have you been asked to respond to any discovery questions at any point in this case?

MR. FERRELL: Objection, calls for a legal conclusion. To the extent that you can understand the question, go ahead and answer.

---

THE WITNESS: Say it again.

BY MR. ARHANGELSKY:

Q. Have you been asked to respond to any discovery questions in this case?

A. I don't understand. I don't get it.

Q. Have you been asked to provide any information about your understanding of the product at issue in this case?

MR. FERRELL: Objection, whom.

MR. ARHANGELSKY: I'm sorry.

MR. FERRELL: Objection, it's vague as to whom.

MR. ARHANGELSKY: Can you repeat the question, please.

(Whereupon, the record was read as follows:)

Q. Have you been asked to provide any information about your understanding of the product at issue in this case?

THE WITNESS: I don't think so.

BY MR. ARHANGELSKY:

Q. Has anyone offered you money as a Plaintiff in this case?

---

A. No, no money.

Q. Have you received any compensation for your participation as a Plaintiff?

A. (Witness Nods).

MR. FERRELL: You have to give audible answers. She can't type down head shakes.

THE WITNESS: No.

BY MR. ARHANGELSKY:

Q. Have you incurred any expenses in the case?

A. Just, no, just I rented a car to get out here.

Q. You had to rent a car to drive out here?

A. Yeah, that's about it, but my motel was paid for.

Q. Who paid for your motel?

A. My attorney.

Q. Who paid for your rental car?

A. I did, myself.

Q. Who paid for your gas?

A. Me.

Q. Who pays for your food?

A. Me.

Q. Now, aside from this Notice of Deposition that you have in front of you right now marked as Exhibit A, have you reviewed any other documents in this case?

A. I think that there might have been one or two.

---

I think there might have been another one. I don't know exactly the name of it, though.

Q. So, maybe one other pleading or document? Excuse me.

MR. FERRELL: Objection, asked and answered, misstates testimony, but you can answer.

THE WITNESS: Like one or two maybe.

BY MR. ARHANGELSKY:

Q. Do recall the substantive matter of those documents?

A. No, I do not.

Q. Have you signed or recorded any statements as a Plaintiff in this case?

A. I'm not sure. I think that I have, though.

Q. You can't recall?

A. I can't recall.

Q. Have you posted any statements about this lawsuit on-line?

A. No, I have not.

Q. Have you made any statements about this lawsuit to any third parties other than your attorney?

A. No.

Q. You're aware that this case was filed in April of 2012?

A. Yes, I am.

Q. And how are you aware of that?

MR. FERRELL: Objection, it's privilege, if it comes from counsel, don't answer.

MR. ARHANGELSKY: You're contending that his awareness of when the case began is through you?

MR. FERRELL: You can't ask him who he's aware from because he has already testified that it only came from counsel. He has only spoken with counsel about it.

So, the substance of any communication that I've had with him is absolutely privileged.

MR. ARHANGELSKY: Well, I think that I disagree with your understanding of the way that privilege works. I don't see that as -- you have no claim that that's something that's subject to attorney-client privilege. And it's not made in aid of legal counsel.

MR. FERRELL: Absolutely, it is.

MR. ARHANGELSKY: Nonetheless, I'll let you make your objection and that's fine. I'll move on.

BY MR. ARHANGELSKY:

Q. So, you're aware that this case is three years old?

A. Yes.

Q. When was the first time that you heard about this case?

A. I want to say like around November of '13.

25

Q. November of 2013 is when you heard about this case?

A. Well, when, um, like when I heard about what was going on with the Sulvant Silver exactly or --

Q. When did you hear about this litigation?

A. Um, a few months after I had purchased the actual product.

Q. And when was that?

A. Um --

Q. Sorry. Let me rephrase.

When was it exactly that you learned about this lawsuit?

A. It was like, like November or maybe January of 2014.

Q. January of 2014?

A. Uh-huh.

Q. I'm going to go back for one second.

How much money do you make a year?

MR. FERRELL: Objection, relevance. To the extent that you know, go ahead.

THE WITNESS: I'm not sure exactly.

BY MR. ARHANGELSKY:

Q. Can you estimate?

MR. FERRELL: To the extent that you can estimate, go ahead, but don't guess.

26

THE WITNESS: Maybe $20,000 maybe.

BY MR. ARHANGELSKY:

Q. Is that gross before taxes?

A. Yeah.

Q. So, walk me through how you became a Plaintiff in this case.

A. I had purchased the product, you know. And it didn't do nothing for me. And then I heard or I seen on-line that there was something going on, a lawsuit going on with the actual product.

So, I just looked forward into it. I looked more into it.

Q. Let me just for the record, when you say the product, can you describe what the product is?

A. Sulvant Silver.

Q. What's the name of the product?

A. Sulvant Silver.

Q. Can you spell that?

A. S-u-l-v-a-n-t, S-i-l-v-e-r, I want to say.

Q. And you said that you saw something on-line about this case?

A. (Witness Nods).

Q. What was it that you saw on-line?

A. It was like a false advertisement. And it didn't do nothing for me, you know. And that's the only

27

reason that I had purchased the product, you know.

Q. Well, we'll get to that in a second. I'm asking a more directed question.

What exactly was it that you saw on-line that notified you about this litigation?

A. You know, that there were lawsuits taken out on it.

Q. Was it a website?

A. Yeah.

Q. Okay. Do you remember the domain name of the website?

A. No, I do not.

Q. Do you remember who sponsored the website?

A. No.

Q. Was it your attorney's website?

A. No.

Q. No, it was not your attorney's website or, no, you don't remember?

MR. FERRELL: Objection, asked and answered, to the extent that you can answer it again.

THE WITNESS: I don't remember.

BY MR. ARHANGELSKY:

Q. Do you recall exactly what the on-line statement said?

A. They was just mentioning that there was

28

lawsuits being taken out on the product for it not working, you know, there was, I don't know.

Q. What did you do with that information?

A. I saved the page. And then I was looking more on it, looking more on it. And then I just contacted the attorney that was on there.

Q. You saved the web page?

A. Yeah.

Q. Do you still have a copy of that web page?

A. I don't think that I do. I don't know. I don't know if I do. I can look it up, but I'm not promising nothing.

Q. What did you do with it?

A. I always erase stuff on my computer. That's what I'm saying. I'm not sure if I still have it or not, maybe and maybe not.

Q. When you say that you saved the page, you saved it electronically on your computer?

A. Um, I just looked it up on my computer. It was just right there and I just looked up everything that was on there.

Q. What was on there?

A. You know, just people saying stuff about it, you know, lawsuits going on about the actual product. And that's where I came in contact with my attorney.

29

Q. So, that website had contact information for your attorney?

A. Yeah.

Q. And then you contacted your attorney based on that web page?

A. Yes, I did.

Q. When was it exactly; when was the first time that you spoke with Newport Trial Group or your counsel?

A. Um, like probably the beginning of 2014.

Q. In January of 2014?

A. (Witness Nods).

Q. And you initiated that communication?

A. (Witness Nods).

MR. FERRELL: You have to answer out loud.

THE WITNESS: Well, I had called it and I left a message to somebody. And then he had gotten back in contact with me.

BY MR. ARHANGELSKY:

Q. When was it when you were asked to serve as a Plaintiff in this case?

A. Around that time.

Q. Around January of 2014?

A. I would say.

Q. Did you sign a retainer agreement?

A. What's a retainer agreement exactly again?

30

Q. Did you sign an agreement with your counsel?

A. Yes, I did.

Q. And when did you sign that?

A. I don't know the exact date.

Q. Would it have been sometime around January of 2014?

A. Maybe.

Q. Did that retainer agreement promise you money if your counsel wins this case?

MR. FERRELL: Objection, asked and answered. To the extent that you can answer it again, go ahead.

THE WITNESS: I believe so.

BY MR. ARHANGELSKY:

Q. Do you know how much that you were promised?

A. No.

Q. You don't recall the terms of that retainer agreement?

A. No.

Q. Okay.

A. It has been a little -- it has been a little minute.

Q. Did you -- withdrawn.

Can you tell me who the Defendant is in the case?

A. I don't know. Would that be me or would that

31

be the Solvant Silver?

Q. So, is the answer to your question you don't know?

A. No.

Q. Looking at the document that you have in front of you marked as Exhibit A, is there something in that document that will refresh your recollection as to who the Defendant is in this case?

A. Natural-Immunogenics.

Q. Do you know who Natural-Immunogenics is; excuse me; do you know what Natural-Immunogenics is?

A. It's probably the company that made the Sulvant Silver maybe.

Q. You don't know that for sure?

A. I want to say that's what it is.

Q. Well, do you know that as a fact or are you guessing?

MR. FERRELL: Objection, asked and answered. To the extent that you can answer again, go ahead.

THE WITNESS: I'm pretty sure that it is.

BY MR. ARHANGELSKY:

Q. And how do you know that?

A. Because what else would it be.

Q. And at some point did you purchase one of the Defendant's products?

32

A. Yes, I have.

Q. And what product did you purchase?

A. It was the Sulvant Silver.

Q. That's the product that you identified before earlier in this deposition?

A. Yes.

Q. And just for the record, I can't remember if I've done this already, but as I refer to the product today, I'm referring to Sovereign Silver, the Defendant's product that you say that you purchased, just so that we have clarity on the record, unless I say otherwise; do you understand that?

A. Yes.

Q. Now, are you aware that there are different types of products that Natural-Immunogenics sells?

A. Um, I'm pretty sure that there is.

Q. Can you describe the different types of products that Natural-Immunogenics sells?

A. No.

Q. What's your basis for saying that they sell different products?

A. I don't think that they just make that one product or maybe or maybe not. Maybe they do and maybe they don't.

Q. The product that you purchased was a dietary

supplement; is that right?

A. A dietary supplement?

Q. Yes. I'm asking you; is that correct?

A. It's supposed to strengthen my immune system.

Q. And was the product labeled as a dietary supplement?

A. I'm not sure.

Q. You don't recall whether it was labeled a dietary supplement?

A. (Witness Nods)

MR. FERRELL: You have to give an audible answer.

THE WITNESS: No.

BY MR. ARHANGELSKY:

Q. Okay. Are you familiar with the phrase "dietary supplement"?

A. No, I'm not.

Q. Other than the product, the Defendant's product that we're talking about today, have you purchased other nutritional products or dietary supplement products in that category in the past?

A. No.

Q. Was this the first time that you purchased a nutritional supplement?

A. Besides protein shakes, would that be, would

that be considered one?

Q. So, your answer is that you've purchased protein shakes in the past?

A. Not from this place, but I like to work out and I like to stay in shape. So, I have purchased that kind of stuff.

Q. Okay. Do you take any vitamins?

A. Yes.

Q. Which ones?

A. I forget the name of them, but I get them from the GNC store.

Q. You buy your vitamins from GNC?

A. Yes.

Q. And those vitamins that you buy, are you the only person who uses them at your house or does your significant other use them?

A. No. I'm the only one.

Q. How often do you purchase these products?

A. Every couple of months.

Q. Nutritional products are different from drug products; right?

A. Yes.

Q. Can you describe how they're different?

A. Nutritional is to help benefit your body. And drug products, I don't know. They're just products for

pain and stuff like that.

Q. Have you bought any drug products --

A. No.

Q. -- in the last four years?

A. No.

Q. But you did tell me that you had a prescription for Motrin before; correct?

A. Yes.

Q. Did you buy that?

A. I think that I paid like a couple of dollars for them, not really that much. Yeah, I did purchase those.

Q. Where did you purchase them?

A. I want to say it was like at a Walgreens in the pharmacy in the Walgreens.

Q. But you didn't get it from the pharmacist; right?

A. I got the prescription from them.

Q. You got your prescription from the pharmacist?

A. I got my prescription from the doctor. And I took it to the pharmacist. And they gave me the medication, the Motrins.

Q. So, you did receive the product from behind the pharmacy counter?

A. Yes.

Q. Have you bought any products in the last four years for colds or coughs?

A. Like Nyquil.

Q. So, you've bought Nyquil before?

A. Yeah.

Q. Where did you get the Nyquil from?

A. Like Walmart, different stores, Walmart, Walgreens, wherever I'm closer to at the time.

Q. Any other products?

A. No.

Q. So, again, can you explain to me why you purchased Nyquil?

A. For a cold.

Q. So, you had a cold and you weren't feeling well and you purchased Nyquil?

A. Yes.

Q. Why did you pick Nyquil?

A. I don't know. It just works, works all right when I know that I'm already sick and when I'm coming down with a cold, I just drink some Nyquil and it helps me out.

Q. Nyquil is a drug; is it not?

MR. FERRELL: Objection, to the extent that you know whether or not Nyquil is a drug, you can answer.

THE WITNESS: I don't think that it's a drug.

37

Q. -- and purchased the Defendant's product; is that correct?

A. Yes.

Q. When was that?

A. Um, like maybe like November, November of 2013.

Q. So, approximately, 18 months ago?

MR. FERRELL: Objection --

MR. ARHANGELSKY: Is my math off?

MR. FERRELL: By a year.

BY MR. ARHANGELSKY:

Q. Okay. November of 2013?

A. Yeah.

Q. How long ago was that?

A. I don't know. How long, how long is it?

Q. I'm not here to answer the questions. I'm sorry. I'm here to ask them. If you don't know, just say that you don't know.

A. I don't know.

Q. Thank you. You don't remember the exact date?

MR. FERRELL: Objection, asked and answered. He said November of 2013.

BY MR. ARHANGELSKY:

Q. It's a different question. You can answer.

A. In November of 2013.

Q. Okay. Do you remember what time of day that

39

BY MR. ARHANGELSKY:

Q. You don't know if Nyquil is a drug?

A. No.

Q. Have you bought any nutritional products -- excuse me, withdraw that.

Other than the Defendant's product, have you -- withdraw that. I'll lay a foundation.

Have you shopped at Sprouts Farmers Market in the last four years?

A. I've been there a couple of times.

Q. And when was the last time that you were in Sprouts?

A. Well, the last time that I got this, when I had gotten that, that's the last time that I had been there.

Q. Before then, when was the last time that you had been there?

A. A few times before that, I don't know the exact dates, though, but not that much, not too long before I got these.

Q. And what did you buy when you went the other times?

A. Just like some vegetables and they have a bunch of different stuff there.

Q. And then at some point you went to Sprouts --

A. Yeah.

38

you went to Sprouts?

A. I think it was probably like when I had gotten off of work around four or five.

Q. So, was that a weekday?

A. Yeah. I don't work on weekends.

Q. And you don't remember the specific day of the week?

A. No.

Q. Why did you choose that Sprouts?

A. Because I know that they have got stuff like that, you know. I know that they have got products like that. And I just happened to walk in there and I seen it.

It could have been any store. It could have been anything. I was just there at the time.

Q. When you say products like that, what are you referring to?

A. Um, like house products, I guess you could say.

Q. What do you mean by house products?

A. Health products.

Q. Health products. What do you mean by health products?

A. Like cold medicine, they have stuff when you're sick, you know, stuff like that. They have a bunch of different stuff there, actually.

40

Q. Which specific Sprouts store did you visit that day to purchase the Defendant's product?

A. I want to say that it's on Second and East Main or somewhere right there. Let me see. I want to say Second and East Main.

Q. What city?

A. El Cajon, California.

Q. And those are cross streets, Second and East Main?

A. Yes.

Q. Did you buy any other products that day at Sprouts?

A. I might have gotten some milk with it.

Q. You don't recall specifically?

A. I don't recall specifically.

Q. Do you remember if you used a shopping cart?

A. No. I didn't use a shopping cart that day.

Q. You just went in for a few items?

A. Yes.

Q. When you went to Sprouts that day, was it your intent to buy the Defendant's product, Sovereign Silver?

A. I was looking for something. And I just so happened to pick that up and get that one.

Q. So, prior to arriving at Sprouts, you did not plan to purchase the Defendant's product?

41

A. No.

Q. You planned to purchase a product in that category?

A. Yes.

Q. Do you have any documents in your possession still today or that could be in your possession that evidence the purchase of the product?

A. No.

Q. How did you --

A. I think that I might still have the bottle only, but as far as receipts and stuff like that, no.

Q. How did you purchase the product?

A. Cash.

Q. All right. And you said that you still do have a copy of the packaging?

A. I believe I still have got the bottle.

Q. Have you -- I apologize if you've answered this, but I want to make sure for the record.

Have you purchased any other products that claim to support the immune system in the last four years?

A. No.

Q. Have you ever heard of Echinacea dietary supplements?

A. No.

42

Q. What did you pay for the Sovereign Silver product?

A. I want to say that it was maybe like 10 to 15 bucks, 10 to 15.

Q. You don't remember exactly?

A. No, around there.

Q. And what size was the product that you purchased?

A. I don't know how many ounces, but like this big, a little bottle. I don't know how many ounces, maybe like, maybe like five ounces.

I don't know the exact how many ounces are in that bottle, but it's a bottle.

Q. Can you describe the product that you purchased?

A. Like what do you mean?

Q. What did it look like?

A. It was in a little dark, brown bottle. And it had a little, you squeeze the top. And then it has a little hose in the middle. And you squeeze it in and you just drop it on your tongue.

Q. Have you heard of the phrase Silver Hydrosol before?

A. No, I have not.

Q. Have you heard of the phrase Colloidal Silver

43

before?

A. No.

Q. You don't have an understanding of the differences between Colloidal Silver and Silver Hydrosol products?

A. No.

Q. So, I want you to walk me through the time when you visited Sprouts to purchase the product.

Can you describe the aisle at Sprouts where you found the product?

A. No.

Q. Is that because you can't recall specifically the details of your visit to Sprouts or are you just --

A. I just don't remember what aisle it was on. The store is kind of big. There are a lot of aisles.

Q. Do you recall whether the aisle was marked with any signage?

A. No.

Q. Do you recall what you see when you first approached the aisle that contains the Defendant's product?

A. No.

Q. Well, there were other products in that section; is that correct?

A. Yes.

44

Q. And you testified before that you chose the Defendant's product among those other products; is that correct?

A. Yes.

Q. So, did you review any of the other products that you saw in that aisle?

A. I looked at them, but this one just for some reason, I don't know, just said, helps strengthen your immune system. So, I just picked it out.

Q. Were there any other products that said that it would help strengthen your immune system?

A. I don't think there was.

Q. Were there any other Silver products?

A. I don't recall.

Q. Did you review any labels of any other products that were in that section?

A. No.

Q. You just --

A. Maybe there might have been one or two, but I don't remember exactly which ones they were or the name of them.

Q. Okay. So, you just reviewed the Defendant's product and that's it?

A. Well, there were a couple of them. Maybe I looked through a couple of them. I don't remember the

45

exact names, but this one just caught my attention. I don't know why. And I just picked it out.

Q. Where on the shelf was the product?

A. Like in the middle.

Q. Right at eye level?

A. Um, like if I were standing up, it would probably be like right here.

Q. Did you perform any research of any other product in that category before you went to Sprouts that day?

A. No.

Q. Did you look at any on-line information about these types of products before you purchased?

A. No.

Q. Do you know any other person who has used these types of products in the past?

A. No.

MR. ARHANGELSKY: Let's go with documents 12 through 23 and just get those out.

MR. ARHANGELSKY: Let me just say this. If you need a break at anytime, let me know and we're happy to take a break, if you need to use the restroom or want some water.

I, of course, would just ask that you answer any pending questions before we take a break, but don't

46

hesitate to let us know.

MR. FERRELL: Okay. Let's take a break right now because I can use the bathroom.

MR. ARHANGELSKY: Of course. Let's go off the record.

(Discussion held off the record.)

BY MR. ARHANGELSKY:

Q. Back on the record.

Mr. Sandoval, did you give us a middle name earlier today?

A. I don't have a middle name.

Q. Have you ever been arrested?

A. Yes.

Q. How many times?

A. A couple of times.

Q. How many is a couple of times?

A. Actually, a few times, like three times.

Q. Have you ever been convicted?

A. Yes.

Q. For what?

A. A couple, I got into a couple of fights, you know.

Q. When was that?

47

A. There were a few different times.

Q. Let's go back to the first one, when was that?

A. Well, the first fight that I got into trouble for was, I want to say, I was probably like 18. I got into a fight and I got into trouble and went to jail. I got an assault charge.

Q. When was that, exactly, what year?

A. I don't know what year, but it was when I was 18, though.

Q. When was the next one?

A. Maybe like when I was 20 years old, another fight, yeah. And I got into trouble for that one, too.

Q. Were you arrested?

A. Yes.

Q. And convicted?

A. Yeah.

Q. And what was your sentence?

A. I did a little, I think that I did like three months in jail for that one because it was my second fight, my second charge that I ever got into trouble for.

Q. Let's backup to the first one; was that in California?

A. Yeah.

Q. Was the second one in California?

48

**Page 49**

A. Yeah. They're all in California.

Q. So, at some point after that was there another situation?

A. Yes. I had gotten into a fight, another fight, and got into trouble for it.

Q. When was that?

A. Maybe when I was like 24. I'm 28 now. I'm not into anything lately. It was like when I was younger.

Q. Four years ago?

A. Yeah.

Q. What was the sentence for that?

A. I did a few months in jail. And then they gave me unsupervised probation.

Q. What was your term of probation?

A. Three years unsupervised.

Q. Beginning when?

A. I don't know the exact dates, but it was when I was like 24.

Q. Are you on probation now?

A. No.

Q. Are you on any other court supervised program?

A. No, no.

Q. Are there any other legal infractions on your record?

A. I had, one time when I was in Spring Valley, I

**Page 50**

had on a tank top, a wife beater. And I was walking down Broadway. And some, the sheriff's territory, and so they stopped me.

And they said, hey, come here, let me talk to you. They were asking me questions. I was on probation at the time, so, they had the right, you know.

They asked me to sit down. And I had, my girlfriend at the time just had given me an ice pick, you know. And I had, I don't know why I was carrying it, but I had it in my little side pocket.

I had some Dickies on. And they asked me to sit down and cross my legs and it had fell out. And I got a weapons charge for that one. It's called the dirk and dagger.

And I did six months in the County for that one. And then I got on probation, but I cleared all of that. That was all when I was younger, you know, when I was young and dumb.

Q. What's your date of birth?

A. 8/28/86.

Q. So, no other run-ins with law enforcement in the last four years?

A. No, no --

Q. Nothing in Arizona?

A. -- no. That was a long time ago when I was

**Page 51**

younger.

MR. FERRELL: You want to make sure to let him finish the question because the court reporter will have a tough time with that.

THE WITNESS: Sorry about that.

MR. ARHANGELSKY: Thank you, Counsel.

BY MR. ARHANGELSKY:

Q. Do you have any gang affiliations?

A. No.

MR. ARHANGELSKY: Just give me one minute. My apologies.

Let's mark this document as next as Exhibit B, please.

(Deposition Exhibit B was marked for identification and is attached hereto.)

BY MR. ARHANGELSKY:

Q. And I gave a copy to counsel. And can you find a document in here, please.

Now, let the record reflect that I've passed the witness a document that's marked as Exhibit B. And this is a photograph that we've placed in front of the witness and a copy to counsel.

**Page 52**

Mr. Sandoval, we were talking earlier before our break about your purchase of the Defendant's product at a Sprouts Farmers Market in November of 2013.

Does this photograph that we put in front of you resemble the aisle that you would have found the Defendant's product at Sprouts?

A. Just it would have been on the aisle, something like that.

Q. Is this photograph any different from the aisle that you saw when you purchased the product in 2013?

A. It's not the exact same.

Q. It's not the exact same, but you said that it was similar?

A. Yeah.

Q. And do you see that in the photograph towards the back that it does say Sprouts --

A. Yeah.

Q. -- on the signage there?

A. Yeah.

Q. This photograph would at least resemble the number of products that you saw that day when you went to Sprouts?

MR. FERRELL: Objection, misstates the witness's testimony. To the extent that you can answer, go ahead.

THE WITNESS: Yeah, I'm not sure if they had all of the same things right there.

BY MR. ARHANGELSKY:

Q. But with respect to the number of products, you would say that that's similar?

A. Yeah, yeah.

MR. FERRELL: Just keep all of these documents in a pile because the court reporter is going to want them when we're done.

THE WITNESS: Okay.

MR. ARHANGELSKY: The next document will be marked as Exhibit C.

(Deposition Exhibit C was marked for identification and is attached hereto.)

BY MR. ARHANGELSKY:

Q. Mr. Sandoval, I've shown you a document that's marked as Exhibit C which is another photograph. And I'll represent to you that it's a photograph taken in closer detail of the photograph that I've shown you as Exhibit B; do you understand that?

A. Yes.

Q. Now, you've testified that this aisle was at

53

least similar to the aisle that you saw in Sprouts in 2013.

Looking at Exhibit C, does that look similar to the display that you saw when you found the Defendant's product?

A. Yeah, it looks similar.

Q. And were there also similar products on display next to the Defendant's product when you arrived that day in 2013?

MR. FERRELL: Objection, asked and answered. To the extent that you can answer it again, go ahead.

THE WITNESS: There are always little products like similar to them or around them, you know.

BY MR. ARHANGELSKY:

Q. And do you see --

A. They have the store brand. And I was trying to not get a store brand.

Q. Okay. So, you see in the picture marked as Exhibit C that there are other Silver products that are located near the Defendant's product; is that correct?

A. This time, yeah.

Q. So, is it your testimony that these similar products were not available for purchase at the Sprouts that you visited in 2013?

MR. FERRELL: Objection, asked and answered,

54

but you can answer again, misstates the witness's testimony.

THE WITNESS: It looks, it's different. It was not the same setup when I had purchased it, but --

BY MR. ARHANGELSKY:

Q. Were there any other products available that had immune support that were written on the product?

A. I'm sure there was.

Q. But you didn't choose those products; right?

A. No.

Q. But you chose the Defendant's product; right?

A. Yes.

Q. And you didn't know anything about the Defendant's product?

A. No.

Q. And what was it about the Defendant's product that made you choose that one among all the other products that were offered?

A. I just picked it.

Q. You just picked it out of a hat, you just picked it?

A. Yeah.

Q. Okay.

A. And all these other ones are like generic brands, too, so.

55

Q. Which one is a generic brand?

A. I don't know, but I want to say the Silver Biotics one doesn't look like -- it looks like more like a store brand.

Q. So, you were relying on when you made your decision, and correct me if I'm wrong, you were relying on the product packaging?

A. That had a lot to do with it. And I don't really like to get store products of anything.

Q. So, it was the appearance of the packaging, the presentation?

A. The appearance and then the immune support, the whole thing.

Q. But lots of other products had immune support; correct?

MR. FERRELL: Objection, argumentative. To the extent that you can answer, go ahead.

THE WITNESS: They did, but that one just, I just picked that one.

BY MR. ARHANGELSKY:

Q. And you didn't know anything about Silver products before you picked that one?

A. No, I did not.

MR. FERRELL: Objection, that has been asked and answered.

56

BY MR. ARHANGELSKY:

Q. Looking back at Exhibit B which is the photograph of taking a step back from the aisle.

A. Yeah.

Q. Can you -- and I apologize if this might be difficult, but please give us your best shot.

Can you locate the Defendant's product on this shelf?

MR. FERRELL: Hang on. Objection as to the entire line of questioning, lacks foundation as to where this is, what this is or what store this is, but to the extent that you can answer, go ahead.

THE WITNESS: Yeah, I do see it.

BY MR. ARHANGELSKY:

Q. Where is it?

A. On the bottom.

Q. Can you circle it for us?

A. Here.

Q. And you've identified that the product is down on the bottom shelf toward the middle of the aisle?

A. Yes. Right here on this picture, yeah.

Q. So, on this aisle which you've already, granted, you said that it's not the same aisle, and we'll concede that.

This display was at the bottom of the aisle?

57

A. Yeah.

Q. And you've testified previously that your display was right in the center of the aisle?

A. Yeah. They move them around all the time. And I used to work at a store like that, so.

Q. Were you aware -- withdrawn.

Was price important to you when you were deciding to purchase the Defendant's product?

A. Just something good. I wanted just something, you know.

Q. I think that I need more.

A. It was not really a factor.

Q. Price was not a factor?

A. No.

Q. Was the concentration of Silver in the product a factor when you decided to purchase?

A. No, it was not.

Q. So, was it important to you that other products that are offered, some right next to this, in Exhibit C some right next to Defendant's product, was it important to you that those other competing products claimed a larger percentage of Silver?

A. I didn't even look at that part.

Q. So, the answer is, no, it was not important?

A. No.

58

Q. Do you have any idea how much Silver is in the product that you purchased?

A. I don't recall.

Q. You don't recall based on parts per million or you don't recall based on labeling statements?

MR. FERRELL: Objection, argumentative, designed to harass. To the extent that you can answer, go ahead.

THE WITNESS: I mean, I just picked it out, you know. I didn't go looking for that one specifically. And I just looked around and I seen that one and it caught my eye and I just bought it.

BY MR. ARHANGELSKY:

Q. There are different size products sold at the Sprouts for the Defendant's product; right?

A. Yeah.

Q. Which size did you pick?

A. I want to say that it was the more smaller one. It was this one right here, yeah, the more smaller one.

Q. Was there a reason that you chose the smaller size?

A. Just to see if it worked. How good it worked and it didn't.

Q. Next, let's look at three. Now, turning your attention to Exhibit C again.

59

A. Yeah.

Q. Do you see on the Silver Biotics product, is there an immune support claim on that product?

A. Yes.

MR. ARHANGELSKY: Now, Mr. Sandoval, I've handed you a document which is stamped as Exhibit D.

(Deposition Exhibit D was marked for identification and is attached hereto.)

BY MR. ARHANGELSKY:

Q. Do you recognize this document?

MR. FERRELL: And take your time to review the document, please.

THE WITNESS: Yes. I'm pretty sure, yes.

BY MR. ARHANGELSKY:

Q. Yes, you recognize this document?

A. Yes.

Q. What is this document?

A. It's a declaration.

Q. Did you prepare this document?

A. Did I prepare it?

Q. Yes.

A. I've read it and I signed it.

60

Q. So, the answer to that question is "no"?

A. Yes.

Q. But you did review this document as you said?

A. Yes.

Q. When did you first see this document?

A. One of the times that I had met up with my attorney. I don't recall exactly the date.

Q. So, turning to the third page of this document, the final page, is that your signature there?

A. Yes.

Q. When did you sign this document?

A. June 18th, 2014.

Q. And that's the date that's recorded on page three of this document?

A. Yes.

Q. And did you say that you met with your counsel in-person to review this document?

A. Yes.

Q. And was that in El Cajon?

A. Yes.

Q. And which is also listed as the location where this document was signed on the third page; is that correct?

A. Yes.

Q. Did you live in El Cajon in June of 2014?

---

A. Yes.

Q. Now refresh my recollection, when did you move again to Yuma?

A. I would say that it has been off and on, you know, maybe like a year, a little less than a year.

Q. Off and on, meaning, that you've been going back and forth between Yuma and California?

A. Yes.

Q. And do you still have a residence in California now?

A. Yes.

Q. And what's that exact address?

A. I don't know the exact address. I forget it, but it's in El Cajon.

Q. You forget the address where you lived?

A. Yeah.

Q. If you wanted to mail yourself a letter, how would you do it?

A. I would call my mom and ask her for the new address.

Q. Do you have a driver's license with a California address?

A. I do have one.

Q. Did you bring it with you?

A. No.

---

Q. Do you have an Arizona driver's license?

A. Yes.

Q. Did you bring that with you?

A. No.

Q. Where is it now?

A. It's put away.

Q. Put away where?

A. With all my stuff.

Q. Where is it, what location?

A. Um, back at the motel.

Q. So, you didn't bring anything with you here today?

A. No.

Q. Not even a driver's license?

A. No.

Q. Did you bring a wallet?

A. No. I didn't even drive here.

Q. Turning your attention to page two of the document that we've marked as Exhibit D, in paragraph two, someone wrote and you signed, and this is the second sentence of paragraph two it says, prior to purchasing Sovereign Silver dietary supplement, I read and reviewed the labeling of the product.

Specifically, I read and relied on the labeling claim regarding immune support.

---

Did I read that correctly?

A. Read it again.

Q. Well, how about you read that statement into the record for us, paragraph two.

A. I have purchased Sovereign Silver from Sprouts store in 2013. Prior to purchasing Sovereign Silver dietary supplement, I read and reviewed the labeling of the product.

Specifically, I read and relied on the labeling claim regarding immune support.

Q. Is that sentence accurate?

A. Yes.

Q. Is there any other information that you read and relied upon before purchasing the product?

A. It was just a, the immune support, you know, that I was looking for that I needed. That's what caught my attention and then the whole box of it.

The other ones looked like store brands. And I really don't buy nothing there just store brands.

Q. What does the phrase "immune support" mean to you?

A. It has helped support my immune system, if not make it more stronger, you know, help me fight off my cold or whatever it is.

Q. You didn't think immune support meant that you

couldn't get sick while taking the product; did you?

A. Say it again.

Q. Did you think that the claim immune support meant that you couldn't get sick while taking the product?

A. Well, it would just help me out with it, you know, help strengthen my immune system is already pretty good. I do get sick every once in a while, you know, for the way that my immune system works, and then this product, I don't see why it wouldn't have.

Q. Your immune system is already fairly strong?

MR. FERRELL: Is that a question?

MR. ARHANGELSKY: Yes, it's a question.

THE WITNESS: It's all right.

BY MR. ARHANGELSKY:

Q. Did you use the Defendant's product as a treatment for any illness or disease?

A. No, I did not.

Q. Were you sick when you started taking the product?

A. No.

Q. How many times did you purchase the Sovereign Silver product?

A. Just once.

Q. And how long did you use it for?

65

A. I want to say within the first week that I was I taking it, I ended up getting sick, like towards the end of that week that I started taking it, you know. And I would think that it would have helped it.

Q. So, you started to use the product for a week. Did you use it, did you continue to use it after you were sick?

A. Not really, a little bit.

Q. So, you discontinued use as soon as you got sick?

A. Well, I used the whole bottle so. And then I didn't purchase no more after that, but I still ended up getting sick.

MR. ARHANGELSKY: Let's get document two. What are we on, Exhibit E.

(Deposition Exhibit E was marked for identification and is attached hereto.)

BY MR. ARHANGELSKY:

Q. I've given you a document that's marked as Exhibit E; do you recognize this document?

A. Yes.

Q. So, the answer to that question is "yes"?

66

A. Yes.

Q. How do you recognize this document?

A. Because it's the biggest one out of all of them.

Q. What's the document?

A. The Second Amended Class Action Complaint.

Q. When was the first time that you reviewed this document?

A. One of the times that I have, one time that I met up with my attorney.

Q. Approximately, what date was that?

A. I don't know, one of them. I don't know. I'm not sure exactly.

Q. So, the answer is that you don't know?

A. I don't know the exact date.

Q. So, yes, the answer is that you don't know when?

A. Yes.

Q. Let me direct your attention to page five, paragraph 20.

Let me clarify.

Page five of at the bottom of the document, paragraph 20, there's also a bates range at the top --

MR. FERRELL: It's right there.

THE WITNESS: Okay.

67

BY MR. ARHANGELSKY:

Q. Please let me know when you're there.

A. Yeah.

Q. Now, in this paragraph 20, the last sentence in the paragraph, could you read that last sentence to me that starts with "regardless".

A. Regardless, Plaintiff did use Sovereign Silver as directed by Defendant and did not provide any immune support to him and was, in fact, worthless to the Plaintiff.

Q. Do you agree with that statement?

A. I do.

Q. Can you describe for me how you used the product as directed?

A. It says, um, you know, it has little droplets, you know. And it says to take six of them and put them under your tongue, you know, every day. And I used pretty much, I took it right as directed and I still didn't see nothing.

Q. Okay. You said that you used the droplets in the product; is that correct?

A. Uh-huh.

Q. How many droplets would you give yourself per day?

A. It says six of them.

68

Q. Do you recall if there were options as far as how to use the product by dose?

A. No.

Q. But you say that you self-administered six full droplets?

A. Yeah.

Q. And you used the product for how long?

A. For about a week as directed. I did everything right. I read the directions and took it right.

Q. And I think that you testified earlier today that you purchased, what was it, the four-ounce product?

A. I don't know how many ounces that it is exactly. It could be four or six, one of those.

Q. Okay. But you said that the product was around $15?

A. Yeah.

Q. Let me direct your attention to Exhibit C.

Do you see the Sovereign Silver product in that picture?

A. Yeah.

Q. And I do apologize because it might be hard to read, but can you see the prices underneath those products?

MR. FERRELL: Yes, objection to this entire line of questioning. If this is Sprouts, what Sprouts,

69

when it was taken, the entirety.

MR. ARHANGELSKY: Okay.

BY MR. ARHANGELSKY:

Q. Do you also see -- I'm sorry.

What was the answer to that question?

A. Yeah, I do see it.

Q. Do you see the price that says $14.49 in this picture?

A. Yes. On this picture it says that, you know, but when I bought it, it could have been different. The product doesn't stay the same, unless you took it two years ago or when I bought it. Prices do change.

Q. Fair enough.

Do you see the Sprouts logo right above there in that picture?

A. Yeah.

Q. So, your testimony is that you don't recall the specific product size that you purchased for $15; is that correct?

MR. FERRELL: Objection, that's asked and answered. To the extent that you can answer it again, go ahead.

THE WITNESS: No. I don't remember. It could have been 15 or it could have been 20 bucks. It was a while ago.

70

BY MR. ARHANGELSKY:

Q. Okay.

A. But I know that it was not the $30 one. It could have been one of these.

Q. And we don't have any way to find out which product that you purchased; is that correct?

A. What size bottle?

Q. Yeah.

A. Um, yeah, we do.

Q. How would we find that out?

A. With the bottle.

Q. Would you produce the bottle that you purchased to us?

MR. FERRELL: Objection, do not answer that question.

MR. ARHANGELSKY: What's your objection?

MR. FERRELL: My objection is discovery is closed. Whether he produces it or not, we would have to get a formal discovery request to that extent with the court re-opening discovery.

MR. ARHANGELSKY: That's fine. I'll rephrase the question.

BY MR. ARHANGELSKY:

Q. If the court were to compel you to produce that information, would you produce the document to us or

71

packaging to us?

A. If the courts were to do that, then yeah.

Q. So, you would supply us with a copy of the package?

A. With the bottle.

Q. Do you have the outer packaging?

A. No.

Q. You didn't save that?

A. No. It's a box. Why am I going to keep a box.

Q. Did you write down the lot number or the batch number of the product?

A. No.

MR. FERRELL: Objection, vague to the extent that you understand lot number or batch number, go ahead and answer.

THE WITNESS: What is the lot or batch number.

BY MR. ARHANGELSKY:

Q. Was there any writing on the product, I mean, stamping or date stamping on the product that you purchased?

A. I don't know.

Q. You don't recall?

A. I don't recall.

Q. And how many times a day did you use the product?

72

Ex. 30
Page 83

A.  A couple times a day.

Q.  And by a couple times a day, did you administer six drops --

A.  Yes.

Q.  -- at each time during that, so, 18 drops per day?

MR. FERRELL:  Objection, misstates what his testimony was.  To the extent that you can answer, go ahead.

THE WITNESS:  Yes.

BY MR. ARHANGELSKY:

Q.  Now, when you were administering those drops, did you insure that the product of the eye dropper was completely full?

A.  Yes.  I did everything right.  I read the directions.  I'm pretty good at that, reading directions of whatever I get and acting out on them off of the directions.

And that's exactly what I did on this one.  I'm pretty good at that.  And it didn't work.

Q.  How much of the bottle did you use?

A.  The whole thing.

Q.  And you did not re-purchase the product?

A.  No.  Why, if it didn't work.

Q.  Turning your attention back to that document

73

Q.  Do you agree with the contents in that paragraph?

A.  I do.

Q.  Now, that says that you discontinued use of Sovereign Silver after discovering potential outcomes which may have included serious adverse outcomes.

What adverse outcomes did you discover?

A.  What do you mean by that?

Q.  What potential outcomes did you discover that caused you to stop using the product?

A.  I ended up getting sick.

Q.  Is that all you learned or just simply that the product didn't work for you?

A.  Pretty much, why are they going to sell something that doesn't work and me spend my money on it.  And I'm pretty sure I'm not the only one who has bought that product and it not work, you know.

Q.  So, you weren't concerned about any adverse health consequences if you were to use the product?

A.  No.

Q.  You didn't speak with anybody other than your attorney, of course, about potential adverse health consequences?

A.  No.

Q.  And you testified earlier that you don't know

75

that we've marked as Exhibit E, the same paragraph, paragraph 20.

And this I'll direct your attention to the previous sentence that you read before starting with fortunately, can you read that sentence to me?

MR. FERRELL:  Before we get to this, I'm going to object on the rule of continuity.  This refers to previous paragraphs.

And unless that is read that into record, he will be unable and I'll instruct him not to answer.

BY MR. ARHANGELSKY:

Q.  Can you read the entire paragraph 20.

A.  Unfortunately for Plaintiff, he believed the claims made by Defendant regarding Sovereign Silver's ability to provide immune support.

Fortunately for Plaintiff, he did not experience any, what is that, aforementioned serious adverse outcomes for the -- of excessive Silver exposure because he had discontinued the use of Sovereign Silver after disregarding potential outcomes or discovering the potential outcomes, and before taking it for an extended period of time, regardless, Plaintiff did not use Sovereign Silver or he did use Sovereign Silver as directed by Defendant and it did not provide any immune support to him.

74

anyone who has used the Sovereign Silver product; is that correct?

A.  I don't know anybody.

Q.  Have you read any information on-line about anyone having adverse health effects from using the product?

A.  I've read that, you know, that other people had said that it didn't work as well.

MR. FERRELL:  Counsel, when you get to a break point, I'd like to grab another soda, please.

MR. ARHANGELSKY:  Okay.  Let's take a break.  Off the record.

(Discussion held off the record.)

BY MR. ARHANGELSKY:

Q.  Back on the record.

Mr. Sandoval, we were talking a little bit earlier about your use of product.  Walk me through in detail exactly how you would use the product from the time that you pour the liquid into the dropper until you swallow.

A.  I just fill it up.  You've got to put it under your tongue so you're dropping things under your tongue, and then swallow it, and that's it.

76

Q. Do you swallow it immediately?

A. I did. It doesn't say to swallow it immediately or it doesn't say to let it sit for any amount of time.

Q. Did the product have a taste?

A. No. It tastes like water, actually. It didn't taste like nothing.

Q. Now, how much money do you spend a week on groceries?

MR. FERRELL: Objection, relevance. To the extent that you can answer that, go ahead.

THE WITNESS: I'm not sure exactly. I eat out a lot, though.

BY MR. ARHANGELSKY:

Q. How much money do you spend on food a week?

MR. FERRELL: Don't guess, but to the extent that you can estimate, go ahead.

THE WITNESS: I don't really know. I want to say maybe like 60 bucks a week maybe. I don't know exactly.

BY MR. ARHANGELSKY:

Q. So, approximately, $60 a week, and I understand that it varies, but approximately $60?

A. Yeah.

Q. $15 is a significant amount of money to

---

Q. Other than speaking to your counsel, did you talk to any other person about the fact that the product didn't work for you?

A. Maybe I told a couple of friends, you know, just mentioning that it, that stuff didn't work because I still had the bottle on my counter and some people asked, oh, what was that bottle and I let them know.

Q. What friends?

A. A couple friends of mine.

Q. What are their names?

A. Um, my friend Charles asked me about it. And then my little sister asked me about it. And that's about it.

Q. What is Charles' last name?

A. Fairman.

Q. Spell the last name.

A. F-a-i-r-m-a-n.

Q. Where does Charles live?

A. He lives in Yuma, Arizona.

Q. Okay. So, the bottle on your countertop was in Yuma, Arizona?

A. At the time, yeah.

MR. ARHANGELSKY: Josh, let's have the product. Let's go off the record for a second.

---

purchase a dietary supplement; isn't it?

MR. FERRELL: Objection, assumes facts not in evidence, but to the extent that you can answer it, go ahead.

THE WITNESS: If it's going on my body or in my body. I buy shoes that are a hundred bucks, 20 bucks. So, it's just as long it's a good product, I'll put it in my body.

BY MR. ARHANGELSKY:

Q. It's worth it to you then?

A. Yes.

Q. This is the only such product that you've bought; is that correct?

A. Yes.

Q. When you found out that the product allegedly didn't work, did you go back to Sprouts and ask for a refund?

A. No. I just let it blow over. And then what caught my attention when I seen it on the internet and seen it on the pages, there was a deal about it, an issue about it. So, that's when I pursued it. If not, I just would have took it as a loss, I guess.

Q. Did you attempt to contact the Defendant about the product?

A. No.

---

(Discussion held off the record.)

MR. ARHANGELSKY: Back on the record.

Let the record reflect that we've given the witness a copy of a physical exhibit which is the product, the Defendant's product Sovereign Silver, two-ounce product eye dropper.

And we've given the witness a copy of photographs of each panel which is the exhibit to be entered on the record. And counsel has stipulated.

MR. FERRELL: Yes.

BY MR. ARHANGELSKY:

Q. Mr. Sandoval, do you recognize the product that we've put in front of you?

A. Yes, I do.

Q. Is that the product that you purchased?

A. Yes, it is.

Q. Is that the same size that you purchased?

A. Yeah.

Q. And the record will reflect that that's the two-ounce product; is that correct?

A. Yep.

Q. When you purchased that product, did you read the label in its entirety?

A. Yes.

**Page 81**

Q. Is there anything that you didn't understand on that label?

A. No. I think that, it just looked like it would work, you know. After reading everything, I thought that it would really work, but it didn't.

Q. And when you say work, what do you mean?

A. I just thought that it would help me out, help build up my immune system, I mean. I mean, it was funny because during the time that I was taking it, I happened to get sick. And I was taking it right and taking it, you know.

Q. Okay. I want to draw your attention to the side of that package that says, supplement facts, that has a little box in white; do you see that?

And for the record -- I'll let the witness answer; do you see that panel?

A. Yes.

MR. ARHANGELSKY: For the record, this is the side of the exhibit. That it's a second page of the Exhibit F.

(Deposition Exhibit F was marked for identification and is attached hereto.)

**Page 82**

BY MR. ARHANGELSKY:

Q. At the bottom of that panel do you see another box that begins with the phrase, these statements have not been evaluated by the F.D.A.?

A. Yes.

Q. Could you read that statement to me.

A. These statements have not been evaluated by the F.D.A. This product is not intended to diagnose, treat or cure, prevent any disease.

Q. Did you see that statement before you purchased the product?

A. Yes, but, yes.

Q. Disease is another word for illness; right?

A. I'm not sure.

Q. What is a disease?

A. You could say that it's an illness.

Q. Does Sovereign Silver have a website?

A. Yes.

Q. Have you visited that website at any point?

A. I did. I did look at it once.

Q. When did you visit that website?

A. Um, when I found out that they didn't or when, after I got done taking this, I just wanted to look it up to see what was going on with it.

And I don't know the exact date, though, but I

**Page 83**

know that I looked it up.

Q. And what information did you see on that website?

A. It was just basically the same thing telling you about it.

Q. All right. Is there any other advertising media that you've seen that relates to this Sovereign Silver product?

A. No.

Q. Earlier we had mentioned the term Silver Hydrosol and Colloidal Silver. And you said that you didn't have an understanding of those terms.

Are you familiar with the term Silver Salt?

A. No.

Q. Are you familiar with the governmental agency known as the Environmental Protection Agency or the E.P.A.?

A. No.

Q. Do you have any factual basis to conclude that Sovereign Silver is not safe?

MR. FERRELL: Objection, calls for expert testimony. To the extent that you can answer as a lay person, go ahead.

THE WITNESS: Repeat the question.

MR. ARHANGELSKY: Read back the question,

**Page 84**

please.

(Whereupon, the record was read as follows:)

Q. Do you have any factual basis to conclude that Sovereign Silver is not safe?

THE WITNESS: That it's not safe, no.

BY MR. ARHANGELSKY:

Q. You've written in the statements that we've mentioned before that the product had no benefit to you.

How do you know that the product did not benefit you?

A. I already told you already because I just didn't feel it. And I still ended up -- I still ended up catching a cold. And it just didn't do nothing for me. I felt like it was, it was doing nothing.

Q. Other than the fact that you got sick, do you have any other basis to support your statement that the product didn't work?

MR. FERRELL: Objection, asked and answered, misstates his testimony, but to the extent that you can answer it again, go ahead.

THE WITNESS: I mean, I know my body.

BY MR. ARHANGELSKY:

Q. Did you have any medical laboratory work, like blood work, for example, performed before you took the product?

A. No, I did not.

Q. Did you have any medical work performed after you took the product?

A. No.

Q. During the time that you took the product?

A. No.

Q. Did you have any analysis or analyses of the bacteria in your body done during or before you took the product?

MR. FERRELL: Objection, asked and answered. To the extent that you can answer again, go ahead.

THE WITNESS: No.

BY MR. ARHANGELSKY:

Q. Did you have any assessment of your white blood cell count performed before or during the time that you took the product?

MR. FERRELL: Same objection.

THE WITNESS: No, but I know my body.

BY MR. ARHANGELSKY:

Q. Did you have any healthcare provider perform any analysis of your immune system before, during or

---

85

---

after you took the product?

MR. FERRELL: Same objection, go ahead and answer.

THE WITNESS: No.

BY MR. ARHANGELSKY:

Q. How did you measure your immune system's function before, during or after you took the product?

MR. FERRELL: Objection, calls for expert testimony. To the extent that you can answer as a lay person, go ahead.

THE WITNESS: Repeat the question.

(Whereupon, the record was read as follows:)

Q. How did you measure your immune system's function before, during or after you took the product?

THE WITNESS: I didn't.

BY MR. ARHANGELSKY:

Q. Now, you said that you became sick at some point after using the product; is that correct, what type of sickness did you have?

A. I caught a cold.

---

86

---

Q. Did you have anyone perform a diagnosis of that?

A. No.

Q. Did you run any test to characterize that illness?

A. No.

Q. Any lab work to characterize that illness?

A. No, but like I said, I know how my body function and I know, you know.

Q. Did you contact a physician to discuss your sickness?

A. No.

Q. Do you have any idea if the illness was viral or bacterial?

A. No.

Q. Do you understand the difference between viral and bacterial infections?

A. No.

Q. Do you have any documentation concerning that illness that you're talking about now?

A. No.

Q. Did you maintain a standardized diet before, during or after your use of the Defendant's product?

MR. FERRELL: Vague as to the term "standardized diet". To the extent that you understand

---

87

---

that, you can answer the question, go ahead.

THE WITNESS: No.

BY MR. ARHANGELSKY:

Q. Did you maintain a food diary while you were taking the product?

A. No.

Q. Did you prepare a sleep log while you were taking the product that documents the hours of sleep that you got?

A. No.

Q. Were you vaccinated at any point within the last -- excuse me, withdrawn.

Were you vaccinated at any point within six months of taking the Defendant's product?

A. No.

Q. And back in November of 2013 did you do any travel?

A. No.

Q. Do you know anybody by the name of Monica Sandoval?

A. No, I do not.

Q. Are you familiar with a person named Eric Rentz, R-e-n-t-z?

A. No.

Q. Are you familiar with a person named Dana

---

88

---



Flavin, F-l-a-v-i-n?

A.  No.

Q.  Are you familiar with a person named Andrew Saxon, S-a-x-o-n?

A.  No.

Q.  Have you ever heard of any of these names that I've just mentioned?

A.  No.

Q.  Are you familiar with a person named Lynn Willis?

A.  No.

Q.  Are you familiar with an individual named Britt Ferrell, F-e-r-r-e-l-l?

A.  No.

Q.  At any point in this case did you discuss with your counsel the prospect of hiring an immunologist?

A.  No.

Q.  Do you know what an immunologist is?

A.  Probably somebody who studies the immune system, probably.  I don't know.

Q.  Have you paid or promised any money to any of the expert witnesses in this case?

A.  No.

Q.  Do you know any of the expert witnesses in this case?

89

(Whereupon, the deposition of GIOVANNI SANDOVAL, JUNIOR, commenced at 9:50 a.m. and concluded at 12:05 p.m.)

91

A.  No.

MR. ARHANGELSKY:  Okay.  Let's go off the record.

(Discussion held off the record.)

MR. ARHANGELSKY:  Back on the record.

That concludes our examination of this witness.

Counsel, would you like to address the stipulation.

MR. FERRELL:  All right.  We have a stipulation which will be such that the original transcript will be sent to my office.

My office will provide a copy of the original transcript to the deponent.  He will be given 30 days to review and to sign and to make any changes.

Counsel has reserved the right to recall the deposition should there be substantive changes subject to any court order or typographical errors and decide whether or not he wants to resume the deposition.

So stipulated.

MR. ARHANGELSKY:  So stipulated.

And we want the transcript in five days, please.

90

STATE OF CALIFORNIA    )
                       )
COUNTY OF LOS ANGELES  )

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions, or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this _____ day of _____,

20_____, at _____, _____.
                     (City)            (State)

_____
GIOVANNI SANDOVAL, JUNIOR

92

Ex. 30
Page 88

REPORTER'S CERTIFICATE

I, ANGELIQUE MELODY FERRIO, C.S.R. NO. 6979, a Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney or of any of the parties, nor financially interested in the action.

I declare under penalty of perjury under the law of the State of California that the foregoing is true and correct.

Dated this 20th day of April, 2015.

_Angelique Melody Ferrio_
Angelique Melody Ferrio
CSR No. 6979

---

A90443B                                    APRIL 27, 2015

LETTER TO DEPOSITION OFFICER/ERRATA SHEET

DEPOSITION OF:

DATE OF DEPOSITION:

CASE:

The following are the corrections which I have made to my transcript:

| PAGE# | LINE# | CORRECTION | REASON FOR CORRECTION |
|-------|-------|------------|-----------------------|
|       |       |            |                       |
|       |       |            |                       |
|       |       |            |                       |
|       |       |            |                       |
|       |       |            |                       |
|       |       |            |                       |
|       |       |            |                       |
|       |       |            |                       |

Please sign your name and date it on the below line. As needed, use additional paper to note corrections, dating and signing each page. If you have no corrections, please write the word "None" above and sign, date, and return this page.

EXECUTED this _____ day of _____, 20____,

at _____ , _____ .
        (City)                    (State)

_____
        (Signature)