Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Joshua S. Furman, Esq. (pro hac vice)
jfurman@emord.com
Eric J. Awerbuch, Esq. (pro hac vice)
eawerbuch@emord.com
EMORD & ASSOCIATES, P.C.
3210 S. Gilbert Road, Suite 4
Chandler, AZ 85286
Phone: (602) 388-8899
Fax: (602) 393-4361
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL-IMMUNOGENICS CORP., | Case No. 8:15-cv-02034-JVS (JCG) |
| Plaintiff, | **DECLARATION OF CLARK BAKER IN SUPPORT OF PLAINTIFF'S CRIME-FRAUD MOTION** |
| v. | |
| NEWPORT TRIAL GROUP, et al., | |
| Defendants. | Judge: Hon. James V. Selna |

## <u>DECLARATION OF CLARK BAKER</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

1. I, Clark Baker, am over the age of 18 and competent to testify to the information below. All matters contained herein are of my own personal

knowledge unless stated as based upon information and belief.

2.     I am a resident of Los Angeles, California and a private investigator (PI), licensed by the California Bureau of Security and Investigative Services (BSIS).

3.     On August 15, 2015, former NIC plaintiff Andrew Nilon contacted an individual named John McNair by telephone. Mr. McNair operated the website www.electricfamilyscam.com, which displayed public information about suspicious lawsuits filed by certain NTG clients, including Andrew Nilon. According to McNair, Nilon said that he had examined the website and found that all of the content on the website was true and accurate.

4.     On August 20, 2015, in an effort to follow-up on the information Nilon had already shared with McNair, I called Nilon's cell phone and identified myself as McNair's associate. I used the alias "AJ Lyon" and the email address electricfamily@nym.hush.com. I hid my identity out of concern that my association with NIC would otherwise be revealed and, if it were, could lead to retaliatory or unlawful action against NIC by those engaged in what appeared to be a criminal conspiracy to abuse judicial process and extort businesses. I was aware at the time that the Newport Trial Group had sued certain businesses repeatedly, and I was aware that Andrew Nilon had filed multiple lawsuits through NTG.

5.     In his August 20, 2015 discussion with me, Nilon repeatedly apologized for participating in the NIC lawsuit. I told Nilon that contrition is a critical part of remorse and that revealing the facts about his participation was important. Nilon agreed and said that he would gladly answer questions. Nilon was cooperative at all times. I made no threats or demands on Nilon. Nilon's emails exchanged with me reflect his willingness to cooperate and share information volitionally.

6.     Using the alias "AJ Lyon" and email address electricfamily@nym.hush.com, I wrote to Nilon by email on August 20, 2015.

DECLARATION OF CLARK BAKER

2

Nilon replied at 13:24, acknowledging that he received my message and thanking me for removing the website Exh. 7 at 2. At 15:20, I asked Nilon if he could be available the next day for a phone call to discuss the information revealed to McNair. Nilon replied at 15:24, writing that he and his associates had "experienced a TON of frustration in [their] experience with (NTG)." Exh. 7 at 3.

7. The next day on August 21, 2015, I called Nilon on his phone as we had arranged. During the call that lasted 30-40 minutes, Nilon conveyed the following:

a. That he attended Arizona State University (ASU) between 2007 and 2011 at the W. P. Carey School of Business. During his time there he became close friends with fellow ASU students Sam Pfleg and Taylor Demulder. After graduating from ASU, Pfleg, Demulder and Nilon moved to a San Diego apartment in August 2011. With student loans, liabilities and limited prospects, they were "essentially broke" by January 2012 and "desperate for money."

b. Around that time, a mutual friend introduced his girlfriend "Talee" to Pfleg, Demulder and Nilon. Talee said "I think I might have some work for you" and provided the name Andrew Baslow and a phone number. When Nilon called, he was directed to Andrew Baslow who identified himself as an employee of the Newport Trial Group (NTG). After a brief conversation, Baslow suggested that they meet.

c. Several days later, Nilon met Baslow at a coffee shop located between Newport Beach and San Diego. During their meeting, Baslow told Nilon that many natural food and supplement companies falsely advertise products that don't do what their advertising claims say they do. Baslow said that the Newport Trial Group needed "a lot of people" and that he would sign Nilon up for a suit, saying that all Nilon had to do was try some products and, if Nilon got back to Baslow, NTG would pay Nilon for his time.

d. Nilon described the NTG operation as "casual and laid back."

DECLARATION OF CLARK BAKER

3

Baslow told Nilon that "these cases are already going through – you can come on to support them and we'll pay you some money."  Baslow later said, "[Nilon] didn't even need to buy or try the product" and that Nilon would be paid if he signed papers that NTG sent to him.

       e.      Nilon said that NTG paid him about $900 or $1000, which Nilon then used to pay the rent.  Nilon said that he took no other money from NTG and that Nilon, Demulder, and Pfleg only had to sign papers to get paid.

       f.      Nilon said that sometime around May 2013, he "got a weird feeling" about the arrangement and told Baslow that he didn't want to have anything more to do with the lawsuit or NTG.  Baslow pressured Nilon to stay put but, when Nilon persisted, Baslow agreed.

       g.      NTG drafted and sent a declaration for Nilon's signature in which Nilon declared that his grandmother was ill and that Nilon had to move to Northern California to take care of her, which prevented Nilon from participating in the lawsuit.  Nilon said that when he signed the declaration he knew it was false, that his grandmother was not sick, and that she didn't need Nilon's company or time.  According to Nilon, the declaration was written by NTG solely to give Nilon a plausible reason to leave the NIC lawsuit without disclosing to the court that Nilon had been paid to sign onto a class-action lawsuit and the Nilon had since abandoned the ruse.

       h.      Nilon also said that he learned sometime around May 2013 that NTG had used his name to file another false claim against ChromaDex – a company whose products Nilon never purchased or used.  Nilon said that when he discovered this, he contacted Baslow and told him to remove his name from the lawsuit.  Nilon said that he learned that the lawsuit had been withdrawn the next day.

       i.      Nilon said that his friends Pfleg, Demulder, Dronkers, and Brudzewski had told Nilon that they were similarly recruited by NTG to file false

lawsuits against companies.  Although Nilon did not recall the particulars of their cases, he said that they each described to Nilon similar experiences with NTG and Baslow – that NTG paid each of them to file false claims against natural health product companies.

8.    As Nilon told his story, I drafted contemporaneous notes in a document that I later saved as a draft declaration for Nilon, in case he later decided to present his story under oath.  Shortly after our conversation, I pasted a copy of my draft into an email to Nilon on August 21, 2015, at 12:55 PM.  Exh. 7 at 5-7.

9.    Based on my conversation with Nilon, I became aware that the Newport Trial Group had enlisted members of the Electric Family to fabricate legal allegations against several businesses, including Natural-Immunogenics, Corp.  Nilon's narrative was consistent with other publicly available information concerning the NTG lawsuits.

10.    My August 21, 2015 email asked Nilon three open-ended questions and then presented his narrative back to him in written form.  The content of my email followed the exact language Nilon conveyed to me by phone earlier that day on August 21, 2015.  My email stated to Nilon that

> The following is a ROUGH DRAFT of what you disclosed this morning.  Please review it for accuracy and correctness and feel free to add, change or modify it as you need to.

Exh. 7 at 6.  Following the draft statement, my email reiterated that I wanted Nilon to speak freely and truthfully, requesting that Nilon "[p]lease respond with any changes you wish to make.  Again, I am interested in NTG's conduct and not yours, your friends (sic), or your company."  *Id*. at 7.

11.    At 15:25, Nilon said he would respond sometime during the weekend.  *Id*. at 5

12.    By August 23, 2015, I hadn't heard anything from Nilon and, thus, I

DECLARATION OF CLARK BAKER

5

sent him a follow-up email at 13:45. Nilon affirmed the content of my draft email saying that he wanted to talk by phone before he sent anything back to me. I have no indication that we spoke again by phone.

13.    On August 24, 2015 at 10:56, Nilon replied to my email with his revised statement. His statement mirrored the content of my draft and added several minor changes concerning Nilon's associates and where they resided. In his reply draft, Nilon highlighted certain text in red font, and also added the following note:

> (I only contacted Baslow 1 time about being removed from all communications with them. Never heard form (sic) them after that)

*See* Exh. 7 at 11. Nilon's email response contained his signature following the revised statement. *Id*.

14.    Shortly after receiving Nilon's modified draft, I formatted his response into a declaration and asked him by email to sign it before a notary public. Nilon then replied that he planned to seek advice from his attorney before signing. Exh. 7 at 13. I later inquired by email when Nilon had not responded on August 25th and 27th, and I called his cell phone on the 28th. During that call, Nilon identified his attorney as Parker Stanbury of the "Legal Shield" law firm. He later wrote in an email that the name and number was incorrect and that he would give me a new name and number by the next Monday. Exh. 7 at 13. At 15:05, I acknowledged that he would not have counsel before Monday.

15.    On August 30, 2015, Nilon wrote a final email identifying his attorney by name and phone number. Exh. 7 at 15. At this point, I forwarded the information concerning Nilon's statements and his attorney information to NIC's attorneys at Emord & Associates, P.C., and did not have or attempt further contact with Nilon.

16.    By September 1, 2015, I determined that Andrew Baslow was married

and lived in Santa Ana, California.  Baslow had married Jamie Loop in 2013 – one year after Loop sued the Hotel Palomar through NTG.

17.    I continued my investigation of the Electric Family cases to determine whether other Electric Family LLC members would corroborate Andrew Nilon's statements to me.  On December 4, 2015 at approximately 10:25, former NTG plaintiff Sam Schoonover took my phone call while exercising at the gym.  I identified myself as an investigator licensed by the California Bureau of Security and Investigative Services.  When I mentioned his lawsuit against the Himalaya Drug Company and Andrew Baslow, Mr. Schoonover laughed and said "THAT was an interesting experience."  I asked him to expound and Schoonover disclosed the following:

a.    In 2012, Talee Rooney was Schoonover's girlfriend.  At the time, Schoonover lived in an apartment with Nilon, Pfleg, and other male friends who eventually formed Electric Family.

b.    Talee told Schoonover and his roommates that Baslow used her to help find "young men to file claims" for lawyers Baslow worked for.  Talee told Schoonover that Baslow works for a law firm that "goes after other companies and makes false claims against companies," saying that they won money by stopping the companies from making false claims.

c.    Schoonover said Baslow asked us if we wanted to get involved. Schoonover said that he didn't remember much about his claim but that he has documents at home about his case.

d.    Schoonover said that when he and his roommates received court documents, "we looked them over and they looked okay, so we signed them. The lawsuits were for shampoo and other products.  We were young and didn't know any better.  About six months after filing the claims we got money – some of us got paid twice."

e.    Schoonover stated that he was essentially hired to sponsor the

---

DECLARATION OF CLARK BAKER

7

lawsuits regardless of his experience (or purchase) with the products.  Schoonover recalled receiving one payment of about $800-$1500.

   f.   Schoonover continued: "A year or two later the IRS told us that we were supposed to have reported the settlement and that NTG had failed to report it."

   g.   Schoonover said that, after that experience, Baslow told him about companies that recorded telephone calls.  Baslow and his boss wanted Schoonover to complete a phone call while preventing the corporate representative from disclosing that the calls were recorded.  That sounded odd and we became suspicious.  Schoonover said that he "got the feeling that Baslow was naïve - probably influenced by his bosses at NTG."

   h.   Schoonover later told Baslow that his boss was "sketchy."  Baslow became defensive and they ended their relationship.

18.   After he shared that information, I asked Schoonover if I could meet with him to gather more information.  Schoonover asked me to call back after his workout – sometime after 1500.   When I called later that afternoon, Schoonover expressed reluctance to talk about the case any further.  I then thanked him for his time and terminated the call.

19.   I then received an unsolicited text message from Schoonover at 14:36 which said the following:

> Hey Clark.  After thinking about this more, I'm going to opt out of any further communication with you or about this case.  I've already said everything I need to say about it.  I feel as if NTG took advantage of our lack of knowledge about these types of cases and when we realized what was going on, we went separate ways.  It happened a long time ago and I don't really care to bring anyone to justice or to continue digging into it.  Thank you for reaching out and trying to make things right.  Best of luck.

*See* Exh. 8.

DECLARATION OF CLARK BAKER

8

20.    **EXHIBIT 7** is a true and correct copy of the email correspondence between Andrew Nilon and Clark Baker in August of 2015.

21.    **EXHIBIT 8** is a true and correct copy of a text message sent from Mr. Schoonover to Mr. Baker on December 4, 2015 at 2:20PM.

Executed on this 14th day of March, 2017.

_____

Clark Baker