# EXHIBIT 1

**A90443B**
**GIOVANNI SANDOVAL, JUNIOR     APRIL 20, 2015**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT

OF CALIFORNIA

- - -

ANDREW NILON, INDIVIDUALLY        )
AND ON BEHALF OF ALL OTHERS       )
SIMILARLY-SITUATED,               )
                                  )
              Plaintiff,          )
                                  )
     vs.                          ) No.:   3:12-CV-00930
                                  )        LAB (BGS)
                                  )
NATURAL-IMMUNOGENICS              )
CORPORATION AND                   )
DOES 1 - 25, INCLUSIVE,           )
                                  )
              Defendant.          )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

DEPOSITION OF

GIOVANNI SANDOVAL, JUNIOR

NEWPORT BEACH, CALIFORNIA

APRIL 20, 2015

Atkinson-Baker, Inc.
Court Reporters
www.depo.com
(800) 288-3376

REPORTED BY:  ANGELIQUE MELODY FERRIO, CSR NO. 6979

FILE NO:      A90443B

A90443B
**GIOVANNI SANDOVAL, JUNIOR**       **APRIL 20, 2015**

---

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT
OF CALIFORNIA
- - -

ANDREW NILON, INDIVIDUALLY )
AND ON BEHALF OF ALL OTHERS )
SIMILARLY-SITUATED, )
)
            Plaintiff, )
)
    vs.        ) No.: 3:12-CV-00930
           ) LAB (BGS)
           )
NATURAL-IMMUNOGENICS )
CORPORATION AND )
DOES 1 - 25, INCLUSIVE, )
           )
           Defendant. )
_____ )

Deposition of GIOVANNI SANDOVAL, JUNIOR, taken on behalf of the Defendant, at 4100 Newport Place Drive, Suite 800, Newport Beach, California, 92660, commencing at 9:50 a.m., Monday, April 20, 2015, before ANGELIQUE MELODY FERRIO, CSR No. 6979.

Page 2

---

A P P E A R A N C E S

FOR THE PLAINTIFF:
    NEWPORT TRIAL GROUP
    BY: RYAN M. FERRELL, ESQ.
    4100 Newport Place
    Suite 800
    Newport Beach, California 92660

FOR THE DEFENDANT:
    EMORD & ASSOCIATES
    BY: PETER A. ARHANGELSKY, ESQ.
    AND JOSHUA FURMAN, ESQ.
    3210 South Gilbert Road
    Suite 4
    Chandler, Arizona 85286

Page 3

---

I N D E X

WITNESS: GIOVANNI SANDOVAL, JUNIOR

EXAMINATION:                           PAGE
    By Mr. Arhangelsky              6


EXHIBITS
                DEFENDANTS'
NUMBER          DESCRIPTION         PAGE

A    Notice of Deposition of Class      18
     Plaintiff Giovanni Sandoval
     Dated April 7, 2015
     Consisting of five pages

B    Colored Xeroxed Photograph        51
     Consisting of one page

C    Colored Xeroxed Photograph        53
     Consisting of one page

D    Declaration of Giovanni Sandoval   60
     Dated June 18, 2014
     Consisting of four pages

Page 4

---

EXHIBITS CONTINUED:

E    Second Amended Class Action Complaint    66
     Dated August 25, 2014
     Consisting of 24 pages

F    Colored Xeroxed Photographs        81
     Consisting of eight pages


QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
PAGE    LINE
    (NONE)


INFORMATION TO BE SUPPLIED:
PAGE    LINE
    (NONE)

Page 5

---

NIC's Request for Judicial Notice
In Opposition to MSJ
Exh. 1

**A90443B**

**GIOVANNI SANDOVAL, JUNIOR     APRIL 20, 2015**

**Page 6**

NEWPORT BEACH, CALIFORNIA, MONDAY, APRIL 20, 2015
9:50 A.M.
-O0O-

GIOVANNI SANDOVAL, JUNIOR,
having first been duly sworn, was
examined and testified as follows:

EXAMINATION

MR. ARHANGELSKY:  Okay.  We're here on the matter of Sandoval or Nilon versus Natural-Immunogenics Corporation.

Could I have counsel identify themselves for the record, please.

MR. FERRELL:  Sure.  I'm Ryan Ferrell on behalf of the Plaintiff, Giovanni Sandoval and the certified class in this action.

MR. ARHANGELSKY:  Peter Arhangelsky for Natural-Immunogenics.  And with me is Josh Furman.

BY MR. ARHANGELSKY:

Q.  Mr. Sandoval, can you state your full legal name for the record, please.

A.  Giovanni Sandoval, Junior.

Q.  What is your current address?

**Page 7**

A.  2681 South Virginia Drive.

Q.  How far way is that from here?

A.  About two hours.

Q.  You said South Virginia Drive, what city is that?

A.  It's down in Yuma.

Q.  Yuma, Arizona?

A.  Arizona.

Q.  Did you drive here today?

A.  I drove here yesterday.

Q.  How long have you lived at that residence?

A.  I've barely been there, I'll say, a year.

Q.  One year, so, you moved there in April of 2014?

A.  Yeah, officially, yeah.  I've just kind of going back and forth from my job from San Diego to Arizona, but I officially moved all of my stuff over there about a year ago.

Q.  Okay.  So, before a year ago what was your address?

A.  In El Cajon, I forget the exact address, but it was on Jeffrey Street in El Cajon, California.

Q.  How long did you live there?

A.  Probably like, I want to say, five years.

Q.  Okay.  And is Sandoval the only name that you go by?

**Page 8**

A.  Yes.

Q.  Sandoval, Junior?

A.  Yes.

Q.  And do you have any other surnames or family names?

A.  No.

Q.  And is Giovanni the only first name that you go by?

A.  Yes.

Q.  Okay.  Mr. Sandoval, have you ever been deposed before?

A.  No.

Q.  Do you understand that here today you're testifying as though you were in court subject to perjury under oath?

A.  Yes.

Q.  And do you have any questions concerning that oath?

A.  No.

Q.  I'll give you a few rules, some background, some rules because you've not been deposed before.  I'm going to ask you some questions here today and we're entitled to your answers.

If you don't understand a question, I'm going to ask that you let me know immediately and I'll clarify

**Page 9**

the question.

If you don't let me know and you don't ask for clarification and you answer the question anyway, I'm going to assume that you understood the question; do you understand that; is that fair?

A.  Yes.

Q.  We need to make our court reporter's job easy today.  And that means that we can't talk over each other.  We need to have a clean transcript.

And so I'm going to also ask that you wait until I finish asking my question before you answer; do you understand that?

A.  Yes.

Q.  Likewise, I'll wait for you to finish your answer before I ask another question.

Your counsel may have objections.  I would ask that you wait until he's finished making his objection before you attempt to answer so that, again, we don't have people talking on the record at the same time; do you understand that?

A.  Yes.

Q.  Is there any reason medically or otherwise that you can't testify truthfully today?

A.  No.

Q.  Have you taken any medications within the past

**A90443B**
**GIOVANNI SANDOVAL, JUNIOR        APRIL 20, 2015**

**Page 10**

24 hours?

A. No.

Q. Do you take any medications at all?

A. No.

Q. Have you ever been prescribed any medications within the last several years?

MR. FERRELL: Objection, as to time. It's vague.

BY MR. ARHANGELSKY:

Q. Have you ever been prescribed any medications in the last four years?

A. Besides some Motrins or a pain pill, no.

Q. Was that a prescription medication?

A. Yeah, some Motrins. That messed up my arm. Yeah, I had messed up my arm. And they gave me, they prescribed me those, but that's about it.

Other than that, I don't take any medication or nothing.

Q. How old are you?

A. I'm 28.

Q. Are you married?

A. No.

Q. Do you have a girlfriend?

A. No.

Q. Do you have a significant other?

**Page 11**

A. Yes.

Q. And who is that?

A. Her name is Juliana Ochoa.

Q. Can you spell that for the record, please.

A. Juliana Ochoa, J-u-l-i-a-n-a, O-c-h-o-a.

Q. And does she live with you?

A. Yes, she does.

Q. How long has she lived with you?

A. A year and a half.

Q. Did she live with you back in El Cajon?

A. Yes.

Q. So, 18 months?

A. I would say.

Q. All right. And how long have you been together with her?

A. Around that amount of time.

Q. Where were you born?

A. I was born in Watsonville, California by San Jose County.

Q. And what's your level of education?

A. I went up to eleventh grade.

Q. What high school was that?

A. El Cajon High School.

Q. Did you pursue a G.E.D.?

A. No, I did not.

**Page 12**

Q. Did you achieve any additional classes after high school?

A. No.

Q. What level of education does your significant other have?

A. She graduated.

Q. From high school?

A. Yes.

Q. Does she have any college education?

A. No.

Q. Do you have any siblings?

A. Yes.

Q. What are their names?

A. I have two sisters. One of them her name is Alicia Sandoval. And I have another sister. Her name is Cynthia Sandoval. And I have a brother. His name is Michael Sandoval.

Q. Do you have any children?

A. Yes.

Q. What are their names?

A. My daughter, her name is Anniah Sandoval. And I have a son. His name is Aiden Isaiah Sandoval.

Q. How old are they?

A. My son is five. And my daughter is six and half, A-n-n-i-a-h, Anniah, Sandoval. My son is, his

**Page 13**

name is Aiden, A-i-d-e-n, Isaiah, I-s-a-i-a-h, Sandoval.

Q. Where do you work right now?

A. It's called J.J.R.D. Investments. We do remodeling, apartments, houses.

Q. Construction work?

A. Yeah.

Q. How long have you had that position?

A. A little more than two years.

Q. Okay. And what are your responsibilities at that job?

A. Just keeping track making sure that everything gets done, you know. I'm in there putting my hands on as well.

Q. When you say putting your hands on, what do you mean?

A. I'm in there doing work in there as well.

Q. Do you have health insurance with that job?

A. No.

Q. And when was the last time that you saw a doctor?

A. For what, like just --

Q. A general physical, anything?

A. I had an eye examination not too long ago.

Q. Okay. And what about anything else, any other visits?

## A90443B
### GIOVANNI SANDOVAL, JUNIOR      APRIL 20, 2015

MR. FERRELL: Objection, vague. To the extent that you can answer, go ahead.

THE WITNESS: Um, not really.

BY MR. ARHANGELSKY:

Q. Have you ever been to the emergency room?

A. Yes.

Q. When was that?

A. A few years ago, I cracked my head open and I had some staples in there.

Q. Was that a job-related accident?

A. No.

Q. Aside from that trip to the emergency room, can you recall the last time that you were at a physicians's office or a healthcare provider?

A. I don't remember.

Q. You said that you were prescribed Motrin at some point?

A. Yes.

Q. Who prescribed that?

A. One of the doctors out there.

Q. Out where?

A. In Yuma.

Q. And when was that?

A. I can't recall the exact date.

Q. So, you saw a doctor for that?

Page 14

A. Yeah.

Q. And what were the circumstances surrounding that visit?

A. Um, just, I just seen him. And he was just -- I was just letting him know what was wrong, you know, and he just --

Q. Do you recall the name of that doctor?

A. No.

Q. Where was he located?

A. In one of the, one of the offices in Yuma.

Q. Which office?

A. I don't know the address. I'm new to there. I don't know exactly the whole streets like I do out here.

Q. Was he a licensed physician?

A. Yes, he was.

Q. He practiced under a medical group?

A. I'm pretty sure that he did.

Q. Was it in the hospital or a private location?

A. It was in like a health clinic.

Q. Okay. I think that you said that you don't recall when that was, but it would have been sometime after you moved to Yuma; is that right?

A. Yeah.

Q. Within the first couple of months after moving to Yuma?

Page 15

A. Within the first few months.

Q. Okay. What other jobs have you had since you were 18 years old?

A. Um, I worked at Vons in Spring Valley for a little bit.

And then after that, I just do drywall, you know, remodeling inside houses. I've always done that since I was young. Since I was 18.

Q. What is Vons?

A. It's a food store.

Q. Can you spell Vons?

A. V-o-n-s.

Q. And it's a food store and where is it located?

A. It's off of Jamacha Boulevard, Spring Valley, J-a-m-a-c-h-a.

Q. California?

A. Yes.

Q. What kind of food do they sell?

A. Just your regular grocery store.

Q. What was your job description there?

A. On that first I started off bagging groceries. And then I moved up to the meat department, cutting up the meat, packaging the meat.

Q. Have you had any jobs in the legal field?

A. No.

Page 16

Q. Okay. Have you had any jobs in the healthcare field?

A. No.

Q. Mr. Sandoval, what did you do to prepare for this deposition today?

A. I ate a good breakfast.

Q. Did you review any information?

A. No.

Q. Did you review any documents?

A. Like when, today?

Q. In the last two weeks?

A. I spoke with my attorney a couple of times.

Q. Okay. So, several times you spoke with your attorney?

A. (Witness Nods).

Q. When was the first time that you spoke with your attorney?

A. Um --

MR. FERRELL: Objection as to time, vague, to but the extent that you can answer, go ahead.

BY MR. ARHANGELSKY:

Q. You can answer.

A. I forget the exact date. It was probably like a year ago. I don't know. I don't know the exact date.

Q. In preparation for this deposition, did you

Page 17

NIC's Request for Judicial Notice
In Opposition to MSJ
Exh. 1

A90443B
**GIOVANNI SANDOVAL, JUNIOR          APRIL 20, 2015**

speak with anybody else other than your attorney?

A. No, I did not.

Q. In this case in general, have you spoken with anybody other than your attorney about your role as a Plaintiff?

A. No.

MR. ARHANGELSKY: Okay. Josh, give me document one, please.

(Deposition Exhibit A was marked for identification and is attached hereto.)

BY MR. ARHANGELSKY:

Q. So, this is a document that we've marked as Exhibit A.

A. Okay.

MR. ARHANGELSKY: And for the record, we have copies for you for all the others. This is the Notice of Deposition. That's it.

MR. FERRELL: That's fine.

BY MR. ARHANGELSKY:

Q. I've put a document in front of you marked as Exhibit A.

Have you seen this document before?

Page 18

A. Yes.

Q. When did you see this document?

A. My attorney has shown it to me.

Q. When did he show it to you?

A. One of the times that I spoke with him, that I met up with him, but I don't know the exact date, though.

Q. Let me direct your attention to -- first, what is this document?

A. Um --

MR. FERRELL: Objection, calls for a legal conclusion. To the extent that you can answer as a lay person, go ahead.

THE WITNESS: Notice of Deposition.

BY MR. ARHANGELSKY:

Q. Let me direct your attention to page two and ask you to just review what starts as a list of requests for documents.

Have you reviewed that list before?

A. Yes, I have.

Q. And have you brought any of those documents that are requested there with you today to this deposition?

A. No.

Q. Have you been asked at any point in this case

Page 19

to produce documents to your counsel?

A. No.

Q. Have you produced any documents to your counsel in this case?

MR. FERRELL: Objection, vague as to "produced". I assume that you mean given. As a lay person, he won't understand the term "produced".

BY MR. ARHANGELSKY:

Q. Did you understand the question that I asked you?

A. Yes. I'm pretty sure that I have.

Q. You've given documents to your counsel.

Can you describe what documents that you've provided to your counsel?

MR. FERRELL: Objection, privilege. Don't answer that.

MR. ARHANGELSKY: I'm entitled to understand what documents that he looked at to --

MR. FERRELL: You're not entitled to understand any of our communications.

MR. ARHANGELSKY: I'm not asking for privileged communications, but I'm asking for him to identify information that he has provided without identifying the substantive matter. I haven't asked him for the substantive matter of the communications.

Page 20

MR. FERRELL: Absolutely not, Counsel.

BY MR. ARHANGELSKY:

Q. Have you produced any receipts for products to your counsel?

MR. FERRELL: Objection, privilege. Do not answer.

BY MR. ARHANGELSKY:

Q. Did you retain copies of receipts for any product purchases that are related this case?

A. I have, but I don't know what I did with them. I don't really save receipts.

Q. So, you don't have those with you?

A. Not the receipts.

Q. You wouldn't be able to produce those if you had to?

A. No. I don't know what happened to it. I think that I threw them away.

Q. Did you bring any documents with you to this office today?

A. No, I did not.

Q. Have you been asked to respond to any discovery questions at any point in this case?

MR. FERRELL: Objection, calls for a legal conclusion. To the extent that you can understand the question, go ahead and answer.

Page 21

NIC's Request for Judicial Notice
In Opposition to MSJ
Exh. 1

**A90443B**
## GIOVANNI SANDOVAL, JUNIOR      APRIL 20, 2015

THE WITNESS: Say it again.

BY MR. ARHANGELSKY:

**Q. Have you been asked to respond to any discovery questions in this case?**

A. I don't understand. I don't get it.

**Q. Have you been asked to provide any information about your understanding of the product at issue in this case?**

MR. FERRELL: Objection, whom.

MR. ARHANGELSKY: I'm sorry.

MR. FERRELL: Objection, it's vague as to whom.

MR. ARHANGELSKY: Can you repeat the question, please.

(Whereupon, the record was read as follows:)

**Q. Have you been asked to provide any information about your understanding of the product at issue in this case?**

THE WITNESS: I don't think so.

BY MR. ARHANGELSKY:

**Q. Has anyone offered you money as a Plaintiff in this case?**

Page 22

A. No, no money.

**Q. Have you received any compensation for your participation as a Plaintiff?**

A. (Witness Nods).

MR. FERRELL: You have to give audible answers. She can't type down head shakes.

THE WITNESS: No.

BY MR. ARHANGELSKY:

**Q. Have you incurred any expenses in the case?**

A. Just, no, just I rented a car to get out here.

**Q. You had to rent a car to drive out here?**

A. Yeah, that's about it, but my motel was paid for.

**Q. Who paid for your motel?**

A. My attorney.

**Q. Who paid for your rental car?**

A. I did, myself.

**Q. Who paid for your gas?**

A. Me.

**Q. Who pays for your food?**

A. Me.

**Q. Now, aside from this Notice of Deposition that you have in front of you right now marked as Exhibit A, have you reviewed any other documents in this case?**

A. I think that there might have been one or two.

Page 23

I think there might have been another one. I don't know exactly the name of it, though.

**Q. So, maybe one other pleading or document? Excuse me.**

MR. FERRELL: Objection, asked and answered, misstates testimony, but you can answer.

THE WITNESS: Like one or two maybe.

BY MR. ARHANGELSKY:

**Q. Do recall the substantive matter of those documents?**

A. No, I do not.

**Q. Have you signed or recorded any statements as a Plaintiff in this case?**

A. I'm not sure. I think that I have, though.

**Q. You can't recall?**

A. I can't recall.

**Q. Have you posted any statements about this lawsuit on-line?**

A. No, I have not.

**Q. Have you made any statements about this lawsuit to any third parties other than your attorney?**

A. No.

**Q. You're aware that this case was filed in April of 2012?**

A. Yes, I am.

Page 24

**Q. And how are you aware of that?**

MR. FERRELL: Objection, it's privilege, if it comes from counsel, don't answer.

MR. ARHANGELSKY: You're contending that his awareness of when the case began is through you?

MR. FERRELL: You can't ask him who he's aware from because he has already testified that it only came from counsel. He has only spoken with counsel about it.

So, the substance of any communication that I've had with him is absolutely privileged.

MR. ARHANGELSKY: Well, I think that I disagree with your understanding of the way that privilege works. I don't see that as -- you have no claim that that's something that's subject to attorney-client privilege. And it's not made in aid of legal counsel.

MR. FERRELL: Absolutely, it is.

MR. ARHANGELSKY: Nonetheless, I'll let you make your objection and that's fine. I'll move on.

BY MR. ARHANGELSKY:

**Q. So, you're aware that this case is three years old?**

A. Yes.

**Q. When was the first time that you heard about this case?**

A. I want to say like around November of '13.

Page 25

NIC's Request for Judicial Notice
In Opposition to MSJ
Exh. 1

## A90443B
### GIOVANNI SANDOVAL, JUNIOR     APRIL 20, 2015

**Page 26**

Q. November of 2013 is when you heard about this case?

A. Well, when, um, like when I heard about what was going on with the Sulvant Silver exactly or --

Q. When did you hear about this litigation?

A. Um, a few months after I had purchased the actual product.

Q. And when was that?

A. Um --

Q. Sorry. Let me rephrase.

When was it exactly that you learned about this lawsuit?

A. It was like, like November or maybe January of 2014.

Q. January of 2014?

A. Uh-huh.

Q. I'm going to go back for one second.

How much money do you make a year?

MR. FERRELL: Objection, relevance. To the extent that you know, go ahead.

THE WITNESS: I'm not sure exactly.

BY MR. ARHANGELSKY:

Q. Can you estimate?

MR. FERRELL: To the extent that you can estimate, go ahead, but don't guess.

**Page 27**

THE WITNESS: Maybe $20,000 maybe.

BY MR. ARHANGELSKY:

Q. Is that gross before taxes?

A. Yeah.

Q. So, walk me through how you became a Plaintiff in this case.

A. I had purchased the product, you know. And it didn't do nothing for me. And then I heard or I seen on-line that there was something going on, a lawsuit going on with the actual product.

So, I just looked forward into it. I looked more into it.

Q. Let me just for the record, when you say the product, can you describe what the product is?

A. Sulvant Silver.

Q. What's the name of the product?

A. Sulvant Silver.

Q. Can you spell that?

A. S-u-l-v-a-n-t, S-i-l-v-e-r, I want to say.

Q. And you said that you saw something on-line about this case?

A. (Witness Nods).

Q. What was it that you saw on-line?

A. It was like a false advertisement. And it didn't do nothing for me, you know. And that's the only

**Page 28**

reason that I had purchased the product, you know.

Q. Well, we'll get to that in a second. I'm asking a more directed question.

What exactly was it that you saw on-line that notified you about this litigation?

A. You know, that there were lawsuits taken out on it.

Q. Was it a website?

A. Yeah.

Q. Okay. Do you remember the domain name of the website?

A. No, I do not.

Q. Do you remember who sponsored the website?

A. No.

Q. Was it your attorney's website?

A. No.

Q. No, it was not your attorney's website or, no, you don't remember?

MR. FERRELL: Objection, asked and answered, to the extent that you can answer it again.

THE WITNESS: I don't remember.

BY MR. ARHANGELSKY:

Q. Do you recall exactly what the on-line statement said?

A. They was just mentioning that there was

**Page 29**

lawsuits being taken out on the product for it not working, you know, there was, I don't know.

Q. What did you do with that information?

A. I saved the page. And then I was looking more on it, looking more on it. And then I just contacted the attorney that was on there.

Q. You saved the web page?

A. Yeah.

Q. Do you still have a copy of that web page?

A. I don't think that I do. I don't know. I don't know if I do. I can look it up, but I'm not promising nothing.

Q. What did you do with it?

A. I always erase stuff on my computer. That's what I'm saying. I'm not sure if I still have it or not, maybe and maybe not.

Q. When you say that you saved the page, you saved it electronically on your computer?

A. Um, I just looked it up on my computer. It was just right there and I just looked up everything that was on there.

Q. What was on there?

A. You know, just people saying stuff about it, you know, lawsuits going on about the actual product. And that's where I came in contact with my attorney.

NIC's Request for Judicial Notice In Opposition to MSJ Exh. 1

A90443B

**GIOVANNI SANDOVAL, JUNIOR          APRIL 20, 2015**

Q. So, that website had contact information for your attorney?

A. Yeah.

Q. And then you contacted your attorney based on that web page?

A. Yes, I did.

Q. When was it exactly; when was the first time that you spoke with Newport Trial Group or your counsel?

A. Um, like probably the beginning of 2014.

Q. In January of 2014?

A. (Witness Nods).

Q. And you initiated that communication?

A. (Witness Nods).

MR. FERRELL: You have to answer out loud.

THE WITNESS: Well, I had called it and I left a message to somebody. And then he had gotten back in contact with me.

BY MR. ARHANGELSKY:

Q. When was it when you were asked to serve as a Plaintiff in this case?

A. Around that time.

Q. Around January of 2014?

A. I would say.

Q. Did you sign a retainer agreement?

A. What's a retainer agreement exactly again?

Page 30

Q. Did you sign an agreement with your counsel?

A. Yes, I did.

Q. And when did you sign that?

A. I don't know the exact date.

Q. Would it have been sometime around January of 2014?

A. Maybe.

Q. Did that retainer agreement promise you money if your counsel wins this case?

MR. FERRELL: Objection, asked and answered. To the extent that you can answer it again, go ahead.

THE WITNESS: I believe so.

BY MR. ARHANGELSKY:

Q. Do you know how much that you were promised?

A. No.

Q. You don't recall the terms of that retainer agreement?

A. No.

Q. Okay.

A. It has been a little -- it has been a little minute.

Q. Did you -- withdrawn.

Can you tell me who the Defendant is in the case?

A. I don't know. Would that be me or would that

Page 31

be the Solvant Silver?

Q. So, is the answer to your question you don't know?

A. No.

Q. Looking at the document that you have in front of you marked as Exhibit A, is there something in that document that will refresh your recollection as to who the Defendant is in this case?

A. Natural-Immunogenics.

Q. Do you know who Natural-Immunogenics is; excuse me; do you know what Natural-Immunogenics is?

A. It's probably the company that made the Sulvant Silver maybe.

Q. You don't know that for sure?

A. I want to say that's what it is.

Q. Well, do you know that as a fact or are you guessing?

MR. FERRELL: Objection, asked and answered. To the extent that you can answer again, go ahead.

THE WITNESS: I'm pretty sure that it is.

BY MR. ARHANGELSKY:

Q. And how do you know that?

A. Because what else would it be.

Q. And at some point did you purchase one of the Defendant's products?

Page 32

A. Yes, I have.

Q. And what product did you purchase?

A. It was the Sulvant Silver.

Q. That's the product that you identified before earlier in this deposition?

A. Yes.

Q. And just for the record, I can't remember if I've done this already, but as I refer to the product today, I'm referring to Sovereign Silver, the Defendant's product that you say that you purchased, just so that we have clarity on the record, unless I say otherwise; do you understand that?

A. Yes.

Q. Now, are you aware that there are different types of products that Natural-Immunogenics sells?

A. Um, I'm pretty sure that there is.

Q. Can you describe the different types of products that Natural-Immunogenics sells?

A. No.

Q. What's your basis for saying that they sell different products?

A. I don't think that they just make that one product or maybe or maybe not. Maybe they do and maybe they don't.

Q. The product that you purchased was a dietary

Page 33

A90443B

GIOVANNI SANDOVAL, JUNIOR      APRIL 20, 2015

supplement; is that right?

A. A dietary supplement?

Q. Yes. I'm asking you; is that correct?

A. It's supposed to strengthen my immune system.

Q. And was the product labeled as a dietary supplement?

A. I'm not sure.

Q. You don't recall whether it was labeled a dietary supplement?

A. (Witness Nods)

MR. FERRELL: You have to give an audible answer.

THE WITNESS: No.

BY MR. ARHANGELSKY:

Q. Okay. Are you familiar with the phrase "dietary supplement"?

A. No, I'm not.

Q. Other than the product, the Defendant's product that we're talking about today, have you purchased other nutritional products or dietary supplement products in that category in the past?

A. No.

Q. Was this the first time that you purchased a nutritional supplement?

A. Besides protein shakes, would that be, would

Page 34

that be considered one?

Q. So, your answer is that you've purchased protein shakes in the past?

A. Not from this place, but I like to work out and I like to stay in shape. So, I have purchased that kind of stuff.

Q. Okay. Do you take any vitamins?

A. Yes.

Q. Which ones?

A. I forget the name of them, but I get them from the GNC store.

Q. You buy your vitamins from GNC?

A. Yes.

Q. And those vitamins that you buy, are you the only person who uses them at your house or does your significant other use them?

A. No. I'm the only one.

Q. How often do you purchase these products?

A. Every couple of months.

Q. Nutritional products are different from drug products; right?

A. Yes.

Q. Can you describe how they're different?

A. Nutritional is to help benefit your body. And drug products, I don't know. They're just products for

Page 35

pain and stuff like that.

Q. Have you bought any drug products --

A. No.

Q. -- in the last four years?

A. No.

Q. But you did tell me that you had a prescription for Motrin before; correct?

A. Yes.

Q. Did you buy that?

A. I think that I paid like a couple of dollars for them, not really that much. Yeah, I did purchase those.

Q. Where did you purchase them?

A. I want to say it was like at a Walgreens in the pharmacy in the Walgreens.

Q. But you didn't get it from the pharmacist; right?

A. I got the prescription from them.

Q. You got your prescription from the pharmacist?

A. I got my prescription from the doctor. And I took it to the pharmacist. And they gave me the medication, the Motrins.

Q. So, you did receive the product from behind the pharmacy counter?

A. Yes.

Page 36

Q. Have you bought any products in the last four years for colds or coughs?

A. Like Nyquil.

Q. So, you've bought Nyquil before?

A. Yeah.

Q. Where did you get the Nyquil from?

A. Like Walmart, different stores, Walmart, Walgreens, wherever I'm closer to at the time.

Q. Any other products?

A. No.

Q. So, again, can you explain to me why you purchased Nyquil?

A. For a cold.

Q. So, you had a cold and you weren't feeling well and you purchased Nyquil?

A. Yes.

Q. Why did you pick Nyquil?

A. I don't know. It just works, works all right when I know that I'm already sick and when I'm coming down with a cold, I just drink some Nyquil and it helps me out.

Q. Nyquil is a drug; is it not?

MR. FERRELL: Objection, to the extent that you know whether or not Nyquil is a drug, you can answer.

THE WITNESS: I don't think that it's a drug.

Page 37

A90443B
**GIOVANNI SANDOVAL, JUNIOR          APRIL 20, 2015**

BY MR. ARHANGELSKY:

Q. You don't know if Nyquil is a drug?

A. No.

Q. Have you bought any nutritional products -- excuse me, withdraw that.

Other than the Defendant's product, have you -- withdraw that. I'll lay a foundation.

Have you shopped at Sprouts Farmers Market in the last four years?

A. I've been there a couple of times.

Q. And when was the last time that you were in Sprouts?

A. Well, the last time that I got this, when I had gotten that, that's the last time that I had been there.

Q. Before then, when was the last time that you had been there?

A. A few times before that, I don't know the exact dates, though, but not that much, not too long before I got these.

Q. And what did you buy when you went the other times?

A. Just like some vegetables and they have a bunch of different stuff there.

Q. And then at some point you went to Sprouts --

A. Yeah.

Page 38

Q. -- and purchased the Defendant's product; is that correct?

A. Yes.

Q. When was that?

A. Um, like maybe like November, November of 2013.

Q. So, approximately, 18 months ago?

MR. FERRELL: Objection --

MR. ARHANGELSKY: Is my math off?

MR. FERRELL: By a year.

BY MR. ARHANGELSKY:

Q. Okay. November of 2013?

A. Yeah.

Q. How long ago was that?

A. I don't know. How long, how long is it?

Q. I'm not here to answer the questions. I'm sorry. I'm here to ask them. If you don't know, just say that you don't know.

A. I don't know.

Q. Thank you. You don't remember the exact date?

MR. FERRELL: Objection, asked and answered. He said November of 2013.

BY MR. ARHANGELSKY:

Q. It's a different question. You can answer.

A. In November of 2013.

Q. Okay. Do you remember what time of day that

Page 39

you went to Sprouts?

A. I think it was probably like when I had gotten off of work around four or five.

Q. So, was that a weekday?

A. Yeah. I don't work on weekends.

Q. And you don't remember the specific day of the week?

A. No.

Q. Why did you choose that Sprouts?

A. Because I know that they have got stuff like that, you know. I know that they have got products like that. And I just happened to walk in there and I seen it.

It could have been any store. It could have been anything. I was just there at the time.

Q. When you say products like that, what are you referring to?

A. Um, like house products, I guess you could say.

Q. What do you mean by house products?

A. Health products.

Q. Health products. What do you mean by health products?

A. Like cold medicine, they have stuff when you're sick, you know, stuff like that. They have a bunch of different stuff there, actually.

Page 40

Q. Which specific Sprouts store did you visit that day to purchase the Defendant's product?

A. I want to say that it's on Second and East Main or somewhere right there. Let me see. I want to say Second and East Main.

Q. What city?

A. El Cajon, California.

Q. And those are cross streets, Second and East Main?

A. Yes.

Q. Did you buy any other products that day at Sprouts?

A. I might have gotten some milk with it.

Q. You don't recall specifically?

A. I don't recall specifically.

Q. Do you remember if you used a shopping cart?

A. No. I didn't use a shopping cart that day.

Q. You just went in for a few items?

A. Yes.

Q. When you went to Sprouts that day, was it your intent to buy the Defendant's product, Sovereign Silver?

A. I was looking for something. And I just so happened to pick that up and get that one.

Q. So, prior to arriving at Sprouts, you did not plan to purchase the Defendant's product?

Page 41

Case 8:15-cv-02034-JVS-JCG   Document 30-5   Filed 01/28/16   Page 13 of 25   Page ID #:679

A90443B

GIOVANNI SANDOVAL, JUNIOR        APRIL 20, 2015

A. No.

Q. You planned to purchase a product in that category?

A. Yes.

Q. Do you have any documents in your possession still today or that could be in your possession that evidence the purchase of the product?

A. No.

Q. How did you --

A. I think that I might still have the bottle only, but as far as receipts and stuff like that, no.

Q. How did you purchase the product?

A. Cash.

Q. All right. And you said that you still do have a copy of the packaging?

A. I believe I still have got the bottle.

Q. Have you -- I apologize if you've answered this, but I want to make sure for the record.

Have you purchased any other products that claim to support the immune system in the last four years?

A. No.

Q. Have you ever heard of Echinacea dietary supplements?

A. No.

Page 42

Q. What did you pay for the Sovereign Silver product?

A. I want to say that it was maybe like 10 to 15 bucks, 10 to 15.

Q. You don't remember exactly?

A. No, around there.

Q. And what size was the product that you purchased?

A. I don't know how many ounces, but like this big, a little bottle. I don't know how many ounces, maybe like, maybe like five ounces.

I don't know the exact how many ounces are in that bottle, but it's a bottle.

Q. Can you describe the product that you purchased?

A. Like what do you mean?

Q. What did it look like?

A. It was in a little dark, brown bottle. And it had a little, you squeeze the top. And then it has a little hose in the middle. And you squeeze it in and you just drop it on your tongue.

Q. Have you heard of the phrase Silver Hydrosol before?

A. No, I have not.

Q. Have you heard of the phrase Colloidal Silver

Page 43

before?

A. No.

Q. You don't have an understanding of the differences between Colloidal Silver and Silver Hydrosol products?

A. No.

Q. So, I want you to walk me through the time when you visited Sprouts to purchase the product.

Can you describe the aisle at Sprouts where you found the product?

A. No.

Q. Is that because you can't recall specifically the details of your visit to Sprouts or are you just --

A. I just don't remember what aisle it was on. The store is kind of big. There are a lot of aisles.

Q. Do you recall whether the aisle was marked with any signage?

A. No.

Q. Do you recall what you see when you first approached the aisle that contains the Defendant's product?

A. No.

Q. Well, there were other products in that section; is that correct?

A. Yes.

Page 44

Q. And you testified before that you chose the Defendant's product among those other products; is that correct?

A. Yes.

Q. So, did you review any of the other products that you saw in that aisle?

A. I looked at them, but this one just for some reason, I don't know, just said, helps strengthen your immune system. So, I just picked it out.

Q. Were there any other products that said that it would help strengthen your immune system?

A. I don't think there was.

Q. Were there any other Silver products?

A. I don't recall.

Q. Did you review any labels of any other products that were in that section?

A. No.

Q. You just --

A. Maybe there might have been one or two, but I don't remember exactly which ones they were or the name of them.

Q. Okay. So, you just reviewed the Defendant's product and that's it?

A. Well, there were a couple of them. Maybe I looked through a couple of them. I don't remember the

Page 45

Case 8:15-cv-02034-JVS-JCG    Document 249-1  Filed 03/16/17  Page 14 of 25  Page
ID #:10961
Case 8:15-cv-02034-JVS-JCG    Document 30-5  Filed 01/28/16  Page 14 of 25  Page
ID #:680

**A90443B**
## GIOVANNI SANDOVAL, JUNIOR          APRIL 20, 2015

exact names, but this one just caught my attention. I don't know why. And I just picked it out.

Q. Where on the shelf was the product?

A. Like in the middle.

Q. Right at eye level?

A. Um, like if I were standing up, it would probably be like right here.

Q. Did you perform any research of any other product in that category before you went to Sprouts that day?

A. No.

Q. Did you look at any on-line information about these types of products before you purchased?

A. No.

Q. Do you know any other person who has used these types of products in the past?

A. No.

MR. ARHANGELSKY: Let's go with documents 12 through 23 and just get those out.

MR. ARHANGELSKY: Let me just say this. If you need a break at anytime, let me know and we're happy to take a break, if you need to use the restroom or want some water.

I, of course, would just ask that you answer any pending questions before we take a break, but don't

Page 46

hesitate to let us know.

MR. FERRELL: Okay. Let's take a break right now because I can use the bathroom.

MR. ARHANGELSKY: Of course. Let's go off the record.

(Discussion held off the record.)

BY MR. ARHANGELSKY:

Q. Back on the record.

Mr. Sandoval, did you give us a middle name earlier today?

A. I don't have a middle name.

Q. Have you ever been arrested?

A. Yes.

Q. How many times?

A. A couple of times.

Q. How many is a couple of times?

A. Actually, a few times, like three times.

Q. Have you ever been convicted?

A. Yes.

Q. For what?

A. A couple, I got into a couple of fights, you know.

Q. When was that?

Page 47

A. There were a few different times.

Q. Let's go back to the first one, when was that?

A. Well, the first fight that I got into trouble for was, I want to say, I was probably like 18. I got into a fight and I got into trouble and went to jail. I got an assault charge.

Q. When was that, exactly, what year?

A. I don't know what year, but it was when I was 18, though.

Q. When was the next one?

A. Maybe like when I was 20 years old, another fight, yeah. And I got into trouble for that one, too.

Q. Were you arrested?

A. Yes.

Q. And convicted?

A. Yeah.

Q. And what was your sentence?

A. I did a little, I think that I did like three months in jail for that one because it was my second fight, my second charge that I ever got into trouble for.

Q. Let's backup to the first one; was that in California?

A. Yeah.

Q. Was the second one in California?

Page 48

A. Yeah. They're all in California.

Q. So, at some point after that was there another situation?

A. Yes. I had gotten into a fight, another fight, and got into trouble for it.

Q. When was that?

A. Maybe when I was like 24. I'm 28 now. I'm not into anything lately. It was like when I was younger.

Q. Four years ago?

A. Yeah.

Q. What was the sentence for that?

A. I did a few months in jail. And then they gave me unsupervised probation.

Q. What was your term of probation?

A. Three years unsupervised.

Q. Beginning when?

A. I don't know the exact dates, but it was when I was like 24.

Q. Are you on probation now?

A. No.

Q. Are you on any other court supervised program?

A. No, no.

Q. Are there any other legal infractions on your record?

A. I had, one time when I was in Spring Valley, I

Page 49

NIC's Request for Judicial Notice
In Opposition to MSJ
Exh. 1

A90443B
## GIOVANNI SANDOVAL, JUNIOR     APRIL 20, 2015

had on a tank top, a wife beater. And I was walking down Broadway. And some, the sheriff's territory, and so they stopped me.

And they said, hey, come here, let me talk to you. They were asking me questions. I was on probation at the time, so, they had the right, you know.

They asked me to sit down. And I had, my girlfriend at the time just had given me an ice pick, you know. And I had, I don't know why I was carrying it, but I had it in my little side pocket.

I had some Dickies on. And they asked me to sit down and cross my legs and it had fell out. And I got a weapons charge for that one. It's called the dirk and dagger.

And I did six months in the County for that one. And then I got on probation, but I cleared all of that. That was all when I was younger, you know, when I was young and dumb.

Q. What's your date of birth?

A. 8/28/86.

Q. So, no other run-ins with law enforcement in the last four years?

A. No, no --

Q. Nothing in Arizona?

A. -- no. That was a long time ago when I was

Page 50

younger.

MR. FERRELL: You want to make sure to let him finish the question because the court reporter will have a tough time with that.

THE WITNESS: Sorry about that.

MR. ARHANGELSKY: Thank you, Counsel.

BY MR. ARHANGELSKY:

Q. Do you have any gang affiliations?

A. No.

MR. ARHANGELSKY: Just give me one minute. My apologies.

Let's mark this document as next as Exhibit B, please.

(Deposition Exhibit B was
marked for identification
and is attached hereto.)

BY MR. ARHANGELSKY:

Q. And I gave a copy to counsel. And can you find a document in here, please.

Now, let the record reflect that I've passed the witness a document that's marked as Exhibit B. And this is a photograph that we've placed in front of the witness and a copy to counsel.

Page 51

Mr. Sandoval, we were talking earlier before our break about your purchase of the Defendant's product at a Sprouts Farmers Market in November of 2013.

Does this photograph that we put in front of you resemble the aisle that you would have found the Defendant's product at Sprouts?

A. Just it would have been on the aisle, something like that.

Q. Is this photograph any different from the aisle that you saw when you purchased the product in 2013?

A. It's not the exact same.

Q. It's not the exact same, but you said that it was similar?

A. Yeah.

Q. And do you see that in the photograph towards the back that it does say Sprouts --

A. Yeah.

Q. -- on the signage there?

A. Yeah.

Q. This photograph would at least resemble the number of products that you saw that day when you went to Sprouts?

MR. FERRELL: Objection, misstates the witness's testimony. To the extent that you can answer, go ahead.

Page 52

THE WITNESS: Yeah, I'm not sure if they had all of the same things right there.

BY MR. ARHANGELSKY:

Q. But with respect to the number of products, you would say that that's similar?

A. Yeah, yeah.

MR. FERRELL: Just keep all of these documents in a pile because the court reporter is going to want them when we're done.

THE WITNESS: Okay.

MR. ARHANGELSKY: The next document will be marked as Exhibit C.

(Deposition Exhibit C was
marked for identification
and is attached hereto.)

BY MR. ARHANGELSKY:

Q. Mr. Sandoval, I've shown you a document that's marked as Exhibit C which is another photograph. And I'll represent to you that it's a photograph taken in closer detail of the photograph that I've shown you as Exhibit B; do you understand that?

A. Yes.

Q. Now, you've testified that this aisle was at

Page 53

A90443B

**GIOVANNI SANDOVAL, JUNIOR          APRIL 20, 2015**

least similar to the aisle that you saw in Sprouts in 2013.

Looking at Exhibit C, does that look similar to the display that you saw when you found the Defendant's product?

A. Yeah, it looks similar.

Q. And were there also similar products on display next to the Defendant's product when you arrived that day in 2013?

MR. FERRELL: Objection, asked and answered. To the extent that you can answer it again, go ahead.

THE WITNESS: There are always little products like similar to them or around them, you know.

BY MR. ARHANGELSKY:

Q. And do you see --

A. They have the store brand. And I was trying to not get a store brand.

Q. Okay. So, you see in the picture marked as Exhibit C that there are other Silver products that are located near the Defendant's product; is that correct?

A. This time, yeah.

Q. So, is it your testimony that these similar products were not available for purchase at the Sprouts that you visited in 2013?

MR. FERRELL: Objection, asked and answered,

Page 54

but you can answer again, misstates the witness's testimony.

THE WITNESS: It looks, it's different. It was not the same setup when I had purchased it, but --

BY MR. ARHANGELSKY:

Q. Were there any other products available that had immune support that were written on the product?

A. I'm sure there was.

Q. But you didn't choose those products; right?

A. No.

Q. But you chose the Defendant's product; right?

A. Yes.

Q. And you didn't know anything about the Defendant's product?

A. No.

Q. And what was it about the Defendant's product that made you choose that one among all the other products that were offered?

A. I just picked it.

Q. You just picked it out of a hat, you just picked it?

A. Yeah.

Q. Okay.

A. And all these other ones are like generic brands, too, so.

Page 55

Q. Which one is a generic brand?

A. I don't know, but I want to say the Silver Biotics one doesn't look like -- it looks like more like a store brand.

Q. So, you were relying on when you made your decision, and correct me if I'm wrong, you were relying on the product packaging?

A. That had a lot to do with it. And I don't really like to get store products of anything.

Q. So, it was the appearance of the packaging, the presentation?

A. The appearance and then the immune support, the whole thing.

Q. But lots of other products had immune support; correct?

MR. FERRELL: Objection, argumentative. To the extent that you can answer, go ahead.

THE WITNESS: They did, but that one just, I just picked that one.

BY MR. ARHANGELSKY:

Q. And you didn't know anything about Silver products before you picked that one?

A. No, I did not.

MR. FERRELL: Objection, that has been asked and answered.

Page 56

BY MR. ARHANGELSKY:

Q. Looking back at Exhibit B which is the photograph of taking a step back from the aisle.

A. Yeah.

Q. Can you -- and I apologize if this might be difficult, but please give us your best shot.

Can you locate the Defendant's product on this shelf?

MR. FERRELL: Hang on. Objection as to the entire line of questioning, lacks foundation as to where this is, what this is or what store this is, but to the extent that you can answer, go ahead.

THE WITNESS: Yeah, I do see it.

BY MR. ARHANGELSKY:

Q. Where is it?

A. On the bottom.

Q. Can you circle it for us?

A. Here.

Q. And you've identified that the product is down on the bottom shelf toward the middle of the aisle?

A. Yes. Right here on this picture, yeah.

Q. So, on this aisle which you've already, granted, you said that it's not the same aisle, and we'll concede that.

This display was at the bottom of the aisle?

Page 57

NIC's Request for Judicial Notice In Opposition to MSJ Exh. 1

A90443B

**GIOVANNI SANDOVAL, JUNIOR**      **APRIL 20, 2015**

A. Yeah.

Q. And you've testified previously that your display was right in the center of the aisle?

A. Yeah. They move them around all the time. And I used to work at a store like that, so.

Q. Were you aware -- withdrawn.

Was price important to you when you were deciding to purchase the Defendant's product?

A. Just something good. I wanted just something, you know.

Q. I think that I need more.

A. It was not really a factor.

Q. Price was not a factor?

A. No.

Q. Was the concentration of Silver in the product a factor when you decided to purchase?

A. No, it was not.

Q. So, was it important to you that other products that are offered, some right next to this, in Exhibit C some right next to Defendant's product, was it important to you that those other competing products claimed a larger percentage of Silver?

A. I didn't even look at that part.

Q. So, the answer is, no, it was not important?

A. No.

Page 58

Q. Do you have any idea how much Silver is in the product that you purchased?

A. I don't recall.

Q. You don't recall based on parts per million or you don't recall based on labeling statements?

MR. FERRELL: Objection, argumentative, designed to harass. To the extent that you can answer, go ahead.

THE WITNESS: I mean, I just picked it out, you know. I didn't go looking for that one specifically. And I just looked around and I seen that one and it caught my eye and I just bought it.

BY MR. ARHANGELSKY:

Q. There are different size products sold at the Sprouts for the Defendant's product; right?

A. Yeah.

Q. Which size did you pick?

A. I want to say that it was the more smaller one. It was this one right here, yeah, the more smaller one.

Q. Was there a reason that you chose the smaller size?

A. Just to see if it worked. How good it worked and it didn't.

Q. Next, let's look at three. Now, turning your attention to Exhibit C again.

Page 59

A. Yeah.

Q. Do you see on the Silver Biotics product, is there an immune support claim on that product?

A. Yes.

MR. ARHANGELSKY: Now, Mr. Sandoval, I've handed you a document which is stamped as Exhibit D.

(Deposition Exhibit D was marked for identification and is attached hereto.)

BY MR. ARHANGELSKY:

Q. Do you recognize this document?

MR. FERRELL: And take your time to review the document, please.

THE WITNESS: Yes. I'm pretty sure, yes.

BY MR. ARHANGELSKY:

Q. Yes, you recognize this document?

A. Yes.

Q. What is this document?

A. It's a declaration.

Q. Did you prepare this document?

A. Did I prepare it?

Q. Yes.

A. I've read it and I signed it.

Page 60

Q. So, the answer to that question is "no"?

A. Yes.

Q. But you did review this document as you said?

A. Yes.

Q. When did you first see this document?

A. One of the times that I had met up with my attorney. I don't recall exactly the date.

Q. So, turning to the third page of this document, the final page, is that your signature there?

A. Yes.

Q. When did you sign this document?

A. June 18th, 2014.

Q. And that's the date that's recorded on page three of this document?

A. Yes.

Q. And did you say that you met with your counsel in-person to review this document?

A. Yes.

Q. And was that in El Cajon?

A. Yes.

Q. And which is also listed as the location where this document was signed on the third page; is that correct?

A. Yes.

Q. Did you live in El Cajon in June of 2014?

Page 61

A90443B
GIOVANNI SANDOVAL, JUNIOR       APRIL 20, 2015

A. Yes.

Q. Now refresh my recollection, when did you move again to Yuma?

A. I would say that it has been off and on, you know, maybe like a year, a little less than a year.

Q. Off and on, meaning, that you've been going back and forth between Yuma and California?

A. Yes.

Q. And do you still have a residence in California now?

A. Yes.

Q. And what's that exact address?

A. I don't know the exact address. I forget it, but it's in El Cajon.

Q. You forget the address where you lived?

A. Yeah.

Q. If you wanted to mail yourself a letter, how would you do it?

A. I would call my mom and ask her for the new address.

Q. Do you have a driver's license with a California address?

A. I do have one.

Q. Did you bring it with you?

A. No.

Page 62

Q. Do you have an Arizona driver's license?

A. Yes.

Q. Did you bring that with you?

A. No.

Q. Where is it now?

A. It's put away.

Q. Put away where?

A. With all my stuff.

Q. Where is it, what location?

A. Um, back at the motel.

Q. So, you didn't bring anything with you here today?

A. No.

Q. Not even a driver's license?

A. No.

Q. Did you bring a wallet?

A. No. I didn't even drive here.

Q. Turning your attention to page two of the document that we've marked as Exhibit D, in paragraph two, someone wrote and you signed, and this is the second sentence of paragraph two it says, prior to purchasing Sovereign Silver dietary supplement, I read and reviewed the labeling of the product.

Specifically, I read and relied on the labeling claim regarding immune support.

Page 63

Did I read that correctly?

A. Read it again.

Q. Well, how about you read that statement into the record for us, paragraph two.

A. I have purchased Sovereign Silver from Sprouts store in 2013. Prior to purchasing Sovereign Silver dietary supplement, I read and reviewed the labeling of the product.

Specifically, I read and relied on the labeling claim regarding immune support.

Q. Is that sentence accurate?

A. Yes.

Q. Is there any other information that you read and relied upon before purchasing the product?

A. It was just a, the immune support, you know, that I was looking for that I needed. That's what caught my attention and then the whole box of it.

The other ones looked like store brands. And I really don't buy nothing there just store brands.

Q. What does the phrase "immune support" mean to you?

A. It has helped support my immune system, if not make it more stronger, you know, help me fight off my cold or whatever it is.

Q. You didn't think immune support meant that you

Page 64

couldn't get sick while taking the product; did you?

A. Say it again.

Q. Did you think that the claim immune support meant that you couldn't get sick while taking the product?

A. Well, it would just help me out with it, you know, help strengthen my immune system is already pretty good. I do get sick every once in a while, you know, for the way that my immune system works, and then this product, I don't see why it wouldn't have.

Q. Your immune system is already fairly strong?

MR. FERRELL: Is that a question?

MR. ARHANGELSKY: Yes, it's a question.

THE WITNESS: It's all right.

BY MR. ARHANGELSKY:

Q. Did you use the Defendant's product as a treatment for any illness or disease?

A. No, I did not.

Q. Were you sick when you started taking the product?

A. No.

Q. How many times did you purchase the Sovereign Silver product?

A. Just once.

Q. And how long did you use it for?

Page 65

A90443B

**GIOVANNI SANDOVAL, JUNIOR        APRIL 20, 2015**

A. I want to say within the first week that I was I taking it, I ended up getting sick, like towards the end of that week that I started taking it, you know. And I would think that it would have helped it.

Q. So, you started to use the product for a week. Did you use it, did you continue to use it after you were sick?

A. Not really, a little bit.

Q. So, you discontinued use as soon as you got sick?

A. Well, I used the whole bottle so. And then I didn't purchase no more after that, but I still ended up getting sick.

MR. ARHANGELSKY: Let's get document two. What are we on, Exhibit E.

(Deposition Exhibit E was marked for identification and is attached hereto.)

BY MR. ARHANGELSKY:

Q. I've given you a document that's marked as Exhibit E; do you recognize this document?

A. Yes.

Q. So, the answer to that question is "yes"?

Page 66

A. Yes.

Q. How do you recognize this document?

A. Because it's the biggest one out of all of them.

Q. What's the document?

A. The Second Amended Class Action Complaint.

Q. When was the first time that you reviewed this document?

A. One of the times that I have, one time that I met up with my attorney.

Q. Approximately, what date was that?

A. I don't know, one of them. I don't know. I'm not sure exactly.

Q. So, the answer is that you don't know?

A. I don't know the exact date.

Q. So, yes, the answer is that you don't know when?

A. Yes.

Q. Let me direct your attention to page five, paragraph 20.

Let me clarify.

Page five of at the bottom of the document, paragraph 20, there's also a bates range at the top --

MR. FERRELL: It's right there.

THE WITNESS: Okay.

Page 67

BY MR. ARHANGELSKY:

Q. Please let me know when you're there.

A. Yeah.

Q. Now, in this paragraph 20, the last sentence in the paragraph, could you read that last sentence to me that starts with "regardless".

A. Regardless, Plaintiff did use Sovereign Silver as directed by Defendant and did not provide any immune support to him and was, in fact, worthless to the Plaintiff.

Q. Do you agree with that statement?

A. I do.

Q. Can you describe for me how you used the product as directed?

A. It says, um, you know, it has little droplets, you know. And it says to take six of them and put them under your tongue, you know, every day. And I used pretty much, I took it right as directed and I still didn't see nothing.

Q. Okay. You said that you used the droplets in the product; is that correct?

A. Uh-huh.

Q. How many droplets would you give yourself per day?

A. It says six of them.

Page 68

Q. Do you recall if there were options as far as how to use the product by dose?

A. No.

Q. But you say that you self-administered six full droplets?

A. Yeah.

Q. And you used the product for how long?

A. For about a week as directed. I did everything right. I read the directions and took it right.

Q. And I think that you testified earlier today that you purchased, what was it, the four-ounce product?

A. I don't know how many ounces that it is exactly. It could be four or six, one of those.

Q. Okay. But you said that the product was around $15?

A. Yeah.

Q. Let me direct your attention to Exhibit C. Do you see the Sovereign Silver product in that picture?

A. Yeah.

Q. And I do apologize because it might be hard to read, but can you see the prices underneath those products?

MR. FERRELL: Yes, objection to this entire line of questioning. If this is Sprouts, what Sprouts,

Page 69

NIC's Request for Judicial Notice In Opposition to MSJ Exh. 1

A90443B
GIOVANNI SANDOVAL, JUNIOR          APRIL 20, 2015

when it was taken, the entirety.

MR. ARHANGELSKY: Okay.

BY MR. ARHANGELSKY:

Q. Do you also see -- I'm sorry.

What was the answer to that question?

A. Yeah, I do see it.

Q. Do you see the price that says $14.49 in this picture?

A. Yes. On this picture it says that, you know, but when I bought it, it could have been different. The product doesn't stay the same, unless you took it two years ago or when I bought it. Prices do change.

Q. Fair enough.

Do you see the Sprouts logo right above there in that picture?

A. Yeah.

Q. So, your testimony is that you don't recall the specific product size that you purchased for $15; is that correct?

MR. FERRELL: Objection, that's asked and answered. To the extent that you can answer it again, go ahead.

THE WITNESS: No. I don't remember. It could have been 15 or it could have been 20 bucks. It was a while ago.

Page 70

BY MR. ARHANGELSKY:

Q. Okay.

A. But I know that it was not the $30 one. It could have been one of these.

Q. And we don't have any way to find out which product that you purchased; is that correct?

A. What size bottle?

Q. Yeah.

A. Um, yeah, we do.

Q. How would we find that out?

A. With the bottle.

Q. Would you produce the bottle that you purchased to us?

MR. FERRELL: Objection, do not answer that question.

MR. ARHANGELSKY: What's your objection?

MR. FERRELL: My objection is discovery is closed. Whether he produces it or not, we would have to get a formal discovery request to that extent with the court re-opening discovery.

MR. ARHANGELSKY: That's fine. I'll rephrase the question.

BY MR. ARHANGELSKY:

Q. If the court were to compel you to produce that information, would you produce the document to us or

Page 71

packaging to us?

A. If the courts were to do that, then yeah.

Q. So, you would supply us with a copy of the package?

A. With the bottle.

Q. Do you have the outer packaging?

A. No.

Q. You didn't save that?

A. No. It's a box. Why am I going to keep a box.

Q. Did you write down the lot number or the batch number of the product?

A. No.

MR. FERRELL: Objection, vague to the extent that you understand lot number or batch number, go ahead and answer.

THE WITNESS: What is the lot or batch number.

BY MR. ARHANGELSKY:

Q. Was there any writing on the product, I mean, stamping or date stamping on the product that you purchased?

A. I don't know.

Q. You don't recall?

A. I don't recall.

Q. And how many times a day did you use the product?

Page 72

A. A couple times a day.

Q. And by a couple times a day, did you administer six drops --

A. Yes.

Q. -- at each time during that, so, 18 drops per day?

MR. FERRELL: Objection, misstates what his testimony was. To the extent that you can answer, go ahead.

THE WITNESS: Yes.

BY MR. ARHANGELSKY:

Q. Now, when you were administering those drops, did you insure that the product of the eye dropper was completely full?

A. Yes. I did everything right. I read the directions. I'm pretty good at that, reading directions of whatever I get and acting out on them off of the directions.

And that's exactly what I did on this one. I'm pretty good at that. And it didn't work.

Q. How much of the bottle did you use?

A. The whole thing.

Q. And you did not re-purchase the product?

A. No. Why, if it didn't work.

Q. Turning your attention back to that document

Page 73

**A90443B**
**GIOVANNI SANDOVAL, JUNIOR        APRIL 20, 2015**

that we've marked as Exhibit E, the same paragraph, paragraph 20.

And this I'll direct your attention to the previous sentence that you read before starting with fortunately, can you read that sentence to me?

MR. FERRELL: Before we get to this, I'm going to object on the rule of continuity. This refers to previous paragraphs.

And unless that is read that into record, he will be unable and I'll instruct him not to answer.

BY MR. ARHANGELSKY:

Q. Can you read the entire paragraph 20.

A. Unfortunately for Plaintiff, he believed the claims made by Defendant regarding Sovereign Silver's ability to provide immune support.

Fortunately for Plaintiff, he did not experience any, what is that, aforementioned serious adverse outcomes for the -- of excessive Silver exposure because he had discontinued the use of Sovereign Silver after disregarding potential outcomes or discovering the potential outcomes, and before taking it for an extended period of time, regardless, Plaintiff did not use Sovereign Silver or he did use Sovereign Silver as directed by Defendant and it did not provide any immune support to him.

Page 74

Q. Do you agree with the contents in that paragraph?

A. I do.

Q. Now, that says that you discontinued use of Sovereign Silver after discovering potential outcomes which may have included serious adverse outcomes.

What adverse outcomes did you discover?

A. What do you mean by that?

Q. What potential outcomes did you discover that caused you to stop using the product?

A. I ended up getting sick.

Q. Is that all you learned or just simply that the product didn't work for you?

A. Pretty much, why are they going to sell something that doesn't work and me spend my money on it. And I'm pretty sure I'm not the only one who has bought that product and it not work, you know.

Q. So, you weren't concerned about any adverse health consequences if you were to use the product?

A. No.

Q. You didn't speak with anybody other than your attorney, of course, about potential adverse health consequences?

A. No.

Q. And you testified earlier that you don't know

Page 75

anyone who has used the Sovereign Silver product; is that correct?

A. I don't know anybody.

Q. Have you read any information on-line about anyone having adverse health effects from using the product?

A. I've read that, you know, that other people had said that it didn't work as well.

MR. FERRELL: Counsel, when you get to a break point, I'd like to grab another soda, please.

MR. ARHANGELSKY: Okay. Let's take a break. Off the record.

(Discussion held off the record.)

BY MR. ARHANGELSKY:

Q. Back on the record.

Mr. Sandoval, we were talking a little bit earlier about your use of product. Walk me through in detail exactly how you would use the product from the time that you pour the liquid into the dropper until you swallow.

A. I just fill it up. You've got to put it under your tongue so you're dropping things under your tongue, and then swallow it, and that's it.

Page 76

Q. Do you swallow it immediately?

A. I did. It doesn't say to swallow it immediately or it doesn't say to let it sit for any amount of time.

Q. Did the product have a taste?

A. No. It tastes like water, actually. It didn't taste like nothing.

Q. Now, how much money do you spend a week on groceries?

MR. FERRELL: Objection, relevance. To the extent that you can answer that, go ahead.

THE WITNESS: I'm not sure exactly. I eat out a lot, though.

BY MR. ARHANGELSKY:

Q. How much money do you spend on food a week?

MR. FERRELL: Don't guess, but to the extent that you can estimate, go ahead.

THE WITNESS: I don't really know. I want to say maybe like 60 bucks a week maybe. I don't know exactly.

BY MR. ARHANGELSKY:

Q. So, approximately, $60 a week, and I understand that it varies, but approximately $60?

A. Yeah.

Q. $15 is a significant amount of money to

Page 77

NIC's Request for Judicial Notice
In Opposition to MSJ
Exh. 1

**A90443B**
**GIOVANNI SANDOVAL, JUNIOR**          **APRIL 20, 2015**

purchase a dietary supplement; isn't it?

MR. FERRELL: Objection, assumes facts not in evidence, but to the extent that you can answer it, go ahead.

THE WITNESS: If it's going on my body or in my body. I buy shoes that are a hundred bucks, 20 bucks. So, it's just as long it's a good product, I'll put it in my body.

BY MR. ARHANGELSKY:

Q. It's worth it to you then?

A. Yes.

Q. This is the only such product that you've bought; is that correct?

A. Yes.

Q. When you found out that the product allegedly didn't work, did you go back to Sprouts and ask for a refund?

A. No. I just let it blow over. And then what caught my attention when I seen it on the internet and seen it on the pages, there was a deal about it, an issue about it. So, that's when I pursued it. If not, I just would have took it as a loss, I guess.

Q. Did you attempt to contact the Defendant about the product?

A. No.

Page 78

Q. Other than speaking to your counsel, did you talk to any other person about the fact that the product didn't work for you?

A. Maybe I told a couple of friends, you know, just mentioning that it, that stuff didn't work because I still had the bottle on my counter and some people asked, oh, what was that bottle and I let them know.

Q. What friends?

A. A couple friends of mine.

Q. What are their names?

A. Um, my friend Charles asked me about it. And then my little sister asked me about it. And that's about it.

Q. What is Charles' last name?

A. Fairman.

Q. Spell the last name.

A. F-a-i-r-m-a-n.

Q. Where does Charles live?

A. He lives in Yuma, Arizona.

Q. Okay. So, the bottle on your countertop was in Yuma, Arizona?

A. At the time, yeah.

MR. ARHANGELSKY: Josh, let's have the product. Let's go off the record for a second.

Page 79

(Discussion held off the record.)

MR. ARHANGELSKY: Back on the record.

Let the record reflect that we've given the witness a copy of a physical exhibit which is the product, the Defendant's product Sovereign Silver, two-ounce product eye dropper.

And we've given the witness a copy of photographs of each panel which is the exhibit to be entered on the record. And counsel has stipulated.

MR. FERRELL: Yes.

BY MR. ARHANGELSKY:

Q. Mr. Sandoval, do you recognize the product that we've put in front of you?

A. Yes, I do.

Q. Is that the product that you purchased?

A. Yes, it is.

Q. Is that the same size that you purchased?

A. Yeah.

Q. And the record will reflect that that's the two-ounce product; is that correct?

A. Yep.

Q. When you purchased that product, did you read the label in its entirety?

A. Yes.

Page 80

Q. Is there anything that you didn't understand on that label?

A. No. I think that, it just looked like it would work, you know. After reading everything, I thought that it would really work, but it didn't.

Q. And when you say work, what do you mean?

A. I just thought that it would help me out, help build up my immune system, I mean. I mean, it was funny because during the time that I was taking it, I happened to get sick. And I was taking it right and taking it, you know.

Q. Okay. I want to draw your attention to the side of that package that says, supplement facts, that has a little box in white; do you see that?

And for the record -- I'll let the witness answer; do you see that panel?

A. Yes.

MR. ARHANGELSKY: For the record, this is the side of the exhibit. That it's a second page of the Exhibit F.

(Deposition Exhibit F was marked for identification and is attached hereto.)

Page 81

NIC's Request for Judicial Notice
In Opposition to MSJ
Exh. 1

Case 8:15-cv-02034-JVS-JCG   Document 249-1   Filed 03/16/17   Page 23 of 25   Page
ID #:10970
Case 8:15-cv-02034-JVS-JCG   Document 30-5   Filed 01/28/16   Page 23 of 25   Page ID #:689

A90443B
GIOVANNI SANDOVAL, JUNIOR        APRIL 20, 2015

BY MR. ARHANGELSKY:

Q. At the bottom of that panel do you see another box that begins with the phrase, these statements have not been evaluated by the F.D.A.?

A. Yes.

Q. Could you read that statement to me.

A. These statements have not been evaluated by the F.D.A. This product is not intended to diagnose, treat or cure, prevent any disease.

Q. Did you see that statement before you purchased the product?

A. Yes, but, yes.

Q. Disease is another word for illness; right?

A. I'm not sure.

Q. What is a disease?

A. You could say that it's an illness.

Q. Does Sovereign Silver have a website?

A. Yes.

Q. Have you visited that website at any point?

A. I did. I did look at it once.

Q. When did you visit that website?

A. Um, when I found out that they didn't or when, after I got done taking this, I just wanted to look it up to see what was going on with it.

And I don't know the exact date, though, but I

Page 82

know that I looked it up.

Q. And what information did you see on that website?

A. It was just basically the same thing telling you about it.

Q. All right. Is there any other advertising media that you've seen that relates to this Sovereign Silver product?

A. No.

Q. Earlier we had mentioned the term Silver Hydrosol and Colloidal Silver. And you said that you didn't have an understanding of those terms.

Are you familiar with the term Silver Salt?

A. No.

Q. Are you familiar with the governmental agency known as the Environmental Protection Agency or the E.P.A.?

A. No.

Q. Do you have any factual basis to conclude that Sovereign Silver is not safe?

MR. FERRELL: Objection, calls for expert testimony. To the extent that you can answer as a lay person, go ahead.

THE WITNESS: Repeat the question.

MR. ARHANGELSKY: Read back the question,

Page 83

please.

(Whereupon, the record was read as follows:)

Q. Do you have any factual basis to conclude that Sovereign Silver is not safe?

THE WITNESS: That it's not safe, no.

BY MR. ARHANGELSKY:

Q. You've written in the statements that we've mentioned before that the product had no benefit to you.

How do you know that the product did not benefit you?

A. I already told you already because I just didn't feel it. And I still ended up -- I still ended up catching a cold. And it just didn't do nothing for me. I felt like it was, it was doing nothing.

Q. Other than the fact that you got sick, do you have any other basis to support your statement that the product didn't work?

MR. FERRELL: Objection, asked and answered, misstates his testimony, but to the extent that you can answer it again, go ahead.

THE WITNESS: I mean, I know my body.

Page 84

BY MR. ARHANGELSKY:

Q. Did you have any medical laboratory work, like blood work, for example, performed before you took the product?

A. No, I did not.

Q. Did you have any medical work performed after you took the product?

A. No.

Q. During the time that you took the product?

A. No.

Q. Did you have any analysis or analyses of the bacteria in your body done during or before you took the product?

MR. FERRELL: Objection, asked and answered. To the extent that you can answer again, go ahead.

THE WITNESS: No.

BY MR. ARHANGELSKY:

Q. Did you have any assessment of your white blood cell count performed before or during the time that you took the product?

MR. FERRELL: Same objection.

THE WITNESS: No, but I know my body.

BY MR. ARHANGELSKY:

Q. Did you have any healthcare provider perform any analysis of your immune system before, during or

Page 85

**A90443B**

## GIOVANNI SANDOVAL, JUNIOR        APRIL 20, 2015

after you took the product?

MR. FERRELL: Same objection, go ahead and answer.

THE WITNESS: No.

BY MR. ARHANGELSKY:

Q. How did you measure your immune system's function before, during or after you took the product?

MR. FERRELL: Objection, calls for expert testimony. To the extent that you can answer as a lay person, go ahead.

THE WITNESS: Repeat the question.

(Whereupon, the record was read as follows:)

Q. How did you measure your immune system's function before, during or after you took the product?

THE WITNESS: I didn't.

BY MR. ARHANGELSKY:

Q. Now, you said that you became sick at some point after using the product; is that correct, what type of sickness did you have?

A. I caught a cold.

Page 86

Q. Did you have anyone perform a diagnosis of that?

A. No.

Q. Did you run any test to characterize that illness?

A. No.

Q. Any lab work to characterize that illness?

A. No, but like I said, I know how my body function and I know, you know.

Q. Did you contact a physician to discuss your sickness?

A. No.

Q. Do you have any idea if the illness was viral or bacterial?

A. No.

Q. Do you understand the difference between viral and bacterial infections?

A. No.

Q. Do you have any documentation concerning that illness that you're talking about now?

A. No.

Q. Did you maintain a standardized diet before, during or after your use of the Defendant's product?

MR. FERRELL: Vague as to the term "standardized diet". To the extent that you understand

Page 87

that, you can answer the question, go ahead.

THE WITNESS: No.

BY MR. ARHANGELSKY:

Q. Did you maintain a food diary while you were taking the product?

A. No.

Q. Did you prepare a sleep log while you were taking the product that documents the hours of sleep that you got?

A. No.

Q. Were you vaccinated at any point within the last -- excuse me, withdrawn.

Were you vaccinated at any point within six months of taking the Defendant's product?

A. No.

Q. And back in November of 2013 did you do any travel?

A. No.

Q. Do you know anybody by the name of Monica Sandoval?

A. No, I do not.

Q. Are you familiar with a person named Eric Rentz, R-e-n-t-z?

A. No.

Q. Are you familiar with a person named Dana

Page 88

Flavin, F-l-a-v-i-n?

A. No.

Q. Are you familiar with a person named Andrew Saxon, S-a-x-o-n?

A. No.

Q. Have you ever heard of any of these names that I've just mentioned?

A. No.

Q. Are you familiar with a person named Lynn Willis?

A. No.

Q. Are you familiar with an individual named Britt Ferrell, F-e-r-r-e-l-l?

A. No.

Q. At any point in this case did you discuss with your counsel the prospect of hiring an immunologist?

A. No.

Q. Do you know what an immunologist is?

A. Probably somebody who studies the immune system, probably. I don't know.

Q. Have you paid or promised any money to any of the expert witnesses in this case?

A. No.

Q. Do you know any of the expert witnesses in this case?

Page 89

Case 8:15-cv-02034-JVS-JCG   Document 30-5   Filed 01/28/16   Page 25 of 25   Page ID #:691

A90443B

**GIOVANNI SANDOVAL, JUNIOR          APRIL 20, 2015**

---

A.  No.

MR. ARHANGELSKY:  Okay.  Let's go off the record.

(Discussion held off the record.)

MR. ARHANGELSKY:  Back on the record.

That concludes our examination of this witness.

Counsel, would you like to address the stipulation.

MR. FERRELL:  All right.  We have a stipulation which will be such that the original transcript will be sent to my office.

My office will provide a copy of the original transcript to the deponent.  He will be given 30 days to review and to sign and to make any changes.

Counsel has reserved the right to recall the deposition should there be substantive changes subject to any court order or typographical errors and decide whether or not he wants to resume the deposition.

So stipulated.

MR. ARHANGELSKY:  So stipulated.

And we want the transcript in five days, please.

Page 90

---

(Whereupon, the deposition of GIOVANNI SANDOVAL, JUNIOR, commenced at 9:50 a.m. and concluded at 12:05 p.m.)

Page 91

---

STATE OF CALIFORNIA   )
                      )
COUNTY OF LOS ANGELES )

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions, or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this _____ day of _____, 20_____, at _____, _____.
                    (City)          (State)

_____
GIOVANNI SANDOVAL, JUNIOR

Page 92

---

REPORTER'S CERTIFICATE

I, ANGELIQUE MELODY FERRIO, C.S.R. NO. 6979, a Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney or of any of the parties, nor financially interested in the action.

I declare under penalty of perjury under the law of the State of California that the foregoing is true and correct.

Dated this 20th day of April, 2015.

_____
Angelique Melody Ferrio
CSR No. 6979