# EXHIBIT 1

**Peter Arhangelsky**

| | |
|---|---|
| **From:** | David Darnell |
| **Sent:** | Friday, March 03, 2017 6:03 PM |
| **To:** | Peter Arhangelsky; Joshua Furman |
| **Cc:** | EDWARD SUSOLIK; Robert Lawrence; bford@forddiulio.com |
| **Subject:** | Natural Immunogenics Corp. v. Newport Trial Group - Deposition Notices for P. Arhangelsky, J. Furman, C. Baker, B. Quinto and T. Quinto |
| **Attachments:** | NOD of Peter Arhangelsky.pdf; NOD of J. Furman.pdf; NOD of Clark Baker.pdf; NOD of Benjamin Quinto.pdf; NOD of Theo Quinto.pdf |

Counsel,

Attached please find copies of NTG's deposition notices in this case, which have set these depositions for the dates noted therein.  If you have a real conflict with any of these dates, please advise me of this as soon as possible and provide me with alternative dates that do work.  Otherwise, we intend to proceed with these depositions as noticed.

Thanks,

David J. Darnell, Esq.
CALLAHAN & BLAINE, APLC
3 Hutton Centre, Ninth Floor
Santa Ana, CA 92707
Tel.:  (714) 241-4444
Fax:  (714) 241-4445
E-Mail: ddarnell@callahan-law.com
Website: www.callahan-law.com
Link to Bio

*Privacy Notice*:  This message is intended only for the use of the individual to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable Federal or State law. If the reader of this message is not the intended recipient, or the employee or agent responsible for the delivery of the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this email in error, please notify us immediately by telephone or return email and delete the original email and any copies thereof.

 **Please consider the environment before printing this e-mail.**

NIC Mot. to Quash
Exh. 1

# EXHIBIT 2

NIC Mot. to Quash
Exh. 2

**CALLAHAN & BLAINE, APLC**
Edward Susolik (SBN 151081)
Esusolik@callahan-law.com
David J. Darnell (SBN 210166)
Ddarnell@callahan-law.com
Robert S. Lawrence (SBN 207099)
Rlawrence@callahan-law.com
3 Hutton Centre Drive, Ninth Floor
Santa Ana, California 92707
Telephone: (714) 241-4444
Facsimile: (714) 241-4445

Attorneys for Defendants NEWPORT TRIAL GROUP,
SCOTT J. FERRELL, RYAN M. FERRELL, VICTORIA
C. KNOWLES, DAVID REID and ANDREW LEE
BASLOW

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| NATURAL IMMUNOGENICS CORP., a Florida corporation , <br><br> Plaintiff, <br><br> v. <br><br> NEWPORT TRIAL GROUP, et al., <br><br> Defendants. | **CASE NO.  8:15-cv-02034-JVS-JCG** <br><br> Judge:       Hon. James V. Selna <br><br> **NOTICE OF DEPOSITION OF PETER A. ARHANGELSKY, ESQ.** <br><br> Date:       March 27, 2017 <br> Time:       9:00 a.m. <br> Location:  Callahan & Blaine, APLC <br> 3 Hutton Centre Drive, <br> Ninth Floor <br> Santa Ana, CA 92707 <br><br> Complaint Filed:   December 7, 2015 <br> Trial Date:          December 5, 2017 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

PLEASE TAKE NOTICE THAT PURSUANT TO Fed. R. Civ. Proc. 30,

Defendant Newport Trial Group shall take the deposition of Peter A. Arhangelsky

(the "Witness").  The deposition will take place on March 27**,** 2017, at 9:00 a.m. at

-1-
NOTICE OF DEPOSITION OF PETER A. ARHANGELSKY

NIC Mot. to Quash
Exh. 2

the following location: Callahan & Blaine, APLC, 3 Hutton Centre Drive, Ninth Floor, Santa Ana, CA 92707.  The deposition will be taken before a deposition officer authorized to administer oaths.  The deposition will be stenographically recorded, including by using an instant visual display method.

**PLEASE TAKE FURTHER NOTICE** pursuant to Federal Rule of Civil Procedure 30(b)(3), that the deposition will be taken stenographically and may be videotaped and/or audiotaped.  In addition, the deposition may be taken using real time transcription technology that provides an instant visual display of the testimony.  Defendant Newport Trial Group reserves the right to use the recordings and/or transcriptions of the deposition testimony at trial.

Dated:  March 3, 2017                    **CALLAHAN & BLAINE, APLC**

By:  */s/ David J. Darnell*
Edward Susolik
David J. Darnell
Attorneys for Defendants NEWPORT TRIAL GROUP, SCOTT J. FERRELL, RYAN M. FERRELL, VICTORIA C. KNOWLES, DAVID REID and ANDREW LEE BASLOW

NOTICE OF DEPOSITION OF PETER A. ARHANGELSKY

NIC Mot. to Quash
Exh. 2

# EXHIBIT 3

**CALLAHAN & BLAINE, APLC**
Edward Susolik (SBN 151081)
Esusolik@callahan-law.com
David J. Darnell (SBN 210166)
Ddarnell@callahan-law.com
Robert S. Lawrence (SBN 207099)
Rlawrence@callahan-law.com
3 Hutton Centre Drive, Ninth Floor
Santa Ana, California 92707
Telephone: (714) 241-4444
Facsimile: (714) 241-4445

Attorneys for Defendants NEWPORT TRIAL GROUP, SCOTT J. FERRELL, RYAN M. FERRELL, VICTORIA C. KNOWLES, DAVID REID and ANDREW LEE BASLOW

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

NATURAL IMMUNOGENICS CORP., a Florida corporation ,

Plaintiff,

v.

NEWPORT TRIAL GROUP, et al.,

Defendants.

**CASE NO.  8:15-cv-02034-JVS-JCG**

Judge:        Hon. James V. Selna

**NOTICE OF DEPOSITION OF JOSHUA S. FURMAN, ESQ.**

Date:        March 28, 2017
Time:        9:00 a.m.
Location:   Callahan & Blaine, APLC
              3 Hutton Centre Drive,
              Ninth Floor
              Santa Ana, CA 92707

Complaint Filed:   December 7, 2015
Trial Date:          December 5, 2017

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

PLEASE TAKE NOTICE THAT PURSUANT TO Fed. R. Civ. Proc. 30, Defendant Newport Trial Group shall take the deposition of Joshua S. Furman (the "Witness").  The deposition will take place on March 28**,** 2017, at 9:00 a.m. at the

-1-
NOTICE OF DEPOSITION OF JOSHUA S. FURMAN

NIC Mot. to Quash
Exh. 3

following location: Callahan & Blaine, APLC, 3 Hutton Centre Drive, Ninth Floor, Santa Ana, CA 92707.  The deposition will be taken before a deposition officer authorized to administer oaths.  The deposition will be stenographically recorded, including by using an instant visual display method.

**PLEASE TAKE FURTHER NOTICE** pursuant to Federal Rule of Civil Procedure 30(b)(3), that the deposition will be taken stenographically and may be videotaped and/or audiotaped.  In addition, the deposition may be taken using real time transcription technology that provides an instant visual display of the testimony.  Defendant Newport Trial Group reserves the right to use the recordings and/or transcriptions of the deposition testimony at trial.

Dated:  March 3, 2017

**CALLAHAN & BLAINE, APLC**

By:   */s/ David J. Darnell*
Edward Susolik
David J. Darnell
Attorneys for Defendants NEWPORT TRIAL GROUP, SCOTT J. FERRELL, RYAN M. FERRELL, VICTORIA C. KNOWLES, DAVID REID and ANDREW LEE BASLOW

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

NOTICE OF DEPOSITION OF JOSHUA S. FURMAN

NIC Mot. to Quash
Exh. 3

# EXHIBIT 4

NIC Mot. to Quash
Exh. 4



A Professional Corporation

WASHINGTON, D.C. | VIRGINIA | PHOENIX

11808 WOLF RUN LANE
CLIFTON, VA 20124

2730 S VAL VISTA DR.
BLDG. 6, SUITE 133
GILBERT, AZ 85295
(602) 388-8899 | FAX (602) 393-4361

March 6, 2017

1050 SEVENTEENTH STREET, N.W.
SUITE 600
WASHINGTON, D.C. 20036
(202) 466-6937 | FAX (202) 466-6938

**VIA EMAIL AND USPS MAIL:**
David J. Darnell, Esq.
Callahan & Blaine
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA 92707
P: (714) 241-4444
E: ddarnell@callahan-law.com

Peter A. Arhangelsky, Esq.
(602) 388-8899
parhangelsky@emord.com

Re:   *Natural-Immunogenics Corp. v. Newport Trial Group, P.C., et al.,*
       *No. 8:15-cv-02034*

Counsel,

On March 3, 2017, NTG served NIC counsel with subpoenas *ad testificandum* unilaterally setting deposition dates for five depositions in the above-captioned matter. Among those documents, NTG defendants served two "notices of deposition" on opposing counsel in this case, Messrs. Peter Arhangelsky and Joshua Furman, both of whom are counsel of record in this matter and trial counsel for plaintiff Natural Immunogenics. As you likely know, attempts to depose opposing counsel in an adversarial matter are highly disfavored and permissible only in the narrowest circumstances. The notices of deposition provide no substantive bases or limitations for the testimony. We find this highly improper, unprofessional, and evidence of harassment of opposing counsel in this matter.

Under applicable law, NTG bears the burden to demonstrate the propriety of this proposed discovery. There are no apparent or plausible bases under which NTG can meet the *Shelton* factors relevant to information in NIC counsel's testimonial evidence. The California federal courts have admonished parties for these abusive tactics, noting the "potential for abuse" and "harassment." *See, e.g., Am. Cas. Co. of Reading, Pa. v. Krieger*, 160 F.R.D. 582, 588 (S.D. Cal. 1995); *see also Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*, No. CV132747DMGAGRX, 2014 WL 12591805, at *3 (C.D. Cal. May 29, 2014); *LA Printex Indus., Inc. v. VF Corp.*, No. CV 13-0949 PSG (SSX), 2014 WL 12587037, at *3 (C.D. Cal. Jan. 14, 2014).

We will move promptly for a protective order, and we will seek sanctions unless you provide a clear showing sufficient to meet your burden, including a full and complete description of the evidence or testimony sought through the deposition subpoenas noticed on opposing counsel. We demand that you retract the subpoenas for depositions of NIC's counsel. In the

EMORD & ASSOCIATES, P.C.
WASHINGTON, D.C. | VIRGINIA | ARIZONA

(202) 466-6937 / FAX (202) 466-6938
WWW.EMORD.COM

NIC Mot. to Quash
Exh. 4

NIC v. NTG | Meet and Confer Re: Depositions of Counsel for NIC
March 6, 2017
Page 2 of 2

alternative, please promptly inform us when you are available to meet and confer concerning our Motion for a Protective Order.

Please also note that end of March is not available for depositions of NIC witnesses as NIC counsel has conflicts. We will review potential dates with NIC witnesses for early- to mid-April.

Sincerely,

/s/ *Peter A. Arhangelsky*
Peter A. Arhangelsky
Joshua Furman
Eric Awerbuch
*Counsel to Plaintiff Natural-Immunogenics Corp.*

Cc: Brendan Ford, Esq.

EMORD & ASSOCIATES, P.C.
WASHINGTON, D.C. | VIRGINIA | ARIZONA

(202) 466-1907 / Fax (202) 466-6938
WWW.EMORD.COM

NIC Mot. to Quash
Exh. 4

# EXHIBIT 5

# CALLAHAN & BLAINE

*California's Premier Litigation Firm℠*

DANIEL J. CALLAHAN
STEPHEN E. BLAINE
MICHAEL J. SACHS
EDWARD SUSOLIK
BRIAN J. MCCORMACK
JAVIER H. VAN OORDT
DAVID J. DARNELL
_____

PETER S. BAUMAN
JASON CASERO
RICHARD T. COLLINS
RAPHAEL CUNG
DAMON D. EISENBREY
SALEEM K. ERAKAT
JAMES M. GOLDEN
DAVID E. HAYEN
ROBERT LAWRENCE
LAURA M. MORRIS
SCOTT D. NELSON
CHRISTOPHER QUEALLY
DANIEL RASHTIAN
JAMES R. ROUSE
JAMES M. SABOVICH
KAMRAN SALOUR
SARAH C. SERPA
STEPHANIE A. SPERBER
JILL A. THOMAS
JOHN D. VAN ACKEREN
RYAN J. WILLIAMS
SHARON T. YUEN

**OF COUNSEL**
SCOTT ABERNETHY
COLDREN LAW OFFICES
SHELLEY M. LIBERTO
MATTHEW SYKEN

**FIRM ADMINISTRATOR**
LAURALI M. KOBAL, CLM

**OUR FILE NUMBER:**
3670-02

Member of the
International Law Firms



March 13, 2017

**VIA EMAIL**

Peter A. Arhangelsky, Esq.
Emord & Associates, P.C.
3210 S. Gilbert Road, Suite 4
Chandler, AZ 85286
Email: parhangelsky@emord.com

> Re: **Natural Immunogenics Corp. v. Newport Trial Group, et al.**
> U.S.D.C., C.D. Cal., Case No. 8:15-cv-02034-JVS (JFGx)

Dear Mr. Arhangelsky,

   This letter responds to your letter of March 6, 2017 regarding Newport Trial Group's ("NTG's") deposition notices to Peter Arhangelsky and Joshua Furman in this case. In your letter, you demand that the NTG Defendants "demonstrate the propriety" of these depositions and "provide a clear showing sufficient to meet your burden [under the *Shelton* factors], including a full and complete description of the evidence or testimony sought through the deposition subpoenas noticed on opposing counsel."

   While we recognize that depositions of opposing counsel are not routine, "[n]either the Federal Rules of Civil Procedure nor the Federal Rules of Evidence prohibit taking the deposition of an opposing party's attorney." *Am. Cas. Co. of Reading, Pa. v. Krieger*, 160 F.R.D. 582, 585 (S.D. Cal. 1995) (citation omitted). In fact, "where an attorney's conduct itself is the basis for a claim or defense,' . . . there is little doubt that the attorney may be examined as any other witness." *Id.* at 588 (quoting *Johnston Dev. Group, Inc. v. Carpenters Local Union No. 1578*, 130 F.R.D. 348, 352 (D.N.J. 1990).) Indeed, "in a case where an attorney has played a role in the underlying facts, both the attorney and the party have every reason to expect that the attorney's deposition may be requested." *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 164 F.R.D. 245, 249 (D. Kan. 1995).

   Your letter also erroneously claims "there are no apparent or plausible bases under which NTG can meet the *Shelton* factors relevant to information in NIC counsel's testimonial evidence." Please note that *Shelton* has no application to what we are dealing with here. As recently explained in *ATS Prods. v. Champion Fiberglass, Inc.*, 2015 U.S. Dist. LEXIS 74015, *12 (N.D. Cal. June 8, 2015), the "heightened test for depositions of opposing counsel" set forth in *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986) is inapplicable when "the subject matter of the deposition of opposing counsel is not his conduct in the pending case but his percipient knowledge of the events surrounding a prior concluded litigation." *ATS Prods.*, 2015 U.S. Dist. LEXIS at *18-19. In those circumstances, "regular discovery standards of Federal Rule of Civil Procedure 26" applies. *Id.* at *18.

NIC Mot. to Quash
Exh. 5

**CALLAHAN & BLAINE**

*California's Premier Litigation Firm*[SM]

www.callahan-law.com

Peter A. Arhangelsky, Esq.
March 13, 2017
Page 2

With one minor exception discussed below, NTG seeks to depose Peter Arhangelsky and Joshua Furman only on issues relating to the now complete case of *Nilon v. Natural-Immunogenics Corp.*, No. 3:12-cv-930-LAB (S.D. Cal.). As Plaintiff is aware, the underlying conduct in that case and the alleged damages in the form of attorneys' fee incurred in litigating it are at the core of Plaintiff's malicious prosecution claim in the instant matter. Dkt. 92, ¶¶ 318-333. In addition, actions in the underlying case and damages in that closed matter are also prominent in Plaintiff's RICO and Unfair Competition claims. Dkt. 92, ¶¶ 340, 368, 403. Plaintiff can hardly dispute that what it refers to as the "Nilon Action" is central to its claims in this case when over one hundred paragraphs of Plaintiff's Second Amended Complaint are spent on it. *Id.*, ¶¶ 13, 49-147, 340, 368, 403.

Peter Arhangelsky and Joshua Furman were both counsel for NIC in that matter and are therefore percipient witnesses with discoverable information. Since Plaintiff has claimed attorneys' fees as damages, one of the issues is whether those fees were reasonable and necessary. Another Eight Circuit case that limited *Shelton*, *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 728 (8th Cir. 2002), dealt with a conceptually similar circumstance when the plaintiff there tried to recover the fees its counsel had incurred in a "completely concluded . . . patent infringement" case. *Id.* at 730. The Eighth Circuit held that its 1986 *Shelton* opinion "was not intended to provide heightened protection to attorneys who represented a client in a completed case and then also happened to represent that same client in a pending case where the information known only by the attorneys regarding the prior concluded case was crucial." *Id.* The attorney deposition was proper because "Dynasty is seeking to depose opposing counsel to discover information peculiarly within counsel's knowledge and centrally relevant to the issues in the indemnification action, i.e., whether the $ 750,000 in attorneys' fees incurred in defending the patent infringement action was reasonable," and other issues. *Id.* at 731.

Here, there are substantial questions regarding NIC's fees, diligence, and conduct in the Nilon Action. NIC's counsel of course have exclusive knowledge of facts relating to the legal work for which Plaintiff is now attempting to recover from NTG. NIC and its counsel have also admitted in the underlying action that there are issues with respect to the diligence of its former counsel, Carolos Negrete. Consistent with this, Judge Selna previously overruled NIC's Motion to Strike NTG's unclean hands, duress, and undue influence affirmative defenses. Dkt. 200 at 6-7. Because "a plaintiff's unclean hands conduct in the underlying action or in the transaction that was the subject of that action can preclude relief in a subsequent malicious prosecution suit," *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 981 (1999), the conduct and its attorneys in the underlying case is clearly at issue.

The only subject not relating to the Nilon Action that NTG currently anticipates asking questions about at deposition is the declaration filed by Mr. Furman in support of NIC's crime fraud motion. That declaration opens with Furman's statement that he is

3 Hutton Centre Drive · Ninth Floor · Santa Ana, CA 92707 · (714) 241-4444 · Fax (714) 241-4445 · www.callahan-law.com

NIC Mot. to Quash

Exh. 5

## CALLAHAN & BLAINE

*California's Premier Litigation Firm*[SM]

www.callahan-law.com

Peter A. Arhangelsky, Esq.
March 13, 2017
Page 3

"competent to testify to the information below," the basis of which included his "personal knowledge" and "information received or conveyed to us by third parties during our investigation of this matter[.]" *Id.*, ¶¶ 1, 4. Of the 90 pages in the declaration, only 14 pages offer exhibits while the remaining 76 pages are Furman offering affirmative testimony evidence. Because of this, Furman has injected himself into the case a witness and, if his declaration is accurate, obviously has discoverable information regarding the basis for testimony that he offered. There are also no privilege concerns here because matters disclosed in a sworn declaration lose any privilege that may have attached to them. *See e.g., Starsight Telecast, Inc. v. Gemstar Dev. Corp.*, 158 F.R.D. 650, 653-55 (N.D. Cal. 1994) (finding partial waiver of attorney-client privilege when party presented two declarations and provided extensive deposition testimony discussing prior art).

For all of these reasons, we intend to move forward with the depositions of Peter Arhangelsky and Joshua Furman. To this end, please identify the specific dates at the end of March and in early April for which you do not have a conflict.

And of course, should you wish to discuss any other these issues further, please just let me know so that we can schedule a call.

Very truly yours,

David J. Darnell

DJD/mk

cc:    Edward Susolik, Esq.
       Brendan M. Ford, Esq.

3 Hutton Centre Drive • Ninth Floor • Santa Ana, CA 92707 • (714) 241-4444 • Fax (714) 241-4445 • www.callahan-law.com

# EXHIBIT 6

Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Joshua S. Furman, Esq. (pro hac vice)
jfurman@emord.com
Eric J. Awerbuch, Esq. (pro hac vice)
eawerbuch@emord.com
EMORD & ASSOCIATES, P.C.
2730 S. Val Vista Dr., Bldg. 6, Ste. 133
Gilbert, AZ 85295
Phone: (602) 388-8899
Fax: (602) 393-4361
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| NATURAL-IMMUNOGENICS CORP.,<br><br>                    Plaintiff,<br><br>      v.<br><br>NEWPORT TRIAL GROUP, *et al.*,<br><br>                    Defendants. | Case No. 8:15-cv-02034-JVS (JCG)<br><br>**DECLARATION OF JOSHUA S. FURMAN IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL**<br><br>Hearing Date:<br>Time:<br>Judge:  Hon. Jay C. Gandhi |

**DECLARATION OF JOSHUA S. FURMAN**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

1.      I, Joshua S. Furman, am over the age of 18 and competent to testify to the information below.

2.      I am an attorney with the law firm Emord & Associates, P.C.  I am counsel of record representing Natural-Immunogenics Corp. ("NIC") against Newport Trial Group ("NTG") in the above captioned matter.

NIC Mot. to Quash
Exh. 6

3.     I make this declaration in support of Joint Stipulation Regarding Plaintiff's Motion to Apply Crime-Fraud and Compel Production of Documents.

4.     This declaration is based on personal knowledge, my review of the documents cited herein, information received in discovery up through the date of this declaration, information received or conveyed to us by third parties during our investigation of this matter, communications with opposing counsel, public records, and information from NIC's files produced in discovery.

## I.     PROCEDURE AND EXHIBITS

5.     The Parties have met and conferred on the instant motion.  NIC explained its position by email on August 23, 2016 and October 28, 2016; by letter on October 21, 2016; and during a telephonic meet and confer on August 26, 2016 and November 1, 2016.  The allegedly "privileged" nature of documents in this case has been routinely addressed by the parties.  The Parties were unable to resolve the disputes subject to the present motion.  **Exhibit 10** is a true and correct copy of the parties' meet and confer written correspondence.

6.     **Exhibit 11** is a true and correct copy of Defendant Matthew Dronkers's Privilege Log submitted in response to Plaintiff NIC's First Set of Requests for Production.

7.     **Exhibit 12** is a true and correct copy of Defendant Taylor Demulder's Privilege Log submitted in response to Plaintiff NIC's First Set of Requests for Production.

8.     **Exhibit 13** is a true and correct copy of Defendant Andrew Nilon's Privilege Log submitted in response to Plaintiff NIC's First Set of Requests for Production.

9.     **Exhibit 14** is a true and correct copy of Defendant Newport Trial Group's Third Supplemental Privilege Log submitted in response to Plaintiff NIC's First Set of Requests for Production.

10. **Exhibit 15** is a true and correct copy of Defendant Sam Pfleg's Responses and Objections to Plaintiff's First Set of Requests for Production, which includes Mr. Pfleg's Privilege Log (at Attachment A, pg. 30), served by Pfleg's counsel on August 15, 2016.

11. **Exhibit 16** is a true and correct copy of Defendant NTG's Responses to NIC's Requests for Production [Set Three] and corresponding privilege log for same.

12. **Exhibit 17** is a true and correct copy of Defendant Sam Schoonover's Privilege Log submitted in response to Plaintiff NIC's First Set of Requests for Production.

13. **Exhibit 18** is a true and correct copy of Mr. Ferrell's retainer letter to Magna whereby Magna engaged NTG in November 2010, and including correspondence related to same.

14. **Exhibit 19** is a true and correct copy of NTG's complaint filed against Chromadex, *Nilon v. Chromadex, Inc.*, No. 56-2013-00436790-CU-MT-VTA (Sup. Ct. Ventura Cnty. May 23, 2013).

15. **Exhibit 20** is a true and correct copy of Scott Ferrell's Class Action Complaint filed in *Vaughn v. Magna-RX, Inc.*, No. BC426097 (LASC Nov. 16, 2009).

16. **Exhibit 21** is a true and correct copy of the Declaration of Pamela M. Spence, filed in support of Plaintiff NIC's Crime-Fraud Motion in this matter.

17. **Exhibit 22** is a true and correct copy of the transcript of Taylor Demulder's Customer Service Call placed to the Carter-Reed Company at 1-800-506-1577 on September 6, 2012.

18. **Exhibit 23** is a true and correct copy of the transcript of Taylor Demulder's deposition held in Las Vegas, Nevada on May 25, 2016 in *Carter-Reed Company, LLC v. Demulder* and designated PPK000012-136.

19.    **Exhibit 24** is a true and correct copy of the transcript of Kelly Ann Fortin's deposition held in Los Angeles, CA on April 6, 2011 in the matter of *Dysthe v. Basic Research, LLC*, No. 09-cv-0813-AG (C.D. Cal. 2011).

20.    **Exhibit 25** is a true and correct copy of Defendant Taylor Demulder's Responses and Objections to Plaintiff's First Set of Interrogatories, served on August 15, 2016.

21.    **Exhibit 26** is a true and correct copy of Defendant Taylor Demulder's Responses and Objections to Plaintiff NIC's First Set of Requests for Production, served on August 15, 2016.

22.    **Exhibit 27** is a true and correct copy of Defendant Matthew Dronkers' Responses and Objections to Plaintiff NIC's First Set of Interrogatories, served on August 15, 2016.

23.    **Exhibit 28** is a true and correct copy of Defendant Matthew Dronkers' Responses and Objections to Plaintiff's First Set of Requests for Production, served on August 15, 2016.

24.    **Exhibit 29** is a true and correct copy of Defendant Andrew Nilon's Responses and Objections to Plaintiff NIC's First Set of Requests for Production, served on July 21, 2016.

25.    **Exhibit 30** is a true and correct copy of Defendant Andrew Nilon's Responses and Objections to Plaintiff's First Set of Interrogatories, served on July 21, 2016.

26.    **Exhibit 31** is a true and correct copy of Newport Trial Group Defendants' Rule 26(a)(1)(A) Disclosures, served on April 18, 2016.  NTG Defendants have not supplemented their Initial Disclosures at any time in litigation.

27.    **Exhibit 32** is a true and correct copy of Defendant Newport Trial Group's Responses to Plaintiff NIC's Interrogatories [Set One], served on July 7, 2016.

Declaration of Joshua S. Furman

4

28.    **Exhibit 33** is a true and correct copy of Defendant Newport Trial Group's Responses to Plaintiff NIC's Request for Production [Set Two], served on September 2, 2016.

29.    **Exhibit 34** is a true and correct copy of Defendant Newport Trial Group's Responses to Plaintiff NIC's Request for Production [Set One], served on August 15, 2016.

30.    **Exhibit 35** is a true and correct copy of Defendant Newport Trial Group's Supplemental Response to Plaintiff NIC's Interrogatory Nos. 1 and 2  [Set One], served on September 15, 2016.

31.    **Exhibit 36** is a true and correct copy of Defendant Sam Pfleg's Responses and Objections to Plaintiff NIC's First Set of Interrogatories, served on August 15, 2016.

32.    **Exhibit 37** is a true and correct copy of Defendant Ryan M. Ferrell's Responses to Plaintiff NIC's Interrogatories [Set Two], served on November 8, 2016.

33.    **Exhibit 38** is a true and correct copy of Defendant Ryan M. Ferrell's Response to Plaintiff NIC's Interrogatories [Set One], served on July 7, 2016.

34.    **Exhibit 39** is a true and correct copy of Defendant Scott J. Ferrell's Responses to Plaintiff NIC's Interrogatories [Set One], served on July 7, 2016.

35.    **Exhibit 40** is a true and correct copy of Defendant Scott J. Ferrell's Responses to Plaintiff NIC's Interrogatories [Set Two], served on August 15, 2016.

36.    **Exhibit 41** is a true and correct copy of Defendant Scott J. Ferrell's Supplemental Response to Plaintiff NIC's Interrogatory No. 6 [Set Two], served on September 16, 2016.

37.    **Exhibit 42** is a true and correct copy of Defendant Scott J. Ferrell's Further Supplemental Response to Plaintiff NIC's Interrogatory No. 6 [Set Two], served on October 21, 2016.

Declaration of Joshua S. Furman

5

38.    **Exhibit 43** is a true and correct copy of Defendant Sam Schoonover's Responses and Objections to Plaintiff NIC's First Set of Interrogatories, served on August 15, 2016.

39.    **Exhibit 44** is a true and correct copy of Defendant Matt Dronkers' public LinkedIn profile posted online at www.Linkedin.com.

40.    **Exhibit 45** is a true and correct copy of Defendant Matt Dronkers' receipt for purchase of Kiss My Face products on March 19, 2012, produced by Defendant Dronkers' in discovery and identified as DRONKERS000001.

41.    **Exhibit 46** is a true and correct copy of the public profile for Kelly Ann Fortin (SBN 158580) published online by the State Bar of California.

42.    **Exhibit 47** is a true and correct copy of an email sent by attorney Scott Vick to Defendant Scott Ferrell, identified as VLG-000569, wherein Mr. Vick confirming that "[t]he documents indicate that Ms. Hanberg was in fact at the high school during the Deviant Art purchase that appears to have taken place in your office."

43.    **Exhibit 48** is a true and correct copy of NIC's Meet and Confer letter sent on September 2, 2016 to NTG counsel concerning NTG's initial disclosures and NTG's responses & objections in discovery.

44.    **Exhibit 49** is a true and correct copy of webpages printed from the website http://dwbhshirts.com, which includes evidence documenting Trycia Carlberg's relationship with Scott Ferrell's wife.

45.    **Exhibit 50** is a true and correct copy of investigative records concerning Jennifer L. Loop, which reflects her known addresses and similar information

46.    **Exhibit 51** is a true and correct copy of investigative records concerning Richard Lee Richardson, which reflects her known addresses and similar information

47.    **Exhibit 52** is a true and correct copy of Defendant Sam Schoonover's public LinkedIn profile produced from https://www.linkedin.com.

Declaration of Joshua S. Furman

6

48.     **Exhibit 53** is a true and correct copy of the documents provided to NIC pursuant to a Rule 45 subpoena to Nature's Way Products, Inc.  The documents include: NTG's multiple demand letters to Nature's Way on behalf of an alleged unnamed "individual Californian," correspondence between NTG and Nature's Way's attorneys, and the eventual settlement agreement between the parties.

49.     **Exhibit 54** is a true and correct copy of Defendant Sam Pfleg's Responses and Objections to Plaintiff NIC's First Set of Requests For Production, served on August 15, 2016.

50.     **Exhibit 55** is a true and correct copy of Sam Pfleg's receipt allegedly related to his case against Nature's Way Products, which Pfleg produced in discovery identified as PFLEG000001.

51.     **Exhibit 56** is a true and correct copy of NTG's demand letter served on Natural Immunogenics Corp. and dated December 27, 2011 on behalf of "an individual California consumer."

52.     **Exhibit 57** is a true and correct copy of email correspondence produced by Chromadex in response to NIC Rule 45 discovery requests, and identified as CHROMADEX00001-00004, which includes communications between Chromadex and NTG concerning Mr. Nilon's purported claims.

53.     **Exhibit 58** is a true and correct copy of NTG's demand letter dated March 21, 2013 and served on ChromaDex, Inc., which was produced by Chromadex in discovery and identified as CHROMADEX00178.

54.     **Exhibit 59** is a true and correct copy of email correspondence produced by Chromadex in response to NIC Rule 45 discovery requests, and identified as CHROMADEX00186-187, from Perrie Weiner of DLA Piper.

55.     **Exhibit 60** is a true and correct copy of the DNIS call center report logging phone calls into Chromadex's third party call center and produced to NIC in discovery.

56.     **Exhibit 61** is a true and correct copy of Chromadex Inc.'s Objections to Natural-Immunogenics Corp.'s Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, served on June 9, 2016.

57.     **Exhibit 62** is a true and correct copy of NTG's Settlement Agreement and Mutual Release of Claims executed between Chromadex and Andrew Nilon on August 6, 2013.

58.     **Exhibit 63** is a true and correct copy of email correspondence produced by NTG in discovery, which includes communications between Scott Ferrell and counsel to Nutrisystem.

59.     **Exhibit 64** is a true and correct copy of email correspondence between Nutrisystem counsel and Scott Ferrell concerning Richard Richardson.

60.     **Exhibit 65** is a true and correct copy of email correspondence between Nutrisystem and NIC counsel in November 2016.

61.     **Exhibit 66** is a true and correct copy of business records received from AT&T in response to a Rule 45 subpoena, which includes AT&T's records key providing descriptions of key terms and acronyms used in AT&T records.  AT&T produces records in Coordinated Universal Time (UTC) and expressed in military time. UTC is either seven or eight hours ahead of Pacific standard time (PST) depending on daylight saving time.

62.     **Exhibit 67** is a true and correct copy of Defendant Andrew Baslow's excerpted phone records produced by AT&T in response to NIC's subpoena, which includes all phone and text messaging contacts for Andrew Baslow's cellular phone during the period responsive to the NIC subpoena.

63.     **Exhibit 68** is a true and correct copy of Defendant Andrew Nilon's excerpted phone records produced by Verizon Wireless in response to NIC's subpoena, which includes all phone contacts for Andrew Nilon's cellular phone during the period responsive to the NIC subpoena.  The origination column in the records identifies the

Declaration of Joshua S. Furman

8

location of the closest cell tower that is used to send or receive the call to or from the accountholder's phone.  The records are produced in Pacific Standard Time.

64.    **Exhibit 69** is a true and correct copy of Defendant Sam Pfleg's excerpted phone records produced by AT&T in response to NIC's subpoena, which includes all phone and text messaging contacts for Sam Pfleg's cellular phone during the period responsive to the NIC subpoena.

65.    **Exhibit 70** is a true and correct copy of Defendant Sam Schoonover's excerpted phone records produced by AT&T in response to NIC's subpoena, which includes all phone and text messaging contacts for Sam Schoonover's cellular phone during the period responsive to the NIC subpoena.

66.    **Exhibit 71** is a true and correct copy of Defendant Raquel Torres's excerpted phone records produced by AT&T in response to NIC's subpoena, which includes all phone and text messaging contacts for Raquel Torres's cellular phone during the period responsive to the NIC subpoena.

67.    **Exhibit 72** is a true and correct copy of AT&T's verification of authenticity of AT&T records, executed by a qualified individual, which is an affidavit sponsoring AT&T phone records and explaining that AT&T records produced were kept in the ordinary course of business.

68.    **Exhibit 73** is a true and correct copy of Giovanni Sandoval's executed retainer agreement with NTG, produced by NTG in discovery and identified as NTG000224.  NTG redacted Mr. Sandoval's phone number in the agreement.  Only the signature page of the agreement was produced.

69.    **Exhibit 74** is a true and correct copy of Austin Glenn's public LinkedIn profile posted online at www.Linkedin.com.

70.    **Exhibit 75** is a true and correct copy of correspondence exchanged between Trent Norris (counsel to Himalaya Drug Co.) and NIC counsel, Joshua Furman, exchanged on September 13, 2016.

71. **Exhibit 76** is a true and correct copy of Himalaya Drug Company's list of recorded California calls incoming to its call center from January through July 2012, which was produced to NIC in discovery from Himalaya's counsel.

72. **Exhibit 77** is a true and correct copy of email correspondence exchanged between Defendant Dave Reid and counsel to Himalaya Drug Company, which was produced to NIC in discovery.

73. **Exhibit 78** is a true and correct copy of the audio file containing Andrew Baslow's phone call to ChromaDex on February 27, 2013. NIC submits the file in its original formatting, as a .wav sound file.

74. **Exhibit 79** is a true and correct copy of the audio file containing Andrew Baslow's phone call to Himalaya Drug Co. on July 16, 2012. NIC submits the file in its original formatting, as a .wav sound file.

75. **Exhibit 80** is a true and correct copy of the audio file containing Sam Schoonover's phone call to Himalaya Drug Co. on July 17, 2012. NIC submits the file in its original formatting, as a .wav sound file.

76. **Exhibit 81** is a true and correct copy of the audio file containing Andrew Nilon's phone call to ChromaDex on February 26, 2013. NIC submits the file in its original formatting, as a .wav sound file.

77. **Exhibit 82** is a true and correct copy of the audio file containing Taylor Demulder's phone call to Carter-Reed Co. on September 6, 2012. NIC submits the file in its original formatting, as a .wav sound file.

78. **Exhibits 83, 84, 85** are true and correct copies of the audio files containing Andrew Baslow's phone calls to Nutrisystem produced by NTG in discovery as NTG000353 - NTG000355. NIC submits the file in its original formatting, as a .wav sound file.

79. **Exhibit 86** is a true and correct copy of the audio file containing a recording of Nutrisystem's disclosure statement regarding the monitoring of calls which

Declaration of Joshua S. Furman

10

was produced in discovery as NTG002413.  NIC submits the file in its original formatting, as a .wav sound file.

80.    **Exhibit 87** is a true and correct copy of the audio file containing Raquel Torres's phone call to Nutrisystem on February 27, 2013.  NIC submits the file in its original formatting, as a .wav sound file.

81.    **Exhibit 88** is a true and correct copy of the publically available corporate filing documents for the Newport Trial Group, P.C. (a/k/a Pacific Trial Attorneys, PC), obtained from the California Secretary of State.

82.    **Exhibit 89** is a true and correct copy of Cox Communications's subpoena response regarding Wynn Ferrell's phone number: 480-507-2222.

83.    **Exhibit 90** is a true and correct copy of web pages from Andrew Baslow and Jamie Loop's wedding website, obtained on December 12, 2016.

84.    **Exhibit 91** is a true and correct copy of NTG's Responses to Plaintiff NIC's Requests for Production Set Three, executed on October 21, 2016.

85.    **Exhibit 92** is a table of information, excerpted from a larger excel spreadsheet for concise presentation, contained in Sprout's Farmers Market's August 2016 subpoena response to NIC.

86.    **Exhibit 93** is a true and correct copy of Giovanni Sandoval's arrest record obtained from the Unified Criminals investigative database.

87.    **Exhibit 94** is a true and correct copy of a joint letter sent from counsel for NIC and counsel for NTG to AT&T's subpoena compliance center regarding the production of Andrew Baslow's phone records and identifying his phone number as 818-519-0164.

88.    **Exhibit 95** is a true and correct copy of a screen shot from Kiss My Face's website identifying a hand lightener cream product.

89.    **Exhibit 96** is a true and correct copy of Raquel Torres's December 13, 2016 Objections to NIC's Subpoena.

Declaration of Joshua S. Furman

90.     **Exhibit 97** is a true and correct copy of the agreement wherein Andrew Nilon retained NTG to file a lawsuit against NIC, identified in discovery as NTG000204-NTG000208.

91.     **Exhibit 98** is a true and correct copy of Obesity Research Institute, LLC's Complaint filed against Joshua Weiss in the matter of *Obesity Research Institute, LLC v. Weiss*, No. 37-2016-00020883-CU-NP-CTL (Sup. Ct. San Diego June 21, 2016).  The complaint alleged that Weiss and NTG had "sued supplement and direct marketing companies for baseless causes of actions and under baseless legal theories."  *Id.* at ¶ 37. "Weiss … profited from Strataluz by engaging in a scheme akin to 'patent trolling,' whereby Strataluz, represented by NTG as legal counsel of record, threatened to sue other companies for alleged Lanham Act violations to extort monetary settlements from them."  *Id.* at ¶ 29.

92.     **Exhibit 99** is a true and correct copy of NTG's latest Supplemental Privilege Log produced on February 15, 2017, which logs documents purportedly responsive to NIC's First Set of Requests for Production that was served on Defendant NTG on June 7, 2016.

93.     **Exhibit 100** is a true and correct copy of a Walmart receipt produced by NTG as NTG006725 in response to NIC's Requests for Production related to the *Morales v. Magna Inc.* case.  The receipt bears a transaction date of April 8, 2010 and identifies two bottles of "MAGNA RX" in the product list.  The telephone number for the store at which the receipt was printed relates to Walmart store #1899 located at 6250 Spring Pkwy, Riverside, CA 92507.

94.     **Exhibit 101** is a true and correct copy of the Request for Dismissal filed in *Nilon v. Chromadex, Inc.*, No. 56-2013-00436790 (Sup. Ct. Orange County) that was filed by NTG's Victoria Knowles on May 23, 2013.

95.     **Exhibit 102** is a true and correct copy of Kelly Ann Fortin's receipt for purchase of Carter-Reed's "Relacore" product on November 1, 2009, which was

NIC Mot. to Quash
Exh. 6

provided to NIC's counsel through informal discovery and, upon information and belief, was produced in the matter of *Dysthe v. Basic Research, LLC*, No. 09-cv-0813-AG (C.D. Cal. 2010), and identified as Bates No. P000004.

## II.    FACTS DERIVED FROM EXHIBITS ATTACHED AND DOCUMENTS CITED

96.    At least **ten (10)** other corporations or parties have accused or suspected NTG of fabricating lawsuits in prior cases.  *See, e.g.*, Exh. 98 at 780, *Obesity Research Institute, LLC v. Joshua Aaron Weiss*, No. 37-2016-20883-CU-NP-CTL (Sup. Ct. San Diego 2016), Complaint at ¶ 29 (alleging that NTG "threatened to sue other companies for alleged Lanham Act violations to extort monetary settlements from them" through shell corporations); *Strataluz LLC v. TruDerma*, No. 3:15-cv-1248, Dkt. 6, at 9 (S.D. Cal. 2015) (alleging that NTG's corporation was "not engaged in the actual manufacture or marketing of legitimate products, but is instead operating solely as a 'Lanham Act Troll' seeking to extract payoffs from legitimate businesses by setting up façade operations, the sole purpose of which is to file suits against 'competitors' in hopes of obtaining payments to avoid litigation and costly legal fees"); *John Doe v. NAC Marketing*, No. 3:15-cv-2522, Dkt. 26, at 2-6 (S.D. Cal. Mar. 8, 2016) ("The timing of [Plaintiff's] October 3, 2015 purchase and the immediate representation by NTG strongly suggests that his purchase was orchestrated to create a case for NTG to pursue"); *Morales v. Magna, Inc., et al.*, No. CV 10-1601-EDL, Dkt. 59, at 9 (N.D.Cal. 2010) (alleging that NTG pursued litigation "on behalf of replacement clients that Plaintiffs' counsel knew, or should have known, were asserting false claims"); *Torres v. Nutrisystem*, No. 12-cv-1854, Dkt. 20, at 20-21 (S.D. Cal. 2013) (alleging that NTG "retained an investigator to find out exactly how to bypass the Disclosure, then found a Plaintiff who intentionally bypassed the Disclosure in the same way"); Response to Original Demand Letter, Exh. 53 at 471-73, *Pfleg v. Nature's Way*, No. 37-2012-

00051979-CU-MT-MC (Super. Ct. San Diego Cnty. Mar. 15, 2012) (asking if NTG's client "attempt[ed] to generate standing for a suit similar to the one brought against Boiron, Inc.?"); *Carter-Reed v. Demulder*, No. 2:16-cv-00057-DB, Dkt. 2-5, at 2 (Jan. 25, 2016) (alleging that NTG's client staged a phone call "deliberately in order to manufacture a claim against Carter-Reed, and did so on the advice, encouragement and/or direction of" other persons); *NIC v. NTG, et. al.*, No. 15-cv-2034, Dkt. 131-5 (Declaration of Scott Vick), at ¶¶ 2-15 (describing events in *Hanberg v. DeviantArt.com*, Los Angeles Superior Court, Case No. BC 615184 (2016) and alleging that NTG executed a purchase on Hanberg's behalf to support litigation); *Bowe v. Public Storage*, No. 1:14-cv-21559 (S.D.Fla. 2014), Dkt. 100, at 1 (alleging that NTG counsel manufactured a defense case by providing "financial inducement to at least one witness who provided favorable testimony"); *Clark v. MyLife.com, Inc.*, No. 12-cv-06889-R , Dkt. 8, at 6 (C.D. Cal. 2012) (explaining that "[t]his case demonstrates the extremes to which the plaintiffs' bar will go to concoct a consumer class action" and elsewhere arguing (Dkt. 13) that NTG's complaint was based on "outright falsehood"). In another matter, yet another corporation accused NTG's long-time client, Thermolife International, LLC, of RICO violations because "Thermolife is nothing more than a sham corporation used … to function as a 'patent troll'" used to file specious lawsuits. *See Thermolife International, LLC v. Hi-Tech Pharmaceuticals, et al.*, No. 1:15-cv-00894-ELR (N.D. Ga. 2015), Dkt. 10 at ¶ 31 (alleging Counterclaims against NTG client).

### A. Torres v. Nutrisystem Inc.

97. On September 18, 2012, NTG and Callahan & Blaine filed a Complaint in the Superior Court of California on behalf of Raquel Torres alleging violations of California's wiretapping laws. *See Raquel Torres v. Nutrisystem Inc.*, No. 8:12-cv-

1854-CJC-JPR (C.D. Cal. Removed Oct. 24, 2012) ("*Torres v. Nutrisystem*"), Dkt. 1 at 12 (State Court Complaint).

98.    In that complaint, NTG and Torres represented to Nutrisystem, Inc. that: (1) Torres made a call to Nutrisystem on August 24, 2012 that conveyed sensitive, private, and confidential information; (2) Torres did not know the call was being recorded; (3) Torres did not give express or implied consent to the recording; and (4) Torres only learned Nutrisystem recorded her conversation *after* that call.  *Id*. at ¶¶ 8-13.

99.    Torres claimed a privacy violation on behalf of a class of similar callers, in part, because Nutrisystem had allegedly recorded her "sensitive" phone call without her knowledge or consent (express or implied).  *Id*.

100.    Before Torres's August 24, 2012 call to Nutrisystem, NTG's Director of Field Operations, Andrew Baslow, called Nutrisystem.  Baslow's stated purpose in calling Nutrisystem was to determine whether Nutrisystem "recorded calls and if they provided [a recording] disclosure." *Torres v. Nutrisystem*, Dkt. 20-4 at 32 (Baslow Deposition); Exh. 67 at 568, 574, 577 (Baslow phone records).  Baslow testified at deposition that he performed that task at the direction of NTG attorneys.  *Torres v. Nutrisystem*, Dkt. 20-4 at 9-10 (explaining that attorneys give him instructions).

101.    On August 6 and 7 of 2012, NTG's Andrew Baslow made <u>one hundred and twenty (120)</u> phone calls to toll-free numbers of businesses nationwide.  Exh. 67 at 565-577.  Five of those calls were made to Nutrisystem, Inc.  Exh. 67 at 568, 574, 577.

102.    Three of those calls were made to Humana Pharmacy, Inc., which NTG later sued through Ray Perea one week after Torres filed her complaint against Nutrisystem.  *Id*. at 572, 576.  Perea's allegations mirrored Torres's claims, including the disclosure of his social security number.  *See Ray Perea v. Humana Pharmacy, Inc.*, No. 8:12-cv-1881-JLS-AN, Dkt. 1 at 14-15 (C.D. Cal Removed on Oct. 29, 2012) ("*Perea v. Humana*").  On information and belief Ray Perea is Raquel Torres's cousin or close relative; discovery is ongoing.

Declaration of Joshua S. Furman

15

103.    Based on my review, the telephone records from AT&T show that Andrew Baslow made more than 2,500 phone calls to toll-free business lines in a twenty-six (26) month period, from February, 2012 until April, 2014.

104.    At deposition, Baslow testified that the reason for multiple calls to Nutrisystem was due to poor cell reception. *Torres v. Nutrisystem*, Dkt. 20-4 at 22, 28-31.

105.    During his five phone calls to Nutrisystem on August 6-7, 2012, Baslow experimented with varied dialing techniques. *Torres v. Nutrisystem*, Dkt. 20-4 at 73-78. Nutrisystem's records and Baslow's deposition testimony suggest that he identified a loophole in Nutrisystem's automated system:  If a caller pressed "1" before hearing any of the routing options and within nine seconds of call seizure, the caller could circumvent Nutrisystem's call recording disclosure and still reach a customer service representative. *Id.* (Deposition transcript); *see also id.*, Dkt. 20-1 (Decl. of Wayne Crossman) at ¶¶ 10-13 (explaining how a caller could bypass the disclosure).

106.    Nutrisystem's call system was designed to play the following recorded message to all callers in accordance with California Penal Code sections 631(a) and 632(a):

> Welcome to Nutrisystem!  Now you can lose weight and learn to keep it off with our most complete program ever:  Nutrisystem Success.  **For quality and training purposes, your call may be monitored or recorded.**  To place an order or learn more about getting on Nutrisystem Success, please press 1.  If you are an existing customer calling about your order, please press 2.  For member counseling, questions about your weight loss, or how to be most effective on your Nutrisystem program, please press 3.  If you need assistance with a QVC order, please press 4. If you know your party's extension, please press 7.  For inquiries on your promotional Android phone, please call 888-683-2765 for support.

*Torres v. Nutrisystem*, Dkt. 20-1 (Decl. of W. Crossman) at ¶ 7 (emphasis added); *see also* Exh. 86 (recording of Nutrisystem warning).

NIC Mot. to Quash
Exh. 6

107. On August 24, 2012, three weeks after Baslow's five calls, Raquel Torres first called Nutrisystem and routed herself past the automated disclosure. Exh. 71 at 679 (Torres Phone Logs).

108. On her initial call to Nutrisystem, Torres pressed "1" six seconds into the call before any routing options were audible and before the initial automated call disclosure could play. *Torres v. Nutrisystem*, Dkt. 20-3 at 54; *Torres v. Nutrisystem*, Dkt. 20-1 at ¶¶ 8-13, 20.

109. Torres testified that she had never called Nutrisystem before her August 24, 2012 call. *Torres v. Nutrisystem*, Dkt. 20-3 at 35-36.

110. Nutrisystem's records show that less than 1.7% of callers are both a possible first-time caller *and* press a routing option before hearing the recording disclosure. *Torres v. Nutrisystem*, Dkt. 20-1 at ¶¶ 23-36. Thus, Torres' call is highly irregular.

111. After successfully reaching an operator without hearing the disclosure, Torres disclosed her social security number without being asked for that information by Nutrisystem's representative. Exh. 87 (Torres Call); *Torres v. Nutrisystem*, Dkt. 20-3 at at 61.

112. NTG's wiretapping plaintiffs frequently disclose, or try to disclose, their social security numbers to the answering company representative. *See e.g.*, Exh. 82 (Demulder disclosed his gratuitously and was stopped by the representative); *Perea v. Humana*, Dkt. 1 at 15 (NTG alleged that Perea "spoke to a customer service representative, and had a sensitive, private and confidential discussion wherein [Perea] provided his name and social security number"); *Clark v. MyLife.com, Inc.*, No. 12-cv-06889-R (C.D. Cal. 2012), Dkt. 29 at 9 (NTG argued that its CIPA plaintiff "had a conversation that he considered to be private and confidential because he disclosed personal information including his social security number"); *Vamvakias v. Lincoln National Corp.*, No. 5:12-cv-1776-DDP-SP, Dkt. 1 at ¶ 8 (C.D. Cal. filed Oct. 16, 2012)

Declaration of Joshua S. Furman

17

("*Vamvakias*") (NTG alleged that its client "connected to a customer service representative and they proceeded to have a sensitive, private and confidential discussion wherein Plaintiff first provided his name and social security number"); *Causillas v. Wellnx Life Sciences USA*, No. 2:12-cv-10044-JFW-FFM (C.D. Cal. Nov. 26, 2012), Dkt. 1 ¶ 8 ("*Causillas*")(NTG alleged that its client "spoke to an employee of Defendant … and they proceeded to have a sensitive, private and confidential discussion wherein Plaintiff provided her name and social security number"); *Doucette v. Rent-A-Center, Inc.*, No. 2:12-6886-DDP-MAN, Dkt. 1 at ¶ 8 (C.D. Cal. filed Aug. 9, 2012)("*Doucette v. Rent-A-Center*") (NTG alleged that its "Plaintiff spoke to a customer service representative … and they proceeded to have a private and confidential discussion" and "Plaintiff also gave Defendant his social security number"); *Torres v. Nutrisystem*, Dkt. 20-6 at 1-2 (Complaint from *John Doe v. Biotab Nutraceuticals, Inc.,* No. 30-2012-611673-CU-MT-CJC (Orange Cty. Filed Nov. 9, 2012)) (NTG and Callahan & Blaine alleged that their "Plaintiff spoke to a [customer service representative] of defendant . . . [and] had a sensitive, private and confidential discussion wherein Plaintiff provided his name and social security number . . .).

113. For each CIPA case identified in the preceding paragraph (which are merely representative examples of NTG's body of work), Andrew Baslow also called the defendant corporation before the lawsuit was filed. Furthermore, each call came at a time when Baslow was calling dozens of other toll-free numbers in rapid succession. The following is confirmed by Baslow's phone records:

     a.    On October 30, 2012, Baslow called 1-800-419-4447 on two occasions, the number identified in the complaint filed against BioTab Nutraceuticals, Inc. *See* Exh. 67 at 650, 654; *Torres v. Nutrisystem*, Dkt. 20-6 ¶ 8. On that same day, Baslow also made **72** calls to toll-free numbers. *Id*. at 649-56.

     b.    On August 6 and 7, Baslow called 1-800-422-8186 on three occasions, the number identified in the complaint filed against Rent-A-Center,

Declaration of Joshua S. Furman

18

Inc. *See* Exh. 67 at 572, 576; *Doucette v. Rent-A-Center*, Dkt. 1 at ¶ 8.  On those same days, Baslow made **120** calls to toll-free numbers, including five calls to Nutrisystem, Inc. and five calls to Humana Pharmacy, Inc. *Id.*

c.        On July 31, 2012 and August 2, 2012, Baslow called 1-800-454-6265 three times, the number identified in the complaint filed against Lincoln National Corp.  *See* Exh. 67 at 610-11, 620; *Vamvakias*, Dkt. 1 at ¶ 8.  Surrounding those three calls, from July 31 to August 2, 2012, Baslow made **84** calls to toll-free numbers.  *Id.* at 609–21.

d.        On October 30, 2012, Baslow called 1-877-370-6152 five times, the number identified in the complaint filed against Wellnx Life Sciences USA, Inc. *See* Exh. 67 at 650, 654; *Causillas*, Dkt. 1 at ¶ 8.  On that same day, Baslow made **72** calls to toll-free numbers, including the calls to BioTab Nutraceuticals, Inc. *Id.* at 649-656.

114.   Where NIC has obtained a transcript or recording of a call identified in the preceding paragraph, the caller disclosed a social security number without being asked for same from the representative.  Exh. 87 (Torres call); Exh. 82 (Demulder call).

115.   NTG counsel has used the fact that its client disclosed his social security number to argue that the call was objectively confidential, as required by Section 632.7, making the following argument in opposition to a motion to dismiss:

> The nature of such communications is inherently personal and private in nature, unlike the bare content of the communications at issue in *Hilton*, which this Court deemed to be not objectively reasonable to expect confidentiality.  Indeed, the defendants in *Hilton* pointed out that the plaintiff in that case did allege any "personal or confidential information, *such as a Social Security number.*"  Here, in contrast, Plaintiff Clark disclose[d] his social security number to Defendant's customer service representative.  Thus, the First Amended Complaint alleges precisely the type of confidential communication that would have met the legal standard articulated by the defendants in the *Hilton* action.

Declaration of Joshua S. Furman

19

*Clark v. MyLife.com, Inc.*, No. 12-cv-06889-R, Dkt. 29, at 19 (C.D. Cal. 2012) (NTG Memo in Opp. to Mot. to Dismiss) (internal citations omitted; emphasis original).

116.   On January 23, 2013, NTG filed a motion to certify class in the Nutrisystem matter. *Torres v. Nutrisystem Inc.*, No. 8:12-cv-01854, Dkt. 17 (C.D. Cal.).  The parties agreed to conduct limited discovery related to that motion, including providing Nutrisystem an opportunity to depose NTG's plaintiff, Raquel Torres, and NTG's investigator, Andrew Baslow.  Exh. 63 at 545-46; *see also Torres*, No. 8:12-cv-01854, Dkt. 18 (C.D. Cal.).

117.   In support of the motion for class certification, Raquel Torres executed a declaration swearing to the following:

   a. "I was not aware that the call was being recorded…. I did not give either express or implied consent to the recording." *Torres v. Nutrisystem*, Dkt. 17-11 at ¶ 4.

   b. "I brought this lawsuit to try to stop Defendant's invasion of the right to privacy by secretly recording confidential telephone conversations without prior notice." *Id.*, at ¶ 5.

These statements mirrored allegations in the Torres complaint. *Torres v. Nutrisystem*, Dkt. 1-4 at ¶¶ 9-13.

118.   Andrew Baslow was deposed in the Nutrisystem matter on February 7, 2013. *Torres v. Nutrisystem*, Dkt. 20-4 (Deposition of Andrew Baslow).  Baslow was represented by NTG Attorney and Defendant in this matter, David Reid.  *Id.*

119.   At deposition, Baslow initially testified that he called Nutrisystem one time. *Torres v. Nutrisystem*, Dkt. 20-4 at 18-19.

120.   Baslow was confronted with evidence that he called multiple times. *Id.* at 22-24; *see also* Exhs. 83-85 (recordings of Baslow's calls).  In response, Baslow stated that he called multiple times because of bad cellular phone reception. *Torres v. Nutrisystem*, Dkt. 20-4 at 24.

NIC Mot. to Quash
Exh. 6

121. Baslow testified that he recorded the last of his five calls to Nutrisystem. *Id*. at 24-25.

122. I have listened to the various recordings of Baslow's calls to Nutrisystem and both sides of the conversation sound clear. Exhs. 83-85. At deposition, counsel for Nutrisystem played their recordings of Baslow's calls and Baslow agreed that the calls were clear. *Torres v. Nutrisystem*, Dkt. 20-4, at 40-41.

123. Baslow testified that he called Nutrisystem solely to complete a "task" given him from NTG attorneys. *Id*. at 36-37.

124. Baslow testified that he did not pay attention to call monitoring disclosures, but on his final call, which he admitted to recording to complete his "task" (for NTG attorneys), he specifically asked the Nutrisystem representative why he had not received a warning that the call would be recorded. *Id*. at 88-89; *see also* Exh. 85 (Baslow's fifth call).

125. Baslow testified that he did not recall ever hearing such a disclosure on his calls to Nutrisystem. *Id*. at 11.

> Q: Have you ever called a company and heard an automated disclosure that says "This call may be monitored or recorded"?
>
> A: Not that I recall.
>
> …
>
> Q: So you don't recall ever calling a company and hearing an automated message, an interactive voice response system, let's say, Welcome to whoever, you can press one, you can press two, and they give you the options of the calls?
>
> Do you recall calling a company and hearing a disclosure of that sort?
> A: Very vaguely.

Declaration of Joshua S. Furman

21

*Id.* Yet, the records show that on at least two of his calls, he did hear the automated disclosure, and on the remaining calls, he bypassed the disclosure intentionally. *Id*. at 82-84, 90, 93. Moreover, Baslow had contacted thousands of corporate toll-free numbers for his NTG investigations.

126. On his fifth call, Baslow pressed "1" within five seconds and before hearing any routing options or the recording disclosure which occur at nine seconds. *Id.* at 79. By doing so, he reached a customer service representative without being "warned" his call was recorded. *Id.* at 48. Baslow then asked the customer service representative if his call was being recorded, and that representative answered in the affirmative. Exh. 85. Baslow then considered his "task" complete. *Torres v. Nutrisystem*, Dkt. 20-4 at 84.

127. At deposition, Baslow never mentioned Richard Richardson. *See generally id*. He did not state, when asked why he made five calls, that he was investigating a claim on behalf of a potential client. *Id*. at 19, 79.

128. Raquel Torres was deposed in the Nutrisystem matter on February 22, 2013. *Torres v. Nutrisystem*, Dkt. 20-3. Torres was represented at deposition by NTG attorney James Hardin. *Id*. Defendant Scott J. Ferrell met with Torres two days before her deposition. Exh. 32 at 297.

129. At deposition, Torres was asked to describe how she found her attorneys, and how she discovered that her call with Nutrisystem was recorded. *Torres v. Nutrisystem*, Dkt. 20-3 at 77-78. Torres testified that "a week or two" after her August 24, 2012 call to Nutrisystem, she read an internet article about companies that record telephone calls. *Id*. at 44, 76-82. She testified that within "a matter of days" after reading that internet article, she searched online using terms to find "privacy" or "wiretapping" attorneys. *Id*. at 78. Torres said that she then called NTG and spoke with Ryan Ferrell in "early September"; apparently learned from NTG that her call was recorded; and then "days" later retained NTG at an in-person meeting. *Id*. at 81-82.

130. She specifically testified as follows:

Declaration of Joshua S. Furman
22

Q.    So at some point after you made your call to Nutrisystem, you saw an article online that informed you that some companies record telephone calls without letting the callers know --

A.    Correct.

Q.    -- is that correct?

Do you remember how long after you called Nutrisystem that you came – came upon that article?

…[1]

A.    It was shortly after, I would say between a week and two.

Q.    And after you found that out, did you do any research of your own to find out if Nutrisystem had in fact recorded your call?

A.    Not on my own, no.

Q.    Other than research that may have been connected – done with your attorneys – did you do any other – did you do any research to find out whether or not Nutrisystem recorded your call?

A.    No.

Q.    And you're represented in this lawsuit by the Newport Trial Group?

A.    Correct.

Q.    How did you find out about the Newport Trial Group?

A.    I just searched online for attorneys, and I think – I'm not sure what words I used, but I think I put like "privacy" or "wiretapping" or something.

…

Q.    Do you remember when you performed the search online?

---

[1] Objections of counsel, Mr. Hardin for NTG, omitted.

Declaration of Joshua S. Furman
23

A.   I don't recall.  It was just – **it was shortly after my – the call**.  I don't remember when.

Q.   **Shortly after your call to Nutrisystem?**

A.   Yeah.  Like a week or two after.

Q.   **Do you remember, in relation to when you came across this article online that we've talked about, when you then looked up attorneys on the Internet?**

A.   I think it was days – a matter of days.

Q.   **Why were you searching for attorneys on the Internet on that occasion?**

A.   Because I wanted to get more information about how to find out if my call was recorded.

Q.   **Did you think to call Nutrisystem and ask them if your call was recorded?**

A.   No.

Q.   **Why not?**

A.   It just didn't cross my mind.  I don't know.

Q.   **And you said the search that you performed to find an attorney, you recall doing this search about attorneys and specifically with respect to wiretapping or privacy?**

…

A.   I don't remember the exact words.  I think I did a couple of different searches.  I don't know exactly what searches I did to come up with that – with the results.

…

Q.   **Did you personally know anyone at the Newport Trial Group at that time?**

A.   No.

Declaration of Joshua S. Furman

24

**Q. To your knowledge, did anyone that you know, relative or a friend, know anybody be [sic] Newport Trial Group at that time?**

A. No.

**Q. In performing that search you came across the Newport Trial Group; is that correct?**

…

A. Yes.

**Q. And you've testified to multiple searches to find an attorney on this occasion. Was that all at the same time?**

A. Yes.

…

**Q. Do you remember who from the firm you contacted?**

A. I don't know who answered the phone, but I ultimately talked to Ryan Ferrell.

Q. <u>And that was the first time you'd ever spoken to anyone from the Newport Trial Group?</u>

A. <u>Yes.</u>

**Q. <u>And do you remember when that was?</u>**

A. <u>Early September, about then.</u>

**Q. Did you retain Newport Trial Group to represent you on your first call to the Newport Trial Group that you just testified to?**

…

A. Not – I don't recall if it was the first call. I don't know.

**Q. Okay. Did you subsequently meet with somebody from the Newport Trial Group in person?**

A. Yes.

Declaration of Joshua S. Furman
25

NIC Mot. to Quash
Exh. 6

> **Q.     How long after you had the initial call with somebody from the Newport Trial Group did you meet with them in person?**
>
> A.     Not long after.  I don't know.  It was probably days I would say.

*Torres v. Nutrisystem*, Dkt. 20-3 at 76-82. (emphasis added).

131.   Torres' phone records show that a call from her cell phone was made to a phone associated with Wynn Ferrell (480-507-2222) on August 24 at 12:17 p.m., three hours before Torres made her call to Nutrisystem.  Exh. 71 at 678.

132.   Wynn Ferrell is an NTG investigator. *Colin Bowe v. Public Storage*, No. 1:14-cv-21559-UU (S.D. Fla.), Dkt. 115-1 at ¶ 4,  (Declaration of Scott Ferrell stating that Wynn Ferrell is an NTG investigative employee); *see also* Exh. 32 at 297-98 (stating that Wynn Ferrell attended a meeting "on behalf of Newport Trial Group").  He is also the father of Ryan and Scott Ferrell.  Cox Communications has confirmed that the number ending in 2222 is Wynn Ferrell's phone.  Exh. 89 at 734 (Cox Records).  Wynn Ferrell has also been listed as NTG's Corporate Secretary.  Exh. 88 at 731 (NTG Corporate Filings).

133.   Torres' phone records also show that on Wednesday, August 22, 2012, Torres began calling the following phone number:  1-800-435-4497.  She called that number three times in close succession on August 22, 2012, but does not appear to have connected to the desired business because the call "seizure" times reflect that no connection lasted more than 25 seconds.  Exh. 71 at 676-679.

134.   Nutrisystem's actual phone number, the number identified in Torres's eventual Complaint, was 1-800-435-44**90** (not 1-800-435-44**97**). *Torres v. Nutrisystem*, Dkt. 1-4 at ¶ 8.

135.   Two days later, on August 24, 2012, Torres again dialed the number 1-800-435-**4497**.  Exh. 71 at 677-679.  On that day she dialed the number *thirteen* times within the span of five minutes, beginning at 12:10 p.m. and ending with her last call at 12:15

NIC Mot. to Quash
Exh. 6

p.m. on August 24, 2012. *Id*. Torres' unsuccessful calls to 1-800-435-44**97** were as follows:

a. On August 22, 2012, Torres called 1-800-435-4497 at 4:35:24 p.m. Exh. 71 at 676.

b. On August 22, 2012, Torres called 1-800-435-4497 at 4:36:02 p.m. *Id.*

c. On August 22, 2012, Torres called 1-800-435-4497 at 4:36:22 p.m. *Id*.

d. On August 24, 2012, Torres called 1-800-435-4497 at 12:10:31 p.m. *Id*. at 677-78.

e. On August 24, 2012, Torres called 1-800-435-4497 at 12:11:36 p.m. *Id*.

f. On August 24, 2012, Torres called 1-800-435-4497 at 12:12:01 p.m. *Id*.

g. On August 24, 2012, Torres called 1-800-435-4497 at 12:12:22 p.m. *Id*.

h. On August 24, 2012, Torres called 1-800-435-4497 at 12:12:31 p.m. *Id*.

i. On August 24, 2012, Torres called 1-800-435-4497 at 12:12:54 p.m. *Id*.

j. On August 24, 2012, Torres called 1-800-435-4497 at 12:13:15 p.m. *Id*.

k. On August 24, 2012, Torres called 1-800-435-4497 at 12:13:31 p.m. *Id*.

l. On August 24, 2012, Torres called 1-800-435-4497 at 12:13:46 p.m. *Id*.

m. On August 24, 2012, Torres called 1-800-435-4497 at 12:14:22 p.m. *Id*.

n. On August 24, 2012, Torres called 1-800-435-4497 at 12:14:37 p.m. *Id*.

o. On August 24, 2012, Torres called 1-800-435-4497 at 12:15:10 p.m. *Id*.

p. On August 24, 2012, Torres called 1-800-435-4497 at 12:15:25 p.m. *Id*.

136. Within minutes of those failed calls, Torres dialed Wynn Ferrell's number ending in 2222. Exh. 71 at 678 (Item No. 4712, calling at 12:17 p.m., one and a half minutes after completing the last of her sixteen failed calls). That call lasted approximately one minute. *Id*. A few hours later, at 3:57 PM Pacific on August 24, 2012, Torres dialed the correct Nutrisystem number (1-800-435-**4490**) and completed her call to Nutrisystem that ultimately undergirded her complaint. *Id*. (Item No. 4745).

Declaration of Joshua S. Furman

27

137.   Torres' cell phone did not call any NTG office line in August or September of 2012.  Her cell phone did not call the main office phone line, (909) 706-6464.  Exh. 71 (including all records available) or any of the direct lines to NTG's offices which all begin with the same six digits, "909-706." *Id*.  In fact, Torres's phone never makes a call to such a number in the phone records produced by AT&T.

138.   NTG's privilege log identifies an executed retainer agreement that was exchanged by "letter" on August 28, 2012. Exh. 14 at 71 (NTG000219).

139.    NTG's sworn Interrogatory responses declared that no NTG employee, attorney, or agent met with Torres in-person in August or September of 2012.  Exh. 32 at 297.

140.   On March 8, 2013, Nutrisystem filed an Opposition to NTG's Motion to Certify a Class. *Torres v. Nutrisystem*, Dkt. 20 at 20-21.  In that brief, Nutrisystem argued that Torres' case appeared to be an attorney-driven set-up because NTG "retained an investigator to find out exactly how to bypass the Disclosure, then found a Plaintiff who intentionally bypassed the Disclosure in the same way." *Id*. at 27-28.

141.   NTG denied those allegations in its Reply to that pleading filed on March 22, 2013. *See generally Torres v. Nutrisystem,* Dkt. 27.  Scott Ferrell argued the following in that Reply brief:

> Nutrisystem implies that there is something "untoward" about the fact that an investigator for Plaintiff's counsel was investigating this matter before Nutrisystem recorded the call with Plaintiff.  In reality, this is a non-issue: as shown by the declaration of Richard Richardson filed concurrently herewith, Plaintiff's counsel was investigating this case on behalf of a different class member prior to being contacted by Plaintiff.

> \*\*\*

> Defendant implies that because the investigator for Plaintiff's counsel, Mr. Andrew Baslow called Defendant *before* Plaintiff's call to determine whether all of its calls with consumers were recorded calls, he or

Declaration of Joshua S. Furman

28

> Plaintiff's counsel must have instructed Plaintiff to call Defendant, bypass the disclosure that Defendant failed to ensure would reach all callers, and then disclosed her social security number. Defendant poses this scenario despite the fact that it deposed both Plaintiff and Mr. Baslow without discovering any proof of surreptitious intent.
>
> ***
>
> [Nutrisystem's] accusation that this is an "attorney driven lawsuit" and that Plaintiff's call was effectively a set-up is unsubstantiated via any evidence, pure inflammatory conjecture intended to bias the Court, and further discredited by the fact that a Class member, Richard Richardson, called Defendant before Mr. Baslow called Defendant, and contacted Plaintiff's counsel seeking legal recourse….If the Court credits Defendant's completely unsupported allegations of foul-play, it would have to conclude that Plaintiff, Mr. Baslow, and Mr. Richardson have all lied.

*Id.* at 7, 19.

142. Defendant Scott Ferrell supported the statements made in the Reply in Support of Raquel Torres' Motion for Class Certification by submitting the Declaration of Richard Richardson. *Torres v. Nutrisystem*, Dkt. 27-3.

143. Richard Richardson stated under oath that he called Nutrisystem in June or July of 2012 to discuss the Nutrisystem diet program and was not advised by Nutrisystem that his call was recorded. *Id.* at ¶ 2. Like Torres, Richardson stated that he read an article on the internet about companies that secretly record calls. *Id.* at ¶ 3. Like Torres, Richardson stated the internet article caused him to suspect he had been recorded by Nutrisystem. *Id.* Richardson stated that he searched the internet for "Best Lawyers in Southern California" and came across Dan Callahan, Scott Ferrell and Edward Susolik on the website: www.superlawyers.com. *Id* at ¶ 4. Richardson stated that he contacted NTG in late July, sought representation, but decided against filing suit when he learned "[he] could be responsible for Nutrisystem's attorney fees if [he] sued and lost." *Id.* at ¶¶ 5-6.

Declaration of Joshua S. Furman

144.   Nutrisystem has no record of a recorded call in June or July of 2012 from an individual named Richard Richardson.  Exh. 64 at 548.

145.   During the pendency of the Nutrisystem matter, Nutrisystem's counsel emailed Scott Ferrell, stating that Richardson did not appear as a caller to Nutrisystem and asking for the telephone number for Richardson to assist in their investigation.  *Id.* Neither NTG nor Nutrisystem produced evidence that Scott Ferrell responded or provided the requested information.  Exh. 65 at 550-52.

146.   NTG has not disclosed Richard Richardson in NTG's Initial Disclosures in the above-captioned matter.  Exh. 31.  NTG's Answer makes no reference to Richard Richardson in response to NIC's allegations related to Baslow's investigation.  *See generally* Dkt. 174.

147.   NIC served two Interrogatories on Scott Ferrell related to Mr. Richardson. Exh. 40 at 395-96.  NIC requested information sufficient to identify Richardson (i.e., telephone numbers, address, date of birth and his full name) and information related to Richardson's alleged phone call to Nutrisystem that undergirded his purported claim (and declaration).  *Id.*

148.   Scott Ferrell denied the existence of any responsive information in his responses submitted under oath.  Exh. 40 at 395-96.

149.   NIC requested, by letter, that NTG confirm that it possessed no information sufficient to identify Richardson.  Exh. 48 at 445.  In response, NTG provided a supplemental discovery response, stating that "[a]fter further investigation, the last known address for Richard Richardson is 305 Poppy Avenue, Corona del Mar, CA 92625.  Defendant does not have a telephone number, email address or date of birth." Exh. 41 at 403.

150.   No Richard Richardson lived at the 305 Poppy address from June 6, 2012 until the house was recently sold this year.  Exh. 21 at 123-24.  Mrs. Pamela Spence lived at that address, beginning June 6, 2012, one month *before* Richardson allegedly

NIC Mot. to Quash
Exh. 6

contacted NTG for potential representation, until she moved last year. *Id.* Mrs. Spence never rented the property to anyone and she does not know anyone by the name of Richard Richardson. *Id.* She did not purchase the property from Richard Richardson or anyone named Richardson. *Id*.

151. On Friday, October 14, 2016, counsel for NIC met and conferred over the phone with counsel for NTG and informed counsel for NTG that the "305 Poppy Ave." address was incorrect and that NIC's counsel believed Scott Ferrell knew the statement was false when he submitted same.

152. One week later, on Friday, October 21, 2016, Scott Ferrell executed a Further Supplemental Response to NIC's Interrogatories and identified the address, phone number, and email address for Richard Richardson as the following: "Richard Richardson, ███████████, Alta Loma, CA 91701; Tel.: 909-472-9779; Email: richardrichardson94@yahoo.com, date of birth: unknown." Exh. 42 at 410.

153. According to Baslow's phone records, the first contact between Baslow and Richardson's number ending in 9779 was not in the summer of 2012, but, earlier, in March of 2012. Exh. 67 at 578-79. Andrew Baslow sent two text messages to Richard Richardson on March 17, 2012. *Id.* Baslow's records show no additional correspondence via text message or phone call until a year later:

      a. On March 3, 2013, Baslow sent Richardson a text message. *Id.* The two exchanged a total of sixteen (16) text messages over the following ten days. *Id.* at 579-83.

      b. On March 13, 2013, Baslow called Richardson at 3:40 p.m. and had nearly a fifteen minute conversation with him. *Id.* at 584

      c. The text and phone call correspondence between Baslow and Richardson after that point are far too numerous to individually enumerate here (e.g., NIC counsel counted more than 250 text messages between Baslow and

Richardson from March 2013 until July 2015 and over sixty (60) phone calls during that same time period).  *Id.*

154.  NIC subsequently discovered that Richard Richardson is either the spouse or live-in boyfriend of Andrew Baslow's sister-in-law.  *See* Garcia Decl. at ¶¶ 4-13. Richardson has resided with Baslow's sister-in-law, Jennifer Loop, at all times relevant to this litigation and, upon information and belief, was present at that address as recently as the week of October 24, 2016.  *Id*; *see also* Exh. 90 at 737 (Jaime Baslow's wedding website); Exh. 50 (public information report for Jennifer Loop); Exh. 51 (public information report for Richard Richardson).

155.  In response to NIC's request for all communications between NTG and Richardson, NTG stated that no documents existed.  Exh. 91 at 740-42.  The request also sought documents "related to or concerning Richard Richardson" and NTG produced a privilege log in response.  Exh. 16 at 84.  There is no entry in that log, including internal correspondence, predating March 13, 2013.  *Id.*  There were 19 contacts by Baslow with Richardson between March 13, 2013 and March 17, 2013.  Exh. 67 at 581-84.

156.  On November 23, 2016, once NTG finally provided Richardson's real contact information, I provided that information to Nutrisystem's counsel and asked Nutrisystem to determine whether it ever received a call from Richardson's phone number in June or July of 2012 as so sworn in Richardson's declaration.  Exh. 65 at 550-52.  Nutrisystem searched their records and found no such call.  *Id.*

157.  In this case, to explain why Baslow had called Nutrisystem in early August, NTG did not argue that Baslow was investigating on behalf of Richardson.  *Id.*  Instead, NTG argued that Torres was a tester and Baslow's calls were predicates to Torres's testing activity.  *Id.*  NTG specifically argued as follows:

> As to Andrew Baslow, NIC refers to "five separate phone calls" made by Baslow for the purpose of furthering a scheme to defraud Nutrisystem….  As alleged in the complaint, the purpose of the calls was to determine if Nutrisystem disclosed that it records incoming calls as

Declaration of Joshua S. Furman

32

required by California law.  As discussed in more detail in the [NTG's] reply brief in support of the anti-SLAPP motion to strike, Newport Trial Group used testers to identify and stop corporations that unlawfully recorded consumers without their knowledge or consent.  The use of testers is a legitimate, widely-accepted tool for consumer and civil rights advocates to identify and stop unlawful activity…  It is more plausible therefore that Baslow's alleged five phone calls to Nutrisystem were made as part of Newport Trial Group's pre-suit investigation prior to pursuing wiretapping claims.

*NIC v. NTG*, Dkt. 65 (NTG Reply Re: Motion to Dismiss) at 8-9.

## B. <u>Nilon v. Natural-Immunogenics Corp.</u>

158.    NTG issued a demand letter to NIC on December 27, 2011, on behalf of an unnamed client.  *See* Exh. 56.  Andrew Nilon later filed suit against NIC in California State Court on March 5, 2012 alleging that NIC falsely advertised its colloidal silver dietary supplement product, "Sovereign Silver," in violation of the California CLRA, UCL and FAL.  *Nilon v. NIC*, No. 3:12-cv-930 (S.D. Cal. 2012) ("*Nilon v. NIC*"), Dkt. 1-1 at ¶¶ 3, 5, 15, 22, 37, 46.

159.    Nilon's false advertising case against NIC depended on allegations that Nilon had "relied on Defendant's representations regarding the efficacy of the Product … and but for those representations, [Nilon] would not have purchased or paid as much for the product."  *Id.* at ¶ 5; *see also id.* at ¶ 27 ("[Nilon] has suffered injury in fact and has lost money as a result of [NIC's] actions" because "[Nilon] purchased the Products in reliance on Defendant's marketing claims with respect to efficacy.").

160.    Nilon attached a "declaration of venue" to his state court complaint that referenced "[t]he Complaint in this action" and swore that he had "personal knowledge of the facts herein and, if called as a witness, I could and would testify competently thereto."  *Id*. at p. 15.  That affidavit contained no caption, made no reference to the

Declaration of Joshua S. Furman
33

NIC Mot. to Quash
Exh. 6

specific lawsuit, had no specifics related to the NIC product, and was otherwise generic. *Id.*

161.    In discovery responses in the present NIC case, Nilon admits to correspondence with NIC's investigator, Clark Baker, by phone and email in August of 2015. *See* Exh. 30 at 263.  He affirmed that the emails in NICs possession were transmitted by him to Mr. Baker.  *Id.*; *see NIC v. NTG*, Dkt. 41 at ¶¶ 21-23.

162.    On August 21, 2015, Nilon described his October 2011 correspondence and meeting with Andrew Baslow, an NTG investigator, in an email to NIC's investigator:

> Baslow suggested that we meet…  Baslow said that [NTG] needs "a lot of people" and that he would sign me up.  Baslow said that all I had to do was buy some products, sign some papers and NTG would pay me for my time.  The NTG operation was casual and laid back.  Baslow told me that "these cases are already going through—you can come on to support them and we'll pay you some money.  Baslow later said that I didn't even need to try the product—that I would be paid if I signed papers that NTG sent to me.
>
> …
>
> My friends Phleg (sic), Demulder, Dronkers, and Brudzewski told me that they were similarly recruited by NTG to file false lawsuits against similar companies.

*See* Exh. 8 at 36 (Nilon emails referenced in Baker Decl.).

163.    The privilege logs provided by NTG confirms that the vast majority of contacts between NTG and their plaintiffs were through Baslow.  *See* Exh. 13 (Nilon log); Exh. 14 (NTG Third Supplemental Priv. Log).

164.    In discovery responses, Nilon claims to have "purchased [the] Sovereign Silver Supplement from a Whole Foods Store in La Jolla, California in **early 2012**." Exh. 30 at 267-68 (emphasis added).  The timing of that comes after the "late 2011" meeting between Nilon and Baslow where the two discussed NTG's representation.  *Id.*

Declaration of Joshua S. Furman

34

NIC Mot. to Quash
Exh. 6

at 266 (stating that Nilon "met Andrew Baslow in person at the end of 2011" and he "recalls discussing potentially retaining Newport Trial Group for legal services").

165.   Nilon alleges in verified discovery responses that he "does not recall the price, the amount paid, the method of payment, the size of the product or the product's SKU." *Id.* at 267-68.   Nilon has no documentary evidence that he ever purchased NIC's product. *See* Exh. 29 at 248 (Nilon is "not aware of any relevant, non-privileged, non-confidential documents" to prove he purchased the NIC product).   Nilon has produced no evidence that he ever investigated the claims of NIC's product or contacted the retailer (Whole Foods) or NIC directly to obtain a refund.

166.   Nilon first met with NTG's investigator "at the end of 2011." Exh. 30 at 266 (Nilon ROG responses).   Baslow's phone records indicate that Baslow initiated contact with Nilon on October 10, 2011 through SMS[2] text messaging. *See* Exh. 67 at 586.

167.   Andrew Nilon's mobile phone number is 925-785-0902. *See* Exhs. 68, 30 at 262.

168.   Andrew Baslow's mobile phone number is 818-519-0164. *See* Exhs. 67, 94 at 761-63.

169.   The phone records show that Baslow and Nilon exchanged 26 text messages from October 10-14, 2011. *See* Exh. 67 at 586-589.   In Nilon's discovery responses he admits to having met with Andrew Baslow "in person at the end of **2011**." Exh. 30 at 266 (emphasis added).   Nilon stated that the purpose of his meeting with Baslow in 2011 was to discuss "potentially retaining Newport Trial Group for legal service." *Id.*

170.   Despite discovery demands, NTG withheld the fact of its agent's October 2011 meeting with Nilon. *See* Exh. 32 at 296.

---

[2] "Short Message Service."

Declaration of Joshua S. Furman

35

171.    Following their 2011 meeting, no record evidence has been produced that Nilon and Baslow had further contact until late February 2012.  *See* Exh. 67 at 590 (Baslow Phone Records); Exh. 13 at 66 (Nilon Priv. Log); Exh. 14 (NTG Priv. Log); Exh. 30 at 266-68 (Nilon responses to interrogatories specifying no in-person meetings). NTG sent its demand letter to NIC on December 27, 2011.  *See* Exh. 56.  Prior to December 27, 2011, the record indicates that Nilon exchanged no documents with NTG or Baslow.  *See infra* ¶ 254.  According to Nilon's statements, he had not yet purchased Natural Immunogenics' Sovereign Silver Product when NTG served the demand letter. *See* Exh. 30 at 267-68.

172.    In discovery responses in this case, and for the first time, attorney Scott Ferrell stated under penalty of perjury that NTG sent its December 27, 2011 letter on behalf of a different alleged class member:  Trycia Carlberg.  Exh. 39 at 389 (Ferrell Resp. To RFP Set One (Sep. 2, 2016)).  Carlberg died in May of 2012.  *Id.*  Information available online indicates that she was close friends with Ferrell's wife, Erin Ferrell. Exh. 49 (DWBH websites).

173.    NIC requested documents related to Trycia Carlberg's purported "claim" underlying the December 27, 2011 letter that NTG served on NIC.  Exh. 48 at 446 (meet and confer letter); Exh. 33 at 315.  NTG produced no responsive documents: none evidencing that NTG had communicated with Carlberg; none evidencing that NTG had been retained by Carlberg; none evidencing that Carlberg ever purchased NIC's product; and none evidencing that Carlberg was ever an NTG client.  Exh. 33 at 315-19 (NTG response to second set of RFPs)

174.    NTG stated that, "Scott Ferrell has seen the bottle and label for NIC's Sovereign Silver product that Carlberg had in her possession, but Defendant does not know what happened to it."  *Id.*  Moreover, "after having made a diligent search and reasonable inquiry, it does not believe … documents that evidence Carlberg's claims against NIC are in its possession, custody or control and that it does not know where

Declaration of Joshua S. Furman

36

they might be located." *Id.* NTG logged no communications with Carlberg, meaning that NTG apparently possesses no documentation of any kind to support the assertion that the December 2011 demand letter was presented on behalf of Carlberg. *Id.* ("[NTG] has been unable to find … any other documents reflecting communications between NTG and Trycia Carlberg about Sovereign Silver, NIC, or the claims in *Nilon v. NIC*.").

175.    On February 24, 2012, phone records indicate that Baslow phoned Nilon. Exh. 67 at 590 (Baslow AT&T Phone Records).

176.    Phone records indicate that Baslow again contacted Nilon by phone on March 2, 2012. Exh. 67 at 591 (Baslow AT&T Phone Records). That same day, Baslow sent Nilon a packet of case initiation documents, including a "Letter from Scott Ferrell to Andrew Nilon re representation." Exh. 13 at NILON00001 (Nilon Priv. Log). On March 3, 2012, phone records indicate that Nilon texted Baslow. Exh. 67 at 592 (Baslow AT&T Phone Records). Following that text, NTG filed its lawsuit against NIC on March 5, 2012. *Nilon v. NIC*, Dkt. 1-1 (Complaint).

177.    The record evidence shows that Andrew Nilon did not communicate with an attorney until a year after his complaint was filed. *See* Exh. 67 (Baslow AT&T Phone Records); Exh. 68 (Nilon Phone Records reflecting no correspondence); Exh. 13 at 66 (Nilon Priv. Log); Exh. 14 (NTG Priv. Log); Exh. 32 at 296 (NTG ROG responses identifying no meetings); Exh. 30 at 264-66 (Nilon ROG responses revealing no meetings).

178.    The record contains no indication that Nilon ever sent Baslow or NTG any documentation—including proof of purchase—related to the NIC case *prior* to the March 5 filing date.[3] In fact, the record reveals no exchange (or opportunity to

---

[3] That record includes NTG's and Nilon's discovery response and logged communications. *See* Exh. 67 (Baslow AT&T Phone Records); Exh. 68 (Nilon Phone Records reflecting no correspondence); Exh. 13 (Nilon Priv. Log); Exh. 14 (NTG Priv.

Declaration of Joshua S. Furman

37

exchange) Nilon's signed declaration of venue prior to the lawsuit, unless Nilon signed that generic document preemptively when he met Baslow in October 2011 (and before he had purportedly purchased Sovereign Silver). *See* Exh. 67 at 586 (Baslow AT&T Phone Records); Exh. 68 (Nilon Phone Records reflecting no correspondence); Exh. 13 at 66 (Nilon Priv. Log); Exh. 14 (NTG Priv. Log); Exh. 32 at 296 (NTG ROG responses identifying no meetings); Exh. 30 at 264-66 (Nilon ROG responses revealing no meetings). The declaration of venue had no date or caption, and it included no specifics concerning the NIC case. *Nilon v. NIC*, Dkt. 1-1 at p. 15.

179. Upon information and belief, Nilon travelled to Newport Beach, Californa on March 6, 2012 to meet with Andrew Baslow. Geolocational data from Nilon's phone record show that Nilon travelled from San Diego, through Mission Viejo, to Newport Beach, California on that day.. *See* Exh. 68 at 658 (Nilon's phone records provided by Verizon). The records show that Nilon and Baslow connected by phone while Nilon drove to Newport Beach. *Id.* Nilon's phone connected to a tower in Newport Beach before the records show that he returned to San Diego. *Id.* Phone records track his trip through geolocation pings which appear to correspond with the I-5 highway. *Id.*

180. Phone records produced by Verizon contain a column titled "Origination," which corresponds with the geolocational data pertaining to the subscriber's phone number. *See generally* Exh. 68. On December 12, 2016, NIC counsel confirmed with Verizon Wireless that the "origination" column contains data only for the phone number subpoenaed. Thus, an "origination" location of "San Diego CA" indicates that the subpoenaed phone connected to a cellular tower located in San Diego, California during the phone call. The "origination" column always pertains to the subpoenaed phone, including the "incoming" call listings. Thus, a listing for the "destination" column

Log); Exh. 32 at 296 (NTG ROG responses identifying no meetings); Exh. 30 at 264-66 (Nilon ROG responses revealing no meetings).

NIC Mot. to Quash
Exh. 6

showing an "Incoming CL" will still show the location of the subpoenaed phone (not the dialing phone) for the "incoming" call.

181.   NIC has received no documentary evidence of any other in-person meeting between NTG and Nilon.  In a discovery response, NTG provided the following sworn statement that Nilon met with Baslow prior to filing the NIC complaint:

> Andrew Baslow met with Mr. Nilon in person at a Starbucks in Newport Beach on or about March 2, 2012.  Responding party cannot recall any additional "in-person" meetings with Mr. Nilon…

Exh. 32 at 296.  Nilon did not identify a March 2 meeting with Baslow in his responses. *See* Exh. 30 at 264-66.

182.   There is no available evidence that the March 2, 2012 meeting ever occurred.  Contemporaneous phone record evidence shows that, in fact, the March 2 meeting at a Newport Beach Starbucks could not have occurred.  Nilon's phone records (including geolocation data) show Nilon's phone to have been in use in San Diego the entire day of March 2, 2012.  *See* Exh. 68 at 659-60 (Nilon phone records provided by Verizon); Exh.67 at 591-92 (Baslow phone records provided by AT&T).  Nilon's phone repeatedly connects with cellular towers in San Diego and La Jolla for the entire day, and leaves no gap for the approximately four-hour round trip to Newport Beach.  *Id.*

183.   In *Nilon v. NIC*, NIC's counsel scheduled a May 14, 2014 deposition for Nilon.  On May 6, 2014, Baslow phoned Nilon.  *See* Exh. 67 at 593.  Baslow followed with an email to Nilon on May 7, 2014—the contents of all such communications are at this point unknown.  *See* Exh. 13 at 67-68 (Nilon privilege log).  Baslow and Nilon exchanged three emails on May 7, 2014 concerning the "status" of the *Nilon v. NIC* matter.  *Id.* (Bates No.: NILON00051).  That is the last documented Nilon communication with Baslow.  Exh. 13 at 67-68 (Nilon Priv. Log); Exh. 14 (NTG Priv. Log).  The record evidence reflects no further email, phone, or text contact after May 7, 2014.  *Id.*; *see also* Exh. 67 at 593 (Baslow Phone Records from AT&T); Exh. 68 (Nilon

NIC Mot. to Quash
Exh. 6

phone records from Verizon). NTG omitted those May 7 communications from its September 9, 2016 privilege log. *See generally* Exh. 14 (NTG Priv Log).

184. On June 30, 2014, after Nilon had missed his fourth deposition date, NIC moved to compel the deposition of Andrew Nilon. *Nilon v. NIC*, Dkt. 49. Nine days later, on July 9, 2014, NTG moved to substitute a new class representative for Andrew Nilon. *Nilon v. NIC*, Dkt. 51.

185. In ruling on the motion to compel, Judge Skomal (of the U.S. District Court for the Southern District of California) found that Nilon had engaged in a "pattern of avoiding his duly-noticed depositions" by ultimately missing four deposition dates (May 3, 2013; May 22, 2013; February 7, 2014; and May 16, 2014) and that Ryan Ferrell and the Newport Trial Group had "frustrated attempts to take Mr. Nilon's deposition by refusing to meet-and-confer with [NIC] counsel." *See Nilon v. NIC*, Dkt. 55 at 5-7. The Court granted NIC's motion to compel the deposition of Andrew Nilon for a date no later than August 15, 2014. *Id.* But on August 15, 2014, NTG filed a motion to withdraw as Nilon's counsel. *Nilon v. NIC*, Dkt. 61 and 61-2 (Ferrell declaration in support).

186. Ryan Ferrell filed the following statement with the Court in support of the motion to withdraw as Nilon's counsel:

> Starting in April of 2014, communication with [Nilon] became difficult and impossible. Declaration of Ryan M. Ferrell ("Ferrell Decl.") ¶ 2. Despite repeated attempts to contact [Nilon], [Nilon] became unresponsive to his counsel. Ferrell Decl. ¶¶ 2, 5, 6, 7. Finally, towards the end of June, counsel for [Nilon] received a phone call from [Nilon] explaining that he had moved, was working more hours at a new job, was caring for his ailing grandmother, and no longer desired to be part of the matter. Ferrell Decl. ¶ 3. Exhibit A to Ferrell Decl. [Nilon] then executed a declaration to that extent and counsel for [Plaintiff] filed a motion to substitute the class representative. Ferrell Decl. ¶ 3; *See* Dckt. 51. That motion is currently under submission.

NIC Mot. to Quash
Exh. 6

*See Nilon v. NIC*, Dkt. 61-1 at 2 (citing Ferrell Declaration *Nilon v. NIC*, Dkt. 61-2).

187.   Ryan Ferrell supported those statements with a declaration under oath.  *See Nilon v. NIC*, Dkt. 61-2.  The contemporaneous documentary evidence contradicts Ryan Ferrell's sworn statement to the Court.  In addition to the three emails exchanged with Nilon by NTG investigator Baslow on May 7, 2014, Nilon and Ryan Ferrell exchanged nine (9) emails throughout the month of June 2014—during the same period when Ryan Ferrell stated to the Court that "communication with [Nilon] became difficult and impossible" and Nilon "became unresponsive to counsel."  *Compare Nilon v. NIC*, Dkt.61-1at 2 *with* Exh. 14 (NTG Priv. Log).  Beginning June 3, 2014, Ferrell and Nilon connected by email.  *See* Exh. 13 at 68 (Andrew Nilon Priv. Log); Exh. 14 (NTG Priv. Log).  Nilon and Ferrell corresponded on June 3, June 4, June 10, June 17, June 18 (twice), June 20, and June 23 (twice).  *See* Exh. 13 at 68 (Nilon Priv. Log).  Nilon often responded to Ferrell within one business day.  *Id.*  That exchange eventually led to Nilon's declaration, which Ferrell sent to Nilon on June 23, 2014.  *See id.*; *see also* Exh. 14 (NTG Priv. Log).

188.   Nilon's written statement to NIC's investigator Baker conflicts with the Ryan Ferrell declaration to the Court.  Nilon wrote:

> I got a weird feeling about the arrangement and told Baslow that I didn't want to have anything more to do with the lawsuit or NTG. Baslow pressured me to stay but, when I persisted, Baslow agreed and NTG drafted and sent me a declaration for my signature in which I declared that my grandmother was ill and that I had to take care of her - which prevented me from participating in the lawsuit. This declaration was false; my grandmother was not sick and she didn't need my company or time. The declaration was written solely to give me a plausible reason to leave the lawsuit without disclosing to the Court that I had been paid to sign onto a class-action lawsuit.

Exh. 8 at 36 (email to Clark Baker on Aug. 24, 2015).

NIC Mot. to Quash
Exh. 6

189.   Ryan Ferrell also swore under penalty of perjury that he sent "3 letters" to Andrew Nilon in August 2014, but neither NTG nor Nilon has produced a single one of those letters and neither has identified those letters in privilege logs. *See Nilon v. NIC*, Dkt. 61-2 *but see* Exh. 14 (NTG Priv. Log).  NIC's Requests for Production specifically requested those three letters. *See* Exh. 34 at 329-30 (NTG RFP responses identifying requests).  NTG responded that it "could not comply with this request because the documents are no longer in Defendant's possession, custody or control." *Id*. at 330 (NTG Aug. 15, 2016 responses to NIC RFPs).

190.   NTG's July 9, 2014 motion to substitute Giovanni Sandoval as the class representative in place of Nilon attached declarations and a proposed Second Amended Complaint.  The complaint was filed as Dkt. 63 and adopted the same CLRA, UCL, and FAL violations as before, but added a recitation of facts relevant to Sandoval's individual experience with NIC's product. *See Nilon v. NIC*, Dkt. 63.

191.   NTG's material allegations included that "Plaintiff [Sandoval] is a resident of San Diego County, California" who "purchased [NIC's product] in this County in or around November of 2013 at Sprout's Market." *Id*. at ¶ 5.  "Plaintiff relied on Defendant's representations regarding the efficacy of the Product, … and but for those representations, Plaintiff would not have purchased or paid as much for the Product." *Id*.  Sandoval also alleged that he "discontinued the use of Sovereign Silver after discovering the potential [serious adverse health] outcomes." *Id.* at ¶ 20.

192.   Class certification was granted for "[a]ll persons located within California who purchased Sovereign Silver Products ...." *See Nilon v. NIC*, Dkt. 117 at 1-2.

193.   NIC deposed Sandoval in April of 2015. *See* Dkt. 30-5.  Before the deposition and despite mandatory disclosures and specific NIC counsel requests, Ryan Ferrell refused to identify Sandoval by name, address, or phone number—effectively precluding NIC from determining who Sandoval actually was. *See Nilon v. NIC*, Dkt.

NIC Mot. to Quash
Exh. 6

122-2 at 2-3 (noting Ferrell's rejection of four separate requests for Sandoval's information).

194.    Based on public records obtained by NIC, the Court later held that Sandoval lived in Arizona, not California as stated in the Complaint and in Sandoval's sworn statements, including during the time when he allegedly purchased NIC's product in California. *See Nilon v. NIC*, Dkt. 117 at 3 (holding that Sandoval had lived in Arizona since at least 2008 and that it was unclear when, if ever, Sandoval became a California resident). Judge Burns explained that "[b]ut for the [Second Amended Complaint's] *false statement about Sandoval's residency*, the Court would not have granted the motion for substitution" and the case would have ended. *Id.* at 4-5 (emphasis added).

195.    Sandoval testified that he rented a vehicle to travel from Yuma, Arizona to the deposition site nearly five hours away in Irvine, California. *See* Dkt. 30-5 at p. 8 (Depo Tr. at 22-23). Sandoval testified that Ryan Ferrell paid for Sandoval's hotel in Irvine, California where the two met on April 19, 2015 to prepare Sandoval for his deposition on April 20, 2015. *See id.* In the presence of his NTG counsel, Ryan Ferrell, Sandoval repeatedly stated under oath that he resided in California when he substituted into the case:

> **Q.  Did you live in El Cajon [California] in June of 2014?**
>
> A.  Yes.
>
> …
>
> **Q. Were you arrested?**
>
> A. Yes.
>
> **Q. And convicted?**
>
> A. Yeah.
>
> **Q. And what was your sentence?**

Declaration of Joshua S. Furman

43

A. I did a little, I think that I did like three months in jail for that one because it was my second fight, my second charge that I ever got into trouble for.

**Q. Let's backup to the first one; was that in California?**

A. Yeah.

**Q. Was the second one in California?**

A. Yeah. They're all in California.

…

**Q. Do you have a driver's license with a California address?**

A. I do have one.

**Q. Did you bring it with you?**

A. No.

Dkt. 30-5 at 17-18 (Sandoval Deposition, Apr. 20, 2015).

196.    Sandoval testified that he moved to Arizona within the year predating his deposition.  Yet, he had lived in Arizona for many years.  *See Nilon v. NIC*, Dkt.117 at 3.  His arrest record reflected Arizona arrests with Arizona addresses attached.  *Id.* Sandoval had many criminal convictions on his record, including multiple sentences in jail in Arizona, not California.  Exh. 93 at 750-54.  Almost all of his criminal history was in Arizona (Yuma County).  *Id.*  He testified to having a valid California driver's license; he had no California driver's license.  *Id.* at 757.  When pressed to show his identification at the deposition, Sandoval claimed to have left all of his belongings (including his wallet) in his hotel room.  Dkt. 30-5 at p. 17.

197.    In January 2014, Ferrell claims to have met with Sandoval.  *See* Exh. 32 at 296 (NTG ROG Responses); Exh. 38 at 372 (Ryan Ferrell ROG responses describing meeting to discuss "possibilities of serving as a class representative").  Both Sandoval and Ferrell admit to that January meeting.  *See* Exh. 32 at 296; Exh. 38 at 372; Exh. 1 at 3; Dkt. 30-5 at pp. 8-9 (Sandoval Depo Tr.).  According to testimony under oath and

Declaration of Joshua S. Furman

44

NIC Mot. to Quash
Exh. 6

verified discovery responses, Sandoval maintains that he purchased NIC's Sovereign Silver product in November 2013.

**Q. And then at some point you went to Sprouts --**

A. Yeah.

**Q. -- and purchased the Defendant's product; is that correct?**

A. Yes.

**Q. When was that?**

A. Um, like maybe like November, November of 2013.

Dkt. 30-5 at p. 12 (Depo Tr. at 38:24 – 39:5); Exh. 1 at 4 (Sandoval ROG responses) (identifying bottle and stating that Sandoval "purchased this product in or around November of 2013 at Sprouts in El Cajon, at Second Street and East Main Street); Exh. 5 at 23 (identifying Sprouts Store Number 202); Dkt. 68 at ¶ 2 (Sandoval Decl.) (stating under oath that "I purchased Sovereign Silver from a Sprouts Store in 2013").

198.   Sandoval swore under penalty of perjury at least three times that he purchased the Sovereign Silver product in November 2013, *before* retaining NTG in January of 2014.  *See* Dkt. 30-5 at 12 (Sandoval Depo Tr. at 38-39); Exh. 1 at 4 (Sandoval ROG responses); *Nilon v. NIC*, Dkt. 51-3 at ¶ 2 (Sandoval Decl. attesting to "2013" purchase date).  Sandoval further testified that he still had the bottle from that purchase, that he paid cash for it, and that he did not have a receipt.  Dkt. 30-5 at 13 (Depo Tr. at 42:5-16).  He testified that he only purchased the product one time.  *Id.* at 18 (Depo Tr. at 65:22-24).

199.   In discovery, Sandoval swore under penalty of perjury that he purchased with cash a 2 fl. oz. bottle of Sovereign Silver inscribed with the Lot No. CC091S and expiration date of February 2017 in El Cajon, California in November of 2013.  *See* Exh. 1 at 3-4.  Sandoval produced pictures of the bottle he claims to have purchased in November 2013, identified as Bates No. SANDOVAL00001-00004.  *See* Exh. 2 (Bottle reflecting description from ROG responses); Exh. 1 at 3-4 (referencing bottle and

Declaration of Joshua S. Furman

45

deposition transcript).  A copy of the bottle image produced in discovery reflects the lot number and expiration date on the product packaging:

*See* Exh. 2 at 12, SANDOVAL00004.

200.  Ryan Ferrell likewise endorsed the alleged Sandoval purchased of the NIC product in 2013 by stating that he met with Sandoval in January of 2014 where Sandoval

Declaration of Joshua S. Furman

46

related the details of his experience with and purchase of NIC's product.  Exh. 38 at 372 (Ryan Ferrell ROG responses).

201.   NIC subpoenaed the Sprouts Store No. 202 in El Cajon, California.  The bottle Sandoval purchased could not have been obtained before May 12, 2014, which was the first date that a cash purchase of the NIC product at Sprouts Store No. 202 occurred after shipment of the specified Lot number.  Exh. 92 at 748(excerpted list of potential cash purchases in April-May 2014 drawn from master Excel spreadsheet produced by Sprouts concerning Store 202 sales).

202.   In August 2016, Sprouts Farmers Market responded to NIC's subpoena by producing documents identifying all instances of cash purchases of NIC's 2 oz. Sovereign Silver product at Sprouts Store No. 202.  The April cash purchases occur on the 2nd and the 9th of the month.  *Id.* (excerpted entries from Sprouts' subpoena response listing cash sales).  Neither transaction fits the bottle or circumstances identified by Sandoval because it had not yet shipped from Florida to California according to NIC witnesses and documentation.  *See* Quinto Decl at ¶¶ 3-13.  Therefore, the earliest possible purchase dates that Sandoval could have acquired the product he identified in discovery appear to be either May 12 or 19, 2014.  *See* Exh. 92 at 748.

203.   Ryan Ferrell stated under oath that Sandoval retained NTG in January 2014. *See* R. Ferrell Decl., *Nilon v. NIC*, Dkt. 51-4 at ¶ 6 ("In January of 2014, I met with Giovanni Sandoval in El Cajon, California at a restaurant to discuss the case and retainer agreement.").

204.   Sandoval testified that before his purchase of NIC's product he rarely shopped at Sprouts, never purchased that kind of product before, and never purchased a dietary supplement before.  Dkt. 30-5 pp. 11-13 (Depo Tr. at 33-46).

205.   Sandoval did not know if he was the defendant or plaintiff:

**Q:   Can you tell me who the Defendant is in the case?**

A:   I don't know.  Would that be me or would that be the Solvant Silver?

Declaration of Joshua S. Furman

47

*Id.* at 10 (Depo Tr. 31-32).

206.    He knew nothing about Natural Immunogenics:

**Q:    Can you describe the different types of products that Natural-Immunogenics sells?**

A:    No.

*Id.* at 10 (Depo Tr. at 33).

207.    Sandoval did not know the correct name of NIC's product at the time of his deposition, or whether he was the plaintiff or the defendant in the action. *Id.* at 10 (Depo Tr. at 33:3) (referring to the product as "Sulvant Silver").  He did not know that the product was labeled as a "dietary supplement":

**Q:    And was the product labeled as a dietary supplement?**

A:    I'm not sure.

*Id.* at 10 (Depo Tr. at 32:5-13); *see also id.* at 11 (Depo Tr. at 34:17) (testifying that Sandoval was unfamiliar with the phrase "dietary supplement," which is what he claimed to have purchased).

208.    Additionally, he lacked knowledge of the purported safety concerns associated with the product which were pled in NTG's Sandoval complaint, directly contradicting his complaint. *Id.* at 23 (Depo Tr. at 83-84) compare to *Nilon v. NIC*, Dkt. 63 at ¶ 20.

209.    Sandoval could provide no explanation for why he chose NIC's product over other similar products making identical claims. *See* Dkt. 30-5 at 16 (Depo Tr. at 54-56).

210.    Sandoval knew of no other individual who had used NIC's product. *Id.* at 14.  He had never before purchased any other nutritional products or dietary supplements in the category of products that NIC sells. *Id.* at 11 (Depo Tr. at 34:18-22).  He performed no research or investigation into NIC's product before allegedly walking into

Declaration of Joshua S. Furman

48

a Sprouts store in El Cajon, California (over 190 miles from his actual residence in Yuma, Arizona) and selecting the NIC product from among similar products. *Id.* 14 at (Depo Tr. at 46). Sandoval spent a substantial amount of his weekly grocery budget on the NIC product, yet claimed price was unimportant to his purchasing decision. *Id.* at 21-22 (Depo Tr. at 77-78).

211. Sandoval testified that he retained NTG in January 2014:

**Q. When was it exactly; when was the first time that you spoke with Newport Trial Group or your counsel?**

A. Um, like probably the beginning of 2014.

**Q. In January of 2014?**

A. (Witness Nods).

**Q. And you initiated that communication?**

A. (Witness Nods).

MR. FERRELL: You have to answer out loud.

THE WITNESS: Well, I had called it and I left a message to somebody. And then he had gotten back in contact with me.

BY MR. ARHANGELSKY:

**Q. When was it when you were asked to serve as a Plaintiff in this case?**

A. Around that time.

**Q. Around January of 2014?**

A. I would say.

**Q. Did you sign a retainer agreement?**

A. What's a retainer agreement exactly again?

**Q. Did you sign an agreement with your counsel?**

Declaration of Joshua S. Furman
49

A. Yes, I did.

**Q. And when did you sign that?**

A. I don't know the exact date.

**Q. Would it have been sometime around January of 2014?**

A. Maybe.

*See* Dkt. 30-5 at 10 (Sandoval Depo Tr. at 30:7-31:7).

212.   At one point, Ryan Ferrell stated under oath that "[i]n **June of 2014**, Newport Trial Group was retained by Giovanni Sandoval." *See Nilon v. NIC*, Dkt. 123-2 (R. Ferrell Declaration).

213.   After Judge Burns dismissed the matter because of, *inter alia*, Sandoval's residency issues, NIC moved for sanctions against Ryan Ferrell.   *Nilon v. NIC*, No. 3:12-cv-00930-LAB-BGS, Dkt. 122 (S.D. Cal.).   Ryan Ferrell then swore under oath that "Sandoval signed a retainer with [NTG] in **January of 2014**" and that the retainer identified a California address. *See Nilon v. NIC*, Dkt. 123 at 8, 15, 19 (citing Ferrell Declaration) (emphasis added); *see also Nilon v. NIC*, Dkt. 123-2 at ¶ 5. (R. Ferrell Decl.).

214.   NTG eventually produced Sandoval's retainer agreement.  The agreement was actually signed not in January 2014 as he swore to the Court, but in May 2014. *See* Exh. 73 at 683.  NTG produced only the signature page of Sandoval's retainer.  That signature page includes a header with the date of "October 7, 2013" and the typed name of Giovanni Sandoval. *Id.*

215.   Sandoval further represented at deposition that he used the product and it provided no benefit to him, "it just didn't do nothing [sic] for me." *See* Dkt. 30-5 at 23 (Sandoval Depo Tr. at 84:17-18).

216.   Sandoval testified that *after* he used the NIC product, he found NTG on the internet discovering NTG's existing lawsuit against NIC. *See* Dkt. 30-5 at 9, 22 (Depo

Declaration of Joshua S. Furman

50

Tr. at 27-29, 78).  At deposition, Sandoval could not recall the website allegedly containing that information.  *See id.* at 9.  The "website" narrative mirrors that used by other NTG clients.  *See, e.g., Torres v. Nutrisystem*, Dkt. 20-3 at 77-78 (Torres Depo.); *Torres v. Nutrisystem*, Dkt. 27-3 at ¶¶ 4-5 (Richardson Decl.).  Sandoval did not contact NIC for a refund or about his alleged concerns with the product before filing a lawsuit. Dkt. 30-5 at 22.

217.    Ryan Ferrell supported that version of events in a sworn declaration, stating that Sandoval contacted NTG in late 2013 or early 2014 to inquire about the lawsuit. According to Ferrell, he discussed Sandoval's experience with the NIC product when he met with Sandoval in January 2014.  *See* Exh. 38 at 371-72 (R. Ferrell ROG response); *See Nilon v. NIC*, Dkt. 123-2 (R. Ferrell Declaration).

218.    Defendant Baslow's phone records reveal two phone calls made to a wireless phone number (619-952-9832) owned by Heidi Franco, Sandoval's mother, on October 17, 2013.  *See* Exh. 67 at 596.  NTG has stated that these calls were not made to Sandoval or his mother, Heidi; instead, NTG claims those calls were directed to Sandoval's sister, Cinthia.  *See* Dkt. 140 at ¶ 2.  While NTG has not revealed the specifics to date, NTG states that it pursued some sort of legal claim on behalf of Cinthia, and Baslow called to discuss that matter with her in October of 2013.  *Id.*

C. <u>**Schoonover v. Himalaya Drug Co.**</u>

219.    On July 19, 2012, NTG filed a class action complaint in federal court on behalf of Sam Schoonover against Himalaya Drug Co.  *See Schoonover v. Himalaya Drug Company*, No. 3:12-cv-01782-JLS-RBB (S.D. Cal. 2012) ("*Schoonover v. Himalaya*"), Dkt. 1-1 (Complaint).  His complaint alleged violations of the California wiretapping law predicated on Sam Schoonover's "summer of 2012" phone call to Himalaya Drug Co.  *Id.* at ¶ 1.  Schoonover alleged that when he called Himalaya Drug Co. he had an expectation that the call was not being recorded, that he did not give

Declaration of Joshua S. Furman

51

implied or express consent to the recording, and that Himalaya nonetheless recorded his call without his knowledge. *Id.* at ¶ 9.

220. Specifically, Schoonover alleged that:

In the summer of 2012, [Schoonover] called Defendant's customer service telephone number (800-869-4640) to gain information about one of Defendant's organic personal care products. Plaintiff spoke to a customer service representative who identified himself as "Ken" and they proceeded to have a sensitive, private and confidential discussion wherein [Schoonover] asked several questions about the organic product [Schoonover] was interested in, its ingredients, and quality.

*Schoonover v. Himalaya Drug Company*, Dkt. 5 at ¶ 9 (First Amended Complaint).

221. To establish standing and legal injury, Schoonover alleged that he was "not aware that [his] calls were being recorded" and that he "did not give either express or implied consent to the recording." *Id.* at ¶ 11.

222. Schoonover alleged that he first discovered the legal injury after completing his call: "After completing [his] call[], [Schoonover] learned that Defendant records *all* incoming telephone calls but does not disclose this to callers unless specifically asked." *Id.* at ¶ 12. Schoonover alleged that he "expected that [his] telephone calls would be private (i.e., neither recorded nor monitored) due to: (1) the sensitive and confidential nature of the conversation; and (2) Defendant's assurances that it respects the privacy of its customers." *Id.* at ¶ 13.

223. NTG and Schoonover also alleged that Schoonover's "subjective expectation of privacy was objectively reasonable based upon prevailing societal norms." *Id.* at ¶ 14; *see also id.* at ¶ 40 (alleging that Schoonover suffered "substantial injury" that was "not an injury [Schoonover himself] could have reasonably avoided").

224. NTG's and Schoonover's Complaint alleged under the UCL that Schoonover had "suffered injury in fact…" *Id.* at ¶ 42. In his original Interrogatory Responses from August 15, 2016, Schoonover explained that he "contacted the

Declaration of Joshua S. Furman

52

NIC Mot. to Quash
Exh. 6

Himalaya Drug Co., Inc.'s customer service telephone number but does not presently recall the number he called from." *See* Exh. 43 at 423.  Schoonover's mobile records have no entry showing that he contacted the Himalaya Drug Company at the number listed in the Complaint (800-869-4640).  *See generally* Exh. 70.

225.   NTG provided Himalaya's counsel with a purported number for Schoonover's call on August 27, 2012, and that number was:  (714) 396-6971.  *See* Exh. 77 at 719 (email from Defendant Reid to Himalaya counsel).  Himalaya did produce a record of "Sam" calling from that number on July 17, 2012.  *See* Exh. 76 at 713 (Himalaya's list of incoming calls from January 11, 2012 to July 23, 2012).

226.   NTG's Complaint against Himalaya also alleged that a separate plaintiff, Randall Harris, called Himalaya's "customer service telephone number (800-869-4640) to inquire about one of Defendant's products for the treatment of acne." *Schoonover v. Himalaya,* Dkt. 5 at ¶ 10.  Evidence provided by Himalaya in discovery shows that Mr. Harris did not call Himalaya.  *See generally* Exh. 77 at 716 (identifying Harris's phone number for Himalaya counsel); Exh. 76 (listing potential records for incoming Himalaya calls); Exh. 75 at 690 (email from Himalaya counsel stating that "Himalaya had no record of any such call").  Defendant David Reid represented to Himalaya's counsel that Randall Harris had called Himalaya from the number (818) 626-4829; however Himalaya never received a call from that number.  *See* Exh. 77 at 716 (Reid Email); Exh. 76 (call records from Himalaya); Exh. 75 at 690.

227.   According to Himalaya's records, on July 17, 2012 at 8:58 AM, an individual by the name of "Sam" did call Himalaya using the phone number (714) 396-6971.  *See* Exh. 76 at 713.  Discovery is still ongoing, however, on information and belief, the (714) 396-6971 number appears to be associated with a telephone used by "Austin Glenn," who is a close friend and business associate of Defendant Andrew Nilon.  *See* Exh. 74 at 685 (Glenn LinkedIn profile showing affiliation with Electric Family LLC); *see also* Exh. 70 (Schoonover phone records from AT&T showing

Declaration of Joshua S. Furman

53

frequent contact with the 6971 number); Exh. 103 (Schoonover deposition) at 962-63 (Schoonover and Glenn are best friends).  Austin Glenn participated in the Electric Family business venture with Defendants Pfleg, Demulder, Nilon, Dronkers, and Schoonover.  *See* Exh. 74; Exh. 103 at 963-64.  NTG's Andrew Balsow had substantial correspondence with Mr. Glenn's phone number beginning in March 2012, including several contact points on July 11, 2012 (within days before the staged Himalaya phone calls).  *See generally* Exh. 67 (Baslow phone records provided by AT&T).

228.   In conflict with Schoonover's Complaint (*Schoonover v. Himalaya*, Dkt. 5 at ¶ 9), during that July 17 call, the caller did not speak with a representative named "Ken;" the caller spoke with a female operator.  *See* Exh. 80 (Schoonover purported call to Himalaya on July 17, 2012) (produced in native format as .wav file).

229.   On July 16, 2012, NTG's Andrew Baslow made **forty (40)** calls to toll-free numbers.  *See* Exh. 67 (Baslow phone records from AT&T).  One of those forty calls was to Himalaya Drug Co. (1-800-869-4640) at 1:15 p.m. on July 16, 2012.  *Id.*

230.   During that July 16 call, Baslow specifically asked whether Himalaya Drug Company recorded its incoming calls, to which the Himalaya representative answered in the affirmative.  *See* Exh. 79 (audio recording of Baslow call to Himalaya on July 16, 2012).

231.   Just **two hours** after Baslow's 1:15pm call with Himalaya, Schoonover (925-209-4303) connected with Baslow at 3:14 pm and for the call lasted six and a half minutes.[4]  *See* Exh. 67 (Baslow phone records); Exh. 70 (Schoonover phone records).

232.   The following morning, at 8:58 a.m., an individual who identified himself as "Sam" called Himalaya Drug Co. from the telephone number (714) 396-6971, not Schoonover's number.  *See* Exh. 76 at 713 (Himalaya incoming calls).

---

[4] The records show that Schoonover and Baslow exchanged phone and text message exchanges dating back to March 2012.  *See* Exh. 70 at 670 (Item Nos. 2671, 2672 in AT&T phone logs).

Declaration of Joshua S. Furman

54

233.    A comparison of the two calls reveals that Baslow's phone call to Himalaya was substantively similar to "Sam's" call, both calls having occurred within 24 hours of one another.  Both Baslow and Sam asked the very same questions concerning the product sales, the main ingredients in the product, and how the product worked, before hanging up:

| Baslow Call, 1:15pm July 16, 2012 | Schoonover Call, 8:58am July 17, 2012 |
|---|---|
| **Baslow (B):** Hi what is the best product that you guys have out there just in general, or what is the best-selling product?  I've tried one of your products but I want to try more.<br><br>**Himalaya Rep (R):**  The Liver Care is our number one worldwide formula that is, ah, the number one.<br><br>**B:**  What's it called?<br><br>**R:**  Liver Care.<br><br>**B:**  Liver Care.  Ok what exactly does that do?<br><br>**R:**  It supports your liver.<br><br>**B:**  It supports your liver?<br><br>**R:**  It supports your liver, you know, with whatever medications you might be taking or, you know, supplements, the air we breathe, the food that we eat that might be damaging to your liver.  If you drink as well it protects the liver, you know.<br><br>**B:**  Ok, do you know the main ingredient in that product?<br><br>**R:**  No, let me see if I can tell you … It's got the capers, chicory, arjuna— | **Schoonover (S):**  Hi how's it going my name's Sam.  I've a couple of questions.  Ah, what is like your guy's best product would you say?<br><br>**Himalaya Rep (R):**  Our best product, our number one product, is the Liver Care.<br><br>**S:**  Litter care?<br><br>**R:**  The Liver care.<br><br>**S:**  Liver Care.<br><br>**R:**  Yeah.  It's the liver support formula.<br><br>**S:**  Oh, ok.  Is that like your guys', would you say that's your best seller?<br><br>**R:**  Yeah that's our number one selling product worldwide.<br><br>**S:**  Really?  Ok.  And what is like the main ingredient?  Can you tell me that or no?  Or how does it work?<br><br>**R:**  Umm.  It supports your liver, you know?  It supports your liver, if you're taking different medications, or supplements, or the stuff we eat, the stuff we breathe sometimes can be damaging to your liver.  It comes in to support your |

Declaration of Joshua S. Furman

55

| | |
|---|---|
| **B:** Ok. | liver. |
| **R:** These are just some of the listings that it has. | **S:** Or like alcohol or something? |
| **B:** Alright I'll continue to do some research and try and find the rest, but that's good to know; those are good ingredients. | **R:** Mmm hmm. |
| | **S:** Ok, cool. That's really actually all I wanted to know. Thank you. |
| **R:** Yeah. It's a very popular, you know. It's worldwide... | **R:** You're welcome. |
| B: One more question I have before I go to finish my research, are your calls recorded or monitored there at Himalaya? | **S:** Bye. |
| R: Ah, yes. | |
| B: Alright, thanks. | |

*Compare* Exh. 79 (Baslow call to Himalaya) *with* Exh. 80 (alleged Schoonover call to Himalaya). At deposition, Schoonover admitted the calls were remarkably similar and initially believed the Baslow call was his own. *See* Exh. 103 (Schoonover Depo.) at X.

234. Just **twelve minutes** after Schoonover purportedly called Himalaya from Glenn Austin's phone, Schoonover emailed Andrew Baslow "seeking legal advice RE Himalaya Drug Co." *See* Exh. 17 at 86 (Schoonover Priv. Log). Schoonover's privilege log indicates that he emailed NTG "seeking legal advice re Himalaya Drug Co." and that NTG provided "initial documents regarding [] prospective litigation" by email, all of which occurred within **fourteen hours** after Schoonover completed his alleged call to Himalaya. *See* Exh. 17. Four emails between Schoonover and Baslow are identified on Schoonover's privilege log on July 17 and 18, (SCHOONOVER00001-SCHOONOVER00013) reflecting substantial correspondence immediately after Schoonover's call to Himalaya. *Id.* Schoonover thus had contact with NTG's Baslow the day before and immediately after the "Sam" call to Himalaya. *Id.*; Exh. 70 at 671 (Schoonover phone records).

Declaration of Joshua S. Furman
56

235.   NTG's September 9, 2016 privilege log omitted all of those email communications with Schoonover.  *Compare* Exh. 17 at 86 (Schoonover Privilege Log) *with* Exh. 14 at 71 (NTG Privilege Log).

236.   On July 19, three days after Baslow's call, NTG filed a class action complaint against Himalaya on behalf of Schoonover.  *Schoonover v. Himalaya*, Dkt. 1.

237.   NTG has identified Schoonover as a "tester" plaintiff.  *See* Exh. 35 at 342. In multiple pleadings filed with the Court, NTG has described "testers" as "individuals who initiate a transaction for the purpose of bringing a lawsuit." *NIC v. NTG*, Dkt. 64 at 6 (NTG Reply to Mot. to Strike); *see also id.* at 13; *see NIC v. NTG*, Dkt. 65 at 9 NTG (Reply to Mot. to Dismiss) (revealing that "Newport Trial Group used testers to identify and stop corporations").  The case docket, NTG's productions, and Himalaya Drug Co.'s productions do not contain any evidence that NTG ever advanced a "tester" theory in the *Schoonover v. Himalaya* case or that NTG ever informed Himalaya that Schoonover was a "tester" plaintiff.

238.   ███████████████████████████████████████

███████████████████████████████████████

### D. **Demulder v. Carter-Reed Co.**

239.   On September 13, 2012, Taylor Demulder filed a lawsuit against the Carter-Reed Company alleging that he was recorded by Carter-Reed without permission in violation of the California wiretapping law.  *Demulder v. Carter-Reed Company, LLC*, No. 12-cv-2232 (S.D. Cal. 2012) ("*Demulder v. Carter-Reed*"), Dkt. 1.  Demulder alleged that he "contacted [Carter-Reed] via its customer service hotline in September of 2012 to gain information about its product, 'Relacore,' including ingredients, how it worked, and how much it cost." *Id.* at ¶ 1.  Demulder alleged that "[w]ithout his knowledge or consent, and without any disclosure whatsoever, Defendant intentionally recorded the confidential telephone call." *Id.*

240.   In his Complaint, Demulder further stated:

On or about the morning of September 6, 2012, [Demulder] called [Carter-Reed's] customer service telephone number (1-800-506-1577) to gain information about its product, "Relacore," including how it worked, potential results, and price.   [Demulder] was transferred to a customer service representative named Melissa. [Demulder] told Melissa his first name and gave her his social security number.  He also revealed that he desired to lose weight due to his dissatisfaction with his weight and social life.  [Demulder] even disclosed to Melissa that he recently lost his job and that he might not be able to afford Defendant's product.  [Demulder] then proceeded to ask several questions about the product.  After gaining the information [he] needed to make an informed decision about potentially ordering [Carter-Reed's] product, [Demulder] concluded his telephone conversation with Melissa and hung up.

*Id.* at ¶ 8.

241.   Demulder alleged that he "was not aware that the call was being recorded." *Id.* at ¶ 9.  Demulder alleged that he "did not give either express or implied consent to the recording."  *Id.*

242.   Demulder alleged that "[a]fter completing his call," he learned that Carter-Reed recorded the conversation, and that his call was "confidential" because "such communications are carried on under circumstances that reasonably indicate that the customer-party to the communication desires it to be confined to them and Defendant." *Id.* at ¶ 10.  Demulder alleged that he had "suffered injury in fact…" *Id.* at ¶ 38.

243.   Demulder's lawsuit was filed by attorney Michael Louis Kelly of the law firm Kirtland & Packard LLP.  *See generally id.*

244.   Privilege logs provided by defendants Demulder and NTG indicate a "referral" from NTG's Scott Ferrell and Andrew Baslow to Kirtland Packard following Demulder's September 6, 2012 call to Carter-Reed.  Exh. 14 at 72; Exh. 12 at 63.

Declaration of Joshua S. Furman
58

245.   From July 30, 2012 through August 2, 2012, NTG's Andrew Baslow made 100 telephone calls to toll-free numbers associated with businesses nationwide.  *See generally* Exh. 67.[5]

246.   On August, 1, 2012, Baslow made 37 such calls to various corporations.  *Id*. One of those calls was to Carter-Reed Co. (800-506-1577).  *Id*.; *see also Demulder v. Carter-Reed*, Dkt. 1 at ¶ 8 (alleging that Demulder called that number to reach Carter-Reed)

247.   After making the call to Carter-Reed Co., Andrew Baslow initiated contact with Taylor Demulder (858-335-8857) on August 17, 2012; they ultimately traded thirty-one (31) text messages and had a twelve (12) minute phone call.  Exh. 67 at 623-33.  Following their August 17 communication, Baslow and Demulder again exchanged texts and phone calls on August 22 and September 4.  *Id*.

248.   On August 25, 2012, Taylor Demulder emailed Andrew Baslow.  Exh. 14 at 71 (NTG000232-33).  That email contained a subject "Re: New case – Relacore" and the "Subject/Description" provided by NTG is "Communication re: Demulder v. Carter-Reed."  *Id*.

249.   Andrew Baslow responded by email that same day.  *Id*.

250.   Baslow sent Demulder another two emails apparently under the same email chain on August 26, 2012 and September 5, 2012 (the day before Demulder's call to Carter-Reed).  *Id*.

251.   On September 6, 2012 at 8:12 a.m. PST, after many communications with Andrew Baslow, who had already called Carter-Reed, Taylor Demulder made his call to

---

[5] NIC counsel has performed a complete review of Andrew Baslow's AT&T phone records, which in combination exceed 5,000 pages.  NIC has attached excerpts of those records for certain relevant dates, but has omitted substantial numbers of pages to avoid burdening the Court.  All parties have copies of the complete, unredacted phone records produced in discovery.  Facts pleaded here concerning those phone records are based on NIC counsel's review of the records in their entirety.

Declaration of Joshua S. Furman

59

Carter-Reed.  *Demulder v. Carter-Reed*, No. 3:12-cv-2232-BTM-MDD (S.D. Cal.) ("*Demulder v. Carter-Reed*"), Dkt. 6 at 9.

252.   Approximately **three hours later**, at 11:38 a.m. PST, Demulder sent four text messages to Andrew Baslow in rapid succession.  Exh. 67 at 629.  The two then exchanged six more messages that day.  *Id*.

253.   Demulder also sent Baslow two emails on September 6, 2012, the same day as Demulder's call to Carter-Reed, however, NTG's privilege log does not identify the time of the emails, and so, it is not clear whether those emails were sent before or after Demulder's call.  *See* Exh. 14 at 72.

254.   Andrew Baslow then called Taylor Demulder on September 10 and the two exchanged text messages and phone calls on September 11 and 13.  Exh. 67 at 630.  On September 10, Baslow emailed Demulder a letter from "Michael Louis Kelly to Taylor Demulder re representation."  Exh. 12.  Demulder returned the executed "acknowledgment of letter from Michael Louis Kelly to Taylor Demulder re representation" to Baslow two days later on September 12, 2012.  *Id*.

255.   Demulder's lawsuit was filed on September 13, 2012.  *Demulder v. Carter-Reed*, Dkt. 1.  Demulder's privilege logs do not reflect any communications with his Kirtland Packard attorneys (or any attorney for that matter) before his complaint was filed on September 13.  Exh. 12.  Communications between Demulder and anyone at Kirtland & Packard related to his lawsuit against Carter-Reed would have been responsive to NIC's Requests for Production No. 2.  *See* Exh. 26 at 214.

256.   The discovery responses provided by Defendants only show communications between Demulder and Andrew Baslow before his complaint was filed.  *See generally* Exhs. 12, 14; *see also* Exh. 32 at 297 (documenting no in-person meetings between NTG and Demulder before his complaint was filed); Exh. 25 at 204-05(same).

257.   On his September 6, 2012 call to Carter-Reed, Demulder provided the Carter-Reed representative with a fake name, "Taylor Vaughn."  Exh. 22 at 128; *see also*

Declaration of Joshua S. Furman

60

82. He stated that he had previously purchased "some pills" from Carter-Reed and asked the customer service representative to "look it up" under the false name. *Id.* Carter-Reed's representative stated that there was no record of any such purchase. *Id.*

258. Demulder attempted to provide his social security number to the company representative during the call. *Id.* That information was not requested by the representative. *Id.*

259. Demulder stated during the call that he had lost his job (a claim that was reiterated in his Complaint). *Id.*; *Demulder v. Carter-Reed*, Dkt. 1 at ¶ 8. In fact, Demulder called Carter-Reed's toll-free number from Demulder's office phone at his employer's Las Vegas office. *Demulder v. Carter-Reed*, Dkt. 6 at 10-11.

260. Demulder stated that he was forty pounds overweight. Exh. 22 at 129 (transcript of Demulder phone call); *see also* Exh. 82 (Demulder audio recording). In fact, Demulder, who is six foot, two inches tall, later testified that he had maintained a body weight of 190 pounds–consistently since college. Exh. 23 at 134-136.

261. NTG has identified Demulder as a "tester" plaintiff. Exh. 35 at 342.

262. In multiple pleadings filed with the Court, NTG has described "testers" as "individuals who initiate a transaction for the purpose of bringing a lawsuit." *See* Dkt. 64 at 6; *see also id.* at 13 (revealing that "some Newport Trial Group clients invited their friends to assist in stopping unlawful wiretapping"); Dkt. 65 at 9 (revealing that "Newport Trial Group used testers to identify and stop corporations").

263. On May 1, 2013, Carter-Reed's counsel filed a complaint against Demulder and several John Doe defendants alleging that Demulder unlawfully staged litigation. *Carter-Reed, LLC v. Demulder*, No. 130903002, Dkt. 2-2 (Utah 3d Dist. 2013). Carter-Reed alleged:

> [C]ontrary to the allegations of Demulder's complaint, (a) Demulder was a resident of the State of Nevada at the time he placed his telephone call, (b) Demulder placed the telephone call from Nevada, not California, (c) when Demulder called Carter-Reed, he deliberately tried to hide his true

Declaration of Joshua S. Furman

61

identity by stating that his name was Taylor Vaughn, (d) although Demulder attempted to provide his social security number during the phone call, he was interrupted and informed that he should not provide his social security number, and (e) at the beginning of Demulder's telephone call, he was in fact notified that the call would be recorded.

*Id.* at 1-2.

264.   Carter-Reed alleged that "[m]any of the factual allegations contained in the Demulder [complaint] are false." *Id.* at ¶ 8.  Carter-Reed alleged that "Demulder knew, at the time that the Demulder Complaint was filed, that the factual allegations were false." *Id.* at ¶ 10.  Carter-Reed explained that, "when Demulder placed the Call, his true purpose was to try to create a basis of a lawsuit against Carter-Reed." *Id*. at ¶ 37; *see also id.* at 4-7 (describing factual circumstances evidencing Demulder's staged litigation).

265.   Nearly six weeks before Demulder called Carter-Reed, NTG's Scott Ferrell sent an email to his associate counsel at Kirtland Packard concerning "Wiretap Referrals," which NTG claims was a "communication re: Demulder v. Carter-Reed." *See* Exh. 14 at 72 (NTG000379).  One day later and, again, six weeks before Demulder called Carter-Reed, Scott Ferrell sent another "communication re: Demulder v. Carter-Reed" to outside counsel with the subject heading "RE: Wiretap Referrals." *Id.* (NTG000380-81); *see also* Exh. 39 at 388 (Scott Ferrell stated in a sworn Interrogatory Response that he "recalls one conversation with Michael Kelly at Kirtland & Packard referring the Demulder case to Mr. Kelly's firm.")..

266.   NTG's privilege log reflects at least **six (6)** direct email communications between Taylor Demulder and Andrew Baslow between August 25, 2012 and September 6, 2012 specifically concerning the "New Case – Relacore," which refers to the Carter-Reed's product identified in Demulder's complaint. *See* Exh. 14 at 71-72 (NTG000232-241).

NIC Mot. to Quash
Exh. 6

267.   Demulder did not log any of the six email communications mentioned in the preceding paragraph.  Exh. 12.

## E. Nilon v. Chromadex Inc.

268.   On January 28, 2013, NTG's Andrew Baslow called Chromadex, Inc. (1-855-777-0660).  *See* 67 at 638 (Baslow phone records from AT&T).  That same day, Baslow called an additional 41 toll-free numbers associated with various businesses, and the following day he called another 71 toll-free numbers.  *Id.* at 634-640.

269.   Approximately two weeks later, on February 14, 2013, Baslow called Nilon for the first time in five months and they spoke for seven minutes.  *See* Exh. 67 at 641.  On February 20, Nilon called Baslow and they spoke for another eight minutes.  *See* Exh. 67 at 642 (Baslow phone records).

270.   Less than one week later, on the evening of February 26, 2013, Nilon called Chromadex (1-855-777-0660) at 4:06 PM from his neighbor's telephone.  *See* Exh. 30 at 262 (Nilon ROG responses identifying phone call made through neighbor's phone); Exh. 60 at 519 (Chromadex phone logs listing incoming call from "Drew" through his neighbor's phone number ending in 6646).  Nilon's call to Chromadex occurred on February 26, 2014 at 6:06 PM Central Time.  *Id.*  His call lasted one minute and twenty-nine seconds.  A complete recording of Nilon's call is attached as Exhibit 81 in native format (.wav).  *See* Exh. 81.

271.   Nilon identified himself as "Drew" (short for Andrew).  *See* Exh. 81.  He called the Chromadex adverse event reporting service to inquire about a so-called "discount" for product.  *Id.*

272.   On that call, Nilon told the operator that he had purchased TrueBlue from Chromadex at a discount and that his call related to that purchase.  *See* Exh. 81.  ChromaDex apparently possesses no documents, records, or account information indicating that Andrew Nilon ever purchased a ChromaDex product or service.  *See* Exh.

Declaration of Joshua S. Furman

61 at 525 (Chromadex response to subpoena request for Nilon purchase history).  In response to a request for documentation concerning Nilon's purchase of product, Chromadex stated that "no responsive documents responsive to the request are in its custody, possession or control."  *Id.*

273.   The Chromadex representative told Nilon to call a different number to discuss his purchase.  *See* Exh. 81.  Discovery from Defendants and third-parties have revealed no evidence that Nilon called the second number given to him.  *See* Exh. 30 at 262 (Nilon ROG Responses); *see also* Exh. 68 (Nilon phone records do not contain a call to the alternative number).

274.   The **next morning** after his call to Chromadex, at 9:16 a.m. on February 27, 2013, Nilon emailed NTG's Baslow, purportedly "seeking legal advice re Blu Science." *See* Exh. 13 at 66 (Nilon Priv. Log at NILON00016).  Then, just **seven minutes** later at 9:23 a.m., Baslow called Nilon and they spoke for nine minutes.  *See* 67 at 643 (Baslow phone records from AT&T).  Within **two minutes** after that call, Nilon sent Baslow another email.  *See* Exh. 13 at 66 (Nilon Priv. Log at NILON00016).

275.   Six minutes after receiving Nilon's email on February 27, 2013, NTG's Baslow called Chromadex for the second time, and he then recorded the call for use as evidence in litigation.  *See* Exh. 67 at 643 (Baslow phone records); *see also* Exh. 60 at 519 (Chromadex phone records showing call from Baslow's 0164 number); Exh. 78 (Baslow informs ChromaDex representative that he is recording the call).  A complete recording of Nilon's call is attached as Exhibit 81 in native format (.wav).  *See* Exh. 78.

276.   NTG has identified Nilon as a "tester" plaintiff against Chromadex.  *See* Exh. 35 at 342 (NTG ROG responses identifying three "tester" plaintiffs).

277.   On March 21, 2013, Scott Ferrell and NTG sent a demand letter to ChromaDex Inc. threatening $50,000,000 in class-wide damages on the basis that Nilon called Chromadex and disclosed personal and sensitive information such as his social security number after being assured the call was confidential.  *See* Exh. 58 at 514 (NTG

NIC Mot. to Quash
Exh. 6

demand letter).  Nilon did not disclose his social security number or any other personal details during his call to ChromaDex.  *See* Exh. 81 (Nilon call recording).  The letter further represented that "[s]hortly after concluding the [call], Mr. Nilon was shocked to learn that ChromaDex recorded his confidential call… without disclosure to or consent by Mr. Nilon." Exh. 58 at 514.

278.   NTG filed a lawsuit against ChromaDex on behalf of Andrew Nilon on May 22, 2013.  *See* Exh. 19 (Complaint in *Nilon v. Chromadex*).  That Complaint was never served on ChromaDex.  *See* Exh. 57 at 512 (emails between NTG and Chromadex counsel discussing the Nilon complaint); Dkt. 92-2 ¶¶ 2-3 (Knowles Declaration dismissing NTG Chromadex lawsuit one day after filing same).

279.   The Complaint alleged that Nilon "called Defendant … from a wireless telephone." *See* Exh. 19 at ¶ 7.  Nilon alleged that he "was not aware that the call was being recorded" and that he "did not give either express or implied consent to the recording." *Id.* ¶ 8.

280.   The **very next** day after filing the ChromaDex complaint, on May 23, 2013, NTG filed a voluntary dismissal of the ChromaDex lawsuit.  *See* Dkt. 92-2 (Knowles Declaration in support of voluntary dismissal); Exh. 101 (Chromadex voluntary dismissal without prejudice).  In support, NTG attorney Victoria Knowles attached a declaration swearing under penalty of perjury that "[Nilon] no longer wishe[d] to pursue th[e] case." *See* Dkt. 92-2 ¶ 3.  Knowles further swore that "[n]either Plaintiff nor his counsel has received, or will receive, any direct or indirect consideration in connection with this case or as a result of this dismissal." *Id.*

281.   Scott Ferrell further swore under oath in the present NIC case that NTG dismissed the ChromaDex matter because Nilon no longer wished to pursue the claim. *See* Dkt. 66 at ¶ 4.  Ferrell testified that:  "After we filed the lawsuit, Mr. Nilon notified Newport Trial Group that he no longer wanted to pursue his claims against Chromadex.

So, consistent with Mr. Nilon's instructions, Newport Trial Group filed a request to dismiss the action without prejudice on May 23, 2013." *See id.*

282.   Upon information and belief, because NTG never served the complaint on ChromaDex before voluntarily dismissing the matter the next day, Chromadex was unaware that the suit had been filed (and dismissed). *See* Exh. 57 at 512.   Chromadex received a solicitation email from Perri M. Weiner, Esq. on July 1, 2013. *See* Exh. 59 at 516.   That email incorrectly represented that the case was still active against Chromadex as of July 1, 2013. *Id.* (attaching the complaint and stating that "[w]e would appreciate the opportunity to speak with you, and develop together a defense strategy in this matter").

283.   One week later, on July 8, 2013, ChromaDex's attorney, Erik Jackson called David Reid of the Newport Trial Group and, upon information and belief, inquired into the status of the Nilon lawsuit. *See* Exh. 57 at 512 (emails exchanged between Chromadex counsel and NTG).

284.   Defendant Reid followed with an email to Chromadex on July 8, 2013, wherein Mr. Reid held out the Nilon claim as if NTG still pursued the claim. *See* Exh. 57 at 511-12 (CHROMADEX00003-04).

285.   Although NTG had dismissed the case because their plaintiff did not *"want[] to pursue his claims"* (*see* Dkt. 66 at ¶ 4) (emphasis added), Reid nonetheless told Chromadex counsel that NTG's dismissal occurred to "allow [ChromaDex] and [NTG] to discuss resolution." Exh. 57 at 511-512 (CHROMADEX00003-04).   Reid represented to ChromaDex's counsel that:

> I did discover that this matter was erroneously filed by our court service after we issued instructions to pull it back.   However, after we discovered the action had been filed, we immediately dismissed the action without prejudice **to allow you and I [sic] to discuss resolution**.   Accordingly, there are no responsive deadlines at this time.   I look forward to hearing from you.

NIC Mot. to Quash
Exh. 6

*Id.* (emphasis added).

286.

287.

288.

289.

290.

291.    Baslow attempted to contact Nilon on May 30, 2013 by phone, just several days after NTG had dismissed its ChromaDex complaint. *See* Exh. 67 at 644 (Baslow phone records from AT&T). He never connected. *Id.* (noting high call "seizure" time

Declaration of Joshua S. Furman

67

NIC Mot. to Quash
Exh. 6

with no call duration).  A call "seizure time" is the "time it takes to connect the call measured from the moment the caller presses 'send' to when the call is connected."  *See* Exh. 66 at 554 (AT&T records key).  A seizure time of 33 seconds would indicate that the call did not connect (or rang) for at least 33 seconds, and the 4 second duration very likely indicates a non-answer or a voicemail connect followed by a prompt termination. *See* Exh. 67 at 644 (Item No. 19857 in Baslow's AT&T phone records).

292.   Based on a global review of phone records, text message records, and correspondence logged in the parties' privilege logs, Andrew Baslow and NTG apparently had no other contact with Nilon until an August 5, 2013 text message.  *See generally* Exh. 67; Exh. 68; Exh. 13; Exh. 14.  Baslow then spoke with Nilon by phone the afternoon of August 5, 2013 for 10 minutes.  *See* Exh. 67 (Baslow phone records provided by AT&T).  Based on a global review of phone records, text message records, and correspondence logged in the parties' privilege logs, NTG apparently had no contact with Nilon during the period when NTG's David Reid negotiated with ChromaDex, and reached a final settlement.  *See generally* Exh. 67; Exh. 68; Exh. 13; Exh. 14; *see also* Exh. 57 (reflecting negotiations in July 2013 between Reid and Chromadex).  Based on the phone records and documents logged in discovery, NTG apparently had no documented contact with Nilon between the date of the dismissal of NTG's Chromadex case on May 23, 2013 and David Reid's decision to settle Nilon's claim against Chromadex.  *See generally* Exh. 67; Exh. 68; Exh. 13; Exh. 14; *see also* Exh. 57 (reflecting negotiations in July 2013 between Reid and Chromadex).

293.   ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ the same Complaint that had been dismissed because Nilon no longer wished to pursue the matter.  *See* Dkt. 66 at ¶ 4; Dkt. 92-2 at 2; Exh. 101 at 922.

294. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
██

295. ████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████

## F. <u>Pfleg v. Nature's Way Products</u>

296.    Scott Ferrell and NTG filed a lawsuit against Nature's Way on behalf of Sam Pfleg on March 16, 2012, in the Superior Court of California.  *Pfleg v. Nature's Way*, No. 3:12-cv-1018 (S.D. Cal. 2012) ("*Pfleg v. Nature's Way*"), Dkt. 1-4 p. 3. Nature's Way removed to the U.S. District Court for the Southern District of California on April 25, 2012.  *Id.* at Dkt. 1.

297.    Pfleg did not speak with an NTG attorney by telephone before filing his lawsuit on March 16, 2012.  *See generally* Exh. 69 at 662-668; *see also* Exh. 36 at 353. Pfleg did not meet with any NTG attorneys in person before filing his lawsuit.  Exh. 32 at 297.  Pfleg did not communicate by email with any NTG attorney before filing his lawsuit.  *See generally* Exhs. 14, 15; *see also* Exh. 54 at 498.  The only pre-lawsuit "communication" identified by the available evidence is an engagement letter purportedly sent to Pfleg by Scott Ferrell.  Exh. 14 at 71 (NTG00213).

298.    Pfleg's Interrogatory responses indicate that he never spoke to an NTG attorney at *any time*.  *See* Exh. 36 at 353.

Declaration of Joshua S. Furman

69

NIC Mot. to Quash
Exh. 6

299.    The complaint alleged that Pfleg had purchased several Nature's Way Boericke & Tafel products and "relied on Defendant's representations regarding the efficacy of the Products, as detailed herein, and but for those representations, Plaintiff would not have purchased or paid as much for the Products." *Pfleg v. Nature's Way*, Dkt. 1-4 ¶ 1. Pfleg alleged that he purchased those products "in reliance upon Defendants' assertions and promises related to the efficacy of the Products. *Id*. at ¶ 21. The Products failed to work as advertised." *Id*. at ¶ 22; *see also id.* at ¶ 1 (alleging that Pfleg "relied on Defendant's representations regarding the efficacy of the Products … and but for those representations, [Pfleg] would not have purchased or paid as much for the products."); *id.* at ¶ 32 ("[Pfleg] purchased the Products in reliance on Defendant's marketing claims. [Pfleg] used the Products as directed, but they did not work as advertised and did not provide any of the promised benefits."); *id.* at ¶ 41 ("[Pfleg] has standing to pursue this cause of action because [he] has suffered injury in fact and has lost money as a result of Defendant's actions…. [Pfleg] used the Products as directed, but they did not work as advertised and did not provide any of the promised benefits."); *id.* at ¶ 50 (same).

300.    Pfleg's alleged injury was said to be based on his reliance on Nature's Way's claims: "[Pfleg] and members of the Class have suffered economic injury by losing money as a result of purchasing the Products. [Pfleg] and members of the Class would not have purchased or would have paid less for the Products had they known that they were not as represented." *Id.* at ¶ 58.

301.    On January 2, 2012, Ryan Ferrell of NTG sent a demand letter to Nature's Way Products on behalf of an unnamed California consumer who allegedly bought Nature's Way's Boericke & Tafel "Arnica Montana" product. Exh. 53 at 469. NTG's demand letter threatened action under the CLRA and UCL for false advertising. *Id.*

302.    On February 1, 2012, counsel for Nature's Way responded by letter and questioned whether NTG had a valid plaintiff:

NIC Mot. to Quash
Exh. 6

Did your client actually purchase a product?  Did he or she purchase the product before your letter was sent? Did she **purchase the product** for personal use, or **to attempt to generate standing for a suit** similar to the one brought against Boiron, Inc.?  Did he or she actually use the product, and, if so, when?

Exh. 53 at 473 (emphasis added).  Neither NTG nor Nature's Way produced to NIC in discovery any responsive letter from Ryan Ferrell.

303.   Sam Pfleg did not purchase his Nature's Way products until <u>March 2012</u>. Exh. 55.  Pfleg did not purchase the Arnica Montana product that was listed in the January demand letter.  *Id*.

304.   Sam Pfleg does not claim to have purchased any Nature's Way product prior to Ryan Ferrell's January 2, 2012 demand letter.  Exh. 36 at 355.  The only purchase he could identify—and to which he has any proof—occurred on March 14, 2012, over two months after NTG served its first demand letter.  *Id*.; *see also* Exh. 55. Pfleg has produced no evidence that he ever investigated the claims of Nature's Way's products.  Pfleg apparently never contacted Nature's Way to obtain a refund or inquire into concerns about the product.  Exh. 36 at 351.

305.   NIC issued an Interrogatory to Ryan Ferrell requesting that he identify the individual on whose behalf he wrote the January 2, 2012 demand letter to Nature's Way Products.  Exh. 37 at 364.  In response, Ryan Ferrell stated that "**Defendant does not recall or have the information requested by this interrogatory.**"  *Id*.  Apparently, no evidence exists showing that NTG represented anyone who actually purchased the Nature's Way product before the date of the January 2, 2012 demand letter.  *Id.*

306.   Pfleg and Nilon are both managers of the Electric Family LLC—a business they started together.  *NIC v. NTG*, Dkt. 30-9 at 2-11.  Defendants Dronkers and Demulder are also members of the Electric Family LLC.  *Id.*

Declaration of Joshua S. Furman

71

307.    Pfleg bought the Nature's Way products on March 14, 2012, which was less than two weeks after NTG filed Nilon's lawsuit against NIC, the *same day* NTG's Andrew Baslow initially called Sam Schoonover (also on March 14, 2012), and within five days of Defendant Dronker's product purchase.  Exh. 45 (Dronkers receipt); Exh. 70 at 670.

308.    On March 14, 2012, at 11:19 AM, a text message was sent from Andrew Baslow's phone to Andrew Nilon's phone.  Exh. 67 at 647.

309.    Five hours later, on March 14, 2012 at 4:18 p.m., Sam Pfleg then purchased six (6) Nature's Way Products from a Vitamin Shoppe located at 110 N. El Camino Real, Encinitas, CA 92024.  Exh. 55.  That store is approximately fifteen to twenty minutes by motor vehicle from Pfleg's residential address at the time.

310.    The Nature's Way "Boericke & Tafel" products he purchased were indicated for differing ailments:

       a.  Arniflora Arnica Gel

       b.  Triflora Arthritis (for arthritis and rheumatism)

       c.  Florasone Cream (for eczema and rashes)

       d.  Sciatic Aide (for relief of pain associated with sciatica)

       e.  Nighttime Cough/Bronchial Syrup (for relief of cough and bronchial congestion)

       f.  Cough & Bronchial (cough suppressant and expectorant).

*See* Exh. 55.

311.    The "Boericke & Tafel" homeopathic brand had already been implicated in NTG's January 2, 2012 letter to Nature's Way.  Exh. 53 at 469.

312.    Three (3) minutes after Pfleg completed his purchase, at 4:21 p.m., Pfleg called Andrew Nilon's phone and they spoke for sixteen minutes.  Exh. 69 at 662.

313.    Thirty-one minutes after Pfleg's call with Nilon ended, at approximately 5:07 p.m., on March 14, 2012, the first contact established by any evidence in this case

Declaration of Joshua S. Furman

72

occurred between Pfleg (817-296-1794) and NTG.  Baslow initiated contact directly with Pfleg by sending two text messages to which Pfleg did not respond.  Exh. 67 at 648.

314.   No available evidence indicates that Pfleg directly provided NTG any documentation or notice of any kind about his product purchase before Baslow contacted him on March 14, 2012.  Exh. 14 (no written communications); Exh. 15 (same); Exh. 36 at 353 (no communications with NTG attorneys); Exh. 32 at 297 (no in-person meetings).  However, internal NTG emails show that NTG came into possession of Pfleg's receipt the same day that he made his purchase, March 14, 2012.  *See* Exh. 99 at 800 (NTG005126-005127).

315.   The following day after Pfleg's purchase, on March 15, and without any apparent communication *from* Pfleg, NTG sent a revised demand letter to Nature's Way listing Arnica Montana 30C "and similar products."  *See* Exh. 53 at 474.  Then, on March 16—again without any documented communication from Pfleg—NTG filed a lawsuit against Nature's Way.  *Pfleg v. Nature's Way*, Dkt. 1-4.

316.   No evidence shows that Pfleg sent a <u>single communication</u> of any kind to NTG until June 30, 2012 (more than three months after NTG filed the Pfleg lawsuit).  Exh. 69 at 665; Exh. 99 (no written communications); Exh. 15 (same); Exh. 36 at 353 (no communications with NTG attorneys); Exh. 32 at 297 (no in-person meetings).

317.   No one from NTG ever met with Pfleg in person.  Exh. 32 at 297.

318.   Pfleg's phone records indicate that he sent no messages to NTG by text message or voicemail until June 30, 2012.  *See generally* Exh. 69 at 662-68.

319.   Pfleg's phone records indicate that he had no telephone calls with NTG prior to July 7, 2016, more than three months after his complaint was filed.  Exh. 69 at 662-68. While Andrew Baslow left several voicemails for Pfleg beginning June 28, 2017 (*Id*. at 524-25), the two did not connect until July 7, 2016.  *Id.*

320.   Pfleg and NTG logged or produced no communications between Pfleg and NTG that would explain the documents allegedly in Pfleg's possession on March 15,

Declaration of Joshua S. Furman

73

2012, including an NTG retainer agreement, which Pfleg purportedly signed on March 15, 2012 just one day after his product purchase.  Exh. 14 at 71; Exh. 15.

321.    The *only* pre-filing communication between NTG and Pfleg logged by defendants is NTG000209-213, a "letter" from Scott Ferrell to Sam Pfleg on March 15, 2012 that represents the "signed retainer agreement with Sam Pfleg re: Boericke & Tefel [sic] Arnica Montana."  Exh. 14 at 71.  As noted, *supra*, in fact Pfleg did not purchase the Arnica Montana product.  Exh. 55.  Sam Pfleg did not log the retainer agreement allegedly sent on March 15, 2012.  Exh. 15.  The retainer was purportedly signed by Pfleg on March 15, 2012.  Exh. 105 at 1111.

322.    NTG was described by Nature's Way's counsel as a "CLRA shop" that determines "what products to issue notice letters on and what products to pursue in litigation" based on a "matrix."  Exh. 53 at 477.

323.    On June 25, 2012, Scott Ferrell served another demand letter on Nature's Way Products which indicated it was sent on behalf of two new California consumers who were allegedly injured by Nature's Way's false advertising in violation of the CLRA.  *Id*. at 480.  That demand letter threatened suit against another group of Nature's Way products.  *Id*.  That demand letter was sent during the pendency of Pfleg's suit.  *Id.*

324.    The June 25 letter stated that Ferrell was "writing on behalf of two individual California consumers, as well as a class of similarly situated persons, to advice [sic] [Nature's Way] that we believe your client's conduct in connection with the marketing, sale and advertisement of the [certain] products violates the California Consumer Legal Remedies Act ("CLRA")."  Exh. 53 at 480.

325.    On June 25, 2012 at 8:23a.m., Ferrell told counsel to Nature's Way that Ferrell represented a "new client involving several products."  Exh. 53 at 479.  But Ferrell did not disclose the identity of those individuals.  *Id*.  On June 28, 2012, Ferrell again represented to Nature's Way's counsel that he represented multiple "clients" and

Declaration of Joshua S. Furman

74

that he had "spoken to [them] and [they] authorized" him to obtain a global settlement of all claims. *Id.* at 482.

326. Pfleg never purchased the other products named in the subsequent demand letters. Exh. 55; Exh. 36 at 354-55.

327. The settlement agreement entered by Pfleg and NTG was signed on July 6, 2012, less than two weeks after NTG's third demand letter (June 25, 2012). Exh. 53 at 486-94. NIC has obtained no evidence from Defendants or third parties that an NTG attorney communicated with Sam Pfleg at any point while counsel for the parties negotiated settlement terms and drafted the settlement agreement. *See e.g.*, Exh. 14 (showing no emails to Pfleg during settlement negotiation); ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

328. Nature's Way directly asked Scott Ferrell whether "Pfleg owns all of the claims" including those "set forth in the June 25 letter" since he was the only NTG client to sign the settlement agreement. Exh. 53 at 483. In response, Scott Ferrell stated that Pfleg's "agreement encompasses all claims and **we do no[t] have any other clients**." *Id*. at 483 (emphasis added).

329. ████████████████████████████████

████████████████████████████████████████

████████████████████

330. Pfleg's complaint contained a generic "Declaration RE: Venue" that was filed as an attachment to his March 16 complaint. *Pfleg v. Nature's Way*, Dkt. 1-4 at p. 23.

Declaration of Joshua S. Furman

75

331.  There is no documented correspondence wherein Pfleg provided an executed Declaration of Venue to NTG from the time of his purchase until the time his complaint was filed.  Exh. 14; Exh. 15; Exh. 32; Exh. 36; Exh. 99.

### G. Dronkers v. Kiss My Face LLC

332.  Matt Dronkers graduated from Arizona State University in 2011 with Andrew Nilon and Sam Pfleg.  *See* Exh. 8 at 36.

333.  Dronkers, Nilon, and Pfleg began a business together in 2012 called the Electric Family LLC, which is a clothing and apparel business for members of the electronic dance music community.  *See NIC v. NTG*, Dkt. 30-9 (Nevada corporate filings); Exh. 44 at 430 (Dronkers LinkedIn public profile).

334.  In 2011 through 2012, Dronkers resided at the same addresses as Andrew Nilon at ▮▮▮▮▮▮, San Diego, CA 92101 and 963 Loring St., San Diego, CA 92109.  *See* Exh. 30 at 258-60 (Nilon ROG responses); Exh. 27 at 223-224 (Dronkers ROG responses).

335.  Dronkers's phone number is 925-989-3649.  *See* Exh. 27 at 227 (Dronkers's ROG responses).  Based on phone records, Dronkers communicated often with Nilon and Schoonover.  *See* Exhs. 68 (Adobe Acrobat's electronic search feature of Dronker's phone number reflects at least 977 actual or attempted connections to Nilon's Verizon Wireless phone number between October 2011 and September 1, 2014); Exh. 70 (Adobe Acrobat's electronic search feature of Dronkers's phone number reflects at least 1,038 actual or attempted connections to Sam Schoonover's mobile phone).

336.  On May 11, 2012, NTG, Scott Ferrell, James B. Hardin, Victoria C. Knowles, and attorneys operating through Kirtland & Packard LLP filed a lawsuit

NIC Mot. to Quash
Exh. 6

against Kiss My Face, LLC ("KMF"),[6] a Delaware limited liability company, in the United States District Court for the Southern District of California. *See Dronkers v. Kiss My Face, LLC*, No. 12-cv-1151-JAH-WMC, Dkt. 1 (S.D. Cal. May 11, 2012).

337.   Dronkers and NTG alleged that KMF violated the California UCL (Cal. Bus. & Prof. Code § 17200 *et seq.*), the FAL (Cal. Bus. & Prof. Code. § 17500 *et seq.*), and the CLRA (Cal. Civ. Code § 1770 *et seq.*).  *Id.*  Dronkers and NTG alleged that KMF had falsely advertised an "organic" product that was not organic because KMF products "do not qualify as 'Organic' under any of the [applicable] criteria."  *Id.* at ¶ 14.

338.   NTG and Dronkers represented that Dronkers had purchased KMF products "in early 2012" in reliance on the organic claims:  "Plaintiff relied on Defendant's representations that the Kiss My Face personal care products he purchased were organic, as detailed herein, and but for those representations, Plaintiff would not have purchased or paid as much for such products."  *Id.* at ¶ 1; *see also id.* at ¶ 14 ("Plaintiff and members of the Class relied on Defendant's misrepresentations and would not have paid as much, if at all, for the Products but for Defendant's misrepresentations."); *id.* at ¶ 39 ("Defendant's wrongful misrepresentations and omissions have directly and seriously injured Plaintiff and the putative class by causing them to pay for a product because they relied on the false and misleading marketing and advertising statements by Defendant").  Dronkers described his injury and standing as follows:

> Plaintiff has standing to pursue this claim as Plaintiff purchased Kiss My Face personal care products labeled as "obsessively organic," believing that they were in fact pure, natural, and organic.  Plaintiff relied on Defendant's advertising and has been damaged because the Products he

---

[6] Kirtland & Packard LLP was also counsel of record, but NTG's privilege logs makes clear that Dronkers came to bring a lawsuit against Kiss My Face through the efforts of NTG alone.  Exh. 14 at 71 (executed retainer agreement between NTG and Matt Dronkers).

Declaration of Joshua S. Furman
77

purchased are not pure, natural and organic; had he known this, he would have either not bought the Products or paid less for them.

*Id.* at ¶ 44.

339. Dronkers and NTG represented that Dronkers had suffered an injury in fact: "As a direct and proximate result of Defendant's misleading and false advertising, Plaintiff and members of the Class have suffered injury in fact and have lost money or property." *Id.* at ¶¶ 29, 37, 48.

340. Dronkers purchased his Kiss My Face products on March 19, 2012 at 3:40 p.m. Pacific. *See* Exh. 45 (DRONKERS000001). He purchased KMF's "Hand Lightener," which was an anti-aging hand cream designed to "trick the hands of time" by "naturally lighten[ing] your hands with Alpha-Arbutin and herbal lighteners in this lavender and chamomile age-defying organic hand treatment." *See* Exh. 95 at 765 (web printout of description for "age-defying" hand treatment). On information and belief, public records show that Dronkers was twenty-two (22) or twenty-three (23) years old at the time he purchased the KMF "age-defying" hand cream.

341. Dronkers purchased the KMF product from the Sprouts Farmer's Market at 1260 Garnett Avenue, San Diego, CA 92109. *See* Exh. 45 (DRONKERS00001). Dronkers has produced no evidence that he ever investigated the organic claims of KMF's products or contacted the retailer (Sprouts Farmers Market) or KMF directly to obtain a refund. *See* Exh. 27 at 226.

342. Dronkers executed his KMF purchase fourteen days after NTG filed Andrew Nilon's lawsuit against Natural Immunogenics Corp. *Compare Nilon v. NIC*, Dkt. 1-1 (March 5, 2012) *with* Exh. 45 (March 19, 2012).

343. Dronkers executed his KMF purchase five days after Sam Pfleg made his purchase of Nature's Way products on March 14, 2012. *Compare* Exh. 55 (March 14 purchase) *with* Exh. 45 (March 19 purchase).

Declaration of Joshua S. Furman
78

344.    Dronkers executed his KMF purchase four days after Baslow connected with Sam Schoonover on March 14, 2012. *Compare* Dkt. 108 (March 19, 2012 purchase) *with* Exh. 70 at 670.

345.    Approximately two hours and thirty minutes after purchasing KMF products on March 19, 2012, Dronkers sent an email to NTG's Andrew Baslow at 6:10 p.m. *See* Exh. 11 at 58 (DRONKERS00001[7]).  The subject of that email to Baslow was "[p]otential legal claim" against KMF. *Id.*

346.    Dronkers included no attachments in his March 19 emails to NTG. *See id.* (Dronkers Priv. Log).

347.    Dronkers had no in-person meetings with NTG or its agents. *See* Exh. 27 at 230-32 (Dronkers responses to ROGs); Exh. 32 at 297 (NTG ROG responses) (stating that NTG "does not recall any 'in-person' meetings with Mr. Dronkers").

348.    On March 20, 2012 at 11:00 AM, NTG's Andrew Baslow responded to Dronkers' March 19 emails with "[i]nitial documents regarding Dronkers v. KMF lawsuit." *See* Exh. 11 at 58 (DRONKERS00003).  Baslow included seven attachments to his March 20, 2012 email, including:  a "Letter from Scott Ferrell to Matthew Dronkers re representation"; a standard document titled "Information re duties of class representative"; and five (5) "draft exhibit[s]" which are each marked "attorney-client privilege and work product doctrine" in Dronkers' "privilege" log. *See* Exh. 11 at 58.

349.    Dronkers responded to Baslow's March 20, 2012 email on March 20, 2012 at 12:05 p.m. through the subject matter "Potential legal claim." *See* Exh. 11 at 58 (Dronkers Priv. Log at DRONKERS00001).

---

[7] Dronkers appears to have inadvertently use the same DOCID control number for two files, his receipt (Exh. 45) and several email communications in Exh. 12, both labeled DRONKERS00001.  The documents to be compelled through this motion are those communications listed in Exh. 11.

NIC Mot. to Quash
Exh. 6

350.   Dronkers's Complaint included a declaration of venue that followed the signature block on page 15 of the CM/ECF file.  *Dronkers v. Kiss My Face, LLC*, No. 12-cv-1151, Dkt. 1 at 15 (S.D. Cal. May 11, 2012).

351.   That declaration of venue included no date, caption, location for execution, or specifics concerning Dronkers' claim against KMF.  *Id.*  But for the printed name "Matt Dronkers" in the signature line, the declaration of venue was identical in all respects to the declarations signed by Electric Family members and NTG clients. *Compare id. with Conde v. Therabiogen, Inc.*, No. 2:12-cv-4771-JFW, Dkt. 1 at 19 (C.D. Cal. 2012) (NTG plaintiff Conde declaration of venue), *Nilon v. NIC*, Dkt. 1-1 at p. 15 (Nilon declaration of venue), *and Pfleg v. Nature's Way*, Dkt. 1-4 at p. 23 (Pfleg declaration of venue), *Crivier v. Hain Celestial Group, Inc. et al.*, No. 2:12-cv-3054, Dkt. 1 at p. 16 (NTG plaintiff Crivier declaration of venue).

352.   The declaration referenced the final complaint filed against KMF:  "The Complaint in this action, filed concurrently with this Declaration, is filed in the proper place for trial under Civil Code Section 1780(d) in that San Diego County is a county in which Defendants are doing business."  *Dronkers v. Kiss My Face*, Dkt. 1 at 15.

353.   NTG supplied privilege logs for communications allegedly had with Matt Dronkers in a document titled "Third Supplemental Privilege Log (9-92016) for Defendant Newport Trial Group's Responses to Plaintiff Natural Immunogenic Corp.'s Request for Production [Set One]."  *See* Exh. 14.  The only correspondence logged in that privilege log by NTG related to its pre-complaint communications with Matt Dronkers is one "Letter" from Scott Ferrell to Dronkers on March 23, 2012 concerning a "Signed retainer agreement with Matt Dronkers re:  Kiss My Face."  *Id.* at 71 (NTG000193).  NTG therefore omitted from its September 9, 2016 privilege log at least five separate email communications between Dronkers and NTG's Baslow on March 19-20, 2012. *Compare* Exh. 11 (Dronkers Priv. Log) *with* Exh. 14 (NTG Priv. Log).

Declaration of Joshua S. Furman
80

**H. Bobba v. Magna, Inc.**

354.   Beginning in November of 2009, NTG initiated two class action lawsuits against Magna-RX, Inc. ("Magna").  On November 16, 2009, NTG filed a state court complaint against Magna and on April 14, 2010, NTG filed a lawsuit against Magna in the Northern District of California alleging essentially the same claims of false advertising, fraud, unfair competition, and civil RICO.  Exh. 20 (Vaughn v. Magna); *Morales v. Magna, Inc., et al.*, No. 3:10-cv-01601-EDL, Dkt. 1 (N.D. Cal. Apr. 14, 2010).

355.   Magna moved to dismiss the Morales case citing improper venue as the plaintiff did not reside in the Northern District of California and no facts were presented establishing that the purported injury occurred in that district.  *Morales v. Magna, Inc., et al.*, Dkt. 23.

356.   At the June 22, 2010 hearing on the motion to dismiss, NTG attorney Michael Velarde represented to the Court that his client was "out of the country at this time[,]" was not sure when he would return, and was "not able to get in contact with him recently."  *Morales v. Magna, Inc., et al.*, Dkt. 43, at 9.  The Court said, "[s]o you've lost track of your plaintiff?"  *Id.*

357.   On June 23, 2010, the Court granted NTG two weeks to amend the complaint and properly allege venue in the district stating that "unless Plaintiff can satisfactorily amend his complaint, Defendants' motion to dismiss or transfer for improper venue will be granted."  *Morales v. Magna, Inc., et al.*, Dkt. 37.

358.   On July 2, 2010, to cure the venue deficiency, NTG filed an amended complaint listing two Northern District plaintiffs:  Chris Rhodes and Dan Bobba.  *Morales v. Magna, Inc., et al.*, Dkt. 38.  However, on July 8th, just six days after NTG filed its complaint, Dan Bobba admitted in a public internet chat room that NTG paid him to serve as an NTG plaintiff in class action litigation.  According to Bobba, in exchange for spending forty dollars on a product and signing a statement saying that it

NIC Mot. to Quash
Exh. 6

did not work, he was promised by NTG a chance to collect between two and ten thousand dollars. *Morales v. Magna, Inc., et al.*, Dkt. 59, at 8. Dan Bobba explained the following in a public internet forum:

> So my friend called me up the other day with a great opportunity. I'm all ears as he explains how his girlfriend's brother is a class action lawsuit attorney in need of clients. I go buy this stuff called magna rx plus which is supposed to permanently increase your penis size. Everyone knows that s**t doesn't work, but I go drop 40 on it. anyway (sic) the lawyer comes over twice and has me sign some documents for this suit saying i (sic) took it, it doesn't work, and that the company is false advertising. long story short it's supposed to pay between 2-10k once settled and these guys have a 90% winrate so I'm hopeful!

*Id.*

359. Once Magna informed NTG of the Bobba online statement, NTG filed a notice of voluntary dismissal. *Morales v. Magna, Inc.*, Dkt. 58. Less than two weeks later, Magna filed a motion for sanctions against NTG attorney Scott Ferrell, alleging, in part, that Mr. Ferrell had knowingly asserted false claims and supported those claims through "a sworn declaration by attorney Scott Ferrell in which Mr. Ferrell purported to have 'confirmed' facts relating to an additional purchase of Defendant's product … even though [NTG] had lost all contact with Morales and did not have a receipt or other physical evidence documenting this alleged transaction." *See Morales v. Magna, Inc.*, Dkt. 59, at 2. The allegations in that case were in the same pattern of substantively similar cases referenced above:

> [NTG] attempted to conceal the fact that they no longer represented a viable client and supported their opposition to Defendant's Motion with the Declaration of attorney Scott Ferrell. Moreover, there is circumstantial evidence indicating that Mr. Ferrell knowingly submitted false testimony in his Declaration in an effort to avoid having this lawsuit dismissed for improper venue.

*Id.* at 6.

Declaration of Joshua S. Furman

360.   When confronted with facts concerning Scott Ferrell's declaration, the Hon. Elizabeth D. Laporte of the Northern District of California stated on the record that she was "troubled by that misleading of the court." *Morales v. Magna, Inc., et al.*, Dkt. 68, at 16.  Additionally, it was revealed at the hearing that NTG's unlicensed investigator (the father of Defendants Ryan and Scott Ferrell), Wynn Ferrell, was "the only person who apparently had any communication with any of these plaintiffs." *Id.* at 12.

361.   Before the Court could rule on Magna's motion for sanctions, ██████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████   No funds in settlement or as a payment for future legal services were ever paid to NTG as a result of the lawsuit against Magna.

362.   NTG's prior state court case against Magna was filed on behalf of plaintiff Kevin Vaughn. Exh. 20 (Complaint in *Vaughn v. Magna*).  The facts of NTG's Vaughn suit are similar to the facts of NTG's suit against NIC:

    a.  Just like the plaintiffs in Nilon v. NIC, Kevin Vaughn cancelled his deposition the night before due to an unexplained "family conflict." Exh. 18 at 94.

    b.  Vaughn alleged that he purchased the bottle giving rise to his claim from a Wal-Mart Store and included a purported picture of that bottle in his complaint. *Id.* at 95-99.  However, like Sandoval's bottle (which was not even manufactured at the time of purported purchase), the markings on the bottle pictured in Vaughn's complaint revealed that it was never sold at a

_____

[8] This practice is unequivocally forbidden by the ethical rules.  Rules of Prof. Conduct, rule 1-500.

Wal-Mart Store as he alleged. *Id.* In discovery, NTG produced a *different* bottle, which had been purchased at a Wal-Mart, than the one pictured in the complaint. *Id.* The switch occurred after Magna informed NTG that the bottle pictured in the complaint could not support Vaughn's allegations. *Id.*

c. Vaughn testified that he provided his attorney, Scott Ferrell, the bottle of Magna's product, the box it came in, and the receipt from the purchase, but Scott Ferrell refused to produce it on the grounds that it was "not the appropriate time." *Id*. at 96-97. However, during scheduling of an inspection of the documents, Scott Ferrell admitted that his client had testified falsely and that there was no receipt for the purchase. *Id*. at 97-98 (explaining that "[e]ither Mr. Vaughn repeatedly perjured himself during his deposition when he testified that he had given you the receipt, or you [Ferrell] are withholding vital evidence").

d. Kevin Vaughn engaged in spoliation of evidence when he "trashed" his computer a month prior to his deposition. *Id*. at 98-99. The computer was said to hold the only evidence of which website Mr. Vaughn had visited where he allegedly saw the advertising that he relied on. *Id.* This was material evidence as some of the websites allegedly visited were owned by Magna, while others were not. *Id.*

## I. Additional Facts Indicating Crime/Fraud/Bad Faith Litigation

363. At least three federal courts have acknowledged that NTG attorneys have filed "false" or "misleading" declarations and pleadings. *See* Dkt. 130 p. 5 (holding that defendant "Reid engaged in misconduct sanctionable under the Court's inherent powers"); *Nilon v. NIC*, Dkt. 117 at 4, n. 1 (holding that "[NTG attorneys] … were required to notify the Court of this false statement of material fact … previously made to

Declaration of Joshua S. Furman

the tribunal."); *Morales v. Magna, Inc., et al.*, No. CV 10-1601-EDL, Dkt. 68, at 16 (N.D.Cal. 2010) (holding that court was "troubled by [NTG's] misleading of the court").

364.   On October 27, 2015, NTG's Scott Ferrell sent a demand letter to DeviantArt, Inc. threatening litigation and claiming that NTG "had been retained to prosecute a class action lawsuit…" *See NIC v. NTG*, Dkt. 131-5 at 35-36.  That demand letter asserted that "[p]rior to purchasing a subscription, our client visited your website at www.deviantart.com." *Id.*  Ferrell's letter alleged his "client did not receive *any* of the post-transaction disclosures required by the Auto-Renewal Statute." *Id.* (emphasis added).

365.   On March 28, 2016, by and through Milstein Adelman LLP, NTG's Scott Ferrell and Kristyne Hanberg caused to be filed a Complaint in the Superior Court of the State of California for the County of Los Angeles.  Dkt. 131-5 at ¶ 8.  The Complaint alleged that:

> [Hanberg] purchased a deviantART Core Membership from Defendant and paid $15.00 to Defendant in California during the Class Period. Plaintiff's credit card was charged at least once for an automatic renewal. Plaintiff and Class Members are consumers as defined under Cal. Bus. & Prof. Code § 17601 (d) and Cal. Civ. Code § 1761(d).

*Id.*

366.   Hanberg's complaint alleged that her purchase was for "personal, family or household purposes." *Id.* at ¶ 39.  Hanberg also alleged that she had "reasonably relied upon [DeviantArt's] material misrepresentations and omissions" on its website when making her purchase. *Id.* at ¶¶ 51-52.

367.   In fact, NTG, not Hanberg, actually made the purchase from NTG's offices in Newport Beach, California. *NIC v. NTG*, Dkt. 131-5 (Declaration of Scott Vick) at 3-4, 9.  At that very time Hanberg was at work, teaching a high school class twenty-seven (27) miles away. *See* Exh. 47 at 438-39.

Declaration of Joshua S. Furman
85

368.   The purchase came from the IP ("internet protocol") address 74.212.229.98. *NIC v. NTG*, Dkt. 131-5 at 3.  That address was assigned to Newport Trial Group's corporate IP address.  *Id.* at 4.

369.   Records showed that Ms. Hanberg never visited or used DeviantArt's website at any time, for any purpose.  *Id*. at 4.  Hanberg had no user activity.  *Id.*  After NTG paid for a Hanberg membership, Hanberg never logged into her account.  *Id.* at 4-5.  Twelve days after her "purchase," NTG served its demand letter.  *Id.* at 4.

370.   Public records revealed that Hanberg was used or listed as a "plaintiff" by NTG in at least five (5) separate cases against various corporations.  *See id.* at 5-6; *see also Jane Doe (Hanberg) v. Egnyte, Inc.*, No. 8:15-cv-1828-JLS-DFM (C.D. Cal. Nov. 6, 2015); *Hanberg v. Drugstore.com*, No. 8:16-cv-00523-DMG-JEM (C.D. Cal. Mar. 18, 2016); *Hanberg v. Tresta, Inc.*, No. 8:16-cv-00613-DOC-DFM (Apr. 1, 2016); *Hanberg v. 800Razor.com, LLC*, No. 8:16-cv-00761-MWF-RAO (Apr. 22, 2016).

371.   Hanberg was deposed on June 10, 2016.  Dkt. 165-10.  At her deposition, Hanberg was unaware that NTG had used her name in multiple other lawsuits.  *Id*. at 28-31.

372.   Hanberg revealed no basic understanding of the facts related to any of the other cases.  *See e.g., id*. at 29, 36-39.

373.   Hanberg testified that she did not meet with her attorneys before NTG dispatched demand letters in her name and Milstein Adelman filed suit on her behalf.  *Id*. at 44-47.

374.   Hanberg's NTG attorney terminated the deposition before opposing counsel completed his examination and, while it commenced, repeatedly interposed objections to block witness responses.  *See generally id*.  NTG counsel terminated the Hanberg deposition after just one hour of questioning.  *Id*. at 53.

375.   Hanberg's NTG attorney Sara Avila also represented each of the non-NTG defendants (i.e., NTG's former clients) in the present NIC case.  Milstein Adelman (and

Declaration of Joshua S. Furman

86

Sara Avila) promptly withdrew from representation in the present NIC case after the Hanberg facts were exposed in litigation.  Dkt. Nos. 166-171.

376.   NTG settled the matter with DeviantArt, Inc. soon after terminating Hanberg's deposition.  *NIC v. NTG*, Dkt. 140 at 15-21.  NTG's Scott Ferrell signed the Hanberg settlement agreement and listed himself as her "counsel."  *Id*. at 20.

377.   In 2009, the law firm Kabateck Brown & Kellner filed a purported consumer class action complaint against Basic Research LLC alleging that a consumer had purchased a weight loss product in July and October 2009 that conferred no benefit to her.  *Shalena Dysthe, et al. v. Basic Research, LLC,* No. 2:09-cv-08013, Dkt. 1 (C.D. Cal. Nov. 2, 2009)).

378.   Ms. Fortin is a licensed California attorney who did not become a plaintiff in the case until the following year, but apparently found her attorney (Scott Ferrell) through her longtime friend, Linda Berger, NTG's office manager, in late 2009.  *See* Exh. 24 at 172-174; Exh. 46.

379.   She executed a declaration of venue supporting her complaint on November 1, 2009.  *Shalena Dysthe, et al. v. Basic Research, LLC,* No. 2:09-cv-08013, Dkt. 50 at 26-27 (C.D. Cal. Nov. 2, 2009) ("*Dysthe v. Basic Research*").  Discovery revealed that Ms. Fortin had purchased her product on November 1, 2009 at 5:14 pm, the same day that she executed her declaration of venue in the case.  *See* Exh. 102 (Fortin Receipt).

380.   Ms. Fortin did not enter the case until the amended complaint was filed several months later on February 16, 2010.  *Dysthe v. Basic Research*, Dkt. 50.   Ms. Fortin testified that she was put in contact with Kabateck Brown & Kellner by her attorneys at the Newport Trial Group.  Exh. 24 at 182-183 (Depo Tr. at 59:14-60:17).

381.   At least two other corporations have filed legal claims alleging that NTG attorneys or their agents formed shell corporate entities for the purpose of filing staged "competitor" lawsuits against other corporations.  *See* Exh. 98; *see also Strataluz, LLC v. Truderma, LLC*, No. 3:15-cv-1248-JM-RBB, Dkt. 6, at 5-9 (S.D. Cal. 2015).

Declaration of Joshua S. Furman

NIC Mot. to Quash
Exh. 6

382.   NTG attorneys Ferrell and Reid have apparently collaborated with other agents to form corporations to pursue Lanham Act claims in litigation, whereby their corporate ownership was masked using other shell companies.  *See* Exh. 98 at ¶¶ 22-32; *Strataluz LLC v. TruDerma*, Dkt. 6, at 5-9.

383.   Continuity alleged that Weiss (a partner with NTG agents Scott Ferrell and David Reid) collaborated with NTG to mask their ownership of Strataluz LLC.  *See* Exh. 98 at ¶ 24.  Continuity alleged that Weiss and NTG attorneys violated multiple ethics rules in the use of Strataluz LLC as a plaintiff in Lanham Act cases.  *Id.* at ¶ 25. Continuity explained that NTG and Weiss:

> Profited from Strataluz by engaging in a scheme akin to "patent trolling," whereby Strataluz, represented by NTG as legal counsel of record, threatened to sue other companies for alleged Lanham Act violations to extort monetary settlements from them.  In other words, [Continuity was] informed and believe, and thereon allege, that Weiss and NTG created a corporate client with the goal of filing and threatening to file cookie-cutter lawsuits against competitors, by misappropriating and misusing [Continuity's] intellectual property and proprietary information.

*Id.* at ¶ 29.

384.   TruDerma alleged that Strataluz's product was fictitious:  "the very existence of this product is a sham."  *See Strataluz LLC v. TruDerma*, No. 3:15-cv-1248, Dkt. 6, at 6 (S.D. Cal. 2015); *see also id.* ("truDerma is informed and believes that ProMAXAL is not even a real product but instead the 'product' and the website have been created solely for the purpose of bringing claims against businesses who sell products in the supplement industry").  TruDerma's evidence and investigation revealed that:

> Strataluz is not engaged in the actual manufacture or marketing of legitimate products, but is instead operating solely as a "Lanham Act Troll" seeking to extract payoffs from legitimate businesses by setting up façade operations, the sole purpose of which is to file suits against

NIC Mot. to Quash
Exh. 6

"competitors" in hopes of obtaining payments to avoid litigation and costly legal fees.

*Id.* at ¶ 16.

385.   NIC has fully briefed the relationship between Scott Ferrell, David Reid, and Joshua Weiss, and their joint organization of Strataluz, LLC in Dkt. No. 202. *See* Dkt. 202 at 24-31.

386.   A review of the phone records produced by AT&T and Verizon for Raquel Torres, Andrew Nilon, Sam Schoonover, Taylor Demulder, and Sam Pfleg, show that none of the cellular phones associated with those individuals *ever* made a call to the Newport Trial Group main office line (949-706-6464).  Furthermore, that same review shows that none of the cellular phones associated with those individuals ever made a call to any direct extension associated with the Newport Trial Group.  However, because NTG has refused to produce a list of its associated telephone numbers in discovery, NIC makes this determination based on publicly available information identifying NTG's associated telephone numbers.  Exh. 32 at 289-90 (NTG's blanket refusal to provide any phone numbers).  Discovery is ongoing.

387.   Defendant Sam Schoonover sat for deposition on January 11, 2017, in Los Angeles, California.  During the course of that deposition counsel for Schoonover and counsel for the Newport Trial Group defendants invoked numerous objections based on the attorney-client privilege and instructed Mr. Schoonover not to answer.  Rather than provide an explanation of the basis for the privilege assertions, Defendant Schoonover's attorney, Mr. Ford, instructed counsel for NIC to move the Court and compel answers if there was disagreement as to whether the line of questioning implicated the attorney client privilege.  Exh. 103 at 947.

388.   **Exhibit 103** is a true and correct copy of the transcript of the January 11, 2017 deposition of Sam Schoonover.

Declaration of Joshua S. Furman

89

389.   **Exhibit 104** is a true and correct copy of the email correspondence between the parties regarding the briefing schedule for the instant Joint Stipulation Re: Plaintiff's Motion to Compel.

390.   **Exhibit 105** is a true and correct copy of the unredacted retainer agreements between NTG and its clients, which were produced to NIC in discovery and Bates stamped NTG000189 through NTG000224.

Executed on this 21st day of February, 2017.

Joshua Furman
*Attorney for Plaintiff*

Declaration of Joshua S. Furman
90

# EXHIBIT 7

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

CERTIFIED TRANSCRIPT

NATURAL-IMMUNOGENICS CORP., )
                    Plaintiff, }
     vs.                       }
                               }  SACV-15-2034-JVS
NEWPORT TRIAL GROUP, et al.,)
                   Defendants. }
----------------------------}

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

January 9, 2017

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

NIC Mot. to Quash
Exh. 7

2

APPEARANCES OF COUNSEL:

For the Plaintiff:

PETER A. ARHANGELSKY
JOSHUA S. FURMAN
EMORD & ASSOCIATES, P.C.
3210 South Gilbert Road, Suite 4
Chandler, AZ  85286
(602) 388-8899

For Defendant NEWPORT TRIAL GROUP:

EDWARD SUSOLIK
DAVID J. DARNELL
CALLAHAN & BLAINE
3 Hutton Circle Drive
Santa Ana, CA  92707
(714) 241-4444

For Defendants ANDREW NYLON; GIOVANNI SANDOVAL;
                MATTHEW DRONKERS; TAYLOR DEMOLDER;
                SAM FLAGG; SAM SCHOONOVER;
                CALEB PATTERSON; DAVID URZUA;
                ISABELLE AJANOVIC:

BRENDAN M. FORD
FORD & DIULIO, PC
695 Town Center Drive, Suite 700
Costa Mesa, CA  92626
(714) 384-5540

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

NIC Mot. to Quash
Exh. 7

3

SANTA ANA, CALIFORNIA; MONDAY, JANUARY 9, 2017; 11:34 A.M.

THE CLERK:  Item No. 5, SACV-15-2034-JVS, Natural-Immunogenics Corporation versus Newport Trial Group, et al.

Counsel, please step forward and state your appearances.

MR. ARHANGELSKY:  Good morning, Your Honor.  Peter Arhangelsky on behalf of plaintiff Natural-Immunogenics. And with me is Joshua Furman.

THE COURT:  Good morning.

MR. SUSOLIK:  Good morning, Your Honor.  Edward Susolik of Callahan Blaine on behalf of the NTG defendants.

MR. DARNELL:  David Darnell also with Callahan Blaine, Your Honor, on behalf of the NTG defendants.

MR. FORD:  Good morning, Your Honor.  Brendon Ford on behalf of the non-NTG defendants.

THE COURT:  Good morning.

Thank you for your report.  In the context of the status conference, there is no way for me to fully appreciate or sort out the parties' various contentions with regard to discovery or the veracity of responses and so on.

I think that this case would benefit in terms of an efficient overall disposition by the appointment of a special master, and I would intend to appoint retired magistrate Judge Rosalyn Chapman, who is intimately familiar

NIC Mot. to Quash
Exh. 7

4

with federal discovery and has very good case management skills.

I want to give you an opportunity to reflect on that, and I will receive any written objections that refer specifically to the concept of a discovery master within ten days.

MR. SUSOLIK:  May I be briefly heard, Your Honor?

THE COURT:  Sure.

MR. SUSOLIK:  I agree 100 percent with the judge's comments as far as you being able to test the veracity of the statements.  I can tell you that they are demonstrably false.  This is another example of hyperbole and exaggeration we've heard since the beginning.

More to the point, Your Honor, this request is simply forum shopping.  We have one discovery motion so far, one, and our side prevailed.  Judge Gandhi ruled in our favor, and that is what the plaintiff is trying to avoid, to have to go back to Judge Gandhi.

All these contentions are simply inaccurate. There are three motions that will be heard next week by Judge Gandhi.  Again, we brought them.  Those are our motions, and we're going to prevail on those.  We are in the process of reviewing 80,000 documents and logging them.  We have been having a rolling production and a rolling privilege log.  Their contentions are demonstrably false.

NIC Mot. to Quash
Exh. 7

5

Let's recall who we're dealing with -- their prior lawyers in bankruptcy court; their expert, their star witness, in bankruptcy court in a fraud, a cyber terrorist. Their client lives in the South Pacific building an arc waiting for the end of the world. These lawyers are just -- he's waiting for the end of the world, Your Honor. The owner of NIC is living on an island waiting for the end of the world.

THE COURT: How do the Federal Rules of Civil Procedure apply any different whether one is sitting in Trump Tower or waiting for the end of the world?

MR. SUSOLIK: I couldn't agree with you more, Your Honor. My point is our side -- I have had to hire six contract attorneys to go through every one of these documents in addition to three full-time attorneys at my firm.

This plaintiff has now filed a motion to modify the Case Management Order, Your Honor, modify the Case Management Order because they don't want to go to mediation.

THE COURT: Well, we'll come to that.

MR. SUSOLIK: Well, my point being that the purpose of the motion is because Mr. Ferrell filed a State Bar Complaint against plaintiffs' counsel for improper settlement discussions. Well, the State Bar of California has now agreed with Mr. Ferrell and has opened an

NIC Mot. to Quash
Exh. 7

6

investigation into plaintiffs' counsels' conduct.

THE COURT:  This is all very interesting, but it doesn't really help me in the processing of this case.

MR. SUSOLIK:  Right.  So, Your Honor, I would strenuously -- we dealt with this three months ago, and Your Honor declined to appoint a discovery master.  I would request Your Honor not to appoint a discovery master.  It's just going to increase the cost to our side.  It's going to accelerate --

THE COURT:  It's not going to increase the cost to any side where people are acting properly.  I contemplate that the special master will have the ability to allocate fees where conduct is found inappropriate by a special master.

MR. SUSOLIK:  What I would request, Your Honor, is let Judge Gandhi make his rulings next week.  He's going to rule in our favor.  It will send a strong message.  Let Judge Gandhi do his job, which is to adjudicate discovery disputes here.

That's one thing that's keeping the cost down from having frivolous motions filed over and over, Your Honor.  So I would request that you just postpone your ruling for 15 days, and then we'll brief it in the meantime.

THE COURT:  You have ten days to make any objection.  I won't do anything until I receive your

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

7

positions or your indications that you are in agreement with the Court's finding.

MR. SUSOLIK:  Thank you very much, Your Honor.  We have been acting in good faith, Your Honor.  In October we -- they met and conferred with us.  In November, we reached an agreement to do a rolling production and rolling privilege logs.  We're doing that.

The bottom line is these are eight cases.  They represented to Your Honor in May it's going to be narrow discovery limited to the eight cases and we're not going to relitigate the issues.

Well, guess what.  Their discovery demands seek everything internally at Newport Trial Group dealing with the eight cases.  So I have had to hire five contract attorneys, and we have to go through each and every document on those eight cases from Newport Trial Group.  It's an incredibly burdensome process.

We're trying in good faith to comply with the request, and we will and we have.

Is there anything else you would like me to address, Your Honor?

THE COURT:  No.

Mr. Arhangelsky.

MR. ARHANGELSKY:  Briefly, Your Honor.  I am -- frankly I don't know how to address some of this

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

NIC Mot. to Quash
Exh. 7

8

information.  The owner of Natural Immunogenics resides in Florida.  The corporate headquarters is in Florida.  We hear these allegations that --

THE COURT:  Sir, we don't need to talk about that.

MR. ARHANGELSKY:  Right.  I don't understand why it's relevant here.  We have to keep in mind that in the underlying case in the Southern District of California it was specifically found that Newport Trial Group had taken a cavalier attitude towards discovery.

THE COURT:  Sir, I have other people waiting. Let's save the rhetoric.

MR. ARHANGELSKY:  Yes, Your Honor.  Of course.  I just want to point out that with respect to these burdens that he's cited, the numbers have fluctuated consistently from one hearing to the next.  They went on record in September and said that they had looked through 11,000 documents.  Now it's 80,000.

The points that I think we made clear in our briefing justify the appointment of a master.  We're seeking transparency.  We're seeking to obtain the evidence in this case so we can try this case on the evidence.

I understand His Honor's order to indicate that we will be receiving a Rule 53 notification to respond to, or will we be briefing on our own accord through a joint submission?  I just want to understand the procedure.

NIC Mot. to Quash
Exh. 7

9

THE COURT:  I will get a brief order out today.

MR. ARHANGELSKY:  Thank you, Your Honor.

THE COURT:  Now, with regard to mediation, I think discussions ought to go forward on the Court's schedule notwithstanding the status of discovery or the need for further discovery.  The sooner you begin to explain your positions to a third-party neutral, the sooner you will able to come to a resolution, if any.

I don't expect this case to resolve in one session with a mediator, but by the same token, you have to begin somewhere.  To the extent a mediator is educated either through briefs submitted or oral presentations, the sooner the mediator will be able to engage in working on the problem.

Where are you in terms of that?

MR. SUSOLIK:  Your Honor, on three occasions, I have sent an e-mail to plaintiffs' counsel asking them to identify potential mediators.  They have refused to do so, and their response was to file a motion with Your Honor to avoid a mediation.

THE COURT:  Well, we're going to have a mediation on the current schedule.  So, you know, either you submit a name to me by the end of the week, or you each submit to me three names and I will pick the mediator.

MR. SUSOLIK:  We will be happy to do so, Your

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

NIC Mot. to Quash
Exh. 7

10

Honor.

MR. ARHANGELSKY:  Your Honor, if I may, the motion that we have noticed is not to avoid mediation.  It's to change the ADR selection that we agreed to earlier in the case.  We have briefed our issues in the motion.

We believe in order to proceed in negotiating issues related to the UCL claim for injunctive relief, we could use the Court's supervision and guidance in allowing us to understand the injunctive relief that might be possible in the case.

It's clear that in these other contexts the discovery offers that were relayed to us in an e-mail format were a ruse to support these attacks.  We can't expose ourselves to that in good faith without understanding through His Honor what the potential injunctions could be.

We're going to be asked to mediate those specific claims.  If we continue like this, it's going to expose us to potential retaliation.

THE COURT:  A skilled mediator can inform you of the likely results on an allocation for injunctive relief based on the facts as you lay them out to the mediator.

MR. SUSOLIK:  One minute, Your Honor, just to rebut.  There was settlement discussions between Mr. Ferrell and a private agent and plaintiffs' counsel.  They sent back in writing a letter threatening to have Mr. Ferrell

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

NIC Mot. to Quash
Exh. 7

11

disbarred.  That's part of the record.  It's attached to their motion.  Mr. Ferrell, understandably upset, made a State Bar Complaint.

The State Bar has now issued an investigation letter.  This plaintiffs' counsel is being investigated, so this entire motion is based on their own conduct.  We just want to comply with the Court's order and have a mediator as the judge ordered, and they refuse to do so.

We will comply with your order and get those three names by Friday.

THE COURT:  Or agree on a name preferably.

MR. SUSOLIK:  We will, Your Honor.

MR. ARHANGELSKY:  Thank you, Your Honor.

Briefly, we can exchange names rapidly.  I will say that the Illinois Bar apparently has now sent these notifications across the country.  The Illinois Bar gave it no credence whatsoever, and I am sure that the California Bar will do the same.

We've obviously never been -- you know, we're not privy at this point to any allegations from the California Bar or any information.  We haven't received anything.  This is patent bad faith.  They're attempting to relitigate the tester issue through the State Bar.  That's the primary thrust of these Bar Complaints.

I think it's improper.  I think it's a disservice

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

NIC Mot. to Quash
Exh. 7

12

to the jurisdiction of this Court, and I think it should stop. This is just further evidence that as we continue we're going to face this type of retaliatory action.

This is the second time, as Your Honor knows, that Mr. Farrell has attempted to do something like this against counsel, specifically, the first being the wide dissemination of a defamatory document accusing us of all kinds of false allegations, including sexual issues, plagiarism, what have you. This is rantings, and I think it should stop.

THE COURT: That's why we're going to get the mediator involved sooner rather than later.

MR. SUSOLIK: We will submit the State Bar letter to Your Honor.

THE COURT: I don't want it. A strong mediator will help you --

MR. SUSOLIK: I couldn't agree more, Your Honor. Honestly, this case is unprecedented in my 26 years of experience, the zealotry and hyper aggressiveness of plaintiffs' counsel. We're talking about eight underlying cases.

Anyway, thank you very much, Your Honor. We will comply with the Court's order.

THE COURT: I will get an order out to appoint a special master.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

NIC Mot. to Quash
Exh. 7

13

MR. SUSOLIK:  Based on your comments, is the motion to modify the Case Management Order off calendar?

THE COURT:  It's off calendar.

Anything further?

MR. ARHANGELSKY:  No, Your Honor.

THE COURT:  Okay.  Thank you.

(Proceeding concluded at 11:48 a.m.)

*     *     *

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

NIC Mot. to Quash
Exh. 7

14

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  January 17, 2017


/s/   Sharon A. Seffens  1/17/17
_____
SHARON A. SEFFENS, U.S. COURT REPORTER

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

NIC Mot. to Quash
Exh. 7