# EXHIBIT 103

**REDACTED VERSION OF**
**DOCUMENT PROPOSED TO BE**
**FILED UNDER SEAL**

Atkinson-Baker Court Reporters
www.depo.com

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

- - -

NATURAL IMMUNOGENICS CORP.,      )
                                 )
                  Plaintiff,     )
                                 )
         vs.                     )   Case No. 8:15-cv-02034-JVS
                                 )            (JCG)
                                 )
NEWPORT TRIAL GROUP, et al.,     )
                                 )
                  Defendants.    )
                                 )
_____)

DEPOSITION OF

SAMUEL SCHOONOVER

LOS ANGELES, CALIFORNIA

JANUARY 11, 2017

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY:  TAMAR (ROBIN) WOLFE, CSR NO. 8110, RMR, CRR

FILE NO.:  AA0D284

1

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

- - -

NATURAL IMMUNOGENICS CORP.,          )
                                     )
                Plaintiff,           )
                                     )
        vs.                          )     Case No. 8:15-cv-02034-JVS
                                     )              (JCG)
                                     )
NEWPORT TRIAL GROUP, et al.,         )
                                     )
                Defendants.          )
                                     )
_____)

Deposition of SAMUEL SCHOONOVER, taken on behalf of Plaintiff, at 800 West Sixth Street, Suite 1220, Los Angeles, California, commencing at 10:01 a.m., Wednesday, January 11, 2017, before Tamar (Robin) Wolfe, CSR No. 8110.

2

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

APPEARANCES:


    FOR PLAINTIFF:

            EMORD & ASSOCIATES
            BY:   PETER A. ARHANGELSKY, ATTORNEY AT LAW
                        -and-
            JOSHUA S. FURMAN, ATTORNEY AT LAW
            3210 South Gilbert Road
            Suite 4
            Chandler, Arizona  85286
            602.388.8899



    FOR DEFENDANTS NEWPORT TRIAL GROUP, ANDREW BASLOW,
        SCOTT FERRELL, RYAN FERRELL, VICTORIA KNOWLES,
        AND DAVID REID:

            CALLAHAN & BLAINE
            BY:   DAVID J. DARNELL, ATTORNEY AT LAW
            3 Hutton Centre Drive
            Ninth Floor
            Santa Ana, California  92707
            714.214.4444



    FOR DEFENDANTS ANDREW NILON, GIOVANNI SANDOVAL, SAM
        SCHOONOVER, MATTHEW DRONKERS, TAYLOR DEMULDER,
        AND SAM PFLEG:

            FORD & DIULIO PC
            BY:   BRENDAN M. FORD, ATTORNEY AT LAW
            695 Town Center Drive
            Suite 700
            Costa Mesa, California  92626
            714.384.5540

3

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

I N D E X

WITNESS:   SAMUEL SCHOONOVER

EXAMINATION BY                                             PAGE

     Mr. Arhangelsky                                         6


E X H I B I T S

PLAINTIFF'S                                                PAGE

  1   Notice of Deposition (3 pages)                     14

  2   AT&T Records Key (10 pages)                        25

  3   Excerpted AT&T Phone Records Re: (925) 209-4303    25
      (55 pages)

  4   Defendant Sam Schoonover's Responses and           41
      Objections to Plaintiff's First Set of
      Interrogatories (26 pages)

  5   Civil Cover Sheet and Class Action Complaint       84
      (10 pages)

  6   CD of Audio Recordings                             92

  7   Retainer Agreement (5 pages)                       99

  8   First Amended Class Action Complaint (10 pages)   108

  9   Declaration of Sam Schoonover (3 pages)           111

 10   Confidential Settlement Agreement and General     118
      Release (9 pages)

 11   Email Correspondence Between Dave Reid and        120
      Angel Garganta (5 pages)

 12   Defendant Newport Trial Group's Responses to      122
      Plaintiff Natural Immunogenics Interrogatories
      (22 pages)

 13   Attachment A, Sam Schoonover's Responses and      124
      Objections to Plaintiff's First Set of Requests
      for Production - Privilege Log (2 pages)

4

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
                    I N D E X (Continued)

                    E X H I B I T S

PLAINTIFF'S                                            PAGE

  14  Text Message from (925) 209-4303 (1 page)        138




              QUESTIONS INSTRUCTED NOT TO ANSWER

                      PAGE        LINE
                       7           15
                       8            4
                      17           11
                      18            2
                      20           10
                      21            3
                      79            3
                      81           19
                      82            6
                      84           13
                     118           10
                     122            3
                     125           15
                     126           11
                     128            1
                     128           16
                     132           24
                     133           17
                     134            1




              INFORMATION TO BE SUPPLIED

                      (None)
```

5

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

LOS ANGELES, CALIFORNIA; WEDNESDAY, JANUARY 11, 2017

10:01 A.M.

- - -

MR. ARHANGELSKY:  Thank you.  Good morning.  We're here in the matter of Natural Immunogenics versus Newport Trial Group, 8:15-cv-02034.

Can we have counsel state their appearance for defendants.

MR. FORD:  Brendan Ford of Ford & Diulio PC on behalf of the witness.

MR. DARNELL:  Good morning.  David Darnell of Callahan & Blaine on behalf of Defendants Newport Trial Group, Scott Ferrell, Ryan Ferrell, Victoria Knowles, David Reid, and Andrew Baslow.

MR. ARHANGELSKY:  My name is Peter Arhangelsky. With me today is Josh Furman.  I represent the plaintiff in this matter, Natural Immunogenics Corporation.

SAMUEL SCHOONOVER,
having declared under penalty of perjury to tell the truth, was examined and testified as follows:


EXAMINATION
BY MR. ARHANGELSKY:

Q.   Mr. Schoonover -- is that how I pronounce your

6

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

name?  Is it Schoonover?

A.  Yes.

Q.  Can you please state your full name and spell it for the record.

A.  Samuel Lee Schoonover, S-a-m-u-e-l L-e-e S-c-h-o-o-n-o-v-e-r.

Q.  And do you go by "Sam"?

A.  Yes.

Q.  Have you ever been deposed before?

A.  No.

Q.  Is this the first lawsuit -- excuse me.  Aside from the lawsuit we'll be talking about, is this the first lawsuit you've been a defendant in?

A.  Yes.

Q.  How many lawsuits have you been involved with in your entire life?

MR. FORD:  Object to the form.  I'm instructing him not to answer.  It exceeds the scope of the discovery in this case.

MR. ARHANGELSKY:  The background information about the witness exceeds the scope of the discovery in this case?

MR. FORD:  The number of lawsuits that he may or may not have been involved in other than this lawsuit is neither relevant nor reasonably calculated to lead

7

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

to the discovery of admissible evidence.  I'm instructing him not to answer.

BY MR. ARHANGELSKY:

    Q.    How many lawsuits have you been involved with with the Newport Trial Group?

    MR. FORD:  Same instruction.

        Don't answer.

    MR. DARNELL:  Same objection.

        And, Counsel, I think I'll probably stipulate that, to the extent Mr. Ford voices an objection, I probably shouldn't have to piggyback and join.  Let's see if we can streamline this.

    MR. ARHANGELSKY:  Sure.  We'll stipulate to that, and I think it's better that we have one party objecting.

    MR. DARNELL:  Unless I need to voice an additional objection.

    MR. ARHANGELSKY:  Of course.  I understand.

    MR. DARNELL:  And for the record the objection is that it exceeds the scope of Judge Selna's July 20th order limiting the scope.

    MR. ARHANGELSKY:  I want to understand the scope of the objection very clearly because I think it could shape the contours of this deposition.

        Your position is background information about

8

Atkinson-Baker Court Reporters
www.depo.com

this witness related to his affairs with the Newport Trial Group -- he is a named defendant, and his case is part of the SAC.

Your position is that any questions into his background with the Newport Trial Group are outside the scope of the July 20, 2016, court order?

MR. FORD:  To the extent they do not relate to The Himalaya Drug case, which is cited in your complaint, yes.

MR. ARHANGELSKY:  So my understanding, then, is that you're passing on a relevance objection with respect to what relates to The Himalaya Drug Company case and instructing this witness not to answer essentially based on a relevance objection.

MR. FORD:  I am instructing the witness not to answer based on the fact that the only case that is relevant or at issue here, per Judge Selna's order, is The Himalaya Drug case.

If you wish to ask him questions about The Himalaya Drug case, we can proceed.  If you want to ask him about lawsuits that he may or may not have been involved in other than The Himalaya Drug case, I'm instructing the witness not to answer.

MR. DARNELL:  And I would like to just clarify. I'm objecting on the fact that the question exceeds the

9

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

scope of permissible discovery as ordered by Judge Selna.

And that is a completely valid objection and a completely valid basis to instruct the witness not to answer per applicable case law in this matter.

MR. ARHANGELSKY:  Okay.  Well, of course we disagree, and this will be part of information we obviously have to bring to the Court, but we'll move on for now, having had the objection lodged.

Q.  Let me present some ground rules since this is the first deposition that you've been involved with.

The way this is going to work is I'm going to ask questions, and you'll answer the questions to the best of your ability unless, of course, your counsel instructs you not to answer a question or if your counsel has an objection.

The critical issue here is to make sure we have a clean transcript and we're not talking over each other.  So I will ask that you wait for me to finish a question before you attempt an answer.

And, likewise, your counsel may have objections, as they just did.  It's imperative that you wait for your counsel to finish his objection before you begin answering questions so we can make sure we

10

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

have a clean transcript.

Is that understood?

A.   Yes.

Q.   Thank you.

You're represented by counsel today, and that is Mr. Ford; correct?

A.   Yes.

Q.   One thing to keep in mind, with respect to answering questions, we have a tendency when we speak informally to say "uh-huh," "huh-uh," nodding heads, shaking heads in response to questions.  Again, we need a clean transcript; so I'm going to ask that you answer questions verbally, "yes" or "no," to the extent you're able.

Is that fair?

A.   Yes.

Q.   If I ask a question and it's confusing and you don't understand the question, I'd like you to let me know if you don't understand the question.  Your counsel may also have an objection to a question that's unclear.

If I don't have an objection and if you attempt to answer my question, I'm going to assume that you've understood the question that I've asked.

Is that also fair?

11

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.   Yes.

Q.   Okay.  We take breaks frequently during depositions, as we need to.  If you feel like you need to take a break during this deposition, if you need to use the bathroom, please just let me know.

The only rule I'll insist upon is I'd like, if I have a question pending, for you to answer that question before we take a break.

Is that also understood?

A.   Yes.

Q.   Okay.  You've taken an oath here today.  Do you recall taking that oath moments ago?

A.   Yes.

Q.   What does that oath mean to you?

MR. DARNELL:  Objection.  Calls for a legal conclusion.

MR. FORD:  Go ahead.

THE WITNESS:  That you have to say the truth.

BY MR. ARHANGELSKY:

Q.   Do you understand that oath is the same as if you were testifying in open court before a judge?

A.   Yes.

Q.   Do you have an understanding as to the consequences for testifying falsely while under oath?

MR. FORD:  Object to the form.  It's argumentative

12

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

and calls for a legal conclusion.

You can answer.

THE WITNESS:  Yes.

BY MR. ARHANGELSKY:

Q.   What are those -- what is your understanding?

MR. DARNELL:  Objection.  Calls for a legal conclusion.

MR. FORD:  Join.

THE WITNESS:  Could you clarify?

BY MR. ARHANGELSKY:

Q.   What is your understanding as to what might happen or what the consequences could be if you testify falsely under oath at a deposition?

A.   I don't know.

MR. DARNELL:  Same objection.

BY MR. ARHANGELSKY:

Q.   You don't know?

A.   (No verbal response.)

Q.   Is there any reason you can't tell the truth here today?

Excuse me.  Let me rephrase that.

Have you taken any medication within the last 24 hours?

A.   No.

Q.   Is there any physical impairment that you're

13

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

aware of that you believe would impair your ability to tell the truth here today?

A.   No.

MR. ARHANGELSKY:   We have marked as Exhibit 1 a copy of the Notice of Deposition for Sam Schoonover, and copies to counsel.  I'll enter this as Exhibit 1.

(Plaintiff's Exhibit 1 was marked for identification.)

BY MR. ARHANGELSKY:

Q.   Have you seen this document before?

A.   No.

Q.   What did you do to prepare for this deposition today?

A.   I met with my attorney yesterday for about an hour.

Q.   When you say your attorney, you mean Mr. Ford?

A.   Yes.

Q.   Did you meet with anybody else?

A.   No.

Q.   Where did you meet with Mr. Ford?

A.   At the law offices of Adelman.  That's all that I know.

Q.   Would that be Milstein Adelman?

A.   I believe so.

Q.   Have you spoken with any of the other

14

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

defendants in this case about your deposition here today?

A. No.

Q. Have you spoken to the Newport Trial Group or any representative of the Newport Trial Group with respect to your testimony here today?

A. No.

Q. Have you brought any documents with you today?

A. No.

Q. Have you brought any personal effects with you today?

A. Yes.

Q. What have you brought?

A. Cell phone, wallet, and keys.

Q. Okay. I'm going to take you back to December 2015 or there around, December 2015. How did you learn that you were a defendant in this case?

A. I don't remember.

Q. Can you tell me approximately when you learned that you were a defendant in this case?

A. I would say sometime in the fall of 2015.

Q. In the fall of 2015?

A. Correct.

Q. Would that have --

A. I have to retract. I don't know.

15

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   Would it refresh your recollection to know that this case was filed in December of 2015?

A.   No.

Q.   So, after you found out about this case, did you speak with anybody concerning your role as a defendant in this case?

MR. FORD:  Objection to the extent it calls for privileged communications.  You're not to discuss anything that you discussed with any attorney.

BY MR. ARHANGELSKY:

Q.   You can still answer the question with respect -- subject to the objection.  And I will clarify that I'm not asking for any communications with you and attorneys.

Let me actually ask a different question.

Other than your attorneys did you speak with anybody about your role as a defendant in this case?

A.   I don't believe so, but I don't remember exactly.

Q.   Did you --

MR. DARNELL:  Mr. Arhangelsky, I apologize, but the AC is really loud.  Can I just have everyone speak up?  The reporter is nodding her head as well.  I think it would help everybody if we can raise the volume just a little bit.

16

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

MR. ARHANGELSKY:  Of course.  Of course.

MR. FORD:  It's very important, sir, that you speak loud enough so that everyone here can hear you.

THE WITNESS:  Understood.

BY MR. ARHANGELSKY:

Q.  Are your parents still living?

A.  Yes.

Q.  Did you speak with your parents about this case?

A.  No.

Q.  Who is -- well, let me -- how did you find your attorney who is representing you in this matter? And by "this" I'll be specific.  I'll say Mr. Ford.

MR. FORD:  Well, I'm going to instruct him not to answer.  That calls for privileged information.

MR. ARHANGELSKY:  I'm sorry.  I want to just understand -- we can lay a foundation for the objection.  The facts surrounding how he found an attorney are privileged?

MR. FORD:  Yes.  I'm instructing him not to answer.

MR. ARHANGELSKY:  In what way are they privileged?

MR. FORD:  They're privileged because I'm asserting a privilege objection, and if you disagree with it, then there are steps you can take.

MR. ARHANGELSKY:  Let me try and lay a foundation

17

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

just so I understand your objection in detail.

Q.   Who informed you that Mr. Ford would be your counsel?

MR. FORD:  Same objection.  I'm instructing him not to answer.

MR. ARHANGELSKY:  I think we need to understand who the communications are between so we can understand whether there is a valid privilege objection here.

MR. FORD:  I disagree.  He's not going to talk about how he hired me.

BY MR. ARHANGELSKY:

Q.   Okay.  How did you find out who was going to -- let me back up.

Are you familiar with the firm Milstein Adelman?

A.   Yes.

Q.   How are you familiar with Milstein Adelman?

A.   They contacted me.

Q.   When did they contact you?

A.   I don't remember.

Q.   And did they contact you about representation in this case?

MR. DARNELL:  Objection.

MR. FORD:  Yeah.  That asks for privileged communication.

18

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

MR. ARHANGELSKY:  So his retention of counsel --

MR. FORD:  Yes.

MR. ARHANGELSKY:  -- is privileged just generally?

MR. DARNELL:  I just want to clarify.  The question was "Did they contact you about representation in this case?"  That is a question that delves into the subject of communication with counsel of record.  So the objection is it calls for an attorney-client privileged communication.

MR. ARHANGELSKY:  Let me just understand.  You've disclosed retainer agreements as part of your discovery package.  You're aware of that, I'm sure.  So are you also alleging that the content of retainers would be privileged?

MR. DARNELL:  We can have this discussion off the record.

MR. ARHANGELSKY:  I'd like to understand the objection.

MR. DARNELL:  I think the content of retainer agreements are privileged if they reflect upon attorney-client privileged communication.  I believe that's what Ninth Circuit precedent provides.  We provided them to you because they are relatively generic-form documents.

MR. ARHANGELSKY:  So the existence of subject

19

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

matter of retention is privileged according to
defendants in this case?

MR. DARNELL:  The question that you asked the
witness is objectionable for the reasons stated.

BY MR. ARHANGELSKY:

Q.   Okay.  So Milstein Adelman contacted you first
in this case.  Is that what your testimony was?  You
did not contact them first?

A.   Correct.

Q.   Okay.  Are you paying or were you paying
Milstein Adelman's legal fees?

MR. FORD:  Object.  Instruct him not to answer.

MR. ARHANGELSKY:  His retention -- the
circumstances of his retention now, who is paying legal
fees, is that involving attorney-client privileged
information?

MR. FORD:  Yes.  I'm instructing him not to answer.

MR. ARHANGELSKY:  Can you at least give me some
elements perhaps that would satisfy the Ninth Circuit
standard of privilege as to why who pays his legal fees
would be privileged?

MR. FORD:  Because that necessarily delves into
communications between an attorney and a client.

MR. ARHANGELSKY:  It's a fact that underlies
communications.  You can't mask that.

20

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

MR. FORD:  Then move.

BY MR. ARHANGELSKY:

Q.   Are you personally responsible for legal fees paid to your attorneys in this case?

MR. FORD:  Same objection.

Don't answer that question.

BY MR. ARHANGELSKY:

Q.   Let me go, then -- let's discuss your personal background.  Where were you born?

A.   Pleasanton, California.

Q.   And have you lived in California your entire life?

A.   Yes.

Q.   Do you have any siblings?

A.   Yes.

Q.   How many?

A.   One.

Q.   And is that a brother or sister?

A.   Sister.

Q.   What's your sister's name?

A.   Taylor.

Q.   Taylee?

A.   Taylor.

Q.   Taylor.  Okay.  How old is your sister?

A.   Twenty-three.

21

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   And how old are you?

A.   Twenty-seven.

Q.   Where are you presently living?

A.   Los Angeles.

Q.   Los Angeles in the city?

A.   No.  West Hollywood area.

Q.   Are you presently living with anybody else?

A.   No.

Q.   You mentioned you had brought a cell phone with you today.  What is your cell phone number?

A.   (925) 209-4303.

Q.   And how long have you had that cell phone number?

A.   I don't know.

Q.   How long have you had a cell phone?

A.   Since eighth grade.

Q.   So can you ballpark a year when you obtained that cell phone?  When were you in eighth grade?

A.   Excuse me?

Q.   What year were you in eighth grade?

A.   Somewhere between 2000 and 2002.

Q.   So is it fair to say you've had a cell phone for quite a while?

A.   Yes.

Q.   More than ten years?

22

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.    Yes.

Q.    Have you had the same cell phone number the entire time you've owned a cell phone?

A.    No.

Q.    How long have you had the (925) 209-4303 number?

A.    I don't know.

Q.    Did you have that number in 2012?

A.    I would imagine, yes.

Q.    Did you have that number in 2010?

A.    I would imagine, yes.

Q.    Okay.  What type of phone do you use right now?

A.    An iPhone.

Q.    And have you used an iPhone consistently for the last five years?

A.    I don't know.

Q.    Okay.  Do you share your cell phone with anybody within a subscription plan?

A.    No.

Q.    So you are the person that pays for your cell phone?

A.    Yes.

Q.    And that is not on a family plan?

A.    No.

23

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   Does anybody else, any other individual, use your cell phone to make phone calls on a regular basis?

A.   No.

Q.   Do you have a password on your cell phone?

A.   Yes.

Q.   Does anyone other than you have access to that password?

A.   Yes.

Q.   And who would that be?

A.   I don't know.

Q.   What was the basis for your answer when you said "yes," somebody has access to your password?

A.   I would imagine that, over the course of my life, I've had friends that would know it or acquaintances.  I don't know who.

Q.   Like a girlfriend perhaps?

A.   Perhaps.

Q.   Okay.  Now, you indicated that you are responsible for your cell phone financially.  Have you ever reviewed a cell phone bill submitted by AT&T?

A.   Clarify "reviewed."

Q.   Have you ever received a bill from AT&T for your cell phone service?

A.   Yes.

Q.   And have you reviewed a call log history that

24

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

might be provided on that bill?

A.    I don't think so.

Q.    Are you aware whether your bills from AT&T, for example, might have call log histories on them?

A.    Aware, yes.

MR. ARHANGELSKY:  Let me mark two exhibits right now, and let's give copies to counsel.  The files that were just exchanged with the witness need to be marked as 2 and 3 respectively.

MR. DARNELL:  Counsel, if we could bring it up again.  I can't hear from down here.

(Plaintiff's Exhibits 2 and 3 were marked for identification.)

MR. ARHANGELSKY:  Okay.  I've placed two documents before the witness, Exhibits 2 and 3.  I'll represent that the first document, Exhibit 2, that you're looking at on your left is the AT&T records key.

And I will represent this information was produced to NIC counsel from AT&T in conjunction with a production of records from AT&T concerning certain phone numbers.

The document on your right, which is marked as Exhibit 3, is a document we have prepared for this deposition which is an excerpt of phone records that we received from AT&T that are designated by specific date

25

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

ranges, as indicated on cover pages and certain inserts reflected throughout the document.

The document marked Exhibit 3 has a footer that is specifically paginated 1 through 55 so that I might refer to specific pages within the exhibit itself.

Q.    Now, Mr. Schoonover --

MR. DARNELL:  Counsel, before you ask your subsequent question, may I inquire?  Exhibit 2, you've represented, is the AT&T records key for certain telephone records.  Which records does this relate to?

MR. ARHANGELSKY:  Thank you.

Q.    I'll represent that the AT&T records key is a generic document that is -- that provides a legend for specific terms that are included in the Exhibit 3 master reference list.  So perhaps it would be helpful if we look at Exhibit 3.

Turning to page 3, we'll just take it from the top.  The first page that actually has records displayed, you'll see at the top there, in addition to a number of entries that appear in table format, at the top of each table is a header, and you'll see terms such as "Item, Conn. Date, Conn. Time, Seizure Time."

Exhibit 2, which is AT&T records --
Mr. Schoonover, do you see Exhibit 2?

26

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.   Yes.

Q.   Do you see the corresponding terms on Exhibit 2?  The first page, which is relevant here, do you see those descriptions for column headings?

MR. DARNELL:  And I'm just going to assert an objection.  No foundation.  And there's several material problems with AT&T's records key, AT&T's documents, and I'm asserting the objection on that ground so that you're put on notice.

But feel free to do whatever you want and say whatever you think they say.

MR. ARHANGELSKY:  Sure, of course.

Q.   Do you see those headings on the AT&T records key that correspond with the headings on Exhibit 3 at the top of each column?

MR. DARNELL:  Objection.  Assumes facts to the extent that you're contending that they correspond.  No foundation.

BY MR. ARHANGELSKY:

Q.   Do you see those designations that I'm asking you to look at?

A.   Yes.

Q.   Okay.  And do those -- for example, on page 1 of Exhibit 2 where it says "Item," do you then see in Exhibit 3 at the top where it says "Item" at the top of

27

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

that row?

A. Yes.

Q. Okay. Where it says "Conn. Date," do you see the corresponding date that says "Conn. Date" in Exhibit 3?

A. Yes.

Q. And "Conn. Time," do you see where it says "Conn. Time" in Exhibit 3 --

A. Yes.

Q. -- and so forth?

So these records say "Conn. Time (UTC)." Can you read for me the passage in Exhibit 2 that's next to "Conn. Time (UTC)."

A. "Connection time. The time the call was connected. Time is in UTC. Time is expressed in military time as hour hour, minute minute, second second."

Q. Do you understand what military time is?

A. Yes.

Q. What do you understand military time to be?

A. A 24-hour time format.

Q. Okay. Now, do you know what UTC time is?

A. No.

Q. For purposes of this deposition -- and, again,

28

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Counsel, notwithstanding your objection to the records, I will represent to the witness that UTC time is a standardized time that is either seven or eight hours in front of Pacific Coast time, depending on the time of year because it does not change based on daylight savings time.

Do you understand that?

A. Yes.

Q. Now, have you seen AT&T's records that they've produced in this case before this deposition?

A. No.

Q. Have you been provided with a copy in discovery of the records that are associated with the phone number (925) 209-4303 produced by AT&T?

A. No.

Q. And you have testified previously -- correct? -- that (925) 209-4303 is, in fact, your mobile telephone number; is that correct?

A. Yes.

Q. Okay. And that it was your mobile telephone number in 2012 as well; correct?

A. Yes.

Q. Thank you.

Now, I'm going to be asking you questions with respect to Exhibits 2 and 3, and I would ask you to

29

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

have those documents in front of you for reference,
particularly Exhibit 2, to the extent that you need any
background information concerning items that are listed
in Exhibit 3.

MR. DARNELL:  Same objection.  No foundation.  And
the question creates a fundamental problem because
there is no connection between this key and this
document, and the AT&T records are inherently
unreliable as noted on the page -- the cover page of
the records that accompanied them.

MR. FORD:  I'll join.

BY MR. ARHANGELSKY:

Q.  Okay.  Looking at Exhibit 3 and on page 3, I
just want to walk through the top item on that list.
It's the very first item.  Under "Item" number it says
"2668."

Do you see that record?

A.  Yes.

Q.  And what does the connection date say next to
that item?

A.  "3/14/12."

Q.  Okay.  Do you understand that to reference a
record of a phone call that was created on 3/14/2012?

MR. DARNELL:  Objection.  No foundation.

MR. FORD:  Join.

30

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Go ahead.

THE WITNESS:  Yes.

BY MR. ARHANGELSKY:

Q.  Now, do you see where the document says "Seizure Time" at the top?

A.  Yes.

Q.  Can you look at Exhibit 2 and tell me what Exhibit 2 says with respect to "Seizure Time."

A.  "The time it takes to connect the
   call measured from the moment the caller
   presses 'Send' to when the call is
   connected."

Q.  So would you agree that Seizure Time involves the time it would require a phone to connect to another phone, but there is no actual connection between the caller and the listener?

MR. FORD:  Objection.  The document speaks for itself.

MR. DARNELL:  Objection.  No foundation.

THE WITNESS:  Yes.

BY MR. ARHANGELSKY:

Q.  Do you see where it says "Originating Number"? Do you see that column?

A.  Yes.

Q.  Okay.  And what is that number with respect to

31

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

2668, Item 2668?

A.    (818) 455-7555.

Q.    Do you see where it says "Terminating Number"?

A.    Yes.

Q.    And what is that number that's listed under "Terminating Number"?

A.    (925) 209-4303.

Q.    And is that terminating number your mobile number?

A.    Yes.

Q.    So, as I ask questions today with respect to these records, if I refer to columns such as "Originating Number, Terminating Number, Seizure Time," those various terms, I'm asking you to understand that this is -- these are the columns that I'm talking about.

Is that fair?

A.    Yes.

Q.    Thank you.  You can set this aside for just a second.

Let's go back a little bit further.  Where did you go to college?

A.    San Diego State University.

Q.    What year were you a freshman at San Diego State?

32

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.    2007.

Q.    Did you graduate San Diego State?

A.    Yes.

Q.    What year?

A.    2012.

Q.    Okay.  Did you have a major?

A.    Yes.

Q.    What was that major?

A.    Marketing.

Q.    What degree did you graduate with?

A.    Marketing.

Q.    Were you involved in any activities while at San Diego State?

A.    Yes.

Q.    What activities were you involved with?

A.    A fraternity.

Q.    What fraternity was that?

A.    SAE.

Q.    Is that otherwise known as Sig Ep?

A.    No.

Q.    What is the full name of that fraternity?

A.    Sigma Alpha Epsilon.

Q.    And excuse me for that mix-up.  I'm sure that's not something you want to hear.

Is that a large chapter at San Diego State?

33

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.   Yes.

Q.   How many members?

A.   I don't know.

Q.   Were you involved in any other extracurricular activities aside from a fraternity?

A.   No.

Q.   After you graduated San Diego State, what was your first position of employment?

A.   Self-employed.

Q.   And how were you self-employed?

A.   Designing websites.

Q.   How long did you hold that position?

A.   Until 2016.

Q.   Okay.  So continuously since graduation --

A.   Correct.

Q.   -- until 2016?

A.   Yes.

Q.   Did your business have a name?

A.   No.

Q.   What other positions have you held aside from your self-employed web design business?

A.   I worked with a music festival called Splash House, and I work at -- now I work at a company called Goldenvoice.

Q.   What does Goldenvoice do?

34

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.    It produces music events.

Q.    And how are you employed for Goldenvoice?

A.    I'm a digital program coordinator.

Q.    What are your job descriptions as a digital program coordinator?

A.    I work in the digital department.  I help my boss with the various digital programs that we deploy at music festivals.

Q.    How many employees does the business have?

A.    About 100.

Q.    And who is your boss that you report to immediately?

A.    His name is Gopi Sangha.

Q.    You might need to spell that for the reporter.

A.    G-o-p-i S-a-n-g-h-a.

Q.    In 2012, aside from your business as a web designer, did you have any other employment?

A.    I worked at a restaurant called Mister A's.

Q.    What is the address of Mister A's?

A.    I don't know.

Q.    General city, state?

A.    San Diego.

Q.    How much did you make -- did you earn annually as a web developer in 2012?

A.    I don't remember.

35

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.    Have you heard of a company called OCSDBeats.com?

A.    Yes.

Q.    Is that your company?

A.    It wasn't a company.  It was a website.

Q.    A website.  Was that a website that you had formed through your web development business?

A.    I actually did not build the website.

Q.    Okay.  Did you work for that website?

A.    Yes.

Q.    In what capacity?

A.    It was a music blog.  We wrote about music.

Q.    Okay.  Were you paid for that position?

A.    No.

Q.    Were there any other employees in that -- underneath that website?

A.    Employees?  No.  Writers, yes.

Q.    Writers.  Members perhaps?

A.    Yes.

Q.    How many?

A.    Four.

Q.    Who were the other writers?

A.    Austin Glenn, Scooter Von, Jeff Ceccaci -- the last name is C-e-c-c-a-c-i -- and Blake Klippa.  The last name is K-l-i-p-p-a.

36

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   And how did you come to be employed with OCSDBeats.com?

A.   Me and Austin wanted to start a music blog.

Q.   Austin was your friend from -- or an acquaintance from before that music blog began?

A.   Yes.  We went to college together.

Q.   Okay.  About what year did you first meet Austin?

A.   I don't know.

Q.   And it was in 2012 that you decided to start the blog together, or was that beforehand?

A.   I don't remember.

Q.   Okay.  Do you still keep in contact with Austin Glenn?

A.   Yes.

Q.   Was Mr. Glenn part of your fraternity?

A.   Yes.

Q.   How long were you employed for OCSDBeats.com?

A.   I don't remember.

Q.   You're not still employed with them presently?

A.   No.

Q.   Do they still exist?

A.   No.

Q.   Where does Mr. Austin Glenn work presently?

A.   At Electric Family.

37

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   And you've also had employment with Electric Family?

A.   No.

Q.   Have you had any affiliation with Electric Family?

A.   Yes.

Q.   And what was that affiliation?

A.   When I first moved to Los Angeles, I helped them -- tried to help them start an events division of their company.

Q.   Did they compensate you for any of your services?

A.   No.

Q.   Can you describe how you helped them begin an events division for their company.

A.   We threw two events at Sound Nightclub.

Q.   So was your involvement with the Electric Family limited to just those two events at the nightclub?

A.   Yes.

Q.   What was that nightclub?

A.   Sound Nightclub in Hollywood.

Q.   And after the second event did you have any other affiliation or any other work for the Electric Family since that time?

38

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.    No.

Q.    When approximately was that that you helped them with the two events?

A.    Summer of 2015.

Q.    Was Mr. Austin Glenn working with the Electric Family at that time?

A.    Yes.

Q.    What was his role with the Electric Family at that time?

A.    No defined role.

Q.    Was he a salaried employee?

A.    I don't know.

Q.    How many employees did the Electric Family have when you were involved with them?

A.    Two.

Q.    And who were those employees?

A.    Austin Glenn, Ken Hilton.

Q.    Was Mr. Glenn a founder of the Electric Family, or was he just an employee?

A.    Employee.

Q.    Who were the founders of the Electric Family?

A.    Matt Dronkers, Drew Nilon, Steve Brudzewski.

Q.    Are you able to spell "Brudzewski"?

A.    I can try.  B-r-u-d-z-e-w-s-k-i.

Q.    Was Mr. Glenn your connection to the Electric

39

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Family when you gained employment with them?

A. No.

Q. Excuse me. To clarify the record, I believe your testimony was that you were not employed for the Electric Family, but you helped them; correct?

A. Correct.

Q. And how did you become familiar with the individuals operating the Electric Family at the time?

A. I grew up with Matt Dronkers and Drew Nilon.

Q. And that is in Pleasanton, California?

A. Yes.

Q. Did you attend school with Mr. Dronkers and Mr. Nilon?

A. High school.

Q. Did you keep in contact with Mr. Nilon and Mr. Dronkers after high school?

A. Yes.

Q. And so was it your connection to Drew Nilon and Mr. Dronkers that brought you to the Electric Family?

A. Yes.

Q. And approximately what time was that -- if you can give a month or a year, as approximately as you can, when was it when you first were introduced to the Electric Family?

40

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.  I don't remember.

Q.  Let's go back to 2012.  Where were you living in 2012?

A.  I don't remember.

Q.  City, state approximately?

A.  San Diego.

Q.  San Diego.  Do you have a specific address that you can testify to with respect to where you might have been living during those years?

A.  No.  I moved around a lot, about once a year, after I graduated college.

(Plaintiff's Exhibit 4 was marked for identification.)

BY MR. ARHANGELSKY:

Q.  Okay.  Mr. Schoonover, I'm handing you -- the clerk has handed you a document we've marked as Exhibit 4, and copies to counsel.

Do you recognize this document?

A.  No.

Q.  Have you ever seen this document before?

A.  I don't know.

Q.  Let me represent that the document is captioned "Defendant Sam Schoonover's Responses and Objections to Plaintiff's First Set of Interrogatories."

41

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Have I read that correct in the middle of the first page to the right?

A.   Yes.

Q.   And at the top there's several names.  Do you recognize any of those names at the top?

A.   Gillian Wade.

Q.   You recognize Ms. Wade's name?

A.   Yes.

Q.   How do you recognize that name?

A.   I believe she represented me.

Q.   You believe -- are you certain or are you guessing that she represented you?

A.   I'm guessing.

Q.   Okay.  Do you recognize any of the other names on this list?

A.   Sara Avila.

Q.   And how do you know Ms. Avila's name?

A.   I don't know.

Q.   How did you recognize her name?

A.   I just recognize it from communications with Mrs. Wade, I would presume.

Q.   Do you have any understanding as to whether Ms. Avila represented you in this case?

A.   I do not know.

Q.   Let me direct your attention to the -- towards

42

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

the back of this document.  It is not paginated, meaning it does not have a page number, but it is the third from the last page.  The top of the page says "Verification."

Can you let me know when you've reached that page.

A.   I have.

Q.   Do you recognize this page?

A.   No.

Q.   Is that your signature towards the bottom of the page?

A.   Yes.

Q.   Do you see where it says "Executed on 8/12/16 at Los Angeles, California"?

A.   Yes.

Q.   Do you recall signing this document?

A.   No.

Q.   Did you sign this document?

A.   Yes.

Q.   How do you know that you signed this document?

A.   That's my signature.

Q.   Okay.  Apart from your signature appearing on the page, do you have any other basis to say that you recall signing this document?

A.   No.

43

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   Do you recall reviewing this document?

A.   No.

Q.   Were you living in Los Angeles, California, on 8/12/16?

A.   Yes.

Q.   I want to direct your attention on this page, where it says "I am a party" -- excuse me.  There is a series of check boxes and paragraphs.  There is one that's checked, and it says -- well, could you read that paragraph for me, please.

A.   "I am a party to this action.  The matters stated in it are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true."

Q.   Okay.  Did you put that check mark in that box?

A.   I don't remember.

Q.   Do you know who prepared this document?

A.   No.

Q.   Do you know who prepared the entire document generally marked as Exhibit 4?

A.   No.

Q.   Let me direct your attention to page 11 and 12

44

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

of this document.  If you can flip through it, the bottom of those pages should be marked.

Directing your attention towards the top of the page, it says "Interrogatory No. 4."  Do you see where that has a sentence beginning with "Identify"?

A.   Yes.

Q.   What does that say?

A.   "Identify every physical address at which you have resided in the last six years."

Q.   And turning the page to page 12, that's the following page, do you see there is a list of addresses?

A.   Yes.

Q.   Are those addresses where you have resided over the course of the last five or six years?

A.   Yes.

Q.   Okay.  Are those addresses in any particular order with respect to the chronology in which you lived at these addresses?

A.   Yes.

Q.   And by that is it fair to say that you lived at    REDACTED    most recently, or is that the farthest away as far as dates are concerned?

A.   The farthest away.

45

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   Do you recall when you lived at REDACTED Street, Apartment 3?

A.   No.

Q.   Okay.  Do you recall when you lived at REDACTED in Los Angeles?

A.   Yes.

Q.   And when did you live at that address?

A.   Now.

Q.   That's your current address?

A.   Yes.

Q.   Okay.  Now, when you lived at REDACTED Street -- you testified that you don't know when.  Was it after college or during college?

A.   After college.

Q.   Was it immediately after college, or was there a break in time between your residence there?

A.   There was a break.

Q.   Did you live at REDACTED Street in 2012?

A.   I don't know.

Q.   How long did you reside at that address?

A.   One year.

Q.   And how long did you reside at the address 4990 Del Monte?

A.   I don't remember.

Q.   How long did you reside at 1958 Pacific Beach

46

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Drive?

A.    I don't remember.

Q.    How long did you reside at ▓ REDACTED ▓?

A.    I don't remember.

Q.    How long did you reside at ▓REDACTE▓ (verbatim)
15th Street?

A.    Six months, I think.

Q.    Now, when you resided at ▓ REDACTED ▓ Street, do
you recall whether you had any roommates at the time?

A.    Yes.

Q.    And who were your roommates?

A.    Matt Dronkers, Drew Nilon, Austin Glenn, Dan
Luxford.

Q.    Can you spell Dan Luxford's name, please.

A.    D-a-n L-u-x-f-o-r-d.

Q.    And you testified -- just so we have the
record straight, did you testify you lived at
▓ REDACTED ▓ Street for one year?

A.    Yes.

Q.    Approximately or exactly?

A.    Exactly.

Q.    And were your roommates Mr. Luxford,
Nilon, Dronkers, and Glenn your roommates for the
entire duration of your residence at ▓ REDACTED ▓
Street?

47

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.   Yes.

Q.   Were you all on the lease together?

A.   I don't remember.

Q.   How do you know Mr. Luxford?

A.   Middle school and high school.

Q.   So he's another friend from your childhood?

A.   Yes.

Q.   As was Mr. Dronkers and Mr. Nilon?

A.   Yes.

Q.   And Mr. Glenn was a friend from college?

A.   Yes.

Q.   So can you describe the circumstances under which you -- the group of you agreed to live together around whatever time you lived at REDACTED

A.   Drew and Matt were moving to San Diego.  I think Dan Luxford was as well, and we'd all been friends for a long time; so we moved in together.

Q.   Mr. Nilon was moving to San Diego from where?

A.   Arizona.

Q.   Is that where he went to school?

A.   Yes.

Q.   Did he go to school with Mr. Dronkers?

A.   No.

Q.   Where did Mr. Dronkers go to school?

A.   He did not.

48

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   Where did Mr. Luxford go to school?

A.   He did not.

Q.   Okay.  What did Mr. Luxford do for work around the time when he lived with you, if you know?

A.   I don't remember.

Q.   What was Mr. Dronkers doing for work around the time he lived with you at REDACTED Street?

A.   Freelance website design.

Q.   What was your rent?  Do you recall?

A.   I don't remember.

Q.   Did you share rent evenly?

A.   No.

Q.   Were there -- how many bedrooms were there in this apartment?

A.   Three.

Q.   So somebody shared a bedroom?

A.   Yes.

Q.   Who was that?

A.   I shared a bedroom with Matt.

Q.   Matt Dronkers?

A.   Yes.

Q.   After you -- after your lease at REDACTED had terminated, you moved to another location.  Was that location 4990 Del Monte?

A.   Yes.

49

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   And did you have any roommates when you lived at Del Monte Avenue?

A.   Austin Glenn.

Q.   Just Mr. Glenn?

A.   Yes.

Q.   When you left Del Monte Avenue and you moved into Pacific Beach Drive, did you have any roommates at Pacific Beach Drive?

A.   Austin Glenn, Mike Garrity.

Q.   Can you spell Mr. Garrity's name?

A.   G-a-r-r-i-t-y.

Q.   And when you moved into REDACTED Street, did you have any roommates in REDACTED Street?

A.   No.

Q.   You lived there by yourself?

A.   Yes.

Q.   Okay.  When you lived at REDACTED Street, Apartment E, did you have any roommates when you lived in that apartment?

A.   I lived by myself.

Q.   By yourself.  And then you testified, I believe, before that you lived by yourself at De Longpre Avenue as well?

A.   Yes.

Q.   So would you agree that on or around 2012,

50

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

based on what you just testified to, you would have lived at the very least with Mr. Glenn; correct?

A. Yes.

Q. But you cannot recall whether or not in 2012 you were residing in any of these specific addresses?

A. No. I don't remember what dates I lived where.

Q. Do you have access to any documents that might help you remember when you resided at these addresses?

A. I don't know.

Q. What information did you review when you provided, if you provided, a list of these addresses to your counsel?

MR. FORD: Assumes facts not in evidence. Objection.

MR. ARHANGELSKY: I'll back up, then. I'll clarify that.

Q. Did you provide these addresses to your counsel?

A. Yes.

Q. Okay. Do you recall about when you provided those addresses to your counsel?

A. No.

Q. It was at some point during this case, I would assume; correct?

51

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.   Yes.

Q.   And do you have any recollection of what information you were reviewing when you compiled this list?

A.   No.

Q.   When you were employed with the Electric Family -- I'm sorry.  Excuse me.  I don't want to mischaracterize your testimony.

When you were performing work for the Electric Family, did you report to anybody in particular?

A.   No.

Q.   How did you -- did you receive any specific assignments or tasks from anybody in particular at Electric Family?

A.   No.

Q.   How did you determine what work you were going to be doing for the Electric Family during that time?

A.   I have a background of promoting events.

Q.   So would it be fair to say that they hired you just generally to promote events without any specific event in mind?

MR. DARNELL:  Objection.  Misstates prior testimony.

MR. FORD:  Join.

THE WITNESS:  They didn't hire me.

52

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

BY MR. ARHANGELSKY:

Q.    Excuse me.  They asked you -- would it be fair to say -- strike my last question.

Would it be fair to say that they asked you to just perform general marketing without regard to any specific event?

A.    They didn't ask me.  I offered it.

Q.    And they accepted your offer?

A.    Yes.

Q.    Did you receive any compensation for your efforts?

A.    No.

MR. DARNELL:  Objection.  Asked and answered.

BY MR. ARHANGELSKY:

Q.    Do you know an individual by the name of Sam Pfleg?

A.    Yes.

Q.    How do you know Mr. Pfleg?

A.    Through Drew Nilon.

Q.    When did you first meet Mr. Pfleg?

A.    I don't remember.

Q.    Do you recall the circumstances in which you met Mr. Pfleg?

A.    No.

Q.    Is Mr. Pfleg Mr. Nilon's acquaintance from

53

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

school?

    A.    Yes.

    Q.    Okay.  So they went to school where?

    A.    Arizona State.

    Q.    Did they graduate in the same year?

    A.    No.

    Q.    When did Mr. Pfleg graduate?

    A.    One year before Drew and I.

    Q.    And you graduated again --

    A.    Actually, I apologize.  One year before Drew.
Drew graduated a year before I did.

    Q.    Okay.  So you've each graduated in different
years?

    A.    Correct.

    Q.    And you graduated when?

    A.    2012.

    Q.    Okay.  And Mr. Nilon graduated in what year?

    A.    2011.

    Q.    And so fair to say Mr. Pfleg graduated in
2010?

    A.    Yes.

    Q.    Were you familiar with Mr. Pfleg in 2012 at
any point?

    A.    Yes.

    Q.    And how were you familiar with him in 2012?

54

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.    I had visited Drew at school and met Sam Pfleg.

Q.    Okay.  So you met him at ASU?

A.    Yes.

Q.    Did Mr. Pfleg ever reside in San Diego while you were residing in San Diego along with Mr. Glenn and Mr. Nilon and Mr. Dronkers?

A.    Yes.

Q.    Do you know where he resided?

A.    Bankers Hill.

Q.    Was that close in proximity to where you were living at the time?

A.    I don't remember where I lived when he lived there.

Q.    Okay.  Did you spend time with Mr. Pfleg in 2012 socially?

A.    I would imagine, yes.

Q.    Okay.  Do you have Mr. Pfleg's phone number?

A.    Yes.

Q.    You were in contact with him on a weekly basis?  A monthly basis?

A.    Weekly basis.

Q.    Was he part of your social circle with respect to social activities at the time?

A.    Yes.

55

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   Is Mr. Pfleg affiliated in any way with the Electric Family?

A.   Yes.

Q.   What does he do for the Electric Family?

A.   I don't know.

Q.   Was he affiliated with the Electric Family when you performed work for them in 2015?

A.   No.

Q.   When did he become affiliated with the Electric Family?

A.   When they started it.

Q.   When did they start it?

A.   I don't know.

Q.   So is he a founder of the Electric Family?

A.   I don't know.  They keep that private.

Q.   Okay.

A.   Like most businesses do.

Q.   Okay.  Nobody's ever told you specifically whether or not Mr. Pfleg was a founder of the Electric Family?

A.   No.

Q.   In your relationship with Mr. Nilon, did he ever inform you whether he was a founder of the Electric Family?

A.   Clarify, please.

56

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   You've testified having an extensive relationship with Mr. Nilon.

A.   Yes.

Q.   Did he ever tell you that he was a founder of the Electric Family?

A.   That who was a founder?

Q.   That Mr. Nilon was a founder of the Electric Family.

A.   Yes.

Q.   Did Mr. Nilon ever inform you whether Mr. Pfleg was a founder of the Electric Family?

A.   No.

Q.   Do you know an individual by the name of Taylor Demulder?

A.   Yes.

Q.   How do you know Mr. Demulder?

A.   Drew Nilon.

Q.   Can you explain how you met Mr. Demulder through Mr. Nilon?

A.   Visiting Drew at ASU.

Q.   Did Mr. Demulder go to ASU?

A.   Yes.

Q.   Do you recall or do you know what year he graduated from ASU?

A.   No.

57

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.    When you visited Mr. Nilon at ASU, how did you meet Mr. Demulder?  Was he living with Mr. Nilon, for example?

A.    I don't remember.

Q.    Can you recall on or about when you would have met Mr. Demulder based on a year or a month?

A.    No.

Q.    Do you recall what year Mr. Nilon would have been in ASU at the time when you were visiting him?

A.    No.

Q.    How often would you have visited Drew Nilon at ASU?

A.    Once or twice a year.

Q.    And you would drive to ASU?

A.    Yes.

Q.    Okay.  Spend the weekend?

A.    Yes.

Q.    Spend time with his friends?

A.    Yes.

Q.    Did you become close with any particular friend of his?

A.    A number of them.

Q.    Which ones?

A.    Sam Pfleg, Zach McDougal.  Those would be the closest.

58

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.    Did you keep in touch with Mr. Demulder after Mr. Demulder left ASU?

A.    A little bit.

Q.    Was Mr. Demulder in your social circle?

A.    Yes.

Q.    Is he still in your social circle?

A.    No.

Q.    When was the last time you spoke with Mr. Demulder?

A.    I don't remember.

Q.    Longer than a year?

A.    No.

Q.    Within the last several months?

A.    October.

Q.    October.  Do you recall what the substance of that conversation was?

A.    No.

Q.    Okay.  When was the last time you spoke with Mr. Nilon?

A.    Yesterday.

Q.    And do you recall what the substance of that conversation was?

A.    Visiting our friend for his birthday.

Q.    And before that when was the last time you talked to Nilon?

59

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.   The day before that, probably every day for the past few years.

Q.   Okay.  So he's one of your closer friends?

A.   Yes.

Q.   When was the last time you talked to Mr. Pfleg?

A.   Last week.

Q.   Do you recall the substance of that conversation?

A.   His wedding in March.

Q.   How frequently do you talk to Mr. Pfleg?

A.   Once every few weeks.

Q.   And Mr. Dronkers, when was the last time you spoke with him?

A.   Every day for the past few years.

Q.   So he, like Mr. Nilon, is one of your closer friends?

A.   Yes.

Q.   Did you talk to anyone -- I should be specific.  Have you talked to Mr. Nilon, Mr. Dronkers, Mr. Demulder about this case?

A.   No.

Q.   So, Mr. Nilon, you've spoken to him on a daily basis for the last several years and you've never spoken to him about this case?

60

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.    No.

Q.    Are you aware that Mr. Nilon is also a defendant in this case?

A.    No.

Q.    Do you have any understanding as to whether or not Taylor Demulder is a defendant in this case?

A.    I don't know.

Q.    Do you have any understanding as to whether Mr. Dronkers is a defendant in this case?

A.    I don't know.

Q.    Do you have any understanding as to whether Mr. Pfleg is a defendant in this case?

A.    I don't know.

Q.    Do you have any relationship with Mr. Brudzewski?

A.    Yes.

Q.    And can you describe that relationship for me.

A.    A friend I met through Drew.

Q.    When did you meet him?

A.    I don't remember.

Q.    And you testified before that he was involved with the Electric Family.  Did you correspond with Mr. Brudzewski while you were affiliated or performing work for the Electric Family?

A.    Yes.

61

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   And how often would you speak with Mr. Brudzewski?

A.   Rarely.

Q.   Okay.  Do you know an individual by the name of Talee Rooney?

A.   Yes.

Q.   Who is Talee Rooney?

A.   Ex-girlfriend.

Q.   How long ago were you dating Ms. Rooney?

A.   I don't remember.

Q.   Do you remember where you were living when you dated Ms. Rooney?

A.   No.

Q.   Do you recall who your roommates were when you were dating Ms. Rooney?

A.   Yes.

Q.   And who were they?

A.   It was actually during the time of **REDACTED**

Q.   Okay.  So, based on your residence history, likely several years ago at least; correct?

A.   Correct.

Q.   Would it be before 2013 or after?

A.   I don't remember.

Q.   How long was your relationship with Ms. Rooney?

62

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.    I don't remember.

Q.    How did you meet her?

A.    At a bar in Pacific Beach.

Q.    Do you recall the bar?

A.    No.

Q.    How old is Ms. Rooney?

A.    I think she was a year older than I was.

Q.    So how old approximately would she have been at the time you met her?

A.    I don't remember.

Q.    How old is she now?

A.    Twenty-eight, I would imagine, but I don't know for sure.

Q.    What was she doing -- what was her line of work, if you know, when you met her at the bar in Pacific Beach?

A.    She worked at a restaurant.

Q.    What restaurant?

A.    I don't remember.

Q.    Was she a server?

A.    No.

Q.    What was her role at the restaurant?

A.    She would sit at the front and direct people to their tables.  I forgot the name of that.

Q.    Hostess?

63

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.    Hostess.

Q.    Did you ever share a residence with Ms. Rooney?

A.    Yes.

Q.    What residence was that?

A.    REDACTED

Q.    So she shared a room with you?

A.    Yes.

Q.    Was that a fixed living arrangement or just something she would occasionally do?

A.    It happened for about a month.

Q.    Did she have her own place at the time?

A.    No.

Q.    Did she receive mail at that REDACTED address?

A.    No.

MR. ARHANGELSKY:  I'm going to propose -- let's go off record for just a minute.

(Brief recess.)

BY MR. ARHANGELSKY:

Q.    Mr. Schoonover, at some point in 2012 do you recall becoming acquainted with an individual named Andrew Baslow?

A.    Yes.

Q.    And how did you --

64

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.   Well, I don't know when that was.

Q.   How did you meet Mr. Baslow?

A.   Through Talee Rooney.

Q.   And can you describe how Miss Rooney introduced you to Mr. Baslow?

A.   No.

MR. FORD:  Ms. Rooney.

MR. ARHANGELSKY:  Ms. Rooney.  Sorry.

Q.   Can you describe the reasons why Ms. Rooney introduced you to Mr. Baslow?

A.   I believe they grew up together.  They knew each other well.

Q.   Did Mr. Baslow come around the REDACTED Street address when Ms. Rooney was living there?

A.   No.

Q.   Did Mr. Baslow communicate -- to your knowledge, did Mr. Baslow communicate with Ms. Rooney by telephone?

A.   I don't know.

Q.   Did you spend any time with Mr. Baslow in two thousand -- in March -- or January through March 2012 in person?

A.   I don't know.

Q.   Did you meet with Mr. Baslow at a party in Yorba Linda in 2012?

65

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.   Where is Yorba Linda?

Q.   I'm asking a question.  Do you have an understanding of where Yorba Linda is?

A.   No.

Q.   Did you meet Mr. Baslow at a party generally in two thousand -- in January through March of 2012?

A.   I don't know when it was or where it was, but I'm pretty sure it was him getting married, and I went with Talee.

Q.   You attended his wedding?

A.   No, not a wedding.  A reception or -- it was at a house.  I don't know if it was his house.

Q.   It was an event that surrounded his nuptials?

A.   I think it was him getting married.  I don't know for sure.

Q.   Okay.  Did you speak with him at that function?

A.   I don't remember.

Q.   How many people were at the function?

A.   I don't remember.

Q.   Where was it?

A.   I don't remember.

Q.   Was it a dinner?  Was it a cocktail hour?

A.   There was food there.

Q.   Okay.  All you remember from that event is

66

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

that there was food?

A.    Yes.

Q.    Okay.  Were there drinks?

A.    Yes.

Q.    Was it at nighttime?

A.    I don't remember.

Q.    You don't recall whether it was day or night?

A.    No.

Q.    Okay.  Was it at a restaurant?

A.    No.

Q.    It was at a residence?

A.    It was at a house, yes.

Q.    Was it his house?

A.    I don't know.

Q.    And did you receive Mr. Baslow's phone number from Ms. Rooney around that time?

A.    I don't remember.

Q.    Let me direct you to what we've marked as Exhibit 3.  Again, these are excerpts of the AT&T records produced to counsel in this case.  And let's go to page 3 of 55.

Now, I'll represent that Mr. Baslow's phone number -- it has been indicated to us that it is (818) 519-0164 and that that phone number is affiliated with Mr. Baslow's mobile phone.

67

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Do you accept that for purposes of this deposition?

A.   Yes.

Q.   Okay.  Looking at Item 2671 on the page I've referenced -- and we've highlighted it for ease of this examination -- do you see a phone call marked "3/15/2012"?

A.   Yes.

Q.   And what are the two numbers that are indicated there, the originating number and the terminating number?

A.   Originating number (925) 209-4303, terminating number (818) 519-0164.

Q.   Okay.  Now, again, that (925) 209-4303 number is your mobile number; correct?

A.   Correct.

Q.   And it appears to be calling -- at least what the records appear to indicate is that it's calling Mr. Baslow's mobile number on March 15, 2012.

MR. DARNELL:  Objection.  No foundation.

BY MR. ARHANGELSKY:

Q.   Does that appear to be what this record shows?

A.   Yes.

MR. DARNELL:  Same objection.

///

68

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

BY MR. ARHANGELSKY:

Q.   Does this refresh your recollection in any way as to whether you had Mr. Baslow's phone number at the time, in 2012, March 2012?

MR. DARNELL:  Objection.  No foundation for the document.

MR. FORD:  Join.

THE WITNESS:  No, I have no recollection.

BY MR. ARHANGELSKY:

Q.   Do you have any recollection whatsoever of calling Mr. Baslow in March 2012?

A.   No.

Q.   Okay.  Going down to the next item that's listed in that sequence, do you see Item 2672?

A.   Yes.

Q.   And what is the originating number in that line?

A.   (925) 209-4303.

Q.   And what is the terminating number?

A.   (818) 519-0164.

Q.   Does that refresh your recollection with respect to whether you may have had Mr. Baslow's phone number in March of 2012?

MR. DARNELL:  Objection.  No foundation.

MR. FORD:  Join.

69

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

THE WITNESS:  Yes, it looks as if I did.

BY MR. ARHANGELSKY:

Q.   Okay.  Do you have -- you testified earlier that you have your cell phone on you now.  Do you have Mr. Baslow's phone number in your cell phone?

A.   I don't know.

Q.   If you had wanted to contact Mr. Baslow in 2012, would you have had his phone number in your cell phone?

MR. FORD:  Object to the form.

THE WITNESS:  I don't know.

MR. FORD:  Vague.

BY MR. ARHANGELSKY:

Q.   Do you recall writing down Mr. Baslow's phone number at any point in time from Ms. Rooney or from any other individual?

A.   I don't recall.

Q.   So, if you wanted to get in touch with Mr. Baslow in 2012, how would you have done it?

MR. DARNELL:  Objection.  Calls for speculation.

MR. FORD:  Join.

THE WITNESS:  I don't know.

BY MR. ARHANGELSKY:

Q.   Okay.

A.   Talee knew him so --

70

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   Would you have talked to Talee in order to reach Mr. Baslow?

MR. DARNELL:  Same objection.

MR. FORD:  Join.

THE WITNESS:  Yes.  I didn't know him other than through Talee.

BY MR. ARHANGELSKY:

Q.   Did you talk to Talee in order to connect with Mr. Baslow in 2012?

A.   Yes.

Q.   Okay.  What was Talee's phone number at the time?

A.   I don't remember.

Q.   Do you have Ms. Rooney's phone number in your cell phone?

A.   I don't know.

Q.   Do you have it in your cell phone right now?

A.   I don't know.

Q.   Is there something you can review to determine whether or not you have Ms. Talee's number?

A.   I can look in my cell phone.  I don't know if it's still her number.

Q.   Would you be willing to look at your phone to determine whether or not you have Ms. Rooney's phone number?

71

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

MR. FORD:  No.  As I represent Ms. Rooney and on her behalf, I'm going to object.  He's not going to do that.

MR. ARHANGELSKY:  On what grounds?

MR. FORD:  On the grounds that it's improper.

MR. ARHANGELSKY:  In what way?

MR. FORD:  That it's improper discovery in purposes of him -- he's not going to go through and read you his contact list from his cell phone.

MR. ARHANGELSKY:  I'm not asking him to read his contact list.  I'm asking him if it would refresh his recollection with respect to what her phone number is.

MR. FORD:  Right.  And I am declining your invitation to do so.

MR. ARHANGELSKY:  And the witness has indicated that he has a document in his possession or an article in his possession that will refresh his recollection.

MR. FORD:  Correct.

MR. ARHANGELSKY:  So you're refusing to produce the information we're requesting?

MR. FORD:  Yes.

MR. DARNELL:  In a deposition, yes.

MR. ARHANGELSKY:  On the grounds that it's improper?

MR. FORD:  Correct.

72

Sam Schoonover
January 11, 2017

MR. ARHANGELSKY:  Do you have any legal authority for that?

MR. DARNELL:  Counsel, do you want to look at my phone?

MR. ARHANGELSKY:  It's not relevant.

MR. DARNELL:  I agree.  I absolutely agree with you 100 percent.

MR. ARHANGELSKY:  Your phone specifically is not relevant.  Information contained within his records is.

MR. DARNELL:  Ask your questions.

MR. FORD:  I have asserted my objection.  I'm telling him not to do that, and we'll proceed accordingly.

BY MR. ARHANGELSKY:

Q.   Let's ask this.  Did you know that your counsel represents Ms. Rooney?

A.   No.

Q.   So, after this get-together which involved Mr. Baslow in some way, was there any point in time in which your communications with Mr. Baslow may have increased over the course of 2012?

A.   I don't remember.

Q.   Okay.  Did you speak to Mr. Baslow at any point in time in July 2012?

A.   I don't remember.

73

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.    Do you know who Mr. Baslow works for?

MR. FORD:  Vague as to time.

BY MR. ARHANGELSKY:

Q.    Presently.

A.    No.

Q.    Do you know who Mr. Baslow worked for in 2012?

A.    Yes.

Q.    And who was that?

A.    NTG.

Q.    And what is NTG?

A.    A law firm.

Q.    And when was the first time you heard of NTG? And by "NTG" I assume you're referring to Newport Trial Group?

A.    Yes.

Q.    And when was the first time you heard of Newport Trial Group?

A.    When Talee introduced me to Andrew Baslow.

Q.    So on the first occasion when you were introduced to Mr. Baslow you learned of the Newport Trial Group?

A.    I don't remember.

Q.    When you say "When Talee introduced me to Andrew Baslow," what specifically are you describing?

A.    Talee introducing me to Andrew Baslow as a

74

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

friend.  I don't remember anything further than that.

Q.   But you recall that -- you learned of the Newport Trial Group at the time?

A.   Maybe not in the first introduction.  Maybe not in the second.  I have no idea.

Q.   And you don't recall whether you spoke to Mr. Baslow at all in July of 2012?

A.   I don't.

Q.   Do you recall whether you spoke to Mr. Baslow in May of 2012?

A.   No.

Q.   Do you know whether Mr. Baslow spoke to any of your other friends in January 2012 through July 2012?

A.   I know that he spoke to some of my friends.  I don't know when, and I don't know the content of the conversations.

Q.   Okay.  Were you aware that Mr. Nilon had a lawsuit with the Newport Trial Group in March -- that was filed in March 2012?

A.   No.

Q.   Mr. Nilon never informed you that he had a lawsuit with the Newport Trial Group during that time?

A.   Drew had told me that he was working with Andrew Baslow, but we didn't know if it was a lawsuit or -- we didn't know what the context of their

75

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

relationship was.

Q.   Just working generally with Mr. Baslow?

A.   Yeah.

Q.   Okay.  Do you have an understanding --

A.   I believe the word may have been "case."

Q.   Do you have an understanding as to whether Mr. Baslow is an attorney?

A.   Yes.

Q.   Okay.  What is that understanding?

A.   That he is an attorney.

Q.   So did Mr. Baslow tell you that he was a licensed attorney?

A.   I don't remember.

Q.   Okay.  How do you have an understanding of Mr. Baslow being an attorney?

A.   That's just my memory of it.  I don't know who would have told me that.  I would imagine maybe he could have told me that.  I just -- I'm not going to say facts unless I know for sure.

Q.   Would that information have come from one of your friends or Mr. Baslow directly?

MR. DARNELL:  Objection.  You're invading the attorney-client privilege when you're asking about questions that Mr. Baslow and -- discussions that Mr. Baslow may have had with a client.  That's

76

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

improper, Counsel.

MR. ARHANGELSKY:  How he understands what his role is at the law firm?

MR. DARNELL:  What Mr. Baslow told him?  You've asked him about it twice now in the last two minutes.

MR. ARHANGELSKY:  I'm asking what the source is of the information that he's already testified to.

MR. DARNELL:  The record speaks for itself.  The transcript will speak for itself as well, Counsel.  Please ask more pointed questions.  Maybe we can move forward.

BY MR. ARHANGELSKY:

Q.  Were you aware that Mr. Pfleg had a lawsuit with the Newport Trial Group?

A.  No.

Q.  Mr. Pfleg never informed you that he had a lawsuit with the Newport Trial Group?

A.  I don't know.

Q.  Did Mr. Pfleg ever indicate that he was working with Mr. Baslow?

A.  I don't know.

Q.  Were you ever aware that Mr. Dronkers had a lawsuit with the Newport Trial Group?

A.  I don't know.

Q.  Did Mr. Dronkers ever make statements to you

77

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

concerning Mr. Baslow?

A.   I don't know.

Q.   Were you aware that Mr. Demulder had a lawsuit with the Newport Trial Group?

A.   I don't know.

Q.   Mr. Demulder never told you that he was working with Mr. Baslow?

A.   I don't know.

Q.   At no point when you were living with Mr. Nilon and -- was it Mr. Pfleg?

A.   No.

Q.   I'm sorry.  Mr. Dronkers.

A.   Yes.

Q.   At no point when you were living with Mr. Nilon and Mr. Dronkers did they inform you that they were working or communicating with Mr. Baslow?

A.   I don't remember.

Q.   Did you file a lawsuit with the Newport Trial Group?

A.   I don't remember filing a lawsuit with the Newport Trial Group.

Q.   Did you cause your attorneys to file a lawsuit on your behalf in 2012?

A.   I don't remember.

Q.   Have you ever heard of a company called

78

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

The Himalaya Drug Company?

    A.    Yes.

    Q.    And how are you familiar with The Himalaya Drug Company?

    MR. FORD:  I'm going to instruct him not to answer.  It breaches the attorney-client privilege.

    MR. ARHANGELSKY:  I'm sorry.  How he knows of The Himalaya Drug Company is privileged material?

    MR. DARNELL:  Outside of what counsel may have told him, you can ask that question.  You cannot ask questions about "what your counsel may have told you about The Himalaya Drug Company."

    MR. ARHANGELSKY:  I did not ask that.

         Can you please repeat the pending question.

         (Record read.)

    MR. DARNELL:  Objection.  To the extent the witness's only knowledge of The Himalaya Drug Company comes from something that his lawyers may have told him, he should not answer that question because it invades the attorney-client privilege.

    MR. FORD:  Yes.  I'm instructing him not to answer that question.

    MR. ARHANGELSKY:  I want to understand the scope of that privilege objection.

    MR. FORD:  I've asserted it and --

79

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

MR. ARHANGELSKY:  Well, now, hold on.  Because this is an important objection.  Because this is obstructionism.

MR. DARNELL:  No, it's not.

MR. ARHANGELSKY:  Does he -- is the only source of his information about The Himalaya Drug Company coming from counsel?

MR. FORD:  I'm instructing him not to answer.

MR. DARNELL:  Counsel, that's an improper question.

MR. ARHANGELSKY:  How is that improper?  He filed a lawsuit as a plaintiff against a company called "The Himalaya Drug Company."  Where does his knowledge of that company come from?

MR. DARNELL:  I'm going to make one suggestion for your question.  This is the last time I'm going to do it.  Why don't you ask him, "Do you have knowledge of The Himalaya Drug Company outside of something your attorneys may have told you?"

MR. ARHANGELSKY:  The question was whether he has information about Himalaya.  I have not asked what information.

MR. FORD:  You said "how."  It was not "whether." You can ask whether he knows about The Himalaya Drug Company.

MR. ARHANGELSKY:  You understand that you have a

80

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

tester defense pending; correct?

MR. DARNELL:  I don't have a tester defense pending, Counsel.

MR. ARHANGELSKY:  Wonderful.  All right.  We'll ask a different question.

MR. FORD:  Yes.  He can answer whether or not he's familiar with The Himalaya Drug Company.  He's not going to answer how.

BY MR. ARHANGELSKY:

Q.  Did you contact The Himalaya Drug Company at any point in time in 2012?

A.  I contacted them.  I don't remember when.

Q.  Okay.  Would it have been July 2012?

A.  I don't know.

Q.  You don't remember.

Do you recall the phone number you used to contact The Himalaya Drug Company in 2012?

A.  I don't remember.

Q.  Do you recall speaking with Andrew Baslow before you contacted The Himalaya Drug Company?

MR. FORD:  I'm going to instruct him not to answer that question.  It's vague, and it's a privileged communication.

MR. ARHANGELSKY:  Whether he had contact with Mr. Baslow before he spoke with The Himalaya Drug

81

Sam Schoonover
January 11, 2017

Company is privileged?

MR. FORD:  Well, you can answer whether you spoke -- well, he's already testified that he's spoken with Andrew Baslow before --

BY MR. ARHANGELSKY:

Q.  Did you speak with Andrew Baslow the day before you contacted The Himalaya Drug Company?

MR. FORD:  I instruct him not to answer.

BY MR. ARHANGELSKY:

Q.  Let's look at Exhibit 3.  Please go to page 27 of 55.

A.  27 of 55.

Q.  Going to Item 5615, that's towards the bottom and highlighted, do you see a phone number that's highlighted that's dated July 16, 2012?

A.  Yes.

Q.  And the first entry there under "5615," what is the originating number and the terminating number in that list?

A.  The originating number, (925) 209-4303; terminating number, (818) 519-0164.

Q.  Does that record purport to show a phone call between your cell phone and Mr. Baslow's cell phone number on July 16, 2012?

MR. FORD:  Objection.

82

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

MR. DARNELL:  No foundation.

MR. FORD:  And the document speaks for itself.

THE WITNESS:  Yes.

BY MR. ARHANGELSKY:

Q.   Item No. 5616, July 16, 2012, can you tell me the originating number and the terminating number in that set.

A.   Originating number, (925) 209-4303; terminating number, (818) 519-0164.

Q.   And that item again also purports to show what appears to be a duplicate, parentheses "D," of the 5615 call?

MR. DARNELL:  Objection.  No foundation.

THE WITNESS:  Yes.

BY MR. ARHANGELSKY:

Q.   Looking at the column heading "ET" at the top, do you see where it says a value under "5615"?

A.   Yes.

Q.   And what is that value?

A.   6:32.

Q.   Okay.  Going back to Exhibit 2, the cover sheet, on page 2 of that exhibit do you see a category that says "ET"?

A.   Yes.

Q.   And what does the "ET" stand for?

83

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.    "Duration of the transaction.  Duration

as in hour hour, minute minute, second

second."

Q.    Does that entry in Exhibit 3 marked "5615"

refresh your recollection of any kind as to whether you

spoke to Mr. Baslow for 6 minutes and 32 seconds on

July 16, 2012?

MR. DARNELL:  Objection.  No foundation.

MR. FORD:  Join.

You can answer.

THE WITNESS:  No.

BY MR. ARHANGELSKY:

Q.    At any point have you received legal advice --

without telling me what, have you received legal advice

from Mr. Baslow?

MR. FORD:  Objection.  I'm going to instruct him

not to answer that question.

MR. DARNELL:  It also calls for a legal conclusion.

Apparently you have a difference of opinion as to what

legal advice is.

MR. ARHANGELSKY:  Let's mark this as Exhibit 5,

please.

(Plaintiff's Exhibit 5 was marked

for identification.)

///

84

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

BY MR. ARHANGELSKY:

Q.   Mr. Schoonover, I am giving you an exhibit that is marked Exhibit 5, and I'd ask that you flip over the cover pages of this exhibit and go to the second page, the second full page.

Do you recognize this document?

A.   No.

Q.   Have you ever seen this document before?

A.   I don't remember.

Q.   We'll give you some time to look through the document just in case anything refreshes your recollection as you review it.

MR. FORD:  Are you asking him to read through the document now?

MR. ARHANGELSKY:  I'm asking him to look through the document to make sure he's had a chance to review it, since his recollection is -- I believe he's testified that he's never seen the document.

THE WITNESS:  No.  I just don't remember.

MR. DARNELL:  That misstates the testimony.

MR. FORD:  He said he doesn't remember this document.

MR. ARHANGELSKY:  Well, let's give him a chance to review it, then.

Q.   And please look up at me when you're finished.

85

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

In your review of this document, is there anything -- has your review refreshed your recollection as to what this document might be?

A.   Yes.  It looks to be a document about the case regarding me and The Himalaya Drug Company.

Q.   Is this a complaint that you caused your attorneys to file on your behalf?

A.   I don't remember.

Q.   Going to the last page of this document, which is marked page 9, do you see where the document is electronically signed?

A.   Yes.

Q.   And who is the signature on this document?

A.   S, dash, Scott J. Ferrell.

Q.   And the date of filing indicates July 19, 2012; is that correct?

A.   Yes.

Q.   Do you have any understanding as to whether this document was filed on July 19, 2012?

A.   I don't remember.

Q.   Have you ever spoken to Scott J. Ferrell?

A.   I don't think so.

Q.   Okay.  Do you know who Scott J. Ferrell is?

A.   No.

Q.   Do you have an understanding as to whether

86

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Mr. Ferrell is a defendant in this litigation?

    A.   I don't know.

    Q.   Do you know whether Mr. Ferrell is an attorney?

    A.   I don't know.

    Q.   I want to direct your attention to paragraph 8 in this document, which is found on page 3.

         Actually, excuse me.  We're going to start at the top.  Let's go to the cover page, which actually starts on the second full page of this document, and it's marked page 1 at the top header.

         Do you see your name in the front page?

    A.   Yes.

    Q.   Okay.  Does that indicate that you're a plaintiff in this case?

    A.   I don't know how to read legal documents.

    Q.   Did you have an understanding as to whether you were a plaintiff in this case?

    A.   I don't remember.

    Q.   You were unaware as to whether you were a plaintiff or a defendant?

    MR. DARNELL:  Objection.  Misstates testimony blatantly.

    MR. ARHANGELSKY:  I'm just asking what the position is.

87

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

THE WITNESS:  This is four years ago.  I don't remember.

BY MR. ARHANGELSKY:

Q.   Do you remember being involved in this lawsuit?

A.   Yes.

Q.   Do you remember whether or not you were involved as a party to this lawsuit?

A.   I don't know what that means.

Q.   Okay.  Were you seeking to obtain relief or money from The Himalaya Drug Company in 2012?

MR. FORD:  I'm going to object to the form.  Calls for a legal conclusion.

You can answer if you understand.

THE WITNESS:  I don't understand.

BY MR. ARHANGELSKY:

Q.   You don't know whether or not you were suing The Himalaya Drug Company?

A.   I don't remember.

Q.   Okay.  Now, on that first page it says -- can you read the first text of paragraph -- the first paragraph of text that goes right before the hash lines on page --

A.   Inside the box?

Q.   Outside the box.  It starts with the

88

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

indentation.

A.    "Plaintiff Sam Schoonover, on behalf
of himself and all others similarly
situated, alleges the following upon
information and belief based upon
investigation of counsel, except to his
own acts, which he alleges upon personal
knowledge."

Q.    Okay.  Would you agree that, where it says "Plaintiff Sam Schoonover," that's describing you; correct?

A.    Yes.

Q.    Turn the page, please, to the following page, marked page 2.  Please look at paragraph 1.

Can you read paragraph 1 for me.

A.    "Plaintiff Sam Schoonover is a resident
of San Diego County, California and
contacted Defendant via its customer
service telephone number in the summer
of 2012 to gain information about one of
its organic personal-care products.
    "Without his knowledge or consent,
and without any disclosure whatsoever,
Defendant intentionally recorded the
confidential telephone call."

89

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   Would you agree that that paragraph is discussing you as a plaintiff in the case?

A.   Yes.

Q.   Okay.  Please go to paragraph 8, please.

Will you read that paragraph for me, please.

A.   "In the summer of 2012, Plaintiff called Defendant's customer service telephone number to gain information about one of Defendant's organic personal care products.

"Plaintiff spoke to a customer service representative who identified himself as 'Ken' and he proceeded to ask several questions about the organic product Plaintiff was interested in, its ingredients, and quality.

"After gaining the information Plaintiff called for, Plaintiff concluded the phone call."

Q.   Would you agree that that paragraph is discussing your experience as a plaintiff?

A.   The paragraph is discussing my experience, but I do not remember it.

Q.   Do you have any recollection today as to whether any of those statements in paragraph 8 are true

90

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

or false?

A.    No.

Q.    So is it your testimony -- just so I understand you, is it your understanding that you cannot recall whether or not you contacted The Himalaya Drug Company as described in that paragraph 8?

A.    Yeah, I do not remember.

Q.    Okay.  Do you have any understanding of what type of products The Himalaya Drug Company sells?

A.    No.

Q.    Did you have any -- that understanding back in 2012?

A.    I don't remember.  Organic products of some sort.

Q.    You just recall that they were organic?

A.    It was four years ago.  I don't remember.

Q.    The statements you made about organic products, is that drawn from your complaint or from any recollection that you might have had?

A.    It says "organic product" right here.

Q.    Okay.  Do you believe that's true?

A.    I don't remember.

Q.    You don't have any basis?

A.    No.

Q.    Do you believe it's true that you contacted

91

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

The Himalaya Drug Company in 2012?

A.   Yes.

Q.   Why were you contacting The Himalaya Drug Company?

A.   I don't remember.

Q.   You don't have any recollection whatsoever as to why you might have contacted The Himalaya Drug Company?

A.   No.

Q.   Have you ever heard of the product "Liver Care"?

A.   No.  I don't remember.

Q.   Okay.  Let's do -- now, I'm going to play an audio recording for you.  This is an audio recording, and a copy to counsel.  We're going to mark that as Exhibit 6, and I'm going to provide a brief description of that exhibit for the record.

(Plaintiff's Exhibit 6 was marked for identification.)

MR. ARHANGELSKY:  The CD which has been exchanged with counsel, which is marked Exhibit 6, contains two audio recordings, both in .wav file format.  These are recordings that have been produced in discovery related to phone calls that were received by The Himalaya Drug Company's call service in July 2012.

92

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

(Audio recording played.)

BY MR. ARHANGELSKY:

Q.   Were you able to hear that clearly?

A.   Yes.

Q.   Do you recognize the voice on the phone?

A.   Yes.  Mine.

Q.   Well, I'll represent to you, in the interest of having a record that's complete, that that is a call recording that was recorded by The Himalaya Drug Company on July 16, 2012, received from Mr. Baslow's phone number.

Does that refresh your recollection with respect to that call?

MR. DARNELL:  Objection.  No foundation.

MR. FORD:  Right.  Join.

THE WITNESS:  I don't remember.

BY MR. ARHANGELSKY:

Q.   Does the voice that you just heard on that phone call sound like Mr. Baslow's voice?

A.   No.

Q.   Would you recognize Mr. Baslow's voice if you heard it on the phone?

A.   I don't think so.

Q.   Okay.  I'll represent that the records that we received from The Himalaya Drug Company and have been

93

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

exchanged with counsel indicate that that phone call occurred approximately one hour before the phone call that you had or that was indicated in the phone records you had with Mr. Baslow later that day.

MR. DARNELL:  Objection.  No foundation.  That misstates the evidence completely, and I think that you are mixing things up.

MR. FORD:  Yes, I object.  It does misstate the discovery.  That misstates the record.

MR. ARHANGELSKY:  Let's go off record for just one second.

(Discussion held off the record.)

MR. ARHANGELSKY:  Let's go back on record.

Play the next one.

(Audio recording played.)

BY MR. ARHANGELSKY:

Q.  Mr. Schoonover, can you hear that clearly?

A.  Yes.

Q.  And do you recognize that call?

A.  No.

Q.  Is that your voice on the call?

A.  Yes.

Q.  That's your voice on the phone call?

A.  Yes.

Q.  Okay.  So you recognize it as your voice?

94

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.    Yes.

Q.    That was you communicating with The Himalaya Drug Company?

A.    Yes.

Q.    Okay.  I understand the confusion between that and the earlier call.  They are similar, would you agree?

A.    Yes.

Q.    There are similar questions asked; correct?

A.    Yes.

Q.    Okay.  You both ask about Liver Care?

A.    Yes.

Q.    You both ask about the main ingredients of the product; correct?

A.    Yes.

Q.    You both asked about at one point alcohol; correct?

A.    I don't remember.

Q.    Or whether the product can be used for alcohol purposes?

MR. FORD:  Objection.  I believe it was only him that asked about alcohol.

BY MR. ARHANGELSKY:

Q.    You both asked about what the best selling product was -- correct? -- for Himalaya?

95

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.   Yes.

Q.   Okay.  Did you both speak to somebody named Belli (phonetic) or Velli (phonetic)?

A.   I didn't hear the name.

Q.   Let's play back the first part of that, just so you can hear.  This is the first call, which is marked on the CD, and I should clarify.

The audio recording we're playing right now, the first one we've played in the sequence, is marked on the CD as "Baslow.7.16.2012-3:15PM CST," which I believe at the time would have been 1:15 Pacific.

The second audio file that we'll play -- and we'll play it right now -- would be a file that's on the CD that is marked "Schoonover.7.17.2012-10:58AM CST."  And both copies have been provided to counsel through the discovery process.

MR. DARNELL:  And just for the record I have to object.  The content that's listed on the CD, the dates and the times, those were listed by plaintiff's counsel.  There is no foundation for the information listed as being accurate.

MR. ARHANGELSKY:  Let's play the first one.

(Audio recording played.)

MR. ARHANGELSKY:  Stop there.  Let's play the second one.

96

Sam Schoonover
January 11, 2017

(Audio recording played.)

BY MR. ARHANGELSKY:

Q.   Both calls, would you agree, indicate that the individual is speaking to the same customer service representative, named Belli or Velli?

MR. DARNELL:  Objection.  Misstates what the recording says.

MR. FORD:  Calls for speculation.

THE WITNESS:  I don't know.

BY MR. ARHANGELSKY:

Q.   Let's go back to the exhibit that we've marked 5, and that's the complaint that you had previously read from.

A.   Yes.

Q.   Paragraph 8 doesn't describe your phone call with The Himalaya Drug Company, does it?

MR. FORD:  Objection.  It's argumentative.

MR. DARNELL:  I think the question is unintelligible as phrased.  You might want to rephrase it, Counsel.

BY MR. ARHANGELSKY:

Q.   Let's go through each item.  You testified that that second phone recording was your voice on the phone with The Himalaya Drug Company; correct?

A.   Yes, it did sound like it.

97

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   How many times did you call The Himalaya Drug Company?

A.   I don't know.

Q.   On the audio recording we played in which you identified -- the second recording, which you identified it being your voice on the phone --

A.   Yes.

Q.   -- the file that says "This is Sam," you didn't speak to somebody named Ken, did you?

A.   It didn't sound like that.

Q.   Okay.  Who did it sound like you spoke to?

A.   I don't know.

Q.   Would you like to hear the recording again?

A.   No.  I don't think any more playing of the recording will help me understand what the name was.  I can't hear it.

Q.   Are you going to tell the jury in this case that you can't hear or understand that that's not "Ken" on the phone?

A.   Absolutely.

Q.   Okay.  Did you talk to them about an organic product on the phone?

A.   No.  Unless Liver Care is organic.

Q.   You have no idea whether Liver Care is organic, though; right?

98

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A. No.

Q. Okay. So would you -- would you say that this paragraph accurately reflects the content of your call with The Himalaya Drug Company that we just played for you on the speaker?

A. I don't know.

Q. Did you review this complaint before it was filed?

A. I don't remember.

Q. Did you have -- did you receive a copy of this complaint before it was filed?

A. I don't remember.

MR. ARHANGELSKY: Mark that as 7.

(Plaintiff's Exhibit 7 was marked for identification.)

MR. ARHANGELSKY: We've marked a document as Exhibit 7 and placed it before the witness, copies to counsel.

Q. Do you recognize this document?

A. No.

Q. Have you ever reviewed -- well, let me ask another foundational question.

Did you sign a retainer agreement with your attorney before they filed a lawsuit on your behalf?

A. I don't remember.

99

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   Please take a moment to review this document cover to cover.

Has your review of the document refreshed your recollection as to what this could be?

A.   It looks to be an agreement for Newport Trial Group to be my attorney in a class action lawsuit against The Himalaya -- The Himalaya Drug Group.  The Himalaya Drug Group, I think.  The Himalaya Drug Company.

Q.   Was The Himalaya Drug Company the company you called in July 2012?

A.   It's the company that I called.  I don't remember when I called them.  Oh, yes, July 20th, you're right, yeah.

Q.   Is The Himalaya Drug Company also the company that's listed as a defendant in the complaint that we shared with you before, which is marked as Exhibit 5?

A.   Yes.

Q.   Looking at the new document, which was marked Exhibit 7, I'd like to direct your attention to the last page of that record.

A.   In Exhibit 7?

Q.   Right.

A.   Yes.

Q.   Do you recognize that page?

100

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.    No.

Q.    Is that your signature?

A.    Yes.

Q.    Was that your address at the time, in July 2012?

A.    If it says so on this document.

Q.    Do you recall when you received this document?

A.    No.

Q.    Would it have been after you made your call to The Himalaya Drug Company?

A.    I don't remember.

Q.    Would it have been before your lawsuit was filed?

A.    I don't remember.  I don't know the process in these things.

Q.    Let's go to the first page of that record.

A.    Of Exhibit 7?

Q.    Exhibit 7.

A.    Okay.

Q.    It's a page in the bottom right that's marked "NTG000214, and under "Scope and Duties" -- would you read what it says there under "Scope and Duties."

A.    "Client is hiring NTG to represent
Client in the matter of class-action
claims arising from alleged unfair

101

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

business practices stemming from alleged
wiretapping by the above-referenced
company.

"Client acknowledges being informed
of various positive aspects and negative
aspects of the case and in particular,
related to Client's acting in the
capacity of class representative and the
potential downside."

Q.   When you received this retainer agreement,
which was prepared apparently by your counsel -- well,
let me ask.  Was this prepared by your counsel?

A.   I don't know.

Q.   Do you recall how you received this document?

A.   No.

Q.   To your recollection, when you received this
document, did you know that you had been recorded by
The Himalaya Drug Company while on the phone with them?

A.   No.

Q.   You don't recall, or you don't know?

A.   I don't remember.

Q.   Okay.  You don't remember at all?

A.   No.

Q.   Okay.  When did you find out that you were
recorded by The Himalaya Drug Company?

102

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

MR. FORD:  Objection.  Answering that question could arguably involve attorney-client communication. So I would ask that you either narrow the question to exclude counsel or I'm going to instruct him not to answer on the basis of attorney-client privilege.

BY MR. ARHANGELSKY:

Q.   Let's go -- I'll ask the question.

Without revealing any communications that your attorneys may have offered to you, do you have a recollection of when you learned that you were recorded by The Himalaya Drug Company when you were on the phone with Velli or Belli?

A.   No, I do not.

MR. DARNELL:  Objection.  Misstates the evidence.

BY MR. ARHANGELSKY:

Q.   You have no recollection?

A.   No.

Q.   Let's go Exhibit 5, which was the complaint. And we're going to go to what's marked as page 8, and it's paragraph 38.

Can you read paragraph 38 for me.

A.   "Pursuant to California Business and Professions Code 17204, an action for unfair competition may be brought by any 'person...who has suffered injury in

103

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

fact and has lost money or property as a result of such unfair competition.'

"Plaintiff and the Class are entitled to statutory damages or three times the amount of actual damages, whichever is higher, pursuant to section 637.2(a) and as such suffered harm within the meaning of section 630 et seq. of the Penal Code."

Q. Did you suffer any harm from The Himalaya Drug Company?

MR. FORD: Objection. Misstates the law. Lacks foundation. Calls for a legal conclusion.

MR. DARNELL: Join.

MR. ARHANGELSKY: Are you instructing him not to answer?

MR. FORD: You can answer if you understand. Have you been harmed?

THE WITNESS: Repeat that again.

MR. ARHANGELSKY: Please repeat the question.

(Record read.)

THE WITNESS: No.

BY MR. ARHANGELSKY:

Q. Did you feel like you had suffered any injury during your phone call with The Himalaya Drug Company?

104

Sam Schoonover
January 11, 2017

MR. FORD:  Same objection.

MR. DARNELL:  Calls for a legal conclusion.

THE WITNESS:  What kind of injury?

BY MR. ARHANGELSKY:

Q.   You tell me.

MR. DARNELL:  Same objection.

MR. FORD:  Yeah.

THE WITNESS:  I don't know what the question is asking.

BY MR. ARHANGELSKY:

Q.   Why did you file your lawsuit against The Himalaya Drug Company?

MR. FORD:  I'm going to object on the grounds that, as phrased, it possibly involves attorney-client communications, and on that basis I would ask that you either exclude communications with counsel or I will instruct him not to answer on the basis of attorney-client privilege.

BY MR. ARHANGELSKY:

Q.   Well, of course excluding communications specifically with your attorneys and their agents, why did you file a lawsuit against The Himalaya Drug Company?

MR. DARNELL:  Objection.  Calls for a legal conclusion.

105

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

MR. FORD:  Join that as well.

You can answer if you understand.

THE WITNESS:  Because I did not consent to a recording of my phone call, and that's illegal --

BY MR. ARHANGELSKY:

Q.  Okay.

A.  -- to record me if I don't consent.

Q.  So you didn't consent to a phone call.  You recall not consenting to that phone call when you called Himalaya?

A.  That was my voice on that phone call, correct.

Q.  How did you learn that you had been recorded?

MR. FORD:  You asked that question a few minutes ago, and I objected saying that you have to narrow it to exclude communications with counsel or I'm going to instruct him not to answer.

BY MR. ARHANGELSKY:

Q.  Just generally speaking when did you learn --

We're asking foundation to lay a privilege, Counsel.

When did you learn that you had been recorded by The Himalaya Drug Company?  Just the general time frame.

A.  I don't remember.

Q.  Was it after your call with The Himalaya Drug

106

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Company?

A. Yeah.

Q. Okay. Was it before you received your retainer agreement from counsel?

A. I don't remember.

Q. Okay. Was it before you filed a lawsuit against The Himalaya Drug Company?

A. Yes.

Q. Well, the lawsuit, it seems, was filed on July 19th. So you'd say that you received that notification prior to July 19th. Is that your testimony?

A. Yes. But I don't remember particularly.

Q. Are you familiar with an individual named Randall Harris?

A. No.

Q. Have you ever heard the name Randall Harris?

A. I don't think so.

Q. Do you have any recollection as to whether Mr. Harris was a co-plaintiff with you in The Himalaya Drug case?

A. I do not know.

Q. Do you know whether your attorneys represented any other individuals in The Himalaya Drug case as plaintiffs in that matter?

107

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.    I don't know.

(Plaintiff's Exhibit 8 was marked

for identification.)

BY MR. ARHANGELSKY:

Q.    I'm showing you a document we've marked as
Exhibit 8.  Please take a moment to review that
document, and let me know when you're finished.

Do you have any idea what this document is?

A.    No.

Q.    You've never seen this document before?

A.    I don't remember.

Q.    Can you look at the first page and the
caption.  Next to your name do you see Mr. Randall
Harris's name in there as well?

A.    Yes.

Q.    And is Mr. Harris purported to be a plaintiff
in this case, based on your lay understanding?

A.    Yeah.

Q.    But you'd never heard of Mr. Harris before?

A.    I just don't remember.

Q.    And you don't recall -- I'm sorry.  Your
testimony was you don't recall or you've never seen
this document before?

A.    I just don't remember.

Q.    Do you recall whether you spoke to your

108

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

attorneys in August 2012?

A.  I do not remember.

MR. ARHANGELSKY:  Let's go off the record.

(Brief recess.)

MR. ARHANGELSKY:  Back on the record.

Q.  Mr. Schoonover, do you recall where you were located when you made your call to The Himalaya Drug Company?

A.  I do not remember.

Q.  Fair to say you don't remember very much about your case with The Himalaya Drug Company; is that correct?

A.  Yes.  It was four years ago.

Q.  Let me --

A.  A lot has happened since then.

Q.  -- show you an exhibit marked -- well, let's go back to Exhibit 4.

We've earlier identified these by the caption as Mr. Schoonover's Responses and Objections to Plaintiff's First Set of Interrogatories.  And let's go to page 21.

A.  Okay.

Q.  Do you see the paragraph that is above where it says "Interrogatory No. 11" and the paragraph beginning with "Subject to and without waiving"?

109

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.   Yes.

Q.   Do you see where it says:

"Defendant made one phone call to

Himalaya Drug Co. in 2012"?

And then later it says:

"Defendant was in San Diego,

California when he made the call."

Did I read that correctly?  I know that I

passed through some of the content.

A.   Yes.

Q.   So in August 2016 you remembered that you were

in San Diego, California, in 2012 when you made the

call to The Himalaya Drug Company?

MR. FORD:  Objection.  That's argumentative.

You can answer.

THE WITNESS:  Yes.

BY MR. ARHANGELSKY:

Q.   Okay.  And that was what?  Four months ago?

A.   Yes.

Q.   So you remembered quite a bit more four months

ago when you prepared your discovery responses than you

did here today; correct?

MR. FORD:  Objection.  It's argumentative.

You can answer.

THE WITNESS:  I would imagine that I was looking at

110

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

records at the time.

BY MR. ARHANGELSKY:

Q.   What records?

A.   I don't have any idea.

Q.   You don't have any idea what records you might have been looking at that would have given you an indication that you were in San Diego in 2012 when you called The Himalaya Drug Company?

A.   I'd imagine it had been when I was compiling where I lived and then estimating that I was in San Diego in 2012.

Q.   Okay.  So you don't know for sure, then, whether or not that's a true statement in your Interrogatory response?

A.   No.  I believe that I was in San Diego in 2012.

MR. ARHANGELSKY:  Okay.  Let's mark as -- I believe we're on 9.

    (Plaintiff's Exhibit 9 was marked for identification.)

MR. ARHANGELSKY:  We've given the witness a document marked 9.

Q.   Please turn to the second full page and take a moment to review this document.

    Do you recognize this document,

111

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Mr. Schoonover?

A.   Yes.

Q.   What is this?

A.   It says right here it's the "Declaration of Sam Schoonover."

Q.   Turning to the last page, is that your signature?

A.   Yes, it is.

Q.   Did you sign this document?

A.   Yes, I did.

Q.   Did you prepare this document?

A.   As in type it up?

Q.   Yes.

A.   No.

Q.   Who prepared the document?

A.   I don't know.

Q.   Who provided the document to you for signature?

A.   I don't remember.

Q.   Is all the information in this document content you've provided to your attorneys?

MR. FORD:  That's --

MR. DARNELL:  Counsel, do you want to restate, or do I need to make an objection to that question?

MR. ARHANGELSKY:  I think it's a fair question.  Is

112

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

this information he's provided to his counsel?

MR. FURMAN:  It's publicly filed.

MR. ARHANGELSKY:  It's publicly filed information.

MR. DARNELL:  Objection.  Calls for attorney communication.

MR. ARHANGELSKY:  So the existence of the transmission of facts is privileged?

MR. DARNELL:  Your question violates the attorney-client privilege, Counsel.  If you want to rephrase it, you're more than welcome to.

BY MR. ARHANGELSKY:

Q.   Did you remember more about your Himalaya Drug case in February 2016?

A.   When?

Q.   When this document was executed in February 2016.

MR. FORD:  Objection.  It's argumentative.

THE WITNESS:  Yeah, apparently I did.  I wrote --

BY MR. ARHANGELSKY:

Q.   I'm sorry.  You wrote what?

A.   Well, I didn't write this, but my information is in this document.

Q.   Okay.  And you recalled specifically there that you had contacted The Himalaya Drug Company; correct?

113

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.   Yes.

Q.   You recalled that you were a plaintiff in The Himalaya Drug case?

A.   Yes.

Q.   Did you review this document before you came to testify here today?

A.   Yes.

Q.   You did?

A.   Yes.

Q.   Do you recall testifying earlier today that you did not recall whether you were a plaintiff or defendant in The Himalaya Drug case?

MR. FORD:  Objection.  It's argumentative, and it's asking for a legal conclusion.

But you can answer.

THE WITNESS:  I just don't know what "plaintiff," "defendant" -- legal terminology, I'm not familiar with any of it.  So I'm not going to answer questions when I don't know exactly what they mean.

BY MR. ARHANGELSKY:

Q.   Is that your language in paragraph 2 of your declaration that you signed under oath before the court?

A.   Yes.

Q.   It is your language.  Was that "yes"?

114

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.    You mean did I write this?

Q.    Is it your language?

MR. FORD:  Objection.  Vague and ambiguous.

MR. DARNELL:  Objection.  Unintelligible.

THE WITNESS:  What do you mean by "language"?

BY MR. ARHANGELSKY:

Q.    Is this your statement, or did somebody else write that for you?

A.    This is my statement.

Q.    Okay.  So that's your language used in paragraph 2?

MR. DARNELL:  Objection.  Unintelligible.

THE WITNESS:  If that's what you mean by "language," then, yes.

BY MR. ARHANGELSKY:

Q.    Wherein you referred to yourself as a plaintiff?

A.    Yes.

Q.    Let's go to Exhibit 7.

This is your retainer agreement.  What were you paid following the completion of The Himalaya Drug case for your recovery as a plaintiff in that case?

A.    I don't remember.

Q.    You don't recall.

Did you have a fee arrangement with your

115

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

counsel with respect to what you would recover as a plaintiff in that lawsuit, in The Himalaya Drug case?

A.   I don't remember.

Q.   Did you provide a statement anywhere in your Interrogatory responses or discovery responses concerning what you received as payment in The Himalaya Drug case?

MR. FORD:  Objection.  Lacks foundation.  Calls for speculation.

THE WITNESS:  I don't remember.

BY MR. ARHANGELSKY:

Q.   Look at the second page of Exhibit 7 under the section "Negotiability of Fees."

Do you see that section on this document?

A.   Yes.

Q.   Can you read that for me.

A.   "Although this Agreement is relatively
       standard for contingency matters, the
       fee arrangement is not set by law, but
       is negotiable between NTG and Client and
       Client acknowledges that this Agreement
       is the subject of a negotiated
       transaction."

Q.   Is there anywhere in this retainer agreement that specifies the specific contingency fee that your

116

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

attorneys would be entitled to recover in your case?

A.   I don't know what a contingency is.

Q.   Is there any language in this agreement that specifies the fee that your attorney would be entitled to take out of your recovery?

A.   Do you want me to read it?

Q.   I want you to review it.  It's your retainer agreement.

MR. FORD:  I'll object that the document speaks for itself.

THE WITNESS:  I would imagine that I reviewed this very thoroughly in 2012, but I don't remember it now.

BY MR. ARHANGELSKY:

Q.   Well, it's in front of you.  So please take your time.

A.   Can you direct me to the section in which this information is?

Q.   Well, I'll represent that it's not in there, but I guess that's -- I'm asking you the question.  Do you see anything in that document that carves out a fee agreement between you and your attorney?

A.   In the last 20 seconds of reviewing, I do not see it.

Q.   Okay.  Did you have a fee agreement with your counsel with respect to your counsel's fees in the

117

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

case?

A.   Yes, I did.

Q.   Was that a separate document than this?

A.   I do not remember.

Q.   Do you recall what the percentage was if -- excuse me.  Let me lay a foundation.

Was there a percentage that you agreed to with your attorney with respect to what you'd be paid?

A.   I don't remember.

Q.   Was there a set value of attorney fees that you agreed to with your attorney?

MR. DARNELL:  Objection.  Calls for attorney-client privileged communication as phrased.

MR. ARHANGELSKY:  All right.  Are you instructing him not to answer?

MR. FORD:  Yes, I am.

BY MR. ARHANGELSKY:

Q.   Based on your review of this document specifically, you cannot recall whether you had a fee agreement in your retainer agreement?

A.   I do not recall, no.

MR. FORD:  I'll object that the document speaks for itself.

(Plaintiff's Exhibit 10 was marked for identification.)

118

Sam Schoonover
January 11, 2017

MR. ARHANGELSKY:  The exhibit marked 10 now appears in front of the witness, copies to counsel.

Q.  Do you recognize this document, Mr. Schoonover?

A.  I do not remember.

Q.  Let's go to the back of the document.  There are signature lines, and the page I'm going to refer you to is -- I think it's the fourth from the last.

A.  Okay.

Q.  Is that your signature on this document?

A.  Yes.

Q.  Can you take a moment to review this document again, and look up when you're done.

MR. FORD:  Is there something specific you want to ask about the document?

MR. ARHANGELSKY:  I'm going to ask him if he can review the document to see if it reflects his recollection of a document that bears his signature.

MR. FORD:  Fair enough.

BY MR. ARHANGELSKY:

Q.  In your review of the document there, do you have any better understanding of what this document might be?

A.  Yes.

Q.  And what is it?

119

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.    REDACTED

REDACTED

Q.    REDACTED

A.    REDACTED

Q.    REDACTED

A.    REDACTED

Q.    REDACTED

A.    REDACTED

REDACTED

Q.    REDACTED

A.    REDACTED

Q.    REDACTED

A.    REDACTED

Q.    REDACTED

A.    REDACTED

Q.    Do you recall when you received this document that you're staring at now?

A.    I do not remember.

Q.    Do you recall whether you spoke to your attorney before receiving this document?

A.    I don't remember.

Q.    Do you recall whether you spoke to your attorney in October 2012?

A.    I do not remember.

     (Plaintiff's Exhibit 11 was marked

120

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

for identification.)

BY MR. ARHANGELSKY:

Q.   The document marked in front of you as Exhibit 11 -- the document is email correspondence between an individual named Dave Reid and Angel Garganta.  Do you have any idea who those two individuals are?

A.   No.

Q.   Do you know who Dave Reid is?

A.   No.  I do not remember.

Q.   Do you know whether Dave Reid was your attorney?

A.   I do not remember.

Q.   Can you read on the first and top of the email the email that's dated October 31, 2012, at 12:01 p.m. It's the first one in the line, in the series, and it says:

REDACTED

REDACTED

Did I read that correctly?

A.   Yes.

Q.   Did you speak with your counsel on October 31, 2012?

A.   I do not remember.

Q.   Do you recall speaking with your counsel prior

121

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

to October 31, 2012?

A.   I do not remember.

Q.   REDACTED

REDACTED

MR. FORD:  I'm going to object and instruct him not to answer on the basis that it seeks attorney-client communications.

BY MR. ARHANGELSKY:

Q.   And I believe you testified before you never spoke with Mr. Randall Harris; correct?

A.   I just don't remember.

(Plaintiff's Exhibit 12 was marked for identification.)

BY MR. ARHANGELSKY:

Q.   Mr. Schoonover, the document -- let me direct you first to what's marked as Exhibit 12.

A.   Okay.

Q.   This document is a document that's titled "Defendant Newport Trial Group's Responses to Plaintiff Natural Immunogenics Interrogatories."

A.   Okay.

Q.   Have you ever seen this document before?

A.   I do not think so.

Q.   Can I have you turn, please, to page 13 of this document.  You see where it says your name --

122

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A. Yes.

Q. -- "Sam Schoonover" towards the top?

A. Yes.

Q. And it says:

"Andrew Baslow met Mr. Schoonover at a party on March 17, 2012 in Yorba Linda."

A. Uh-huh.

Q. Did I read that correctly?

A. Yes.

Q. Is that the party that you were referring to earlier today during your testimony?

A. I don't remember.

MR. FORD: Objection. Asked and answered.

BY MR. ARHANGELSKY:

Q. I'm sorry?

A. I don't remember.

Q. Have you had any other in-person meetings with Mr. Baslow since that party in 2012?

A. I don't remember.

Q. Have you ever heard of an individual by the name of Victoria Knowles?

A. I don't think so.

Q. Have you ever spoken to an individual by the name of Victoria Knowles?

A. I don't remember.

123

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

(Plaintiff's Exhibit 13 was marked

for identification.)

BY MR. ARHANGELSKY:

Q.   The document marked Exhibit 13, let's turn to that.

A.   Okay.

Q.   Do you recognize this document?

A.   I don't think so.

Q.   And I will apologize about the printing.  I know the text is rather small, but have you ever seen this document before?

A.   I don't know.

Q.   Looking at the content on this document, I'll direct you -- let's just use the first line under the headings that say "DOCID."  Do you see there is an indication that there is "Schoonover0001"?

A.   Yes.

Q.   Okay.  Going down across from left to right, do you see the "From" column?  Then it says "Sam Schoonover," and then it says S-a-m-s-c-h-o-o-n@gmail.com.

Did I read that correctly?

A.   Yes.

Q.   Is that your email address?

A.   Yes.

124

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   Do you have any understanding with respect to what that line purports to be in this document?

MR. FORD:  Objection.  Calls for a legal conclusion and asks for a legal opinion on something that a layperson wouldn't know.

THE WITNESS:  I don't know.

BY MR. ARHANGELSKY:

Q.   Does this appear to identify email correspondence between you and Mr. Baslow?

A.   It appears to.

Q.   Do you know whether, in fact, you had an email between you and Mr. Baslow on July 17, 2012, at 9:10 a.m.?

A.   I don't remember.

Q.   Did you provide your counsel with records relating to these entries in this document?

MR. FORD:  I'm going to object that this question asks for attorney-client communications, and on that basis I'm going to instruct him not to answer.

BY MR. ARHANGELSKY:

Q.   On the top -- can you read the title of this document.

A.   "Attachment A, Sam Schoonover's Responses and Objections to Plaintiff's First Set of Requests for Production - Privilege Log."

125

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   I'm going to talk to you about your efforts in discovery.  Were you asked at any point -- or excuse me.  I'll rephrase that.

At any point in this case did you perform a search of your own records to produce information to NIC related to your Himalaya Drug case?

A.   NIC?

Q.   Natural Immunogenics, the plaintiff in this case.

A.   I don't know.

Q.   Were you asked at any point in the last year and a half to perform a search of your own records related to litigation?

MR. FORD:  I'm going to object to that question on the basis that it seeks attorney-client communications, and on that basis I'm going to instruct him not to answer.

BY MR. ARHANGELSKY:

Q.   Did you perform a search of your own records with respect to litigation over the course of the last year and a half?

A.   Yes.

Q.   When did you do that?

A.   I don't remember.

Q.   Can you describe for me what it is you did to

126

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

locate information during that search.

A.  I also don't remember.

Q.  How long ago was it?

A.  I don't remember.

Q.  Within the last year and a half; correct?

A.  That sounds about right, but I also don't remember.

Q.  But you have no recollection of what you did within the last year and a half?

A.  Generally?

Q.  With respect to that specific project.

A.  Correct, I do not.

Q.  How many times did you perform searches of your records related to litigation in the last year and a half?

A.  I don't remember.

Q.  Okay.  Do you have any understanding as to whether or not the descriptions of emails on this document are accurately reflected in this document?

A.  Can you rephrase that?

MR. ARHANGELSKY:  Can you repeat the question.

(Record read.)

THE WITNESS:  So are you asking me whether -- go ahead.

MR. ARHANGELSKY:  I'll rephrase the question.

127

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.    Exhibit 13 that you're looking at right now, do you have any indication -- or any understanding, rather, as to whether or not the emails that are listed in this document, Exhibit 13, are correctly listed?

MR. FORD:  I'm going to object to that question on the grounds that it seeks communications between an attorney and client, and on that basis I'm going to instruct him not to answer.

BY MR. ARHANGELSKY:

Q.    Do you have any basis at all to determine whether this is -- these emails actually exist in your files?

A.    Yes.

Q.    And what is that basis?

A.    Samschoon@gmail.com is my email.

Q.    Were these documents that you provided to any other person in litigation?

MR. FORD:  Objection.  That seeks communications between him and his lawyer, and on that basis I'm going to instruct him not to answer.

BY MR. ARHANGELSKY:

Q.    Did you receive a copy of the original complaint filed against you in this case?

A.    A copy of the original complaint?

Q.    Right.

128

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.   Is that an exhibit here?

Q.   No, it's not an exhibit.  I'm just asking did you receive a copy of the legal complaint filed against you in this case?

A.   I don't know.  I received a lot of documents. I just don't remember what they were and --

MR. FORD:  You've answered the question.

BY MR. ARHANGELSKY:

Q.   Okay.  I'm going to take you back to Exhibit 4 while we prepare another one, and I want to direct your attention to page 14 of this exhibit.

A.   Okay.

Q.   And where there is bullet points that have names -- do you see where I'm referring to?  The only bullets on the page.

A.   Yes.

Q.   Do you know an individual by the name of Ryan M. Ferrell?

A.   I don't think so.

Q.   Have you ever met in person with anybody named Ryan M. Ferrell?

A.   I don't think so.

Q.   We already addressed Mr. Scott Ferrell earlier in this deposition; correct?

A.   Correct.

129

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   And have you ever had any in-person meetings with Mr. Scott Ferrell?

A.   I don't think so.

Q.   Have you ever spoken to Mr. Ferrell?

A.   I don't think so.

Q.   Okay.  Do you know an individual by the name of James B. Hardin?

A.   I don't think so.

Q.   Have you ever spoken to an individual named James B. Hardin?

A.   I don't think so.

Q.   Would it be fair to say that, to the extent you communicated with the Newport Trial Group at all, your correspondence was limited to Mr. Baslow?

A.   Yes.

Q.   Did you speak with Mr. Baslow at any other -- on any other phone numbers other than his mobile phone?

A.   I don't remember.

Q.   Do you remember any instance in which you called Mr. Baslow on his mobile phone?

A.   I don't remember.

Q.   So you cannot recall a single moment where you've called Mr. Baslow on his mobile phone?  I just want to understand the testimony.

A.   I do not remember.

130

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

MR. FORD:  Object to the question.  That's argumentative.

But you can answer it.

THE WITNESS:  I do not remember.

BY MR. ARHANGELSKY:

Q.  Are you familiar with an individual by the name of Raquel Torres?

A.  I don't think so.

Q.  Have you ever spoken with anybody named Raquel Torres, to your recollection?

A.  I don't think so.

Q.  Do you know anybody by the name of Giovanni Sandoval?

A.  I don't think so.

Q.  Have you ever spoken with anybody named Giovanni Sandoval?

A.  I don't know.

Q.  Do you have any understanding as to whether Mr. Sandoval is another defendant in this case?

A.  I do not know.

Q.  Have you ever spoken with anybody named Cynthia Sandoval?

A.  I don't think so.

Q.  Does that name sound familiar?

A.  It does not sound familiar.

131

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.   Have you ever spoken with anybody named Isabella Janovick?

A.   I do not think so.

Q.   Have you ever spoken with anybody by the name of Justin Romeg (phonetic)?

A.   I do not think so.

Q.   Do you know the name Justin Romeg?

A.   I do not think so.

Q.   Have you ever spoken with anybody named Kenneth McCormack?

A.   I do not think so.

Q.   Have you ever heard of the name Kenneth McCormack?

A.   I do not think so.

Q.   Do you have any understanding as to whether Mr. McCormack is acquainted with Mr. Nilon?

A.   I do not know.

Q.   Okay.  Are you at all friendly with Mr. Nilon's father?

A.   Yes.

Q.   Do you have any understanding as to whether Mr. McCormack is acquainted with Mr. Nilon's father?

A.   I do not know.

Q.   Do you know whether or not your counsel Mr. Ford represents any of the other individuals I just

132

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

named in that sequence?

MR. FORD:  Objection.  I'm instructing him not to answer on the basis that it seeks attorney-client communications.

BY MR. ARHANGELSKY:

Q.  Have you signed anything along the lines of a joint defense agreement or other agreement that relates to privilege concerning other defendants in this case?

MR. DARNELL:  Objection.  Calls for a legal conclusion.

MR. FORD:  I'll join.

THE WITNESS:  I don't know.

BY MR. ARHANGELSKY:

Q.  Have you ever heard of an individual by the name of Joshua Weiss?

A.  I don't think so.

Q.  Do you have any understanding as to whether or not your counsel represents Mr. Weiss?

MR. FORD:  Objection.  I'm going to instruct him not to answer that question on the basis it seeks attorney-client communications.

BY MR. ARHANGELSKY:

Q.  Do you have any -- have you ever heard of an individual by the name of Richard Richardson?

A.  I don't think so.

133

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q.    Do you have any understanding as to whether your counsel represents Mr. Richardson in this case?

MR. FORD:  I'm going to object on the grounds that it seeks attorney-client communications and on that basis instruct him not to answer.

BY MR. ARHANGELSKY:

Q.    Have you signed any conflicts -- letters concerning legal conflicts concerning other defendants in this case?

MR. DARNELL:  Objection.  Calls for a legal conclusion.

MR. FORD:  I'll join.

BY MR. ARHANGELSKY:

Q.    Are you aware of the legal term "conflict of interest"?

A.    Yes.

Q.    And how are you aware of that?

MR. DARNELL:  Calls for a legal conclusion.

I withdraw the objection, actually.  You can answer the question.

THE WITNESS:  "Conflict of interest" means when you are trying to achieve two things that don't work together.

BY MR. ARHANGELSKY:

Q.    And have you had any -- have you executed any

134

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

agreements between you and other defendants in this case related to conflicts?

MR. FORD:  I'll object.

Assuming you know what that means.

THE WITNESS:  I don't know what that means.

MR. FORD:  Calls for a legal conclusion.

BY MR. ARHANGELSKY:

Q.   Other than -- have you signed a retainer agreement with your existing counsel?

MR. FORD:  I will object to the extent it calls for a legal conclusion.

You can answer.

THE WITNESS:  I think you have to; right?

BY MR. ARHANGELSKY:

Q.   Have you?

MR. FORD:  Don't ask -- answer the question.

THE WITNESS:  Yes.

BY MR. ARHANGELSKY:

Q.   Okay.  When did you sign a retainer agreement?

A.   I don't remember.

Q.   Did you sign more than one retainer agreement in this case or just one?

A.   I don't remember.

Q.   Did your retainer agreement include any information about conflicts?

135

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.   I don't know.

Q.   Do you know whether or not your retainer agreement in this case has been produced to the opposing party in the case?

A.   I don't know.

Q.   Have you -- are you aware of whether or not any documents belonging to you have been produced to the opposing party in this case?

A.   I don't know.

Q.   So do you have any understanding as to whether or not responses that you've provided to the opposing side are complete?

MR. FORD:  Object.  It calls for a legal conclusion.

You can answer.

THE WITNESS:  I don't know.

BY MR. ARHANGELSKY:

Q.   Are you continuing to look for information responsive to NIC, to plaintiff in this case, discovery responses presently?

A.   Define "discovery responses."

Q.   Discovery requests.  I'm sorry.  I misspoke.

A.   Can you define "discovery requests."

Q.   Have you been served with any requests for documents from Natural Immunogenics in this lawsuit?

136

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

A.   I don't remember.

MR. FORD:  I'll also belatedly object that it calls for a legal conclusion.

BY MR. ARHANGELSKY:

Q.   Do you recall seeing any documents related to discovery or using the terms "discovery" that were authored by Natural Immunogenics and served on defendants in this case?

A.   I don't know.

Q.   Have you ever heard of an individual by the name of Clark Baker?

A.   Yes.

Q.   And how do you know that name?

A.   He contacted me.

Q.   When did he contact you?

A.   I don't remember.

Q.   Did he contact you before you were aware that you were a defendant in this case?

A.   I don't remember.

Q.   Where were you when he contacted you?

A.   I also don't remember.

Q.   Do you remember any of the subject matter of your conversation with Mr. Baker?

A.   I do not remember.

Q.   Do you remember how long you spoke with

137

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Mr. Baker?

A.   I do not remember.

Q.   Are you going to tell the jury in this case that you don't recall your communications with Mr. Baker?

A.   Yes.

Q.   Do you recall text messaging Mr. Baker?

A.   Yes.

Q.   I'm showing you an exhibit that's marked Exhibit 15.  Do you recognize your phone number at the top of that?

A.   Yes.

Q.   I'll represent that this was received December 4, 2015, at 2:20 p.m. Pacific.

     Do you recognize this document?

A.   No.

MR. DARNELL:  Counsel, is there a reason this document does not have a Bates stamp number on it?

     (Discussion held off the record.)

     (Plaintiff's Exhibit 14 was marked
  for identification.)

BY MR. ARHANGELSKY:

Q.   Just a correction to the exhibit list.  The exhibit that we've just placed in front of you, which you've identified as bearing your phone number at the

138

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

top, is Exhibit 14, so marked.

MR. DARNELL:  And just to follow up, I'd inquired before we went off the record why there was no Bates stamp number on this document.

I believe that plaintiff's counsel has represented to me in good faith that this is an exhibit that was attached to a declaration of Clark Baker that was filed in this case.  Based on that representation, I'll just reserve my objections at this point in time.

BY MR. ARHANGELSKY:

Q.   Do you recognize the contents of this document?

A.   I don't remember.

Q.   Would you read that, please for me.

A.   "Hey Clark, after thinking about this more, I'm going to opt out of any further communication with you or about this case.  I've already said everything I need to say about it.  I feel as if NTG took advantage of our lack of knowledge about these types of cases and when we realized what was going on, we went separate ways.

"It happened a long time ago and I don't really care to bring anyone to justice or to continue digging into it.

139

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

Thank you for reaching out and trying to make things right.  Best of luck."

Q.   And you testified that you don't recall how long you spoke with Mr. Baker on the phone?

A.   Correct.

Q.   Did you share information with Mr. Baker on the phone concerning your involvement with the NTG law firm?

A.   Yes.  I don't remember what.

Q.   And you remember the details that you provided Mr. Baker on the phone in December 2015; correct?

A.   No.

Q.   I'm sorry.  I want to clarify that.

Did you provide information to Mr. Baker on the phone on December 4, 2015, concerning your involvement with the Newport Trial Group?

A.   Yes.

Q.   Okay.

MR. FORD:  Is there a date reference on this?

THE WITNESS:  I don't know what the date was.

MR. FORD:  I'm just clarifying because I don't see a date on this; so I just want to make sure it's accurate.

MR. ARHANGELSKY:  I will, of course, agree that the witness has not conceded to the December 4th date.

140

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

MR. FORD:  That's fine.

MR. ARHANGELSKY:  That's part of the record, but we can move on.

Q.  Did you write to Mr. Baker through your mobile phone that you've already said everything you need to say about your involvement with the Newport Trial Group?

A.  It says here that I did.

Q.  Did you write that you feel as if NTG took advantage of your lack of knowledge about these types of cases "and when we realized what was going on, we went separate ways"?

A.  It says here that I did.

Q.  How did NTG take advantage of you?

A.  I don't know.

Q.  When you say "these types of cases" what were you referring to?

A.  I don't remember.

Q.  When you say "when we realized what was going on," what were you referring to?  What was going on?

A.  I don't remember.

Q.  When you wrote "I don't care to bring anyone to justice," who were you talking about?

A.  I don't know.

Q.  So I think it's fair to say, then, you don't

141

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

have any recollection of the details of the communications you had with Clark Baker in December 2015?

A. Yes.

MR. ARHANGELSKY: Let's go off the record.

(Brief recess.)

MR. ARHANGELSKY: We are at this point going to conclude our examination with the understanding that we reserve our right obviously to compel responses to the information that's withheld by privilege.

And because we believe, of course, that privilege is being overdesignated and wrongfully invoked, we do intend to compel the information, and we reserve our right to seek relief from the Court to recall this witness at such time in the future.

We don't believe that there has been an adequate foundation laid for privilege in any of these questions, and it's inconsistent with the law.

Now, that said, another point of order here. There may be information that we have exchanged with the witness, documents, that may be subject to the protective order in this case. We have provided the witness unredacted information. He's a defendant to the case and subject to the protective order.

To the extent that defendants wish to impose

142

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

redactions of any of the exhibits that we've exchanged that go beyond information that's represented in those documents, then, you know, I guess we can at some point agree to a mutual exchange of redactions. Other than that, I have nothing further.

MR. DARNELL: I don't disagree with us talking further about any issues, but I think we should stipulate that all documents that may arguably be subject to a protective order in this case shall be respected as such until further order of the Court or the parties otherwise stipulate.

MR. ARHANGELSKY: Right. That's our understanding, and my proffer here, so to speak, is just that, if there is any information in any of these exhibits that may go before the Court -- because these exhibits are often filed with the court.

And if it's beyond what has been designated already confidential under the protective order, we would just want to be advised. It's the same request we made with our pending crime fraud motion, which I think we had agreed to with respect to redactions.

MR. DARNELL: We'll follow what the protective order says about who has the burden and who has the obligation to address those issues. I think that's the best way to treat it.

143

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

MR. ARHANGELSKY:  Understood.  Thank you.

MR. FORD:  The deposition's concluded.

THE COURT REPORTER:  Is a transcript being ordered, and if so, when is the delivery expected?

MR. ARHANGELSKY:  Yes.  We'll take a rough, and then I think we'll get together and try to get some understanding.  We're, like, a week out usually.  I don't need it any more expeditiously than that.

THE COURT REPORTER:  So you're getting a rough and regular turnaround on the transcript?

MR. ARHANGELSKY:  Yes.

        (Ending time:  1:21 p.m.)

144

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

STATE OF _____)
                                         )SS.
COUNTY OF _____)


          I, the undersigned, declare under penalty of

perjury that I have read the foregoing transcript, and I

have made any corrections, additions or deletions that I

was desirous of making, that the foregoing is a true and

correct transcript of my testimony contained therein.

          EXECUTED this _____ day of _____,

20_____, at _____, _____.
                      (City)                (State)


                    _____
                              SAMUEL SCHOONOVER

145

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

REPORTER'S CERTIFICATE

I, TAMAR WOLFE, CSR No. 8110, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and was thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this    day of January 2017.


_____
TAMAR WOLFE, CSR No. 8110

146

Sam Schoonover
January 11, 2017

Atkinson-Baker Court Reporters
www.depo.com

REPORTER'S CERTIFICATION OF CERTIFIED COPY

I, TAMAR WOLFE, CSR No. 8110, a Certified Shorthand Reporter in the State of California, certify that the foregoing pages 1 through 146 constitute a true and correct copy of the original deposition of SAMUEL SCHOONOVER taken on January 11, 2017.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this     day of January 2017.

_____
TAMAR WOLFE, CSR NO. 8110

Sam Schoonover
January 11, 2017