Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Joshua S. Furman, Esq. (pro hac vice)
jfurman@emord.com
Eric J. Awerbuch, Esq. (pro hac vice)
eawerbuch@emord.com
Emord & Associates, P.C.
3210 S. Gilbert Road, Suite 4
Chandler, AZ 85286
Phone: (602) 388-8899
Fax: (602) 393-4361
Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL-IMMUNOGENICS CORP., a Florida corporation,<br><br>Plaintiff,<br>v.<br><br>NEWPORT TRIAL GROUP, et al.,<br><br>Defendants. | Case No. 8:15-cv-02034-JVS (JCG)<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT DEMULDER'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT (DKT. 387)**<br><br>Date: August 14, 2017<br>Time: 1:30 p.m.<br>Location: Courtroom 10C<br><br>Judge: Hon. James V. Selna |

///

///

///

///

///

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................ 1

II. FACTS ..................................................................................................... 5

    A. Torres v. Nutrisystem ...................................................................... 7

    B. The Demulder, Nilon, Schoonover, and Pfleg CIPA Claims .................. 11

III. LEGAL STANDARDS ............................................................................. 16

IV. ARGUMENT ........................................................................................... 17

    A. This Court Has Already Determined That Demulder's Conduct
       Was Unlawful if NIC Allegations of Staged Litigation Are True ........... 18

    B. Whether Demulder Could Have Sued Under Nevada Law Is
       Irrelevant ......................................................................................... 19

    C. Demulder's CIPA Claim Was Objectively False and Fraudulent ........... 20

    D. Demulder Never Had an "Objectively Reasonable Expectation
       that He Was Not Being Overheard or Recorded" .................................. 21

    E. Demulder's Fraudulent Activities Violated RICO ................................ 23

    F. The UCL Claim Should Not Be Dismissed .......................................... 25

V. CONCLUSION .......................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..........................................16

*Bogart v. George K. Porter Co.*, 193 Cal. 197 (1924) .........................................22

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................. 16, 25

*Cheong Yu Yee v. Cheung*, 220 Cal.App.4th 184 (2013) ...................................20

*Demulder v. Carter-Reed Company, LLC*, No. 3:12-cv-02232 (S.D. Cal.) .........................................................................................................7, 15

*EMC Corp. v. Sha*, No. 13-CV-0118 EJD, 2013 WL 4399025 (N.D. Cal. Aug. 13, 2013) .................................................................................22

*Federal Deposit Ins. Corp. v. New Hampshire Ins. Co.*, 953 F.2d 478 (9th Cir. 1991) ...............................................................................................23

*Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003)...............................................23

*Freeman v. Superior Court, San Diego Cty.*, 44 Cal. 2d 533 (1955) ...................22

*Hataishi v. First Am. Home Buyers Prot. Corp.*, 223 Cal. App. 4th 1454 (2014)...............................................................................................3

*Hernandez v. Balakian*, 480 F. Supp. 2d 1198 (E.D. Cal. 2007) ........................22

*In re Ivey*, 85 Cal.App.4th 793 (2000)................................................................22

*In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 682 F. Supp. 1073 (C.D. Cal. 1987)..................................................................23

*Innovation Ventures v. Rubinstein*, No. G046242, 2012 WL 5992116 (Cal. Ct. App. Nov. 29, 2012) .........................................................................24

*Lazzarevich v. Lazzarevich*, 39 Cal. 2d 48 (1952)...............................................22

*Lustiger v. United States*, 386 F.2d 132 (9th Cir. 1967)......................................24

*Manufactured Home Communities, Inc. v. Cty. Of San Diego*, 655 F.3d 1171 (9th Cir. 2011) ...........................................................................18

*Marble Bridge Funding Grp., Inc. v. Euler Hermes Am. Credit Indem.*

*Co.*, 225 F. Supp. 3d 1034 (N.D. Cal. 2016)....................................................22

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297 (C.D. Cal. 1996) ...........................................................................17

*Negro v. Superior Court*, 230 Cal.App.4th 879 (2014) ........................................21

*Nilon v. Chromadex, Inc.*, No. 56-2013-00436790 (Cal. Sup. Ct. Ventura Cnty.) ...................................................................................7

*People v. Singh*, 37 Cal. App. 4th 1343 (1995), *opinion modified on denial of reh'g* (Aug. 21, 1995) ...........................................................24

*River City Markets, Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458 (9th Cir. 1992) .....................................................................................23

*Scarff v. Wells Fargo Bank, N.A.*, No. C03-03394 JFPVT, 2005 WL 3454136 (N.D. Cal. Dec. 16, 2005)..............................................................22

*Schoonover v. Himalaya Drug Co.*, No. 3:12-cv-01782 (S.D. Cal.)......................7

*Stueve Bros. Farms, LLC v. Berger Kahn*, 222 Cal.App.4th 303 (2013)...........................................................................................................22

*TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktienbolaget LM Ericsson*, No. SACV140341JVSDFMX, 2016 WL 6921885 (C.D. Cal. Aug. 9, 2016) .................................................................................16

*Torres v. Nutrisystem, Inc.*, 289 F.R.D. 587 (C.D. Cal. 2013) .............................11

*Torres v. Nutrisystem, Inc.*, No. 8:12-cv-01854 (S.D. Cal.).................................7

*U.S. v. Al-Shahin*, 474 F.3d 941 (7th Cir. 2007)........................................... 17, 23

*U.S. v. Bibbero*, 749 F.2d 581 (9th Cir. 1984)......................................................23

*U.S. v. Montgomery*, 384 F.3d 1050 (9th Cir. 2004).............................................23

*United States v. Cervantes*, 170 F. Supp. 3d 1226 (N.D. Cal. 2016) ...................23

*United States v. Hall*, 542 F. App'x 586 (9th Cir. 2013) ......................................17

*United States v. Hightower*, No. 04 CR 0047, 2004 WL 897886 (N.D. Ill. Apr. 23, 2004) .................................................................................24

*United States v. Kelly*, 527 F.2d 961 (9th Cir. 1976)............................................16

*United States v. Lummi Indian Tribe*, 235 F.3d 443 (9th Cir. 2000)....................19

*United States v. Mills*, 597 F.2d 693 (9th Cir. 1979)..............................................22

*United States v. Nelson*, 419 F.2d 1237 (9th Cir. 1969).......................................16

*United States v. Polizzi*, 500 F.2d 856 (9th Cir. 1974) ............................. 4, 16, 25

*Vasic v. PatentHealth, L.L.C.*, 171 F. Supp. 3d 1034 (S.D. Cal. 2016) ...............16

**Statutes**

Cal. Bus. & Prof. Code § 17204 .....................................................................4, 21

Cal. Penal Code § 632................................................................................. 3, 17, 18

Cal. Penal Code § 637.2..................................................................................3, 17

Nev. Rev. Stat. § 200.690 ...................................................................................19

**Rules**

Fed. R. Civ. P. 56..............................................................................................16

Fed. R. Civ. Pro 56..........................................................................................1, 7

**Docket Numbers**

Dkt. 139...................................................................................................... 18, 19

Dkt. 157....................................................................................................... 2, 5, 18

Dkt. 291....................................................................................................... 7, 9, 21

Dkt. 292..............................................................................................................7

Dkt. 296............................................................................................................19

Dkt. 375-2 .........................................................................................................16

Dkt. 375-3 .........................................................................................................16

Dkt. 375-4 .........................................................................................................16

Dkt. 375-5 .........................................................................................................16

Dkt. 387................................................................................................... passim

Dkt. 64 ........................................................................................................... 1, 11, 18

Dkt. 65 ......................................................................................................................18

Dkt. 72 ......................................................................................................................18

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Demulder's Motion for Partial Summary Judgment (Dkt. 387) should be denied consistent with FRCP 56(a) and (d), applicable precedent, and the law of the case doctrine.  There is a genuine dispute of material fact as to NIC's RICO claims and thus a decision cannot be issued in Demulder's favor as a matter of law.  Defendant moves despite the factual record being incomplete and against the governing law, thus failing the summary judgment standard.  NIC accompanies this Opposition with a contemporaneously filed Motion for Relief under Rule 56(d).  Because discovery is stymied by Defendants continued withholding of all documents germane to RICO, doing so on priviletge grounds, NIC is unable to oppose NTG's motion on a complete record.  For the reasons stated in NIC's Rule 56(d) submission, the Court should deny Demulder's motion.  Nonetheless, to the extent this Court receives argument on the pending motion, NIC hereby opposes.

## I.    INTRODUCTION

Genuine issues of material fact exist regarding Defendant's bases for relief.  Demulder's motion fails on the facts and law.  Put simply, staging fake legal injuries for the purpose of shaking down businesses through sham litigation is unlawful and fraudulent.  Based on NIC's Counter-Statement of Undisputed Facts (NIC "CSUF"), this Court should find that genuine issues of material fact predominate, and a reasonable jury could conclude the Defendants liable under the RICO statute.

As Demulder admits, the proper CIPA analysis "examines whether the caller had an objectively reasonable expectation that he was not being overheard or recorded."  *See* Dkt. 387 at 17.  In Demulder's case, as in all other NTG-driven CIPA cases, the evidence proves that he, one NTG has already admitted, "initiate[d] a transaction for the purpose of bringing a lawsuit" (*see* Dkt. 64 at 1), made his call prepped in advance by NTG agent Baslow and with a specific intent of being recorded solely to lay a foundation for a CIPA suit.  *Id.* at ¶¶ 3, 9, 10, 11,

86, 101-104, 113, 116, 118, 122, 126-132, 147, 151-154.  That conduct was fraudulent, particularly because Demulder's CIPA complaint depended on the false allegation that Demulder did not know his call was recorded, had no reason to think that it would be, and suffered an injury as a result.  *See* NIC RJN 1 (Demulder Complaint) at ¶¶1, 2, 8, 9, 10, 25, 36[1], 38.  This Court ruled in August 2016 that valid allegations of this kind support RICO claims.  *See* Dkt. 157.  The allegations are now proven true by the record.  *See generally* NIC CSUF ¶¶ 1-215.

Weeks *before* Demulder made his call, NTG's attorneys sent emails related to the prospective case against Carter-Reed on wiretapping claims.  CSUF ¶¶ 89-91.  NTG's Baslow corresponded dozens of times with Demulder prior to Demulder's call to Carter-Reed.  *Id.* at ¶ 118.  Baslow investigated Carter-Reed beforehand, making his own investigatory call to the company's order line well before Demulder made his call, proving that Baslow and NTG knew Carter-Reed a target before Demulder made his staged call.  *Id.* at ¶¶ 112-113, 118.  NTG's Baslow emailed Demulder concerning the "new case" weeks before Demulder's Carter-Reed call.  *Id.* at 180 (citing NTG00232-33).

The pretext for Demulder's Carter-Reed call was false.  *Id.* at ¶¶ 122, 124-131.  Demulder was not a sincere customer, as he provided false information throughout.  *Id.*  He gave Carter-Reed a false name.  *Id.* at ¶ 126.  He lied about personal information.  *Id.* at ¶¶ 124-131.  He falsely claimed to have lost his job.  *Id.* at ¶ 128.  He falsely claimed to be forty pounds overweight.  *Id.* at ¶ 129.  He lied about having purchased the Carter-Reed product in the past.  *Id.* at ¶ 130.  He gratuitously disclosed his Social Security Number (SSN) without being asked for it, a practice that NTG CIPA plaintiffs routinely employed so that NTG could argue that the calls were "confidential," an impossible coincidence without staging.

---

[1] Demulder even claimed in his complaint that the injury he allegedly suffered as a "tester" and at NTG's specific direction was an unavoidable outcome: "[Carter-Reed's] practices are additionally unfair because they have caused Plaintiff … substantial injury …, and is not an injury the consumers themselves could have reasonably avoided."  *See* NIC RJN 1 at ¶ 36.

*Id.* at ¶¶ 131, 138, 143. NTG's demand letters were so sloppy and prolific that NTG routinely alleged that "clients" had disclosed Social Security Numbers even in individual instances when they had not. *Id.* at ¶¶ 141-142.

Demulder gave no justification for his call, *Id.* at ¶¶ 155, 201-204, 212; he did not place an order (indeed, none of the NTG CIPA plaintiffs placed any order). He could not explain why he gave false information or why he tried to disclose his SSN without prompting. *See* RJN 25 at 85 (Demulder Tr.). He called Carter-Reed in September 2013, at the same time his best friend, Defendant Sam Pfleg, also pursued NTG-staged CIPA wiretapping cases at the behest of NTG's Baslow. *Id.* at ¶¶ 164, 166-169.[2] Demulder contacted NTG just **three hours** after completing his Carter-Reed call. *Id.* at ¶118. In 2015, two of Demulder's close friends (defendants Schoonover and Nilon) admitted that NTG recruited them to pursue false legal claims in exchange for payment. *Id.* at ¶ 118.

Defendants admit that Demulder, Shoonover, and Nilon were "testers" whose calls were staged at NTG's request. *Id.* at ¶¶ 101-104, 144. Demulder argues in a convolution of logic that his "status as a 'tester' did not preclude him" from serving as a bona fide CIPA plaintiff. *See* Dkt. 387 at 19. But NTG and Demulder withhold all documents germane to their "tester" relationship, and they give no contemporaneous documentation of any kind to support their conclusory assertion that the "testers" were legitimate CIPA plaintiffs. Defendants protest that no Court has specifically forbidden their testers (*see id.* at 19), but conveniently ignore the fact that the CIPA statute itself specifically prohibits staged cases, requiring an actual privacy injury (Section 637.2(a)) and prohibiting only recordings that are *non-consensual* recordings (Section 632). *See* Cal. Penal Code § 632 (prohibiting recordings "without the consent of all parties").[3] And Demulder

_____

[2] Pfleg, for his part, pursued at least five (5) cases with NTG, including several CIPA matters. CSUF ¶¶164-165.

[3] *See, e.g., Hataishi v. First Am. Home Buyers Prot. Corp.*, 223 Cal. App. 4th 1454, 1466 (2014) (explaining that "consent" issues in a CIPA matter are specific to each caller and "may depend on numerous specific factors" unique to

never divulged to the court below or opposing counsel that he was a tester; rather, he did the opposite, filing a false complaint alleging that he was a legitimate caller that had no reason to believe he would be recorded.  A party who calls with the intention or goal of being recorded has, by definition, *consented* to that recording. The use of a consumer "tester" under the UCL[4] and CIPA laws has never been accepted, approved, or upheld by any Court in the Ninth Circuit, and that practice could not be approved because it directly violates statutory law.

Defendants' "tester" admissions beget an important point.  Demulder was calling Carter-Reed as an alleged "tester" for the purpose of pursuing litigation under the California CIPA **wiretapping** laws; he certainly knew (indeed intended) that he would be recorded at the time.

"There comes a point when the innocent explanation is so much less likely than the culpable one that jurors properly could decide that a defendant in fact was acting in furtherance of the conspiracy and shared its illegal purpose." *United States v. Polizzi*, 500 F.2d 856, 905 (9th Cir. 1974).  Here, the facts specific to Demuulder's underlying case together with the impossibly similar facts related to his friends' identical NTG cases and the admissions made by those friends could well lead a reasonable jury to find that Demulder agreed to participate in a RICO scheme to file fraudulent lawsuits for pecuniary gain.  A reasonable jury could find Demulder aware that his call would be recorded when he called Carter-Reed at Baslow's direction, and that he called for the express purpose of being recorded so that he could collect money as a for-hire NTG CIPA plaintiff.  Demulder's motion should be denied.

Finally, Demulder's self-serving affidavits supporting his motion are incompetent because Demulder's own deposition testimony from the *same day*

that caller's experience).  If the CIPA statute were interpreted to allow claims based on staged injuries, the *consent* element in the statute (which includes implied consent) would be read out of the law.

[4] Demulder also advanced claims under the UCL, which required proof of actual injury.  *See* Cal. Bus. & Prof. Code § 17204.

conflicts with his declarations.  Demulder testified at deposition that he could not recall the very facts for which he professed complete recall in his declaration executed the same day.  Because Demulder's declaration (Dkt. 387-1) is contradicted by record evidence, and that declaration was the only material evidence supporting his motion, the Court should deny the motion outright.

## II.    FACTS

In August 2016, this Court held that NIC's RICO claims were not precluded by the *Noerr-Pennington* doctrine.  *See* Dkt. 157 at 7-12.  The Court also held that NIC's factual allegations, if true, support NIC's RICO claims and predicate acts.  *Id.*at 12-24.  On summary judgment, Defendant proffers no new evidence other than what was supplied to this Court in prior motions, to wit, a conclusory affidavit alleging that his CIPA case was legitimate.  *See* Dkt. 387-1.

Demulder's Motion depends on these factual assumptions disputed and disproven by the evidentiary record:  (1) that prior to his call, Demulder did not know he would be recorded (NIC proves that he did know he would); (2) that Demulder did not expect his call would be recorded (NIC proves that he did expect recordation); (3) that Demulder revealed personal information on his call (but he did so without even being asked for it, which indicates that he intended to ensure that the call included confidential matter; NIC proves that Demulder followed the same pattern and plan used by NTG CIPA "clients" to gratuitously reveal personal information solely to support the ruse); (4) that nobody from NTG told Demulder that his call would be recorded (NIC's evidence proves otherwise); and (5) that Demulder did not consent to having his call recorded (NIC proves that, at the very least, Demulder impliedly consented to recordation when he called specifically for that purpose).  *See* Dkt. 387 at 2 (summarizing material facts advanced by Demulder).

The contemporaneous evidence in NIC's accompanying Statement of Facts, summarized below, reveals that NTG staged CIPA litigation through hired

plaintiffs. Those "plaintiffs" and NTG attempted to conceal their preexisting relationships with NTG. *See* CSUF ¶¶ 37-74, 158-160. In all of the NTG CIPA cases, NTG's unlicensed "investigator" Baslow called the target corporation to ascertain each entity's recording practices *before* the NTG "plaintiff" later called pretending to be a legitimate consumer. *Id.* at ¶¶ 2-3, 9-12, 112, 118. Baslow dialed thousands of corporate numbers looking for targets. *Id.* at ¶ 3, 9. NTG's attorneys began investigating potential CIPA targets weeks before the alleged "clients" made staged calls. *Id.* at ¶¶ 12, 13, 112-13, 118, 151-53, 169-70. NTG's "clients" were in close contact with Baslow immediately before their calls. *Id.* at ¶¶ 113, 117-19. NTG knew corporations ripe targets when instructing the "clients" to make calls. Schoonover, Torres, Nilon, and Demulder each had communication with NTG immediately before making phone calls to their targets. *Id.* at 20, 113, 117-19. The phone calls then closely mirrored the content of Andrew Baslow's exploratory practice calls. *Id.* at ¶¶ 122, 133-34, 146-50.

Each of these "clients" provided false information to the target corporations, including fake names and stories that included false personal information. *Id.* at ¶148. Nilon, Schoonover, and Demulder called from third party phones that were not associated with them. *Id.* at ¶¶125-26. The NTG "clients" were evidently instructed to reveal their SSNs gratuitously without being asked, so that NTG could later argue in pleadings that the calls were "confidential." *Id.* at ¶143. The record reveals an impossible circumstance where almost all NTG plaintiffs gratuitously revealed SSNs during these calls without a one being asked for the numbers. *Id.* at ¶¶137-138. Most of the plaintiffs were recruited from within the same social circles. For example, Demulder, Schoonover, Pfleg, and Nilon were close friends who lived together. *Id.* at ¶¶64, 82, 91, 120, 166, 172-73. After completing their staged calls, each promptly contacted NTG to confirm call completion. *Id.* at ¶116-19. In 2013, NTG conceded in pleadings that this very practice was unlawful, calling the staging of CIPA cases "foul-play." *Id.* at ¶160.

In its pleadings before this Court, it admitted the staging, referring to it as use of "testers," but omitting the material fact that in none of the underlying cases did it ever reveal it relied on hired plaintiffs who falsely alleged injuries. *Id.* at ¶¶101-104.

The CIPA, CLRA, and UCL cases advanced by NTG since 2010 reflect a pattern of staged, fraudulent litigation by NTG hired plaintiffs.[5] NIC presents evidence relevant to four "CIPA" lawsuits:  (1) *Nilon v. Chromadex, Inc.*, No. 56-2013-00436790 (Cal. Sup. Ct. Ventura Cnty.); (2) *Demulder v. Carter-Reed Company, LLC*, No. 3:12-cv-02232 (S.D. Cal.); (3) *Schoonover v. Himalaya Drug Co.*, No. 3:12-cv-01782 (S.D. Cal.); and (4) *Torres v. Nutrisystem, Inc.*, No. 8:12-cv-01854 (S.D. Cal.).

### A. <u>Torres v. Nutrisystem</u>

*Torres v. Nutrisystem* illustrates the means by which NTG staged its CIPA cases.  Facts concerning *Torres* relate to all NTG CIPA cases, including Demulder's case, which were pursued by NTG using the same means, same false pretenses, and same NTG agent. *See generally* CSUF ¶¶4-88.

On August 6, 2012, NTG's Baslow contacted Nutrisystem to ascertain if Nutrisystem was a good target. *Id.* at ¶13.  Part of Baslow's role in 2012-2013 involved locating potential NTG targets.  Baslow placed over 2,500 phone calls to toll-free numbers in 2012-2013. *Id.* at ¶9.  In every CIPA case NTG pursued, Baslow contacted the corporate defendant at least once *before* the NTG "client" later placed a call to the same corporate line, using the same method Baslow used. *Id.* at ¶10.

Baslow contacted Nutrisytem five times on August 6 and 7, 2012. *Id.* at

---

[5] NIC presented a complete statement of facts concerning the NTG operation in its pending crime-fraud motion filed under Dkt. Nos. 291 and 292.  NIC respectfully directs this court to those pleadings for further background on the relationship between NTG's CLRA and CIPA cases, which were often pursued by the same individuals. *See* Fed. R. Civ. Pro 56(c)(3)(stating that, in ruling on a motion for summary judgment, the court "may consider other materials in the record").

¶13.  Through trial and error, Baslow learned that he could bypass Nutrisystem's automated notice of pre-recording,  *Id.* at ¶15, by pressing the number "1" within eight seconds of the call Baslow learned he could circumvent Nutrisystem's disclosure.  *Id.*  On Aug. 6 and 7, when Baslow contacted Nutrisystem he also called 120 other corporate numbers, and several became NTG litigation targets.  *Id.* at ¶120.  For example, Baslow called Humana Pharmacy on August 6 and 7.  *Id.* at ¶64.  Raquel Torres's brother, Ray Perea, filed a lawsuit through NTG against Humana alleging CIPA claims virtually identical to those asserted by Demulder.  *Id.* at ¶¶64-65.  Perea filed his NTG CIPA lawsuit one week after his sister's filing, which also mirrored in content the other NTG CIPA suits.  *Id.*

Raquel Torres attempted to call Nutrisystem on August 22, 2012, about two weeks after Baslow had completed his investigatory calls.  Torres apparently transcribed the wrong number from NTG.  *Id.* at ¶16.  On August 22 and 24, Torres attempted to call Nutrisystem fifteen (15) separate times using 1-800-435-44**97**.  *Id.* at ¶¶16-25.  But Nutrisystem's phone number selected by Baslow and identified in Torres's Complaint was actually 1-800-435-44**90**.  *Id.* at ¶17.  The "4490" Nutrisystem number had not been used by the company since 2008 and was not published, so Torres failed in her task.  *Id.* at ¶21.  Then on August 24, 2012 at 12:17pm, Torres called NTG at 480-507-2222, which is the number of Wynn Ferrell at NTG (another unlicensed NTG investigator and the father of defendants Ryan and Scott Ferrell).  *Id.* at ¶20.  After first speaking with NTG on August 24, 2012, Torres then dialed the correct Nutrisystem phone number (1-800-435-4490) three hours later on August 24, 2012 at 3:57pm.  *Id.* at ¶¶22.

Torres's phone call to Nutrisystem closely mirrored the method and content of Baslow's exploratory calls.  Although a first-time caller, Torres dialed the number "1" within eight seconds of the call so that she bypassed Nutrisystem's automated pre-recording notice.  *Id.* at ¶¶25-26.  Moreover, as her brother did in his call to Humana Pharmacy, Torres gratuitously divulged her SSN without being

asked for that information. *Id.* at ¶32. The record shows that NTG clients routinely revealed their SSNs during the CIPA calls without being requested so to do. *Id.* at ¶35. Andrew Nilon was unable to do so during his ChromaDex call only because he did not dial a valid retail number. *Id.* at ¶¶141. But NTG's practice of having clients gratuitously reveal SSNs was so common, NTG assumed in NTG's demand letter to Chromadex, Inc. that Nilon had done so (*Id.* at ¶142), erroneously claiming that Nilon gave his SSN to a Chromadex customer service representative, when in fact he never did. *Id.* Revealing SSNs allowed NTG to facially allege satisfaction of the statutory element that the calls be "confidential." *Id.* at ¶143.

As a first time caller, Torres's use of a calculated dialing methodology to circumvent the Nutrisystem automated notice of recording revealed advance call coaching that mimicked NTG's Baslow's method. Nutrisystem introduced testimony showing that less than 2% of callers (in a universe of more than 116,970 California callers) were able to bypass the company's automated disclosure within nine seconds of the call. *Id.* at ¶¶29-34. Most bypassed calls came from repeat callers who acquired knowledge of the peculiar bypass method through experience. *Id.* at ¶31.

Torres was deposed in her *Nutrisystem* case, and she testified falsely to conceal her preexisting relationship with NTG. At deposition in 2013, Torres testified that she first spoke with NTG weeks *after* her Nutrisytem call after learning about NTG through internet searches. *Id.* at ¶¶39-42. Phone records in this case prove that Torres actually connected with NTG three hours *before* her Nutrisystem call, and likely earlier in August. *Id.* at ¶¶20-22.[6]

Based on Baslow's calls to Nutrisystem in early August 2012, followed by Torres's call several weeks later, Nutrisystem's counsel accused NTG of fabricating the lawsuit. *Id.* at ¶46. NTG deflected those allegations by claiming

---

[6] NIC's motions to compel pre-injury communications between NTG and its "clients" is pending. *See* Dkt. 291, 292.

that Baslow's early-August 2012 calls were actually on behalf of a *different* class plaintiff named Richard Richardson. *Id.* at ¶47. Richardson's story surfaced in March 2013 only after Nutrisystem accused NTG of improper conduct in February 2013. *Id.* at ¶¶43, 54-55. Richardson's story followed the Torres narrative; he claimed to have found NTG through an internet search after contacting Nutrisystem and suspecting that his call was recorded. *Id.* at ¶49. NTG appealed to the Court's trust in counsel:

> Defendant's accusation that this is an "attorney driven lawsuit" and that Plaintiff's call was effectively a set-up is unsubstantiated via any evidence, pure inflammatory conjecture intended to bias the Court, and further discredited by the fact that a Class member, Richard Richardson, called Defendant *before* Mr. Baslow called Defendant, and contacted Plaintiff's counsel seeking legal recourse. If the Court credits Defendant's completely unsupported allegations of foul-play, it would have to conclude that Plaintiff, Mr. Baslow, and Mr. Richardson have all lied [under oath].

*See* CSUF at ¶56 (emphasis original) (identifying the conduct here as "**foul-play**").

But phone and corporate records prove that Richardson never contacted Nutrisystem. *Id.* at ¶¶50-54. Richardson's declaration submitted in the *Torres* matter was false and, to prevent disclosure of that impropriety, NTG attempted to conceal Richardson from NIC in this case. *Id.* at ¶¶57-59, 67-74. NTG submitted two false discovery responses directing NIC to a false address for Richardson, and falsely claimed that NTG had no information about Richardson. *Id.* at ¶68. NIC eventually discovered that Richardson is the live-in partner of Defendant Baslow's sister-in-law. *Id.* at ¶¶57-59. The first relevant contact between Baslow and Richardson occurred in March 2013, after Nutrisystem accused NTG of staged litigation. *Id.* at ¶¶54-55. In other words, to escape trouble in the *Torres* matter, NTG used a family connection to supply a false narrative that would somehow explain Baslow's early August 2012 phone calls to Nutrisystem. The false testimony and fabricated Richardson narrative used to explain Baslow's investigatory calls reveal that NTG never believed "testers" were appropriate. The tester argument here is a legally flawed *post hoc* justification for RICO conduct.

The Court in *Torres v. Nutrisytem* eventually denied NTG's request to certify a class.  Given the improbable circumstances of Torres's call, the Court held her claims would not be typical of a class.  *See, e.g., Torres v. Nutrisystem, Inc.*, 289 F.R.D. 587, 594 (C.D. Cal. 2013) ("The issue of whether class members consented to the recordings would also require a detailed factual inquiry for each class member, likely resulting in varying responses to the consent issue.").

### B. The Demulder, Nilon, Schoonover, and Pfleg CIPA Claims

NTG's Nilon, Schoonover, Demulder, and Pfleg CIPA cases followed the same pattern as the *Torres* matter, wherein NTG's Baslow first located target corporations, then recruited individuals to call the corporations for litigation purposes, who made the calls under false pretenses and divulged gratuitously SSNs.  *Id.* at ¶¶10, 110-122.

At the outset, both Nilon and Schoonover have admitted that NTG recruited them to pursue sham legal matters which included the CIPA wiretapping cases.  *Id.* at ¶¶75-88, 182.  Schoonover admitted that NTG wanted the Non-NTG defendants to complete phone calls while preventing the corporate representative from disclosing that the calls were recorded.  *Id.* at ¶¶85-88.  He implicated other Non-NTG Defendants, and admitted that each knew they were cooperating with Baslow solely so they could be recorded for NTG's litigation purposes.  *Id.*; *see also* CSUF ¶88.

Non-Defendants Nilon, Schoonover, Pfleg, Demulder, and Pfleg are close friends, several of whom lived together in 2012 when they pursued these cases with NTG.  *Id.* at ¶¶64, 82, 91, 120, 166, 172-73.  Of that group, Nilon, Schoonover, Pfleg, and Demulder each pursued CIPA cases with NTG's Baslow.  Pfleg pursued two CIPA matters.  *Id.* at ¶¶172-73.  The Nilon, Schoonover, and Demulder CIPA cases closely resembled the fraudulent calls in the *Torres* matter.

In this case, NTG now claims, for the first time *post hoc* in this case, that Nilon, Schoonover, and Demulder were "tester" plaintiffs.  *See* Dkt. 64 at 8

(admitting that "some Newport Trial Group clients *invited their friends to assist in stopping unlawful wiretapping*") (emphasis added). "Tester" is a euphemism for hired plaintiff. NTG thus concedes that it hired Nilon, Schoonover, and Demulder to make calls solely to bring false CIPA claims. At their depositions, Nilon, Schoonover, and Demulder gave no testimony that they were sincere consumers interested in purchasing a product, each relying instead on their relationships with NTG's Baslow as the reason for their calls. *Id.* at ¶¶154-157, 200-215. At no point in the underlying cases did NTG inform the Courts or opposing counsel that it was using paid "testers" who lacked bona fide injuries. *Id.* at ¶144.

The record shows that NTG attorneys instructed Baslow to find corporate targets weeks or months before NTG "clients" made their calls. *See* RJN 6 at 21, 44-45, 54-55 (Baslow Tr.). Baslow testified in the *Torres* matter that he was instructed to make the exploratory calls by NTG attorneys. *Id.*

Baslow called ChromaDex, Himalaya Drug Co., and Carter-Reed Co. before Nilon, Schoonover, and Demulder each phoned those companies for their staged calls. *See* CSUF at ¶¶ 2-3, 9-12, 112, 118. Nilon, Schoonover, and Demulder then each called their target companies under false pretenses, providing false information to create the façade of a legitimate customer call. *Id.* at ¶¶114-153. Within hours or sometimes minutes after completing the calls, Nilon, Schoonover, and Demulder sent confirmatory email or text messages back to NTG's Baslow. *Id.* at ¶116.

Baslow called Himalaya Drug Company on July 16, 2012 at 1:15pm. *Id.* at ¶117. He connected with Sam Schoonover on July 16, 2012 at 3:14pm. *Id.* Sam Schoonover called Himalaya for his staged call on July 17, 2012 at 8:58am. *Id.* Schoonover then emailed Baslow 12 minutes later to confirm that his task was completed. *Id.*

Baslow called Carter-Reed on August 1, 2012. *Id.* at ¶118. He connected with Demulder frequently thereafter, sharing more than thirty (30) calls, text

messages and emails in August 2013. *Id.* (explaining that Baslow had contacted Demulder by email concerning Demulder's "new case" *prior* to Demulder's phone call). Demulder completed his staged call to Carter-Reed on September 6, 2012 at 8:12am. *Id.* He then contacted Baslow three hours later at 11:38am on September 6, 2012. *Id.*

NTG's Baslow called Chromadex on January 28, 2013. *Id.* at ¶119. He connected with Andrew Nilon on February 14, 2013. *Id.* Nilon executed his staged call to Chromadex on February 26, 2013 at 4:06pm. *Id.* Nilon then confirmed with Baslow the next morning at 9:16am on February 27, 2013 through email. *Id.*

When Nilon, Demulder, and Schoonover eventually called the target corporations, their phone calls were substantively indistinguishable and transparently staged. Each made his call under false pretenses; for instance, Demulder and Schoonover each asked company representatives for information about the product the company sold, but did not purchase the product. *Id.* at ¶¶122-131 (citing audio files of recordings). Nilon purported to call regarding a previous product purchase, despite the fact that he had never purchased anything from ChromaDex, nor does ChromaDex sell to consumers. *Id.* at ¶123. Demulder concealed his true identity on the call, reflecting an awareness of unlawful activity. *Id.* at ¶127. Both Schoonover and Nilon elected to call from third party mobile telephones not connected to them. *Id.* at ¶125. Demulder called from his work phone (not his personal mobile) and provided a false name and other false personal information. *Id.* at ¶126.

Schoonover's call followed a nearly identical script to Baslow's call made the preceding day. *Id.* at ¶133. They asked the same questions in the same order. *Id.* Baslow and Schoonover called under the same false pretense, *i.e.*, inquiring into the company's "best-selling product." *Id.* In fact, the calls are so similar that at deposition Schoonover mistakenly believed Baslow's call recording to be his

own. *Id.* at ¶134.  Notably, the only substantive difference between the two calls is that before concluding his exploratory call, Baslow asked the Himalaya Drug Co. representative whether they record all incoming calls to which the employee answered in the affirmative.  Thus, when Baslow spoke with Schoonover the night before Schoonover's call, Baslow had already determined that Himalya Drug Co. recorded all incoming calls.

Thus, in each NTG CIPA case, the following facts are proven:  (1) that the pretexts for these consumer calls were false; (2) that NTG pre-selected each corporation to be called; (3) that NTG's CIPA "clients" each spoke to NTG's agent prior to calling the targeted corporations; (4) that NTG's CIPA "clients" contacted NTG's agent soon after completing the CIPA calls; (5) that each call involved the gratuitous revelation of personal information like SSNs; and that (6) NTG admits *post hoc* (for the first in this case) that the individuals were "testers."  CSUF at ¶¶ 1-186.  NIC has filed the audio recordings of all relevant phone calls for the Court's review.  *See* Exhs. 3, 4, 9, 10, 12, 13, 14, 15, 16, 47, 52 (Audio Recordings).[7]

In context, Demulder's call reveals fraud.  The entire pretext for Demulder's call to Carter-Reed was false.  Demulder gave a fake name when calling Carter-Reed.  CSUF at ¶127.  He falsely claimed to have ordered "some pills" from Carter-Reed, and then used that false statement as a pretext to reveal gratuitously his SSN.  *Id.* at ¶130-131.  He also, without request, divulged false personal information not topical to the conversation.  *Id.* at ¶128-131.  He falsely claimed to be "very overweight" (he was not at the time).  *Id.* at ¶129.  He falsely claimed to have "just lost [his] job."  *Id.* at ¶128.  In fact, he was employed, calling Carter-Reed from his office.  *Id.*  After blurting that (false) information, he promptly terminated the call without ordering any product.  *Id.* at ¶122.

After its hired "clients" gratuitously dumped SSNs and other personal

---

[7] Filed conventionally in native .wav format.

details, NTG could then argue that their staged calls met the "confidential" CIPA element, reflected in the following passage by Defendant Scott Ferrell in a representative NTG CIPA brief:

> The nature of such communications is inherently personal and private in nature, unlike the bare content of the communications at issue in *Hilton*, which this Court deemed to be not objectively reasonable to expect confidentiality. Indeed, the defendants in *Hilton* pointed out that the plaintiff in that case did not allege any "personal or confidential information, *such as a Social Security number*." Here, in contrast, [NTG's] Plaintiff Clark disclose[d] his social security number to Defendant's customer service representative. Thus, the First Amended Complaint alleges precisely the type of confidential communication that would have met the legal standard articulated by the defendants in the *Hilton* action.

*See* CSUF at ¶143 (citing *Clark*, RJN 37 at 19, NTG Memo) (emphasis original).

Nilon, Schoonover, and Demulder never disclosed in litigation, pleadings, or correspondence to opposing counsel that their calls were staged or that they were NTG paid, "tester" plaintiffs. To the contrary, they repeatedly asserted to the Courts and opposing counsel the falsehoods that they did not expect recordation and did not impliedly consent (consent through conduct) to being recorded. *See, Schoonover v. Himalaya,* Dkt. 5 at ¶¶ 9-14, 40, 42; *Demulder v. Carter-Reed,* Dkt. 1 at ¶¶ 1, 8-10, 38; Exh. 19 at ¶¶ 7-10. They falsely professed actual injury. Nilon represented that he was injured from having divulged personal information, such as his SSN, which was false, *inter alia*, because Nilon never disclosed his SSN. *Id.* at ¶¶141-42. *See id.* at ¶¶3, 9, 10, 11, 86, 113, 116, 118, 122, 126-132, 147, 151-154. Nilon, Schoonover, and Demulder had no expectation of privacy or confidentiality in a call which they knew would (indeed intended to be) recorded.

At deposition, Nilon, Schoonover, and Demulder claimed to have almost no knowledge of their underlying CIPA cases. *Id.* at ¶¶154-157, 195, 199-215. Schoonover could not recall whether he even sued the Himalaya drug company in 2012. *Id.* at ¶208. Nilon could recall no basic facts about his case against Chromadex, and answered "I don't remember" to nearly all questions asked. *See*

RJN 28 (Nilon Tr.).  Demulder, like Nilon, could not recall even the most basic facts about his Carter-Reed lawsuit.  *Id.* at ¶201 (citing Demulder Tr., RJN 25).  Demulder did not know the names of the attorneys who represented him in that case, and could not explain why he called Carter-Reed.  *Id.* at ¶200 (citing Demulder Tr., RJN 25).  The testimony provided by defendants in Dkt. Nos. 375-2 through 375-5, and Dkt. 387-1 is directly contradicted by testimony given at their depositions.  *See* CSUF ¶¶199-215.  On May 12, 2017, Demulder testified at deposition to having no memory of his lawsuit, but then executed an attorney-prepared declaration for the present MSJ the **_very same day_** providing details that Demulder testified he did not know.  NIC reveals the contradictions in its companion Rule 56(d) motion filed contemporaneous with this Opposition.

## III.    LEGAL STANDARDS

"Summary judgment is appropriate where the record, read in the light most favorable to the nonmovant, indicates 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *See TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktienbolaget LM Ericsson*, No. SACV140341JVSDFMX, 2016 WL 6921885, at *1 (C.D. Cal. Aug. 9, 2016) (citing Fed. R. Civ. P. 56(a) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  The Court may not make credibility findings related to factual evidence for the jury.  *See Vasic v. PatentHealth, L.L.C.*, 171 F. Supp. 3d 1034, 1039 (S.D. Cal. 2016).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

NIC may prove RICO elements, including conspiracy, through direct and circumstantial evidence.  *See United States v. Kelly*, 527 F.2d 961, 965 (9th Cir. 1976) ("circumstantial and testimonial evidence are indistinguishable insofar as the jury fact-finding function is concerned, and … circumstantial evidence can be used to prove any fact, including facts from which another fact is to be inferred.").

"[C]ircumstantial evidence is not inherently less probative than direct evidence, and, in many conspiracy cases, is the only kind of evidence available." *See United States v. Polizzi*, 500 F.2d 856, 904 (9th Cir. 1974) (internal citations omitted); *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir. 1969) (same). "Circumstantial evidence that a defendant participated in a fraudulent scheme can support a conviction for wire fraud." *United States v. Hall*, 542 F. App'x 586, 588 (9th Cir. 2013); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1309 (C.D. Cal. 1996) ("The proof of scienter in fraud cases is often a matter of inference from circumstantial evidence.").

## IV.   <u>ARGUMENT</u>

Staging legal injuries in sham litigation is unlawful and fraudulent. *See, e.g., U.S. v. Al-Shahin*, 474 F.3d 941, 946-47 (7th Cir. 2007). NTG hired individuals to represent themselves falsely to be legitimate consumer plaintiffs and to allege false injuries; it hid the fact that they were paid shills from defendants and the courts. The NTG plaintiffs suffered no real legal injuries. They were instructed by NTG to self-injure—to buy certain products or call certain companies—only after NTG had planned the litigation. They performed tasks at NTG's direction. *See* CSUF ¶¶ 3, 9, 10, 11, 75-88, 113, 116, 118, 122, 126-132, 147-148, 151-154. At least ten (10) other parties have accused NTG of unlawfully staging cases in litigation. *See* CSUF ¶198.

Without any apposite authority, and directly contrary to the CIPA statute, Demulder asks this Court to rule that his staging of false CIPA litigation is lawful. Demulder cannot proffer a single case or authority supporting that conclusion, or supporting the use of "tester" plaintiffs outside of the very narrow context of federal housing and ADA cases. Among the flaws in Demulder's argument, the California Penal Code specifically requires an objectively reasonable expectation of privacy and violation of that privacy for an actionable claim, and recordings that are expressly or impliedly "consensual" are not actionable. *See* Cal. Penal Code §§

632, 637.2 (a).  An individual who willfully self-injures solely to advance a lawsuit clearly has no legitimate privacy injury.  NTG used its hired plaintiffs to extort lucrative settlements from unsuspecting corporations, and never achieved any public benefit (i.e., injunctive relief or payments to any class members other than the hired plaintiffs).  The plaintiffs submitted intentionally false pleadings for that purpose.  They committed fraud at its most elemental level.

### A. This Court Has Already Determined That Demulder's Conduct Was Unlawful if NIC Allegations of Staged Litigation Are True

NIC specifically alleges that the NTG-driven Chromadex, Carter-Reed, Himalaya Drug, and Nutrisystem actions all lacked probable cause because the material allegations supporting the class representative's claims in the operative complaints were intentionally false.  In February 2016, Defendants raised the identical argument they raise here at the motion to dismiss stage, arguing that the use of "testers" to pursue staged cases was lawful.  *See* Dkt. 64.  Defendants raised their "tester" argument in at least eight separate pleadings, arguing as early as March 2016 that the use of "testers" in CIPA cases is legally permissible." *See, e.g.,* Dkt. 64 at 6, 13; Dkt. 65 at 9; Dkt. 72 at 5.  In dispositive motions, defendants argued that "Plaintiff's 'tester' theory fails to support a RICO claim." *See* Dkt. 139 at 7-9.

This Court rejected the "tester" defense argument in ruling on those dispositive motions.  *See* Order, Dkt. 157.  The Court sustained NIC's allegations concerning NTG's wiretapping litigation scheme generally and ruled that NIC's allegations, if true, would support claims for RICO.  *Id.* at 13-14.  The Court explained the "wiretapping scheme" as followings:

> Under the wiretapping scheme, the Newport Trial Group and Baslow would identify individuals to serve as potential lead plaintiffs in consumer privacy class actions.  Newport Trial Group when then bribe these individuals to stage private phone calls to various companies, and then later make intentionally false representations that (1) they were not aware that the call was being recorded; (2) they did not consent to the recording; and (3) they

> later learned that the company recorded all incoming calls only after completing the call.  Using these false allegations, [NTG] would threaten companies with statewide class actions under the California Invasion of Privacy Act, Cal. Pen. Code § 632 *et seq…*

*Id.* at 3.  The Court's determination is law of the case.  *Manufactured Home Communities, Inc. v. Cty. Of San Diego*, 655 F.3d 1171, 1181 (9th Cir. 2011).  The law of the case doctrine applies to issues "decided explicitly or by necessary implication" in the previous decision.  *See* Order, Dkt. 296 at 9 (citing *United States v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000).

In ruling that NIC's RICO claims may proceed, this Court necessary rejected Defendants' argument that NTG could use testers (i.e., hired plaintiffs) in CIPA cases.  *See* Dkt. 139 at 3-4 (NTG's brief arguing that "to the extent Plaintiff's RICO claim is based on a theory that [CIPA] testers are per se unlawful, the claim should be dismissed without leave to amend.").

Demulder's motion must therefore depend only on his *factual* argument that he did not know of the recording beforehand and that, as a hired NTG client, he did not know he would be recorded when calling Carter-Reed.  In support of that argument, Demulder submits only his own self-serving affidavit (and no contemporaneous written evidence of any kind) which affidavit conflicts with his own deposition testimony that very same day and contemporaneous evidence NIC supplies here in Opposition.

## B. Whether Demulder Could Have Sued Under Nevada Law Is Irrelevant

Demulder argues that his deliberately false CIPA complaint was not unlawful because he might have sued Carter-Reed under Nevada state law.  *See* Dkt. 387 at 8-10.  But whether Demulder might have sued under Nevada law is irrelevant to the claims he actually brought in California, which were transparently false and fraudulent.  Moreover, Demulder could not have asserted a Nevada claim, because the Nevada law cited by Demulder (Nev. Rev. Stat. § 200.690(1)) also has a "consent" element that precludes claims on behalf of any person who consented to the recording.  Thus, just like in California, Demulder would have no

claim because he consented to the recording when he called for the purpose of being recorded so that he could profit from NTG's litigation scheme. The Nevada court's rulings in the unrelated *Carter-Reed v. Demulder* action, which was based on different legal claims, elements, and facts, are not relevant to this RICO case.

### C. **Demulder's CIPA Claim Was Objectively False and Fraudulent**

On NTG brief at 10-21, Demulder alleges that his CIPA claim was legitimate because, according to Demulder's affidavit, he did not know he would be recorded when he called. *See* Dkt. 387 at 10-21. Demulder argues that he reasonably believed his call would *not* be recorded because all consumers are entitled to that belief, and Demulder's conduct during his call (i.e., revealing his Social Security number) suggests that he thought the call would be private. He argues that, because Carter-Reed never expressly told him that the call would be recorded, he suffered a privacy injury when that call was ultimately recorded. *Id.* at 14.

Demulder's motion must be denied because—even if his argument had merit (it does not)—his requested relief depends on issues of contested fact, to wit, whether Demulder knew that he would be recorded when placing his staged call to Carter-Reed. NTG's admission that Demulder was a "tester" combined with the evidence presented with NIC's opposition here, which is summarized *supra*, proves that Demulder was complicit in staging his CIPA claim, and that his call was a sham or pretext solely to build a CIPA claim in litigation. *See, e.g.,* CSUF ¶¶3, 9, 10, 11, 75-88, 113, 116, 118, 122, 126-132, 147-148, 151-154. Under those facts, a reasonable jury can conclude that Demulder's declaration (which contradicts his deposition testimony) is false or unreliable, and that Demulder knew (indeed, intended that) his call to Carter-Reed would be recorded when made. *See Cheong Yu Yee v. Cheung*, 220 Cal.App.4th 184, 200 (2013) ("A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a

legal theory which is untenable under the facts known to him."). Demulder was calling as an alleged "tester" solely for the purpose of filing **wiretapping** cases. Given the overwhelming evidence of fraud across multiple NTG cases—for which defendants have no explanation—a reasonable jury is likely to credit Defendant Schoonover's 2015 out-of-court admissions wherein he stated to NIC's investigator the following:

> … Baslow told him about companies that recorded telephone calls. Baslow and his boss wanted Schoonover to complete a phone call while preventing the corporate representative from disclosing that the calls were recorded.

*See* Baker Decl., Dkt. 291-6 at ¶ 18(g). The evidence corroborates Schoonover's admissions with respect to Demulder, Schoonover, and Nilon's CIPA claims. The evidence proves that Baslow arranged CIPA claims by coordinating in advance with the firm "clients."

Finally, Demulder ignores that he also advanced a claim under the California Unfair Competition Law (UCL), which requires actually injury. *See* Cal. Bus. & Prof. Code § 17204 (permitting claim by "a person who has suffered an injury in fact"). Demulder's complaint therefore alleged that he suffered injury for purposes of the California UCL. Put simply, review of Demulder's complaint as a whole reveals that he held himself out to be a legitimate caller (not a hired "tester") who suffered a legitimate privacy injury. Because that was false—Demulder's injury was instead staged—his claim was objectively false.

### D. <u>Demulder Never Had an "Objectively Reasonable Expectation that He Was Not Being Overheard or Recorded"</u>

California courts have explained that:

> In the wiretapping context, a finding of implied-in-fact consent requires circumstances indicating that the party knowingly agreed to the surveillance. The circumstances will vary from case to case, but will ordinarily include language or acts which tend to prove (or disprove) that a party knows of, or assents to, encroachments on the routine expectation that conversations are private.

*See Negro v. Superior Court*, 230 Cal.App.4th 879, 892 (2014) (internal citations omitted).  Here the preponderance of the evidence (indeed, all of the evidence but for Demulder's self-serving affidavit) reveals that Demulder performed "acts which tend to prove" that he knew of and assented to the recording with Carter-Reed.

The "jury can infer actual knowledge from circumstantial evidence."  *See Hernandez v. Balakian*, 480 F. Supp. 2d 1198, 1206 (E.D. Cal. 2007) (citing *United States v. Mills*, 597 F.2d 693, 697 (9th Cir. 1979)); *EMC Corp. v. Sha*, No. 13-CV-0118 EJD, 2013 WL 4399025, at *5 (N.D. Cal. Aug. 13, 2013) ("Actual knowledge may be proven through inference or circumstantial evidence"); *Marble Bridge Funding Grp., Inc. v. Euler Hermes Am. Credit Indem. Co.*, 225 F. Supp. 3d 1034, 1040 (N.D. Cal. 2016) ("proof indicative of fraud may be given by inference, by circumstances surrounding the transaction, and the relationship and interest of the parties."); *Scarff v. Wells Fargo Bank, N.A.*, No. C03-03394 JFPVT, 2005 WL 3454136, at *7 (N.D. Cal. Dec. 16, 2005) (knowledge "may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances").[8]  The jury can infer that Demulder knew his call would be recorded from the many facts showing that he must have known under the circumstances.

Most certainly, no California court has authorized the use of fake or staged injuries to support CIPA lawsuits.  The absence of authority is indicated by Defendant Ferrell's response to Nutrisystem's allegations of "attorney-driven"

---

[8] In addition, in California the attorney's knowledge is imputed to the client because "a person is held to know what his attorney knows and should communicate to him."  *See, e.g., Lazzarevich v. Lazzarevich*, 39 Cal. 2d 48, 50 (1952); *Bogart v. George K. Porter Co.*, 193 Cal. 197, 210 (1924); *Stueve Bros. Farms, LLC v. Berger Kahn*, 222 Cal.App.4th 303, 316 (2013); *In re Ivey*, 85 Cal.App.4th 793, 804 (2000) (same).  In civil cases, there is a *presumption* that the lawyer will convey relevant information to the client, and that "presumption is deemed **conclusive** for the purposes of civil actions."  *See Freeman v. Superior Court, San Diego Cty.*, 44 Cal. 2d 533, 537 (1955) (emphasis added).  NTG's knowledge beforehand that its hired clients would be recorded during phone calls was imputed to the hired clients themselves when they called.

litigation in 2013.  CSUF ¶¶158-160.  After Nutrisystem accused Ferrell of staging CIPA litigation, Ferrell expressed outrage that Nutrisystem would accuse him of "foul-play."  *Id.* at ¶160.

### E. Demulder's Fraudulent Activities Violated RICO

Demulder argues NIC has no "admissible evidence that Demulder knew about and agreed to facilitate an unlawful RICO scheme."  *See* Dkt. 387 at 21.[9]  To the contrary, NIC presented substantial evidence that Demulder was aware of the scope of NTG's enterprise and agreed to participate in it with knowledge that he was submitting false allegations for pecuniary gain.  *See supra* at 11-16 (and supporting citations).  Those facts are sufficient for RICO conspiracy.

"[T]he scope of conspiracy law is quite broad" and conspiracy under RICO may be proven through a broad lens.  *See United States v. Cervantes*, 170 F. Supp. 3d 1226, 1238 (N.D. Cal. 2016); *U.S. v. Montgomery*, 384 F.3d 1050, 1061 (9th Cir. 2004).  "Proof of agreement in RICO conspiracy cases can, and often is, based on inferences drawn from circumstantial evidence." *In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 682 F. Supp. 1073, 1094 (C.D. Cal. 1987) (internal quotations omitted); *River City Markets, Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1463 (9th Cir. 1992) "[C]onspiracies rarely are memorialized in writing and often must be proved by circumstantial evidence.").  "A formal agreement is not necessary; rather the agreement may be inferred from the defendants' acts pursuant to the scheme, or other circumstantial evidence." *U.S. v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984).

---

[9] Demulder's argument concerning "admissible" evidence is misguided.  "At the summary judgment stage, [courts] do not focus on the admissibility of the evidence's form.  [Courts] instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  "[T]he nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Federal Deposit Ins. Corp. v. New Hampshire Ins. Co.*, 953 F.2d 478, 485 (9th Cir. 1991).  All of the facts and exhibits proffered by NIC in its opposition will be admissible at trial and sponsored by appropriate witnesses.  That evidence satisfies Rule 56.

Many courts have held staging fake injuries for litigation fraudulent and unlawful. *See, e.g., U.S. v. Al-Shahin*, 474 F.3d 941, 946-47 (7th Cir. 2007) (mail fraud involving scheme to collect money through fraudulent insurance claims through "staged accidents"); *United States v. Hightower*, No. 04 CR 0047, 2004 WL 897886, at *3 (N.D. Ill. Apr. 23, 2004) (mail fraud for pursuing legal claims based on accidents involving "non-existent injuries"); *People v. Singh*, 37 Cal. App. 4th 1343, 1366 (1995), *opinion modified on denial of reh'g* (Aug. 21, 1995) (felony convictions for staging injuries); *Innovation Ventures v. Rubinstein*, No. G046242, 2012 WL 5992116 (Cal. Ct. App. Nov. 29, 2012) (malicious prosecution liability for staged consumer case). In *Singh*, the court found criminal liability for fraudulent declarations prepared by counsel in furtherance of the scheme to defraud through staged accidents. *See Singh*, 37 Cal.App. 4th at 1376.

NIC need only establish that Demulder conspired to participate in a "scheme reasonably calculated to deceive." *See Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967) (same) (collecting circuit authority. Based on the record evidence, Demulder and at least four of his close friends worked with NTG and its agent Baslow to stage fraudulent lawsuits and understood the scope of NTG's fraudulent enterprise which involved them all. That includes evidence of: the admission of "tester" status; the pre (i.e., set up) and post (i.e., confirmation) CIPA call interactions with NTG agent Baslow; Demulder's substantial relationship with Baslow before his Carter-Reed phone call; Demulder's false representations and concealment of true identity during the Carter-Reed phone call; Demulder's apparent knowledge of his friends' CIPA calls and equally fraudulent lawsuits (including five NTG legal matters pursued by Sam Pfleg, one of Demulder's closest friends); Non-NTG defendants Nilon's and Schoonover's admissions that NTG recruited the group of friends to pursue staged cases; that Demulder became associated with NTG at the same time as his friends; that he filed a suspicious lawsuit in the exact same window as did his friends; that Demulder became

associated with NTG's Baslow through the same social connections as the other Non-NTG Defendants who filed fraudulent lawsuits; and that Demulder was forced to create a contrived "tester" explanation in this case when confronted with compelling proof of his involvement in unlawful activity.  *See supra* at 11-17.

Those facts alone, even without considering the compelling evidence of fraud in the other cases, are sufficient to create a genuine issue of material fact. As is the case with Demulder's CIPA lawsuit, "[t]here comes a point when the innocent explanation is so much less likely than the culpable one that jurors properly could decide that a defendant in fact was acting in furtherance of the conspiracy and shared its illegal purpose."  *United States v. Polizzi*, 500 F.2d 856, 905 (9th Cir. 1974).  Demulder has failed his burden to show the nonexistence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[A]ny doubt as to the existence of a genuine issue for trial should be resolved against the moving party."  *Id.* at 330 n.2.

### F.  <u>The UCL Claim Should Not Be Dismissed</u>

Because NIC's civil RICO claim against Demulder survives on the facts incorporated herein (and supporting attachments), NIC's pendant Unfair Competition Law claim must also survive.  Demulder has proffered no argument concerning the UCL claim that is independent of the RICO counts.

### V.    <u>CONCLUSION</u>

For the foregoing reasons, Demulder's Motion to Dismiss should be denied under Rule 56(d) because NIC has not had a sufficient opportunity to litigate privilege issues that are necessary in discovery.  Alternatively, the Motion must be denied because Demulder has failed to show the nonexistence of a genuine issue of fact.

DATED:  July 24, 2017.

Respectfully submitted,

NATURAL-IMMUNOGENICS CORP.

By:    */s/ Peter A. Arhangelsky*
Peter A. Arhangelsky, Esq. (SBN 291325)
E-mail: parhangelsky@emord.com
Emord & Associates, P.C.
2730 S. Val Vista Drive
Building 6, Suite 133
Gilbert, AZ 85295
Phone: (602) 388-8899
Fax: (602) 393-4361

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2017 the foregoing, **MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was electronically filed using the Court's CM/ECF system and was sent by that system to the following:


Brendan M. Ford
bford@forddiulio.com
Kristopher P. Diulio
kdiulio@forddiulio.com
Ford & Diulio PC
695 Town Center Drive, Suite 700
Costa Mesa, California 92626
Tel: (714) 384-5540
*Attorney for Andrew Nilon, Giovanni Sandoval,*
*Sam Schoonover, Matthew Dronkers, Taylor Demulder, Sam Pfleg*

David J. Darnell, Esq.
ddarnell@callahan-law.com
Edward Susolik, Esq.
es@callahan-law.com
Callahan & Blaine
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA 92707
Tel: (714) 241-4444
*Attorney for Newport Trial Group, Andrew Baslow,*
*Scott Ferrell, Ryan Ferrell, David Reid, and Victoria Knowles*


  */s/ Peter A. Arhangelsky*
Peter A. Arhangelsky, Esq.