Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Joshua S. Furman, Esq. (pro hac vice)
jfurman@emord.com
Eric J. Awerbuch, Esq. (pro hac vice)
eawerbuch@emord.com
Emord & Associates, P.C.
2730 S. Val Vista Dr., Bldg. 6, Ste. 133
Gilbert, AZ 85295
Phone: (602) 388-8899
Fax: (602) 393-4361
Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL-IMMUNOGENICS CORP., a Florida corporation,<br><br>Plaintiff,<br><br>v.<br><br>NEWPORT TRIAL GROUP, et al.,<br><br>Defendants. | Case No. 8:15-cv-02034-JVS (JCG)<br><br>**EMERGENCY RELIEF REQUESTED**<br><br>**PLAINTIFF'S EMERGENCY OBJECTIONS TO SPECIAL MASTER'S ORDER DENYING PROTECTIVE ORDER RE QUINTO DEPOSITIONS (DKT. 433)**<br><br>Judge:          Hon. James V. Selna<br><br>Special Master: Hon. Rosalyn Chapman<br><br>Fact Discovery Cut-off:  Aug. 21, 2017<br>Expert Discovery Cut-off: Aug. 28, 2017<br>Pretrial Conf. Date: November 20, 2017<br>Trial Date:          December 5, 2017 |

# TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................... 1

II.  FACTS ................................................................................... 4

    A. Procedural History ............................................................ 4

    B. The Quintos' Circumstances .............................................. 6

    C. Video Depositions ............................................................ 7

III. LEGAL STANDARD ............................................................. 8

IV.  ARGUMENT .......................................................................... 9

    A. The Costs and Burdens on the Deponents Are Substantial ..................... 9

    B. NTG Was Dilatory in Discovery and Repeatedly Delayed Taking
       the Quinto Depositions ................................................. 10

    C. The Quinto Depositions are Evidently not Relevant to Expert
       Reports that Were Disclosed One Month Ago on July 17, 2017 .......... 11

    D. NIC is Not At Fault for this Conflict ................................ 12

    E. Video Deposition Technology Would Provide a Seamless and
       Cost-Effective Alternative ............................................ 13

    F. NTG Must Pay the Witnesses' Reasonable Fees and Costs ................. 14

V.   CONCLUSION ...................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Cadent Ltd. v. 3M Unitek Corp.*, 232 F.R.D. 625 (C.D. Cal. 2005).........................8

*Fausto v. Credigy Servs. Corp.*, 251 F.R.D. 427 (N.D. Cal. 2008).........................9

*Hyde & Drath v. Baker*, 24 F.3d 1162 (9th Cir. 1994)..............................................9

*McGee v. Hanger Prosthetics & Orthotics, Inc.*, No. 2:12-CV-00535-PMP, 2013 WL 1701098 (D. Nev. Apr. 18, 2013).........................................................................9

**Rules**

Fed. R. Civ. Pro 26.......................................................................................................8

Fed. R. Civ. Pro 30............................................................................................... 9, 15

Fed. R. Civ. Pro 33.......................................................................................................4

Fed. R. Civ. Pro 34.......................................................................................................4

Fed. R. Civ. Pro 36.......................................................................................................4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   __INTRODUCTION__

On August 7, 2017, Plaintiff NIC moved the Special Master for a Protective Order under Rule 26(c) that would protect two party witnesses, Benjamin Quinto and Theo Quinto, from extraordinary burdens in discovery.  The NTG defendants noticed depositions for those witnesses for the week of August 14, 2017, which coincides with the Quintos family reunion in Southeast Asia.  Although the Quintos would be away from the country from August 5th through early September 2017, the NTG defendants have sought to compel their attendance in California for in-person depositions.  That request would require the Quinto brothers to each travel more than seventy (70) hours by plane from Southeast Asia to California and back, lose time with their families in August, incur substantial travel-related expenses, and sacrifice significant portions of their family vacation that was booked and fully paid in January 2017 (more than eight months before discovery in this case closed).

Defendants now argue that, absent those extraordinary burdens on plaintiffs, NTG will be unable to take the depositions of party witnesses within the remaining discovery calendar.  But these troubles are entirely NTG's fault.  Discovery in this case commenced in May 2016.  Defendants performed almost no discovery until late March 2017.  Over the course of the first eleven (11) months of discovery, NTG defendants had served just twenty-six (26) requests for documents, no interrogatories, no requests for admission, and taken no depositions.  Then, beginning in March, NTG chose to begin discovery, serving the balance of its nearly 500 document requests, multiple sets of interrogatories, requests for admissions, and notices of deposition.  To date, NTG has taken just three depositions:  one of Clark Baker, and two depositions of NIC's trial counsel (Messrs. Furman and Arhangelsky).  NTG noticed the Quinto depositions originally for April 2017.  The parties later rescheduled those depositions for May 17 and 18, 2017 at NTG's request.  Then, on May 9th, NTG unilaterally cancelled

the May Quinto depositions.  NTG made no attempt at that time to reschedule.  NTG did not confer with NIC as to the witnesses' availability over the summer in 2017.  On July 7, 2017, NTG served amended notices of deposition on the Quintos, listing August 10 and 11 as deposition dates.  On July 11, 2017—fully one month before those depositions were scheduled—NIC counsel informed NTG that the Quintos would be unavailable after August 5, 2017.  NTG made no effort to schedule those deposition for the remaining days in July 2017.  Instead, NTG insisted on deposition dates that were within the last two weeks of fact discovery.  NTG then argued to the Special Master that such depositions had to occur because, otherwise, the clock on discovery would lapse.  NTG has elsewhere opposed NIC's attempts to seek extensions of the discovery calendar to prevent these conflicts.

In an effort to compromise, NIC offered to make the Quintos available by video deposition using Veritext's remote deposition platform.  The NTG defendants refused, and insisted on "in person" depositions that would require the Quintos to forfeit a substantial portion of their $55,000 family reunion, which was planned well in advance of August 2017, and fully paid in January 2017.  NIC offered to stipulate to an extension of the discovery calendar solely with respect to the Quinto depositions so that those proceedings could occur in September 2017, when the Quintos returned—which would be still three months before the current trial date in this case.  NTG Defendants again refused, insisting instead on the in-person depositions in California during the week of August 14, 2017.  The NTG Defendants cannot identify any prejudice to their defense that would stem either from video depositions or a short, three week extension of those Quinto depositions in September.  Rather, the NTG defendants' position appears to be based on a desire to maximize burdens on a party opponent in the waning weeks of discovery.

NIC filed a motion for a protective order with the Special Master.  The motion was denied, citing the closing discovery calendar set to expire on August

21, 2017.  NIC has pending a motion before this Court to extend calendar dates, in part, to avoid these irreconcilable conflicts.

The Special Master's Order denying NIC's Motion for a Protective Order misapplies the factual record.  First, the Special Master erroneously concluded that the Quintos are partly at fault because, having received the Notices of Deposition, they continued with their preplanned trip.  However, the Quintos had served a joint stipulation for a protective order before they left the country.  Moreover, the Quintos informed NTG counsel of their unavailability on July 11, 2017, which afforded NTG more than three weeks to schedule a deposition beforehand in July 2017.  The Quintos were also available for the balance of the other fourteen (14) months in discovery.  The Special Master also concluded, without any basis in the record and without any citation, that the Quintos would "not necessarily" be forced to undergo substantial travel burdens in litigation.  The undisputed record demonstrates that the Quintos would be compelled to travel thirty (30) hours per direction which, with the stop in California, would exceed seventy hours of travel time.  In fact, NTG concedes that in-person depositions would force the Quintos to lose up to five days of their trip in round-trip travel.  *See* Dkt. 429 at 9.  Finally, the Special Master erred in finding that the Quinto depositions must occur in August rather than two weeks later in September 2017.  *See* Dkt. 433 at 14-15.  The Special Master held that the "Quintos' depositions need to be taken now – or sufficiently in advance of the expert witnesses' exchange of reports and depositions – so the experts can review the testimony."  *Id.* at Dkt. 433.  That finding was clear error.  The parties have already exchanged all expert reports in this case.  Initial reports were exchanged on July 17, 2017, and rebuttal reports were completed on August 7, 2017.  *See* Dkt. 363.  None of those expert reports or opinions depend on information that would be supplied by the Quinto witnesses.  Moreover, if NTG's experts required information from the Quintos beforehand, then logically NTG should have scheduled these depositions for a date *prior* to the

exchange of reports on July 17, 2017—and the Quintos were available before that time.

Accordingly, while NIC has shown good cause for postponing these depositions until September (which is still months before the existing trial date), NTG has not shown why those depositions must occur in August when these witnesses are unavailable.  NIC has not argued that depositions should not proceed, or that the witnesses are completely unavailable.  NIC is proposing a continuance of these depositions by just two weeks.  The Special Master compelled the Quinto depositions by "no later than August 23, 24 and 25," which is already outside of the fact discovery deadline that closes on August 21.  *See* Dkt. 433 at 17.  NIC has proposed an extension of those depositions to the week of September 5, 2017, which would mark a continuance of **<u>about twelve (12) days</u>**.  NTG has not shown –nor can it show—that a delay of about two weeks prejudices their defense to the point where these substantial burdens and costs must be placed on party witnesses.

## II.  <u>FACTS</u>

### A. Procedural History

Prior to March and April 2017, the NTG Defendants had served almost no written discovery and taken no depositions.  Arhangelsky Decl. at ¶ 8 ("PAA Decl.").  On March 3, 2017, NTG served deposition notices for Benjamin and Theo Quinto setting their depositions for April 17 and 18.  *See* Decl. of Darnell, Dkt. 429-1 ("Darnell Decl.") at ¶ 3.  NTG did not consult NIC regarding the witnesses' availability prior to unilaterally setting those dates.  PAA Decl. at ¶ 4.  On March 16, March 21, and April 4, 2017, NTG served more than four hundred document requests on NIC as well as interrogatories and requests for admission.  Darnell Decl. at ¶ 4; *see also* PAA Decl. at ¶ 9.  The default deadlines for responses and objections to that written discovery were April 17, 2017, April 24, 2017, and May 8, 2017.  *See* Fed. R. Civ. Pro 33(b)(2), 34(b)(2)(A), 36(a)(3).

Therefore, none of the responsive documents would have been produced in time for the Quinto deposition dates unilaterally set by NTG, meaning that NTG did not contemplate having those documents prior to the Quito depositions scheduled for April 17 and 18.

Counsel for NIC timely informed counsel for NTG that the selected deposition dates were not workable (as those dates had been set unilaterally). Darnell Decl. at ¶¶ 5-6. On April 3, 2017, the Special Master held a monthly status conference. Furman Decl. at ¶ 3. On that call, counsel for NTG raised the issue of the Quinto depositions and argued to the Special Master that those depositions had to proceed as soon as possible and that NTG could not wait until May to take them. *Id*. The Special Master ordered counsel for NIC to make at least one of NIC's principals available for deposition in April. *Id*. The following day, counsel for NIC informed counsel for NTG that Theo Quinto had rearranged his schedule to be available on April 18, the date originally selected by NTG, as well as April 19 and 20. *See* Exhibit 4 to Darnell Decl., Dkt. 429-1. NIC further explained that Benjamin Quinto could not be available until the week of May 15, but would be available that entire week. *Id*.; NIC Exh. 9. Despite their representation to the Special Master that these depositions should occur as soon as possible, the NTG Defendants then postponed Theo Quinto's deposition from April to May 2017. Darnell Decl. at ¶ 7 (noting that after meet and confer, NTG rescheduled depositions for May 17 and 18). Counsel for NTG represented that the reason for delaying Theo Quinto's deposition until May was because NTG wanted to take the Quinto depositions on consecutive days. Furman Decl. at ¶ 4.

On May 9, 2017, Counsel for NTG again postponed the deposition of Theo Quinto and also postponed the deposition of Benjamin Quinto. *See* Darnell Decl. at ¶ 9. On that call, counsel represented that it needed documents responsive to its March and April discovery requests before it could proceed with depositions. *Id*. Yet, the requests at issue were served so late in discovery that the responsive

documents would never have been produced prior to the April dates originally selected by NTG.

On July 7, 2017, the NTG Defendants again unilaterally noticed the depositions of Benjamin and Theo Quinto this time for August 10 and 11, 2017. PAA Decl. at ¶¶ 3-4.  Defendants made no effort to consult with NIC counsel prior to scheduling those depositions.  *Id.*  The indisputable facts therefore show:  (1) NTG delayed its discovery efforts until the last minute in this case; (2) NTG postponed the Quinto depositions in May without determining whether those witnesses would later be available; (3) NTG delayed until the *last week* of fact discovery to schedule Quinto depositions; (4) NTG has not cooperated with opposing counsel on the selection of mutually convenient dates and has, instead, scheduled and then canceled dates selected over a course of several months' time; and (4), now, because of NTG's unwillingness to take discovery during the first fourteen (14) months of discovery, NTG seeks to compel NIC's principals to travel more than seventy (70) hours to appear in person for a deposition in California.

**B. The Quintos' Circumstances**

Benjamin and Theo Quinto are currently out of the country for a four-week family trip in the South Pacific that was scheduled seven (7) months ago.  *See* Quinto Decl. at ¶ 15.  The cost of that trip is substantial.  *See id.* at ¶ 18.  Round-trip flights to Los Angeles, California begin at more than $1,400 dollars.  *See* Darnell Decl., Dkt. 429-1 at ¶ 24.  Moreover, the travel time ranges from 21 hours to 30+ hours each way.  The NTG Defendants admit that the round-trip to Los Angeles would result in up to five days of lost time for the deponents.  *See* Dkt. 429 at 9.  The deponents will also be required to book hotel accommodations in Los Angeles and will lose any prepaid activities, hotel accommodations, and other planned events or expenses for their vacation.  *See* Quinto Decl. at ¶¶ 18-23.  The deponents will also be forced to miss significant time with their family.  *Id.*  Thus, in-person attendance at deposition will impose substantial financial, time, and

personal burdens on the deponents.  Basic principles of civility militate against an order that would conscript witnesses to travel for more than 70 hours for deposition under these circumstances.

**C. Video Depositions**

NIC proposed that the depositions be taken remotely by video.  PAA Decl. at ¶ 7.  That proposal was rejected despite the fact that court reporter services have developed technology expressly designed to facilitate video depositions seamlessly.  *Id.* at ¶¶ 10.  As an example, NIC's counsel has contacted Veritext Legal Solutions.  Furman Decl. at ¶ 9.  Veritext offers a virtual remote deposition service that would be cost-effective (adding only $600 to the total cost of the deposition) and streamlined.  *Id.*  Veritext has a Los Angeles office where counsel for all parties and the court reporter could hold the deposition.  *Id.*  The only distinction between the video deposition and a traditional, in-person deposition would be that in the location where the deponent normally sits there would be instead a large video screen where the deponent appears remotely.  *Id.*  The Veritext remote deposition application allows for document exhibits to be provided to the deponent in real time.  *Id.*  The document is displayed on screen for the deponent, the deposing attorney, and all others present in the Los Angeles conference room.  *Id.*

[INTENTIONALLY LEFT BLANK]

Here is an example of the screen:



The exhibits are displayed in the bottom right of the screen. The RealTime transcript is displayed on the bottom left. The participants are on video at the top.[1]

For Benjamin and Theo Quinto to attend a Veritext Virtual Remote deposition, they only require a laptop computer with a camera, a hardline internet connection, and a telephone. Furman Decl. at ¶ 9(a). They can readily obtain those items in Indonesia.

## III. __LEGAL STANDARD__

"Federal Rule of Civil Procedure 26(c) governs the discretionary granting of a protective order to regulate the terms, conditions, time or place of discovery...." *Cadent Ltd. v. 3M Unitek Corp.*, 232 F.R.D. 625, 629 (C.D. Cal. 2005). "A protective order should be granted when the moving party establishes 'good cause' for the order and 'justice requires [a protective order] to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense....'" *Id.* (citing Fed. R. Civ. P. 26(c)). "Once their protection is sought, district courts have

---

[1] Source https://www.veritext.com/services/veritext-virtual/

1    wide discretion to establish the time and place of depositions." *Fausto v. Credigy*

2    *Servs. Corp.*, 251 F.R.D. 427, 429 (N.D. Cal. 2008) (citing *Hyde & Drath v. Baker*,

3    24 F.3d 1162, 1166 (9th Cir. 1994)). "Courts consider the relative convenience of

4    and hardships to the parties when determining whether there is good cause to grant

5    a protective order." *Id.*

6         "Under Rule 30(b)(4), the court may order 'that a deposition be taken by

7    telephone or other remote means.'" *McGee v. Hanger Prosthetics & Orthotics,*

8    *Inc.*, No. 2:12-CV-00535-PMP, 2013 WL 1701098, at *5 (D. Nev. Apr. 18, 2013)

9    (quoting Fed. R. Civ. Pro 30(b)(4)).

10        The Central District Civility and Professionalism Guidelines require counsel

11   to "consult [opposing] counsel regarding scheduling matters in a good faith effort

12   to avoid scheduling conflicts." *See* Civility and Professionalism Guidelines at B(2)

13   (Scheduling).  NTG counsel made no such effort here.

14

15   **IV.   ARGUMENT**

16     **A. The Costs and Burdens on the Deponents Are Substantial**

17        Defendants evidently cannot dispute that an order compelling in person

18   depositions in August would substantially burden the witnesses.  The Quinto

19   brothers are presently away from the country in Southeast Asia.  An order

20   compelling their attendance in California would require both witnesses to travel

21   more than seventy (70) hours, and lose five (5) total days related to the deposition.

22   Moreover, the witnesses will incur substantial travel-related costs in the thousands

23   of dollars.  More fundamentally, however, the witnesses will be required to leave

24   their families in the middle of a pre-planned family reunion for a substantial period

25   of time (almost one week).  The Defendants have been far less than diligent in

26   pursuing the depositions, having scheduled and then canceled them repeatedly over

27   an extended period of several months.  Moreover, they have not been cooperative,

28   failing to consult with opposing counsel on reasonably available dates after having

canceled depositions on dates previously agreed to by the parties. Rule 26(c) was developed specifically to prevent imposition of these types of burdens, particularly so where the difficulties at issue are the responsibility here of the moving party, NTG.

## B. NTG Was Dilatory in Discovery and Repeatedly Delayed Taking the Quinto Depositions

To the extent that the Parties are litigating the issue of requiring in-person deposition at this late stage of discovery, NTG is to blame. NIC has repeatedly made its principals available for in-person deposition. Theo Quinto first rearranged his travel schedule to make himself available on April 18, 2017, the original date noticed by NTG. NTG postponed his deposition. Benjamin and Theo then made themselves available in mid-May. NTG postponed the depositions. NTG then, with discovery closing fast, waited another two months to notice the Quinto depositions.

NTG complains that it required documents before it could take the Quinto depositions, but NTG waited until eleven months into discovery to serve the written discovery it now argues was required for it to perform the Quinto depositions. Moreover, NTG's own conduct belies their argument that the documents were actually required to take the depositions because NTG noticed the original depositions for dates that would have predated any document production.

NTG waited until the very last week of discovery to schedule depositions of NIC's principals. They selected those dates without consulting NIC counsel, or determining whether the witnesses would be available. NTG was informed **one month** before the scheduled August deposition dates that the Quintos would not be available and, yet, NTG chose not to schedule those depositions for a time before the Quintos departed on August 5, 2017. NTG had **fourteen months** of discovery to schedule Quinto depositions. Yet, in that span of at least fifty-six (56) weeks, NTG now claims that they would suffer extreme prejudice if the Quintos cannot be

deposed in August 2017.  NTG has not identified any factual content to be gleaned at the Quinto depositions that is necessary for expert discovery or motions practice. To the extent this scheduling conflict exists at all, this is the NTG Defendants' creation.  NTG now seeks to compel two witnesses to travel more than seventy (70) hours at substantial expense solely because NTG claims an abstract need for in-person depositions.  Moreover, NTG has consistently *opposed* NIC's requests to extend the discovery calendar, even arguing that all discovery will easily be accomplished within the existing calendar.  Those arguments were disingenuous, because completion of discovery within the existing calendar would not be possible without imposing substantial burdens on witnesses in this case.  Had NTG agreed to a short extension of the calendar, the parties would not be in this position.  Undoubtedly, NTG bears almost all of the responsible for this predicament.

Thus, to the extent that a video deposition or a short postponement of the deposition dates would cause the NTG Defendants any minor prejudice, that small prejudice could have been avoided by greater diligence in discovery.  Given the substantial time, cost, and personal burden eliminated by a video deposition and the minor, if not non-existent, prejudice to NTG caused by a video deposition, the equities in this case tip in favor of granting NIC's request for a protective order and denying the NTG Defendants' motion to compel an in-person deposition.

### C. The Quinto Depositions are Evidently not Relevant to Expert Reports that Were Disclosed One Month Ago on July 17, 2017

The Special Master erroneously found that the Quinto depositions must occur by August 25 because they will provide information relevant to expert discovery, specifically expert reports and depositions.  Yet expert disclosure, expert report disclosure, and rebuttal expert report disclosure occurred between July 17, 2017 and August 7, 2017 and has already passed.  NTG did not even

attempt to schedule the Quinto depositions before the July 17, 2017 expert disclosure deadline. Instead, NTG scheduled the depositions for August 10 and 11, the week after the rebuttal experts were disclosed. Thus, the Quinto depositions are evidently unrelated to expert discovery and NTG has provided no valid support for a contrary position.

### D. NIC is Not At Fault for this Conflict

The Special Master faults NIC witnesses for continuing with their travel plans. *See* Dkt. 433 at 12 ("the Quintos departed on their international trip several weeks *after* the notices of their depsitions and NIC's Rule 30(b)(6) deposition were served on NIC"). But that finding is irrelevant to the issues presented here, which concern the burden placed on the Quintos for having to change their prepaid travel plans. And while the Quintos may have avoided travel time, they could not have avoided the financial expenses lost in having to cancel prepaid travel and lost time with their families. Indeed, the Special Master wrongfully discounts or entirely ignores the loss of personal family time spent with aging relatives and family members—the loss of experiences and time with such individuals cannot be quantified with money—and those losses are hardships under Rule 26(c). The family reunion is a significant event, similar to a wedding or graduation. A price cannot be placed on those life events, and the Special Master's Order therefore threatens to impose irreparable harm.

The Special Master therefore held that the Quintos were obligated to affirmatively *incur* the harms presented in their Motion for a Protective Order even though they took necessary measures to bring these issues before the Court.[2] *See*

---

[2] This Court should note the irony in the Special Master's Order wherein she found that NIC could not advance its motion for a protective order earlier in July 2017 because "the correspondence between counsel suggests that part of the delay in the meet-and-confer process was due to Mr. Darnell [NTG's counsel] being on vacation when NIC's counsel initially wanted to discuss the Quintos' depositions." *See* Dkt. 433 at 8.

Fed. R. Civ. Pro 37(d)(2) (explaining that a failure to appear for deposition "is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under Rule 26(c)").

### E. Video Deposition Technology Would Provide a Seamless and Cost-Effective Alternative

Even if the Court were to compel depositions before August 25, a video deposition is a reasonable compromise. In contrast to the substantial time and financial burdens associated with compelling in-person attendance, the video deposition technology now available provides a seamless and cost-effective alternative. The added costs to have a Virtual Remote deposition is less than six hundred dollars. NIC is willing to bear those costs to avoid the unnecessary and wasteful travel for an in-person deposition.

The Special Master's concerns about technical difficulties are both speculative and misinformed. All that is required to perform a seamless video deposition on the Veritext system is a laptop computer with a hardline high-speed internet connection. Furman Decl. at ¶ 9. Moreover, Veritext employs a technical support team that can "speed check" the internet connection at the Quinto's Indonesian location. *Id*. The Special Master questioned whether "the Veritex system actually can work from Indonesia (high speed internet; international phone lines, etc.); and has not presented any proof that Veritexy in the past has successfully worked from remote locations like Indonesia." Dkt. 433 at 13-14. However the Veritext system—like many others available in 2017—is specifically designed for these types of depositions.

Third, NTG's speculative concern about time delays causing a disorderly deposition are unfounded. In 2017, the relevant technologies have evolved to eliminate these concerns. Parties routinely communicate by video through common platforms such as Skype, Facetime, etc. High-speed internet is available in developed countries world-wide. Companies like Veritext routinely facilitate

video depositions that closely mimic the in-person experience. Rejection of that alternative outright without balancing the relative burdens on parties and witnesses would be clear error and an abuse of discretion.

Fourth, the document intensive nature of the deposition will not create difficulty. The Veritext system (and similar models) was expressly created to facilitate video depositions involving the presentation of document exhibits to witnesses. Modern technology, including high speed internet and data compression, allow for the seamless provision of documents digitally to the witness. Moreover, the application displays the exhibit for all parties to see, and allows attendees to view exhibits with the witness in a manner that is *easier* than a traditional deposition. The application allows the participants to make notations on the document digitally. Put simply, the "document intensive" nature of the deposition is a non-issue.

Taking into account the state of modern technology and the capabilities of the Veritext Virtual Remote deposition platform, NTG cannot actually support its extreme claim that a video deposition would cause "severe[] prejudice." Dkt. 429 at 9.

## F. NTG Must Pay the Witnesses' Reasonable Fees and Costs

To the extent the Court grants NTG's motion to compel, the defendants must pay the witnesses' reasonable costs of travel to attend the in-person deposition. NIC proposed reasonable alternatives that would avoid the substantial costs related to international travel. NTG rejected those alternatives and, as discussed *supra*, NTG is primarily responsible for this conflict given their delays in deposition practice. To the extent this Court compels NIC's witnesses to attend depositions in person in California, the defendants should bear the costs of travel. The witnesses would be required to travel more than seventy (70) hours in association with these depositions. Sharing costs and burdens here is a reasonable compromise.

## V.    **CONCLUSION**

For the foregoing reasons, this Court should deny the NTG motion to compel.  Under a proper balancing of the hardships and burdens, the NTG defendants have not shown a sufficient need for in-person depositions.  NIC's role as a plaintiff in this case does not supersede the limitations of the Federal Rules that protect against undue burden and harassment.  *See* Fed. R. Civ. Pro 30(b)(2)(C).  Moreover, NTG may not calculate their deposition schedules to impose maximum burdens on NIC, which they have attempted here.

DATED:  August 10, 2017

Respectfully submitted,

EMORD & ASSOCIATES P.C.

By:    */s/ Peter A. Arhangelsky*
Peter A. Arhangelsky, Esq. (SBN 291325)
E-mail: parhangelsky@emord.com
Emord & Associates, P.C.
2730 S. Val Vista Dr., Bldg. 6, Ste. 133
Gilbert, AZ 85295
Phone: (602) 388-8899
Fax: (602) 393-4361

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 10, 2017 the foregoing, **PLAINTIFF'S EMERGENCY OBJECTIONS TO SPECIAL MASTER'S ORDER DENYING PROTECTIVE ORDER RE QUINTO DEPOSITIONS (DKT. 433)** was electronically filed using the Court's CM/ECF system and was sent by that system to the following:


Brendan M. Ford
bford@forddiulio.com
Kristopher P. Diulio
kdiulio@forddiulio.com
Ford & Diulio PC
695 Town Center Drive, Suite 700
Costa Mesa, California 92626
Tel: (714) 384-5540
*Attorney for Andrew Nilon, Giovanni Sandoval,*
*Sam Schoonover, Matthew Dronkers, Taylor Demulder, Sam Pfleg*

David J. Darnell, Esq.
ddarnell@callahan-law.com
Edward Susolik, Esq.
es@callahan-law.com
Callahan & Blaine
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA 92707
Tel: (714) 241-4444
*Attorney for Newport Trial Group, Andrew Baslow,*
*Scott Ferrell, Ryan Ferrell, David Reid, and Victoria Knowles*


      */s/ Peter A. Arhangelsky*
     Peter A. Arhangelsky, Esq.