Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Joshua S. Furman, Esq. (pro hac vice)
jfurman@emord.com
Eric J. Awerbuch, Esq. (pro hac vice)
eawerbuch@emord.com
Emord & Associates, P.C.
2730 S. Val Vista Dr., Bldg. 6, Suite 133
Gilbert, AZ 85295
Phone: (602) 388-8899
Fax: (602) 393-4361
*Attorneys for Plaintiff*

**FILED WITH REDACTIONS
PURSUANT TO COURT
ORDER DKT. 587**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

NATURAL-IMMUNOGENICS
CORP.,

Plaintiff,

v.

NEWPORT TRIAL GROUP, et al.,

Defendants.

Case No. 8:15-cv-02034-JVS (JCG)
JAMS No. 1220055347

**JOINT STIPULATION REGARDING
PLAINTIFF NIC'S MOTION TO
COMPEL STRATALUZ
DOCUMENTS**

Judge:  Hon. James V. Selna
Master: Hon. Rosalyn Chapman

Complaint Filed:      Dec. 7, 2015
Discovery Cut-Off:   Dec. 31, 2017
Trial Date:               TBD

The parties, by and through counsel of record, and for the reasons set forth below, hereby submit the following Joint Stipulation pursuant to Local Rule 37-2. Plaintiff Natural Immunogenics Corp. ("NIC") moves this Court to compel documents responsive to NIC's discovery Requests for Production of documents relevant to Strataluz, LLC.  In particular, Defendants have withheld 1,339 documents on privilege grounds.  NIC asks this Court to compel production of those files identified hereinbelow.  NTG Defendants oppose NIC's motion for the reasons set forth below.

The parties have met and conferred on this matter and have been unable to reach an agreement on the issues identified below.  The parties began communication in response to NIC's letter of November 2, 2017.  NIC served additional written correspondence on December 22, 2017.  NTG responded in writing by letter dated January 2, 2018.  The parties met telephonically on January 9, 2017.

## I.    PLAINTIFF NIC'S INTRODUCTORY STATEMENT

NIC asks the Court to compel Strataluz-related documents wrongfully withheld on privilege grounds on three bases.  The documents here at issue involve files produced by Defendants in response to Rule 34 requests seeking corporate files from or concerning the now-defunct Strataluz LLC.

First, all documents at issue were exchanged, created, or compiled in furtherance of Strataluz-related activities and by former corporate officers of the Strataluz organization, a now defunct and dissolved corporate entity.  The files at issue belonged to the corporation, and are now withheld by defendants on privilege grounds.  However, under apposite precedent, defunct and dissolved corporations may not assert or maintain privilege except during the windup process, under narrow circumstances.  *See, e.g., City of Rialto v. U.S. Dep't of Def.*, 492 F.Supp. 2d 1193, 1197 (C.D. Cal. 2007); *Melendrez v. Superior Court of the State of*

*California*, 215 Cal. App. 4th 1343, 1353-54 (2013); *Virtue Glob. Holdings Ltd. v. Rearden LLC*, No. 15-cv-00797-JST, 2016 WL 1588268, at *4 (N.D. Cal. Apr. 20, 2016). Accordingly, because no privilege exists for the materials withheld, all files designated "privileged" by defendants in relation to Strataluz business activities (i.e., all files in Exhibit 6 attached) should be produced despite the Defendants' claims of privilege for the files.

Second, under Ninth Circuit precedent, work-product protection may not be invoked in this litigation for documents prepared by or for Strataluz LLC because that entity is not a party to this litigation. *See In re Cal. Pub. Utils, Comm'n*, 892 F.2d 778, 781 (9th Cir. 1989) (holding that work-product doctrine, on its face, limits protection to one who is a party to litigation in which the discovery is sought); *see also Hawkins v. South Plains Intern. Trucks, Inc.*, 139 F.R.D. 682, 683 (D. Colo. 1991) ("The language of the rule limits protection to one who is a party (or a party's representative) to the litigation in which discovery is sought" and "[a]ll recent case law is in accord."). Therefore, documents concerning the Strataluz corporation are not subject to protection under the work-product doctrine in this case, and those files must be produced. Defendants Reid and Ferrell are not entitled to invoke the corporation's privileges here simply because they were former officers of the corporation or corporate counsel. *See Loustet v. Refco, Inc.*, 154 F.R.D. 243, 247 (C.D. Cal. 1993) ("Documents prepared for one who is not a party to the present suit are wholly unprotected even though the person may be a party to a closely related lawsuit in which he will be disadvantaged if he must disclose in the present suit"). Nonetheless, even if work product protection were to apply, NIC has a compelling need for those files that overcomes the qualified protection.

Third, even if the Court determines that privilege applies, the documents related to the ProMAXAL litigation should be compelled under the crime-fraud exception. The Court earlier ruled that Strataluz was formed as part of a scheme to

defraud corporations through fraudulent legal claims.  *See* Dkt. 299 at 7-21.  Recent discovery confirms that Defendants S. Ferrell and Reid used the Strataluz entity to pursue federal Lanham Act litigation under fraudulent circumstances.  Beginning in 2015, Defendants Ferrell and Reid pursued litigation (and threats of litigation) based on purported Strataluz consumer product that never existed or were never marketed for sale.  In that context, S. Ferrell and Reid sponsored demonstrably false statements in pleadings and in demand letters, including representations about Strataluz's damages—all of which were false.  Although Ferrell and Reid were owners of Strataluz, they concealed their ownership interests and posed as independent litigation counsel to create a false appearance of legitimacy in order to extort settlement payments.  They attempted to secure settlements from would-be Strataluz victims by offering to provide a license to intellectual property that never existed.  Because that activity falls within the crime-fraud exception as outlined by the Court in prior decisions, the documents here must be produced.

In addition, in furtherance of its crime-fraud analysis, NIC requested that Defendants provide a more detailed privilege log so that NIC could narrow the scope of information requested in this motion.  Defendants' Strataluz-related privilege logs do not contain *any* information that would allow NIC to narrow the scope of documents requested (other than basic information like date, time, and recipients).  *See* Exh. 6 (NTG Privilege Logs).  On January 26, 2018, Defendants served a revised Strataluz privilege log that lifted work product designations for approximately one hundred documents and identified which of the more than 1300 documents related to ProMaxal.  *See* Exhibit 94 ("Revised Privilege Log"); *compare to* Exhibit 6 (designating every single document work-product).  The Revised Privilege Log identified 292 files related to ProMaxal.  *See* Exhibit 94.  NIC therefore identifies 333 files for *in camera* review.  *See* Appendix A.  However, to the extent this Court deems the volume of information in Appendix A

greater than desired for *in camera* review, NIC requests that the Court issue a Preliminary Order requiring Defendants to provide more descriptive information regarding the subject matter of the documents identified in Appendix A so that NIC can meaningfully reduce the number of documents requested for the Court's review.

Finally, NIC seeks its fees incurred in prosecuting this motion under Rule 37(a)(5), in part, because the Defendants' invocation of privilege over Strataluz corporate files is improper, there being ample apposite precedent against that position.

## II.   NTG DEFENDANT'S INTRODUCTORY STATEMENT

There is a simple adage.  "[F]ool me once, shame on you; fool me twice, shame on me[.]" *Sugar v. Estate of Stern*, 201 So.3d 103, 108 (2015).  Starting in September 2016 and continuing to this date, NIC has argued that the NTG Defendants formed a "sham" corporation called Strataluz, LLC ("Strataluz"). According to NIC, "'Strataluz, LLC' was an artifice used by NTG to extort settlement payouts from target 'competing' corporations," (Dkt. 262 at 7:22-23; 19:5-7), with only "fictitious" products that never "participated in the commercial market." (Dkt. 198 at 5; Dkt. 202 at 28:6-12, 28:27-28).  There was reason to doubt NIC.  NIC's alleged "source" for this information sounded the alarm that NIC's counsel's "declared recollection" on this topic "is exaggerated, inaccurate and self-serving." (Dkt. 179-1).  Further, the NTG Defendants offered sworn declarations attesting that Strataluz was a legitimate company that really did advertise and sell products.

Volumes of Strataluz documents have now been produced and it is clear from them that the NTG Defendants were truthful while NIC was wrong.  The company that NIC claimed was nothing but an "artifice used by NTG to extort settlement" had all the extensive expenses, sales, marketing, product development,

product labeling, product testing, vendor communications, market research, and logistics one would expect from a direct response marketing company. The development, formulation, production, and marketing of the products NIC called "fictions" is all documented.

Hoping to repeat its prior discovery windfall, NIC now claims that the "ProMAXAL litigation was objectively fraudulent" because "ProMAXAL never existed" so the crime fraud exception applies to all litigation involving ProMaxal. NIC is being no more truthful this time. Whereas it previously sought *in camera* review of one email chain, it now seeks *in camera* review of 3391 documents. The testimony of NIC's principals, along with extensive internal documents, prove that ProMaxal was developed, formulated, branded, supported by detailed sales strategies, and even had ingredient licensing. In other words, ProMaxal did exist. Since NIC's premise that ProMaxal did not exist is false, there is no basis for a crime fraud finding.

NIC's other arguments seeking to vitiate privilege also fail. Its newfound argument that there can be no privilege over Strataluz documents because Strataluz dissolved is foreclosed by the law of the case and is without merit. The issue of whether the attorney-client privilege can exist over Strataluz documents was resolved against NIC when the Special Master held that Strataluz corporate formation documents were subject to the attorney-client privilege and NIC did not appeal that ruling. (Dkt. 234 at 11-20). Under the law of the case doctrine, NIC is not at liberty to make up "successively different legal . . . theories that could have been presented in a prior request for review[.]" *Investor Prot. Corp. v. Vigman*, 74 F.3d 932, 937 (9th Cir. 1996). Indeed, NIC has raised this same theory in its Answer brief in the appeal that is currently pending before the Ninth Circuit. As a practical matter, that forecloses raising it before the Special Master or the Court

---

1 NIC states in briefing that it requests review of 333 documents but review of Attachment A shows 339 documents.

because any ruling would likely be affected by the later Ninth Circuit decision. Substantively, the cases relied on by NIC do not address the current circumstances where allegations are made against a company before its dissolution and continue afterwards. NIC's position that work product may not be asserted over Strataluz documents is similarly flawed. As attorneys and parties to this litigation, Reid and Ferrell have standing to assert work product objections.

The Court ordered Reid and Ferrell to provide Strataluz related discovery. They complied, producing voluminous documents proving that NIC's proffered reason for seeking Strataluz discovery in the first place was unfounded. That should have been the end of the matter. Instead, NIC has now broadly sought to vitiate all privilege for Strataluz with factual misstatements and inapposite legal theories through this Motion to Compel. Accordingly, this Motion to Compel should be denied and Reid and Ferrell awarded their fees and costs.

## III.   PLAINTIFF NIC'S POSITION
### A. DOCUMENTS AT ISSUE

NIC has attached as Exhibit 94 the Revised Privilege Log provided by NTG Defendants Scott Ferrell and David Reid. Those files collectively include 1,338 documents. NIC has prepared and attached Appendix A which identifies files excerpted verbatim from the documents listed in Exhibit 94. Concerning NIC's requested relief below, NIC asks this Court to take the following action concerning the documents listed in Exhibits 94 and Appendix A:

(1)   Compel all documents withheld on attorney-client privilege and work-product grounds on the basis that Strataluz corporate files are no longer privileged after the corporation has been dissolved, terminated, and wound down, and that Strataluz may not invoke work-product protection in this litigation;

(2)  In the alternative, if the Court's analysis proceeds to the crime-fraud exception:

   a)  Compel the defendants to produce all files identified in Appendix A for *in camera* review.  If the 333 files identified in Appendix A are still too numerous, the Court should order the Defendants to supplement their Revised Privilege Log (Exhibit 94) and provide more detailed subject matter or descriptive information regarding all ProMaxal related files.  Such supplementation would provide NIC with the necessary information to narrow its *in camera* request further; and,

   b)  Upon performing *in camera* review, this Court should compel NTG to produce all documentation relevant to ProMAXAL litigation (and NTG's plan to pursue sham lawsuits) pursuant to the crime-fraud exception.

## B. FACTS

### 1. Procedural History

On January 28, 2016, NIC filed an amended complaint in this case alleging that NTG defendants had used sham corporations to file bogus lawsuits in order to extort settlement payments.  *See* Dkt. 30 (First Amended Complaint).  Defendants Scott Ferrell and Dave Reid were formerly part owners of a now-defunct corporation named Strataluz, LLC.  *See* Ferrell Declaration (Exh. 81) at ¶ 2. Dkt. 202; *see also* Reid Declaration (Exh. 82) at ¶ 2.  Within one week after that filing, on January 31, 2016, Scott Ferrell filed with the Nevada Corporate Commission paperwork dissolving all corporations within the Strataluz lineage.  *See* Exhs. 73 & 75 (Nevada dissolution); Exh. 74 (California dissolution).

In February 2016, NIC counsel was contacted by an in-house attorney for Continuity Research LLC concerning NTG's litigation activities.  NIC sought leave to take Strataluz discovery in September 2016.  *See* Dkt. 165 (NIC Motion

for Leave). The Court granted NIC's request to take discovery from Continuity (which ultimately concerned Strataluz) "because the allegations suggest a pattern of racketeering activity." *See* Order, Dkt. 198 at 4-5 (observing that allegations related to sham corporations would be "at the heart of this case"). After NIC subpoenaed Continuity, the NTG defendants filed motions to quash on privilege grounds. *See* Dkt. 202 (Joint Stip.). The Special Master denied Defendants' motion and held that certain emails were within the crime-fraud exception to the attorney-client privilege. *See* Order, Dkt. 234.

The District Court upheld that Order. *See* Dkt. 299. Judge Selna found that "[t]he evidence suggests that Strataluz sued numerous companies, but did not actually make any products itself." *See* Dkt. 299 at 16-17. The Court also found that Defendants Reid and S. Ferrell concealed their interests in the Strataluz corporation, an entity that was incorporated using multiple shell holdings corporations. *See* Dkt. 299 at 19-20. NTG Defendants and non-party Josh Weiss appealed Judge Selna's Order [Dkt. 299] to the Ninth Circuit on May 8, 2017. *See* Dkt. 302 (Notice of Appeal). The NTG Defendants then filed a Motion to Stay the Court's Order pending appeal. *See* Dkt. 308. Judge Selna denied the Motion to Stay on June 19, 2017. *See* Dkt. 348. The Court held that NTG defendants likely have no right to an appeal and, regardless, they had little likelihood of success on the merits related to the district court's finding that Reid, Weiss, and Ferrell were "engaged in or planning a fraudulent scheme when they formed Strataluz[.]" *See id.* at 3-8.

The Court restated its evaluation of the evidence. *See id.* at 10-12. The Court found significant the fact that legitimate sales of Strataluz products did not evidently occur, and that Strataluz's product advertisements were not compelling evidence of legitimate activity:

> The NTG Defendants and Weiss further argue that the Court ignored a "professionally produced advertisement for ProMAXAL. The Court considered this evidence, but determined that a one-minute

internet advertisement did not constitute significant evidence of actual sales. In fact, such an advertisement is consistent with allegations that Reid, Weiss, and Ferrell formed a facially-valid corporation solely to pursue litigation.

*Id.* at 11 (internal citations omitted). The Court also concluded that Strataluz litigation involving the ProMAXAL product would constitute sham litigation. *Id.* at 14.

Defendants filed "emergency" motions before the Ninth Circuit seeking to stay Judge Selna's ruling. *See, e.g.,* Order, *NIC v. Ferrell & Reid*, No. 17-55661 (9th Cir. July 7, 2017) at Dkt. 23. The Ninth Circuit denied those motions. *Id.*

### 2. Strataluz Discovery

Plaintiff NIC served Rule 34 Requests for Production related to Strataluz on NTG Defendants on August 1 and 2, 2017. Declaration of Joshua Furman ("Furman Decl.") at ¶1. NTG produced documents on September 22, 2017 and September 26, 2017. *Id.* at ¶2. It produced a privilege log on September 22, 2017 containing more than 1300 entries. *See* Exh.6. The privilege log did not contain information that would enable NIC to verify the legitimacy of privilege claims. *See generally id.* (identifying no descriptive or subject information). Moreover, Strataluz documents produced by NTG contained redactions within the body of the text without explanation. *See e.g.* Exhs. 8 & 9.

NIC began efforts to meet and confer concerning the Strataluz production files on November 2, 2017. *See* Exh. 5 (Nov. 22 letter from Darnell responding to Nov. 2 letter). NTG initially refused to provide any subject matter or descriptive information for the privilege log entries. *Id.* (correspondence refusing to supplement the privilege log). NIC was therefore unable to determine which files relate to general Strataluz business versus specific legal matters. On January 9, 2018, the NTG Defendants agreed to provide a revised privilege log that identifies which files are related to the "ProMaxal" product, but have otherwise maintained their position that subject matter or descriptive information is not required. *See*

Exh. 93.  The Defendants agreed to provide that revised privilege log before this joint stipulation is filed, however, at the time that NIC drafted its portion of the joint stipulation it was not privy to that supplemental information.  *Id*.

NIC was afforded seven (7) non-party depositions under the Court's initial scheduling order.  *See* Dkt. Nos. 90, 91.  NIC scheduled three non-party depositions concerning the Strataluz corporation, including Joshua Weiss, James Hardin, and Jarrod Bentley.  All three of those individuals had ownership interests in the corporation.  *See* Exh. 90 (Weiss Deposition) at 772, 776 (Tr. 43:6-15, 47:16-22).  Jarrod Bentley was the "President" of Strataluz and responsible for day-to-day operations.  *Id.* at 778 (Tr. 49:4-8); *see also* Exh. 88 (Bentley Deposition) at 635 (Tr. 38:9-14).  Mr. Bentley's deposition was taken on December 15, 2017.  *See* Exh. 88.  One week after completing Mr. Bentley's deposition, NIC served NTG with correspondence under Rule 37-2 related to the outstanding production of allegedly privileged Strataluz documents.  Exh. 1 (Dec. 22 letter).

### 3. Defendants Use of Strataluz to Assert Objectively Baseless Claims
#### a. Strataluz Formation

Defendants Scott Ferrell and Dave Reid are attorneys in the Newport Trial Group ("NTG"), which has since changed names to the "Pacific Trial Attorneys." NIC brings suit in this case alleging that Defendants Ferrell and Reid collaborated with others to pursue sham litigation based on contrived legal injuries and baseless accusations in litigation in order to extort settlement payments, which they pursued ██████████████████████████████████

In or about 2012, NTG filed several lawsuits in a series against Continuity Products LLC.  Exh. 90 at 756-760 (Tr. 27:18—31:20).  Consistent with the pattern identified in other NTG litigation at the time, NTG began litigation against Continuity Products in late 2011 or early 2012 through a CLRA false advertising lawsuit.  *Id*. at 756-757 (Tr. 27:18—28:10).  NTG followed that lawsuit with a

CIPA claim against Continuity in the summer of 2012. *Id*. at 758-760 (Tr. 29:12—31:20). During the same relevant time period, NTG also pursued its tandem CLRA/CIPA claims against other corporations using Non-NTG Defendants and Raquel Torres.[2]

Joshua Weiss was Continuity Products' in-house counsel in 2012. Exh. 79 at ¶¶2-3; Exh. 90 at 749 (Tr. 20:14—22:5). To limit NTG from repeatedly suing Continuity Products, Weiss proposed an arrangement whereby Continuity would "retain" NTG so that the firm would be conflicted and thus unable to pursue future suits against Continuity. Exh. 79 at ¶3. Weiss arranged to pay NTG $30,000 for that benefit. *Id*. Weiss, Ferrell, and Reid began a business relationship.

In late 2013, Weiss and Jarrod Bentley agreed to help operate a direct response marketing corporation that would purport to sell dietary supplement products under the corporate name "Strataluz, LLC." *See* Exh. 9. Bentley was formerly employed with Continuity Products. Exh. 88 at 632 (Tr. 29:6-21). Scott Ferrell, Dave Reid, and James Hardin (another NTG attorney at the time) agreed to provide funding to Weiss and Bentley so they could begin corporate operations. Exh. 89 at 697-698 (Tr. 48:13—49:7); Exh. 90 at 776-777 (Tr. 47:16—48:7).

In an email written to Bentley, Hardin, Weiss, and Reid on December 20, 2013—before the corporation was incorporated—Scott Ferrell identified his "stream of consciousness ideas" for the corporate entity. *See* Exh. 9. He identified six points. In produced documents, two of those points were redacted by NTG

---

[2] The CLRA cases were all filed in early 2012. *See e.g, Nilon v. NIC*, No. 3:12-cv-00930-LAB-BGS (S.D. Cal., Filed on March 5, 2012); *Pfleg v. Nature's Way*, No. 37-2012-0051979-CU-MT-NC (Sup. Ct. San Diego Cnty., Filed on March 16, 2012); *Schoonover v. Vogue International, Inc.*, No. 30-2012-00541309-CU-MT-CXC (Sup. Ct. Orange Cnty., Filed on March 27, 2012) . The CIPA (wiretapping cases) were filed in the Summer of 2012. *See e.g.*, *Sam Schoonover v. Himalaya Drug Company*, No. 3:12-cv-1782-JLS-RBB (S.D. Cal., Filed July 19, 2012); *Demulder v. Carter-Reed*, No. 3:12-cv-0333-BTM (S.D. Cal. Sept. 13, 2012).

Defendants on work product doctrine grounds.  *Id.*; *see also* Exh. 6 at 58 (NTG063580); Appendix A at 1 (Documents Related to Strataluz's Purpose).  In other words, already before the date of incorporation, NTG contemplated litigation activities through the startup entity.  *Id.*[3]  NTG contemplated an arrangement whereby Bentley would operate the front business, and NTG would provide funding—and eventually use the corporation to pursue Lanham Act litigation.  *See* Exh. 9; *see also* Exhs. 11-26 (Lanham Act demand letters); Exhs. 68-70 (Lanham Act complaints).

Defendant Ferrell setup Strataluz to mimic two other corporate entities that NTG had used for litigation purposes, Harcol LLC and Tawnsaura Group LLC. Exh. 9.  He explained:  "We can handle set-up and accounting issues through the NTG back-office, the way that we do with Tawnsaura and Harcol."  *Id.* (NTG063804).[4]  Defendant Scott Ferrell informed his agents that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Tawnsaura and Harcol were two shell corporations owned by NTG Defendants and operated as non-participating entities that, through NTG, pursued hundreds of contrived patent lawsuits.  The Tawnsaura Group LLC was another Nevada corporation owned and operated by NTG principal Scott Ferrell.  Exh. 85 (listing Scott Ferrell as Manager).  NTG filed at least ninety (90) cases using Tawnsaura as a plaintiff over a short span of thirteen months.  In October 2012, another NTG attorney formed Harcol Research, LLC.  Dkt. 202-1 at 199 (NTG's website identified Kalman Magyar as an NTG attorney); Exh. 84 (Harcol listed Kalman Magyar as Manager). Through Harcol, NTG filed at least twenty-seven (27) cases within eighteen months.  Those cases were built on alleged patent violations for bargain patent

---

[3] The document identified as "NTG063804" should be reviewed *in camera* without redactions because the redacted portions of that document are likely to provide evidence of Defendants' intent concerning use of Strataluz LLC.

[4] Strataluz used Harcol's properties though token transactions involving transfers of inapplicable or unenforceable Patent rights for $1.  *See* Exh. 64 (Harcol License Agreement).

rights NTG acquired.  In August 2012, the Central District of California held that Tawnsaura's patents were invalid and unenforceable.  *See Tawnsaura Group, LLC v. Maximum Human Performance, LLC*, No. 2:12-cv-07189 (C.D. Cal. filed Aug. 21, 2012), Dkt. 281 (Order holding patent invalid).

NTG Defendants' Scott Ferrell and Dave Reid setup "Strataluz" so their ownership interests in the corporation would be concealed.  Strataluz was therefore owned by several "blocker" holdings corporations, including:  (1) Binary Resource Management, LLC; which was then owned by (2) International Brandery, LLC; which was then owned by (3) Quintogos, LLC.  Exh. 3 at 21.  All of those entities were incorporated on the same date of January 28, 2014.  *Id.*  Ferrell instructed that Strataluz would be ███████████████████████████████████████████ ████████

The Strataluz corporation had "minimal sales" and made no profits.  Exh. 79 at ¶ 13.  Jarrod Bentley was the President of Strataluz LLC.  Exh. 88 at 635 (Tr. 38:9-14).  He received no salary for his work at Strataluz.  *Id.* at 638 (Tr. 53:5-12).  NTG tasked Bentley with forming product concepts and attempting to operate a nascent business, while the NTG side developed plans to use Strataluz as a litigation vehicle.  Although Bentley was the President of Strataluz and responsible for day-to-day management, he had no knowledge of NTG's litigation activities on behalf of Srataluz.  *Id.* at 639-640 (Tr. 57:25—58:23).  The bulk of funds invested by NTG into Strataluz were used by Bentley to prepare test marketing campaigns and advertisements.  The corporation ordered few quantities of product and, when it did acquire product, the stock was apparently purchased from entities that offered prefabricated product for private labeling.  *See* Exh. 88 at 637 (Tr. 47:8— 49:19).  Strataluz test marketed purported product through questionable advertising claims.  For example, so-called "dry test" advertising campaigns involved false product claims, including use of testimonials for products that did not exist.  *Id.* at 640 (Tr. 58:25—60:23); *see also id.* at 642 (Tr. 67:7-21) (explaining that Strataluz

filmed a "spokesperson" ad for a product that had never even been manufactured).

In 2015, NTG began using Strataluz to threaten and file Lanham Act complaints against companies selling dietary supplements or health products. *See, e.g., Natural Products Solutions, LLC v. Strataluz, LLC*, No. 1:15-cv-1675-ELH (D. Md. June 9, 2015), Dkt. 1-1; *Strataluz, LLC v. Nip + Fab Limited*, No. 8:15-cv-749 (C.D. Cal. May 12, 2015), Dkt. 1 (Exh. 68); *Strataluz, LLC v. TruDerma, LLC*, No. 15-cv-1248-JM-RBB (S.D. Cal. June 3, 2015) (hereinafter "*Truderma*") (Exh. 70); *Blissworld, LLC et al. v. Strataluz, LLC*, No. 1:15-cv-4649 (S.D. N.Y. June 16, 2015), Dkt. 1-1.

Relevant to this motion, NTG threatened corporations with litigation under the Lanham Act for a purported male enhancement product they called ProMAXAL. *See e.g.,* Exhs. 12, 13, 23, 24, 25 (ProMaxal Demand Letters); *see also* Exhs. 69, 70 (ProMaxal Complaints). ProMAXAL never existed. Exh. 88 at 637, 638 (Tr. 46:7—47:7, 52:8—53:4). Strataluz never had ProMAXAL product to sell consumers. *Id*. at 640 (Tr. 58:25—61:1). It had no product sales for ProMAXAL. *Id*.; *see also* Exh. 87 (showing "0" units sold for Promaxal). NTG filed lawsuits using the Strataluz "ProMAXAL" product without even having a product. *See* Exh. 88 at 637, 638, 640 (Tr. 46:7—47:7, 52:8—53:4, 58:25—61:1) (ProMAXAL was never manufactured, sold, or put up for sale and the company never even developed product packaging); *but see* Exh. 70 (Lanham Act Complaint filed on June 3, 2015).

The ProMAXAL website created by Strataluz was intentionally designed to trigger a shopping cart error message when consumers attempted to purchase product. *See* Exh. 88 at 640 (Tr. 60:11—61:1); *see also* Exh. 83 at 478. Strataluz invested no research into the ProMAXAL product. *Id*. at 630, 638 (Tr. 20:16-22, 52:13-20). It published statements online purporting to have patent rights in ProMAXAL technology. *See* Exh. 83 at 476 (advertising a "patented delivery system"). No such patent applied to the product. *See* Exh. 3 at 29 (District Court

order finding NTG's referenced patent inapplicable).  Strataluz's President, Jarrod Bentley, was unaware of any patent rights for the non-existent ProMAXAL product.  *See* Exh. 88 at 637, 640-641 (Tr. 48:13-17, 61:22—62:6).  In litigation and in settlement discussions, NTG attempted to sell opposing parties a "license" in purported "LIFTGATE" technology, which was alleged to be part of the ProMAXAL product.  Exhs. 12, 13, 23, 24, 25.  No such technology existed and the licenses were shams.  Strataluz's President had never heard the term "Liftgate" in conjunction with Strataluz products, and, in fact, had never heard the term "Liftgate" at all.  *See* Exh. 88 at 630 (Tr. 20:23—21:3).  Strataluz's President was largely unaware of the entity's litigation activities.  *See id.* at 638-39 (Tr. 52-55).  Other than Ferrell and Reid, the other members of Strataluz professed little to no knowledge of the Strataluz litigation activities.  *See* Exh. 89 at 702-03 (Tr. 53:20—54:9) (Hardin); Exh. 90 at 800-01 (Tr. 71:6-72:9) (Weiss).

Testimony from Strataluz's President confirmed that ProMAXAL was not a legitimate product.  Exh. 88 at 636, 637, 639 (Tr. 56 (testifying that there was no e-commerce engine built into the ProMAXAL website); Tr. 55:4-11 (the ProMAXAL website was a "dry test"); Tr. 57 (Strataluz's President did not know if any patents were associated with the ProMAXAL idea); Tr. 42 (Strataluz never had physical inventory for ProMAXAL); Tr. 42 (Strataluz never sold or manufactured ProMAXAL); Tr. 48 (Strataluz never performed product testing for ProMAXAL); Tr. 48 (Strataluz had no packaging for the purported ProMAXAL product, had no source for ingredients, and had not identified a supplier); Tr. 49 (testifying that Strataluz published advertisements for the ProMAXAL product which did not exist)).[5]

---

[5] Strataluz's former President later claimed that the product was "formulated," but no documentary evidence substantiates that point.  Mr. Bentley could not identify the name of the company that allegedly formulated product.  *See* Exh. 88 at 642 (Tr. 68).  He could not identify any documents showing payment for formulation.  *Id.* at 640 (Tr. 61).  He could not recall the cost of alleged formulation.  *Id.*  He could not identify the ingredients.  *Id.* at 638 (Tr. 51).

A cached copy of the ProMAXAL website (www.promaxal.com) is available online, which displays the product website as it existed on June 10, 2015—just one week after NTG filed suit against Truderma on behalf of Strataluz. *See* Exh. 83 at 476; *see also* Exh. 70 (complaint filed on June 3, 2015). That website had one short page of content featuring a graphic image of the ProMAXAL bottle at the top left of the page. Exh. 83 at 474-476. Strataluz apparently registered the "www.promaxal.com" domain on May 21, 2015, less than two weeks before NTG began threatening lawsuits under the Strataluz name against TruDerma and others in June 2015. *See* Exh. 78 at 416, ¶ 6.  The image used for the ProMAXAL bottle was a graphic rendering—not an actual photo of a ProMAXAL bottle. *See* Exh. 83 at 474.  Strataluz's president testified that Strataluz never had product packaging and did not develop a bottle.  Exh. 88 at 638 (Tr. 52:22-23, 63:18-22).  The graphic illustration was, therefore, not of a real product, but rather a graphic with digital lettering superimposed over stock imaging of a generic vitamin bottle.

Strataluz's website was engineered to refuse sales.  The ProMAXAL website was designed to trigger an error message whenever visitors attempted to acquire product through the "Try it now!" button placed on the website's right sidebar. *See* Exh. 83 at 478; *see also See* Exh. 78 at 415, 431-45; ; Exh. 88 at 640 (Tr. 60:19—61:1).  Strataluz claimed that product was exclusively for sale on its website, and that the product was "not available in stores[.]" Exh. 83 at 476; *see also* Exh. 78 at 431-45.  But the underlying HTML code was designed to trigger a "shopping cart error" message, and whenever the purchase button was selected, the site would trigger the following message: "We're sorry! Due to overwhelming demand, ProMAXAL is currently out of stock." *See* Exh. 83 at 478; Exh. 78 at 431-45. Bentley's testimony confirmed that product was never created, manufactured, sold, or available to consumers.

NTG's Strataluz pleadings and website content referenced patent protection for the fake ProMAXAL product. *See* Exh. 70 at ¶1; Exh. 83 at 476 (referencing patented technology); Exh. 25 (claiming that ProMAXAL included a "patent protected, proprietary male enhancement formula").  The patent referenced by Strataluz in pleadings and online content was U.S. Patent No. 5,817,364 (the "364 Patent"). That patent does not relate to male enhancement, sexual performance, or any of the claimed benefits cited by Strataluz in any of its promotional materials, demand letters, or pleadings. Exh. 3 at 29 (Court finding patent is unrelated); *see also* Exh. 4 at 45 (same).  Bentley was unaware of any patents that applied to the product.  Exh. 88 at 630 (Tr. 20:23—21:3, 57).

In short, NTG used the "ProMAXAL" product as a front for Lanham Act litigation despite never having a viable claim or product.  Moreover, NTG Defendant Scott Ferrell took significant steps to conceal the fraud by posing as independent counsel for Strataluz without identifying (1) that the ProMAXAL product never existed; (2) that Ferrell was a majority owner of Strataluz; (3) that Strataluz's "President" had no knowledge of Strataluz litigation activities, which were pursued by Ferrell; (4) that the technology offered to opposing corporations was nonexistent; and (5) that the patent listed for the "ProMAXAL product was not in fact not a patent for that product.  *See* Exhs. 27-38 (Ferrell's misleading emails to opposing counsel); *see also* Exhs. 11-26 (Demand letters containing misleading or false statements of material facts).  NTG filed objectively false pleadings to support those Lanham Act claims.  *See* Exh. 70.  NTG's Ferrell submitted disclosure statements deemed misleading by Judge Selna, which failed to identify Ferrell's interest in Strataluz.  *See* Exh. 3 at 30-31; *see also* Exh. 4 at 45.

Unlike NTG's patent cases (filed through the NTG-created Tawnsaura Group), NTG's Lanham Act false advertising claims depended on allegations that NTG's Strataluz suffered a specified business injury through lost or diverted sales. Thus, in NTG's demand letters and legal pleadings, NTG's attorneys alleged the

following injuries to Strataluz, LLC, said to be caused through unfair competition with the Strataluz's "ProMAXAL" product:

- Strataluz, LLC "markets ProMAXAL, a male enhancement product. ProMAXAL is the only male enhancement product sold in the United States that contains LIFTGATE technology, a proven, patent-protected, proprietary male enhancement formula." Exhs. 12, 13, 23, 24, 25; *see also* Exh. 70 at ¶ 1 (alleging that Strataluz sells ProMAXAL, a "clinically proven and patented performance enhancer");

- "The damages to Strataluz from TruDERMA, LLC's false and misleading claims about Viaxus are significant. Strataluz has invested a significant amount of resources in researching, formulating, developing, and obtaining the exclusive rights to the Patented LIFTGATE Technology for male enhancement purposes." Exhs. 12, 13, 23, 24, 25; *see also* Exh. 70 at ¶¶ 1, 14;

- Strataluz had suffered "significant harm … based on diverted sales." *See* Exh. 70 ¶ 14; *see also* Exh. 69 at ¶¶ 17-18;

- That Truderma's "false and misleading statements have diverted, do divert, and will continue to divert sales to 'Viaxus' at the expense of [Strataluz's] ProMAXAL products, and have lessened, are lessening, and will continue to lessen the goodwill enjoyed by ProMAXAL products[.]" Exh. 70 at ¶ 18;

- That "[Strataluz] has suffered injury in fact and lost money or property, including lost sales and damage to [Strataluz's] and ProMAXAL product's goodwill with existing, former, and potential customers and consumers." Exh. 70at ¶ 26; *see also id*. at ¶ 32 (same); Exh. 69 at ¶¶ 17-18 (alleging diverted sales);

Those representations were demonstrably false because the ProMAXAL product never existed.

In demand letters to potential victims, Ferrell claimed that ProMAXAL was "the only male enhancement product sold in the United States that contains LIFTGATE technology," and he attempted to settle the contrived legal claims in

exchange for "a fully paid-up, non-assignable license to the Patented LIFTGATE Technology in return for a one-time payment of $200,000." *See* Exhs. 12, 13, 23, 24,25; *see also* Exh. 63. Again, like ProMAXAL, the LIFTGATE technology never existed. *See* Exh. 88 at 629 (Tr. at 16) (Strataluz's President testified that "[he doesn't] know what liftgate technology is" and that he had "never heard of liftgate technology").

Several intended corporate victims were skeptical. Despite their concerns, at least two agreed to settle the nuisance ProMAXAL claims even though Strataluz never had an actual product subject to the lawsuit. *See* Exhs. 67 & 65; *see also* Exh. 66 (settlement related to additional Strataluz product). For example, opposing counsel repeatedly questioned the veracity of Ferrell's representations:

- "Yes, we did receive a copy of the complaint also. I could not find any information regarding your client's product online. Can you send us any information that you have regarding ProMAXAL?" Exh. 56.

- "Frankly, we do not understand the nature of your claims. We found no website, nor indeed any internet presence at all for ProMAXAL or LIFTGATE, nor any U.S. patent owned by or assigned to Strataluz, LLC, whose own website is nothing but a holding page with no information. Under these circumstances we have no way of advising our client of the legitimacy of your threat, or any reason to consider your license proposal of $200,000." Exh. 57.

- "The recent lawsuit filed by Strataluz, LLC against TruDerma, LLC is the third time one of your 'clients' has attempted to extract money from TruDerma on dubious grounds." Exh. 62 (identifying issue with Ferrell's litigation conduct). "The fact that the www.promaxal.com website was not even live at the time the lawsuit was filed and was only registered as a domain on May 21, 2015 leads us to the conclusion that it was established solely for the purpose of sending out sham demand letters and lawsuits to numerous sellers of male enhancement products." *Id*.

- "I am perplexed about the request for TruDerma to purchase a license from Strataluz." Exh. 61.

- "Natural Products Solution is resolute in its position that Strataluz unreasonably manufactured this dispute in bad faith

and without any rational cause of action.  Strataluz merely was trying to fleece a possibly unsuspecting target." Exh. 60.

Defendant Scott Ferrell designed his communications with opposing counsel to appear as though Ferrell had a legitimate client, and that Ferrell was serving as independent counsel, when in reality he was the owner of Strataluz making all litigation decisions for the corporation.  *See e.g.*, Exhs. 27-38 (deceptive communications with opposing counsel).  A plain reading of those communications reveals that Ferrell never disclosed that he owned Strataluz yet was the primary (if not only) individual making litigation decisions for the corporation.  *Id*.  None of the other members of Strataluz had any real awareness of the cases, and none other than Ferrell (and perhaps Reid) were involved in any litigation decisions. *See* Exh. 89 at 702-703 (Tr. 53:20—54:9) (Hardin); Exh. 90 at 800-801 (Tr. 71:6-72:9) (Weiss); Exh. 88 at 639-640 (Tr. 57:25—58:23).  Consider Ferrell's comments to opposing counsel in settlement discussions, and compare those to testimony of Strataluz's "President," Jarrod Bentley (the individual tasked with running the corporation):

- "I relayed Twinlab's offer to my client, which they have respectfully rejected." Exh. 27; *compare* Exh. 88 at 638 (Tr. 52-53 ("Q.  Were you involved in any way in that litigation?  A. No."); *id.* ("Q.  Were you consulted in any way during that litigation?  A. Only other than being told that it was going to happen."); Tr. 54 ("Did you have any input as to the litigation itself?  A. No."); *id.* "Q. Were you consulted on any of the decisions in the litigation?  A. No.")).

- "Your proposal is acceptable to my client." Exh. 37.

- "Thank you.  I will circle back with you after I speak with my client." Exh. 38.

- "I was on the phone with Strataluz's GC when I received your e-mail and we discussed it.  I explained the situation described below and while they are sympathetic, $8k over four months will not resolve this case." Exh. 35.

- "I just got off the phone with my client.  After a lengthy discussion, I convinced them to accept your offer—which is a tribute to your negotiation skills, since the conversation started

with a string of profanities and instructions to file." Exh. 36; *compare to* Exh. 90 at 800-801 (Tr. 71:17—72:9) (Weiss testified that he has never spoken with Scott Ferrell or David Reid about Strataluz litigation).

- "I have confirmed with my client that your change is acceptable." Exh. 37.

- "My client has instructed me to file suit on Friday if we do not have 'meaningful progress' by that time." Exh. 32.

- "My client has asked me to advise you that, if we are not making genuine progress by the end of next week, we will be proceeding with the Complaint." Exh. 29; *see also* Exh. 30 ("I have discussed with my client both our conversation and the two studies that you provided. My client has asked me to advise you that they are well aware of the Lamm studies, but find them wholly unpersuasive…").

- "I was on the phone with Strataluz's General Counsel when I received your voice mail and discussed it with him. Strataluz has directed me to inform you that they reject NPS's settlement demand." Exh. 59.

- "I have discussed your client's position with my client, and suffice it to say that our clients disagree vigorously about the merits of their respective positions." Exh. 31.

- "I have spoken to my client, and while they are amenable to considering a mediation, they do not want to schedule one until and unless your client has made a meaningful offer." Exh. 33.

### 4. Strataluz Dissolution, Windup, and Termination

On January 28, 2016, NIC filed an amended complaint in this case which included allegations that NTG had used self-owned corporations to pursue sham litigation. *See* Dkt. 30 at ¶¶37-40. Shortly thereafter, in early 2016, NTG shut down Strataluz, liquidated its remaining cash accounts, and dissolved the corporation. *See* Exh. 48, ("Please close the account and distribute the remaining money as follows in accordance with our contribution percentage").

As of early 2016, the Strataluz corporation ceased to exist. *See* Exh. 75 (corporate dissolution listing effective date of 1/31/2016); Exh. 74 (California dissolution); *see also* Exh. 52 (invoice for termination of KeyState as nominee

director).  Members of Strataluz exchanged emails identifying the fact that the corporation had been through windup, and was no longer in existence.  *See* Exh. 49 (April 19, 2016 email from Ferrell instructing assistant:  "Let's close the Quintogos account and distribute the money between James, Dave, and me in accordance with our funding ratios"); Exh. 45 (January 11, 2016 email from Ferrell:  "Let's wind this company up, correct?"); Exh. 50 (April 19, 2016 email stating:  "We should close this out and close out any Strataluz account, since these entities have been shut down since the business wound down last year, yes?"); Exh. 51 (March 3, 2016 email stating that "Quintogos LLC and all the other attached entities were closed this past January and thus, we will no longer need your services"); Exh. 53 ("Did you guys let them know we shut this down?"); Exh. 54 ("As we discussed, I think we need to shut down Quintogos"); Exh. 46, (March 3, 2016 email:  "Didn't we already shut this down and pay someone to process the closure of the business entities?"); Exh. 47 (March 3, 2016 email stating:  "My understanding is that the companies were previously wound down.")  At present, the Strataluz corporation conducts no ongoing business, and has no actual or threatened legal claims pending against the corporation.  *See* Exh. 86 (State and Federal docket report based on keyword search for "Strataluz," listing only cases that have been resolved and/or closed); Exh. 89 at 696 (Tr. 47:4-7).  The Defendants have identified Strataluz as a "defunct" corporation.  *See* Dkt. 245 at 10 (docket pagination).

## C. ARGUMENT

### 1. Strataluz May Not Invoke Privilege to Preclude Discovery Because a Corporation's Privilege is Lost After Dissolution and Windup

Strataluz is defunct.  *See* Dkt. 245 at 10.  Strataluz's accounts have been emptied.  *See* Exh. 90 at 802 (Tr. 73:2-8) (Weiss Depo); Exh. 89 at 696 (Tr. 47:9-14); Exh. 48.  The corporation has been formally dissolved.  *See* Exh 74; Exh. 75. Therefore, under applicable precedent, Strataluz may no longer claim privilege.

The burden to demonstrate privilege is on the party asserting same. *U.S. v. Martin*, 278 F.3d 988, 999-1000 (9th Cir. 2002) (citing *United States v. Munoz*, 233 F.3d 1117, 1128 (9th Cir. 2000)).  Here NTG cannot meet that burden to protect Strataluz's corporate documents because California Courts have consistently held that once a corporation ceases to function, through formal dissolution or otherwise, that corporation's attorney-client privilege is lost.  *See City of Rialto*, 492 F. Supp. 2d at 1197; *Lopes v. Vieira*, 688 F. Supp. 2d 1050, 1061–62 (E.D. Cal.), *on reconsideration*, 719 F. Supp. 2d 1199 (E.D. Cal. 2010); *Wallis v. Centennial Ins. Co.*, No. 2:08-CV-2558 WBS AC, 2013 WL 434441, at *7–8 (E.D. Cal. Feb. 1, 2013) (collecting cases).  Other courts in the Ninth Circuit have similarly found that privilege does not survive the death of a company or corporation.  *See e.g.*, *United States Commodity Futures Trading Comm'n v. WeCorp, Inc.*, No. 2:09-CV-00153-PMP, 2010 WL 11530274, at *1 (D. Haw. Mar. 29, 2010); *Wallis v. Centennial Ins. Co.*, No. 2:08-CV-2558 WBS AC, 2013 WL 434441, at *7–8 (E.D. Cal. Feb. 1, 2013); *Virtue Glob. Holdings Ltd. v. Rearden LLC*, No. 15-CV-00797-JST, 2016 WL 1588268, at *5 (N.D. Cal. Apr. 20, 2016); *Melendrez v. Superior Court of the State of California*, 215 Cal. App. 4th 1343, 1353–54, 156 Cal. Rptr. 3d 335, 343–44 (2013); *Catalina Investments, Inc. v. Jones*, 98 Cal. App. 4th 1, 7, 119 Cal. Rptr. 2d 256, 261 (2002).

Courts have also consistently held that former corporate officers may not assert the privilege of a defunct or non-functioning corporation or company. *United States v. Head*, No. 08-CR-116 KJM, 2013 WL 5739095, at *3 (E.D. Cal. Oct. 22, 2013) (collecting cases).  Therefore, none of the Strataluz owners, including David Reid and Scott Ferrell, may assert Strataluz's privilege or claim the corporate privilege as their own.  Thus, all of the documents identified in the Strataluz privilege log are not subject to privilege protection and must be produced. *S.E.C. v. Carrillo Huettel LLP*, No. 13 CIV. 1735 GBD, 2015 WL 1610282, at *3 (S.D.N.Y. Apr. 8, 2015) ("limiting the duration of the attorney-client privilege to

the life of a corporation is consistent with the principle that the privilege is to be construed narrowly because it withholds relevant information from the judicial process").

Courts nationwide have held that a corporation loses privilege upon dissolution and windup, meaning that privileged corporate communications can no longer be protected or withheld. *See Official Comm. of Admin. Claimants ex rel. LTV Steel Co. v. Moran*, 802 F. Supp. 2d 947, 948–49 (N.D. Ill. 2011) (holding that "the weight of authority suggests" that the attorney-client privilege does not survive dissolution of a corporation); *TAS Distrib. Co. v. Cummins Inc.,* No. 07–1141, 2009 WL 3255297, at *2 (C.D. Ill. Oct. 7, 2009) (collecting cases for the proposition that "[a]bsent some compelling reason to the contrary, the attorney client privilege does not survive the death of a corporation"); *Gilliland v. Germamita*, No. 2:05-cv-01059, 2006 WL 2642525, at *4 (W.D. Pa. Sep. 14, 2006) (explaining that "there should be a presumption that the attorney-client privilege is no longer viable after a corporate entity ceases to function, unless a party seeking to establish the privilege demonstrates authority and good cause"); *United States v. von Biberstein*, No. 7:14-CV-175-BO, 2015 WL 1742433, at *2 (E.D.N.C. Feb. 13, 2015), *report and recommendation adopted in part,* No. 7:14-CV-175-BO, 2015 WL 1387931 (E.D.N.C. Mar. 25, 2015) ("When a corporation ceases to exist or function … the privilege no longer applies"); *In re Fundamental Long Term Care, Inc.*, No. 8:11-BK-22258-MGW, 2012 WL 4815321, at *9 (Bankr. M.D. Fla. Oct. 9, 2012) (explaining that "the privilege protects the corporation—not the individual employees").[6]

---

[6] *See, e.g., S.E.C. v. Carrillo Huettel LLP*, No. 13 CIV. 1735 GBD, 2015 WL 1610282, at *2 (S.D.N.Y. Apr. 8, 2015) ("The weight of authority … holds that a dissolved or defunct corporation retains no privilege"); *In re Behr Dayton Thermal Products, LLC,* 298 F.R.D. 536, 541–43 (S.D. Ohio 2014); *Trading Technologies International, Inc. v. GL Consultants, Inc.,* Nos. 05–4120, 05 C 5164, 2012 WL 874322, at *4 (N.D.Ill. March 14, 2012); *Lopes v. Viera,* 688 F.Supp.2d 1050, 1059–69 (E.D.Cal.2010).

In *City of Realto*, the Central District of California relied in significant part on the Supreme Court's reasoning in *Commodity Futures Trading Comm. V. Weintraub*, 471 U.S. 343 (1985), wherein the Supreme Court held that privilege concerns applicable to corporations must be construed differently and apart from those of the individuals. *See City of Realto*, 492 F.Supp. 2d at 1199; *see also Weintraub,* 471 U.S. at 357 (holding that the public good served by the privilege is somewhat lessened when the client is a company rather than a person). Defendants urge this Court to find that California state law in *Favila* alters this outcome, and that the *Favila* and *Reilly* decisions alter the well-established precedent such that Strataluz LLC can continue to assert privilege in perpetuity. *See* Exh. 2 (NTG letter citing *Reilly v. Greenwald & Hoffman, LLP*, 196 Cal. App. 4th 891, 903-904 (2011) and *Favila v. Katten Muchin Rosenman LLP*, 188 Cal. App. 4th 189, 220 (2010)). However, at most, those cases suggest that a corporation can retain and assert privilege throughout the "windup" process until all business and obligations are final. Strataluz is past that point.

The Court in *Red Vision* explained the critical distinction in a well-reasoned decision collecting cases from nationwide jurisdictions: "[t]he key fact is whether the corporation is 'dead' as opposed to being in some other state, such as a windup phase, bankruptcy or liquidation, or having merged into or been acquired by a successor." *Red Vision Sys., Inc. v. Nat'l Real Estate Info. Servs., L.P.*, 2015 PA Super 5, 108 A.3d 54, 65 (2015) (distinguishing and explaining California decisions on this issue including *Reilly* and *Favila*). "To determine whether a corporation has 'died,' courts should look to the practical business realities rather than technical status." *See Moran*, 802 F.Supp. 2d at 949. "A completely defunct corporation should not be allowed to assert privilege, regardless of whether it has technically maintained its legal status." *Id.* (citing *Lewis v. United States*, No. 02-2958, 2004 WL 3203121, at *4-5 (W.D. Tenn. Dec. 6, 2004). "[I]f a business is dissolved and/or has ceased to operate, and has neither a legal successor nor some

remaining management with authority to handle the company's post-dissolution windup, then there is no longer any 'client' to raise or waive the privilege." *Red Vision Sys., Inc. v. Nat'l Real Estate Info. Servs., L.P.*, 2015 PA Super 5, 108 A.3d 54, 68 (2015).

Here, Strataluz was terminated, dissolved, and wound down in early 2016. The corporate members had the corporation formally dissolved with the Nevada Corporate Commission.  *See* Exh. 72 at 4; Exh. 73 at 4; Exh. 75 at 4; Exh. 77 at 4; Exh. 74 (California dissolution).  They distributed the remaining cash to founding members according to their pro rata contributions.  *See* Exh. 48; Exh. 89 at 696 (Tr. 47:15-19 (Hardin Depo).  Several of those founding members explained in contemporaneous emails to each other that the corporation had been "closed,"[7] "shut down,"[8] and "wound down."[9]  *See also* Exh. 53 (NTG065642) ("Did you guys let them know we shut this down?").  A query of all federal and state dockets nationwide reveals no active litigation or ongoing legal matters involving "Strataluz."  *See* Exh. 86.  The corporation did not proceed into or through bankruptcy.  Defendants have argued earlier in this proceeding that Strataluz is "a now-defunct Nevada corporation[.]"  *See* Dkt. 245 at 10 (docket pagination).  Strataluz has no web presence, is not a registered entity in Nevada or any other state (including California).  A formal "dissolution was made by the vote of all the members" and filed with the Secretary of State for the State of California on February 18, 2016.  *See* Exh. 74.  That submission constituted a "cancellation" that expressly acknowledged that, "[u]pon the effective date of this Certificate of Cancellation, this LLC's Articles of Organization (CA LLCs) or Certificate of Registration (registered foreign LLCs) will be cancelled and its powers, rights and privileges will cease in California."  *Id.*

---

[7] Exh. 51
[8] Exh. 53; Exh. 46.
[9] Exh. 47.

NTG Defendants have no tenable argument that the Strataluz entity or its parent holding corporations have any ongoing business, nor are there any active managers or officers of the corporation that ceases to exist. At best, the Defendants invoke privilege to protect the interests of the corporate officers, namely Defendants Scott Ferrell and Dave Reid. But the privilege belonged to the corporation, and not the former employees or officers. *See United States v. Ferrell*, No. CR07-0066MJP, 2007 WL 2220213, at *4 (W.D. Wash. Aug. 1, 2007) (collecting cases).[10] The documents here at issue are the corporate files. Those documents were produced in response to NIC's Rule 34 Requests that sought corporate files. *See* Exh. 91 (NIC Rule 34 Requests); Exh. 92 (same). The documents were exchanged and created in furtherance of the Strataluz corporate affairs.[11]

NIC has attached hereto the purported "privilege log" produced by Defendants Reid and S. Ferrell in response to discovery requests that target corporate documents. *See* Exh. 6. Because the corporate privilege no longer exists, this Court must compel all such documents.

---

[10] Under the Ninth Circuit's decision in *U.S. v. Graf*, an employee seeking to assert a personal claim of attorney-client privilege jointly over corporate materials must affirmatively show five factors, none of which can be established in this case. *See U.S. v. Graf*, 610 F.3d 1148, 1160 (9th Cir. 2010). For instance, the employee or officer must show that, in communicating with counsel or sharing privileged information, "they made clear that they were seeking legal advice in their individual rather than in their representative capacities." *Id.* The party must also show that "counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise." *Id.* Those elements alone reveal that NTG's "Strataluz" documents would not meet the Ninth Circuit's test. Nonetheless, to the extent the Defendants argue for a joint privilege, this Court must review the files *in camera* to determine whether NTG meets its high burden to prove the existence of a joint privilege. And because NTG bears the burden when asserting privilege, ambiguities should be resolved against the privilege in this instance.

[11] To the extent the Defendants contend otherwise, they bear the burden to prove that specific documents were not exchanged as part of the corporate affairs or in the interests of the corporation.

## 2. The Work-Product Doctrine May Not Be Invoked for Documents Prepared by or For Strataluz LLC

Because the corporation may no longer assert privilege, the protections of the work product doctrine are not available. *See, e.g., In re Behr Dayton Thermal Products, LLC*, 298 F.R.D. 536, 541 (S.D. Ohio 2014) (holding that liquidated and dissolved debtor corporation lacked standing to assert attorney-client or work product privileges).

That point notwithstanding, Strataluz documents designated "work product" should be compelled to be produced for yet another reason. Work-product protection may not be invoked for documents prepared by or for Strataluz LLC because Strataluz LLC is not a party to this litigation. *See In re Cal. Pub. Utils. Comm'n,* 892 F.2d 778, 781 (9th Cir. 1989) (holding that work-product doctrine, on its face, limits protection to one who is a party to the litigation in which the discovery is sought) (hereinafter "*In re CPUC*"); *see also Hawkins v. South Plains Intern. Trucks, Inc.*, 139 F.R.D. 682, 683 (D. Colo. 1991) ("The language of the rule limits protection to one who is a party (or a party's representative) to the litigation in which discovery is sought" and "[a]ll recent case law is in accord."); *Dowling v. Arpaio*, No. CV-09-1401-PHX-JAT, 2011 WL 1456732, at *2 (D. Ariz. Apr. 15, 2011) (applying *In re Cal. Pub. Utils Comm'n* and denying work product claim where individual asserting privilege was not a party to litigation); *Carrillo v. Cty. of Los Angeles*, No. CV1110310SVWAGRX, 2012 WL 12884899, at *2, *3 (C.D. Cal. Sept. 25, 2012) (citing *In re CPUC*). "Documents prepared for one who is not a party to the present suit are wholly unprotected even though the person may be a party to a closely related lawsuit in which he will be disadvantaged if he must disclose in the present suit." *Loustalet v. Refco, Inc.*, 154 F.R.D. 243, 247 (C.D. Cal. 1993); *see also In re NVIDIA GPU Litig.*, No. C08-04312 JW (HRL), 2009 WL 4573311, at *1 (N.D. Cal. Nov. 30, 2009) (quoting *In re Cal. Pub. Utils. Comm'n*, 892 F.2d at 781). Thus, when evaluating work

product designations, "documents prepared **for** one who is not a party to the present suit are wholly unprotected even though the person may be a party to a closely related lawsuit in which he will be disadvantaged if he must disclose in the present suit." *See* C. Wright & A. Miller, *Federal Practice and Procedure* § 2021, at 201-02 (emphasis added).

The Ninth Circuit has refused to extend the protections of the work product privilege beyond the face of the rule. *See In re Cal. Pub. Util. Com'n*, 892 F.2d at 781. The Court's holding is consistent with the principles undergirding the work product doctrine, which is merely to protect the adversarial process for preparation of the instant litigation. *See, e.g., United States v. Nobles*, 422 U.S. 225, 254, 95 S. Ct. 2160, 2178 n.16 (1975) (explaining that the "purpose of the rule protecting the work product is to remove the incentive a party might otherwise have to rely solely on his opponent's preparation"). In *Grolier*, the Supreme Court addressed whether the work product privilege protects information prepared parties in prior litigation. *See F.T.C. v. Grolier Inc.*, 462 U.S. 19, 25 (1983). The Court expressly stated that a condition of later protection is that protected materials must have been "prepared by or for a party to the subsequent litigation." *Id.*

The Strataluz documents do not fall within the protections of work product as interpreted by the Ninth Circuit. Strataluz is not a party here to litigation. The Ninth Circuit explained that the protections of the work product doctrine relate to the work product prepared only *by or for the party* in current litigation. *Id.* Thus, because Strataluz is not a party to this case, it has no right to assert work product protections. And because Defendants Ferrell and Reid did not prepare documentation in their capacity as representatives for *a party in this* litigation, they cannot invoke work product protections over the Strataluz material. Moreover, Defendants Ferrell and Reid are not present in this litigation as representatives of Strataluz because, in fact, Strataluz is not a party to litigation and no longer exists as an entity. In short, the Strataluz documents prepared for prior corporate

litigation were not "prepared by or for a party to the subsequent litigation" *See Grolier Inc.*, 462 U.S. at 25.

Concerning these Strataluz documents, Defendants Ferrell and Reid can only be involved here in two capacities:  (1) as former officers or owners of the corporation; or (2) as former attorneys for the defunct corporation.  As to the former, for the reasons discussed *supra*, neither Ferrell nor Reid can invoke privilege on behalf of the defunct, dissolved, and dead corporation.  As to the latter, neither Ferrell nor Reid are representatives of any party in this case because Strataluz is not a named party.

Defendants attempt to argue that Ferrell can assert work product privilege because he is a party to this case (though in his individual capacity), and he prepared some of the underlying Strataluz documentation.  Thus, because the privilege protects documents "prepared by or for a party to the subsequent litigation," defendants argue that work product protections can apply to Ferrell's documentation prepared by him.  *See Grolier*, 462 U.S. at 25 (emphasis added).  There are at least three fatal flaws in that reasoning:

First, even if this Court finds that work product can be asserted, the privilege could only protect documents prepared by Ferrell in his capacity as an independent attorney for the Strataluz corporation.  There are two types of work product potentially at issue:  (1) the corporation's work product; and (2) NTG's attorney work product.  Documentation prepared for the corporation in Ferrell's capacity as an owner (rather than attorney) would belong to the non-party Strataluz corporation.  That information would not be privileged under *In re CPUC*, because Strataluz is not a party to this litigation.  Thus, this Court would compel files that are the corporation's work product.  Here NTG's Ferrell and Reid were owners of Strataluz who elected to represent themselves in litigation matters for the corporation.  Although they conducted litigation business through their identities as NTG attorneys, Defendants have produced no documentation indicating that

Strataluz used NTG as independent counsel, rather than simply using its founding members for pro se or in-house legal services.  Defendants produced no retainer agreement between Strataluz and NTG, or evidence that the corporation paid any attorney fees to the NTG firm.  Defendants Ferrell and Reid used their "NTG" attorney email addresses and resources to operate the Strataluz corporation.  For instance, Ferrell routinely sent routine business communications to his Strataluz business partners using his NTG email account, which include intra-NTG communications solely related to non-legal Strataluz activities.  *See, e.g.,* Exhs. 8, 9, 10, 39, 40, 41, 42, 45, 46, 47, 48, 49, 50, 51, 53, 54, 55.  NTG was effectively in-house counsel for Strataluz.  Under those circumstances, Defendants S. Ferrell and Reid cannot pose as independent attorneys solely to circumvent the Ninth Circuit's ruling in *In re CPUC*.  All of their communications belong to the Strataluz corporation, and Strataluz is not a party to this case.  Thus, Defendants cannot invoke work product as a shield here.

Second, the dispositive question is whether the documents were prepared *for a party* in this litigation, and here the files were not (they were prepared for non-party Strataluz).  "The language of the rule limits protection to one who is a party (or a party's representative) to the litigation in which discovery is sought," which is this instant case.  *See Hawkins*, 139 F.R.D. at 683-84.  Although attorneys may jointly share in the work product privilege, the phrase "prepared by or for a party" relates to work performed on behalf of a specific "party" in prior litigation.  A proper interpretation of that phrase allows protection for material (1) directly "prepared <u>by</u>" an individual or corporation in anticipation of litigation, as where a corporation prepares its own litigation folder; or (2) documents "prepared <u>for</u> a party" in litigation, as where an attorney compiles documents.  Defendants' argument here attempts to conflate these concepts by concluding that documents "prepared by or for Strataluz" were instead "prepared by or for Scott Ferrell."

The Ninth Circuit's decision in the *In re CPUC* case explained that Rule

26(b)(3) did "not protect materials prepared by CPUC attorneys from discovery in the present litigation, because the CPUC is not a party to the litigation between Edison and Westinghouse." *See In re CPUC*, 892 F.2d at 781.  Similarly, Strataluz is not a party to this litigation and, so, documents prepared by NTG for Strataluz would not remain protected here simply because NTG is a party in this unrelated litigation.  *See Ramsey v. NYP Holdings, Inc.*, No. 00 CIV.3478(VM)(MHD), 2002 WL 1402055, at *7 (S.D.N.Y. June 27, 2002) (holding that a party's representative could not invoke work product protections, particularly where the policy of the Rule "would not be advanced … by protecting a representative's work product that is undertaken in anticipation of the representative's own separate litigation").  The *Ramsey* decision explained that a contrary approach "would create an arbitrary distinction between non-party witnesses and litigants' representatives, since the non-party witness cannot invoke Rule 26(b)(3) to protect work product created for his own litigation, whereas the representative could invoke the rule even if he too created trial preparation materials purely for his own lawsuit."  Defendants here plea for that improper "arbitrary distinction," where Strataluz clearly cannot assert Rule 26(b)(3) protections, but NTG argues that it, as Strataluz's purported counsel, could yet assert those same protections where the client would be compelled to produce same by subpoena (if the corporation still existed and were subject to subpoena).  That outcome extends greater protections to NTG (as Strataluz's purported representative) than Strataluz would possess itself, even where the files were created for Strataluz in the corporation's interest.  The Ninth Circuit noted that "[d]ocuments prepared <u>for</u> one who is not a party to the present suit are wholly unprotected even though the person may be a party to a closely related lawsuit in which he will be disadvantaged if he must disclose in the present suit."  *Id.* (emphasis added; quoting C. Wright & A. Miller, *Federal Practice and Procedure* § 2024, at 201-02).  The purpose of the work product doctrine is to protect trial preparation materials from an adversary in the same litigation.  *See United States v.*

*Christensen*, 828 F.3d 763, 805 (9th Cir. 2015) (explaining that "it would be improper to allow an attorney to exploit the privilege for ends that are antithetical to that process"). Those concerns are not present here where NIC seeks documents related to Strataluz litigation, and NIC would not gain any adversarial litigation advantage from disclosure of that material because NIC is not in litigation with Strataluz. In fact, the only identifiable interest in maintaining documentary protections relates to Defendants' desire to prevent disclosure of relevant (and potentially incriminatory) information in an unrelated civil RICO lawsuit. But those concerns should not justify a departure from the Ninth Circuit precedent identified *supra*.

Third, even if this Court determines that NTG defendants can claim work product over Strataluz files, NIC has a compelling need for that documentation which cannot be obtained from other sources. *See* Fed. R. Civ. Pro 26(b)(3)(A)(ii) (permitting disclosure where requesting party shows "that it has a substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means"). The work product privilege is a qualified immunity. The documentation at issue directly relates to the NTG defendants' intentions and motivations concerning the use of Strataluz as a litigation vehicle. NIC's RICO allegations depend on elements of scienter which require exploration of the NTG Defendants' mindset when pursuing these cases, particularly the ProMAXAL litigation which was pursued under fraudulent circumstances. *See Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992) ("the rule permits discovery when mental impressions are the pivotal issue in the current litigation and the need for the material is compelling"). This evidence can only be had through examination of the work product documents associated with Strataluz litigation. Strataluz's former President, Jarrod Bentley, professed no knowledge of litigation activities and, so, the testimonial record does not permit development of these factual issues. *See* Exh. 88 at 640

(Tr. 58:3-23.  None of the other non-party Strataluz owners had any knowledge of litigation.  *See* Exh. 90 at 800 (Tr. 71:6-19); Exh. 89 at 702 (Tr. 53:20-25-54:1-9).  In cases where mental impression is at issue, the *Holmgren* decision suggested that discovery should be available "unless the information is available elsewhere[.]"  *See Holmgren*, 976 F.2d at 577.  In *Orr*, the Northern District of California compelled for production mental impression work product largely on the basis that information in the documents "cannot be obtained from any other source."  *See E.E.O.C. v. Safeway Store, Inc.*, No. C-00-3155 TEH(EMC), 2002 WL 31947153, at *7 (N.D. Cal. Sept. 16, 2002).  Here the allegedly privileged "work product" files (or testimony related to same) are the *only* evidence of NTG's intentions concerning the Strataluz litigation, and NTG's understanding of the facts underlying those claims.  The attorneys are parties to this litigation, and their mental state concerning the Strataluz litigation is direction at issue—specifically, whether they formed a scheme to use Strataluz as a litigation vehicle to pursue fraudulent cases.  NIC has a compelling need for this information.

Thus, Strataluz LLC work product must be compelled in this case.

### 3. The Documents Designated NTG063804 and NTG063502 Are Not Privileged and Should be Produced in Unredacted Form

Even if this Court were to find that Strataluz retains privilege, the documents identified as NTG063804 and NTG063502 must be produced because they do not contain privileged material.  In its September 2017 production, NTG produced two documents with certain content redacted.  *See* Exh. 8; Exh. 9.  The redactions were identified as privileged content, but the documents do not appear to concern or involve any privileged material.  The defendants' redactions may conceal potentially relevant information.  Those redactions should be removed and the documents produced in their entirety.

The document designated "NTG063804" (Exh. 9) includes business communications between the owners of Strataluz LLC concerning their strategy

for use of the Strataluz corporation.  That document was exchanged in December 2013 before the corporation was formed.  Because the communications were exchanged between those individuals in their capacities as business owners (not attorneys), at a time when no specific litigation was threatened, pending, or anticipated, the communications are not protected by the attorney-client privilege.  *See United States v. ChevronTexaco Corp.*, 241 F.Supp.2d 1065, 1076 (N.D. Cal. 2002) (holding that the attorney-client privilege "does not protect an attorney's business advice" and "[c]orporations may not conduct their business affairs in private simply by staffing a transaction with attorneys").  Because the Strataluz corporation had yet to be incorporated, and no litigation was imminent, the documents were self-evidently not prepared in anticipation of litigation.  *See In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 908 (9th Cir. 2004) (explaining that the work product doctrine requires that documents be prepared because of the prospect of actual litigation such that the document "would not have been created in substantially similar form but for the prospect of litigation").  As the party seeking to withhold responsive information through redactions, NTG bears the burden of proving that content is privileged.  The context of this document indicates otherwise.

Similarly, the document designated "NTG063502-063503" (Exh. 8) evidently does not address subject matter that would be privileged under either the work product doctrine or attorney-client privilege.  The document is a communication between business partners concerning the affairs and marketing of the business, and relates to the development of promotional materials.  None of the correspondence involves the solicitation of legal advice by an attorney serving in their capacity as a legal advisor (as opposed to business capacity).  Yet this document also includes line-redactions that are unexplained.  The document does not concern or relate to litigation.  Moreover, because the correspondence was generated as part of business operations, the document would have been generated

regardless of litigation activities that may or may not have existed.  Work product productions are inapplicable.

Accordingly, regardless of how this Court rules on the balance of privileged files at issue here, the two documents designated "NTG063804" and "NTG063502" should be compelled.  *See* Exh. 8; Exh. 9.

### 4. Strataluz Documentation Related to ProMaxal Litigation Should Be Compelled Under the Crime-Fraud Exception to Privilege

#### a.  The Strataluz "ProMAXAL" Litigation was Fraudulent

The District Court earlier found that NTG Defendants incorporated Strataluz, at least in part, for the purpose of pursuing fraudulent litigation.  *See* Dkt. 299 at 8-21.  The focus of that order was on NTG's use of a fictitious product (ProMAXAL) to threaten and file Lanham Act lawsuits against purported "competitors."  For the reasons stated *supra*, Strataluz may not preclude discovery on privilege grounds.

However, to the extent this Court determines that Strataluz may still assert privilege, NIC is entitled to discover documents relating to the ProMAXAL litigation efforts under the Crime-Fraud exception to the attorney-client privilege. Application of the crime-fraud exception does not require that a document reveal indicia of fraud on its face (i.e., within the four corners of the document).  The document need only be "in furtherance" of a crime or fraud, which merely requires that the document have some reasonable relationship to the fraudulent scheme.  *See In re Nat'l Morg. Equity Corp.*, 116 F.R.D. 297, 302 (C.D. Cal. 1987); *United States v. Chen*, 99 F.3d 1495, 1504 (9th Cir. 1996).  Thus, "[a] communication between client and attorney can be 'in furtherance of' the client's criminal conduct even if the attorney does nothing after the communication to assist the client's commission of a crime, and even though the communication turns out not to help (and perhaps even to hinder) the client's completion of a crime."  *See In re Grand*

*Jury Proceedings*, 87 F.3d 377, 382 (9th Cir. 1996) (explaining that the "government is not required to prove that the communications with Roe or Doe *in fact* helped the targets commit the crimes").

Moreover, "[t]he crime or fraud exception applies even where the attorney is completely unaware that his advice is sought in furtherance of such an improper purpose." *United States v. Hodge & Zweig,* 548 F.2d 1347, 1354 (9th Cir.1977), *abrogated on other grounds, In re Grand Jury Subpoenas,* 803 F.2d 493, 496–498 (9th Cir.1986), *corrected,* 817 F.2d 64 (9th Cir.1987); *see also United States v. Friedman,* 445 F.2d 1076, 1086 (9th Cir.1971) (noting that for the crime or fraud exception to apply, "[t]he attorney need not himself be aware of the illegality involved; it is enough that the communication furthered, or was intended by the client to further, that illegality"), *cert. denied,* 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971); *Chen,* 99 F.3d at 1504 (observing that it is "irrelevant ... that [the lawyers] may have been in the dark") (quoting *In re Grand Jury Proceedings,* 87 F.3d at 381–382).  Courts have explained that a prima facie case is "one which will suffice for proof of a particular fact unless contradicted and overcome by other evidence" or "[i]n other words, evidence from which reasonable inferences can be drawn to establish the fact asserted, i.e., the fraud." *See Action Performance Companies, Inc. v. Bohbot*, 420 F. Supp. 2d 1115, 1119 (C.D. Cal. 2006)

The Strataluz ProMAXAL litigation was replete with false representations of material fact and intent to deceive NTG's targets in litigation in order to extort settlement payments.  Those facts establish fraud sufficient to invoke the crime-fraud exception.  In particular, discovery has now affirmed the factual record presented to the Court in NIC's prior Strataluz-related crime-fraud motion.  *See* Dkt. 299 at 8-20 (Order citing material facts).  For instance, the Court cited facts related to ProMAXAL litigation and found significant the fact that ProMAXAL may not have existed.  *Id.* at 17-18.

Discovery has revealed that ProMAXAL, in fact, never existed and was instead a concept that NTG used solely for litigation purposes. *See* Exh. 88 at 637 (Tr. 46:12-25-47:1-7) (testifying that Strataluz never sold or manufactured ProMaxal); *id.* at 638 (Tr. 52:18-20) (testifying that Strataluz performed no testing for ProMaxal, and had no packaging); *id.* at 640 (Tr. 60:13-:25-61:1 (testifying that the ProMaxal website was not designed to receive consumer orders); *id.* at 630 (Tr. 20:23-25) (Strataluz's former president testifying that he had never heard of "liftgate" technology); Exh. 83 (declaration with attachments identifying absence of public information about ProMaxal). NTG threatened and prepared ProMAXAL-related lawsuits alleging specific damages (including lost profits and "diverted sales") without having a product to sell. *See* Exh. 12 (Vitrix Demand Letter); Exh. 13 (Virmax Demand Letter); Exh. 23 (Twinlab Demand Letter); Exh. 24 (Enzyte Demand Letter); Exh. 25 (TruDerma Demand Letter). Strataluz never manufactured or sold ProMAXAL. *See* Exh. 88 at 637-638 (Tr. 46:20-25-47:1-7, 52:22-23), 640 (Tr. 60:19-25-61:1). It never had a finished product available for sale or even manufactured a single pill. *Id.* The rudimentary website posted by Strataluz for ProMAXAL was engineered to refuse product sales, and never had an e-commerce engine built into the website. *Id.* at 640 (Tr. 60:19-25-61:1).

NTG began serving demand letters for ProMAXAL just days after the website domain was registered for ProMAXAL. *See* Exh. 78 at ¶6. Those demand letters (and ensuing complaints) were replete with false statements of fact, including claims that Strataluz invested resources into ProMAXAL research and development, and that Strataluz lost money through diverted product sales. *See, e.g.,* NTG's Twinlab Demand Letter (Exh. 23) (claiming that "ProMAXAL is the only male enhancement product sold in the United States that contains LIFTGATE technology…"); *see also* Exhs. 12, 13, 24, 25; Exh. 69 at ¶¶1, 4, 14, 17, 18 (Twinlab Complaint alleging diverted sales); Exh. 70 (TruDerma Complaint). Defendant Scott Ferrell included objectively false representations of fact in

furtherance of those threatened lawsuits, including the claim that ProMAXAL was subject to patent protection (it was not). *See* Exh. 83 (at Dkt. 262-16) (U.S. Patent No. 5,817,364 reflecting no applicable technology to male enhancement products). Strataluz's former President was unaware of any patent rights or protections for the ProMAXAL product (which had never been manufactured). *See* Exh. 88 at 640-641 (Tr: 61:22-25-62:1-6). Moreover, Defendant Ferrell attempted to "settle" the ProMAXAL cases by offering $200,000 licenses to purported "LIFTGATE" technology—a technology that simply did not exist. *See* Exhs. 12, 13, 23, 24, 25. Again, Strataluz's former President (who was responsible for formulation and product development), had never heard of "Liftgate" technology. *See* Exh. 88 at 630 (Tr. 20:23-25-21:1-3). No patents or trademarks exist for "LIFTGATE" technology. *See* Exh. 83 at Dkt. 262-18) (reflecting search results of U.S. Patent and Trademark Office database).

Strataluz used the ProMAXAL website apparently as a front, and claims made on that website were objectively false. For example, the website claimed that ProMAXAL was "clinically proven" to work as advertised. *See* Exh. 83 at Dkt. 262-3 (ProMaxal website capture). Strataluz did not even have a product when it posted that web content in June of 2015, and it had performed no research on the product. *See* Exh. 88 at 637-638 (Tr. 46:20-25-47:1-7), (Tr. 52:22-25-53:1-4). The video attached to the website claimed that consumers could obtain ProMAXAL "direct from the virility clinic" for a discounted price. *See* Exh. 83 at 262-3 (reflecting screencap of video link).

Defendant Ferrell took measures to conceal his interest in the corporation, which was a material fact that would have likely alerted target corporations to the scheme. For instance, in communications with opposing counsel, Ferrell repeatedly referred to conversations with his "client," and posed as though his "client" was making litigation decisions. *See* Exhs. 27-38 (Ferrell emails exchanged with opposing counsel). In reality, Ferrell was solely responsible for

NTG's Strataluz-related litigation.  *See* Exh. 88 at 640 (Tr. 58:3-22); Exh. 89 at 702 (Tr. 53:20-25-54:1-9); Exh. 90 at 800 (Tr. 71:6-19).  Strataluz's former President, Jarrod Bentley, testified that he had no knowledge of the litigation activities, that he made no litigation decisions, and that he was simply told that litigation would happen.  *See* Exh. 88 at 640 (Tr. 58:3-22).  Similarly, Joshua Weiss and James Hardin professed no knowledge of Ferrell's Strataluz-related litigation activities.  *See* Exh. 89 at 702 (Tr. 53:20-25-54:1-9); Exh. 90 at 800 (Tr. 71:6-22).  Finally, Ferrell took significant steps to conceal his ownership by

██████████████████████████████████████████

*See* Exh. 10.  Ferrell filed corporate disclosure statements in litigation which omitted disclosure of his interests in Strataluz—filings which were deemed misleading by Judge Selna.  *See* Exh. 3 (Order, Dkt. 299) at 11, 19 (holding that "Strataluz's owners concealment of their interests in the company supports *in camera* review").

In short, the ProMAXAL litigation was objectively fraudulent and pursued by NTG despite the fact that ProMAXAL never existed.  NIC therefore requests that this Court compel production of all litigation documents and communications that relate to ProMAXAL under the crime-fraud exception.

### b.  Whether Strataluz Sold Other Allegedly "Legitimate" Products Is Irrelevant to Whether ProMAXAL Litigation Was Fraudulent

NTG has erroneously suggested that because Strataluz had (very) minimal sales of some other products, the corporation was legitimate and, so, the crime-fraud exception cannot apply with respect to ProMAXAL litigation.[12]  The record suggests that NTG attorneys funded Jarrod Bentley and tasked him with producing

---

[12] Strataluz did purchase several products for "private labeling," meaning that it hired outside corporations to build model products that Strataluz could then adopt as its own for marketing purposes.  *See, e.g.,* Exh. 88 at 637 (Tr. 47:8-49:19).

a facially legitimate corporation.  *See* Exh. 9.  As part of his efforts, Bentley caused some products to be designed and eventually manufactured.  But Strataluz turned no profit of any kind, and early strategy emails exchanged between the owners likely show that at least part of Strataluz's purpose was to support litigation activities.  *See* Exh. 9; Exh. 88 at 636-637 (Tr. 45:15-25-46:1-3); Exh. 89 at 693 (Tr. 44:4-5).  After the corporation was established, and when it was evident that the corporation had no prospect of commercial success, NTG began aggressively serving demand letters and lawsuits.  *See* Exhs. 11-26 (sixteen (16) demand letters served on target corporations within several months in 2015).  The email correspondence even shows that Attorney Ferrell maintained a "chart" of litigation targets that his NTG staff maintained as demand letters and complaints were served.  *See* Exhibit 43 (Email to office staff member, Mandy Jung, regarding litigation chart); *see also* Appendix A at 7 (NTG066637) (Mandy Jung email attaching ProMaxal Excel spreadsheet).

Judge Selna has rejected the argument that NTG is immune from a crime-fraud order simply because Strataluz may have completed some minimal sales.  At oral argument on April 17, 2017, the Court had the following exchange with NTG counsel:

DARNELL:     The point I am making is that forming the corporation itself is not evidence of a crime or a fraud.  If there is evidence that the Court finds that the corporation was formed and actually it sold products, which the plaintiff does not dispute that with respect to three of the products at issue –they focus solely on one product, ProMAXAL.  So if the corporation was formed and it actually sold the three other products, by definition, it would have to be a legitimate corporation.

COURT:     Why is that so?

DARNELL:     Because I think the –

COURT:        I mean, I sell a bogus line of goods, and I sell three good valuable lines of goods.  Why does it follow that selling the good lines immunizes the bad line?

DARNELL:      It follows because the allegation upon which the plaintiff's entire argument is premised is that the corporate formation reflected a plan to form sham corporate entities solely to pursue legal claims.  If the corporation is selling products, it's legitimate, and it doesn't vitiate the entire attorney/client privilege.

COURT:        How many shady businesses use a real business as a cover?

DARNELL:      I don't know the answer to that question, but, yes, there are shady businesses –

COURT:        That does occur doesn't it?

*See* Apr. 17, 2017 Transcript at 16-18 (Exh. 93).

DARNELL:      . . . Now, I don't believe that Strataluz can be found to be an illegitimate corporation for certain products and a sham corporation for others.  It's either a real corporation or it's not.  The whole premise upon which they filed this motion to vitiate the attorney/client privilege is that it is a sham corporation.  That's their language.

COURT:        It's all or nothing?  I mean, you can run three good lines of business and use the corporation as a foil to conduct illegal activity?  Does the fact that you run three legitimate lines of business immunize them?

*See id.* at 21.

Judge Selna's position is supported by precedent; a business that commits unlawful activity is not immunized for that conduct solely because it has other allegedly legitimate activities.  In the criminal context, seizure laws and RICO doctrine have evolved to address that very conduct.  *See, e.g., United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1568 (9th Cir. 1989) (upholding seizure order where defendant "used legitimate businesses as fronts for his illegal drug

trafficking activities"); *U.S. v. Zemek*, 634 F.2d 1159, 1167 (9th Cir. 1980) (explaining that use of "a legitimate business as an alleged 'front'" for unlawful activity is "precisely the type of operation Congress intended to encompass within the enterprise concept").

The ProMAXAL litigation reveals the NTG defendants' willingness and intent to defraud based on contrived, false legal claims.  In the underlying crime-fraud proceedings, neither NTG nor non-party Weiss provided evidence that ProMAXAL was a legitimate product, despite multiple opportunities to do so.  *See generally* Apr. 17, 2017 Tr. at 16-22 (Exh. 93); Dkt. 308 (NTG Motion to Stay); Dkt. 309 (Weiss Motion to Stay); Dkt. 327 (NTG Reply); Dkt. 325 (Weiss Reply); Dkt. 244 (Weiss Objections); Dkt. 245 (Ferrell Objections); Dkt. 262 (Weiss Reply); Dkt. 270 (Ferrell Reply); Dkt. 203 (Motion to Quash); Dkt. 208 (NTG Supplemental Memo).  They made no such argument because ProMAXAL never existed.  At best, ProMAXAL was a concept that Defendants considered but never carried through.  Yet NTG's ProMAXAL litigation represented that the product was "sold" to consumers, and that Strataluz suffered a concrete injury as a result of "lost sales" and "diverted" customers.  To have standing under the Lanham Act, Strataluz would have needed to show "commercial injury."  *See, e.g., Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1037 (9th Cir. 2005); *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1112 (2d Cir. 1997) (rejecting Lanham Act standing where plaintiff attempted to sue based on an "undeveloped product" and explaining that "Friedlander and PDK are not competitors for purposes of Lanham Act standing because Friedlander does not currently sell a retail weight loss product that competes with PDK's products."); *Nat. Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1332 (11th Cir. 2008) (explaining that Lanham Act claim could not proceed where plaintiff did not sell product because it "could not have lost any customers or potential customers").  Under the precedent, even if Strataluz had determined a formula for the ProMaxal

product, it could not assert a valid competitor suit under the Lanham Act without ever having manufactured, produced, or sold a single product. That is why Scott Ferrell made false statements regarding product sales, research and development, diversion of sales, and loss of goodwill. Scott Ferrell understood he needed to allege those false facts to make out a colorable claim. Those false representations were made as part of a scheme to defraud corporations and thus, the crime-fraud exception to privilege applies.

### 5. NIC Is Entitled to Its Fees and Costs under Rule 37(a)(5)

As discussed *supra* in Plaintiff's Sections C.1 and C.2, the weight of authority in courts nationwide (state and federal) holds that a corporation like Strataluz loses its ability to claim privilege after the corporation ceases to exist and the windup process is complete. The parties exchanged multiple written correspondence on the issue, and NIC requested the defendants produce the Strataluz documentation. Defendants' refusal to produce document necessitated this motion. Moreover, the defendants have no justifiable basis to conclude that Strataluz may continue to assert privilege long after the corporation has ceased to exist. Because the Defendants were not justified in withholding the corporation documentation on privilege grounds, Rule 37(a)(5) permits NIC to recover its reasonable expenses and fees. NIC requests that the Court grant NIC its fees and costs here.

## IV.   NTG DEFENDANTS' POSITION

### A.    Procedural Background

As the Special Master will recall, NIC's counsel claimed in September of 2016 to have received a phone call from Allison Borts of Continuity Research, LLC ("Continuity") telling NIC of an email that "contained NTG's instructions to employees of Continuity to form dummy corporations that would facially appear to

be legitimate 'competitors.'" (Dkt. 165-1 at 11:25-12:2).  According to NIC, "NTG later used those dummy corporations as sham 'plaintiffs' in litigation involving intellectual property claims against corporate defendants." (*Id.* at 12:2-5).  In support of its September 2, 2016 request to take additional discovery, NIC argued that "[t]he fabrication of shell corporations for litigation purposes reveals a method of operation, common scheme or plan, and exposes NTG's willingness to manufacture baseless legal claims." (*Id.* at 12:10-14).

On October 25, 2016, the Court issued an Order granting NIC's motion for leave to seek discovery of correspondence in the possession of Continuity that NIC alleged "contained NTG's instructions from David Reid and Scott Ferrell to create corporate entities solely to pursue legal claims." (Dkt. 198 at 4).  The Order noted that NIC developed this belief based on discussions between NIC's counsel and Borts, an in-house attorney at Continuity.  (*Id.* at 4).  However, when Borts learned of the declaration from NIC's counsel purporting to recount their conversation, Borts confirmed NIC's counsel's statement were not truthful:

> I was shocked to find that you had filed this declaration without any permission or advanced notice from me. Were you to have sent it to me in advance, I would have advised you that *it was not an accurate representation of the communications that we shared*.  Although we did in fact have a conversation, *your declared recollection of this communication is exaggerated, inaccurate and self-serving.  I demand that you retract the declaration* or I may be forced to take additional action.

(Dkt. 179-1) (emphasis added).

Notwithstanding the fact that Borts made clear that the declaration from NIC's counsel "was not an accurate representation of [their] conversations," the Court noted that the correspondence would be relevant **if** the allegations of NIC's

counsel were true:

> The Court finds that discovery is appropriate with respect to Continuity. The alleged correspondence contains conversations between Newport Trial Group attorneys about a plan to form sham corporate entities solely to pursue legal claims. Although the dueling declarations disputed the correspondence's exact content, such allegations are at the heart of this case. If true, this evidence would support Natural-Immunogenics' claim of a pattern of RICO activity. Therefore, the Court finds that the importance of this discovery outweighs the burden on the parties and is proportional to the case's needs.

(Dkt. 198 at 5). Based on these allegations, the Court permitted discovery of an email string regarding the corporate formation of Strataluz, LLC ("Strataluz Formation Emails"). The Court expressly noted that the "correspondence allegedly contained NTG's instructions from David Reid and Scott Ferrell to create corporate entities solely to pursue legal claims" and held that "[i]f true, this evidence would support Natural Immunogenics' claim of a pattern of RICO activity." (Dkt. 198 at 5).

Beginning in November 2016, the parties then litigated the applicability of the attorney-client privilege to the Strataluz Formation Emails. (*See generally* Dkt. 202). NIC noted in its briefing that Strataluz had been recently dissolved, and notes that its allegations against Strataluz predated that dissolution. (Dkt. 202 at 31 (NIC arguing "[w]ithin one week after that filing, [by NIC alleging that NTG had used sham corporations to file bogus lawsuits], Scott Ferrell filed with the Nevada Corporate Commission to dissolve all corporations within the Strataluz lineage.")). Yet NIC never argued that the dissolution of Strataluz had any impact on the

attorney-client privilege.  (*See generally* Dkt. 202)).  Rather, NIC posited that the Strataluz Formation Emails were not privileged because "the emails include business discussions that are not privileged[.]"  (Dkt. 202 at 37:7 (initial caps altered)).  Additionally, NIC invoked the crime fraud exception, claiming that all of "Strataluz's products were fictitious" and that Strataluz "existed only during the period when it was used as a plaintiff in suits or threatened suits against corporate defendants."  (Dkt. 202 at 28:6-12; *see also id.* at 28:27-28 ("Strataluz claimed to have owned many products, most of which were apparently fictional or never sold commercially. Strataluz never legitimately participated in the commercial market.")).

On February 6, 2017, the Special Master ordered Defendants Ferrell and Reid to provide the Special Master with the Strataluz Formation Emails for her *in camera* review.  (Dkt. 234).  On March 6, 2017, the Special Master held oral argument in connection with the Motion to Quash the Continuity Subpoena and issued its Order in connection with that motion that same day, which was served on the parties the following day on March 7, 2017.  (Dkt. 234).  In this Order, the Special Master specifically found that the Strataluz Formation Emails were protected by the attorney-client privilege, that the attorney-client privilege was not waived, but that the crime fraud exception applied.  (Dkt. 234 at 11-20).

Defendants Reid and Ferrell did not object to the portions of the Special Master's Order confirming the Strataluz Formation Emails were protected by the attorney-client privilege and that the attorney-client privilege was not waived, but did object to the portions addressing the crime-fraud exception to the attorney-client privilege (Dkt. 234 at 17-20).  In opposing objections by Reid and Ferrell and third-party Weiss, NIC again advanced that "'Strataluz, LLC' was an artifice used by NTG to extort settlement payouts from target 'competing' corporations," and argued that the sworn declarations of the owners of Strataluz, attesting that Strataluz did in fact market and sell a number of products, should be disregarded.

(Dkt. 262 at 7:22-23; 19:5-7).

The resulting orders gave NIC's allegations the benefit of the doubt. The Court stated "[e]vidence in the record suggests that Strataluz may have been designed primarily as a litigation vehicle," and that "there is other evidence that Strataluz never actually sold any products." (Dkt. 299 at 17-18). The Court largely dismissed the declarations of Weiss, Reid, and Ferrell, all of which testified that Strataluz had actual products and sales, finding that "while Weiss, Reid, and Ferrell all submitted declarations that Strataluz was a legitimate business, this does not negate the other evidence — or absence thereof — in the record." (Dkt. 299 at 18).

Thereafter, NIC served broad document requests calling for documents related to Strataluz on Defendants Reid and Ferrell and on Strataluz's former owner and President Jarrod Bentley ("Bentley"), former owner and internal counsel Joshua Weiss ("Weiss") and former owner James Hardin ("Hardin"). In response, they served a total of 1,985 responsive documents spanning 5,151 pages. (Dkt. 564-1, ¶ 2)). The materials were so voluminous that the NTG Defendants were forced to employ a team of six document reviewers working full time for multiple weeks. (*Id.*) The hard cost of the document review alone, excluding the substantial time of defense counsel, exceeded $40,000. (*Id.*)

Defendants Reid and Ferrell served a privilege log for the privileged Strataluz documents on September 22, 2017. NIC sent a meet and confer letter requesting subject matter descriptions for that privilege log on November 2, 2017. (Dkt. 564-3 at 2-3). On November 9, 2017, Reid and Ferrell declined NIC's request based on established precedent and the Special Master's prior ruling, but did identify the general categories to which documents on the privilege log belonged. (Dkt. 564-4 at 2-3). On December 22, 2017, which was three months after the privilege log had been served, NIC sent a letter claiming for the first time that because Strataluz had been dissolved, "all of the documents identified in the

Strataluz privilege log are not subject to privilege protection and must be produced," and that "work-product protection may not be invoked in this litigation for documents prepared by or for Strataluz LLC because Strataluz LLC is not a party to this litigation." (Dkt. 564-5 at 3-6).

### B. The Evidence Proves that Strataluz Operated as a Legitimate Health Product Sales Company

The Strataluz documents that have been produced and the related testimony of individuals such as former President Jarrod Bentley disprove NIC's prior allegations that Strataluz was a "sham" formed "solely to pursue legal claims . . . ." with "fictitious" products that never "participated in the commercial market." (Dkt. 198 at 5; Dkt. 202 at 28:6-12, 28:27-28). Bentley testified that far from being a sham litigation contrivance, Strataluz grew out of a "general business plan" by Bentley to "market products via television infomercials." (Dkt. 564-2 at 6: 8-16). When asked why "you needed Scott F[e]rrell, James Hardin and David Reid," Bentley explained "I needed capital." (*Id.* at 6:23-36:10). The arrangement was that Bentley "brought the knowledge of direct marketing, and they brought money to the table." (*Id.*). Consistent with this, early emails between Bentley and the future owners of Strataluz, including Reid and Ferrell, discuss plans and hopes for an "extremely successful" health and supplement company. Declaration of James M.Sabovich ("Sabovich Decl."), Exh. A (NTG063808) ("I wanted to get you something to start going over. I've included some initial numbers, and will also send you some rough commercials that we can discuss . . . I'm convinced that we can be extremely successful.); Exh. B (NTG063805) (Email from Reid responding "I like what I see and think we can really build something successful); Exh. C (NTG063802) (product planning email from Bentley stating listing "timing/things to do" as "2 Minute Booty, Glutia, Acne Freeze, Diet Pill, More for All Products, including Telemarketing, Fulfillment, SEO, getting the product and procuring testimonials, can't wait to get started."). In early March of 2014, Weiss met with

owner of VB Cosmetics and discussed 40 potential products, including "anti-aging" lotions which are doctor formulated, a possible joint venture, and the possibility of VB acquiring equity in Strataluz.  Sabovich Decl., Exh. D (NTG063745).

By mid-2014, Strataluz was close to being fully operational with accounts, logistics, advertising, and multiple products.  A May 28, 2014 "update" from Bentley discusses the progress to date and explains:

- "It has taken longer to get accounts set up than I would have liked but there has been a lot of going back and forth on the contracts. Josh has prevailed though and we now have accounts with fulfillment, telemarketing, media, merchant processing, and web ordering."
- "Fulfillment will be done at Moulton Logistics. They will handle all of our customer service, shipping, chargebacks, and mostly everything to do with customer interaction."
- "Telemarketing will be done at West and they are in the process of setting up our call centers and order taking systems. To test, we will use live operators. After we figure out what the customers best respond to, we will switch to automated phone order systems (IVR.)"
- "The websites will be up an running within the week and what I've seen so far, I think they're going to be awesome."
- "We do still need to get liability insurance. Josh is working on our seller's permit."

Sabovich Decl., Exh. E (NTG063506).  After providing updates on Glutia and 2 Minute Booty – including stating that the later "is ready to ship from China," Bentley summarizes "[s]o, bottom line is that the next few weeks will be busy finalizing everything for test dates of the 16th and 23rd of June."

As for other products, Bentley states "we are still working on the cholesterol pill and the penis pill (for lack of a better description.) The nail polish is at a stand still for now. I'll send updates to the commercials ASAP." (*Id.*). Reid and Ferrell also produced many documents discussing Strataluz's real product, strategies for them, and business strategies for Strataluz overall. (Sabovich Decl., Exh. F-I (NTG063389) (Aug. 13, 2014: detailed update on multipole products); (NTG063599) (Aug. 24, 2014: discussion of Strataluz progress to date, noting that "most of the costs to-date have been setup" and that they do not want to "buy other people's ideas or spread themselves too thin launching 8 products"); (NTG063546) (June 4, 2014: Bentley updating owners on a meeting he had with a "product formulator" in which they "discussed 3 new products: 1.) Sleeping Pill, 2.) Male Enhancement Pill, and 3.) Diet Pill."); (NTG063550) (June 4, 2014: email from Ferrell stating I share Jarrod's perception that, with our infrastructure in place, it will be easier to launch additional products.)).

Bentley explained in detail how order fulfillment at Strataluz worked. "The manufacturer will send the bottles of inventory to the fulfillment house. The fulfillment house will receive records from us, and then they would send those orders out." (*Id.* at 10:21-11:16). Bentley testified that he already had the rights to one Strataluz product, the 2 Minute Booty (Dkt. 564-2 at 9:1-10), and that it initially made a profit, but ultimately did not, (*id.* at 12:22-13:3). He also testified that Strataluz developed other products, including Eversilk, Delete Diet Pill, Glucoslim, and ProMaxal. (*Id.* at 43:7-19). Some products were private labeled while others were formulated. Bentley explained that it "depends on the product. For EverSilk I was interested in pursuing a cellulite slimming cream. So I contacted a bunch of manufacturers in that area, did some searches, and found companies that I felt were able to provide product at a reasonable price, and was looking for things like substantiation for the claims, looking for ingredients that might be added to help with the marketing." (*Id.* at 14:8-48:2; *see also* Sabovich

Decl., Exh. J (NTG065783) (contract with Moulton Logistics Management for fulfillment services)).

Ferrell produced detailed spreadsheets from 2014 and 2015 listing numerous fees, including merchant fees, bank fees, internet fees, and shipping and mailing fees.  Those spreadsheets also listed inventory and suppliers, expenses for production, expenses for order fulfilment, and telemarketing, media, tape duplication, office supplies and professional services expenses.  (Dkt. 564-8 at 1-7; Dkt. 564-9 at 1-11).  Those spreadsheets document in detail over $90,000.00 in business expenses in that timeframe.  (*Id.*).  Internal documents confirmed hundreds of sales and substantial spending on advertising.  (Dkt. 564-10 at 2). Strataluz's websites for many products allowed purchases.  (Dkt. 564-1 at 18:4-13).  Internal emails include detailed, comprehensive product marketing strategies and profitability analysis.  For example, on July 15, 2015, Jarrod Bentley sent an email to Scott Ferrell, David Reid, and Joshua Weiss providing a general update and proposed strategy:

> We ran another test for Eversilk last week with a $4k media spend. The hope on this test was to see if we could duplicate some of the earlier results that we had seen in the overnight airings - but now with a bigger budget. Although we were hoping for a 2 to 1 MER, we came in a little lower with a 1.4 to 1 MER - meaning for every dollar we spent on media, we got $1.40 back. For this campaign our break even is right around this number. This factors in media, inventory, telemarketing, fulfillment, returns and bad debt. Also, to save money I've been doing the fulfillment and customer service.

(Dkt. 564-11 at 2).  Bentley explains that this means that "[m]aking money on this campaign will come in retail. However, getting into retail will take about 6 months of airing commercials at larger budgets. This is risky but very rewarding in the long-run. (For comparison purposes, Lipozene rarely breaks the 1 to 1 mark, loses

money from television but makes it up in retail.)" (*Id.*).

NIC continues to claim that one of Strataluz's products – a male enhancement called ProMAXAL – "never existed." (*See also* Dkt. 563-1 at 2:19 (NIC claiming that "Mr. Bentley testified that ProMAXAL never existed[.]")). NIC is wrong. That same email discusses ProMaxal. Bentley explains that "I want to focus on products that have the highest potential reward" and "I believe that without a doubt these products *are our Male Enhancement pill – ProMaxal* and a diet pill." (Dkt. 564-11 at 2). Based on that, Bentley proposes, and Scott Ferrell approves, the following strategy:

> I love the ProMaxal story and commercial and am eager to start testing it. I think focusing on this campaign is imperative. Second, I really think we need to do a diet pill campaign. It's the category that I personally know the best and I see a real void in the market right now for a diet pill television campaign. With that said, I've sent (via hightail) a very rough segment of a commercial I've been working on for a diet pill concept and with your approval I'd like to move forward with it. Please forgive the voice over – as mentioned it's rough. After thinking about this and looking at the diet pill concept – let me know what you think or if you have any questions

(*Id.* at 3). This is only one of many detailed product sales strategy assessments. (Dkt. 564-12 at 2-3 (Bentley providing updates on the results of product testing)).

Bentley testified that the product was formulated with a "specific ingredient that [Strataluz] billed ProMaxal around." (Dkt. 564-2 at 16:14-24). Strataluz's internal counsel, Weiss, likewise testified that ProMaxal was formulated. (Sabovich, Exh. K at 59:17-20 (Weiss Dep.) ("Q. And was ProMaxal ever formulated? A. Yes, to the best of my knowledge.")).

## 1. A Chronology of ProMaxal Events Demonstrates ProMaxal Was a Real Product

Internal documents confirm that ProMaxal was a real product into which Strataluz put extensive effort. This is apparent from a timeline of internal documents discussing ProMaxal:

- July 3, 2014. Bentley updates the owners on his meeting with a "product formulator" on three new products, including a "Male Enhancement Pill." (Sabovich Decl., Exh. H (NTG063546)). He states he would like to "start developing these new products ASAP" and requests a release of $50,000 to do so. (*Id.*). The $50,000 is released with Ferrell stating he "I like the idea of the male enhancement pill and the sleeping pill very much. As to male enhancement, the category used to be dominated by Extenze and Enzyte, but both of them have had serious problems recently and don't advertise much." (Sabovich Decl., Exh. I (NTG063550)).

- July 5, 2014. Bentley emails with a commercial update stating "…if everyone could be thinking of some names for the male enhancement pill and sleeping pill that would be great. Getting lots of input on the names can really help." (Sabovich, Exh. I (NTG063550)).

- July 24, 2014. Bentley emails with an update that the formulation for the male enhancement pill and the sleeping pill are under way. (Sabovich, Exh. L (NTG063555)).

- September 4, 2014. Bentley emails with an update stating "[w]e have made some good progress over the past couple of weeks with our spots… Male Enhancement Pill (Excite): . . . Once you give me the green light, I can get the spot on the air within a couple of weeks. I'll be looking to test about $2,000 on this to get a good read on the demand. Also, let me know if you like the pill name – EXCITE."

(Sabovich, Exh. M (NTG063560)).  Strataluz would later settle on the name "ProMaxal."  (Sabovich, Exh. N (NTG066431)).

- December 8, 2014.  Bentley provides an update and assessment stating "In the meantime, I think my time will be better suited to put the Male Enhancement pill spot together.  So that's what I'll be doing over the next couple of weeks."  (Sabovich Decl., Exh. O (NTG064335)).

- May 21, 2015.  Strataluz enters a license agreement for the component for its male enhancement product.  The agreement states "Harcol owns U.S. Patent No. 5,817,364 ("the '364 Patent").  Licensee wishes to sell a male enhancement product that contains alpha-ketoglutaric or a salt thereof…"  (Sabovich, Exh. P (NTG065720)).

- May 24-26, 2015.  There are email exchanges between Jarrod Bentley and graphic artist Kate Griffin regarding the design of ProMaxal packaging.  (Sabovich, Exhs. Q (NTG065976) and R (NTG065975)).

- May 26-27, 2015.  Strataluz principals discuss a "name for our male enhancement product and the proprietary blend it will contain[.]" (Sabovich, Exh. N (NTG066431).

- May 27-28, 2015.  Email exchange between Bentley and principals of Strataluz confirming the male enhancement product name "ProMaxal," that Strataluz has a "domain for it," that Strataluz will "apply for the trademark," and that "our formulation guy should have it to us within the next couple days."  Bentley confirms that Strataluz is "just about finishing on the commercial and website."  The next day, Bentley explains that that he "Just spoke with the formulation people and they are recommending 300mg of AKG per serving" and that as with "the other ingredients, it'll probably be 2 pills per serving."  Bentley and Ferrell then agree that "300mg" is "an effective

dose." (Sabovich, Exh. S (NTG070553)).

- <u>May 27, 2015</u>. Strataluz principals discuss the naming of the proprietary blend to be contained in ProMaxal. Scott Ferrell states "I think that we should also identify our proprietary blend (of AKG, yohimbe, etc.) as 'Patented LIFTgate Technology', 'Patented JackHAMR Technology', or 'Patented Balla Status Technology', since the AKG is patented…" (Sabovich, Exh. T (NTG066446)).

- <u>May 29, 2015</u>. Email from Jarrod Bentley to Scott Ferrell sending a "ProMaxal Rough spot." (Sabovich, Exh. U (NTG063576)).

- <u>June 15, 2015</u>. A spreadsheet documents inventory expense related to "private label nutrition – ProMaxal formulation[.]" (Sabovich, Exh. V (NTG065997)).

- <u>July 1, 2015</u>. Email from Jarrod Bentley regarding his "proposal moving forward." He states that "[i]f I'm going to spend the next 6 months running a campaign/s, I want to focus on products that have the highest potential reward. I believe that without a doubt these products are our Male Enhancement pill – ProMaxal, and a diet pill. First, the ME [male enhancement] pill. I love the ProMaxal story and commercial and am eager to start testing it. I think focusing on this campaign is imperative." (Dkt. 564-11 at 2). Ferrell authorizes the approach, stating "I am totally on board with this and trust your judgment." *Id.*

- <u>July 2, 2015</u>. Email from Jarrod Bentley stating "I really believe that the male enhancement pill and a diet pill is the way to move forward. Once they are successfully running, we can re-visit EverSilk and other products . . . [f]rom my perspective, these two products MUST work. I hate to admit that I've had to learn with the first half of the money with respect to some operational things, but these lessons will give

these next products the greatest chance for success."  Scott Ferrell then confirmed additional investment of $50,000.  (Sabovich, Exh. W (NTG063999)).

- June 5, 2015.  Email from Jarrod Bentley to Scott Ferrell with the subject line "ProMaxal Spot" stating that Bentley "[f]inished up the spot," may "change the VO [voice over]" and is "still working on a blister pack."  (Sabovich, Exh. X (NTG063578)).

- June 8, 2015.  Jarrod Bentley indicates "I've got a website up now for promaxal. It's pretty basic but will continue to refine it and make it much better."  He confirmed that "[a]s for the product, I'll have an a good estimate when we'll have inventory very soon. As mentioned to Scott, this will be around 5-6 weeks but I'll do my best to get sooner." (Sabovich, Exh. Y (NTG063447)).

- August 7, 2015.  Email from Jarrod Bentley forwarding proposed ProMaxal commercial and stating "[w]ith your approval [it] can be on the air next weekend.  (Sabovich, Exh.  Z (NTG063493)).

- August 15, 2015.  Internal spreadsheet confirms a $1,254.00 "TV Media Spend" for "Promaxal."  (Sabovich, Exh. AA (NTG065457)).

- September 29, 2015.  Internal update from Jarrod Bentley explains "I've tested a couple of stations with both ProMaxal and Delete without much luck on either." (Sabovich, Exh.  BB(NTG063495)). To address this, Bentley states that he will work on "toning them down a little to get better coverage" and that he is also "putting together a very comprehensive web campaign." (*Id.*).

NIC has made much of the fact that the ProMaxal website did not allow purchases, invoking this as *prima facie* evidence of fraud.  But as Bentley explained, the ProMaxal commercials were what is referred to in the industry as a "dry test," which is "you're testing a commercial for the purpose to see if the

message resonates." (Dkt. 564-2 at 17:1-20).[13] This is a common technique recommended by numerous articles and commentators. As one commentator explained:

> Unless you have a lot of money and are a crapshooter, you do not want to create product (or publish a magazine or a newsletter) and manufacture a bunch of them without a clue as to whether anybody will buy the thing. You've spent a small fortune for a warehouse full of product, whereupon you have to come up with a ton more money to take it to market . . . My suggestion: take your idea directly to the marketplace via the dry test route.

(Sabovich Decl., Exh. CC (The Art and Science of the Dry Test (Feb. 8, 2011)); Exh. DD (In Praise of Dry Testing) (Aug. 1, 2003); Exh. EE (How to Increase Product Development Success with Ghetto Testing) ("according to the Harvard Business Review, very few new launched products succeed despite tons of R&D and armies of smart people . . . . But marketing and product development folks can improve their odds greatly with a simple technique known as Interactive Dry Testing" which is "a market test to discover whether a product or service is worth pursuing.")).

In sum, the actual evidence in this case proves that Strataluz was a legitimate company and that ProMaxal was a real product.

## C. NIC Has Not Met Its Burden to Compel Production of Documents on Reid's and Ferrell's Privilege Log

NIC seeks generally to deny Reid and Ferrell the protections that the attorney-client privilege and work product protection enshrine. There is no real dispute that the logged documents are either attorney-client communications or

---

13 Barron's Business Dictionary defines a "dry-test" as "promoting a product that is not yet available for delivery to the buyer in order to test response to the product before incurring the costs of producing or delivering the product . . . Dry-testing is not encouraged, but it is legal." Barrons, Dictionary of Marketing Terms: "dry-test" (2018) publicly available at https://www.allbusiness.com/barrons_dictionary/dictionary-dry-testing-4966246-1.html

attorney work product.  NIC seeks to deny those protections to Reid and Ferrell through a combination of inapposite technicalities and misrepresentations.  It claims for the first time that there is no privilege over Strataluz documents because Strataluz has dissolved.  The argument is both foreclosed by the law of the case doctrine and beside the point since Reid and Ferrell, not Strataluz, claimed privilege.  NIC likewise argues that work product cannot apply because Strataluz is not a party to this litigation.  Again, the protection was asserted by Reid and Ferrell who are parties.  Finally, NIC invokes the crime fraud exception based on the fallacy that "NTG filed lawsuits using the Strataluz 'ProMAXAL' product without even having a product."  Only the overwhelming evidence proves ProMaxal was a conceived product that was actually formulated and marketed.  Thus, as explained in more detail below, none of NIC's challenges to Reid and Ferrell's privilege log has merit.

## 2. NIC's Argument That There Is No Attorney-client Privilege Over Strataluz Documents Because Strataluz Dissolved Is Without Merit

The attorney-client privilege protects confidential communications between attorneys and clients made for the purpose of giving legal advice. *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). The U.S. Supreme Court has recognized the attorney-client privilege as "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981); see *U.S. v. Zolin*, 491 U.S. 554, 562 (1989).  Although the underlying rationale for the privilege has changed over time, courts have long viewed its central concern as one "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id*. at 389.  The assurance of confidentiality for attorney-client communications is also "central to the legal system and the

adversary process." *U.S. v. Hodge & Zweig*, 548 F.2d 1347, 1355 (9th Cir. 1977); *Zolin*, 491 U.S. at 562. In addition, the attorney-client privilege protects fundamental liberty interests by allowing individuals to seek the legal advice they need "to guide them through [the] thickets" of complex laws. *UMG Recording, Inc. v. Bertelsmann AG (In re Napster Copyright Litig.)*, 479 F.3d 1078, 1090 (9th Cir. 2007) (abrogated in part by *Mohawk Indus. v. Carpenter*, 558 U.S. 100 (2009)) ("*Napster*").

The parties began litigating the issue of attorney-client privilege over Strataluz documents over one year ago (Dkt. 202) and that issue is now on appeal before the Ninth Circuit. In late December of 2017 – after the Special Master and the Court had already ruled on the issue, and after Opening Briefs had been field in the Ninth Circuit, NIC apparently thought up a new theory. According to NIC, "Strataluz corporate files are no longer privileged after the corporation has been dissolved, terminated, and wound down[.]" In other words, NIC purports to have discovered that no corporate document relating to Strataluz is subject to the attorney-client privilege. That issue, however, was already resolved against NIC when the Special Master held, and NIC did not appeal, that for the Strataluz Formation Emails "the attorney-client privilege applied and the Objectors did not waive the privilege." (Dkt. 299 at 1). The law of the case doctrine precludes NIC from now offering "successively different legal . . . theories that could have been presented in a prior request for review" to secure a ruling that Strataluz documents are categorically excluded from attorney-client privilege. *Investor Prot. Corp. v. Vigman*, 74 F.3d 932, 937 (9th Cir. 1996) (quotations and citations omitted). There is no doubt that NIC could have presented this argument in connection with the Strataluz Email Chain since NIC has now improperly made that argument in its Ninth Circuit brief.

In any event, NIC's argument is without merit. Attorney-client privilege is asserted by Reid and Ferrell, not Strataluz. Even if Strataluz were somehow

necessary for standing, and it is not, by NIC's own allegations Strataluz dissolved after NIC's allegations against it began.  Thus, documents pertaining to those allegations would fairly be regarded as part of the winding up process.

### a) The Law of the Case Doctrine Precludes NIC's Argument that Attorney-client Privilege Over Strataluz Related Documents Ended on Dissolution

The issue of whether the attorney-client privilege applies to Strataluz related documents has already been decided against NIC.  (Dkt. 202).  Beginning in October 2016, NIC sought production of an email chain regarding the "corporate formation" of Strataluz.  (Dkt. 202 at 5).  NTG Defendants Ferrell and Reid, who were owners of Strataluz, sought "to quash the subpoena *duces tecum*" on the grounds of "attorney-client privilege . . . ."  (Dkt. 202 at 7).  In opposition, NIC argued, among other things, that "the Document is not a communication protected by the attorney-client privilege, as the moving parties have not established the essential elements of attorney-client privilege . . . ."  (Dkt. 202 at 8).  The Special Master held against NIC and "ultimately found that the attorney-client privilege applied and the Objectors did not waive the privilege."  (Dkt. 299).  NIC did not file objections.  While the NTG Defendants objected to the Special Master's crime fraud finding, they did not "object to the portions to the Order confirming the Document was protected by the attorney-client privilege and that the attorney-client privilege was not waived[.]"  (Dkt. 245 at 13:21-24).  "[T]he failure to object to findings of fact and conclusions of law entered by a [special master] waives the opportunity to contest those matters on appeal."  *Smith v. Frank*, 923 F.2d 139, 141 (9th Cir. 1991).  Accordingly, that ruling on the applicability of the attorney-client privilege is now law of the case.

As the Court has previously stated "[t]he law of the case "precludes a court 'from reconsidering an issue previously decided by the same court, or a higher court in the identical case" and applies to "issues 'decided explicitly or by

necessary implication' in the previous decision." (Dkt. 299 at 12 (internal citations omitted)).  Under the law of the case doctrine, a party may neither "revisit theories that it raises but abandons," nor "offer up successively different legal or factual theories that could have been presented in a prior request for review." *Sec. Investor Prot. Corp. v. Vigman*, 74 F.3d 932, 937 (9th Cir. 1996) (quotations and citations omitted); *Stephens v. County of Haw. Police Dep't*, 2013 U.S. Dist. LEXIS 4894, *4-5 (D. Haw. 2013) (same); *Shum v. Intel Corp.*, 2008 U.S. Dist. LEXIS 83005, *11 (N.D. Cal. 2008) (same).  A position is rejected by "necessary implication when the holding stated or result reached is inconsistent with the argument." *United States v. Jingles*, 702 F.3d 494, 502 (11ᵗʰ Cir. 2005).  Thus, in *United States v. Jingles*, 702 F.3d 494, 502 (9th Cir. 2012), the Ninth Circuit held that a previous panel decision that "concluded that the variance was harmless" would be "inconsistent with an argument that the indictment denied [defendant] the benefit of the popular scrutiny of a grand jury with respect to those charges, "the prior panel's decision resolved Jingles's constructive amendment claim by necessary implication." *Id.*  This was true even though a "constructive amendment claim" was not made in the prior appeal.

Here, it is undisputable that NIC's dissolution argument is inconsistent with the ruling that the Strataluz Formation Emails are subject to attorney-client privilege.  NIC specifically noted in its prior briefing that Strataluz had been dissolved.  (Dkt. 202 at 30:4-5; 31:4-7).  If, as NIC now contends, Strataluz dissolution ended attorney-client privilege over Strataluz corporate documents, then Reid and Ferrell could not have asserted attorney-client privilege over the Strataluz Formation Emails.  Indeed, NIC corporate dissolution argument is largely cut and paste from its Ninth Circuit brief in which NIC argues for the first time that "the defunct corporation [Strataluz] cannot assert the attorney-client privilege" over the Strataluz Formation Emails.  (Sabovich Decl., Exh. FF at 59 (NIC Answer Brief Dkt. 40)).

NIC may respond that it did not expressly argue dissolution in prior briefing. However, under Ninth Circuit law, NIC is not free to continually make up "successively different legal or factual theories that could have been presented in a prior request for review" to reach a different result. *Sec. Investor Prot. Corp.*, 74 F.3d 932 at 937. Again, NIC knew and pointed out that Strataluz had dissolved. According to its current brief, "California Courts," "courts in the Ninth Circuit," and "Courts nationwide" have "consistently held" that dissolution ends attorney-client privilege. NIC's statement of the law is incorrect, but it must have at least considered this theory earlier and simply chose not to present it. NIC may not now, after the issue of Reid's and Ferrell's standing to assert attorney-client privilege over Strataluz corporate documents has been decided, argue for the first time that Reid and Ferrell lack standing to assert attorney-client privilege over Strataluz corporate documents.

The judicial "efficiency and consistency" concerns that animate the law of the case doctrine are particularly implicated here because NIC has concurrently raised this argument before the Ninth Circuit and now in this Court. Thus, NIC has brought the parties and Court into the procedural twilight zone where the same argument in the same case is pending before both the trial court and the reviewing appellate court at the same time. This raises a morass of jurisdictional and consistency problems such that any substantive ruling by the Special Master or the Court would potentially be subject to reconsideration based on the Ninth Circuit's treatment of that same argument. Circumstances such as these are precisely why the law of the case doctrine allows a party "his bite at the apple" and not "a second bite unless one of the exceptions to the law of the case doctrine applies." *Jingles*, 702 F.3d at 502.

If NIC truly believed that the dissolution of Strataluz ended attorney-client privilege for all Strataluz related documents, it should have said so when it first sought Strataluz attorney-client communications. It did not, nor did it object to the

Special Master's order holding that Reid and Ferrell held an attorney-client privilege over the Strataluz Formation Email. Accordingly, the law of the case doctrine forecloses NIC's dissolution argument.

### b) NIC's Newfound Position On Strataluz Dissolution Is Without Merit

NIC has latched onto the general line of cases addressing whether a dissolved and completely closed corporation that has been sued may nonetheless assert the attorney-client privilege[14] "when it must defend itself as a party to litigation." *Lopes v. Vieira*, 688 F. Supp. 2d 1050, 1061 (E.D. 2010). *City of Rialto v. U.S. Dep't of Def.*, 492 F. Supp. 2d 1193, 1197 (C.D. Cal. 2007), relied upon by NIC, is representative of the issue. In *City of Rialto*, the Court for the Central District of California found that a successor entity to a corporation that went bankrupt and dissolved in the 1950s "became the sole shareholder of [the bankrupt company] and acquired all of [its] assets" and that the successor "acquired the attorney-client privilege" at that time as well. *City of Rialto*, 492 F. Supp. 2d at 1201. The court concluded that an assertion of privilege by the long-dissolved company was ineffective because that entity no longer existed and therefore had no privilege to assert; the successor entity's failure to assert the privilege was deemed a waiver. *City of Rialto*, 492 F. Supp. 2d at 1196-1201. Relying on such inapposite authority, NIC maintains that "under applicable precedent, Strataluz may no longer claim privilege."

NIC is confused. Strataluz is not a party to this case nor did NIC attempt to subpoena it. Strataluz did not serve a privilege log. As should be apparent, attorney-client privilege is asserted by Reid and Ferrell who are both attorneys and independent clients. For example, it has already been established that Reid and

---

14 NIC seems at points to take the position that dissolution affects both the attorney-client privilege and attorney work product. To be clear, even if dissolution affected the attorney-client privilege, and it did not here, that would have no effect on work product. *Software Rights Archive, LLC v. Google, Inc.*, 2010 U.S. Dist. LEXIS 11581, *5 (N.D. Cal. 2010); *In re JMP Newcor Int'l, Inc.*, 204 B.R. 963, 964, (Bankr.N.D.Ill.1997) (distinguishing between the attorney-client privilege and work product in the context of corporate dissolution).

Ferrell "retained the services of attorney Craig Etem of the law firm Lionel Sawyer & Collins for the purposes of forming Strataluz and for related legal work." (Dkt. 202-3 at 45, ¶ 3; 48, ¶ 3). None of the cases cited by NIC even consider the proposition that a client who retains an attorney to form a corporation loses attorney-client protection if the resulting corporation is dissolved.

Even if the assertion of attorney-client privilege were somehow dependent on the corporate existence of Strataluz, and it is not, that condition would be met in this context because dealing with NIC's allegations and discovery demands is fairly regarded as winding up. *City of Rialto*, which *Lopes* and the other cases cited by NIC follow, addressed California corporations and specifically whether those corporations maintain the authority to assert the attorney-client privilege post-dissolution as they existed in 2007. Specifically, *City of Rialto* relied upon sections 1905 and 2010 of the California Corporations Code, and case law interpreting those sections, to hold that a dissolved California corporation lacked the formal capacity to assert the attorney-client privilege. *City of Rialto*, 492 F. Supp. 2d at 1197-99. In doing so, the Court noted that "there are no California cases directly on point." *Id.* at 1999. That is no longer the case as California courts have now consistently held that dissolved corporations do have authority to assert attorney-client privilege in litigation. *Favila v. Katten Muchin Rosenman LLP*, 188 Cal. App. 4th 189, 220 (holding that, under California corporate law, "a dissolved corporation continues to exist for various purposes [so] . . . the persons authorized to act on the dissolved corporation's behalf during the windup process—its ongoing management personnel—should be able to assert the privilege, at least until all matters involving the company have been fully resolved and no further proceedings are contemplated"); *Reilly v. Greenwald & Hoffman, LLP*, 196 Cal. App. 4th 891, 903-904 (2011) ("*Rialto* acknowledges that when it was decided, there was no California law determining whether a corporation loses the attorney-client privilege on dissolution. Now we have the opinion

in *Favila*[.]").

By NIC's own allegations, it has caused Strataluz to have ongoing affairs. NIC's allegations against Strataluz began before Strataluz dissolved and have not yet stopped.  Without any apparent appreciation of the irony, NIC claims in a federally filed brief describing its longstanding litigation to obtain Strataluz documents that "[a] query of all federal and state dockets nationwide reveals no active litigation or ongoing legal matters involving 'Strataluz.'"  NIC's argument entirely ignores the current litigation which it obviously cannot do.

Since a corporation "should be able to assert the privilege, at least until all matters involving the company have been fully resolved and no further proceedings are contemplated," *Favila*, 188 Cal. App. 4th at 220, and NIC's pre-dissolution allegations and litigation pertaining to Strataluz are not yet "fully resolved," the privilege still exits. Here the circumstances are more similar to *Reilly* and *Favila*.  There, the respective courts held that the attorney-client privilege did apply in shareholder derivative actions against the dissolved corporation's outside counsel.

### c) **NIC's Position That Documents Designated NTG063804 and NTG063502 Should Be Produced in Unredacted Form Is Without Merit**

Reid and Ferrell properly produced two documents, NTG063804 and NTG063502, with privileged information redacted.  NIC responds with the curious objection that because the unredacted information is non-privileged business discussions, the "redactions should be removed and the documents produced in their entirety."  NIC's position is nonsensical.  Material was redacted was because it was not unprivileged business discussions but rather attorney-client and work product information within an email that happened to also contain unprivileged information.

NIC claims that "[b]ecause the communications were exchanged between those individuals in their capacities as business owners (not attorneys), at a time when no specific litigation was threatened, pending, or anticipated, the communications are not protected by the attorney-client privilege." As noted above, NIC offered this same argument against application of the attorney-client privilege to the Strataluz Formation Emails and the Special Master nonetheless found that privilege applied. Consequently, the law of the case doctrine precludes this argument. *Supra*.Part.III.A.1.

### 3. Work Product Applies Because Attorneys Have Standing to Assert Work Product Objections

NIC invokes the general rule that Rule 26(b)(3) "limits its [work product] protection to one who is a party (or a party's representative) to the litigation in which discovery is sought," *In re California Public Utilities Com.*, 892 F.2d 778, 781 (9th Cir. 1989), to argue that parties to this case in which discovery is sought may not assert work product protection. The obvious flaw is that Reid and Ferrell are parties to this case.

Rule 26(b)(3) provides that "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. Proc. 26(b)(3). As the Ninth Circuit held in *In re California Public Utilities Com.*, 892 F.2d 778, 781 (9th Cir. 1989), the literal language of this rule requires the work product assertion be by a "party" to the action. In *In re California Public Utilities Com.*, and other cases cited by NIC, the "the sole reason work product protection could not be invoked was because the person who refused to comply with the subpoena ***was not a party***." *Loustalet v. Refco, Inc.*, 154 F.R.D. 243, 247 (1993) (emphasis added). Courts have characterized this as a "standing" issue, where the objecting party lacks standing to assert an objection under Rule 26(b)(3). *Id.*

Caselaw holds that this rule has no applicability where "the documents from the prior litigation *were* prepared by or for a party to the subsequent litigation." *Tennison v. City & County of San Francisco*, 226 F.R.D. 615, 620 (N.D. Cal. 2005) (emphasis in original).  Reid and Ferrell are quite undisputedly "parties" to this litigation.  As attorneys, they have independent standing to assert work product objections over their attorney work product.  Work product protection may be asserted by either the attorney or the client since "an attorney has an independent right to claim work-product protection."  *Memry Corp. v. Ky. Oil Tech., N.V.*, 2007 U.S. Dist. LEXIS 104031, at *7 (N.D. Cal. 2007).  "It is well-established that the work-product privilege may be invoked by either the client or the attorney" and that "[a]n attorney has an independent interest in privacy" and may invoke work product "as long as invoking the privilege would not harm the client's interests." *Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir. 2006).  This is true even when the client lacks standing to assert work product objections.  *Software Rights Archive, LLC v. Google, Inc.*, 2010 U.S. Dist. LEXIS 11581, *5 (N.D. Cal. 2010) ("The work product doctrine may protect documents from disclosure and the attorney, as well as the client, does have standing to assert it even if the client does not.").

In response NIC goes to war with the text of Rule 26(b)(3).  While NIC's positions are far from clear, it seems to argue that because Reid and Ferrell were also owners of Strataluz they were not truly "independent attorneys" so "[a]ll of their communications belong to the Strataluz corporation, and Strataluz is not a party to this case."  This is wholly fabricated – there is no subjective "independence" requirement for counsel to assert work product.   Next, NIC claims "the dispositive question is whether the documents were prepared *for a party* in this litigation . . . ."  Actually, the dispositive question is whether the document was prepared "***by or*** for another party . . . ." to the litigation.  Fed. R. Civ. Proc. 26(b)(3).  Work product prepared by the NTG Defendants falls literally within that

term.  NIC laments that "Strataluz clearly cannot assert Rule 26(b)(3) protections, but NTG argues that it, as Strataluz's purported counsel, could yet assert those same protections where the client would be compelled to produce same by subpoena (if the corporation still existed and were subject to subpoena)."  To the extent this is interpretable, it is also beside the point because NIC sued attorneys and attorneys have independent standing to assert work product objections.  In the end, NIC is unable to cite any case that has held that a party attorney cannot assert work product objections.

Finally, NIC argues a compelling need by alleging that "[t]he documentation at issue directly relates to the NTG Defendants' intentions and motivations concerning the use of Strataluz as a litigation vehicle."  According to NIC, its "RICO allegations depend on elements of scienter which require exploration of the NTG Defendants' mindset when pursuing these cases, particularly the ProMAXAL litigation which was pursued under fraudulent circumstances."  NIC's arguments here to not establish compelling need.  To compel disclosure of Defendants' fact work product, NIC must show both a "substantial need" for the information in the documents and an inability to "obtain their substantial equivalent by other means." *See* FRCP 26(b)(3)(A)(ii).  Moreover, assuming NIC could satisfy this burden, FRCP 26(b)(3)(B) still requires the Court to "protect against disclosure of [opinion work product]."  As to opinion work product, Subdivision (B) provides that "[i]f the court orders discovery of those materials, it must protect against disclosures of the mental impressions, conclusions, opinions, or legal theories of a party's attorney … concerning the litigation." Fed.R.Civ.P. 26(b)(3)(B); *see also Upjohn Co. v. U.S.*, 449 U.S. 383, 401 (1981) ("As Rule 26 and *Hickman* [*v. Taylor*, 329 U.S. 495 (1947)] make clear, [opinion] work product cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship.")  Specifically, NIC must show Defendants' "mental impressions are ***at issue*** in [the] case ***and the need for the material is compelling***." *See*

*Holmgren v. State Farm Mut. Auto. Ins. Co*., 976 F.2d 573, 577 (9th Cir. 1992) (citing *Upjohn Co*., 449 U.S. at 401-02). (emphasis added)

NIC has no need for work product, much less a substantial one.  To be clear, neither Strataluz nor ProMaxal are even mentioned in NIC's currently operative complaint.  (Dkt. 92).  The Court only authorized discovery based on NIC's allegations of the NTG Defendants having formed "sham corporate entities solely to pursue legal claims."  (Dkt. 198 at 5).  As detailed above, the NTG Defendants have produced extensive documentation regarding Strataluz to NIC and NIC has already taken the depositions of Bentley and Weiss.  That evidence proves to any reasonable observer that Strataluz made, marketed, and sold products.  (Supra.Part.II.B). Indeed, NIC no longer even argues that Strataluz was formed to bring sham litigation.  The result of NIC's foray into Strataluz, with the vast consumption of party and judicial resources that entailed, are limited allegations regarding a single product – ProMaxal.  As set forth above, NIC already has extensive documentation related to the formation of Strataluz, sales of Strataulz products, development of ProMaxal, dry testing of ProMaxal and marketing strategies related to ProMaxal.  Further, despite NIC's arguments to the contrary, Strataluz and ProMaxal are not necessary for its RICO claims as neither the entity nor the product form any of the predicate acts for NIC's RICO allegations.

NIC also cannot claim it has a "substantial" or "compelling need" for the work product while simultaneously claiming it has already obtained evidence that demonstrates the Defendants' alleged unlawful scheme.  Yet that is exactly what NIC does.  For example, in its Objections to the Special Master's Crime-Fraud Order, NIC insists that it has:

- "proved the eight SAC cases were in furtherance of a scheme to defraud corporations.  Each fact in NIC's motion was supported by documentary evidence."  (Dkt. 473 at 22:22-23.)

- "established by a preponderance of the evidence that in the eight cases

at issue the Defendants filed sham lawsuits that alleged injuries that were in fact staged." (*Id*. at 1:4-5.)

- "prove[d] by a preponderance of the evidence that Defendants operated an unlawful, fraudulent scheme to defraud corporations through staged litigation built on contrived 'consumer injuries.'" (*Id*. at 1:11-2:9.)

- "prove[d] that Sandoval purchased product specifically for litigation after meeting with NTG attorneys, which rendered his Complaint objectively false." (*Id*. at 14:15-17; see also *id*. at 14:21-27.)

(*See also id.* at 5:3-12, 15:14-15, 17:13-16 and 18:19-21.)

Similarly, in opposition to the NTG Defendants' Motion for Summary Adjudication related to the "CIPA Scheme," NIC claims it has (1) "established that NTG has a consistent and ongoing pattern of pursuing fraudulent litigation consistent with NIC's allegations in the Second Amended Complaint"; (2) "established the NTG defendants' policy and practice of using hired plaintiffs to pursue staged legal cases"; and (3) "proven a prolonged pattern of unlawful activity by NTG." (*See* Dkt. 480 at 11:4-6, 11:16-17 and 15:19; *see also* Dkt. 247 (NIC's Opp. to MSJ re malicious prosecution) at 19:14-22 (asserting the "evidence obtained in discovery provides substantial evidence for a jury to conclude that Nilon's claim was staged and meritless").) By NIC's own words, it does not have a substantial need for the work product protected information because it claims to already have sufficient evidence to prove its RICO allegations through multiple other sources.

### 4. **NIC Has Not Met Its Burden of Showing Crime Fraud With Regard to ProMaxal**

Finally, NIC offers a series of misleading statements, material omissions, trivialities, and outright misstatements in the hopes of again securing a crime fraud windfall in its favor. Only now Strataluz documents have been produced and

Strataluz's principals deposed.  The resulting evidence shows beyond any reasonable doubt that NIC's allegations that Strataluz was a "sham" corporation, with "fictitious" products (Dkt. 202 at 28:6-12) were false.  Detailed expense and sales spreadsheets, internal marketing and sales strategies and discussions, vendor exchanges, and accounting documents for these supposedly "fictitious" products were produced.  *Supra*, Part.II.B.  Strataluz's non-party former President, who by NIC's own allegations had no involvement with litigation, gave credible testimony on Strataluz's founding, product development, product marketing and sales.  (*Id.*).  In sum, he and the documentary evidence confirm that everything NIC told the Special Master and the Court about Strataluz was untrue.  As explained below, NIC's latest attempt to obtain a crime fraud ruling based ProMaxal is no better.  And contrary to NIC's assertions, this Court's hearing questions to counsel do not endorse NIC's latest ProMaxal theory.

The law sets a high standard for one seeking to invoke the crime fraud exception, one that NIC comes nowhere near meeting.  Exceptions to the attorney-client privilege are not to be found lightly since "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.'" *United States v. Mett*, 178 F.3d 1058, 1065 (9th Cir. 1999). Consistent with this, the Court in *Laser Indus. v. Reliant Techs.*, 167 F.R.D. 417, 430-31 (N.D. Cal. 1996) explained that if "it would have been rational . . . for the trier of fact to draw either inference," then the crime-fraud exception does not apply). Moreover, "[a] moving party does not satisfy [its] threshold burden merely by alleging that a fraud occurred and asserting that disclosure of any privileged communications may help prove the fraud. There must be a *specific* showing that a *particular* document or communication was made *in furtherance* of the client's alleged crime or fraud." *In re BankAmerica Corp. Sec. Litig.*, 270 F.3d 639, 642 (8th Cir. 2001) (emphasis added).

In the Ninth Circuit, a party seeking to vitiate the attorney-client privilege

under the crime-fraud exception must satisfy a two-part test. "First, the party must show that 'the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme.'" *United States v. Doe (In re Grand Jury Investigation)*, 231 Fed. Appx. 692, 695 (9th Cir. 2007). Second, that party "must demonstrate that the attorney-client communications for which production is sought are 'sufficiently related to' and were made '*in furtherance* of [the] intended, or present, continuing illegality.'" *Id.* (quoting *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1097 (9th Cir. 2007), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 130 S. Ct. 599, 175 L. Ed. 2d 458 (2009)). Application of the "crime-fraud exception requires a showing of 'probable cause to believe' that each of the particular attorney-client communications at issue was used in furtherance of [a] crime or fraud." *Macnamara v. City of New York*, 2008 U.S. Dist. LEXIS 3937, *12-15 (S.D.N.Y. 2008); *In re BankAmerica Corp. Sec. Litig.*, 270 F.3d 639, 642 (8th Cir. 2001) (There "must be a *specific* showing that a *particular* document or communication was made *in furtherance* of the client's alleged crime or fraud."). The party seeking to invoke the crime fraud exception "cannot rest merely upon the movant's presentation of a 'theory' regarding widespread fraud." *Macnamara*, 2008 U.S. Dist. LEXIS 3937 at 13. Mere allegations that a lawyers services were used in furtherance of a crime and that relationship between the document in question and the service are insufficient.

NIC, relying on *United States v. Chen*, 99 F.3d 1495, 1504 (9th Cir. 1996), assigns itself a light burden, contending that it need only show that "the document have some reasonable relationship to the fraudulent scheme" to invoke the crime fraud exception. But in *United States v. Doe (In re Grand Jury Investigation)*, 231 Fed. Appx. 692, 695 (9th Cir. 2007) the Ninth Circuit expressly rejected that exact standard and interpretation of the *Chen* decision. There, a district court correctly found reasonable cause defendant engaged in illegal stock loans, stock

manipulation and made false and misleading statements in SEC filings and therefore ordered disclosure of communications between defendant and his counsel. *Id.* The Ninth Circuit reversed:

> The district court ordered disclosure of otherwise privileged documents and communications on the basis of a showing that: (1) the Law Firm's services were used in furtherance of a crime or fraud; and (2) there is a reasonable relationship between the communications and the illegality. This analysis was improper because the crime-fraud exception applies only to documents and communications that were themselves in furtherance of illegal or fraudulent conduct.

*Id.* at 695.

This bears repeating - the district court's "analysis was improper because the crime-fraud exception applies only to documents and communications that were themselves in furtherance of illegal or fraudulent conduct." *Id.* In that case the Government, as NIC does, relied on the *Chen* decision's light "reasonable relationship" standard. *Id.* However, the Ninth Circuit explained that the passage in *Chen* "does not articulate an alternative, less stringent 'in furtherance' test that focuses only on the intent in employing attorneys," and that earlier *Chen* had itself reiterated that the communications at issue must be "in furtherance of an intended or present illegality . . . .'" *Id.* (quoting *United States v. Chen*, 99 F.3d 1495, 1504 (9th Cir. 1996)).

In sum, when measured against the correct standard, NIC's allegations regarding ProMaxal fail to establish that the crime fraud exception applies.

### a) The Court's Prior Orders Do Not Support a Crime Fraud Finding for ProMaxal Documents

The entire premise of discovery into Strataluz was NIC's allegation that Strataluz was a "sham" formed "solely to pursue legal claims . . . ." (Dkt. 198 at

5).  That allegation is no longer tenable in light of the overwhelming internal and testimonial evidence that Strataluz made, marketed, and sold actual products.  NIC sought review of a single email chain based on that theory.  While the Court gave NIC the benefit of the doubt on NIC's "sham" corporation theory, the Court later clarified the limited nature of its holding.  Specifically, the Court stated:

> The Court has not conclusively determined that Strataluz was a "sham entity" or that its litigation activities were baseless.  Instead, the Court has only determined that (1) NIC proffered sufficient evidence to receive an in camera review and (2) that evidence, combined with the Court's in camera review, shows that it is more likely than not that ***the Document*** falls under the crime-fraud exception to the attorney-client privilege.  ***Any attempt by NIC to extend this factual determination to other areas of the litigation will likely require a further evidentiary showing.***

(Dkt. 348-1 at 15 (emphasis added); *see also* Dkt. 299 at 21 (limiting decision to the documents at issue)).  Thus, the Court's ruling on the Strataluz Formation Emails have no effect on NIC's current Motion, especially in light of the fact that the NTG Defendants have now produced substantial evidence disproving NIC's theory that Strataluz was merely a "sham" corporation.

NIC now admits that Strataluz "caused some products to be designed and eventually manufactured," rendering its prior theory de-bunked.  NIC, however, argues that at the April 17, 2017 Hearing, the Court ratified a theory that would allow crime fraud to be invoked even where Strataluz was formed as legitimate corporation with actual products and even "completed some minimal sales."  In particular, NIC latches onto limited questioning by the Court that if one where to form a corporation and "sell a bogus line of goods, and [also] sell three good valuable lines of goods. Why does it follow that selling the good lines immunizes the bad line?"  (April 17, 2017 Hearing Tr. at 17:10-12).  Contrary to NIC's

representation, the Court did not take a "position" – the transcript simply reflects probing questions to counsel.  The issue is not addressed in the Court's final order. (*See generally* Dkt. 299).

More importantly, the circumstances have changed.  NIC is no longer seeking *in camera* review of single document.  Rather, now it seeks review of 339 documents and does so based on a demonstrably false claim that ProMaxal never existed.  Thus, the issue is no longer whether a party can invoke the crime fraud exception when the corporation or one of its products is a "sham" imagined for fraudulent litigation.  Those allegations cannot survive contemporaneous emails from Bentley – who by NIC's allegations had no involvement in litigation – explaining "without a doubt these products" that "have the highest potential reward" are "our Male Enhancement pill – ProMaxal and a diet pill."  (Sabovich Decl., Exh. GG (NTG063459)).  Nor can they be reconciled with internal emails – dated before a single demand letter was ever sent – showing that Bentley had "[j]ust spoke with the formulation people and they are recommending 300mg of AKG per serving," for ProMaxal, and confirming that dosage before "proceeding."  (Sabovich Decl., Exh. S).

### b) **NIC's Allegations That ProMaxal Did Not Exist Are Undisputedly False**

NIC brought this Motion on an undisputedly false premise "the Strataluz 'ProMAXAL' litigation was fraudulent," because, according to NIC, "[d]iscovery has revealed that ProMAXAL, in fact, never existed and was instead a concept that NTG used solely for litigation purposes."  That is false:  the overwhelming documentary and testimonial evidence proves that ProMaxal was a genuine product.  Shortly after Strataluz was formed, and well before any demand letter was sent, work began on the "male enhancement" product that became ProMaxal. (Sabovich Decl., Exhs. I and L (NTG063550; NTG063555)).  That pill was one of the topics of a meeting with a formulation expert in July of 2014 and $50,000 in

funding was approved for that and other projects.  Sabovich Decl., Exh. H (NTG063546).  Internal discussions show the male enhancement project was favored due to weak competition:  "As to male enhancement, the category used to be dominated by Extenze and Enzyte, but both of them have had serious problems recently and don't advertise much."  Sabovich Decl., Exh. I (NTG063550).  By September 2014 Strataluz was already testing commercials for the product.  (Sabovich Decl., Exh. M (NTG063560)).  Beginning in May 2015 the product took final shape.  Strataluz executed a license for the active ingredient.  (Sabovich Decl., Exh. P (NTG065720)).  It commissioned graphic design work for the packaging.  (Sabovich Decl., Exhs. Q & R (NTG065976; NTG065975)).  The principals discussed and decided on the name ProMaxal.  (Sabovich Decl., Exh. S (NTG070553)).  They also discussed the branding of the "propriety blend" it would contain, including the name "LIFEGATE," which was to be based on the patent that Strataluz had licensed.  (Sabovich Decl., Exh. T (NTG066446)).  Far from being an amorphous concept, the product was actually created and marketed.  Bentley testified that ProMaxal was formulated.  (Dkt. 564-2 at 16:14-24).  Internal emails confirm that formulation work, including the specific ingredients and dosage, and estimates for obtaining inventory of ProMaxal in the near term.  (Sabovich Decl., Exh. Y (NTG063447).  Internal documents likewise demonstrate extensive and sophisticated direct marketing as well as sales work and strategies for ProMaxal.  Multiple commercials were produced, aired and the results analyzed.  (Sabovich Decl., Exhs. HH-NN (NTG063577; NTG063614; NTG063430; NTG065929; NTG063457; NTG063495; NTG065457)).  Specific adjustments were made to marketing based on issues identified, such as "clearance" issues with stations.  (Sabovich Decl., Exh. MM (NTG063495)).  Bentley – who NIC agrees was not involved in litigation – stated "I really believe that the male enhancement pill and a diet pill is the way to move forward" and reiterated his commitment to the project:  "[f]rom my perspective, these two

products MUST work." (Sabovich Decl., Exh. W (NTG063999)). When Bentley requested additional funding of $50,000 for ProMaxal work, the money was allocated. Even as late as September 29, 2015 – over three months after demand letters were sent – internal documents show diligent and genuine work on ProMaxal and an optimistic assessment by its President, "I'm working on doing this but I'm also putting together a very comprehensive web campaign. This should be completed very soon and I'll send you the web videos as they are done. I'm still optimistic about everything and hope to send you good news soon." (Sabovich Decl., Exh. MM (NTG063495)).

NIC dismisses Bentley's sworn testimony that ProMaxal was "formulated," and thus quite obviously a real product, by telling the Special Master that "no documentary evidence substantiates that point." As seen above, that is not true. (Sabovich Decl., Exhs. L; Y; S; W (NTG063555; NTG063447; NTG070553; NTG065997)). As for Bentley's testimony, NIC's only response is to quibble that he could not recall from memory certain precise two year old details, such as the exact cost of formulation and ingredients used in the formulation. That hardly undermines his testimony, supported by contemporaneous documents, that ProMaxal was formulated. And in any event Strataluz's internal counsel, Weiss, also testified that ProMaxal was formulated. (Sabovich, Exh. K at 59:17-20 (Weiss Dep.) ("Q. And was ProMaxal ever formulated? A. Yes, to the best of my knowledge.")).

NIC's other arguments against ProMaxal are at best misleading. NIC equates the fact that the ProMaxal website refused sales with illegitimacy and fraud. In reality it was legitimate "dry testing," an accepted and common practice in the industry. *Supra*.Part.II.B. NIC's allegations are particularly disingenuous because internal documents show that Strataluz was actively working on, and close to obtaining, inventory of ProMaxal. (Sabovich Decl., Exhs. Y; W (NTG063447; NTG065997 (inventory expense related to "private label nutrition – ProMaxal

formulation)).

Next, NIC disputes the existence of "LIFTGATE" technology and the claim of patent protection. It claims that "like ProMAXAL, the LIFTGATE technology never existed." NIC's supposed evidence is that Bentley, multiple years after the fact, did not recall the term LIFTGATE at deposition. That is hardly evidence of nonexistence when Reid and Ferrell produced internal communications on "LIFTGATE technology" that included Bentley. (Sabovich Decl., Exh. T (NTG066446)). NIC claims that "[n]o patents or trademarks exist for 'LIFTGATE' technology." Again, NIC is playing a slight of hand. Internal documents show that LIFTGATE was simply the name that Strataluz coined to refer to its proprietary blend. (Sabovich Decl., Exh. T (NTG066446)). The patent is not for "LIFTGATE" but for AKG, which is included in the blend. (*Id.*; *see also* Sabovich Decl., Exh. S (confirming ProMaxal formulation of "300mg of AKG per serving.")).

NIC does not dispute the existence of a patent for AKG, but takes issue with its applicability. Again, NIC's only evidence is no evidence. NIC claims that "Strataluz's President, Jarrod Bentley, was unaware of any patent rights for the non-existent ProMAXAL product." That proves nothing since Bentley directly told NIC he did not "search for any patent applications or patents held or licensed by Strataluz." (Sabovich Decl., Exh. OO at 19:4-6 (Bentley Dep.)). Weiss explained that while Strataluz did not own patents, it licensed rights, including for ProMaxal. (Sabovich Decl., Exh. K at 55:24-56:9; 65:14-15 (Weiss Dep.)). Bentley recalled correctly. The documents show that on May 21, 2015 Strataluz entered a license agreement with Harcol Research LLC that specifically stated "[l]icensee wishes to sell a male enhancement product that contains alpha-ketoglutaric or a salt thereof…" NIC claims in conclusory fashion that the patent is inapplicable to a male enhancement pill. While this is slightly better than NIC's recent outright misrepresentation to the Ninth Circuit that the patent had been

invalidated,[15] NIC's current argument is not defensible.  The patent is for, *inter alia*, a "beverage, or a dry composition therefor, providing an energy source in situations with demand of large and rapid energy supply to a healthy mammal comprising 0.1 to 2.5 percent of the wet weight of α-ketoglutaric acid." *Harcol Reearch, LLC v. Europea Sports Prods.*, 2014 U.S. Dist. LEXIS 155307 **5-7 (N.D. Tx. 2014).  In *Harcol,* the District Court found that "the phrase 'situations with demand of large and rapid energy supply,'" claimed in the patent, "does mean 'situations demanding significant physical exertion.'"  (*Id.* at *21).  That, on its face, is at least related to the purpose of a male enhancement pill.  In any event, patent claims construction is a complex and specialized area of law, requiring careful analysis of "the claims themselves, the specification, and the prosecution history."  (*Id.* at *6).  Claims construction is a question of law for the court, decided in what are referred to as pre-trial *Markman* hearings.  *In Markman v. Westview Instruments*, 517 U.S. 370 (1996).  This is not a patent case and none of the requisite evidence for claims interpretation is before the Special Master or the Court.  Thus, it is simply not possible to hold on this record that the patent could not apply to a "male enhancement" product.

Finally, NIC seems to argue that ProMaxal lawsuits and demands were fraudulent because Strataluz had not yet sold ProMaxal, and according to NIC, therefore lacked "standing under the Lanham Act[.]"  But that leads nowhere as it is accepted under Lanham Act precedent that "a commercial interest, present or contemplated" confers standing.  *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1111 (2d Cir. 1997); *National Lampoon, Inc. v. American Broadcasting Co.*, 376 F. Supp. 733, 746 (S.D.N.Y. 1974) (plaintiff's standing established by allegation of

---

15 In its recent Ninth Circuit Answer Brief, NIC misrepresented to the Court that the patent was "invalidated on multiple grounds by the Eastern District of Texas in November 2014" and that the order "reveals that the '364 Patent has no applicability whatsoever to the ProMAXAL 'male enhancement' product." Sabovich Decl., Exh. [], fn. 6 (NIC Answer Brief).  That is a pure fabrication.  As seen in *Harcol Reearch, LLC v. Europea Sports Prods.*, 2014 U.S. Dist. LEXIS 155307 **5-7 (N.D. TExh. 2014), the order at issue did not even address validity.  Rather, the dispute was over claims construction.   *Id.*

plans to expand into television market where potential confusion would arise), *aff'd*, 497 F.2d 1343 (2d Cir. 1974).  None of the cases cited by NIC find a lack of standing, much less some manner of fraud, on remotely similar facts.  *Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1037 (9th Cir. 2005) involved whether "a national dog club's policy banning members that register their dogs with an alternative club" confers standing for claims of false advertising pursuant to the Lanham Act.  *Id.* at 1029.  No products were involved and it was admitted that the parties were not competitors.  *Id.* at 1037.  Likewise, *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1331 (11th Cir. 2008), the plaintiff "could suffer no such commercial or competitive injury, because it was no longer selling or promoting HerbaQuit Lozenges at the time of the alleged injury."  In *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1112 (2d Cir. 1997), the Court agreed that "a future 'potential for a commercial or competitive injury' can establish standing under the Lanham Act, the plaintiff's "hopes of eventually obtaining FDA approval and selling a retail weight loss product are too remote at this stage to confer standing to challenge defendant's advertising."  *Id.* at 1112.  Here, it is undisputable Strataluz contemplated, funded, studied, formulated, licensed a patent ingredient for, and marketed a real product.  And they show that Strataluz was working on, and quite close, to obtaining inventory.  (Sabovich Decl., Exh. Z (NTG063447) ("As for the [ProMaxal] product, I'll have a good estimate when we'll have inventory very soon. As mentioned to Scott, this will be around 5-6 weeks but I'll do my best to get sooner.").

Finally, NIC complains of Ferrell and Reid allegedly concealing their ownership interest in Strataluz.  The argument is both without merit and beside the point.  NIC faults Ferrell for referring to Strataluz as his "client" in communications with opposing counsel.  Notably, many of the alleged misstatements do not even relate to ProMaxal but to cases such as *Twinlabs*, where

it is undisputed that Strataluz had a commercially sold product. *See e.g.* Furman Decl., Exhs. 27, 29, 30, 32, 35, 36, 58, 63. In any event, a Limited Liability Company is a distinct entity, so such a statement is substantively true. NIC has not cited any rule that would in substance or spirit require an attorney to disclose the attorney's ownership interest in a client to opposing counsel. Indeed, as postulated by NIC such a disclosure would be for the purpose of undermining the client's claim and so quite potentially run afoul of the duty of confidentiality and of zealous advocacy.

Additionally, NIC argues the use of "blocker" corporations in forming Strataluz somehow proves fraud. These are hold-overs from NIC's now abandoned argument that Strataluz was a "sham" corporation formed to bring litigation. They have no relevance to NIC's argument that the ProMaxal litigation was fraudulent. NIC does not even attempt to argue the corporate form used had anything to do with the later ProMaxal litigation. Nor is one conceivable. After all, if "blocker" corporations were illegal or fraudulent, they would be banned as a matter of law, which they obviously are not.

### 6. The Special Master Should Award the NTG Defendants Their Fees and Costs

NIC has brought an entirely unjustified Motion to Compel based on inapposite law and fabricated facts. It contends that attorney-client privilege cannot apply to Strataluz documents even though that issue has been resolved against it and the law does not support it. Supra.Part.III.A. It disputes party invocation of work product via the facially inapplicable rule that work product may only be invoked by a party. Supra.Part.III.B. And most beguiling it seeks to invoke the crime fraud privilege based on the outright falsehood that ProMaxal did not exist when the overwhelming evidence proves it did. Worse still, it makes this argument after receiving documents that prove its prior allegations regarding Strataluz were false. Since these positions are not "substantially justified," the

NTG Defendants should be permitted to recover their fees and costs under Rule 37(a)(5).

## V.   PLAINTIFF NIC'S CONCLUSION

For the foregoing reasons, Plaintiff NIC requests that this Court order NTG Defendants to produce all documents designated "privileged" in Exhibit 94 (Revised Privilege Log).  This Court should compel defendants to produce unredacted copies of Exhibits 8 and 9, which are documents bearing the control numbers NTG063502 and NTG063804 respectively.  In the alternative, to the extent this Court finds that defendants may assert privilege over Strataluz corporate files, NIC requests that the Court perform *in camera* review of the files identified in Appendix A pursuant to the crime-fraud exception.  If the Court determines that the requested files are too voluminous, NIC asks that the Court issue a preliminary order instructing the NTG Defendants to provide supplemental descriptions regarding the files so that NIC can effectively narrow the documents requested for *in camera* review.  Finally, NIC requests an award of its fees and costs in pursuing this motion.

## VI.   NTG DEFENDANTS' CONCLUSION

NIC has a stated litigation goal of obtaining privileged documents. Respectfully, NIC's Motion to Compel is proof of that, not of any impropriety in the NTG Defendants' claim of privilege.  NIC's Motion to Compel should be denied.

/ / /

/ / /

/ / /

/ / /

/ / /

DATED: February 20, 2018

RESPECTFULLY SUBMITTED:

FOR PLAINTIFF NATURAL
IMMUNOGENICS

FOR NTG DEFENDANTS

*/s/ Peter A. Arhangelsky*
Peter A. Arhangelsky (CA 291325)
parhangelsky@emord.com
EMORD & ASSOCIATES, P.C.
2730 S. Val Vista Dr.
Bldg 6, Ste. 133
Gilbert, AZ 85295
Ph: (602) 388-8899
Fx: (602) 393-4361

*/s/ Stephanie A. Sperber*
Stephanie A. Sperber (CA 230006)
ssperber@callahan-law.com
CALLAHAN & BLAINE
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA 92707
Ph: (714) 241-4444
Fx: (714) 241-4445

*Attorneys for Plaintiff Natural-Immunogenics*

*Attorneys for Defendants Newport Trial Group PC, Scott Ferrell, Ryan Ferrell, Victoria Knowles, David Reid and Andrew Baslow*

Attestation pursuant to L.R. 5-4.3.4(a)(2)(i) regarding signatures: I, Peter A. Arhangelsky, attest that all other signatures listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized the filing.

DATED: February 20, 2018

EMORD & ASSOCIATES, PC

By:     /s/ Peter A. Arhangelsky
        Peter Arhangelsky
        Joshua S. Furman
        *Attorneys for Plaintiff Natural Immunogenics Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2018, the foregoing, **JOINT STIPULATION REGARDING PLAINTIFF NIC'S MOTION TO COMPEL STRATALUZ DOCUMENTS** was electronically filed using the Court's CM/ECF system and was sent via that system to the following:

Brendan M. Ford
bford@forddiulio.com
Kristopher P. Diulio
kdiulio@forddiulio.com
Ford & Diulio PC
650 Town Center Drive, Suite 760
Costa Mesa, California 92626
Tel: (714) 384-5540
*Attorney for Andrew Nilon,*
*Giovanni Sandoval, Sam Schoonover,*
*Matthew Dronkers, Taylor Demulder, Sam Pfleg,*

David J. Darnell, Esq.
ddarnell@callahan-law.com
Edward Susolik, Esq.
es@callahan-law.com
Callahan & Blaine
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA  92707
Tel:  (714) 241-4444
*Attorney for Newport Trial Group, Andrew Baslow,*
*Scott Ferrell, Ryan Ferrell, Victoria Knowles*

*/s/ Peter A. Arhangelsky*
Peter A. Arhangelsky, Esq.