Brendan M. Ford (Bar No. 224333)
Kristopher P. Diulio (Bar No. 229399)
**FORD & DIULIO PC**
650 Town Center Drive, Suite 760
Costa Mesa, CA 92626
Telephone: (714) 450-6830
Facsimile: (844) 437-7201
Email:  bford@forddiulio.com
        kdiulio@forddiulio.com

Attorneys for Defendants TAYLOR DEMULDER,
MATTHEW DRONKERS, ANDREW NILON,
SAM PFLEG, GIOVANNI SANDOVAL, and
SAM SCHOONOVER

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL IMMUNOGENICS CORP., a Florida corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>NEWPORT TRIAL GROUP, et al.,<br><br>Defendants. | Case No.    8:15-cv-02034-JVS-JCG<br><br>**SAM SCHOONOVER'S OBJECTIONS TO THE SPECIAL MASTER'S ORDER FOLLOWING SECOND REMAND [DOCKET 625]**<br><br>*[HEARING REQUESTED]*<br><br>Judge:    Hon. James V. Selna<br>Complaint Filed:    Dec. 7, 2015<br>Trial Date:    TBD |

## **TABLE OF CONTENTS**

I.    INTRODUCTION…………………………………………………………1

II.   FACTUAL AND PROCEDURAL BACKGROUND.....................................2

    A.    Sam Schoonover Served as a Tester One Time When he Called Himalaya Drug Company ........................................................................ 2

    B.    Other Cases the Non-NTG Defendants Participated in Are Outside the Permissible Scope of Discovery ........................................ 4

    C.    The Special Master Was Required To Conduct An Independent *In Camera* Review of SCHOONOVER 00082-00094 ........................ 6

III.  ARGUMENT ....................................................................................... 8

    A.    Schoonover Is Entitled to *Noerr-Pennington* Immunity Because Serving as a Tester Is Lawful and Does Not Convert CIPA Cases into a Sham......................................................................................... 8

    B.    The Special Master Failed to Follow the *Napster* Test ...................... 11

    C.    The Special Master Erred by Refusing to Allow Schoonover to Redact Privileged Communications that were (1) Unrelated to Himalaya; and/or (2) not in Furtherance of a Crime or Fraud............ 14

    D.    Analysis of the Communications Within Each Documents Demonstrates the Special Master's Errors.......................................... 16

        1.    SCHOONOVER00082 ............................................................. 16

        2.    SCHOONOVER00083 ............................................................. 17

        3.    SCHOONOVER00084 ............................................................. 18

        4.    SCHOONOVER00085 ............................................................. 18

        5.    SCHOONOVER00086 ............................................................. 18

        6.    SCHOONOVER00087 ............................................................. 19

        7.    SCHOONOVER00088 ............................................................. 20

        8.    SCHOONOVER00089 ............................................................. 20

        9.    SCHOONOVER00090 ............................................................. 20

        10.   SCHOONOVER00091 ............................................................. 21

        11.   SCHOONOVER00092 ............................................................. 21

IV.   CONCLUSION ................................................................................. 21

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*In re Burlington Northern, Inc.*,
822 F.2d 518 (5th Cir. 1987) ............................................................................... 18

*by Mohawk Indus., Inc. v. Carpenter*,
558 U.S. 100 (2009) ............................................................................................ 13

*Feldman v. Allstate Ins. Co.*,
322 F.3d 660 (9th Cir. 2003) ............................................................................... 11

*In re Grand Jury Investigation*,
810 F.3d 1110 (9th Cir. 2016) ............................................................................. 15

*In re Grand Jury Subpoenas*,
144 F.3d 653 (10th Cir. 1998) ............................................................................. 17

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ............................................................................................ 11

*In re Napster Copyright Litig.*,
479 F.3d 1078 (9th Cir. 2007) .......................................................... 13, 14, 15, 17

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*,
508 U.S. 49 (1993) .............................................................................................. 12

*In re Richard Roe*,
68 F.3d 38 (2d Cir. 1995) ............................................................................... 14, 17

*Smith v. Pac. Props. & Dev. Corp.*,
358 F.3d 1097 (9th Cir. 2004) ............................................................................. 11

*United States v. Zolin*,
491 U.S. 554 (1989) ............................................................................................ 10

**California Cases**

*Kearney v. Salomon Smith Barney, Inc.*,
39 Cal. 4th 95 (2006) .......................................................................................... 12

- ii -

*Lieberman v. KCOP Television, Inc.*,
  110 Cal. App. 4th 156 (2003)................................................................................. 12

*Marich v. MGM/UA Telecommunications, Inc.*,
  113 Cal. App. 4th 415 (2003)................................................................................. 11

*Ribas v. Clark*,
  38 Cal. 3d 355 (1985)............................................................................................. 12

**California Statutes**

California Penal Code
  § 632 ..............................................................................................................4, 11, 12
  § 632.7 .................................................................................................................... 11

**Other Authorities**

Federal Rule of Civil Procedure 53 ................................................................................. 10

FRE 404(a)....................................................................................................................... 10

FRCP 26............................................................................................................................. 6

## I.   INTRODUCTION

After reviewing the text messages reflected in SCHOONOVER00082-00094, the Special Master agreed that several communications did not relate to Himalaya, yet she ordered Defendant Schoonover to produce those privileged communications because "Defendant Schoonover has not established good cause exists to redact any parts of the documents that may not specifically pertain to *Himalaya Drug*." [Dkt. 625 at 10 n.3]  This was clear error under Ninth Circuit precedent, and is contrary to this Court's prior orders limiting discovery to the eight predicate lawsuits identified in the Second Amended Complaint.

Likewise, the Special Master never found a crime or fraud that Schoonover committed or was intending to commit.  Instead, the Special Master just adopted NIC's allegations wholesale.  For example, the Special Master made clear that "the crime or fraud is as they have framed it in their pleadings . . . I don't have to do anything other than say, hey, that supports their version." [Exh. 1 (April 11, 2018 Hearing Tr.) at 28:16-29:1]  However, the fact that Schoonover was a tester when he called Himalaya is not a crime or fraud.  The Special Master previously agreed that there "is no authority that precludes the use of 'testers' under CIPA." [Dkt. 458 at 13:24-25]  Accordingly, communications that may confirm Schoonover was a tester are insufficient to vitiate the attorney-client privilege.

Finally, the Special Master failed to comply with the Ninth Circuit's requirement that each communication be found – by a preponderance of the evidence – to be "in furtherance of" a crime or fraud.  Instead, the Special Master repeatedly explained that she found the crime-fraud exception applied because the communications "support[] their version of what they've alleged with Mr. Schoonover." [Exh. 1 at 29:1-2]  The Special Master's method for finding crime-fraud was clearly error and in contravention of well-established Ninth Circuit precedent.

- 1 -

As discussed in greater detail below, the Court should sustain Schoonover's objections.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Sam Schoonover Served as a Tester One Time When he Called Himalaya Drug Company

On July 17, 2012, Schoonover called Himalaya Drug Company.  [Dkt. 375-4 ¶ 2]  When he spoke to Himalaya, he did not know that his call was being recorded.  [Dkt. 375-4 ¶ 3]  Himalaya did not disclose that it was recording Schoonover's call.  [*Id*.]  Schoonover did not have any reason to believe that his call was being recorded and has previously testified that he "believed that [his] call would not be recorded."  [*Id*.]   During his deposition, Schoonover testified that he learned his call to Himalaya was recorded after the call was completed:

Q:    . . . When did you learn that you had been recorded by The Himalaya Drug Company?  Just the general time frame.

A:    I don't remember.

Q:    Was it after your call with The Himalaya Drug Company?

A:    Yeah.

[Dkt. 291-102 (Schoonover 1/11/17 Depo Tr.) at 106:21-107:2]

On July 19, 2012, NTG filed a complaint against Himalaya on behalf of Schoonover, alleging that Himalaya violated California Penal Code § 632 by recording his call without his consent.  [Dkt. 375-8 at 73-81 (Exhibit F)]

There is no evidence that Schoonover submitted a false declaration or false testimony in his case against Himalaya.  There is no evidence that NTG or any of its agents promised or paid Schoonover any money to pursue the case against Himalaya prior to the settlement that was voluntarily entered into by all parties.  And, contrary to the Special Master's statements during the most recent hearing addressing whether Schoonover's communications were in furtherance of a crime or fraud, there is no allegation or evidence that Schoonover took steps to bypass a disclosure

- 2 -

from Himalaya that it records incoming calls.[1] [Ford Decl, Exh. 1 (April 11, 2018 Hearing Tr.) at 56:21-57:22]  In short, NIC has not presented evidence of any conduct Schoonover engaged in that is a crime or fraud.  Schoonover's only involvement in the pending litigation is based on NIC's cause of action alleging that Schoonover conspired to violate RICO. [Dkt. 157 at 29-30 (dismissing NIC's RICO claims agaisnt Schoonover)]

NTG has indicated that Schoonover served as a tester (*i.e.*, he was someone who lawfully and ethically took an action that was motivated in whole or in part by a desire to help identify, prove, and eradicate an unlawful practice) when he placed his call to Himalaya.  [Dkt. 291-43 at 341-342]  NIC has argued that Schoonover's role as a "tester" was unlawful.  However, the Special Master found that "there simply is no authority that precludes the use of 'testers' under CIPA." [Dkt. 458 at 13:24-25]

NIC also points to the fact that Andrew Baslow (NTG's investigator) called Himalaya the day before Schoonover's call, then Baslow had a conversation with Schoonover, prior to Schoonover's call to Himalaya.  First, this is consistent with the fact that Schoonover was a tester, which is lawful.  Second, NTG *disclosed to Himalaya* that its investigator had called and confirmed that Himalaya recorded all calls.  [Dkt. 291-85 at 722 (Scott Ferrell informing Himalaya's counsel that "*[p]rior to filing suit*, an investigator from my office called the same number" and the customer service represented stated "all calls are recorded") (emphasis added)] Third, these facts do not demonstrate by a preponderance of the evidence that Schoonover knew Himalaya would record his call or that his case against Himalaya

---

[1] NIC alleges that Raquel Torres pushed buttons in an intentional effort to bypass Nutrisystem's message that would have disclosed her call was being recorded. However, Torres has testified that she was simply trying to reach a customer service representative.  Regardless, NIC makes no such allegation against Schoonover.  This issue highlights the fact that bifurcation should have been granted because of the confusion and undue prejudice of combining facts and actions of unrelated persons.

was a sham.

B.    **Other Cases the Non-NTG Defendants Participated in Are Outside the Permissible Scope of Discovery**

On December 7, 2015, NIC filed its Initial Complaint against 15 defendants. [Dkt. 1]  In January 2016, when NIC filed its First Amended Complaint, it contained 112 pages of allegations broken down into 495 paragraphs.  [Dkt. 29]  The Court granted Defendants' Motion to Dismiss the RICO claims in the FAC.  [Dkt. 88-1]  In May 2016, NIC filed its Second Amended Complaint where it narrowed its allegations to 8 "predicate" lawsuits.  [Dkt. 92]

The day before NIC filed its Second Amended Complaint, the parties appeared before the Court for the Rule 26(f) conference.  At that hearing, the Court affirmatively raised the fact that it was concerned about the scope of discovery. [Ford Decl, Exh. 2 (May 9, 2016 Hearing Tr.) at 7:10-12 ("THE COURT:  Okay. One thing I'm concerned about is the potential number of other lawsuits that you are going to want to inquire into.")]  Although NIC agreed at that hearing to limit the scope of its discovery to the 8 predicate lawsuits identified in the SAC, the Court was forced to confirm this limitation in a July 20, 2016 Order.  [Dkt. 155]  Three months later, the Court re-confirmed this limitation when NIC again sought to expand the scope of discovery.  [Dkt. 198 at 4 (denying NIC's request to expand discovery because NIC "already has specified eight cases for discovery," and noting "the risk of sprawling discovery" and additional increases to "the case's cost and complexity")]

Despite this, NIC's Rule 26 Disclosures identifying potential witnesses listed 37 former NTG clients [Exh. 3 at 8-10], 47 companies NTG had filed lawsuits against [*id*. at 11-15], and 144 attorneys with knowledge of NTG's allegedly unlawful litigation [*id*. at 16-42].[2]

---

[2] In November 2016, NIC served a supplemental disclosure, which added 10 companies NTG had filed lawsuits against and 24 attorneys with knowledge of

- 4 -

In July 2017, NIC again asked this Court to expand the scope of discovery, specifically focusing on other matters the Non-NTG Defendants had participated in with NTG.  [Dkt. 414 at 6]  This Court rejected NIC's request and its argument that this discovery was "necessary . . . because these lawsuits show the Non-NTG Defendants' cooperation in [NTG's] RICO enterprise."  [*Id*. at 6-7]  The Court further explained:

> THE COURT:  . . . When the plaintiffs identified eight lawsuits that they wanted to pursue, it seemed to be quite a number of lawsuits, but also it at least defined the boundaries.  I believe that the discovery with respect to those lawsuits has or will provide the grist for the RICO and other claims if such grist exists.

[Ford Decl., Exh. 5 (July 31, 2017 Hearing Tr.) at 18:18-23]

Based on this Court's repeated and unequivocal rulings, Defendants have generally limited the scope of their discovery responses to information regarding the 8 lawsuits identified in the SAC.

In August 2016, Schoonover responded to NIC's requests for production. [Dkt. 593-3]  Schoonover made clear that he was only providing NIC with information related to the case against Himalaya.  [*Id*. (objecting to the extent the scope of permissible discovery "is limited to specific prior suits alleged in the [SAC] . . . [and] Schoonover v. Himalaya Drug. Co. is the only lawsuit filed by Defendant that is identified in the [SAC])]  However, in May 2017, in an effort to avoid further discovery motions, Schoonover agreed to provide a supplemental privilege log reflecting communications unrelated to the Himalaya case.  [Dkt. 593-1 ¶ 8]  NIC does not dispute the fact that most of the documents reflected in that supplemental privilege log are unrelated to Schoonover's case against Himalaya. Instead, NIC has sought to discover text messages reflected in NTG's allegedly unlawful litigation.  [Exh. 4 to the Ford Decl.]

- 5 -

SCHOONOVER00082-00094, claiming those communications are related to Himalaya. [Dkt. 590]

**C.      The Special Master Was Required To Conduct An Independent _In Camera_ Review of SCHOONOVER 00082-00094**

Following a Notice of Errata Regarding Sam Schoonover Documents [Dkt. 583], the Court issued an Order compelling the Special Master to review SCHOONOVER 00082-00092 _in camera_ [Dkt. 610].   In the Errata, counsel explained that the 13 pages of Schoonover text messages "discuss a case outside the scope of discovery (_Vogue_), a potential new case that was never initiated, also outside the scope of discovery, and the case at issue here (_Himalaya Drug_). [Dkt. 583 at 2:24-3:1]  The Errata further explained that none of the text messages directly references which case is being discussed.  [_Id_. at 3-:1-2]   However, following additional review, the Errata and accompanying privilege log explained the following:

- SCHOONOVER 92 appeared to include communications that related solely to Himalaya;

- SCHOONOVER00089,        SCHOONOVER00091,        and SCHOONOVER00093 to SCHOONOVER00094 appeared to include communications that did not relate to Himalaya and communications that did relate to Himalaya[3]; and

- SCHOONOVER   00082   to   SCHOONOVER00088   and SCHOONOVER00090 did not appear to relate to Himalaya.

Following _in camera_ review, the Special Master issued a Tentative Order on March 27, 2018 where she found the following:

---

[3] Specifically, the November 7, 2012 communications on SCHOONOVER00089 appeared to relate to Himalaya, the redacted portions of SCHOONOVER00093 (_i.e._, the December 5, 2012 communications) appeared to relate to Himalaya, and the December 5, 2012 communications on SCHOONOVER00094 appeared to relate to Himalaya.

- 6 -

- "SCHOONOVER00082-00092 do pertain, in whole or in part, to *Himalaya Drug*";

- "SCHOONOVER00093-00094 do not pertain to *Himalaya Drug*"; and

- SCHOONOVER00083-00089 should be produced pursuant to the crime-fraud exception because those communications "were in furtherance of the wiretapping scheme."

[Exh. 6 (Tentative Order) at 8-9]  Following oral argument on the Tentative Order, the Special Master expanded her ruling, deciding SCHOONOVER00082-00092 should be produced under the crime-fraud exception.[4]  [Dkt. 625 at 9-10]  The Special Master acknowledged that some of the communications in those text messages were unrelated to the *Himalaya Drug* case, but decided they should be produced because "Defendant Schoonover has not established good cause exists to redact any parts of the documents that may not specifically pertain to *Himalaya Drug*." [*Id.* at 9-10 & n.3]

As discussed below, the Special Master's Order was in error for several reasons.  First, the Special Master incorrectly found that certain communications were related to *Himalaya Drug* when they clearly were not.  Second, the Special Master ordered production of documents unrelated to *Himalaya Drug*, despite this Court's limitations on the scope of discovery.  Third, the Special Master erred in her

---

[4] The Special Master also completely did an about-face regarding the Pfleg documents and determined they should be produced.  While that decision was clearly in error, those documents are completely innocuous and Defendant Pfleg has chosen to produce them pursuant to the Order rather than waste unnecessary resources objecting.  Obviously, that production is not an admission of crime-fraud, does not constitute a waiver of privilege, and does not serve as an admission with regard to any other privileged documents NIC seeks to compel from Pfleg or others.

crime-fraud determinations.[5]  Not only did the Special Master simply adopt NIC's theories of crime-fraud, but the Special Master also failed to make any findings – by a preponderance of the evidence – that any specific communication was "sufficiently related to" and made "in furtherance of [an] intended, or present, continuing illegality."  Instead, the Special Master repeatedly stated:

> It's enough that it supports their pleading as it exists.  . . .  I'm just saying, hey, based upon their theory as pleaded, this would fall into their theory, this would support their theory.

[Exh. 1 at 30:13-31:5]

As a result, the Special Master's Order compelling the production of SCHOONOVER00082-00092 was error.

**III.   ARGUMENT**

Pursuant to Federal Rule of Civil Procedure 53(f)(3) and (4), the Court is required to review all objections to the Special Master's findings of fact and conclusions of law *de novo*.  *See* FRCP 53(f)(3) and (4).  Pursuant to Federal Rule of Civil Procedure 53(f)(1), Defendant Schoonover requests a hearing to address the issues raised in his objections.

**A.   <u>Schoonover Is Entitled to *Noerr-Pennington* Immunity Because Serving as a Tester Is Lawful and Does Not Convert CIPA Cases into a Sham</u>**

In NIC's Omnibus Motion to Compel, NIC argued that Demulder falsely alleged that (1) he was not aware that his call was being recorded; (2) he did not

---

[5] As an initial matter, NIC did not present sufficient evidence to justify *in camera* review of documents related to *Schoonover v. Himalaya Drug. Co.*, as required by *United States v. Zolin*, 491 U.S. 554 (1989).  As discussed below, Schoonover's tester status is not a crime or fraud and does not establish wrongdoing.  Although NIC attempts to show crime-fraud in *Schoonover v. Himalaya Drug. Co.* by using activities from other lawsuits, those lawsuits involve other parties and do not constitute evidence that Schoonover's actions were criminal or fraudulent.  *See* FRE 404(a).

give express or implied consent; and (3) he only learned that Himalaya Drug recorded his incoming call after he completed his call. [Dkt. 291-1 at 40:26-41:1] In support of that argument, NIC points to the fact that Demulder was a tester. [*Id.* at 41:9-15] NIC argues that tester "is a euphemism for hired plaintiff" and that NTG defined testers as "individuals who initiate a transaction for the purpose of bringing a lawsuit." Neither is true.

NTG defined testers in its discovery responses. [Dkt. 291-43 at 341-342] "Tester" is not a euphemism for "hired plaintiff," but rather is a practice that has been approved of by the United States Supreme Court in certain contexts. *See, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374 (1982) ("That the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, does not negate the simple fact of injury within the meaning of [the statute prohibiting unlawful misrepresentations]."). The Ninth Circuit has also recognized that "[t]esters have played a long and important role in fair housing enforcement." *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1102 (9th Cir. 2004).

Tester standing was endorsed in the fair housing context because those statutes do not require that the plaintiff actually intend to rent or lease property (*i.e.*, be a sincere potential consumer). The statutes grant *all people* the right to be free from discriminatory conduct. Likewise, California Penal Code Section 632 and 632.7 grants all people the legal right not to be recorded without their consent. "Penal Code § 632 is an integral component of California's substantive state policy of protecting the privacy of its citizens." *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 667 (9th Cir. 2003). "Penal Code Section 632 is violated the moment a confidential communication is recorded without consent." *Marich v. MGM/UA Telecommunications, Inc.*, 113 Cal. App. 4th 415, 425 (2003). A person who was recorded without their knowledge or consent is injured by the very act of being recorded, and thus entitled to statutory damages for that injury. *Lieberman v. KCOP*

- 9 -

*Television, Inc.*, 110 Cal. App. 4th 156, 167 (2003) ("[T]o recover statutory damages for violation of Section 632, [plaintiff] was not required to prove actual damages resulting from the recording"); *Ribas v. Clark*, 38 Cal. 3d 355, 365 (1985) (Section 632.7 "authorized civil awards of $3,000 for each violation of the Privacy Act despite a party's inability to prove actual injury"). It is therefore appropriate to use testers to identify and stop corporations that unlawfully record consumer telephone calls. Not only is there nothing unlawful or improper about using testers to ensure companies are complying with the California Invasion of Privacy Act ("CIPA"), taking measures to ensure citizens' privacy rights are protected is a valid and noble cause. *See Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 116 (2006) (noting that the private right of action afforded is "perhaps the most effective enforcement mechanism available").

As set forth in the Motion for Partial Summary Judgment that was filed in July 2017 [Dkt. 375], but then taken off calendar [Dkt. 423], Schoonover's lawsuit against Himalaya is protected by the *Noerr-Pennington* doctrine and not subject to the "sham" exception. Indeed, as pointed out in the pending Motion for Partial Summary Judgment, even if a dispute exists regarding the ability to use testers in the CIPA context, a lawsuit does not qualify as a "sham" if it is "arguably warranted by existing law or at the very least based on an objectively good faith argument for the extension, modification, or reversal of existing law." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 65 (1993) (quoting Federal Rule of Civil Procedure 11). Here, there is no evidence that Schoonover knew Himalaya would record his call or that he impliedly or expressly consented to the recording of his call. There is no evidence that Schoonover proffered false testimony or accepted a bribe. In the context of a crime-fraud motion, there is certainly not a preponderance of evidence to demonstrate Schoonover was planning or committing a crime or fraud. Accordingly, Schoonover is entitled to immunity under the *Noerr-Pennington* doctrine and the Special Master erred in her crime-fraud findings, which

- 10 -

failed to address whether Schoonover's conduct was actually lawful, instead accepting NIC's general theory of the case:

> HON. ROSALYN CHAPMAN: Look at, you've got a different theory than they have. I found that, fine, your tester theory you can use as a defense. That's fine. But their theory is that it wasn't a tester situation, that it was bribing people to do these acts and sometimes these acts weren't even done until after the client-attorney relationship was established with a particular person. Okay?
>
> *      *      *
>
> . . . [T]he crime or fraud is as they have framed it in their pleadings. That's exactly what I'm finding.

[*See, e.g.*, Exh. 1 at 27:9-16, 28:16-18]  This was improper and the Court should sustain Schoonover's objections to the Special Master's Order.

### B.      The Special Master Failed to Follow the *Napster* Test

In the *Napster Litigation*, the Ninth Circuit set forth the test that must be used when deciding whether the crime-fraud exception vitiates the attorney-client privilege in a civil case. *See In re Napster Copyright Litig.*, 479 F.3d 1078 (9th Cir. 2007), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009). Specifically, "[a] party seeking to vitiate the attorney-client privilege under the crime-fraud exception must satisfy a two-part test":

> First, the party must show that "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further that scheme." Second, it must demonstrate that the attorney-client communications for which production is sought are "sufficiently related to" and were made "*in furtherance of* [the] intended, or present, continuing illegality."

*Id*. at 1090 (emphasis in original) (internal citations omitted).

In the *Napster Litigation*, the Ninth Circuit specifically emphasized the "in

- 11 -

furtherance of" language. *Id.* Moreover, it added a citation to *In re Richard Roe*, 68 F.3d 38, 40 (2d Cir. 1995), when it emphasized the "in furtherance of" language. *Id.* The Ninth Circuit's emphasis of the "in furtherance of" language combined with its citation to the Second Circuit is significant because the Second Circuit criticized a district court judge's decision that the crime-fraud exception applied based on its finding that "the[] [privileged] documents, read collectively, have the real potential of being relevant evidence of activity in furtherance of a crime." *In re Richard Roe*, 68 F.3d at 40. The Second Circuit found that the district court -- although stating the communications were "in furtherance of" a crime -- had improperly applied a "relevant evidence" test. *Id.* The Second Circuit explained that the "in furtherance of" requirement demands more than a showing of relevance:

> The "relevant evidence" test departs from the correct "in furtherance" test in two respects. First, the crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud. . . . Instead, the exception applies only when the court determines that the client communication or attorney work product in question was *itself* in furtherance of the crime or fraud.

*Id.* (emphasis in original) (citations omitted).

Here, NIC did now show (and the Special Master did not find) that Schoonover "was engaged in or planning a criminal or fraudulent scheme." *See In re Napster Copyright Litig.*, 479 F.3d at 1090. Indeed, such a finding would be impossible because testers are either permitted or were arguably permissible in 2012 when this conduct occurred. In fact, it appears that the Special Master was applying facts from *Torres v. Nutrisystem* to Schoonover when she made references to Schoonover "figur[ing] out a way to get around the call being recorded." [Exh. 1 at 57:3-5] Accordingly, the Special Master apparently committed error with regard to the facts that she believed supported crime-fraud and certainly did not find evidence

- 12 -

that would satisfy the first step in the Ninth Circuit's crime-fraud test.

In addition, the Special Master erred because she failed to follow the second step in the Ninth Circuit's crime-fraud test, which requires a finding – by a preponderance of the evidence – "that the attorney-client communications for which production is sought are 'sufficiently related to' and were made '*in furtherance of* [the] intended, or present, continuing illegality.'"  *See In re Napster Copyright Litig.*, 479 F.3d at 1082, 1090.  In fact, the Special Master repeatedly stated she was simply adopting NIC's theories of crime-fraud, then finding that the communications "could support" NIC's theory.  The Special Master's approach is wholly inconsistent with the Ninth Circuit's requirement that the Special Master decide, by a preponderance of the evidence, that each communication was "in furtherance of" a crime or fraud.  *See In re Grand Jury Investigation*, 810 F.3d 1110, 1113-14 (9th Cir. 2016) (holding "a district court must examine the individual documents themselves to determine that the specific attorney-client communications . . . are sufficiently related to and were made in furtherance of the intended, or present, continuing illegality") (internal quotations omitted).

For example, in response to counsel's argument that "[w]e don't know what crime or fraud is allegedly being furthered by these communications," the Special Master explained:

> [T]he crime or fraud is as they have framed it in their pleadings . . . and of course with Schoonover it's just the wiretap scheme . . . that they allege is part of the crime-fraud.  ***I don't have to do anything other than say, hey, that supports their version of what they've alleged with Mr. Schoonover***.
>
> *   *   *
>
> I don't have to parse out whether it's actually the crime of wire fraud or it's the crime of mail fraud.  I mean, it's their version of what they claim are the underlying criminal acts supporting their RICO charges.

- 13 -

&ast; &ast; &ast;

*It's enough to show that it supports their pleading as it exists.*

&ast; &ast; &ast;

. . . I'm just saying, hey, based upon their theory as pleaded, ***this would fall into their theory, this would support their theory***.

[Exh. 1 at 28:11-31:5 (emphasis added)]   These statements make clear that the Special Master was not making a crime-fraud finding and was not making a finding that the individual communications were "in furtherance of" a crime or fraud.

NIC has alleged that the allegations in *Schoonover v. Himalaya Drug Co.* were false.  Although NIC argues that Schoonover was not a valid consumer, that is irrelevant to CIPA.  To be clear, the only material issue is whether Schoonover had a valid expectation of privacy when he placed his call to Himalaya.  NIC has not offered any evidence to contradict Schoonover's privacy rights.  The Special Master did not make any crime-fraud finding that Schoonover made misrepresentations regarding his expectation of privacy when he placed his call to Himalaya. Compounding the error associated with the fact that no finding of crime-fraud was made as it relates to Schoonover, the Special Master (unsurprisingly) did not make any findings that any of the specific privileged communications were in furtherance of criminal or fraudulent conduct.  Thus, the Special Master's Order compelling the production of SCHOONOVER00082-00092 was error.

**C.** **<u>The Special Master Erred by Refusing to Allow Schoonover to Redact Privileged Communications that were (1) Unrelated to Himalaya; and/or (2) not in Furtherance of a Crime or Fraud</u>**

The Special Master refused to grant Schoonover's request to redact privileged communications that exceed the scope of discovery or are not "in furtherance of" any crime or fraud:

Although part of a text message may not specifically pertain to Schoonover's role in the *Himalaya Drug* case, the message is,

- 14 -

nevertheless, "sufficiently related to" and was made "in furtherance of" NTG's alleged "pattern of fabricated and fraudulent litigation and threats of such litigation."   As such, Defendant Schoonover has not established good cause exists to redact any parts of the documents that may not specifically pertain to *Himalaya Drug*.

[Dkt. 625 at 10 n.3; *see also* Exh. 1 at 18:16-17 ("when I say a document has to be turned over, I'm not parsing out parts of a document")]  This was clear error on the part of the Special Master.

The crime-fraud test set forth in the *Napster Litigation* expressly precludes production of privileged communications unless they are made "in furtherance of" the intended, or present, continuing illegality.  *In re Napster Copyright Litig.*, 479 F.3d at 1090.  Consistent with this, cases have held that application of the crime-fraud exception requires precision and should be narrowly tailored to apply only to the information or documents found to be in furtherance of the crime or fraud.   For example, in *In re Grand Jury Subpoenas*, 144 F.3d 653, 661 (10th Cir. 1998), the Tenth Circuit expressly held that "district courts should define the scope of the crime-fraud exception narrowly enough so that information outside of the exception will not be elicited before the grand jury."  Continuing, the Court held that before ordering testimony in front of the grand jury, a district court could appropriately require, outside of the presence of the jury, "an in camera examination of the witness or the questions to be asked of the witness . . . to ensure the scope of the inquiry will not be too broad."  *Id; see also In re Richard Roe, Inc.,* 68 F.3d 38, 41 (2d Cir. 1995) (requiring "examination of each document under the proper standard" and that the district court "specify the factual basis for the crime or fraud that the documents or communications are deemed to have furthered"; also holding that before testimony could be given before the grand jury, the district court must specify "the scope of the examination permitted, and the basis … for applying the crime-fraud exception" and that the district court could appropriate require the witnesses to

- 15 -

be examined "in camera before ordering testimony before a grand jury."). Similarly, in *In re Burlington Northern, Inc.*, 822 F.2d 518, 525 (5th Cir. 1987), the Fifth Circuit expressly held "[t]he focus must be narrowed to the specific purpose of the particular communication or document. To the extent the document deals with a protected activity, it is immune from discovery."

Here, the Special Master created an unheard-of standard by requiring Schoonover to establish "good cause" for redacting communications that were (1) unrelated to Himalaya; and/or (2) not in furtherance of a crime or fraud. Because this standard is in conflict with the Ninth Circuit's requirement that privileged communications not be compelled absent a specific finding of crime-fraud, the Court should sustain Schoonover's objections to the Special Master's Order.

**D.      Analysis of the Communications Within Each Documents Demonstrates the Special Master's Errors.**

### 1.      *SCHOONOVER00082*

SCHOONOVER00082 contains 2 communications on July 3, 2012 and 2 communications on July 5, 2012. [Dkt. 583-1] Because of a lack of specificity in the Special Master's Order, it is entirely unclear whether she found that these communications related to Himalaya or whether she found that it was relevant to discovery this Court has previously prohibited (*i.e.*, NIC's allegations that the Non-NTG Defendants' role in other lawsuits supports its allegations of a "pattern of fabricated and fraudulent litigation").

NIC has alleged that Baslow called Himalaya on July 16, 2012 and Schoonover called Himalaya on July 17, 2012, at Baslow's instruction. [Dkt. 291-1 at 43:19-23] Thus, the Special Master erred when she apparently rejected Schoonover's description in his privilege log that these communications from July 5 and 7 are "regarding Vogue Settlement Agreement." [Dkt. 583-1 at 1] On that basis alone, the Court should sustain Schoonover's objection to the Special Master's Order compelling production of SCHOONOVER00082.

- 16 -

Separately, and for the reasons previously discussed, there is no evidence of a crime or fraud in SCHOONOVER00082 or that Schoonover was communicating with NTG in furtherance of a crime or fraud.

### 2.    SCHOONOVER00083

SCHOONOVER00083 contains 1 communication on July 5, 2012 and 6 communications on July 16, 2012.  As before, the July 5, 2012 communication is clearly a follow-up to the Vogue settlement discussion and should not have been compelled.   The Court should therefore sustain Schoonover's objection to the Special    Master's    Order    compelling    production    of    this    portion    of SCHOONOVER00083.   Indeed, to the extent the Special Master compelled production because "Defendant Schoonover has not established good cause exists to redact any parts of the documents that may not specifically pertain to *Himalaya Drug*" [Dkt. 625 at 10 n.3], that decision was error.

NIC has argued that the July 16, 2012 communications must relate to Himalaya because this is the date that Baslow called Himalaya.  While these communications do relate to a new case, Himalaya is in Sugar Land, Texas.  [Dkt. 375-8 at 74 (Exhibit F)]  This means Himalaya is in the Central Time Zone.  Based on the reference in SCHOONOVER00084 (communication # 2), it appears that SCHOONOVER00083 relates to a new case, but not to Himalaya.

Obviously, none of the communications in SCHOONOVER00082-00094 specifically refer to Himalaya or any other case by name.  The Special Master disagreed with Schoonover's assessment about SCHOONOVER00082 and found the July 16, 2012 communications related to Himalaya.  Assuming *arguendo* that the Special Master was correct, there is nothing in these communications that reflects a crime or fraud.  As previously addressed, serving as a tester is lawful.  Moreover, Schoonover did not make any false statements, offer any false testimony, and was not bribed.  The Special Master's view that SCHOONOVER00083 could "support" NIC's theory is inadequate.  Accordingly, the Court should sustain

- 17 -

Schoonover's objection to the Special Master's Order compelling production of SCHOONOVER00083.

### 3. SCHOONOVER00084

SCHOONOVER00084 contains 4 communication on July 16, 2012 and 2 communications on July 17, 2012. Again, assuming *arguendo* that the Special Master was correct that these communications relate to Himalaya, there is nothing in these communications that reflects a crime or fraud. As previously addressed, serving as a tester is lawful. The Special Master's view that SCHOONOVER00084 could "support" NIC's theory is inadequate. Accordingly, the Court should sustain Schoonover's objection to the Special Master's Order compelling production of SCHOONOVER00084.

### 4. SCHOONOVER00085

SCHOONOVER00085 contains 10 communications on July 17, 2012 and 1 communication on August 11, 2012. Again, assuming *arguendo* that the Special Master was correct that these communications relate to Himalaya, there is nothing in these communications that reflects a crime or fraud. As previously addressed, serving as a tester is lawful. The Special Master's view that SCHOONOVER00085 could "support" NIC's theory is inadequate. Accordingly, the Court should sustain Schoonover's objection to the Special Master's Order compelling production of SCHOONOVER00085.

### 5. SCHOONOVER00086

SCHOONOVER00086 contains 1[6] communication on August 11, 2012, 1 communication on September 23, 2012, 2 communications on September 27, 2012, and 2[7] communications on November 1, 2012.

---

[6] This does not include the top bubble on SCHOONOVER00086 both because it is cut off and because it is a repeat of the last bubble on SCHOONOVER00085.

[7] Like the top bubble on SCHOONOVER00086, the bottom bubble is not considered both because it is cut off and because it is a repeat of the first bubble on SCHOONOVER00087.

- 18 -

Again, assuming *arguendo* that the Special Master was correct that the communications between August 11 through September 27 relate to Himalaya, there is nothing in these communications that reflects a crime or fraud.  Indeed, these communications reflect nothing.  Accordingly, the Court should sustain Schoonover's objection to the Special Master's Order compelling production of the August 11, 2012 to September 27, 2012 communications contained in SCHOONOVER00086.

With regard to the November 1, 2012 communications, it is clear that they do not relate to Himalaya and reflect a discussion regarding a new potential case.  This is consistent with the fact that, by October 31, 2012, the Himalaya case was settled or nearly settled.  [Dkt. 291-2 at 33 (*see* NTG006402)]  In fact, Schoonover had signed the settlement agreement by November 7, 2012 [Dkt. 590-21], and the case against Himalaya was dismissed on November 13, 2012 [Dkt. 375-8 at 83-84 (Exhibit G)].  As a result, the November 1, 2012 communications could not have been "in furtherance of" any crime or fraud regarding Himalaya.  It was error for the Special Master to compel production of the November 1, 2012 communications contained in SCHOONOVER00086.

### 6.    SCHOONOVER00087

SCHOONOVER00087 contains 3 communications on November 1, 2012 and 2 communications on November 2, 2012.  As discussed in the context of SCHOONOVER00086, the communications on November 1, 2012 do not relate to Himalaya.  Moreover, they are evidence of nothing and certainly not communications in furtherance of a crime or fraud.  Accordingly, it was error for the Special Master to compel production of the November 1, 2012 communications contained in SCHOONOVER00087.

Likewise, the November 2, 2012 communications clearly do not relate to Himalaya, but rather relate to legal advice regarding a new potential case.  As reflected by the discussion that follows, this case was never pursued.  Regardless, it

- 19 -

was error for the Special Master to compel a privileged communication regarding a different case. It was further error for the Special Master to compel the November 2, 2012 communications because they unequivocally reflect the fact that they are not "in furtherance of" any crime or fraud and certainly not "in furtherance of" any crime or fraud related to Himalaya.

### 7. SCHOONOVER00088

SCHOONOVER00088 reflects a continuation of the November 2, 2012 communications from SCHOONOVER00087. For the reasons discussed in relation to SCHOONOVER00087, the Special Master's Order compelling production of SCHOONOVER00088 was error both because the communications are related to a new potential case (as opposed to Himalaya, which had settled) and because the communications are not "in furtherance of" a crime or fraud.

### 8. SCHOONOVER00089

SCHOONOVER00089 contains 4 communications on November 2, 2012 and 2 communications on November 7, 2012. With regard to the November 2, 2012 communications, it was error for the Special Master to compel these communications for the reasons discussed regarding the November 2 communications reflected in SCHOONOVER00087-00088.

As set forth in the Errata, the November 7, 2012 communications do relate to Himalaya. However, the communications are not "in furtherance of" a crime or fraud. Accordingly, the Special Master's Order compelling production of SCHOONOVER00089 was error.

### 9. SCHOONOVER00090

SCHOONOVER00090 contains 9 communications from November 7, 2012.[8] The Special Master did not provide any analysis as to whether these

---

[8] At the top and bottom of SCHOONOVER00090 are 2 messages that were not included because they are cut off and because they are fully reflected in SCHOONOVER00089 and SCHOONOVER00091.

- 20 -

communications were in furtherance of a crime or fraud or whether they were deemed to relate to Himalaya.  Schoonover's privilege log, however, accurately identified this as "[c]ommunications regarding review of NTG."  [Dkt. 583-1 at 2] The Special Master's apparent rejection of that description and order compelling SCHOONOVER00090 was error.

### 10.   SCHOONOVER00091

SCHOONOVER00091 contains 4 communications from November 7, 2012. The Special Master did not provide any analysis as to whether these communications were in furtherance of a crime or fraud or whether she disagreed with Schoonover's characterization of these documents.  Because there is nothing that suggests these documents should have been compelled, the Court should sustain Schoonover's objections.

### 11.   SCHOONOVER00092

SCHOONOVER00092 contains 4 communications from November 7, 2012 and 6 communications from December 5, 2012.  Again, the Special Master did not provide any analysis as to whether these communications were in furtherance of a crime or fraud or whether she disagreed with Schoonover's characterization of these documents.  Because there is nothing that suggests these documents should have been compelled, the Court should sustain Schoonover's objections.

## IV.   CONCLUSION

For the foregoing reasons, Defendant Schoonover respectfully requests that the Court sustain his objections to the Special Master's Order compelling production of SCHOONOVER00082-00092.  Alternatively, to the extent the Court does not sustain the objections in their entirety, Schoonover requests that he be allowed to redact from production any privileged communications that are either unrelated to Himalaya or for which there has not been a finding that the communication was in furtherance of a crime or fraud.

- 21 -

SAM SCHOONOVER'S OBJECTIONS TO THE SPECIAL MASTER'S ORDER
FOLLOWING SECOND REMAND [DOCKET 625]

Dated:  April 27, 2018                                    **FORD & DIULIO PC**


By:  /s/ *Brendan M. Ford*
      Brendan M. Ford
      Kristopher P. Diulio


Attorneys for non-NTG Defendants

- 22 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 27, 2018, I electronically filed the foregoing **SAM SCHOONOVER'S OBJECTIONS TO THE SPECIAL MASTER'S ORDER FOLLOWING SECOND REMAND [DOCKET 625]** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

/s/ *Brendan M. Ford*
Brendan M. Ford