Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Jonathan W. Emord, Esq. (pro hac vice)
jemord@emord.com
Joshua S. Furman, Esq. (pro hac vice)
jfurman@emord.com
Eric J. Awerbuch, Esq. (pro hac vice)
eawerbuch@emord.com
Emord & Associates, P.C.
2730 S. Val Vista Drive, Bldg 6, Ste 133
Gilbert, AZ 85295
Phone: (602) 388-8899
Fax: (602) 393-4361
*Attorneys for Plaintiff Natural Immunogenics Corp.*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL-IMMUNOGENICS, a Florida corporation,<br><br>Plaintiff,<br>v.<br><br>NEWPORT TRIAL GROUP, et al.,<br><br>Defendants. | Case No.: 8:15-cv-02034-JVS-JCG<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS RE DEFENDANT SCOTT J. FERRELL'S FALSE DECLARATION [DKT. 812-1]**<br><br>Hearing Date:   October 21, 2019<br><br>Hearing Time:   1:30 PM<br><br>Courtroom:   10C<br><br>Judge:  Hon. James V. Selna |

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ....................................................................................1

II.     FACTS ....................................................................................................3

III.    ARGUMENT.........................................................................................13

    A.    Legal Standards ..........................................................................13

    B.    Scott Ferrell Prepared a False and Perjurious Declaration
        for an Improper Purpose ..............................................................15

        1.   Scott Ferrell's Declaration Contained Intentionally False
            Statements of Material Fact ...............................................15

        2.   Ferrell Submitted His False Declaration in Bad Faith.......16

    C.    Substantial Sanctions Are Warranted and No Lesser
        Sanctions Will Suffice ................................................................19

        1.   Adverse Inference Jury Instructions Are Necessary...........20

        2.   Monetary Sanctions Are Appropriate ................................23

        3.   The Court Should Compel All Documents Related to
            Carlberg under the Crime-Fraud Exception.......................25

IV.     CONCLUSION .....................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Action Star Enter. v. Kaijet Tech. Int'l*, No. CV1208074BROMRWX, 2014 WL 12589632 (C.D. Cal. July 7, 2014) ................................................................................................23

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 881 F.Supp.2d 1132 (N.D. Cal. 2012) ................................................................ 14, 20

*Barnd v. City of Tacoma*, 664 F.2d 1339 (9th Cir. 1982) ........................14

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ...................................14

*Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040 (S.D. Cal. 2015) ...................................................... 20, 23

*Erum v. Cnty of Kauai*, No. 08-00113, 2008 WL 2598138 (D. Haw. June 30, 2008) ............................................................................14

*Estate of Blas Through Chargualaf v. Winkler*, 792 F.2d 858 (9th Cir. 1986) .........................................................................................14

*Everett v. Bankers Life & Cas. Co.*, No. C13-2246, 2015 WL 135775 (W.D. Wash. Jan. 9, 2015) ........................................ 14, 19, 20

*Fink v. Gomez*, 239 F.3d 989 (9th Cir. 2001) ...................................14

*In re Ryan M. Ferrell,* Case No. 19-80072 (9th Cir. 2019) ......................7

*In re Silberkraus*, 253 B.R. 890 (C.D. Cal. 2000) ...............................14

*Knickerbocker v. Corinthian Colleges*, 298 F.R.D. 670 (W.D. Wash. 2014) ..............................................................................23

*Medversant Techs., L.L.C. v. Morrisey Assocs., Inc.*, No. 09-CV-05031, 2011 WL 13124039 (C.D. Cal. Mar. 11, 2011) ......................22

*Mercury Serv., Inc. v. Allied Bank of Texas*, 117 F.R.D. 147 (C.D. Cal. 1987), *aff'd*, 907 F.2d 154 (9th Cir. 1990) .................................13

*Optyl Eyewear Fashion International Corp. v. Style Cos.*, 760 F.2d 1045 (9th Cir. 1985) ....................................................................14

*Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644 (9th Cir. 1997) ..............................................................................................23

*Roadway Exp., Inc. v. Piper*, 447 U.S. 752 (1980)....................................................13

*Smith v. Smith*, 145 F.3d 335 (5th Cir. 1998) ..........................................................20

*United States v. Blodgett*, 709 F.2d 608 (9th Cir. 1983) ..........................................22

*United States v. Shaffer Equip. Co.*, 11 F.3d 450 (4th Cir. 1993) ......................2, 22

*Zest IP Holdings, LLC v. Implant Direct Mfg., LLC*, No. CIV. 10–
   0541, 2013 WL 6159177 (S.D. Cal. Nov. 25, 2013) ............................. 14, 19, 20

**Statutes**

28 U.S.C. § 1927 ................................................................................. passim

Plaintiff Natural Immunogenics Corp. ("NIC") hereby moves for sanctions against NTG Defendant Scott J. Ferrell ("Ferrell") for his *in camera* submission of a materially false sworn declaration [Dkt. 812-1].  Through that false declaration, Ferrell intended to influence this Court's judgment in its review of NTG's Objections to the Special Master's Order at Docket No. 708.  Based on proof supplied herein, NIC moves to sanction Ferrell under the Court's inherent powers (*see, e.g.,* Dkt. 130 (sanctioning Defendant Reid under the Court's inherent powers for filing a recklessly false declaration)) and for relief under 28 U.S.C. § 1927.

## I.   **INTRODUCTION**

On December 27, 2011, Scott Ferrell served a demand letter on NIC threatening class litigation.  *See* Dkt. 812-1 ("Demand Letter").  NTG lacked a client at the time Ferrell signed that Demand Letter, thus evidencing an attempted extortion.  Endeavoring to exculpate himself in this case, Ferrell concocted a false narrative:  that his demand letter was prepared on behalf of Trycia Carlberg (deceased at the time he presented the narrative to the Court), a person he alleged became his client in December 2011 after retaining him in his home on December 24, 2011.  Ferrell presented no contemporaneous evidence to corroborate those representations.  *See* Dkt. 708 at 10-15.  Ferrell signed multiple statements under oath in this case attesting to those and related facts to support his contention that Trycia Carlberg was a *bona fide* NTG client and a willing participant in NTG litigation.  *See* Dkt. 694-1 at ¶¶ 5-6; 812-1 at ¶¶ 5-10.  As three non-party witnesses reveal in declarations and documentary evidence attached hereto, Scott Ferrell's narrative is false and perjurious in every material respect.

On March 1, 2019 the Court "grant[ed] the NTG Defendants' request to proffer additional evidence regarding the existence of an attorney-client relationship between NTG and Carlberg for *in camera* review."  *See* Dkt. 785 at 14.  NTG also produced supplemental discovery to NIC on July 3, 2019, which included content about Carlberg.  That production raised suspicion that Ferrell's

testimony about Carlberg was misleading.  NIC's investigation of that production ultimately confirmed Ferrell's declaration false, as evidenced by the testimony of several direct eye-witnesses and the documents appended as exhibits.  *See* Decl. of Charlotte Carlberg ("CC Decl."), Exh. B (Photo from December 24, 2011).

The conduct of Ferrell, an attorney, is egregious.  He submitted to the Court a false *jurat in camera* in support of repeated and equally false pleadings containing many of the same falsehoods.  *See* Dkt. 783.   The clear aim of the false declaration and statements in pleadings was to secure a tactical advantage in this case, by leading the Court to deny production of inculpatory evidence on Counts I and II of NIC's complaint.  The perjurious declaration was an effort to obstruct justice.  That act marks the fifth time in this case where Defendants have filed false statements or supplied misleading testimony, including a prior instance wherein this Court sanctioned NTG's David Reid (Ferrell's law partner) for filing another false declaration.  *See* Dkt. 130; Dkt. 736 at 14-17 (collecting evidence related to false Richardson narrative); Dkt. 610 at 4-5 (noting the "evolving" representations of Defendants' counsel); s*ee also* Dkt. 202-3 at 45 ¶2 (Ferrell submitted a false declaration stating that ProMaxal was marketed and sold).  The repeated false submissions and, in this particular case, false sworn declaration establish that Ferrell lacks the essential candor required of witnesses and attorneys.[1]

In this specific instance, Ferrell's perjurious testimony had the added effect of causing emotional injury to Carlberg's family and friends, who view the attempt to associate their daughter with Ferrell's sham litigation to be reprehensible and an affront to Carlberg's reputation for honesty and fair dealing—an affront to the reputation of one, now deceased, who is unable to defend herself.  *See* Decl. of MaryAnn Buc ("MAB Decl.") ¶ 33; Decl. of Jim Buc ("JB Decl.") ¶ 16.  Trycia

---

[1] All attorneys, as officers of the Court, have a duty of candor and "have the first line task of ensuring the integrity of the process."  *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457-58 (4th Cir. 1993) ("The system can provide no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end.").

Carlberg had nothing to do with NIC or this case and, yet, because of Ferrell's false testimony, the Carlberg family and her friends feel obliged to set the record straight.  *See* CC Decl. ¶ 16; *see also* Declaration of Jim Buc ("JB Decl.") ¶ 16. The wanton and repeat nature of Ferrell's offense, combined with the fact that he is an officer of the court who has practiced before this district and other federal and state courts in hundreds of cases, leads to the certain conclusion that a substantial sanction is needed to stem the pattern of perjury and protect the integrity of this Court and its judicial processes.  NIC therefore requests that this Court:

    (1)   Enter an adverse factual finding that NTG and Scott Ferrell lacked any client in December 2011 when Scott Ferrell served his December 27, 2011 Demand Letter on NIC alleging therein that he had a client prepared to sue;

    (2)   Impose monetary sanctions on Ferrell equivalent to NIC's costs and fees incurred while litigating and investigating Ferrell's false narrative concerning Trycia Carlberg;

    (3)   Compel production of all communications exchanged between Ferrell and any other individual related to the content and subject matters presented in the false declaration filed in Dkt. 812-1, including any communication created or exchanged during the pendency of this lawsuit, and including those exchanged with Ferrell's counsel under the crime-fraud exception;[2] and,

    (4)   Any other sanctions that the Court deems necessary and appropriate.

## II.   <u>FACTS</u>

On December 27, 2011, Defendant Scott Ferrell, allegedly on behalf of a client, issued a demand letter to NIC threatening class action litigation over NIC's advertising claims.  *See* Dkt. 812-1 at 9 ("I am writing on behalf of an individual California consumer…" and noting that his "client relied on [NIC's] assertions…").  When NIC would not entertain settlement discussions, Ferrell sued

---

[2] Ferrell's declaration was prepared and filed with his counsel's assistance.

NIC in the U.S. District Court for the Southern District of California, alleging violations of California's CLRA and UCL.  *See Nilon v. Natural Immunogenics Corp.*, No. 3:12-cv-00930-LAB(BGS) (S.D. Cal. 2012) ("*Nilon v. NIC*"), Dkt. 1 (Notice of Removal).  That complaint listed Andrew Nilon as the named plaintiff. *Id*.  But Nilon later testified that he purchased NIC's product in 2012, *after* Ferrell sent the December 2011 demand letter, revealing that NTG did not have a client in 2011.  *See id.* at Dkt. 21-2 at ¶2 (Nilon Declaration).  Addressing that discrepancy, Ferrell testified in this case that he authored the document on behalf of "Trycia Carlberg." a person who deceased in May 2012.  *See* Dkt. 680-3 at 4-5.  NTG had never before mentioned Trycia Carlberg in the underlying *Nilon* litigation.

NTG's 2011 demand letter never mentioned Carlberg's name.  Dkt. 812-1 at 9.  The first time NTG mentioned Carlberg was on July 7, 2016, in this case.  *See* Dkt. 680-2 at 4.  NTG could not produce a <u>single</u> document evidencing Ferrell's relationship with Carlberg, or her participation as a client in litigation.  *See* Dkt. 608-3 at 4-5.  NTG could not produce a retainer agreement with Carlberg, even though NTG had retainers for every other client at issue in this litigation.  *Id* at 5. NTG produced no evidence that Carlberg purchased or used NIC's "Sovereign Silver" product.  *See* Dkt. 680-3 at 6-7; *see also* Dkt. 708 at 10-15.  NTG had no evidence of any kind—other than Ferrell's self-serving testimony—that Carlberg was ever involved in litigation with NTG.

On June 12, 2018, the Court held that NTG could not invoke work product protections over documents not prepared for a specific client in advance of litigation.  Dkt. 659 at 28-29.  The Court remanded documents to the Special Master and instructed her to determine "the date that the attorney-client relationship commenced and the [date] it was terminated" for each of the SAC cases.  *See* Dkt. 659 at n.12; *see also* Dkt. 708 at 3-5 (summarizing procedural history).  In briefing before the Special Master, NTG submitted a false declaration authored by Scott Ferrell claiming that his attorney-client relationship with

Carlberg began on December 24, 2011. *See* Dkt. 694-1.

Carlberg passed away at the age of 36 on May 5, 2012 following a battle with breast cancer. Dkt. 785 at 11. Ferrell's declaration claimed Carlberg had lived in his home over Christmas in 2011. *See* Dkt. 694-1 ¶ 4; *see also* 812-1 ¶ 5. It was over that holiday, according to Ferrell, that Carlberg asked Ferrell to sue NIC over its advertising of "Sovereign Silver." 812-1 ¶ 9. At oral argument before the Special Master, NTG's counsel argued that the Court should accept Scott Ferrell's version of events because Carlberg was unavailable. *See* Declaration of Arhangelsky, Exh. 1 at 115:17-21. Ferrell (through counsel) argued that the absence of documentation concerning Carlberg's legal claim was justifiable given that Carlberg was "living in Mr. Ferrell's home" at the time:

> MS. SPERBER:   Yes, Your Honor. And the reason I characterize this as N.T.G. being improperly penalized is for two things. First is that Ms. Carlberg has passed away, and so she's unable to verify the relationship.
>
> SPEC. MASTER:   So that makes her the perfect client, huh? Go ahead.
>
> MS. SPERBER:   If she were alive, the issue would be cleaned up easily. It would be easy. The second reason that N.T.G. is being penalized is that N.T.G. cannot find the retainer agreement associated with Ms. Carlberg, but there's a very specific explanation for that, which is that she was living in Mr. Ferrell's home.
>
> And that explanation is reasonable. A woman who is at the end of her life. She's living in Mr. Ferrell's home. The fact that he would communicate with her in person on behalf of N.T.G. rather than by e-mail, the fact that he may respect that she may not want to be tied to electronics in those last few months, this is –

Decl. of Arhangelsky, Exh. 1 at 115-16. NTG also argued these points in briefing: "[G]iven the seriousness of her illness and that she was staying in the Ferrells'

home, one should actually be surprised to find that anyone in Mr. Ferrell's position would have resorted to … impersonal means of communicating with a close friend." *See* Dkt. 694 at 3-5.

The Special Master remained skeptical and "thought the [Ferrell] declaration had huge holes that you could run a truck through." *Id.* at 116.  In her final order, the Special Master observed that "NIC raises quite serious concerns about Ferrell's credibility." Dkt. 708 at 10.  Noting deficiencies in Ferrell's declaration, the Special Master held that "[t]he declaration of Ferrell is entitled to little weight since it is conclusory and devoid of essential, basic facts." *Id.* at 11-12.

This Court reached similar conclusions.  *See* Dkt. 785 at 12-13 ("The Court finds that the NTG Defendants have not sufficiently established that NTG represented Carlberg in the *Nilon* action").  Notably, the Special Master and this Court found that Ferrell's verified discovery responses contradicted his declaration.  *See* Dkt. 708 at 14; *see also* Dkt. 785 at 13.  The Court cited evidence "placing the NTG Defendants' credibility in doubt in the instant action based on past alleged false and fraudulent statements made under oath, either by the NTG Defendants or at their direction."  *See* Dkt. 785 at 13 ("the Court finds that these arguments further undermine the credibility of Ferrell's self-serving, conclusory declaration").  That evidence included proof of the following misconduct:

(1) David Reid's (Ferrell's law partner's) submission of a materially false declaration earlier in this case, for which Reid was censured by this Court.  *See* Dkt. 732-1 at 20-21; Dkt. 130.  David Reid was NTG's managing partner.

(2) Scott Ferrell's submission of a false declaration in the *Morales v. Magna RX* lawsuit.  *See* Dkt. 732-1 at 21.

(3) Scott Ferrell's direction to Raquel Torres in *Torres v. Nutrisystem* that she testify falsely at deposition.  *See id.*

(4) Defendant Ryan Ferrell's submission of a false declaration in the

*Nilon v. NTG* concerning contacts with Andrew Nilon. *Id.[3]*

(5)   Ferrell's false declaration earlier in this case claiming under oath that Strataluz completed sales of ProMAXAL when, in fact, it had not. *Id.*

(6)   Ferrell's preparation and submission of a false declaration by Richard Richardson in the *Torres v. Nutrisystem* matter and his subsequent submission of false interrogatory responses to conceal that misconduct. *Id.* at 21-22.

(7)   False statements by Schoonover's counsel claiming that incriminatory text messages were unrelated to Schoonover's SAC case when, in fact, a plain reading of those messages revealed the opposite (as held by the Special Master). *See* Dkt. 610 at 3-4; *see also* Dkt. 625 at 8-10 (finding the messages related to SAC cases).

At oral argument on February 8, 2019, after the Court rejected his original declaration, Ferrell requested an opportunity to submit a more detailed declaration *in camera*. *See* Dkt. 781 at 4.  Ferrell filed that *in camera* declaration on February 27, 2019.  *See* Dkt. 809 (summarizing procedural history).  This Court ultimately rejected Ferrell's *in camera* declaration, finding that Ferrell "fail[ed] to provide any declaratory facts or evidentiary proof beyond what was provided to the Court in connection with the NTG Defendants' original briefing…" *See* Dkt. 785 at 14.  NIC then filed an application for public disclosure of Ferrell's Declaration.  *See* Dkt. 809 (Order summarizing procedure).  NTG opposed public disclosure, representing that Ferrell supplied the declaration on the understanding that it would remain non-public.  *See* Dkt. 802 at 1-2 (NTG stating Ferrell supplied the

---

[3] The Arizona Bar and Ninth Circuit recently disbarred Defendant Ryan Ferrell for identical conduct alleged against Scott Ferrell here: the pursuit of litigation without having a legitimate client.  *See* PAA Decl., Exh. 2; *In re Ryan M. Ferrell,* Case No. 19-80072 (9th Cir. 2019), Dkt. 3.  Ryan Ferrell attempted to extort settlement money through a new firm, the "Apex Trial Group."  *See* PAA Decl., Exh. 4.  The Arizona Bar initiated disciplinary proceedings when the evidence proved Ryan Ferrell did not have a legitimate client at the time, and that he threatened suit on objectively false facts.  *See* Decl. of Arhangelsy, Exh. 3 (Arizona State Bar Complaint); *see also* PAA Decl., Exh. 4 (Declaration of Miro Posavec).

declaration "with the expectation that it would be confidential").  The Court ordered NTG publicly docket Ferrell's declaration, which NTG did at Dkt. 812-1.

Contemporaneous with its filing in Dkt. 812-1, NTG served NIC with supplemental discovery on July 3, 2019.  *See* PAA Decl. at Exh. 6 (email to attorneys with document production).  That production included a DVD copy of a documentary entitled "Enter Stage 4," produced in March 2017 by Trycia Carlberg's close friend.  *See* PAA Decl. at Exh. 5.  NIC had been unaware of that documentary until NTG's supplemental production.  *See* PAA Decl. at 4.  The documentary tracked Carlberg's final years battling breast cancer.  *See* PAA Decl., Exh. 5 ("Enter Stage 4" documentary).  The film revealed contradictions in Ferrell's declaration [Dkt. 812-1], including evidence that Carlberg was not residing at Ferrell's home in December 2011, and that her medical condition at the time made participation in class litigation impracticable, if not impossible.  Moreover, documents compelled by the Court's [Dkt. 785] revealed Ferrell lacked knowledge of a client in January 2012 or that, even if he had a client, it was not Carlberg under the circumstances described in his declarations.

Ferrell's *in camera* declaration to this Court represented that, on December 24, 2011, he had an intimate conversation with Carlberg in his home where she "cried" and professed a desire to sue NIC.  *See* Dkt. 812-1 ¶¶6-7.  Yet, just three weeks later, Ferrell apparently forgot about those circumstances.  Ferrell's *in camera* declaration to this Court represented that, on December 24, 2011, he had an intimate conversation with Carlberg in his home where she "cried" and professed a desire to sue NIC.  *See* Dkt. 812-1 ¶¶6-7.  Yet, just three weeks later, Ferrell apparently forgot about Trycia Carlberg.  *See* NTG022177.  NTG has been unable to produce a single document in discovery—not a text message, email, photo, or writing of any kind—that relates to Carlberg.  Dkt. 785 at 12-13.  NTG has produced no contemporaneous evidence to substantiate or support any material representation in Ferrell's declaration in Dkt. 812-1.  *Id.*

In early August 2019, NIC followed investigative leads derived from the documentary, "Enter Stage 4," that Ferrell produced on July 3, 2019. *See* Declaration of Jennifer Fernandes at 3-7. NIC contacted the film's producer, a long-time friend of Carlberg. *Id* at 8. NIC was then placed in contact with eye-witnesses, each having personal knowledge of Carlberg's life, daily activities, and whereabouts in 2011 until her passing in May 2012. The witnesses include Charlotte Carlberg (Trycia's mother), MaryAnn Buc (Trycia's close family friend), and Jim Buc (MaryAnn's husband and Trycia Carlberg's long-time friend). MaryAnn Buc knew Trycia from childhood, and was often introduced as Trycia's Aunt. *See* Decl. of MaryAnn Buc ("MAB Decl.") ¶ 3. Charlotte Carlberg and the Bucs helped care for Trycia while terminally ill. *See* Decl. of Charlotte Carlberg ("CC Decl.") ¶ 9; *see also* MAB Decl. ¶¶ 17-19; Decl. of Jim Buc ("JB Decl.") ¶¶ 5-6. They were among the people closest to Trycia in her final years. The Bucs also operated Trycia's "Don't Worry Be Happy" foundation (DWBH), which helped pay for Trycia's medical expenses. *See* MAB Decl. ¶ 4; JB Decl. ¶ 4. The three witnesses have produced the attached sworn testimony, revealing, conclusively, that Scott Ferrell's declaration about Trycia Carlberg supplied *in camera* is false in all material respects.

Each witness testified that Ferrell's declaration described an impossible set of circumstances. Trycia never resided or lived at the Ferrells' home in December 2011—a fact which undermines every material position in Ferrell's declaration. *See* CC Decl. ¶¶ 5-8; MAB Decl. ¶¶ 9-15; JB Decl. ¶ 8. Trycia spent the last days of December 2011 with her mother at her mother's home in San Clemente. *Id*. On the same day Ferrell claims to have had a conversation about Sovereign Silver with Carlberg in Ferrell's house, Carlberg was actually residing in her mother Charlotte's home, spending her last Christmas with immediate family. *Compare* Dkt. 812-1 ¶¶ 5-7 *with* CC Decl. ¶¶ 5-8; MAB Decl. ¶¶9-15; JB Decl. ¶ 8. Charlotte Carlberg attaches to her declaration a date-stamped photo of Trycia with

her family, at Charlotte's house, on December 24, 2011, proving beyond doubt that Trycia was not then at Ferrell's home. *See* CC Decl., Exh. B. All three witnesses confirm that Trycia was not at the Ferrell's home at any time over the Christmas holiday in 2011. *See* CC Decl. ¶¶ 5-8; MAB Decl. ¶¶ 9-15; JB Decl. ¶ 8. Moreover, the witnesses confirm that Carlberg disliked Ferrell's litigation. *See* JB Decl. ¶ 14; MAB Decl. ¶¶ 21-23; CC Decl. ¶11. Trycia Carlberg had knowledge of Scott Ferrell's litigation practices and deemed them unethical and immoral. *Id.* MaryAnn and Jim Buc were each aware that Trycia would never participate in Ferrell's litigation. *See* CC Decl. ¶ 11; JB Decl. ¶ 14; MAB Decl. ¶ 24.

At the invitation of Erin Ferrell (Scott Ferrell's wife) Trycia Carlberg, then dog-sitting to earn a living, did stay at the Ferrell's home in the month of March 2012 (not in 2011), but she fled following a limited stay, experiencing discomfort living with the Ferrells. *See* MAB Decl. ¶¶ 28-30; JB Decl. ¶¶ 13, 15; CC Decl. ¶ 13. She had no relationship with Scott Ferrell, and would not have confided in him over personal matters. *See* CC Decl. ¶ 13; JB Decl. ¶ 15. At Trycia's request, Scott and his wife were expressly asked not to visit Trycia in the hospital in 2012 because Trycia felt uncomfortable with them. *See* CC Decl. ¶¶ 14-15.

Trycia never informed individuals closest to her (including her mother and the Bucs with whom she resided in 2011) that she was involved in any lawsuit or legal matter. *See* CC Decl. ¶ 11; MAB Decl. ¶ 24; JB Decl. ¶¶ 11-12. She never mentioned that Scott Ferrell was her attorney or would represent her. *Id.* She neither possessed at her residences, nor made mention of, "Sovereign Silver" at any time in 2011. *See* CC Decl. ¶ 10; MAB Decl. ¶ 26; JB Decl. ¶ 10.

In 2011 through May 2012, Trycia's caretakers (Charlotte Carlberg, Jim Buc, and MaryAnn Buc) purchased all of Trycia's medications and health products. *See* JB Decl. ¶¶ 5-6, 10; MAB Decl. ¶¶ 17, 26. They were intimately familiar with every health product Trycia used. *Id.* None of those three witnesses recall ever seeing a product labeled "Sovereign Silver." *See* CC Decl. ¶ 10; MAB

Decl. ¶ 26; JB Decl. ¶10.  Neither MaryAnn Buc, Jim Buc, nor Charlotte Carlberg purchased Sovereign Silver for Trycia, saw that product in their houses, or saw Trycia use that product.  *Id.*  Trycia was satisfied with the products she was consuming, never expressing disappointment.  She had no substantive complaint about any of the products she used in 2011 through 2012.  *See* MAB Decl. ¶ 27.

The evidence reveals Scott Ferrell's declaration to be a fabricated narrative, engineered by him to evade liability and production of documents.  In his sworn declaration [Dkt. 812-1], Ferrell made the following materially false statements under oath:

(1)   Ferrell testified that Carlberg "began living in [Ferrell's] home in 2011 because she was very ill with cancer and needed [his] support and assistance."  *See* Dkt. 812-1 ¶¶ 5-7.  That statement is false.  Carlberg never stayed in the Ferrells' home in December 2011.  *See* CC Decl. ¶¶ 5-8; MAB Decl. ¶¶9-15; JB Decl. ¶ 8.

(2)   Ferrell testified that Carlberg lived in his home until "the early part of 2012, when she moved into a hospice facility, where she stayed until shortly before her death on May 5, 2012."  *See* Dkt. 812-1 ¶ 5.  That statement is false.  Carlberg stayed with the Ferrells for just several weeks in March 2012, after which she departed the Ferrells' home on poor terms, and lived thereafter with her mother, Charlotte, until she entered hospice care.  *See* CC Decl. ¶¶ 7, 10, 12-13; MAB Decl. ¶¶ 10-15, 28; JB Decl. ¶ 8.

(3)   Ferrell testified that "during the period of time that Ms. Carlberg lived in [his] home, she frequently updated [him] on her illness and health, as well as the treatment she was receiving and the ups and downs associated with that treatment."  *See* Dkt. 812-1 ¶ 6.  That statement is false.  Carlberg did not then live in Scott Ferrell's home and had no close relationship with Scott Ferrell where she shared private information.  *See* CC Decl. ¶ 13; MAB Decl. ¶¶ 10-15; JB Decl. ¶¶ 12, 15.

(4)   Ferrell testified that "[i]n late 2011, Ms. Carlberg told me that she decided to see a 'naturalpathic/homeopathic doctor' for alternative treatments…"

*See* Dkt. 812-1 ¶ 6.  That statement is false because Carlberg was not staying in Ferrell's home in "late 2011" as described in Ferrell's declaration.  *See* CC Decl. ¶ 13; JB Decl. ¶ 8.

(5)   Ferrell testified that, "[o]n December 24, 2011, Ms. Carlberg told [him] that her naturalpathic [sic] doctor had recommended a variety of alternative treatments and actions to fight cancer" and that "[s]he then showed [him] some of the products she had purchased and was taking or using, one of which was Sovereign Silver…" *See* Dkt. 812-1 ¶ 7.  Those statements are false: Carlberg was not in Ferrell's house on December 24, 2011.  *See* CC Decl. ¶ 10, 13; MAB Decl. ¶¶ 10-15; JB Decl. ¶ 8.  Moreover, Carlberg was not using, and had not purchased, Sovereign Silver.  *See* CC Decl. ¶ 10; MAB Decl. ¶¶ 20, 26; JB Decl. ¶¶ 5-6, 10.  Photographic evidence and the testimony of three witnesses confirm that Carlberg was not (and could not have been) in Ferrell's home on December 24 or 25, 2011.  *See* CC Decl., Exh. B.

(6)   Ferrell also testified that Carlberg's naturopathic doctor recommended she use Sovereign Silver.  *See* Dkt. 812-1 ¶ 7.  That testimony is false.  MaryAnn Buc and Jim Buc attended Trycia's naturopathic appointments with Trycia and, along with Charlotte Carlberg, purchased all of her health products.  *See* CC Decl. ¶¶ 9-10; MAB Decl. ¶¶ 20, 26; JB Decl. ¶¶ 5-6, 10.  They confirm under oath that Trycia's naturopathic doctor never recommended that she consume Sovereign Silver and that they never purchased Sovereign Silver for her.  *See* CC Decl. ¶¶ 9-10; MAB Decl. ¶¶ 19-20, 26; JB Decl. ¶ 10.

(7)   Ferrell testified about a private, in-person conversation he allegedly had with Carlberg in his home on December 24, 2011.  *See* Dkt. 812-1 ¶¶ 7-9.  That testimony is false: Carlberg was not at Ferrell's home, or in his company, at any time over the Christmas holiday in 2011.  *See* CC Decl. ¶¶ 5-6; MAB Decl. ¶¶ 10-15; JB Decl. ¶ 8.

(8)   Ferrell testified that he "took a photograph of the label on the box of

Ms. Carlberg's Sovereign Silver product" on December 24, 2011 at 5:08pm. *See* Dkt. 812-1 ¶ 10. That testimony is false because Carlberg did not purchase Sovereign Silver, did not reside in Ferrell's home in December 2011, and was not in Ferrell's company at any time during the Christmas holiday in 2011. *See* CC Decl. ¶¶ 5-6, 10; MAB Decl. ¶10-15, 26; JB Decl. ¶¶ 5-6, 8, 10. Accordingly, Ferrell's photograph was not of "Carlberg's Sovereign Silver," as he falsely testified. Rather, the photograph together with his email to his father (*See* NTG022175) confirm that he, Ferrell, purchased "Sovereign Silver" himself for use in litigation.

(9)   Ferrell testified that "[o]n either December 24 or December 25, 2011, [he] had Ms. Carlberg execute an engagement letter with [his] firm." *See* Dkt. 812-1 ¶ 12. He testified that Carlberg signed a printed copy of that declaration in his home over the Christmas holiday. *Id*. That testimony is false. Carlberg was not in the Ferrell's home over the Christmas holiday, and was instead in the physical company of her mother at her mother's house. *See* CC Decl. ¶¶ 5-6; MAB Decl. ¶10-15; JB Decl. ¶ 8. Conveniently, Ferrell claims to have lost his retainer agreement with Carlberg. *See* Dkt. 680-3 at 5 ("Defendant states that while it believes Trycia Carlberg signed a retainer agreement with NTG with respect to her claims against NIC, Defendant has been unable to find it.").

## III.   ARGUMENT

### A. Legal Standards

Federal Courts have inherent power to "levy sanctions in response to abusive litigation practices." *See* Dkt. 130 (quoting *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 765 (1980)). "Sanctioning a party or its counsel for the filing of false or seriously misleading affidavits is appropriate under these inherent powers…" *Mercury Serv., Inc. v. Allied Bank of Texas*, 117 F.R.D. 147, 158 (C.D. Cal. 1987), *aff'd*, 907 F.2d 154 (9th Cir. 1990). To impose sanctions, "the Court must find "bad faith or conduct tantamount to bad faith."" *See* Dkt. 130 (quoting *Fink v.*

*Gomez*, 239 F.3d 989, 994 (9th Cir. 2001)).  "Upon a finding of bad faith, courts can levy an assortment of sanctions under their inherent power, including monetary awards, attorneys' fees, adverse inference jury instructions, and even dismissal of claims." *Everett v. Bankers Life & Cas. Co.*, No. C13-2246, 2015 WL 135775, at *4 (W.D. Wash. Jan. 9, 2015) (citing *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 881 F.Supp.2d 1132, 1135 (N.D. Cal. 2012); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)).  "Sanctions should be commensurate to the sanctioned party's degree of fault and the other party's prejudice." *Id.* (citing *Zest IP Holdings, LLC v. Implant Direct Mfg., LLC*, No. CIV. 10–0541, 2013 WL 6159177, at *7 (S.D. Cal. Nov. 25, 2013)).  "A trial court's inherent powers unquestionably include the power to assess attorney's fees against [one] who willfully abuses judicial process or otherwise conducts litigation in bad faith." *Barnd v. City of Tacoma*, 664 F.2d 1339, 1342 (9th Cir. 1982).  The Court must find bad faith by a preponderance of the evidence.  *In re Silberkraus*, 253 B.R. 890, 913 (C.D. Cal. 2000); *Erum v. Cnty of Kauai*, No. 08-00113, 2008 WL 2598138, at *7 (D. Haw. June 30, 2008).

This Court also has the authority to sanction litigants if they vexatiously increase the costs of litigation upon a showing of recklessness or bad faith.  *See* 28 U.S.C. § 1927; *Estate of Blas Through Chargualaf v. Winkler*, 792 F.2d 858, 860 (9th Cir. 1986).  "Bad faith is present when [a litigant] knowingly or recklessly raises a frivolous argument or advances a frivolous or false paper. *Id*. (citing *Optyl Eyewear Fashion International Corp. v. Style Cos.*, 760 F.2d 1045, 1050-51 (9th Cir. 1985)).

Ferrell's false declaration is sanctionable because in response to this Court's Order permitting the filing of a declaration, he filed a materially and willfully false declaration *in camera* for the improper purpose of securing an Order enabling him to avoid production of incriminatory information and thereby maintain a false narrative in defense of Counts I and II of NIC's complaint.

**B. Scott Ferrell Prepared a False and Perjurious Declaration for an Improper Purpose**

**1. Scott Ferrell's Declaration Contained Intentionally False Statements of Material Fact**

Ferrell's February 27, 2019, declaration is false in every material respect. Ferrell testified Carlberg lived with him in December 2011, that he had an in-person conversation with her at his home on December 24, 2011, and that she signed a retainer agreement at his home on December 25, 2011. *See* Dkt. 812-1 ¶¶ 5-7, 10, 12. Testimony from Carlberg's mother and from two of her closest friends along with contemporaneous documentary evidence establish that Carlberg did not live with the Ferrells in December 2011, was not in his home over the Christmas holiday, and was not in his home or presence for at least two weeks preceding those dates. *See* CC Decl. ¶¶ 5-6; MAB Decl. ¶10-15; JB Decl. ¶ 8. NIC attaches a photograph taken at Carlberg's mother's home on December 24, 2011, which shows Carlberg (far right) and her family together on that date. *See* CC Decl., Exh. B. The photograph disproves Ferrell's statements in his sworn affidavit. *Id.* Carlberg's mother also testifies that Trycia was with her for the entire holiday, a fact corroborated by two other non-party declarants. *See* CC Decl. ¶¶ 5-6; MAB Decl. ¶10-15; JB Decl. ¶ 8. By contrast, Ferrell's narrative has absolutely no documentary support, is contradicted by his own discovery responses and documents, and is authored by a RICO defendant in need of an exculpatory narrative. *See* Dkt. 785 at 14.

Ferrell falsely testified that Carlberg showed him a bottle of Sovereign Silver and that she wanted to sue NIC. *See* Dkt. 812-1 ¶ 7. MaryAnne and Jim Buc ran Trycia's "Don't Worry Be Happy" Foundation and used the proceeds to purchase Trycia's health products because she did not have the funds to pay for medical expenses. *See* JB Decl. ¶ 4-5, 6; MAB Decl. ¶ 26. The Bucs never bought Sovereign Silver, never discussed silver products with Trycia, and never saw Trycia with that product. *See* MAB Decl. ¶ 26; JB Decl. ¶ 10. Similarly, the Bucs

and Trycia's mother, who attended medical appointments with Trycia and participated in medical decisions, never heard any mention of and never saw the Sovereign Silver product.  *See* MAB Decl. ¶¶ 17, 18-19, 26; JB Decl. ¶¶ 5-6, 10; CC Decl. ¶¶ 9-10.  Trycia never mentioned any intention to pursue litigation against anyone, and, in March 2012, Trycia informed the Bucs that she thought Ferrell's litigation practices morally corrupt and detestable.  *See* JB Decl. ¶ 14; MAB Decl. ¶ 21.  Trycia told MaryAnn Buc that Ferrell had tried to solicit her to be a shill plaintiff in his litigation scheme, but that she refused because she viewed Ferrell's practice as morally repugnant.  *See* MAB Decl. ¶¶ 21-22; *compare* SCHOONOVER00087-88 (Schoonover reporting that his father thought the NTG lawsuits were unethical).

Ferrell's sworn narrative hinges on the false statement that Carlberg was present in his house during the Christmas holiday in 2011.  According to Ferrell, Trycia's presence in his home over that holiday explained or justified:  (1) the absence of documentation about her legal claim; (2) the absence of her retainer; and (3) the opportunity for Carlberg to become a client.  As noted *supra*, contradictory testimony supported by contemporaneous photographic evidence proves Ferrell's declaration false.

## 2. Ferrell Submitted His False Declaration in Bad Faith

Ferrell carefully planned each false statement to convince this Court of the falsehood that he had a client in December 2011 for his case against NIC.  The evidence reflects the deliberateness of Ferrell's false testimony to this Court in order to achieve a tactical advantage in the litigation:

First, Andrew Nilon had already testified that he did not purchase Sovereign Silver until 2012.  *See* Dkt. 410-28 (Deposition of Andrew Nilon) at 79 (Tr. 78:4—22); *see also Nilon v. Natural Immunogenics Corp;* Case No. 3:12-cv-00930-LAB (BGS), Dkt. 21-2 at ¶ 2.  Ferrell thus could not claim that Nilon was his "client" in December 2011 without also conceding that he had manufactured the NIC case and

sent a demand letter before his client even bought the product.  Ferrell needed a client in December of 2011, whom he could contend was the one to which he referred in his 2011 demand letter.  Ferrell concocted the false narrative that Carlberg was that client, a position enabled by the fact that Carlberg was deceased and could not contradict the narrative.  *See* Declaration of Arhangelsky, Exh. 1 at 115:22-23 (Special Master noting that Carlberg was the "perfect client" because she had passed and could not answer questions).  Scott Ferrell also endeavored to convey the impression that he was a "good actor" by falsely representing himself to be Carlberg's residential caretaker in December 2011.  He weaponized Carlberg's death and her battle with cancer in open Court by having his counsel argue that NIC's probe into Carlberg's legal claim in 2011 was in bad taste.  *See* Dkt. 694 at 6 ("NIC makes the audacious claim that Trycia Carlberg was not a real client . . . the premise behind NIC's argument is not only completely false, but it is also highly offensive."), at 13 (NIC's offensive and unsubstantiated claim that there was no attorney-client relationship with Ms. Carlberg must be rejected.").

Ferrell never explains how it was practical for the terminally ill Carlberg to be a class plaintiff in litigation.  Carlberg was hospitalized after having collapsed the same month that Ferrell claims she retained him.  *See* PAA Decl., Exh. 5.  By December 2011, she learned that her cancer had returned in Stage 4 (metastasis).  *Id*.  Her focus at that time was on survival, not suing a dietary supplement manufacturer.  *See* CC Decl. ¶ 11; MAB Decl. ¶ 27; JB Decl. ¶ 12.  She had only months to live, yet Ferrell claims that, in that same month and within weeks of her hospitalization, she agreed to be lead plaintiff in a class action lawsuit wherein Carlberg would not have been representative or typical of the class.

Second, the record contained a December 24, 2011 email from Scott Ferrell to himself that attached a picture of the Sovereign Silver bottle.  Ferrell needed his Carlberg timeline to line up with the picture he took of that bottle, and the demand letter that he sent on December 27, 2011.  He thus falsely claimed that Carlberg

lived with him on December 24, 2011. In his false declaration, Ferrell alleged in-person conversations with Carlberg in Ferrell's home on December 24, 2011, because that date would support his claim that he obtained the Sovereign Silver bottle from her. Moreover, the alleged in-person conversation in his home would not have been of a kind overheard by others, making an opponent's contradiction of the false narrative more difficult.

Third, Ferrell also needed to explain the absence of a retainer agreement or any communications about Carlberg within NTG. He therefore testified falsely that Carlberg was at his home over the 2011 Christmas holiday, and, as a result, he did not prepare documents at the NTG office, but instead did so at home. According to Ferrell, that also explained why he could produce no emails exchanged regarding preparation of a retainer, why he could not find a copy of the retainer, and why he had no other documents or communications about Carlberg's claim. *See* Dkt. 716 at 22-24; Dkt. 694 at 7-10.

Finally, Ferrell used the Carlberg narrative to portray himself as an altruist, not of a character capable of repeatedly filing false, sham litigation before the courts. He claimed that he and his wife physically cared for Carlberg until she entered hospice, which caretaker narrative is also false. *See* Dkt. 694-1 ¶¶ 4-5; Dkt. 812-1 ¶¶ 5-6. He held himself out as an individual looking to aid a terminally ill friend when, in reality, he had little involvement with Carlberg and, indeed, caused her to leave his home in 2012 on poor terms, fleeing from his residence. Far from supporting a good character, the evidence reveals Ferrell to have used his wife's terminally ill associate, since deceased, as a convenient alibi in an effort to defraud this Court into excusing his involvement in sham litigation, i.e., using perjury to cover-up a litigation practice of defrauding the Courts (lies atop lies).

Ferrell's underlying purpose in creating the false narrative is strong evidence of bad faith. NTG has argued from the outset that NIC's "standing" to advance a RICO claim is based on its malicious prosecution count. While that argument is

legally erroneous, NTG still maintains it moving forward.  Ferrell thus concocted the Carlberg story as an attempt to rebut NIC's case by falsely asserting the existence of a client before he sent his original demand letter to NIC.  Ferrell then used his false Carlberg narrative to prevent the disclosure of damaging documents.  His abuse of the *in camera* process is particularly malicious because he endeavored by submitting the false details *in camera* to hide the falsehoods from opposing counsel and thus escape investigation of the false narrative.  He even admitted to this Court that he submitted the declaration with the expectation that NIC would never see it.  *See* Dkt. 802; *see also* Dkt. 812-1 ¶ 3.

Finally, the Court should find bad faith because Ferrell's fraud on the Court has caused Carlberg's loved ones to be distressed and drawn into this litigation in order to set the record straight.  Ferrell's use of Carlberg is reprehensible and has unnecessarily (yet predictably) caused non-parties to suffer.  His conduct amounts to bad faith in part because it is indecent and shameful.

## C. Substantial Sanctions Are Warranted and No Lesser Sanctions Will Suffice

Under the Court's inherent powers and Section 1927, it has broad authority to issue appropriate sanctions.  "Upon a finding of bad faith, courts can levy an assortment of sanctions under their inherent power, including monetary awards, attorneys' fees, adverse inference jury instructions, and even dismissal of claims." *Everett*, No. C13-2246JLR, 2015 WL 135775, at *4.  "Sanctions should be commensurate to the sanctioned party's degree of fault and the other party's prejudice."  *Id.* (citing *Zest IP Holdings*, No. CIV. 10–0541–GPC WVG, 2013 WL 6159177, at *7).  The Court should: (1) award NIC attorney's fees for the costs incurred as a result of Ferrell's false statements;[4] (2) issue an adverse inference jury instruction to ensure an accurate record and eliminate the need to pull Carlberg's family and friends into Court to rebut Ferrell's demonstrably false

[4] *See* Dkt. 680; Dkt. 699; Dkt. 731; Dkt. 801.

testimony; (3) compel production of all documents and communications related to Carlberg that were exchanged by or with the NTG Defendants; and (4) order any other sanctions that the Court deems necessary and appropriate.

### 1. Adverse Inference Jury Instructions Are Necessary

A court may sanction a party for the bad faith submission of a false affidavit by levying an assortment of sanctions which may include adverse inference instructions or dispositive sanctions. *Everett*, No. C13-2246, 2015 WL 135775, at *4 (citing *Apple, Inc.*, 881 F.Supp.2d at 1135) ("Upon a finding of bad faith, courts can levy an assortment of sanctions under their inherent power, including . . . adverse inference jury instructions, and even dismissal of claims."). Generally, the Court has broad discretion in fashioning the appropriate sanction based on the specific circumstances before the Court. *Id*. The Courts are instructed to issue a sanction commensurate with the egregiousness of the conduct and the degree of prejudice flowing from that misconduct. *Id.* (citing *Zest IP Holdings*, No. CIV. 10–0541, 2013 WL 6159177, at *7). As explained below, the most appropriate sanction is an adverse factual finding that Ferrell did not have a client when he sent the December 27, 2011 demand letter to NIC.

NIC's requested adverse inference is directly related to, and effectively cures, Ferrell's misconduct. The purpose of Ferrell's false submission was to prevent the discovery of evidence that would prove that Ferrell did not have a client in December of 2011 and to deceive the court into concluding that he *did* have a client. NIC requests an adverse inference establishing the very fact that Ferrell denied existed. The sanction is therefore narrowly and specifically tailored to the misconduct warranting sanctions.

"The court may consider the party's motivations, and can consider his 'dilatory and obstructive conduct' in the **case and other related cases**." *Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1053 (S.D. Cal. 2015) (quoting *Smith v. Smith*, 145 F.3d 335, 344 (5th Cir. 1998) (emphasis

added)).  Here, the Defendants have repeatedly sought to deceive this Court and NIC throughout this case.  The specific perjurious narrative contained in Scott Ferrell's declaration was also presented in open Court in the effort to dissuade production of inculpatory evidence and to create a false predicate for countering Counts I and II of the Complaint.  The repeated filing of false declarations and false submissions to this Court is characteristic of the greater effort to defraud the Courts that is at the heart of this litigation:  Defendants have engaged in widespread fraud on the courts as part of their racketeering scheme.  Dkt. 659 at 13-16; Dkt. 820 at 14-15.  The Defendants, working at Scott Ferrell's direction, have submitted false and perjurious declarations on behalf of themselves and witnesses.  Dkt. 659 at 18; Dkt. 820 at 22.  They have instructed witnesses to lie under oath at deposition.  *See* NTG017134-NTG017135 (submitted to the Court *in camera*).  Put simply, the evidence before the Court overwhelmingly proves that the Defendants will not be dissuaded from testifying falsely under oath by a censure or monetary sanction alone.  This Court already sanctioned Defendant Reid for the submission of a false declaration by issuing a formal reprimand, but that had no effect on dissuading Reid's law partner, Scott Ferrell, from submitting yet another false declaration to the Court.  Dkt. 130.  Given the repeat and unrepentant nature of the efforts to defraud the Court, particularly meaningful monetary sanctions are warranted.  At the time of the Reid false declaration, Defendants' counsel pledged to the Court that the NTG defendants had learned their lesson and would henceforth take seriously the submission of sworn testimony (something the Defendants should have understood to be fundamental given that they are licensed attorneys).  But despite the prior sanction and that pledge, Scott Ferrell nonetheless propounded an intentionally false narrative designed to deceive this Court for tactical advantage.  The record thus demonstrates that lesser sanctions will not dissuade Defendants from submitting false testimony.  The Court should thus deny Scott Ferrell the opportunity to

present the same false testimony before a jury and instead issue the requested adverse factual finding.

Courts also evaluate the severity of misconduct. *Medversant Techs., L.L.C. v. Morrisey Assocs., Inc.*, No. 09-CV-05031, 2011 WL 13124039, at *4 (C.D. Cal. Mar. 11, 2011) (citing *United States v. Blodgett*, 709 F.2d 608, 611 (9th Cir. 1983)). Ferrell's conduct is among the most egregious. He intentionally lied to this Court. He filed a false affidavit in response to this Court's order permitting him the opportunity to present *in camera* a sworn declaration of the facts. His false declaration was not reckless; it was intentional, wanton, and repeat. Ferrell intentionally contrived the false narrative to avoid production of inculpatory evidence, to avoid discovery orders, and to deceive the Court as to facts critical to plaintiff's Counts I and II. As a perjurious declarant, Ferrell has committed a crime that undermines the judicial system. *Shaffer Equip.*, 11 F.3d at 457-58.

Finally, Ferrell's false narrative unnecessarily thrust Carlberg's mother and friends into this civil dispute. They are the eye-witnesses whose declarations rebut Ferrell's false statements. They are experiencing the emotional trauma of having to defend the good name and reputation of a deceased daughter and friend against scurrilous charges, and the costs associated with being pulled by Ferrell into this matter. Without an adverse inference, those non-parties will be required to testify at trial to prove Ferrell's unsupported narrative false. As non-parties with no stake in this litigation, it would be unjust to force them deeper into litigation when the record so amply demonstrates that Ferrell's declaration is false and contrived. Here, again, this Court should recognize that NTG and Ferrell have literally <u>no contemporaneous evidence</u> supporting Ferrell's false declaration. No reasonable jury could credit that declaration, particularly in the presence of directly contradictory testimony from non-parties and documentation proving Ferrell's declaration factually impossible. This Court already determined Ferrell's declaration inadequate to establish an attorney-client relationship with Carlberg.

Dkt. 785 at 12-13.  On this new evidence, the Court should sanction NTG with an adverse inference to protect Carlberg's family from further burden and expense.

Given the severity of the misconduct, the close relationship between the requested sanction and that misconduct, the Defendants' history of deceptive practices, and the need to protect non-parties from undue hardship, this Court should issue an adverse inference as an appropriate sanction.

### 2. Monetary Sanctions Are Appropriate

NIC should be compensated for the substantial expenses it has incurred investigating, disproving, and litigating the false Carlberg narrative.  Scott Ferrell substantially increased NIC's costs and burdened this Court's resources with the false Carlberg testimony.  Section 1927 is designed to reimburse a party for the unreasonable and unnecessary fees incurred as a result of vexatious litigation conduct.  *Action Star Enter. v. Kaijet Tech. Int'l*, No. CV1208074BROMRWX, 2014 WL 12589632, at *2 (C.D. Cal. July 7, 2014).  Moreover, "[u]nder its inherent powers, a district court may award sanctions in the form of attorney's fees against a party or counsel who acts in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Compass Bank*, 104 F. Supp. 3d at 1061 (quoting *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997) (internal quotations omitted)); *see also Knickerbocker v. Corinthian Colleges*, 298 F.R.D. 670, 682 (W.D. Wash. 2014).  Here, Ferrell substantially increased the volume of litigation by presenting his false Carlberg testimony.  *See* Dkt. 694-1; *see also* Dkt. 812-1.  NIC should be compensated for the unnecessary legal fees and costs flowing directly from Ferrell's false testimony, including his false discovery responses that were also submitted under oath.

First, Ferrell substantially increased the volume and costs of litigation over this Court's work product remand to the Special Master.  Because the Court ruled that Ferrell could not assert work product over documents prepared when he did not have a client, Ferrell submitted the first of two false declarations.  Dkt. 659 at

28-29.  The majority of the expenses in that work product remand proceeding related to the factual disputes surrounding the Carlberg story.  In fact, at oral argument, nearly the entire argument from both parties related to Carlberg.  None of those expenses would have been incurred had Ferrell not advanced a false declaration to support his fictive narrative about Carlberg.

Second, the NTG Defendants' objection to the Special Master's order regarding the work product remand related, for the most part, on the false Carlberg story.  *See* Dkt. 716.  Defendants argued that Carlberg was an NTG client and advanced the first false affidavit, requiring NIC to expend resources responding to those same arguments.  *See id.*; *see also* Dkt. 731.  NTG argued that it was hamstrung in its ability to provide sworn testimony about Carlberg because of Scott Ferrell's ethical obligation to maintain his client's privilege.  In reliance on that false statement, the Court permitted a second declaration from Scott Ferrell to be filed *in camera*.  The Court ultimately rejected the narrative, but not before NIC expended significant additional resources in litigation on that topic.

Third, NIC was forced to expend resources to obtain a copy of the *in camera* affidavit by filing an application for public docketing against NTG's opposition.  *See* Dkt. 801.  Without a copy of that declaration, NIC could not have evaluated the truth of Ferrell's testimony.  The Court granted that application.  *See* Dkt. 809.

Fourth, NIC expended resources investigating the facts contained in the Dkt. 812-1 declaration, and in the supplemental production made by Ferrell on July 3, 2019.  NIC contacted more than five witnesses and spent substantial professional time interviewing those witnesses and obtaining their testimony.

Finally, NIC expended resources meeting and conferring on this sanctions motion and preparing this motion.  None of those expenses would have been necessary if Scott Ferrell had not submitted false interrogatory responses and declarations in this case.  All of these expenses are recoverable under the Court's inherent powers and Section 1927, and should be awarded by this Court.

### 3. The Court Should Compel All Documents Related to Carlberg under the Crime-Fraud Exception

The Court has already found that, by a preponderance of the evidence, Scott Ferrell engaged in widespread and systematic fraud on the Court sufficient to invoke the crime-fraud exception. Dkt. 659 at 12-13, 16; Dkt. 712 at 22; Dkt. 820 at 17. He has done so through the submission of false affidavits. Ferrell's false declaration about Carlberg—while sanctionable in itself—is a repeat example of fraud on the court consistent with NTG's established pattern. The false declaration was created for the purpose of facilitating perjury, obstruction of justice, and fraud on the court directly (particularly given that the declaration was submitted *in camera*). NIC should be entitled to investigate the falsity of that declaration in full, which would include all documents exchanged within NTG or by NTG (and its agents) related to the false declaration. That production should include documents exchanged between or among: NTG Defendants and NTG staff or internal agents; NTG Defendants and co-defendants in this case; and NTG Defendants and individuals within Callahan & Blaine (whose services were used in the submission of false testimony). Those documents were created for the purpose of furthering Scott Ferrell's false and unlawful testimony. NIC should receive those documents so that all of the facts related to Scott Ferrell's false and deceptive testimony are available in this case.

## IV.   <u>CONCLUSION</u>

Based on the foregoing, the Court should grant NIC's motion for sanctions in its entirety.

/ / /

/ / /

/ / /

/ / /

/ / /

1

2  DATED:  September 19, 2019

3                                    Respectfully submitted,

4

5                                    NATURAL-IMMUNOGENICS CORP.

6

7                        By:      */s/ Peter A. Arhangelsky*
                                 Peter A. Arhangelsky, Esq. (SBN 291325)
8                                E-mail: parhangelsky@emord.com
9                                Emord & Associates, P.C.
                                 2730 S. Val Vista Dr., Suite 133, Building 6
10                               Gilbert, AZ 85295
11                               Phone: (602) 388-8899
                                 Fax: (602) 393-4361
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28