Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Jonathan W. Emord, Esq. (pro hac vice)
jemord@emord.com
Joshua S. Furman, Esq. (pro hac vice)
jfurman@emord.com
Eric J. Awerbuch, Esq. (pro hac vice)
eawerbuch@emord.com
Emord & Associates, P.C.
2730 S. Val Vista Drive, Bldg 6, Ste 133
Gilbert, AZ 85295
Phone: (602) 388-8899
Fax: (602) 393-4361
Attorneys for Plaintiff Natural Immunogenics Corp.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL-IMMUNOGENICS, a Florida corporation,<br><br>Plaintiff,<br>          v.<br><br>NEWPORT TRIAL GROUP, et al.,<br><br>Defendants. | Case No.: 8:15-cv-02034-JVS-JCG<br><br>**PLAINTIFF NIC'S OPPOSITION TO NTG'S REQUEST FOR ORDER TO SHOW CAUSE REGARDING SANCTIONS, PERJURY, AND SUBORNATION OF PERJURY [DKT. 855]**<br><br>Date:          November 18, 2019<br>Time:          1:30 PM<br>Judge:        Hon. James V. Selna<br>Room:        10C |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.     INTRODUCTION ....................................................................... 1

II.    FACTS ....................................................................................... 4

    A.    Preparation and Submission of Truthful Declarations .......... 4

    B.    NTG Failed to Meet and Confer in Good Faith, and NIC Did Not Attempt to Sequester Witnesses ...................................... 8

    C.    NIC Responsibly Withdraws Its Motion for Sanctions ........ 10

    D.    NTG Brings False and Unprofessional Allegations Against Opposing Counsel Without Any Evidence ........................... 11

III.   ARGUMENT ........................................................................... 12

    A.    Facts Germane to Possible Impeachment Are Not Perjury ... 12

    B.    The Declarations Were Based on Witnesses' Recollection and Were Not Intentionally False ......................................... 13

        1.    MaryAnn Buc's Testimony Was Not Intentionally False ................ 14

        2.    Charlotte Carlberg's Declaration Was Not Intentionally False ........................................................ 17

        3.    Jim Buc's Testimony Was Not Intentionally False ........................... 19

    C.    NTG Presents No Evidence Suggesting that NIC or Its Counsel Suborned Perjury ................................................... 20

    D.    NIC's Original Motion Had Merit and NTG's Request for an OSC Is an Improper Tactical Filing ..................................... 22

IV.    CONCLUSION ........................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alston v. Macomber*, No. 2:14-cv-1500, 2016 WL 5944071 (E.D. Cal. Cot. 13, 2016) ........................................................................................12

*Fink v. Gomez*, 239 F.3d 989  (9th Cir. 2001) ..........................................12

*Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644 (9th Cir. 1997) ...............12

*Rivera v. Small*, No. SACV 09-0312, 2012 WL 6764523 (C.D. Cal. Aug. 21, 2012), *report and recommendation adopted,* No. SACV 09-0312, 2012 WL 6761568 (C.D. Cal. Dec. 28, 2012)........................................21

*Rivera v. State of Hawaii*, 26 F.3d 132 (9th Cir. 1994 (Table)) ..............12

*Strickland v. Salazar*, No. CV 09-4103, 2010 WL 5173852 (C.D. Cal. Dec. 6, 2010), *report and recommendation adopted,* 2010 WL 5175030 (C.D. Cal. Dec. 9, 2010) ................................................................13

*U.S. v. Martin*, 59 F.3d 767 (8th Cir. 1995)..............................................13

*U.S. v. Zuno-Arce I*, 44 F.3d 1420 (9th Cir. 1995) ..................................21

*United States v. Dunnigan*, 507 U.S. 87 (1993) .......................................12

*United States v. Flake*, 746 F.2d 535 (9th Cir. 1984) *abrogation on other grounds recognized in U.S. v. Uchimura*, 125 F.3d 1282 (9th Cir. 1997)..........13

*United States v. Taylor*, 749 F.3d 842 (9th Cir. 2014) .............................12

**Statutes**

18 U.S.C. § 1622.......................................................................................21

**Other Authorities**

C.D. Cal. Civ. & Prof. Guidelines B(8).............................................*passim*

**Rules**

Fed. R. Civ. P. 11 ...............................................................................3, 11

L.R. 7-3 .........................................................................................................3

L.R. 11-9 ............................................................................................................3

Plaintiff Natural Immunogenics Corp. ("NIC") hereby opposes the NTG Defendants' request for an Order to Show Cause. *See* Dkt. 855.

## I.   **INTRODUCTION**

Defendants falsely accuse NIC's counsel of criminal activity based not on facts but entirely on speculation. Their filing falsely speculates that counsel conspired to defraud the Court through the submission of perjurious testimony. The most probative evidence, the communication between NIC counsel and the non-party witnesses, not only fails to support the charge but establishes definitively that the charge is false. That evidence, NIC offered to supply NTG counsel during the meet and confer directly before it submitted its present motion, but NTG counsel refused to receive it, thus revealing no sincere effort to discover the truth and a preference to proceed with "unfounded accusations of impropriety" in direct violation of Rule B(8) of this Court's Civility and Professionalism Guidelines.[1] Moreover, immediately upon receipt of NTG's evidence of a conflict in testimony (evidence NTG withheld from NIC during the meet and confer preceding NIC's motion for sanctions), NIC promptly withdrew its Motion and the supportive declarations, recognizing that the conflict removed the motion from the legal ambit of the Ninth Circuit's sanctions precedent. *See* Dkt. 847.

The relevant facts and evidence, including communications with the witnesses attached hereto, prove that NIC not only did nothing improper but maintained high ethical standards throughout its dealings with the three witnesses in question, endeavoring repeatedly to ensure that the declarations they offered were accurate and complete in every particular. When interviewed each witness explained in detail that several statements in Ferrell's declaration were false.[2] That

---

[1] Rule B(8) of the Central District's Civility and Professionalism Guidelines, which prohibit counsel from disparaging the integrity of opposing counsel, or attributing bad motives or improper conduct to counsel through "unfounded accusations of impropriety."

[2] NIC had no contact with the witnesses of any kind other than through counsel's firm. *See* P. Arhangelsky Decl. ("PA Decl.") ¶6.

testimony remains entirely unchallenged but for the whereabouts of Trycia Carlberg over the December 2011 Christmas holiday.  Each had personal knowledge of the events in question and was close to Trycia Carlberg.  The witnesses' statements aligned perfectly with the record then available to NIC Counsel, were complementary, and were also supported by photographic evidence from Charlotte Carlberg.  All three affiants made multiple edits to drafts of their declarations, following repeated requests from NIC Counsel and Counsel's staff that the witnesses ensure the accuracy and completeness of their statements.  The witnesses were given Microsoft Word versions of their declarations so they could perfect them through edits made directly to the documents.  Two of the three affiants drafted their own statements.  NIC Counsel's staff consistently advised each witness: "We need to make sure the document is truthful on all respects."  *See* Decl. of J. Fernandes ("JAF Decl.") at ¶¶39, 43, 46, 50.  Every effort was made on repeat occasions to ensure that the witnesses understood clearly the need for accuracy and completeness and made every edit they deemed necessary to achieve that end.  *Id.; see also id. at* ¶¶3, 7, 9, 13.

Based on the undisputed record at the time, NIC filed a fully supported motion for sanctions [Dkt. 844].  NTG failed to meet-and-confer in good faith prior to that filing.  Although possessed of allegedly conflicting evidence, NTG withheld it during the meet and confer.  NTG did not explain NTG's responsive position.  *See* PA Decl. at ¶10.  NTG's Opposition [Dkt. 846] was the first instance in which NIC received NTG's evidence.  Immediately thereafter, NIC withdrew its motion in light of disputes of fact inappropriate for resolution on a sanctions motion.  *See* Dkt. 847.

NTG's motion is predicated on false speculation as to NIC Counsel's intentions.  NTG leaps from evidence of a conflict in testimony as to the whereabouts of Trycia Carlberg over the 2011 Christmas holidays to the unfounded conclusion that NIC's counsel must have known of that falsehood

despite NTG having withheld even reference to that conflicting evidence prior to NIC's motion.  On that unfounded conclusion, NTG asks this Court to presume NIC Counsel suborned perjury and defrauded the Court.  Without a shred of requisite evidence and in willful ignorance of the most probative evidence (the communications with the non-party witnesses that NIC offered to NTG Counsel but that NTG Counsel refused to receive in advance of its motion), NTG proceeds with "unfounded accusations of impropriety" against opposing Counsel in direct violation of Section B(8) of this Court's Civility and Professionalism Guidelines. NIC here supplies the very same communications had with the witnesses in advance of their declarations that it offered to supply NTG Counsel, so the Court can evaluate the relevant interactions.  NIC counsel's paralegal, Jennifer Fernandes, submits a detailed declaration explaining the circumstances surrounding the non-party witness interactions.  *See generally* JAF Decl.

NTG provides no evidence establishing that the non-party witnesses knowingly or intentionally testified falsely or that NIC Counsel knowingly filed false declarations with this Court.  That evidence was required of NTG Counsel before it filed a brief accusing all witnesses and counsel of the crimes of perjury, subornation of perjury and defrauding the court.  *See* Fed. R. Civ. P. 11; L.R. 11-9. NTG's evidence consists entirely of material that until the filing of its motion was exclusively within NTG's possession and withheld from NIC before NIC filed its motion, an action which suggests wrongful withholding for tactical advantage, an untoward effort to create a "gotcha" moment, precisely what the meet and confer rules and Rule B(8) are designed to prevent.  *See* L.R. 7-3; *See* PA Decl. ¶¶ 9-10. NTG admits that its purpose for the OSC is to manufacture an unclean hands defense or seek dispositive sanctions that might nullify NTG Defendants' liability. *See* Dkt. 856 at 3.[3]  NTG's lying in wait approach (through the tactical withholding of evidence) is antithetical to Local Rule 7-3, and should not be

---

[3] Pinpoint citations to docket pagination.

countenanced.[4]

NTG morphs what is an effort at impeachment into a claim of perjury, but a conflict in factual recitations that may give rise to impeachment does not satisfy the elements of perjury without proof of an intent to deceive.  Every civil action involves disputes of fact.  Witness testimony can be undermined or impeached, but no reasonable attorney would think conflicting facts proof of perjury absent proof of deceptive intent.  Here, there is not only no such proof, but the communications with the non-party witnesses establish reasonable and repeated efforts to ensure the accuracy and completeness of the non-party witnesses' testimony.

## II.   FACTS

### A. Preparation and Submission of Truthful Declarations

In a declaration publicly docketed on July 3, 2019, Defendant Scott Ferrell testified he sent a demand letter to NIC on December 27, 2011 on behalf of Trycia Carlberg.  *See* Dkt. 812-1.  NTG and Ferrell were unable to produce any evidence in discovery supporting the claim that Carlberg was a valid client.  *See, e.g.,* Dkt. 785 at 13.  Ferrell never made that claim in the prior NTG litigation against NIC.  No such evidence has ever been produced.  Ferrell could not produce a retainer agreement for Carlberg's NIC matter, even though he had retainers in every other SAC case.  *Id.*  He had no written communications (of any kind) documenting Carlberg's alleged experience with NIC's product or even her purchase of it.  *Id.*  In correspondence between Ferrell and his father in January 2011, Ferrell appeared to lack knowledge of his NIC client, even asking his father to provide him the name of a client.  *See* NTG022177.  Ferrell had no internal communications within his firm (including emails with those who worked on the NIC file) that contained information specifically about Carlberg or her use of NIC's product.  *See* Dkt. 785 at 12-13.  NTG never mentioned Carlberg's name in the prior NIC litigation.  *See*

---

[4] The Civility Guidelines (Rule B(8)) required NTG counsel to "engage in more than a mere pro forma discussion … in an effort to resolve the issue with opposing counsel."

Dkt. 812-1at 9.  Evidence establishes that part of NTG's unlawful litigation scheme involved Ferrell and his accomplices serving demand letters on corporations without first having viable clients.  *See* Exh. 25 at 32-33 (Hr. Tr.); *see also* Exh. 26 (Disbarment of R. Ferrell).

Remarking upon the profound lack of relevant evidence supportive of NTG's *post hoc* claim, first made in this litigation, that Carlberg was his client in the prior litigation, the Special Master "thought the [Ferrell] declaration had huge holes that you could run a truck through."  Dkt. 694 at 116.  The District Court similarly concluded that "the NTG Defendants have not sufficiently established that NTG represented Carlberg in the *Nilon* action."  Dkt. 785 at 12-13.  The Court found that Ferrell's verified discovery responses contradicted his declaration.  *See* Dkt. 708 at 14.

On July 3, 2019, NIC's counsel received a supplemental discovery production from NTG containing information about Trycia Carlberg.  *See* JAF Decl. ¶3, including therein a video called "Enter Stage 4," documenting Trycia Carlberg's battle with cancer and her life in December 2011.  *Id* at ¶4.  The video documented Trycia's poor health at the time and her hospitalizations in December 2011.  That information was inconsistent with her serving as a class representative, or someone "typical" of a consumer class.  The producer of the video, Erika Bookhart, was a long-time friend of Trycia Carlberg. *See* JAF Decl. ¶4.

On August 9, 2019, Emord & Associates' paralegal, Jennifer Fernandes, spoke to Brookhart about Trycia.  *See Id* at ¶6.  Brookhart recommended that Fernandes call Trycia's mother, Charlotte Carlberg, *Id* at ¶9, which Fernandes did do on August 9, 2019.  *Id* at ¶10.  Fernandes read Charlotte the Ferrell declaration, and Charlotte said material portions of it were false. *Id* at ¶¶13-14.  Fernandes provides a detailed account of her interactions with the witnesses in her declaration attached hereto.

Charlotte Carlberg referred Fernandes to two other individuals with

knowledge who were willing to discuss facts related to Trycia's life in 2011 and 2012. *See Id* at ¶19. Those individuals were MaryAnn and Jim Buc. *Id.* Fernandes interviewed the Bucs on August 10, 2019 by telephone. She read them the Ferrell declaration [Dkt. 812-1], and they too stated that material portions of Ferrell's declaration were false, corroborating Charlotte Carlberg's statement. *Id* at ¶¶26-31.

MaryAnn Buc, Jim Buc, and Charlotte Carlberg agreed to provide their testimony in declarations attesting to relevant facts about Trycia Carlberg. *Id* at ¶¶21, 32, 37. On August 10, 2019, Fernandes prepared a draft declaration for Charlotte Carlberg reducing to writing the statements Charlotte made during a phone interview. *Id* at ¶39. Carlberg received that draft declaration in Microsoft Word format, and was instructed to make changes directly into the document as necessary to ensure that the document was truthful in all respects. *Id.* Fernandes explained:

> We need to make sure the document is truthful on all respects. So please don't hesitate to let us know if you see anything that is inaccurate, misleading or incomplete.

*Id* at ¶39. The witnesses were repeatedly so advised, asked to check and verify the content of their draft declarations. *Id at* ¶43 (to "let us know if you see anything that is inaccurate, misleading, or incomplete.").

After reviewing her original declaration, Charlotte indicated that several dates needed to be revised concerning when Trycia resided with the Ferrells, and that she needed to check her recollection of those dates. *Id* at ¶42. Between August 10 and 22, 2019, Ms. Carlberg made <u>seven (7)</u> revisions: to the dates when Trycia lived with her; to where Trycia spent the Christmas holiday in 2011; to what occurred with Trycia when she entered the hospital; and to what occurred after Trycia entered hospice care in her mother's home. *Id* at ¶¶63. Charlotte stated that the changes were based on recollections triggered by documents she

reviewed, including a photo (attached as an exhibit to her declaration). *Id* at ¶42. On August 23, 2019, after reviewing the document for the last time, she provided a signed copy via email and she mailed the original. *Id* at ¶62.

On August 12, 2019, Fernandes prepared draft declarations for the Bucs based on information they provided. *Id* at ¶45. Fernandes supplied the drafts in Word format so the witnesses could make changes to ensure accuracy. *Id* at ¶46. She asked the Bucs to make whatever changes would be necessary to ensure that all statements in the document were truthful and accurate. *Id*.

On August 19, 2019, Jim Buc informed Fernandes that he was revising his own and his wife's declarations for accuracy. *Id* at ¶48. On August 21, 2019, Jim Buc sent rewritten declarations that he and his wife produced from scratch regarding Trycia Carlberg's life from December 2011 through May 5, 2012. *Id* at 49. Mrs. Buc dictated her declaration into email form using her phone. *Id* at ¶49. She said, "[t]his is my words they can shrink it." *Id* at ¶49. On August 21 and 22, 2019, Fernandes placed the declarations of MaryAnn and Jim Buc on pleading paper, with minor edits to sentence structure, formatting, and placing the content in chronological order. *Id* at ¶50. Those revisions also included standard language referencing exhibit attachments. *Id* at ¶54.

Fernandes then returned the declarations to the Bucs with instructions to each of the Bucs to "[p]lease review the declaration and make sure that you are in agreement with everything stated." *Id* at ¶50 (explaining that "if [Buc] was not in agreement with any portion of the document, [to] please contact [Fernandes] and we can make whatever edits you desire."); *Id.* (telling the witness to "[p]lease review the declaration and make sure you are in agreement with everything stated."). Fernandes further instructed the Bucs to "review the declarations carefully and to let me know their thoughts." *Id* at ¶55. On August 23, Jim Buc emailed additional changes. *Id* at ¶58. Fernandes returned another draft with those revisions incorporated. *Id.*

The Bucs reviewed the final draft and, on August 23, 2019, provided their signed declarations via email and mailed original copies. *Id* at ¶59. Jim Buc informed Fernandes that he made additional changes for accuracy in the final signed version. *Id.* He removed statements regarding dates when Trycia spent time in certain locations because, according to Jim, he did not "remember dates the way [his] wife does" and, so, he could not testify about those dates consistent with MaryAnn's testimony. *Id* (citing Exh. 17).

At all times, the interaction between Fernandes and the witnesses was cordial, voluntary, and deferential to their desired testimony. *Id* at ¶40. No effort was ever made to change the substantive content of their testimony. Fernandes informed the witnesses that they should seek their own attorneys if they had any questions or concerns. *Id* at ¶¶21, 37. At one point, the Bucs said they would consider hiring an attorney, but later they elected not to do so. *Id* at ¶47. No individual affiliated with NIC communicated with the three witnesses other than employees of Emord & Associates, P.C. *See* PA Decl. at ¶6.

NIC thereafter contacted NTG counsel regarding NIC's intent to seek sanctions for Ferrell's submission of false testimony in his Dkt. 812-1 declaration. *See* PA Decl. at ¶7 (citing Exhibit 24). NTG withheld all information it possessed conflicting with that testimony, leading NIC Counsel to believe NTG had no evidence to the contrary. *See* PA Decl. at ¶¶9-10, 12; *see also* Decl. of J. Furman ("Furman Decl.") at ¶¶5-6.

## B. NTG Failed to Meet and Confer in Good Faith, and NIC Did Not Attempt to Sequester Witnesses

NTG counsel did not meet-and-confer in good faith. On August 26th, NIC served a letter which included a comprehensive delineation of all bases for seeking sanctions against Ferrell. *See* PA Decl. at ¶7 (citing Exhibit 24). NIC and NTG counsel spoke by phone on September 3rd at 1:30pm. *Id* at ¶8. During the call, NTG counsel failed to disclose any conflicting evidence NTG then possessed that

1    it later presented for the first time in support of NTG's request for an Order to

2    Show Cause.  *Id* at ¶¶9-10.  In response to NIC's detailed letter, NTG counsel

3    verbally stated their disagreement, but declined to discuss the merits.  *Id* at ¶10.

4    NTG counsel then shifted the discussion to whether NIC was attempting to limit

5    contact with the witnesses.  *Id*.

6         All three witnesses expressed fear of retaliation by Scott Ferrell if they

7    testified.  *See* JAF Decl. at ¶64.  They each asked NIC counsel that they not be

8    contacted by Mr. Ferrell or his agents outside of formal process, and they asked

9    NIC counsel to inform Ferrell's counsel of that position.  *Id* at 65.  In NIC's

10   August 26, 2019 letter, NIC conveyed the witnesses' request to NTG, stating that

11   the "witnesses demand that neither Ferrell nor any person associated with him

12   contact them outside of formal process in this case."  *See* Exh. 24 at 3; 846-1 at 7.

13   NIC's letter nonetheless disclosed each witness, along with the subject matter of

14   their testimony.  *Id*.

15        During the phone call on September 3rd at 1:30pm, NTG counsel Darnell

16   asked whether NIC took the position that the witnesses could not be contacted.  *See*

17   PA Decl. at ¶11.  NIC counsel expressly stated that NTG's attorneys were <u>not</u>

18   limited from contacting witnesses.  *Id*.  NIC counsel made clear that the witnesses

19   were not represented parties, and that NTG's counsel was free to contact those

20   individuals.  *Id*.  On September 5, 2019, NTG counsel contacted Erika Brookhart

21   by telephone.  *See* JAF Decl. at ¶66.  Then, on September 27, 2019, Scott Ferrell's

22   private investigators contacted Charlotte Carlberg in person.  *Id* at ¶¶69-70; *see

23   also* Dkt. 857-3 at ¶2.  The investigators contacted MaryAnn Buc by phone on that

24   same date.  *See* Dkt. 857-3 at ¶3; *see also* JAF Decl. ¶69.  The non-party

25   witnesses' prior concerns with potential retaliation were borne out in those

26   investigator contacts, which are more fully revealed in their written

27   correspondence appended to NIC's witness tampering motion.  Ferrell's

28   investigators made unmistakable threats on his behalf to MaryAnn Buc to induce

her to withdraw her testimony.  *See* Dkt. 857-5.

## C. NIC Responsibly Withdraws Its Motion for Sanctions

On September 27, 2109, NTG filed an Opposition to NIC's Motion for Sanctions wherein NTG first disclosed evidence relating to Trycia Carlberg's relationship with the Ferrells and her location during the 2011 Christmas holiday. Dkt. 846. NTG withheld that evidence during the meet and confer that preceded the filing of NIC's motion.  *See* PA Decl. at ¶10.  NIC had no basis to know of that evidence prior to its filing on September. 27.  *Id* at ¶¶10, 12-13.  The evidence created issues of fact inappropriate for resolution on a motion for sanctions.  NIC promptly withdrew its motion for sanctions on the following business day.  Dkt. 847.  NIC explained that, had NTG disclosed its evidence as part of the meet and confer, "the motion for sanctions would not have been filed."  *See* Dkt. 847 at 2.

The following volume of material facts in the non-parties' declarations appended to NIC's Motion for Sanctions were not placed in dispute:

(1)  No proof exists that Trycia Carlberg retained NTG or Scott Ferrell to pursue a claim against NIC in December 2011;

(2)  No proof exists that Carlberg ever purchased NIC's product in reliance on label claims;

(3)  No proof exists that Carlberg ever used NIC's product;

(4)  Carlberg was never mentioned or named by Scott Ferrell in the underlying litigation against NIC;

(5)  Defendant Scott Ferrell was aware in December 2011 that Carlberg was ill and lacked fitness to serve as a class representative; and

(6)  Defendant Scott Ferrell's internal emails show that he could not identify the name of his client in the NIC case just three weeks after he had sent the December 27, 2011 demand letter (NTG022177).

The following *immaterial* facts were placed in dispute:

(1)  Where Trycia Carlberg spent her time on Christmas Eve 2011;

(2)   Where Trycia Carlberg lived at various times in December 2011;

(3)   How Trycia Carlberg viewed the Ferrells and how often she visited their house or complimented them in writing;

(4)   The extent of Trycia Carlberg's involvement in other NTG cases outside of the Court's eight SAC cases.

### D. NTG Brings False and Unprofessional Allegations Against Opposing Counsel Without Any Evidence

Supported by speculation only, NTG has levied false accusations against opposing counsel in its papers.  *See* Dkt. 846.  After this Court removed NIC's motion from the calendar on October 7 [Dkt. 852], NTG renewed those same false allegations in its instant filing. *See* Dkt. 855.  Without <u>any</u> evidentiary support, NTG accuses opposing counsel of: (1) withholding negative evidence from the court (Dkt. 855 pg. 28-29); (2) soliciting, drafting, and presenting intentionally false declarations; (3) attempting to "fix" the case through false declarations; (4) attempting to conceal the falsity of declarations by blocking access to witnesses; and (5) forcing witnesses to "sign on" to false declarations (Dkt. 855 at 25).  Each charge is an "unfounded accusation of impropriety" in direct violation of Professionalism Guideline B(8) and fails Rule 11 standards.

Before NTG filed its motion, NIC offered to produce to NIC the communications exchanged between NIC's counsel and the witnesses.  *See* Furman Decl. at ¶11.  NIC made that offer to avoid unnecessary motions practice. *See* PA Decl. at ¶15; *see also* Furman Decl. at ¶11.  NTG refused to receive and review the communications before it filed its motion, consciously electing to proceed on speculation.  Ironically, while NTG argues (erroneously) that NIC attempted to hijack litigation through an unsupported sanctions request, NTG now asks this court for that exact kind of relief, including dispositive sanctions and a new "unclean hands" defense, all based on frivolous allegations.

## III.    ARGUMENT

### A. Facts Germane to Possible Impeachment Are Not Perjury

"[A] specific finding of bad faith … must precede any sanction under the court's inherent powers." *See Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001). "[M]ere recklessness . . . does not justify sanctions ..." *Id.* at 993. The Ninth Circuit has explained, "[t]he bad faith requirement sets a high threshold[.]" *See Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) (noting "sanctions should be reserved for the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose.").

NTG alleges without legal foundation that NIC and three non-party witnesses engaged in bad faith conduct, the filing of perjurious declarations. *See* Dkt. 855 (citing "perjury" 59 times in defendants' 25-page brief). Perjury is "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Willfulness ". . . requires that the [testifying witness] consciously act with the purpose of obstructing justice." *United States v. Taylor*, 749 F.3d 842, 848 (9th Cir. 2014). "Falsity is not established merely by showing that the witness made an earlier inconsistent statement, or that the witness's testimony differs from that of another witness … Discrepancies in testimony … could as easily flow from errors in recollection as from lies." *Alston v. Macomber*, No. 2:14-cv-1500, 2016 WL 5944071, at *9 (E.D. Cal. Oct. 13, 2016).

Courts reject Defendants' theory that a contradiction or inconsistency in evidence is tantamount to perjury. *See, e.g., Rivera v. State of Hawaii*, 26 F.3d 132 at *1 (9th Cir. 1994 (Table)) (appellant "demonstrated nothing more than various inconsistencies in witness accounts of the events."). Facts germane to potential impeachment are not perjurious. *See U.S. v. Martin*, 59 F.3d 767, 770 (8th Cir.

1995) ("Mere inconsistency between witnesses' testimony is not necessarily perjury, and not every contradiction is material").  An "inconsistency is not tantamount to perjury absent a showing of knowing falsehood."  *United States v. Flake*, 746 F.2d 535, 539 (9th Cir. 1984) *abrogation on other grounds recognized in U.S. v. Uchimura*, 125 F.3d 1282 (9th Cir. 1997); *Strickland v. Salazar*, No. CV 09-4103, 2010 WL 5173852, at *15 (C.D. Cal. Dec. 6, 2010), *report and recommendation adopted,* 2010 WL 5175030 (C.D. Cal. Dec. 9, 2010) (rejecting perjury because "petitioner has offered no evidence demonstrating that Officer … *knowingly* testified falsely…") (emphasis original).

Errors of recollection, memory, or judgment are not perjury.  As the movant, NTG bears the burden to prove that the witness testimony was intentionally false.  NTG provides no proof of intentional falsehood (providing only speculation).  Speculation, or mere conclusory assertion, is no substitute for evidence of intent required for perjury.

### B. The Declarations Were Based on Witnesses' Recollection and Were Not Intentionally False

NTG argues that the declarations were "false in every material respect."  Dkt. 855 at 21.  That is incorrect.  NTG's brief challenges only one primary point present in two declarations:  whether Trycia Carlberg spent time in Ferrell's house on the Christmas holiday in 2011 and at times in 2011.  *See* Dkt. 855.  That testimony is immaterial to whether Trycia Carlberg was an NTG client poised to sue NIC in 2011.  At best, NTG produced impeachment material related to points in two declarations.  *See* Dkt. 846-4 at 4-13; Dkt. 846-2 at 4-13; Dkt. 846-3 at 28-29.  Each declaration provides the perspective of a particular witness.  The fact that two close friends have similar recollections of events is not evidence of a conspiracy to commit perjury.  In accusing these witnesses of federal crimes, NTG simply assumes the perjurious intent without a shred of evidence to so conclude.

Critically, NTG's impeachment material was sourced from private files,

devices, and accounts in the exclusive possession of individuals affiliated with NTG, which NTG and its counsel withheld.  *See* Dkt. 846-2; *see also* Dkt. 846-3; 846-4.  Finally, in its show cause motion, NTG attached pictures stored on the mobile phone of an NTG employee (*see* Dkt. 846-4); attached letters and emails sourced from Scott Ferrell's wife (*see* Dkt. 846-3); and make no showing that that Charlotte Carlberg or the Bucs were in possession of that evidence.  *See* Dkt. 855. Although NTG argues Charlotte Carlberg was "estranged" from her daughter in 2012, that assumption is disputed.  NTG has raised conflicts in testimony which provide no proof of intent to deceive needed for perjury, disputes inappropriate for resolution by the court on a motion for sanctions.[5]

### 1.  MaryAnn Buc's Testimony Was Not Intentionally False

MaryAnn Buc testified regarding whether Trycia Carlberg was with the Ferrells on December 24 and 25, 2011.  She testified: "Trycia was not at Mr. Ferrell's house on those dates, and she was instead with her mother and her family."  *See* Dkt. 844-4 at ¶10.  NTG presents evidence suggesting that Trycia also spent time at the Ferrells' residence on those dates.  That evidence does not establish that MaryAnn Buc knew Trycia was at the Ferrells.  As her declaration makes clear, MaryAnn's recollection was based on the fact that she had spoken with Trycia several times over the holiday and, in each instance, Trycia was at Charlotte Carlberg's house.  For example, MaryAnn declared:

> I know through my conversations with Trycia that she was not in the presence of Scott Ferrell or his wife at any point over the Christmas holiday in 2011.  I spoke with Trycia daily in December 2011 and she was at no time with the Ferrells.

*See* Dkt. 844-4 at ¶14.  The evidence confirms that Trycia was at Charlotte's house over the Christmas holiday in 2011.  *See* Dkt. 844-3.  NTG claims, however, that Trycia also traveled to the Ferrells' residence at times during that same holiday.

---

[5] For similar reasons, NIC withdrew its motion for sanctions.  *See* Dkt. 847.

*See* Dkt. 855 at 14.  The fact that MaryAnn was unaware that Trycia spent time at the Ferrells' home does not prove MaryAnn a liar.  That is particularly so because MaryAnn's knowledge was expressly based on her communicating with Trycia by phone.  MaryAnn testified in detail regarding her reasons for recollecting where Trycia spent time in December 2011.  *See* Dkt. 844-4 at ¶¶11-13.  She testified that her memory of Trycia's whereabouts was anchored from and after December 14, 2011, which was the date Trycia brought her a Christmas gift.  *See* Dkt. 844-4 ¶12.

MaryAnn's declaration included 33 paragraphs, most focused on her direct knowledge of Trycia's medications and use of therapies.  *See generally* Dkt. 844-4.  NTG's evidence does not challenge those paragraphs, except to suggest that Trycia had a positive experience at the Ferrells.  *See* Dkt. 855 at 15-19.  But the fact that Trycia may have written positively of her experiences to the Ferrells does not prove that Trycia did not communicate disdain for them to MaryAnn.  For example, MaryAnn testified that "Trycia revealed to me that Scott Ferrell had asked her to participate in lawsuits for products, and that Trycia felt those lawsuits were immoral and unethical."  *See* Dkt. 844-4 at ¶21.  NTG suggests that testimony is false because Trycia may have participated in a different lawsuit in February 2012.  *See* Dkt. 855 at 20.  It is entirely possible that Trycia had regrets about her involvement with the Ferrells or that she expressed different sentiment to the Bucs than she did the Ferrells.  In the absence of Trycia, we simply cannot know, and in the absence of evidence that MaryAnn's testimony was intentionally false, there is no basis for perjury.  NTG has literally no evidence that MaryAnn testified falsely or that she testified with knowledge that any statement she made was false.  At best, NTG has material it might endeavor to use to impeach MaryAnn, not accuse her of perjury.

The most material aspects of MaryAnn's testimony relate to her recollection of Trycia's medications.  *See* Dkt. 844-4.  Those statements are not rebutted by any NTG evidence.  In fact, the bulk of MaryAnn's declaration goes unrebutted,

including these statements:

- MaryAnn was close with Trycia and spent considerable time with her during Trycia's final year (Dkt. 844-4 ¶¶2-3, 11-13, 16-19);

- The Bucs ran the Don't Worry Be Happy Foundation to help raise medical money for Trycia (Dkt. 844-4 at ¶4);

- Trycia stayed in the Bucs' home for periods of time in December 2011 (Dkt. 844-4 at ¶11);

- Trycia's mother, Charlotte, served as a primary caregiver for Trycia for large stretches of Trycia's illness (Dkt. 844-4 at ¶17);

- The Bucs took Trycia to many of her doctor appointments in 2011 through 2012 (Dkt. 844-4 at ¶18);

- MaryAnn attended a party at the Ferrells' home in March 2012 with Trycia present (Dkt. 844-4 at ¶23);

- Trycia never spoke to MaryAnn about "Sovereign Silver" (Dkt. 844-4 at ¶26);

- MaryAnn knew Trycia had never taken a silver supplement in 2010, 2011, and 2012 (Dtk. 844-4 at ¶26);

- Trycia purchased her medications through the DWBH Foundation (Dkt. 844-4 at ¶26);

- Trycia never expressed concerns to MaryAnn about products she was using (Dkt. 844-4 at ¶27); and

- Trycia never spoke to MaryAnn about her participation in a lawsuit with Ferrell (Dkt. 844-4 at ¶24).

NTG has cited impeachment material related to narrow aspects of MaryAnn's declaration, but none of that goes to the intentional deception required to allege perjury. Moreover, the vast majority of material statements remain unrebutted. Far from "false in every material respect," NTG's evidence addresses only a small and immaterial fraction of MaryAnn's statements. Impeachment is not perjury. Faulty memory is not sanctionable. NTG's allegations against

MaryAnn are void of requisite grounds and, so, reckless and unprofessional.

## 2. Charlotte Carlberg's Declaration Was Not Intentionally False

Charlotte Carlberg is Trycia's mother. *See* Dkt. 844-3 at ¶2. She spent substantial time with her daughter during the final years of Trycia's life. *See* Dkt. 844-3 at ¶3. She testified based on her recollection of events in Trycia's life during that time. *See generally* Dkt. 844-3. Charlotte stated, "[m]y daughter was in my home on Christmas Eve in 2011[.]" *See* Dkt. 844-3 at ¶5. That statement was true, and corroborated by photographic evidence she found on her phone. *See* Dkt. 844-3 at ¶8 (citing Exh. B). Based on memories of Trycia being present in her home during the holidays, Charlotte then testified: "Trycia was not at Mr. Ferrell's house on [December 24-25, 2011], and Trycia was instead in my presence on both days." *See* Dkt. 844-3 at ¶6. The context of Charlotte's declaration reveals her recollection was in part refreshed from photographs showing Trycia in her home on the December 2011 Christmas holidays. *See* Dkt. 844-3 at ¶8; *see also* JAF Decl. at ¶¶38, 41, 42.

NTG argues Charlotte must have committed perjury because, "[i]t is inconceivable that [she] just forgot that her daughter moved out for the last six months of her life[.]" *See* Dkt. 855 at 23. But Charlotte did not testify that Trycia lived at no other locations during Trycia's last six months. Rather, her testimony was that Trycia spent the holidays with her mother and family, and was by virtue of that fact not in Ferrell's presence. Charlotte's testimony that Trycia was with her during the holiday was truthful, and NTG does not rebut that point. NTG shows that Trycia may have traveled from Charlotte's home to the Ferrells during that period. *See* Dkt. 855 at 14. NTG does not prove through declarations or evidence that Charlotte knew her daughter Trycia was ever at the Ferrell's residence during the Christmas 2011 holidays. Charlotte may have been unaware that Trycia left to be in the company of the Ferrells, or Charlotte's recollection may have faltered. NTG does not prove through declarations or evidence that Trycia

actually lived with the Ferrells at the time.  Proof supportive of the element of intentional deceit is wholly absent.

Moreover, NTG fails to explain why a non-party witness, Charlotte Carlberg, would offer intentionally false testimony.  If NTG suggests that NIC somehow bullied her into a false statement, the actual communications prove the opposite, a conscientious regard for obtaining voluntary and truthful testimony.  *See generally* JAF Decl.  Indeed, Charlotte exercised care, making seven (7) revisions to her draft declarations, and was repeatedly instructed to ensure her declaration was accurate and truthful in all respects.  *See* JAF Decl. at ¶63.

Moreover, as with MaryAnn Buc's declaration, the most material aspects of Charlotte's testimony relate to other aspects of Trycia's life.  *See generally* Dkt. 844-3 compared with Dkt. 844-4.  Here again, those statements remain unrebutted by NTG's evidence:

- That Charlotte was aware of medications and supplements that Trycia consumed in 2011 and 2012 (Dkt. 844-3 ¶9);

- That Trycia confided in Charlotte regarding her medical issues and treatments, and made medical decisions with her mother (Dkt. 844-3 ¶9);

- That Charlotte had never seen Trycia use Sovereign Silver, never saw that product in her house, and never spoke to Trycia about that product (Dkt. 844-3 ¶10);

- That Trycia never spoke to Charlotte about a lawsuit, that Trycia would be involved in any legal matters in 2011 through 2012, or that she would be represented by Ferrell in litigation (Dkt. 844-3 ¶11);

- That Scott and Erin Ferrell had no role with Trycia's hospice care, and that Trycia did not go straight from the Ferrells' home into hospice (Dkt. 844-3 ¶12);

Dkt. 844-3.

To the extent NTG raises doubt about the veracity of certain statements, that

may go to impeachment, but it does not constitute grounds for perjury.

### 3. Jim Buc's Testimony Was Not Intentionally False

Jim Buc had a close relationship with Trycia Carlberg, a fact unrebutted by NTG. *See* Dkt. 844-5 ¶2. NTG's so-called evidence of "falsity" does not relate to Jim Buc's declaration at all. He did not testify as to the whereabouts of Trycia in December 2011 specifically because he professed a lack of specific memory on that issue. *See* JAF Decl. at ¶59 (". . .I don't remember dates the way my wife does so I had to take out the points you added" Exh. 17). Jim's conscientiousness disproves NTG's speculative theory that he was willing to testify falsely on command.

Jim Buc's declaration is sixteen (16) paragraphs. NTG's evidence touches on just two sentences in Paragraphs 14 and 15. He testified about a conversation he had with Trycia in March 2012. He explained that, "[f]rom [his] interactions with Trycia that evening, [he] understood that she viewed Ferrell's purchase of those products to set up lawsuits with unmistakable disapproval." *See* Dkt. 844-5 at ¶14. NTG has no evidence showing that did not occur. He also testified that ". . . Trycia did not view Scott Ferrell as a friend or as one in whom she placed trust or confided." *See* Dkt. 844-5 at ¶15. In response, NTG provided evidence that Trycia was a plaintiff not in the law suit against NIC but in another NTG lawsuit. *See* Dkt. 855 at 20; *see also* Dkt. 846-4 at 18-25. NTG also provided evidence that Trycia may have had a closer relationship with the Ferrells. *See* Dkt. 855 at 28. But such evidence is below that necessary to establish intentionally false testimony. The remaining sections of Jim Bucs' testimony—whether Trycia used Sovereign Silver, his role in her care, and his knowledge of her medications—are left unrebutted.

Jim's testimony has not been shown false in any respect. His statements are not proven intentionally false because other evidence suggests Trycia later agreed to participate in Ferrell's litigation scheme or told the Ferrells she liked them. For

all we know, Trycia may have conveyed disdain for Ferrell's practices to the Bucs to avoid bearing the Bucs' disapproval of Ferrell's practices.  Jim testified that Trycia never disclosed that she was a plaintiff in Ferrell's litigation mill.  *See* Dkt. 844-5 at ¶ 11.

Finally, evidence showing that Jim Buc considered, but decided against, retaining Ferrell is irrelevant to the issues here in dispute.

### C. NTG Presents No Evidence Suggesting that NIC or Its Counsel Suborned Perjury

As NTG's brief observes, courts should not "take lightly … accusations of perjury and a party must be wary of making such serious accusations without evidentiary or legal support."  *See* NTG Brief at 28.  Although so aware, NTG nonetheless does exactly what is forbidden.  Without evidence of impropriety (and in willful disregard of communications disproving it), NTG accuses NIC of a "coordinated effort to use a combination of perjured testimony and witness obstruction to commit a fraud on the Court."  *See* Dkt. 855 at 30.  NTG has thus chosen to attribute the very worst possible motives and conduct to NIC's counsel, doing so in deliberate disregard of the best evidence (the communications between NIC counsel and the non-party witnesses that NTG refused to receive and consider before filing its motion).  The communications reveal not only an utter absence of evidence of impropriety, but affirmative evidence to the contrary, of repeated interactions wherein every reasonable effort was made to ensure that the non-party witnesses supplied testimony that was accurate and complete in every particular.  The NTG allegations directly violate Part B(8) of the Courts Civility Guidelines which admonish counsel not to "attribute bad motives or improper conduct to other counsel or bring the profession into disrepute by unfounded accusations of impropriety."  *See* C.D. Cal. Civility & Prof. Guidelines, Rule B(8).

Subornation of perjury requires evidence of perjury, which requires evidence of an intent to deceive the Court.  *See* 18 U.S.C. § 1622.  As explained *supra*, NTG

has not shown any intentional falsehood.  A party suborns perjury only if that party has knowledge that the testimony is false, and acted with intent that the witnesses deceive the Court.  *See, e.g., U.S. v. Zuno-Arce I*, 44 F.3d 1420, 1423 (9th Cir. 1995) (presentation of contradictory testimony "does not conclusively prove that the prosecutor knew that the … testimony was false"); *U.S. v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir. 1989) (prosecutor did not present perjured testimony by presenting contradictory testimony because, "[w]ithout knowledge of whose testimony was false, [the prosecutor] could not have *knowingly* presented perjured testimony") (emphasis original); *Rivera v. Small*, No. SACV 09-0312, 2012 WL 6764523, at *11 (C.D. Cal. Aug. 21, 2012), *report and recommendation adopted,* No. SACV 09-0312, 2012 WL 6761568 (C.D. Cal. Dec. 28, 2012) (same).  Here, immediately upon first receipt of NTG's evidence of a conflict in testimony, NIC took the responsible step of withdrawing its sanctions motion, an affirmative and independent NIC action contrary to the presumed intent to deceive the Court.  As NIC Counsel explained several times, had NTG acted in good faith during the pre-motion meet and confer by supplying NIC with the evidence it then had (or, at a minimum, a fair description of it), NIC would not have filed its motion.  *See* PA Decl. at ¶14; *see also* Exh. 29 at 7-8 (stating that, "[t]o the extent [NTG] had properly met [its] obligations under the local rules, NIC would likely have withheld the motion in the first instance.").  Instead, NTG chose to withhold the evidence and lie in wait, seeking a strategic advantage through an ill-conceived "gotcha" moment.

As the attached communications reveal, NIC had no undue influence over the non-party witnesses, who each reviewed successive drafts of their declarations under instructions from counsel's staff to make sure those statements were "truthful on all respects."  *See generally* JAF Decl.  NIC itself had no communication of any kind with the witnesses.  *See* PA Decl. at ¶6.  NIC counsel, through its paralegal, interviewed each witness and prepared draft declarations

based on the specific information conveyed.  *See generally* JAF Decl.  From that point forward, each witness reviewed and edited declaration drafts multiple times. Two of the three wrote their own declarations from scratch "for accuracy."  *See* JAF Decl. at ¶49.  Charlotte Carlberg made a combined seven revisions to her declaration.  *Id*. at ¶63.  The witnesses elected not to testify in certain areas where they questioned their memories.  *Id*. at ¶¶49, 59, 63.

Each witness provided details supporting their testimony, including corroborating personal narratives.  Those narratives were supported, in part, by the complete absence of any information in discovery related to Trycia Carlberg's alleged participation in litigation, and the record before the court showing Ferrell's declaration unsupported.  *See* Dkt. 785 at 12-14; Dkt. 708 at 10-15.  NTG has skipped over its obligation to prove a sanctionable offense, devoting its brief to *ad hominem* attacks on opposing counsel and discussion of the unremarkable proposition that perjury and subornation of perjury should be punishable.  *See* Dkt. 855 at 29-32.  In summary fashion, NTG argues that "all available evidence suggests that NIC suborned perjury."  *See* Dkt. 855 at 16.  Tellingly, NTG then fails to cite a single fact in the record supporting its conclusion.  *See generally* Dkt. 855.

Even assuming NTG could impeach narrow aspects of the testimony here, NTG has no adequate basis to allege that NIC counsel was aware that the testimony it received was false when received.  This Court must deny NTG's motion because there is no evidence showing that NIC acted with an improper purpose and in bad faith.

### D. NIC's Original Motion Had Merit and NTG's Request for an OSC Is an Improper Tactical Filing

NIC's motion for sanctions was meritorious under the available record in discovery.  NTG could produce (and to this day has) no evidence establishing that Trycia Carlberg was a client in December 2011.  NTG had no evidence that

Carlberg ever used or purchased the NIC product (it still has no such evidence). *See* Dkt. 785 at 12-13; Dkt. 708 at 10-15.  Both the Court and Special Master identified serious concerns with Ferrell's credibility based, in part, on a pattern of false representations or misrepresentations made by Ferrell and defendants in this case.  *See* Dkt. 785 at 13; *see also* Dkt. 708 at 10 ("NIC raises quite serious concerns about Ferrell's credibility").  Internal documents produced to NIC under the crime-fraud orders established that, despite Ferrell's narrative about Carlberg, he had no knowledge of a purported client in the NIC matter just several weeks after allegedly speaking with Carlberg about the lawsuit in late December.  *See* NTG022177.

The testimony from Charlotte Carlberg, Jim Buc, and MaryAnn Buc confirmed that Trycia had never discussed litigation with them.  *See* Dkt. 844-3 at ¶11; *see also* Dkt. 844-4 at ¶22; Dkt. 844-5 at ¶¶11-12.  Trycia had never used a Silver-based product around those witnesses.  *See* Dkt. 844-3 at ¶10; *see also* Dkt. 844-4 at ¶ 26; Dkt. 844-5 at ¶10.  Those witnesses had never acquired that product for Trycia despite paying for her medication through Foundation funds.  *See* Dkt. 844-3 at ¶ 9; *see also* Dkt. 844-4 at ¶26; Dkt. 844-5 at ¶¶5-6, 10.  Those witnesses attended Trycia's medical appointments with her, and never heard her doctors recommend Silver-based therapies, as declared by Ferrell in his testimony.  *See* Dkt. 844-3 at ¶10; *see also* Dkt. 844-4 at ¶ 26; Dkt. 844-5 at ¶10.

NTG has produced no retainer agreement for Carlberg in the NIC matter, despite having copies of retainers for literally every other client relevant to this case including, perhaps, a lawsuit involving Carlberg from February 2012.  *See* Dkt. 785 at 12-13 compared to Dkt. 846-4 at 19.  Indeed, NTG's own Opposition contained evidence supportive of NIC's sanctions motion, including clear inconsistencies with Ferrell's statements made to this Court.  For example, Ferrell testified in Dkt. 812-1:

Unfortunately, Ms. Carlberg's health continued to worsen in 2012.

> In light of this, I concluded that while she was still my client and
> would also be a member of the putative class for the Sovereign
> Silver case against NIC, she might not be healthy enough to serve
> as a class representative in that matter. Because of this and because
> the action against NIC appeared to require litigation, in the middle
> part of January 2012, I concluded that it would be prudent to try to
> identify additional consumers of Sovereign Silver who had
> complaints about the product…

*See* Dkt. 812-1 at ¶14.[6]  Ferrell claimed that Carlberg was too ill for litigation.
And yet he used Carlberg as a plaintiff just one month later, having her apparently
sign a retainer late in her illness on February 8, 2012. *See* Dkt. 846-4 at 19. Those
inconsistent statements further undermine Ferrell's declaration. Moreover, the fact
that Ferrell possesses a retainer for Carlberg in 2012, but not in 2011, is prima
facie evidence that Ferrell was in the practice of having clients sign retainers (even
Carlberg). Ferrell claimed that he lacked a retainer agreement for the NIC matter
because Carlberg was sick and living with him (812-1 at ¶5), but according to his
own evidence, those same factors existed in 2012 when she executed the retainer
agreement he does possess.

A jury will likely conclude that Scott Ferrell's narrative about Carlberg is
false. The service of demand letters without having viable retained clients is a
practice used in the unlawful litigation scheme at issue before this Court.[7]
Nonetheless, NTG's Opposition to NIC's Motion for Sanctions raised disputes of
fact over portions of the record, which raised credibility issues more appropriate
for the factfinder. NIC's counsel acted reasonably under the circumstances and

---

[6] By mid-January, NTG had received just one email from NIC explaining
simply that "[o]nce we have completed our analysis we will contact you with the
company's response." *See* NTG022170 (lodged in camera, Dkt. 746). There was
no indication at the time that lengthy or significant litigation would be necessary.

[7] For example, Scott Ferrell's brother, Ryan Ferrell (a co-defendant in this
case), was recently disbarred by the State of Arizona and the Ninth Circuit Court of
Appeals after evidence emerged showing that he threatened a lawsuit without
having a viable client. Dkt. 844-8. The evidence proved that Ryan Ferrell could
not possibly have had a client as alleged in his demand letter and draft complaint.
Dkt. 844-9. Ferrell abandoned his license rather than face prosecution.

elected to withdraw the motion based on the presence of facts in dispute.  NTG now faults NIC for taking action aimed at reducing disputes and burdens on the Court.  NTG fails to realize that NIC Counsel's withdrawal of the motion for sanctions undercuts NTG's argument that NIC Counsel defrauded the Court.  Certainly, were fraud intended (or were there such an intent), NIC would not have acted promptly to withdraw the motion on its first receipt of conflicting testimony.

Here Defendants' motion is a tactical measure to achieve a windfall in litigation.  That purpose has been apparent from the outset when NTG refused to meet-and-confer in good faith.  Fully aware of its evidence, NTG chose not to inform NIC of its position in the meet-and-confer process, thus inviting NIC to file the Motion for Sanctions.  NTG intentionally sandbagged its evidence, choosing instead to spring that information on NIC and the Court in an attempt to generate a new affirmative defense in this case.  Moreover, to avoid evidence disproving its contentions against NIC Counsel, NTG Counsel refused NIC's offer to supply NTG Counsel with NIC Counsel's communications with the non-party witnesses in advance of the OSC motion filing.  *See* PA Decl. at ¶15.  Defendants request an OSC here for the express purpose of generating either (1) an unclean hands defense or (2) a dispositive sanction against NIC.  *See* Dkt. 855.  Both tactics are aimed at diverting this Court from the merits of the case.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, NTG's motion for an OSC, bereft of requisite facts and in violation of Local Rule B(8), should be summarily denied.

/ / /

/ / /

/ / /

/ / /

/ / /

DATED:  October 28, 2019

Respectfully submitted,

EMORD & ASSOCIATES, P.C.

By:    */s/ Peter A. Arhangelsky*
Peter A. Arhangelsky, Esq. (SBN 291325)
E-mail: parhangelsky@emord.com
Emord & Associates, P.C.
2730 S. Val Vista Dr., Suite 133
Gilbert, AZ 85295
Phone: (602) 388-8899
Fax: (602) 393-4361

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2019 the foregoing, **PLAINTIFF NIC'S OPPOSITION TO NTG'S REQUEST FOR ORDER TO SHOW CAUSE REGARDING SANCTIONS, PERJURY, AND SUBORNATION OF PERJURY [DKT. 855]** was electronically filed using the Court's CM/ECF system and was sent by that system to the following:

Brendan M. Ford, Esq.
bford@FordDiulio, PC
650 Town Center Dr, Ste 760
Costa Mesa, CA 92625
Tel: (714) 384-5540
*Attorney for Andrew Nilon, Giovanni Sandoval,*
*Sam Schoonover,Matthew Dronkers, Taylor Demulder, Sam Pfleg,*

David J. Darnell, Esq.
ddarnell@callahan-law.com
Edward Susolik, Esq.
es@callahan-law.com
Callahan & Blaine
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA 92707
Tel: (714) 241-4444
*Attorney for Newport Trial Group and Scott Ferrell*

///

///

///

///

///

///

///

Nicole Whyte
nwhyte@bremerwhyte.com
Benjamin Price
bprice@bremerwhyte.com
Kyle A. Riddles
kriddles@bremerwhyte.com
Bremer Whyte Brown & O'Meara, LLP
20320 S.W. Birch Street
Second Floor
Newport Beach, CA 92660
Tel: (949) 211-1000
*Attorneys for Ryan Ferrell. Andre Baslow, David Reid, and Victoria Knowles*

                                       */s/ Peter A. Arhangelsky*
                                      Peter A. Arhangelsky, Esq.