**CALLAHAN & BLAINE, APLC**
Edward Susolik (SBN 151081)
Esusolik@callahan-law.com
David J. Darnell (SBN 210166)
Ddarnell@callahan-law.com
James M. Sabovich (SBN 218488)
jsabovich@callahan-law.com
3 Hutton Centre Drive, Ninth Floor
Santa Ana, California 92707
Telephone: (714) 241-4444
Facsimile: (714) 241-4445

Attorneys for Defendants NEWPORT TRIAL GROUP
and SCOTT J. FERRELL

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| NATURAL IMMUNOGENICS CORP., a Florida corporation,<br><br>Plaintiff,<br><br>v.<br><br>NEWPORT TRIAL GROUP, et al.,<br><br>Defendants. | CASE NO.  8:15-cv-02034-JVS-JCG<br>JAMS NO.  1220055347<br><br>**NTG'S REPLY IN SUPPORT OF REQUEST FOR ORDER TO SHOW CAUSE REGARDING SANCTIONS, PERJURY, AND SUBORNATION OF PERJURY**<br><br>Special Master: Hon. Rosalyn Chapman<br>Judge:            Hon. James V. Selna<br><br>Date:        November 18, 2019<br>Time:        1:30 p.m.<br><br>Dept.:        10C<br><br>Complaint Filed:    Dec. 7, 2015<br>Trial Date:        TBD |

1

# TABLE OF CONTENTS

2                                                                              <u>Page</u>

3   I.     INTRODUCTION ..................................................................................... 1

4   II.    NIC'S OPPOSITION DRAMATICALLY CONFIRMS THAT AN
           OSC IS NECESSARY ............................................................................ 3
5
           A.     NIC's Own Documents Confirm that it Knowingly Submitted
6                 False Testimony ........................................................................... 6

7                 1.     NIC Knew that Trycia's Facebook Contained Photographs
                         Proving that Scott Ferrell's Testimony About Trycia
8                        Living with the Ferrells In Late 2011 Was Truthful. ............... 6

9                 2.     NIC Prepared and Filed Declarations and a Motion With
                         Statements it Knew Were False ................................................ 10
10
           B.     None of NIC's Excuses Have Any Merit ......................................... 13
11
                  1.     NIC Cannot Rely On the "I Thought I Would Get Away
12                       With It" Defense to Perjury or Subornation of Perjury ............. 13

13                2.     NIC's Revisionist Positions on Materiality Are
                         Duplicitous and False ............................................................... 17
14
           C.     NIC Does Not Rebut the Showing that the Declarations Were
15                Perjured ........................................................................................ 20

16                1.     Charlotte Carlberg ..................................................................... 23

17                2.     MaryAnn Buc .............................................................................. 23

18                3.     Jim Buc ....................................................................................... 24

19  III.   CONCLUSION ......................................................................................... 25

20

21

22

23

24

25

26

27

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1

# TABLE OF AUTHORITIES

2
**Pages**

3

**Cases**

4

*ABF Freight Sys., Inc. v. N.L.R.B.*,
5      510 U.S. 317 (1994) ................................................................................. 4

6

*Alexander v. Caraustar Indus., Inc.*,
7      930 F. Supp. 2d 947 (N.D. Ill. 2013).................................. 19, 20, 21, 25

8

*Bassey v. City Case of Huntington Woods*,
9      344 Mich. 701, 74 N.W.2d 897 (1956) ............................................... 25

10

*Benjamin v. Bixby*,
       No. 108CV1025AWIDLB, 2009 WL 2171781 (E.D. Cal. July 21,
11      2009) ....................................................................................................... 3

12

*Burriola v. Nevada*,
13      551 F. App'x 332 (9th Cir. 2013)........................................................... 4

14

*Campbell v. Obama*,
15      No. 5:14-CV-03071-PSG, 2014 WL 7892162 (N.D. Cal. Feb. 10,
       2014)...................................................................................................... 18
16

*Cox v. Burke*,
17      706 So.2d 43 (Fla. Ct. App. 1998) ...................................................... 17

18

*In re Curl*,
19      803 F.2d 1004 (9th Cir.1986).............................................................. 14

20

*Erickson v. Newmar Corp.*,
21      87 F.3d 298 (9th Cir. 1996) ................................................................... 3

22

*Fink v. Gomez*,
23      239 F.3d 989 (9th Cir. 2001) ................................................................. 4

24

*In re Girardi*,
25      611 F.3d 1027 (9th Cir. 2010).............................................................. 14

26

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
27      563 U.S. 754, 131 S. Ct. 2060, 179 L. Ed. 2d 1167 (2011) ................ 16

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

Reply ISO Request for OSC

1

**TABLE OF AUTHORITIES**
**(CONTINUED)**

2

<u>Pages</u>

3

*Lockary v. Kayfetz,*

4

974 F.2d 1166 (9th Cir.), *cert. denied, sub. nom., Pacific Legal Foundation v. Kayfetz*, 508 U.S. 931, 113 S. Ct. 2397, 124 L. Ed. 2d

5

298 (1993)..................................................................................................3

6

*Manez v. Bridgestone Firestone North American Tire, LLC,*

7

533 F.3d 578 (7th Cir. 2008) .....................................................................3

8

*Newman v. Brandon,*

9

No. 1:10-CV-00687 AWI JL, 2012 WL 4933478 (E.D. Cal. Oct. 16, 2012)...........................................................................................4, 17, 18

10

*In re Retz,*

11

606 F.3d 1189 (9th Cir. 2010) .................................................................16

12

*Roadway Exp., Inc. v. Piper,*

13

447 U.S. 752 (1980) ...................................................................................4

14

*Sec. Farms v. Int'l Bhd. of Teamsters, Chauffers, Warehousemen & Helpers,*

15

124 F.3d 999 (9th Cir. 1997) .....................................................................7

16

*United States v. Alston,*

17

609 F.2d 531 (D.C. Cir. 1979), *cert. denied*, 445 U.S. 918 (1980).....................13

18

*United States v. Fawley,*

19

137 F.3d 458 (7th Cir. 1998) ...................................................................16

20

*United States v. Lara,*

21

181 F.3d 183 (1st Cir. 1999) ...................................................................22

22

*United States v. Shaffer Equip. Co.,*

23

11 F.3d 450 (4th Cir. 1993) .......................................................................2

24

*United States v. Talao,*

25

222 F.3d 1133 (9th Cir. 2000) ...................................................................4

26

*Youngevity Int'l v. Smith,*

27

Case No. 16-cv-704-BTM-JLB 2019 U.S. Dist. LEXIS 4950 (S.D. Cal. Jan. 10, 2019).................................................................................5

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

Reply ISO Request for OSC

**TABLE OF AUTHORITIES**
**(CONTINUED)**

<u>**Pages**</u>

**Statutes**

U.S.C. § 1623(d) ................................................................................. 15

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

Reply ISO Request for OSC

Defendants Newport Trial Group and Scott Ferrell (collectively "NTG") respectfully submit their reply in support of request for an Order to Show Cause regarding sanctions, perjury, and subornation of perjury.

## I.  **INTRODUCTION**

Stated bluntly, the record indicates that NIC has committed grave misconduct and repeatedly lied to this Court in a failed attempt to cover up its misconduct. Specifically: (1) NIC wrote and filed declarations that NIC knew were false; (2) NIC hid from this Court pictures showing that NIC's declarations were false; (3) NIC filed a "death penalty" sanctions motion advancing a factual narrative that NIC knew was false; and (4) NIC repeatedly lied to the Court while attempting to cover up its crimes. ***This is not litigation hyperbole – documents before this Court prove all of the above.***

Scott Ferrell filed a declaration stating, *inter alia*, that Trycia Carlberg "stayed as a guest in my home from the latter part of 2011 through the early part of 2012," and had discussed NIC's Sovereign Silver with him in December 2011. (Dkt. 812-1, ¶¶ 5-9.)  NIC filed a motion for "death penalty" sanctions that accused Scott Ferrell of perjury, assuring the Court that indisputable evidence showed "Trycia never resided or lived at the Ferrells' home in December 2011—a fact which undermines every material position in Ferrell's declaration."

***Astoundingly, NIC knew its criminal accusations against Ferrell were false before NIC filed its Motion.***  One of NIC's own declarants, Trycia's mother Charlotte Carlberg, specifically warned NIC's counsel: "***[m]y dates, looking back on Trycia's Facebook are wrong. I see pics of her at their [i.e, the Ferrells'] house during Nov, Dec, Feb, March . . . So, can't sign declaration with certainty.***"  (Dkt. 859-8 [emphasis added].)  Thus, before filing its Motion, NIC knew there were Facebook posts by Trycia showing her in the Ferrells' home in December 2011 – exactly as Scott Ferrell testified she was.  Not surprisingly, that Facebook account – which Charlotte Carlberg expressly brought to NIC's counsel's attention – contains

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 1 -

dozens of posts and pictures showing Trycia living with the Ferrells, including during the 2011 Christmas Holiday, such as posts of her at the Ferrell's home saying "Love living here!" and another titled "Holiday Festiveness w The Ferrells[.]"  Yet NIC told the Court precisely the opposite of what NIC knew to be true.

NIC's opposition does not address these facts nor anything else of substance. Rather, NIC shows shameless hypocrisy to distract from the severity of its misconduct:  Issues that NIC once claimed required "death penalty" sanctions are now "immaterial"; a witness e-mail warning NIC that pictures prove the falsity of NIC's motion purportedly show NIC's "high ethical standards"; Ferrell is to blame for not warning NIC that he would defend himself against false criminal accusations; and Trycia, who NIC described as a "highly ethical" deceased woman whose reputation was being unfairly maligned, must have been "duplicitous."

As this Court well knows, NIC has spent nearly four years piously lecturing the Court about how NIC brought this lawsuit to eradicate "[r]ampant fraud on the court by officers of the court" that "destroys the essential trusts courts must place in those privileged to practice law." (Dkt. 780 at 18.)  Yet NIC now claims that its own proven crimes and lies to the Court should have no consequences.

NIC's motion for sanctions did, however, stumble onto one kernel of truth.  In footnote one, NIC said "[a]ll attorneys, as officers of the Court, have a duty of candor and 'have the first line task of ensuring the integrity of the process,'" and that "[t]he system can provide no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end."  (Dkt. 844-1 at 6 *quoting United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457-58 (4th Cir. 1993).)  On that point, the parties agree.  This Court should issue an order to show cause and hold NIC to that standard.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

## II.   <u>NIC'S OPPOSITION DRAMATICALLY CONFIRMS THAT AN OSC IS NECESSARY</u>

NIC has responded to NTG's request for an order to show cause regarding sanctions, perjury, and subornation of perjury with feigned indignation, smoke and mirrors, and ***direct evidence proving NIC's guilt***.  It is a remarkable case where a party defends criminal allegations by insisting that it maintained "high ethical standards," but then submits an email in which its own witness warns that party that Facebook posts and pictures prove the party is lying.

Respectfully, the circumstances here beg for an order to show cause.  It is the work of this Court to safeguard the integrity of the judicial process and to regulate "the conduct of attorneys appearing before it." *Erickson v. Newmar Corp.*, 87 F.3d 298, 301 (9th Cir. 1996); *Lockary v. Kayfetz*, 974 F.2d 1166, 1170 (9th Cir.), *cert. denied, sub. nom., Pacific Legal Foundation v. Kayfetz*, 508 U.S. 931, 113 S. Ct. 2397, 124 L. Ed. 2d 298 (1993).  "No matter who allegedly commits a fraud on the court—a party, an attorney, or a nonparty witness—the court has the inherent power to conduct proceedings to investigate that allegation and, if it is proven, to punish that conduct." *Manez v. Bridgestone Firestone North American Tire, LLC*, 533 F.3d 578, 585 (7th Cir. 2008).  That includes the authority to "schedule an Order to Show Cause to determine whether the statements made under penalty of perjury were made falsely or without sufficient inquiry." *Benjamin v. Bixby*, No. 108CV1025AWIDLB, 2009 WL 2171781, at *7 (E.D. Cal. July 21, 2009)

Indeed, submitting perjured testimony is deadly serious and often requires dismissal:

There is no point to a lawsuit, if it merely applies law to lies. True facts must be the foundation for any just result  ... [W]hen a party falsely testifies to a fact material to the substance of a litigation, such is anathema to the function of the courts. Perjury is much more than simply a "gotcha," harmful in effect only for the reason that one

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 3 -

1   got caught. Litigation is not a game in which perjury warrants a five

2   yard penalty for a minor untruth, fifteen yards if the perjury was really

3   serious. Rather, perjury on any material fact strikes at the core of the

4   judicial function and warrants a dismissal of one's right to participate

5   at all in the truth seeking process. If one can be punished

6   for perjury with up to five years imprisonment, 18 U.S.C. § 1621, it

7   should not seem out of place that a civil action might be dismissed for

8   the same conduct.

9   *Newman v. Brandon*, No. 1:10-CV-00687 AWI JL, 2012 WL 4933478, at *4 (E.D.

10  Cal. Oct. 16, 2012) (citations omitted); *see also Burriola v. Nevada*, 551 F. App'x

11  332 (9th Cir. 2013) (affirming terminating sanctions for filing a false declaration,

12  then attempting to "withdraw the declaration without recanting the false statements

13  underlying it."). As the Supreme Court has observed, "[f]alse testimony in a formal

14  proceeding is intolerable," and a court "must neither reward nor condone such a

15  `flagrant affront' to the truth-seeking function of adversary proceedings." *ABF*

16  *Freight Sys., Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994) (citation omitted).

17  Consequently, "[p]erjury should be severely sanctioned in appropriate cases."

18       To be clear, while perjury itself is very bad, what NIC did here is worse by

19  far. As the Ninth Circuit has explained "[f]ew, if any, unethical acts by counsel are

20  more heinous than subornation of perjury," *United States v. Talao*, 222 F.3d 1133,

21  1140 (9th Cir. 2000). This Court has the inherent power to "levy sanctions in

22  response to abusive litigation practices." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752,

23  765 (1980). That inherent power extends to a "broad range of willful improper

24  conduct." *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001). As this Court has

25  previously noted, that "includes filing false affidavits." (Dkt. 130 at 4.) To "impose

26  sanctions under the court's inherent powers, the court must find 'bad faith or

27  conduct tantamount to bad faith.'" *Id. quoting Fink v. Gomez*, 239 F.3d 989, 994

28  (9th Cir. 2001). However, "an attorney's reckless misstatements of law and fact,

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 4 -

1    when coupled with an improper purpose, . . . are sanctionable under a court's

2    inherent power." (Dkt. 130 at 5.).

3        Here, it is disputable that NIC sought dispositive issue sanctions based on

4    false representations and declarations.  Indeed, NIC no longer even claims that the

5    declarations it wrote and filed were truthful; NIC no longer argues that the

6    dispositive motion it filed was based upon truthful evidence; NIC no longer accuses

7    Scott Ferrell of perjury regarding Trycia's whereabouts in December of 2011; and

8    NIC did not raise a single objection to the authenticity of the collection of pictures,

9    cards, and Facebook posts that prove NIC was lying.

10        Such paralysis by a hyper-aggressive litigant like NIC is remarkably telling:

11   as this Court knows, a truly innocent party would express genuine shock that it had

12   been duped, insist upon a meaningful investigation to clear its good name, produce

13   internal communication demonstrating its good faith, and – above all -- apologize to

14   both the Court and to Mr. Ferrell.

15        NIC did nothing of the sort; instead, NIC has done everything one would

16   expect of a party caught red-handed pedaling perjured testimony and hiding key

17   evidence from the Court: (1) NIC sequestered the witnesses by threatening witness

18   tampering if Ferrell's counsel even attempted to interview them; (2) NIC makes no

19   effort to explain why it hid Trycia's Facebook pictures from the Court; and (3) NIC

20   now claims that evidence that once justified "death penalty" sanctions now amounts

21   to mere "possible impeachment."  (Dkt. 859 at 10).[1]

22

23

_____

24   [1] NIC is also silent as to how eerily similar misconduct landed its principal case
     witness, Clark Baker, in federal prison for perjury, witness tampering, and
25   obstruction of justice.  Nor does NIC offer any defense of its counsel's misconduct
     in the ongoing *Youngevity v. Smith* case, where Judge Moskowitz recently
26   complained that NIC's lawyers were practicing "scorched earth" tactics beyond
     anything he had seen in 31 years as a federal judge. *Youngevity Int'l v. Smith*, Case
27   No. 16-cv-704-BTM-JLB 2019 U.S. Dist. LEXIS 4950 (S.D. Cal. Jan. 10, 2019).
     Clearly, this pattern of abuse by NIC and its lawyers at the Emord law firm will
28   continue unless stopped here.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 5 -

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

**A.    NIC's Own Documents Confirm that it Knowingly Submitted False Testimony**

Exhibit 5 to Jennifer Fernandes' declaration proves that NIC attempted, and is currently engaged in a cover-up of, a fraud on NTG and the Court.  At the time NTG filed its request for an order to show cause, the best-case scenario for NIC was that it conducted a slipshod investigation and was duped by three witnesses who all spontaneously told NIC the same false but favorable narrative.  We now know – based on the documents that NIC views as helpful to its cause – that the truth is far worse.

**1.    NIC Knew that Trycia's Facebook Contained Photographs Proving that Scott Ferrell's Testimony About Trycia Living with the Ferrells In Late 2011 Was Truthful.**

NIC's counsel spoke with Charlotte Carlberg on Friday afternoon, August 9, 2019 regarding Trycia Carlberg and regarding Scott Ferrell's declaration.  (Dkt. 859-1, ¶¶ 10-14.)  NIC's counsel then sent an email to Charlotte Carlberg stating "I understand Trycia was with you during Christmas 2011 and that she wasn't living with Scott Ferrell until sometime in late February or March 2012, and that she only lived with him and Erin for approximately three to four weeks."  (Dkt. 859-4.)

By noon Saturday, August 10, 2019 –apparently without diligence or effort to corroborate those statements – Fernandes had drafted and sent Charlotte Carlberg a declaration.  (Dkt. 859-6.)  NIC promised to "hold Ferrell accountable, and otherwise keep your involvement to a minimum."  (Dkt. 859-6.)  In neither this email, nor any other, does Fernandes seek evidence generally on the statements in Scott Ferrell's declaration.  Rather, she asks only for more "documents showing that Ferrell's declaration was false."  (*Id.*)

Within hours, though, it was clear that NIC's central premise – the argument that Ferrell had lied because Trycia did not live with the Ferrells in December of

- 6 -
Reply ISO Request for OSC

2011 – was indisputably false.  Specifically, at 4:24 p.m. that day Charlotte Carlberg warned NIC's counsel that:

> My dates, looking back on Trycia[']s Facebook are wrong. *I see pics of her at [the Ferrells'] house during Nov, Dec, Feb, March*. But at my house Dec.24/25 Christmas. Maryann will have pics and dates as well. *So, can't sign declaration with certainty.*

(Dkt. 859-8 (emphasis added).)

At this point, NIC's counsel knew three things.  First, it had a declarant who clearly lacked independent knowledge of Trycia's location during December of 2011.  Second, it knew that its own witness had photographs confirming that Trycia was at the Ferrells' house in December of 2011, exactly as Scott Ferrell had testified.  And third, NIC now knew that there was an independent, objective source of evidence regarding Trycia Carlberg's location – Trycia's Facebook account – to which NIC had access through Charlotte Carlberg.

After being warned that Trycia's Facebook page contained pictures of her living at the Ferrells in December 2011, it must be expected that NIC meticulously combed through Trycia's Facebook page as part of the "diligent investigation" NIC claims it conducted before filing its Motion.  After all, NIC had an insatiable appetite for evidence against Ferrell and all three of NIC's witnesses, as Trycia's Facebook friends, had access to Trycia's Facebook page.  Regardless, NIC's lawyers had a "duty to conduct a reasonable inquiry to determine that the declarations [they file] were 'well grounded in fact.'"  *Sec. Farms v. Int'l Bhd. of Teamsters, Chauffers, Warehousemen & Helpers*, 124 F.3d 999, 1017 (9th Cir. 1997).  Thus, if Trycia really only lived with the Ferrells for a few weeks in March 2012, and not from late 2011 to early 2012, her Facebook account would be an invaluable source of evidence.  NIC would be able to show picture after picture and post after post of Trycia with her mom or others, not the Ferrells, during that period.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

Except Trycia's account proves the opposite.  There are about 60 pages of photographs and posts on Trycia's page related to the Ferrells and her time with them.  On October 13, 2011, she can be seen in the Ferrell's yard in a photograph that indicates she is with Erin Ferrell and ***NIC declarant MaryAnn Buc***.  (Sabovich Decl., Exh. A at 3.)  On November 8, 2011, she posted multiple birthday pictures at the Ferrells' house.  (*Id.* at 4-7.)  On November 25, 2011, she is on the Ferrells' stairway with Scott and Erin.  (*Id.* at 9.)  There are multiple posts and photographs of her at the Ferrells' home in December 2011.  (*Id.* at 11-15.)  On December 18, 2011 she can be seen standing with Erin in front of a Christmas Tree.  (*Id.* at 12.) Three days later she wrote "Holiday Festiveness w The Ferrells" and posted a picture of her drink.  (*Id.* at 15.)  On January 24, 2012, she took a picture of the Ferrell's ocean view and wrote "Just now . . . ahhh! Love living here." (*Id.* at 23.) On Valentine's Day 2012, a friend wrote Trycia "Happy Valentines day beautiful lady!  So enjoyed talking with you at Erin's house, hope you are doing well."  (*Id.* at 30.)  Later, on February 23, 2012, Erin writes Trycia "[w]henever I hear this song, it reminds me of you . . . seeing you relaxing on our deck, soaking in the sunshine, taking in the ocean air . . . HEALING!!!  So happy to have you here with us."  (*Id.* at 39.)  On April 1, 2012 (after NIC and its declarants claim Trycia fled the Ferrells' home on poor terms), her friend Jonathan George posts a picture of her indicating he is "with Trycia Carlberg and Erin Ferrell."  (*Id.* at 51.)  He writes "Best weekend with Trycia and Edgar!! Thanks Erin for sharing your resort with us!!."  (*Id.*)  On May 7, 2012, after Trycia's death, Simi Rush posted on Trycia's Facebook page: "Trycia, a friend of my gracious friends, Erin Ferrell and Scott Ferrell passed away this weekend . . . Trycia stayed with Erin and her husband at their house in Laguna to heal." (Dkt. 846-1 at 28.)

At this point, it would be absolutely unthinkable for any borderline ethical attorney to continue seeking declarations accusing Scott Ferrell of perjury for testifying that Trycia Ferrell lived with him in December of 2011: independent,

- 8 -

Reply ISO Request for OSC

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

irrefutable evidence confirmed Scott Ferrell's testimony to have been entirely truthful. Any honorable attorney would have dropped the issue and moved on. Not NIC. Instead, NIC's counsel orchestrated a call with Charlotte Carlberg, and Jim and MaryAnn Buc on August 10, 2010. (Dkts. 859-9, 859-10.) Everyone on the call *knew* that Trycia's Facebook showed that Trycia was living with the Ferrells' from late 2011 to early 2012, just as Scott Ferrell testified – in fact, just a day earlier, Charlotte Carlberg had personally told NIC's counsel that very fact.

After the call, NIC's counsel then sent a joint email to all three witnesses attaching draft declarations. (Dkt. 859-10.) NIC has withheld from NTG and the Court all of the draft declarations[2] it sent the witnesses and has refused to provide them. (*See e.g.*, Dkt. 859-9 (email to Charlotte Carlberg listing attachment "2019-8-12 - Declaration of Charlotte Carlberg.docx" but not including that document in the exhibit; Sabovich Decl., Exh. B (Oct. 31, 2019 email.) The declarations are discussed in more detail below. *Infra*.Part.II.C. With the exception of Jim Buc – who refused to swear to NIC's version of events in "December 2011" (Dkt. 859-20) – it appears from the correspondence provided that the drafts were substantively similar to what NIC ultimately filed on all material points. (*See generally* Dkt. 859-10 to Dkt. 859-23.) And those declarations all swear to NIC's false narrative that Trycia only lived in the Ferrells' house briefly in 2012 and fled on bad terms. (Dkts. 844-4, ¶ 13; 844-4, ¶ 21, 844-5, ¶ 13.)

It is now crystal clear why the NIC witnesses were concerned about "retaliation" by Ferrell (Docket 859-10): it is because NIC was pressuring them to sign declarations accusing Ferrell of perjury even though NIC, its counsel, and all

---

[2] The failure to provide attachments goes beyond draft declarations. NIC emailed Charlotte Carlberg a pdf of what appears to be a declaration from Trycia in another lawsuit. (Dkt. 859-4.) Because NIC has not provided attachments it is not possible to know what this is. If it is a suit in which NTG represented Trycia, then NIC knew its statements that Trycia disliked Scott and would never have been his client were false. This underscores the need for an OSC and the production of all requested documents.

three witnesses knew their claims could be proven false if Ferrell were able to gain access to Trycia's Facebook page.  (Dkts. 859-8 and 858-9.)  Thus, when NIC says "retaliation," what it actually means is punishment of perjury (or what is more commonly referred to as "justice.").  To convince the witnesses to proceed with the scheme, NIC's counsel apparently told them about its "ability to protect them" and indicated "Mr. Arhangelsky will correspond independently by email concerning . . . protections[.]"  (Dkt. 859-10.)

NIC has refused to provide its correspondence with the witnesses promising them "protection" in return for signing perjured declarations.  That communication is almost certainly the genesis of NIC's threats and allegations of "witness tampering" discussed more fully in NTG's Opposition to NIC's Motion for Sanctions (Dkt. 861.)

**2.   <u>NIC Prepared and Filed Declarations and a Motion With Statements it Knew Were False</u>**

Going from bad to worse, NIC then filed a motion and three declarations swearing to a central premise that NIC knew to be false.  While NIC has tried desperately to miscast and transform its sanctions motion into something it was not, NIC's core allegation throughout the motion was that Trycia did not live with the Ferrells in late 2011.  This is what NIC told the Court:

> Each witness testified that Ferrell's declaration described an impossible set of circumstances. Trycia never resided or lived at the Ferrells' home in December 2011—a fact which undermines every material position in Ferrell's declaration.

(Dkt. 844-1 at 13.).

Twenty-six times NIC accused Scott Ferrell of presenting a false "narrative" regarding Trycia.  (*See generally* Dkt. 844-1.)  The express assertion that Trycia Carlberg did not live with the Ferrells in 2011 appears at least 15 times in NIC's sanctions motion.  (Dkt. 844-1 at 12:10-12, 13:19-22, 14:10-13, 15:10-13, 15:16-18,

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

Reply ISO Request for OSC

15:24-25, 16:1-2, 16:23-26, 17:3-4, 17:12-14, 19:8-12, 21:7-9, 22:1-2, 22:7-9, 22:19-21.)  NIC's sanctions motion alleged that Scott Ferrell's declaration made ten "materially false statements under oath[.]"  (Dkt. 844-1 at 15-17.)  All but one of these accusation was expressly predicated on NIC's "evidence" that Trycia was not living with the Ferrells in December 2011 as Scott Ferrell testified.  (*Id.* at 15-16.)

Gambling that Ferrell could not disprove its false claims about what happened nearly eight years ago, NIC further "gilded the lily" by assuring the Court that Trycia personally disliked Scott Ferrell, was never his client, and even that the Ferrells mistreated and imprisoned Trycia.  NIC claimed based on the NIC witnesses, that in March, Trycia "fled [the Ferrells' home] following a limited stay, experiencing discomfort living with the Ferrells." (Dkt. 844-1 at 14, 15, 21.)  NIC told the Court that Scott Ferrell "held himself out as an individual looking to aid a terminally ill friend when, in reality, he had little involvement with Carlberg and, indeed, caused her to leave his home in 2012 on poor terms, fleeing from his residence."  (Dkt. 859 at 22.).  Harsh words, indeed.

Again, NIC supported every one of those false statements with citations to "unequivocal" testimony (which was "unequivocal" because NIC had written the declarations to support its false narrative).  (*See generally* Dkts. 844-3, 844-4, 844-5; Dkt. 844-1 at 19 ("Testimony from Carlberg's mother and from two of her closest friends along with contemporaneous documentary evidence establish that Carlberg did not live with the Ferrells in December 2011, was not in his home over the Christmas holiday[.]"); *id.* at 13 ("The three witnesses have produced the attached sworn testimony, revealing, conclusively, that Scott Ferrell's declaration about Trycia Carlberg supplied *in camera* is false in all material respects."; *id.* at 14 ("All three witnesses confirm that Trycia was not at the Ferrell's home at any time over the Christmas holiday in 2011."); *id.* at 26-27 ("No reasonable jury could credit that declaration, particularly in the presence of directly contradictory testimony from non-parties and documentation proving Ferrell's declaration factually impossible.")

Reply ISO Request for OSC

The undisputed evidence shows that NIC drafted these statements, and the supporting statements in the witness declarations, knowing full well that the statements were false.  NIC's own witness told NIC that Trycia's own Facebook page had pictures "of her at [the Ferrells'] house during Nov, Dec, Feb, March." (Dkt. 859-9.)  The account, which NIC had access to via its witnesses, confirmed that Trycia was living with the Ferrells from late 2011 to early 2012, just as Scott Ferrell testified.  *Supra.*Part.II.A.1. Yet NIC drafted and filed three declarations testifying to a completely false narrative:  that Trycia ***did not*** live with the Ferrells in 2011.  (Dkts. 844-4, ¶¶ 28-30; 844-3, ¶ 13; 844-5, ¶ 8.)  NIC and its declarants repeatedly asserted that Trycia was not with the Ferrells in December 2011 or over the December 2011 Holiday (Dkts. 844-3, ¶¶ 5-6, 844-4, ¶¶ 10-15, 844-5, ¶ 8, 844-1 at 13-14) even though NIC knew that Trycia was living with the Ferrells at the time. The Facebook account NIC was specifically directed to literally had pictures of her standing with the Ferrells in front of a Christmas tree and a post in which Trycia wrote on December 21, that she was celebrating "Holiday Festiveness w The Ferrells".  (Sabovich Decl., Exh. A at 13-15.)  NIC and the declarants knew the bizarre story about Trycia fleeing on poor terms in March 2012 was false.  There are posts of Trycia happily at the Ferrells home in April 2012, when she spent a weekend with a friend named Jonathan George.  (*Id.* at 51.)

At this point, NIC had to know that everything else it had written – from the claims about Trycia not being "close" to Scott Ferrell to the testimony in which the declarants claim to know that she did not take Sovereign Silver – were false as well. Trycia's Facebook is replete with pictures of her spending time with Scott and Erin Ferrell.  (Sabovich Decl., Exh. A at 9, 13, 20, 41, 43, 44.)  And since Trycia was with the Ferrells from late 2011 to shortly before her death in 2012, NIC knew that the declarants could not possibly have complete knowledge of what supplements she was taking.  And yet, NIC proceeded to file the motion for sanctions.

It is rare to have such unequivocal and unchallengeable evidence of a fraud on the court.  Because bad actors like NIC rarely volunteer their own criminal intent, crimes like perjury are typically proven circumstantially "from the totality of the circumstances and need not be proven by direct evidence." *United States v. Alston*, 609 F.2d 531, 538 (D.C. Cir. 1979), *cert. denied*, 445 U.S. 918 (1980).  As discussed in NTG's Motion, even without NIC's Exhibit 5, the circumstances here strongly indicated an attempt to deceive the Court into issuing a "death penalty" sanction in NIC's favor based on completely fabricated evidence.  (Dkt. 855 at 24-27.)  NIC's Exhibit 5 just confirms that NIC's efforts to frame Ferrell were premeditated, precisely executed, and beyond all bounds of decency.

### B.    None of NIC's Excuses Have Any Merit

Based on the false declarations it drafted, NIC called Scott Ferrell's "use of Carlberg reprehensible . . . indecent and shameful."  (Dkt. 844-1 at 23.)  Those words better describe NIC, which tried to frame a litigation opponent for perjury and "win" what it claims to be a multi-million dollar lawsuit with testimony that it knew to be false – all while hiding from the Court pictures that proved Ferrell was telling the truth.  Caught red-handed, NIC offers several self-serving excuses, none of which withstand basic scrutiny and all of which are entirely duplicitous.

### 1.    NIC Cannot Rely On the "I Thought I Would Get Away With It" Defense to Perjury or Subornation of Perjury

NIC first claims that it did nothing wrong because NIC did not have NTG's evidence proving that NIC's statements were false (of course, this is another lie – NIC's own Exhibit 5 shows that NIC *did* have such evidence).  Undeterred by reality, NIC uses this fantasy to build two excuses.  First, it attempts to exonerate the witnesses and itself by positing that the witnesses were just innocuously speculating about Trycia's whereabouts in December of 2011 and their "recollection may have faltered."  (Dkt. 859 at 22.)  Not true: Exhibit 5 shows that NIC and the declarants knew the testimony was false.  But even setting that aside, the witnesses did not

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 13 -

1    admit any fog of memory when accusing Ferrell of perjury, and NIC represented to

2    this Court that "[t]he three witnesses have produced the attached sworn testimony,

3    revealing, ***conclusively***, that Scott Ferrell's declaration about Trycia Carlberg

4    supplied *in camera* is false in all material respects."   (Dkt. 844-1 at 13 (emphasis

5    added).)  Even if it were the case that NIC only presented speculation as hard fact –

6    which is far less insidious then what actually happened – it would still have been

7    lying.  As the Ninth Circuit explained, "[e]ven if attorneys 'only 'chose to state as a

8    fact what was at the best a guess and a hope, [they] engaged in misrepresentation.'"

9    *In re Girardi*, 611 F.3d 1027, 1037–38 (9th Cir. 2010) *quoting In re Curl,* 803 F.2d

10   1004, 1006 (9th Cir.1986).  Here, the gravity of NIC's attempted fraud is

11   compounded by the fact that NIC deliberately blocked access to the witnesses,

12   concealed evidence, and urged this Court to act on the declarations without

13   requiring them to testify.  (Dkt. 844-1 at 26.)

14        Second, NIC argues that NTG "did not meet-and-confer in good faith"

15   because[3] it did not give NIC evidence NTG later filed.  (*Id.* at 859 at 12-13.)  In

16   reality, that argument is facially absurd because NIC did not provide any evidence to

17   NTG in meet-and-confer (NIC already had the signed witness declarations but did

18   not provide them).  (*Id.* at 12.)  NTG, of course, could not provide evidentiary

19   rebuttals to declarations it had not even seen.  In any event, counsel for NTG

20   truthfully told NIC that its factual positions were completely without merit.

21   (Declaration of David Darnell, ¶ 2.)

22        In retrospect, NIC's failure to provide the signed declarations is strong

23   circumstantial evidence that NIC knew those declarations were false.  NIC's own

24   documents confirm that NIC pushed the witnesses to sign the declarations before

25   NIC opened meet-and-confer.  An August 21, 2019 email leaves no doubt that NIC

26

27   [3] NIC also claims that NTG refused a supposed offer by NIC to supply the
communications.  (Dkt. 859 at 5.)  That is not true.  NIC conditions any offer of

28   providing documents on NTG agreeing not to seek discovery from the declarants.
(Dkt. 859-32.)

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

was rushing the witnesses.  In that email Jim Buc states "[t]ime is of the essence to
get these completed declarations in your hands, that is understood," that his "wife
spoke into her phone to produce the below declaration," and that he would "try and
get mine over today as well."  (Dkt. 859-11.)  Yet NIC's August 26, 2019 meet and
confer letter not only fails to include or cite the declarations on which NIC would be
basing its motion, that letter strongly implied that such declarations did not yet exist.
It stated "at least three witnesses *intend to testify* that Ferrell's declaration was
false."  (Dkt. 846-1 at 7.)  The witnesses did not "intend to testify" – they had
already signed declarations and NIC's motion for sanctions expressly asked that
they be excused from testifying.  (Dkt. 846-1 at 7.)

Thus, at the time of the meet-and-confer, NIC knew these declarations were
false but was hoping that NTG could not prove it.  If NIC provided signed
declarations, NIC could have subjected the witnesses and itself to sanctions and
potentially criminal prosecution risk.  But if it just generally described witness
testimony without admitting that it already had signed declarations, there would be
no such risk.  In sum, NIC's conduct more resembled casing an anticipated crime
scene than good-faith meet-and-confer.

Next, NIC attempts to leverage its purported lack of access to NTG's
evidence into evidence of NIC's good faith,[4] claiming that if it knew NTG had such
evidence "NIC would not have filed its motion."  (Dkt. 859 at 25.)  Likewise, NIC
claims the declarants lacked an intent to deceive because there is "no showing that
that Charlotte Carlberg or the Bucs were in possession of that evidence."  (Dkt. 859
at 17-18.)  It is unclear why NIC would even make this argument in light of Exhibit
5 (the August 10, 2019 email in which Charlotte Carlberg warns NIC's counsel that
she will not sign the declaration because Trycia's Facebook shows she was living at

---

[4] NIC invokes its withdrawal of the motion was evidence of "good faith."  (Dkt. 859
at 25.)  That is just evidence that NIC was caught.  Indeed, one cannot defend itself
by withdrawing perjured testimony after it has "become manifest that such falsity
has been or will be exposed."  U.S.C. § 1623(d).

Reply ISO Request for OSC

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1   the Ferrells in December of 2011).  Even if Charlotte Carlberg had not told NIC in

2   writing that the Facebook account contained independent evidence that Trycia

3   Carlberg lived with the Ferrells from late 2011 to early 2012 (which she did), NIC

4   cannot insulate itself from criminality by remaining willfully blind.  As the Supreme

5   Court explained, "[m]any criminal statutes require proof that a defendant acted

6   knowingly or willfully, and courts applying the doctrine have held that defendants

7   cannot escape the reach of these statutes by deliberately shielding themselves from

8   clear evidence of critical facts that are strongly suggested by the circumstances."

9   *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 131 S. Ct. 2060, 2062–63,

10  179 L. Ed. 2d 1167 (2011); *In re Retz*, 606 F.3d 1189, 1199 (9th Cir. 2010) (a party

11  cannot "merely by playing ostrich and burying his head deeply enough in the sand,

12  disclaim all responsibility for statements which he has made under oath."); *United*

13  *States v. Fawley*, 137 F.3d 458, 468 (7th Cir. 1998) (affirming perjury conviction

14  based on willful blindness).  Thus, NIC cannot defend itself from future criminal

15  proceedings, much less from the substantially lower "reckless" standard applicable

16  here, by claiming it did not "know" the statements were false.

17        NIC claims that "the witnesses' statements aligned perfectly with the record

18  then available to NIC Counsel," and cites a December 24, 2011 photograph, the lack

19  of a retainer agreement, a claimed lack of evidence that Trycia used sovereign

20  silver, and a January 27, 2012 email that NIC claims shows that "Ferrell appeared to

21  lack knowledge of his NIC client."  (Dkt. 859 at 6, 8-9.)  Again, all of this is *post*

22  *hoc* rationalization given the August 10, 2019 email in which NIC was told that

23  Trycia's Facebook showed her living at the Ferrells' house from late 2011 to early

24  2012.  Even setting that aside, none of NIC's points are credible.  The photograph is

25  ambiguous and in no way even suggests that Trycia Carlberg was not also at the

26  Ferrells' home on December 24, 2011.  (Dkt. 855 at 14-15.)  There is evidence of

27  Trycia's use of Sovereign Silver – there is a time stamped December 24, 2011

28  photograph of Sovereign Silver taken by Scott Ferrell on an evening when he was

with Trycia and multiple photographs proving that Trycia was in the Ferrells' home on that date.  (Dkt. 812-1 at 22-23; Dkt. 855 at 14-16.)  And the fact that Scott Ferrell did not recall the new NIC matter client's name is completely consistent with having switched clients in the NIC matter.

In reality, it is not that NIC or its declarants thought the statements were true – they simply "believe[d] NTG had no evidence to the contrary."  (Dkt. 859 at 12.) In other words, NIC argues that perjury and subornation of it are fine so long as the perpetrators are unaware of conclusively incriminating evidence.  No matter how preposterous, this defense is not available to NIC or its witnesses *because they did know*.  But more fundamentally, the fact that someone believes they will not be caught provides a motive and opportunity to submit perjured testimony, not a defense against having done so.  "The integrity of the civil litigation process depends on the truthful disclosure of facts" and "a system that depends on an adversary's ability to uncover falsehoods is doomed to failure, which is why [that] kind of conduct must be discouraged in the strongest possible way."  *Cox v. Burke*, 706 So.2d 43, 47 (Fla. Ct. App. 1998).

Taken together, all of the available evidence – including NIC's absurd position, its flippant excusal of false testimony, its unrepentant indignation at having been caught, as well as its attempt to deflect blame for its misconduct onto the victim – betrays a lack of seriousness regarding submitting false testimony. *Newman v. Brandon*, No. 1:10-CV-00687 AWI JL, 2012 WL 4933478, at *4 (E.D. Cal. Oct. 16, 2012) ("Perjury is much more than simply a 'gotcha,' harmful in effect only for the reason that one got caught.")

## 2. NIC's Revisionist Positions on Materiality Are Duplicitous and False

Having been caught submitting false testimony, NIC next tries to downplay the importance of that testimony, misrepresents the extent to which it has been

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

Reply ISO Request for OSC

disproven, and reverses itself for the fourth time in two months on the definition of "materiality."

NIC claims that "NTG's brief challenges only one primary point present in two declarations: whether Trycia Carlberg spent time in Ferrell's house on the Christmas holiday in 2011 and at times in 2011," then claims "[t]hat testimony is immaterial to whether Trycia Carlberg was an NTG client poised to sue NIC in 2011." (Dkt. 859 at 17; *id*. at 15 (claiming "[t]he following *immaterial* facts were placed in dispute:  (1) Where Trycia Carlberg spent her time on Christmas Eve 2011, (2) Where Trycia Carlberg lived at various times in December 2011 . . . .")

It is unclear how NIC can make such a claim.  NIC moved for "death penalty" on the very basis that "Trycia never resided or lived at the Ferrells' home in December 2011—a fact which undermines every material position in Ferrell's declaration." (Dkt. 844-1 at 13.)  How can that exact fact now be "immaterial"?  Indeed, the express assertion that Trycia Carlberg did not live with the Ferrells in 2011 appeared at least 15 times in NIC's sanctions motion, and in nine of NIC's ten allegations of "materially false statements under oath."  And that was only one of the materially false statements.  Virtually everything – the claim that Trycia disliked Scott and his litigation practice, the statement that she refused to be Scott Ferrell's client, the assertion that she only stayed with the Ferrell's briefly in March 2012, and the statements that she "fled" in March 2012 on poor terms – were all completely false.  (Dkt. 855 at 19-20.)

NIC's position on materiality is reminiscent of the "fanciful world of Lewis Carroll, the inhabitants could turn fact into fiction and fiction into fact by mere *ipse dixit*." *Campbell v. Obama*, No. 5:14-CV-03071-PSG, 2014 WL 7892162, at *1 (N.D. Cal. Feb. 10, 2014).  "As Humpty Dumpty scornfully informed Alice, 'When I use a word, it means just what I choose it to mean—neither more nor less.'"  As Humpty Dumpty went on to explain, the real issue was not "whether you can make words mean so many different things," but "which is to be master—that's all."  *Id.*

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 18 -

NIC sees itself as master and so is unaccountable for its words.  First, the statements were "material" enough to justify death penalty sanctions two months ago.  Next, "the whereabouts of Trycia Carlberg" were a "fact not material to the ultimate issue . . . ." when NIC was defending itself from perjury.  (Dkt. 851 at 3.)  Then, when NIC tried to distract the Court with accusations of witness tampering, it was material again.  (Dkt. 857-1 at 17.)  Now, the falsity of NIC's "narrative" in support of a death penalty sanctions motion is once again "immaterial."  (Dkt. 859 at 1.)

As NTG's motion pointed out, NIC is not the first party to press a claim based on perjured testimony, then respond to being caught by dropping the claim and asserting that the false statements were "immaterial."  (Dkt. 855 at 31.)  NTG directed this Court to *Alexander v. Caraustar Indus., Inc.*, 930 F. Supp. 2d 947, 957 (N.D. Ill. 2013), which addressed this exact issue and several others that are present here.  In that wage and hour action, plaintiff employees alleged that they were not paid for certain activities and filed "declarations in support of their motion for conditional certification which detailed their additional, uncompensated work duties."  *Id.* at 949.  When statements in the declarations were proven false, they abandoned certain of those claims, then "argue[d] that because they have abandoned their . . . claims, their statements [supporting those claims] are not material and, therefore, cannot be perjurious."  *Id.* a 957.  This is what NIC has done and the District Court noted the obvious absurdity of the position:

> [T]he argument is preposterous. The question in cases of claimed perjury is whether the false statements were material *when made. United States v. Abroms,* 947 F.2d 1241, 1246 (5th Cir.1991). "A false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'... The statement need not *actually* affect the decision." *United States v. Grigsby,* 692 F.3d 778, 785 (7th Cir.2012). If it were otherwise—if it were the way the plaintiffs want

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

Reply ISO Request for OSC

1   it to be—litigants could lie about claims to the point of getting caught,

2   then withdraw those claims with impunity. It would be well worth it

3   to pursue a pattern of perjury because there would no risk, either

4   civilly or criminally so long as the perjurer abandoned the claims

5   intended to be supported by the perjurious testimony. Under the

6   defendants' perverse view, the integrity of the judicial system can be

7   compromised with the wrongdoer suffering no effective sanction.

8   *Id.* ("falsifying claims and then simply withdrawing them without consequence and

9   proceeding apace with the balance of a suit creates a farcical situation."); *id.*, fn. 5

10  ("Withdrawal of the perjurious claims without more does not in the slightest

11  penalize the plaintiffs since the charges never should have been brought.")

12      There is no doubt that the false statements in the declaration and the motion

13  had "a natural tendency to influence, or [were] capable of influencing" the decision

14  maker.  After all, NIC brought a motion for death penalty sanctions based on them.

15  (Dkt. 844-1 at 7.)  Enough said.

16      **C.   <u>NIC Does Not Rebut the Showing that the Declarations Were</u>**

17      **<u>Perjured</u>**

18      NIC argues that the declarations were not intentionally false and that "[a]t

19  best, NTG produced impeachment material related to points in two declarations."

20  (Dkt. 859 at 17.)  This consists mostly of NIC: (1) mischaracterizing the pervasive

21  nature of the false statements in the declarations, (2) downplaying the overwhelming

22  evidence disproving those statements,[5] and (3) offering implausible, common sense-

23  defying explanations.

24

25

---

26  [5] NIC suggests that the declarants' statements regarding knowing that Trycia did not
    take Sovereign Silver have not been controverted.  (Dkt. 859 at 18-24.)  NIC is
27  incorrect – the evidence is that Trycia showed Scott Ferrell a bottle of Sovereign
    Silver on December 24, 2011.  Moreover, these are declarants who were not with
28  Trycia so could not possibly offer testimony on what supplements she took.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

Reply ISO Request for OSC

Nothing NIC offers on these points is credible.  As a preliminary matter, NIC's explanations on behalf of the declarants have no value.  In *Alexander*, 930 F. Supp. 2d at 954, the Court addressed a similar instance of an attorney making excuses for a perjuring witness.  The Court noted:

> The problem with these excuses—apart from their obvious and inherent implausibility—is that they come, not from Ms. Maldanado, but her counsel. There is no affidavit from Ms. Maldanado providing any explanation whatsoever for the false statements she made in her declaration, however flimsy that explanation might have been . . . Her attorney's attempted explanation has no evidentiary effect . . . .

*Id.*  The declarants knew that evidence has been submitted showing that they made false statements.  (Dkt. 859-24 ("Ferrell's filing argues that your declarations were inaccurate. Once you have read those documents, please contact our office so we can discuss.")  And MaryAnn Buc has even filed a declaration in this matter since that time.  (Dkt. 857-3.)  Yet none have given any explanation for the false statements in their declarations.

As explained above, all of these witnesses and NIC knew that they were offering false testimony as of August 10, 2019, before the witnesses signed or NIC filed the Motion.  Charlotte Carlberg knew from viewing Trycia's Facebook page that her daughter lived with the Ferrells from late 2011 to early 2012.  (Dkt. 859-8.) She stated she was going to "confer with the Bucs to be sure on dates."  (Dkt. 859-7).  So even if the Bucs and NIC's counsel did not independently check Facebook, they would have known from Charlotte.  Even setting that aside, the nature and number of statements and the declarants' relationship with Trycia render an innocent explanation impossible.

As discussed in NTG's motion, the declarations all make the same false statements in NIC's favor. They testify from personal knowledge that Trycia was never a client of Scott Ferrell (Dkt. 844-3, ¶¶ 10-13; Dkt. 844-4, ¶¶ 21-24; 844-5, ¶¶

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

12, 14), but executed engagement letters and settlement checks prove that Trycia was a client of Scott Ferrell's as of December 2011. (Dkt. 846-4 at 18-25.)  They testify from personal knowledge that Trycia could not have been with the Ferrells on December 24, 2011, but multiple photographs prove she was. (*Compare* Dkt. 844-4, ¶¶ 9, 14; Dkt. 844-3, ¶¶ 5-7; Dkt. 844-5, ¶ 8 *with* Dkt. 855 at 14-15.)  Likewise, they testify from personal knowledge that Trycia did not live with the Ferrells in 2011, but multiple documents prove that she did. (*Compare* Dkt. 844-5, ¶ 13; Dkt. 844-3, ¶ 13; Dkt.844-4, ¶ 13 *with* Dkt. 855 at 16-19; Dkt. 859-8.)  They testify from personal knowledge that Trycia was "starved" by the Ferrells and "fled" their home "in distress" in March 2012, but multiple documents prove that she considered the Ferrells to be the "most caring and generous people" she knew and lived with them until she went into hospice care around April of 2012. (*Compare* Dkt. 844-4, ¶¶ 28-30; Dkt. 844-5, ¶ 15; Dkt. 844-3, ¶ 13 *with* Dkt. 855 at 16-19.)

NIC's (not the declarants') explanation is to claim that the fact that "close friends have similar recollections of events is not evidence of a conspiracy to commit perjury."  (Dkt. 859 at 17.)  That is both disingenuous and "elevate[s] coincidence to an art form."  *United States v. Lara*, 181 F.3d 183, 201 (1st Cir. 1999).  The declarations are the same because NIC wrote them that way and they were specifically intended to be "collaborating".  (Dkt. 859-20 (Jim Buc explaining "I understand that it is desirable when multiple declarations corroborate the same point, however, I don't remember dates the way my wife does . . . .")

For all declarants NIC attempts to downplay the significance of the misrepresentation by claiming that the declaration contained other statements that have not been controverted.  NIC is wrong.  For example, it claims the statement that "Charlotte was aware of medications and supplements that Trycia consumed in 2011 and 2012" remains "unrebutted."  (Dkt. 859 at 22.)  But Charlotte Carlberg could not have been aware of supplements that Trycia was taking when Trycia was with the Ferrells, not her.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

Moreover, as shown below, NIC's tortured defenses of each declarant defy credulity and are contradicted by all available evidence.

### 1. **Charlotte Carlberg**

As discussed above, Charlotte Carlberg knew she was offering false testimony.  She reviewed, and advised NIC of, Trycia's Facebook page that showed Trycia was living with the Ferrells from late 2011 to early 2012 and that she was with them for the December 2011 holiday.  Yet she still testified that "Trycia was with her immediate family throughout the Christmas holiday in 2011, including on December 24 and 25, 2011. At no point was Trycia in the presence of Scott Ferrell or his wife."  (Dkt. 844-3, ¶ 7.)  Like all of NIC's witnesses, she testifies to the false narrative that Trycia only "stay[ed] in the Ferrells' home for a brief period in 2012" and "left the Ferrells' house on poor terms and in distress."  (Dkt. 844-3, ¶ 13.)

NIC's excuse seems to be that Charlotte was simply speculating and "may have been unaware that Trycia left to be in the company of the Ferrells, or Charlotte's recollection may have faltered."  (Dkt. 859 at 22.)  But Trycia had already moved in with the Ferrells at that time.  (Dkt. 846-3 at 15 (November 8, 2011 Facebook chat between Trycia and Erin Ferrell that unequivocally confirms that Trycia was "living with" the Ferrells at that time.); Dkt. 846-3 at 28-29 (November 28, 2011 card from Trycia stating "I just wanted to take a moment to thank you both for allowing me to live with you in your beautiful home.").)  Regardless, Exhibit 5 shows that both Char Carlberg and NIC knew that her statements were false and her recollection had not "faltered."

### 2. **MaryAnn Buc**

MaryAnn Buc knew full well that Trycia Carlberg was living with the Ferrells from late 2011 to early 2012.  Trycia's Facebook page shows that MaryAnn Buc visited Trycia at the Ferrells' home on October 13, 2011 and attended a party with her there on March 10, 2012.  (Sabovich Decl., Exh. A at 3, 45.)  She and Jim Buc took Trycia to dinner on her birthday, November 8, 2011, a time when she "live[d]"

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 23 -

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

1   with the Ferrells.  (Dkt. 846-3 at 15, 18.)  Moreover, MaryAnn Buc claimed that she

2   spoke to Trycia "daily" and claimed to have taken her to "many of her doctor and

3   chemotherapy appointments in 2011 and 2012 at Kaiser Los Angeles . . . ."  (Dkt.

4   844-4, ¶¶ 14, 17.)

5        Yet she testified to a completely fictional account of Trycia's life spanning

6   six months.  NIC concedes that MaryAnn Buc offered false testimony, but claims

7   that "[t]he fact that MaryAnn was unaware that Trycia spent time at the Ferrells'

8   home does not prove MaryAnn a liar."  (Dkt. 859 at 19.)  Trycia did not just "spend

9   time" at the Ferrells' house, she was living there for approximately six months,

10  including December 2011.  It is impossible to believe that MaryAnn Buc spoke to

11  Trycia daily, visited her there, picked her up and dropped her off from doctors'

12  appointments there, yet somehow remained oblivious to that fact.

13       NIC claims that "the fact that Trycia may have written positively of her

14  experiences to the Ferrells does not prove that Trycia did not communicate disdain

15  for them to MaryAnn."  (Dkt. 859 at 19.)  So NIC's reconciliation of MaryAnn

16  Bucs' testimony that the Ferrells imprisoned and starved Trycia in March 2012,

17  (Dkt. 844-4, ¶¶ 28-30) with Trycia's own words calling them "most caring and

18  generous people," is that Trycia – who just two months ago NIC described as

19  "highly ethical" -- was actually conniving and duplicitous.  This is, to borrow NIC's

20  word, "shameful."  All the more so because, as NIC knows, Trycia's own Facebook

21  account shows her still living at the Ferrells in April 2012, after she supposedly

22  "fled" in March 2012.  *Supra*.Part.II.A.1.

23       **3.    Jim Buc**

24       Jim Buc, like his wife, testified to a completely false narrative in which

25  Trycia disliked Scott, only stayed with the Ferrells briefly in 2012 before "fleeing in

26  distress," and said she refused to be Scott's client.  (Dkt. 855 at 11-13.)  NIC

27  attempts to exonerate him by claiming that "[h]e did not testify as to the

28

- 24 -

1  whereabouts of Trycia in December 2011 specifically because he professed a lack of

2  specific memory on that issue."  (Dkt. 859 at 23.)

3      Once again, documents prove NIC is not being candid.  In NIC's sanctions

4  Motion, NIC represented to the Court that "[a]ll three witnesses confirm that Trycia

5  was not at the Ferrell's home at any time over the Christmas holiday in 2011" and

6  cited Jim Buc's declaration.  (Dkt. 844-1 at 14.)  NIC's only excuse for Jim Buc's

7  false testimony is to speculate that "[f]or all we know, Trycia may have conveyed

8  disdain for Ferrell's practices to the Bucs to avoid bearing the Bucs' disapproval of

9  Ferrell's practices."  (Dkt. 859 at 23.)  That is not only shameful, it is ridiculous.

10  The Bucs asked Scott to represent them right after this alleged conversation took

11  place.  (Dkt. 855 at 20.)  "'Courts are not required to close their eyes to facts

12  obvious to the rest of mankind.'" *Alexander*, 930 F. Supp. 2d at 959 *quoting Bassey*

13  *v. City Case of Huntington Woods*, 344 Mich. 701, 74 N.W.2d 897, 899 (1956).

14  This is a fabrication – just like the other false statements in the declaration.

## III.   CONCLUSION

16      The circumstances here show a deliberate, calculated effort to tamper with

17  justice.  First, NIC solicited perjured testimony from three witnesses.  Second, NIC

18  wrote and the witnesses signed three perjured declarations.  Third, NIC hid evidence

19  from the Court and sequestered the witnesses.  Now, NIC is not only unrepentant, it

20  is engaged in a cover-up of its misconduct and the perjury of the witnesses.

21  Respectfully, an order to show cause regarding sanction, perjury, and subornation of

22  perjury is absolutely necessary to safeguard the integrity of the Court.

23  Dated:  November 4, 2019          **CALLAHAN & BLAINE, APLC**

25      By:  */s/ James M. Sabovich*
        Edward Susolik
26        David J. Darnell
        James M. Sabovich
27        Attorneys for Defendants NEWPORT
        TRIAL GROUP and SCOTT J.
28        FERRELL