# EXHIBIT 1

Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Joshua S. Furman, Esq. (pro hac vice)
jfurman@emord.com
Eric J. Awerbuch, Esq. (pro hac vice)
eawerbuch@emord.com
Emord & Associates, P.C.
2730 S. Val Vista Dr., Bldg. 6, Ste. 133
Gilbert, AZ 85295
Phone: (602) 388-8899
Fax: (602) 393-4361
Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

NATURAL-IMMUNOGENICS
CORP., a Florida corporation,

     *Plaintiff*,

  v.

PACIFIC TRIAL ATTORNEYS, a
California Corporation; SCOTT J.
FERRELL, a California resident;
RYAN M. FERRELL, an Arizona
resident; VICTORIA C.
KNOWLES, a California resident;
DAVID REID, a California
resident; ANDREW LEE
BASLOW, a California resident;
ANDREW NILON, a California
resident; SAM PFLEG, a California
resident; MATTHEW
DRONKERS, a California resident;
TAYLOR DEMULDER, a Nevada
resident; SAM SCHOONOVER, a
California resident; GIOVANNI
SANDOVAL, an Arizona resident;
and DOES 1-10, inclusive,

Case No. 8:15-cv-02034-JVS (JCG)

**PLAINTIFF'S THIRD AMENDED
COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF FOR:**

1. Malicious Prosecution;

2. Violation of the RICO Act (18 U.S.C.
  §§ 1961, 1962(c), 1964(c)) by:

  a. Wire Fraud (18 U.S.C. §§ 1343,
   1349);

  b. Mail Fraud (18 U.S.C. §§ 1341,
   1349);

  c. Extortion (18 U.S.C. § 1951);

  d. Obstruction of Justice (18 U.S.C.
   §§ 1503, 1512(c));

  e. Bribery (18 U.S.C. § 201); and

  f. Witness Tampering (18 U.S.C. §
   1512(b));

3. Violation of the RICO Act (18 U.S.C.
  §§ 1961, 1962(d), 1964(c)); and,

| | |
|---|---|
| Defendants. | 4.  Unfair Competition (Cal. B&P Code §§ 17200, *et seq.*; Cal. B&P Code §§ 7520, *et seq.*). |
| | JURY TRIAL DEMANDED |

## PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

### I.  PARTIES

**The Plaintiff:**

1.     Plaintiff NIC is a Florida corporation with its principal place of business in Sarasota, Florida.  NIC is a family-owned and operated company established in 1998.  It sells dietary supplements and homeopathic products, including a national line of colloidal silver products marketed under the brand "Sovereign Silver."

**The Defendants:**

2.     Defendant Pacific Trial Attorneys (formerly the Newport Trial Group, hereinafter "NTG") is a professional corporation based in Newport Beach, California with its principal place of business at 4100 Newport Pl. Dr., No. 800, Newport Beach, California 92660.  At the time of the conduct at issue in this action, Pacific Trial Attorneys was named Newport Trial Group, PC.  In 2016, after this action was filed, NTG formally changed its name to Pacific Trial Attorneys by amending its articles of incorporation on file with the California Secretary of State.  NTG has filed class action litigation at the state and federal level, including hundreds of demand letters, threats of suit, and suits against defendants nationwide.  NTG has participated in a pattern of fabricated and fraudulent litigation, and threats of litigation, in an unlawful scheme to defraud defendants nationwide.  NTG and its members have profited substantially from NTG's unlawful filings in state and federal court.

DECLARATION OF JOSHUA FURMAN                                    EXHIBIT 1

1       3.    Scott J. Ferrell is an attorney licensed in California and residing in

2   California.  He is the founding member of NTG (now named Pacific Trial

3   Attorneys) and a practicing attorney with that firm.  As described below, Ferrell

4   has designed, initiated, and pursued fabricated and fraudulent legal claims in state

5   and federal court.  Ferrell has hired, supervised, and worked with NTG employees

6   (e.g., lawyers, investigators, support staff, etc.) who have also unlawfully aided

7   and abetted the plaintiffs-for-hire scheme and the fabrication of fraudulent NTG

8   lawsuits.

9       4.    Ryan M. Ferrell, the brother of Scott J. Ferrell, is an attorney licensed

10  in California and residing in Maricopa County, Arizona.  He was licensed in the

11  State of Arizona and the Ninth Circuit Court of Appeals but was disbarred in both

12  jurisdictions in 2019.  At the time of the conduct at issue in this case, he was a

13  practicing attorney with NTG.  Ferrell has designed, initiated, and pursued

14  fabricated and fraudulent legal claims in state and federal court.  R. Ferrell has

15  supervised and worked with NTG employees (e.g., lawyers, investigators, support

16  staff, etc.) who have also aided and abetted the plaintiffs-for-hire scheme and the

17  fabrication of fraudulent NTG lawsuits.

18      5.    Victoria C. Knowles is an attorney licensed in California and residing

19  in California.  She is a practicing attorney with NTG.  Knowles has designed,

20  initiated, and pursued fabricated and fraudulent legal claims in state and federal

21  court.  Knowles has supervised and worked with NTG employees (e.g., lawyers,

22  investigators, support staff, etc.) who have also aided and abetted the plaintiffs-for-

23  hire scheme and the fabrication of fraudulent NTG lawsuits.

24      6.    David Reid is an attorney licensed in California and residing in

25  California.  He is a practicing attorney and managing partner with NTG.  Reid has

26  designed, initiated, and pursued fabricated and fraudulent legal claims in state and

27  federal court.  Reid has supervised and worked with NTG employees (e.g.,

28

lawyers, investigators, support staff, etc.) who have also aided and abetted the plaintiffs-for-hire scheme and the fabrication of fraudulent NTG lawsuits.

7.     Andrew Lee Baslow is an individual residing in Orange County, California.  Baslow works for NTG as a field representative and recruiter.  Baslow has filed declarations in federal district court wherein he presents evidence through sworn affidavits as "an investigator for Newport Trial Group."  *See, e.g., Neal v. NaturalCare, Inc.*, No. 12-cv-531 (C.D. Cal.), Dkt. 17-8; *Shin v. Digi-Key Corporation*, No. 12-cv-5415-PA (C.D. Cal.), Dkt. 11-3 ("I am an investigator for Newport Trial Group"); *Clark v. MyLife.com, Inc.*, No. 12-cv-6889 (C.D. Cal.), Dkt. 12-2 ("I am an investigator for Newport Trial Group").  On NTG's behalf, and under supervision of NTG attorneys, Baslow solicited, recruited, paid or promised to pay individuals to serve as plaintiffs in fabricated and fraudulent NTG lawsuits.  Baslow has instructed and advised individuals to sign documents containing statements known to be false in support of those fabricated and fraudulent NTG lawsuits.  Baslow has been compensated by NTG for activities that include running and capping in violation of California Business and Professions Code Sections 6151–6156 (or 6152).

8.     Andrew Nilon is an individual and resident of California.  Nilon and his associates served as plaintiffs in NTG lawsuits beginning in 2012.  Nilon was paid from NTG to serve as a plaintiff and to support false claims in litigation NTG (and its agents) fabricated.  *See Nilon v. Natural-Immunogenics Corp.*, No. 3:12-cv-00930-LAB-BGS (C.D. Cal. 2012); *Nilon v. Chromadex, Inc.*, No. 56-2013-00436790-CU-MT-VTA (Sup. Ct. Ventura Cnty. 2013).  Nilon has admitted that his legal claims in those cases were fabricated and fraudulent, that he was promised payment from NTG to support false claims in those cases, and that NTG had him sign false affidavits which were filed in those cases by NTG.  *See* Dkt. 54-1 (Decl. of Clark Baker); *see also* Dkt. 54-2 (Decl. of John McNair).  Nilon is close personal friends with Sam Schoonover, Matthew Dronkers, Taylor

Demulder, and Sam Pfleg, who also served as NTG plaintiffs, each of whom was also paid by NTG to sponsor and assert false legal claims in lawsuits fabricated by NTG.

9.      Giovanni Sandoval, Jr. is a resident of Yuma County, Arizona.  On August 25, 2014, Sandoval substituted himself for Nilon in the NTG fabricated suit against NIC.  *See Nilon v. Natural-Immunogenics Corp.*, No. 12-cv-930-LAB (S.D. Cal.), Dkt. No. 63.  Sandoval filed a false Complaint wherein he claimed that his residence was in California when it was not.  *Id.*  Sandoval actually lived in Arizona, making him ineligible to serve as a class representative against NIC.  On information and belief, Sandoval never purchased or used NIC's product.  In the alternative, Sandoval only purchased the NIC product after first meeting with Ryan Ferrell to discuss the pending suit against NIC.  Sandoval lied under oath to support NTG's litigation.  On May 22, 2015, Judge Larry A. Burns of the Southern District of California dismissed Sandoval's claims against NIC with prejudice.  *See id.* at Dkt. 120.

10.      Sam Pfleg, Matthew Dronkers, and Sam Schoonover are each residents of California.  They and their associates served as plaintiffs in NTG lawsuits beginning in 2012.  Sam Pfleg had five legal matters with NTG from 2012 to 2013.  Sam Schoonover had two legal matters with NTG in 2012.  NTG promised payment or paid Pfleg and his associates to serve as plaintiffs and to support false claims in litigation NTG (and its agents) fabricated.  *See Sam Pfleg v. Nature's Way Products, Inc.*, No. 37-2012-0051979-CU-MT-NC (Sup. Ct. San Diego Cnty. 2012).  NTG promised payment or paid Dronkers and his associates to serve as plaintiffs and to support false claims in litigation NTG (and its agents) fabricated.  *See Dronkers v. Kiss My Face, LLC*, No. 3:12-01151-JAH (S.D. Cal. May 11, 2012).  NTG promised payment or paid Schoonover and his associates to serve as plaintiffs and to support false claims in litigation NTG (and its agents)

fabricated.  *See Schoonover v. Himalaya Drug Co.*, No. 12-cv-1782 (S.D. Cal. July 19, 2012).

11.     Taylor Demulder is a resident of Nevada.  Demulder served as a plaintiff in a lawsuit contrived by NTG beginning in 2012.  NTG promised payment or paid Demulder and his associates to serve as plaintiffs and to support false claims in litigation NTG (and its agents) fabricated.  *See Demulder v. Carter-Reed Co., LLC*, No. 3:12-cv-0333-BTM (S.D. Cal. Sept. 13, 2012).  Demulder was also a defendant in a suit filed in May 2013 by the Carter-Reed Company, LLC, for his earlier pursuit of a false claim against Carter-Reed.  *See Carter-Reed Company, LLC v. Taylor Demulder*, No. 130903002 (Dist. Ct. Salt Lake Cnty. 2013).  Upon information and belief, NTG (for Demulder's benefit) paid Carter-Reed a substantial sum to dismiss the claims for malicious prosecution that were at issue in the 2013 action.

12.     Defendants DOES 1-10 are presently unidentified or unknown individuals and/or entities who have facilitated, participated, or cooperated in the unlawful enterprise and scheme to defraud corporations nationwide through fabricated legal claims (or threats of same) initiated by NTG, its attorneys and agents.  The nature and identity of those defendants will become known through discovery.

**Complaint Summary**

13.     Defendants Newport Trial Group ("NTG"), Scott Ferrell, Ryan Ferrell, Victoria Knowles, and David Reid sued NIC in March 2012 for false advertising, unfair competition, and violation of the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*  NTG certified a class action against NIC.  *See, e.g., Nilon v. Natural-Immunogenics Corp.*, No. 3:12-cv-930-LAB, Dkt. Nos. 1, 41 (S.D. Cal.).  In that suit, NTG promised the lead Plaintiff and class representative, Andrew Nilon, $1,000 from any settlement or judgment if he would serve as a putative plaintiff and support false allegations.  Nilon either did

not purchase NIC's product before suit was filed or he purchased it at NTG's direction for the sole purpose of staging suit.  Thus, he did not rely on NIC's representations regarding the product and Nilon's allegations were therefore fraudulent and fabricated.  The fraudulent and fabricated Nilon suit was but one of many similar lawsuits filed by NTG over at least a five year period.  This Second Amended Complaint (SAC) sues NTG for its use of for-hire plaintiffs who suffered no actual injury in the suits NTG fabricated.

14.    NIC endured more than three years of litigation based on Nilon's fabricated and fraudulent claims, and incurred substantial legal fees as a proximate and foreseeable result of NTG's fraudulent scheme involving frivolous shakedown lawsuits.  NIC suffered direct and substantial injury to its property, reputation, and goodwill stemming from NTG's false allegations and suffered financial losses resulting therefrom.

## II.    JURISDICTION AND VENUE

15.    This Court has original subject matter jurisdiction over this action pursuant to the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964 (the "RICO Act" or "RICO").

16.    This Court also has original subject matter jurisdiction under 28 U.S.C. § 1332 because Plaintiff NIC is a resident of Florida, while no other named Defendant resides in Florida.  Factoring available damages, the matter in controversy substantially exceeds $75,000.

17.    This Court has supplemental jurisdiction over all state claims pursuant to 28 U.S.C. § 1367(a).

18.    This Court has personal jurisdiction over all Defendants and venue is proper in this District because the majority of all named Defendants, except Ryan M. Ferrell, Giovanni Sandoval, Jr. and Taylor Demulder, are residents of the State of California.  This Court has personal jurisdiction over Defendant Ryan M. Ferrell

because he at all times relevant to this complaint he is employed by NTG, a law firm with its principal place of business in California, and Ferrell regularly conducts business in California. Moreover, Ryan Ferrell continues to list a California address as his place of business. This Court has personal jurisdiction over Defendants Giovanni Sandoval, Jr. and Taylor Demulder because they filed unlawful actions and documents in California District Court in exchange for the promise of monetary compensation provided by NTG, a California-based law firm. This Court also has personal jurisdiction over Taylor Demulder because he was an officer in Electric Family, LLC which has its principal place of business in California.  Furthermore, the acts and practices of all Defendants described herein occurred in California and this Court has jurisdiction over the controversy which arises out of that conduct.

19.     Venue is proper under 28 U.S.C. § 1391(b)(2) because NTG, the central cog in the racketeering scheme described herein, has its principal place of business in the Central District of California.

### III.    ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF
#### A. Background

20.     NTG is a law firm based in Newport Beach, California.

21.     NTG has obtained over three hundred million dollars pursuing various claims, including actions brought under the Consumers Legal Remedies Act (Cal. Civ. Code § 1750), the False Advertising Law (Cal. Bus. & Prof. Code § 17500), the Unfair Competition Law (Cal. Bus. & Prof. Code § 17200), the Wiretapping Statute (Cal. Penal Code § 632.7), the Auto-Renewal Statute (Cal. Bus. & Prof. Code § 17600), and the Lanham Act (15 U.S.C. §1051 *et seq.*).

22.     NTG and its attorneys, including Defendants Scott Ferrell, Victoria Knowles, David Reid and Ryan Ferrell, derive substantial profit from threatening and filing lawsuits based on knowingly false statement of fact and the concealment

of material facts.  Defendants create sham claims by paying or offering to pay individuals to serve as class representatives and by creating corporate Defendants to serve as plaintiffs in Lanham Act litigation.

23.    NTG and its attorneys, with the help of investigators such as Defendant Andrew Baslow, identify potential class action defendants and thereafter pay or promise to pay individuals to serve as plaintiffs through bribery.

24.    NTG acquired individuals willing to serve as plaintiffs by identifying personal and familial connections of NTG's attorneys and employees and determining if those individuals would be willing to fabricate claims in exchange for the promise of remuneration, and by dangling the prospect of financial recovery in exchange for contrived legal claims.

25.    Although NTG's RICO enterprise may include additional predicate acts, the allegations in this Complaint primarily focus on three of NTG's sham litigation schemes:  (1) the CLRA/UCL/FAL scheme, (2) the CIPA scheme, and (3) the Lanham Act scheme.  All three schemes operate under similar methodologies.

**The CLRA Scheme**

26.    The "CLRA Scheme" involves threats and/or the filing of a class action lawsuit predicated on alleged violations of California's Consumers Legal Remedies Act (CLRA), False Advertising Law (FAL), and Unfair Competition Law (UCL).

27.    The purpose of the scheme is to secure rapid out-of-court settlements from defendant corporations without those corporations discovering that NTG has no valid class representative or that NTG's class representative is a shill, having been bribed to sponsor the litigation and participate to whatever extent required to support the ruse, and without those corporations discovering that the injuries alleged are false.  NTG and its associates used the threat of significant class action liability and costs to create fear in defendant corporations of crippling financial

losses, and many corporations invariably decided—based on that fear—to pay NTG and its "plaintiff" settlement monies in exchange for the non-filing of threatened suits or the dismissal of suits NTG filed.

28.     To further that scheme, NTG, its attorneys, and its plaintiffs-for-hire, made false representations of fact in an effort to support essential elements of a CLRA/UCL/FAL claim.

29.     In the CLRA Scheme, NTG, its attorneys and its plaintiffs-for-hire made intentionally false representations that (1) the plaintiff purchased the defendant's product in reliance on advertising claims and representations; (2) that the product did not work for the "plaintiff" as advertised; and (3) that the plaintiff was injured in their money or property as a result of their reliance on advertising claims.

30.     Because those plaintiffs either never purchased the product or only purchased it for the purpose of suing the defendant, none of those material representations are true.

**The Wiretapping Scheme**

31.     The "CIPA Scheme" involved the threat and/or filing of class action lawsuits predicated on alleged violations of California Penal Code §§ 632, 632.7, and 637.2(a) (also known as the California Invasion of Privacy Act, or CIPA).

32.     The purpose of that scheme was to reach fast, out-of-court settlements with defendant corporations without that corporation discovering that NTG either had no class representative or that NTG's class representative was a shill, bribed to sponsor the litigation and participate to whatever extent required to support the scheme.  NTG and its associates used the threat of significant class action liability and costs to create fear in defendant corporations of crippling financial losses under those CIPA claims, and many corporations invariably decided—based on that fear—to pay NTG and its "plaintiff" settlement monies in exchange for dismissals.

33.     To further that scheme, NTG, its attorneys, and its plaintiffs-for-hire, made false representations of fact in an attempt to support essential elements of a CIPA claim which they knew to be false.  Those representations were made via demand letters, class action complaints, in deposition, and/or declarations.

34.     In the CIPA Scheme, NTG, its attorneys and its plaintiffs-for-hire made the intentionally false representations that:  (1) the plaintiff was not aware that the call was being recorded; (2) that the plaintiff did not give express or implied consent to the recording; (3) that the plaintiff expected that his/her telephone call would be private and not recorded; and (4) that the plaintiff only learned that the defendant recorded all incoming calls *after* completing his/her call.

35.     In fact, the NTG plaintiffs in those cases never held any of these beliefs, nor could they under the circumstances.  They were hired by NTG and its attorneys to telephone potential defendant corporations for the express purpose of being recorded.  NTG, through its attorneys and Andrew Baslow, instructed those individuals to avoid recorded disclosures given by the corporations and provide confidential and personal information (i.e., Social Security numbers) to a company representative without being asked for same.

36.     The NTG plaintiffs partnered with NTG or served as NTG's agent for pursuing CIPA claims that were based on false statements of fact.  The NTG plaintiffs met with NTG agents or attorneys *prior to calling* the corporate numbers. The NTG plaintiffs called the corporations solely for the purpose of creating lawsuits under the CIPA.  Because those individuals knew that they would be recorded (or certainly should have known that their calls would not remain private), their allegations in the CIPA complaints were false.  The NTG plaintiffs and NTG knew that the statements were false.  NTG never disclosed to the Court or opposing parties that the NTG plaintiffs were plaintiffs-for-hire who alleged false injuries under the CIPA.

37.    The false allegations under the CIPA provided NTG and its plaintiffs-for-hire the facially valid evidence necessary to threaten costly lawsuits that could, absent discovery, survive initial motions, thus increasing pressure on defendants to pay NTG to settle the suits.

38.    NTG's litigation history concerning those CIPA claims demonstrates that such claims were pursued exclusively for NTG's pecuniary gain, with no relief provided to California consumers.  During NTG's most active period for CIPA claims (e.g., between 2010-2014), NTG's litigation included the following:

   a.    NTG settlement agreements under CIPA required corporate defendants to pay NTG plaintiffs-for-hire substantially less than the $5,000 statutory value that should have gone to plaintiffs.  *See* Cal. Penal Code § 632.7(a)(1).  NTG retained most of the payments (more than 85% of the settlement proceeds recovered from corporate defendants).

   b.    Between 2010 and Jun 2014, no class had been certified in any of NTG's CIPA cases and, in fact, in each of the three cases wherein NTG moved for class certification, the court denied certification. *See, e.g., Shin v. Digi-Key Corp.*, No. 12-cv-5415-PA-JCG (C.D. Cal. 2012), Dkt. 28 (holding that "Plaintiff's call to a toll-free ordering number is not a 'confidential communication' pursuant to section 632"); *Clark v. MyLife.com*, No. 12-cv-6889-R-PLA (C.D. Cal. 2012), Dkt. 34); *Torres v. Nutrisystem Inc., et al.*, No. 12-cv-1854 (C.D. Cal. 2013).

   c.    NTG obtained no judgments for any of its plaintiffs-for-hire.

   d.    No attorney fees were awarded to NTG by motion.

   e.    There were no confirmable monetary awards provided to the putative class members in any of the cases.

---

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 12 -

f.  At least fourteen of the thirty two reported CIPA cases during this time period were voluntarily dismissed by NTG (apparently without settlement).

39.  Despite failing to achieve a single meaningful outcome for the "public" or "classes," NTG received substantial settlement proceeds from the CIPA scheme between 2010 and 2014.

**The Lanham Act Scheme**

40.  Defendants NTG, Scott Ferrell, and David Reid also pursued a fraudulent litigation scheme predicated on false and fabricated "competitor standing" under the Lanham Act.

41.  Like the CLRA and CIPA schemes, this scheme operated by way of threats or filing of litigation premised on false representations to corporate defendants (often the very same defendants previously victimized by NTG's CIPA or CLRA schemes).

42.  In the Lanham Act scheme, Defendants NTG, Scott Ferrell, and David Reid created their own "plaintiff" by forming a Limited Liability Company, Strataluz LLC ("Strataluz"), and by concealing their ownership interest in that company.

43.  Defendants NTG, David Reid, and Scott Ferrell then utilized that dummy company as a plaintiff to threaten suit against companies that sold various dietary supplement companies under a Lanham Act false advertising theory.  They falsely conveyed that Strataluz had competitor standing and actual damages.  They concealed their ownership interest in the dummy company.

44.  In May and June of 2015, Defendants NTG, Scott Ferrell, and David Reid began threatening suit against companies that sold male enhancement products based on false allegations that their "client," Strataluz, manufactured, sold, and distributed a patented and effective male enhancement product called ProMaxal.  They falsely claimed that ProMaxal's efficacy was backed by clinical

research that Strataluz had funded.  The ProMaxal product did not exist, had never been manufactured, and was never sold.  All of the material statements made about that product were false.

45.    Through the threat of frivolous Lanham Act litigation, Defendants NTG, Scott Ferrell, and David Reid attempted to extort hundreds of thousands of dollars from unsuspecting companies in exchange for dismissal and the offer of a worthless license that the Defendants claimed had significant value.

### The Electric Family

46.    Defendants Nilon, Pfleg, Dronkers, Demulder, and Schoonover (collectively the "Electric Family Defendants" or "Electric Family") were all managers or members of Electric Family, LLC, a Nevada Limited Liability Company.  The Electric Family Defendants are friends, associates and, at various times, roommates.

47.    The Electric Family is a clothing and apparel company started by individuals within the electronic dance music (EDM) community, which sells product and apparel to those within that same community.

48.    In late 2011 and early 2012, Defendants Nilon, Pfleg, Dronkers, Demulder, and Schoonover were impecunious and in search of financial opportunities.

49.    In late 2011, Schoonover's then girlfriend, Talee Rooney, informed the Electric Family Defendants during a social gathering that she had a high school friend, Defendant Andrew Baslow, who worked for a law firm, NTG, which needed individuals to serve as plaintiffs in lawsuits against various companies.

50.    Rooney explained that it was easy work.  The Electric Family Defendants discussed the "opportunity" and agreed to each contact Defendant Baslow to inquire about the "opportunity."

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 14 -

51.     NTG billing records reflect that Baslow interacted directly with NTG clients or plaintiffs when developing evidence for NTG cases.

52.     Between late 2011 and early 2012, pursuant to their agreement to all join NTG's scheme, Defendants Nilon, Dronkers, Pfleg, Demulder, and Schoonover each contacted Defendant Baslow by phone.

53.     In October 2011, Nilon and Baslow met at a coffee shop between San Diego and Los Angeles.  In that meeting, Baslow explained to Nilon that he was an employee of NTG, that NTG needed individuals to sponsor claims against companies who advertise products, that Nilon could "sign up" if he was interested, and that Baslow would give Nilon instructions on what product to buy or how to participate in the ensuing lawsuit.  Baslow explained that he would provide Nilon with papers to sign and that Nilon would be paid from settlement or judgment proceeds secured with Nilon's help.  Baslow later explained that Nilon did not need to buy the product and only needed to sponsor the litigation, and provide declarations, deposition testimony, or trial testimony in support of claims created by NTG.

54.     Defendants Schoonover, Dronkers, Pfleg, and Demulder each communicated with Andrew Baslow by phone, in person, and/or by email.  Baslow gave them each the same offer, the promise of monetary payment in exchange for their promise to sponsor and support contrived litigation, including testimony, which they each accepted.  Baslow's interactions and dealings with the NTG for-hire plaintiffs (including the Electric Family group) therefore apply and should be considered in context with the following factual allegations related to specific NTG cases.

## B. Andrew Nilon v. Natural-Immunogenics Corp., No. 12-cv-930 (S.D. Cal. 2012-2015)

55.     In December of 2011, NTG and Scott Ferrell developed a scheme to defraud Natural-Immunogenics Corp.

56.    The scheme involved the fabrication of claims against NIC related to its advertising of the NIC Sovereign Silver product.  Sovereign Silver is colloidal silver sold nationally as a dietary supplement.

57.    NTG and Scott Ferrell sought to obtain settlement money from NIC under threat of CLRA, FAL and UCL class action litigation.  The costs and negative publicity of a class action claim would, in fact, be substantial for NIC.

**Mail Fraud and Extortion – Demand Letter:**

58.    On December 27, 2011, after Defendant Nilon had met with NTG but before Defendant Nilon claims to have purchased the NIC product, NTG dispatched a demand letter to NIC by certified US mail.

59.    NTG and Scott Ferrell stated in that letter that they wrote "on behalf of an individual California consumer, as well as a putative class of similarly situated consumers."  That statement was false.  NTG and Scott Ferrell knew the statement was false and made the statement with the intent to defraud NIC.  NTG did not write on behalf of any individual California consumer and did not represent a valid class representative at the time.

60.    NTG and Scott Ferrell stated in that letter that "[o]ur client relied on your assertions and did not experience any of the promised benefits."  That statement was false.  NTG and Scott Ferrell knew that statement was false and made the statement with the intent to defraud NIC.  NTG did not yet have a client, and the client that NTG ultimately obtained had not yet even purchased the product and thus did not rely on any of NIC's representations.

61.    When NIC did not agree to settle the claims as a result of Scott Ferrell's demand letter, Scott Ferrell and NTG filed suit against NIC.

62.    Sometime in early 2012, Andrew Baslow, on behalf of NTG, and at the direction of Scott Ferrell, offered to pay Andrew Nilon money in exchange for Andrew Nilon's promise to be the plaintiff class representative in and sponsor the litigation against NIC, including in exchange for his execution of false

declarations, the delivery of false deposition testimony, and/or the delivery of false trial testimony.  Nilon agreed to the proposal with the understanding that he would be paid.

**Mail Fraud or Obstruction – State Court Complaint**

63.    On March 5, 2012, NTG, Scott Ferrell, and Victoria Knowles filed a Class Action Complaint against NIC in the Superior Court of the State of California for the County of San Diego allegedly on behalf of Andrew Nilon and a purported class of similarly situated individuals (hereinafter the "Nilon Lawsuit"). *See Nilon v. Natural-Immunogenics Corp.*, No. 12-cv-930 (S.D. Cal., March 5, 2012), Dkt. 1-1 ("Nilon State Complaint").  Scott Ferrell signed the complaint and Victoria Knowles appeared in the caption.  *Id*.  Andrew Nilon swore under penalty of perjury to personal knowledge of facts contained in the Nilon State Complaint. *Id.* at 15.

64.    The Nilon State Complaint was sent to NIC by U.S. Mail on March 7, 2012 by, or on behalf of, NTG, Scott Ferrell, and Victoria Knowles.

65.    David Reid was and is the Managing Partner of the NTG.  He had full authority over the Nilon Lawsuit and had knowledge of its underlying facts, pleadings and motions.  *See id.,* No. 3:12-cv-00930-LAB-BGS, Dkt. 78-1 ¶¶ 2, 4 (Decl. of David Reid In Support of Plaintiff's Mot. for Terminating Sanctions).  He participated in that matter, and made strategy decisions concerning same.

66.    The complaint contained four paragraphs related to Nilon's alleged "experience" with NIC's product.  *Id*., Dkt. 1-1 at ¶¶ 3, 5, 14-15.

67.    Those paragraphs made the following false material representations:

      a.    That Nilon had purchased the Sovereign Silver product in San Diego County.

      b.    That Nilon had relied on representations made by [NIC] regarding the efficacy of Sovereign Silver, and,

but for those representations, Nilon would not have

purchased or paid as much for the product.

    c.    That Nilon's experience in relying on the

representations made by NIC was similar to those of

the "Class."

68.    The representations in paragraph 67(a)-(c) hereinabove made by Defendants NTG, Scott Ferrell, Victoria Knowles, and Andrew Nilon were intentionally false.

69.    Nilon never purchased the Sovereign Silver product prior to filing the Class Action Complaint in reliance on any representations made by NIC.

70.    Nilon never produced in litigation any proof of purchase.

71.    Even if Nilon did purchase the NIC product, he did so in "early 2012," after he had already met with Andrew Baslow and discussed NTG litigation, and after NTG had already dispatched a demand letter to NIC claiming to represent a California consumer.  Thus, his purchase was made for the purpose of bringing litigation and done at the direction of NTG, and he did not therefore rely on any of NIC's representations when he purchased the product.

72.    Because Nilon did not purchase the product in reliance on any representations or claims made by NIC and did not suffer any injury, his true experience was not similar to that of the purported Class.  Because he did not purchase the product prior to filing suit, he could not have satisfied the elements of a California CLRA/UCL/FAL claim—he suffered no injury.  Nilon's claim was baseless, and would have appeared baseless to any reasonable lawyer or litigant.

73.    The representations made in Scott Ferrell's demand letter and the Nilon State Complaint were material and necessary to establish the basic elements of a CLRA, FAL and UCL cause of action brought against NIC.

74.    The Underlying Lawsuit was removed to the US District Court for the Southern District of California on April 16, 2012.

---

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 18 -

**Wire Fraud or Obstruction – Motion to Certify Class**

75.     On February 26, 2013, in furtherance of the scheme to defraud NIC, Defendants NTG, Scott Ferrell, Victoria Knowles, and Ryan Ferrell filed a "Motion to Certify Class" in the Nilon Action on behalf of Andrew Nilon through the court's CM/ECF system which caused that Motion to be sent through the interstate wires to the court and NIC ("Motion to Certify"). *Id.*, Dkt. 21.  Scott Ferrell, Ryan Ferrell, and Victoria Knowles appeared on the signature line of that Motion. *Id*.

76.     The Motion to Certify furthered the scheme to defraud NIC because a successful class certification would substantially increase NIC's potential financial exposure and would increase in the likelihood that NIC would satisfy NTG's settlement demands for fear of financial harm.

77.     The Motion to Certify made the same representations identified in Paragraph 67 hereinabove. *Id*., Dkt. 21-1 at 1, 3, 7-8, 12.

78.     Those representations were false because Nilon never purchased the product in reliance on any of NIC's representations, did not suffer a valid injury, and would have purchased the product regardless of any representations because he intended to purchase a lawsuit.  For those same reasons, Nilon's claims were not typical of the class.  Nilon's claims were intentionally false.

79.     The representations made in the Motion to Certify were material because they were necessary to create a facially plausible cause of action under the CLRA, FAL, and UCL.

80.     Defendants NTG, Scott Ferrell, Ryan Ferrell, Victoria Knowles and David Reid knew the representations in the Motion to Certify were false and made them with the intent to defraud NIC and mislead the courts.

81.     On September 30, 2013, Judge Burns denied class certification due to pleading deficiencies in the Nilon State Complaint, but did so *without prejudice* and with *leave to amend* in reliance on the truth of the representations made in the

Motion to Certify. *See id.*, Dkt. 31. Had Judge Burns known the truth, he would have denied certification with prejudice since the action was brought by an invalid class representative and knowingly false representations of material fact.

82.     Thus, NIC was forced to continue litigating the case for nearly two more years when it should have ended on September 30, 2013. Indeed, had the true facts concerning Nilon's role in litigation been disclosed at the outset, the case could not have moved forward.

**Wire Fraud or Obstruction – First Amended Complaint**

83.     NTG, Scott Ferrell, Ryan Ferrell, David Reid and Victoria Knowles made the same representations identified in Paragraph 67 hereinabove when they filed a First Amended Complaint through the CM/ECF electronic filing system on October 15, 2013 which caused the misrepresentations to be sent through the interstate wires to NIC. *See id.*, Dkt. 34 at ¶¶ 3, 5, 20-22 ("Nilon Amended Complaint"). Scott Ferrell signed the Nilon Amended Complaint and Victoria Knowles' name appeared in the caption. *Id*. Ryan Ferrell was an attorney of record in the action and had full knowledge of the filing and its representations. David Reid was a managing partner on the case and had full knowledge of the filing and its representations.

84.     Nilon's counsel, NTG, Scott Ferrell, Ryan Ferrell, Victoria Knowles, and David Reid knew that the representations made in the Nilon Amended Complaint were intentionally false because their authorized agent and employee, Andrew Baslow, had bribed Nilon to ratify and support whatever statements NTG and its attorneys made in litigation on his behalf (i.e., they promised Nilon money in exchange for false testimony). NTG and its agents drafted the intentionally false statements on Nilon's behalf, to which Nilon affixed his signature knowing that such claims were false.

85.     NTG, Scott Ferrell, Ryan Ferrell, David Reid and Victoria Knowles made the representations in the Nilon Amended Complaint with the intent to

defraud NIC and with the intent to prolong the litigation through class certification that would apply greater leverage against NIC and increase the likelihood of a settlement payout.

86.     On April 15, 2014, Judge Burns granted class certification in reliance on the materially false representations in the Nilon Amended Complaint. *Id.*, Dkt. 41 at 8-9 (finding that Nilon's claims are typical of the class members').

87.     Because the court granted class certification, NIC was forced to continue litigating and undergo discovery and litigation over complex scientific issues related to fictional "class" claims that were, in reality, not sustainable through Nilon's intentionally false allegations.  NIC was compelled to endure more than three years of civil litigation based on NTG's and Nilon's false statements in pleadings and affidavits.

**Obstruction of Justice and Witness Tampering – Missed Depositions**

88.     On April 18, 2013, NIC served a Notice of Deposition on Nilon through his counsel Scott Ferrell, Ryan Ferrell, and NTG. *Id.*, Dkt. 55 at 2 (Judge Skomal Order sanctioning NTG).  The notice set a May 3, 2013 deposition date, which Nilon and his counsel selected. *Id.*  On April 24, 2013, Ryan Ferrell cancelled the May 3, 2013 deposition purportedly because Nilon had a "conflict come up and [was] no longer available." *Id.*, Dkt. 49 at 52 (email from Ryan Ferrell).

89.     In truth, Nilon was available for deposition on May 3, 2013 and he avoided the deposition because he did not wish to answer questions or produce documents revealing the falsity of material facts contained in the First Amended Complaint.

90.     Upon information and belief, Ryan Ferrell knew that Nilon was available for deposition on May 3, 2013, knew that avoiding a deposition to prevent the disclosure of damaging information was unlawful and wrong, and

engaged in misleading conduct towards NIC's counsel with the intent to withhold
Nilon's potentially damaging testimony.

91.     On May 7, 2013, NIC served another Notice of Deposition on Nilon
through his counsel which set a May 22, 2013 deposition date per Ryan Ferrell's
request.  *Id*., Dkt. 55 at 2.  On the day of the deposition, May 22, 2013, Jeanette
Francis, on behalf of Ryan Ferrell and Victoria Knowles, again cancelled the
deposition stating that Nilon "ha[d] become unavailable [that] morning."  *Id*., Dkt.
49 at 69.

92.     In truth, Nilon was available for deposition on May 22, 2013 and he
avoided the deposition because he did not wish to answer questions or produce
documents revealing the falsity of material facts contained in his First Amended
Complaint.

93.     Upon information and belief, Ryan Ferrell knew that Nilon was
available for deposition on May 22, 2013, knew that avoiding a deposition to
prevent the disclosure of damaging information was unlawful and wrong, and
engaged in misleading conduct (through representations made by his subordinate)
towards NIC's counsel to withhold Nilon's potentially damaging testimony.

94.     On January 3, 2014, NIC served a First Amended Notice of
Deposition on Nilon through his counsel which scheduled the deposition for
February 7, 2014.  *Id*., Dkt. 55 at 2.  Nilon did not appear for deposition on
February 7, 2014.  *Id*.

95.     Nilon was available for deposition on February 7, 2014, knew the
deposition was duly scheduled, and avoided the deposition because he did not wish
to answer questions or produce documents revealing the falsity of material facts
contained in the First Amended Complaint.  In the alternative, NTG never
informed Nilon that his deposition had been scheduled for February 7, 2014 and
NTG never intended to produce Nilon for deposition because they did not want
damaging testimony to be revealed through that process.  NTG thus intentionally

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 22 -

obstructed a duly noticed subpoena for testimony to conceal their fraudulent conduct.

96.     On April 29, 2014, NIC served a Second Amended Notice of Deposition on Nilon which scheduled the deposition for May 16, 2014. *Id*. On May 13, 2014, Ryan Ferrell on behalf of Andrew Nilon refused to produce Nilon for deposition on May 16, 2014. *Id*.

97.     In truth, Nilon was available for deposition on May 16, 2014 and avoided the deposition because he did not wish to answer questions or produce documents revealing the falsity of material facts contained in the First Amended Complaint.

98.     Upon information and belief, Ryan Ferrell knew that Nilon was available for deposition on May 16, 2014, knew that avoiding a deposition to prevent the disclosure of damaging information was unlawful and wrong, and engaged in misleading conduct towards NIC's counsel to withhold Nilon's potentially damaging testimony.

99.     The four notices of deposition served on Nilon also included document requests for evidence supporting Nilon's claims.  Nilon, by avoiding deposition, avoided his obligation to provide documents responsive to those requests and thus avoided disclosing that he possessed no evidence to support his fabricated legal claims.

100.     On July 31, 2014, Judge Skomal (of the U.S. District Court for the Southern District of California) found Nilon had engaged in a "pattern of avoiding his duly-noticed depositions." *Id.*, Dkt. 55 at 7.  The court also found that Ryan Ferrell and the Newport Trial Group had "frustrated attempts to take Mr. Nilon's deposition by refusing to meet-and-confer with [NIC] counsel." *Id*.  The court found no justification for Nilon's failures to appear. *Id*. at 7-8.  The court sanctioned Ryan Ferrell and Scott Ferrell $5,053.90 for their role in Nilon's

"pattern of unjustified cancellations over the course of an entire year." *Id.*, Dkt. 59 at 2 (Skomal Order imposing sanctions).

**Wire Fraud or Obstruction – Motion to Substitute**

101.   On July 9, 2014, in furtherance of the scheme to defraud NIC, Defendants NTG, Scott Ferrell, Ryan Ferrell, Victoria Knowles, and David Reid filed a Motion to Substitute Class Representative using the court's CM/ECF system which caused a copy of that Motion and its exhibits and attachments to be sent through the interstate wires to NIC. *See id.*, Dkt. 51.  Ryan Ferrell signed the Motion to Substitute. *Id.*  Scott Ferrell and Victoria Knowles appeared in the caption of the motion. *Id.*  David Reid was the managing partner on the case and had full knowledge of and authority over the representations made in the Motion to Substitute.

102.   The Motion to Substitute made the following false representations to NIC and the court (*id.*, Dkt. 51-1 at 3):

a.   Nilon's grandmother had become ill and was unable to adequately care for herself physically or financially.

b.   Nilon moved from San Diego to the San Francisco area to help his grandmother.

c.   Because of the change in residence and the need to provide financial assistance to his grandmother, Nilon also changed employment and employment hours.

d.   Because of the changed circumstances, Nilon wishes to be relieved from his duties as Class Representative.

e.   Class counsel has another valid class representative, who is a member of the certified class, willing to serve as lead plaintiff.

103.   The representations described in the preceding paragraph were intentionally false.

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 24 -

104.   Nilon did not move to the San Francisco area to help care for his sick grandmother.  He did not change jobs or circumstances to help his sick grandmother.  His grandmother did not need his company or time.  Instead, he withdrew from the action because he no longer wished to be involved in litigation that would ultimately require him to testify falsely under oath in deposition to maintain the fraudulent scheme.  *Id.*, Dkt. 49 (Judge Skomal ordering Nilon to sit for a deposition and produce documents).

105.   Nilon's false "sick grandmother" affidavit is part of a pattern.  Taylor Demulder—one of Nilon's close associates—prepared and filed an affidavit in another matter wherein Demulder also attempted to oppose a jurisdictional motion based on his alleged need to care for an elderly grandmother.  *See Carter-Reed v. Demulder*, No. 16-cv-0057-DB, Dkt. 25 at 10 (arguing for remand on jurisdictional grounds related to allegations that "Demulder travels frequently to California in order to visit his elderly grandmother, who is in need of elder care").

106.   When Nilon sought to withdraw, NTG did not have a new, valid class representative who was a member of the class.  *Id.*, Dkt. 117 at 4 (Judge Burns holding that Sandoval was not a member of the class).

107.   NTG's and Nilon's representations were material and furthered the scheme because if the true reason for his withdrawal was known to the court and NIC, the court would have issued terminating sanctions and the Newport Trial Group's scheme to defraud NIC would result in a loss.  *See id.* (dismissing the case and noting Nilon's repeated failure to appear for deposition).  The Court later explained that it would not have permitted a substitute plaintiff to move forward had the court known that representations in the NTG pleadings were false.  *Id*. at 4-5.

**Witness Tampering and Obstruction of Justice – Nilon Declaration**

108.   In support of NTG's Motion to Substitute, on June 23, 2014, Nilon executed a declaration under penalty of perjury that made the same representations

identified in Paragraph 102(a)-(d).  *Id.*, Dkt. 51-2 ("Nilon Declaration").  Those representations were false.

109.   Upon information and belief, Ryan Ferrell drafted the Nilon Declaration to create a plausible reason for Nilon to withdraw from the case while also allowing Ferrell to present a new Class Representative willing to testify falsely and continue the unlawful and corrupt legal action.  Ryan Ferrell knew that providing false testimony under oath was wrong and that Nilon's declaration contained false statements of material facts.

110.   Upon information and belief, Ryan Ferrell instructed Andrew Baslow to inform, and Baslow did inform, Nilon that if he wished to withdraw from the case, he would have to sign a declaration containing false statements.

111.   Nilon executed the knowingly false declaration to escape litigation for which he had been promised approximately $1,000 in compensation.

**Bribery, Witness Tampering and Obstruction of Justice - Sandoval Enters the Case**

112.   Sometime in early 2014, upon information and belief, Ryan Ferrell or Andrew Baslow offered a bribe to Giovanni Sandoval, Jr.  Upon information and belief, Ryan Ferrell or Andrew Baslow promised payment (out of settlement or judgment proceeds to be acquired) if Sandoval would agree to be named a substitute plaintiff in the contrived litigation against NIC by ratifying, supporting and executing false declarations or pleadings and by the giving of false testimony at deposition and trial.

113.   Upon information and belief, Giovanni Sandoval, Jr. agreed to the offer described in the preceding paragraph.  Sandoval never purchased the NIC product or, if he did, he had interacted or met with NTG, Ryan Ferrell, or Andrew Baslow before making that purchase and thus purchased the product solely to buy into NTG's lawsuit and not in reliance on any NIC advertising claim.

114.   In support of the Motion to Substitute, on June 18, 2014, Sandoval executed a declaration under penalty of perjury in which Sandoval swore to the following facts (*id.*, Dkt. 51-3 at ¶¶ 1-5):

  a. Sandoval is a member of the certified class.

  b. Sandoval purchased Sovereign Silver from a Sprouts Store in 2013 and prior to that purchase Sandoval read, reviewed and relied on the immune support claims on the product label.

  c. At the time of his purchase, Sandoval believed the labeling regarding immune support.

  d. But for the immune support representations on the Sovereign Silver product, Sandoval would not have purchased Sovereign Silver.

115.   The representations described in the preceding paragraph were intentionally false.

116.   In truth, if Sandoval purchased the NIC product at all, he purchased it in May or June of 2014 for the purpose of furthering the NTG scheme to defraud. The product bottle that Sandoval claims he purchased was not even manufactured until February of 2014, months after the date he claimed to have purchased the bottle under oath.  Sandoval refused to produce that bottle during the Underlying Action.

117.   Upon information and belief, Ryan Ferrell drafted the Sandoval Declaration to support allegations necessary to convince the court that a new Class Representative was available and, thus, endeavored to avoid dismissal of the Underlying Action.  Ryan Ferrell knew that testifying falsely under oath was wrong and that the Sandoval Declaration contained false statements of material facts.

118.    Upon information and belief, either Ryan Ferrell or Andrew Baslow told Giovanni Sandoval that he would need to execute the false declaration in order to obtain payment from NTG.

119.    Sandoval executed the knowingly false declaration to support the Underlying Action.

120.    On August 22, 2014, Judge Burns granted the Motion to Substitute in reliance on Nilon, Sandoval, NTG, Scott Ferrell, Ryan Ferrell, Victoria Knowles, and David Reid's knowingly false representations made in the Motion to Substitute, the Nilon Declaration, and the Sandoval Declaration described above. *Id.*, Dkt. 62 at 1-2, 4-7.

121.    Judge Burns' August 22, 2014 order relying on false statements of fact allowed the Underlying Action to continue for another nine months, which increased litigation costs for NIC, sapped NIC's resources, and maintained pressure on NIC to settle in furtherance of NTG's scheme to defraud NIC.  Based on Judge Burns' August 22, 2014 ruling (which relied on the false Sandoval documents), the matter proceeded into expert discovery, wherein NIC was obligated to incur substantially more legal fees and costs.

**Wire Fraud or Obstruction – Second Amended Complaint**

122.    On August 25, 2014, Defendants NTG, Scott Ferrell, Ryan Ferrell, Victoria Knowles, and David Reid on behalf of new class representative Giovanni Sandoval, Jr., filed a Second Amended Complaint against NIC in the U.S. District Court for the Southern District of California using the court's CM/ECF electronic filing system which caused a copy of the Second Amended Complaint to be sent over the interstate wires to NIC and the court.  *Id.*, Dkt. 63.  Ryan Ferrell signed the Second Amended Complaint.  *Id*.  Victoria Knowles and Scott Ferrell appeared on the signature line.  *Id*.  David Reid had full authority and control over the case and knowledge of all facts, allegations and pleadings.

123.   The Defendants identified in the preceding paragraph made the following representations to NIC and the court through the Second Amended Complaint (*id.* at ¶¶ 3, 5, 19-21):

        a.   Giovanni Sandoval is a resident of San Diego County, California.

        b.   Giovanni Sandoval purchased Sovereign Silver in San Diego County around November of 2013 at a Sprout's Market.

        c.   Giovanni Sandoval relied on NIC's representations regarding Sovereign Silver's efficacy and, but for those representations, Sandoval would not have purchased or paid as much for Sovereign Silver.

        d.   Giovanni Sandoval discontinued using Sovereign Silver "after discovering the potential [adverse safety] outcomes."

        e.   Giovanni Sandoval's claims are typical of the claims of the members of the Class.

124.   The representations identified in the preceding paragraph 123 were intentionally false.

125.   Giovanni Sandoval was a resident of Arizona, not California, at the time he allegedly purchased Sovereign Silver and for years prior.  *Id.*, Dkt. 117 (Sandoval was a resident of Arizona and not a member of the class).

126.   Sandoval either did not purchase Sovereign Silver or, if he did, did not purchase it in reliance on any representations made by NIC on the label or otherwise.  Sandoval purchased the product solely to initiate a lawsuit and would have purchased it regardless of its representations, price, or any other factor.

127.   Sandoval produced no evidence of purchase in discovery or at deposition.  At the time he claimed to have purchased the NIC product in

California, he was prohibited from leaving the State of Arizona pursuant to the terms of a supervised probation attendant to a felony conviction.  In the above-captioned matter, Sandoval identified a bottle that he claimed to have purchased but the bottle was not manufactured until February of 2014, three months after he swore under oath to have purchased the product in November 2013.

128.   Sandoval either never used Sovereign Silver or only used it in preparation for deposition so that he would know how to describe the product.  At deposition he testified that he had no knowledge of any adverse health effects and did not discontinue use of the product on that basis (thus conceding that sections of his complaint were false or inaccurate).

129.   Sandoval was not a class member, nor did he purchase the product in reliance on any representations by NIC.  Sandoval could therefore not be said to have claims "typical" of the class.

130.   The misrepresentations in the Second Amended Complaint were material because they established the basic elements of a CLRA, FAL, and UCL claim and established Sandoval's status as a member of the class, i.e. a California resident who purchased the product in California.  Without those false statements of fact, Sandoval could not have maintained a viable cause of action at the outset.

131.   Judge Burns relied on the misrepresentations contained in the Second Amended Complaint when he reviewed that document in granting the Motion to Substitute, and due to that reliance, NIC was exposed to the cost of an additional nine months of litigation, sapping NIC's resources and applying additional pressure to settle the false claims.  *Id.*, Dkt. 117 at 4-5 ("But for the [Second Amended Complaint's] false statement about Sandoval's residency, the Court would not have granted the motion for substitution.").

132.   Sandoval knew the representations in the Second Amended Complaint were false and he made those representations with the specific intent to defraud NIC.

133.   Defendants NTG, Ryan Ferrell, Scott Ferrell, Victoria Knowles, and David Reid knew that the representations in the Second Amended Complaint were false because their agent or employee bribed Sandoval to participate in the litigation and support the false claims.

**Wire Fraud or Obstruction of Justice – Ryan Ferrell's Fraudulent Declaration**

134.   On August 15, 2014, NTG, Ryan Ferrell, Scott Ferrell, David Reid, and Victoria Knowles filed a Motion to Withdraw as Counsel for Andrew Nilon. *See id.*, Dkt. 61.  In that motion, the Defendants claimed to have lost all communication with Andrew Nilon.

135.   To support the Motion to Withdraw, the Defendants made the following representations to the Court:

a)  Beginning in April of 2014, Nilon stopped communicating with NTG entirely;

b)  At the end of June, after months of no communication, Nilon called Ryan Ferrell and asked to withdraw from the matter;

c)  After Andrew Nilon executed the June declaration, NTG and Ryan Ferrell were unable to reach Nilon despite dozens of phone calls;

d)  In an effort to reach Nilon, Ryan Ferrell sent three letters to Nilon's last known address and sent an investigator to that address to attempt contact;

e)  None of those efforts succeeded and NTG had completely lost track of Nilon by the end of June 2014.

136.   NTG, Ryan Ferrell, Scott Ferrell, David Reid, and Victoria Knowles supported the Motion to Withdraw by attaching a declaration signed by Ryan Ferrell under oath that attested to the same representations in the Motion to Withdraw that are identified in the preceding paragraph.

137.   All of the statements identified above that were attested to under oath by Ryan Ferrell were knowingly and intentionally false.

138.   Ryan Ferrell and NTG had been in frequent communication with Andrew Nilon from May 2014 through the end of June 2014.  Andrew Baslow communicated with Andrew Nilon by email and telephone in May 2014.  Ryan Ferrell communicated by email with Andrew Nilon beginning in early June 2014. The two exchanged nearly one dozen emails and Nilon responded rapidly and frequently throughout June 2014.

139.   Nilon did not first request withdrawal from the case in a phone call in late June 2014 (that call never happened).  Upon information and belief, he instead requested withdrawal nearly a year before, in August 2013 and NTG had concealed the fact that their named plaintiff no longer wished to participate in the action for nearly one year, including the avoidance of duly noticed depositions under false pretenses.

140.   NTG never sent any letters to Andrew Nilon's last known address after Nilon executed his June declaration.  Upon information and belief, NTG never dispatched an investigator to Nilon's last known address.

141.   Ryan Ferrell did not make dozens of phone calls to Andrew Nilon after he had executed his June declaration.  In fact, Ryan Ferrell and Andrew Baslow (Nilon's primary contact point) did not make any phone calls to Andrew Nilon.

142.   The Court relied on the Defendants' fraudulent representations when it granted the Motion to Withdraw and later denied sanctions against NTG for their failure to produce Nilon for deposition despite a court order.  *See id.*, Dkt. No. 62 at 7; Dkt. No. 73 at 5.

143.   Thus, Ryan Ferrell submitted an intentionally and materially false declaration to the court.

144.   The purpose of the fraudulent motion to withdraw was to eliminate the risk that the Court would require NTG to answer for Nilon's failure to appear at deposition and ensure that Nilon would never appear for a deposition.  By claiming

that Nilon had disappeared and that NTG could no longer represent him, the
Defendants left NIC and the Court without recourse to enforce the Court's order to
require Nilon to appear for deposition.  Thus, NTG's fraudulent statements were
made to conceal their fraud and permit the sham lawsuit to continue.

**Obstruction of Justice and Witness Tampering – Deposition of Sandoval**

145.   On April 20, 2015, NIC deposed Giovanni Sandoval in Newport
Beach, California.  Ryan Ferrell defended Sandoval at his deposition.  Sandoval
provided testimony under oath in an official proceeding.

146.   At deposition, Sandoval lied under oath repeatedly.

147.   He testified that he had been living in Arizona for only a year, but his
criminal records indicated that he had lived in Arizona for years prior to the
deposition.  *See id.*, Dkt. 117 (finding that Sandoval lied about his residency, that
he had a California driver's license, and "may have made several other false
statements during his deposition").

148.   Sandoval stated that he had only been arrested on three occasions, but
the publicly available criminal records showed that he had been arrested at least
fourteen (14) times.

149.   Sandoval testified that he had purchased Sovereign Silver in El Cajon,
California in November of 2013 at Sprouts, but he admitted that he had no receipt
for the purchase.  Upon information and belief, Sandoval did not purchase the
Sovereign Silver product in El Cajon, California, or, if he did, he did not purchase
it in November 2013 since the bottle he claims to have purchased was not
manufactured until February 2014.

150.   Sandoval testified that he read the NIC product label and relied on that
label's claims concerning immune support before allegedly purchasing NIC's
product.  Upon information and belief, Sandoval did not purchase the product in
reliance on claims made on the label because he either did not purchase the product

1    at all or he bought it in an effort to purchase a lawsuit after he had met with NTG

2    in January of 2014.

3        151.   Upon information and belief, Ryan Ferrell knew that Sandoval lied

4    under oath at his deposition regarding his residency, purchase of the product, and

5    alleged reliance on NIC claims, and had persuaded him to do so through the

6    promise of remuneration from potential settlement or judgment monies.  Upon

7    information and belief, Ryan Ferrell suborned perjury to conceal the true facts

8    surrounding Sandoval's involvement in the case and Sandoval's fabricated

9    experience in purchasing Sovereign Silver so that the NTG lawsuit could continue

10   against NIC.

11       152.   Ryan Ferrell knew that lying under oath is wrong and illegal.

12   **Obstruction of Justice – Ryan Ferrell Attempts to Conceal Evidence**

13       153.   In April of 2015, NIC provided Ryan Ferrell with public documents

14   proving that Sandoval was a resident of Arizona at the time of his alleged purchase

15   and at the time that NTG substituted Sandoval into the case as lead plaintiff.  *See*

16   *id.*, Dkt. 117 (Judge Burns cites to same public records and takes *judicial notice* of

17   same).

18       154.   From at least April 2015, Ryan Ferrell was aware that Sandoval was

19   not a valid member of the class, and that public information proved Sandoval had

20   lied during his deposition.

21       155.   NIC attempted to include that information in the parties' Joint

22   Statement of Undisputed Facts related to pending dispositive motions that was to

23   be filed on April 27, 2015 in relation to NIC's pending Motion for Summary

24   Judgment.

25       156.   Ryan Ferrell refused to include those facts despite the undisputed

26   nature of the public records.  Ryan Ferrell then moved to strike the inclusion of

27   those dispositive facts in NIC's Reply brief.  *Id.*, Dkt. 114 (Sandoval's Evidentiary

28   Objections to NIC's Reply Brief).

---

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 34 -

157.   Judge Burns found that Ryan Ferrell should have informed the court of this critical and dispositive information upon his receipt of the indisputable evidence.  *Id.*, Dkt. 117 at n. 1 ("Additionally, as soon as Plaintiff's counsel learned that Sandoval wasn't a resident of California (or a member of the class) they were required to notify the Court of this 'false statement of material fact… previously made to the tribunal.'").

158.   Ryan Ferrell sought to impede the due administration of justice by concealing facts which he knew defeated key elements of his case and contradicted prior statements made to the tribunal.

159.   Ryan Ferrell knew before Sandoval's deposition that Sandoval was not a valid class member because he was not a California resident.  Ryan Ferrell had Sandoval travel to California (from Arizona) to sit for deposition, and even paid for Sandoval's local hotel, even though NIC's counsel were based in Arizona. Ryan Ferrell knew that Sandoval's Arizona residence would expose NTG's false statements in the complaint concerning Sandoval's address.  Moreover, prior to the Sandoval deposition, Ryan Ferrell refused to provide NIC with Sandoval's true name and address despite four separate requests for that information by NIC, and despite Rule 26(a)(1) requiring the delivery of that information to counsel for NIC.

**Favorable Termination – The Underlying Action is Dismissed**

160.   On May 12, 2015, Judge Burns issued a Tentative Order decertifying the class and dismissing the class claims without prejudice.  *Id.*

161.   In that order, Judge Burns found:

    a.   Sandoval was not a resident of California and thus was never a member of the class he purported to represent.  *Id.* at 4.

    b.   Plaintiff's counsel, Newport Trial Group, Ryan Ferrell, Scott Ferrell, and Victoria Knowles should have known that Sandoval was not a California resident and fell short

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 35 -

of the Rule 11 mandate to conduct a reasonable inquiry
into facts alleged in a Complaint.  *Id*. at 4-5.

c.   But for the false statements about Sandoval's residency in
the Second Amended Complaint the Court would not have
granted Sandoval's substitution for Nilon.  *Id*. at 5.

d.   "Plaintiff's counsel ha[d] displayed a cavalier attitude
towards discovery obligations practically from the get-
go."  *Id*.

e.   "Because Nilon repeatedly failed to appear for scheduled
depositions, and Sandoval isn't a member of the class, the
putative class members' interests have been
compromised… Based on counsel's conduct and repeated
inability to propose an adequate class representative, the
Court… vacate[s] class certification and dismiss[es] this
case without prejudice."  *Id*. at 6.

f.   That NTG failed to produce a valid class representative
despite three attempts.  *Id*.

g.   That Sandoval had testified falsely under oath.  *Id*. at 3.

h.   That NTG's complaint and pleadings had included "false
statements."  *Id*. at 4.

162.   In response to Judge Burns' tentative order, Defendants NTG, Ryan
Ferrell, Scott Ferrell, Victoria Knowles, David Reid and Giovanni Sandoval,
submitted a response agreeing with the court that dismissal of the class claims was
warranted and additionally **requested that the court dismiss Sandoval's claims
with prejudice.**  *Id*., Dkt. 118.

163.   On May 22, 2015, Judge Burns issued an Order of Dismissal that
vacated class certification, dismissed the class claims without prejudice, and
dismissed Sandoval's claims with prejudice.  *Id*., Dkt. 120.  The court noted in that

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 36 -

order that Plaintiff's counsel had requested the dismissal of Sandoval's claims with prejudice. *Id.*

164.   The Underlying Action terminated in NIC's favor because Sandoval's claims were dismissed with prejudice, the class claims were dismissed without prejudice, and Nilon withdrew from the case due to his refusal to sit for deposition or in any way prosecute the action.  Furthermore, the dismissal of Sandoval's claims came at the request of NTG and constitutes a voluntary dismissal.  That voluntary dismissal was necessitated because NTG could not prove its prima facie case without a valid plaintiff, Sandoval had testified falsely under oath and could not thereafter credibly testify, and because only Sandoval's testimony could have met essential elements of NTG's case (even if Sandoval's testimony was admissible, and it was not).

**NIC Suffered a Direct and Cognizable Injury**

165.   NIC incurred hundreds of thousands of dollars in legal fees associated with the three year defense of the Underlying Action.  NIC also incurred damage to its reputation and goodwill as a result of the false claims brought against it in the Underlying Action.

166.   The legal fees described in the preceding paragraph were directly and proximately caused by the predicate acts of bribery, extortion, wire fraud, mail fraud, obstruction of justice, and witness tampering described in paragraphs 58 through 159 above.  Those predicate acts, performed by or at the direction of the NTG, Ryan Ferrell, Scott Ferrell, Victoria Knowles, David Reid, Andrew Baslow, Andrew Nilon, and Giovanni Sandoval, allowed for the assertion of sham litigation against NIC and prolonged a sham lawsuit, causing NIC to incur legal fees that it should never have been forced to incur.

**C. <u>Andrew Nilon v. Chromadex Inc.</u>**

167.   In late 2012 or early 2013, an agent, employee, or attorney of the NTG, offered a bribe to Andrew Nilon.  NTG promised payment of money (to be

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 37 -

paid out of any settlement or judgment proceeds acquired), if Nilon supported litigation NTG contrived against Chromadex Inc. through the ratification, support, or execution of false declarations and pleadings, and through the delivery of false testimony at deposition or trial.

168.   Nilon agreed to the arrangement described in the preceding paragraph by accepting the promise of future payment from settlement or judgment proceeds in exchange for his promise to provide testimony (written or oral) in support for claims which he and NTG (and its agents) knew to be false.

169.   In exchange for the promise of payment, Nilon agreed to support false legal claims filed by NTG attorneys against Chromadex.

170.   In late 2012 or early 2013, Defendants NTG, Scott Ferrell, David Reid and Victoria Knowles developed a scheme to defraud Chromadex through the fabrication of a class action lawsuit based on CIPA and UCL claims.  That scheme involved threatening Chromadex with a large class action lawsuit that would instill fear of expensive, protracted litigation along with the threat of a potentially costly class judgment attendant with adverse publicity.  Defendants endeavored to cause Chromadex to agree to settlement demands, paying NTG thousands of dollars to dismiss the fabricated lawsuit.

171.   On May 22, 2013, in furtherance of the scheme to defraud Chromadex, NTG, Scott Ferrell, David Reid, and Victoria Knowles filed a Class Action Complaint (the "Chromadex Complaint") on behalf of Nilon against Chromadex in the Superior Court of the State of California for the County of Ventura.  *See* Complaint in *Nilon v. Chromadex, Inc.*, No. 56-2013-00436790-CU-MT-VTA (Sup. Ct. Ventura Cnty. 2013) (Exhibit A).  Scott Ferrell signed the Chromadex Complaint, and Victoria Knowles and David Reid appeared in the caption.  *Id*.

172.   NTG filed the Chromadex Complaint on behalf of Nilon on the very same day that he missed, for the second time, a duly noticed deposition in Nilon's

case against NIC.  *Nilon v. Chromadex, Inc.*, No. 56-2013-00436790-CU (Sup. Ct. Ventura Cnty., May 22, 2013).  Nilon had missed his depositions in the NIC matter because he no longer wished to participate in the fabricated lawsuit.  NTG nonetheless pursued the separate cause of action against Chromadex in Nilon's name.

173.   Through the Chromadex Complaint, Nilon, NTG, Scott Ferrell, David Reid, and Victoria Knowles made the following intentionally false representations (*See id.* at ¶¶ 1,7-10, 16):

  a.   That, in February of 2013, Nilon called Chromadex at 855-777-0660 to inquire about a "BlueScience" product he had recently purchased and about the possibility of receiving a discount on future purchases.

  b.   That Nilon was not aware that the call was being recorded.

  c.   That Nilon did not give either express or implied consent to being recorded.

  d.   That only after completing the call did Nilon discover Chromadex had recorded all incoming calls.

  e.   That Nilon expected the call to be private, neither monitored nor recorded.

  f.   That Nilon's claims are typical of the claims of the members of the Class.

174.   The representations identified in the preceding paragraph were intentionally false.

175.   Nilon called Chromadex at the direction of NTG, Andrew Baslow, Scott Ferrell, and David Reid, and for the sole purpose of a bringing suit against Chromadex.

176.   Thus, Nilon call Chromadex with knowledge that the call would be recorded and with the intent to have that call recorded as a basis for suit against Chromadex.  At very least, he impliedly consented to have his call recorded. Because Nilon was aware that his call would be recorded, and knew that the call was for litigation purposes, he could not have had a reasonable belief under the circumstances that his call would remain private or confidential.

177.   Because he did not believe the call was private or confidential and made the call for the purpose of initiating litigation, Nilon's claims could not be typical of those other class members, making NTG's class allegations intentionally false.

178.   Soon after NTG filed the Chromadex Complaint, Nilon changed his mind and decided that he did not want to continue participating in the NTG scheme.  He informed NTG of his wish to be removed from NTG legal cases.

179.   The next day after filing its Chromadex Complaint, May 23, 2013, Defendant Andrew Nilon, through Defendants NTG, Scott Ferrell, David Reid, and Victoria Knowles, voluntarily dismissed his claims against Chromadex *with prejudice*, but the class claims without prejudice.  *See* Exhibit B (Decl. of Victoria Knowles).

180.   In support of that voluntary dismissal, Victoria Knowles swore under penalty of perjury that "[n]either [Nilon] nor his counsel has received, **or will receive,** any direct or indirect consideration in connection with this case or as a result of this dismissal." *Id.* at ¶ 3 (emphasis added).

181.   Despite dismissing Nilon's claims *with prejudice* and in furtherance of the scheme to defraud Chromadex, Scott Ferrell, David Reid, and/or an agent of NTG, used the interstate wires to contact Chromadex and threaten a subsequent CIPA lawsuit (ostensibly on behalf a new class representative) unless Chromadex paid NTG and Andrew Nilon settlement monies and entered into a confidential settlement agreement.

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 40 -

182.   NTG, through Scott Ferrell (or an agent of NTG), threatened to pursue litigation against Chromadex despite having no plaintiff capable of pursuing the litigation.

183.   In August 2013, Chromadex, for fear of the crippling costs of protracted litigation and the risk of a catastrophic class damages award, agreed to pay to settle the threatened claims.

184.   Because NTG, Scott Ferrell, David Reid, and Victoria Knowles had yet to acquire a new "plaintiff," the agreement was executed between Nilon and Chromadex (despite Knowles' sworn testimony that no payment would be made to Nilon in connection with the case, and despite the fact that Nilon's claim was dismissed **with prejudice** which would bar his recovery from Chromadex entirely). Andrew Nilon then received $1,000 from the settlement and NTG received the remainder.

185.   NTG (a law firm) had no lawful basis to threaten an action, or recover monies, on behalf of Nilon for legal claims that had been dismissed with prejudice and were therefore non-actionable.

186.   NTG had no lawful basis to threaten an action, or recover monies, on behalf of future and speculative class plaintiffs that did not actually exist.  NTG essentially threatened to sue Chromadex without a plaintiff, and then recovered settlement proceeds for its own benefit.

187.   NTG recovered almost 90% of the settlement award paid by Chromadex.

188.   The false representations made by Nilon and NTG against Chromadex identified herein were material because if their truth were disclosed, Chromadex would have known that Nilon had no viable claim for relief and that NTG had pursued them under false claims:

      a.   A caller may not receive protection under the CIPA statute unless they hold an objectively reasonable belief that the recorded call

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 41 -

1   was private or confidential (i.e., not recorded).  *See Flanagan v.*
2   *Flanagan*, 27 Cal. 4th 766, 776-77 (2002); *Kearney v. Salomon*
3   *Smith Barney, Inc.*, 39 Cal. 4th 95, 117 n.7 (2006); *Shin v. Digi-*
4   *Key Corp.*, No. 12-cv-5415-PA-JCG, 2012 WL 5503847, at *2
5   (C.D. Cal. Sept. 17, 2012); Cal. Penal Code § 632(c) (defining
6   "confidential communication" to include "any communication
7   carried on in circumstances as may reasonably indicate that any
8   party to the communication desires it to be confined to the parties
9   thereto, but excludes a communication made in a public gathering
10   or in … any other circumstances in which the parties to the
11   communication may reasonably expect that the communication
12   may be overlooked or recorded"); *Sajfr v. BBG Commc'ns, Inc.*,
13   10-cv-2341-AJB, 2012 WL 398991, at *6 (S.D. Cal. Jan. 10,
14   2012) ("consumer calls to a customer care center to discuss a
15   billing issue do not support an expectation of privacy sufficient to
16   qualify such calls as 'confidential communication' under section
17   632").

    b.   The caller must also suffer an injury to a privacy right which
cannot exist where they have no reasonable belief that the call is
private.  *See* Cal. Penal Code § 632.7(a) (requiring an injury-in-
fact stemming from "a violation of this chapter").

    c.   The caller similarly cannot receive protection where they give
implied consent to the recording, or where they know that the call
will not remain private.  *Deteresa v. American Broadcasting*
*Companies, Inc.*, 121 F.3d 460 (9th Cir. 1997).

189.   Nilon knew the material misrepresentations made to Chromadex in
the Chromadex Complaint were false and nonetheless made those representations
with the intent to defraud Chromadex.

190.   As a current plaintiff in NTG litigation, and an NTG "client" since at least March 2012, Nilon certainly interacted with NTG agents before allegedly phoning Chromadex in 2013.  Nilon received instructions from NTG (through Andrew Baslow) on how to make the call and avoid recording.  He was instructed as to the nature of the phone call, the target of the phone call, and the nature of the intended use for that phone call *before* making the phone call or electing to sue Chromadex based on false pretenses.

191.   Defendants NTG, Scott Ferrell, David Reid, and Victoria Knowles facilitated the filing of Nilon's fabricated lawsuit and knew the representations made in the Chromadex Complaint were false because they had recruited Nilon to be a plaintiff-for-hire and to make false claims.

192.   The Chromadex Complaint was a sham predicated on intentionally false statements of material fact that, if known to the court and defendant, could not have supported a viable legal action.

193.   The intentionally false statements made to Chromadex through the Chromadex Complaint (and Scott Ferrell's telephone calls to Chromadex) deprived the litigation of legitimacy.  Chromadex ultimately paid NTG and Nilon settlement money in reliance on those misrepresentations.  Had Chromadex known that Nilon was a for-hire plaintiff who had suffered no cognizable legal injury, or that NTG never had a new plaintiff to continue its legal threats, Chromadex would not have paid settlement money to NTG and Nilon.

**D. <u>Sam Pfleg v. Nature's Way</u>**

194.   In early 2012, Defendant Andrew Baslow offered a bribe to Defendant Sam Pfleg.  Baslow promised payment if Pfleg promised to sponsor contrived litigation against Nature's Way Products, Inc. through the ratification, support, and execution of false declarations, pleadings, or oral testimony.  Upon information and belief, at all times during their interaction, Baslow acted as an

agent and employee with full authority on behalf, and at the direction, of Defendants NTG, Scott Ferrell and David Reid.

195.   Sam Pfleg agreed to the arrangement described in the preceding paragraph by accepting the promise of future payment from settlement or judgment proceeds in exchange for his promise to provide testimony (written or oral) in support for claims which he, and NTG and its attorneys and agents, knew to be false.  He agreed to serve as a for-hire plaintiff for NTG.

196.   In January of 2012, Defendants NTG, Scott Ferrell, David Reid, and Ryan Ferrell developed a scheme to defraud Nature's Way Products, Inc. through the fabrication of a class action false advertising suit predicated on CLRA, FAL, and UCL claims.  The scheme involved threats of class action litigation against Nature's Way Products, Inc.  NTG endeavored to cause Nature's Way Products Inc. to pay thousands of dollars to NTG to avoid the filing of or dismiss the class action suit.

197.   On January 2, 2012, in furtherance of that scheme, Defendants NTG and Ryan Ferrell sent a demand letter through the U.S. Mail to Nature's Way Products Inc.

198.   On March 15, 2012, in furtherance of that scheme, Defendants NTG and Scott Ferrell sent a second demand letter through the U.S. Mail to Nature's Way Products Inc.

199.   The demand letters made the following materially false representations to Nature's Way:

      a.   That NTG and Ferrell were writing on behalf of an individual California Consumer who represents a class of consumers; and,

      b.   That Nature's Way's marketing and advertising of Arnica Montana 30C caused NTG's client to purchase the product; and

      c.   That "she" did not experience any of the purported benefits.

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 44 -

200.   The representations described in the preceding paragraph were intentionally false.

201.   NTG and Scott Ferrell's client, Sam Pfleg (a male) did not purchase Arnica Montana 30C at all, and the Nature's Way products he did purchase were not bought in reliance on advertising claims.

202.   Pfleg purchased the Nature's Way products on March 14, 2012 at the direction of NTG, Scott Ferrell, and Andrew Baslow for the sole purpose of suing Nature's Way Products, Inc.  Pfleg did not hold a subjective belief that the product conferred the promised benefits, and in fact, Sam Pfleg did not care whether the product conferred any benefit because he did not intend to use the product.

203.   Pfleg did not represent any class of individuals with the characteristics described in the March 15, 2012 letter.

204.   Pfleg's misrepresentations were material because, had Nature's Way been informed of the true facts, Nature's Way would have known that no viable class claim existed since NTG's client could not meet the elements of reliance or injury and could not be a class representative.  Under the UCL, a party may not purchase a lawsuit, meaning that Pfelg could not purchase the Arnica Montana 30C product knowing—as he did—that the reason for purchase was solely to support a manufactured lawsuit.

205.   Defendants NTG and Scott Ferrell knew the representations made to Nature's Way in the March 15, 2012 demand letter were false and made those representations with the intent to obtain settlement money from Nature's Way.

206.   On March 16, 2012, in furtherance of the scheme described above, Defendants NTG, Scott Ferrell, and Ryan Ferrell filed a Verified Class Action Complaint against Nature's Way Products, Inc. on behalf of plaintiff and class representative Sam Pfleg.  *See Sam Pfleg v. Nature's Way Products, Inc.*, No. 3:12-cv-01018-LAB-BLM (S.D. Cal. Removed on April 25, 2012), Dkt. 1-4 (Original

---

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 45 -

State Court Complaint).  Scott Ferrell signed the Complaint.  Ryan Ferrell and James Hardin appeared in the caption.

207.   In furtherance of the scheme to defraud Nature's Way, Defendants Newport Trial Group, Scott Ferrell, and Ryan Ferrell sent a copy of the Original State Court Complaint to Nature's Way by U.S. Mail.

208.   The Complaint made the following false representations (*See id*. at ¶¶ 1, 21, 27):

    a.   Pfleg relied on Nature's Way's representations regarding the efficacy of the products when he purchased several of Nature's Way's products in early 2012, including Arniflora Arnica Gel, Triflora Arthritis Gel, Florasone Cream, Aciatic Aide, B&T Nighttime Cough & Bronchial Syrup, and Cough & Bronchial Syrup;

    b.   Pfleg would not have purchased the products or paid as much for them but for Nature's Way's efficacy representations; and

    c.   Pfleg's claims were typical of the claims of the members of the Class.

209.   The representations identified in the preceding paragraph were materially and intentionally false.

210.   Pfleg did not purchase any of the Nature's Way products in reliance on any representations made by Nature's Way.  Pfleg purchased the products with no intention of actually taking the products or experiencing their benefit, but instead to create the facially valid circumstances necessary to support a lawsuit.

211.   Pfleg purchased the products at a Vitamin Shoppe after NTG and Scott Ferrell identified Nature's Way as a potential target, Scott Ferrell instructed Defendant Baslow to direct an individual to make a purchase from the Vitamin Shoppe, and Baslow instructed Pfleg to purchase the products.

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 46 -

212.   In fact, NTG's March 15, 2012 demand letter alleged only that Pfleg purchased Arnica Montana 30C, but the State Court Complaint never identified Arnica Montana 30C as a product which Pfleg allegedly purchased or consumed.

213.   Because Pfleg did not rely on the representations of Nature's Way and was not injured in his money or property, his claims could not have been similar to, or typical of, the class identified in the Complaint (another false representation).

214.   The misrepresentations in the State Court Complaint were material because plausible claims for relief under the CLRA, FAL, and UCL would only have been viable were those representations true.

215.   Pfleg executed a declaration in support of that complaint, wherein he swore to have personal knowledge of facts alleged therein and that he would testify competently thereto if called upon to do so.  *Id.* at 18.  Therefore, Pfleg was aware of the representations made on his behalf to Nature's Way and knew those representations to be false.

216.   The material misrepresentations made in the State Court Complaint were made to Nature's Way by Defendants NTG, Scott Ferrell, Ryan Ferrell, and Pfleg.

217.   Defendants NTG, Scott Ferrell, and Ryan Ferrell knew the representations made in the State Court Complaint were false because their agent Andrew Baslow had recruited and bribed Pfleg, at their direction and request, to support the lawsuit.

218.   The material misrepresentations in the State Court Complaint were made by Defendant NTG, Scott Ferrell, Ryan Ferrell, and Pfleg to defraud Nature's Way and cause Nature's Way to pay settlement money or a judgment predicated on the intentionally false allegations.

219.   On June 25, 2012, in furtherance of the scheme to defraud Nature's Way Products, NTG and Scott Ferrell sent an additional demand letter through the U.S. Mail to Nature's Way claiming to have two new clients.

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 47 -

220.   Upon information and belief, the representations in the June 25, 2012 letter were false because NTG did not have two new clients and were simply attempting to leverage a larger settlement payment from Nature's Way under false pretenses.

221.   In July of 2012, Nature's Way agreed to enter into a confidential settlement agreement with NTG and Pfleg in reliance on the misrepresentations identified in Paragraphs 208(a)–(d).  Pursuant to the terms of that agreement, Scott Ferrell and NTG filed a request for voluntary dismissal on July 6, 2012 on behalf of Pfleg.  *Id.*, Dkt. 8; *see also id.*, Dkt. 9 (Order Granting Dismissal by Judge Burns).  Pfleg received a monetary payment under that agreement and NTG received the remainder of the settlement funds.

222.   The Pfleg Complaint was a sham containing false statements of fact and intentional misrepresentations as described in Paragraphs 208-214.

223.   The false statements and misrepresentations in the Pfleg Complaint deprived the litigation of its legitimacy.  Nature's Way ultimately paid Pfleg and the NTG settlement money in reliance on the truth of the representations in the Pfleg Complaint.  Had Nature's Way known that Pfleg was a for-hire plaintiff who fabricated claims for Pfleg and NTG profit, it would not have paid to settle the claim.

**E.  Matthew Dronkers v. Kiss My Face LLC**

224.   In early 2012, Defendant Andrew Baslow offered a bribe to Matthew Dronkers.  Baslow promised payment (to be paid out of any settlement or judgment proceeds acquired) if Dronkers promised to sponsor contrived litigation against Kiss My Face, LLC, a Delaware Limited Liability Company, through the ratification, support, or execution of false declarations, pleadings, and testimony.  Upon information and belief, at all times during their interaction, Baslow acted as an agent and employee with full authority on behalf, and at the direction, of Defendants NTG, Scott Ferrell, and David Reid.

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 48 -

225.   Dronkers agreed to the arrangement described in the preceding paragraph by accepting the promise of future payment from settlement or judgment proceeds in exchange for his promise to provide false declarations, pleadings, and testimony in support of NTG's suit against Kiss My Face, LLC.

226.   In early 2012, Defendants NTG, Scott Ferrell, David Reid and Victoria Knowles developed a scheme to defraud Kiss My Face, LLC through the fabrication of a class action false advertising lawsuit predicated on CLRA, FAL, and UCL claims.  The purpose of that scheme was to threaten Kiss My Face, LLC with significant class action liability to cause Kiss My Face to pay NTG's settlement demands in settlement.

227.   On May 11, 2012, in furtherance of the scheme described above, Defendants NTG, Scott Ferrell, and Victoria Knowles filed a Verified Class Action Complaint against Kiss My Face, LLC on behalf of plaintiff and class representative Dronkers.  *See Matthew Dronkers v. Kiss My Face, LLC*, No. 3:12-cv-1151-JAH-WMC (S.D. Cal. filed May 11, 2012), Dkt. 1 (the "Dronkers Complaint").  Michael Louis Kelly of Kirtland & Packard LLP signed the Dronkers' Complaint.  NTG, Scott Ferrell, Victoria Knowles, and James Hardin appeared in the caption.

228.   NTG filed the Dronkers Complaint through the court's CM/ECF system which uses the interstate wires to make filed documents available to the public and parties (including service on defendants).

229.   In furtherance of the scheme to defraud Kiss My Face, Defendants NTG, Scott Ferrell, Victoria Knowles, and Dronkers sent a demand letter by U.S. Mail to Kiss My Face prior to filing the Dronkers' Complaint.

230.   NTG used the letter to communicate the false claims to Kiss My Face and demand settlement.  The demand letter also furthered the scheme because a valid claim under the CLRA requires the service of a pre-suit demand letter.

231.   The Dronkers' Complaint made the following intentionally false representations (*See id*. at ¶¶ 1, 14, 20):

    a.   That Dronkers purchased several of Kiss My Face's products in early 2012 in reliance on Kiss My Face's representations regarding the organic nature of the products that he purchased;

    b.   That Dronkers would not have purchased the products or paid as much for them but for Kiss My Face's "organic" representations;

    c.   That Dronkers' claims were typical of the claims of the members of the Class.

232.   On May 18, 2012 at 10:13 a.m., the representations identified above were made to Kiss My Face through personal service of the Dronkers' Complaint on behalf of Defendants NTG, Scott Ferrell, Victoria Knowles, and Dronkers.

233.   The representations identified above were intentionally false.

234.   Dronkers did not purchase the Kiss My Face products in reliance on representations made by Kiss My Face.  Any purchase of a Kiss My Face product by Dronkers was made with no intention of taking the product or experiencing its benefit, but instead to create the facially valid circumstances necessary to support a lawsuit.  Dronkers received instructions on how to serve as a plaintiff from NTG counsel *prior* to any purchase of product by Dronkers.

235.   Because Dronkers did not rely on the representations of Kiss My Face in making a purchase and because he was not injured in his money or property, his claims could not be similar or typical of the class identified in the Dronkers' Complaint.

236.   The misrepresentations in the Dronkers' Complaint were material because a plausible claim for relief under the CLRA, FAL, and UCL could only exist if those representations were true.

237.   Dronkers executed a declaration in support of that complaint, wherein he swore to have personal knowledge of the facts alleged therein and that he would

testify competently thereto if called.  *Id.* at 15.  Therefore, Dronkers was aware of the representations made on his behalf to Kiss My Face and knew that those representations were false.

238.   The material misrepresentations made in the Dronkers' Complaint were made to Kiss My Face by Defendants NTG, Scott Ferrell, Victoria Knowles, and Matthew Dronkers.

239.   Defendants NTG, Scott Ferrell, and Victoria Knowles knew the representations made in the Dronkers' Complaint were false because their agent Baslow had recruited and bribed Dronkers, at their direction, to be a plaintiff-for-hire and support the lawsuit.

240.   The material misrepresentations in the Dronkers' Complaint were made by Defendant NTG, Scott Ferrell, Victoria Knowles, and Dronkers with the intent to defraud Kiss My Face and cause Kiss My Face to pay settlement money.

241.   In November of 2012, Kiss My Face entered into a confidential settlement agreement with the NTG and Dronkers in reliance on the misrepresentations identified in paragraphs 231(a)–(c).  *Id.*, Dkt. 21 (Notice of Settlement).  Pursuant to the terms of that agreement, the parties entered a stipulated dismissal.  *Id.*, Dkt. 25; *see also id.*, Dkt. 26 (Order Granting Dismissal by Judge Houston).  Dronkers received approximately $900 to $1500 under that agreement and NTG received the remainder of the settlement payout.

242.   The Dronkers' Complaint was a sham predicated on knowingly false statements of fact and the intentional misrepresentations described in paragraphs 209-14.

243.   The false statements and misrepresentations in the Dronkers' Complaint deprived the litigation of legitimacy.  Had Kiss My Face known that Dronkers was a for-hire plaintiff who had suffered no cognizable legal injury, it would not have paid settlement money.

**F.  <u>Taylor Demulder v. Carter-Reed Co.</u>**

244.   In 2012, Defendant Baslow bribed Taylor Demulder.  Baslow promised payment (to be paid out of any settlement or judgment proceeds acquired) if Demulder served as a plaintiff-for-hire and sponsored contrived litigation against Carter-Reed Company, LLC, a Utah Limited Liability Company, through the ratification, support or execution of false declarations, pleadings, and testimony.  At all times during his interaction with Demulder, Baslow served as an agent and employee with full authority on behalf, and at the direction, of Defendants NTG, Scott Ferrell, and David Reid.

245.   Demulder agreed to the arrangement described in the preceding paragraph by accepting the promise of future payment from settlement or judgment proceeds in exchange for providing documentation and testimony in support of claims he, NTG, and its attorneys and agents, knew to be false.

246.   In the spring or summer of 2012, Defendants NTG, Scott Ferrell, and Baslow developed a scheme to defraud Carter-Reed Company through the fabrication of a class action CIPA and UCL lawsuit.  NTG threatened Carter-Reed with a large class action lawsuit to cause Carter-Reed to pay NTG settlement proceeds.

247.   On September 6, 2012 at 9:12 a.m., Demulder called Carter-Reed's customer service line at 1-800-506-1577 at the direction of Baslow, an NTG employee.  Demulder intentionally bypassed the automatic disclosure which warns all callers that Carter-Reed records incoming calls.  Demulder had no prior experience with Carter-Reed's phone system and, so, could not have known how to bypass the warning without receiving instructions beforehand from Baslow. Demulder spoke with a customer service representative named Melissa Caspeta. That call was routed across state lines.  *See* Exhibit C.

248.    Prior to that call, Baslow had instructed Demulder on how to bypass the automatic disclosure so that Demulder could allege that he had not been warned that the call would be recorded (an element in a prima facie CIPA claim).

249.    Demulder made the call to manufacture evidence that NTG could then use to assert a facially plausible—but in reality a false—CIPA claim against Carter-Reed.

250.    During his call with Carter-Reed, Demulder gratuitously provided his Social Security number and other personal details without being asked to provide same.  He stated that he was overweight and wanted to lose forty pounds and that he had recently been fired from his job.  *Id.*

251.    He provided a fake last name:  Vaughn.  *Id.*

252.    The representations identified in Paragraph 250 were false.  Demulder was not overweight.  He had not been fired from his job.  Demulder made the call from his office at Stryker Orthopedics, 5905 Decatur Blvd., Suite 8, Las Vegas, Nevada 89118.  The false information provided by Demulder evidences the illegitimate purpose of the call.  None of the false information provided by Demulder to Carter-Reed had any justifiable or reasonable commercial basis. Demulder offered that information solely because he was instructed by NTG to reveal personal and intimate details (even if fake), so that the call would appear to have been "private" and confidential when reviewed by the corporate defendant, Carter-Reed.

253.    Those representations were material because, taken at face value, they established a plausible CIPA claim that Demulder "reasonably believed" that the call was private, confidential, and not recorded.

254.    Following Demulder's call to Carter-Reed on September 6, 2012, NTG through an unknown attorney, agent or employee, provided to the Law Offices of Kirtland & Packard, 2041 Rosecrans Ave., Suite #300, El Segundo, CA

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 53 -

90245, Demulder's information for presently unknown reasons and presently

unknown consideration.

255.   Just one week after his call, on September 13, 2012, in furtherance of

the scheme described above, Defendant Demulder, through Michael Louis Kelly of

Kirtland & Packard, filed a Verified Class Action Complaint against Carter-Reed

Company, LLC in the US District Court for the Southern District of California.

*See Taylor Demulder v. Carter-Reed Company, LLC*, No. 3:12-cv-2232-BTM-

MDD (S.D. Cal. filed September 13, 2012), Dkt. 1 (the "Demulder Complaint").

256.   In furtherance of the scheme to defraud Carter-Reed, Demulder,

through his attorneys at Kirtland & Packard, caused the Demulder Complaint to be

sent by U.S. Mail on September 14, 2012 to Carter-Reed's registered agent.

257.   The Demulder Complaint made the following false representations

(*See id.* at ¶¶ 1, 8-10, 12, 16):

        a.   That Demulder is a California citizen and resident of San Diego
County, California;

        b.   That Demulder contacted Carter-Reed's customer service hotline
in September of 2012 to gain information about its product,
"Relacore";

        c.   That Carter-Reed recorded the call without Demulder's
knowledge or consent, either express or implied;

        d.   That Demulder told the customer service representative
information that he believed to be private and confidential, such
as his social security number, desire to lose weight, and that he
had recently been fired;

        e.   That Demulder only learned that Carter-Reed recorded his call,
and all calls, after completing his call; and

        f.   That Demulder's claims are typical of the claims of the members
of the Class.

258.   The representations identified in the preceding paragraph were intentionally false.

259.   Demulder was a resident of Nevada, not California, and was located in Nevada at the time of his call, a fact that by itself would invalidate his California CIPA claim.

260.   Demulder only called the hotline for the purpose of creating evidence of a recording so that he could bring suit against Carter-Reed.  Demulder made the phone call at the direction of NTG, through Andrew Baslow, after NTG had already investigated Carter-Reed's phone system in August 2012.  Demulder knew he would be recorded when he made the phone call.

261.   Demulder provided false private information; he was not overweight; he had not lost his job; he had never purchased the product before; and his last name is not Vaughn.

262.   Thus, he did not believe the call was private or confidential, he gave implied consent by making a call which he knew would be recorded, and he did not first learn that Carter-Reed records all incoming calls only after completing his call.  Demulder's claims could not be typical of the class, because the only relevant class would involve individuals bribed into calling Carter-Reed solely for litigation purposes.

263.   The false representations in the Demulder Complaint were material; if the true facts were disclosed to the Court or Carter-Reed, they would have known that the suit was invalid and that no relief was possible:

      a.   A caller may not receive protection under the CIPA statute unless they hold an objectively reasonable belief that the recorded call was private or confidential (i.e., not recorded).  Cal. Penal Code § 632(c).

      b.   The caller must also suffer an injury to a privacy right which cannot exist where they have no reasonable belief that the call is

private. *Videckis v. Pepperdine Univ.*, 100 F. Supp. 3d 927, 932–33 (C.D. Cal. April 16, 2015).

c.  The caller similarly cannot receive protection where they give implied consent to the recording. *Negro v. Superior Court*, 179 Cal. Rptr. 3d 215, 224 (Cal. Ct. App. 2014) *as modified* (Nov. 18, 2014), *review denied* (Jan. 28, 2015) (quoting *Griggs-Ryan v. Smith*, 904 F.2d 112, 117 (1st Cir. 1990)).

d.  CIPA only protects calls that originate from California and are made by California residents. *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 931 (Cal. 2006).

264.   Because Demulder lacked standing, injury-in-fact, intentionally bypassed the recording warning, and had no objectively reasonable basis to believe the call was private or confidential, his claims could not be similar to or typical of the class identified in the Demulder Complaint.

265.   The misrepresentations in the Demulder Complaint were material because a plausible claim for relief under CIPA would only exist if those representations were true.

266.   Demulder knew the material misrepresentations made to Carter-Reed in the Demulder Complaint were false and made those representations with the intent to defraud Carter-Reed.

267.   Defendants NTG, Scott Ferrell and Baslow facilitated the filing of Demulder's fabricated lawsuit, knew the representations made in the Demulder Complaint were false, and bribed Demulder to support the lawsuit. Those defendants contrived the Demulder claim, and developed the false allegations used against Carter-Reed.

268.   Demulder is a defendant in subsequent litigation brought by Carter-Reed under Nevada state torts for abuse of civil process. Carter-Reed Co. v. Demulder, No. 2:13-cv-00435-DBP, Dkt. 2-2 p. 10 (June 12, 2013). Carter-Reed's

claims are predicated on Demulder's intentionally false statements and his lack of any tenable legal claim at the outset of litigation. *Id.* at 4. Carter-Reed first discovered that Demulder's case was a sham *after* Demulder had voluntarily dismissed his lawsuit. *Id.* at 10.

269.   In his pending state court case, Demulder is defended by Scott Ferrell and NTG.

270.   Carter-Reed has expended substantial resources and time defending against Demulder's fabricated and fraudulent claims. The claims identified in Paragraph 263 were utterly false and brought with the specific intent to defraud. Thus, the litigation resulting from the defense and investigation into those claims was deprived of legitimacy. Demulder's litigation is part of a pattern of baseless and unjustifiably false lawsuits filed, advanced, or sponsored by NTG over the past five years.

### G. Schoonover v. Himalaya Drug Co.

271.   In early 2012, Defendant Baslow bribed Defendant Sam Schoonover. Baslow promised payment (to be paid out of any settlement or judgment proceeds acquired), to Schoonover if he served as a plaintiff-for-hire and sponsored contrived litigation for NTG through the ratification, support and execution of false declarations, pleadings, and testimony. At all times during his interaction with Schoonover, Baslow acted as an agent and employee with full authority on behalf, and at the direction, of Defendants NTG, Scott Ferrell, and David Reid.

272.   Schoonover agreed to the arrangement described in the preceding paragraph by accepting the promise of future payment (from settlement or judgment proceeds) in exchange serving as a plaintiff-for-hire and for testimony in support of claims which he, NTG, and its attorneys and agents, knew to be false.

273.   In the summer of 2012, Defendants NTG, Scott Ferrell, and Baslow developed a scheme to defraud the Himalaya Drug Company through the

fabrication of a class action CIPA and UCL lawsuit.  The purpose of the scheme
was to threaten Himalaya Drug Company with a large class action lawsuit to cause
Himalaya Drug Company to pay NTG settlement proceeds.

274.   On July 7, 2012, in furtherance of the scheme to defraud Himalaya
Drug Company, NTG, Scott Ferrell, and Victoria Knowles filed a sham Class
Action Complaint (the "Schoonover Complaint") on behalf of Schoonover in the
U.S. District Court for the Southern District of California against the Himalaya
Drug Company using the court's CM/ECF electronic filing system.  *See Sam
Schoonover v. Himalaya Drug Company*, No. 3:12-cv-1782-JLS-RBB (S.D. Cal.
Filed July 19, 2012) (hereinafter "*Schoonover v. Himalaya*").  Scott Ferrell signed
the Schoonover Complaint.  Victoria Knowles and James Hardin appeared in the
caption.

275.   In furtherance of their scheme to defraud Himalaya Drug Company,
NTG and Scott Ferrell (or their authorized agent), on behalf of Schoonover, caused
the Schoonover Complaint to be sent to Himalaya Drug Company by the U.S.
mails on July 25, 2012.  *See id.*, Dkt. 3 (Notice of Lawsuit and Request for Waiver
of Service).

276.   In the Schoonover Complaint, Schoonover, NTG, Scott Ferrell, and
Victoria Knowles made the following intentionally false representations (*See id.*,
Dkt. 1 at ¶¶ 1, 8-10, 12, 16):

    a.   Sam Schoonover contacted Himalaya Drug Company via its
       customer service telephone line (800-869-4640) in "the summer
       of 2012" to gain information about one of its organic products
       because Schoonover was interested in the product, its ingredients
       and its quality.

    b.   Himalaya Drug Company recorded the call without Schoonover's
       knowledge or consent, either express or implied.

    c.   Schoonover was not aware the call was being recorded.

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 58 -

d.   Schoonover, a male, only learned that Himalaya Drug Company records all incoming calls *after* completing "her" call.  *Id.* at ¶ 10.

e.   Sam Schoonover's claims are typical of the claims of the members of the Class.

277.   The representations identified in the preceding paragraph were intentionally false.

278.   Schoonover never called the Himalaya Drug Company, or, if he did, he did so at the direction of Baslow acting on behalf of NTG and for the sole purpose of creating a facially valid recording that could be used in litigation against Himalaya Drug Company.

279.   Thus, even if Schoonover did call the number as alleged, he did so with knowledge that the call would be recorded and with the intent to be recorded. He therefore gave implied consent to the recording and could not have maintained a reasonable belief under the circumstances that his call was private or confidential.  He attempted to use his contrived phone call to buy into litigation as a false plaintiff.

280.   Schoonover's claims could never have been typical of the class defined in his complaint, because he never believed that call was private or confidential, he gave implied consent by making a call which he knew would be recorded, and he made the call for the purpose of initiating litigation.  The class allegations in the complaint were therefore unsupported and false.

281.   Those false representations were material because if Himalaya Drug Company understood them to be false, it would have known that Schoonover had no viable claim for relief:

a.   A caller may not receive protection under the CIPA statute unless they hold an objectively reasonable belief that the recorded call was private or confidential (i.e., not recorded).  *See Flanagan v. Flanagan*, 27 Cal. 4th 766, 776-77 (2002); *Kearney v. Salomon*

1     *Smith Barney, Inc.*, 39 Cal. 4th 95, 117 n.7 (2006); *Shin v. Digi-*
2     *Key Corp.*, No. 12-cv-5415-PA-JCG, 2012 WL 5503847, at *2
3     (C.D. Cal. Sept. 17, 2012); Cal. Penal Code § 632(c) (defining
4     "confidential communication" to include "any communication
5     carried on in circumstances as may reasonably indicate that any
6     party to the communication desires it to be confined to the parties
7     thereto, but excludes a communication made in a public gathering
8     or in … any other circumstances in which the parties to the
9     communication may reasonably expect that the communication
10    may be overlooked or recorded"); *Sajfr v. BBG Commc'ns, Inc.*,
11    10-cv-2341-AJB, 2012 WL 398991, at *6 (S.D. Cal. Jan. 10, 2012)
12    ("consumer calls to a customer care center to discuss a billing issue
13    do not support an expectation of privacy sufficient to qualify such
14    calls as 'confidential communication' under section 632").

b.    The caller must also suffer an injury to a privacy right which
      cannot exist where they have no reasonable belief that the call is
      private.  *See* Cal. Penal Code § 632.7(a) (requiring an injury-in-
      fact stemming from "a violation of this chapter").

c.    The caller similarly cannot receive protection where they give
      implied consent to the recording, or where they know that the call
      will not remain private.  *Deteresa v. American Broadcasting*
      *Companies, Inc.*, 121 F.3d 460 (9th Cir. 1997).

282.   Schoonover knew the material misrepresentations made to Himalaya Drug Company in the Schoonover Complaint were false and made those representations intending to defraud Himalaya Drug Company by securing settlement money (or judgment money) through his false allegations.

283.   Defendants NTG, Scott Ferrell, and Baslow facilitated the filing of Schoonover's fabricated lawsuit and knew the representations made in the

Schoonover Complaint were false because Baslow bribed Schoonover to be a plaintiff-for-hire and support the lawsuit.

284.   In November of 2012, Himalaya Drug Company entered into a confidential settlement agreement with NTG and Schoonover in reliance on the misrepresentations identified in paragraphs 276(a)–(e).  Pursuant to the terms of that agreement, NTG, Scott Ferrell, Victoria Knowles, and Schoonover filed a voluntary dismissal. *Schoonover v. Himalaya*, Dkt. 11.  Schoonover received approximately $900 to $1500 under that agreement and NTG received the remainder of the settlement payout.

285.   The Schoonover Complaint was a sham petition predicated on knowingly false statements of fact and intentional misrepresentations described in Paragraph 276.  Had Himalaya Drug Company known that Schoonover was a false, for-hire plaintiff who never suffered a cognizable injury, it would not have paid settlement money to NTG.

286.   The false statements and misrepresentations in the Schoonover Complaint deprived the litigation of its legitimacy.

**H. NTG Plaintiff Dan Bobba**

287.   In 2009, Defendants Scott Ferrell and NTG developed a scheme to defraud Magna, Inc. and Steve Moidel (collectively "Magna") through the fabrication of a class action suit predicated on CLRA, FAL, UCL, RICO, and fraud claims.  The purpose of that scheme was to threaten Magna with a large class action lawsuit along with the threat of trebled RICO damages.  Through those allegations, NTG intended to cause Magna to pay NTG settlement proceeds.

288.   On April 7, 2010, in furtherance of the scheme described above, Defendants NTG and Scott Ferrell threatened Magna with a federal class action lawsuit based on legal claims for a "new" client.

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 61 -

289.   That threat was frivolous and baseless because NTG's purported client on whose behalf they ultimately filed the lawsuit, Felipe Morales, had not yet purchased the product and thus had no legal claim whatsoever.

290.   On April 8, 2010, the day after NTG claimed to have a new client, Morales purchased the Magna Rx+ product for the purpose of pursuing a lawsuit and at NTG's direction.

291.   On April 14, 2010, in furtherance of the scheme described above, Defendants NTG and Scott Ferrell filed a Verified Class Action Complaint against Magna on behalf of plaintiff and class representative Felipe Morales.  Through that complaint, NTG and Scott Ferrell falsely represented that Felipe Morales purchased the Magna Rx+ product in reliance on Magna's advertising claims and that he was injured-in-fact as a result.  *See Morales, et al. v. Magna, Inc., et al.*, No. 3:10-cv-1601-EDL (N.D. Cal. filed Apr. 14, 2010), Dkt. 1.

292.   At some point after the complaint was filed, NTG either lost track of Felipe Morales or he refused to continue participating in the fraudulent scheme. On June 22, 2010, to avoid dismissal of the action, NTG represented to the district court that they had new clients who were adequate class representatives to replace Morales.  That representation was false because NTG's eventual substitute clients had not yet purchased the Magna product and were not legitimate plaintiffs.

293.   On July 2, 2010, in furtherance of the scheme described above, Defendants NTG and Scott Ferrell filed a Verified Class Action Complaint against Magna on behalf of plaintiff and class representative Dan Bobba.  *See Morales, et al. v. Magna, Inc., et al.*, No. 3:10-cv-1601-EDL (N.D. Cal. filed Apr. 14, 2010), Dkt. 38 (the "Bobba Complaint").

294.   The Bobba Complaint was filed by Scott Ferrell through the court's CM/ECF system and was sent by that system through the interstate wires to all attorneys noticed on the docket.  The filing of the Bobba Complaint caused the

Bobba Complaint to become publicly available through use of the interstate wires to any individual in the world in possession of a PACER account.

295.   In the Bobba Complaint, Defendants NTG and Scott Ferrell made the following intentionally false representations (*See id.* at ¶¶ 6, 15, 17, 22-23, 40):

    a.  Bobba purchased Magna-Rx+ [Magna's product at issue] in the fall of 2009 at Wal-Mart.

    b.  Prior to purchasing the product, Bobba read, reviewed, relied upon and believes the claims made on www.magnarx.com as well as affiliate marketer website advertising.

    c.  Bobba purchased the product because he hoped to achieve an increase in penis size, as asserted in Magna-Rx+ advertising.

    d.  Bobba reviewed and relied on affiliate marketing claims regarding Magna-Rx+ from before his purchase until at least March 20, 2010.

    e.  Bobba's claims were typical of the claims of the members of the Class.

296.   On July 2, 2010, the representations identified above were made to Magna through electronic service of the Bobba Complaint by Defendants NTG and Scott Ferrell.

297.   The representations contained in the Bobba Complaint were intentionally false.

298.   On July 8, 2010, six days after the Bobba Complaint was filed, Bobba posted the following on a public forum:

> So my friend called me up the other day with a great opportunity. I'm all ears as he explains how his girlfriend's brother is a class action lawsuit attorney in need of clients. I go buy this stuff called magna rx plus which is supposed to permanently increase your penis

> size.  [E]veryone knows that s**t doesn't work, but [I] go drop 40
> [dollars] on it.  [A]nyway the lawyer comes over twice and has me
> sign some documents for the suit saying [I] took it, it doesn't work.
> [A]nd that the company is false advertising. [L]ong story short it's
> supposed to pay between 2 – 10k once settled and these guys have a
> 90% winrate (sic) so I'm hopeful!

*Id.*, Dkt. 59-2; *see also id.,* Dkt. 63-6 (Declaration of Dan Bobba) (admitting to
posting the online statement).

299.   On August 3, 2010, Bobba followed that public disclosure with
another on the same website confirming that he was consuming the product solely
to maintain a lawsuit:

> [I]'m currently taking magna-rx + **for my lawsuit** (it doesn't work for
> shit) prolixus is getting sent in the mail [I]'ll post updated as to if it
> really works…

*Id.* (emphasis added).

300.   Bobba's July 8, 2010 and August 3, 2010 statements show that he did
not purchase the product in reliance on any Magna representations and that he
never believed the product would work as advertised.  He claimed to have paid
forty dollars for the product although knowing in advance that the product "doesn't
work."  The statements further show that he purchased the product solely to
maintain a lawsuit and that his claims were therefore not typical of the class.

301.   The misrepresentations in the Bobba Complaint were material because
an actionable claim for relief under the CLRA, FAL, and UCL would only exist if
those representations were true.  Furthermore, claims for fraud under the common
law could only exist where Bobba had *relied* on the advertising representations
(and he did not).  A claim under RICO would not exist where Bobba suffered no
injury.  Thus, Magna would have never needed to litigate the case beyond the
pleadings had NTG disclosed the true facts in its pleading: that Bobba was hired to

purchase the product solely to maintain a lawsuit that he viewed as a business
opportunity.

302.   The material misrepresentations made in the Bobba Complaint were
made to Magna by Defendants NTG and Scott Ferrell.

303.   After Bobba learned of NTG's "need for clients," he contacted NTG
through a social connection.  NTG, through an agent or attorney, offered Bobba
approximately $2,000 to $10,000 out of any settlement or judgment proceeds
obtained from Magna in exchange for Bobba's cooperation in contrived litigation.
NTG made that offer in exchange for Bobba's promise to purchase the product and
serve as a plaintiff-for-hire, execute false declarations, and give false testimony
against Magna.

304.   Therefore, Defendants NTG and Scott Ferrell knew the
representations made in the Bobba Complaint were false because they had
recruited Bobba for the express purpose of fabricating a claim.

305.   The material misrepresentations in the Bobba Complaint were made
by Defendant NTG and Scott Ferrell with the intent to defraud Magna and cause
Magna to pay settlement money.

306.   As a direct and proximate result of NTG's, Ferrell's, and Bobba's
intentionally false representations to the court, Magna was compelled to spend
substantial amounts of money in its defense.

307.   Bobba's legal case was sham litigation because his claim was
predicated on intentionally false allegations designed to mislead the court and the
parties, and, without those false allegations, Bobba could not have maintained his
lawsuit.  Bobba's case was predicated on bribery and intentional abuse of the legal
system.

**Witness Tampering and Obstruction of Justice – Defendants NTG,
Scott Ferrell, and Ryan Ferrell Suborn Perjury to Conceal their
Wrongdoing**

308.   In August 2010, Magna discovered Daniel Bobba's internet post admitting to fraudulently manufacturing a claim at NTG's direction.

309.   Magna moved for sanctions against NTG and Scott Ferrell on September 3, 2010 based on the fraudulent nature of Bobb'a claims.  *See id.*, Dkt. 59.

310.   On September 4, 2010, NTG and Scott Ferrell sent Ryan Ferrell and Wynn Ferrell to Daniel Bobba's home for the purpose of procuring Bobba's signature on an exculpatory declaration drafted and prepared by NTG.

311.   Daniel Bobba signed the declaration on September 5, 2010 which contained intentionally false statements of fact on points material to NTG's defense against the sanctions motion.

312.   Upon information and belief, NTG through its agents obtained Bobba's signature on the false declaration under threat and/or exertion of significant pressure.

313.   For instance, in an effort to disprove the allegation that NTG manufactured Bobba's claim by directing him to purchase the Magna product, NTG, Scott Ferrell, and Ryan Ferrell included in the declaration the statement that Daniel Bobba purchased the product in 2009 (before the Magna lawsuit began and before NTG was in need of a replacement client).  That statement was knowingly false because NTG directed Daniel Bobba to purchase the product *after* the June 22, 2010 hearing and Scott Ferrell had even reviewed Bobba's purchase receipt shortly before preparing the declaration which showed a purchase date in June 2010.

314.   NTG and Scott Ferrell then submitted the Daniel Bobba declaration to the Court to fraudulently conceal their wrongdoing in staging Bobba's claims and to obstruct the Court's truth seeking function regarding whether NTG's conduct was sanctionable.

## I. **Torres v. Nutrisystem Inc.**

315.   In late July or early August of 2012, Defendants NTG, Scott Ferrell, David Reid, Victoria Knowles, and Baslow developed a scheme to defraud Nutrisystem, Inc. ("Nutrisystem"), a Delaware Corporation, through the fabrication of a class action CIPA and UCL lawsuit.  The purpose of that scheme was to threaten Nutrisystem with a large class action lawsuit to cause Nutrisystem to pay NTG settlement proceeds.

316.   The *Torres* "wiretapping" or CIPA claim is representative and illustrative of all NTG CIPA claims, in part, because it reveals how NTG contrives and prosecutes CIPA lawsuits.  NTG's CIPA cases follow the pattern of *Torres*. NTG's CLRA/UCL/FAL claims involve a similar pattern of attorney-contrived lawsuits followed by manufactured and false "injuries" alleged by for-hire plaintiffs acquired by NTG only after it had developed legal claims.

317.   On August 6 and 7, 2012, in furtherance of the scheme to defraud Nutrisystem and at the direction of Scott Ferrell, Baslow made five telephone calls through the interstate wires to Nutrisystem's customer service line (800-435-4490). *See Torres v. Nutrisystem*, 8:12-cv-01854-CJC-JPR, Dkt. 20-4 pp. 25–26.

318.   Baslow called Nutrisystem on August 6, 2012 at 5:10 p.m. and 5:13 p.m. and on August 7, 2012 at 2:33 a.m., 2:34 a.m., and 7:25 p.m.  Each of these telephone calls crossed interstate lines.  *Id*. at 34, 52-53, 62-63, 71-74, 78.

319.   Baslow's purpose in making those calls was to determine how Nutrisystem's automated telephone routing system operated, when or if Nutrisystem provided an automated disclosure that warned callers of the recording, and how to bypass that disclosure (if possible).  *Id*. at 38-43.

320.   Through his series of trial calls, Baslow determined that the automated disclosure could be bypassed by pressing "1" for a customer service representative within six seconds after connecting and before *any* options were

given to the caller (the numerical options were otherwise given *after* the statutory

warning).

321.   Only after he determined how to bypass the automated disclosure

effectively did Baslow on August 7, 2012, make a final phone call to Nutrisystem

wherein he recorded his call for evidentiary purposes.  He only recorded that final

call wherein he intentionally bypassed the automated disclosure.

322.   In August of 2012, *after* Baslow made his five trial calls to

Nutrisystem, he came into contact with Raquel Torres through NTG's recruitment

channels.  NTG offered a bribe to Raquel Torres.  NTG promised payment (to be

paid out of any settlement or judgment proceeds acquired), if Torres would be a

plaintiff-for-hire and would support NTG contrived litigation against Nutrisystem

including her ratification, support, and execution of false declarations, pleadings,

and testimony.

323.   On August 24, 2012, NTG, through its agent Wynn Ferrell, spoke

with Raquel Torres.  Upon information and belief, he informed Torres that she had

to make a phone call to Nutrisystem in accordance with Baslow's instructions.

324.   On August 24, 2012, in furtherance of the scheme to defraud

Nutrisystem, Raquel Torres called Nutrisystem's customer service line at 800-435-

4490 using the interstate wires.  Torres made the call at the direction of NTG.

325.   On that call, per Baslow's instructions, Torres pressed "1" without

first hearing any routing options and before the automated disclosure was given.

She pressed the "1" button within six seconds after connecting with Nutrisystem.

She had never called Nutrisystem before and, so, had no basis to know that

pushing "1" within six seconds would route her call around the automated

disclosure.  She knew that only through Baslow's instructions.  *Torres v.*

*Nutrisystem*, 8:12-cv-01854-CJC-JPR, Dkt. 20-3 pp. 54–55.

326.   After she was routed to a customer service representative, Torres

gratuitously provided her social security number without being prompted and

without any reasoned basis to disclose that sensitive information.  She also disclosed other unnecessary intimate and personal information gratuitously and without receiving a request for same.  She disclosed that information in accord with NTG's instructions.  She made those disclosures so that NTG could support fabricated legal claims for an invasion of privacy.  *Id*. at 61.

327.   On September 18, 2012, in furtherance of the scheme to defraud Nutrisystem, NTG and Scott Ferrell filed a Class Action Complaint on behalf of Raquel Torres in the Superior Court of California, County of Orange, alleging violations of the CIPA and UCL.  *See Raquel Torres v. Nutrisystem Inc.*, No. 30-2012-598787-CU-FR-CXC (Sup. Ct. Cnty. Orange filed Sept. 2012); *see also Torres v. Nutrisystem*, 8:12-cv-01854-CJC-JPR, Dkt. 1.  Attorneys Scott Ferrell and Edward Susolik (of Callahan and Blaine) signed the Complaint.  *Id*.  Daniel J. Callahan, James B. Hardin, and Victoria Knowles also appeared in the caption.  *Id*.

328.   On November 20, 2012, in furtherance of the scheme to defraud Nutrisystem, NTG and Scott Ferrell filed an Amended Class Action Complaint on behalf of Raquel Torres in the U.S. District Court for the Central District of California against Nutrisystem.  *See Raquel Torres v. Nutrisystem, Inc.*, No. 8:12-cv-1854-CJC-JPR (C.D. Cal. removed October 24, 2012) (hereinafter "*Torres v. Nutrisystem*"), Dkt. 13.  Scott Ferrell and Edward Susolik signed the Torres Complaint.  *Id*.  Victoria Knowles, James B. Hardin, and Daniel J. Callahan appeared on the caption page.  *Id*.  David Reid later appeared in the case, and had knowledge of the representations made in the Torres Complaint.

329.   The filing of the Torres Complaint using the court's CM/ECF electronic filing system caused the Torres Complaint to be sent to Nutrisystem over the interstate wires on November 20, 2012.

330.   Through both the Torres State Complaint and the Torres Federal Complaint, NTG, Scott Ferrell, Victoria Knowles, David Reid, and Raquel Torres

made the following intentionally false representations (*See id.*, Dkt. 1 at ¶¶ 8-12, 19):

    a.   In August of 2012, Torres contacted Nutrisystem via its customer service telephone line (800-435-4490) for a legitimate inquiry.

    b.   Torres spoke to a customer representative and proceeded to have a sensitive, private and confidential discussion.

    c.   Torres was not aware the call was being recorded.

    d.   Torres did not give express or implied consent to the recording of the call.

    e.   Torres only learned that Nutrisystem records all incoming calls *after* completing her call.

    f.   Torres expected her call would be private and not recorded because of the sensitive nature of the conversation and Nutrisystem's assurances that it respects the privacy of its customers.

    g.   "[Torres'] subjective expectation of privacy was objectively reasonable."

    h.   Torres' claims are typical of the claims of the members of the Class.

331.   The representations identified in the preceding paragraph were intentionally false.

332.   Torres called Nutrisystem at the direction of Baslow, Wynn Ferrell, and NTG for the purpose of obtaining evidence to support the scheme to defraud Nutrisystem.

333.   Torres knew the call was being recorded and impliedly consented by making the call.

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 70 -

334.   Torres did not believe the call was private or confidential because she knew it was being recorded and intentionally disclosed private information to form the basis of a legal claim.

335.   Torres' claims could not be typical of those of the class because Torres did not believe the call was private or confidential, she gave implied consent to the recording by participating on a call that she knew would be recorded, and she made the call for the purpose of initiating litigation.

336.   These false representations were material because if the truth were known, Nutrisystem would have understood that Torres had no viable claim for relief:

> a.   A caller may not receive protection under the CIPA statute unless they hold an objectively reasonable belief that the recorded call was private or confidential (i.e., not recorded).  *See Flanagan v. Flanagan*, 27 Cal. 4th 766, 776-77 (2002); *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 117 n.7 (2006); *Shin v. Digi-Key Corp.*, No. 12-cv-5415-PA-JCG, 2012 WL 5503847, at *2 (C.D. Cal. Sept. 17, 2012); Cal. Penal Code § 632(c) (defining "confidential communication" to include "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in … any other circumstances in which the parties to the communication may reasonably expect that the communication may be overlooked or recorded"); *Sajfr v. BBG Commc'ns, Inc.*, 10-cv-2341-AJB, 2012 WL 398991, at *6 (S.D. Cal. Jan. 10, 2012) ("consumer calls

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 71 -

to a customer care center to discuss a billing issue do not
support an expectation of privacy sufficient to qualify
such calls as 'confidential communication' under section
632").

 b. The caller must also suffer an injury to a privacy right
which cannot exist where they have no reasonable belief
that the call is private.  *See* Cal. Penal Code § 632.7(a)
(requiring an injury-in-fact stemming from "a violation of
this chapter").

 c. The caller similarly cannot receive protection where they
give implied consent to the recording.  *Deteresa v.
American Broadcasting Companies, Inc.*, 121 F.3d 460
(9th Cir. 1997).  A caller cannot have a reasonable
expectation that a call will remain private when the
purpose of making the phone call is to use that recording
in litigation.  Moreover, a caller who knows the
conversation will be recorded, but participates in the call
anyway, clearly consents to the recording in the same way
that a caller would obviously consent by remaining on the
line after an express disclosure "this call is recorded."

337. Defendants NTG, Scott Ferrell, Victoria Knowles, David Reid, and
Baslow facilitated the filing of Torres' fabricated lawsuit and knew the
representations made in the Torres Complaint were false because NTG bribed
Torres to support the lawsuit and instructed her to make a call that would avoid the
automated disclosure and to gratuitously supply private information without any
request for same.

338. On January 23, 2013, to increase the pressure on Nutrisystem to settle,
NTG and Scott Ferrell filed a Motion to Certify Class using the court's CM/ECF

electronic filing system which uses the interstate wires. *Torres v. Nutrisystem*, Dkt. 17.

339.   In support of the Motion to Certify, Torres filed a declaration under penalty of perjury which was drafted by or at the direction of NTG.  That declaration reiterated the exact representations made in the Torres Complaint (and described hereinabove) which Torres, NTG, Scott Ferrell, Victoria Knowles, and David Reid knew to be false. *Id.*, Dkt. 17-11.

340.   On February 7, 2013, Andrew Baslow was deposed by Nutrisystem. David Reid defended Baslow's deposition. *Id.*, Dkt. 20-4.  In that deposition, Baslow testified falsely under oath for the purpose of maintaining the contrived allegations and claims in the Torres lawsuit. *Id.* For example, Baslow stated he only called Nutrisystem one time when he actually called five times. *Id.* at 18–19. Once caught in that lie, he explained that his other calls never went through due to service issues with his cellular phone.  That too was false:  he had actually had clear conversations with a Nutrisystem customer service representative on more than one call.

341.   David Reid knew that Baslow lied under oath during his deposition and instructed Baslow (as his superior within NTG) before the deposition to avoid disclosing information that would damage NTG's case or impugn the integrity of NTG's attorneys.

342.   David Reid is an attorney and knows that subornation of perjury is unlawful.

343.   On February 22, 2013, Torres was deposed by Nutrisystem. *Torres v. Nutrisystem Inc., et al.*, No. 8:12-cv-01854-CJC-JPR Dkt. 20-3 (March 8, 2013). Torres was represented at the deposition by James Hardin, an agent and attorney of Defendant NTG, and directly subordinate to David Reid and Scott Ferrell. *Id.*

344.   At her deposition, Torres swore under penalty of perjury that she first contacted NTG in "early September," several weeks after she made her August 21,

2012 phone call to Nutrisystem.  *Id*. at 81.  She claimed to have learned generally

of illegal wiretapping through internet research performed a week after her call to

Nutrisystem (but not specifically related to Nutrisystem).  *Id*.  She testified that she

learned of Nutrisystem's recorded calls from Defendant Ryan Ferrell a few days

after completing her research and searching for "wiretapping" law firms on the

internet.  *Id*.  She could not remember any details about the research she

performed.  *Id.*  Throughout her testimony, Torres represented herself to be a bona

fide caller who legitimately contacted Nutrisystem for commercial purposes,

believing that her call would not be recorded.

345.  The statements identified in the preceding paragraph were all

intentionally false.

346.  Defendants NTG, Scott Ferrell, Ryan Ferrell, David Reid, Victoria

Knowles, and Baslow have since argued that Torres (along with NTG's other

"wiretapping" plaintiffs) was a "tester plaintiff," defined as an individual who

"ferrets out" unlawful conduct by knowingly exposing themselves to the injury at

the direction of the NTG.  Those like Torres, per NTG, were "individuals who

initiate a transaction for the purpose of bringing a lawsuit…"  *See* Dkt. 64 at 1, 6

(Defendants' Reply Brief in Support of Mot. to Strike); *see also* Dkt. 90 at 14–15,

34, n.10 (Joint Rule 26(f) Report).

347.  Torres contacted NTG prior to making her call, not after, and she

knew her call was being recorded when she made it.  Torres made the call for the

purpose of being recorded and at the direction of NTG's attorneys and agents.

348.  NTG, through its agent James Hardin, knew that Torres lied under

oath at her deposition and attempted to conceal that fact by instructing her not to

answer damaging questions.  Hardin also sought to conceal that information by

invoking the attorney-client privilege for harmful facts and answers that ostensibly

would not qualify for such privileged protections.  NTG, Scott Ferrell, and Victoria

Knowles persuaded Torres to testify falsely and misleadingly under oath through

the promise of compensation from settlement proceeds or the threat of exposure to liability for maintaining a false complaint.

349.   On March 22, 2013, NTG, Scott Ferrell, David Reid, and Victoria Knowles filed a Reply in Support of the Motion to Certify which was supported by the Declaration of Richard Richardson.

350.   The Richardson Declaration made the following intentionally false statements:

a.   In June or July of 2012, Richardson called Nutrisystem to discuss signing up for a diet plan.

b.   Richardson was not told he would be recorded by Nutrisystem.

c.   In July of 2012, Richardson became concerned he may have been surreptitiously recorded and found NTG and Callahan & Blaine's information via the internet.

d.   In late July 2012, Richardson called NTG about filing a lawsuit against Nutrisystem but ultimately decided not to pursue the claims.

351.   Defendants Scott Ferrell and Victoria Knowles drafted the false declaration and knew that the statements in the preceding paragraph were false.

352.   Richard Richardson never called Nutrisystem and he did not contact NTG in 2012 to seek legal advice or representation in a CIPA matter.  Instead, in March of 2013, NTG and Scott Ferrell devised a scheme to discredit Nutrisystem's evidence that NTG had manufactured the lawsuit by obtaining a declaration from an individual that would claim to have contacted the firm about Nutrisystem before their pre-suit investigation.

353.   NTG and Scott Ferrell directed Andrew Baslow to find an individual willing to sponsor that false declaration for the purpose of rebutting Nutrisystem's allegations that NTG manufactured the *Torres* case.

354.   Richard Richardson was a close familial connection to Andrew Baslow.  He was first contacted by Andrew Baslow to procure his involvement in

March of 2013, months after his declaration claimed he first communicated with

NTG.  He agreed to sponsor false testimony for unknown compensation or benefit.

355.   Scott Ferrell directed Andrew Baslow to obtain Richardson's

signature on the fraudulent declaration.

356.   Once signed, Defendants NTG, Scott Ferrell, David Reid, and

Victoria Knowles submitted that knowingly false declaration to support false

statements regarding why they had investigated Nutrisystem weeks before their

plaintiff made her telephone call.

357.   The Torres Complaint and the entire matter was a sham predicated on

knowingly false statements of fact and intentional misrepresentations described in

paragraph 330(a)–(h).

358.   The false statements and misrepresentations in the Torres Complaint

deprived the litigation of legitimacy.  Nutrisystem relied on NTG's and Torres'

intentionally false pleadings throughout litigation, particularly in the preliminary

stages when dispositive motions would otherwise have terminated the litigation

were the truth known.

**J. ProMaxal Litigation**

359.   In late-2013, Defendants David Reid and Scott Ferrell developed a

scheme to defraud through the threat and filing of knowingly frivolous lawsuits

under the Lanham Act.

360.   In January of 2014, in furtherance of that scheme, Defendants David

Reid and Scott Ferrell formed a limited liability company called Strataluz LLC

with three other individuals and concealed their ownership interest in that company

through the use of blocker companies and for-hire, fictitious corporate managers.

361.   Scott Ferrell was the chief decision-maker and the primary source of

funds for the Strataluz company.

362.    In furtherance of the scheme to defraud, in late-May and early-June

of 2015, Defendants NTG, Scott Ferrell, and David Reid began sending demand

letters to various corporations nationwide that manufactured male enhancement products.

363.   Defendants NTG, Scott Ferrell, and David Reid sent the letters through the US Mail to at least the following companies:  (1) Natural Products Solutions, LLC; (2) Nutrex Research, Inc.; (3) TwinLab Corp.; (4) Pristine Bay; and (5) truDerma, LLC.

364.   Through those letters, Defendants threatened suit on behalf of Strataluz LLC based on purported competitor standing to pursue a false advertising claim under the Lanham Act.

365.   Defendants offered to settle the false claims and provide a license to use Strataluz's allegedly exclusive patented "LIFTGATE" technology in exchange for a payment of $200,000.

366.   Defendants made the following false representations in the demand letters (identified in paragraphs 362-363 *supra*) in an effort to extort hundreds of thousands of dollars from the various companies:

a.   Strataluz manufactures, markets, and sells a male enhancement product called ProMaxal which competes with the defendant's product;

b.   ProMaxal is the only male enhancement product sold in the United States based on a "proven" and "patent-protected" proprietary male-enhancement formula (called LIFTGATE technology);

c.   Strataluz has confirmed that the defendant's product does not work and that ProMaxal does; and

d.   Strataluz has suffered significant damages because Strataluz has invested a significant amount of resources in researching, formulating, developing, and obtaining the exclusive rights to the LIFTGATE technology.

---

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 77 -

367.   Those representations were knowingly false because Strataluz did not manufacture or sell the male enhancement product, ProMaxal.  At the time the representations were made, ProMaxal had not been manufactured and not a single unit sold.  Moreover, Strataluz did not even have suppliers for any of the purported ingredients and did not have a manufacturer or storage facility.  Simply put, ProMaxal was not an existing or saleable product in any fashion.

368.   Moreover, Strataluz had performed no clinical testing or testing of any kind on the ProMaxal product (which did not exist).

369.   Strataluz did not lose any profits or experience decreased sales of the ProMaxal product (which did not exist).

370.   Strataluz was not a competitor of any of the companies threatened by NTG, David Reid, and Scott Ferrell because it was not competing in the market and was simply a shell.

371.   Strataluz did not possess an exclusive license in the allegedly patented "Lift-Gate Technology."  Strataluz's had actually purchased a **non-exclusive** license for $1 from one of Scott Ferrell's other shell companies and the patent in question was entirely inapplicable to male enhancement.

372.   In furtherance of the scheme to defraud, in the summer of 2015, Defendants David Reid and Scott Ferrell directed and oversaw the creation of a website advertising the non-existent ProMaxal product so that the product would appear legitimate when corporations threatened with suit investigated the product. The website was intentionally designed to present a "shopping cart error" if a visitor attempted to purchase the product.  The error falsely claimed that the product was out-of-stock due to high demand.  In truth, no e-commerce engine was even included in the website's coding because there was no intention of selling product, only of threatening companies with frivolous lawsuits.

373.   Defendants therefore attempted to extort settlement funds under threat of frivolous suit in exchange for the provision of a worthless license.

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 78 -

374.   On June 3, 2015, in furtherance of the scheme to defraud identified in paragraphs 362-363 *supra*, Defendants NTG, Scott Ferrell, and David Reid filed a Lanham Act lawsuit on behalf of Strataluz in the U.S. District Court for the Southern District of California against TruDerma LLC.  *See Strataluz, LLC v. TruDerma, LLC*, No. 15-cv-1248-JM-RBB (S.D. Cal. June 3, 2015) (hereinafter "TruDerma").  Defendants NTG, Scott Ferrell, and David Reid served that fraudulent complaint via U.S. Mail.

375.   The complaint contained the same knowingly false representations made in the demand letters described in paragraphs 362-363 *supra*.  The complaint also falsely alleged that Strataluz had significant sales of the ProMaxal product and that Strataluz had suffered substantial damages due to the diversion of sales from Strataluz to TruDerma.

376.   The TruDerma lawsuit was a sham predicated on knowingly false statements of fact and intentional misrepresentations described in paragraph 366(a)-(d).

377.   The false statements and misrepresentations in the TruDerma complaint deprived the litigation of legitimacy.

## COUNT ONE

### Malicious Prosecution

378.   The allegations of paragraphs 1 through 377 are incorporated herein by reference.

379.   Defendants NTG, Scott J. Ferrell, Ryan M. Ferrell, Victoria C. Knowles, Baslow, Nilon, and Sandoval (collectively "NTG") are liable for malicious prosecution as described herein.

380.   The malicious action was initiated by Nilon, NTG, Scott Ferrell and Victoria Knowles on March 5, 2012 when those individuals filed the Nilon State Complaint.  *See supra* at ¶ 63.

381.   Baslow procured Nilon's participation in the malicious action through bribery.  *See supra* at ¶ 53.

382.   Ryan Ferrell maintained, supported, and advanced the malicious action as lead counsel.  *See supra* at ¶¶ 101, 122.

383.   David Reid was the managing partner overseeing the malicious action. He had full knowledge of all facts, pleadings, representations and motions.  *See supra* at ¶¶ 65, 83, 101.

384.   Sandoval ratified and maintained the malicious action by substituting into the case as a Class Representative.  *See supra* at ¶¶ 9, 112-114, 120, 131. Sandoval was also an improper plaintiff bribed to falsify allegations.

385.   The Nilon Action lacked probable cause because Nilon never purchased Sovereign Silver in reliance on any representations made by NIC.  He suffered no injury and his bogus claim was not typical of the class claims.  Nilon purchased the Sovereign Silver product at the direction of NTG's investigator Baslow, who operated with full authority from attorneys Scott Ferrell, Ryan Ferrell, Victoria Knowles, and/or David Reid.

386.   Sandoval's claims in the Nilon action also lacked probable cause because he was not a member of the class he purported to represent, he had not purchased the product in reliance on NIC's representations, and his claims were not typical of the class.  If Sandoval purchased the NIC product he did so for the sole purpose of bringing a lawsuit and at the direction of Baslow, or another authorized agent of NTG.

387.   In the Underlying Action, neither Nilon nor Sandoval produced any documentary evidence showing, suggesting, or proving that they ever purchased the NIC product.

388.   The Nilon Action was initiated and maintained with malice because NTG, Scott Ferrell, Ryan Ferrell, Victoria Knowles, David Reid, Nilon, and Sandoval knew the action lacked probable cause when it was initiated, maintained,

and supported.  The plaintiffs Nilon and Sandoval were sham plaintiffs-for-hire. The suit was brought for an improper purpose, to cause NIC to pay NTG settlement proceeds predicated on a sham lawsuit.

389.   Nilon's failure to appear for four duly noticed depositions and subsequent withdrawal from the case after being ordered to sit for deposition constitutes a termination favorable to NIC.

390.   Sandoval's voluntary dismissal with prejudice from the action as a result of his lack of credibility, inability to serve as class representative, and inability to sponsor any proof of product purchase or injury constitutes a termination favorable to NIC.

391.   The decertification of the class claims and dismissal of class claims without prejudice constitutes a favorable termination for NIC.  *See also* Order re Motions, Dkt. 88 at 25 ("The substitution of Nilon, the vacating of class certification, and the dismissal with prejudice are terminations in favor of NIC and, collectively, indicate that the 'entire action' was terminated in favor of NIC").

392.   NIC suffered substantial harm as a direct result of the Nilon Action. NIC incurred approximately $250,000 in legal fees and costs, plus damage to goodwill and reputation (actual and presumed) provable at trial.

393.   NIC seeks compensatory damages, including its attorney fees and costs incurred in defending the underlying action.  NIC seeks exemplary or punitive damages to the extent allowable under the law, in an amount to deter future similar conduct, to be determined by the jury.

394.   WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants NTG, Scott Ferrell, Ryan Ferrell, Victoria Knowles, David Reid, Baslow, Nilon and Sandoval as follows:  actual damages, punitive damages, and attorneys' fees.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT TWO

### Violation of RICO Section 1962(c)

### (18 U.S.C. §§ 1962(c), 1964(c))

395.   The allegations of paragraphs 1 through 394 are incorporated herein by reference.

### Pattern of Racketeering Activity:

396.   All Defendants have engaged in, and continue to engage in, a pattern of racketeering activity comprised of the predicate acts of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), extortion (18 U.S.C. § 1951), obstruction of justice (18 U.S.C. § 1503, 1512(c)), bribery of witnesses (18 U.S.C. § 201), and witness tampering (18 U.S.C. § 1512(b)).

### Bribery of a Witness (18 U.S.C. § 201)

397.   Bribery of a witness occurs when one "directly or indirectly, corruptly gives, offers, or promises anything of value to any person … with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing or other proceeding, before any court … or with intent to influence such person to absent himself therefore."  18 U.S.C. § 201(b)(3).  Attempting a bribe is also prohibited, as is accepting the bribe.  *See* 18 U.S.C. § 201(b)(3)-(4).  The bribe need not have been successful, and the influence of the bribe need not have come to fruition.  *See United States v. Dixon*, 658 F.2d 181, 191 (3d Cir.1981); *United States v. Muhammad*, 120 F.3d 688, 693 (7th Cir.1997); *United States v. Gallo*, 863 F.2d 185, 189 (2d Cir.1988); *United States v. Aguon*, 851 F.2d 1158, 1185 (9th Cir.1988) overruled on other grounds by *Evans v. United States*, 504 U.S. 255, 259 (1992).  In other words, the individual accepting the bribe need not have testified or provided the benefit of the quid pro quo arrangement before liability attaches.

398.   The NTG defendants bribed the other defendants by promising them payment in exchange for being plaintiffs-for-hire, supporting sham litigation,

DECLARATION OF JOSHUA FURMAN                    EXHIBIT 1

executing false affidavits, and giving false testimony.  When a lawyer hires an individual on the condition that such person testify to a specific set of false facts (or to support such false facts through written testimony and pleadings) in exchange for monetary compensation (either in the future or immediately), that lawyer has bribed the witness under 18 U.S.C. § 201.

399.   When an individual (i.e., the non-NTG defendants) accepted the NTG offer of payment in exchange for their promise to support sham litigation, execute false affidavits, and give false testimony, those persons accepted bribes for purposes of Section 201.

400.   When agreeing to serve as lead plaintiffs in class action lawsuits, the non-NTG defendants clearly agreed to provide testimony in support of the false legal claims contained in NTG complaints, in part, because service as a lead plaintiff necessary requires a person to testify at deposition and at trial.  Without that testimony, a case could never proceed.  Most of the NTG plaintiffs-for-hire sponsored their complaints by submitting verifications explaining that they had "personal knowledge of the facts [t]herein and, if called as [] witness[es], [they] could and would testify competently thereto."  *See, e.g., Nilon v. NIC*, No. 12-930, Dkt. 1-1 at 15 (S.D. Cal. 2012).  Among others, Defendants Nilon, Pfleg, Dronkers, Sandoval, and Baslow all signed such declarations.

### Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343, 1349)

401.   The wire fraud statute prohibits the use of the interstate wires for the purpose of executing a scheme or artifice to defraud.  *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001).

402.   The mail fraud statute prohibits the use of the mails for the purpose of executing a scheme or artifice to defraud.  *Id.*

403.   A "scheme or artifice to defraud" is a plan to deprive a person of something of value by trick, deceit, chicanery or overreaching.

404.   "[A]ny mailing that is incident to an essential part of the scheme satisfies the mailing element, even if the mailing itself contain[s] no false information." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008). The same rule applies to any use of the interstate wires.  The scheme need not be successful in order for liability to attach under the statute.

405.   Each mailing or use of the wires in furtherance of the scheme to defraud constitutes a separate violation and predicate act.  *Garlick*, 240 F.3d at 792.

406.   Fraudulent intent is established by proof of intentional fraud or by demonstrating a "reckless indifference to the truth."  *Irwin v. U.S.*, 338 F.2d 770, 774 (9th Cir. 1964).  Intentional fraud is established by a conscious knowing intent to defraud and that the defendant contemplated or intended some harm to the property rights of the victim.

407.   No showing of reliance is required to establish that a person has violated 18 U.S.C. § 1962(c) through mail or wire fraud.  *Phoenix Bond*, 553 U.S. at 649.

408.   By participating in fraudulent lawsuits based on false legal allegations, all defendants have participated in, or conspired in furtherance of, schemes to defraud the target corporations out of money either through settlements or from tainted judgments.  *See supra* at ¶¶ 58-82, 122–133, 194–223, 224–243, 244–270, 271–286.

**Extortion (18 U.S.C. § 1951)**

409.   Extortion occurs through the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.  The predicate act of extortion includes attempts at extortion and conspiracy to extort, even if unsuccessful.  *See* 18 U.S.C. § 1951(a).

410.   Extortion may occur through fear of only economic loss.  *See, e.g., United States v. Margiotta*, 688 F.2d 108, 134 (2d Cir. 1982), *cert. denied*, 461 U.S. 913 (1983).  The NTG and non-NTG defendants identified herein this complaint threatened to divest money from corporations through unlawful and wrongful means.  Their threats to divest money through fabricated legal proceedings were "wrongful" under Section 1951 because, when threatening suit, they were not legally entitled to the property sought and could not have had a good-faith belief in that entitlement (which was based on fabricated legal allegations).  *See supra* at ¶¶ 28, 40-45, 58, 198, 229-230, 359-360.

411.   When bringing lawsuits based on intentionally false and fabricated allegations as alleged, *supra* ¶¶ 66-67, 172-174, 206-209, 214, 229-230, 250-253, 275-280, 293-296, 328-331, the NTG and non-NTG defendants' purpose was to pressure corporate defendants by increasing both the perceived magnitude of their potential exposure and the perceived likelihood that the exposure would eventually culminate in substantial legal fees in defense and ultimate class liability.  As described in the factual paragraphs above at paragraphs 20 to 358, the NTG and non-NTG defendants advanced their claims through manifestly wrongful means, to wit, through sham litigation, misrepresentations, omission of material information about the plaintiffs in those cases, and intentionally false allegations.  Such tactics did, in fact, increase the perceived threat of harm to all named defendants in those various actions, either by increasing the perceived dollar exposure, by increasing the perceived probability of an unfavorable judgment, or by increasing the perceived probability of protracted (and costly) litigation with massive defense fees.  The wrongful use of plaintiffs-for-hire and assertion of fabricated legal allegations caused defendants to pay settlement proceeds, which payments were exacted based on wholly illegitimate grounds.

412.   NTG and the non-NTG defendants made representations they knew to be materially false in order to exact settlement proceeds from the defendants.

a.  As described herein, *supra*, they falsely represented that their plaintiffs-for-hire were legitimate consumers and callers that had legitimate legal claims when, in fact, those plaintiffs were promised payment in exchange for serving as plaintiffs in sham litigation and for making false representations.

b.  As described herein, *supra*, NTG falsely represented that their plaintiffs-for-hire had actually purchased products from defendants when, in fact, those purchases never occurred.

c.  As described herein, *supra*, NTG falsely represented that their plaintiffs-for-hire made phone calls to companies expecting to have private conversations when, in fact, those plaintiffs called solely for the purpose of contriving legal claims for NTG and, thus, fully expected that their phone conversations would be public.

d.  As described herein, *supra*, NTG falsely represented that their plaintiffs-for-hire were members of large consumer class claims that, when aggregated, would form the basis for substantial monetary relief against the target corporations when, in fact, no viable class claim could be brought under the true facts that NTG kept from those corporate targets (and the courts).

413.  NTG and the non-NTG defendants repeatedly used threats of potential liability that they knew were false.  *See supra* at ¶¶ 4, 28, 58, 198, 229-230.

414.  NTG and the non-NTG defendants pressured corporations by causing third parties to Act on their misrepresentations.  *See supra* at ¶¶ 81, 86, 120-121, 131, 157, 161, 221.

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 86 -

415.   As described herein, the NTG and non-NTG defendants are therefore liable for extortion as follows in each case brought under wrongful threat of fear. *See infra* at ¶¶ 427-435.

**Obstruction of Justice (18 U.S.C. §§ 1503, 1512(c))**

416.   Obstruction of justice occurs when one "corruptly or by threats of force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede the due administration of justice." *See* 18 U.S.C. § 1503; *see also* 18 U.S.C. § 1512(c) (relating to obstruction by one who corruptly alters or conceals evidence in any official proceeding or "otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so").

417.   The named defendants filed and supported contrived legal claims in the courts with the wrongful intent or improper purpose of abusing judicial process and the courts in an effort to instill fear of liability in defendants to extort settlement proceeds.  Whether or not the Defendants were successful in influencing those proceedings is irrelevant under the statute—only the attempt to influence is sufficient for liability.  The defendants' conduct has had the actual, natural and probable effect of interfering with the due administration of justice.  *See U.S. v. Aguilar*, 515 U.S. 593, 600 (1995).

418.   Obstruction is a predicate act under RICO in cases where, as here, the defendants' efforts were "designed to prevent detection and prosecution of the organization's illegal activities [and] were part of a consistent pattern that was likely to continue for the indefinite future, absent outside intervention."  *See U.S. v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991); *see also Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1527 (9th Cir. 1995) (describing continuity elements of RICO).

**Witness Tampering (18 U.S.C. § 1512(b))**

419. Witness tampering under Section 1512(b) includes the "corrupt persuasion" of a witness. *See U.S. v. Khatami*, 280 F.3d 907, 911 (9th Cir. 2002) (holding that witness tampering occurred where conviction arose solely out of non-coercive conduct directed toward witness based on theory that defendant had corruptly persuaded those witnesses to mislead investigators with false information). Attempts to persuade a witness to "give false testimony and bribing a witness to withhold information are both forms of non-coercive conduct that fall within the reach of the statute…" *Id.* at 913-14 (holding that "non-coercive attempts to persuade witnesses to lie … violated 18 U.S.C. § 12(b)").

420. An individual acts "corruptly" for purposes of Section 1503 where they act "for an improper purpose (such as self-interest) and with consciousness of wrongdoing." *See U.S. v. Doss*, 630 F.3d 1181, 1189 (9th Cir. 2011).

421. Witness tampering includes when one "knowingly uses intimidation, threats, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding." *See* 18 U.S.C. § 1512(b).

422. One corruptly persuades under the statute when they have a "consciousness of wrongdoing." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 704-06 (2005); *see also U.S. v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013).

423. Witness tampering also involves an attempt to "hinder, delay, or prevent the communication to a … judge of the United States information relating to the commission or possible commission of a Federal offense." *See* 18 U.S.C. § 1512(b)(3).

424. Through causing, aiding, and abetting witnesses in the delivery of false testimony, in the withholding of material information from defendants and the courts, and in the maintenance of sham litigation, the NTG Defendants have engaged in witness tampering.

**Specific Predicate Acts For Each Defendant**

425.   NIC hereby incorporates by reference the foregoing paragraphs numbered 1 through 424.  The specific facts and particulars related to the NTG fabricated legal actions support the following predicate acts which NIC will prove at trial:

426.   At all times relevant to this Second Amended Complaint, Defendants Andrew Baslow, Scott Ferrell, Ryan Ferrell, David Reid and Victoria Knowles acted as authorized agents, employees, attorneys or principals of Defendant Newport Trial Group, PC.  Their conduct was performed for the benefit of Newport Trial Group and caused Newport Trial Group to profit by unlawful means.  Any predicate act identified herein which was performed by, or at the direction of, an agent, employee, attorney or principal of the Newport Trial Group was also performed by or at the direction of the Newport Trial Group.  *See Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149, 1155 (9th Cir. 1992) ("an employer that is benefited by its employee or agent's violations of section 1962(c) may be held liable under the doctrines of respondeat superior and agency when the employer is distinct from the enterprise.").

427.   The following defendants are liable for the below predicate acts committed by and through their pursuit of claims against NIC in the matter of: *Nilon v. Natural-Immunogenics Corp.*, No. 3:12-cv-930-LAB (S.D. Cal. 2012):

a.   David Reid, Scott Ferrell, Victoria Knowles, Ryan Ferrell, Baslow, Nilon, and Sandoval are liable for designing, pursuing, supporting, and conspiring to further a singular scheme to defraud NIC through the threat of, and filing of, fabricated legal allegations predicated on intentionally false statements and bribery.  *See supra* at ¶¶ 55-85.

b.   Mail Fraud (or obstruction of justice) through the demand letter served on NIC (NTG and Scott Ferrell), s*ee supra* at ¶¶ 58-61;

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 89 -

c. Bribery of witnesses (Baslow, Scott Ferrell, NTG) and acceptance of bribes (Nilon and Sandoval), see supra at ¶ 62;

d. Mail Fraud (or obstruction of justice) through the State Court Complaint (NTG, Nilon, Scott Ferrell, Victoria Knowles), see supra at ¶¶ 63-73;

e. Wire Fraud (or obstruction of justice) through the Motion to Certify Class (NTG, Scott Ferrell, Victoria Knowles, Ryan Ferrell, David Reid, Nilon), see supra at ¶¶ 75-82;

f. Wire Fraud (or obstruction of justice) through the First Amended Complaint (NTG, Scott Ferrell, Ryan Ferrell, Victoria Knowles, David Reid and Andrew Nilon), see supra at ¶¶ 83-87;

g. Obstruction of Justice and Witness Tampering through missed depositions:

   i. Nilon's first missed deposition [Ryan Ferrell (witness tampering or obstruction) and Nilon (obstruction)], see supra at ¶¶ 95-97, 99-100;

   ii. Nilon's second missed deposition [Ryan Ferrell (witness tampering or obstruction) and Nilon (obstruction)], see supra at ¶¶ 91-93, 99-100;

   iii. Nilon's third missed deposition [Ryan Ferrell (witness tampering or obstruction) and Nilon (obstruction)], see supra at ¶¶ 94-95, 99-100;

   iv. Nilon's fourth missed deposition [Ryan Ferrell (witness tampering or obstruction) and Nilon (obstruction)], see supra at ¶¶ 96-100;

h. Wire Fraud (or obstruction of justice) related to NTG's Motion to Substitute Sandoval as the Plaintiff in place of Nilon (NTG, Scott

Ferrell, Ryan Ferrell, Victoria Knowles, and David Reid), *see supra* at ¶¶ 101-107;

i. Obstruction of Justice and Witness Tampering through Nilon's false declaration explaining his inability to continue as a plaintiff [Baslow and Ryan Ferrell (witness tampering or obstruction); Nilon (obstruction)], *see supra* at ¶¶ 102, 108-109;

j. Bribery related to Sandoval's false and contrived legal claims [Sandoval (acceptance of bribe) *see supra* at ¶ 113; Ryan Ferrell and Baslow (offer of bribe) *see supra* at ¶ 112]

k. Obstruction of Justice and Witness Tampering related to Giovanni Sandoval's false declaration supporting the motion to substitute [Sandoval (obstruction); Ryan Ferrell (obstruction or witness tampering)], *see supra* at ¶¶ 114-115;

l. Wire Fraud (or obstruction of justice) related to the Second Amended Complaint containing intentionally false allegations [NTG, Scott Ferrell, Ryan Ferrell, Victoria Knowles, David Reid, and Sandoval], *see supra* at ¶¶ 122-133;

m. Obstruction of Justice through the submission of Ryan Ferrell's intentionally false declaration in support of the motion to withdraw and the false statements made to the Court and NIC in the motion to withdraw [NTG, Scott Ferrell, Ryan Ferrell], *see supra* at ¶¶ 134-144;

n. Obstruction of Justice and Witness Tampering related to Giovanni's deposition wherein the witness testified falsely [Sandoval (obstruction); Ryan Ferrell (witness tampering or obstruction)], *see supra* at ¶¶ 145-152;

1

o. Obstruction of Justice relating to Ryan Ferrell's concealment of

2

evidence related to Sandoval's residence [Ryan Ferrell], *see supra*

3

at ¶¶ 153-159.

4

428.   The following defendants are liable for the below predicate acts

5

committed by and through their pursuit of claims against Chromadex in the matter

6

of:  *Nilon v. Chromadex, Inc.*, No. 56-2013-00436790-CU-MT-VTA (Sup. Ct.

7

Ventura Cnty. 2013):

8

a. Bribery of a witness (NTG, and as yet unknown members of same)

9

and acceptance of a bribe in exchange for fabricated legal

10

allegations (Nilon), *see supra* at ¶¶ 167-169;

11

b. Extortion of Chromadex based on wrongful threats (Nilon, NTG,

12

Scott Ferrell, and as yet unknown members of NTG), *see supra* at

13

¶¶ 167-193;

14

c. Wire Fraud related to the Chromadex complaint containing

15

intentionally false allegations (NTG, Scott Ferrell, Ryan Ferrell,

16

Victoria Knowles, and Nilon), *see supra* at ¶¶ 171-182;

17

429.   The following defendants are liable for the below predicate acts

18

committed by and through their pursuit of claims against Nature's Way Product,

19

Inc.:  *Pfleg v. Natura's Way Products, Inc.*, No. 37-2012-51979-CU-MT (Sup. Ct.

20

San Diego Cnty. Mar. 16, 2012):

21

a. Bribery of a witness (Baslow, NTG, Scott Ferrell, and David Reid)

22

and acceptance of same (Pfleg), *see supra* at ¶¶ 194-195;

23

b. Mail Fraud (or obstruction of justice) related to the false demand

24

letter sent in March 2012 (Scott Ferrell, NTG, David Reid, Ryan

25

Ferrell, and Pfleg), *see supra* at ¶¶ 196-205;

26

c. Wire Fraud (or obstruction of justice) related to the Pfleg

27

Complaint containing intentionally false allegations and filed

28

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 92 -

through the interstate wires (Scott Ferrell, David Reid, Ryan Ferrell, and Pfleg), *see supra* at ¶¶ 206-216;

d. Extortion based on wrongful threats (Pfleg, NTG, Scott Ferrell, David Reid, and Ryan Ferrell), *see supra* at ¶¶ 194-223;

e. Mail Fraud (or obstruction of justice) related to the false demand letter sent in June 2012 (NTG and Scott Ferrell), *see supra* at ¶¶ 219-220.

430. The following defendants are liable for the below predicate acts committed by and through their pursuit of claims against the Himalaya Drug Company:  *Schoonover v. Himalaya Drug Company*, No. 12-cv-1782-JLS (S.D. Cal. 2012):

a. Bribery of a witness (Baslow, NTG, and Scott Ferrell) and acceptance of same (Schoonover), *see supra* at ¶¶ 271-272;

b. Wire fraud (or obstruction of justice) related to the Schoonover Complaint containing intentionally false allegations and filed through the interstate wires (NTG, Scott Ferrell, Victoria Knowles, and Schoonover), *see supra* at ¶¶ 273-283;

c. Extortion based on wrongful threats (Schoonover, NTG, Victoria Knowles, and Scott Ferrell), *see supra* at ¶¶ 271-286.

431. The following defendants are liable for the below predicate acts committed by and through their pursuit of claims against Kiss My Face:  *Dronkers v. Kiss My Face, LLC*, No. 12-cv-1151-JAH (S.D. Cal. May 10, 2012):

a. Bribery of a witness (Baslow, NTG, Scott Ferrell, and David Reid) and acceptance of same (Dronkers), *see supra* at ¶¶ 224-225;

b. Wire Fraud (or obstruction of justice) related to the Dronkers Complaint containing materially and intentionally false allegations and filed through the interstate wires (NTG, Scott Ferrell, Victoria Knowles, David Reid and Dronkers), *see supra* at ¶¶ 226-240;

      c.  Extortion based on wrongful threats (Dronkers, NTG, Scott Ferrell, Victoria Knowles, and David Reid), *see supra* at ¶¶ 224-243.

432.  The following defendants are liable for the below predicate acts committed by and through their pursuit of claims against Carter-Reed: *Demulder v. Carter-Reed*, No. 3:12-cv-2232-BTM-MDD (S.D. Cal. 2013):

      a.  Bribery of a witness (Baslow, NTG, and Scott Ferrell) and acceptance of same (Demulder), *see supra* at ¶¶ 244-245;

      b.  Wire Fraud related to Demulder's use of the wires to call Carter-Reed in furtherance of the scheme to defraud (Demulder, Baslow, and NTG), *see supra* at ¶¶ 246-253;

      c.  Wire Fraud (obstruction of justice) related to the Demulder Complaint containing materially and intentionally false allegations and filed through the interstate wires (Demulder), *see supra* at ¶¶ 255-267;

      d.  Mail Fraud (or obstruction of justice) related to the Demulder Complaint containing materially and intentionally false allegation and was sent through the US mail (Demulder), *see supra* at ¶¶ 255-267;

      e.  Extortion based on wrongful threats (Demulder), *see supra* at ¶¶ 244-270.

433.  The following defendants are liable for the below predicate acts committed by and through their pursuit of claims against Nutrisystem: *Torres v. Nutrisystem, Inc.*, No. 8:12-cv-1854-CJC-JPR (C.D. Cal. 2012):

      a.  Bribery of a witness (Baslow, NTG, Scott Ferrell and David Reid), *see supra* at ¶ 322;

      b.  Wire Fraud related to Andrew Baslow's first call to Nutrisystem in furtherance of the scheme to defraud (Baslow, Scott Ferrell and NTG), *see supra* at ¶¶ 315-321;

c. Wire Fraud related to Baslow's second call to Nutrisystem in furtherance of the scheme to defraud (Baslow, Scott Ferrell, and NTG), *see supra* at ¶¶ 315-321;

d. Wire Fraud related to Andrew Baslow's third call to Nutrisystem in furtherance of the scheme to defraud (Baslow, Scott Ferrell, and NTG), *see supra* at ¶¶ 315-321;

e. Wire Fraud related to Andrew Baslow's fourth call to Nutrisystem in furtherance of the scheme to defraud (Baslow, Scott Ferrell, and NTG), *see supra* at ¶¶ 315-321;

f. Wire Fraud related to Andrew Baslow's fifth call to Nutrisystem in furtherance of the scheme to defraud (Baslow, Scott Ferrell, and NTG), *see supra* at ¶¶ 315-321;

g. Wire Fraud related to Raquel Torres' call to Nutrisystem in furtherance of the scheme to defraud (Baslow, NTG, Scott Ferrell, and David Reid), *see supra* at ¶¶ 322-325;

h. Wire Fraud (or obstruction of justice) related to the Amended Torres Complaint containing materially and intentionally false allegations and filed using the interstate wires (NTG, Scott Ferrell, Victoria Knowles, and David Reid), *see supra* at ¶¶ 327-337;

i. Wire Fraud (or obstruction of justice) related to the Motion to Certify which was filed using the interstate wires in furtherance of the scheme to defraud and contained materially false statements (NTG, Scott Ferrell, Victoria Knowles, and David Reid), *see supra* at ¶ 338;

j. Wire Fraud, witness tampering or obstruction of justice related to the Torres Declaration in support of the Motion to Certify which was filed using the interstate wires in furtherance of the scheme to defraud and contained materially false testimony prepared by, or at

the direction of Scott Ferrell (Scott Ferrell, NTG, Victoria Knowles, and David Reid), *see supra* at ¶ 339;

k. Obstruction of justice related to Baslow's false deposition testimony (Baslow), *see supra* at ¶¶ 340-342;

l. Obstruction of justice or witness tampering related to David Reid's participation and influence over Baslow's tainted deposition (David Reid and NTG), *see supra* at ¶¶ 340-342;

m. Obstruction of Justice or witness tampering related to Raquel Torres' false deposition testimony defended by NTG through James Hardin (NTG), *see supra* at ¶¶ 343-348;

n. Extortion based on wrongful threats (NTG, Scott Ferrell, Victoria Knowles, and David Reid), *see supra* at ¶¶ 315-358.

o. Obstruction of Justice related to the subornation of perjury and submission of a knowingly false declaration signed by Richard Richardson (NTG, Scott Ferrell, Andrew Baslow, Victoria Knowles, David Reid), *see supra* at ¶¶ 353-256.

434.   The following defendants are liable for the below predicate acts committed by and through their pursuit of claims against Magna Inc.: *Morales v. Magna, Inc., et al.*, No. 3:10-cv-1601-EDL (N.D. Cal. Apr. 14, 2010):

a. Bribery of a witness (Scott Ferrell and NTG), *see supra* at ¶ 303;

b. Wire fraud (or obstruction of justice) related to the Bobba Complaint containing materially and intentionally false allegations and filed in furtherance of the scheme to defraud through the interstate wires (NTG and Scott Ferrell), *see supra* at ¶¶ 287-302;

c. Extortion based on wrongful threats (Scott Ferrell and NTG), *see supra* at ¶¶ 287-307; and,

d. Witness Tampering related to the acquisition of the knowingly
false declaration of Daniel Bobba under threat or coercive pressure
(NTG, Scott Ferrell, Ryan Ferrell), *see supra* at ¶¶ 308-314;

e. Obstruction of Justice related to the subornation of perjury and
submission of a knowingly false declaration signed by Daniel
Bobba (NTG, Scott Ferrell, Ryan Ferrell), *see supra* at ¶¶ 310-312.

435.   The following defendants are liable for the below predicate acts
committed by and through their threats of suit and filing of suit related to the
fictitious ProMaxal product:

a. Extortion related to each instance of threatened sham litigation
against corporations that manufactured male enhancement products
(NTG, Scott Ferrell, David Reid), *see supra* at ¶¶ 359-361;

b. Mail Fraud related to each instance of the use of demand letters
sent via U.S. Mail to threaten sham litigation against corporations
that manufactured male enhancement products (NTG, Scott
Ferrell, David Reid), *see supra* at ¶¶ 362-364;

c. Wire Fraud related to the use of the interstate wires to create a
sham product website for the ProMaxal product in furtherance of
the scheme to defraud related to frivolous Lanham Act claims
(NTG, Scott Ferrell, David Reid), *see supra* at ¶¶ 359-377; and,

d. Obstruction of Justice (or Mail Fraud) through the filing of the
TruDerma lawsuit on behalf of Strataluz LLC based on knowingly
frivolous Lanham Act claims (NTG, Scott Ferrell, David Reid), *see
supra* at ¶¶ 374-377.

**The RICO Enterprise and Pattern of Racketeering Activity**

436.   The Defendants in this action have engaged and/or continue to engage
in a pattern of racketeering activity comprised of the predicate acts of mail fraud

(18 U.S.C. §§ 1341, 1349), wire fraud (18 U.S.C. §§ 1343, 1349), extortion (18 U.S.C. § 1951), obstruction of justice (18 U.S.C. § 1503, 1512(c)), bribery of a witness (18 U.S.C. § 201), and witness tampering (18 U.S.C. § 1512(b)).  Those predicate acts are detailed herein.

437.   Each Defendant in this action has engaged in two or more predicate acts as detailed herein.

438.   The Defendants in this action comprise an associated-in-fact enterprise which maintains a "hub-and-spoke" structure.  NTG, through its attorneys, employees and agents, including Ryan Ferrell, Scott Ferrell, Victoria Knowles, David Reid and Baslow, operates at the center of the enterprise.  The sham plaintiffs, including Nilon, Sandoval, Pfleg, Demulder, Schoonover, Dronkers, Torres, Bobba, and likely many others obtained through bribery (i.e., NTG's unlawful recruitment of plaintiffs), operate as the spokes.  The hub identifies potential victim corporations and acquires a sham plaintiff through bribery, the sham plaintiff then engages in whatever conduct and provides whatever testimony is necessary to maintain the pressure of facially valid litigation, ultimately attempting to secure ill-gotten settlement or judgment monies. Those plaintiffs did, in fact, take affirmative actions—based on NTG's instructions—to pose as legitimate plaintiffs.  Some made staged phone calls, others made strawman purchases of product hoping to secure money through the planned legal action.

439.   The plaintiffs-for-hire are indispensable to the enterprise because the CLRA, FAL, UCL, and CIPA suits, which comprise the majority of the enterprise's conduct, require a plaintiff and class representative.  The sham lawsuits cannot be filed or pursued without a bribed plaintiff willing to support those actions as the "plaintiff" partnered with NTG.

440.   Each Defendant agreed to conduct, and did conduct or participate in, the enterprise's affairs through a pattern of racketeering activity.  That activity was

1   intended to obtain ill-gotten proceeds through settlement or judgment from NIC

2   and other similarly situated corporate victims.  That activity was intended to injure

3   Plaintiff NIC in its property and financial interests.

4        441.   The predicate acts described herein are related because they were

5   committed using the same or similar methods and conduct, targeted the same or

6   similar victims, involved the same or similar participants, and were performed for

7   the same or similar purposes.  *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240

8   (1989).

9        442.   The predicate acts described herein are continuous, occurring from

10  2009 until at least April of 2015.  *See supra* at ¶¶ 55-159, 287-314.  That time

11  period represents close-ended continuity under *Nw. Bell* and its progeny.  *H.J. Inc.*

12  *v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989).  However, Defendants NTG, Scott

13  Ferrell, Ryan Ferrell, Victoria Knowles, and David Reid continue to threaten and

14  file the same or similar sham lawsuits, and, thus, the enterprise reveals an extant

15  continuing threat that unlawful conduct will continue, representing open-ended

16  continuity under *Nw. Bell* and its progeny.  *Id*.

17       443.   The associated-in-fact enterprise identified herein historically reuses

18  the same individuals as sham plaintiffs—often having them serve in multiple

19  lawsuits—or uses family members of previous sham plaintiffs.[1]  Those sham

20

21       [1] *See*, *e.g.*, *Martin Conde v. Obesity Research Institute, LLC*, No. 12-cv-
22  0413-RSWL (C.D. Cal., Jan. 19, 2012); *Martin Conde v. Bio-Engineered*
    *Supplements & Nutrition, Inc.*, No. 8:14-cv-00945, Dkt. No. 1 (C.D. Cal removed
23  on June 19, 2014); *Jimmy Conde v. Therabiogen*, No. BC478051 (Sup. Ct. Los
    Angeles Cnty., Jan. 30, 2012); *Jose Conde v. Sensa Products, LLC*, No. 14-cv-
24  0051-JLS (S.D. Cal. 2014); *Isabella Janovick v. American Breast Cancer*
    *Foundation, Inc.*, No. 3:13-cv-02697-DMS (S.D. Cal., Jan. 2, 2014); *Kyle Janovick*
25  *v. Maximum Human Performance*, No. 12-cv-2129-LAB (S.D. Cal. 2013); *Nicole*
26  *Forlenza (Carl Winzen), et al. v. Dynakor Pharmacal, LLC, et al.*, No. 2:09-cv-
    03730-AG-SS (C.D. Cal. filed on May 26, 2009); *Carl Winzen v. Experian*
27  *Information Solutions, Inc., et al.*, No. 8:10-cv-1783-JVS-RZ (C.D. Cal. removed
28  on Nov. 19, 2010).

plaintiffs also perform predicate acts by influencing or persuading other
individuals (e.g., family and friends) to join the unlawful enterprise.  The
enterprise therefore reveals an extant, continuing threat that the conduct of
Defendants Nilon, Schoonover, Pfleg, Demulder, Dronkers, Sandoval, may
continue or recur.  *Id*.

### The Enterprise Affected Interstate Commerce:

444.   The Defendants are engaged in an enterprise and related activities that
are in or affect interstate commerce.  Defendants' fraudulent lawsuits affect
corporate victims that are principally located within, and do business, in all fifty
states.  The Defendants' fraudulent lawsuits affect individual victims, to wit,
owners of those corporations, who are principally located within, and do business,
in all fifty states, and the employees of those corporations.  All Defendants are
employed or associated with the unlawful enterprise described in this Complaint.

445.   The associated-in-fact enterprise described herein pursued fraudulent
legal claims against companies throughout the United States.  NIC, a victim of the
racketeering activity described herein and the Plaintiff in this action, is a company
located in Florida.  Carter-Reed, sued by Demulder and the NTG Defendants, is
located in Utah.  Many of the other victims of the racketeering activity described
herein are located in states other than California.

446.   By procuring settlement monies (or causing the expense of unjustified
legal fees) from victim companies nationwide, the associated-in-fact enterprise
described herein affected interstate commerce.

### Injury to Business or Property:

447.   Plaintiff NIC was injured in its business and property because it
endured approximately three years of protracted and costly litigation stemming
entirely from the enterprise's false statements of material facts.  That litigation

would never have proceeded (it could not have proceeded) absent the enterprise's
falsification of information critical to the legal elements involved.

448.   NIC relied to its detriment on the representations made by the NTG
Defendants, Nilon, and Sandoval.

449.   Plaintiff NIC reasonably relied on NTG—licensed attorneys—to obey
and properly assert statutes, court orders, court rules, rules of evidence, written
agreements, representations to the court by officers of the court, ethical rules, and
representations made under oath to the court by NTG's attorneys, agents, and
clients.  *See Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353,
359 (9th Cir. 2005).

450.   The predicate acts performed by members of the enterprise, including,
*e.g.*, NTG Defendants, Nilon, and Sandoval, were the direct and proximate cause
of NIC's loss of hundreds of thousands of dollars in unjustified legal fees, expert
fees, travel expenses.  On information and belief, NIC suffered injury in the form
of injuries stemming from the redirection of corporate funds into costly litigation
(e.g., opportunity costs).

451.   WHEREFORE, Plaintiff requests that this Court enter judgment
against the ALL Defendants as follows: actual damages, treble damages,
exemplary or punitive damages, and attorney fees.

## COUNT THREE

### Conspiracy to Violate RICO Section 1962(d)

### (18 U.S.C. §§ 1962(d), 1964(c))

452.   The allegations of paragraphs 1 through 451 are incorporated herein
by reference.

453.   The Defendants have each conspired to violate 18 U.S.C. § 1962(c) in
violation of 18 U.S.C. § 1962(d).

---

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 101 -

454.   Defendants each agreed to facilitate all or some of the predicate acts described in paragraphs 20 through 377 herein.  That agreement is manifest by their knowing participation in or support of the predicate acts identified herein.

455.   Defendants each intended to further, facilitate or engage in some or all of the predicate acts described in paragraphs 20 through 377 herein.  Those acts satisfy the elements of the substantive criminal offenses of mail fraud, wire fraud, extortion, obstruction of justice, witness tampering, and bribery and, taken together, constitute a violation of 18 U.S.C. § 1962(c).

456.   The Defendants associated with Electric Family, LLC (Nilon, Demulder, Pfleg, Dronkers, and Schoonover), agreed to further, facilitate or support the fraudulent lawsuits brought by each of those Defendants through NTG and its attorneys, agents or employees as described in paragraphs 46 through 54 herein.  Nilon, Demulder, Pfleg, Dronkers and Schoonover were close friends, roommates and/or coworkers who each possessed knowledge of their associates' lawsuits and knowledge that those suits were shams like their own.  Each of the Electric Family Defendants knew that they had each agreed with Andrew Baslow, on behalf of NTG and its attorneys, to sponsor fraudulent litigation.  *See supra* at ¶¶ 62, 14-56, 194-195, 224-225, 244-245, 271-272.

457.   Defendant David Reid is a managing partner with authority and oversight over the cases identified hereinabove.  He possessed knowledge of the invalidity of the class representatives' claims and the recruitment of same.  He therefore agreed to facilitate, further or support the predicate acts identified herein.

458.   Defendant Victoria Knowles is an attorney whose name appeared in the caption of nearly every case identified herein.  As an attorney on those cases she possessed knowledge of the invalidity of the class representatives' claims and the recruitment of same.  She therefore, agreed to facilitate, further or support the predicate acts identified herein.

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 102 -

459.   As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property as described in paragraphs 453 through 458 herein.

460.   WHEREFORE, Plaintiff requests that this Court enter judgment against ALL Defendants as follows:  actual damages, treble damages, and attorneys' fees.

## COUNT FOUR

### California State Unfair Competition

### (California Business and Professions Code §§ 17200, *et seq.*)

461.   The allegations of paragraphs 1 through 460 are incorporated herein by reference.

462.   Defendants are liable for violations of the California unfair competition laws.

463.   Plaintiff NIC brings this Count pursuant to the Unfair Competition Law at Business & Professional Code §§ 17200, *et seq.*  The Defendants' conduct described in Counts One, Two, and Three constitutes unfair, unlawful and/or fraudulent business practices within the meaning of Business & Professional Code § 17200.

464.   Malicious prosecution (Count One) constitutes an unlawful, unfair or, under the circumstances alleged, fraudulent business practice and, as such, constitutes a predicate offense under the UCL.

465.   A violation of 18 U.S.C. § 1962(c) (Count Two) or 18 U.S.C. § 1962(d) (Count Three) constitutes an unlawful, unfair or, under the circumstances alleged, fraudulent business practice and, as such, constitutes a predicate offense under the UCL.

---

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 103 -

466.   Plaintiff NIC brings this Cause of Action on behalf of themselves and on behalf of the public as private attorneys general pursuant to Business & Professional Code § 17204.

467.   Plaintiff is subject to a real and immediate threat of continuing or additional injury from Defendants and their enterprise.  NTG often files multiple fraudulent complaints against companies, purportedly on behalf of different "plaintiffs."  NTG's attacks on businesses are therefore not isolated, and the threat of repeated harm is present and palpable.  Injunctive relief is necessary to prevent continuing or future harm to NIC and the public generally.

468.   Pursuant to Business & Professions Code § 17204, NIC seeks an order of this Court enjoining Defendants from continuing to engage in the acts as set forth in Counts One, Two, and Three, which acts constitute violations of Business & Professions Code § 17200 *et seq*.

469.   NIC further seeks an order of this Court imposing pre-filing requirements on Defendants NTG, Scott Ferrell, Ryan Ferrell, David Reid, and Victoria Knowles, including but not limited to, pleading all future claims with Rule 9(b) particularity, identifying the name, address, and telephone number of any plaintiff on whose behalf they assert claims, and obligating the disclosure of any relevant order in this case to a Judge, tribunal and/or defendant in any future case wherein they seek class certification.

470.   NIC and the public will be irreparably harmed if such an order is not granted.

471.   The NTG Defendants have injured the legal profession as a whole by threatening and pursuing frivolous "shakedown" lawsuits against countless corporate victims.  NTG has repeatedly violated ethical rules and rules of professional responsibility in a relentless drive to profit off of its fraud on the courts and its victims.  NTG's conduct damages consumer confidence in the legal profession and inhibits litigation in future consumer protection cases by

substantially undermining defendants ability to trust in the veracity of representations that come from lawyers as officers of the court.

472.   The defendants' conduct presents a matter of substantial public concern and interest necessitating injunctive relief that will limit the potential for abusive, shakedown lawsuits prospectively.

## **PRAYER FOR RELIEF:**

WHEREFORE, NIC prays for judgment in its favor and against Defendants jointly and severally, and requests that this Court award NIC the following:

A.   An award of compensatory damages in an amount equal to NIC's expenditure in the underlying Nilon action, including attorney's fees and costs expended in defending against the malicious claims.

B.   An award of exemplary or punitive damages under Cal. Civ. Code § 3294 and other applicable laws and statutes for Defendants' conduct undertaken with intent to injure Plaintiff, or with a willful and conscious disregard of Plaintiff NIC's rights.  This is an exceptional case that involves deliberate abuse of the judicial system by those individuals entrusted most to uphold and follow the law. NTG has advertised that its firm recovered more than $300 million over the past half-decade from unsuspecting victims, much of which was reaped from lawsuits designed by NTG and fabricated through false strawman plaintiffs.  An award of punitive damages sufficient to deter and prevent future conduct is appropriate in this case;

C.   An award of threefold damages sustained by Plaintiff pursuant to RICO, 18 U.S.C. § 1964(c);

D.   A permanent injunction or injunctive relief as the court shall deem fit and just, including, but not limited to, an injunction imposing prophylactic pre-filing requirements on all defendants as described hereinabove;

---

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 105 -

E. A preliminary Order barring NTG and its attorneys from continuing to furnish legal services or legal advice to the individually-named defendants during the pendency of this litigation;

F. An Order requiring the Defendants to file with this Court a compliance plan under oath describing the method and manner in which Defendants intend to comply with the injunction(s), including a description of any new operating procedures and policies, to be filed within 30 days after service of an injunction;

G. An award of costs and reasonable attorney fees and expenses incurred by NIC in connection with this action pursuant to 18 U.S.C. § 1964(c), 15 U.S.C. §§ 1116-1117, Cal. Code Civ. Proc. § 1021.5, Cal. B&P Code § 14250;

H. An accounting of all Defendants' profits, revenues, accounts, and proceeds received or obtained, directly or indirectly, or arising out of Defendants history of malicious prosecution, unfair competition, RICO violations, and all other allegations presented hereinabove, including a full accounting of all gross revenues derives from NTG's alleged "legal services" after January 1, 2009.

I. General damages for loss of goodwill or harm to NIC's reputation stemming from the publication and dissemination of fraudulent allegations against NIC during the course of three years in litigation.

J. Punitive damages to the extent permissible under applicable law;

K. Pre-judgment and post-judgment interest on the above damage awards;

L. An order adjudging all Defendants jointly and severally liable, as the law allows, under each cause of action asserted by NIC and for all damages awarded against any Defendant;

M. Such other relief as this Court may deem just.

DATED:  February 14, 2020

Respectfully submitted,

NATURAL-IMMUNOGENICS CORP.

By:      */s/ Peter A. Arhangelsky*
         Peter A. Arhangelsky, Esq. (SBN 291325)
         Eric J. Awerbuch, Esq. (pro hac vice)
         Joshua S. Furman, Esq. (pro hac vice)
         Jonathan Emord (pro hac vice)
         Emord & Associates, P.C.
         2730 S. Val Vista Dr., Ste. 133, Bldg. 6
         Gilbert, AZ 85295
         Phone: (602) 388-8899
         Fax: (602) 393-4361
         E-mail: parhangelsky@emord.com
         *Attorney for Plaintiff Natural Immunogenics*
         *Corp.*