3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING


NATURAL-IMMUNOGENICS CORP.,  ) CERTIFIED TRANSCRIPT
                  Plaintiff, }
     vs.                      }
                              }  SACV-15-02034-JVS
NEWPORT TRIAL GROUP, et al.,  )
                  Defendants. }
------------------------------}


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

March 2, 2020


SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiff:

 3   PETER A. ARHANGELSKY
     JOSHUA S. FURMAN
 4   EMORD & ASSOCIATES, P.C.
     3210 South Gilbert Road, Suite 4
 5   Chandler, AZ  85286
     (602) 388-8899
 6

 7   For Defendant NEWPORT TRIAL GROUP:

 8
     EDWARD SUSOLIK
 9   DAVID J. DARNELL
     CALLAHAN & BLAINE
10   3 Hutton Circle Drive
     Santa Ana, CA  92707
11   (714) 241-4444

12   For Defendants ANDREW NILON; GIOVANNI SANDOVAL;
                   MATTHEW DRONKERS; TAYLOR DEMULDER;
13                 SAM PFLEG; SAM SCHOONOVER;
                   KALEB PATTERSON; DAVID URZUA;
14                 ISABELLA JANOVICK:

15   BRENDAN M. FORD
     FORD & DIULIO, PC
16   695 Town Center Drive, Suite 700
     Costa Mesa, CA  92626
17   (714) 384-5540

18   For Defendants ANDREW LEE BASLOW; VICTORIA C. KNOWLES;
                   RYAN M. FERRELL; DAVID REID:
19

20   KYLE A. RIDDLES
     BREMER WHYTE BROWN & O'MEARA, LLP
21   20320 Birch Street, 2nd Floor
     Newport Beach, CA  92660
22   (949) 221-1000

23

24

25
```

```
 1  SANTA ANA, CALIFORNIA; MONDAY, MARCH 2, 2020; 1:27 P.M.
 2            THE CLERK:  Item No. 15, SACV-15-02034-JVS,
 3  Natural-Immunogenics Corporation versus Newport Trial Group,
 4  et al.
 5            Appearances please, counsel.
 6            MR. ARCANGELSKY:  Good afternoon, Your Honor.
 7  Peter Arhangelsky on behalf of the plaintiff
 8  Natural-Immunogenics.
 9            THE COURT:  Good afternoon.
10            MR. FURMAN:  Good afternoon, Your Honor.  Joshua
11  Furman on behalf of the plaintiff Natural-Immunogenics.
12            THE COURT:  Good afternoon.
13            MR. DARNELL:  Good afternoon, Your Honor.  David
14  Darnell on behalf of Scott Ferrell and Newport Trial Group.
15            THE COURT:  Good afternoon.
16            MR. FORD:  Good afternoon, Your Honor.  Brendon
17  Ford on behalf of the non-NTG defendants.
18            THE COURT:  Good afternoon.
19            MR. RIDDLES:  Good afternoon, Your Honor.  Kyle
20  Riddles on behalf of Andrew Baslow, David Reid, Victoria
21  Knowles, and Ryan Ferrell.
22            Let's begin with you, Mr. Darnell.
23            MR. DARNELL:  Thank you, Your Honor.
24            I would like to come back up here after you hear
25  from plaintiff's counsel.  We are willing to submit.  I
```

understand the Court has wide discretion with respect to discovery issues. I have also read I believe it's page 15 of the Court's order that talks about how it gave a lot of diligent thought to weighing and balancing the interests here. I believe that is what particularly drove the ruling.

I would prefer the Special Masters ruling. I understand the rationale of the Special Masters ruling. But we are willing to submit if that is the order of the Court. The one thing that we do want is a November 3 trial date. I will also note that we still have the depositions --

THE COURT: Why wouldn't we still have that?

MR. DARNELL: We still do. But I woul also note that we still have the depositions of the four individual defendants, as well as the 30(b)(6) deposition, with I think 49 topics was what I received last week. We'll meet and confer on that. We'll address that. But I just note that because I think that discovery issues are going continue in this case unfortunately, and we'll do our best to meet and confer on that so we get to trial in November. Subject to that and any arguments from counsel, we would submit, Your Honor.

THE COURT: Mr. Arhangelsky.

MR. ARHANGELSKY: Yes, Your Honor, thank you.

Your Honor, I would like to address two issues in the tentative order, the first being the Court's denial of

1    the crime-fraud motion, and the second being some of the
2    language in the tentative regarding the scope of the
3    depositions or limitations placed on those depositions.
4           Beginning with the crime-fraud motion, though,
5    Your Honor, there is some discussion in the tentative about
6    the application of the law of the case doctrine, and for
7    various reasons, I think that's an undergirding reason for
8    why the Court --
9           THE COURT:  It's a -- what kind of a reason?
10          MR. ARCANGELSKY:  An undergirding reason for why
11   the Court denies the crime-fraud motion at least with
12   respect to a significant number of the documents.  I think
13   that the reliance on the law of the case doctrine is
14   misplaced here in this instance for several reasons
15   primarily because this is not -- it's not actually the law
16   of the case.
17          I mean, the Court hasn't actually evaluated the
18   question we posed to the Court, which is application of the
19   crime-fraud exception to in this case 16 pages of text
20   messages.  Those 16 pages -- each page contains I think
21   probably on average about -- and we don't know for sure --
22   based on others we have seen, less than a hundred words per
23   page.  The scope of the material is very discrete.  It's a
24   request we made of this Court after consideration of the
25   entire record that we received based on the Court's

1  privilege orders.
2       When we had been before the Court earlier and we
3  talked about this idea of Vogue-related discovery, the
4  question was much different for the Court.  It was at that
5  time we were actually asking the Court to seek discovery
6  broadly into these cases.  There were several of which we
7  had identified.  The request on Vogue-related discovery at
8  the time was -- it would have included things like a request
9  for information about the settlement, for communications
10 about Vogue in other places.
11      Here we are talking about very small substantive
12 communications.  And for reasons I will get to in a moment,
13 I think it's very important that the Court consider our
14 request here on the crime-fraud exception because of how
15 those documents fit within the larger case as a whole.
16      There is another issue lurking here, though, which
17 is that even if the Court were to say, okay, this is law of
18 the case, the Court doesn't have a factual basis to say
19 that.  There is a significant problem we have had throughout
20 this case.  The Court is essentially taking the defendants'
21 word for it saying, because they said it relates to Vogue in
22 their privilege log, we're not going to look at it.  We're
23 going to take their word for it.  We have no due process at
24 this point to determine whether or not their designations on
25 the privilege log are even correct.  But what we have shown

```
 1   throughout this case, is that their privilege log --
 2            THE COURT:  Do you have any reason to believe that
 3   they're not correct?
 4            MR. ARHANGELSKY:  We do, Your Honor.
 5            THE COURT:  Do you have reason to believe that
 6   they are perpetrating a fraud on the Court?
 7            MR. ARCANGELSKY:  Your Honor, we've --
 8            THE COURT:  Do you have reason to believe that
 9   with their privilege logs they are perpetrating a fraud on
10   the Court?
11            MR. ARHANGELSKY:  I don't think fraud on the
12   Court.  No, I don't think that's the correct term.  I don't
13   think that's what we're saying.  I think what we have seen
14   and what we have proven in other situations, including with
15   respect to the text messages you've seen even as part of
16   this proceeding, their privilege log designations are often
17   incredibly vague and incredibly broad so that we can't fully
18   appreciate this.
19            Let me give you an example so you understand where
20   we're coming from.  Before the Court, we filed in-camera a
21   number of text messages that we did receive already to date,
22   one of which is Schoonover 87 through 88.  And this is just
23   one example.  There are many.  But here is a text messages
24   exchanged between Mr. Baslow and Mr. Schoonover that just
25   very clearly doesn't -- this is the situation where
```

1  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
2  XXXX--
3            MR. DARNELL:  Excuse me, Your Honor.  I'm sorry,
4  but he is quoting from a document that's been designated as
5  "Confidential" that's subject to a stipulated Protective
6  Order.  If we are going to start doing that, we have to seal
7  the record.  I think it's highly inappropriate for counsel
8  to just launch into quoting documents like that.  He knows
9  better.  But I feel the need to object on that ground and
10 request that that be done.
11           MR. ARHANGELSKY:  Your Honor, I don't need to
12 characterize the substance of the text message any further.
13 The Court can review it in the Court's chambers.
14           The point here is that that text message was
15 designated on a privilege log that just said conversation
16 regarding the status of the case.  That's it.  For every one
17 of these messages, it just said conversation about the
18 status of the case.
19           That message is not a conversation about the
20 status of the case, and a number of these are not about the
21 status of the case.  In fact, this Court has actually had to
22 reverse itself on two prior orders because we were able to
23 show that representations about privilege log communications
24 were inaccurate.
25           So here we have a situation -- we very strongly

1  believe that a number of these communications probably don't
2  relate to the Vogue case, or if they do, they do so
3  tangentially.  What these communications really are -- at
4  least we believe -- is these are the formative communication
5  where Mr. Schoonover was recruited into the scheme.  We have
6  a conspiracy charge against Mr. Schoonover under the RICO
7  statute and one that this Court has upheld.
8              We only have half of the conversation that's
9  relevant, though.  The first half is what we've asked for.
10 That's communications that occur right at critical times in
11 this case where critical events were happening.  It was
12 these communications where Mr. Baslow brought Mr. Schoonover
13 into the case, gave him instructions to -- perhaps for
14 Vogue, perhaps for other cases.  It's unclear from the
15 privilege logs.  These communications also apparently
16 involve referral communications with Mr. Schoonover where he
17 references out Mr. Baslow to some of his friends.
18             The timing is so critical here.  These
19 communications happened in March 2012.  That is the same
20 exact window of time where a number -- at least three of the
21 SAC cases transpired.  Mr. Nilon's claim was a March 2012
22 claim.  Mr. Phleg's claim was March 2012.  Mr. Dronkers came
23 to the firm around that same time.
24             Mr. Phleg purchased his Nature's Way product on
25 the same exact date as some of these text message

1   communications on March 14, 2012, as to some of these text
2   messages that go back and forth between Baslow and
3   Schoonover, and we know that Schoonover had an instrumental
4   role in this scheme.  So it's fine for them to say it
5   relates to Vogue on its face as a way to try to avoid
6   discovery in this case, but this information is pivotal.
7   It's critical information.
8           And the key here -- the Court raised several
9   questions in its order saying it's unclear what the
10  significance of these documents are to the case.  Well, we
11  now have had a chance to look at the record we received
12  following the privilege orders.  We got a chance to look at
13  some of these e-mail communications that we thought might
14  contain information, and we know now from the text messages
15  that a lot of their e-mails were sanitized because of text
16  messages.
17          In other words, there are messages where Sam
18  Schoonover sent an e-mail out, and it said one thing, and
19  Andrew Baslow texted back and said I can't write that.  It
20  has to be different.  So we know that the e-mail record --
21  they were much more guarded in their e-mail communications.
22  The text messages are much more candid from what we've seen.
23          It's important for the Court to understand this is
24  unique evidence in the case.  Each defendant in this case
25  but for Mr. Schoonover did not preserve text messages.  He

1  is the only individual who has text messages who can produce
2  that information to us.  So this information is not
3  available from other sources because we've seen that the
4  level of communication is much different from their guarded
5  e-mails in which a lot of times they're polished based on
6  instructions from the text messages.
7           So, Your Honor, I think that there is another
8  concern.  As far as proportionality is concerned, we are
9  standing here today and we're saying these could be some of
10 the most critical documents in the case.  At the same time,
11 we're looking at -- and that's an informed inference based
12 on what we have seen from the other text messages that have
13 been produced.  We are looking at a burden of 16 pages of
14 content that contains less than a hundred words per page.
15 It's the kind of thing the Special Master based on history
16 could probably process in 15 minutes.  This type of
17 information, the value of the case, substantially outweighs
18 any of the concerns the Court would have in proportionality
19 as the Court has identified here.
20          At the very least, as I noted, someone has to take
21 a look at these documents to verify whether they are
22 significant.  How can we have a proportionality analysis if
23 we don't even know what the content of those documents
24 actually is even though we have a strong supposition we know
25 what it's going to show in that regard?

1          THE COURT: You wanted to get on to the
2    restrictions on some of the discovery.
3          MR. ARHANGELSKY: Yes, Your Honor. The Court has
4    allowed the depositions with respect to certain witnesses.
5    We think there is some uncertainty with respect to the
6    tester depositions. What we would suggest is there's
7    language in paragraph five of the ordering section to this
8    on 16 that talks about our ability to ask questions related
9    to the subject matter of documents. I think it should be
10   made clear that we have the right to ask questions regarding
11   the subject matter of documents. The way the order reads
12   now it's unclear whether or not we would just be limited to
13   asking about a document. I think that's important.
14         But I'd also go one step further and say that I
15   don't know that the restrictions are necessary at all given
16   the Court's prior orders limiting discovery, which have been
17   very significant in this case, limiting questions just to
18   SAC cases exclusively combined with the four-hour
19   limitation. It appears like that's the only limitations
20   that we would need in this instance.
21         Certainly for the two witnesses that have never
22   been deposed before, Mr. Bobba and Mr. Ferrell, those Wynn
23   witnesses -- these are not recall depositions. We've never
24   had a chance to have those witnesses under oath, and both
25   witnesses are probably unavailable for trial, too.

1  Mr. Ferrell is out of state -- he's in Arizona -- which
2  means this is probably going to be deposition for trial
3  testimony.  From that perspective, we should be at least
4  afforded the leeway to ask background questions, ask context
5  questions, and be able to explore the testimony in its
6  entirety.
7              Our position is that again the four-hour
8  limitation that the Court's already imposed combined with
9  the prior discovery limitations should be all that's
10 required to prevent any kind of burden on the witness or
11 abuse of the scope of discovery here, Your Honor.
12             THE COURT:  Okay.  Thank you.
13             MR. DARNELL:  Your Honor, I will quickly address
14 the Mr. Bobba and Mr. Wynn Ferrell depositions.
15             THE COURT:  If they have never been deposed
16 before, why doesn't the four-hour limitation do it?
17             MR. DARNELL:  Because they were designated on
18 their witness list.  They told the Court that they only need
19 seven non-party depositions.  They were the ones that
20 proposed that.  The Court accepted that.  They did that
21 repeatedly.  They have also told the Court that this is a
22 case about eight underlying cases.  Now they are trying to
23 get into Vogue.  So they say a lot of things, and then they
24 do something different.  They told the Court they only
25 needed seven witness depositions.  They did not take the

1    deposition of Dan Bobba.  They did not take the deposition
2    of Wynn Ferrell, even though they knew about them and they
3    identified them on their witness list.
4         The Court's tentative has specifically noted that
5    as a valid basis for denying the right to take the
6    depositions of these two witnesses.  But then it went one
7    step further and said balancing all of the interests and
8    whether this discovery is proportional, the prejudice to the
9    defendant, we're going to limit this discovery, and I'm only
10   going to allow this discovery -- Your Honor, I'm
11   paraphrasing your words -- because it pertains to documents
12   that they did not have before.
13        If the Court is going to revise that ruling, that
14   upsets the apple cart here.  That changes everything, Your
15   Honor.  The reason that we are willing to submit is because
16   we recognize this is a judgment call.  It's a difficult call
17   to make, and it's based on the balancing of the interests.
18   To go back and now give them a do-over, let them get more
19   than two weeks of trial like they said, let them ask for
20   more than $234,000 in compensatory damages like they've
21   stipulated to, or to let them take more than the seven
22   witnesses that they have stipulated to, would be a grave
23   injustice and prejudice to the defendants.
24        We already have so much discovery that is going to
25   trigger more motions most likely.  As to the scope of

1  privilege and what they have to answer beyond which the
2  Court has already ruled on, I think we need to focus on what
3  is in front of us and get that done.
4         The second issue, Your Honor, is they have not
5  come out and told Your Honor that we have committed a fraud
6  on the Court or that Mr. Ford's office has committed a fraud
7  on the Court with respect to Schoonover's privilege logs.
8  They can't say that.  They're speculating.  That's all this
9  is.  This is rank speculation based upon what these
10 privilege logs say, and the Court specifically identifies
11 those privilege logs and the designations at page 14 of the
12 tentative.  They cannot stand up here and say any one of
13 those descriptions is somehow inaccurate other than
14 speculation that they're offering before the Court.
15        As to the text communications with Schoonover in
16 March of whatever year it occurred, I don't know how they
17 can say that's relevant to communications with Phleg that
18 other parties may have had at other times.  It's not.  It's
19 pure speculation.  That is not the basis of a crime-fraud
20 motion.  Given the Court's findings about proportionality,
21 we would respectfully submit that the tentative stand.
22        THE COURT:  I want to take one more look at this.
23        When are you going to notice up the four principal
24 depositions that you haven't taken?
25        MR. ARHANGELSKY:  Your Honor, we've contacted

1  opposing counsel.  We are looking to set deposition dates
2  in -- we asked for availability in April through June.  We
3  are working on dates at this point.  We have an overlapping
4  conflict in May.  I am going to be in trial for most of the
5  month.  We think we'll have them done by summer, though,
6  Your Honor.
7             THE COURT:  I'd like to set a further status
8  conference.  Absent extraordinary circumstances, this case
9  is coming to conclusion by going to trial on November 3, and
10 I assure you that is going to happen.  I'd like to get
11 together about 60 days out.  Do you want to propose a date?
12            MR. ARHANGELSKY:  Your Honor, it looks like if
13 it's 60 days we are talking about early May at that point,
14 probably the beginning of the week of May 4.  We have that
15 Monday.  We have trial commencing in the Southern District
16 on the 11th, and it's scheduled for probably three to four
17 weeks.  So after that, it becomes difficult.
18            THE COURT:  Mr. Darnell.
19            MR. DARNELL:  I can do May 4, Your Honor.
20            THE COURT:  Okay.  What time?
21            MR. DARNELL:  1:30.
22            THE COURT:  I'd rather not do it during the law
23 and motions calendar.  Either 3:00 or in the morning.
24            MR. DARNELL:  I will defer to opposing counsel.
25            MR. ARHANGELSKY:  We would prefer the afternoon,

1  Your Honor.
2  THE COURT: 3:00.
3  I am going to order you to go back to Judge
4  Phillips or if she is not available Judge Feese no later
5  than October 1 for a further settlement conference. So you
6  need to put that date on the calendar and make sure it's
7  used and continues to be on your radar.
8  MR. ARHANGELSKY: Yes, Your Honor. That was
9  actually the point I wanted to raise. The last time we were
10 here you ordered us I think by May 1 to mediate, and we have
11 been working to try to find dates.
12 THE COURT: Well, you can do it earlier but no
13 later than that.
14 MR. ARHANGELSKY: Well, the issue is going to be
15 we're going to need to have probably a short extension
16 because I think it's --
17 THE COURT: Of what?
18 MR. ARHANGELSKY: Of the earlier date. The
19 October date is fine. We can meet that. I just wanted to
20 mention to the Court we had already set that.
21 THE COURT: All right.
22 MR. FORD: Could I mention one thing about the
23 settlement conference? I have two clients that are out of
24 state. One is in Vegas, Mr. DeMulder, and one is in
25 Chicago, Mr. Phleg. I tried to discuss whether they could

1   attend telephonically.  The other ones are in Southern
2   California.  But there was some disagreement whether or not
3   they needed to be personally present.  I would ask that they
4   could be available by telephone and that the other ones be
5   there in person.
6           THE COURT:  Take that up with Judge Phillips.
7           MR. FORD:  I will, Your Honor.  Thank you.
8           THE COURT:  Okay, thank you very much.  There was
9   another motion on calendar, but apparently it didn't get
10  calendared properly, and we have not attended to it, so you
11  are going to be back here in two weeks on a Motion for
12  Partial Summary Judgment.
13          MR. DARNELL:  No, I believe the motion that we are
14  back here on, Your Honor, is the Plaintiffs' Motion for
15  Leave to File an Amended --
16          THE COURT:  A Third Amended Complaint.  Okay, we
17  will take up that other motion on that date.
18          MR. DARNELL:  Thank you for catching that.  We
19  appreciate it, Your Honor.
20          THE COURT:  Okay.  Thank you.
21          MR. ARHANGELSKY:  Thank you, Your Honor.
22          MR. DARNELL:  Thank you, Your Honor.
23          (Whereupon, the proceedings were concluded.)
24                    *    *    *
25

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  March 12, 2020


/s/   Sharon A. Seffens   3/12/20
_____
SHARON A. SEFFENS, U.S. COURT REPORTER