**CALLAHAN & BLAINE, APLC**
Edward Susolik (SBN 151081)
Esusolik@callahan-law.com
David J. Darnell (SBN 210166)
Ddarnell@callahan-law.com
James M. Sabovich (SBN 218488)
Jsabovich@callahan-law.com
3 Hutton Centre Drive, Ninth Floor
Santa Ana, California 92707
Telephone: (714) 241-4444
Facsimile: (714) 241-4445

Attorneys for Defendants and Counterclaimants
NEWPORT TRIAL GROUP and SCOTT J. FERRELL

**PUBLIC REDACTED VERSION FILED WITH CONDITIONAL REDACTIONS PER FED. R. CIV. PROC. 26(b)(5)(B) AND L.R. 79-5.2.2**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

NATURAL IMMUNOGENICS CORP., a Florida corporation,

Plaintiff,

v.

NEWPORT TRIAL GROUP, et al.,

Defendants.

_____

NEWPORT TRIAL GROUP, a professional corporation; and SCOTT J. FERRELL, an individual,

Counterclaimants,

v.

NATURAL IMMUNOGENICS CORP., a Florida corporation; BENJAMIN QUINTO, an individual; THEO QUINTO, an individual; EMORD & ASSOCIATES, P.C., a District of Columbia corporation; PETER A. ARHANGELSKY, an individual; CHARLOTTE CARLBERG, an individual; MARYANN BUC, an individual; and JIM BUC, an individual,

Counter-Defendants.

CASE NO.   8:15-cv-02034-JVS-JCG

**DEFENDANTS NEWPORT TRIAL GROUP'S AND SCOTT J. FERRELL'S FIRST AMENDED COUNTERCLAIM FOR:**

1. Violation of RICO Act (18 U.S.C. §§ 1961, 1962(c), and 1964(c)

2. Conspiracy to Violate RICO Act (18 U.S.C. §§ 1961, 1962(d), and 1964(c))

**DEMAND FOR JURY TRIAL**

Judge:      Hon. James V. Selna

Complaint Filed:    December 7, 2015
Trial Date:             November 3, 2020

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

1.     Defendants and Counterclaimants Newport Trial Group, now known as Pacific Trial Attorneys ("Newport Trial Group" or "NTG") and Scott J. Ferrell (collectively "Counterclaimants") bring the instant Counterclaims against Natural Immunogenics Corp. ("NIC"), Benjamin Quinto, Theo Quinto, Emord & Associates, P.C., Peter A. Arhangelsky, Charlotte Carlberg, MaryAnn Buc, and Jim Buc (collectively "Counter-Defendants") alleging the following on personal knowledge or, where Counterclaimants lack personal knowledge, upon information and belief, including the investigation of counsel.  Other individuals who have not been named as Counter-Defendants in this action but who have nevertheless assisted in the unlawful acts described herein include Joshua S. Furman, Jennifer Fernandes, Clark W. Baker, and Carlos F. Negrete (collectively, the "Non-Party Co-Conspirators").

## I.     INTRODUCTION

2.     This Counterclaim exposes a vengeful plot against attorneys who tried to expose a company making millions of dollars selling a quack potion to desperate consumers.  The plotters include: (1) a company that has fraudulently accumulated vast wealth by exploiting fear and falsely marketing its "IMMUNE SUPPORT" treatment; (2) an enabling partner and law firm willing to break the rules to further the company's vendetta; (3) at least three witnesses who, with the assistance of the company and its attorneys, filed demonstrably false declarations before this Court; and (4) a scofflaw investigator with a history of blackmailing witnesses.

3.     For the past five years, Counter-Defendants and the Non-Party Co-Conspirators have waged a war of retaliation against Ferrell, his law firm, and his employees and his clients because they exposed NIC's existential danger to the public health.  A sampling of Counter-Defendants' ongoing criminal acts include:

a.     actively soliciting and filing knowingly false declarations accusing Ferrell of multiple felonies in an effort to secure "death penalty" sanctions and avoid a trial on the merits;

FIRST AMENDED COUNTERCLAIM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

b.      suborning perjury by promising witnesses the benefit of NIC's "vast resources" in exchange for false declarations;

c.      presenting a litany of provably false accusations in filings before this Court, including but not limited to the often repeated but completely false claim that Andrew Nilon lied in a declaration about his grandmother being sick (*see e.g.* Dkt. 911 at 25, ¶105 ["Nilon's false 'sick grandmother' affidavit is part of a pattern"]);

d.      extorting and tampering with a witness by publishing a derogatory website designed to coerce that witness to provide false testimony;

e.      utilizing an investigator (who is now a convicted felon and registered sex offender) who illegally impersonated law enforcement to procure false testimony; and

f.      presenting and repeatedly citing a false declaration claiming a party had evaded a properly noticed deposition, among other criminal acts.

4.      All of these criminal acts advance the common illegal purpose of securing and presenting false claims and evidence against NTG and Ferrell.  This Counterclaim intends to expose and seek redress for these crimes.

## II.      <u>SUMMARY OF LEGAL CLAIMS</u>

5.      This action is brought under the federal Racketeer Influenced and Corrupt Organizations Act (the "RICO Act"), 18 U.S.C. §§ 1961, 1962(c)-(d) and 1964(c), based on multiple acts of fraud, false allegations, perjury and other unlawful acts, including mail fraud (18 U.S.C. §§ 1341, 1349), wire fraud (18 U.S.C. §§ 1343, 1349), extortion (18 U.S.C. § 1951), obstruction of justice (18 U.S.C. § 1503, 1512(c)), and witness tampering (18 U.S.C. § 1512).

6.      As described more fully below, these unlawful acts have been undertaken by Counter-Defendants and the Non-Party Co-Conspirators through a criminal enterprise and as part of a pattern of racketeering activity that was deliberately designed to inflict revenge upon Counterclaimants and to "chill" or

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

1   otherwise send a message to class action attorneys and other whistleblowers who

2   might bring actions on behalf of consumers or the public seeking to stop NIC's

3   fraudulent marketing and false advertising practices.

4        7.    NIC manufactures, markets, and sells colloidal silver to fearful and

5   vulnerable individuals by falsely claiming that it provides "IMMUNE SUPPORT."

6   NIC's product "has no known function or benefits in the body when taken by

7   mouth."  National Institute of Health, Silver available at

8   https://nccih.nih.gov/health/colloidalsilver.

9        8.    Stated differently, NIC is in the business of selling proverbial snake oil

10   to the weak, the sick, and the scared.  Despite overwhelming evidence that colloidal

11   silver does more harm than good, and despite specific prohibitions on marketing

12   colloidal silver for health benefits or as a treatment, NIC profits by doing exactly

13   that.  NIC has even bribed doctors to push Sovereign Silver as a treatment for

14   everything from cancer to the common cold.

15        9.    Most recently, NIC has sought to profit from the COVID-19 crisis by

16   promoting its product as a preventative treatment for the Coronavirus and by having

17   its "expert," Robert Scott Bell, and its Medical Director, Dr. David Blyweiss, tout

18   colloidal silver as a "treatment" for the Coronavirus.  NIC's Co-Presidents,

19   Benjamin Quinto and Theo Quinto, have even gone so far as to directly promote

20   Sovereign Silver as a preventative treatment for the Coronavirus.  In a public post in

21   NIC's own website, NIC's Co-Presidents wrote:  "News of the Coronavirus has sent

22   shockwaves across the world and now, the United States. We urge you to take

23   precautionary measures, not based in fear, but based in the reality of the situation."

24   https://naturalimmunogenics.activehosted.com/index.php?action=social&chash=ac1

25   dd209cbcc5e5d1c6e28598e8cbbe8.378.  One of the "precautionary measures" that

26   they recommend is to "[i]ncrease your intake of Sovereign Silver to the Immune

27   Building Dose; 1 tsp, 3x daily."  (*Id.*)

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 3 -

FIRST AMENDED COUNTERCLAIM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

10.     The Federal Trade Commission ("FTC"), which previously warned NIC regarding its own false advertising, has said of companies like NIC in connection with the COVID 19 crisis: "What we don't need in this situation are companies preying on consumers by promoting products with fraudulent prevention and treatment claims."  An expert from the Mayo Clinic has issued a similar warning:

> Colloidal silver isn't considered safe or effective for any of the health claims manufacturers make. Silver has no known purpose in the body. Nor is it an essential mineral, as some sellers of silver products claim. …
>
> Manufacturers of colloidal silver products often claim that they are cure-alls, boosting your immune system, fighting bacteria and viruses, and treating cancer, HIV/AIDS, shingles, herpes, eye ailments and prostatitis.
>
> However, no sound scientific studies to evaluate these health claims have been published in reputable medical journals. In fact, the Food and Drug Administration has taken action against some manufacturers of colloidal silver products for making unproven health claims.

*See* https://www.mayoclinic.org/healthy-lifestyle/consumer-health/expert-answers/colloidal-silver/faq-20058061.

11.     Other experts have rightfully observed that "companies selling products with colloidal silver that claim to prevent or cure illnesses like coronavirus are a major threat to public health, as they might stop or delay consumers from seeking the appropriate medical treatment."  *See* R. Cairns, Insider, *Colloidal silver is not safe to consume or apply to your skin* (Mar. 26, 2020) available at https://www.insider.com/is-colloidal-silver-safe.  That is NIC's stock in trade and the criminal acts against NTG described herein have been driven by NIC's efforts to cover-up and allow it continue to perpetrate its ongoing fraud on the public.

- 4 -

12. For the past five years, NIC, in conjunction with other Counter-Defendants and the Non-Party Co-Conspirators, has spearheaded a criminal enterprise to retaliate against NTG and Ferrell for their efforts to expose NIC's false advertising of Sovereign Silver and the danger NIC poses to the public health. These criminal acts by Counter-Defendants and the Non-Party Co-Conspirators, which are summarized in Paragraph 3(a)-(f) above and described more fully below, are rooted in fraud, false allegations, and perjury, and also constitute mail fraud, wire fraud, extortion, obstruction of justice, and witness tampering.

13. These criminal acts were undertaken, and continue to be undertaken, as part of an unlawful scheme to deliberately harm and make an example of NTG, its founder Scott J. Ferrell, and NTG's other attorneys, employees and former clients. These criminal acts were also in retaliation for NTG and Ferrell pursuing a class action lawsuit to stop NIC from falsely claiming that its product provides "IMMUNE SUPPORT."

## III.   JURISDICTION AND VENUE

14. This action arises under the RICO Act and this Court has original subject matter jurisdiction over these claims under the RICO Act pursuant to 18 U.S.C. § 1964, as well as 28 U.S.C. § 1331 (federal question).

15. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b)(1)-(2).

16. This Court has personal jurisdiction over all Counter-Defendants because the unlawful acts described herein were directed at Counterclaimants in the state of California and occurred in the state of California. In fact, many of the unlawful acts occurred in the Central District of California and were made in furtherance of this action before this Court. Accordingly, this Court has jurisdiction over the controversy which arises out of that conduct.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

## IV. <u>PARTIES</u>

17.     Defendant and Counterclaimant NTG is a California law firm with its principal place of business in Newport Beach, California.  NTG and its attorneys handle a variety of legal matters, but one of its practice areas involves representing consumers and other individuals in class action lawsuits against corporations and other business entities who violate laws designed to protect the public or consumers, or to safeguard an individual's right to privacy, among other things.

18.     Defendant and Counterclaimant Scott J. Ferrell is an attorney licensed to practice law in the state of California.  Scott J. Ferrell is also the founder and owner of NTG.

19.     Counter-Defendant Natural Immunogenics Corp. ("NIC") is a Florida corporation with its principal place of business in the state of Florida.  NIC has specifically availed itself and is subject to the jurisdiction of this Court through the instant action and through the acts that form the basis of the RICO predicates described herein.

20.     Counter-Defendant Benjamin Quinto is Co-President and General Manager of NIC and, on information and belief, a resident of the state of Florida.  Benjamin Quinto has specifically availed himself and is subject to the jurisdiction of this Court through the instant action and through the acts that form the basis of the RICO predicates described herein.

21.     Counter-Defendant Theo Quinto is Co-President of Natural Immunogenics Corp. and, on information and belief, is a resident of the state of Florida.  Theo Quinto has specifically availed himself and is subject to the jurisdiction of this Court through the instant action and through the acts that form the basis of the RICO predicates described herein.

22.     Counter-Defendant Emord & Associates, P.C. (the "Emord Firm") is incorporated in the District of Columbia with a principal place of business in the state of Virginia.  The Emord Firm has specifically availed itself and is subject to

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

1   the jurisdiction of this Court through the instant action and through the acts that

2   form the basis of the RICO predicates described herein.

3        23.    Counter-Defendant Peter A. Arhangelsky ("Arhangelsky") is, on

4   information and belief, a resident of the state of Arizona and is employed as an

5   attorney at the Emord Firm as a principal.  Arhangelsky has specifically availed

6   himself and is subject to the jurisdiction of this Court through the instant action and

7   through the acts that form the basis of the RICO predicates described herein.[1]

8        24.    Counter-Defendant Charlotte Carlberg is, on information and belief, a

9   resident of the state of California.

10        25.    Counter-Defendant MaryAnn Buc is, on information and belief, a

11   resident of the state of California.

12        26.    Counter-Defendant Jim Buc is, on information and belief, a resident of

13   the state of California.[2]

14        27.    Counterclaimants are ignorant of the true names and capacities of

15   Counter-Defendants sued herein as DOES 1 to 10, inclusive, and therefore sue these

16   Counter-Defendants by such fictitious names.  Counterclaimants will amend this

17   Counterclaim to allege their true names and capacities when ascertained.

18   Counterclaimants are informed and believe and thereon allege that each of the

19   fictitiously named Counter-Defendants is responsible as hereinafter shown for the

20   occurrences and injuries alleged in this Counterclaim.

21        28.    At all times mentioned herein, Counter-Defendants, and each of them,

22   were members of, and engaged in, a joint venture, partnership, and common

23   enterprise, and acted within the course and scope of, and in pursuance of, said joint

24   venture, partnership, and common enterprise.

25   _____

26   [1]  Counter-Defendants NIC, Benjamin Quinto, Theo Quinto, the Emord Firm, and
     Arhangelsky are collectively referred to as the "NIC Counter-Defendants."

27
28   [2]  Counter-Defendants Charlotte Carlberg, MaryAnn Buc, and Jim Buc are
     collectively referred to as the "Declarants."

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

29.     At all times mentioned herein, the acts and omissions of Counter-Defendants, and each of them, contributed to the various acts and omissions of each and all of the other Counter-Defendants in proximately causing the injuries and damages as alleged herein.

30.     At all times mentioned herein, Counter-Defendants, and each of them, ratified each and every act or omission complained of herein.  At all times mentioned herein, Counter-Defendants, and each of them, aided and abetted the acts and omissions of each and all of the other Counter-Defendants in proximately causing the damages as alleged herein.

## V.     NON-PARTY CO-CONSPIRATORS

31.     Non-Party Co-Conspirator Joshua S. Furman ("Furman") is, on information and belief, a resident of the state of Arizona and is employed as an attorney at the Emord Firm.

32.     Non-Party Co-Conspirator Jennifer Fernandes ("Fernandes") is, on information and belief, a resident of the state of Arizona and is employed as a paralegal at the Emord Firm.

33.     Non-Party Co-Conspirator Clark W. Baker is, on information and belief, a resident of the state of California.  Clark Baker is a convicted felon, registered sex offender, and pedophile.

34.     Non-Party Co-Conspirator Carlos F. Negrete ("Negrete") was, at certain times relevant to the allegations against him, a resident of the state of California but, on information and belief, is now a resident of the state of North Carolina.

## VI.     FACTS

35.     Counter-Defendants and the Non-Party Co-Conspirators have engaged in an unlawful racketeering enterprise and conspiracy to deliberately harm and make an example of NTG, its founder Scott J. Ferrell, and NTG's other attorneys, employees and clients through fraud, false allegations, perjury and other unlawful

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

acts, including mail fraud, wire fraud, extortion, obstruction of justice and witness tampering.

36.    The facts and circumstances involved in each of these ongoing criminal acts are described more specifically below, but they generally comprise Counter-Defendants and the Non-Party Co-Conspirators:

a.    actively soliciting and filing knowingly false declarations accusing Ferrell of multiple felonies in an effort to secure "death penalty" sanctions and avoid a trial on the merits;

b.    suborning perjury by promising witnesses the benefit of NIC's "vast resources" in exchange for false declarations;

c.    presenting a litany of provably false accusations in filings before this Court, including but not limited to the often repeated but completely false claim that Andrew Nilon lied in a declaration about his grandmother being sick (*see e.g.* Dkt. 911 at 25, ¶105 ["Nilon's false 'sick grandmother' affidavit is part of a pattern"]);

d.    extorting and tampering with a witness by publishing a derogatory website designed to coerce that witness to provide false testimony;

e.    utilizing an investigator (who is now a convicted felon and registered sex offender) who illegally impersonated law enforcement to procure false testimony; and

f.    presenting and repeatedly citing a false declaration claiming a party had evaded a properly noticed deposition, among other criminal acts.

37.    The overall purpose of this scheme is to deter any future action against NIC's false claims by demonstrating that NIC will do anything to destroy anyone who sues it.

38.    NIC is a Florida corporation founded by an individual named Stephen Quinto.  Because Stephen Quinto was convinced that the end of the world on Earth was near ("Twenty more years at the outside, that's all that's left for the end of the

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

destruction of this world. Finished.") ("Oh yeah, we're in it," he says. "We're in the end of the world."),[3] he moved from Florida to build an ark on an island in the south Pacific Ocean, and handed over management of NIC to his two sons, Benjamin Quinto and Theo Quinto, who currently operate the company as NIC's Co-Presidents.

39.    NIC is in the business of selling proverbial snake oil, which is generally understood to mean "a substance with no real medicinal value sold as a remedy for all diseases."[4]  Interestingly, the modern federal and police powers to regulate the practice of medicine and medicines arouse from public outrage over the harm inflicted by snake oil salesman:

> Historically, such remedial statutes have been adopted as a result of hindsight and in the wake of a stream of public abuse at the hands of the entrepreneur medicine man purveying his snake oil elixir.  Odious chicanery of this type was rivaled only by the "Shell game" artist and rainmaker.  Eventually, public outrage over insipid and often harmful patent medicines and the ministrations of untrained healers became so widespread and the effects of their handiwork so egregious that the Federal and State governments were forced to act.  On the national level the Food and Drug Administration was established to oversee and regulate the commercial drug industry.  Such has been the long, arduous development of the legislative safeguards we cherish today.

[3] http://media.news.com.au/nnd/captivate/edenhope/index.html#chapter3 (last visited Mar. 3, 2020).

[4] Oxford English Dictionary *available at* https://en.oxforddictionaries.com/definition/snake_oil

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 10 -

FIRST AMENDED COUNTERCLAIM

*Garcia v. Texas State Board of Medical Examiners*, 384 F. Supp. 434, 437-438 (S.D. Tex. 1974).

40.     Colloidal Silver has a long and ongoing history as snake oil.  For example, a 1909 medical article produced by NIC reported a committee investigation of advertising claims regarding a colloidal silver mixture.  The claim, made at a time when medicine had only "limited resources in regard to infectious diseases and their treatment with drugs," was that in this colloidal silver mixture the medical community had "for the first time a drug that will prevent nearly any bacterial infection if used prophylactically" and will "check existing infections, if used early . . . ."  Jour. A.M.A., Report of the Committee Appointed to Consider the Claims Made Regarding its Effects (Mar. 13, 1909) produced as (NIC0018720-32.)  Reviewers observed that if true, "the drug is a tremendous boon to humanity; if not true, these claims are cruelly misleading."  (*Id.*)  Upon investigation, the claims were found to be "gross exaggerations, "directly false," and "very misleading." (NIC0018732.)  Current medical literature also produced by NIC still reflects this assessment of colloidal silver as snake oil:

> A web search engine search will quickly show that the need for magic cures of medical problems continues and thrives in our time and that Ag [silver] containing preparations are prominent among 'snake oil' remedies offered in health food shops, pharmacies and supermarkets.

S. Silver, *Bacterial silver resistance: molecular biology and uses and misuses of silver compounds*, FEMS Microbiology Reviews, 27 (2003) 341-353 at 349.

41.     Starting in 1994, the United States Food and Drug administration was forced to regulate the false advertising of colloidal silver.  In October 1994, the United States Food and Drug Administration ("FDA") issued Health Fraud Bulletin #19 to address the emerging marketing of colloidal silver products offered for serious disease conditions.  In that bulletin, the agency stated that it was ''not aware

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 11 -

of any substantial scientific evidence which demonstrates that any OTC colloidal silver solution is useful to prevent or treat any serious disease condition.'' 61 Fed. Reg. 53685.  On October 15, 1996, the FDA formally "propos[ed] to declare all OTC drug products containing colloidal silver ingredients or silver salts as not generally recognized as safe and effective . . . ." 61 Fed. Reg. 53686.  In doing so, the FDA cited evidence that "the indiscriminate use of colloidal silver solutions, especially in the prophylaxis and treatment of respiratory tract infections, probably does more harm than good" and that "there is no acceptable evidence that the routine use of silver solutions for the prophylaxis of colds is at all efficacious, and cases of argyria have resulted from this practice." *Id.*

42.    Other authorities relied on by the FDA directly counseled against the ingestion of colloidal silver.  The FDA observed that "[t]he Dispensatory of the United States of America also stated that there is no justification for the internal use of colloidal silver either theoretically or practically[.]" (*Id.*)  A then recent article had "reviewed the basic chemistry, pharmacokinetics, pharmacology, clinical toxicology, and case reports of adverse events of OTC silver-containing medicinal products, including colloidal silver proteins" and "concluded that silver has no known physiologic function and that the risk of using these products exceeds any unsubstantiated benefit." 61 Fed. Reg. 53686 *citing* Fung, M. C., and D. L. Bowen, ''Silver Products for Medical Indications: Riskbenefit Assessment,'' Clinical Toxicology, March 1996.  Thus, the FDA concluded that "no colloidal silver ingredients or silver salts are generally recognized as safe and effective for OTC use." 61 Fed. Reg. 53686.

43.    In 1999, after notice and comment, the FDA issued a final rule banning colloidal silver in over-the-counter drugs. "The Food and Drug Administration (FDA) is issuing a final rule establishing that all over-the-counter (OTC) drug products containing colloidal silver ingredients or silver salts for internal or external use are not generally recognized as safe and effective and are misbranded." 64 Fed.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

Reg. 44654.  In doing so, the FDA evaluated information submitted as part of notice and comment, including "testimonials," "case reports," and arguments regarding colloidal silver's claimed effectiveness against "bacteria, fungi, yeast, and viruses[.]"  64 Fed. Reg. 44655.  The FDA found these inadequate, concluding that "the data and information submitted are not sufficient to establish general recognition of effectiveness for colloidal silver or other silver ingredients for any specific OTC condition."  (*Id.*)  Specifically, the FDA found that "[i]solated case reports, random experience, and reports lacking the details that permit scientific evaluation are not considered adequate to establish effectiveness.  Testimonials from consumers cannot be considered as adequate proof of effectiveness or safety.  None of the comments presented any evidence of safety or effectiveness beyond personal experience."  64 Fed. Reg. 44656.

44.    Moreover, in May 2007, the FDA found NIC to be in violation of the prohibition on marketing dietary supplements to "diagnose, treat, cure, or prevent any disease."  The FDA indicated to NIC that it had "reviewed your website at the internet address http://www.natural-immunogenics.com and has determined that the product "Sovereign Silver" and that the "marketing of this product with these claims [of benefits by NIC] violates the Act."  On its website, NIC had claimed, among other things, that Sovereign Silver "may be your most effective tool for maintaining and sustaining your immune defense in the presence of emerging strains of bacterial, viral and fungal infections . . . ."  Reiterating its prior finding, the FDA responded: "your product is not generally recognized as safe and effective for the above referenced conditions . . . ."

45.    Unfortunately, despite these findings and the FDA's demands that NIC stop its fraudulent marketing of Sovereign Silver, NIC has remained steadfast and undeterred as it is currently pushing high dosages of Sovereign Silver as a preventative treatment for the Coronavirus and COVID-19.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

46.     Moreover, to retaliate against NTG for suing NIC in the first place, and to send a message to others and ensure that NIC is never again subject to a consumer protection lawsuit based on its false claims regarding colloidal silver, NIC and its counsel have over-litigated virtually every aspect of this case, resulting in more than 900 docket entries (and counting).[5]

47.     But to make matters worse, NIC, its Co-Presidents (Benjamin Quinto and Theo Quinto), and their counsel (the Emord Firm and Arhangelsky) have taken their approach of "by any means necessary" to the point of committing multiple unlawful acts to further their criminal enterprise and vendetta.

A.     **NIC Suborned Perjured Declarations from Charlotte Carlberg, MaryAnn Buc and Jim Buc and then Filed them to Request Death Penalty Sanctions from this Court**

48.     Most recently, NIC has sought to effectively "win" this lawsuit though the solicitation and submission of perjured testimony.  This most recent unlawful scheme to provide false testimony to the Court was undertaken by NIC and its executives (Benjamin and Theo Quinto), along with NIC's witnesses (Charlotte Carlberg, MaryAnn Buc and Jim Buc (the "Declarants")), and the legal team at the Emord Firm that procured the false declarations from these Declarants. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

49.     By way of background, on February 20, 2019, the Court issued an order granting the NTG Defendants' request to proffer additional evidence regarding the existence of an attorney-client relationship between Trycia Carlberg and NTG.

---

[5]  This is not the only case in which NIC's counsel has adopted extreme measures in litigation.  In this regard, Judge Moskowitz recently observed of the Emord Firm and Arhangelsky's representation in *Youngevity v. Smith*, S.D. Cal. Case No. 16-cv-00704-BTM (JLB):  "The parties have engaged in scorched earth litigation reminiscent of Mad Magazine's cartoon Spy vs. Spy. . . . The attorneys have unfortunately taken up their clients' attitude."

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 14 -

FIRST AMENDED COUNTERCLAIM

(Dkt. 781 at 1.)  The Court thus directed the NTG Defendants to submit such evidence to the Court for *in camera* review.  *Id.*

50.     On February 28, 2019, the NTG Defendants lodged (for *In Camera* Review) the Declaration of Scott J. Ferrell with *Privileged Information* in Support of Attorney-Client Relationship with Trycia Carlberg.  (Dkt. 783.)  That Ferrell declaration was later publicly filed as part of the Court's docket on July 3, 2019. (Dkt. 812-1.)

51.     Counterclaimants are informed and believe and on that basis allege that sometime around April 2019, NIC, the Emord Firm, and Arhangelsky developed a scheme to move for sanctions based on that declaration.  NIC and the Emord Firm have not yet produced proper privilege logs and that issue is likely to require further law and motion before this Court.  However, the inadequate log that has been provided to date indicates that communications related to NIC's subsequent motion began in "April 2019."  (March 23, 2020 NIC Priv. Log.)

52.     The Ferrell Declaration that prompted NIC's Motion for Sanctions stated truthfully that "Ms. Carlberg was a close friend of my family" who "began living in our home in 2011 because she was very ill with cancer and needed our support and assistance." (Dkt. 812-1, ¶ 5.)  The declaration further stated that Trycia Carlberg stayed with the Ferrell family "the latter part of 2011 through the early part of 2012, when she moved into a hospice facility, where she stayed until shortly before her death on May 5, 2012." (*Id.*)

53.     Regarding NIC's Sovereign Silver, the Ferrell declaration stated:
> On December 24, 2011, Ms. Carlberg told me that her
> naturalpathic doctor had recommended a variety of alternative
> treatments and actions to fight her cancer, including the use of
> crystals, wearing special bracelets, eating a vegan diet, and other
> ways to "strengthen her cell detoxification" and "cleanse her
> lymphatic system" to order to increase her resistance to cancer.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

She then showed me some of the products she had purchased and was taking or using, one of which was Sovereign Silver, for which she showed me a bottle and a box that were labeled with the words "IMMUNE SUPPORT."

(*Id.*, ¶ 7.)

54.    The Ferrell declaration also attached a photograph he took of the Sovereign Silver bottle, with metadata confirming the photograph was taken on December 24, 2011, the same day that Ferrell had these discussions with Trycia Carlberg. The declaration then confirmed that after "receiving Ms. Carlberg's consent to send a demand letter to NIC and after having her sign my firm's engagement letter at my home," Ferrell sent a "December 27, 2011 demand letter to NIC . . . ." (*Id.*, ¶ 13.)

55.    On August 26, 2019, NIC, via the Emord Firm and Arhangelsky, sent Counterclaimants a meet and confer letter with numerous false accusations about the Ferrell declaration and a demand that Ferrell stipulate to "dispositive sanctions" and "financial sanctions," among other things. (Dkt. 846-1 at 5-8.)  In particular, NIC's letter falsely represented that:

a.    "Ms. Carlberg did not, in fact, live in Ferrell's home at the end of 2011 or in early 2012. She resided with her mother at the time."

b.    "Carlberg was not close with Scott Ferrell. While she had a relationship with Mr. Ferrell's wife, Erin, she had a limited and perfunctory relationship with Scott and would not have confided in him over any personal matters."

c.    "Carlberg neither purchased nor used Sovereign Silver, nor could she have 'showed [Ferrell] a bottle and box' on December 24, 2011, because she was with her mother at her mother's residence on December 24, 2011.

d.    "Ferrell falsely testified that his attorney-client relationship began with Carlberg on December 24, 2011. Again, that narrative is an

FIRST AMENDED COUNTERCLAIM

impossibility, in part, because Carlberg was not in Ferrell's home or his presence on the relevant dates."

      e.    "Ferrell falsely testified to having Carlberg execute a retainer agreement '[o]n either December 24 or December 25, 2011[.]' Carlberg was never in Ferrell's presence at any point during the holiday, and could not have executed a retainer agreement under the circumstances described in Ferrell's declaration."

      f.    "Carlberg had knowledge of Ferrell's sham litigation enterprise, she considered those lawsuits to be morally reprehensible, and, consequently, she was predisposed against serving as Ferrell's client. In fact, Carlberg mentioned Ferrell's unlawful scheme to at least three witnesses, each of whom intend to testify that Carlberg distrusted Ferrell, and found his business practices repugnant, morally corrupt and unethical." (*Id.*)

56.    NIC, the Emord Firm and Arhangelsky knew, or had reason to know, that these statements were false at the time they were made. Counterclaimants are informed and believe and on that basis allege that these statements were made to induce fear on the part of Ferrell and thereby convince him to agree to pay money to NIC and waive his legal rights.

57.    On September 19, 2019, NIC, the Emord Firm, and Arhangelsky filed a Motion for Sanctions against Ferrell. (Dkt. 844.) NIC's Motion for Sanctions argued that Ferrell's averment that Trycia Carlberg was his client in 2011 was "unequivocally false" and "impossible" because of the testimony of three witnesses who were "close" with Trycia Carlberg. (*Id.*) NIC, the Emord Firm, and Arhangelsky assured the Court that their testimony was based on "personal knowledge." (*Id.* at 13.)

58.    In support of NIC's Motion for Sanctions, NIC, the Emord Firm and Arhangelsky filed the Declaration of Charlotte Carlberg dated August 22, 2019. (Dkt. 844-3.) Charlotte Carlberg's Declaration made the following false statements under oath:

FIRST AMENDED COUNTERCLAIM

"5.     Mr. Ferrell's declaration claims that my daughter had a discussion with him on December 24, 2011 in Ferrell's house and, based on that discussion, Trycia retained him as her counsel.  *See id.* at ¶¶ 7-10.  Ferrell testified that, on December 24, 2011, Trycia "showed [him] some of the products she had purchased and was taking or using[.]"  *See id.* at ¶ 7.  ***Those statements cannot be true.***  My daughter was in my home on Christmas Eve in 2011 (December 24, 2011).

6.     Mr. Ferrell testified that, "[o]n either December 24 or December 25, 2011, [he] had Ms. Carlberg execute [an] engagement letter with [his] firm."  *See* Exh. A at ¶ 12.  Again, ***that statement cannot be true because Trycia was not at Mr. Ferrell's house on those dates***, and Trycia was instead in my presence on both days.

7.     Trycia was with her immediate family throughout the Christmas holiday in 2011, including on December 24 and 25, 2011.  At no point was Trycia in the presence of Scott Ferrell or his wife.  Neither Scott Ferrell nor his wife were present at my home at any point during the Christmas holiday in 2011.

. . .

13.     Trycia did stay in the Ferrells' home for a ***brief period in 2012***. Trycia's time with the Ferrells did not end well.  She left the Ferrells' house on poor terms and in distress."

(Dkt. 844-3 at 2-4 (emphasis added).)

59.     NIC, the Emord Firm, and Arhangelsky also filed the Declaration of MaryAnn Buc dated August 23, 2019.  (Dkt. 844-4.)  MaryAnn Buc's Declaration made the following false statements under oath:

"8.     On August 10, 2019, it came to my attention that Mr. Scott Ferrell had filed a declaration in federal court claiming that he

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

represented Trycia in legal matters in 2011 and into 2012.  A copy of that declaration is attached as **Exhibit A**.  In his declaration, Ferrell testified that Trycia had retained him over the Christmas holiday in 2011.  See Exhibit A at ¶¶ 5-13.  Ferrell testified that he authored a legal demand letter on December 27, 2011 on behalf of Trycia with her consent.  *See id.* at ¶ 4.

9.      Mr. Ferrell's declaration claims that Trycia had a discussion with him on December 24, 2011 in Ferrell's house and, based on that discussion, Trycia retained him as her counsel.  *See id.* at ¶¶ 7-10.  Ferrell testified that, on December 24, 2011, Trycia 'showed [him] some of the products she had purchased and was taking or using[.]'  *See id.* at ¶ 7.  ***I know those statements are false*** because Trycia was at her mother's house on Christmas Eve in 2011 (December 24, 2011), where she spent her final Christmas with her family.

10.     Mr. Ferrell testified that, '[o]n either December 24 or December 25, 2011, [he] had Ms. Carlberg execute [an] engagement letter with [his] firm.'  *See* Exh. A at ¶ 12.  ***Again, that statement cannot be true because Trycia was not at Mr. Ferrell's house on those dates***, and she was instead with her mother and her family.

. . .

14.     Trycia was with her immediate family throughout the Christmas holiday in 2011, including on December 24 and 25, 2011.  I know through my conversations with Trycia that she was not in the presence of Scott Ferrell or his wife at any point over the Christmas holiday in 2011.  I spoke with Trycia daily in December 2011 and she was at no time with the Ferrell's.

. . .

FIRST AMENDED COUNTERCLAIM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

21.     Trycia *later* spent time in the Ferrells' home *in or about March 2012*.

. . .

28.     Trycia did stay in the Ferrells' home for a brief period in 2012. Trycia had joked about feeling like Rapunzel at the Ferrell's home. Most days she was unable to even leave the guest room to go upstairs and eat, watch the sunset, or look at the views.

. . .

30.     Trycia was finally able to pack up her bag that she took from house to house, get in her car, and go to a housesitting job in March 2012.  From that house, she called her mother, and told her mother that [she] was starving, and asked if her mother could bring her food."

(Dkt. 844-4 at 2-4, 6 (emphasis added).)

60.     NIC, the Emord Firm and Arhangelsky also filed the Declaration of Jim Buc dated August 21 2019.  (Dkt. 844-5.)  Buc's Declaration made the following false statements under oath:

"7.     On August 10, 2019, I read a declaration that Mr. Scott Ferrell had filed in federal court where he claimed to have represented Trycia in legal matters in 2011 and into 2012.  A copy of Ferrell's declaration is attached as **Exhibit A**.  In his declaration, Ferrell testified that Trycia had retained him over the Christmas holiday in 2011.  *See* Exhibit A at ¶¶ 5-13.  Ferrell testified that he authored a legal demand letter on December 27, 2011 on behalf of Trycia.  *See id*. at ¶ 4.  Ferrell testified that Trycia had used a dietary supplement called 'Sovereign Silver.'  *See* Exh. A at ¶ 7.

8.     Mr. Ferrell also testified that, '[o]n either December 24 or December 25, 2011 [he] had Ms. Carlberg execute [an] engagement letter with [his] firm.'  *See* Exh. A at ¶ 12.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 20 -

FIRST AMENDED COUNTERCLAIM

. . .

13.     Trycia did stay in the Ferrells' home for a ***brief period*** which specifically overlapped with Scott Ferrell's birthday ***in March 2012***.

. . .

15.     Trycia's stay with the Ferrells did not end well.  Trycia left the Ferrells' house on poor terms.

. . .

16.     I object to Ferrell's use of Trycia's name in support of ***false statements in his declaration***.  I want to correct the record so that Trycia is not erroneously associated with Ferrell or with his legal practice."

(Dkt. 844-5 at 2-4 (emphasis added).)

61.     In NIC's supporting Memorandum of Points and Authorities, NIC, the Emord Firm and Arhangelsky further argued in relevant part as follows:

"Each witness testified that Ferrell's declaration described an impossible set of circumstances.  Trycia never resided or lived at the Ferrells' home in December 2011—a fact which undermines every material position in Ferrell's declaration.  *See* CC Decl. ¶¶ 5-8; MAB Decl. ¶¶ 9-15; JB Decl. ¶ 8. Trycia spent the last days of December 2011 with her mother at her mother's home in San Clemente.  *Id.*  On the same day Ferrell claims to have had a conversation about Sovereign Silver with Carlberg in Ferrell's house, Carlberg was actually residing in her mother Charlotte's home, spending her last Christmas with immediate family."

(Dkt. 844-1 at 13.)

62.     In addition, NIC's witnesses testified, and NIC, the Emord Firm and Arhangelsky claimed, that Trycia Ferrell found Scott Ferrell's business practices repugnant and would not have been his client.  (Dkt. 844-1 at 14 ("MaryAnn and

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 21 -

FIRST AMENDED COUNTERCLAIM

1   Jim Buc were each aware that Trycia would never participate in Ferrell's

2   litigation."), 20 ("Trycia told MaryAnn Buc that Ferrell had tried to solicit her to be

3   a shill plaintiff in his litigation scheme, but that she refused because she viewed

4   Ferrell's practice as morally repugnant.").)

5        63.    Further, each off the witnesses purported to claim based on personal

6   knowledge that Trycia had not been involved in any legal matters in 2011 through

7   2012.  (Dkt. 844-4, ¶ 24) ("Trycia never mentioned that she was involved in a

8   lawsuit, or would be involved in any legal matter in 2011 through 2012 . . . . If

9   Trycia had intended to participate in a legal matter, she would have discussed that

10  with me, my husband, or her mother."); (Dkt. 844-4, ¶ 27) ("Trycia would never

11  have been interested in litigation, particularly not in 2011 and 2012."); (Dkt. 844-5,

12  ¶¶ 11-12) ("In 2011 and 2012, Trycia never mentioned to me that she was involved

13  in any lawsuit, or that she wanted to be involved in any lawsuit. It would have been

14  well out of character for Trycia to pursue any legal matter-let alone through Scott

15  Ferrell-under the conditions described in Ferrell's declaration."); (Dkt. 844-3, ¶ 11)

16  ("Trycia never mentioned to me that she was involved in a lawsuit, or would be

17  involved in any legal matter in 2011 through 2012. She never mentioned that Ferrell

18  would represent her for any legal concern, or that Ferrell had performed any legal

19  work on her behalf. If Trycia had intended to participate in a legal matter, she would

20  have certainly discussed that with me or another member of her family. It would

21  have been well out of character for Trycia to pursue a legal matter with Scott Ferrell

22  under the conditions described in Mr. Ferrell's declaration, and without having

23  shared that information with me, particularly while she was living in my house at

24  the time.").

25       64.    These statements were false.  The Declarants, the Emord Firm,

26  Arhangelsky, and NIC all knew that Trycia Carlberg had filed another consumer

27  lawsuit in the first few months of 2012.  In fact, on August 9, 2019, Emord paralegal

28  Fernandes provided Charlotte Carlberg with a copy of a declaration from Ferrell that

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 22 -

FIRST AMENDED COUNTERCLAIM

was filed in this case (Dkt. 812-1), along with a copy Trycia Carlberg's March 22, 2012 declaration from the case of *Trycia Carlberg v. Bret Bros Sports International, Inc.*, Case No. 2:12-cv-00259 (Feb. 12, 2012) (W.D. Wash.) ("Trycia Carlberg's titanium bracelet lawsuit").  (DEC_00723 and DEC_00725.)

65.     Trycia Carlberg's titanium bracelet lawsuit was a false advertising class action filed by the firm of Kirkland & Patrick, LLP on Trycia Carlberg's behalf. Documents produced by Charlotte Carlberg, MaryAnn Buc and Jim Buc also reveal that they had multiple discussions with Fernandes about Trycia Carlberg's titanium bracelet lawsuit before they signed their declarations and before NIC filed its Motion for Sanctions (Dkt. 844), all of which expressly disavowed Trycia Carlberg's involvement in any consumer lawsuits, let alone one that was associated with Ferrell and NTG.  Moreover, like many of the other cases that Ferrell and NTG referred to Kirtland & Packard (which the Emord Firm, Arhangelsky, and NIC have long known about), the Emord Firm, Arhangelsky, and NIC also knew that Trycia Carlberg's titanium bracelet lawsuit originated with Ferrell and NTG.  In fact, this is exactly why Fernandes attached both (1) the declaration from Trycia Carlberg's titanium bracelet lawsuit and (2) the declaration from Ferrell in this case to the email that she sent to Charlotte Carlberg on August 9, 2019.

66.     NIC, the Emord Firm, Arhangelsky and the Declarants all had additional cause to know that other aspects of their narrative before the Court was false.  Specifically, NIC, the Emord Firm, Arhangelsky, and the Declarants claimed to the Court that on March 10, 2012, "Trycia told MaryAnn Buc that Ferrell had tried to solicit her to be a shill plaintiff in his litigation scheme, but that she refused because she viewed Ferrell's practice as morally repugnant."  (Dkt. 844-1 at 20; Dkt. 844-4, ¶¶ 21-23; Dkt. 844-5, ¶ 14.)  Not only did they all know that Trycia was in fact a client of (or at least a referral of) Ferrell's at that time, but they also knew that the Bucs had also been clients of Ferrell.  While no lawsuit was filed on their behalf, Jim Buc told Arhangelsky that they had been clients of Ferrell's.

- 23 -
FIRST AMENDED COUNTERCLAIM

1   (DEC_00072.)  Based on NIC and the Emord Firm's prior conduct in questioning

2   other NTG clients, the Emord Firm, and Arhangelsky surely inquired about the

3   Bucs' prior representation in detail.  And those details are critical given the fact that

4   the Bucs' pursued Ferrell to represent them _after_ supposedly being informed of his

5   unethical practices.[6]  Clearly, the Bucs would not have pursued Ferrell to represent

6   them if they had just been told by Trycia that Ferrell was unethical with "repugnant"

7   business practices.

8       67.    NIC, the Emord Firm, and Arhangelsky also knew, but did not disclose,

9   that they had been informed that their theory that Trycia Carlberg was only with the

10  Ferrells for a brief period in March 2012 was incorrect.  Prior to filing NIC's Motion

11  for Sanctions on September 19, 2019 (Dkt. 844), Charlotte Carlberg told the Emord

12  Firm on August 10, 2019:

13          "I cannot sign this due to dates that she actually did stay at their house."

14          (Dkt. 859-8 at 2.[7])  About an hour later, Charlotte Carlberg sent a

15          follow up email:

16          "My dates, looking back on Trycia['s] Facebook are wrong.  I see pics

17          of her at their [the Ferrells] house during Nov, Dec, Feb and March."

18  (Dkt. 859-8 at 2.)  In other words, Charlotte Carlberg told the Emord Firm that she

19  had access to Trycia Carlberg's Facebook page, and that she saw photographs of

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

21  _____

[6] While Jim Buc first inquired about representation on March 9, 2012, on March 12,
22  2012, Jim Buc wrote Scott Ferrell "Thanks for inviting us to the party. Let me know
    if you can help us" regarding a mold dispute.  (Dkt. 846-1 at 30-32.)  Thereafter, the
23  Bucs pursued Scott Ferrell for days to represent them, including by profusely
    apologizing for the Bucs' prior behavior.  (Dkt. 846-1 at 39 (March 12, 2012 email
24  from MaryAnn Buc stating "I am terribly sorry for the lack of communication and
    misunderstanding today. We know how busy you are and respect your opinion and
    appreciate your time. We in NO way intended any disrespect. We didnt want to
25  assume that you had time to take our mold case."); (_Id._ at 39 (March 12, 2012 email
    from Ferrell to MaryAnn Buc stating "You are quite welcome.  I will send you the
26  engagement letter tomorrow, and the letter to Joe Flaherty will also go out.").)  NTG
    ultimately elected not to proceed with the representation.(_Id._ at 33-35.)

27  [7] The Fernandes Declaration was filed in support of NIC's Opposition to NTG's
    Request for Order to Show Cause Regarding Sanctions, Perjury, and Subornation of
28  Perjury [Dkt. 855], which was filed on October 28, 2019.  (Dkt. 859.)

FIRST AMENDED COUNTERCLAIM

Trycia Carlberg at Ferrell's house in December of 2011 through March 2012, which is the exact opposite of what NIC, the Emord Firm, and Arhangelsky argued before this Court.

68.     Counterclaimants are informed and believe and on that basis allege that NIC, the Emord Firm and Arhangelsky also had access to Trycia Carlberg's Facebook page through Charlotte Carlberg.  On August 10, 2019, Charlotte Carlberg texted Fernandes "Ill find date from her Facebook to show during time she was there and came home at that time too."  (DEC_01015.)  That same day, Charlotte Carlberg sent Fernandes facebook picture showing Trycia with Erin Ferrell on January 6, 2012.  (DEC_01022.)  While NIC, the Emord Firm, and Arhangelsky have taken the position that they did not have access to information on Trycia Carlberg's Facebook account, there are extensive text messages between Charlotte Carlberg and Fernandes in early November 2019 attaching Facebook posts from Trycia.  (DEC_00016, DEC_00042-00047.)

69.     Counterclaimants are informed and believe and on that basis allege NIC, the Emord Firm, and Arhangelsky were not interested in the truth, and instead were only interested in "documents showing that Ferrell's declaration was false." (DEC_00059.)  Indeed, despite being expressly told that there were photographs showing Trycia in the Ferrell's house in December 2011, the Emord Firm drafted and filed a statement in MaryAnn Buc's declaration that "I spoke with Trycia daily in December 2011 and she was at no time with the Ferrell's."  (Dkt. 844-4, ¶ 14.) There is also evidence that the Emord Firm lied to other witnesses about what Charlotte Carlberg told them.  For example, on August 12, 2019 – two days after Emord was informed that Facebook showed pictures of Trycia at the Ferrells' "house during Nov, Dec, Feb and March," Fernandes told MaryAnn Buc the opposite (i.e., that Charlotte Carlberg stated that Trycia lived with Charlotte Carlberg "in december, January, and February."  (DEC_00158.)

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 25 -

FIRST AMENDED COUNTERCLAIM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

70.     NIC, the Emord Firm, and Arhangelsky also knew their claims that Trycia Carlberg only resided with the Ferrells for a brief period in March 2012 were false because Jonathan George and Chris Hagan had not confirmed that claim.  The Declarants had specifically directed the Emord Firm to Jonathan George and Chris Hagan and even arranged for the Emord Firm to speak with them.  (DEC_01029-DEC_01030; DEC_00395 [August 22, 2019 email from Charlotte Carlberg telling Fernandes "Jennifer, please get back with Jonathan [George] to get his statement."]; and DEC_00816 [August 20, 2019 email of Charlotte Carlberg referring Emord to Jonathan George and Chris Hagan].)

71.     Even without legal training, the Declarants appreciated that NIC, Arhangelsky's, and the Emord Firm's strategy of trying to enlist the Declarants as "NIC's witnesses," and attempting to shield them from the typical discovery process for third party percipient witnesses, was problematic.  For example, on August 12, 2019, Maryann Buc texted Fernandes indicating that she had been advised by counsel "if it would be possible that we would be subpoenaed for testimony instead[?]"  (DEC_000158.)

72.



73.

FIRST AMENDED COUNTERCLAIM



- 27 -

FIRST AMENDED COUNTERCLAIM

1   ██████████████████████████████████████████████████████

2   ████████████████████

3   78.   ████████████████████████████████████

4   ██████████████████████████████████████████████

5   ██████████████████████████████████████████████

6   ████████████████████████████████████████████

7   █████████████████

8   79.   To be clear, Declarants' ████████████████████████

9   ████████████████████████   knew they would be offering false testimony against

10   Ferrell that NIC would then use to try to inflict further harm to Ferrell.

11   (DEC_00496 (Jim Buc lamenting that Ferrell could see their testimony as

12   contributing to the "fall" of his "empire.")  Arhangelsky also advised the witnesses,

13   truthfully, that there was no history of Ferrell or NTG seeking to intimidate or

14   retaliate against witnesses.  (DEC_00393 (Arhangelsky advises the Declarants

15   "[w]e've had numerous people provide evidence against Ferrell, and we haven't

16   seen any indication of tampering or harassment.")  NIC, the Emord Firm and

17   Arhangelsky knew there was no realistic threat of harassment or retaliation but also

18   knew that the promise of protection had great value to the Declarants.  Similarly,

19   NIC assured the Declarations that "[h]e [Ferrell] has no recourse against you for

20   testimony."  (DEC_00393.)

21   80.   The Declarants obviously harbored grudges against Ferrell that have

22   nothing to do with allegedly false statements in his declaration.  On August 16,

23   2019, Jim Buc emailed Arhangelsky stating "Scott Ferrell has a very nasty angry

24   self that we've seen lash out at us personally as he was dropping us as clients when

25   he found he couldn't sue someone for big bucks."  (DEC_0072; DEC_00108 (Buc

26   sending signed declaration and stating "Here you are, go get him"); DEC_00933

27   (MaryAnn Buc text stating "Scot is a nasty nasty person").)  It is likewise clear that

28   Charlotte Carlberg held a deep personal grudge against Ferrell.  (DEC_00393

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

(Charlotte Carlberg states "I'm going for the dirt bag! [smiley face]"); DEC_398 (Charlotte Carlberg states "Scott is one nasty man.")  The fact is that Trycia Carlberg was estranged from her mother.  (Dkt. 846-3 at 37) (Trycia Carlberg tells her mother "[y]ou think you know me, but you have no idea . . . I am not the horrible, ungrateful daughter you think I am."); (Dkt. 846-3 at 35-38 (Trycia Carlberg emailed her mother explaining why she had moved out of her mother's house.  She wrote that her mother had "taken everything SO personally, getting your feelings hurt, playing the victim, blaming me, making me feel guilty for trying to have a life. Its NOT about you and all I've asked is that you give me my space. I actually had some time this week that I was going to invite you out for lunch because I missed you. But you turned on me once again for no reason and pushed me away.")  Charlotte Carlberg clearly blames the Ferrells for some of the problems in their relationship, claiming that "they told her I wasn't a good mom and she could continue living there."  (Dkt. 871-1, ¶ 8; DEC_01021 (Charlotte Carlberg texting Fernandes "The Ferrils [sic] interfered in our lives to a detriment.").  After Counterclaimants filed detailed evidence proving that the Declarants has submitted false declarations, Charlotte Carlberg all but admitted that the declarations had been about revenge.  After all, on October 1, 2019, she texted Ferrell's investigator the message "Karma's a Bitch" and clarified that it was only "[d]irected at Scott." (DEC_00774.)

81.     After being caught red-handed with their lies, NIC, the Emord Firm, and Arhangelsky then proceeded to double down and file even more false statements and declarations before this Court in connection with its Sur-Reply to NTG's Motion for Sanctions.  (Dkts. 871, 871-1, 871-2, 871-3, 871-4.)  For example:

a.     NIC filed a further declaration from Charlotte Carlberg stating Trycia "came Christmas Eve and spent the night."  (Dkt. 871-1, ¶ 9.)  NIC, the Emord Firm and Arhangelsky knew this statement was false because NTG had filed photographs showing Trycia with the Ferrells in their home at 10:11 P.M., 10:25

FIRST AMENDED COUNTERCLAIM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1  P.M., 11:17 PM on December 24, 2011 and 12:49 A.M. and 1:00 A.M. on

2  December 25, 2011.  (Dkt. 846-2.)

3          b.  ███████████████████████████

4  ████████████████████████████████████

5  ████████████████████████████████

6  ████████████████████████████████████████

7  ████████████████████████████████████████

8  ███████████████████████

9          82.    Despite all of this, NIC, the Emord Firm, and Arhangelsky proceeded

10 to file the Motion for Sanctions (Dkt. 844), along with declarations of Charlotte

11 Carlberg, MaryAnn Buc and Jim Buc, anyway.  In doing so, NIC and its attorneys at

12 the Emord Firm went all in and falsely accused Ferrell of having committed the

13 federal crime of perjury based upon the argument that Trycia Carlberg was never in

14 Ferrell's home in December of 2011, despite the fact that Charlotte Carlberg had

15 already told them that she could not truthfully sign their declaration because she had

16 pictures of Trycia Carlberg at Ferrell's home in December of 2011.

17         83.    As such, not only did NIC and its attorneys make arguments that they

18 knew to be false.  They also had access to evidence showing that their claim was

19 false.  Nevertheless, NIC and its attorneys pressed forward by filing briefs and

20 papers that presented knowingly false arguments and false declarations before the

21 Court.

22         84.    On September 27, 2019, NTG and Ferrell filed a Memorandum in

23 opposition to NIC's Motion for Sanctions and made a request for an order to show

24 cause regarding sanctions, perjury, and subornation of perjury.  (Dkt. 846 at 1-29.)

25 The documentary evidence in the form of photographs, emails, and other written

26 documents conclusively showed that Trycia Carlberg did, in fact, live with the

27 Ferrells from late 2011 through early 2012, consistent with Ferrell's testimony, and

28 that Trycia Carlberg did spend time at the Ferrells' home during the Christmas 2011

- 30 -

**FIRST AMENDED COUNTERCLAIM**

holiday (including Christmas Eve, December 24, 2011, Christmas Day, December 25, 2011, and the day after Christmas, December 26, 2011).  (*See, e.g.*, Declaration of Mike Holden of September 26, 2019, ¶¶ 2-9 and 12 and Exhs. A-G and J [Dkt. 846-2]; Declaration of Sariah Para of September 26, 2019, ¶¶ 2-9 and Exhs. A-F [Dkt. 846-4].)  Such documentary evidence also showed that Trycia Carlberg lived with the Ferrells for far more than the "brief period" in part of March 2012 acknowledged by the Declarants.  (Declaration of Erin Ferrell of September 25, 2019, ¶¶ 2-7 and 9 and Exhs. A-F and H [Dkt. 846-3]); Declaration of Mike Holden of September 26, 2019, ¶¶ 10, 11 and 12 and Exhs. H-J [Dkt. 846-2]; Declaration of Sariah Para of September 26, 2019, ¶ 10 and Exh. G [Dkt. 846-4]; Declaration of James M. Sabovich of September 26, 2019, ¶¶ 3, 5-8 and 11 and Exhs. B, D-G and J [Dkt. 846-1].)  As such, Charlotte Carlberg, MaryAnn Buc, and Jim Buc committed perjury by making the false statements in their respective declarations regarding this precise topic.  In addition, the foregoing circumstances show that the Emord Firm and its attorneys and paralegal suborned perjury by intentionally disregarding Charlotte Carlberg's August 10, 2019 emails.

85.    Indeed, faced with such irrefutable documentary evidence, on September 30, 2019, NIC, the Emord Firm, and Arhangelsky filed a Notice of Withdrawal of its Motion for Sanctions.  (Dkt. 847 at 1-4.)

86.    On October 28, 2019, in an attempt to excuse its egregious litigation misconduct, NIC, the Emord Firm, and Arhangelsky filed the Declaration of Peter A. Arhangelsky, which averred in relevant part:  "Prior to the date of NTG's Opposition, NIC located no public information indicating that Trycia Carlberg spent time in the Ferrells house in December 2011."  (Dkt. 859-2 at 3-4.)  This statement is not only false but it is also designed to deliberately mislead this Court.  Exhibit 5 to the Declaration of Jennifer Fernandes dated October 28, 2019, demonstrates that Charlotte Carlberg told the Emord Firm that Trycia Carlberg's Facebook page showed her to be at the Ferrells' house in December of 2011.  (Dkt. 859-8 at 2.)  In

FIRST AMENDED COUNTERCLAIM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

other words, the Emord Firm was told by this same witness that their narrative could not be true.  And they were even directed to the public information that proved it to be false.  Because of this, NIC, the Emord Firm and Arhangelsky did not need to locate any public information as claimed in Arhangelsky's declaration before this Court.  They already had direct knowledge based on what their own witness told them.

87.    All three of NIC's witnesses (i.e., Charlotte Carlberg, MaryAnn Buc, and Jim Buc) were Trycia Carlberg's Facebook friends.  As such, NIC and the Emord Firm had access to Trycia Carlberg's Facebook page via such witnesses had NIC and the Emord Firm been interested in conducting a diligent investigation.

88.    On November 4, 2019, NTG and Ferrell filed their Reply in Support of Request for Order to Show Cause Regarding Sanctions, Perjury, and Subornation of Perjury.  (Dkt. 865.)  In support, NTG and Ferrell filed the Declaration of James M. Sabovich dated November 4, 2019, which attached as an exhibit the Facebook posts from Trycia Carlberg's Facebook account, which further shows that the Declarations of Charlotte Carlberg, MaryAnn Buc, and Jim Buc were false declarations.  (Declaration of James M. Sabovich of November 4, 2019, ¶ 2 and Exh. A [Dkt. 865-2 at 2 and Dkt. 865-3 at 1-65])

89.    There are about 60 pages of photographs and posts on Trycia Carlberg's Facebook page related to the Ferrells and her time with them.  On October 13, 2011, she can be seen in the Ferrell's yard in a photograph that indicates she is with Erin Ferrell and NIC declarant MaryAnn Buc.  (Sabovich Decl., Exh. A [Dkt. 865-2 at 2 and Dkt. 865-3 at 3].)  On November 8, 2011, she posted multiple birthday pictures at the Ferrells' house.  (*Id.* at 4-7.)  On November 25, 2011, she is on the Ferrells' stairway with Scott and his spouse, Erin Ferrell.  (*Id.* at 9.)  There are multiple posts and photographs of her at the Ferrells' home in December 2011.  (*Id.* at 11-15.)  On December 18, 2011 she can be seen standing with Erin Ferrell in front of a Christmas Tree.  (*Id.* at 12.)  Three days later she wrote "Holiday

Festiveness w The Ferrells" and posted a picture of her drink.  (*Id.* at 15.)  On January 24, 2012, she took a picture of the Ferrell's ocean view and wrote "Just now . . . ahhh! Love living here."  (*Id.* at 23.)  On Valentine's Day 2012, a friend wrote Trycia "Happy Valentines day beautiful lady! So enjoyed talking with you at Erin's house, hope you are doing well."  (*Id.* at 30.)  Later, on February 23, 2012, Erin Ferrell writes Trycia "[w]henever I hear this song, it reminds me of you . . . seeing you relaxing on our deck, soaking in the sunshine, taking in the ocean air . . . HEALING!!! So happy to have you here with us."  (*Id.* at 39.)  On April 1, 2012 (after NIC and its declarants claim Trycia fled the Ferrells' home on poor terms), her friend Jonathan George posts a picture of her indicating he is "with Trycia Carlberg and Erin Ferrell."  (*Id.* at 51.)  He writes "Best weekend with Trycia and Edgar!! Thanks Erin for sharing your resort with us!!."  (*Id.*)  On May 7, 2012, after Trycia's death, Simi Rush posted on Trycia's Facebook page: "Trycia, a friend of my gracious friends, Erin Ferrell and Scott Ferrell passed away this weekend . . . Trycia stayed with Erin and her husband at their house in Laguna to heal."  (Dkt. 846-1 at 28.)

90.     The Court's Order entered on February 7, 2020, stated that Counterclaimant Scott J. Ferrell has "a right to sue a party who he believes has committed perjury . . . against him, so long as it is not done without merit and for the sole purpose of harassing or influencing the witness."  (Dkt. 891 at 16.)  The Court found that "Ferrell had grounds to believe that the declarations contained inaccuracies, and cannot be deprived of his right to file a lawsuit when he believes he has been wronged."  (*Id.*)  The Court added that "perjury and filing false declarations in federal court are federal crimes."  *Id.*

91.     Counterclaimants are informed and believe and on that basis allege that the conduct described in paragraphs 48 to 90 above are new and independent acts as compared to the other predicate acts alleged below.  As such, the aforementioned acts are not reaffirmations of the other prior predicate acts alleged below and do not

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 33 -

flow from the predicate acts alleged below.  Moreover, because NIC has improperly claimed privilege in a broad and expansive way, and has also failed to produce a meaningful privilege log, Counterclaimants do not know the precise date the scheme resulting in the acts alleged in paragraphs 48 to 90 began.  The categorical privilege log produced by NIC reflects a time frame of "August 2019 through Present" for documents "which relate to NIC counsel's investigation into and strategy concerning Trycia Carlberg's role as a plaintiff for NTG in 2012," and a time frame of "April 2019 through Present" entries for other related categories of documents.  Based on those entries, Counterclaimants are informed and believe and on that basis allege that NIC's planning for the acts described in paragraphs 48 to 90 likely started as early as April 2019, but Counterclaimants did not first discover many of the facts and conduct described in paragraphs 48 to 90 above until approximately August of 2019 and thereafter.

92.    Counterclaimants' first injuries from the acts alleged in paragraphs 48 to 90 occurred in approximately August of 2019 in the form of legal fees and costs, investigative fees, damage to reputation, and fees and costs of responding to NIC's false allegations.  Those damages constitute a new and accumulating injury that is separate and independent from injuries Counterclaimants sustained from Counter-Defendants' other earlier predicate acts.  If Counterclaimants had not engaged in the new and independent acts alleged in paragraphs 48 to 90, Counterclaimants would not have incurred the substantial legal fees and costs, investigative fees, and damage to reputation that they have incurred since August of 2019.

93.    The misrepresentations described in paragraphs 48 to 90 went to a core issue in the litigation and were so serious as to deprive the litigation of its legitimacy.  Those misrepresentations were made for the purpose of, and were used in an effort to, usurp the Counterclaimants' right to a fair trial by obtaining a "death penalty" issue preclusion sanction before trial.  NIC used the false declarations to seek an "adverse factual finding that Ferrell did not have a client when he sent the

FIRST AMENDED COUNTERCLAIM

December 27, 2011 demand letter to NIC." (Dkt. 844-1 at 24.) NIC and its co-conspirators knew that such an adverse inference would be tantamount to a "win" of its case. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 219–20 (S.D.N.Y. 2003) ("In practice, an adverse inference instruction often ends litigation—it is too difficult . . . to overcome."); *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 23 (Tex. 2014) (Adverse inference is "tantamount to a death-penalty sanction[.]") Even further, the subject of those misrepresentations was central to this litigation. After all, NIC told the Court that "the Carlberg narrative is central to Ferrell's defense against the NIC charge of malicious prosecution in the prior NTG case against NIC" so "Ferrell's tampering goes to a central issue in this case, further supporting imposition of dispositive or, at a minimum, issue preclusive sanctions." (Dkt. 857-1 at 17.) Counter-Defendants sought to resolve that "central issue" in NIC's favor through false testimony. Moreover, on September 19, 2019, NIC subsequently used the false declarations in support of its efforts to obtain disciplinary action by the Texas State Bar against Ferrell.

94.   Unfortunately, the most recent transgressions are not the first time that Counter-Defendants have violated the law in their crusade against NTG and Ferrell. In fact, there have been multiple other acts of fraud, false allegations, perjury and other crimes, including mail fraud, extortion, obstruction of justice, and witness tampering, all of which have been in furtherance of Counter-Defendants' criminal enterprise in violation of the RICO Act, as described below.

**B.     NIC's Efforts to Coerce a False Confession from Nilon by Using a Derogatory Website**

95.   On April 16, 2012, the *Nilon* Action was removed to the U.S. District Court for the Southern District of California by its attorney of record, Carlos Negrete. (Dkt. 1 in *Nilon* Action.) On April 15, 2014, the court denied NIC's motion to dismiss the first amended complaint and granted a motion for class certification. (Dkt. 41 in *Nilon* Action.)

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

96.     The core issue in the *Nilon* Action was whether NIC's colloidal silver actually provided immune support as NIC claimed.  As the Court explained, the central allegation was that "Natural-Immunogenics' Sovereign Silver . . . is snake oil and Natural-Immunogenics is advertising otherwise[.]"  (Dkt. 233-1 at 111 in *Nilon* Action.)  Indeed, the Court in the *Nilon* Action found commonality was satisfied for class certification purposes because "Sovereign Silver either is snake oil or it isn't."  (*Id.* at 148 in *Nilon* Action.)

97.     Counterclaimants are informed and believe and on that basis allege that NIC knew they had little to no chance of prevailing on the merits of whether Sovereign Silver provided immune support.  NTG was able to offer the testimony of an internationally renowned immunologist and founder of the UCLA Department of Immunology, Dr. Andrew Saxon.  As one court explained, Dr. Saxon's "research has focused on immunologic concepts" and is well-respected, having "written nearly 200 articles that have appeared in peer-reviewed publications."  *McGuire v. Sec'y of HHS*, 2015 U.S. Claims LEXIS 1348, *11 (Fed. Cl. 2015).

98.     Dr. Saxon testified unequivocally in the *Nilon* Action that "Natural-Immunogenics claim that Sovereign Silver™ provides 'immune system support' has no scientific basis and is false."  (Saxon Dep. Exh. 314 (Saxon Report).)  NIC, in contrast, was and is unable to offer any credible scientific evidence that its claims of immune support were true.  In the current litigation the best NIC could offer is Dr. Devlin – an unqualified alternative medicine retailer for NIC who self-medicates with colloidal silver for "cat scratch" and illicitly proscribes it to patients as a cure-all for everything from "urinary tract infections" to "cancer."  (Devlin Dep. at 104:4-25; Devlin Dep. Exh. 344 at 23-24.)

99.     Litigation over the efficacy of NIC's colloidal silver also had the potential to reveal NIC's efforts to use paid doctors, such as Dr. Devlin, to illicitly promote its colloidal silver as a cure-all.  Despite orders from the FTC and the FDA that NIC stop promoting its Sovereign Silver as a treatment, NIC aggressively

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

pursues doctors as vendors.  (Devlin Dep. at 99:10-17, 101:2-8).  To this end, NIC has paid Dr. Devlin, and likely other doctors, for their travel and housing expenses at various conferences in exchange for their promotion of NIC's colloidal silver and their loyalty to the NIC brand and family.

100.   Counterclaimants are informed and believe and on that basis allege that NIC knew that a judicial finding of false advertising by NIC would be an existential threat to NIC.  After all, NIC's entire business is promoting – either directly or through its confederates – a substance of no medical benefit as a "cure all" for everything from HIV to COVID-19.

101.   Given that NIC could not defend its product on the merits, NIC and its co-conspirators settled on a scheme of attacking NTG and its clients by any means necessary, including extortion, witness tampering, false allegations and perjury. Counterclaimants are informed and believe and on that basis allege that this scheme had the purposes of: (1) evading liability, (2) inflicting as much harm and damage upon Ferrell, NTG, and their associated attorneys and employees as possible, (3) making an example of NTG and sending a message to plaintiffs class action lawyers and other whistleblowers who might bring actions to protect the public and thus ensure that NIC could continue falsely advertise and defraud the public through "snake oil" sales.

102.   The completion of the *Nilon* Action, however, was delayed by the decision of Nilon to withdraw as the named plaintiff and class representative because, in part, of his relocation from Southern California to Northern California to assist with the care of his grandmother, whose health had been declining.  (Dkt. 61-1 at 2; Dkt. 61-3 at 3.)  Due to suitability issues with a replacement class representative that had nothing do with the merits of whether NIC's product provided immune support as claimed, the *Nilon* Action was ultimately dismissed without prejudice to the class.  (Dkt. 117 in *Nilon* Action.)  The dismissal of the

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

*Nilon* Action was expressly without prejudice as to the potential class of NIC victims.

103.   Since the Court had found that NIC could be sued again by others, NIC then set out on a strategy to destroy and make an example of NTG and to discourage others who might sue NIC for its advertising and marketing practices.  NIC thus embarked on a criminal enterprise with Baker, a private investigator, who devised a plan to extort and blackmail false declarations from witnesses.

104.   Baker's modus operandi was to create derogatory and defamatory Internet websites that were intended to harm the reputations and business interests of his intended targets (i.e., individuals who were witnesses in either existing or potential litigation against Baker's clients), and to offer to take down such websites in exchange for his targets either signing false declarations or making harmful statements that would benefit Baker's clients or Baker in actions against adverse third parties.

105.   Baker has a history of deploying derogatory and defamatory websites for extortion, so much so that there is an adverse inference in the matter of *In re Clark Warren Baker*, Adv. Case No. 2:15-AP-01535-BB (the "*Murtagh v. Baker* Action"), prohibiting Baker from contesting "Baker's scienter and purpose that Baker uses 'adverse websites' to coerce witnesses."  (Dkt. 369 at 5 in *Murtagh v. Baker* Action.)

106.   Part of the evidence that lead to that inference was Baker deploying the same illegal tactics against a non-party witness, David Bender f/k/a Kevin Kuritsky ("Bender").  Baker had offered multiple favorable declarations from Bender.  In litigation against Dr. James Murtagh, who had sued Baker for various torts including defamation in *Murtagh v. Clark Baker, et al.*, Case No. BC527716 (Los Angeles

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 38 -

County Superior Ct. filed Nov. 15, 2013).[8]  It turned out that Baker was extorting Bender for false declarations to support Baker's claims.  Bender explained that the declarations had been untrue and that he had been "totally pressured" and "extorted" by Baker into signing the declaration in exchange for Baker's agreement to remove all embarrassing and damaging materials that Baker had posted about Bender on the Internet.  *In re Clark Warren Baker*, Adv. Case No. 2:15-AP-01535-BB, Dkt. 152-3 at 1-3.  *Id.*, ¶ 4.)  According to Bender, "his sole motivation in signing the Declaration was to get Baker to remove Baker's posts about him on the internet." (*Id.*, ¶ 4.)  Specifically, "Baker had threatened him that with a flick of a switch he could and would reactivate the damaging and embarrassing internet content about him."  (*Id.*, ¶ 6.)

107.   During the course of extorting Bender through an adverse website, Baker spoke with Bender telephonically on multiple occasions.  During these conversations, Baker would brag that he was doing the same thing to other individuals.  Baker would express that if Bender would only show "contrition" and comply with Baker's demands, Baker would stop inflicting harm upon him.  Baker would use other instances Baker's internet extortion as examples.  Bender recalls that Baker specifically mentioned doing the same thing on behalf of a "supplement company."  Counterclaimants are informed and believe and on that basis allege that the "supplement company" Baker was referring to in his conversation with Bender was NIC.

108.   In late 2014, Negrete, and later NIC, retained Baker to provide his website based extortion services.  Benjamin Quinto and his brother, Theo Quinto,

---

[8]  On May 12, 2015, the Los Angeles County Superior Court ordered Baker to pay $60,000 in sanctions to reimburse Murtagh for attorneys' fees and costs attributable to a frivolous motion that Baker had filed therein.  *In re Clark Warren Baker*, Adv. Case No. 2:15-AP-01535-BB, Dkt. 513 at 2 of 28 (Bankr. C.D. Cal. June 27, 2019).  Instead of paying these monetary sanctions, Baker instead filed a chapter 7 bankruptcy petition on June 29, 2015, which commenced his bankruptcy case, No. 2:15-bk-20351.  (*Id.*)  The state court action was thereafter stayed.  (*Id.*)

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

were directly involved in interviewing and ultimately hiring Baker to work on NIC's behalf.  (Dkt. 54-1.)  On or about November 6, 2014, Benjamin Quinto introduced Baker to Negrete.  (Dkt. 311-1 at 81.)

109.  NIC, Benjamin Quinto, and Baker knew that Nilon was financially vulnerable as Nilon was operating a fledgling small business known as Electric Family LLC ("Electric Family") that was gaining momentum.  (Baker Decl., ¶ 4 [Dkt. 54-1, ¶ 4].)  Therefore, at NIC's direction, Baker designed an adverse website named "Electric Family Scam" at www.electricfamilyscam.com (the "Website") targeting Nilon's business.

110.  In keeping with the finding "that Baker uses 'adverse websites' to coerce witnesses" (Dkt. 369 at 5), the Electric Family Scam website was established for that purpose.  On or about November 17, 2014, Baker signed a written retainer agreement with Negrete and with NIC, which required that NIC directly pay Baker for his services.  (Dkt. 320-15 at 2-4.)  Negrete signed such agreement on or about November 24, 2014.  By structuring the agreement in this manner, Baker, Negrete, and NIC all intended for Baker's communications with Negrete to be protected by the attorney-client privilege and for Baker's investigative services to be subject to the attorney work-product rule.  In other words, Baker, Negrete, and NIC were all well aware that Baker was technically providing his services directly to an attorney, Negrete, but that Baker's indirect, but ultimate client was NIC.

111.  On or about February 4, 2015, Baker's friend, John McNair ("McNair"), a resident of Australia, registered the domain name of the Website on NIC's and Baker's behalf.  (Declaration of John McNair of Mar. 11, 2016 ("McNair Decl."), ¶ 4 [Dkt. 54-2].)  Baker and the rest of NIC's defense team made a conscious decision to ensure that McNair would be a resident of a foreign country, *i.e.*, Australia, to ensure that he would be beyond the subpoena power of U.S. federal or state courts.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 40 -

FIRST AMENDED COUNTERCLAIM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

112.   In or about February 2015, the Website went live.  Significantly, the Website accused Nilon and the rest of his business partners at Electric Family of having filed frivolous lawsuits including against NIC.  Such Website used words to describe Electric Family and/or its members as "vexatious," "Shady Business," "trolling," and referenced "Electric Family's questionable lawsuits."  In referencing such lawsuits, the Website stated, "Filing meritless lawsuits doesn't improve the [EDM] culture . . . ."  The company "Electric Family" had not been a party to any lawsuit – the use of that name in the Website was intended to harm an unrelated business owned by Nilon and others and thus create financial leverage over Nilon.

113.   While not essential to its extortionate purpose, the Website includes false statements.  For example, it states, "After losing on summary judgment, Nilon refiled a second amended complaint."  That is false for several reasons.  First, Nilon did not "lose" any motion for summary judgment in the *Nilon* Action addressing the merits of his individual claim against NIC.  Although NIC filed a motion for summary judgment in the *Nilon* Action on April 2, 2015 (Dkt. 95 in *Nilon* Action), and although such motion was fully briefed and taken under submission by the court (Dkt. 115 in *Nilon* Action), the court did not actually issue a ruling regarding that particular motion.  Second, Nilon was no longer the class representative of the certified class after the court substituted Sandoval in his place via an order issued on August 22, 2014.  (Dkt. 62 in *Nilon* Action.)  Third, Sandoval, not Nilon, filed the second amended complaint in the *Nilon* Action on August 25, 2014.  (Dkt. 63 in *Nilon* Action.)  Indeed, three days earlier, on August 22, 2014, the court had previously entered an order granting NTG's motion to withdraw as attorneys for Nilon.  (Dkt. 62 in *Nilon* Action at 8:4-5.)  The Website also stated that "Demulder was represented by Attorney Scott Ferrell of the Newport Trial Group (NTG)."  But, Ferrell and NTG were not Demulder's attorneys of record in *Demulder v. Carter-Reed Co., LLC, et al.*, No. 12-cv-2232 (S.D. Cal. filed Sept. 13, 2012).  Rather, Michael Louis Kelly, Behram V. Parekh, and Heather M. Baker of the law firm

- 41 -

FIRST AMENDED COUNTERCLAIM

1    known as Kirtland & Packard LLP, which is located in El Segundo, California,

2    served as attorneys of record for Demulder in that action.

3    114.   In or about August 2015, Nilon became aware of the Website.  On or

4    about August 15, 2015, Nilon tracked down the web host of the Website, an

5    individual who identified himself as John McNair, via a phone number in Australia

6    and called him to have the Website taken down because it was false and was

7    damaging Nilon's business.  (Declaration of Andrew Nilon of February 18, 2016

8    ("Nilon Decl."), ¶ 22 [Dkt. 41 at 16]; Declaration of Andrew Nilon of May 25, 2017

9    ("Nilon Decl. II"), ¶ 6 [Dkt. 328-1 at 3]; McNair Decl., ¶ 7 [Dkt. 54-2 at 2]).)

10   During such call, Nilon explained to McNair that the statements on the Website

11   were untrue and asked him to take it down.  (Nilon Decl., ¶ 22 [Dkt. 41 at 16].)

12   McNair stated that he made the Website, and had the power to take it down.  (Nilon

13   Decl. II, ¶ 6 [Dkt. 328-1 at 3].)  McNair stated that he would deactivate the Website,

14   which he did so.  (Nilon Decl., ¶ 22 [Dkt. 41 at 16]; McNair Decl., ¶ 9 [Dkt. 54-2 at

15   2].)

16   115.   McNair then immediately notified Baker about his conversation with

17   Nilon.  (McNair Decl., ¶ 10 [Dkt. 54-2 at 2].)  Counterclaimants are informed and

18   believe, and thereon, allege that Baker, in turn, communicated the fact that Nilon

19   had made firsthand contact with McNair without any legal representation, and that

20   Baker intended to implement his and NIC's extortion campaign against Nilon

21   directly.

22   116.   On or about August 20, 2015, McNair (or presumably Baker while

23   impersonating him) left Nilon a message asking him to call McNair.  (Dkt. 41 at 21.)

24   In so doing, Counterclaimants are informed and believe, and thereon, allege that

25   McNair informed Nilon that McNair could be contacted via an email address at

26   electricfamily@nym.hush.com, despite the fact that that hushmail email account

27   was exclusively owned and used by Baker, who had exclusive control of it.  Nilon

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 42 -

FIRST AMENDED COUNTERCLAIM

1  responded to McNair's message by sending an email to the person who he thought

2  to be John McNair, but, in reality, was Baker.

3      117.   Upon receiving Nilon's email message, Baker, while impersonating

4  McNair, replied to Nilon by scheduling a phone call between himself and Nilon.

5  Notably, Baker gave a false reassurance to Nilon as follows:

6          "*I am not interested in your actions – I have no interest in defaming*

7          *you or damaging your career (or your associates)*.  I'm most

8          interested in the conduct of your attorneys.  I'd like to discuss your

9          experience with the Farrells and how and why they facilitated your

10         transparently bogus lawsuits[.]"

11  (Nilon Decl., Exh. B [Dkt. 41 at 23]; Baker Decl., Exh. B [Dkt. 54-5 at 2] (emphasis

12  added).)

13     118.   At the time that Baker made such written statements to Nilon via a

14  wire, Baker knew that his statements to Nilon were not true insofar as Nilon and the

15  other members of Electric Family (including Brudzewski) were targets of NIC.

16  Baker, while impersonating McNair, and Nilon arranged to speak to each other

17  again on August 21, 2015 at 10 a.m. Pacific Daylight Time.  (Nilon Decl., Exh. C

18  [Dkt. 41 at 25].)

19     119.   On August 21, 2015, Baker, using the false identity "AJ Lyon," called

20  and spoke with Nilon at the previously scheduled time for Nilon's call with McNair.

21  (Nilon Decl., ¶ 22 [Dkt. 41 at 16-17].)  Baker misrepresented his identity in

22  communicating with Nilon and concealed his relationship with NIC when

23  communicating with Nilon.  (*Id.*)   Baker (aka AJ Lyon) claimed to be the business

24  associate of McNair.  (Nilon Decl. II, ¶ 7 [Dkt. 328-1 at 3].)

25     120.   Just like he did with Bender, Baker told Nilon that the Website would

26  be put back up if Nilon did not cooperate with him, but it would stay down if Nilon

27  told him what he wanted to hear about.  (Nilon Decl., ¶ 22 [Dkt. 41 at 16-17]; Nilon

28  Decl. II, ¶ 7 [Dkt. 328-1 at 3].)  Baker told Nilon that if McNair and Baker were not

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 43 -

FIRST AMENDED COUNTERCLAIM

1  satisfied with Nilon's cooperation, then the Website would be put back up.  (Nilon

2  Decl. II, ¶ 7 [Dkt. 328-1 at 3].)

3        121.  Baker told Nilon that he wanted to "get" NTG.  (Nilon Decl., ¶ 22 [Dkt.

4  41 at 16-17].)  Baker then asked Nilon a series of questions that suggested the

5  answer, told him that if he "cooperated," then "they" would leave him alone, and

6  that Baker and others wanted to "focus" on NTG.  (*Id.*)

7        122.  At no point during their August 21, 2015 conversation did Baker

8  disclose that:  (1) he was actually the author of the Website; (2) the Website had

9  been funded and created for NIC; (3) Baker was acting on NIC's behalf; (4) Nilon

10  should retain counsel and (5) there was a conflict of interest between NIC and

11  Nilon, who were directly adverse to each other.  (Nilon Decl. II, ¶ 7 [Dkt. 328-1 at

12  3].)

13        123.  On August 21, 2015, Baker sent Nilon an email, purporting to

14  summarize an earlier telephonic conversation that they had had earlier that same

15  day, which contained numerous false or misleading statements including about

16  Nilon's action against NIC.  Although the email dated August 21, 2015 from Baker

17  to Nilon stated that "my grandmother was not sick and she didn't need my company

18  or time" (Nilon Decl., ¶ 21 and Exh. E [Dkt. 41 at 16 and 29]), Nilon's

19  grandmother, Joan N. Williams, was actually in poor health at the time that Nilon

20  signed his declaration (Dkt. 51-2 in the *Nilon* Action).  Specifically, and consistent

21  with Nilon's earlier declaration, Nilon's grandmother had chronic stage V kidney

22  disease, hypertension, acute renal failure, renal artery stenosis, and atheroembolic

23  disease of multiple blood vessels as reflected by the medical records of Williams's

24  May 17, 2013 medical visit.  (Nilon Decl. II, ¶ 10 and Exh. B [Dkt. 328-1 at 4 and

25  6-10].)

26        124.  The allegation that Nilon's grandmother was not actually sick has been

27  one of NIC's recurring litigation narratives before this Court.  NIC, the Emord Firm

28  and Arhangelsky have continued to falsely maintain that Nilon's grandmother was

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

not sick as recently as its March 24, 2020 Third Amended Complaint.  (Dkt. 911 at 24-25, ¶¶ 102-105.)  They have done so even though they have medical records proving these allegations are false and even though Nilon produced contemporaneous documents showing that Nilon's statements in his declaration about his grandmother being sick were completely true.  (*See* Dkt. 328-1 at 4 and Exh. B thereto, filed May 30, 2017 [where NIC makes this false claim]; Dkt. 496 at 26, filed October 23, 2017 [where NIC again makes this false claim] Dkt. 698 at 9, filed August 6, 2018 [where NIC continues to falsely alleged Nilon lied about his ailing grandmother]; and Dkt. 911 at 25, ¶105, filed March 24, 2020 ["Nilon's false 'sick grandmother' affidavit is part of a pattern"].)

125.    The August 21, 2015 email from Baker to Nilon also included text of a draft declaration prepared by Baker.  (Nilon Decl., ¶ 6.)  This email concluded by making a false reassurance to Nilon as follows:  "Again, I am interested in NTG's conduct *and not yours, your friends, or your company*."  (Nilon Decl., Exh. E [Dkt. 41 at 29]; Baker Decl., Exh. C [Dkt. 54-6 at 2-3] (emphasis added).)

126.    Fearful and scared that Baker would re-publish the Website as Baker had explicitly threatened to do earlier that same day, Nilon did not object to the untrue statements in Baker's August 21, 2015 email.  (Nilon Decl., ¶ 22 [Dkt. 41 at 16-17]; Nilon Decl. II, ¶ 11 [Dkt. 328-1 at 4].)  Instead, at Baker's direction, Nilon made a few changes to Baker's August 21, 2015 email and sent it back to Baker hoping that Baker and NIC would stop threatening Nilon and his business partners and leave them alone so that Electric Family's members could continue to pursue their business.  (Nilon Decl., ¶ 23 [Dkt. 41 at 17].)

127.    On August 24, 2015, Baker sent Nilon an actual draft declaration containing false statements and urged Nilon to sign right away before a notary public.  (Nilon Decl., ¶ 24 and Exh. I [Dkt. 41 at 17 and 37-40]; Baker Decl., Exh. E [Dkt. 54-8 at 2].)

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 45 -

FIRST AMENDED COUNTERCLAIM

128.   Paragraph 6 of the draft declaration entitled "Affidavit of Andrew William Nilon," which Nilon never signed, contained the untrue statement that "my grandmother was not sick and she didn't need my companionship or time.  That declaration [stating that my grandmother was sick] was prepared by NTG and I signed it solely to give me a plausible reason to leave the lawsuit without disclosing to the Court that I had been paid by NTG to sign onto a class-action lawsuit." (Dkt. 41 at 39.)

129.   Nilon responded to Baker's August 24, 2015 email by informing Baker:

> "I will get this signed AJ but it will take me a day or two.  ***I am going to speak with my attorney*** just to get advice first before signing.  I'm sure you can understand that."

(Nilon Decl., ¶ 10 and Exh. I [Dkt. 41 at 14 and 37]; Baker Decl., Exh. E [Dkt. 54-8 at 2] (emphasis added).)  Thus, Nilon expressly informed Baker that he was either represented by counsel on this specific matter and/or was in the process of doing so.

130.   On August 25, 2015, at 10:54 a.m. Pacific Daylight Time, after Nilon had sent his email to Baker expressly stating his intention to speak with his attorney regarding the draft declaration of Nilon, Benjamin Quinto sent an email to Baker and copied Arhangelsky and Theo Quinto requesting a conference call for that afternoon "to talk about the declaration and strategy."  (Dkt. 311-1 at 175.)  The email chain also indicates that Jonathan Emord was on the conference call that occurred that day.  (Dkt. 311-1 at 178-79.)

131.   On August 25, 2015, shortly before the conference call was scheduled to begin at 1:30 p.m., Baker (still using a false identity) finally responded to Nilon's August 25, 2015 email at approximately 1:14 p.m. by stating: "I understand – thank you."  (Nilon Decl., ¶ 12 and Exh. K [Dkt. 41 at 15 and 44].)

132.   Baker was scheduled to participate in a conference call with NIC's high level executives and most of NIC's litigation team just a few minutes.  Hence,

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

1 Counterclaimants are informed and believe, and thereon allege, that Baker
2 communicated the fact that Nilon insisted on speaking with his attorney before
3 proceeding with his draft declaration with the rest of NIC's team during such
4 conference call.

5     133. After this NIC strategy call, and despite knowing that Nilon was
6 represented by counsel, Baker threatened Nilon to immediately sign the declaration:

7         "I will let *them* know that you won't have counsel before Monday.  I
8         recommend that we get a declaration signed and to *them* today.  If you
9         drag it on *they might misinterpret your delays*. Ideally, it would be best
10         that you got something signed and mailed this weekend."

11 (Nilon Decl., ¶¶ 14 and 24 and Exh. M [Dkt. 41 at 15, 17 and 48]; Baker Decl., Exh.
12 G [Dkt. 54-10 at 2] (emphasis added).)

13     134. Nilon ultimately refused to sign the draft declaration because it
14 required that he make statements under penalty of perjury that were untrue.  (Nilon
15 Decl., ¶ 25 [Dkt. 41 at 17]; Nilon Decl. II, ¶ 11 [Dkt. 328-1 at 4].)

16     135. A mere few months later, on December 7, 2015, NIC sued Nilon and
17 other members of the Electric Family along with NTG, Ferrell,[9] and others in the
18 instant action.

19     136. Baker and NIC subsequently used Nilon's emails exchanged with
20 Baker (including the emails in which Baker was impersonating John McNair) as
21 purported evidence in support of NIC's action against Nilon, NTG, and other
22 defendants in the instant action.  (Baker Decl., Exhs. A-G [Dkt. 54-4 at 2, Dkt. 54-5
23 at 2, Dkt. 54-6 at 2-3, Dkt. 54-7 at 22, Dkt. 54-8 at 2, Dkt. 54-9 at 2 and Dkt. 54-10
24 at 2].)  The emails between Baker and Nilon mentioned above, however, are not
25 under oath and are not competent evidence, which is precisely why Baker tried to
26
27 [9] In furtherance of NIC's goal of revenge, Arhangelsky and the Emord Firm have filed frivolous complaints against Ferrell before multiple state bars.  None of those
28 licensing bodies have taken adverse action against Ferrell as a result of such frivolous complaints.

coerce Nilon into signing a fraudulent declaration.  (*See* Nilon Decl., Exh. I [Dkt. 41 at 38-40].)

137.   The communications between Baker and Nilon are the product of coercion, and constitute evidence reflecting that NIC has used illegal tactics to prevent injured consumers from trying to stop NIC from falsely advertising its dangerous products.

138.   California's Private Investigator Act prohibits investigators from committing any act "constituting dishonesty or fraud."  Cal. Bus. & Prof. Code § 7561.4.  This Act has been subsequently interpreted by case law to not just prohibit investigators from expressly misrepresenting themselves or their principals, but also simply by silence or other language or conduct creating a misleading impression. *Wayne v. Bureau of Private Investigators & Adjusters*, 201 Cal. App. 2d 427, 436-38 (1962).  Baker engaged in conduct to create the false and misleading impression that he represented a governmental agency, which clearly violated section 7561.4 of the Business and Professions Code.

139.   Baker was acting as NIC's authorized agent when he contacted Nilon using a false name.  (Dkt. 54-1 at 5; Dkt. 320-3 at 3, 5 ("During the period of August 20, 2015 through August 25, 2015, when I was communicating with Andrew Nilon . . . [m]y client was NIC . . . .")

140.   NIC, the Emord Firm, and Arhangelsky have filed multiple declarations from Baker that try to cover up and deny this coercion, that falsely deny that Baker was acting at NIC's direction, and that falsely deny that Baker was even NIC's agent.  (Dkt. 54-1 at 12, ¶30; Dkt. 320-3, ¶¶ 11-25, 40; Dkt. 671-2, ¶¶ 49-59.)

141.   NIC, the Emord Firm and Arhangelsky also filed the Declaration of John McNair dated March 11, 2016 (Dkt. 54-2), whereby McNair presents a similar false narrative to conceal the coercion of Nilon.  (Dkt. 54-2, ¶¶ 7-12.)

142.   In response to the NTG Defendants' motion for sanctions, NIC, the Emord Firm and Arhangelsky filed the Declaration of Benjamin Quinto, which was

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

1  executed on May 22, 2017.  (Dkt. 320-2.)  Benjamin Quinto similarly falsely

2  disclaimed coercion.  (Dkt. 320-2 at 3.)

3      143.   The misconduct described above, including the extortionate conduct by

4  Baker and NIC's subsequent false declarations to try to cover that up, are additional

5  facts that would support an affirmative defense of unclean hands.  After all,

6  Counter-Defendants' unclean hands affirmative defense was based, *inter alia*, on

7  extortion and misrepresentations directed at Nilon.  (Dkt. 784 at 16.)  Despite

8  knowing that such conduct had occurred, and despite knowing that Baker was acting

9  as its agent and at its direction at the time of such conduct, NIC took the affirmative

10  act of moving for summary adjudication of Counterclaimants' unclean hands

11  affirmative defense.  NIC moved for summary adjudication of that unclean hands

12  defense based in significant part on its denials of Baker's wrongdoing and its claim

13  that Baker was not acting at NIC's direction.  (Dkt. 671-2, ¶¶ 49-59; Dkt. 671-2 at

14  22-23; Dkt. 784 at 11 ("NIC argues that the undisputed evidence establishes that

15  Baker did not act at NIC's direction when he contacted Nilon in August 2015 using

16  an alias.").)  This was false, and NIC, Emord, and Arhangelsky knew it to be false:

17  Baker was acting at NIC's direction, and NIC had knowledge of Baker's conduct.

18  Yet the Court accepted the material misrepresentations, finding that "Baker was not

19  acting at the direction of NIC when he communicated with Nilon via telephone and

20  email in August 2015 using an alias," and granted NIC's motion for summary

21  adjudication on the issue of unclean hands.  (Dkt. 784 at 11.)  This injury occurred

22  on February 28, 2019, when the Court issued its order at Docket 784.

23  **C.**   **NIC's Scheme to Use Baker to Extort and Tamper with Witnesses**

24       **and Obstruct Justice by Attempting to Procure False Testimony**

25       **from Isabella Janovick, Deborah Winzen, and Others**

26      144.   In late 2015, Baker contacted former NTG clients Isabella Janovick and

27  Debbie Winzen and deceptively identified himself as "Officer Clark Baker" and

28  falsely represented that he was either a "federal law enforcement officer," or an

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 49 -

investigator for a government agency called the "Bureau of Security and Investigation Services."

145.   Counterclaimants are also informed and believe that Baker contacted other former NTG clients around this time and made similar false representations about Baker working for, and conducting an investigation on behalf of, the California State Bar or a related California governmental agency.  Baker also told such NTG clients that Ferrell and Andrew Baslow were going to prison, and that the NTG clients with whom Baker was speaking would be going to prison as well if they did not "come clean" and admit to having engaged in numerous crimes.

146.   Counterclaimants are informed and believe that a record of Baker advising the Emord Firm and Arhangelsky, in particular, about his conversations with NTG clients exists in the form of a privilege log that NIC filed in Baker's bankruptcy case, *In re Clark Warren Baker*, Adv. Case No. 2:15-AP-01535-BB, Dkt. 420 (Bankr. C.D. Cal. Mar. 18, 2019).

147.   On December 3, 2015, Janovick received a telephone call from a blocked phone number.  Janovick answered the call, and a man deceitfully identified himself to Janovick as "Officer Clark Baker."

148.   Baker falsely told Janovick that he was a law enforcement officer who worked for a government agency called the "Bureau of Security and Investigation Services."

149.   Baker then falsely told Janovick that the government was prosecuting Ferrell and NTG for crimes against consumers.

150.   Baker falsely told Janovick that the legal documents showed that both Janovick and her husband were "victims" of Ferrell and NTG because Ferrell had forged their names on legal documents to steal money from them.

151.   Baker falsely told Janovick that it was urgent that she sign a government affidavit to receive payment from the "victim compensation fund."

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

Baker then stated Janovick's home address, and told her that he would be at Janovick's house for her to sign the documents "very soon."

152.   Janovick told Baker that he was not welcome at her home, and to not contact either herself or her family again.  Baker responded that Janovick was going to be in "a lot of trouble" for not cooperating with a government investigation.

153.   As a direct result of such conversation, Janovick felt scared and her disturbing conversation with Baker caused her to have trouble sleeping.

154.   The end result of Janovick's conversation with Baker was that the NIC Counter-Defendants proceeded to include her as a named party to various RICO claims in the instant action in order to punish her for her lack of cooperation with their planned case against NTG, Ferrell, and others.

155.   In early December 2015, Deborah Winzen ("Winzen"), a former client of NTG, received a call on her mobile telephone number from an individual who deceitfully identified himself as "Officer Clark Baker."  Baker falsely stated that he was a "federal law enforcement officer."

156.   Baker falsely stated that the government was investigating Ferrell and NTG for crimes.  Baker falsely stated that Ferrell had stolen money from Winzen and forged her signature on legal documents.

157.   Baker falsely stated that the government had prepared a legal affidavit that Winzen needed to sign as soon as possible to claim her "victim restitution".

158.   Baker knew both Winzen's home address and work address and said that he planned to come to her home or place of work for her to sign the affidavit immediately.

159.   Winzen told Baker that he was wrong and not to call her again.

160.   Baker falsely told Winzen that she would be liable for "obstruction" of a government investigation if she did not sign Baker's document or if she reported his call to Ferrell.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 51 -

161.   During this early December 2015 time frame, Baker was reporting back to the Emord Firm and to NIC via numerous email messages about his communications with witnesses in the instant action whereby he had threatened, extorted/blackmailed/impersonated an officer to Janovick and Winzen. Counterclaimants are informed and believe that such email communications are reflected in NIC's privilege log attached as Exhibit A to the Declaration of Peter Arhangelsky filed on March 18, 2019 in *In re Clark Baker*, Adv. Case No. 2:15-ap-01535-BB (Bankr. C.D. Cal. Mar. 18, 2019).

162.   These illicit contacts by Baker with NTG clients were contemporaneously memorialized in a December 7, 2015 letter from NTG to Emord.

### D.   NIC's False Declaration Regarding the Deposition of Nilon

163.   Prior to the dismissal of the *Nilon* Action, NIC had been awarded discovery sanctions based on a false declaration that NIC's counsel, Carlos Negrete, had filed before the Court.  These discovery sanctions and the false declaration of Negrete also factored into the Court's later decision to dismiss the Nilon Action. Specifically, by declaration dated June 30, 2014, Negrete represented to the Court that "NIC served another Amended Notice of Deposition [on] Plaintiff's counsel on January 3, 2014, noticing NILON'S deposition for February 7, 2014 at 10:00 a.m. in Mission Viejo, California . . . Plaintiff's counsel again refused to produce Andrew Nilon pursuant to a July noticed deposition and did so without justification."  (Dkt. 49 at 17 in *Nilon* Action.)

164.   That testimony was false.  Negrete never noticed a deposition for February 7, 2014 and never scheduled one with the court reporting service.  In connection with that testimony, Negrete prepared and filed a false proof of service indicating that an amended notice of deposition was served on January 3, 2014 by mail and email.  (Dkt. 49 at 70-71 in *Nilon* Action.)  No such notice was served.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COUNTERCLAIM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

165.   The testimony was similarly material and deprived the litigation of its legitimacy.  Counterclaimants are informed and believe and on that basis allege that the fictional February 7, 2014 non-appearance was so that NIC could argue that Nilon was repeatedly evading or avoiding appearing for a "properly noticed" deposition.  This was especially significant because NIC's overall theory was that Nilon was deliberately avoiding deposition because his case was frivolous.  NIC's scheme here was successful in part as sanctions were issued (Dkt. 55 in *Nilon* Action), and the dismissal order relied on this fact (Dkt. 117 in *Nilon* Action).

166.   NIC, directly and via its agent Negrete, fraudulently concealed its false assertion that it noticed Nilon's deposition for February 7, 2014.  NIC, through Negrete, took the affirmative act of filing a proof of service, which are commonly relied upon in the legal industry as evidence of actual service.  Counterclaimants had no way of knowing, through the exercise of reasonable diligence, that the proof of service and the Negrete declaration were false.  It was only in October 2017, through investigation in preparation for Negrete's deposition in this case, that Counterclaimants learned that a February 7, 2014 deposition had not actually been noticed and thus that they had been injured.  Prior to approximately October 2017, Counterclaimants did not know, and could not reasonably have known, that they had been injured via a false declaration that the Court in the *Nilon* Action relied upon.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### VIOLATION OF RICO (18 U.S.C. §§ 1961, 1962(c), 1964(c))

### (Against All Counter-Defendants)

167.   Counterclaimants incorporate by reference the preceding paragraphs of their counterclaims as though fully set forth herein.

### The RICO Enterprise

168.   Counter-Defendants operated an association-in-fact enterprise with a hub-and-spoke structure.  The purpose of the enterprise is to harm and make an

- 53 -

FIRST AMENDED COUNTERCLAIM

1   example of NTG and Ferrell, those associated with them, and to deter any lawsuits

2   or other actions based on NIC's fraudulent products.

3       169.   The Counter-Defendants, and each of them, played a role in directing

4   the affairs of the RICO enterprise.  For example, the NIC Counter-Defendants

5   identified herein closely monitored and/or guided the substantive content of Baker's

6   communications with NTG's former or existing clients.  They also participated

7   directly in the scheme to attempt to obtain "death penalty" sanctions through the use

8   of false declarations offered by the Declarants.

9       170.   The Counter-Defendants identified herein each knew about the general

10  nature of the enterprise and knew that the enterprise extended beyond his or her

11  individual role.  As a prime example, the Declarants were expressly promised that

12  they would have the "protection" and "vast resources" of NIC's enterprise.

13      171.   All Counter-Defendants identified herein in this action were part of an

14  associated-in-fact enterprise consisting of NIC, Benjamin Quinto, Theo Quinto, the

15  Emord Firm, and Arhangelsky, with the Declarants joining the ongoing enterprise

16  on or about August 2019.

17      172.   The Counter-Defendants identified herein comprise an associated-in-

18  fact enterprise which maintains a "hub-and-spoke" structure.  NIC, largely through

19  its Co-Presidents and sometimes through its attorneys, operate at the center of the

20  enterprise.  NIC's attorneys and other agents and affiliated witnesses operate as the

21  spokes.  The hub concocts the legal strategy including the decision-making to solicit

22  and rely upon false testimony through corrupt or fraudulent acts.  The spokes engage

23  in whatever conduct is necessary to obtain such false testimony and to maintain the

24  fictional legitimacy of the instant action, ultimately attempting to secure a settlement

25  or judgment monies from Counterclaimants.  The spokes carried out the hub's

26  directions.

27      173.   Each Counter-Defendant identified herein agreed to conduct, and did

28  conduct or participate in, the enterprise's affairs through a pattern of racketeering

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 54 -

FIRST AMENDED COUNTERCLAIM

1  activity. That activity was intended to obtain ill-gotten proceeds through settlement

2  or judgment from Counterclaimants and other similarly situated law firms or

3  individuals who crossed paths with the NIC Counter-Defendants identified herein in

4  the litigation context.  That activity was intended to injure Counterclaimants in their

5  property and financial interests.

6  **Pattern of Racketeering Activity:**

7  174.  "To be liable under RICO, defendants 'must be guilty of a 'pattern of

8  racketeering activity,' which requires at least two separate racketeering acts (often

9  called 'predicate acts').'"  *United States v. Christensen*, 828 F.3d 763, 782 (9th Cir.

10  2015), *cert. denied*, 137 S. Ct. 628 (2017).  The RICO statute defines "pattern of

11  racketeering activity" to require that the defendant at least commit "two acts of

12  racketeering activity" within ten years of each other.  18 U.S.C. § 1961(5).

13  175.  Offenses that qualify as "predicate acts" are listed in 18 U.S.C. §

14  1961(1), including "any act . . . involving . . . extortion, . . . which is chargeable

15  under State law and punishable by imprisonment for more than one year[.]"

16  California Penal Code §§ 518 and 520 make extortion a felony.  Additional offenses

17  that qualify as "predicate acts"  include "any act which is indictable under any of the

18  following provisions of title 18, United States Code: . . . section 1341 (relating to

19  mail fraud), section 1343 (relating to wire fraud), . . . section 1503 (relating to

20  obstruction of justice), . . . section 1512 (relating to tampering with a witness,

21  victim, or an informant), [or] . . . section 1952 (relating to racketeering) . . . ."

22  176.  The NIC Counter-Defendants have engaged in, and continue to engage

23  in, a pattern of racketeering activity comprised of the predicate acts of mail fraud

24  (18 U.S.C. §§ 1341, 1349), wire fraud (18 U.S.C. §§ 1343, 1349), extortion (Cal.

25  Penal Code § 520; 18 U.S.C. § 1951), obstruction of justice (18 U.S.C. §§ 1503,

26  1512(c)), and witness tampering (18 U.S.C. § 1512).

27

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 55 -

## Mail and Wire Fraud (18 U.S.C. § 1343, 1349):

177.   The federal mail fraud statute prohibits parties from using the United States mails to carry out fraudulent schemes.  18 U.S.C. § 1341.  The federal wire fraud statute similarly prohibits parties from using the United States wires to carry out fraudulent schemes. (*Id.,* § 1343.) "The mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud . . . ." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).

178.   The mail and wire fraud statutes prohibit the use of the interstate wires for the purpose of executing a scheme or artifice to defraud.  *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001).

179.   A "scheme or artifice to defraud" is a plan to deprive a person of something of value by trick, deceit, chicanery or overreaching.

180.   "[A]ny mailing that is incident to an essential part of the scheme satisfies the mailing element, even if the mailing itself contain[s] no false information." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008). The same rule applies to any use of the interstate wires.  The scheme need not be successful in order for liability to attach under the statute.

181.   Each mailing or use of the wires in furtherance of the scheme to defraud constitutes a separate violation and predicate act.  *Garlick*, 240 F.3d at 792.

182.   Fraudulent intent is established by proof of intentional fraud or by demonstrating a "reckless indifference to the truth." *Irwin v. United States*, 338 F.2d 770, 774 (9th Cir. 1964).  Intentional fraud is established by a conscious knowing intent to defraud and that the defendant contemplated or intended some harm to the property rights of the victim.

183.   No showing of reliance is required to establish that a person has violated 18 U.S.C. § 1962(c) through mail or wire fraud.  *Phoenix Bond*, 553 U.S. at 649.

184.   The Court has previously held that sending via the U.S. mail and electronically filing documents containing intentionally false representations can constitute the predicate acts of mail and wire fraud.  (Dkt. 157 at 13.)

185.   By participating in fraudulent claims and filing, or offering testimony to be filed, containing knowing on recklessly false statements using mail or wire, all Counter-Defendants have participated in, or conspired in furtherance of, schemes to defraud Counterclaimants out of money or legal rights of value to Counterclaimants.

## Extortion (18 U.S.C. § 1951):

186.   Extortion occurs through the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. The predicate act of extortion includes attempts at extortion and conspiracy to extort, even if unsuccessful.  *See* 18 U.S.C. § 1951(a).

187.   Extortion may occur through fear of only economic loss.  *See, e.g.*, *United States v. Margiotta*, 688 F.2d 108, 134 (2d Cir. 1982), *cert. denied*, 461 U.S. 913 (1983).

188.   The NIC Counter-Defendants identified herein threatened to defame Nilon and destroy his fledgling small business through unlawful and wrongful means.  Their threats to do so were "wrongful" under Section 1951 because, when threatening Nilon, they were not legally entitled to the property sought (a declaration supporting NIC or Nilon's emails with Baker) and could not have had a good-faith belief in that entitlement.  *See supra*, ¶¶ 92-139.

189.   The NIC Counter-Defendants identified herein are therefore liable for extortion for making a wrongful threat of fear upon Nilon.

## Obstruction of Justice (18 U.S.C. § 1503, 1512(c))

190.   Obstruction of justice occurs when one "corruptly or by threats of force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede the due administration of justice."  *See* 18 U.S.C. § 1503; *see also* 18 U.S.C. § 1512(c) (relating to obstruction

FIRST AMENDED COUNTERCLAIM

by one who corruptly alters or conceals evidence in any official proceeding or "otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so").

191.   NIC and its agents have made threatening oral and written communications via telephone call and emails to NTG's former clients in an attempt to corruptly influence their witness testimony to corroborate NIC's false version of events against NTG, Ferrell, and the other defendants in the instant action.  Such communications were made with the wrongful intent or improper purpose of abusing the judicial process and the Court in an effort to instill fear of liability in such witnesses to extort favorable witness testimony from them.  NIC and its agents similarly effectuated a scheme to corruptly cause Declarants to give false testimony and to insulate such false testimony from discovery and any meaningful scrutiny. Declarants participated in that scheme with the intent of Counter-Defendants to pay money, submit to sanctions, or cause the Court to order the same, based on false testimony.

192.   Whether or not the NIC Counter-Defendants identified herein were successful in influencing those proceedings is irrelevant under the statute—only the attempt to influence is sufficient for liability.  The conduct of the NIC Counter-Defendants identified herein has had the actual, natural and probable effect of interfering with the due administration of justice.  *See U.S. v. Aguilar*, 515 U.S. 593, 600 (1995).

193.   Obstruction is a predicate act under RICO in cases where, as here, the efforts of the NIC Counter-Defendants identified herein were "designed to prevent detection and prosecution of the organization's illegal activities [and] were part of a consistent pattern that was likely to continue for the indefinite future, absent outside intervention."  *See U.S. v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991); *see also Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1527 (9th Cir. 1995) (describing continuity elements of RICO).

FIRST AMENDED COUNTERCLAIM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

**Witness Tampering (18 U.S.C. § 1512(b)):**

194.   Witness tampering under Section 1512(b) includes the "corrupt persuasion" of a witness.  *See U.S. v. Khatami*, 280 F.3d 907, 911 (9th Cir. 2002) (holding that witness tampering occurred where conviction arose solely out of noncoercive conduct directed toward witness based on theory that defendant had corruptly persuaded those witnesses to mislead investigators with false information). Attempts to persuade a witness to "give false testimony and bribing a witness to withhold information are both forms of non-coercive conduct that fall within the reach of the statute…" (*Id.* at 913-14 (holding that "non-coercive attempts to persuade witnesses to lie … violated 18 U.S.C. § 12(b)").)

195.   An individual acts "corruptly" for purposes of Section 1503 where they act "for an improper purpose (such as self-interest) and with consciousness of wrongdoing."  *See U.S. v. Doss*, 630 F.3d 1181, 1189 (9th Cir. 2011).

196.   Witness tampering includes when one "knowingly uses intimidation, threats, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding."  *See* 18 U.S.C. § 1512(b).  One corruptly persuades under the statute when they have a "consciousness of wrongdoing."  *Arthur Andersen LLP v. United States*, 544 U.S. 696, 704-06 (2005); *see also U.S. v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013).

197.   Witness tampering also involves an attempt to "hinder, delay, or prevent the communication to a … judge of the United States information relating to the commission or possible commission of a Federal offense."  *See* 18 U.S.C. § 1512(b)(3).

198.   The NIC Counter-Defendants identified herein have knowingly used intimidation and threats to corruptly persuade NTG's former clients with intent to influence their testimony in the instant action.

FIRST AMENDED COUNTERCLAIM

199.   At all times relevant to this Counterclaim, the NIC Counter-Defendants identified herein acted as authorized agents, employees, attorneys or principals of Counter-Defendant NIC or Counter-Defendant Emord Firm.  Their conduct was performed for the benefit of NIC and the Emord Firm and caused NIC and the Emord Firm to profit by unlawful means.  Any predicate act identified herein which was performed by, or at the direction of, an agent, employee, attorney or principal of the NIC or the Emord Firm was also performed by or at the direction of NIC or the Emord Firm.  *See Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149, 1155 (9th Cir. 1992) ("an employer that is benefited by its employee or agent's violations of section 1962(c) may be held liable under the doctrines of respondeat superior and agency when the employer is distinct from the enterprise.").

## **Specific Predicate Acts for Each Counter-Defendant**

200.   Counterclaimants hereby incorporate by reference paragraphs 1 through 199.  The specific facts and particulars related to the unlawful acts for which each Counter-Defendant is liable are set forth below.

201.   The NIC Counter-Defendants and Non-Party Co-Conspirators identified herein have engaged in, and continue to engage in, a pattern of racketeering activity comprised of the predicate acts of mail and wire fraud (18 U.S.C. §§ 1341, 1343, 1349), extortion (Cal. Penal Code § 520; 18 U.S.C. § 1951), obstruction of justice (18 U.S.C. § 1503), and witness tampering (18 U.S.C. § 1512). Those predicate acts are detailed herein.

202.   At all relevant times, the Emord Firm and Arhangelsky acted as agents for NIC, Benjamin Quinto and Theo Quinto directed the actions of NIC, and the Declarants acted as co-conspirators with NIC, the Emord Firm and Arhangelsky. Any predicate act identified herein which was performed by, or at the direction of, an agent, employee, attorney or principal of the NIC was also performed by or at the direction of the NIC. *See Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149, 1155 (9th Cir. 1992) ("an employer that is benefited by its employee or agent's violations

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

of section 1962(c) may be held liable under the doctrines of respondeat superior and agency when the employer is distinct from the enterprise.").

203. The following Counter-Defendants are liable for the below predicate acts committed by them and in relation to Counter-Defendants efforts to frame Ferrell for perjury. *See supra*, ¶¶ 48-91.

        a.    NIC, Benjamin Quinto, Theo Quinto, the Emord Firm, Arhangelsky, Charlotte Carlberg, MaryAnn Buc and Jim Ann Buc for soliciting, preparing, executing and filing the intentionally or recklessly false declarations and NIC's Motion for Sanctions against Ferrell (Dkt. 844). *Id.*

        b.    Mail and wire fraud based on the filing of multiple false declarations and in connection with NIC's Motion for Sanctions and the associated meet and confer letter containing false statements. *Id.*

        c.    Obstruction of justice based on the filing of multiple false declarations and in connection with NIC's Motion for Sanctions and the associated meet and confer letter containing false statements. *Id*

        d.    Witness tampering by NIC, the Emord Firm, and Arhangelsky based on their corrupt efforts to influence the testimony of witnesses in connection with NIC's Motion for Sanctions. *Id.*

204. The following Counter-Defendants are liable for the below predicate acts committed by them and in relation to NIC's attempt to extort false testimony from Nilon. *See supra*, ¶¶ 92-139.

        a.    Mail and wire fraud by NIC based on the filing of multiple false declarations seeking to cover up NIC's and Baker's efforts to extort Nilon. *Id.*

        b.    Obstruction of justice by NIC based on the filing of multiple false declarations seeking to cover up NIC's and Baker's efforts to extort Nilon and based on extortionate efforts to obtain false testimony from Nilon. *Id.*

        c.    Witness tampering by NIC based on NIC's (via its agent Baker) attempts to corruptly influence Nilon's testimony. *Id.*

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 61 -

FIRST AMENDED COUNTERCLAIM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

d.     Extortion by NIC based on wrongful threats to Nilon.  *Id.*

205.   The following Counter-Defendants are liable for the below predicate acts committed by them and in relation to NIC's scheme to tamper with the testimony of former NTG clients.  *See supra*, ¶¶ 140-158.

a.     Wire fraud by NIC (based on its agent Baker's conduct) based on use of the interstate wires to coerce statements from NTG former clients. *Supra.*Part.VI.C.

b.     Extortion by NIC (via its agent Baker's conduct) based on its wrongful threats to NTG's former clients.  *Id.*

c.     Witness tampering by NIC (via its agent Baker's conduct) attempts to corruptly influence the testimony of NTG's former clients.

206.   The following Counter-Defendants are liable for the below predicate acts committed by them and in relation to NIC's filing of a false declaration regarding the Nilon deposition.  *See supra*, ¶¶ 159-161.

a.     Wire fraud by NIC (via its agent Negrete's conduct) in filing a false declaration.  *Id.*

b.     Obstruction of justice by NIC (via its agent Negrete's conduct) in the filing of a false declaration.  *Id.*

207.   Each of the Counter-Defendants identified herein has engaged in two or more predicate acts as described above.

208.   The predicate acts described herein are related because they were committed using the same or similar methods and conduct, targeted the same or similar victims, involved the same or similar participants, and were performed for the same or similar purposes.  *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240 (1989).

209.   The predicate acts described herein are continuous, occurring from 2014 until at least 2020.  *See supra* at ¶¶ 48-164.  The predicate acts include attempts by NIC to obtain false testimony, including Baker's predicate acts against

- 62 -

Nilon (August-September 2015), Baker's predicate acts against other NTG former clients (December 2015), the attempted cover up of Baker's misconduct against Nilon via false declarations filed by Baker and McNair (March 2016) and additional, subsequent false declarations filed by Baker, Benjamin Quinto, and Arhangelsky (May 2017), and the scheme of the NIC Counter-Defendants and the Declarants to obtain a financial award and "death penalty" sanctions through the filing of knowingly or recklessly false declarations accusing Ferrell of perjury.  That time period represents close-ended continuity under *Northwestern Bell* and its progeny.  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240 (1989).

210.   In addition, it supports the existence of open-ended continuity because NIC has an enterprise of seeking false testimony, which is likely to repeat itself again and again in the future against any and all future litigation adversaries. Indeed, as recently as November 2019, the Declarants were providing, and NIC was filing, knowingly false declarations.  *Supra*, ¶¶ 48-91.

211.   The NIC Counter-Defendants identified herein continue to file the same or similar sham declarations, and, thus, the enterprise reveals an extant continuing threat that unlawful conduct will continue, representing open-ended continuity under *Northwestern Bell* and its progeny.  *Id.*

**The Enterprise Affected Interstate Commerce:**

212.   The activities of the NIC Counter-Defendants identified herein affect interstate commerce.

213.   The NIC Counter-Defendants identified herein are engaged in an enterprise and related activities that are in or affect interstate commerce.  NIC operates a nationwide business that sells its products to consumers in most or all 50 states.

214.   The Emord Firm, whose principal is located in Washington, DC and Virginia offices, operates nationwide including in the states of Arizona and California.

FIRST AMENDED COUNTERCLAIM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

215.   The fraudulent lawsuit of NIC filed by and prosecuted by the Emord Firm in the instant action affects its victims who practice law in multiple jurisdictions including, *inter alia*, California and Texas.

216.   By causing the Counterclaimants the expense of unjustified legal fees, the associated-in-fact enterprise described herein affected interstate commerce.

**Injury to Business or Property:**

217.   Counterclaimants were injured multiple times in their business and property from the enterprise's false statements of material facts and predicate acts. The harm from each of the four schemes discussed in Sections VI.A-D above is independent.  Counterclaimants would not have suffered any of this harm if Counter-Defendants had not undertaken each of the pled acts, each of which is a separate and independent cause of Counterclaimants' injuries.  For instance, beginning in August 2019, Counterclaimants were put to significant expense defending against false declarations accusing Ferrell of perjury.  (*Supra*. ¶¶ 48-94.) On February 28, 2019, Counterclaimants were injured by having summary adjudication entered against them based on NIC's false representation that Baker was not acting as NIC's agent.  (*Supra*, ¶¶ 95-144.)  Prior to that, Counterclaimants incurred significant legal expenses and costs addressing the extortion and false statements by NIC's agent, Baker.  (*Id.*; *see also supra,* ¶¶ 144-163.)  And in approximately October of 2017, Counterclaimants learned that they had been injured through a false declaration filed by Negrete.  (*Supra*, ¶¶ 163-166.)  As such, Counterclaimants have suffered concrete financial injuries via attorneys' fees and costs and injuries to their business and reputation due to the predicate acts identified herein.

218.   Counterclaimants have relied, to their detriment, on the representations made by the NIC Counter-Defendants identified herein that their activities have been in good faith.

**FIRST AMENDED COUNTERCLAIM**

219.   Counterclaimants reasonably relied on the Emord Firm – licensed attorneys – to obey and properly assert statutes, court orders, court rules, rules of evidence, written agreements, representations to the court by officers of the court, ethical rules, and representations made under oath to the court by NIC's attorneys, agents, and clients.  *See Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 359 (9th Cir. 2005).

220.   The predicate acts performed by members of the enterprise were the direct and proximate cause of Counterclaimants' loss in the form of legal fees.  On information and belief, Counterclaimants suffered injury in the form of injuries stemming from the redirection of funds into costly litigation (e.g., opportunity costs).

221.   WHEREFORE, Counterclaimants request that this Court enter judgment against all Counter-Defendants identified herein as follows: actual damages, treble damages, exemplary or punitive damages, and reasonable attorney fees.

## SECOND CLAIM FOR RELIEF

## CONSPIRACY TO VIOLATE RICO (18 U.S.C. §§ 1961, 1962(d), 1964(c))

## (Against All Counter-Defendants)

222.   Counterclaimants incorporate by reference the preceding paragraphs of their counterclaims as though fully set forth herein.

223.   Counter-Defendants have each conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

224.   Counter-Defendants each knew about the essential nature and scope of the enterprise and intended to participate in it.

225.   Counter-Defendants each agreed to facilitate all or some of the predicate acts described in paragraphs 48 through 221 herein.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 65 -

226.   Counter-Defendants each intended to further, facilitate, or engage in some or all of the predicate acts described in paragraphs 48 through 221 herein. Those acts satisfy the elements of the substantive criminal offenses of mail fraud, wire fraud, extortion, obstruction of justice, and witness tampering, and taken together constitute a violation of 18 U.S.C. § 1962(c).

227.   As a direct and proximate result of Counter-Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Counterclaimants have been forced to spend millions of dollars defending against these false accusations, which have also caused them to suffer substantially injury to their property and reputation.

228.   Counterclaimants request that the Court enter judgment against the Counter-Defendants including actual damages, treble damages, punitive damages, and reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

1.   WHEREFORE, Counterclaimants respectfully request the following relief:

A.   Judgment for the damages suffered by Counterclaimants as a result of Counter-Defendants' wrongful acts in an amount to be determined at trial.

B.   Judgment trebling Counterclaimants' recovery against Counter-Defendants pursuant to 18 U.S.C. § 1964(c).

C.   Judgment awarding Counterclaimants' reasonable attorneys' fees in this action, pursuant to 18 U.S.C. § 1964(c), and otherwise as appropriate.

D.   Judgment awarding Counterclaimants pre- and post- judgment interest, as well as costs of the action.

E.   Such other and further relief as the Court deems just and proper.

FIRST AMENDED COUNTERCLAIM

1

## JURY DEMAND

2

Counterclaimants hereby demand a trial by jury on all issues so triable.

3

4    Dated:  May 7, 2020                    **CALLAHAN & BLAINE, APLC**

5

6                                           By: /s/ *David J. Darnell*
                                                 Edward Susolik
7                                                David J. Darnell
                                                 James M. Sabovich
8                                                Attorneys for Defendants and
                                                 Counterclaimants NEWPORT TRIAL
9                                                GROUP and SCOTT J. FERRELL

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 67 -