Hon. Andrew J. Guilford, Ret.
Judicate West
1851 East First Street
Suite 1600
Santa Ana, CA 92705
Phone: (714) 834-1340

Special Master

FILED
CLERK, U.S. DISTRICT COURT
NOV 24, 2020
CENTRAL DISTRICT OF CALIFORNIA
BY: ___rrp___ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL-IMMUNOGENICS CORP., <br><br> Plaintiff, <br><br> vs. <br><br> NEWPORT TRIAL GROUP, SCOTT J. FERRELL, RYAN M. FERRELL, VICTORIA C. KNOWLES, DAVID REID, ANDREW LEE BASLOW, ANDREW NILON, SAM PFLEG, MATTHEW DRONKERS, TAYLOR DEMULDER, SAM SCHOONOVER, GIOVANNI SANDOVAL, and DOES 1 through 10, inclusive <br><br> Defendants. | Case No. 8:15-cv-02034 JVS (JCGx) <br><br> (JW Reference No.: A270221) <br><br> **ORDER OF SPECIAL MASTER REGARDING NEWPORT TRIAL GROUP'S MOTION TO COMPEL (DKT. 981)** |

In May 2020, Defendant Newport Trial Group ("NTG") filed a Motion to Compel. (Dkt. No. 981.) Soon after, NTG and Plaintiff Natural-Immunogenics Corp. ("NIC") each filed a supplemental memorandum to support their positions regarding the motion. (Dkt. Nos. 994, 995.) After some later rulings in the case, including the Court's acceptance of the Honorable Rosalyn M. Chapman's retirement from her role in the case and the appointment of this Special Master (*see* Dkt. Nos. 1029, 1039), the parties filed an August 2020 joint report regarding whether one of the Court's rulings mooted some or all of NTG's motion. (Dkt. No. 1032.) At a status conference with the parties in October, in addition to scheduling a hearing regarding another pending dispute, the Special Master set a hearing on the dispute for November 19, 2020.

Before the hearing the parties were emailed a tentative ruling on the motion.

The Special Master has considered all the parties' arguments, including those presented at the hearing, and now **DENIES** NTG's motion and all associated requests for fees.

1. BACKGROUND

    1.1     General Background

Judge Selna previously provided a summary of the background of this case in an early February 2020 Order:

> This case concerns litigation between NIC and NTG, its attorneys, and its clients. In brief, NIC alleges that NTG routinely fabricated class-action litigation to extort money from defendants nationwide. Docket No. 92 ¶ 2. In addition to the NTG Defendants, NIC has sued Taylor Demulder ("Demulder"), Matthew Dronkers ("Dronkers"), Andrew Nilon ("Nilon"), Sam Pfleg ("Pfleg"), Giovanni Sandoval ("Sandoval"), and Sam Schoonover ("Schoonover") (collectively, the "Non-NTG Defendants"), who served as lead plaintiffs in these cases. Id. NIC's Second Amended Complaint ("SAC") alleges that the NTG Defendants perpetrated two litigation schemes: (1) the false-advertising scheme and (2) the unauthorized recording, or "wiretapping" scheme. See generally, id. [NIC has since filed a Third Amended Complaint that alleges substantially similar schemes. (See Dkt. No. 911.)]
>
> In the false advertising scheme, NTG and its investigator Andrew Baslow ("Baslow") would identify individuals to serve as lead plaintiffs in consumer fraud class actions against companies selling products in California. Docket No. 92 ¶¶ 23–24. NTG would then bribe these individuals to make intentional false representations that (1) they purchased the defendant's product in reliance on the

representations made in defendant's product advertisements; (2) the product did not work as advertised; and (3) they were injured as a result of their reliance on the advertisements. Id. ¶ 29. Using these false allegations, NTG would threaten companies with statewide class actions under various California consumer protection statutes, [footnote 1 omitted] and, before the companies could discover that the allegations were false, extort out-of-court settlements from these companies. Id. ¶ 27.

The wiretapping scheme functioned similarly. Under the wiretapping scheme, NTG and Baslow would identify individuals to serve as potential lead plaintiffs in consumer privacy class actions. Id. ¶¶ 23–24. NTG would then bribe these individuals to stage private phone calls to various companies, and then later make intentionally false representations that (1) they were not aware that the call was being recorded; (2) they did not consent to the recording; and (3) they later learned that the company recorded all incoming calls only after completing the call. Id. ¶ 34. Using these false allegations, NTG would threaten companies with statewide class actions under the California Invasion of Privacy Act, Cal. Pen. Code §§ 632 et seq., ("CIPA") [footnote 2 omitted] and, before the companies could discover that the allegations were false, extort out-of-court settlements from these companies. Id.

(Dkt. No. 891 at 2–3.)

### 1.2   The Parties' Sanction & Discovery Motions Regarding the NIC Witnesses

Relevant to the current dispute, Judge Selna's February 2020 Order further explains:

On July 3, 2019 [Defendant and NTG attorney Scott Ferrell] submitted a declaration regarding his relationship with Trycia Carlberg explaining that she retained him to send a demand letter on her behalf to NIC. Ferrell Decl., ECF No. 812-1. On September 19, 2019, NIC filed a motion for sanctions against Ferrell arguing that his declaration was false. ECF No. 844-1. As part of this motion, NIC filed the declarations of [Charlotte Carlberg, MaryAnn Buc, and Jim Buc ("the NIC Witnesses")]. Id.

NIC withdrew its motion on September 30, 2019 explaining that new evidence presented in NTG's opposition "includes new evidence the veracity of which is presently unknown, thus warranting withdrawal of the motion in light of the Ninth Circuit's strict standards for sanctions." ECF No., 847, 2.

(*Id.* at 3.)

After NIC's motion for sanctions was withdrawn, NTG filed a Request "for Order to Show Cause re: Sanctions, Perjury, and Subornation of Perjury" against NIC and the NIC Witnesses. (Dkt. No. 855.) NTG also filed a Motion "for Leave to Conduct Discovery Regarding False

1  Declarations." (Dkt. No. 856.) The same day, NIC filed a Motion for Sanctions for Witness
2  Tampering based on text messages sent in September 2019 by Defendant Scott J. Ferrell's
3  private investigator to the NIC Witnesses. (Dkt. No. 857.)
4      Judge Selna ruled on these three motions in his February 2020 Order. (Dkt. No. 891.)
5  Like the portions of the order already quoted, the February 2020 Order provides a clear
6  summary of the facts surrounding the parties' disputes over the NIC Witness Declarations. (*See*
7  *id.* at 2–9.) The Order concludes that NTG's request for an order to show cause failed to meet
8  the procedural requirements of Rule 11. (*Id.* at 11–13.) It also finds that even though Ferrell's
9  investigator's conduct was "inadvisable," it did "not rise to the level of witness tampering. (*Id.* at
10 15.) Finally, the Order grants NTG's motion for leave to conduct discovery and "allows NTG to
11 serve one set of document requests to NIC and its counsel, along with a records subpoena to
12 each of the NIC witnesses." (Dkt. 891 at 18.) In permitting discovery, the Order provides the
13 following analysis:

> The arguments made by NTG in its motion largely mirror those made in the request for an order to show cause. Although the Court denied NTG's request for an order to show cause on the grounds that there was no legal basis upon which to grant NTG's request, the Court finds that there is a likelihood here that the evidence will be relevant. NTG has provided evidence, as detailed in the background section of this order, that refutes the NIC Witnesses' declarations by suggesting that Trycia Carlberg lived with the Ferrell's and that Ferrell at some point represented her in a class action lawsuit. See Para Decl., Ex. A-E; Erin Ferrell Decl., 28-29. For example, NTG provides a hand written card from Trycia Carlberg thanking the Ferrells for allowing her to live in their home and an executed retainer agreement. Id. *However, the evidence presented does not show that NIC or its counsel tampered with witness testimony or was aware of the falsehoods contained in the declarations. Furthermore, NTG's arguments regarding "NIC's pre- and post-filing witness obstruction" also lack merit.* See Leave Mot., 17. The Court notes that there is evidence that NIC conveyed to NTG that the NIC Witnesses "demand[ed] that neither Ferrell nor any person associated with him contact them outside of formal process in this case. Each witness should be contacted through Emord & Associates. To the extent any unauthorized contact occurs, we intend to investigate and pursue potential sanctions for witness tampering." See ECF No., 859-27. However, conveying such a message from the NIC Witnesses is not "witness obstruction." NTG always had the option of seeking testimony from the witnesses through seeking from the Court leave to file a subpoena prior to NIC's withdrawal of its motion. Nonetheless, as of NIC's Sixth Supplemental Disclosure dated August 26, 2019, the NIC Witnesses were listed as "Individuals Likely To Have Discoverable Information." Second Sabovich Decl., Ex. A, ECF 867-2.

> Therefore, evidence pertaining to their credibility would certainly be relevant for trial. The requested discovery would thus be warranted here because it will likely lead to relevant evidence. This factor weighs heavily in favor of granting leave.

(*Id.* (emphasis added).)

### 1.3  NTG's Discovery Sought Regarding the NIC Witnesses

In mid-February 2020, NTG served (1) a set of Rule 34 requests for production on NIC and (2) seven Rule 45 subpoenas on the three NIC witnesses, two attorneys at Emord & Associates (counsel for NIC, "Emord"), a paralegal at Emord, and Emord itself. (*See* Dkt. No. 981 at 54.) NIC states, "Defendants' Rule 34 requests and subpoenas contained four hundred and sixty (460) document requests. That single round of discovery doubled the total number of requests that NTG issued in this entire four-year RICO lawsuit." (*Id.* (citations omitted).) NIC further asserts, and NTG also does not dispute, that many of the requests were either copied verbatim or "entirely redundant and overlapping but presented with slightly different language." (*Id.* at 55.) The same mid-February day that NTG served its discovery requests, Emord stated that it would be representing the NIC Witnesses in the discovery sought. (*Id.* at 11.)

At that point, NIC and the NIC Witnesses provided responses and objections to the requests. (*Id.* at 57.) As part of these responses, NIC asserts that "NIC and the Declarants produced all but one email chain and communication exchanged between NIC and the Declarants prior to . . . September 27, 2019." (Dkt. No. 981 at 57.) NIC states that the one email chain and communication before that date was withheld as privileged. (*Id.* at 57 n.8.) NIC emphasizes the September 27, 2019 date because it was the day NTG's opposition to NIC's original motion for sanctions was filed, which included with it a request for sanctions against NIC, and the day Ferrell's private investigators first attempted to contact some of the NIC Witnesses regarding the content of their original declarations. (*Id.*; *see also id.* at 50, 58.) NIC and the Declarants provided an itemized privilege log for documents created and prepared by those parties after September 27, 2019. (*Id.* at 57–58.) NIC states that NTG agreed that Emord and the three subpoenaed Emord employees could respond to their four subpoenas in one responsive document. (*Id.* at 58.) For communications within Emord & Associates or between

5

Emord and NIC, NIC provided a categorical rather than itemized privilege log. (*Id.*)

After receiving responses to its discovery requests, NTG filed this motion to compel. (Dkt. No. 981.)

### 1.4 Post-Motion Court Rulings

After the Court originally permitted leave for NTG to seek discovery regarding the NIC Witnesses, but before NTG filed its motion to compel, NTG filed counterclaims adding the NIC witnesses, Emord & Associates, and others as counter-defendants in the case. (*See* Dkt. No. 918.) In August 2020, after the motion to compel was briefed, Judge Selna granted a motion brought by NIC to strike the counterclaims and issued sanctions under Rule 11. (Dkt. No. 1028.) In finding NTG's counterclaims time-barred, Judge Selna reiterated his earlier finding that "the evidence presented does not show that NIC or its counsel tampered with witness testimony or was aware of the falsehoods contained in the declarations." (*Id.* at 13.) Soon after, Judge Selna asked the parties to file a joint report regarding the effect of his ruling, if any, on NTG's pending motion to compel. (Dkt. No. 1029.)

Also a few days later, the Court denied NTG's motion for leave to conduct discovery relating to new Strataluz-related allegations in NIC's recently-filed Third Amended Complaint. (Dkt. No. 1030.) In denying the motion, Judge Selna stated,

> [t]his Court has wide latitude in controlling discovery, but it also has an obligation to ensure that discovery is proportional and that the Court's docket and resources are managed conscientiously. See [Lane v. Dep't of Interior, 532 F.3d 1128, 1134 (9th Cir. 2008)]; Fed. R. Civ. P. 26(b)(1). The days of proportional discovery requests here have long expired . . . . Furthermore, given the history of misconduct and excessive discovery in this action, there is a high probability that granting any further discovery here will result in more of the same.

(*Id.* at 6–7.)

In late October, the Court also granted judgment on the pleadings as to Defendants' unclean hands affirmative defense in their answer to the Third Amended Complaint. (Dkt. No. 1062.) The affirmative defense had stated, "Plaintiff's claims may be barred or limited in whole or in part by the equitable doctrine of unclean hands because Plaintiff has made false claims and solicited and filed false declarations before this Court." (Dkt. No. 1017 ¶ 473.) The October

order found that unclean hands affirmative defenses are not permitted in response to RICO claims. (Dkt. No. 1062 at 20.) Although the Court acknowledged further analysis was not necessary to resolve the issue (*id.* at 12), the October order also considered other bases for judgment on the pleadings. For example, the Court found the parties had a potential factual dispute about "whether NIC <u>intended</u> to mislead the Court when it filed the three declarations." (*Id.* at 7 (emphasis in original).) It concluded, however, that NTG was trying to "put the cart before the horse" because it was requesting that "the Court consider NIC's subjective intent before it even considers whether the filings were objectively baseless or had any effect on the proceedings at the time." (*Id.* at 8.) The Court found that because NIC's sanctions motion (and the three attached NIC Witness declarations) were withdrawn before they were ever considered, there was no effect on the proceedings and no reason to find the filings objectively baseless. (*Id.*) The Court also found that the law of the case, and specifically the Court's order striking NTG's counterclaims, supported dismissing the affirmative defense. Throughout the October order, Judge Selna acknowledged the pending discovery on this issue, including this motion to compel before the Special Master and NTG's arguments emphasizing it. (*See, e.g. id.* at 4, 6, 7, 8, 13, 17, 19.) The October order did not find that the pending motion to compel provided a basis to permit NTG's unclean hands affirmative defense to survive judgment on the pleadings.

2. ANALYSIS

   2.1 NIC's Mootness Challenges to Ongoing Relevance of Discovery Sought

In the parties' August joint report, NIC argued that Judge Selna's order striking NIC's counterclaims "substantially moot[ed] the purported basis and justification" for NTG's motion to compel. (*See, e.g.* Dkt. No. 1032 at 3.) NTG disagreed, noting that the Court permitted it to seek discovery before it even filed its (stricken) counterclaims. (*Id.* at 5.) NTG also referenced its (now dismissed) affirmative defense of unclean hands as a basis to permit discovery. (*Id.* at 7–8.) NTG further stated, "[t]he discovery authorized by this Court remains relevant to [the NIC witnesses'] credibility and to the general issue of whether NTG had a client when it sent the demand letter." (Dkt. No. 1032 at 6.)

After Judge Selna granted NIC's motion for judgment on the pleadings as to NTG's

affirmative defense of unclean hands, NIC requested a further opportunity to brief the mootness issue to the Special Master. The Special Master found further briefing unnecessary.

In his original ruling permitting discovery, Judge Selna clearly found that "the evidence presented does not show that NIC or its counsel tampered with witness testimony or was aware of the falsehoods contained in the declarations." (Dkt. No. 891 at 18.) In other words, he rejected NTG's argument that discovery was warranted due to alleged witness tampering or perjury by NIC's counsel. He reiterated this finding when resolving NIC's motion to strike NTG's counterclaim. (Dkt. No. 1028 at 13.) Further, now that NTG's counterclaim and unclean hands affirmative defense are both out of the case, NTG has not persuasively shown that there is a relevant, legal basis for it to pursue discovery into NIC's counsel's conduct in prosecuting this case, including in NIC's counsel's preparation of declarations and related filings involving the NIC Witnesses.

At the hearing, NTG disputed these determinations. Among other things, it noted that NIC's counsel also served as counsel of record in *Nilon*. In this case, Judge Selna permitted depositions of NIC's counsel regarding their prosecution of *Nilon*. (Dkt. No. 298.) NTG suggested that NIC's counsel would be called to testify at trial and that their credibility thus separately remains relevant to the issues in this case. Based on the record before the Special Master, he finds NTG's arguments insufficient to support permitting the discovery from NIC's counsel that it currently seeks. Again, NTG's counterclaim and unclean hands affirmative defense have been dismissed. And from what the Special Master can tell, NTG has not raised an argument like this before to support their current requests for discovery into NIC's counsel's affairs. There are other ways – much more proportional – to test NIC's counsel's credibility regarding their prosecution of *Nilon* (including the depositions NTG was already permitted to take) beyond permitting inquiry into NIC's trial strategy for this case itself.

Judge Selna found that discovery *was* warranted so that NTG could explore questions relating to the NIC Witnesses' credibility. (Dkt. No. 891 at 18.) This aspect of Judge Selna's ruling was not impacted by his order striking NTG's counterclaims, nor his order dismissing NTG's unclean hands affirmative defense. (*See also* Dkt. No. 1032 at 6.) It remains a live issue

for consideration in reviewing the pending motion. And although it does interrelate to the preparations of NIC's counsel, it requires a different focus.

Even though the Special Master acknowledges that the credibility of the NIC Witnesses remains relevant to the claims and defenses in this case, that acknowledgement deserves some context. In its Fourth Amended Complaint, NIC has identified over 70 predicate acts as the bases for NTG's alleged false advertising and wiretapping schemes. The NIC Witnesses' testimony relates to just one of those acts. Specifically, the NIC Witnesses' testimony relates to the conduct of Trycia Carlberg, who was NIC's originally-planned lead plaintiff for *Nilon v. Natural-Immunogenics Corp.*, Case No. 3:12-cv-00930 LAB (BGSx) (C.D. Cal. 2012). At the hearing, NTG strongly urged that *Nilon* and what happened in that case are critical to the damages NIC seeks in this case and particularly to NIC's malicious prosecution claim, as *Nilon* is the only predicate action at issue in that claim. But as NIC countered at the hearing, ultimately, Andrew Nilon – not Carlberg – served as the lead plaintiff in that action. NIC has brought separate allegations regarding Nilon's conduct apart from Carlberg's. Ultimately, the credibility of witnesses challenging Ferrell's and Carlberg's statements about Carlberg's whereabouts and actions in 2011 and 2012 is one issue out of many that will need consideration in this case. Proportionality and the substantial resources that the parties, the Court, and both Special Masters have already expended on this issue are relevant here. (*See also* Dkt. No. 1030 at 6–7.)

### 2.2 NIC's Other Procedural Challenges to Number and Type of Discovery Requests Served, Including Discovery Served on NIC's Counsel

Judge Selna's order "allow[ed] NTG to serve one set of document requests to NIC and its counsel, along with a records subpoena to each of the NIC witnesses." (Dkt. 891 at 18.) NTG served over 400 requests, including a set of Rule 34 requests for production on NIC and seven Rule 45 subpoenas on the three NIC witnesses, two attorneys at Emord, a paralegal at Emord, and Emord itself. (*See* Dkt. No. 981 at 54, 90–91.) In responding to NTG's motion to compel, NIC argues that it was improper for NTG to serve Rule 45 subpoenas on Emord and its attorney and paralegal employees (even though NIC went ahead and expended the money and resources

to collectively respond to those subpoenas). (*See, e.g.* Dkt. 981 at 58.)

The Special Master agrees with NIC, both based on the plain language of Judge Selna's discovery order itself and because the Special Master finds NTG has failed to show a relevant legal basis for it to pursue discovery from these individuals and entities now that NTG's counterclaims and unclean hands affirmative defense are no longer in this case. Thus, NTG's requests to compel documents and things, including phone records, from Emord or its attorney and paralegal employees is rejected.

For similar reasons, NTG's challenge to NIC's categorical privilege log for communications between NIC and its counsel (or among NIC's counsel) is rejected as a threshold matter. NTG has again failed to show that it is entitled to seek discovery of these categories of documents and communications in this case, given the claims and defenses that remain at issue. Moreover, attorney client privilege and/or work product protection likely cover many of these documents, which are between NIC and its counsel or among NIC's counsel, prepared after this litigation was filed, and regarding filings in this case. Aside from a "good for the goose, good for the gander" argument, NTG does not attempt to reasonably argue to the contrary. And the "goose-gander" argument is unpersuasive because it relates to different circumstances.

Regarding the nature of the categorical privilege log itself, although the Special Master acknowledges the fact that Judge Selna and Judge Chapman previously rejected NTG's proposal to submit categorical privilege logs for other documents in this case (Dkt. Nos. 241, 458, 981-24), given the specific nature of the issues and documents raised here and considering issues of fairness and proportionality, *to the extent it was necessary at all*, the Special Master finds NIC's categorical privilege log was sufficient.

### 2.3 Parties' Remaining Disputes Regarding Responses of NIC and the NIC Witnesses

The remaining disputes on the merits hinge on the relationship between NIC and the NIC Witnesses, and certain dates in the development of that relationship. Of note, at the hearing, although much time was devoted to the threshold issues discussed in §§ 2.1 and 2.2 (as well as the two withheld August 2019 emails), there was only limited, if any, discussion regarding

NIC and the NIC Witnesses' relationship as discussed in this Section, including the Special Master's joint defense theory analysis.

On February 12, 2020, Emord informed NTG that it would represent the NIC Witnesses in responding to NTG's subpoenas. But NIC argues that February 12, 2020 isn't the critical date here. Instead, NIC states that it "**has produced all responsive communications (except one privileged email chain) between Emord and the Declarants** prior to September 27, 2019, which predate Scott Ferrell's threats of imminent litigation and request for serious sanctions." (Dkt. No. 981 at 74 (emphasis in original).) NIC argues that after that date, "[t]he documents and communications created in preparation of a joint defense to Ferrell's litigation threats are work product protected." (*Id.*; *see also* Dkt. No. 981-20.)

The "common interest" doctrine – also called the "joint defense" rule – "is an exception to ordinary waiver rules designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other." *Pacific Pictures Corp. v. United States District Court*, 679 F.3d 1121, 1129 (9th Cir. 2012). Stated differently, it is "an extension of the attorney-client privilege," which "establish[es] a duty of confidentiality on the part of the additional attorney and party to the agreement." *United States v. Gonzalez*, 669 F.3d 974, 981 (9th Cir. 2012). To invoke the doctrine, "the parties must make [a] communication in pursuit of a joint strategy in accordance with some form of agreement—whether written or unwritten." *Pacific Pictures Corp.*, 679 F.3d at 1129. "[A] shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this exception. Instead, the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement — whether written or unwritten." *Id.* (citation omitted).

Some Ninth Circuit courts have applied the following test to determine if the rule applies: "(1) the communication is made by separate parties in the course of a matter of common interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived." *Tatung Co. v. Shu Tze Hsu*, No. 8:13-cv-1743 DOC (ANx), 2016 U.S. Dist. LEXIS 22012, at *25 (C.D. Cal. Feb. 19, 2016) (Carter, J.) (quoting *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003)); *Baldwin v. United States*, No. 8:17-mc-00027 CJC (KESx),

2018 U.S. Dist. LEXIS 219455, at *20–21 (C.D. Cal. June 14, 2018) (Stevenson, J.). The party asserting the privilege has the burden of establishing both the existence of a common interest agreement and the privileged nature of the communication. See *United States v. Gonzalez*, 669 F.3d 974, 979 (9th Cir. 2012).

The Special Master agrees that the common interest doctrine applies to protect the documents between the NIC Witnesses and NIC's counsel after September 27, 2019 from production. On that date, an investigator hired by Scott Ferrell contacted the NIC Witnesses. (Dkt. No. 891 at 5.) The next day, after some text exchanges between the investigator and MaryAnn Buc, the investigator wrote, in part, that "Mr. Ferrell is very upset and told us he had prepared a lawsuit that he intends to file against you early next week." (*Id.* at 6.) NTG and Ferrell eventually did indeed make good on this statement, naming the NIC Witnesses as counter-defendants in this case, albeit after they had already retained Emord to respond to NTG's Rule 45 subpoenas. (Dkt. No. 918 (filed April 2020).) September 27, 2019 is also the day that NTG moved for sanctions in response to NIC's original motion, arguing that NIC and the NIC Witnesses had intentionally falsified the declarations in order to support NIC's claims in the case. (*See* Dkt. No. 846.)

NIC has persuasively shown that the private investigator's actions and NTG's responsive motion for sanctions created the need for NIC and the NIC Witnesses to continue to correspond so that they could commonly defend against NTG's allegations in this case and additional threats of suit. (*See, e.g.* Dkt. No. 981 at 81.) Specifically, NTG challenged the veracity of the declarations NIC prepared with the NIC Witnesses for submission in this case, and threatened litigation against the NIC Witnesses on that same basis. Although NIC and the NIC Witnesses did not sign a *written* Joint Defense Agreement ("JDA") until May 2020, the Special Master finds that this written JDA simply reflected the implied agreement between the parties that arose on September 27, 2019. See *Ellis v. J.P. Morgan Chase & Co.*, No. 12-cv-03897-YGR (JCS), 2014 U.S. Dist. LEXIS 45681, at *22 (N.D. Cal. Apr. 1, 2014); *Gonzalez*, 669 F.3d at 979, 981. The Special Master has also considered NTG's argument that the common interest doctrine cannot apply here because the NIC Witnesses were unrepresented by counsel in late September 2019.

The Special Master agrees with the district courts that have not followed this rigid approach to the common interest doctrine, and instead permitted it to extend to unrepresented third parties. (*See* Dkt. No. 981 at 81, 82 (collecting cases).)

It is also notable that in this particular case, the NIC Witnesses eventually *did* retain Emord as their own counsel in February 2020 and eventually *were* (at least for a short time) named as parties in this action. Particularly when viewing the "joint defense" privilege as "an extension of the attorney-client privilege," *Gonzalez*, 669 F.3d at 981, the approach urged by NTG under the circumstances is unpersuasive. *See, e.g. Tekstar Communs., Inc. v. Sprint Communs. Co. L.P.*, No. 08-1130 (JNE/RLE), 2009 U.S. Dist. LEXIS 144184, at *16–17 (D. Minn. May 14, 2009) ("We decline the Defendant's invitation to exalt form over substance, as the practical effect of the shared interest privilege is to allow commonly situated litigants, or imminently prospective litigants, to share a common defense. While the privilege is frequently effected by communications between counsel, the Defendant offers no cogent reason why this privilege is not as equally important to unrepresented litigants who share the same liability exposure, and may well be in search of counsel.")

To the extent NTG maintains its argument that it is still entitled to these documents because it has a substantial need for them, that argument fails. In *Gonzalez*, the Ninth Circuit explained that because the common interest privilege is an extension of the attorney client privilege, the substantial need exception to work product privilege does not apply. *Gonzalez*, 669 F.3d at 981 (quoting *Admiral Ins. Co. v. U.S. Dist. Ct*., 881 F.2d 1486, 1494-95 (9th Cir. 1989) ("[p]rivilege cannot be overcome by a showing of need, whereas a showing of need may justify discovery of an attorney's work product.").

NTG's waiver argument is also unpersuasive. NTG argues that NIC waived the privilege by referring to documents between NIC's counsel and the NIC Witnesses when NIC was working with the NIC Witnesses to prepare the original NIC Witness Declarations. (Dkt. No. 38–39.) The timeline is important here: the NIC Witness Declarations were filed with the Court on September 19, 2019, eight days *before* NIC asserts the common defense doctrine applies. NIC states that it has produced all documents and communications between NIC and the NIC Witnesses

regarding their original declarations, save one email chain (discussed soon). Indeed, NIC attached those declarations to some of its filings in this case. NTG has not shown that waiver extends to the documents created or prepared *after* the original declarations were filed and it had responded with its motion for sanctions.

NIC presents separate arguments regarding attorney client privilege and work product privilege for some of the withheld documents. Because the Special Master agrees that the common interest doctrine is properly invoked to withhold documents created by the NIC Declarants and Emord after September 27, 2019, the Special Master doesn't address the parties' overall arguments on these other grounds.

As noted, in addition to the post-September 27, 2019 documents, NIC and the NIC Witnesses have withheld one August 2019 email chain on the basis of attorney client privilege and the joint defense privilege. After further consideration and based on the arguments at the hearing, the Special Master directed NIC to submit the documents for *in camera* review. Based on that review, the Special Master is persuaded that the joint defense privilege properly applies. (Dkt. No. 981 at 87–88.) The document relates to a joint plan to protect against possible retaliatory actions by Defendants. In the circumstances presented, production of the two email chain documents is not warranted.

Regarding NIC Witnesses' phone records before September 27, 2019, the Special Master agrees with NIC that balancing their minimal relevance and the potential burden to the NIC Witnesses, proportionality does not support compelling their production. *See supra* § 2.1. The discussion at the hearing failed to persuade the Special Master otherwise. NTG's argument that it should be entitled to phone records because NIC was entitled to phone records on a different issue earlier in this case is also unpersuasive.

### 2.4 Fee Shifting

The Special Master denies NTG's motion to compel. Thus, Rule 37(a)(5)(B) applies. Under Rule 37(a)(5)(B),

> [t]he court . . . must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed

>the motion its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion as substantially justified or other circumstances make an award of expenses unjust.

Judge Selna recently declined to issue sanctions on another matter. In doing so, he stated, "the Court declines to sanction NTG given the likelihood of <u>any</u> sanction order issued by the Court to cause additional litigation unrelated to the actual and add to an already lengthy docket list." (Dkt. No. 1062 (emphasis in original).) The Special Master follows Judge Selna's lead here. The special circumstances surrounding this particular dispute do no warrant sanctions, including because it has already been litigated far beyond what is warranted by the needs of this case.

### 2.5   Page Limits

The Special Master is concerned that the joint stipulation process contemplated by C.D. Cal. Local Rule 37-2 is being used by the parties as an opportunity to file lengthy statements in support of their competing positions that are well beyond what they would get if they were filing a non-discovery motion before Judge Selna. And the Special Master isn't persuaded that the disputes raised by the parties so far have warranted the length of those statements. The Special Master asks that unless a party receives advance permission from the Special Master, the total pages of a party's combined introduction and points and authorities sections in a joint stipulation should not exceed 25 pages.

The parties are also reminded to include an "indexed table of contents setting forth the headings or subheadings contained in the body thereof" in their L.R. 37-2 joint stipulations. See C.D. Cal. L.R. 37-2.1. Lastly, the parties are reminded that if they file future motions to be heard by the Special Master under L.R. 37-2, they are expected to contact the Special Master's Case Manager in advance to schedule a hearing date.

///
///
///
///
///

3. **CONCLUSION**

The Special Master **DENIES** NTG's motion and all associated requests for fees.

IT IS SO ORDERED.

Dated: Nov. 24, 2020

Hon. Andrew J. Guilford, Ret.
Special Master