Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Joshua S. Furman, Esq. (pro hac vice)
jfurman@emord.com
Eric J. Awerbuch, Esq. (pro hac vice)
eawerbuch@emord.com
Emord & Associates, P.C.
2730 S. Val Vista Dr., Bldg. 6, Ste. 133
Gilbert, AZ 85295
Phone: (602) 388-8899
Fax: (602) 393-4361
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL-IMMUNOGENICS CORP.,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC TRIAL ATTORNEYS, et al.,<br><br>Defendants. | Case No. 8:15-cv-02034-JVS (JCG)<br>(JW Reference No.: A270221)<br><br>**LR 37 JOINT STIPULATION RE:**<br><br>**PLAINTIFF'S MOTION TO COMPEL DOCUMENTS CONCERNING DAN BOBBA**<br><br>Master:  Hon. Andrew Guilford (Ret.)<br>Judge:  Hon. James V. Selna |

## **TABLE OF CONTENTS**

I.   PLAINTIFF NIC'S POSITION.........................................................................1

    A.   Introduction ........................................................................................1

    B.   Facts ....................................................................................................3

        1.  The "*Bobba* Action" (*Morales v. Magna, Inc., et al.*, No. 3:10-cv-01601-EDL (N.D. Cal. 2010)..............................3

        2.  Testimony Regarding Bobba's September 2010 Sham Declaration ..............................................................7

        3.  Procedural History .................................................................10

        4.  Documents at Issue ................................................................11

    C.   Argument............................................................................................13

        1.  The Discovery Sought Is Relevant and Proportional.........................................................................14

        2.  The Crime-Fraud Exception Applies to All Documents Listed on Appendix A...................................16

        3.  NTG Waived Work Product Protections by Testifying about "Privileged" Material.........................21

        4.  Daniel Bobba Waived His Privileges by Testifying About "Privileged" Material.........................23

    D.   Conclusion..........................................................................................24

II.  DEFENDANTS' POSITION .........................................................................25

    A.   Introduction .......................................................................................25

    B.   Background .........................................................................................26

    C.   Argument............................................................................................31

        1.  NIC Unreasonably Delayed in Bringing its Motion to Compel ...............................................................31

        2.  NIC's Request for Another Crime Fraud Review is Disproportionate and Without Merit .........................36

3.  The Crime Fraud Exception Does Not Apply ..........................39

4.  NIC's Waiver Arguments Should be Rejected ........................43

D.   Conclusion..........................................................................48

Plaintiff Natural-Immunogenics Corp. ("NIC"), pursuant to Fed. R. Civ. P. 37(c), hereby moves for an Order compelling production of documents relevant to the NTG suit brought by Daniel Bobba against Magna-RX, Inc. in *Morales, et al. v. Magna-RX, Inc.*, 10-CV-1601-EDL (N.D. Cal. 2010) ("*Bobba* action"). The documents sought are listed in Appendix A hereto. This motion is pursuant to a Joint Stipulation submitted under Local Rule 37-2. The parties met and conferred regarding the motion on January 7, 2021. *See* L.R. 37-1. The parties were unable to reach an agreement that would eliminate or narrow the issues in dispute. Defendants oppose the motion.

## I.   **PLAINTIFF NIC'S POSITION**

### A.   **Introduction**

NIC moves under Rule 37(a)(3)(B)(iv) to compel production of documents concerning NTG's use of Dan Bobba as a client in sham litigation. This motion is supported by new documentary and testimonial evidence obtained in the "post-privilege" phase of discovery following the Court's various privilege Orders. *See* Dkt. 570; Dkt. 597; Dkt. 659; Dkt. 681; Dkt. 712; Dkt. 820; Dkt. 878.

NIC's RICO case alleges NTG routinely manufactures extortionate, sham litigation. In 2010, NTG pursued such a case against "Magna-RX, Inc." ("Magna"). *See* Exh. 8 (Compl., *Bobba* Action, Dkt. 1) at ¶ 22 & 38 at ¶ 15 (N.D. Cal. Apr. 14, 2010); *see* Exh. 1 (Bobba Tr.) at 31-42. Bobba did not purchase the Magna product as a legitimate consumer. NTG's "field rep" drove Bobba to a GNC, told him to purchase Magna's product, and gave him $60 to do so. *Id.* Bobba later posted his experience online in a poker forum, revealing the suit to be a sham. *See* Exh. 4 (Bobba Online Post). Facing a motion for sanctions, NTG confronted Bobba at his home in Northern California and had him sign a declaration that was false and purported to exonerate NTG. *See* Exh. 5 (Magna Mot. for Sanctions); Exh. 1 at 58-69 (Bobba Tr.).

Bobba testified the declaration contained material falsehoods and did not

accurately reflect his actual experience.  *See* Exh. 1 at 58-69 (Bobba Tr.).  That is new evidence supporting the conclusion that NTG committed predicate RICO acts (i.e., subornation of perjury and obstruction of justice) to conceal use of shill clients in attorney-driven suits.  Judge Selna granted NIC leave to take Bobba's deposition in March 2020.  *See* Dkt. 902.  Two other relevant depositions occurred in July and October of 2020.  *See* Exh. 1 (Bobba Tr., July 22, 2020); Exh. 2 (W. Ferrell Tr., Aug. 21, 2020); Exh. 3 (R. Ferrell Tr., Oct. 29, 2020).

Bobba and NTG agents waived privileges expressly and impliedly through testimony regarding the *Bobba* action.  NTG defended itself with testimony that its former client Bobba was a liar.  *See* Exh. 2 (W. Ferrell Tr.) at 68, 74, 84.  NTG's attorney (R. Ferrell) and field rep (W. Ferrell) testified at length concerning their communications with Bobba.  *See* Exh. 3 (R. Ferrell Tr.) at 223-242; Exh. 2 (W. Ferrell Tr.) at 68, 72-75, 78-82, 84, 107-109.  They did not assert a privilege objection.  *See generally* Exh. 3 (R. Ferrell Tr.) (asserting no privilege objections); Exh. 2 (W. Ferrell Tr.) (asserting no privilege objections).  NTG may not selectively disclose privileged material in defense while withholding key documents germane to the same subject matter. Consistent with governing precedent, this Court should compel the relevant documents in Appendix A. *See Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010) (*quoting United States v. Nobles*, 422 U.S. 225, 239-40 (1975), work product privilege "waived 'with respect to matters covered in testimony.'"); *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003).

NIC's requested relief is relevant and proportionate under Rule 26(b).  The documents sought are narrow and few.  The material is indispensable at trial. Bobba will testify before the jury.  Underlying documents relevant to the veracity of his testimony bear directly on issues in dispute between NTG and its former client and on an issue central to the RICO allegations, whether NTG fabricated a declaration to conceal unlawful activities in the *Bobba* action.  *See* NIC Fourth

Amended Complaint ("FAC"), Dkt. 1007 at ¶¶287-314.  NIC does not seek expansion or the reopening of discovery, delay in any pending discovery, or delay in any proceedings. The documents come from NTG's existing privilege logs.

Judge Selna and the former Special Master, Hon. Rosalyn Chapman (ret.), contemplated the need to resolve disputes stemming from post-privilege deposition practice.  *See* Dkt. 876 at 30. The Court should favor process that facilitates trial on a full record.  This action addresses repeated and continuous fraud on the Courts by the NTG firm over many years.  The public interest in ferreting out that fraud is consistent with Congressional intent underlying the civil RICO statute.  *See* Dkt. 659 at 16 ("Defendants were engaged in a pattern or scheme to manufacturing litigation, which threatens to harm the integrity of the judicial process").

As explained in detail below, this Court should review *in camera* all documents listed on Appendix A (attached hereto).  The Court should compel those documents because (1) they fall within the crime-fraud exception; and/or (2) NTG and Bobba have waived privileges.[1]

## B.   Facts

The germane facts have been described in prior dockets (*see, e.g.,* Dk. 292-1 at 66-72; Dkt. 292-2 at ¶¶354-362 (and supporting exhibits); Dkt. 473 at 19-20 (and supporting exhibits); Dkt. 628 at 6-7, 10-18, 21-22; Dkt. 659 at 14-15).  New facts have also been adduced in recent discovery.

### 1.   The "*Bobba* Action" (*Morales v. Magna, Inc., et al.*, No. 3:10-cv-01601-EDL (N.D. Cal. 2010)

NTG originally filed its *Magna-RX* complaint on behalf of "Felipe Morales."

---

[1] NIC's Appendix A includes 149 entries excerpted from NTG's privilege logs.  Of those, 141 have <u>not</u> been reviewed by the Court.  NIC includes eight (8) documents that were reviewed earlier by the Special Master *in camera*, but should be reviewed again here in context with the more developed record.  Those documents are:  NTG009984; NTG009989; NTG09990; NTG010001-NTG010002; NTG010003; NTG011030; and NTG011057; NTG011150-NTG011156.

*See* Exh. 8 (Morales Compl.) at ¶6 (alleging Morales "purchased Magna-Rx+ in California at Wal-Mart within the past 60 days").  That suit was staged by NTG. The alleged "purchase" actually occurred on the same evening Morales met with NTG's representative.  *See* Exh. 9 (NTG007983) (describing meeting with Morales on Apr. 8, 2010); Exh. 23 (Morales' Walmart receipt of April 8, 2010 at 8:51pm). On April 8, 2020, NTG agent Wynn Ferrell (father of defendants Scott and Ryan Ferrell) met with Morales to evaluate whether NTG would use Morales in litigation against Magna-RX, Inc.  *Id.*  Morales then purchased the Magna product following that meeting.  Exh. 23 (Morales receipt).  W. Ferrell conceded at deposition that, in the ordinary course, he would instruct NTG clients to make purchases to support NTG lawsuits.  *See* Exh. 2 (W. Ferrell Tr.) at 107-110. Morales proved unsuitable, however, because his purchase did not occur in the Northern District of California.  *See* Exh. 5 at 2 (Magna Mot. for Sanctions, *Bobba* Action, Dkt. 59).  The Court threatened dismissal because of concerns with the forum.  *See, e.g.,* Exh. 11 (Order, *Bobba* Action, Dkt. 37).

On June 22, 2010, at a hearing on Magna's motion to dismiss, NTG told the Court that it had lost contact with Morales.  *See* Exh. 12 at 9 (Trancript, *Bobba* Action, Dkt. 43).  To avoid dismissal, NTG represented it had found two new plaintiffs as stand-ins for Morales.  *Id.* at 3 ("[W]e have been contacted by two additional plaintiffs that we intend to add as named plaintiffs . . .").  Bobba was one of the two.  As of the June 22, 2010 hearing, Bobba had not yet purchased the Magna-RX product or retained the NTG firm.

At his deposition in July 2020, Bobba testified about his role in that 2010 NTG suit.  *See* Exh. 1 (Bobba Tr.) at 32-46.  He was a friend of Chris Rhodes who had been in contact with NTG.  *Id.* at 29-31.  Rhodes put Bobba in contact with NTG and told him he could get money from the NTG firm.  *Id.* at 31-32.

NTG's field rep W. Ferrell met Bobba in June 2010 for an "intake" interview in the Magna case.  *See* Exh. 6 at ¶7 (Decl. of W. Ferrell, *Bobba* Action,

Dkt. 63-5).  Bobba testified that, on June 28, 2010, an NTG rep picked him up at his house; drove him to a local GNC in Mountain View, CA; gave him $60 in cash; and told him to purchase the Magna-RX product in the store.  *See* Exh. 1 (Bobba Tr.) at 32-34.  Bobba complied.  His receipt dated June 28, 2010 shows he purchased one item of Magna-RX+ for $39.00 ($43.69 with tax).  Exh. 10 (Bobba receipt, NTG011063).  Bobba paid cash in the amount of $60.  *Id.*  He returned to the vehicle and gave his receipt to the NTG field rep.  *See* Exh. 1 (Bobba Tr.) at 35-37.  He testified that his purchase on June 28, 2010 was the only time he ever bought the Magna-RX product.  *Id.* at 38-39.  He did not consume the product before that day.  *Id.*

Bobba signed a printed retainer dated "June 28, 2010"—the same date he purchased the Magna product—specifically for a "class action lawsuit against Magna-RX[.]"  *See* Exh. 13 (Bobba retainer, NTG000194).  Bobba and NTG agents confirmed they had only one meeting in June of 2010.  *See* Exh. 1 (Bobba Tr.) at 44; Exh. 2 (W. Ferrell Tr.) at 73-75.  That means Bobba signed his retainer agreement on the same day he purchased his product.  NTG had prepared and printed Bobba's retainer for litigation against Magna-Rx before Bobba made the purchase.

W. Ferrell testified that Bobba's testimony was false.  *See* Exh. 2 (W. Ferrell Tr.) at 68, 74, 84 (referring to Bobba's alleged "lies").  W. Ferrell denied he drove Bobba to GNC; he denied giving Bobba cash to acquire the product.  *See id.* at Tr. 103.  Although specific as to his recollection for those denials, he professed a near complete lack of memory concerning his initial meeting with Bobba in June 2010. *See id.* at 72-73.

On July 2, 2010, NTG filed an amended complaint listing Bobba as a plaintiff against Magna-Rx.  *See* Exh. 14 (Amend. Compl., *Bobba* Action, Dkt. 38).  NTG alleged that Bobba was a bona fide purchaser who suffered an advertising-related injury because, *inter alia*, he "reviewed, believed, and relied

upon [Magna's] marketing claims" when deciding whether to purchase the product. *Id.* at ¶¶15, 17, 22, 45. NTG alleged Bobba reviewed Magna-Rx's website before making his purchase. *Id.* at ¶¶15, 17. Those statements were false. He did not review Magna's website. *See* Exh. 1 (Bobba Tr.) at 39. He did not purchase the Magna product in reliance on advertising claims.

Consistent with his deposition testimony, on July 8, 2010, Bobba contemporaneously revealed the NTG sham in an online discussion forum:

> So my friend called me up the other day with a great opportunity. I'm all ears as he explains how his girlfriend's brother is a class action lawsuit attorney in need of clients. I go buy this stuff called magna rx plus which is supposed to permanently increase your penis size. Everyone knows that shit doesn't work, but I go drop 40 on it. anyway (sic) the lawyer comes over twice and has me sign some documents for this suit saying i (sic) took it, it doesn't work, and that the company is false advertising. long story short it's supposed to pay between 2-10k once settled and these guys have a 90% win rate so I'm hopeful!

*See* Exh. 4 (Donkdown.com post). At deposition, Bobba testified that his online post accurately reflected his experience with NTG. *See* Exh. 1 (Bobba Tr.) at 51-53, 64. The post reveals Bobba's claim against Magna was baseless because he conceded to purchasing the product strictly for litigation and with foreknowledge that the product would not work as advertised. Bobba did not "rely" on Magna advertising or suffer injury from same. *See* Exh. 4 (Donkdown.com post); *Kwikset Corp. v. Superior Court,* 51 Cal. 4th 310, 327, 246 P.3d 877, 888 (2011); *Buckland v. Threshold Enterprises, Ltd., supra,* 155 Cal.App.4th at pp. 818–819, 66 Cal.Rptr.3d 543 (2008) (purchaser who suspected product was mislabeled in order to pursue a UCL fraud action had no actual injury needed for standing).

Magna's counsel discovered Bobba's post and, on September 3, 2010, moved for sanctions against NTG. *See* Exh. 5 (*Bobba* Action, Dkt. 59). That motion raised troubling allegations, revealing NTG's attempt to stage litigation and submit misleading declarations to conceal improprieties. *Id.* at 2-3 (alleging NTG

"[o]ffered compensation to individuals to purchase Magna RX+ and then serve as class representatives").  In response, Defendant S. Ferrell sent his brother (Ryan Ferrell) and father (Wynn Ferrell) to meet Bobba in person and urge him to sign a declaration.  *See* Exh. 2 (W. Ferrell Tr.) at 74.

NTG attorneys prepared the declaration.  *See* Exh. 3 (R. Ferrell Tr.) at 221. It included a narrative Bobba testified was false: that Bobba's July 8, 2010 online post was a "locker room rant" that although "based on true events" "was written tongue in cheek."  *See* Exh. 7 (Bobba Decl.) at ¶4; Exh. 1 (Bobba Tr.) at 63-65. The declaration also contained conclusory assertions apparently designed to exonerate NTG: "Let me be very clear:  neither Wynn Ferrell nor anyone from [NTG] has ever done anything dishonest or unethical or asked me to do or say anything unethical in this case."  *Id.* at ¶8.  Bobba signed the declaration on September 5, 2010.  *Id.* at 4.  NTG filed it on September 21, 2010 in opposition to Magna's motion for sanctions.  *Id.*  At deposition, Bobba said that he did not draft the declaration, and that he recalled signing it at NTG agents' request without reviewing it.  *See* Exh. 1 (Bobba Tr.) at 58-65.

Before the Court could rule, NTG agreed to pay Magna for dismissal of its motion for sanctions.  *See* Exh. 15 at 3 ("NTG will pay $5,000 to Magna…").  The matter was dismissed, and the Court never ruled on NTG's misconduct.

### 2. Testimony Regarding Bobba's September 2010 Sham Declaration

Bobba testified he met with NTG representatives once in September 2010 regarding the declaration.  *See* Exh. 1 (Bobba Tr.) at 44-45, 55.  Two individuals from NTG arrived at his house with a declaration already prepared.  *Id.* at 55-59. NTG's internal emails show R. Ferrell drafted the declaration and provided it to S. Ferrell around 11pm on September 4, 2010, the night before Bobba signed it.  *See* Exh. 16 (NTG011593).  NTG's privilege logs show S. Ferrell revised Bobba's declaration without having spoken with Bobba, and then provided R. Ferrell with an edited version the night of September 4, 2010.  *See* Exh. 17 (highlighted

excerpts of NTG Privilege Logs).  R. Ferrell later testified contrary to the record that S. Ferrell never revised the declaration.  *See* Exh. 3 (R. Ferrell Tr.) at 231-233.

NTG's agents met with Bobba for between 20 to 30 minutes on September 5, 2010.  *See* Exh. 1 (Bobba Tr.) at 55, 80-81.  At no point did they ask Bobba to make changes to his declaration.  *Id.* at 58-61.  Bobba testified that none of the content in the declaration came from him.  *Id.* at 60 ("I wasn't referenced for any of its content directly").  Bobba did not review the document before he signed it.  *Id.* at 59 ("I just signed.").

According to Bobba's testimony and the documentary record in this case, the contents of his NTG-prepared declaration are false and incorrect.  For example, the declaration states Bobba "purchased several penis enhancement products over the past couple of years" and that one "was Magna-RX, which [Bobba] purchased in late 2009."  *See* Exh. 7 (Bobba Decl., *Bobba* Action, Dkt. 63-6) at ¶5.  Bobba testified that was false.  *See* Exh. 1 at 64-65.   It falsely suggests that Bobba was a legitimate client who purchased prior to his first meeting with NTG.  Bobba testified that the only time he purchased any penis enhancement product was in 2010 when NTG drove him to GNC for that purpose.  Exh. 1 (Bobba Tr.) at 39, 64-65.  The declaration also states that, "During August of 2010, [Bobba] met with Wynn Ferrell for several hours to prepare for [his] deposition in this case…"  Exh. 7 (Bobba Decl., *Bobba* Action, Dkt. 63-6) at ¶7.  Bobba and NTG's witnesses all testified that Bobba never had a meeting in August to prepare for deposition.  *See* Exh. 1 (Bobba Tr.) at 44-45, 55; Exh. 2 (W. Ferrell Tr.) at 73-75; Exh. 3 (R. Ferrell Tr.) at 227-229.  When asked about statements in his declaration, Bobba testified: "It was fabricated.  Didn't come from me."  *See* Exh. 1 (Bobba Tr.) at 65.  The declaration also falsely attests to a 2009 product purchase when none occurred.  *See id.* At 64-65.

Following Bobba's deposition in July 2020, NIC deposed W. Ferrell and R. Ferrell on August 21, 2020 and October 29, 2020 respectively.  They both testified

about preparation of Bobba's declaration.  *Id*.  Neither W. nor R. Ferrell asserted privilege when examined about their communications with Bobba their preparation of his declaration, or their internal discussions within the firm.  *See generally id*.

NTG's representatives defended against Bobba's testimony by calling their former client a liar.  *See* Exh. 2 (W. Ferrell Tr.) at 68, 74, 84 (referring to Bobba's alleged "lies").  W. Ferrell testified he generally lacked memory of his interactions with NTG clients, including those in the *Magna-RX* case.  *See* Exh. 2 (W. Ferrell Tr.) at 38-39, 44, 59, 60-62, 63, 66-68, 69, 70-72, 73, 75, 78, 79-84, 86-89, 128-129, 133, 134-135.  He could not recall his interaction with Bobba in June of 2010. *Id.* at 68-69, 70-71, 73.  He lacked memory of conversations with Bobba, or facts generally related to the *Magna-RX* case.  *See generally id*.  But in preparation for his 2020 deposition, he reviewed his September 21, 2010 declaration from the *Magna-RX* case between "six or eight times."  *Id.* at 113; *see also id.* at 75; Exh. 6 (W. Ferrell Decl., *Bobba* Action, Dkt. 63-5).  W. Ferrell testified consistent with that declaration despite having professed no recollection of the underlying facts. He conceded, however, that he sent prospective NTG clients to stores to purchase products.  *See* Exh. 2 (W. Ferrell Tr.) at 107-110.  He could not recall if Bobba was one of those he sent to the store.  *Id.* at 127-128.  He could not explain why certain statements in his 2010 declaration were false.  *Compare* Exh. 6 at ¶8 *with* Exh. 2 (W. Ferrell Tr.) at 78.

R. Ferrell testified in detail to his interaction with Bobba in September 2010, and his preparation of Bobba's declaration.  *See* Exh. 3 (R. Ferrell Tr.) at 223-242. In direct contrast with Bobba's testimony, R. Ferrell testified to visiting Bobba's house three separate times the weekend of September 4-5, 2010.  *Id.* at 227-228. R. Ferrell testified he and W. Ferrell met Bobba at his house on Saturday, September 4th, to interview Bobba for a declaration.  *Id*. at 226-228.  R. Ferrell testified he prepared a draft declaration and shared it with S. Ferrell by email the night of September 4, 2010.  *Id.* at 230-233.  R. Ferrell testified S. Ferrell never

edited the Bobba declaration.  *Id*.  Documents on NTG's privilege log conflict with R. Ferrell's testimony.  *See* Exh. 17 (highlighted excerpts of NTG priv logs).  R. Ferrell testified all changes made to Bobba's declaration were made at Bobba's request.  *See* Exh. 3 (R. Ferrell Tr.) at 234-238.  R. Ferrell claims he presented Bobba a revised declaration at a September 5, 2010, morning meeting, which Bobba allegedly asked be revised.  *Id.* at 230-241.  R. Ferrell stated he departed Bobba's house and returned on September 5th with a corrected declaration version which Bobba then signed.  *Id.* at 237-242.  On this issue, R. Ferrell's testimony directly conflicts with Bobba's.  *See* Exh. 1 (Bobba Tr.) at 58-65.[2]

### 3.  Procedural History

NIC's Second Amended Complaint (SAC) alleged that NTG committed RICO predicate acts pursuing an extortionate, sham suit using Bobba as a shill client.  *See* Dkt. 92 at ¶¶265-281.  In April 2017, NIC filed a motion to pierce NTG privileges, in part, under the crime-fraud exception.  *See* Dkt. 291-1 (NIC Crime-Fraud motion).  NIC proved that NTG pursued manufactured claims in the *Magna-RX* case.  *See* Dkt. 291-1 at 66-73.  NIC asked the Court to compel documents germane to Bobba's suit.  *See* Dkt. 291-2 at 94-100 (NIC's Appendix listing documents from *Morales v. Magna-RX*).  But NIC did not ask the Court to review all relevant documents, instead excerpting from NTG's privilege log files those which appeared most relevant based on dates and subject titles.  *Compare* Dkt. 291-2 at 94-100 *with* Dkt. 1099-2 (NTG priv. logs).  The Special Master reviewed only 68 out of 1,231 files listed on NTG's privilege log associated with the *Magna-RX* case.  *See* Exh. 18 (excerpted NTG privilege logs associated with Magna Case). NIC now asks the Court to compel another limited subset of 149.

On June 12, 2018, the Court granted NIC's original motion to compel under

---

[2] Bobba testified that he had just one short meeting with NTG representatives on September 5, 2010 (the day he signed the declaration), and he signed his attorney-prepared declaration without even reviewing the document. *See* Exh. 1 (Bobba Tr.) at 57-65.

the crime-fraud exception.  *See* Dkt. 659.  The Court remanded to the Special Master for another *in camera* review, which she completed on July 23, 2018.  *Id.* at 25;[3] *see* Dkt. 681.  On August 5, 2019, the Court overruled NTG's objections.  *See* Dkt. 820.  The Court found communications in the *Bobba* Action were "in furtherance" of NTG's ongoing "illegality and . . . cover-up of NTG's scheme to defraud as related to <u>Magna</u>."  *Id.*

After NIC received Bobba-related documents following the privilege orders, NIC moved to take Bobba's deposition, which request was granted by the Court on March 5, 2020.  *See* Dkt. 902 at 3-5;16-17.  Judge Selna ruled that recent discovery (including Bobba's inculpatory product receipt) justified new discovery from Bobba.  *See id.* at 11-12 ("Bobba's deposition testimony legitimately flows from the Court's Privilege Orders and this new evidence provides good cause to depose Bobba").  The Court also granted NIC's request to take W. Ferrell's deposition.  *See id.* at 12-13 (citing NIC's acquisition of new evidence).

Soon after the Court's March 5, 2020 Order granting leave [Dkt. 902], the Covid-19 pandemic halted in-person discovery practice.  *See* Dkt. 1014 at 4-7 (Joint Status Report).  Video depositions followed.  NIC deposed Bobba on July 22, 2020; W. Ferrell on August 21, 2020; and R. Ferrell on October 29, 2020.  Following receipt of final deposition transcripts, NIC met and conferred with Defendants regarding this motion in December 2020.  *See* Exh. 19 (Dec. 22, 2020 Ltr).

### 4.  Documents at Issue

NIC seeks to compel *Magna-RX* case related documents, specifically those concerning NTG's acquisition of Bobba as a client and NTG's preparation of Bobba's sham declaration in September 2010.  *See* Appendix A; Exh. 18 (Excerpted NTG priv. logs relevant to *Bobba* action).  The documents involve ten

---

[3] The Special Master had originally reviewed only a sampling (248) of the approximately 1,600 documents requested by NIC's motion to compel.  *See* Dkt. 659 at 22.  Judge Selna later compelled a full review.

specifically relevant email "threads" or conversations:

- <u>NTG009935-NTG009959</u>.  Related to NTG's acquisition of Bobba as a client in June 2010 after NTG sought a replacement for its original plaintiff, Morales.  *See* Appendix A at 1-3.

- <u>NTG009980-NTG010003</u>.  Related to NTG's recruitment of Bobba, the "First Amended Complaint" that NTG prepared naming Bobba, and "new Magna Plaintiffs" which included Bobba.  *See* Appendix A at 3-4.

- <u>NTG010362-NTG010385</u>.  Related to NTG's acquisition of a declaration from Bobba in July 2010.  *See* Appendix A at 5.

- <u>NTG011021-NTG011162</u>.  Related to Bobba's deposition sought by Magna-RX after having discovered Bobba's online post on DonkDown.com.  This includes "deposition prep outlines" and other deposition-related documents prepared by NTG attorneys.  *See* Appendix A at 6-8.

- <u>NTG011592-NTG011624</u>.  Related to NTG's preparation of Bobba's sham declaration in September 2010, including revisions made to the declaration, and NTG's correspondence exchanged about its meeting with Bobba in September 2010.  *See* Appendix A at 9-10.

- <u>NTG011909-NTG011959</u>.  Related to NTG internal correspondence about NTG sham plaintiffs used in the *Magna-RX* case, the sham Bobba declaration, and statements prepared by NTG in opposition to Magna's motion for sanctions.  *See* Appendix A at 10-12.

- <u>NTG011983-NTG011994</u>.  Related to the sham Bobba declaration and other statements prepared by NTG in opposition to Magna's motion for sanctions.  *See* Appendix A at 12; Exh. 7 (Bobba Decl., *Bobba* Action, Dkt. 63-6).

- <u>NTG012048-NTG012049</u>.  Related to NTG's internal correspondence regarding W. Ferrell's declaration that NTG prepared in response to the Magna-RX motion for sanctions.  That declaration concerns NTG's interaction with Bobba.  *See* Appendix A at 12; Exh. 6 (W. Ferrell Decl., *Bobba* Action, Dkt. 63-5).

- <u>NTG012070-NTG012087</u>. Related to NTG's internal correspondence about the declaration of W. Ferrell, which declaration concerned the NTG firm's use of Bobba in litigation.  *See* Appendix A at 13; Exh. 6 (W. Ferrell Decl., *Bobba* Action, Dkt. 63-5).

- <u>NTG012105-NTG012111</u>.  Related to NTG's correspondence about the

declaration of W. Ferrell concerning NTG's use of Bobba in litigation. *See* Appendix A at 13; Exh. 6 (W. Ferrell Decl., *Bobba* Action, Dkt. 63-5).

## C.   <u>**Argument**</u>

Deposition practice from July through October 2020 revealed new evidence related to the *Magna-RX* lawsuit.  NTG's former client Bobba testified that the NTG suit involving him was staged by NTG.  Bobba never suffered an advertising-related injury.  An NTG agent drove Bobba to GNC.  They told Bobba to purchase the Magna product and gave him money to make the purchase.  Bobba bought the product as directed while an NTG rep waited outside in the car.  *See* Exh. 1 (Bobba Tr.) at 34-39.  To cover-up that misconduct, NTG attorneys fabricated a declaration for Bobba.  Exh. 7 (Bobba Decl., *Bobba* Action, Dkt. 63-6); *see also* Dkt. 820 at 16. That declaration included knowingly false statements that NTG had Bobba sign under oath.

The Court should compel documents in Appendix A under the crime-fraud exception.  Bobba's testimony and the Court's prior crime-fraud findings support *in camera* review under Step One of the *Zolin* test.  Judge Selna has already concluded that material germane to these issues falls within the crime-fraud exception.  *See* Dkt. 820 at 16 (holding Bobba-related documents "'in furtherance' of an ongoing, continuing illegality and a cover-up of NTG's scheme to defraud as related to <u>Magna</u>").  NIC now asks the Court to find the documents listed in Attachment A are also "in furtherance" of NTG's scheme to defraud, or cover-up such conduct.

Even without the exception, NTG and Bobba waived privileges.  Deposition testimony from Bobba came without an assertion of privilege and W. and R. Ferrell's testimony conflicts with NTG's former client.  NTG rebutted Bobba's testimony by suggesting that he was lying.  The Ferrells testified without privilege objection about their communications with Bobba, recruitment of him, and preparation of his declaration. Bobba and NTG thus waived privileges over the remaining documents in NTG's files that concern this subject matter.

### 1.  The Discovery Sought Is Relevant and Proportional

The documents NIC seeks are necessary to a full and fair trial on the merits. The proportionality factors favor NIC's motion. The documents are integral to a full record for the jury.  The public interest in ferreting out abuses of the legal system is consistent with Congressional intent underlying the civil RICO statute. The scope of requested production is limited, the specific documents identified, and the number of documents few.  The motion is supported by new evidence in deposition testimony.  NIC's motion does not impact any deadlines in the suit, will not result in follow-up discovery, and will not postpone other events in litigation.

The case is to be tried in November 2021.  NTG's former client, Bobba, directly testified that NTG paid him cash to purchase the Magna product, and later covered that fact with an attorney-authored declaration that was materially false. *See* Exh. 1 (Bobba Tr.) at 32-42, 57-68.  That testimony establishes predicate RICO Acts against NTG.  NTG witnesses countered that testimony by claiming Bobba lied.  *See* Exh. 2 (W. Ferrell Tr.) at 68, 74, 84 (referring to Bobba's alleged "lies").  NTG has thus become an adversary of its former client and can be expected to challenge his credibility before the jury.  *See* Exh. 1 (Bobba Tr.) at 94-95, 102-104 (NTG counsel questioning Bobba regarding his sobriety); *id.* at 96 (NTG counsel asking Bobba if he was "living on the streets at any point in 2010"); *id.* at 97-99 (NTG counsel examining Bobba about his criminal record); *id.* at 76-80 (NTG counsel examining Bobba regarding head injuries).  The documents NIC requests will directly assist the jury in evaluating witness veracity (NTG's and Bobba's). *People v. Kasim*, 56 Cal. App. 4th 1360, 1378, 66 Cal. Rptr. 2d 494, 505 (1997).

The documents NIC lists in Appendix A concern NTG predicate acts and are indispensable to NIC's case because the information contained in those "privileged" documents cannot be obtained through any other source.  The documents are communications exchanged within the NTG firm that reflect on knowledge, planning, and participation in unlawful activities in the Bobba case—

conduct that Judge Selna has already deemed unlawful.  *See* Appendix A; Dkt. 820 at 16; Dkt. 659 at 14-15.  The universe of information is discrete, and directly responsive to issues raised in recent depositions.  Where the importance of evidence in litigation is significant, as it is here, that factor may overcome the other considerations in the Rule 26(b) proportionality analysis.  *See, e.g., Visteon Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. CIV. 07-12250, 2008 WL 2026131, at *2 (E.D. Mich. May 12, 2008); *Benson v. Rosenthal*, No. CV 15-782, 2016 WL 1046126, at *3 (E.D. La. Mar. 16, 2016) (ruling that the information requested was discrete, and its "importance to the central issue in this case so clear, that proportionality analysis weighs heavily in favor of permitting the requests.").

The public interest is served through this discovery.  Judge Selna earlier ruled: "There is a strong public policy in favor of preventing racketeering activity and fraud on the judicial system."  *See* Dkt. 788 at 15 ("Congress passed civil RICO to advance this policy…").  The defendants in this case are attorneys.  The RICO subject matter is the NTG firm's prior litigation activities.  As a result, Defendants withheld almost all key documents in this case under claims of privilege.  NIC has had to battle for the essential documents.  In most other cases, internal correspondence among coconspirators would have been produced much earlier in litigation, and without need for substantial litigation.  NTG has consistently endeavored to conceal highly relevant information from NIC to delay case progression and increase costs.  The privilege objections in this case have nonetheless forced NIC to obtain access to key evidence piecemeal over a span of years.  Yet this Court has recognized the importance of resolving these privilege issues before trial.  *See* Dkt. 1090 at 5.  A complete record is essential to a fair trial.  *See Block v. Solis*, No. C08-1850JLR, 2010 WL 2079688, at *9 (W.D. Wash. May 20, 2010), *aff'd,* 436 F. App'x 777 (9th Cir. 2011).

Here the files reflect NTG's concealment of unlawful activity through a declaration that the declarant Bobba testified was "fabricated" by NTG lawyers.

*See* Exh. 1 (Bobba Tr.) at 65.  NIC's amended complaint puts this conduct directly before the jury.  *See* Fourth Amend. Compl., Dkt. 1007 at ¶¶308-314.  The documents concern the veracity of the Defendants and Bobba.  Those files may be dispositive of certain RICO predicate acts in this case, and the contents of those documents cannot be had through any other available source.

The Court has acknowledged post-privilege depositions might raise significant discovery disputes affording NIC a right to pursue this relief.  *See* Dkt. 876 at 30; *see also id.* at 31 (same).  This dispute falls within that context, and should thus be resolved by the Courts on the merits.

## 2. The Crime-Fraud Exception Applies to All Documents Listed on Appendix A

The Court should review the Appendix A documents *in camera* to determine whether the crime-fraud exception applies based on new evidence received by NIC in post-privilege discovery.  The Court earlier reviewed documents from NTG's *Magna-RX* lawsuit concerning (1) whether the suit was part of NTG's scheme to defraud, and (2) whether the declaration NTG prepared for Bobba in September 2010 was part of its attempt to cover up those unlawful activities.  *See* Dkt. 597 at 6 ("the Special Master exercised her sound discretion to randomly sample or select the documents for *in camera* review"); Dkt. 659 at 14-15, 23-26 (holding crime fraud exception applied and compelled review of all documents listed on NIC's Appendix); Dkt. 681 at 4-5 (compelling documents after remand); Dkt. 820 at 16, 31-32.[4]  The Court held that the crime-fraud exception applied.  *Id.* at 15-16.  The Court found by a preponderance of the evidence that "communications concerning NTG's defense against the <u>Magna</u> sanctions motion constituted a 'cover-up' and

---

[4] Despite the prior proceedings, the Court has not reviewed the substantial majority of NTG documents listed by NIC in Appendix A.  The Court has reviewed just five percent (5%) of all NTG files pertaining the *Magna* lawsuit (68 documents out of 1,231).  The Court earlier reviewed 8 of the 149 documents now requested by NIC in Appendix A.  However, with respect to those 8 documents already reviewed, the Court was lacking essential context now provided by new evidence.

were thus made in furtherance of the scheme to defraud despite the fact that such communications post-dated the dismissal of the litigation."  Dkt. 820 at 16. The Court's finding that NTG acted unlawfully in the *Magna* action is law of the case. *Id.*  Here, the Special Master must therefore evaluate whether documents NIC lists in Appendix A are "in furtherance" of that prior-identified crime-fraud activity.

The record supports a finding by a preponderance of the evidence that files listed in Appendix A were "in furtherance" of the criminal or fraudulent conduct cited by the Court in Dkts. 659 and 820.  Bobba testified that NTG staged the suit that named him as a plaintiff.  *See* Exh. 1 (Bobba Tr.) at 32-40.  NTG disclosed that it met Bobba only once in June 2010 and that meeting was with W. Ferrell (Defendant S. Ferrell's father) for a client "intake."  *See* Exh. 6 (W. Ferrell Decl., *Bobba* Action, Dkt. 63-5) at ¶7; Exh. 2 (W. Ferrell Tr.) at 69.  Bobba testified that during this one June 2010 meeting the NTG representative drove him to GNC and gave him $60 in cash to purchase the Magna product so that NTG could pursue litigation.  *See* Exh. 1 (Bobba Tr.) at 34-35.  Bobba's claim was thus fraudulent because he could not have suffered a legitimate "consumer" injury.  He never lost money as a result of Magna's commercial practices, and he never relied to his detriment on Magna's advertising.  *See* Exh. 14 (Bobba Complaint), at ¶15 (alleging "Before purchasing Magna-Rx+, [Bobba] read, reviewed, relied upon, and believed the false claims made on www.magnarx.com, as well as Affiliate Marketer website advertising"); *id.* at ¶52 (alleging "[Bobba] reasonably relied upon and believed the Defendants' false efficacy representations in deciding to purchase and use the product"); *compare to* Exh. 4 (Bobba Donkdown.com post) ("I go buy this stuff called maga rx plus … everyone knows that s**t doesn't work, but I go drop 40 on it"); Exh. 1 (Bobba Tr.) at 32-39.  Bobba pocketed $16.31 (the difference between the Magna purchase price and the money given him by NTG's agent).  *See* Exh. 10.

Bobba's online post on DonkDown.com in July 2010 disclosed NTG's

scheme, so NTG engineered a false declaration to remedy Bobba's online disclosure.  *See* Exh. 2 (W. Ferrell Tr.) at 74:5-9 ("Scott asked Ryan and I to go out and visit with Mr. Bobba and to see if he still qualified as a candidate for us to represent and to find out what was really going on").  That declaration was prepared by NTG attorneys and included language that excused NTG from "ethical" violations.  *See* Exh. 7 (Bobba Decl., *Bobba* Action, Dkt. 63-6) at ¶8; Exh. 16 (NTG011593) (R. Ferrell email to S. Ferrell attaching draft declaration); Exh. 3 (R. Ferrell Tr.) at 221 ("I believe I drafted his declaration and went over it with him").  That attorney-prepared declaration contained false statements, including reference to an August meeting between Bobba and NTG that never happened, and an alleged purchase of Magna-RX in 2009 by Bobba that never occurred.  *See* Exh. 7 (Bobba Decl., *Bobba* Action, Dkt. 63-6) at ¶¶ 5, 7; *see also* Exh. 20 (NTG ROG Resp.) at 13-14 (Disclosing only one meeting with Bobba in September 2010).  The declaration misrepresented the meeting between Bobba and NTG on June 28, 2010.  *See* Exh. 7 (Bobba Decl., *Bobba* Action, Dkt. 63-6) at ¶6. Bobba testified that the declaration was false, that the words did not come from him, and that he simply signed it as requested by NTG without reviewing it.  *See* Exh. 1 (Bobba Tr.) at 64-66 ("It was fabricated.  Didn't come from me").

The documentary record supports Bobba's testimony at deposition.  Bobba first met with NTG on June 28, 2010.  That was also the day when Bobba purchased the product (Exh. 10, Bobba Receipt) and then signed a retainer agreement that was already printed out for him bearing the same date.  Exh. 13 (Bobba retainer).  Bobba's meeting with NTG on June 28, 2010 was over a week after NTG attorneys stated in open Court at a June 22, 2010 hearing that they already had two replacement plaintiffs, even though at the time Bobba had yet to even purchase the Magna-RX product.  *See* Exh. 12 (Transcript, *Bobba* Action, Dkt. 43) at 3.  Bobba's online post on www.DonkDown.com was accurate, and Bobba testified at deposition that it was truthful when written.  *See* Exh. 1 (Bobba

Tr.) at 64.  Bobba (a non-party) has no reason or motivation to testify falsely in this RICO lawsuit.

Bobba's testimony is also corroborated by evidence of NTG's similar conduct in other false advertising cases.  NIC's RICO claim alleges that the NTG recruited shill clients to pursue staged extortionate "consumer" suits.  *See* Dkt. 659 at 2-3 (describing NIC's allegations re the false advertising scheme).  In August 2015, Andrew Nilon authored an email explaining that the NTG firm recruited him to pursue baseless litigation.  *See* Dkt. 291-16 ("[NTG] said that all I had to do was buy some products, sign some papers and NTG would pay me for my time").  Phone records and email correspondence establish the NTG firm was in contact with each of its clients immediately *prior* to when those individuals purchased their products for litigation and instructed those clients to take certain actions for planned litigation.  *See, e.g.,* Exh. 21 (SCHOONOVER00066); Exh. 22 (NTG000239) (email between NTG and Demulder reflecting staged litigation).  NTG's original client in the *Magna-RX* case, Felipe Morales, also met with NTG's W. Ferrell the same evening that Morales purchased the Magna-RX product from a local Walmart.  *See supra* at Part B.1.  Nilon first met with NTG in October 2012 to discuss litigation, which was months before Nilon purchased the product in 2012.  *See* Dkt. 291-1 at 28 (and supporting exhibits).  NTG later replaced Nilon with Giovanni Sandoval as the class representative in the *Nilon* action.  *See Nilon v. NIC*, No. 12-cv-930 (S.D. Cal.), Dkt. 51-1.  Like Nilon, Sandoval purchased his NIC product only after first meeting with NTG attorneys to discuss the litigation.  *See* Dkt. 291-1 at 38-42 (and supporting exhibits).

"Crime-fraud" documents produced earlier include the following text message sent from NTG's "field rep" to Sam Schoonover in March 2012, hours *before* Schoonover would purchase product for litigation:

> Hey Sam, it's Andrew Baslow.  I got your contact info from Andrew Nilon as he mentioned you would like to participate in a class action. I have a case for you, but it is very urgent and you would have to move

> quickly.  I need you to pick up a bottle of "Organix" shampoo and conditioner sold at CVS.  Also, throw a couple of household items on there that you need at the moment so it isn't just the shampoo.  Can you do that today and get the proof of purchase (POP) over to me?

*See* Exh. 21 (SCHOONOVER00066).[5]  That text message was the first ever contact between NTG and Schoonover.  NTG later used Schoonover's purchase to allege a consumer-related injury.  As with NTG's other cases at issue, that case was manufactured by NTG as part of its RICO enterprise.

The documents sought by this motion are evidence a jury should evaluate in context with the *Magna-RX* lawsuit and testimony NTG intends to offer.  At his deposition, R. Ferrell testified repeatedly that Defendant S. Ferrell had no role in editing the false Bobba declaration that NTG had Bobba sign in September 2010.  *See* Exh. 3 (R. Ferrell Tr.) at 231-232.  NTG's privilege logs contradict that testimony, indicating that S. Ferrell did, in fact, return a revised Word version of the Bobba declaration to R. Ferrell on September 4, 2010.  *See* Exh. 17 (NTG excerpted priv. logs reflecting transmission of a revised declaration from S. Ferrell to R. Ferrell on September 4, 2010).  If S. Ferrell substantively revised that declaration, he did so without having Bobba's input, and show that S. Ferrell engineered Bobba's testimony.  Those substantive changes conflict with R. Ferrell's testimony at deposition and also suppoort Bobba's statement that the declaration was "fabricated" and prepared in advance of his meeting with NTG in September 2010.

NTG's deposition testimony is now in direct conflict with its former client on a critical issue in this case.  "At bottom, once the court finds reasonable cause to believe that an attorney's services were employed in furtherance of a crime—whether by *in camera* review of the evidence or otherwise—'the seal of secrecy is broken.'"  *In re Subpoena to Testify Before Grand Jury*, No. 15-MC-80207-JSC,

---

[5] Those and similar messages were provided to NIC as part of the Court's crime-fraud orders.  *See* Dkt. 1022.  NIC received the Schoonover correspondence following the Court's Order on July 23, 2020.  *Id.*

2015 WL 5359703, at *3 (N.D. Cal. Sept. 14, 2015).  These issues involve corrupt counsel partnering with shill plaintiffs to extort money from defendants who they defraud by falsely accusing them of causing what are in fact fictive consumer injuries.  All actions taken within that improper relationship are "in furtherance" of the unlawful scheme.  Here, because NTG carried out its scheme through litigation, all files prepared within and for the fraudulent *Magna-RX* case are by definition "in furtherance of the fraudulent activity.  The Fifth Circuit has recognized that in appropriate circumstances where the client's entire representation was in furtherance of unlawful activity, the entire client file should be produced.  *In re Grand Jury Subpoena*, 419 F.3d 329, 344 n.12 (5th Cir. 2005).  Documents may be "in furtherance" even "if the attorney does nothing after the communication to assist the client's commission of a crime, and even though the communication turns out not to help (and perhaps even to hinder) the client's completion of the crime." *In re Grand Jury Proceedings*, 87 F.3d 377, 382 (9th Cir. 1996) (parenthesis in original); *see also Chen*, 99 F.3d at 1504 (same); *Laurins*, 857 F.2d at 540 (same); *In re Nat'l Mortg. Equity*, 116 F.R.D. at 300–02.  Under that well-settled precedent, a communication can "further" the unlawful purpose even if the communication ultimately "hinder[s]" the crime.  The "in furtherance" test is thus broad and requires evaluation of whether documents were created with a purpose of furthering that scheme.  Here, all files in Appendix A meet that test.  They were created and exchanged for the purpose of maintaining the Bobba suit or concealing the fraud that occurred within same.

### 3.  NTG Waived Work Product Protections by Testifying about "Privileged" Material

NTG may not selectively disclose facts regarding purportedly privileged areas while concurrently precluding NIC from investigating source files that would allow the jury to verify truthfulness of NTG's testimony. *Bittaker v. Woodford*, 331 F.3d 715, 718 (9th Cir. 2003).  In addition, an express waiver occurs when parties, like NTG here, "disclose[ ] privileged information to a third party who is not

bound by the privilege, or otherwise show[] disregard for the privilege by making the information public." *Id.* at 719.

W. Ferrell testified concerning his discussions with Bobba, the intake process that he performed, his telephone calls with Bobba, conversations with S. Ferrell about the lawsuit, and preparation of declarations. *See* W Ferrell Tr. at 68, 72-73, 74-75, 78, 82, 84, 107. R. Ferrell testified at length concerning his interaction with Bobba in September 2010, and the preparation of Bobba's declaration in opposition to Magna's motion for sanctions. *See* R. Ferrell Tr. at 223-242. Represented by counsel, Bobba testified in full, asserting no privilege. *See generally* Exh. 1. Counsel for NTG attended these depositions and did not interpose privilege or work product objections on behalf of the firm or the attorneys. *Id.*

 "[W]hen one party makes a tactical, selective waiver of the privilege as to a portion of some material it is incumbent upon the court to ensure that the waiver also encompasses any additional information which needs to be disclosed in order to avoid any unfair litigative advantage." *R.D. v. Shohola Camp Ground & Resort*, No. 3:16-CV-1056, 2017 WL 1178050, at *3 (M.D. Pa. Mar. 30, 2017). Therefore, where counsel testifies about privileged matters at deposition, courts have found and enforced waivers where that testimony was less revealing than with NTG's witnesses here. *See, e.g., Medicines Co. v. Mylan Inc.*, 936 F. Supp. 2d 894, 897 (N.D. Ill. 2013); *Ironburg Inventions Ltd. v. Valve Corp.*, No. C17-1182-TSZ, 2018 WL 4281531 (W.D. Wash. Sept. 7, 2018); *Starsight Telecast, Inc. v. Gemstar Dev. Corp.*, 158 F.R.D. 650 (N.D. Cal. 1994); *Seaman v. Sedgwick, Detert, Moran & Arnold LLP*, No. SACV110664, 2014 WL 12700973 (C.D. Cal. Sept. 30, 2014).

In *Medicines Co.*, the plaintiff's attorney testified to privileged conversations regarding whether plaintiff had followed a certain manufacturing process. *See Medicines*, 936 F.Supp. 2d at 901-902. The Court held the proffered testimony

both "support[ed plaintiff's] position … but simultaneously seeks to conceal information that potentially does not support its position," requiring a waiver. *See also Ironburg*, 2018 WL 4281531 at *2-4.  The *Ironburg* decision found a waiver and compelled plaintiff to produce, *inter alia*, "all communications and documents bearing on [plaintiff's agents'] knowledge of the Mod reference and the UK Examiner's combined report, and their intent in failing to disclose or withholding these documents from the PTO[.]"  *See id.* at *4.

In *Starsight Telecast*, one defendant, an inventor of the relevant product, testified to having a "custom and practice to disclose to [inventor's patent attorney] or to other lawyers working for [his] law firm, any or all prior art about which [he was] aware that is material to any invention that [he was] seeking to have patented." *See Starsight Telecast, Inc.*, 158 F.R.D. at 654.  The Court also cited deposition testimony from defendant's counsel on the issue.  *Id*.  The Court held that such testimony "more than merely deny [plaintiff's] charge of inequitable conduct, and therefore [defendants] have partially waived the attorney-client privilege."  *Id*.  So, too, here NTG's testimony "more than merely den[ied] Bobba's testimony.  They provided an affirmative narrative explaining in detail their interactions with Bobba.  NTG's W. Ferrell also testified to having a custom and practice of sending NTG clients to purchase products from stores.  *See* Exh. 2 (W. Ferrell Tr.) at 107-110.  NIC is entitled to review documents germane to the custom and practice, at least with respect to Bobba.

Under *Bittaker*, the waiver extends to all information that NIC requires to adequately dispute or evaluate the truthfulness of NTG's testimony.  *See Bittaker*, 331 F.3d at 719 ("In practical terms, this means that parties in litigation may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials.").

### 4.  Daniel Bobba Waived His Privileges by Testifying About "Privileged" Material

Bobba testified concerning his correspondence and interaction with the NTG

firm throughout his deposition.  *See* Exh. 1 (Bobba Tr.) at 34-35, 51-52, 58-62, 65, 116, 120-122, 126.  Portions of that testimony were elicited during examination by NTG's own counsel.  *Id.* at 116, 120-122, 126.  Bobba never invoked privilege or objected to questions on these subjects.  He was represented by independent counsel throughout his deposition.  *See* Exh. 1 (Bobba Tr.) at 20.  He disclosed information about communications with NTG representatives in June 2010.  *Id.* at 32-38.  He disclosed that he received $60 in cash to purchase products for litigation.  *Id.* at 34-35.  He testified about his interactions with the NTG firm in relation to the draft declaration NTG had him sign on September 5, 2010.  *Id.* at 64-65, 116, 121-122.  He testified comprehensively about his relationship with NTG, limited only by his ability to recall those events.  Bobba has clearly abandoned any claim to privilege over communications and documents exchanged between him and the NTG firm.  Privileges are thereby waived with respect to the subject matters of Bobba's testimony.  *See United States v. Sanmina Corp.*, 968 F.3d 1107, 1117 (9th Cir. 2020) ("Under this rule, disclosure of information resulting in the waiver of the attorney-client privilege constitutes waiver only as to communications about the matter actually disclosed").  The client possesses the right to abandon and waive attorney-client privilege.  *See, e.g., Devlyne v. Lassen Mun. Util. Dist.*, No. CIV. S-10-0286 MCE, 2011 WL 4905672, at *5 (E.D. Cal. Oct. 14, 2011) ("[T]he client holds the attorney-client privilege, and not the attorney").  Bobba has clearly waived the attorney-client privilege and the Defendants would have no right to assert the privilege over documents now.  Bobba's waiver is also extended under *Bittaker*.  *See supra.*

### D.   Conclusion

For the foregoing reasons, NIC respectfully requests that the Special Master (1) compel NTG files listed on NIC's Appendix A (attached) because those documents fall within the crime-fraud exception and are thus not privileged; and/or (2) compel those files because both NTG and Bobba have waived privileges by

testifying to privileged material at deposition.

## II.    DEFENDANTS' POSITION

### A.    Introduction

The parties have a significant amount of work to do in order to prepare for the upcoming trial on November 1, 2021.  Remaining depositions must be taken, lay and expert witnesses prepared, trial exhibits compiled, and motions *in limine* brought and litigated, to name only a few of the tasks that accompany every complex trial.  Yet NIC seems determined to burden the Special Master, the District Court, and Defendants with seemingly endless discovery litigation.  As the present circumstances show, it is rare for NIC not to have a discovery motion pending.  Moreover, it was only three weeks ago (on March 1, 2021) when the District Court rejected NIC's attempt to continue to litigate discovery issues by affirming the Special Master's rejection of NIC's unreasonably expansive 30(b)(6) deposition, but already NIC is seeking more unjustified discovery.

This time, NIC moves to compel 146 documents from a March 7, 2017, privilege log.  NIC's request is approximately four years late and comes after years of litigation regarding this same privilege log.  Indeed, dozens of the documents that NIC seeks were already subject to *in camera* crime fraud review.  Thus, the request must be denied as untimely.  *Infra*.Part.C.1.  Further, NIC's belated request is grossly disproportionate to the needs of this case.  *Infra*.Part.C.2.  According to NIC, it already has testimony from Bobba that "establishes predicate RICO Acts against NTG . . . ."  Hence, NIC's only stated purpose of the seeking more documents regarding Bobba is to fish for what NIC presumes will be conflicting impeachment testimony.  Such tangential impeachment evidence (if it even exists and if it even shows what NIC presumes it to be) is hardly "indispensable" as NIC claims.  It is certainly not justified years after discovery closed and after the District Court clarified that "[t]he days of proportional discovery requests here

have long expired." (Dkt. No. 1030 at 6-7.) As if this was not clear enough, the District Court reaffirmed this ruling on March 1, 2021. (Dkt. 1100 at 9.) NIC's latest request for yet another crime-fraud review – years after documents from the privilege log at issue were already reviewed – is not proportional to the needs of the case. Even if it was, NIC has not satisfied *Zolin* for application of the crime-fraud exception as NIC's narrative goes far beyond what even Daniel Bobba could recall and competently testify to, and the testimony that he could recall is wrought with inconsistencies and credibility issues.[6] *Infra*.Part.C.3.

Finally, NTG did not "waive" work product protection over the documents at issue. To be clear, there is no support for the proposition that a former employee answering a deposition question waives work product protection that a party holds over all related documents. *Infra.*Part.C.4. Relatedly, the fact that a former employee denied NIC's factual allegations in responses to questioning by NIC at deposition is not grounds for waiver against a party. NIC's position to the contrary is not only opposite established law but a recipe for more unnecessary litigation.

Accordingly, NIC's motion should be denied.

## B.  Background

In April 2017, NIC filed a behemoth motion to compel privileged communications based on its belief that the crime-fraud exception vitiated attorney-client privilege and work product immunity. (Dkt. 291.) That motion, as well as NIC's then pending Second Amended Complaint, included extensive allegations claiming that NTG committed RICO predicate acts pursuing an extortionate, sham suit using Bobba as a shill client in the case of *Morales, et al. v. Magna, Inc., et al.*, No. 3:10-cv-1601-EDL (N.D. Cal. 2010). *See* (Dkt. 92 at

---

[6] To follow NIC's reasoning, if inconsistencies from a witness or a party about recollections of events from many, many years ago could somehow justify a crime-fraud review – which obviously comes nowhere close to what is required under *Zolin* – then NTG would also be subject to further discovery and crime-fraud litigation based on inconsistent testimony and declarations from NIC's other witnesses in this case.

¶¶265-281; Dkt. 263-1 at 66-73.)  As it does now, NIC claimed **over three years ago** that the "evidence establishes that NTG directed Felipe Morales and Daniel Bobba to purchase the Magna Rx+ product solely for the purpose of pursuing," and that "Dan Bobba publicly admitted that his claim was intentionally false and fabricated." *Id.* at 73.  Thereafter, and following remand by the District Court, the parties specifically litigated the applicability of the crime-fraud exception to certain documents that NIC had sought related to Bobba, including through multiple *in camera* reviews.  (*See generally* Dkts. 431, 458, 534, 565, 597.)

Significantly, NIC currently seeks the production of dozens of documents that were already subject to crime fraud review during prior crime fraud litigation.  Specifically, the following 26 documents from NIC's Appendix A were already reviewed at least once: (1) NTG009984, (2) NTG009985, (3) NTG009988, (4) NTG009990, (5) NTG009991, (6) NTG009992, (7) NTG009994, (8) NTG009996, (9) NTG009999, (10) NTG010001, (11) NTG010003, (12) NTG011030, (13) NTG011031, (14) NTG011035, (15) NTG011057, (16) NTG011064, (17) NTG011091, (18) NTG011149, (19) NTG011150, (20) NTG011597, (21) NTG011598, (22) NTG011602, (23) NTG011910, (24) NTG011911, (25) NTG011983, (26) NTG011984.  Dkts. 669, 573, 458. [7]

On October 14, 2019, NIC moved for leave to take additional discovery, including the post-cutoff depositions of non-parties Bobba and Wynn Ferrell.  (Dkt. 902 at 5.)  The Special Master denied that portion of the request, but the District Court overruled, granting leave to depose Bobba and Wynn Ferrell for "no

---

[7] NIC's portion of this brief refers to 149 documents on Appendix A (the numbered documents there run to 146) and erroneously claims that only eight documents were previously reviewed by the Special Master and/or the District Court.  But a close comparison of NIC's Appendix A to NTG's notice of lodgment and the various orders of the Special Master and the District Court shows that at least 26 of the documents in NIC's Appendix A have previously been subject to *in camera* review.

more than four hours on questions and subjects relating to documents NIC now possesses pursuant to the Court's Privilege Orders." (Dkt. 902 at 12-13.)

The depositions of Daniel Bobba, Wynn Ferrell, and Ryan Ferrell took place on July 22, 2020, August 21, 2020, and October 29, 2020, respectively, and raise a number of disputed factual issues that will need to be weighed and determined by the trier of fact at the time of the trial in this action. Arhangelsky Decl., Exhs. 1-3. To this end, NTG submits that Ryan Ferrell and non-party Wynn Ferrell credibly answered NIC's allegations of misconduct regarding Bobba. *Supra*.Part.C.3.

NIC, however, contends otherwise. In doing so, NIC consistently and materially misrepresents Bobba's testimony. For example, NIC claims that Bobba testified that "NTG's 'field' rep' drove Bobba to GNC, told him to purchase Magna's product, and gave him $60 to do so." But Bobba could not and did not testify to these facts. *See* Arhangelsky Decl., Exh. 1 (Bobba Depo. at 34 ["Q.· ·Was that in- -- individual affiliated with the·Newport Trial Group?. MR. DARNELL:· Objection.· Lacks foundation; calls for speculation. THE WITNESS:· I don't know.") and at 79-83 (wherein Bobba admits he cannot say that the person who drove him to the store was affiliated with NTG; nor can he say that the driver was Ryan Ferrell, Wynn Ferrell or anyone else from NTG that he subsequently met with). Despite this, NIC falsely claims elsewhere in its motion that Bobba testified that "an NTG rep picked him up at his house; drove him to a local GNC" and that "Bobba testified that during this one June 2010 meeting the NTG representative drove him to GNC." Again, NIC knows this to be untrue as Bobba never claimed that an NTG representative or agent drove him. Accordingly, NIC's latest motion is driven by a false narrative.

Bobba is also wildly inconsistent and vague on his recollection of what actually happened more than ten years ago. For example, Bobba's internet post from 2010– made much closer in time – said nothing of being driven to a store or being given cash by NTG or anyone else. Arhangelsky Decl., Exh. 7, ¶ 3. But at

deposition more than ten years after the fact and even though that statement appears nowhere in his 2010 description, Bobba now claims he was driven to the store by someone (he cannot say it was NTG) and given cash for this purchase. NIC's motion then takes it one step further to argue that the online post from 2010 "accurately reflected his experience with NTG" and was somehow "consistent with his deposition testimony." But again, the online post from 2010 says nothing about being driven to a store or given cash to make a purpose. (NIC's motion at pg. 7.) To the contrary, unlike his deposition testimony, Bobba's online post from 2010 merely says "the lawyer comes over twice and has me sign some documents …" To state the obvious, this raises seriously questions about the credibility of Bobba's statements – both in his online post and in his deposition testimony.[8]

Moreover, as NIC itself acknowledges, NTG's allegation (based on information from Bobba) was that Bobba had "purchased [the product] prior to his first meeting with NTG."[9] The same was true of the prior plaintiff, Felipe Morales. Arhangelsky Decl., Exh. 8, ¶ 22. For Morales, NIC relies on a subsequent purchase to argue that the prior purchased did not happen. But Wynn Ferrell explained a reasonable protocol for a "repurchase" where a credible potential client no longer had a receipt. Wynn Ferrell said that under those circumstances, he would ask questions about the label, the person's frequency and duration of use, if the person gave "it a chance to work," if the person "followed the directions exactly," and the like. Sabovich Decl., Exh. A at 106-8. Wynn also testified that if the person appeared to be qualified and credible, "but they didn't have any product or any proof they had done it, I would ask them to go down to the store and rebuy that product that was the exact same product with the exact

---

[8] Relatedly, Bobba's online post stated he received a call from a "friend" whose "girlfriend's brother is a class action lawyer attorney in need of clients," but that does not describe anyone at NTG.

[9] Wynn Ferrell confirmed that he "believe[d] that Mr. Bobba had already purchased Magna at the time that you had the first meeting with him." *Id.* at 115.

same advertising on it . . ." *Id.* at 108.  Wynn Ferrell explained that this was done because "we would want to be able to show the false advertising on the box." *Id.* at 109.  Far from being fraudulent, this would help confirm that the person had previously used the product:  NTG "wanted to make sure that they had actually purchased the product, they knew what the label was, that they knew what they relied upon, and so if they would get the exact same product, then it  could be held as evidence for the -- for the misrepresentation on the label." *Id.* at 124-5.

Similarly, contrary to NIC's allegations, Wynn Ferrell confirmed that he never picked "Mr. Bobba up in a car and drive him to a store so that he could buy Magna," never gave "Mr. Bobba cash so that he could buy Magna," and never told "Dan Bobba that he would get money if he pursued his case with Newport Trial Group." *Id.* at 116.

Wynn Ferrell likewise refutes NIC's allegations of a false declaration that Bobba did not read.  He explained that he and Ryan Ferrell "read it with him sitting side by side, going over  it sentence by sentence, asking him if there's  anything that he would change about that, if there's  anything that's not true.  Then Mr. Bobba said everything was true and correct, and when he did that, then Ryan asked him to sign it." *Id.* at 117.  Consistent with this, Ryan Ferrell testified in detail on meeting with Bobba, drafting "his declaration and [going] over it with him." Sabovich Decl., Exh. B at 221.  He testified to specific changes requested by Bobba: "I believe he decided that he wasn't emotional, he wasn't worked up, and so we removed that.  He was sensitive about drinking, so we removed a reference to a bar.  And I believe he added things about meeting with my father." *Id.* at 229.  Ryan Ferrell confirmed that all the information in the declaration was "gleaned from Mr. Bobba himself" and that he made "sure that [the declaration] was accurate" when he prepared it. *Id.* at 230-231.  He even explained the questions he asked Bobba that supported certain statements in the declaration.  For example, the statement, "[l]et me be very clear, neither Wynn Ferrell nor anyone from the

Newport Trial Group has ever done anything dishonest or unethical or asked me to do or say anything unethical in this case," was supported by Bobba's response to questions like "[h]as anyone promised you anything?  Has anyone asked you to say anything inaccurate?  Has anyone given you anything?"  *Id.* at 237-238.

NIC has not contended that Ryan Ferrell or Wynn Ferrell did not fully respond to questioning during their deposition.  Instead, it now contends that because their testimony is in "conflict" with NIC's allegations and NIC's version of what it thinks Bobba said, NIC is somehow entitled to file a belated motion seeking more discovery on these disputed facts.

### C.   Argument

NIC's motion must be denied for four separate and independent reasons.  First, NIC's motion is untimely and brought without leave.  *Infra.*Part.C.1.  Second, it is not proportional to the needs of the case and the crime-fraud review it seeks is without merit.  *Infra.*Part.C.2.  Third, NIC's crime-fraud arguments are without merit and most definitely are not satisfied by pointed to alleged inconsistencies in recollections or testimony about events from more than ten years ago..  *Infra.*Part.C.3.  Fourth and finally, NIC's waiver argument is legally frivolous.  *Infra.*Part.II.C.4.

### 1.  NIC Unreasonably Delayed in Bringing its Motion to Compel

The present circumstances illustrate the self-perpetuating and never-ending nature of NIC's discovery litigation.  It sought leave to depose Bobba and Wynn Ferrell post-cutoff, even though it knew of them for years beforehand.  Then, when the depositions it sought led to conflicting testimony, it uses the conflict to justify a motion to compel documents from a four-year-old privilege log.  NIC's motion is grossly untimely.  NTG listed the documents subject to NIC's motion on March 7, 2017.  Sabovich Decl., ¶ 2.  That log was subject to extensive discovery and crime fraud litigation.  In April 2017, sixteen (16) months after this lawsuit was initiated, NIC filed its crime-fraud motion seeking the production or *in camera* review of

1,047 documents from Defendants' privilege log.  (*See* Dkt. 291-1.)  NIC then filed its Supplemental Memorandum in Support of the Crime-Fraud Motion, adding more documents from that privilege log.  Specifically, NIC asked for an order compelling production of an "additional 649 documents now listed in NIC's (Supplemental) Appendix C," or that those documents be added to the *in camera* review.  (*See* Dkt. 294 at 2:3-6 [seeking disclosure of 1,696 privileged documents in total].)

After dozens of filings and multiple orders by the Special Master, the Court, and even the Ninth Circuit Court of Appeals, NIC's omnibus motion is resolved and the parties should be moving forward with wrapping up the final fact depositions.  (Dkts. 788, 820).  Despite this, NIC wants to pursue another crime-fraud motion regarding documents on the same privilege log that NIC challenged over two years ago.  NIC's challenges to that privilege log have already been addressed, and the rulings are the law of the case and binding on NIC.  *United Steel Workers of Am. v. Retirement Income Plan for Hourly-Rated Employees of ASARCO, Inc.*, 512 F.3d 555, 564 (9th Cir. 2008).

NIC does not address the obvious timeliness defect with its motion.  On this issue, it is important that the Court set a strict discovery cutoff of December 31, 2017.  (Dkt. 500.)  Under the case law of this district, "[p]arties may not unduly delay in filing motions to compel no matter their merit."  *KST Data, Inc. v. DXC Tech. Co*., 344 F. Supp. 3d 1132, 1136 n.1 (C.D. Cal. 2018); *Wyles v. Sussman*, 445 F. Supp. 3d 751, 755 (C.D. Cal. 2020) (same); *Jorgensen v. Cassiday*, 320 F.3d 906, 913 (9th Cir. 2003) ("The district court is given broad discretion in supervising the pretrial phase of litigation.") (internal citations and quotations omitted).  Additionally, "several courts have... determined compliance with the discovery cutoff requires motions to compel be filed and heard sufficiently in advance of the cutoff so that the Court [can] grant effective relief within the

allotted discovery time." *Gerawan Farming Inc. v. Rehrig Pac. Co*., No. 1L11-CV-0123730LJO-BAM, 2013 WL 492103, *2 (E.D. Cal. February 8, 2013); *see also, e.g., Watts v. Allstate Indem. Co*., No. 2:08-CV-01877-LKK-KJN, 2012 WL 5289314, *2 (E.D. Cal. October 23, 2012) ("Motions to compel such discovery had to have been heard 30 days before [the discovery] cutoff in order for discovery to be completed by the cutoff."); *Lacy v. American Biltrite, Inc*., No. 10-CV-0830-JM(RBB), 2012 WL 909309, *8 (S.D. Cal., March 16, 2012) ("The discovery cutoff includes hearings on motions to compel and discovery ordered as a result of a motion to compel.").

"Although the Federal Rules of Civil Procedure place no time limit on the outside date for the filing of a motion to compel discovery, motions to compel filed after the close of discovery generally are deemed untimely." *Thomason v. City of Fowler*, No. 1:13-CV-00336-AWI-BAM, 2014 WL 4436385, at *4 (E.D. Cal. Sept. 9, 2014) (citing cases). Indeed, "a line of sorts has been sketched by a series of decisions: motions to compel filed after the close of discovery are almost always deemed untimely." *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 331, 332 (N.D. Ill. 2005). Accordingly, district courts have frequently denied motions to compel filed after the close of discovery. *See, e.g., Stevenson v. Holland*, No. 1:16-cv-01831-AWI-JLT, 2019 WL 4747644, at *6 (E.D. Cal. Sept. 30, 2019) ("[T]he untimeliness of a motion to compel 'is sufficient ground, standing alone, to deny a discovery motion'") (citation omitted); *Vanderbusch v. Chokatos*, No. 1:13-cv-01422-LJO-EPG (PC), 2018 WL 3031488, at *4 (E.D. Cal. June 15, 2018); *Pacific Marine Center, Inc. v. Philadelphia Indemnity Insurance Company*, No. 1:13-cv-00992-DAD-SKO, 2016 WL 110291, at *4 (E.D. Cal. Jan. 11, 2016); *Watts v. Allstate Indem. Co*., No. 2:08-cv-01877 LKK KJN, 2012 WL 5289314 (E.D. Cal. Oct. 23, 2012) ("Motions to compel such discovery had to have been heard 30 days before [the discovery] cutoff in order for discovery to be completed by the cutoff"); *Lacy v. Am. Biltrite, Inc.*, No. 10CV0830 JM RBB, 2012 WL 909309, at

*1 (S.D. Cal. Mar. 16, 2012) ("the discovery cutoff includes hearings on motions to compel and discovery ordered as a result of a motion to compel.").  An untimely filing may be allowed only upon a showing of excusable neglect under Rule 6(b).  *See, e.g.*, *Victory v. Barber*, No. 1:05-CV-01578-LJO-DLB PC, 2010 WL 4362813, at *2 (E.D. Cal. Oct. 28, 2010).

Here, the delay is over three years.  The discovery cutoff necessarily includes motions to compel, *Lacy*, 2012 WL 909309, at *1, and that period expired on December 31, 2017.  Courts regard delays of months – not years – as facially unreasonable.  *Farier v. City of Mesa*, 384 F. App'x 683, 684 (9th Cir. 2010) (holding that "the district court did not abuse its discretion in denying Farier's motion to compel because it was untimely by more than six months and Farier failed to establish good cause to excuse his delay[.]"); *Patriot Rail Corp. v. Sierra R. Co.,* No. 2:09-CV-00009-MCE, 2011 WL 3319579, at *2 (E.D. Cal. Aug. 1, 2011) ("the Magistrate Judge was well within the law in declaring that the six months it took Sierra to file a Motion to Compel—from September 10, 2010 to March 17, 2011—demonstrated a lack of due diligence and thus made it untimely."); *Prejean v. Lynwood Unified Sch. Dist.*, No. CV 07-05053 DDPCTX, 2008 WL 5115246, at *2 (C.D. Cal. Dec. 3, 2008) (awarding sanctions when party "waited six months, until two days before the discovery deadline, to file an untimely motion to compel.").

Courts are particularly unlikely to excuse untimeliness when the issues are longstanding and have been raised in prior briefing.  *Montoya v. Orange Cty. Sheriff's Dep't*, No. SACV111922JGBRNBX, 2013 WL 12347292, at *5 (C.D. Cal. Oct. 15, 2013) ("delay is exacerbated by the fact that Plaintiff raised the issue in numerous prior motions, including two motions to compel."); *Audi AG v. D'Amato*, 469 F.3d 534, 541-42 (6th Cir. 2006) (affirming denial of motion to compel that would have required extending discovery deadline when movant was "aware of the issue ... a full two-and-a-half months before the discovery deadline"

1  but did not file motion to compel until after discovery deadline since "a delay of

2  two-and-a-half months is dilatory").

3        Here, there is no question that NIC's motion is untimely and that there is no

4  excuse for its delay.[10]  NIC knows that bringing a post-cutoff motion to compel

5  requires leave as it previously sought leave when to move to compel a small

6  number of documents related to Schoonover.  (Dkt. 902 at 13-14.)  Nor is it

7  disputable that NIC has been raising these same issues regarding Bobba for years,

8  including in NIC's 2017 omnibus motion to compel.  (Dkt. 291-2 at 94-100 [NIC's

9  Appendix A seeking Bobba certain Bobba documents].)  Indeed, in its omnibus

10 motion, NIC offered essentially the same crime-fraud arguments regarding Bobba

11 and *Morales, et al. v. Magna, Inc., et al.*, No. 3:10-cv-1601-EDL (N.D. Cal. 2010).

12 (Dkt. 263-1 at 66-73.)  As it does now, NIC claimed <u>over three years ago</u> that the

13 "evidence establishes that NTG directed Felipe Morales and Daniel Bobba to

14 purchase the Magna Rx+ product solely for the purpose of pursuing" and "Dan

15 Bobba publicly admitted that his claim was intentionally false and fabricated." *Id.*

16 at 73.  Thereafter, and following remand by the District Court, the parties

17 specifically litigated the applicability of the crime-fraud exception to the *Magna*

18 action and related Bobba declaration.  (*See generally* Dkt. 597 [March 12, 2018,

19 Special Master order re Bobba documents].)

20        NIC's request is deeply prejudicial to NTG, both in terms of resources and

21 trial preparation.  With the exception of a small number of remaining depositions,

22 discovery in this case is complete and NTG is preparing for trial in November

23 2021.  NIC seeks to turn the clock back to 2017 and litigate over documents that

24 NTG logged over three years ago.  As both the Special Master and the District

25 _____

26 10 Nor are the depositions of Dan Bobba, Wynn Ferrell, or Ryan Ferrell an excuse
   for NIC's untimeliness.  Those depositions took place on July 22, 2020, August 21,
27 2020, and October 29, 2020, respectively.  Arhangelsky Decl., Exhs. 1-3.  Thus,
   the delay would still be multiple months.  But more significantly, the depositions
28 did not change anything as NIC has been making the same allegations regarding
   the *Magna* case since 2016.  (Dkt. 92, ¶¶ 265-281.)

Court noted in the context of NIC's recent 30(b)(6) overreach, NIC's efforts are virtually certain to result in further discovery litigation.  (Dkt. 1100 at 10 ["the Court is certain that any dispute over NTG's representative's inability to respond in a satisfactory manner (or a manner deemed satisfactory by NIC) would end up before the Court again."].)  Moreover, if the Special Master sets the precedent of allowing new challenges to a 2017 privilege log based on NIC's claims of a "conflict" with deposition testimony, it is virtually certain that NIC will file more motions, whether they be for more documents or more recalled depositions, or both.  Respectfully, NTG cannot prepare for trial if it is forced to constantly deal with near constant discovery motions from NIC.

For these reasons alone, NIC's untimely motion should be denied.

## 2.  NIC's Request for Another Crime Fraud Review is Disproportionate and Without Merit

Discovery litigation in this matter is beyond any reasonable proportion to the needs of this case.  With this Motion, it has reached the surreal point of NIC seeking crime fraud review for dozens of documents that were already subject to such a review.  In contrast to NIC, NTG listened when the District Court stated on August 7, 2020, that "[t]he days of proportional discovery requests here have long expired."  (Dkt. No. 1030 at 6–7.)  It has not brought new discovery motions and has tried to reasonably resolve pending discovery disputes.  The recent litigation over the 30(b)(6) deposition is a case in point: NTG offered a reasonable 30(b)(6) deposition, but NIC expended NTG's, the Special Master's, and the District Court's time with an expansive demand that would have been "almost impossible" to comply with.  (Dkt. 1096 at 13; Dkt. 1100 at 8.)  Barely three weeks after the District Court reiterated again that the "days of proportional discovery" are past, NIC is back with another discovery motion seeking to compel documents from a four-year-old privilege log.  Respectfully, NIC's motion mill will only stop when the Special Master and the District Court strictly enforce proportionality.

As the Special Master is well aware, discovery has already been extensive, burdensome, and litigious.  As of August 7, 2020, it has been the ruling of this Court that "[t]he days of proportional discovery requests here have long expired." (Dkt. No. 1030 at 6–7.)  The Special Master reemphasized this in his recent order rejecting NIC's effort to obtain an overbroad 30(b)(6) deposition, then on March 1, 2021, the District Court did the same.  (Dkt. 1100 at 9.)  To repeat, the compensatory damages in this case – if NIC wins a full recovery of them – are only $234,966.52.  (Dkt. 612-3 at 3:1-2.)  Moreover, it is the law of the case that "[t]he burdens imposed by this litigation are not justified by the amount in controversy" and that "the amount in controversy is not so high as to validate unending discovery . . . ."  (Dkt. 788 at 13.)  Because NIC has brought this motion, it has the burden of showing relevance and proportionality.  *Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012).

As the Court previously explained, "Federal Rule of Civil Procedure 26(b)(1) requires district courts to consider whether discovery is 'proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden and expense of the proposed discovery outweighs its likely benefit.'"  (Dkt. 788 at 10.)  All of these factors cut against allowing NIC an out-of-time motion to compel.

As the District Court already found, the amount in controversy is not high. Previously, the Court rejected every one of NIC's arguments in favor of a large judgment.  The Court rejected NIC's claim that it could receive punitive damages up to 72 times the award and stated it "fundamentally disagrees with NIC's argument" that "the parties' access to resources also favors the discovery at issue because the NTG Defendants' defense 'is funded by an unlimited insurance contract.'"  (*Id*. at 14.)  As the District Court explained ultimately, the "Court must

draw a line past which discovery is no longer proportional to the needs of the case."  (Dkt. 788 at 15.)  NIC does not even address this issue.

The parties' relative access to information does not favor NIC as NIC claims.  NIC's arguments to the contrary simply ignore that NIC has already received extensive discovery on Bobba and allowed unobstructed depositions of those allegedly involved.  NIC cannot even offer an internally consistent need for the documents.  It claims documents are "indispensable" to its case but on the same page asserts that Bobba's "testimony establishes predicate RICO Acts against NTG."  Indeed, dozens of the documents that NIC requests were previously subject to *in camera* crime fraud review.  Not only does the law of the case preclude NIC from seeking re-review of these same documents, but the fact that they were included in a motion challenging a four year old privilege log further underscores the extent to which NIC is overreaching.

NIC's position seems to be that because there is a "direct conflict" between Ryan and Wynn Ferrell, on the one hand, and its allegations and Daniel Bobba, on the other hand, it needs additional documents to bolster Bobba's "credibility."  But that witness testimony will conflict and credibility will be at issue is hardly unusual – that occurs in almost every trial.  "Interpreting evidence and evaluating witness credibility compromise the paradigmatic role a jury plays in American jurisprudence."  *Williams v. Hofstad*, No. 1:13-CV-01190-MC, 2011 WL 12841403, at *2 (D. Or. July 9, 2011).

Finally, the burden on NTG far outweighs any benefit to NIC.  NIC proposes to open a new round of crime-fraud litigation at a time when the parties should be preparing for trial.  This burdens the Special Master, the District Court, and NTG and is virtually certain to result in extensive additional litigation.  Moreover, if the existence of "conflicts" between deposition testimony is accepted as a reason to effectively re-open discovery and challenge old privilege logs, the final depositions in this case are sure to result in more discovery litigation.

Accordingly, the Special Master should find that NIC's untimely motion to compel is disproportionate to the needs of this matter and should be denied.

### 3.  The Crime Fraud Exception Does Not Apply

As seen below, NIC has not demonstrated the applicability of the crime-fraud exception to the 146 documents in Appendix A.  As a preliminary matter, crime-fraud review is particularly problematic here because NIC is effectively asking the Special Master to resolve (for discovery purposes) a credibility conflict between witnesses.  Substantively, NIC failed to show to make out a *prima facie* case that each document was in "furtherance" of a crime or fraud.

NIC admits that the entire basis for its crime-fraud motion is a "conflict" between its witness (Dan Bobba) and Ryan and Wynn Ferrell.[11]  As discussed in detail above, both Wynn and Ryan Ferrell offered credible testimony refuting that of Daniel Bobba.  *Supra*.Part.B.  Wynn Ferrell testified to a reasonable "repurchase"[12] when a believable purchaser no longer has a receipt or the physical

---

[11] This, if anything understates the conflict because several key NTG witnesses – including Scott Ferrell - have not yet given deposition testimony.

[12] NIC argues that relies on cases such as *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 327 (2011) and *Buckland v. Threshold Enterprises, Ltd.,* 155 Cal.App.4th at pp. 818–819, 66 Cal.Rptr.3d 543 (2008) for the proposition that Bobba could not show reliance on the false advertising.  NIC is misstating the extent to which false labels can be ignored.  As the Supreme Court in *Kwikset* explained "[s]imply stated: labels matter. The marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities they may come to associate with a particular source . . . An entire body of law, trademark law. . . exists to protect commercial and consumer interests in accurate label representations as to source, because consumers rely on the accuracy of those representations in making their buying decisions."  *Id.* at 246.  Moreover, NIC's argument misses the point; the allegation was that the product was purchased before meeting with counsel so there is no factual issue of the purchaser "knowing" the label was false.

product, and both testified to a reasonable and ethical drafting process for the declaration that NIC contends was fraudulent. *Id.*

This dispute is appropriately resolved by the jury, which is charged with "evaluating witness credibility" in the judicial system. *Williams*, 2011 WL 12841403, at \*2. Thus, courts have declined to find crime fraud when to "conclude that the crime-fraud exception applies, the [court] would, in effect, need to make a credibility choice between witnesses." *Latele Television, C.A. v. Telemundo Commc'ns Grp.*, LLC, No. 12-22539-CIV, 2014 WL 5529403, at \*2 (S.D. Fla. Nov. 3, 2014). This is especially problematic here because NIC is virtually certain to use any crime-fraud ruling to argue that the testimonial conflict has been judicially resolved in its favor for purposes of trial. To be clear, there is no support for such an argument and any such finding would infringe upon the sanctity of the jury, as well as violate the rules of evidence and principles of due process.

In any event, in the Ninth Circuit, courts cannot vitiate privilege based on the crime-fraud exception unless the communications were "sufficiently related to and were made in furtherance of [the] intended, or present, continuing illegality." *UMG Recording, Inc. v. Bertelsmann AG (In re Napster Copyright Litig.)*, 479 F.3d 1078, 1090 (9ᵗʰ Cir. 2007), *abrogated in part on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009). Emphasizing the "in furtherance of" requirement, the Ninth Circuit cited to the Second Circuit's decision in *In re Richard Roe, Inc.*, 68 F.3d 38 (2d Cir. 1995). The Second Circuit found that the District Court — although stating the communications were "in furtherance of" a crime or fraud — had improperly applied a "relevant evidence" test. *Id*. The Second Circuit explained:

> [T]he crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud. . . . Instead, the exception applies only when the court

determines that the client communication or attorney work product in question was *itself* in furtherance of the crime or fraud.

*Id*. (emphasis in original).  Application of a more stringent requirement is consistent with the District of Columbia Circuit Court of Appeals, which has held that "[t]he crime-fraud exception has a precise focus: It applies only when the communications between the client and his lawyer ***further*** a crime, fraud or other misconduct. It does not suffice that the communications ***may be*** related to a crime." *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989) (emphasis added) (Ruth Bader Ginsburg, J.).

In other words, the crime-fraud exception does not apply to privileged communications that are relevant to a theory of crime or fraud, or that may support a finding of crime or fraud.  Rather, the crime-fraud exception only applies upon a finding that each communication was itself "in furtherance of" the crime or fraud. *See, e.g., In re BankAmerica Corp. Sec. Litig.*, 270 F.3d 639, 642 (8th Cir. 2001) (requiring a finding that the "particular document or communication was made in furtherance of the client's alleged crime or fraud").  In fact, in *United States v. Doe (In re Grand Jury Investigation)*, 231 Fed. Appx. 692, 695 (9th Cir. 2007), the Ninth Circuit expressly rejected the proposition that the crime-fraud exception applies because "there is a reasonable relationship between the communications and the illegality." *Id.*  The Ninth Circuit explained "this analysis was improper because the crime-fraud exception applies only to documents and ***communications that were themselves in furtherance of illegal or fraudulent conduct***." *Id.* (emphasis added).

In addition, this Court's findings regarding each communication must satisfy the "preponderance of the evidence" standard.  *In re Napster Copyright Litig.*, 479 F.3d at 1094-95.  Consistent with this burden of proof, the Ninth Circuit has explained that "hard cases should be resolved in favor of the privilege, not in favor of disclosure." *United States v. Mett*, 178 F.3d 1058, 1065 (9th Cir. 1999).

Similarly, in *Laser Industries, Ltd. v. Reliant Technologies, Inc.*, 167 F.R.D. 417, 438 (N.D. Cal. 1996), Judge Brazil explained that "if a judge . . . concludes that the evidence and argument are essentially in equipoise, . . . the judge must deny the motion to penetrate the privilege under the crime/fraud exception." *See also id*. at 435 (explaining that if "it would have been rational . . . for the trier of fact to draw either inference," the crime-fraud exception does not apply).

Here, NIC has offered no evidence that any particular document was "in furtherance" of a crime or fraud.  Indeed, much of NIC's crime-fraud discussion does not even relate to Bobba or the *Magna* matter, much less to the 146 documents it seeks.  The only specific entry that NIC references is a log entry that NIC claims reflects "transmission of a revised declaration from S. Ferrell to R. Ferrell on September 4, 2010."  This, NIC argues, contradicts Ryan Ferrell's testimony that he did not believe Scott Ferrell was involved in editing Bobba's declaration.  NIC claims if he did revise the declaration, it shows "S. Ferrell engineered Bobba's testimony."  This is nonsensical.  As NIC knows full well, attorneys commonly draft and revise declarations.  An attorney revising a declaration is not even unusual, much less fraudulent or criminal.  It is certainly not evidence that an attorney "engineered testimony."  Moreover, the testimony from both Ryan Ferrell and from non-party Wynn Ferrell is that they personally went through Bobba's declaration with him and confirmed its truthfulness. *Infra*.Part.B.  Bobba may testify to the contrary at trial, NTG will raise the significant credibility issues calling into question his veracity, and the jury can decide.  Whether or not any particular lawyer revised the declaration is beside the point.

NIC's lack of specificity is particularly problematic because many of the documents it seeks have already been subject to crime-fraud review.  As discussed above, dozens of the documents sought by NIC were already subject to at least one crime fraud review. *Supra*.Part.B.

For all of these reasons, NIC's crime fraud argument is without merit.

### 4.  NIC's Waiver Arguments Should be Rejected

Throughout this litigation, NIC has repeatedly argued that the NTG and Non-NTG Defendants have impliedly waived the attorney-client privilege.  (*See* Dkt. 291-1 at 84 and 123:20-26; Dkt. 443-1 at 85-87.)  NIC's tactic is to level allegations regarding attorney conduct or communications, then claim that denying those allegations constitutes a waiver of privilege.  (*See generally* Dkt. 568 at 5-12.)  As the District Court has already found, NIC's premise is wrong: denying NIC's allegations is not a "waiver," particularly where the party does not refer to "contents of any specific communications with counsel."  *Id.* at 7.  Here, the circumstances are even worse than NIC's prior frivolous positions on waiver because the predicate testimony is from former employees or affiliates of NTG, which is not even testimony from NTG, let alone an affirmative position taken by NTG.[13]

---

13 NIC also argues that Bobba waived attorney-client privilege.  But the cited portions do not show Bobba disclosing specific protected attorney-client communications.  Nor does the limited testimony in question show that Bobba "abandoned" all privilege as NIC claims.  In any event, this is beside the point because "[i]t is well-established that the work-product privilege may be invoked by either the client or the attorney" and that "[a]n attorney has an independent interest in privacy" and may invoke work product "as long as invoking the privilege would not harm the client's interests."  *Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir. 2006).  Thus, the District Court specifically held that attorneys could assert independent work product objections.  (Dkt. 820 at 28-30 ["an attorney-defendant may assert work product protection over his work product from relevant predicate cases."].)  Importantly, work product is more difficult to waive than the attorney-client privilege.  *United States v. Sanmina Corp.*, 968 F.3d 1107, 1120 (9th Cir. 2020) ("courts appear to have reached a general "uniformity in implying that work-product protection is not as easily waived as the attorney-client privilege" based on the distinct purposes of the two privileges.").

The Ninth Circuit uses a three-prong test to determine whether a party has impliedly waived the attorney-client privilege.[14] *United States v. Amlani*, 169 F.3d 1189, 1195 (9th Cir. 1999). "First, the court considers whether the party is asserting the privilege as the result of some affirmative act, such as filing suit. Second, the court examines whether through this affirmative act, the asserting party puts the privileged information at issue. Finally, the court evaluates whether allowing the privilege would deny the opposing party access to information vital to its defense." *Id.* (internal citations and quotations omitted). "To waive the attorney-client privilege by voluntarily injecting an issue in the case, a defendant must do more than merely deny a plaintiff's allegations. The holder must inject a new factual or legal issue into the case. Most often, this occurs through the use of an affirmative defense." *Fox v. Cal. Sierra Financial Servs*., 120 F.R.D. 520, 530 (N.D. Cal. 1988) *quoting Lorenz v. Valley Forge Ins. Co*., 815 F.2d 1095, 1099 (7th Cir. 1987) (emphasis omitted); *see also Genentech, Inc. v. Insmed Inc*., 236 F.R.D. 466, 469 (N.D. Cal. 2006) ("The mere denial of intent is insufficient to establish waiver of the privilege."). "If a party merely denies an allegation it does not waive the privilege, but assertions regarding a defendant's good faith may be so inextricably intertwined with the defendant's state of mind that the privilege must give way to an inquiry into the basis for such belief." *Regents of Univ. of Cal. v. Micro Therapeutics, Inc.*, No. C 03 05669 JW (RS), 2007 WL 2069946, at *2 (N.D. Cal. July 13, 2007) *citing United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). Additionally, "[w]aiver is not likely to be found when the statements alleged to constitute waiver do not disclose the contents of a specific communication between client and attorney." *Genentech*, 236 F.R.D. at 469 *citing Laser Indus. v. Reliant Technologies*, 167 F.R.D. 417, 446 (N.D. Cal. 1996).

---

14 Because the District Court directly addressed this issue in connection with NIC's last attempt to claim waiver, and the Court's discussion is the law of the case, the legal standards herein are taken directly from the District Court's January 24, 2018, Order at Docket 568 at 6-7.

1    Moreover, if the Court finds that waiver exists, then it must "impose a
2 waiver no broader than needed to ensure the fairness of the proceedings before it."
3 *Bittaker*, 331 F.3d at 720.  The Court should closely tailor the waiver's scope to the
4 opposing party's needs in litigating the specific claims.  *Id*.  However, "the holder
5 of the privilege may preserve the confidentiality of the privileged communications
6 by choosing to abandon the claim that gives rise to the waiver condition." *Id*. at
7 721.

8    Applying these standards, both the Special Master and the District Court
9 rejected NIC's prior argument that declarations by Nilon, Schoonover, and
10 Demulder and non-party Torres in support of a partial summary judgment motion
11 waived privilege.  (Dkt. 568 at 5-8.)  Then, as here, NIC sought to compel over 100
12 documents based on the argument that Defendants had "waived" privilege by
13 disputing NIC's allegations of improper attorney conduct and communications.
14 (Dkt. 519 at 11-13.)  The Special Master compared the statements to the
15 allegations by NIC and confirmed that the "individuals are not raising any claims
16 or defenses . . . [r]ather, they are merely denying the allegations against them." *Id*.
17 at 18.  Moreover, in "denying the allegations against them, none of the declarants
18 refers to the contents of any communications he or she had with his or her counsel
19 or any advice of counsel." *Id*. at 18.  The District Court agreed, holding that the
20 declarations did not "inject any new issues into the case" and that "in denying the
21 allegations . . . none of the declarations refer to the contents of any specific
22 communications with counsel." *Id*. at 7.  Moreover, the District Court found that
23 even "if the filing of declarations in support of a motion for summary judgment
24 can be characterized as an affirmative act, it was not the declarants that put
25 communications with their counsel at issue." *Id*. at 7-8.  Rather, they "merely
26 denied NIC's allegations in the SAC, and it was NIC that injected these issues into
27 the case." *Id.* at 8.
28

NIC's current waiver argument is significantly worse than its prior failed one – this time NIC does not even rely on party testimony.  NIC's entire argument is based on pretending that Wynn Ferrell and Ryan Ferrell – who are not even currently employed by NTG – are NTG 30(b)(6) witnesses offering testimony on NTG's behalf.  Sabovich Decl., Exh. A (R. Ferrell Depo.) at 120 (Ryan Ferrell left Newport Trial Group at "the end of 2015" in order to form his "own law firm."); Sabovich Decl., Exh. B (W. Ferrell Depo.) at 44 (Wynn Ferrell stopped "working for NTG" in 2015).  Thus, NIC argues that "NTG may not selectively disclose fact" and claims that "NTG's testimony . . . provided an affirmative narrative explaining in detail their interactions with Bobba."  But Ryan Ferrell and Wynn Ferrell are not current authorized representatives of NTG.  They are simply former employees.  Wynn Ferrell is not even a party.  Thus, their testimony cannot satisfy the first or second prong of the Ninth Circuit's test as to NTG, namely that "***the party*** is asserting the privilege as a result of some affirmative act" and "through this affirmative act, ***the asserting party*** puts the privileged information at issue." *Amlani*, 169 F.3d at 1195.  To be clear, these are former employee that cannot take "positions" on behalf of NTG.  As former employees, Wynn and Ryan Ferrell cannot even make hearsay admissions for NTG since those must be "made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  Fed. R. Evid. 801(d)(2)(D).  To make binding admissions for a company, one must be "in effect, the corporation's 'alter ego[.]'" *Palmer v. Pioneer Inn Assocs. Ltd.*, 257 F.3d 999, 1003 (9th Cir. 2001) *quoting* Restatement (Third) Of Law Governing Lawyers § 100, cmt. e (1998).  Accordingly, there can be no waiver because testimony of former employees/contractors Wynn Ferrell and Ryan Ferrell cannot constitute the positions of NTG.

Even if the Special Master were to regard the third-party testimony of Wynn Ferrell as that of NTG, which it cannot, review of the cited portions show that, at most, he simply denied NIC's factual claims of misconduct regarding Bobba and

the *Magna* action.  NIC does not rely on any specific testimony as constituting a
waiver but instead relies on what it claims to be Wynn Ferrell's general testimony
"concerning his discussions with Bobba, the intake process that he performed, his
telephone calls with Bobba, conversations with S. Ferrell about the lawsuit, and
preparation of declarations."  It similarly claims that Ryan Ferrell "testified at
length concerning his interaction with Bobba in September 2010, and the
preparation of Bobba's declaration in opposition to Magna's motion for sanctions."
Much of what NIC cites is non-specific background, or the witness not recalling
events from ten years ago, none of which is not conceivably privileged.  *See e.g.*,
Arhangelsky Decl., Exh. 2 at 68 ("Q.   And do you remember when you first
 communicated with Mr. Bobba? A.   I don't remember the exact time.  I'm
guessing it was 2010, I'm guessing.  I don't know."); *id.* at 72 ("Q.   And so did he
sign a retainer agreement at the intake? A.   I believe so.  I don't know for sure."),
75 ("Q.   And you remember that conversation with that level of specificity? A.   I
don't recall the questions Ryan asked him.  I remember I was there, that Ryan took
the lead."), 78 ("Q.   So you don't remember anything about this information
referenced in paragraph 9? A.   I remember that it's in there and I read that.  But
I've searched my memory, and I don't remember."), 82 ("Q.   Do you recall how
long you were in Northern California surrounding those meetings with Bobba
related to him signing the declaration? A.   I don't."), Arhangelsky Decl., Exh. 3 at
223-332 (Ryan Ferrell discussing logistics of declaration, such as whether Ryan
Ferrell stayed at a hotel, how many visits he made to Bobba's home, whether he
went "right back to the airport," and the like).  None of this implicates privilege.
Had NTG blocked such questioning on work product and/or attorney-client
privilege grounds, NIC would surely have moved to compel.

NIC complains that Wynn and Ryan Ferrell "conflict" with their
allegations/Dan Bobba's testimony and that, according to NIC, "NTG defended
itself with testimony that its former client Bobba was a liar."  Again, Wynn Ferrell

1   is a third-party witness and Ryan Ferrell is a former employee. They are not

2   "NTG." But even setting that aside, a conflict in testimony is not grounds for a

3   waiver. Even if Ryan and Wynn Ferrell were regarded as NTG – which they

4   cannot be – it would at most be denial of NIC's allegations. For example, NIC's

5   Fourth Amended Complaint relies on an internet post from Dan Bobba as proof

6   that "he did not purchase the product in reliance on any Magna representations"

7   and that "he purchased the product solely to maintain a lawsuit . . . ." (Dkt. 1007,

8   ¶¶ 298-300.) Wynn Ferrell testified that he remembered Bobba because he

9   "interviewed him and signed him up, and he subsequently

10   wrote some lies on the Internet about what we talked

11   about." Arhangelsky Decl., Exh. 2 at 68. The law is clear

12   that this is not grounds for waiver.

13       Accordingly, NIC's waiver argument is without merit and its motion must

14   be denied.

15   **D. Conclusion**

16       For the forgoing reasons, NIC's motion must be denied.

17

18   RESPECTFULLY SUBMITTED:

19

20

21   FOR PLAINTIFF NATURAL                FOR NTG DEFENDANTS
     IMMUNOGENICS CORP.

22   */s/ Peter A. Arhangelsky*           */s/ David Darnell*

23   Peter A. Arhangelsky (CA 291325)     David Darnell (CA 210166)
     parhangelsky@emord.com              ddarnell@callahan-law.com

24   EMORD & ASSOCIATES, P.C.            CALLAHAN & BLAINE
     2730 S. Val Vista Dr.               3 Hutton Centre Drive, Ninth Floor

25   Bldg 6, Ste. 133                     Santa Ana, CA 92707
     Gilbert, AZ 85295                    Ph: (714) 241-4444

26   Ph: (602) 388-8899                   Fx: (714) 241-4445
     Fx: (602) 393-4361

27                                        *Attorneys for Defendants Newport Trial
     *Attorneys for Plaintiff Natural-*   *Group PC and Scott Ferrell*

28   *Immunogenics*

FOR THE ATTORNEY
DEFENDANTS


 */s/  Kyle Riddles*
Kyle Riddles (CA 309854
kriddles@bremerwhyte.com
BREMER WHYTE BROWN &
O'MEARA LLP
20320 S.W. Birch Street
Second Floor
Newport Beach, CA 92660
Ph: (949) 221-1000
Fx: (949) 221-1001

*Attorney for Ryan Ferrell, Victoria
C. Knowles, David Reid, and
Andrew Lee Baslow*




Attestation pursuant to L.R. 5-4.3.4(a)(2)(i) regarding signatures: I, Peter A.

Arhangelsky, attest that all other signatories listed, and on whose behalf this filing

is submitted, concur in the filing's content and have authorized the filing.

DATED:  March 24, 2021




                                  EMORD & ASSOCIATES, PC


                          By:     */s/ Peter A. Arhangelsky*
                                  Peter A. Arhangelsky, Esq. (SBN 291325)
                                  Joshua S. Furman (pro hac vice)
                                  Attorneys for Plaintiff
                                  *Natural Immunogenics Corp.*

---

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2021 the foregoing, **RULE 37 JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DOCUMENTS CONCERNING DAN BOBBA** was electronically filed using the Court's CM/ECF system and was sent by that system to the following:

Brendan M. Ford, Esq.
bford@FordDiulio, PC
650 Town Center Dr, Ste 760
Costa Mesa, CA 92625
Tel: (714) 384-5540
Attorney for Andrew Nilon, Giovanni Sandoval,
Sam Schoonover, Matthew Dronkers, Taylor Demulder, and Sam Pfleg,

David J. Darnell, Esq.
ddarnell@callahan-law.com
Edward Susolik, Esq.
es@callahan-law.com
Callahan & Blaine
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA 92707
Tel: (714) 241-4444
Attorney for Newport Trial Group and Scott Ferrell

Nicole Whyte
nwhyte@bremerwhyte.com
Benjamin Price
bprice@bremerwhyte.com
Kyle A. Riddles
kriddles@bremerwhyte.com
Bremer Whyte Brown & O'Meara, LLP
20320 S.W. Birch Street
Second Floor
Newport Beach, CA 92660
Tel: (949) 211-1000
Attorneys for Ryan Ferrell, Victoria Knowles, David Reid, and Andrew Baslow

1

Robert Tauler, Esq.
rtauler@taulersmith.com

2

Tauler Smith, LLP

3

626 Wilshire Blvd., Suite 510
Los Angeles, CA 90017

4

Tel: (310) 590-3927

5

Attorney for David Reid and Victoria Knowles

6

7

   */s/ Peter A. Arhangelsky*

8

Peter A. Arhangelsky, Esq.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28