TAULER SMITH LLP
Robert Tauler (SBN 241964)
rtauler@taulersmith.com
626 Wilshire Blvd., Suite 510
Los Angeles, CA 90017
Telephone:  (310) 590-3927

Attorneys for Defendants,
Victoria C. Knowles and Dave Reid

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| NATURAL-IMMUNOGENICS CORP., a Florida Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>NEWPORT TRIAL GROUP, et al.,<br><br>Defendants. | Case No. 8:15-cv-02034-JVS-JCG<br><br>Judge:  Hon. James V. Selna<br><br>**DECLARATION OF ROBERT TAULER IN SUPPORT OF DEFENDANT VICTORIA KNOWLES' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S FIRST CLAIM FOR RELIEF**<br><br>Date: June 14, 2021<br>Time: 1:30 p.m.<br><br>Complaint Filed:  December 7, 2015<br>Trial Date:        November 1, 2021 |

## DECLARATION OF ROBERT TAULER

I, Robert Tauler, Esq., declare:

1.     I am counsel for Victoria C. Knowles and David Reid in this action. The facts set forth in this Declaration are true of my own knowledge, and if called upon to testify, I could and would testify as thereto.

2.     Attached hereto as **Exhibit A** are true and correct copies of excerpts of the Deposition of Carlos Negrete, dated October 25, 2017.

BREMER WHYTE BROWN & O'MEARA LLP
20320 S.W. BIRCH STREET
SECOND FLOOR
NEWPORT BCH, CA  92660
(949) 221-1000

DEC. OF TAULER ISO KNOWLES' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S MALICIOUS PROSECUTION CLAIM

1601.116  4812-3912-4455.2

3.     Attached hereto as **Exhibit B** are true and correct copies of excerpts of the Deposition of Theo Quinto, dated September 7, 2017.

4.     Attached hereto as **Exhibit C** are true and correct copies of excerpts of Volume I of the Deposition of Benjamin Quinto as Natural Immunogenics Corp.'s Person Most Qualified, dated September 7, 2017.

5.     Attached hereto as **Exhibit D** are true and correct copies of excerpts of the Deposition of Andrew Nilon, dated June 7, 2017.

6.     Attached hereto as **Exhibit E** is a true and correct copy of Exhibit 240 to the Deposition of Benjamin Quinto as Natural Immunogenics Corp.'s Person Most Qualified, dated September 8, 2017.

7.     Attached hereto as **Exhibit F** is a true and correct copy of Defendant Natural-Immunogenics Corp.'s Memorandum of Points and Authorities in Support of Defendant's Motion for Rule 11 and Other Monetary Sanctions, filed in the case of *Andrew Nilon v. Natural-Immunogenics Corp, et al.* (Southern District of California, Case No.: 3:12-cv-00930-LAB (BGS)), dated June 24, 2015.

8.     Attached hereto as **Exhibit G** is a true and correct copy of Exhibit 214 to the Deposition of Carlos Negrete, dated October 25, 2017.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  This declaration is executed on this 26th day of April, 2021, at Los Angeles, California.

DATED:      April 26, 2021                    TAULER SMITH LLP


                                              By:   /s/ Robert Tauler
                                                    Robert Tauler
                                                    Attorney for Victoria C. Knowles and
                                                    David Reid

BREMER WHYTE BROWN & O'MEARA LLP
20320 S.W. BIRCH STREET
SECOND FLOOR
NEWPORT BCH, CA  92660
(949) 221-1000

2
DEC. OF TAULER ISO KNOWLES' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S MALICIOUS PROSECUTION CLAIM
1601.116  4812-3912-4455.2

# EXHIBIT "A"

# EXHIBIT "A"

**NATURAL-IMMUNOGENICS CORP. VS. NEWPORT TRIAL GROUP, ET AL.**
**Carlos Negrete on 10/25/2017**

1                    UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
2                CASE NO. 8:15-CV-02034-JVS (JCG)

3

4
    NATURAL-IMMUNOGENICS CORP., a Florida
5   corporation,

6             Plaintiff,

7   VS.

8   NEWPORT TRIAL GROUP, a California
    corporation, et al.,
9
              Defendants.
10  _____/

11

12

13

14                            Huseby Inc.
                             53 Orange Street
15                           Asheville, North Carolina 28801
                             Wednesday, October 25th, 2017
16                           9:10 a.m. - 4:03 p.m.

17

18

19        VIDEOTAPED DEPOSITION OF CARLOS NEGRETE

20            Taken before Beverly Bourlier James,

21   Registered Professional Reporter, Certified Realtime

22   Reporter and Notary Public in and for the State of

23   North Carolina at Large, pursuant to Notice of Taking

24   Deposition filed in the above-mentioned cause.

25

**NATURAL-IMMUNOGENICS CORP. VS. NEWPORT TRIAL GROUP, ET AL.**
Carlos Negrete on 10/25/2017                                           Page 158

```
 1    clearly lying that Andrew -- Andrew Nilon existed or
 2    existed as a class member.  He did not.  He lied.
 3         Q.    What exactly --
 4         A.    Victoria --
 5         Q.    -- were the words that Ryan Ferrell said
 6    that were a lie?
 7         A.    Andrew Nilon wants to have his deposition
 8    taken and is ready.  We're going to produce him, but
 9    we've got to overcome some discovery
10    meet-and-confers.  I believe the magistrate was
11    Skomal, I think that was the magistrate.  He had a
12    peculiar rule concerning meet-and-confers.  He was
13    very strict about the meet-and-confers, and you had
14    to submit something, so I'd go through the routine
15    again and again and again with Ryan.  Victoria was
16    participant in one.  I'm not too vivid as to that
17    one, except other -- it was represented to me that
18    Ryan -- Ryan represented to me that he'd be there.
19    He lied, it was Victoria.  Victoria didn't have
20    knowledge of what was going on in the case.
21         Q.    Victoria didn't have knowledge of what was
22    going on in the case?
23         A.    I think she may have litigation knowledge,
24    but she was jerking me around with respect to Nilon.
25         Q.    What exactly were the conversations that
```

**NATURAL-IMMUNOGENICS CORP. VS. NEWPORT TRIAL GROUP, ET AL.**
Carlos Negrete on 10/25/2017                                    Page 159

```
 1   you had with Victoria Knowles?

 2       A.    I don't remember specifically, I don't

 3   remember the words uttered, don't remember the timing

 4   exactly, just that she was lying.

 5       Q.    And what exactly were the words that she

 6   said that were a lie?

 7       A.    We will produce Andrew Nilon.

 8       Q.    And do you remember what time frame that

 9   was that she said those words to you?

10       A.    No, I'd have to refer back to the

11   declarations.  It's -- it's during this period.

12       Q.    Is it possible, given the medical issues

13   that you were going through during this period of

14   time, that you might be mistaken about the timing of

15   these conversations?

16       A.    On many other things in life, probably so.

17       Q.    Uh-huh.

18       A.    On this particular point, sharp as a

19   button.

20       Q.    So you are sharp as a button that you were

21   requesting the deposition of Andrew Nilon before

22   April 2013?

23       A.    Don't know about the timing.  Requesting

24   the deposition, yes.  I may be confused as to

25   Sandoval.  Wouldn't matter, they were both -- they
```

1    Q.    So, to be clear, to the extent that she was

2    jerking you around, I want to know about this case

3    and how many conversations you had with her related

4    to this case.

5    A.    That's understood.  One I remember in

6    person.  At least one, maybe two.  Telephone

7    conversations, several.  Maybe there was emails, I

8    don't know.  It's mostly Ryan, occasionally it's

9    Victoria.

10   Q.    Mr. Negrete, I just want to understand when

11   Victoria did this because there's not a single

12   document in this case reflecting communications that

13   you had with her.

14   A.    That's your problem, not mine.  Now, I

15   don't know where the documents are or if there is

16   documents, I'm just giving you my testimony.  This is

17   my recollection.

18   Q.    Okay, but your recollection as far as you

19   know isn't supported by any documents?

20         MR. FURMAN:  Objection, misstates the

21      record.

22         THE WITNESS:  Yeah, I -- I object, too.

23         I don't know that.

24   BY MS. SPERBER:

25   Q.    Okay.  You don't know that one way or

1   another?

2       A.      No, documents on this case, emails such as

3   that, they -- I think -- I think there is documents

4   because there's writings and perhaps motions or

5   stipulations or something, not the writings that you

6   seem to want to talk about, just there is writings.

7       Q.      There's writings that Victoria Knowles was

8   authoring or are there writings that --

9       A.      I seem to have --

10      Q.      -- reflect conversations with Victoria

11  Knowles?

12      A.      I seem to have a recollection of that.

13  The reason is Victoria's role in other cases was

14  rather limited.  I don't even know if she still works

15  there or not, or worked there all the time when I was

16  there.  They also changed offices.  So I remember we

17  worked on stipulations, we worked on position papers

18  or whatever jointly.

19      Q.      In this case?

20      A.      I believe in this case.

21      Q.      Okay.  So there should be a record of that

22  then?

23      A.      One would hope.

24      Q.      Okay.  Now, with regard to your letter on

25  October 30, 2013, at the bottom of the second

# EXHIBIT "B"

# EXHIBIT "B"

NATURAL IMMUNOGENICS CORP.: THEO QUINTO

Page 1

1                    U.S. DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                    SOUTHERN DIVISION

4                                  )
    NATURAL IMMUNOGENICS CORP., a  )
5   Florida corporation,           )
                                   )
6                      Plaintiff,  )
                                   )
7           vs.                    ) Case No. 8:15-CV-
                                   )    02034-JVS-JCG
8                                  )
    NEWPORT TRIAL GROUP, et al.,   )
9                                  )
                       Defendants. )
10  _____)

11                              **ORIGINAL**

12

13

14

15             VIDEOTAPED DEPOSITION OF

16                    THEO QUINTO

17

18          Thursday, September 7, 2017

19          Santa Ana, California 92707

20

21

22

23

24  Reported by:
    TRACY SATO
25  CSR No. 13013, RPR

hglitigation.com                    

NATURAL IMMUNOGENICS CORP.: THEO QUINTO

Page 47

```
 1      A.   Right.
 2      Q.   What is your knowledge of the facts and
 3  the evidence that supports NIC's malicious
 4  prosecution claim?
 5           MR. ARHANGELSKY:  I'm going to object on
 6  privilege grounds.  Please, to the extent that you
 7  can -- you may answer the question to the extent it
 8  doesn't reveal communications with your attorney in
 9  this case.
10           THE WITNESS:  Again, I point you to the
11  record.  It's a substantial, voluminous record.
12  BY MR. DARNELL:
13      Q.   Can you actually identify any fact or any
14  evidence that supports the malicious prosecution
15  claim?
16           MR. ARHANGELSKY:  I'm going to make the
17  exact same instruction.  I'm also going to instruct
18  you not to answer any information that reveals your
19  legal strategy in this case or mental impressions of
20  the strength of evidence.
21           THE WITNESS:  All the information is in
22  our complaint and our amended complaints.
23  BY MR. DARNELL:
24      Q.   I'm asking, as you sit here today, instead
25  of just saying, "Yeah, it's over there," can you
```

hglitigation.com

Page 53

1   prosecution claim as you sit here today?

2            MR. ARHANGELSKY:  I'm going to object on

3   privilege grounds.  And to the extent you can

4   provide any information in your personal knowledge

5   that does not come from counsel, you may answer the

6   question.  To the extent that information comes from

7   counsel, I'm instructing the witness not to answer.

8            THE WITNESS:  It's in the complaint.

9   BY MR. DARNELL:

10       Q.   Do you have knowledge of any facts or

11   evidence that supports the malicious prosecution

12   claim that does not come from your counsel?

13       A.   What I know is in the complaint.

14       Q.   And what do you know is in the complaint?

15       A.   I'd have to have the complaint in front of

16   me.

17       Q.   So you can't answer without the complaint

18   in front of you?

19       A.   I'd rather not speculate.

20       Q.   Can you identify any facts or evidence

21   that supports the claim that the defendants

22   committed wire fraud?

23            MR. ARHANGELSKY:  I will object on

24   privilege grounds and instruct the witness not to

25   answer to the extent information comes from counsel.



NATURAL IMMUNOGENICS CORP.: THEO QUINTO

Page 56

```
 1              THE VIDEOGRAPHER:  The time is 11:03 a.m.
 2    We are now off the record.
 3              (Recess taken.)
 4              THE VIDEOGRAPHER:  The time is 11:26 a.m.
 5    and we're back on the record.
 6    BY MR. DARNELL:
 7        Q.    Mr. Quinto, do you have any personal
 8    knowledge of any facts that support the malicious
 9    prosecution claim?
10              MR. ARHANGELSKY:  And objection to form.
11              THE WITNESS:  So I have general knowledge
12    of the underlying case which is really why we're
13    here today, in the instant case.  We received a
14    highly questionable letter.  We wouldn't cave to
15    those demands.  We had a highly questionable class
16    representative who somehow excused himself from the
17    case, raising further questions.  There was a
18    replacement class representative who couldn't
19    possibly represent the class.  And so those are the
20    general facts that I know.
21    BY MR. DARNELL:
22        Q.    Can you identify any other facts that
23    support the malicious prosecution claim as you sit
24    here today?
25              MR. ARHANGELSKY:  Objection to form.
```



NATURAL IMMUNOGENICS CORP.: THEO QUINTO

Page 57

```
 1            THE WITNESS:  Not without seeing documents
 2   in front of me.
 3   BY MR. DARNELL:
 4       Q.   You said you have a general knowledge of
 5   the underlying case.  What is the basis for your
 6   general knowledge?
 7       A.   Meetings with my brother and on
 8   information as the case went along.
 9       Q.   Is the sole basis for your general
10   knowledge what your attorneys communicated with you?
11            MR. ARHANGELSKY:  Objection to form.
12            THE WITNESS:  Our lawyers know most of
13   everything.
14   BY MR. DARNELL:
15       Q.   I'm asking about the basis for your
16   knowledge.  Is your knowledge based solely on what
17   your lawyers communicated to you?
18            MR. ARHANGELSKY:  Objection to form.
19   Mischaracterizes testimony.
20            THE WITNESS:  Mostly.
21   BY MR. DARNELL:
22       Q.   What facts do you know about that are
23   separate and apart from what your lawyers
24   communicated to you that support the malicious
25   prosecution claim?
```



NATURAL IMMUNOGENICS CORP.: THEO QUINTO

Page 58

```
 1              MR. ARHANGELSKY:  Objection to form.
 2              THE WITNESS:  I know that -- I know that
 3    Nilon communicated to our private investigator and
 4    acquiesced to his role.
 5    BY MR. DARNELL:
 6         Q.   And that's based on what your private
 7    investigator told you?
 8         A.   I think it's really based upon what Nilon
 9    said.
10         Q.   Did Nilon say these things to you?
11         A.   No.
12         Q.   So what did Nilon say?
13              MR. ARHANGELSKY:  Objection.  Vague and
14    ambiguous.
15              THE WITNESS:  That he was basically paid
16    to be a class representative.
17    BY MR. DARNELL:
18         Q.   Who did he say this to?
19         A.   I believe our private investigator.
20         Q.   Did he say it to anyone else?
21         A.   I do not know.
22         Q.   And your knowledge as to Nilon saying that
23    he was paid to be a class representative is based on
24    what Clark Baker told you?
25              MR. ARHANGELSKY:  Objection.
```



NATURAL IMMUNOGENICS CORP.: THEO QUINTO

Page 72

```
1   BY MR. DARNELL:
2       Q.   Outside of information that comes from
3   counsel, are you aware personally of any other facts
4   that support the malicious prosecution claim?
5            MR. ARHANGELSKY:  I'm going to also --
6   well, I'll object to form.  Also instruct the
7   witness not to reveal any work product or strategy
8   with respect to the case.
9            THE WITNESS:  I don't think so.
10  BY MR. DARNELL:
11      Q.   You mentioned a highly questionable
12  letter.  Was that the demand letter?
13      A.   It was.
14      Q.   That was dated December 27, 2011; do you
15  recall that?
16      A.   Around that time, it was a long time ago.
17      Q.   And do you recall that letter referenced
18  the client as being a female?
19      A.   Vaguely.  We maybe thought it was a typo
20  or something.
21      Q.   Do you know who that letter was sent on
22  behalf of?
23      A.   Not offhand.
24      Q.   Have you ever heard of an individual by
25  the name of Tricia Carlberg?
```



NATURAL IMMUNOGENICS CORP.: THEO QUINTO

Page 91

```
 1       Q.    You believe that each of the cases that
 2   are identified in the civil complaint, that the
 3   defendants in those cases committed extortion or
 4   fraud?
 5            MR. ARHANGELSKY:  Objection to form.
 6            THE WITNESS:  I do.
 7   BY MR. DARNELL:
 8       Q.    Which defendants?
 9       A.    Both parties, NTG and non-NTG.
10       Q.    What did Victoria Knowles do to commit
11   extortion?
12            MR. ARHANGELSKY:  Objection to form.
13   Calls for speculation.  Calls for a legal
14   conclusion.
15            THE WITNESS:  She was involved.
16   BY MR. DARNELL:
17       Q.    How so?
18       A.    I don't recall exactly.
19       Q.    How do you know she was involved?
20       A.    But she's a defendant and so she was
21   definitely named and responsible for certain
22   actions.
23       Q.    How do you know Ms. Knowles was involved
24   in any type of extortion?
25            MR. ARHANGELSKY:  Objection.  And I'll
```

NATURAL IMMUNOGENICS CORP.: THEO QUINTO

Page 92

1    instruct on privilege grounds not to reveal any

2    attorney-client communications or work product

3    information.

4              THE WITNESS:  I do not know.

5    BY MR. DARNELL:

6       **Q.   Do you have any knowledge of David Reid**

7    **being involved in any type of extortion?**

8              MR. ARHANGELSKY:  I'll make the same

9    objection and same instruction.

10             THE WITNESS:  I do not know outside of him

11   being the general manager of the firm.  Managing

12   partner, right?

13   BY MR. DARNELL:

14      **Q.   Are you aware of any specific act that was**

15   **undertaken by David Reid in furtherance of any type**

16   **of extortion?**

17             MR. ARHANGELSKY:  I'm going to object to

18   form.  Calls for a legal conclusion.  Calls for

19   speculation.  Also, going to instruct the witness

20   not to reveal attorney-client communications and

21   work product information.

22             THE WITNESS:  There might have been issues

23   involved in declarations but I don't know the

24   specifics.

25   //



# EXHIBIT "C"

# EXHIBIT "C"

Page 1

1                  U.S. DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                    SOUTHERN DIVISION

4                                    )
   NATURAL IMMUNOGENICS CORP., a     )
5   Florida corporation,             )
                                     )
6                    Plaintiff,      )
                                     )
7          vs.                       ) Case No. 8:15-CV-
                                     )    02034-JVS-JCG
8                                    )
   NEWPORT TRIAL GROUP, et al.,      )
9                                    )
                     Defendants.     )
10  _____)

11

12

13

14            VIDEOTAPED DEPOSITION OF

15    NATURAL IMMUNOGENICS CORP.'S PERSON MOST QUALIFIED

16                 BENJAMIN QUINTO

17                   Volume I

18

19          Thursday, September 7, 2017

20          Santa Ana, California 92707

21

22                              **ORIGINAL**

23

24  Reported by:
    TRACY SATO
25  CSR No. 13013, RPR



NATURAL IMMUNOGENICS CORP.: BENJAMIN  QUINTO - VOLUME 1

Page 16

 1   revealing communications with your attorney, then

 2   please do.

 3            THE WITNESS:  Do you mind restating the

 4   question?

 5   BY MR. DARNELL:

 6      Q.   What is the evidence that is set forth in

 7   the complaint, the first amended complaint, and the

 8   second amended complaint that supports the malicious

 9   prosecution claim?

10            MR. ARHANGELSKY:  Same objection.  Same

11   instruction.

12            THE WITNESS:  I'm not sure I can speak

13   confidently to what constitutes evidence or not, but

14   I know that there have been two admissions by former

15   NTG plaintiffs on their participation in sham

16   lawsuits.

17   BY MR. DARNELL:

18      Q.   Are you aware of any other documents,

19   testimony, statements, or admissions that are set

20   forth in the complaint, the first amended complaint,

21   or the second amended complaint that support the

22   malicious prosecution claim?

23            MR. ARHANGELSKY:  Objection on privilege

24   grounds.  Do not disclose work product.  And I'll

25   instruct the witness not to answer to the extent it

NATURAL IMMUNOGENICS CORP.: BENJAMIN  QUINTO - VOLUME 1

Page 17

```
1   reveals work product communications.
2            I'll also object on form grounds.  Vague
3   and ambiguous.  Calls for legal conclusions.  And
4   question is overbroad to the point of being
5   impossible to answer.
6            THE WITNESS:  I'm afraid I'll have to take
7   the advice of counsel on this.
8   BY MR. DARNELL:
9      Q.   You cannot identify any other documents,
10  testimony, statements, or admissions because doing
11  so would be based solely on information that you
12  learned from counsel; is that correct?
13           MR. ARHANGELSKY:  You're asking for a
14  compilation of information that has been --
15           MR. DARNELL:  Counsel, please stop
16  speaking.  That is a speaking objection.  It's
17  entirely inappropriate.
18           MR. ARHANGELSKY:  I'm just stating my
19  objection.
20           MR. DARNELL:  Please state the objection
21  succinctly.
22           MR. ARHANGELSKY:  I made my objection --
23  my objection and my instruction, and I think it
24  applies equally to that question.
25           MR. DARNELL:  I'll ask the question again
```



1   and I'll ask counsel to limit his objection to a

2   proper objection.

3   BY MR. DARNELL:

4       Q.   Mr. Quinto, can you identify any other

5   documents, testimony, statements, or admissions

6   besides the two admissions that you just referenced?

7            MR. ARHANGELSKY:  And my same objection.

8   Please do not reveal attorney-client communications.

9            THE WITNESS:  Can you list those four

10  items again, please?

11  BY MR. DARNELL:

12      Q.   And I just want to be clear and give you

13  the benefit of the doubt to make sure you understand

14  the question.  You've identified two admissions from

15  underlying parties in cases that you believe support

16  the malicious prosecution claim.  Your counsel has

17  instructed you not to identify any other evidence,

18  whether it be admissions, documents, testimony, or

19  statements if the sole basis of your knowledge is

20  what counsel told you.  I don't want to know what

21  counsel told you.  I only want to know what you know

22  outside of what counsel told you.

23           So my question is, outside of what counsel

24  told you, can you identify any other documents,

25  statements, or admissions, or testimony that support



Page 19

1    the malicious prosecution claim?

2         A.    I believe a report has been provided in

3    discovery from our private investigator who

4    discovered information relating to the lead

5    plaintiff, Andrew Nilon, consequentially, who made

6    admissions of his participation in what would be

7    considered a sham lawsuit.  And through further work

8    by such investigator, it was discovered that all of

9    his work partners had been involved in similar

10   litigation.

11        Q.    You're referring to a report that was

12   provided by Clark Baker?

13        A.    I believe it has been provided in

14   discovery.

15        Q.    And I'm going to follow up but I just want

16   to make sure that we're talking about a report that

17   was authored by Clark Baker.

18        A.    I believe so.

19        Q.    And it's your belief that Mr. Baker's

20   report was produced in discovery?

21        A.    I believe so.

22        Q.    Do you know when that was produced?

23        A.    No.

24        Q.    And are you referring to a report that

25   Mr. Baker prepared in connection with the underlying



Page 31

1    BY MR. DARNELL:

2        Q.    Can you -- strike that.

3            Can you identify any other documents that

4    you reviewed to prepare as the person most

5    knowledgeable?

6        A.    Not at this time.

7        Q.    You have identified two admissions by

8    parties that you believe support the malicious

9    prosecution claim?

10       A.    I have.

11       Q.    What are those admissions?

12       A.    I believe that there's a statement from

13   Nilon admitting to the fact that he was paid to

14   pursue the litigation.

15       Q.    What is the other admission?

16       A.    I can't say that the other admission

17   directly relates to our malicious prosecution claim.

18       Q.    But what is it?

19       A.    I believe there was another admission by

20   Schoonover that was similar.

21       Q.    Schoonover admitted that he was paid to

22   pursue litigation?

23       A.    To my knowledge, yes.

24       Q.    And what form did Nilon make this

25   admission in?



Page 35

```
1              MR. ARHANGELSKY:  Objection.  Vague and
2    ambiguous.  Form with respect to the question's
3    beyond the witness's knowledge.
4              THE WITNESS:  I don't think there was much
5    I thought I needed to do to prepare further.
6              MR. DARNELL:  Why don't we take a break so
7    I can confer with your counsel?
8              THE VIDEOGRAPHER:  The time is 4:03 p.m.
9    We are now off the record.
10             (Recess taken.)
11             THE VIDEOGRAPHER:  The time is 4:17 p.m.
12   And we're back on the record.
13   BY MR. DARNELL:
14        Q.   Prior to the break, you testified that
15   there was a wealth of information in NIC's filings
16   that support the malicious prosecution claim,
17   correct?
18        A.   Correct.
19        Q.   Can you specifically identify any
20   information, as you sit here today, in NIC's filings
21   that support the malicious prosecution claim?
22        A.   Sure.  I can speak to the facts of which I
23   have personal knowledge.  We received a demand
24   letter in late 2011 that claimed that there was a,
25   quote/unquote, client referred to as a "her" that
```

Page 36

1    had a problem with our product.  Months later, we

2    were served with a suit, the underlying case of

3    Nilon versus NIC.  And, obviously, Nilon was a he,

4    not a she.

5            Serve -- getting served a demand letter

6    without any contact from an unhappy client was an

7    unusual event for us as a company.  And for that to

8    proceed to litigation without any contact from that

9    client expressing their displeasure with the --

10           THE REPORTER:  I'm sorry.

11           THE WITNESS:  And for that to lead to

12   litigation without, again, any contact from the

13   client expressing their displeasure with the product

14   was a concern.

15           There was the matter of Nilon repeatedly

16   not showing up for deposition, raising our concern

17   further.

18           I believe Nilon never produced proof of

19   purchase of the product in the underlying case.  And

20   the work of our PI later revealed that Nilon and all

21   of his associates in a business he had started had

22   all commenced or been party to similar litigation

23   through the same law firm, under similar pretext.

24           So there was a lot of concern that this

25   was not a valid suit or claim.



Page 55

1    that to be the case.  There are many defendants.

2    There are several charges.

3        Q.   What did Victoria Knowles do to cause the

4    underlying case to be maliciously prosecuted?

5        A.   I'm not sure I can speak to that besides

6    saying she was part of the firm that pursued a

7    malicious prosecution -- that pursued a case

8    maliciously, or maliciously as defined by law, which

9    I cannot speak to.  And I believe her name appeared

10   on a variety of filings.  I cannot say whether

11   that's accurate right now.

12       Q.   Do you believe that her name appeared on

13   filings in the underlying case?

14       A.   They may have.

15       Q.   Are you aware of any involvement by

16   Ms. Knowles in the underlying case beyond the

17   possibility that her name may have appeared on

18   filings and that she was part of the firm?

19       A.   I cannot say so specifically at this time.

20       Q.   What did David Reid do to cause the

21   underlying case to be maliciously prosecuted?

22       A.   I would offer a similar response as to

23   Victoria Knowles.

24       Q.   You understand that Ryan Ferrell was

25   involved in the underlying case?



# EXHIBIT "D"

# EXHIBIT "D"

Atkinson-Baker Court Reporters
www.depo.com

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3

 4   NATURAL-IMMUNOGENICS          )

 5   CORPORATION,                  )

 6         Plaintiff,              )   No. 8:15-CV-02034-JVS

 7         vs.                     )   (JCG)

 8   NEWPORT TRIAL GROUP,          )

 9   et al.,                       )

10         Defendants.             )

11   _____     )

12

13

14

15                         DEPOSITION OF

16                         ANDREW NILON

17                       IRVINE, CALIFORNIA

18                    WEDNESDAY, JUNE 7, 2017

19

20

21

22    ATKINSON-BAKER,INC.
      COURT REPORTERS
23    (800) 288-3376

24    REPORTED BY: SHERRY A. CASE, RPR, CSR NO. 2989

25    FILE NO.:  AB04147
```

1

Atkinson-Baker Court Reporters
www.depo.com

| | | | |
|---|---|---|---|
| 1 | A   For the last year and a half or so. | | 11:10 |
| 2 | Q   Was that a general -- one general phone line or | | 11:10 |
| 3 | one line with multiple extensions? | | 11:10 |
| 4 | MR. DIULIO:  Objection.  Lacks foundation. | | 11:10 |
| 5 | Calls for speculation. | | 11:10 |
| 6 | MR. DARNELL:  Objection.  Vague as phrased. | | 11:10 |
| 7 | THE WITNESS:  Multiple phone lines, phone | | 11:10 |
| 8 | numbers. | | 11:10 |
| 9 | BY MR. ARHANGELSKY: | | 11:10 |
| 10 | Q   Did you ever use your Electric Family phone | | 11:10 |
| 11 | line to communicate information concerning this case? | | 11:10 |
| 12 | A   I don't remember. | | 11:10 |
| 13 | Q   Do you know anybody by the name of | | 11:10 |
| 14 | Wynn Ferrell? | | 11:10 |
| 15 | A   Can you repeat the name? | | 11:10 |
| 16 | Q   Wynn Ferrell, W-Y-N-N, Ferrell, F-E-R-R-E-L-L. | | 11:10 |
| 17 | A   I do not. | | 11:11 |
| 18 | Q   Do you know anybody by the name of | | 11:11 |
| 19 | Ryan Ferrell? | | 11:11 |
| 20 | A   Familiar, yes. | | 11:11 |
| 21 | Q   How is he familiar? | | 11:11 |
| 22 | A   I believe he is one of the owners of NTG. | | 11:11 |
| 23 | Q   Did Ryan Ferrell ever represent you in | | 11:11 |
| 24 | litigation? | | 11:11 |
| 25 | A   I don't know if it was Ryan or Andrew.  I can't | | 11:11 |

Andrew Nilon
June 7, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
1   say for sure.                                          11:11
2       Q   You said you don't know if it was Ryan or     11:11
3   Andrew.                                                11:11
4           Are you referring to Andrew Baslow?            11:11
5       A   Yes.                                           11:11
6       Q   Do you believe Andrew Baslow is an attorney?   11:11
7       A   Yes.                                           11:11
8       Q   Why do you think Andrew Baslow is an attorney? 11:11
9           MR. DIULIO:  Here I caution the witness not to 11:11
10  reveal any communications with Mr. Baslow.  I object   11:11
11  on the basis of privilege.                             11:11
12          If you can answer other than communications    11:11
13  with counsel, you can do so.                           11:11
14          THE WITNESS:  Because he works at a law firm.  11:11
15  BY MR. ARHANGELSKY:                                    11:11
16      Q   Did Mr. Baslow tell you he was an attorney?    11:11
17          MR. DARNELL:  Objection.                       11:11
18          MR. DIULIO:  Objection.  Attorney-client       11:11
19  communications.  I instruct the witness not to answer  11:12
20  what he was told by Mr. Baslow.                        11:12
21  BY MR. ARHANGELSKY:                                    11:12
22      Q   Did you ever receive documentation wherein     11:12
23  Mr. Baslow used the title "attorney" after his name?   11:12
24          MR. DIULIO:  Objection.  Attorney-client       11:12
25  communications.                                        11:12
```

Andrew Nilon
June 7, 2017

# EXHIBIT "E"

# EXHIBIT "E"

**To:**    Carlos F. Negrete[cnegrete1@hotmail.com]; 'Clark Baker'[cb@omsj.org]
**Cc:**    Theo - Natural Immunogenics[theo@n-icorp.com];
amy@negretelaw.com[amy@negretelaw.com]; Marla Shulman[marla@negretelaw.com]; 'Stacy Moore'[smoore@negretelaw.com]
**From:**    Benjamin - Natural Immunogenics
**Sent:**    Wed 11/26/2014 9:23:09 AM
**Importance:**    Normal
**Subject:**    RE: Sandoval vs. Natural Immunogenics - Investigation
**MAIL_RECEIVED:**    Wed 11/26/2014 9:23:12 AM
SKMBT_C652D14112612050.pdf

Attached is our executed copy. Thank you Carlos, and Clark!


ben


**From:** Carlos F. Negrete [mailto:cnegrete1@hotmail.com]
**Sent:** Wednesday, November 26, 2014 10:08 AM
**To:** 'Clark Baker'
**Cc:** Benjamin - Natural Immunogenics; Theo - Natural Immunogenics; amy@negretelaw.com; Marla Shulman; 'Stacy Moore'
**Subject:** Sandoval vs. Natural Immunogenics - Investigation


Dear Clark:

Please find the signed OSMJ - Client Agreement attached to this email.

It is requested that you keep Natural Immunogenics updated as to the progress of the investigation.

The first priority is item II (c.), which is investigation of Andrew Nilon and Giovani Sandoval. The other items we can prioritize once you complete Nilon and Sandoval.

I look forward to working with you.

In the meantime, please have a very Happy Thanksgiving!

Cordially,

Carlos <<...>>


Carlos F. Negrete, Esq.
LAW OFFICES OF CARLOS F. NEGRETE



EXHIBIT 240
B. Quinto
PMQ

9/8/2017


BAKER_0000221

27442 Calle Arroyo
San Juan Capistrano, CA 92675
Phone:     (949) 493-8115
Fax:       (949) 493-8170

Email:     cnegrete@negretelaw.com

CONFIDENTIALITY: This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.
NOT INTENDED AS A SUBSTITUTE FOR A WRITING: Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender. LAW OFFICES OF CARLOS F. NEGRETE, LLP, any of its clients, or any other person or entity.
IRS CIRCULAR 230 DISCLOSURE: In order to comply with requirements imposed by the Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

Code:

Rev:

Prp:

BAKER_0000222



**OFFICE OF MEDICAL AND SCIENTIFIC JUSTICE**
PO Box 1507 Studio City, Ca 91614-1517
(323) 650-6667 | (323) 656-3909 (f)  www.OMSJ.org

*California Dept. of Consumer Affairs*
*Lic. #26869*

Monday, November 17, 2014

## OMSJ - CLIENT AGREEMENT

I.  This **Agreement** between the OFFICE OF MEDICAL & SCIENTIFIC JUSTICE, INC. (OMSJ) and Attorney Carlos F. Negrete, Esq (the "Client") commences on November 17, 2014 and shall remain in full force until terminated by either party. OMSJ agrees to provide the following services to the Client according to the terms and conditions of this Agreement.

II.  **Services:** In the matter of Natural-Immunogenics Corp, OMSJ shall provide Client the following services:



Privileged

III.  **Compensation:** In consideration of OMSJ's services, Natural-Immunogenics Corp shall pay OMSJ a refundable retainer in the amount of $5000.00, which represents TWENTY (40) HOURS at a rate of $125.00 per hour. Additional hours shall be billed at the rate of $125 per hour. Natural-Immunogenics is responsible for all billing, with reports to be delivered to Natural-Immunogenics and to the Client. OMSJ will bill Natural-Immunogenics Corp for fees on a monthly basis by emailed invoice (unless otherwise agreed). To secure payment of fees and before we begin work, client shall pay a retainer of $5,000.

OMSJ, Inc.
PO Box 1507

(323) 650-6667   (323) 656-3909 (f)
cb@OMSJ.org    www.OMSJ.org

Page | 1

BAKER_0000223

IV.   **Expenses:** Client shall also reimburse OMSJ for all pre-approved reasonable business expenses, including mileage at .62 cents per mile traveled.

V.    **Confidentiality:** OMSJ agrees during the term of this Agreement and for all times thereafter to hold inviolate and keep secret all knowledge or information obtained during the course of the contractual relationship. Confidential Information may be disclosed if required by law or court order. All services, information, reports, and documents generated between OMSJ, Client, and Natural-Immunogenics shall be considered attorney-work product and obtained for the purposes of the Client's investigation.

VI.   **Termination:** Either party may terminate this Agreement and service at any time without cause and without penalty upon SEVEN (7) business days' prior written notice to the other party, effective upon sending. This contract automatically terminates upon the death of either party with all monies due thereunder to be paid to the benefit of the respective heirs, representatives, successors, and assigns of that party.

VII.  **Arbitration:** Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration in accordance with the rules of the American Arbitration Association or other arbitration service mutually agreed between the parties. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The losing party shall pay the costs of arbitration. However, in the event of noncompliance with or violation of paragraph 5 (Confidentiality), the Client may alternatively apply to the court of competent jurisdiction for a temporary restraining order injunctively, and/or such other legal and equitable remedies as may be appropriate, since the Client would have no adequate remedy at law for such violation on non-compliance.

VIII. **Written Notice:** All communications regarding this Agreement should be sent to cb@OMSJ.org unless notified to the contrary, Benjamin@n-icorp.com, and to cnegrete@negretelaw.com. Any written notice hereunder shall become effective as of the date of mailing by registered or certified mail, or email (www.readnotify.com) and shall be deemed sufficiently given if sent to the email addressee at the address stated in this Agreement or such other address as may hereunder be specified by notice in writing.

IX.   **Integration and Contract Modification:** This Agreement replaces all previous agreements and the discussions relating to the subject matters hereof and constitutes the entire agreement between the Client and the OMSJ with respect to the subject matter of this Agreement. This Agreement may not be modified in any respect by any verbal statement, representation, or agreement made by any employee, officer, or representative of the Client, or by any written documents unless signed by both the Client and OMSJ.

X.    **Severability.** If any term or provision of this Agreement is deemed invalid, contrary to, or prohibited under applicable laws or regulation of any jurisdiction, it

BAKER_0000224

OMSJ-Client Agreement
. 11/17/2014 11:50 AM

shall not affect the validity of any other clause or provision, which shall remain in full force and effect.

XI.    Governing Law: This Agreement shall be governed by the laws of the State of California.

XII.   Remedy In Event of Default In Payment. The Client is responsible for paying all fees and expenses for OMSJ's services. Accounts TEN DAYS OLD will incur a finance charge of 1.5% per month. Client agrees to pay any collection costs and/or reasonable attorney's fees sustained by OMSJ in collecting Client's account.

IN WITNESS WHEREOF, the parties have executed this Agreement effective the date first stated above.

By: _____ Date: .17 November 2014
OMSJ

By: _____ Date: 11/24/14
Client
Print Name: BY: CARLOS F. NEGRETE - LAW OFFICES OF CARLOS F. NEGRETE
Address: 27442 CALLE ARROYO City SAN JUAN CAPITANO State CA Zip 92675
Phone: 949 493-8115

By: _____ Date: 11/26/2014
Natural Immunogenics
Print Name: BENJAMIN QUINTO
Address: 7504 PENNSYLVANIA AVE City SARASOTA State FL Zip 34243
Phone: 941·702·6100

Page | 3

BAKER_0000225

# EXHIBIT "F"

# EXHIBIT "F"

Peter A. Arhangelsky, Esq. (SBN 291325)
Emord & Associates, P.C.
3210 S. Gilbert Road, Suite 4
Chandler, AZ 85286
Phone: (602) 388-8899
Fax: (602) 393-4361
Attorney for Defendant

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW NILON, individually and on behalf of all others similarly situated, | **Case No.: 3:12-cv-00930-LAB (BGS)** |
| *Plaintiff,* | Hon. Larry A. Burns |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR RULE 11 AND OTHER MONETARY SANCTIONS** |
| NATURAL-IMMUNOGENICS CORP.; and DOES 1-25, Inclusive, | |
| *Defendant.* | Hon. Bernard G. Skomal |
| | DATE: July 31, 2015 |
| | TIME: |
| | COURTROOM: |
| | JUDGE: Hon. Bernard G. Skomal |

///

///

///

///

///

///

i

1

## <u>TABLE OF CONTENTS</u>

STATEMENT OF FACTS .................................................................................2

FACTS ............................................................................................................2

ARGUMENT ..................................................................................................9

    I.    Monetary Sanctions Should Issue Against Ryan Ferrell and NTG ................9

        A.   Monetary Sanctions Are Appropriate for Counsel's Willful
            Violation of Fed. R. Civ. P. 11 ................................................. 10

           1.  Counsel's Violations Warrant Monetary Sanctions............................. 13

           2.  Monetary Sanctions Are Warranted Despite NIC's Delay in
              Taking Sandoval's Deposition .............................................. 16

        B.   Punitive Sanctions are Appropriate Under 28 U.S.C. § 1927 and
            this Court's Inherent Authority.................................................. 18

        C.   Fairness Requires that NIC be Awarded Fees and Costs Under
            The Court's Inherent Power........................................................ 20

    II.   NIC Requests Reasonable Fees and Costs Incurred as a Direct
        Result of Counsel's Improper Conduct..........................................22

        A. Fees and Costs Incurred......................................................... 22

        B.   Reasonableness of Amount Requested.................................... 23

CONCLUSION .............................................................................................24

# **TABLE OF AUTHORITIES**

**Cases**

*B.K.B. v. Maui Police Dept.*, 276 F.3d 1091 (9th Cir. 2002) ...................................19

*Bartholomew v. Pasadena Tournament of Roses Ass'n, Inc.*, 453 F. App'x
   745 (9th Cir. 2011) ...................................................................................13

*Blum v. Stenson*, 465 U.S. 886, 895(1984) ...............................................................23

*Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498
   U.S. 533 (1991) ...................................................................................10

*Campana v. Muir*, 615 F.Supp. 871 (M.D. Pa. 1985), *aff'd* 786 F.2d 188
   (3rd Cir. 1986) ...................................................................................19

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990)...........................................13

*Cotterill v. City & Cnty. of San Francisco,* No. C 08-2295 JSW JL, 2010
   WL 1223146 (N.D. Cal. Mar. 10, 2010) ...................................................2

*Donaldson v. Clark*, 819 F.2d 1551 (11th Cir. 1987)...............................................13

*Dronkers v. Kiss My Face, LLC*, No. 12-CV-1151-JAH-WMc, Dkt. No. 1
   (S.D. Cal. filed May 11, 2012) ...................................................9, 15

*Fink v. Gomez*, 239 F.3d 989 (9th Cir. 2001) ...............................................10

*Fischer v. SJB–P.D. Inc.*, 214 F.3d 1115 (9th Cir. 2000)...........................................23

*Gadda v. Ashcroft*, 377 F.3d 934 (9th Cir. 2004) .......................................................18

*Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531 (9th Cir.
   1986) ...................................................................................11

*Haynes v. City & Cnty. of San Francisco*, 474 F. App'x 689 (9th Cir. 2012)2, 18, 19, 22

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ...............................................23

*Joe Hand Promotions, Inc. v. Maldonado*, No. 08 CV 1823 JLS AJB, 2010
   WL 3504858 (S.D. Cal. Sept. 3, 2010) ...................................................24

3:12-CV-00930-LAB (BGS)

*Lahiri v. Univ. Music and Video Distrib. Corp.*, 606 F.3d 1216 (9th Cir. 2010) ............................................................................................... 18

*Miller v. Pancucci*, 141 F.R.D. 292 (C.D. Cal. 1992) ......................................... 4

*Mont-Bell Co. v. Mountain Hardwear, Inc.*, No. C-96-1644-FMS, 1998 WL 101741 (N.D. Cal. Feb. 23, 1998) ................................................... 18

*Morales v. City of San Rafael*, 96 F.3d 359 (9th Cir. 1996) ............................ 23

*Nilon v. Chromadex, Inc.*, No. 56-2013-00436790-CU-MT-VTA (Ventura County) ......................................................................................................... 8

*Pfleg v. Nature's Way Products, Inc.*, No. 37-2012-51979-CU-MT-NC, *removed to* 3:12-CV-01018-LAB-BLM, Dkt. No. 1-4 (S.D. Cal. removed Apr. 25, 2012) ............................................................................. 9, 15

*Pratt v. California*, 11 Fed. Appx. 833 (9th Cir. 2001) .................................... 18

*Stewart v. Am. Int'l Oil & Gas Co.*, 845 F.2d 196 (9th Cir. 1988) .............. 10, 12

*Thompson v. Univ. Med. Ctr.*, 520 F. App'x 568 (9th Cir. 2013) ..................... 11

*Tucker v. CBE Grp., Inc.*, 710 F. Supp. 2d 1301 (M.D. Fla. 2010) .......... 19, 20, 22

United States v. Osborn, 561 F.2d 1334 (9th Cir.1977) ..................................... 4

*Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041 (9th Cir. 2000) ............ 24

*Verdun v. I.C. Sys., Inc.*, No. 14-CV-225 JM JMA, 2014 WL 1456295 (S.D. Cal. Apr. 14, 2014) ......................................................................... 24

*Williams v. Peralta Cmty. Coll. Dist.*, 227 F.R.D. 538 (N.D. Cal. 2005) ............ 21

**Rules**

Cal. R. Prof. Conduct 3-200 ............................................................................. 21

Cal. R. Prof. Conduct 3-210 ............................................................................. 22

Cal. R. Prof. Conduct 5-200 ............................................................................. 21

Cal. R. Prof. Conduct 5-220 ............................................................................. 21

iv

CivLR 7.1 ...................................................................................................................6

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR RULE 11 AND OTHER MONETARY SANCTIONS

Defendant Natural-Immunogenics Corp. ("NIC"), pursuant to Fed. R. Civ. P. 11, 28 U.S.C. § 1927, and the Court's inherent powers, hereby moves for monetary sanctions against Plaintiff's Counsel Ryan M. Ferrell ("Mr. Ferrell" or "Counsel") and the Newport Trial Group ("NTG"). In a pattern of sanctionable conduct, Mr. Ferrell made false statements in pleadings including, but not limited to, his Motion to Substitute Class Representative (Dkt. 51) and Second Amended Complaint (Dkt. 63). *See* Dkt. 117 at 5 (concluding that Mr. Ferrell made false statements in pleadings and his performance "falls short of Rule 11's mandate").

This case should have ended in August 2014 after Mr. Ferrell's original class representative missed four depositions and later withdrew. Instead, Mr. Ferrell successfully substituted Giovanni Sandoval as a new class representative based on Mr. Ferrell's repeated representations that Sandoval was a California resident. Dkt. 117 at 2. The Court would not have granted Plaintiff's Motion to Substitute had Mr. Ferrell disclosed Sandoval's true address and identity. *Id.* at 4-5. In the nine months of litigation that followed, Mr. Ferrell deliberately concealed Sandoval's identity in violation of Rule 26(a)(1), falsely represented him to be a California resident, and even required the parties to travel into California for a deposition on the basis that Sandoval resided in California. Decl. of P. Arhangelsky at ¶¶ 4-13 ("P.A. Decl."). After NIC learned that Sandoval was not a California resident, and thus not a valid class representative, Mr. Ferrell took steps to hide that information from the Court. He refused to stipulate to Sandoval's residency in NIC's pending motion for summary

1

judgment, and he then filed a motion to "strike" that dispositive information from NIC's pleadings. *Id.* at ¶¶ 19-28.

Through his false pleadings and willful concealment of Sandoval's address, Mr. Ferrell vexatiously and unnecessarily increased NIC's litigation costs, and abused the judicial process. Having already been sanctioned once by the Court, Mr. Ferrell's conduct appears to be intentional and is certainly reckless and derelict. Indeed, NTG has a documented history of the very same conduct. Monetary sanctions in the amount of NIC's unnecessary costs and fees are the appropriate remedy here.[1] For the reasons articulated in more detail below, this Court should sanction Ryan M. Ferrell and NTG and impose such other relief as is just.[2]

## STATEMENT OF FACTS

Beginning in early May 2013, the original class representative (Andrew Nilon) failed to appear at scheduled depositions. *See* Dkt. No. 55, at 2–3. Plaintiff canceled or failed to appear at four separate depositions. *Id.*[3] This case faced dismissal without a participating class representative. Then, in July 2014, Mr. Ferrell moved to substitute Sandoval as the class representative. *See* Dkt. No. 59, at 2. Mr. Ferrell

---

[1] *Cotterill v. City & Cnty. of San Francisco,* No. C 08-2295 JSW JL, 2010 WL 1223146, at *15 (N.D. Cal. Mar. 10, 2010) *report and recommendation adopted,* No. C 08-02295 JSW, 2010 WL 1910528 (N.D. Cal. May 11, 2010) *aff'd in part, remanded on other grounds, Haynes v. City & Cnty. of San Francisco*, 474 F. App'x 689 (9th Cir. 2012).

[2] NIC respects the Court's prior ruling (Dkt. 120 at 2) and, accordingly, NIC does not request attorney fees or costs attributable to NIC's former counsel's failure to timely depose Mr. Sandoval in October 2014. As explained below, NIC instead requests only those costs and fees related to legal events that likely would have occurred regardless of whether Sandoval was deposed in October 2014 or April 2015.

[3] Mr. Ferrell was sanctioned by this Court for that conduct on July 31, 2014. *See* Dkt. No. 55, at 5–8, 10.

2

based his motion to substitute on the false statement that "[c]lass counsel has been contacted by an additional individual, *who is a member of the certified class*." *Compare* Dkt. 51-1 at 1 (emphasis added)*, with* Dkt. 117 at 6 ("Sandoval isn't a member of the class.").  According to Sandoval, he signed a retainer agreement in January 2014, almost six months before substituting into the case.  *See* Exh. A at 10 (30:24–31:7) (Sandoval Deposition Transcript).  At no point did Plaintiff's counsel voluntarily disclose Sandoval's address or full legal name, as required by Fed. R. Civ. Pro. 26(a)(1).  *See* Dkt. 117 at 2; *see also* Dkt. 110 at ¶ 31.

The Court granted Plaintiff's Motion to Substitute on August 22, 2014, and Mr. Ferrell then filed an Amended Complaint listing "Giovanni Sandoval" as the new class representative.  *See* Dkts. 62, 63.  To establish Sandoval's standing as a class member, the Second Amended Complaint stated that "Plaintiff is a resident of San Diego County, California…"  *See* Dkt. No. 63 at ¶ 5.  In fact, court records prove that Sandoval has lived in Yuma, AZ—not San Diego County—since at least 2008.  *See* Dkt. 117 at 3.  Counsel's failure to disclose Sandoval's full name and true address misled NIC and the Court, causing NIC to search in vain for a "Sandoval" living in San Diego County based on the Amended Complaint.  NIC incurred $2,294.88 in discovery costs associated with that unnecessary investigation.  Dkt. 113-3 at ¶ 7; Dkt. 95-4, at ¶ 9 (Baker Decl.).  NIC's private investigator, Clark Baker, spent sixteen (16) hours at $125/hour searching California records for a Giovanni Sandoval when that Sandoval instead resided in Arizona.  *Id.*

In early February 2015, NIC terminated its counsel and retained new counsel who entered an appearance on February 13, 2015.  *See* Dkt. 86; *see also* Dkt. 85.  On

3:12-CV-00930-LAB (BGS)

February 20th, NIC's new counsel sought leave to take Sandoval's deposition. Dkt. 90. On April 2, 2015, NIC also moved for summary judgment (Dkt. 95) based, in part, on the Plaintiff's failure to disclose admissible fact witnesses. The Court granted NIC's request to depose Sandoval on April 6, 2015, and NIC deposed him on April 20, 2015. Dkts. 97, 108. But leading up to that deposition, Mr. Ferrell still withheld Sandoval's name and address despite <u>four</u> separate requests for that information by NIC's counsel (thrice by email and once by telephone).[4] P.A. Decl. at ¶ 5. The deposition occurred in *California* even though Mr. Sandoval, Mr. Ferrell, and NIC's counsel all reside in Arizona. Dkt. 108; *see* P.A. Decl. at ¶ 8, 11. Mr. Ferrell had selected a Newport Beach, California location for that deposition. NIC did not object because it still thought Sandoval resided in San Diego County—as the Amended Complaint stated. *Id.* NIC therefore incurred $1,466.25 in travel expenses while traveling to the California deposition from Arizona (where Sandoval actually lived). P.A. Decl. at ¶ 11.

During Sandoval's deposition, Mr. Ferrell frustrated the discovery process through baseless "privilege" objections. *See* P.A. Decl. at ¶ 14. He instructed Sandoval not to answer questions such as: "You've given documents to your counsel. Can you describe what documents that you've provided to your counsel?"[5] *Id.* Mr.

---

[4] At no point in this litigation did Mr. Ferrell provide Mr. Sandoval's mandatory Rule 26 information to NIC. Dkt. 117 at 2.

[5] That question was appropriate under Ninth Circuit precedent. *See Miller v. Pancucci,* 141 F.R.D. 292, 302 (C.D. Cal. 1992) (citing *United States v. Osborn,* 561 F.2d 1334, 1339 (9th Cir.1977) ("To properly claim attorney-client privilege, the claimant must specifically designate and describe the documents claimed to be within the scope of the privilege and to be reasonably precise in stating the reasons for preserving their confidentiality.").

4

Ferrell also concealed the circumstances surrounding Sandoval's entrance as a Plaintiff in this case through frivolous privilege objections. *Id.* at ¶ 15.

Information obtained during the deposition revealed that Mr. Ferrell's Motion to Substitute and his Second Amended Complaint contained materially false statements about Sandoval's standing as a class member. *See* Dkt. 117 at 3. Sandoval revealed that he actually lived in Arizona on the date that the Second Amended Complaint listed his residence as San Diego County. Dkt. 117 at 3. NIC later provided Mr. Ferrell with evidence of Sandoval's Arizona residency, which was supported by Sandoval's extensive Arizona criminal record. P.A. Decl. at ¶¶ 18-20. NIC tried to present that information to this Court in May 2015 under NIC's then-pending Motion for Summary Judgment. *Id.* Mr. Ferrell, confronted with documentary proof of Sandoval's address, never voluntarily informed the Court that the Second Amended Complaint was incorrect, or that Sandoval was not actually a class representative. Dkt. 117 at 4, n. 1. Instead Mr. Ferrell concealed that evidence by expurgating from the parties' Joint Statement of Undisputed Facts (Dkt. 110) all facts drawn from Sandoval's deposition and public criminal records. P.A. Decl. at ¶¶ 20-27. He categorically disputed all facts sourced from the deposition—including Sandoval's *name and address* (something he was actually required to provide under Rule 26(a)). *Id.* at ¶ 18. His categorical refusal to acknowledge the deposition prevented NIC from presenting uncontested facts like Sandoval's name and address, as Mr. Ferrell made clear:

> I will not stipulate to any portion of the statement that refers to the deposition transcript.

*Id.* at ¶ 27.

After the Sandoval deposition, Mr. Ferrell then pressed forward in litigation despite having facts which called for voluntary dismissal. He filed an Opposition to NIC's Motion for Summary Judgment on April 27, 2015. *See* Dkt. 111. That filing forced NIC to spend resources drafting a Reply (Dkt. 113) to alert this Court of Mr. Ferrell's false statements and new facts developed since Sandoval's deposition. *See* Dkt. 110 (failing to reveal Sandoval's Arizona residency); *see also* Dkt. 111 (same). NIC needed to seek leave to exceed the page count in its Reply just to set out undisputed information sourced from the deposition. *See* Dkt. 112. Mr. Ferrell followed NIC's Reply with an improper combination motion and objection. *See* Dkt. 114 (May 6, 2015). He tried to suppress facts revealing that Sandoval was an improper plaintiff. *See* Dkt. 114 at 2, 7 (requesting that the Court "strike new evidence" or "strike Defendant's Reply in its entirety"). Because Mr. Ferrell filed his motion (Dkt. 114) as both an objection and a *motion* to strike, NIC was obligated under Local Rule 7.1(f)(3)(a) to oppose that motion, thus incurring more costs. *See* CivLR 7.1; *see also* Dkt. 116 (NIC's Opp., May 7, 2015). Then, on April 27, 2015— one week <u>after</u> Sandoval's deposition—Mr. Ferrell served documentation claiming that his estimated class damages exceeded $380 million, an amount bereft of any legal or factual support, and patently unreasonable under applicable law. *See* P.A. Decl. at ¶ 29.

On May 12, 2015, the Court issued an Order Tentatively Vacating Class Certification and Dismissing the Case Without Prejudice. Dkt. 117.[6] The Court found that Mr. Ferrell "has displayed a cavalier attitude towards discovery obligations practically from the get-go." *See* Dkt. 117 at 5. The Court found that Mr. Ferrell filed papers containing materially false statements. *Id.* at 4. It found that Mr. Ferrell did not conduct a reasonable inquiry and, thus, his conduct "falls short of Rule 11's mandate." *Id.* at 4-5. The Court stated unequivocally that "but for the SAC's false statement about Sandoval's residency, the Court would not have granted the motion for substitution" in August 2014. *Id.*

Mr. Ferrell filed a Response to the Tentative Order that also misrepresented the record. Dkt. 118 at 2. He wrote that "*subsequent to the retainer agreement* [signed in January of 2014], Plaintiff moved from California." *Id.* (emphasis added). That statement was false and unsupported. *See* Dkt. 117 at 3. The Court had explained that "Sandoval's publicly available criminal history demonstrates that he has lived at the same… address in Yuma, Arizona since 2008," well before the retainer agreement in January 2014. *Id.*

NIC then requested sanctions under Rule 11, 21 U.S.C. § 1927, and the Court's inherent authority. *See generally* Dkt. 119. The Court issued an Order of Dismissal on May 22, 2015. Dkt. 120. That Order decertified the class, dismissed Sandoval's claims with prejudice, and dismissed the class claims without prejudice. *Id.* at 1. The

---

[6] On May 7, 2015, NIC sought a hearing date to file a motion for sanctions based on the conduct described in this instant motion. However, during a May 11, 2015 teleconference, the Court denied NIC that opportunity given the upcoming Tentative Order.

7

Court denied NIC's request for sanctions without prejudice, while granting NIC the right to bring its motion before Magistrate Judge Skomal. *Id.* at 2.

Mr. Ferrell and NTG have a history of using straw man plaintiffs. They have used improper plaintiffs under almost identical circumstances in at least two other cases to front class action claims on NTG's behalf. For example, the original plaintiff, Andrew Nilon, never meaningfully participated in the case. He produced no discovery, failed to appear on four separate deposition dates, and eventually withdrew from the case when pressed to appear. Dkt. 117 at 2. He alleged that a family issue precluded his continued involvement in litigation. *See* Dkt. 51-2. But at the very same time Mr. Nilon was missing depositions allegedly because of familial obligations, NTG still used Andrew Nilon as a plaintiff in a separate action filed against Chromadex, Inc. in Ventura County Superior Court. *See Nilon v. Chromadex, Inc.*, No. 56-2013-00436790-CU-MT-VTA (Cal. Super. Ct. Ventura Cty. filed May 22, 2013).[7]

Mr. Nilon is a manager of a startup business called Electric Family, LLC, a Las Vegas company wherein Nilon sells clothing with four other associates. *See* Exh. B (Nevada Commercial Recordings). NTG has represented two of Mr. Nilon's other business associates in litigation against California businesses based on similar legal

---

[7] In fact, on the very same day Mr. Nilon was supposed to attend a deposition in this case on May 22, 2013, NTG filed a new Complaint listing Andrew Nilon as a named plaintiff against another company. *See Chromadex*, No. 56-2013-00436790-CU-MT-VTA. Nilon, of course, failed to appear for his NIC deposition, marking the second such failure; and he would later disregard two additional deposition dates. *See* Dkt. No. 55 at 2-3.

8

theories.[8]  Matthew Dronkers and Sam Pfleg are members of Nilon's LLC who each brought CLRA and UCL claims in the Southern District of California through NTG.  *See* Exh. C (Dronkers Complaint); *see also* Exh. D (Pfleg Complaint).  In both complaints, NTG alleged that Dronkers and Pfleg were "resident[s] of San Diego County."  *See* Exh. C at ¶ 1; *see also* Exh. D at ¶ 1.  Yet at the same time as that litigation, Pfleg lists a Las Vegas, Nevada address in publicly filed documents.  *See* Exh. B at 29 (listing address in Nevada).

In this case, Sandoval was also never a proper plaintiff.  *See* Dkt. 117 at 6.  He testified that he was lured into becoming a plaintiff through a website inviting contact with NTG.  *See* Exh. A at 9-10 (28:4-30:6).  When deposed, Sandoval lacked knowledge of NIC's product, called the product by the wrong name repeatedly, did not recognize the names of any expert witness in the case (plaintiff or defense), could not remember his California address, refused to provide identification, and lied repeatedly under oath concerning his criminal record (which would have revealed his residency).  *Id.* at 10, 24-25 (31:23-33:6, 88:22-90:1); *see also* Dkt. 117 at 3.  As with Sandoval's class claims, in each of the above cases (*supra* note 8), NTG voluntarily dismissed its claims before facing scrutiny.

## ARGUMENT

### I.    Monetary Sanctions Should Issue Against Ryan Ferrell and NTG

---

[8] *See* Complaint in *Dronkers v. Kiss My Face, LLC*, No. 12-CV-1151-JAH-WMc, Dkt. No. 1 (S.D. Cal. filed May 11, 2012) (Exh. C); *see also* Complaint in *Pfleg v. Nature's Way Products, Inc., No. 37-2012-51979-CU-MT-NC, removed to* 3:12-CV-01018-LAB-BLM, Dkt. No. 1-4 (S.D. Cal. removed Apr. 25, 2012) (Exh. D).

"Three primary sources of authority enable courts to sanction parties … for improper conduct:  (1) Federal Rule of Civil Procedure 11… (2) 28 U.S.C. § 1927, which is aimed at penalizing conduct that unreasonably and vexatiously multiplies the proceedings, and (3) the court's inherent power."  *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001).  In its Motion for Summary Judgment (Dkt. 95), NIC proved that Plaintiff had no admissible evidence to prove its claims.  Summary Judgment would have been appropriate had Sandoval qualified as a plaintiff.  Now, given counsel's pattern of egregious conduct, and because this Court dismissed class claims without prejudice, monetary sanctions are appropriate and should be awarded.

## A. Monetary Sanctions Are Appropriate for Counsel's Willful Violation of Fed. R. Civ. P. 11

Plaintiff's counsel violated Rule 11 on at least four occasions.  Rule 11 "imposes on a party who signs a pleading, motion or other paper… an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing" and "the applicable standard is one of reasonableness under the circumstances."  *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 551 (1991).  The Ninth Circuit employs a two prong test to evaluate Rule 11 violations.  *Stewart v. Am. Int'l Oil & Gas Co.*, 845 F.2d 196, 200 (9th Cir. 1988).  The Court first asks whether the pleading was frivolous, and then whether the false or frivolous pleading was interposed for an improper purpose.  *Id*.  "An objective standard of reasonableness is applied to determinations of both frivolousness and improper purpose."  *Id.* at 201.  Pleadings have been found frivolous where the signer never performed a reasonable investigation into the facts alleged.  *Bus. Guides*, 498 U.S. at

551; *see also Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1537 (9th Cir. 1986).  Pleadings are filed for an improper purpose when filed to unnecessarily delay, multiply, or extend proceedings.  *See Stewart*, 845 F.2d at 201.

The Court already found that Mr. Ferrell falsely stated in his Second Amended Complaint that "Sandoval 'is a resident of San Diego County, California.'"  *See* Dkt. 117 at 4.  That false statement infected the entire pleading, infected the Motion to Substitute Class Representative, and infected the entire case.  Dkt. 117 at 4-5 ("But for the SAC's false statement about Sandoval's residency, the Court would not have granted the motion for substitution.").  The Court also found that, based on "Sandoval's deposition testimony and criminal record," it was clear that counsel failed to conduct a reasonable inquiry.  Dkt. 117 at 4.  Under the first prong of the Ninth Circuit's Rule 11 analysis, both the Motion to Substitute Class Representative and the Second Amended Complaint were frivolous.

Those false statements were interposed for an improper purpose under Ninth Circuit precedent.  When Counsel moved to substitute Sandoval for Nilon, Plaintiff's case was at a crossroads.  Without a class representative, dismissal was likely. [9]  So to "extend" these proceedings, Mr. Ferrell filed two frivolous pleadings predicated on Sandoval's fictitious California residency.  *See* Dkt. 51; *see also* Dkt. 63; *but see* Dkt. 117 at 6.  Those false statements were necessary to establish standing and keep the action alive.  *Id*.  Therefore, under the second prong of the Ninth Circuit test, the false

---

[9] Case dispositive sanctions have been issued where a Plaintiff fails to sit for deposition in violation of a court order.  *Thompson v. Univ. Med. Ctr.*, 520 F. App'x 568 (9th Cir. 2013).  *See* Dkt. 59 (Order sanctioning Plaintiff's counsel for Nilon's repeated failure to sit for deposition).

11

statement was interposed for the improper purpose of prolonging a frivolous action. *See Stewart*, 845 F.2d at 201. Based on those facts, this Court held that Counsel's conduct fell "short of Rule 11's mandate" and that "this [wasn't] an isolated occurrence." *See* Dkt. 117 at 4. The Court cited another Rule 11 violation when Mr. Ferrell failed to notify the Court upon discovery of the material falsehood "previously made to the tribunal." *Id*. at n.1.

Mr. Ferrell also included false or misleading statements for an improper purpose in his Opposition to Defendant's Motion to Strike (Dkt. 98) and his Declaration in support of that Opposition (Dkt. 98-1). In an effort to oppose NIC's motion to strike expert testimony, Mr. Ferrell stated in Dkt. 98 that "[Sandoval] has been intimately involved with every decision taken since he became the lead Plaintiff …" Dkt. 98 at 3. Mr. Ferrell supported that statement with an affidavit stating that "[s]ince being named as named Plaintiff, Giovanni Sandoval has been completely involved in the litigation." Dkt. 98-1 at ¶ 9. Yet at deposition, Sandoval did not know who the defendant was in this case or the name of the product at issue. Exh. A at 10 (31:23-33:6). He did not recognize the name of a single expert witness in the case. *Id*. at 24-25 (88:22-90:1). He was unaware of, and had no basis for, Mr. Ferrell's many allegations in the Amended Complaint concerning the safety of NIC's product. *Id*. at 21, 23 (74:12-75:24, 83:19-84:9). If Sandoval was intimately involved in the case, he would know those basic details. If he had been "intimately" involved in the case, Mr. Ferrell would have known that Sandoval was not a California resident and was, in fact, an Arizona resident. *See* Dkt. 117 at 3.

Mr. Ferrell also made false statements for an improper purpose in his Response to the Court's Tentative Order. Dkt. 118. He stated that Sandoval moved to Arizona *after* the retainer agreement was signed in January of 2014. *See* Dkt. 118 at 2. He cited the Court's Tentative Order in support. *Id.* Yet the Court, citing publicly available records, said nothing of the sort. Dkt. 117 at 3. The Court took judicial notice of the fact that Sandoval had resided in Yuma, Arizona since 2008 and was on probation in that state since 2012. *Id.* Ironically, when Mr. Ferrell made that false statement in his response, the Court had not yet issued its final order. It had requested an explanation from Mr. Ferrell concerning the "troubling" events surrounding the false statements made in Plaintiff's Second Amended Complaint. *See* Dkt. 117 at 6; Dkt. 120 at 2.

### 1. Counsel's Violations Warrant Monetary Sanctions

Monetary sanctions may be imposed for violations of Rule 11. *Bartholomew v. Pasadena Tournament of Roses Ass'n, Inc.*, 453 F. App'x 745 (9th Cir. 2011); *see also Donaldson v. Clark*, 819 F.2d 1551, 1557 (11th Cir. 1987) ("Imposing a financial penalty often will be the most effective and fair means of enforcing Rule 11 and deterring baseless suits."). "Such a sanction may… include payment of the other parties' expenses." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990); *see also* Advisory Committee Note on Rule 11. The monetary award may be in the amount of "expenses and attorney's fees for the services directly and unavoidably caused by the violation." *See* Advisory Committee Note on Rule 11. In determining the appropriateness of a sanction under Rule 11, the Advisory Committee recommended that courts consider:

13

3:12-CV-00930-LAB (BGS)

Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants…

*Id.*

Here, every factor listed in the Committee Notes supports imposition of significant monetary sanctions. Mr. Ferrell has engaged in a pattern of improper conduct. He participated in a "pattern of unjustified [deposition] cancellations" that this court found "deeply troubling," and for which Mr. Ferrell and NTG were sanctioned. *See* Dkt. 55 at 7. After those sanctions, Mr. Ferrell repeatedly refused to provide mandatory Rule 26(a) information in violation of the Federal Rules of Civil Procedure. *See* Dkt. 117 at 3; *see also* P.A. Decl. at ¶¶ 4-6. He made materially false statements in Plaintiff's Motion to Substitute Class Representative; Plaintiff's Second Amended Complaint; Plaintiff's Opposition to NIC's Motion to Strike; and Plaintiff's Response re Tentative Decision. *See* Dkt. 51-1 at 1; Dkt. 63 at ¶ 20; Dkt. 98 at 3; Dkt. 98-1 at ¶ 9; Dkt. 118 at 2. He knowingly caused NIC to incur unnecessary travel expenses associated with Sandoval's deposition. *See* P.A. Decl. at ¶¶ 8-11. He made legally unsupported privilege objections at Sandoval's deposition to mask the circumstances surrounding Sandoval's involvement in this case. *Id.* at ¶¶ 14-15. He refused to stipulate to basic and undisputable facts in the parties' Joint Statement of Undisputed Facts (Dkt. 110) in an effort to conceal his false statements from the

14

Court. *Id*. at ¶¶ 17-28. The Court also found that Mr. Ferrell violated his legal obligations when he failed to independently notify the Court of material falsehoods in the Second Amended Complaint. *See* Dkt. 117 at 4, n. 1. That pattern of egregious conduct alone justifies monetary sanctions.

Moreover, the false statements in Plaintiff's Motion to Substitute and Amended Complaint infected the entirety of those pleadings (and this case). Those false facts were necessary to establish Sandoval's standing and, but for those false statements, the Court would not have allowed the case to continue past August 2014. Dkt. 117 at 4-5.

Publicly available records suggest that NTG may have engaged in the very same conduct in prior litigation. NTG brought a CLRA and UCL claim against Nature's Way on behalf of Sam Pfleg in 2012.[10] *See* Exh. C (Pfleg Complaint). Yet, publicly available information appears to contradict NTG's allegation of Mr. Pfleg residency in paragraph 1 of that complaint. *See* Exh. C at ¶ 1; *compare to* Exh. B at 29. That action was voluntarily dismissed with prejudice as to Pfleg. *See Pfleg*, No. 3:12-CV-01018-LAB-BLM, Dkt. No. 8. Sandoval's deposition testimony confirms that NTG actively recruits plaintiffs with little concern for their suitability as class representatives or the veracity of statements made in written pleadings. Exh. A at 9-10 (28:4-30:6).

Mr. Ferrell's false statements to the Court in this case substantially increased the costs of litigation and unnecessarily extended the case for nearly one year, causing

---

[10] NTG also pursued an action on behalf of Nilon's business associate, Matthew Dronkers, which was voluntarily dismissed after settlement. *See Dronkers,* No. 3:12-CV-01151-JAH-WMC, Dkt. Nos. 21, 25; *see also* Exh. B at 33-34.

NIC substantial litigation costs.  *Compare* Dkt. 51 (moving to substitute Sandoval in
July 2014) *with* Dkt. 120 (dismissing case on May 22, 2015).

Mr. Ferrell and his supervisors at NTG are trained in the law and members of
the California State Bar.  Mr. Ferrell and NTG have substantial financial resources.
NTG's website states that the firm has recovered over $300 million in judgments.[11]
The firm claims that its 2013 revenue exceeded $10 million dollars.[12]  Counsel was
already sanctioned once by this court in the amount of $5,053.90 in August of 2014.
Dkt. 59 at 2.  That amount did not deter improper conduct.  Accordingly, substantial
monetary sanctions are now warranted.

### 2. Monetary Sanctions Are Warranted Despite NIC's Delay in Taking Sandoval's Deposition

In its Final Order (Dkt. 120), the Court was reluctant to grant NIC monetary
sanctions because NIC "also contributed to the delay in this case" by failing to depose
Sandoval in October 2014.  Dkt. 120 at 2.  NIC accepts that it is bound by decisions of
terminated counsel even though prior counsel acted in conflict with NIC's instruction
to depose Sandoval.  As the Court observed, certain delays, costs, and fees could have
been avoided had Sandoval been timely deposed.[13]  But other costs and fees could not
have been avoided, and are directly attributable to Plaintiff's sanctionable conduct.

---

[11] Newport Trial Group Home Page: About Newport Trial Group,
http://www.trialnewport.com/ (last visited June 17, 2015).

[12] Alexandra Schwappach, *Punching Above Their Weight*, Los Angeles Daily
Journal, December 13, 2013, a*vailable at*
http://www.trialnewport.com/images/NewportTrial-Article.pdf.

[13] NIC's new counsel acted with diligence since entering this case.  New
counsel filed a request for leave to take Mr. Sandoval's deposition within one week

16

Regardless of when NIC took Sandoval's deposition, NIC would still have been forced to incur costs of that deposition, an event that was unnecessary had Mr. Ferrell provided Sandoval's mandatory Rule 26(a) information. Mr. Ferrell's failure to provide Rule 26(a) information provided, in part, grounds for NIC's Motion for Summary Judgment. *See* Dkt. 95. That dispositive motion would also have been required regardless of when Sandoval was deposed. Because Mr. Ferrell attempted to conceal Sandoval's true residence after the deposition, pressed forward in litigation, and failed to timely notify the Court of prior false pleadings, NIC would obviously have needed to bring a dispositive motion to elicit action no matter when the deposition occurred.

The Court also found that Mr. Ferrell's failure to promptly notify the Court of falsities in his earlier pleadings was an independent legal concern. *See* Dkt. 117 at 4 n.1. Thus, at the very least, all litigation following Sandoval's deposition should have been unnecessary, but Mr. Ferrell's sanctionable conduct compelled those efforts as NIC needed to maintain its defense. Indeed, on April 27, 2015—one week *after* Sandoval's deposition—Mr. Ferrell served notice that his estimated class damages exceeded an astounding $380 million,[14] a grossly inflated value that affirmed NIC's need to zealously defend against Mr. Ferrell's claims. *See* P.A. Decl. at ¶ 29.

As detailed below and in supporting materials, NIC now reasonably seeks monetary sanctions for costs and fees attributable to the legal events that were

---

after entering the case. *See* Dkt. 86 (Notice of Appearance, February 13, 2015) *and compare to* Dkt. 90 (Mot. to Modify, February 20, 2015).

[14] That exorbitant and frivolous damages estimation was backed by specious reasoning and totaled hundreds of millions of dollars more than even the highest gross revenue estimation for NIC during the relevant period. *See* P.A. Decl. at ¶ 29.

necessary and unavoidable given Mr. Ferrell's sanctionable conduct; that would have been incurred regardless of when Sandoval was deposed; and which were directly attributable to Mr. Ferrell's sanctionable conduct. *See* P.A. Decl. at ¶¶ 30-32.

### B. Punitive Sanctions are Appropriate Under 28 U.S.C. § 1927 and this Court's Inherent Authority

Under 28 U.S.C. § 1927, the Court may sanction an attorney for "excess costs, expenses, and attorney's fees reasonably incurred because of… conduct [which unreasonably and vexatiously multiplies the proceedings]." *See* 28 U.S.C. § 1927. A finding of "[r]ecklessness suffices for § 1927 sanctions." *Lahiri v. Univ. Music and Video Distrib. Corp.*, 606 F.3d 1216, 1218–19 (9th Cir. 2010). Parties that take unreasonable or unsupported positions are held accountable under § 1927. *See Gadda v. Ashcroft*, 377 F.3d 934, 943 at n.4 (9th Cir. 2004); *Pratt v. California*, 11 Fed. Appx. 833, 836 (9th Cir. 2001); *Lahiri*, 606 F.3d at 1223. "[T]he focus under § 1927 is on the entire course of conduct, rather than on any particular papers." *Mont-Bell Co. v. Mountain Hardwear, Inc.*, No. C-96-1644-FMS, 1998 WL 101741, at *1 (N.D. Cal. Feb. 23, 1998). "[T]he district court [also] has the inherent authority to impose sanctions for bad faith, which includes a broad range of willful improper conduct." *Id.* at 992. "[S]anctions are available if the court specifically finds bad faith or conduct tantamount to bad faith." *Id.* at 994 (explaining that "reckless misstatements of law and fact" can be sanctionable under the court's inherent power). The Ninth Circuit has upheld awards of attorney fees and costs under circumstances similar to those in this case. *See Haynes v. City & Cnty. of San Francisco*, 474 F. App'x 689 (9th Cir. 2012) (citing *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1107 (9th Cir.

2002)); *see also Campana v. Muir*, 615 F.Supp. 871 (M.D. Pa. 1985), *aff'd* 786 F.2d 188 (3rd Cir. 1986).

Here, as stated in this Court's Tentative Order, at least by Sandoval's deposition Mr. Ferrell knew that Sandoval was not a member of the class he purported to represent. Dkt. 117 at 4 n.1. The Court noted that Mr. Ferrell shirked his responsibility to notify the Court of that fact, and instead proceeded forward in litigation. *Id.* His conduct is more reckless than that in *Haynes* because Mr. Ferrell had an affirmative duty under the Federal Rules to specifically obtain the information that belied Sandoval's standing. *See* Fed. R. Civ. P. 26(a)(1).

Courts have imposed sanctions in the form of fees and costs associated with each frivolous claim litigated. *Tucker v. CBE Grp., Inc.*, 710 F. Supp. 2d 1301, 1307 (M.D. Fla. 2010). In *Tucker*, the "[p]laintiff and his attorney multiplied the proceedings … unreasonably and vexatiously and exhibited a *deliberate indifference to obvious facts*." *Id.* (emphasis added). Sanctions were appropriate because, as in this case, the plaintiff's deposition contradicted material allegations made in the complaint. *Id.* The court found "even more troubling" the fact that, as in this case, "Plaintiff's counsel, an officer of the Court, filed a complaint wherein … the allegations had no basis in fact and then failed to dismiss any of [those] allegations until a summary judgment motion was filed." *Id.*

Here Mr. Ferrell filed both the Second Amended Complaint and Motion to Substitute his class representative with materially false statements of obvious facts concerning Sandoval's class status and residence. Dkt. 117 at 4-5; *see also* Dkt. 51-1 at 1. Submission of that material evidenced a "deliberate indifference to obvious

19

facts" because counsel had an affirmative duty, aside from his Rule 11 obligations, to determine Sandoval's name and address under Rule 26(a)(1). Furthermore, as in *Tucker*, Mr. Ferrell never notified the Court of material falsities, nor did he voluntarily dismiss claims after "discovering" that Sandoval was not a class member. Dkt. 117 at 4 n.1. Instead, he tried to prevent the Court from discovering that information by filing a motion to strike all facts concerning Sandoval's deposition. *See* Dkt. 114. He refused to include in the Joint Statement of Facts (Dkt. 110) any information from Sandoval's deposition. *See* P.A. Decl. at ¶¶ 20-27. He refused to stipulate to Sandoval's Arizona residency. *Id.* at ¶ 27; *see also* Dkt. 117 at 3 (taking judicial notice of Sandoval's Arizona residency since 2008).

That activity goes beyond the reckless and sanctionable conduct in *Tucker*, and instead embodies a bad faith motive to profit despite the record facts. *See* Dkt. 117 at 5. Mr. Ferrell was already sanctioned for "Plaintiff's pattern of avoiding … duly-noticed depositions" which the Court found "deeply troubl[ing]." Dkt. 55 at 7. Had Mr. Ferrell provided Sandoval's information, NIC could have addressed the standing issues *ab initio* in response to Plaintiff's Motion to Substitute. And because that deceptive conduct is part of a continued pattern of reckless or willful behavior, including similar instances in other cases, the punitive sanctions contemplated in 28 USC § 1927 are proper in conjunction with deterrent sanctions under Rule 11.

### C. Fairness Requires that NIC be Awarded Fees and Costs Under The Court's Inherent Power

This Court's Final Order was tantamount to a Rule 41(a) voluntary dismissal without prejudice. *See* Dkt. 120 at 2. "In determining whether to award costs [and

fees] ... after a voluntary dismissal without prejudice, courts generally consider the following factors: (1) any excessive and duplicative expense of a second litigation; (2) the effort and expense incurred by a defendant in preparing for trial; (3) the extent to which the litigation has progressed; and (4) the plaintiff's diligence in moving to dismiss." *Williams v. Peralta Cmty. Coll. Dist.*, 227 F.R.D. 538, 540 (N.D. Cal. 2005).

Dismissal *without* prejudice leaves NIC vulnerable to suit on these same claims that NIC litigated for more than three years. Yet NIC has already incurred the costs of three years of litigation. Dkt. 117 at 1. While it is unclear whether Andrew Nilon was ever a valid Class Representative due to his failure to sit for deposition, certainly from the time Sandoval entered as the class representative, NIC incurred fees and costs stemming from an improper Plaintiff. Dkt. 117 at 4 ("Sandoval... wasn't a member of the class he purported to represent."). As stated *supra*, and in fairness, here NIC has substantially and reasonably limited its request for fees and costs to specific legal work.

The Court should also consider that Mr. Ferrell apparently violated California Rules of Professional Conduct. He violated Rule 5-200 through false statements of fact or law to the Court. *See* Cal. R. Prof. Conduct 5-200. He violated Rule 5-220 by actively concealing evidence of those false statements after Sandoval's deposition. *See* Cal. R. Prof. Conduct 5-220. He violated Rule 3-200 by bringing a meritless claim before the Court in August 2014. *See* Cal. R. Prof. Conduct 3-200. He may have violated Rule 3-210 by scheduling Sandoval's deposition in California, when he

21

reasonably knew or should have known that Mr. Sandoval was on probation in Arizona and could not leave the state. *See* Cal. R. Prof. Conduct 3-210.

As explained *supra*, Mr. Ferrell's willful and reckless conduct triggers this Court's authority through Rule 11, Section 1927, and its inherent powers, to issue punitive and remedial sanctions which are just and reasonable under these circumstances.

## II. NIC Requests $91,863.96 in Reasonable Fees and Costs Incurred as a Direct Result of Counsel's Improper Conduct

### A. Fees and Costs Incurred

NIC may recover fees and costs incurred as a result of Mr. Ferrell's sanctionable conduct. *See* 28 U.S.C. § 1927; *see also Haynes*, 474 F. App'x 689; *Tucker*, 710 F. Supp. 2d at 1307. All NIC fees incurred after Sandoval's deposition on April 20, 2015 would have resulted from Mr. Ferrell's conduct regardless of when that deposition occurred and, according to Ninth Circuit precedent, those fees are appropriate sanctions. *See Haynes*, 474 F. App'x 689 (upholding district court's decision to grant all fees incurred subsequent to depositions that revealed the claims were meritless.) The attorney hours dedicated and the total cost of NIC's legal work incurred after the April 20, 2015 Sandoval deposition is itemized in P.A. Decl. at ¶ 30.

Sandoval's deposition was an unavoidable result of Mr. Ferrell's improper conduct. Had Mr. Ferrell met his obligations under Federal Rule 26(a), the Court would never have granted Sandoval's substitution, and Sandoval's deposition would

22

similarly have been unnecessary.[15]  NIC therefore requests its attorney fees associated

with that deposition.  *See* P.A. Decl. at ¶ 30.  NIC's Motion for Summary Judgment

was based on the inadmissibility of Sandoval's testimony, and Plaintiff's failure to

supply admissible factual evidence.  That dispositive motion was warranted by the

facts, and properly submitted as a means to expedite a legal resolution.  NIC therefore

requests its fees associated with the Motion for Summary Judgment.  *Id*.  NIC also

requests that Mr. Ferrell and NTG pay NIC's costs associated with all work described

in the supporting documentation attached.  P.A. Decl. at ¶ 32 (itemized costs).

## B. Reasonableness of Amount Requested

Reasonable attorney fees must "be calculated according to the prevailing

market rates in the relevant community," factoring the fees charged by "lawyers of

reasonably comparable skill, experience, and reputation."  *Blum v. Stenson*, 465 U.S.

886, 895–896 n. 11 (1984).  Courts typically use a two-step process in determining fee

awards.  *Fischer v. SJB–P.D. Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000).  First, the

Court must calculate the lodestar amount "by taking the number of hours reasonably

expended on the litigation and multiplying it by a reasonable hourly rate."  *Id*.  Other

factors should also be considered such as special skill, experience of counsel, and the

results obtained.  *Morales v. City of San Rafael*, 96 F.3d 359, 364 n.9 (9th Cir. 1996).

"The party seeking an award of fees should submit evidence supporting the hours

worked and rates claimed ..."  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

---

[15] The express purpose of Rule 26(a) is to "facilitate the exchange of basic
information" early in litigation so that parties may avoid unnecessary expenditure.
*See* Committee Notes on Amendments to Fed. R. Civ. P., 146 F.R.D. 401, 628-30
(1993).

3:12-CV-00930-LAB (BGS)

Second, "the lodestar amount is presumptively the reasonable fee amount, and thus a multiplier may be used to adjust the lodestar amount upward or downward only in rare and exceptional cases, supported by both specific evidence and detailed findings…" *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000) (internal quotations omitted).

The blended hourly rate for all attorney work claimed in this motion is $246.09/hour. *See* P.A. Decl. at ¶ 31 (total hours divided by total cost). A blended rate of $250/hour has been deemed reasonable in the Southern District of California. *See Joe Hand Promotions, Inc. v. Maldonado*, No. 08 CV 1823 JLS AJB, 2010 WL 3504858, at *1 (S.D. Cal. Sept. 3, 2010); *see also Verdun v. I.C. Sys., Inc*., No. 14-CV-225 JM JMA, 2014 WL 1456295, at *4 (S.D. Cal. Apr. 14, 2014) (finding a rate of $315/hour to be reasonable). A description of the hours expended on each litigation event relevant to NIC's request for fees, along with a brief explanation for the reasonableness of those fees may be found in the P.A. Decl. at ¶¶ 30, 32.

## CONCLUSION

NTG's false statements in Plaintiff's Motion to Substitute Class Representative and Second Amended Complaint infected this entire proceeding, and publicly available records indicate this may not be the first time that NTG filed a complaint based on a false residency statement. NTG's practice of filing complaints without performing a suitable inquiry has cost NIC (and possibly other defendants) substantial fees in defense. That conduct includes willful ignorance to dispositive facts and warrants substantial sanctions under Rule 11, Section 1927 and the Court's inherent powers. For the foregoing reasons, Defendant Natural-Immunogenics Corp.

24

respectfully requests that this Court enter sanctions against Plaintiff's Counsel Ryan Ferrell and NTG in the amount of NIC's unnecessary costs and fees as described hereinabove, in supporting documentation filed contemporaneously, and in NIC's Proposed Order.

DATED:  June 24, 2015

Respectfully submitted,

By:     /s/ Peter A. Arhangelsky
        Peter A. Arhangelsky, Esq.
        Emord & Associates, P.C.
        3210 S. Gilbert Road, Suite 4
        Chandler, AZ 85286
        Phone: (602) 388-8899
        Fax: (602) 393-4361
        E-mail: parhangelsky@emord.com
        *Attorney for Defendant*

3:12-CV-00930-LAB (BGS)

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2015, the foregoing, **DEFENDANT'S MOTION FOR FRCP 11 AND OTHER MONETARY SANCTIONS** was electronically filed using the Court's CM/ECF system and was sent by that system to the following:

Scott J. Ferrell, Esq., (SBN 202091)
Ryan Mark Ferrell, Esq., Bar No. 258037
Newport Trial Group
4100 Newport Place, Suite 800
Newport Beach, CA 92660
Phone: (949) 706-6464
Fax: (949) 706-6469


Carlos F. Negrete, Esq. (SBN 134658)
Law offices of Carlos F. Negrete
27422 Calle Arroyo
San Juan Capistrano, CA 92675-2747
(p) 949-493-8115
(f) 949-493-8170


        _/s/ Peter A. Arhangelsky_____
        Peter A. Arhangelsky, Esq.

26

# EXHIBIT "G"

# EXHIBIT "G"



**Operation Image Browser 2.0**

| | | | | | |
|---|---|---|---|---|---|
| Site | VIEWPOINTE | Paid Date | 09022014 | Serial No | 4403 |
| Routing | 12104288 | Account | 3496548235 | PC | 000060 |
| Amount | 5053.90 | Sequence | - | Capture Source | 00010003 |

### Front Black & White Image



### Back Black & White Image



P D Exhibit 274
Witness: Negrete
Date: 6 25 /2017
Beverly James, RPR,CRR

# <u>CERTIFICATE OF SERVICE</u>

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 20320 S.W. Birch Street, Second Floor, Newport Beach, California 92660.

On April 26, 2021, I served the within document(s) described as:

**DECLARATION OF ROBERT TAULER IN SUPPORT OF DEFENDANT VICTORIA KNOWLES' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S FIRST CLAIM FOR RELIEF**

on the interested parties in this action as stated on the attached mailing list.

☒ (BY CM/ECF) I hereby certify that I have caused the foregoing to be served upon counsel of record and all interested parties through the Court's electronic service system.

I certify that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on April 26, 2021, at Newport Beach, California.

I declare under penalty of perjury that the foregoing is true and correct.

| Laurinda L. Palacio | /s/ Laurinda L. Palacio |
|---|---|
| (Type or print name) | (Signature) |

BREMER WHYTE BROWN & O'MEARA LLP
20320 S.W. BIRCH STREET
SECOND FLOOR
NEWPORT BCH, CA  92660
(949) 221-1000

1

1601.116  4828-1753-6181.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Natural-Immunogenics Corp. v. Newport Trial Group, et al**

**Case No. 8:15-cv-02034-JVS-JCG**

**BWB&O CLIENT:**     Ryan Ferrell; Victoria Knowles; Dave Reid; and Andrew Lee Baslow

**BWB&O FILE NO.:**    **1601.116**

**SERVICE LIST**

**James M Sabovich**
jsabovich@callahan-law.com
mkingsbury@callahan-law.com

**Peter A Arhangelsky**
parhangelsky@emord.com

**Joshua S Furman**
jfurman@emord.com

**Kristopher Price Diulio**
kdiulio@forddiulio.com

**Brendan M Ford**
bford@forddiulio.com

**Leah M Kaufman**
leah@leahmkaufman.com

**Rosalyn Chapman (Ret.)**
rchapman@jamsadr.com

BREMER WHYTE BROWN & O'MEARA LLP
20320 S.W. BIRCH STREET
SECOND FLOOR
NEWPORT BCH, CA  92660
(949) 221-1000

2

1601.116 4828-1753-6181.1