Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Joshua S. Furman, Esq. (pro hac vice)
jfurman@emord.com
Eric J. Awerbuch, Esq. (pro hac vice)
eawerbuch@emord.com
Emord & Associates, P.C.
2730 S. Val Vista Dr., Bldg. 6, Ste. 133
Gilbert, AZ 85295
Phone: (602) 388-8899
Fax: (602) 393-4361
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| NATURAL-IMMUNOGENICS CORP., | Case No. 8:15-cv-02034-JVS (JCG) |
|---|---|
| Plaintiff, | **PLAINTIFF NIC'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY ADJUDICATON ON COUNT II (RICO)** |
| v. | |
| NEWPORT TRIAL GROUP, et al., | |
| Defendants. | Hearing Date:  May 24, 2021 |
| | Time:  1:30PM |
| | Courtroom:  10C |
| | Judge:  Hon. James V. Selna |

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.    UNDISPUTED FACTS..........................................................................1

    A. The False Advertising Scheme...........................................................2

    B. The Wiretap Scheme .........................................................................5

       1) Schoonover v. Himalaya Drug ......................................................6

       2) Demulder v. Carter-Reed...............................................................8

    C. The Strataluz Scheme .......................................................................9

III.   LEGAL STANDARDS .......................................................................11

IV.    ARGUMENT.......................................................................................12

    A. Defendants Participated in the Conduct of the Enterprise ......................12

       1) Scott Ferrell ..................................................................................13

       2) Andrew Baslow ............................................................................13

       3) Newport Trial Group ....................................................................13

    B. Defendants Directed and Participated in Operation of an Enterprise...........................................................................................14

    C. The Enterprise Committed at Least Twelve Predicate Acts of Mail and Wire Fraud .......................................................................14

       1) Predicate Acts Committed in the Wiretapping Scheme ......................17

          a. As a matter of law, Defendants Schoonover and Demulder knew they would be recorded when they made CIPA calls..................................................................................18

          b. The Scheme Was Designed with a Specific Intent to Defraud ...................................................................................20

          c. Defendants used interstate wires to further the schemes in *Himalaya* and *Carter-Reed* .........................................................21

       2) Predicate Acts Committed in the Strataluz Scheme.............................23

a.  Defendants created the scheme to defraud through
    Strataluz LLC with the intent to defraud.........................25

b.  Defendants used mail and interstate wire in furtherance
    of the scheme........................................................26

3)  Predicate Acts Committed in the False Advertising Scheme..............26

c.  The Defendants acted with intent to defraud ................................27

d.  Specific Mail and Wire Fraud Predicate Acts within the
    Nature's Way case....................................................28

D. The Predicate Acts Form a Pattern of Racketeering Activity.................28

1)  The Predicates Are Related .................................................28

2)  The Predicate Acts Are Sufficiently Continuous ...............................29

V.  CONCLUSION.................................................................30

1

## **TABLE OF AUTHORITIES**

2

**Cases**

*A.B.C. Chevrolet Co. v. Kirk*, No. 85 C 10001, 1986 WL 10045 (N.D. Ill. Sept. 8, 1986) .................................................................................16, 27

*Albergo v. Immunosyn Corp.*, No. 09CV2653, 2012 WL 12953736 (S.D. Cal. June 19, 2012)..........................................................................12

*Allwaste, Inc. v. Hecht*, 65 F.3d 1523 (9th Cir. 1995) ...............................29

*Anderson v. Liberty Lobby*, Inc., 477 U.S. 242 (1986).......................11, 26

*Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133 (C.D. Cal. 2005) ...................5

*Caples v. City of Phoenix*, 804 F. App'x 595 (9th Cir. 2020)...................................19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................11

*CSX Transp., Inc. v. Gilkison*, 2012 WL 1598081 (N.D.W.Va. May 3, 2012)...........................................................................................17

*Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990 (9th Cir. 2014) ...............................................................................15, 16

*Feinstein v. Resolution Trust Corp.*, 942 F.2d 34 (1st Cir. 1991) ...........................28

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989) .............................29, 30

*In re Locust Bldg. Co.*, 299 F. 756 (2d Cir. 1924)..................................19

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 467 F. Supp. 2d 1071 (S.D. Cal. 2006)...............................................................................16

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) .......................................5

*Keller v. United States*, No. CV-11-02345, 2017 WL 3719878 (D. Ariz. Aug. 29, 2017), *aff'd,* 788 F. App'x 543 (9th Cir. 2019)...........................20

*Lies v. Farrell Lines, Inc*., 641 F.2d 765 (9th Cir. 1981) ..........................11

*Link v. Wabash R.R.*, 370 U.S. 626 (1962) ............................................19

*Lustiger v. United States*, 386 F.2d 132 (9th Cir. 1967)...........................15

*Navajo Health Found. - Sage Mem'l Hosp., Inc. v. Razaghi Dev. Co., LLC*, 2020 WL 8416009 (D. Nev. Dec. 11, 2020) .................................................15

*Negro v. Superior Court*, 230 Cal. App. 4th 879 (2014) ........................................20

*Nieto v. Pence*, 578 F.2d 640 (5th Cir.1978) ...............................................16, 27

*Otis v. Zeiss*, 175 Cal. 192, 165 P. 524, 525 (1917) ..............................................19

*People v. Singh*, 37 Cal. App. 4th 1343 (1995), *opinion modified on denial of reh'g* (Aug. 21, 1995) .........................................................17

*POM Wonderful LLC v. Coca Cola Co.*, 166 F. Supp. 3d 1085 (C.D. Cal. 2016) ...............................................................11

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) .........................................12

*Ringgold Corp. v. Worrall*, 880 F.2d 1138 (9th Cir. 1989) .................................19

*Roche v. Hyde*, No. A150459, 2020 WL 3563410 (Cal. Ct. App. June 30, 2020) ...............................................................20

*Schmuck v. United States*, 489 U.S. 705 (1989) .........................................15, 21, 22

*Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120 (3d Cir. 1998)..................16

*Scott v. Harris*, 550 U.S. 372 (2007) .........................................11, 21

*Shoultz v. Derrick*, 369 F. Supp. 3d 1120 (D. Or. 2019) ........................................13

*Suits v. Little Motor Co.*, 642 F.2d 883 (5th Cir. 1981)........................................16

*Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187 (9th Cir. 1987).......................12

*Ticor Title Ins. Co. v. Florida*, 937 F.2d 447 (9th Cir. 1991)...............................28

*U.S. v. Al-Shahin*, 474 F.3d 941 (7th Cir. 2007)...............................17

*U.S. v. Green,* 745 F.2d 12015 (9th Cir. 1984).........................................16

*United States v. DiRoberto*, 686 F. App'x 458 (9th Cir. 2017) (unpublished).........................27

*United States v. Fabel*, 312 F. App'x 932 (9th Cir. 2009) (unpublished)...............15

*United States v. Garlick*, 240 F.3d 789 (9th Cir. 2001).......................................15, 21

*United States v. Hansmeier*, 988 F.3d 428 (8th Cir. 2021) .............................passim

*United States v. Hightower*, No. 04 CR 0047, 2004 WL 897886 (N.D. Ill. Apr. 23, 2004) .........................................................................................17

*United States v. Laedeke*, No. CR 16-33, 2016 WL 5390106 (D. Mont. Sept. 26, 2016)...........................................................................................16

*United States v. Lothian*, 976 F.2d 1257 (9th Cir. 1992)................................22, 27

*United States v. Marbella*, 73 F.3d 1508 (9th Cir. 1996) ........................................17

*United States v. Selby*, 557 F.3d 968 (9th Cir. 2009) ..............................................16

*United States v. Sullivan*, 522 F.3d 967 (9th Cir. 2008)..........................................27

*United States v. Turkette*, 452 U.S. 576 (1981) ......................................................14

*United States v. Williams*, 492 F. App'x 777 (9th Cir. 2012) .................................16

*United States v. Woods*, 335 F.3d 993 (9th Cir. 2003) ......................................15, 18

*Walter v. Drayson*, 538 F.3d 1244 (9th Cir. 2008)..................................................13

*Wiggins v. Ellis*, No. 2:12-CV-02705, 2021 WL 537274 (N.D. Ala. Feb. 12, 2021) ...............................................................................................12

**Statutes**

18 U.S.C. § 1341 ...................................................................................................15

18 U.S.C. § 1343 ...................................................................................................15

28 U.S.C. § 1962(c) .........................................................................................12, 29

**Rules**

Fed. R. Civ. P. 56(a)........................................................................................11, 12

Fed. R. Civ. P. 56(e)(2)..........................................................................................11

## I.  <u>INTRODUCTION</u>

Plaintiff NIC moves under Rule 56(a) for partial summary judgment ("SJ") on all elements of the Count II RICO claim in NIC's Fourth Amended Complaint ("FAC") save the element on injury and damages which is reserved for trial.[1]  NIC moves against Newport Trial Group ("NTG"), Scott Ferrell ("Ferrell"), and Andrew Baslow ("Baslow").  Undisputed facts prove their participation in a racketeering enterprise that manufactured sham litigation to extort settlement payments.  The record proves interrelated predicate acts (**Appendix A** (attached)) spanning three plus years, establishing closed-ended continuity.  Contemporaneous facts of the RICO enterprise structure are documented and undisputed.  Defendants and NTG's witnesses testified to no memory of material facts, but the contemporaneous documentary record is robust, clear, and controlling, inviting SJ at this stage.

## II.  <u>UNDISPUTED FACTS</u>[2]

Ferrell formed NTG in 2010.  He is its sole owner.  *See* NIC's Statement of Undisputed Material Facts (hereinafter "SOF") at ¶¶1-2.  Beginning in 2010, NTG pursued suits under California's CLRA/FAL/UCL.  *Id.* at ¶¶186-187.  By summer 2012, NTG threatened and filed "wiretap" suits under California's CIPA.  *Id.* at ¶47.  NTG filed numerous CIPA cases, forming a pattern, wherein it routinely used shill plaintiffs who falsely pled injuries they did not experience.  *See id.* at ¶¶47-185.  NTG staged cases to extort settlement payments, and held out the firm's "clients" as bona fide when in fact they were shills directed by NTG's agents—facts NTG affirmatively withheld from adversaries, co-counsel, and courts.  *See, e.g.,* ¶¶41-46, 47-65, 101, 116, 150, 192, 193, 196, 233, 239, 307.  In 2013, NTG formed an attorney-owned corporation, Strataluz LLC, in which NTG attorneys threatened and filed contrived Lanham Act suits.  *Id.* at ¶¶327-464.  By more than a preponderance

---

[1] NIC also intends to prove at trial all remaining predicate RICO acts alleged in its Fourth Amended Complaint (Dkt. 1007) other than those identified herein this Motion.

[2] Filed simultaneous herewith is a statement of undisputed material facts.

of the evidence, this Motion proves predicate acts in each of three NTG schemes: (1) the false advertising scheme; (2) the wiretap scheme; and (3) the Strataluz scheme.

### A.  <u>The False Advertising Scheme</u>

The Court summarized NIC's false advertising scheme allegations in Dkt. 820 at 2.  Undisputed material facts prove NTG, Ferrell, and Baslow operated that scheme as NIC alleged.  NTG committed the RICO predicate acts in, *inter alia, Pfleg v. Nature's Way*.

Sam Pfleg and Andrew Nilon were close friends and co-workers; both were friends of Sam Schoonover.  SOF ¶¶269-270.  Nilon and Schoonover lived together in March 2012.  *Id.* at ¶270.  NTG pursued "false advertising" claims variously naming Nilon, Schoonover, and Pfleg as plaintiffs in March 2012.  *Id.* at ¶268.  In each, NTG initiated litigation well before contacting Nilon, Pfleg, and Schoonover.  SOF ¶191.

In *Nilon v. NIC*,[3] NTG served a demand letter in December 2011.  SOF ¶273.  In January 2012, NTG sought a substitute plaintiff in litigation against NIC after its prior client could not proceed.  *Id.* at ¶274.  Baslow called Nilon on February 24, 2012.  *Id.* at ¶277.  NTG filed suit in Nilon's name on March 5, 2012.  *Id.* at ¶272.  In an August 2015 email, Nilon admitted he was instructed by NTG to purchase product (i.e., to stage) the litigation.  *Id.* at ¶293.  He also admitted he and Pfleg participated in other NTG staged cases.  *Id.*  Nilon gave Baslow the names of friends who would likewise be shills in the NTG litigation scheme.  *Id.* at ¶280.

NTG filed Schoonover's false advertising suit in 2012 against Vogue International alleging it falsely advertised shampoo and conditioner.  SOF ¶268 (citing RJN 19).  On March 14, 2012, Baslow sent Schoonover this text:

Hey Sam, it's Andrew Baslow.  I got your contact info from Andrew

---

[3] *Nilon v. Natural-Immunogenics Corp.*, No. 3 :12-cv-00930-LAB-BGS (C.D. Cal. 2012).

Nilon as he mentioned you would like to participate in a class action. I have a case for you, but it is very urgent and you would have to move quickly. I need you to pick up a bottle of "Organix" shampoo and conditioner sold at CVS. Also, throw a couple of household items on there so it isn't just the shampoo. Can you do that today and get the proof of purchase (POP) over to me?

SOF ¶280.   The ensuing texts reveal Schoonover staged at NTG's direction consumer purchases that NTG used to file a CLRA suit against Vogue. *Id.* at ¶¶280-292; *see also* Exhs. 22, 25.   For his role, Schoonover received payment from settlement proceeds. SOF ¶291.

Baslow solicited Schoonover to find other shills. SOF ¶287 ("As soon as you talk to them send info my way.   I have some potentially very good cases on deck right now").   Baslow encouraged Schoonover and his contacts not to e-mail about the cases: "e-mails can translate to other things very quickly." *Id.* at ¶289.   After Vogue settled, Baslow urged him to be a plaintiff in more NTG contrived suits. SOF ¶292. ("[L]et's get you going on another case if you wish? I have one ready now").

Ferrell supervised and directed Baslow's contacts with shill recruits, and Baslow did as Ferrell's instructed.   SOF ¶¶35, 38, 119, 120, 248.   Ferrell maintained ultimate supervision over Baslow in all his NTG work. *Id.*

In the *Nature's Way* false advertising litigation, NTG served a demand letter on Nature's Way originally on behalf of Theresa Martinez.   SOF ¶¶209, 263-265. But on May 14, 2012, Ferrell decided not to proceed with that plaintiff, and instructed Baslow to find another.   SOF ¶¶211-213.   Ferrell also identified the retail location where Nature's Way products could be purchased. *Id.* at ¶207.   He instructed his employees to litigate against all Nature's Way homeopathic products sold under the brand "Boericke & Tafel." *Id.* at ¶210.   On March 14, 2012—the same day Schoonover purchased product for litigation against Vogue—Pfleg purchased Boericke & Tafel products for litigation against Nature's Way. *Id.* at ¶¶213-216.

At 9:46 am on Wed., March 14, 2012, Ferrell directed Baslow to "move forward on this." SOF ¶212.   Baslow contacted Nilon one hour later. *Id.* at ¶214.

Nilon provided Baslow with names of friends who might be shills. *Id.* at ¶¶215, 280. Nilon worked with Pleg at the time. *Id.* at ¶269. Five hours later, Pfleg purchased a half dozen Boerick & Tafel products from a Vitamin Shoppe—the same retailer mentioned in Ferrell's email earlier to Baslow. *Id.* at ¶¶207-216. He did not purchase any other products. *Id.* at ¶216. Forty-five minutes after his purchase and twenty minutes after he could have arrived home if he drove directly, Baslow texted Pfleg. *Id.* at ¶¶217-219. Pfleg then emailed Baslow a copy of his receipt several hours later. *Id.* at ¶220. Within twelve hours after had Ferrell directed Baslow to find a new plaintiff, Pfleg produced his receipt to Baslow for the exact products had NTG targeted months earlier in January 2012. *Id.* at ¶¶205-221.

The day after receiving Pfleg's receipt, Ferrell sent a new demand letter to Nature's Way threatening litigation on Pfleg's behalf. *Id.* at ¶¶222, 230-233. NTG claimed Pfleg purchased the Nature's Way product in reliance on its advertising, and that Pfleg was the representative of a class of similarly situated consumers. *Id.* at ¶¶230-243. Ferrell filed the Pfleg class action against Nature's Way and therein made those same representations, which were false. *Id.* at ¶¶238-239. Ferrell and NTG withheld that Pfleg's purchase was at NTG's direction. *Id.* at ¶¶233, 239, 244. NTG extorted significant funds in settlement payments from Nature's Way. *Id.* at ¶¶255-256. NTG paid Pfleg a modest fraction and kept the rest. *Id.* at ¶¶200, 255-256.

When settling that case, an NTG employee noted that Theresa Martinez, the original plaintiff, was not a part of the settlement discussions. *Id.* at ¶¶264-265 (citing Exh. 108). The employee asked Ferrell if Martinez should be paid. *Id.* (citing Exh. 108). Ferrell dismissed the notion, stating simply, "Let my dad [Wynn Ferrell] know that we actually had two people on this but that we'll work with Ms. Martinez on another appropriate case." *Id.* at ¶264.

Plaintiffs must have suffered an actual injury through reasonable reliance on false advertising to have standing. California courts have long held a plaintiff who

purchases product to manufacture litigation lacks standing under UCL/CLRA.  *See,
e.g., Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133, 1138–39 (C.D. Cal. 2005);
*In re Tobacco II Cases*, 46 Cal. 4th 298, 316 (2009) ("The specific abuse of the UCL
at which Proposition 64 was directed was its use by unscrupulous lawyers who
exploited the generous standing requirement of the UCL to file 'shakedown' suits to
extort money from small businesses.).

## B.   <u>The Wiretap Scheme</u>

This Court summarized NIC's wiretap scheme allegations in Dkt. 820 at 2-3.
Undisputed facts prove NTG, Ferrell, and Baslow operated the wiretap scheme as
NIC alleged.  In particular, NTG committed RICO predicate acts in *Schoonover v.
Himalaya Drug*, No. 12-cv-1782 (S.D. Cal. 2012) and *Demulder v. Carter-Reed* No.
3:12-cv-0333-BTM (S.D. Cal. 2012).

NTG hired plaintiffs for its wiretap cases.  SOF ¶¶55-65, 76-84, 135-149.
NTG interchangeably used its paid shills in CLRA and wiretap cases.  *Id.* at ¶76
("Hey man, I've got another case for you and have confirmation that we can use you
again.  You down?"); *id.* ("Yup.  Send me over the information or lemme know what
I have to do"); *id.* at ¶¶266.

At Ferrell's direction, NTG had Baslow "audit" corporate toll-free numbers
to find those wherein the company recorded or monitored incoming calls without
disclosing the practice.  *Id.* at ¶¶52-54.  Ferrell instructed Baslow to call numbers
for certain companies, ask basic questions about products, and ask if the calls were
recorded or monitored.  *Id.* at ¶¶52-54, 66-67.  Baslow reported his findings to Ferrell
who determined whether to sue.  SOF ¶¶69-75.  If Baslow identified a viable target,
NTG then solicited shills to stage CIPA cases by making calls as instructed by NTG
following Baslow's method.  *Id.* at ¶¶55-57, 60-65.

Baslow determined whether target company disclosures could be "bypassed"
by selecting numerical dialing options that would route a caller past the recorded
disclosure.  *Id.* at ¶¶51-52, 53-54, 162-163.  Baslow always performed an audit call

before any shill called.  *See, e.g., id.* at ¶¶53-54.  NTG maintained Excel spreadsheets of its planned wiretap targets.  *Id.* at ¶52 (Exh. 21).  The charts listed companies and stated if they gave rise to "minimal bypass" cases.  *Id.*  The sheets identified when Baslow or other employees deemed cases "seasoned," meaning ready for litigation.  *Id.* (citing Exh. 21).

### 1) Schoonover v. Himalaya Drug

On July 13, Ferrell ordered Baslow to audit Himalaya's toll-free number.  SOF ¶¶66-67. Baslow completed the audit call, in which a customer service representative told him Himalaya recorded incoming calls without disclosing the practice.  *Id.* at ¶¶68-71.  On July 16, 2012 at 2:35pm, Baslow confirmed to Ferrell that his Himalaya audit was successful and NTG could "proceed" with litigation.  *Id.* at ¶72.  Seventeen minutes later, Baslow texted Schoonover: "got another case for you and [had] confirmation that we can use you again."  *Id.* at ¶76.  Baslow wrote: "This one is a little different.  You won't have to buy anything.  Just make a phone call, but I'll need to chat with you on the phone to tell you all the details."  *Id.*  Baslow then spoke to Schoonover for over six minutes on July 16, 2012, giving instructions on calling Himalaya.  *Id.* at ¶¶77-85.  Baslow admits NTG instructed wiretap shills like Schoonover before the shills made wiretap calls.  *Id.* at ¶¶57, 81, 119-120.

As was NTG's custom, Baslow asked Schoonover to send a confirmation email after Schoonover completed his staged call.  *Id.* at ¶¶60-65, 83, 87-95.  NTG sent the confirmation emails to co-counsel and opposing counsel to mislead them into believing the calls legitimate.  *Id.* at ¶65.

Schoonover called Himalaya on July 17, 2012 at 8:58am.  SOF ¶¶85-86.  Ten minutes later, Schoonover sent Baslow his "confirmation" email.  *Id.* at ¶87.  Schoonover's email disclosed his call was at Baslow's direction.  *Id.* ("I called Himalaya … with the number that you provided me on July 16th at 3pm").  NTG did not want its case staging revealed.  Baslow thus directed Schoonover to send another email with the damning admissions removed:

> Hey.  Got your email.  Everything is good except a few things.  1.) don't address it to me nor say that I provided you with the number 2.) please include the number you called from besides your cell and the actual number I gave you to call, and 3.) make sure you mention that through all this nobody told you that your call would be recorded/monitored.

*See id.* at ¶89.  Schoonover sent Baslow the requested email.  *Id.* at ¶¶90-95.  Thirty minutes thereafter, Ferrell instructed Knowles to prepare a wiretap complaint against Himalaya.  *Id.* at ¶96.  NTG filed that complaint on July 19, 2012.  *Id.* at ¶97. It falsely listed Schoonover as a bona fide consumer who had independently contacted Himalaya.  *Id.* at ¶¶97-101.  At no point did NTG reveal that the Schoonover case was staged.  *Id.* at ¶116.  Himalaya's counsel queried if NTG's "investigator" (Baslow) had first contacted Himalaya to stage the suit.  *Id.* at ¶¶111.  Ferrell falsely represented to that counsel (through subordinate attorney Reid) that Baslow called Himalaya on July 18, 2012 (*after* Schoonover had called), rather than on July 16, 2012 (the actual date, which was *before* Schoonover called).  *Id.* at ¶¶69, 85, 112.

The Himalaya case settled.  NTG paid Schoonover a modest amount for his role.  *Id.* at ¶114.  NTG retained the balance.  *Id.*  Baslow asked Schoonover to do more wiretap cases.  *Id.* at ¶117.  Schoonover demurred stating that his father "doesn't want me participating in any more phone call cases because he feels like its not as 'ethically correct' his words, not mine." *Id.* at ¶118.  But Schoonover did not want to forego the pay-outs, so he agreed to do "more product based cases," stating, "[T]hat last 1500 and this forthcoming 2000 have been extremely helpful." *Id.*

After *Himalaya,* Ferrell concluded he could extort more money if NTG's shills disclosed confidential information in the wiretap calls.  SOF ¶¶58-59.  In late August 2012, he reminded the firm's shill plaintiffs to inform NTG about the confidential information they disclosed during their calls.  *Id.* at ¶ 168 ("each of them will need to advise us of what confidential information that they shared with the defendant"); *see also id.* at 58, 142, 143.  After that, NTG began routinely alleging that their clients disclosed their Social Security Numbers (SSN) during wiretap calls.

*Id.* at ¶¶ 141, 142, 144, 172.

### 2) Demulder v. Carter-Reed

On June 2, 2012, Ferrell asked Baslow to find a wiretap shill for litigation against Carter-Reed. *Id.* at ¶127. Baslow completed an "audit" call of Carter-Reed on August 1, 2012. *Id.* at ¶128. He then recruited Taylor Demulder to be the shill in mid-August 2012. *Id.* at ¶¶131-139. Demulder had already been an NTG "wiretap" shill earlier that month in NTG's pursuit against a company called Healthy Med. *Id.* at ¶¶129-134. Baslow asked him to pursue a new wiretap case and provided Demulder information for that call. *Id.* at ¶¶136-138 (citing Exh. 39). When Demulder delayed making his call, Baslow asked Demulder for an update on whether he planned to proceed with his "new Relacore wiretap case." *Id.* at ¶137.

Demulder later completed his staged call to Carter-Reed on September 6, 2012. *Id.* at ¶139. As with Schoonover, he promptly sent a confirmation email to Baslow. *Id.* at ¶144; *id.* at ¶146 ("sent over the paperwork and I think it's really strong"). Demulder's call to Carter-Reed contained false information. *Id.* at ¶141. He used a fake name, falsely stated he lost his job, and falsely stated he ordered product before from Carter-Reed. *Id.* He gratuitously disclosed his SSN. *Id.* NTG referred Demulder's Carter-Reed case to another firm for litigation, and NTG maintained referral fee arrangements whereby NTG received part of the settlement proceeds. *Id.* at ¶¶148, 150. But NTG never informed its co-counsel or opposing counsel that NTG staged the calls. *Id.* at ¶150.

NTG's other wiretap clients also gratuitously disclosed their SSNs during staged wiretap calls—an impossible coincidence. In *Torres v. Nutrisystem*, No. 8:12-cv-01854 (C.D. Cal. 2012), Baslow determined in August 2012 he could bypass Nutrisystem's disclosures by pressing "1" within seconds of call connection. *Id.* at ¶¶159-163. Ferrell asked his father Wynn Ferrell to help with the Nutrisystem case. *Id.* at ¶166. Torres first connected with Nutrisystem on August 24, a few hours after first talking with Wynn. *Id.* at ¶¶164-169. Like Demulder, she gratuitously

disclosed her SSN in the call.  *Id.* at ¶172.  NTG pursued a wiretap case on behalf of Torres' step-father, Ray Perea, within a week of the Torres suit.  *Id.* at ¶142. Perea also gratuitously disclosed his SSN in his staged call.  *Id.*  In March 2013, NTG served a demand on Chromadex alleging erroneously that Nilon disclosed his SSN when he made that call.  *See* SOF ¶142 (Exh. 19).  Plaintiffs in numerous other NTG wiretapping cases gratuitously disclosed their SSNs.  *Id.* at ¶¶ 141, 142, 144, 172. Torres was deposed.  *Id.* at ¶183.  At Ferrell's direction, she testified falsely under oath to conceal her contact with NTG immediately prior to completing her Nutrisystem call.  *Id.* at ¶¶177-184.

## C.   The Strataluz Scheme

This Court summarized NIC's allegations regarding the Lanham Act scheme in Dkt. 987 at 3.  The undisputed record proves Ferrell and NTG engaged in the Strataluz scheme as alleged.

In late 2013, Ferrell formed Strataluz LLC.  *Id.* at ¶¶354-357.  He designed the corporate structure to conceal his and other NTG attorneys' ownership.  *Id.* at ¶¶327-368.  Ferrell intended to use the company as a sham plaintiff.  *Id.* at ¶¶329, 333, 336, 339-341, 371-374.  He explained to his corporate formation attorney that hiding the attorney owners was essential to prevent adversaries from taking discovery from and depositions of them.  *Id.* at ¶¶334-336.  He also wanted to hide their ownership from the courts contrary to mandated Statements of Interested Parties.  *Id.* at ¶336.  He formed Strataluz LLC under three parents entities, each successively owning 100% of the next and the top, Quintogos LLC, managed by a nominal manager/director, so Nevada public records would reveal only an unaffiliated person and not the true owners (NTG's attorneys).  *Id.* at ¶¶339, 358. Before Strataluz, Ferrell had used two other attorney-owned corporations to pursue extensive patent litigation.  *Id.* at ¶¶341, 343.  He owned Harcol Research, LLC and Tawnsaura Group, LLC, which filed over one hundred patent cases in less than 24 months.  *Id.*

---

In May 2015, NTG and Ferrell made Strataluz a litigant. *Id.* at ¶¶380-404, 411-433. Ferrell sent demand letters to targets threatening Lanham Act suits, falsely representing Strataluz to be a bona fide "competitor." *Id.* at ¶¶382, 386-391, 411, 416-417, 422-426. NTG tried to "wrangle six figures" and "shake … money loose" from its targets. *Id.* at ¶¶45, 404, 414, 461. To accomplish that purpose, the demand letters NTG and Ferrell sent contained false statements of fact, half-truths, and omitted critical information (including Ferrell's Strataluz ownership). *Id.* at ¶¶371-464. For instance, when Ferrell sent demand letters to companies selling cellulite products, Strataluz's comparable product (EverSilk) was only in a pre-market "testing" phase. Strataluz's advertising was, by its President's admission, "impossible to substantiate" and "totally bogus." *Id.* at ¶379.

NTG and Ferrell sent demand letters to companies selling male enhancement products alleging Strataluz suffered substantial financial and reputational losses. *See, e.g., id.* at ¶¶423, 433-437. But Strataluz's male enhancement product (ProMaxal) was never manufactured, did not have packaging, was never sold, and was unavailable for sale. *Id.* at ¶¶434-438. Ferrell contrived ProMaxal for litigation. The main "product" component was a dietary ingredient said to be owned by Ferrell's other company, Harcol Research, having no relation whatsoever to male sexual performance. *Id.* at ¶¶409, 410. Strataluz never conducted or paid for clinical trials of ProMaxal or EverSilk despite representing that it had conducted extensive trials proving product efficacy. *Id.* at ¶¶391-400, 433-438.

Although ProMaxal was only a concept, never made or sold, Ferrell falsely represented to adversaries that it was superior in its effectiveness, had a patent worth a $200,000 license, and had required significant resources to develop. *Id.* at ¶¶415-416, 422-424, 433-443. He falsely held Strataluz out to opposing parties as an independent client of NTG's, never admitting he and his NTG co-counsel owned it. *Id.* at ¶¶450-455.

Ferrell sent demand letters containing these false representations to extort

settlement payments.  SOF ¶¶423, 433-437.  To convince one adversary ProMaxal was real, Ferrell directed Strataluz's President to create a phony website with a nonfunctional e-commerce point-of-sale falsely listing the product as out-of-stock due to high demand.  *Id.* at ¶¶441-444.  Despite neither manufacturing nor selling a single bottle of ProMaxal, Ferrell and Strataluz threatened at least a half dozen lawsuits and filed at least one complaint.  *See, e.g., id.* at ¶¶416, 432-433.  As revealed in NIC's Statement of Undisputed Material Facts, NTG routinely depended on deceit to extort the amounts demanded.  *Id.* at ¶¶333-363, 371-464; *id.* at 45 (citing Exh. 202 ("there is going to be a learning curve on what buttons to push for the best settlements").

### III.      LEGAL STANDARDS

Summary judgment applies when no genuine dispute exists as to any material fact.  Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party has the initial burden to prove the absence thereof.  *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 256 (1986).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . ., the court may . . . consider the fact undisputed."  Fed. R. Civ. P. 56(e)(2).

A mere "scintilla of evidence in support of the [nonmoving party]'s position [is] insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *POM Wonderful LLC v. Coca Cola Co.*, 166 F. Supp. 3d 1085, 1091 (C.D. Cal. 2016).  "If the evidence [proffered by the nonmovant] is merely colorable, or is not significantly probative, [SJ] may be granted."  *Anderson*, 477 U.S. at 249–50.  No genuine dispute of fact arises where a nonmovant's declarations are self-serving or where its testimony is obviously false in light of the documentary record.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that

version of the facts for purposes of ruling on a motion for summary judgment.").

The Court may grant SJ on all or part of a claim. *See* Fed. R. Civ. P. 56(a) (judgment on "part of each claim"); *see also* Committee Notes re 2010 Amendment, Fed. R. Civ. P. 56(a). Courts thus grant motions for partial SJ that seek resolution of elements within a claim. *See, e.g., Albergo v. Immunosyn Corp.*, No. 09CV2653, 2012 WL 12953736, at *1 (S.D. Cal. June 19, 2012); *Wiggins v. Ellis*, No. 2:12-CV-02705, 2021 WL 537274, at *27 (N.D. Ala. Feb. 12, 2021).

## IV.   **ARGUMENT**

NTG engaged in a pattern of fraud through staged suits whereby shill plaintiffs falsely claimed "injuries" to extort settlement payments. NTG threatened and filed suits holding out hired shills as bona fide plaintiffs, actively concealing the sham nature of the suits and making intentional misrepresentations to opponents and the courts. That conduct falls under RICO and involves predicate acts, including mail and wire fraud.

Under 28 U.S.C. § 1962(c), RICO requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.[4] To prove pattern, NIC has alleged over seventy predicate acts in its FAC, but need only prove two or more for RICO liability to attach. *See Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 193 (9th Cir. 1987) ("[I]f a defendant commits two or more predicate acts that are not isolated events, are separate in time, and are in furtherance of a single criminal scheme, then RICO's pattern requirement is satisfied").

### D.   **Defendants Participated in the Conduct of the Enterprise**

Under Section 1962(c), a defendant must "participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). "While simply performing services . . . [is not] direction, a defendant can

---

[4] Additionally, a plaintiff must show an injury to money or property from the conduct constituting the violation. *See Living Designs, Inc. v. E. I. Dupont de Numours and Co.*, 431 F.3d 353, 361 (9th Cir. 2005). NIC reserves that issue for trial.

be a part of an enterprise without having a role in its management and operation." *Shoultz v. Derrick*, 369 F. Supp. 3d 1120, 1125 (D. Or. 2019); *Walter v. Drayson*, 538 F.3d 1244, 1248 (9th Cir. 2008). A defendant "participates" if he or she directly manages enterprise affairs, "knowingly implement[s] decisions of upper management," or is "indispensable to achievement of [the management] goal." *Walter*, 538 F.3d at 1249.

### 1) Scott Ferrell

Ferrell participated in the conduct of the enterprise. He was NTG's upper management and sole owner. SOF ¶¶2, 35-36, 38, 43. He directed its activities. *Id.* at ¶¶11, 15, 19, 31, 35, 38, 43. He was the final decision-maker on representations NTG made to adversaries and the courts. *Id.* He personally supervised NTG's "field reps." *Id.* at ¶¶31, 35, 38, 52. Baslow worked at Ferrell's direction. *Id.* at ¶¶35-36, 38. NTG's "clients" took action based on Ferrell's orders conveyed by NTG's two field reps, Baslow and Wynn Ferrell. *Id.* at ¶¶31, 35, 38, 41-42, 52, 57, 75, 119-121. Ferrell directed subordinate attorneys in settlement negotiations with opposing counsel. *Id.* at ¶¶108, 109.

### 2) Andrew Baslow

Baslow was indispensable to enterprise affairs and took direction from upper management. *Id.* at ¶¶33-38. He directed enterprise affairs acting as the go-between for NTG management and NTG "clients" in staged litigation. *Id.* He was directed by Ferrell. *Id.* Baslow also obtained documents and signatures from "clients" on settlement agreements to secure payment in staged suits. *See, e.g.,* Exhs. 24, 25.

### 3) Newport Trial Group

NTG is liable as a corporate entity because its sole owner, managing partner, and employees directed and participated in the enterprise's unlawful affairs. NTG was indispensable to the enterprise; it gave the appearance of a legitimate law firm, through which the enterprise's finances flowed. SOF ¶¶39, 256, 460 (NTG's trust account received settlement payments); *Id.* at ¶5 (NTG employed attorneys,

paralegals, and field representative)); *Id.* at ¶¶228, 229 (NTG executed contracts with its sham litigation "clients").

## E.   Defendants Directed and Participated in Operation of an Enterprise

To prevail under RICO, a party must prove not only an "enterprise" but also a "connected 'pattern of racketeering activity.'" *See* Dkt. 987 at 7 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). "The enterprise is . . . a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* The enterprise is "'an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *Id.*

Undisputed facts prove the NTG firm is an enterprise. NTG acted as a facially legitimate cover for criminal activity (the threatening and filing of sham litigation). *See generally* SOF ¶¶47-464. NTG attorneys advance illicit acts and interests of the enterprise as licensed attorneys and officers of the court. *Id.* at ¶¶6, 12, 16. The enterprise employs field reps (e.g., Baslow) who are foot soldiers, interacting with and recruiting people to serve as sham plaintiffs to perform as directed in NTG-contrived cases. *Id.* at ¶¶28-37. Finally, the enterprise depends on shill plaintiffs (among them at least one contrived corporate plaintiff owned by Ferrell himself). *Id.* at ¶43; *see also id.* at ¶¶55, 57, 60-65, 77-95, 131-148, 191, 280.

The NTG firm, its attorneys, and field reps operate as the "hub" and the putative "clients" as "spokes," which may come and go, but the enterprise always maintains many "spokes" at one time. Because undisputed facts reveal a clear, ascertainable structure in substantially the same form the entire relevant time, the question of whether the Defendants formed a RICO enterprise rests on whether the enterprise engaged in racketeering. It indisputably did.

## F.   The Enterprise Committed at Least Twelve Predicate Acts of Mail and Wire Fraud

Relevant to this Motion, the enterprise committed at least twelve (12) predicate acts of mail and wire fraud in furtherance of three fraudulent schemes: (1)

the false advertising scheme; (2) the wiretapping scheme; and (3) the Strataluz scheme. *See* Dkt. 157 at 12 (citing 18 U.S.C. §§ 1341 and 1343). Those statutes "contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).

The Ninth Circuit defines "scheme to defraud" broadly: "a scheme reasonably calculated to deceive." *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967). "Deceitful statements of half truths or the concealment of material facts is actual fraud . . ." *Lustiger*, 386 F.2d 138. "If the scheme is devised with the intent to defraud, and the mails are used in executing the scheme, the fact that there is no misrepresentation of a single existing fact is immaterial." *Id.*; *United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003), explains: "[S]chemes are condemned which are contrary to public policy or which fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society."

To be "in furtherance," mails or wires need not be "essential element[s] of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710 (1989). "It is sufficient for the mailing to be 'incident to an essential part of the scheme' or 'a step in the plot.'" *Id.* (internal citations omitted). Each mail or wire in furtherance constitutes a separate predicate act. *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001). A mailing need not be interstate, but must merely be made through the U.S. Post Office or a "commercial interstate carrier." *See United States v. Fabel*, 312 F. App'x 932, 934 (9th Cir. 2009) (unpublished) (citing 18 U.S.C. § 1341). Federal Express (FedEx) is a commercial interstate carrier. *Id.* An interstate wire, by contrast, must travel interstate or internationally. *See* 18 U.S.C. § 1343; *see also Navajo Health Found. - Sage Mem'l Hosp., Inc. v. Razaghi Dev. Co., LLC*, 2020 WL 8416009, at *8 (D. Nev. Dec. 11, 2020). An interstate email or call is a "wire." *United States v.*

*Selby*, 557 F.3d 968, 978 (9th Cir. 2009) (E-mail); *United States v. Williams*, 492 F. App'x 777, 778 (9th Cir. 2012) (same); *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 467 F. Supp. 2d 1071, 1082 (S.D. Cal. 2006) (interstate calls were wire fraud). "[T]he wire communication [need only] cross[] state lines." *United States v. Laedeke*, No. CR 16-33, 2016 WL 5390106, at *3 (D. Mont. Sept. 26, 2016) (collecting cases).

Finally, whether a scheme reveals an intent to defraud can be inferred from facts and circumstances in words, actions, and evident knowledge. *See Eclectic Properties E., LLC*, 751 F.3d at 997 ("by examining the scheme itself the court may infer a defendant's specific intent to defraud"); *U.S. v. Green,* 745 F.2d 12015, 1207 (9th Cir. 1984). Where the undisputed record connotes actual knowledge of falsity or the defendant misleads by withholding material facts, "a court may infer as a matter of law that he did so with intent to defraud." *A.B.C. Chevrolet Co. v. Kirk*, No. 85 C 10001, 1986 WL 10045, at *1–2 (N.D. Ill. Sept. 8, 1986) (citing *Suits v. Little Motor Co*., 642 F.2d 883, 886 (5th Cir. 1981)); *see also Nieto v. Pence*, 578 F.2d 640, 642 (5th Cir.1978) (presuming actual knowledge to infer fraudulent intent, while accepting the sufficiency of even constructive knowledge). Critically, where "the record as a whole point in one direction," that of fraud," there is no genuine dispute. *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998).

The Eighth Circuit recently upheld an indictment of attorneys for a fraudulent litigation scheme including misrepresentations and material concealment. *See United States v. Hansmeier*, 988 F.3d 428, 437 (8th Cir. 2021). The case involved conduct very similar to NTG's. The decision hinged on proof of attorney concealment of information material to adversaries and courts. *See id.* The Court found a fraudulent scheme (*Id.* at 437-38) when the attorneys created multiple organizations to pursue litigation under names of associates. *Id.* at 437 ("Had the courts known that Hansmeier and Steele intentionally posted the films … or that [they] were . . . the personal beneficiaries of the 'clients' copyright claims, they

would have treated the subpoena requests with far greater skepticism"); *id*. at 437-38 ("That [the attorneys] created multiple organizations under the names of their associates in order to pursue litigation … itself suggests . . . they knew how relevant the courts would find this information"). The *Hansmeier* decision is on all fours with the NTG attorneys' concealment of their Strataluz ownership and real party in interest status.

### 1) Predicate Acts Committed in the Wiretapping Scheme

The evidence proves that the *Carter-Reed* and *Himalaya* suits were contrived by Baslow at Ferrell's direction.  SOF ¶¶66-156.  NTG misrepresented to, and omitted material information from, its litigation targets and the courts.  *Id.* at ¶¶66-156; *see also id.* at ¶¶116, 150.  Staging injuries is fraud, particularly where litigants depend on misrepresentations.  *See, e.g., Hansmeier*, 988 f.3d at 437-38; *U.S. v. Al-Shahin*, 474 F.3d 941, 946-47 (7th Cir. 2007) ("staged accidents"); *United States v. Marbella*, 73 F.3d 1508, 1511 (9th Cir. 1996); *United States v. Hightower*, No. 04 CR 0047, 2004 WL 897886, at *3 (N.D. Ill. Apr. 23, 2004); *People v. Singh*, 37 Cal. App. 4th 1343, 1366 (1995), *opinion modified on denial of reh'g* (Aug. 21, 1995); *CSX Transp., Inc. v. Gilkison*, 2012 WL 1598081, at *10 (N.D.W.Va. May 3, 2012).

NTG's "clients" never suffered the wiretap injuries NTG alleged because they acted instead to create sham litigation for profit.  *See* SOF¶¶47-185 (facts related to wiretap scheme).  NTG concealed its staging, intentionally misled litigation opponents and the courts, and threatened litigation based on false premise—that NTG was retained by independent bona fide clients who suffered genuine injuries. NTG's wiretap litigation scheme satisfies the Ninth Circuit's broad definition of a "scheme to defraud."

NTG held out Demulder and Schoonover as bona fide consumers calling toll free numbers for legitimate commercial purposes with expectations of privacy.  In reality, NTG instructed each to make the calls so that NTG could pursue staged CIPA claims.  Demulder and Schoonover knew, at the time of their calls, they were setting

up wiretap litigation for NTG. *See* SOF; *see also infra* Section IV(F)(1)(a) (law of agency). NTG knew Schoonover and Demulder would be recorded before they called, based on Baslow's prior audit calls and targeting of companies. *Id.* at ¶¶54, 72, 128. The NTG shills' wiretapping calls were under false pretenses, replete with false statements to target companies. *See, e.g., id.* at ¶141.

In *Himalaya*, NTG and Ferrell's complaint falsely stated that Schoonover was a bona fide consumer, withheld the staged nature of the suit, falsely claimed Schoonover made his call expecting privacy, and falsely claimed Schoonover learned about Himalaya's call recording practices only after his call. *Id.* at ¶¶98-101. Ferrell directed Reid to give false information to Himalaya's counsel on the timing and sequence of the Schoonover and Baslow calls. *Id.* at ¶112. Under the totality of the circumstances, *Himalaya* was fraudulently contrived and executed.

In *Carter-Reed*, NTG conveyed false and misleading information to its co-counsel. *Id.* at ¶¶144, 148-150. NTG used Demulder's false confirmation statement to make his claims appear genuine to co-counsel. Those attorneys conveyed that falsehood to Carter-Reed in Demulder's complaint. *Id.* at ¶¶154-156. Attorney contrived litigation wherein false representations are made to opposing counsel and courts lacks "moral uprightness" and "fundamental honesty, fair play and right dealing in the general and business life of members of society." *Woods*, 335 F.3d at 998; *Hansmeier*, 988 F.3d at 437-38.

### a. As a matter of law, Defendants Schoonover and Demulder knew they would be recorded when they made CIPA calls

Before Demulder called Carter-Reed, he participated in a prior NTG wiretapping case and already knew his Carter-Reed call had to be recorded without him receiving a recording disclosure. *Id.* at ¶¶129-134. Baslow referred to Carter-Reed as a "new Relacore wiretap case" in emails with Demulder preceding Demulder's Carter-Reed call. *Id.* at ¶¶137-138. Baslow similarly contacted Schoonover to discuss his new case before Schoonover called Himalaya. *Id.* at ¶¶76-

84.   Demulder and Schoonover sent confirmation emails immediately after their wiretap calls with no intervening opportunity to "learn" they had been recorded.  *Id.* at ¶¶85-94; 139-141, 144.   Their statements reflect clear understanding that the companies' recording practices were at issue.  *Id.* at ¶¶94 (citing Exh. 29), 144 (citing Exh. 41)  All contemporaneous documentary evidence points to their actual knowledge.  They knew they would be recorded but their complaints falsely alleged the contrary.

The law of agency nevertheless creates a <u>conclusive presumption</u> that Demulder and Schoonover had knowledge.  "[T]he knowledge of an attorney is the knowledge of his client."  *Otis v. Zeiss*, 175 Cal. 192, 195–96, 165 P. 524, 525 (1917); *see also In re Locust Bldg. Co.*, 299 F. 756, 769 (2d Cir. 1924) ("Notice to an agent is notice to the principal, and . . . notice to an attorney is notice to the client.").   "The attorney is conclusively presumed to have informed his client of all material facts which the attorney acquires knowledge of, and which affect the client's rights, while the attorney is acting in the course of his employment and within the scope of his authority."  *In re Locust*, 299 F. at 769; *see also Link v. Wabash R.R.*, 370 U.S. 626 (1962).   In this Circuit, a client is automatically imputed with notice of material facts on the date his attorney learns them.  *Caples v. City of Phoenix*, 804 F. App'x 595, 596 (9th Cir. 2020); *see also Ringgold Corp. v. Worrall*, 880 F.2d 1138, 1141–42 (9th Cir. 1989) (clients "considered to have notice of all facts known to their lawyer").

Baslow, Ferrell, and NTG all knew that Himalaya and Carter-Reed recorded all incoming calls *before* they directed Schoonover and Demulder to stage calls.  SOF ¶¶54, 72, 128, 137.  The record includes recordings of Baslow's "audits" made at Ferrell's direction wherein Baslow asked each company's reps whether calls were recorded and was informed they were.  *Id.*   Baslow notified Ferrell his "audits" confirmed the companies recorded incoming calls and that suits could proceed.  *Id.* at ¶72 (citing Exh. 27).   After Baslow and NTG learned those material facts, they

directed Demulder and Schoonover to make calls to stage the litigation.  *Id.* at ¶¶78-87, 135-138.   As a matter of law, Schoonover and Demulder are conclusively deemed to have notice that the numbers called were recorded lines.

Attorneys are ethically and legally obliged to convey known material facts to clients regarding their rights and claims.  *See, e.g., Keller v. United States*, No. CV-11-02345, 2017 WL 3719878, at *3 (D. Ariz. Aug. 29, 2017), *aff'd*, 788 F. App'x 543 (9th Cir. 2019); *Roche v. Hyde*, No. A150459, 2020 WL 3563410, at *21–24 (Cal. Ct. App. June 30, 2020).   The Courts deem the exchange of that material information a legally binding expectation.   Defendants nonetheless argue that they violated that duty by keeping their clients blinded so that the NTG firm could pursue CIPA cases on the pretext that their clients did not actually know they would be recorded.  *See* Dkt. 659 at 38.  Even if true, that practice is morally repugnant within the ambit of the wire and mail fraud statutes.  *See* Dkt. 659 at 38 (holding "even if the NTG Defendants did strategically conceal the fact that the calls would be recorded from the lead plaintiffs before directing them to place the calls, such conduct further emphasizes the contrived nature of the lawsuits and the deliberateness of the scheme.").

### b.  The Scheme Was Designed with a Specific Intent to Defraud

NTG, Ferrell, and Baslow knew NTG's wiretapping suits were contrived, concealing information material to litigation adversaries and the courts. The undisputed evidence thus proves Defendants acted with intent to defraud under the statutes.   NTG and Ferrell knew litigation adversaries and courts viewed attorney manufactured wiretapping suits to be "foul play."   SOF ¶¶174-176.   CIPA claims have no merit if the caller knew *or suspected* they were going to be recorded before they made a call.[5]  When Himalaya's counsel requested the number that Schoonover

---

[5]  When a caller proceeds to call "after receiving notice that his or her communication ***may*** be intercepted," he or she has impliedly consented to the recording.  *Negro v. Superior Court*, 230 Cal. App. 4th 879, 892 (2014) (emphasis added).

called from, Ferrell and Baslow conspired to withhold the information because it might be traced back to NTG.  SOF ¶¶105-106 ("I want to make sure it wasn't your [Baslow's] house, your cell, or anything like that where they could link it back to us").  Baslow specifically requested Schoonover rewrite his confirmation statement to conceal the staged nature of NTG's litigation.  *Id.* at ¶90.  When Himalaya's counsel requested the date of NTG's investigator call, Ferrell directed Reid to lie by providing a false date, giving the misimpression that NTG had first contacted Himalaya *after* Schoonover's July 17, 2012 call, when in fact NTG did so before.  *Id.* at ¶¶111-112.  NTG concealed from its co-counsel the fact that litigation was manufactured at NTG's direction.  *Id.* at ¶150.  NTG provided Demulder's confirmation statement representing falsely that Demulder had no prior contact with Baslow.  *Id.* at ¶¶65, 148, 149.  Demulder's confirmation statement misleading omitted any prior relationship with NTG, and Demulder's phone call (made at NTG's direction) was engineered to provide false information.  *Id.* at ¶144.

The only reasonable inference is NTG conveyed false information with an intent to deceive adversaries and courts.  Where the nonmovant tells a story that is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a [SJ] motion . . ." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### c. Defendants used interstate wires to further the schemes in *Himalaya* and *Carter-Reed*

Where the movant establishes a scheme to defraud, each mailing and wire in furtherance thereof is a separate offense. *Garlick*, 240 F.3d at 792.   Mailings or wires need only be "incident to an essential part of the scheme" or "a step in [the] plot" to fall under the fraud statutes. *Schmuck*, 489 U.S. at 710-11.  Moreover, the Defendant "need not personally have mailed the letter or made the . . . call; the offense may be established where one acts with the knowledge that the prohibited actions will follow in the ordinary course of business or where the prohibited acts

can reasonably be foreseen." *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992).   Acts and statements of co-participants in a scheme to defraud are admissible against other participants; "knowing participants in the scheme are legally liable for their co-schemers' use of the mails or wires." *Id.* at 1263 (internal quotations omitted).

Each Baslow *Himalaya* and *Carter-Reed* call was a separate wire fraud offense because each such "audit" was a necessary "step in the plot." *Schmuck*, 489 U.S. at 710-11.   NTG used the audits to determine whether corporations were suitable for sham litigation.   SOF ¶66.   Ferrell specifically tasked Baslow with auditing each company before NTG selected a prospective shill to make a follow-up call to stage litigation. *Id.* at ¶¶66-75; 128-139.   Ferrell is vicariously liable for those predicate acts because Baslow operated his direction. *Id.* at ¶¶35, 38, 119, 120, 248.   The specific interstate calls were: (1) Baslow's call to Himalaya Drug Co. on July 16, 2012 at July 16, 2012 (Appendix A, No. 2), and (2) Baslow's call to Carter-Reed Co. on August 1, 2012 (Appendix A, No. 1).

Similarly, each call by Demulder and Schoonover to those entities is a separate wire fraud offense.   Calls made to target corporations by recruited shills were essential steps in the plot to extort settlement funds because NTG used the calls to facially legitimize threatened CIPA claims in its sham litigation.   Baslow and Ferrell are similarly liable for the predicate acts because Baslow personally directed individuals to make calls, and then had them return confirmation statements free of reference to NTG call staging.   Ferrell directed Baslow to setup cases, and Baslow testified he always acted as Ferrell directed.   SOF ¶¶71, 120.   Thus, Ferrell and Baslow knew and reasonably foresaw that the relevant calls would occur because they specifically directed and encouraged them.   The specific interstate calls were: (1) Demulder's call to Carter-Reed Company on September 6, 2012 (Appendix A, No. 4), and (2) Schoonover's call to Himalaya Drug Company on July 17, 2012 (Appendix A, No. 3).

Emails exchanged by Baslow and Demulder in August to September 2012 wherein Baslow solicited Demulder's *Carter-Reed* involvement and directed him to call to stage litigation were independent acts of wire fraud. Those emails were indispensable steps in NTG's plot to manufacture the *Carter-Reed* suit; each constitutes an act of wire fraud. Ferrell is vicariously liable for those predicate acts because Baslow operated at his direction. SOF ¶¶35, 38, 119, 120, 248. Ferrell specifically tasked Baslow with finding a plaintiff to pursue litigation against Carter-Reed. *Id.* at ¶127. The specific communications comprising those violations are: (1) Baslow's email to Demulder on August 25, 2012 (Appendix A, No. 5); (2) Demulder's email providing his "confirmation statement" to Baslow on September 6, 2012 at 8:30 AM (Appendix A, No. 6).

The December 2012 wire payment from Himalaya Drug Co. via its Texas place of business to NTG's trust account in California is another wire fraud violation. Obtaining financial fruits of its fraud from target companies is an essential step in NTG's plot. Under the settlement negotiated by NTG, Himalaya wired money to NTG's trust account. SOF ¶114. Ferrell is liable on this predicate because NTG's acquisition of settlement funds was foreseeable and Ferrell executed the settlement agreement. *Id.* at ¶¶125, 126, 199, 200, 245, 256, 291, 377.

Finally, NTG mailed Schoonover a check (his portion of the proceeds from the fraudulent scheme). *Id.* at ¶126. That act independently violated the mail fraud statute. Provision of payment to sham plaintiffs is a necessary and anticipated step in NTG's plot. NTG used shill plaintiffs in multiple suits and mailed payment of proceeds was necessary to maintain that illegal service. *See, e.g.,* at ¶¶199, 200, 259-260.

The undisputed facts demonstrate **seven (7)** wire and mail fraud predicate acts from July 2012 to December 2012 as part of the wiretapping scheme.

**2) Predicate Acts Committed in the Strataluz Scheme**

Defendants created a company to threaten and file staged Lanham Act suits

based on false, misleading, and concealed information to extort settlement payments. That was a scheme to defraud. In 2013 and 2014, Ferrell and Reid concealed information from and mislead potential defendants in litigation involving Strataluz LLC. SOF ¶¶327-464. Ferrell and NTG's Reid created Strataluz LLC (and its parent companies) for use as a plaintiff in staged cases. *Id.* at ¶¶329, 333, 336, 339-341, 371-374. They structured the company to conceal their ownership. *Id.* at ¶¶327-368. They said their purpose was to prevent discovery of their real party in interest status and ownership by adversaries and the courts. *Id.* at ¶¶334-336. NTG used its back office and legal services to operate and assist Strataluz. *Id.* at ¶¶330.

NTG's litigation threats and filings for Strataluz included misrepresentations, half-truths, and material omissions. *Id.* at ¶¶382, 386-391, 411, 416-417, 422-426. NTG sent demand letters to, and filed suits against, companies that manufactured cellulite creams and male enhancement products. *See, e.g., id.* at ¶¶388-389, 416-417, 422-423. NTG and Ferrell threatened litigation based on allegations that Strataluz manufactured and sold superior, clinically proven, proprietary and highly profitable products, including EverSilk (a cellulite cream) and ProMaxal (a male enhancement). *Id.* at ¶¶415-416, 422-424, 433-443. Those representations were false. *Id.* at ¶¶392-399, 433-444. The complaints that NTG prepared for Strataluz against likewise included falsehoods about Strataluz and its alleged injuries. *Id.* at ¶¶432-440, 457. Notably, in the RICO context, the failure to disclose ownership interest has been deemed fraudulent. *Hansmeier*, 988 F.3d at 437-38; *United States v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980).

The undisputed purpose of the Strataluz litigation scheme was to extort money from litigation targets. Ferrell and Reid repeatedly stated that the scheme would "shake money loose" and "wrangle six figures" from opponents. SOF ¶¶45, 404, 414, 461. They sought large financial settlements based on objectively false allegations, including false claims of high market losses. SOF ¶¶371-460; *see also id.* at ¶374 (NTG attorney questioning "what the damage theory is in these cases").

They expressly intended to use fear of discovery and embarrassment of litigation as a tool to procure higher settlement values. *Id.* at ¶378 (intending to use "fear that we will use discovery to learn about their sales figures, product formulations, etc."), ¶427. As the owner of Strataluz LLC and NTG, Ferrell derived profit from both sides of the "attorney-client relationship." *Id.* at ¶2. He proposed a 50% contingency fee for NTG (in which he is 100% owner) and the other 50% would be paid back to Ferrell and the other NTG attorneys (James Hardin and David Reid). *Id.* at ¶373.

Under the Ninth Circuit's broad definition, NTG's use of Strataluz as a sham litigant was a scheme to defraud. *See Hansmeier*, 988 F.3d at 437-38 ("[B]y having separate companies that they controlled act as their clients, they obscured their personal and financial involvement in those lawsuits" which was a "deliberate plan of action … to hide or misrepresent information"). Ferrell created the company to facilitate extortion.

### d. Defendants created the scheme to defraud through Strataluz LLC with the intent to defraud

Ferrell's communications in 2013 reveal Strataluz was chosen to aid concealment and deceit in litigation in aid of extortion. SOF ¶¶327-368. Ferrell had actual knowledge that representations made to adversaries on behalf of Strataluz were false. *Id.* at ¶¶396-398, 438-440. He knew ProMaxal had no sales and was not available for sale. *Id.* at ¶438. He knew ProMaxal had no clinical research, and that Strataluz paid for none. *Id.* at ¶439. He expressly structured the company with the purpose of misleading litigation opponents and the courts by concealing his ownership interest and role in litigation. *Id.* at ¶¶327-368. The complaints Ferrell filed and demand letters he sent contained statements which contradicted those facts, along with other half truths and material omissions. SOF ¶¶388-460. When questioned by opposing counsel, Ferrell emailed Bentley, stated that the attorney's suspicions hindered settlement, and directed Bentley to create a phony, non-operable website to give the false impression that Strataluz's product was available for sale.

*Id.* at ¶¶441-444.

The facts point in one direction, that Ferrell created Strataluz to defraud litigation defendants and the courts, part of his overall sham litigation scheme to extort settlement payments.  On the contemporaneous record, no reasonable trier of fact could conclude otherwise.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment is appropriate where the documentary evidence produced by the parties permits only one conclusion).

### e. Defendants used mail and interstate wire in furtherance of the scheme

The record confirms Ferrell mailed at least four ProMaxal demand letters through which he tried to extort $200,000.  SOF ¶424.  Each letter, sent through an interstate mail carrier, is a predicate act of mail fraud.  The demands were designed to "shake money loose" from target companies.  *Id.* at ¶¶404, 414, 461.  The specific letters sent in furtherance of the scheme were letters from NTG and Ferrell: (1) NTG's letter mailed to Natural Product Solutions on June 2, 2015 (Appendix A, No. 9); (2) NTG's letter to Nutrex Research on June 2, 2015 (Appendix A., No. 10); (3) NTG's letter to Twinlab Corp. on June 2, 2015 (Appendix A, No. 11); and (4) NTG's letter to Pristine Bay on June 2, 2015 (Appendix A, No. 12).

### 3) Predicate Acts Committed in the False Advertising Scheme

Defendants manufactured false advertising cases by directing shills to buy NTG-identified products so NTG could allege those individuals suffered false injuries to extort settlement payments.  SOF ¶¶191-204.  Baslow directed individuals to do so in ways that would make the purchases appear legitimate.  He sought to recruit additional plaintiffs for other NTG pre-identified false advertising suits.  SOF ¶¶215, 282-290.  NTG and Ferrell misrepresented and omitted material facts in communications with adversaries and the courts in the complaints NTG filed.  *See id.* at ¶¶186-326.  NTG sought to extort and did extort money from the targeted companies through its scheme.  *Id.*

The scheme to defraud through manufactured false advertising cases involved

predicate acts of wire and mail fraud not subject to reasonable dispute in the context
of *Pfleg v. Nature's Way Products*.  The allegations and statements made by Ferrell
and NTG to Nature's Way were fabrications, conveying a false impression of the
material facts and constituting unlawful and morally reprehensible deception.

### f.  The Defendants acted with intent to defraud

Actual knowledge that one's representations are false is sufficient for the
Court to find intent to defraud.  *See United States v. DiRoberto*, 686 F. App'x 458,
461 (9th Cir. 2017) (unpublished) ("Intent may be inferred from misrepresentations
made by the defendant[ ], and the scheme itself may be probative circumstantial
evidence of an intent to defraud."); *United States v. Sullivan*, 522 F.3d 967, 974 (9th
Cir. 2008) (same); *Lothian*, 976 F.2d at 1267 (discussing "badges of fraud" as proof
of fraudulent intent, including knowing misrepresentations); *A.B.C. Chevrolet Co.
v. Kirk*, No. 85 C 10001, 1986 WL 10045, at *1–2 (N.D. Ill. Sept. 8, 1986); *Nieto*,
578 F.2d at 642.

Ferrell made knowingly false representations about Pfleg's reliance on
product advertising and the failure of the products to work for Pfleg.  SOF ¶¶236-
243. Baslow instructed NTG CLRA clients to purchase products for litigation.  *Id.*
at ¶192.  He asked shills to structure purchases to avoid suspicion by buying other
household items at the same time, ostensibly so "proofs of purchase," the receipts,
would appear to be routine consumer transactions. *Id.* (citing Exh. 24).  He advised
shills to avoid written communication about their interactions with NTG.  *Id.* at ¶289
("stay away from e-mail").

NTG maintained a pattern of recruiting shills for staged CLRA litigation.
Ferrell directed Knowles to prepare a CLRA letter to Nature's Way before he even
knew NTG had a "client."  *See* SOF ¶¶207-211.  Ferrell tasked Baslow with locating
a shill for litigation against Nature's Way, and gave Baslow the specific retailer's
web address (Vitamin Shoppe).  *Id.* at ¶¶212-213.  Pfleg couldn't purchase the
products and use them as directed in the few hours between the time of purchase and

the time he returned his receipt to Baslow for litigation. *Id.* at ¶¶216-221. Ferrell nonetheless represented in the Pfleg complaint falsehoods, including that Pfleg relied on advertising representations to make his purchase, used the product as directed, and was a bona fide consumer. *Id.* at ¶¶232-243. Ferrell even alleged Pfleg purchased products that he never actually purchased. *Id.* at ¶240. Ferrell emailed NTG employees regarding the firm's original "client," Theresa Martinez, revealing his awareness that the firm recycled its "clients" in consumer cases. *Id.* at ¶264.

On the same day Baslow directed Pfleg to purchase a product for litigation, Baslow also directed Schoonover (Pfleg and Nilon's friend) to purchase product for litigation. *Id.* at ¶¶223, 281. Baslow also asked Schoonover to refer him to other individuals who would be shills in NTG contrived cases. *Id.* at ¶224. The record shows NTG's ordinary course was to manufacture false advertising cases for profit even before identifying "clients." *See generally id.* at ¶¶186-326. The numerous false representations made to Nature's Way leads to the inescapable conclusion of an intent to defraud.

### g. Specific Mail and Wire Fraud Predicate Acts within the Nature's Way case

NTG and Ferrell's March 15, 2012 demand letter is a predicate act of mail fraud. SOF ¶¶230-232. It was sent via U.S. Mail to Nature's Way. *See* Appendix A, No. 8. It threatened suit, made false representations, and was also a necessary step in the plot because, under the CLRA, a plaintiff is required to send notice of violations by letter before filing suit. *See* Cal. Civ. Code §1782(a).

## G. The Predicate Acts Form a Pattern of Racketeering Activity

A pattern of racketeering activity exists when an enterprise commits two or more related predicates that have sufficient continuity to pose a threat of continued criminal activity. *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 450 (9th Cir. 1991).

### 1) The Predicates Are Related

"The relatedness test is not a cumbersome one for a RICO plaintiff." *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 44 (1st Cir. 1991). Courts use a flexible

approach to determine relatedness, including consideration of whether predicate acts have the "same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242–43 (1989).

The predicate acts identified in this Motion are related. The three schemes use similar methodology, i.e., litigation staged by NTG whereby NTG-selected plaintiffs allege false injuries to extort settlement proceeds from corporate defendants or whereby NTG directs its attorney-owned corporate plaintiff to allege false injuries to extort settlement proceeds from allegedly competing corporate defendants. The participants are all similar. The victims are manufacturers of supplements and nutritional products. The purpose and intended results are the same—to enrich members of the RICO enterprise by extorting settlement payments. Enterprise members participate to gain financially through the fraudulent schemes. *See* SOF ¶¶199-201.

### 2) The Predicate Acts Are Sufficiently Continuous

The Section 1962(c) continuity requirement is flexible and may be established through closed- or open-ended continuity. *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1527 (9th Cir. 1995). Closed-ended continuity involves the commission of predicate acts over a "substantial" period. *Id*. Courts hold that criminal activity spanning more than <u>one year</u> satisfies the closed-ended continuity requirement. *Id*. at 1258 (more than 13 months held to satisfy it). Open-ended continuity is shown through "past conduct that . . . projects into the future with a threat of repetition." *Allwaste*, 65 F.3d at 1528. Predicate acts that "become a regular way of doing business" satisfy the open-ended continuity requirement. *Id.* Here the predicate acts satisfy both forms of continuity.

The predicate acts associated with the false advertising scheme occurred in March 2012. *See* Appendix A. Additional predicates associated with the wiretapping scheme occurred in July, August, September, and December 2012. *Id.*

Predicate acts associated with the Strataluz scheme occurred in June 2015. *See id*. Taken together, the predicates span three plus years, far longer than is required to establish closed-ended continuity.

"[T]he threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *H.J.*, 492 U.S. at 242–43. The undisputed evidence proves "continuity" because NTG's litigation racket operationally defines the NTG law firm to be a structural component of NTG's long-term enterprise. Staged litigation was NTG's "regular way of doing business." *See generally* SOF ¶¶38-464.

This Court earlier acknowledged that NTG defrauded the courts for years. *See* Dkt. 659 at 16 ("[T]he evidence indicates that the Defendants' actions were part of a vast scheme or conspiracy to manufacture litigation"). NTG's internal communications prove NTG systematically manufactured cases through a large, multi-faceted and continuously operational litigation mill. NTG maintained charts of its wiretap cases, listing numerous litigation targets for cases to be assigned to plaintiffs. SOF ¶¶44, 49-51, 163, 380, 464. NTG routinely identified potential litigation targets without first having "clients," and then solicited shills willing to plug into pre-determined litigation. *See generally id.* at ¶¶38-326. In the false advertising and wiretapping schemes, Ferrell directed NTG field representatives to have shills take specific actions to stage "consumer" suits. *Id.*

## V.    **CONCLUSION**

For the foregoing reasons, and supported by NIC's companion Statement of Undisputed Material Facts filed contemporaneously herewith, this Court should grant partial summary judgment against Defendants NTG, Scott Ferrell, and Andrew Baslow on the first four elements of NIC's RICO claim in Count II.

/ / /

/ / /

/ / /

DATED:  April 26, 2021.

Respectfully submitted,

EMORD & ASSOCIATES, PC.


By:     /s/ Joshua S. Furman
Peter A. Arhangelsky, Esq. (SBN 291325)
Joshua S. Furman, Esq. (pro hac vice)
*Attorneys for Plaintiff Natural*
*Immunogenics Corp.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 26, 2021 the foregoing, **PLAINTIFF NIC'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY ADJUDICATON ON COUNT II (RICO)** was electronically filed via the CM/ECF system and sent by that system to the following:

Brendan M. Ford [*bford@forddiulio.com*]
Kristopher P. Diulio [*kdiulio@forddiulio.com*]
Ford & Diulio PC
650 Town Center Drive, Suite 760
Costa Mesa, California 92626
Tel: (714) 450-6830
*Attorney Defendants Andrew Nilon, Giovanni Sandoval,*
*Sam Schoonover, Matthew Dronkers, Taylor Demulder, Sam Pfleg*

David J. Darnell, Esq. [*ddarnell@callahan-law.com*]
Edward Susolik, Esq. [*es@callahan-law.com*]
Callahan & Blaine
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA 92707
Tel: (714) 241-4444
*Attorneys for Newport Trial Group and Scott Ferrell*

Nicole Whyte [*nwhyte@bremerwhyte.com*]
Benjamin Price [*bprice@bremerwhyte.com*]
Kyle A. Riddles [*kriddles@bremerwhyte.com*]
Bremer Whyte Brown & O'Meara, LLP
20320 S.W. Birch Street
Second Floor
Newport Beach, CA 92660
Tel: (949) 211-1000
*Attorneys for Defendants Ryan Ferrell, Andrew Baslow, David Reid, and*
*Victoria Knowles*

Robert Tauler, Esq.
rtauler@taulersmith.com
Tauler Smith, LLP
626 Wilshire Blvd., Suite 510
Los Angeles, CA 90017
Tel: (310) 590-3927
*Attorney for David Reid and Victoria Knowles*

/s/ Joshua S. Furman
Joshua S. Furman, Esq.