# EXHIBIT 1

Atkinson Baker, a Veritext Company
www.depo.com

```
 1            IN  THE  UNITED  STATES  DISTRICT  COURT

 2        FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

 3

 4   NATURAL-IMMUNOGENICS CORP.,            CERTIFIED COPY

 5                    Plaintiff,

 6        vs.                              Case No.
                                          8:15-cv-02034-JVS
 7   NEWPORT  TRIAL  GROUP, et al.,        (JCG)

 8                    Defendants.
     _____
 9

10

11

12               ZOOM  VIDEOCONFERENCE

13        VIDEO  DEPOSITION  OF  SCOTT  JASON  FERRELL

14                    March 30, 2021

15                     9:26 a.m.

16

17               Santa Ana, California

18

19

20

21   Reported by:  QUYEN N. DO, CSR No. 12447

22

23   ATKINSON-BAKER, INC., A Veritext Company

24   (800) 288-3376
     www.depo.com
25   FILE NO. AF01A89
```

```
 1   APPEARANCES:

 2

 3       For Plaintiff:

 4           EMORD & ASSOCIATES, P.C.
             PETER A. ARHANGELSKY, ESQ.
 5           JOSHUA S. FURMAN, ESQ.
             2730 South Val Vista Drive
 6           Building 6, Suite 133
             Gilbert, Arizona  85295
 7           602.388.8899
             602.393.4361 Fax
 8           parhangelsky@emord.com
             jfurman@emord.com
 9

10       For Defendants Newport Trial Group, Andrew
         Baslow, Scott Ferrell, Ryan Ferrell, Victoria
11       Knowles:

12           CALLAHAN & BLAINE, APLC
             DAVID J. DARNELL, ESQ.
13           3 Hutton Centre Drive, Ninth Floor
             Santa Ana, California  92707
14           714.241.4444
             714.241.4445 Fax
15           ddarnell@callahan-law.com

16

17       For Defendants Andrew Nilon, Giovanni
         Sandoval, Sam Schoonover, Matthew Dronkers,
         Taylor Demulder, and Sam Pfleg:
18
             FORD & DIULIO PC
19           BRENDAN M. FORD, ESQ.
             650 Town Center Drive, Suite 760
20           Costa Mesa, California  92626
             714.450.6830
21           bford@forddiulio.com

22

23

24   //

25   //
```

Atkinson Baker, a Veritext Company
www.depo.com

```
 1    APPEARANCES (cont.):

 2


 3        For Defendants Ryan Ferrell. Andre Baslow,
          David Reid, and Victoria Knowles:
 4
              BREMER WHYTE BROWN & O'MEARA, LLP
 5            KYLE A. RIDDLES, ESQ.
              20320 S.W. Birch Street, Second Floor
 6            Newport Beach, California  92660
              949.211.1000
 7            949.221.1001 Fax
              kriddles@bremerwhyte.com
 8

 9        Also Present:

10            Andrew Baslow

11            Michael Kelley, Videographer

12            David Reid

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Atkinson Baker, a Veritext Company
www.depo.com

1   of Media file No. 3.  [Unintelligible] the time          10:47:20

2   is --                                                     10:47:21

3            THE REPORTER:  I cannot hear you,                10:47:27

4   Mr. Videographer.                                         10:47:29

5            THE WITNESS:  He just made the statement         10:47:30

6   that we're going on record, but I think we can go         10:47:32

7   ahead and proceed.                                        10:47:34

8               (Discussion off the record)                   10:47:42

9            MR. ARHANGELSKY:  Yeah, it might -- it           10:47:46

10  might help if you spoke more into the record -- into      10:47:50

11  the microphone.                                           10:47:53

12              (Discussion off the record)                   10:48:25

13           THE VIDEOGRAPHER:  This is the beginning         10:49:26

14  of Media No. 3 [unintelligible].                          10:49:27

15              (Discussion off the record)                   10:49:34

16           THE VIDEOGRAPHER:  This is the beginning         10:50:05

17  of Media File No. 3.  We're now going on record.          10:50:06

18  The time is 10:49 a.m.                                    10:50:10

19           MR. ARHANGELSKY:  Thank you.  We're on the       10:50:14

20  record.  All right.                                       10:50:18

21      Q   (By Mr. Arhangelsky)  Mr. Ferrell, can you        10:50:22

22  hear me?                                                  10:50:23

23      A   I can hear you quite well.  Thank you.            10:50:24

24      Q   Thank you.                                        10:50:30

25           Have you ever been contacted by the FBI          10:50:31

1  concerning the NIC v. NTG case?                      10:50:33

2      A    I have not been contacted by the FBI.       10:50:37

3      Q    Have you ever been contacted by the U.S.    10:50:41

4  Attorneys office concerning the NIC v. NTG case?     10:50:43

5      A    I have not.                                  10:50:48

6      Q    Do you have an ownership interest in the    10:50:52

7  Newport Trial Group?                                 10:50:55

8      A    I do.                                        10:50:58

9      Q    And what is that interest?                  10:51:00

10     A    It's private corporation of which I own     10:51:05

11  100 percent.                                        10:51:07

12     Q    So, there are no owners of the Newport      10:51:10

13  Trial Group?                                        10:51:13

14     A    That is correct.                            10:51:15

15     Q    Does NTG have any other partners?           10:51:19

16     A    Yes.                                        10:51:23

17     Q    And who are the partners?                   10:51:24

18     A    David Reid and Victoria Knowles.            10:51:28

19     Q    They are nonequity partners?                10:51:33

20     A    That's correct.                             10:51:38

21     Q    And when you first start -- well, let me    10:51:39

22  back up.                                            10:51:42

23          When did you first start NTG as a firm?     10:51:43

24     A    I believe it was 2009.                      10:51:48

25     Q    And prior to 2009, you worked at a firm     10:51:53

1  called Call & Jensen; is that right?                    10:51:57

2      A    That is accurate, though incomplete.           10:52:01

3      Q    Sorry.  It was called Jensen & Ferrell; is     10:52:06

4  that right?                                             10:52:09

5      A    That is also accurate, but also               10:52:10

6  incomplete.                                             10:52:13

7      Q    And how is that incomplete?                    10:52:15

8      A    When I started there as an associate, the     10:52:19

9  name of the firm was Call, Clayton & Jensen.            10:52:23

10 Mr. Clayton then retired to take a position with the    10:52:26

11 hierarchy of the LDS church, and the name of the        10:52:37

12 firm became Call & Jensen.  When I was promoted to      10:52:43

13 named partner, the firm became Call, Jensen &           10:52:47

14 Ferrell; and after I left to start my own firm, the     10:52:54

15 firm reverted to the name of Call & Jensen.             10:53:01

16         (Discussion off the record)                    10:53:09

17 BY MR. ARHANGELSKY:                                     10:53:15

18     Q    When you started NTG in 2009, how many         10:53:16

19 employees did the firm have?                            10:53:18

20     A    When I started the firm, I was the only        10:53:22

21 employee.                                               10:53:24

22     Q    Did the firm have any employees in 2010?       10:53:32

23     A    Yes.                                           10:53:36

24     Q    And who were the employees that you can        10:53:37

25 recall in 2010?                                         10:53:40

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | A    Again, going back almost a decade, I | 10:53:44 |
| 2 | believe that in 2010 the employees were Roger Borg, | 10:53:49 |
| 3 | Michael Velarde, Dave Reid, and Sariah Para. | 10:53:56 |
| 4 | Q    Did the NTG firm use any nonattorney | 10:54:08 |
| 5 | investigators in 2010? | 10:54:12 |
| 6 | A    Yes. | 10:54:15 |
| 7 | Q    And who were the nonattorney investigators | 10:54:17 |
| 8 | that the firm used in 2010? | 10:54:19 |
| 9 | A    In 2010 I know that we, at least, worked | 10:54:24 |
| 10 | with my father, Wynn Ferrell as an investigator. | 10:54:32 |
| 11 | (Reporter clarification) | 10:54:37 |
| 12 | THE WITNESS:  Wynn Ferrell as an | 10:54:38 |
| 13 | investigator. | 10:54:46 |
| 14 | I don't recall if we had any other | 10:54:48 |
| 15 | investigator in 2010. | 10:54:52 |
| 16 | BY MR. ARHANGELSKY: | 10:54:54 |
| 17 | Q    Was Wynn Ferrell an independent contractor | 10:54:58 |
| 18 | in 2010? | 10:55:01 |
| 19 | A    Wynn Ferrell was not an independent | 10:55:04 |
| 20 | contractor. | 10:55:07 |
| 21 | Q    Was he a W-2 employee? | 10:55:09 |
| 22 | A    He was not. | 10:55:21 |
| 23 | Q    How would you describe Wynn Ferrell's | 10:55:21 |
| 24 | association with the Newport Trial Group in 2010? | 10:55:24 |
| 25 | A    He was a father, with a background in | 10:55:27 |

Atkinson Baker, a Veritext Company
www.depo.com

1  investigation, who had just retired from his career       10:55:31

2  and wanted this spend time with his son, and so he         10:55:36

3  volunteered to help me try to make the company             10:55:43

4  successful.                                                10:55:49

5       Q    So, Wynn Ferrell was not compensated, at         10:55:51

6  least originally in 2010?                                  10:55:55

7       A    That's correct.                                  10:55:59

8       Q    Do any of -- well, strike that.                  10:56:02

9            How many employees does NTG have today?          10:56:04

10      A    I believe we have approximately ten.             10:56:14

11      Q    And how many employees would you say NTG         10:56:18

12  had in 2015?                                               10:56:22

13      A    I can give you an informed estimate.             10:56:30

14      Q    Go ahead.                                         10:56:38

15      A    Probably -- probably 20.                          10:56:38

16      Q    Does that number 20 include nonattorney          10:56:46

17  investigators?                                             10:56:51

18      A    That number 20 includes all people               10:56:52

19  employed by or associated with the firm.                  10:56:57

20      Q    Does it include nonattorney investigators?       10:57:02

21      A    Yes.                                              10:57:06

22      Q    And are those nonattorney investigators          10:57:09

23  sometimes referred to as field representatives in         10:57:11

24  NTG?                                                       10:57:14

25      A    Yes.                                              10:57:16

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | Q   Do any NTG employees use home or personal | 10:57:19 |
| 2 | computers for business purposes? | 10:57:24 |
| 3 | A   I can only speak for myself, but I use a | 10:57:28 |
| 4 | home computer for business purposes. | 10:57:34 |
| 5 | Q   Did you have a dedicated connection to the | 10:57:42 |
| 6 | NTG firm server files when working from your home | 10:57:45 |
| 7 | computer? | 10:57:49 |
| 8 | MR. DARNELL:  Objection.  Vague as | 10:57:53 |
| 9 | phrased. | 10:57:53 |
| 10 | THE WITNESS:  I struggle with technology, | 10:57:56 |
| 11 | and so I don't know what a dedicated connection is. | 10:57:59 |
| 12 | BY MR. ARHANGELSKY: | 10:58:02 |
| 13 | Q   Can you describe how you connected to NTG | 10:58:03 |
| 14 | servers when you worked remotely from home? | 10:58:06 |
| 15 | A   Yes.  I log on to my computer.  I click | 10:58:11 |
| 16 | Microsoft Office, and my Microsoft e-mail Office | 10:58:21 |
| 17 | comes up. | 10:58:29 |
| 18 | Q   Other than e-mail, do you have a method to | 10:58:34 |
| 19 | transfer electronic files to the NTG office from | 10:58:37 |
| 20 | home? | 10:58:42 |
| 21 | A   I believe such a method exists, although | 10:58:48 |
| 22 | I've never used it. | 10:58:51 |
| 23 | Q   Okay.  Are you familiar with the "S" drive | 10:58:54 |
| 24 | at Newport Trial Group? | 10:58:58 |
| 25 | (Reporter clarification) | 10:59:01 |

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | THE WITNESS:  I am. | 10:59:06 |
| 2 | MR. ARHANGELSKY:  S, as in Sam. | 10:59:13 |
| 3 | BY MR. ARHANGELSKY: | 10:59:13 |
| 4 | Q    What is the S-Drive? | 10:59:13 |
| 5 | A    The S-Drive is a function of Microsoft | 10:59:18 |
| 6 | Office that enables shared collaboration between | 10:59:26 |
| 7 | various shake holders by maintaining a. | 10:59:32 |
| 8 | (Reporter clarification) | 10:59:41 |
| 9 | THE WITNESS:  By maintaining a provenanced | 10:59:46 |
| 10 | source of various documents and data. | 10:59:50 |
| 11 | BY MR. ARHANGELSKY: | 10:59:53 |
| 12 | Q    What type of documents and data did NTG | 10:59:57 |
| 13 | store on its S-Drive? | 10:59:59 |
| 14 | A    I believe that we store Word documents. | 11:00:11 |
| 15 | Q    Who had access -- who -- excuse me. | 11:00:21 |
| 16 | Who at NTG had access to files that were | 11:00:23 |
| 17 | stored on the S-Drive? | 11:00:26 |
| 18 | A    At what time period? | 11:00:29 |
| 19 | Q    At any point since 2010. | 11:00:33 |
| 20 | A    I believe that since 2010 every -- every | 11:00:41 |
| 21 | credentialed employee of NTG would have access to | 11:00:50 |
| 22 | the S-Drive function of Microsoft Windows, if they | 11:00:55 |
| 23 | choose to utilize it. | 11:01:01 |
| 24 | Q    Did the NTG firm maintain any data that | 11:01:04 |
| 25 | was only available to certain employees? | 11:01:07 |

| | | |
|---|---|---|
| 1 | Q    Here, in this document, Wynn Ferrell has | 12:19:57 |
| 2 | signed as the secretary of the Newport Trial Group. | 12:20:02 |
| 3 | Was Wynn Ferrell the secretary of Newport | 12:20:06 |
| 4 | Trial Group? | 12:20:09 |
| 5 | A    I believe so. | 12:20:11 |
| 6 | Q    Since December of 2015, other than | 12:20:17 |
| 7 | amending the name of the corporation to add the | 12:20:22 |
| 8 | d/b/a, have you made any other changes to the NTG | 12:20:24 |
| 9 | articles of incorporation? | 12:20:28 |
| 10 | A    I believe that they were amended to make | 12:20:33 |
| 11 | either [inaudible] -- | 12:20:37 |
| 12 | (Reporter clarification) | 12:20:43 |
| 13 | THE WITNESS:  -- either Dave Reid or | 12:20:44 |
| 14 | Sariah Para the secretary of the company. | 12:20:50 |
| 15 | BY MR. ARHANGELSKY: | 12:20:54 |
| 16 | Q    Okay.  And when do you think that | 12:20:59 |
| 17 | occurred? | 12:21:01 |
| 18 | A    I don't know for sure, but | 12:21:03 |
| 19 | [unintelligible] -- | 12:21:05 |
| 20 | (Reporter clarification) | 12:21:07 |
| 21 | THE WITNESS:  But it would be reflected in | 12:21:13 |
| 22 | the operative documents. | 12:21:15 |
| 23 | BY MR. ARHANGELSKY: | 12:21:18 |
| 24 | Q    And the NTG firm hasn't added any | 12:21:22 |
| 25 | shareholders since 2015; is that right? | 12:21:24 |

| | | |
|---|---|---|
| 1 | A    That is correct. | 12:21:28 |
| 2 | Q    What was the purpose of the August 2016 | 12:21:31 |
| 3 | name change from NTG to Pacific Trial Attorneys? | 12:21:36 |
| 4 | A    Do you mean what was the purpose or what | 12:21:43 |
| 5 | was the motivation? | 12:21:45 |
| 6 | Q    Let's start with what was the purpose of | 12:21:49 |
| 7 | the name change. | 12:21:51 |
| 8 | A    The purpose of the name change was to | 12:21:54 |
| 9 | change the name. | 12:21:56 |
| 10 | Q    And what was the motivation to change the | 12:22:00 |
| 11 | name? | 12:22:02 |
| 12 | A    There were at least two principal | 12:22:03 |
| 13 | motivations. | 12:22:07 |
| 14 | Q    What were those two principal motivations? | 12:22:13 |
| 15 | A    The first was that I was advised by a | 12:22:17 |
| 16 | client that they had wanted to hire us for a matter, | 12:22:24 |
| 17 | but believed that our practice was restricted to | 12:22:33 |
| 18 | Newport Beach, California, and so I wanted to change | 12:22:38 |
| 19 | the name to be consistent with our roots of being on | 12:22:42 |
| 20 | the Pacific coast, but to be more reflective of the | 12:22:49 |
| 21 | fact that we handled matters outside of | 12:22:54 |
| 22 | [inaudible] -- | 12:22:58 |
| 23 | (Reporter clarification) | 12:22:59 |
| 24 | THE WITNESS:  Outside of Newport Beach. | 12:23:03 |
| 25 | BY MR. ARHANGELSKY: | 12:23:06 |

1    Q    And what was the second motivation?          12:23:08

2    A    The second motivation was that the          12:23:12

3  publicity surrounding this lawsuit and the efforts     12:23:19

4  by NIC and its agents and counsel to publicize the     12:23:26

5  case to post false comments about us and about me on    12:23:34

6  the Internet and to direct Google searches to          12:23:43

7  derogatory and false statements about us on the        12:23:53

8  Internet was becoming a concern to me.                 12:24:00

9    Q    You believe NIC has published false and      12:24:10

10 derogatory comments about this case on the Internet?   12:24:14

11   A    Can you ask that again?                       12:24:18

12   Q    You believe NIC has published false and      12:24:21

13 derogatory comments about this case on the Internet?   12:24:23

14   A    Yes.                                          12:24:29

15   Q    And where has NIC published those            12:24:31

16 comments?                                             12:24:33

17   A    I can certainly tell you all of the ones     12:24:37

18 that I know of.                                        12:24:42

19   Q    That's what I'm --                            12:24:49

20   A    Start- --                                     12:24:50

21   Q    -- asking.  Where have they published        12:24:50

22 them?                                                  12:24:52

23   A    Starting with the website that NIC and       12:24:53

24 Mr. Baker created, I believe, for the purpose of       12:25:00

25 defaming NTG, second would be media interviews that    12:25:10

| | | |
|---|---|---|
| 1 | A    I would [inaudible]. | 12:31:43 |
| 2 | (Reporter clarification) | 12:31:51 |
| 3 | THE WITNESS:  I would just be guessing. | 12:31:52 |
| 4 | BY MR. ARHANGELSKY: | 12:31:54 |
| 5 | Q    Were your annual distributions relatively | 12:32:05 |
| 6 | consistent from year to year from 2015 through 2020? | 12:32:07 |
| 7 | A    I believe that they trended higher in 2020 | 12:32:20 |
| 8 | than in previous years. | 12:32:25 |
| 9 | Q    Do you have any -- any years from 2015 | 12:32:31 |
| 10 | through 2020 where your distributions were less than | 12:32:34 |
| 11 | a million? | 12:32:37 |
| 12 | A    There may have been one year where it was | 12:32:41 |
| 13 | less than a million, but I don't know for sure. | 12:32:45 |
| 14 | Q    Were you responsible for making employment | 12:32:51 |
| 15 | decisions at the Newport Trial Group? | 12:32:53 |
| 16 | (Reporter clarification) | 12:32:58 |
| 17 | MR. ARHANGELSKY:  No. | 12:32:58 |
| 18 | THE WITNESS:  If I understand your | 12:33:04 |
| 19 | question correctly, I am ultimately responsible for | 12:33:06 |
| 20 | authorizing instructing all [inaudible] -- | 12:33:13 |
| 21 | (Reporter clarification) | 12:33:19 |
| 22 | THE WITNESS:  If I understand your | 12:33:20 |
| 23 | question correctly, I am either directly or | 12:33:23 |
| 24 | indirectly responsible for all of the employment | 12:33:27 |
| 25 | decisions at Newport Trial Group that get made or | 12:33:33 |

1   delegated.                                                      12:33:39

2   BY MR. ARHANGELSKY:                                             12:33:39

3       Q    Did you also make decisions about employee            12:33:40

4   compensation?                                                  12:33:43

5       A    I make decisions about employee                       12:33:48

6   compensation in consultation with the compensation             12:33:50

7   guides found in various reference documents on the             12:33:58

8   Internet.                                                      12:34:08

9       Q    Okay.  So, yes, you're responsible for                12:34:09

10  making employment compensation decisions?                      12:34:10

11      A    I believe that that is accurate, though               12:34:16

12  incomplete.                                                    12:34:19

13      Q    Okay.  Who makes decisions at NTG                     12:34:21

14  regarding whether to pay employees bonuses?                    12:34:25

15      A    I ultimately make those decisions based               12:34:31

16  upon a variety of factors that I have identified and           12:34:34

17  discern from the various best practice guides that I           12:34:42

18  consult.                                                       12:34:46

19      Q    Did you hire Andrew Baslow when he first              12:34:49

20  started working for NTG?                                       12:34:52

21      A    I did.                                                12:34:55

22      Q    And what was Andrew Baslow's start date              12:34:56

23  approximately?                                                 12:35:04

24      A    I don't recall.                                       12:35:07

25      Q    Did he start in 2011?                                 12:35:10

| | | |
|---|---|---|
| 1 | A     I believe so. | 12:35:19 |
| 2 | Q     And what was his job title in 2011? | 12:35:19 |
| 3 | A     I believe that his formal job title was | 12:35:26 |
| 4 | field representative. | 12:35:30 |
| 5 | Q     Did Mr. Baslow have any experience in the | 12:35:36 |
| 6 | legal field before he took a job with NTG? | 12:35:39 |
| 7 | A     If he did, I don't know about it. | 12:35:46 |
| 8 | Q     What does Mr. Baslow do for the NTG firm | 12:35:52 |
| 9 | today? | 12:35:56 |
| 10 | A     Andrew fulfills a role that has been | 12:36:00 |
| 11 | identified as a crucial role for consumer-oriented | 12:36:04 |
| 12 | [unintelligible] -- | 12:36:10 |
| 13 | (Reporter clarification) | 12:36:16 |
| 14 | THE WITNESS:  -- for consumer-oriented | 12:36:16 |
| 15 | firms in maintaining best practices for client | 12:36:23 |
| 16 | intake. | 12:36:30 |
| 17 | BY MR. ARHANGELSKY: | 12:36:30 |
| 18 | Q     Is Mr. Baslow -- | 12:36:38 |
| 19 | A     [Unintelligible]. | 12:36:38 |
| 20 | (Reporter clarification) | 12:36:39 |
| 21 | BY MR. ARHANGELSKY: | 12:36:41 |
| 22 | Q     Mr. Baslow's role involves communicating | 12:36:42 |
| 23 | with the firm clients, does it not? | 12:36:45 |
| 24 | A     Part of Mr. Baslow's role is to be the | 12:36:51 |
| 25 | relationship manager of certain clients. | 12:36:55 |

| | | |
|---|---|---|
| 1 | MR. DARNELL:  Counsel -- | 12:37:01 |
| 2 | MR. ARHANGELSKY:  [Unintelligible]. | 12:37:01 |
| 3 | MR. DARNELL:  Counsel, I'd like to take a | 12:37:02 |
| 4 | two-minute break.  I don't even think we need go off | 12:37:04 |
| 5 | the record, but I would like to take a two-minute | 12:37:07 |
| 6 | break to address something off the record with my | 12:37:10 |
| 7 | client, and -- something I need to address, so bear | 12:37:11 |
| 8 | with me one second. | 12:37:12 |
| 9 | MR. ARHANGELSKY:  Okay. | 12:37:18 |
| 10 | (Pause in proceedings) | 12:38:32 |
| 11 | BY MR. ARHANGELSKY: | 12:38:32 |
| 12 | Q    All right, so, yes, Mr. Baslow | 12:38:33 |
| 13 | communicates with clients on behalf of the NTG firm; | 12:38:42 |
| 14 | is that right? | 12:38:46 |
| 15 | A    Yes. | 12:38:46 |
| 16 | Q    Has Mr. Baslow's role changed at all over | 12:38:54 |
| 17 | the course of the ten-plus years that he's worked | 12:38:56 |
| 18 | for the Newport Trial Group? | 12:39:01 |
| 19 | A    Yes. | 12:39:02 |
| 20 | Q    And how has his role changed? | 12:39:02 |
| 21 | A    It would be difficult to describe the | 12:39:09 |
| 22 | gradiation [sic] of how his role has changed, but I | 12:39:15 |
| 23 | believe it's fair to say that he has taken on more | 12:39:22 |
| 24 | responsibility as he has developed experience with | 12:39:30 |
| 25 | client relationships. | 12:39:34 |

| | | |
|---|---|---|
| 1 | Q    Mr. Baslow receive a promotion at any | 12:39:38 |
| 2 | point over the course of last ten years? | 12:39:40 |
| 3 | A    I believe so. | 12:39:46 |
| 4 | Q    When was his last promotion? | 12:39:49 |
| 5 | A    I don't recall specifically. | 12:39:55 |
| 6 | Q    Was it after 2015? | 12:39:57 |
| 7 | A    I don't recall. | 12:40:02 |
| 8 | Q    How many promotions has Mr. Baslow | 12:40:05 |
| 9 | received? | 12:40:07 |
| 10 | A    I'm only aware of one promotion. | 12:40:12 |
| 11 | Q    Was he given the title director of field | 12:40:16 |
| 12 | operations at some point? | 12:40:18 |
| 13 | A    Yes. | 12:40:21 |
| 14 | Q    Are there any employees that report now to | 12:40:26 |
| 15 | Mr. Baslow as director of field operations? | 12:40:29 |
| 16 | A    No. | 12:40:34 |
| 17 | Q    Who supervises Mr. Baslow and his work for | 12:40:37 |
| 18 | the firm? | 12:40:41 |
| 19 | A    Ultimately, I have ultimate supervise -- I | 12:40:47 |
| 20 | believe that he also reports to the other attorneys | 12:40:50 |
| 21 | as appropriate. | 12:40:55 |
| 22 | Q    Has NTG produced any document in this case | 12:41:00 |
| 23 | revealing specific legal ethics training that was | 12:41:03 |
| 24 | given to Mr. Baslow? | 12:41:07 |
| 25 | MR. DARNELL:  Objection.  Vague. | 12:41:11 |

| | | |
|---|---|---|
| 1 | THE WITNESS:  I don't know what documents | 12:41:16 |
| 2 | have been produced that relate to Andrew's ethics | 12:41:22 |
| 3 | training or not. | 12:41:26 |
| 4 | BY MR. ARHANGELSKY: | 12:41:27 |
| 5 | Q    Has NTG provided ethics training for | 12:41:31 |
| 6 | Mr. Baslow? | 12:41:35 |
| 7 | A    Yes. | 12:41:36 |
| 8 | Q    What kind of ethics training has | 12:41:37 |
| 9 | Mr. Baslow received? | 12:41:40 |
| 10 | A    At our monthly docket meetings, prior to | 12:41:47 |
| 11 | the onset of the COVID-19 pandemic, I took the | 12:41:49 |
| 12 | opportunity to speak about legal ethics, our | 12:41:57 |
| 13 | obligation, new developments, and things like that; | 12:42:02 |
| 14 | and I believe that Andrew has attended some of my | 12:42:05 |
| 15 | continuing legal education lectures that I provided | 12:42:16 |
| 16 | as well. | 12:42:21 |
| 17 | Q    Have you provided continuing legal | 12:42:26 |
| 18 | education lectures on legal ethics? | 12:42:28 |
| 19 | A    I don't know if the topics | 12:42:38 |
| 20 | [unintelligible] -- | 12:42:40 |
| 21 | (Reporter clarification) | 12:42:44 |
| 22 | THE WITNESS:  I said let me back up. | 12:42:46 |
| 23 | I've lectured dozens, if not hundreds, of | 12:42:50 |
| 24 | times, and part of those lectures involve question | 12:42:54 |
| 25 | and answer, and oftentimes the question-and-answer | 12:42:58 |

1 potential clients who they think that would -- could          12:53:18

2 benefit to speak --                                           12:53:21

3          (Reporter clarification)                             12:53:27

4          THE WITNESS:  To speak to us.                        12:53:28

5 BY MR. ARHANGELSKY:                                           12:53:30

6     Q    Did the NTG firm publish any content                 12:53:36

7 online in 2012 regarding the Sovereign Silver                 12:53:40

8 product?                                                      12:53:47

9     A    I don't believe that we published anything           12:53:51

10 online regarding the Sovereign Silver product, but I         12:53:54

11 know that information about the lawsuit was                   12:54:00

12 available online.                                             12:54:02

13     Q    Okay.  And that was after the lawsuit was           12:54:04

14 filed?                                                        12:54:13

15     A    Well, there was a great deal of                     12:54:15

16 information about colloidal silver and dangers                12:54:18

17 online before we filed the lawsuit, but information           12:54:27

18 about our lawsuit was only available online after we         12:54:32

19 filed the lawsuit.                                            12:54:37

20     Q    Did the Newport Trial Group specifically            12:54:40

21 publish anything online, asking for plaintiffs to             12:54:43

22 contact the firm in 2012 regarding the sovereigns of         12:54:47

23 a product?                                                   12:54:51

24     A    I don't recall one way or the other.                12:54:56

25     Q    Do you supervise Andrew Baslow in his               12:55:03

| | | |
|---|---|---|
| 1 | communications with clients of the firm? | 12:55:06 |
| 2 | A    I believe so. | 12:55:11 |
| 3 | Q    And how do you supervisor Mr. Baslow in | 12:55:13 |
| 4 | his interactions with firm clients? | 12:55:16 |
| 5 | A    I identify the best practice protocol | 12:55:23 |
| 6 | regarding client communications.  I observe them | 12:55:27 |
| 7 | myself.  I instruct our employees to observe them, | 12:55:35 |
| 8 | and that includes Andrew. | 12:55:39 |
| 9 | Q    You believe Andrew follows your | 12:55:42 |
| 10 | instructions when it comes to communication with the | 12:55:44 |
| 11 | firm clients? | 12:55:48 |
| 12 | A    I've always known Andrew to be diligent, | 12:55:51 |
| 13 | honest, take any instructions that I've given, so | 12:55:55 |
| 14 | yes. | 12:55:58 |
| 15 | Q    I believe you testified earlier that your | 12:56:03 |
| 16 | father, Wynn Ferrell, had volunteered for the | 12:56:06 |
| 17 | Newport Trial Group.  I think that was soon after | 12:56:11 |
| 18 | the firm had began; is that correct? | 12:56:16 |
| 19 | A    Yes. | 12:56:19 |
| 20 | Q    Has Wynn Ferrell ever received | 12:56:23 |
| 21 | compensation from the Newport Trial Group? | 12:56:25 |
| 22 | A    He's received reimbursement for his | 12:56:31 |
| 23 | expenses, such as travel and things like that, but I | 12:56:34 |
| 24 | don't believe [unintelligible] -- | 12:56:37 |
| 25 | (Reporter clarification) | 12:56:43 |

| | | |
|---|---|---|
| 1 | THE WITNESS:  -- but I don't believe he's | 12:56:44 |
| 2 | ever received any direct compensation for work. | 12:56:47 |
| 3 | BY MR. ARHANGELSKY: | 12:56:50 |
| 4 | Q    Who supervises Wynn Ferrell in his | 12:56:56 |
| 5 | interactions with firm clients? | 12:56:59 |
| 6 | A    Your question implies a present temporal | 12:57:04 |
| 7 | aspect, and Wynn Ferrell does not work for Pacific | 12:57:10 |
| 8 | Trial Attorneys anymore. | 12:57:15 |
| 9 | Q    No.  When Mr. Ferrell did -- Mr. Wynn | 12:57:20 |
| 10 | Ferrell did work for NTG, who supervised his | 12:57:24 |
| 11 | communication with clients? | 12:57:29 |
| 12 | A    Primarily me. | 12:57:30 |
| 13 | Q    And when did Mr. Wynn Ferrell stop working | 12:57:32 |
| 14 | for the Newport Trial Group? | 12:57:36 |
| 15 | A    It was shortly after he received a | 12:57:46 |
| 16 | diagnosis of early onset dementia.  I don't know | 12:57:49 |
| 17 | [inaudible] -- | 12:57:56 |
| 18 | (Reporter clarification) | 12:58:00 |
| 19 | THE WITNESS:  It was shortly after he | 12:58:04 |
| 20 | received a diagnosis of early onset dementia, but I | 12:58:06 |
| 21 | don't know the specific dates. | 12:58:12 |
| 22 | BY MR. ARHANGELSKY: | 12:58:14 |
| 23 | Q    That was after 2016, you believe? | 12:58:16 |
| 24 | A    I don't know the specific date. | 12:58:21 |
| 25 | MR. RIDDLES:  Counsel, I have to take a | 12:58:23 |

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | hard -- | 12:58:23 |
| 2 | BY MR. ARHANGELSKY: | 12:58:23 |
| 3 | Q    When he -- | 12:58:23 |
| 4 | MR. RIDDLES:  -- break -- this is Kyle | 12:58:23 |
| 5 | Riddles.  I have to take a hard break in two | 12:58:27 |
| 6 | minutes, so if you have a question that you need to | 12:58:29 |
| 7 | wrap up, I'd appreciate that. | 12:58:32 |
| 8 | MR. ARHANGELSKY:  All right, let me -- | 12:58:34 |
| 9 | I'll just finish this line, and we'll take a break. | 12:58:35 |
| 10 | It'll take a second, I hope. | 12:58:38 |
| 11 | Q   (By Mr. Arhangelsky)  Did Wynn Ferrell take | 12:58:40 |
| 12 | specifics assignments from you when he worked for | 12:58:42 |
| 13 | the Newport Trial Group? | 12:58:46 |
| 14 | A    Yes. | 12:58:47 |
| 15 | Q    Did you ask Wynn Ferrell to assist the | 12:58:48 |
| 16 | firm in wiretapping cases? | 12:58:50 |
| 17 | A    I don't recall a specific conversation | 12:58:59 |
| 18 | like that, but I believe that the answer could be | 12:59:02 |
| 19 | discerned from the contemporaneous documents. | 12:59:06 |
| 20 | Q    Okay.  Do you know what Wynn Ferrell's | 12:59:10 |
| 21 | role was in wiretapping cases for NTG? | 12:59:13 |
| 22 | A    I don't believe that Wynn had a specific | 12:59:24 |
| 23 | role as it relates to that line of cases.  His role | 12:59:29 |
| 24 | was as a client relationship manager. | 12:59:35 |
| 25 | Q    Okay. | 12:59:43 |

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | MR. ARHANGELSKY:  I know, Kyle, you need | 12:59:46 |
| 2 | to stop right now.  We can -- we can go off the | 12:59:48 |
| 3 | record.  Is this a time where we should break for | 12:59:50 |
| 4 | lunch? | 12:59:53 |
| 5 | MR. DARNELL:  Yes. | 12:59:55 |
| 6 | MR. ARHANGELSKY:  Okay.  How much -- how | 12:59:56 |
| 7 | long do you want for lunch, David? | 12:59:57 |
| 8 | MR. DARNELL:  We're fine with a half an | 01:00:01 |
| 9 | hour. | 01:00:02 |
| 10 | MR. ARHANGELSKY:  Okay.  Fine with us as | 01:00:03 |
| 11 | well.  Thank you.  We'll resume at 1:30. | 01:00:06 |
| 12 | THE VIDEOGRAPHER:  This is the end of | 01:00:12 |
| 13 | Media file -- this is the end of Media File No. 4. | 01:00:13 |
| 14 | Now going off the record, the time is 12:59 p.m. | 01:00:14 |
| 15 | (Reporter clarification) | 01:00:25 |
| 16 | THE VIDEOGRAPHER:  Yeah.  I'm going to -- | 01:00:25 |
| 17 | (Reporter clarification) | 01:00:34 |
| 18 | THE VIDEOGRAPHER:  This is the end of | 01:00:37 |
| 19 | Media File No. 4.  Now going off the record, the | 01:00:38 |
| 20 | time is 12:59 p.m. | 01:00:41 |
| 21 | --oOo-- | 01:00:45 |
| 22 | (LUNCHEON RECESS TAKEN FROM | 01:00:46 |
| 23 | 12:59 P.M. TO 1:43 p.m.) | 01:00:46 |
| 24 | --oOo-- | 01:42:46 |
| 25 | THE VIDEOGRAPHER:  This is the beginning | 01:44:05 |

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | of Media File No. 5.  Now going on the record, time | 01:44:06 |
| 2 | is 1:43 p.m. | 01:44:12 |
| 3 | EXAMINATION (Resumed) | 01:44:14 |
| 4 | BY MR. ARHANGELSKY: | 01:44:14 |
| 5 | Q   We're back on the record after lunch, | 01:44:17 |
| 6 | Mr. Ferrell. | 01:44:20 |
| 7 | Did you meet with anybody other than your | 01:44:21 |
| 8 | attorneys at lunchtime? | 01:44:23 |
| 9 | A   I did not. | 01:44:25 |
| 10 | Q   Mr. Ferrell, who is Sariah Para? | 01:44:31 |
| 11 | A   Sariah is our office manager. | 01:44:35 |
| 12 | Q   And how old is Sariah Para? | 01:44:37 |
| 13 | A   If I had to estimate [unintelligible], | 01:44:43 |
| 14 | mid-40s. | 01:44:47 |
| 15 | (Reporter clarification) | 01:44:51 |
| 16 | THE WITNESS:  If I had to estimate, | 01:44:52 |
| 17 | mid-40s. | 01:44:56 |
| 18 | BY MR. ARHANGELSKY: | 01:44:58 |
| 19 | Q   When did you first meet Sariah Para? | 01:45:00 |
| 20 | A   We worked together at Call, Clayton & | 01:45:05 |
| 21 | Jensen. | 01:45:14 |
| 22 | Q   When you formed NTG in 2009, was that when | 01:45:15 |
| 23 | Sariah came to work for the Newport Trial Group? | 01:45:20 |
| 24 | A   No. | 01:45:24 |
| 25 | Q   When did she start with NTG? | 01:45:24 |

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | A    It was shortly after that. | 01:45:29 |
| 2 | Q    What are her job responsibilities with | 01:45:33 |
| 3 | NTG? | 01:45:36 |
| 4 | A    Those that can generally be described as | 01:45:40 |
| 5 | office manager.  She coordinates payroll, | 01:45:42 |
| 6 | coordinates vendors.  To use a euphemism, she makes | 01:45:55 |
| 7 | sure that the trains run on time. | 01:46:00 |
| 8 | Q    Is Sariah Para a joint account holder for | 01:46:02 |
| 9 | any of NTG's bank accounts? | 01:46:05 |
| 10 | A    Yes. | 01:46:07 |
| 11 | Q    Which accounts? | 01:46:08 |
| 12 | A    I believe she's a joint signatory on all | 01:46:09 |
| 13 | of them. | 01:46:12 |
| 14 | (Reporter clarification) | 01:46:12 |
| 15 | BY MR. ARHANGELSKY: | 01:46:12 |
| 16 | Q    Was she also responsible for | 01:46:22 |
| 17 | [unintelligible] -- | 01:46:23 |
| 18 | (Reporter clarification) | 01:46:23 |
| 19 | BY MR. ARHANGELSKY: | 01:46:27 |
| 20 | Q    -- issuing settlement checks to NTG | 01:46:28 |
| 21 | clients? | 01:46:33 |
| 22 | A    Yes. | 01:46:35 |
| 23 | Q    Did Sariah Para have any communication | 01:46:39 |
| 24 | with NTG clients in her role as an office manager? | 01:46:42 |
| 25 | A    Yes. | 01:46:45 |

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | Q     Did she have any communication with firm | 01:46:53 |
| 2 | clients concerning the substance of their lawsuits? | 01:46:54 |
| 3 | A     Not that I know of. | 01:47:02 |
| 4 | Q     Who is Carla Weiss? | 01:47:05 |
| 5 | A     Carla is a firm paralegal. | 01:47:10 |
| 6 | Q     Is she still employed with NTG? | 01:47:13 |
| 7 | A     She is. | 01:47:18 |
| 8 | Q     How long has she worked for NTG? | 01:47:18 |
| 9 | A     Just estimating, ten years. | 01:47:26 |
| 10 | Q     In her role as paralegal, does Carla Weiss | 01:47:28 |
| 11 | interact with any of the firm's clients? | 01:47:33 |
| 12 | A     Yes. | 01:47:40 |
| 13 | Q     Does she speak with the firm's clients | 01:47:42 |
| 14 | regarding the substantive nature of their legal | 01:47:44 |
| 15 | claims? | 01:47:49 |
| 16 | A     As I sit here, I don't know. | 01:47:51 |
| 17 | Q     Who is Katherine Kirshner? | 01:47:54 |
| 18 | A     Katherine is a firm paralegal. | 01:47:59 |
| 19 | Q     Does Katherine Kirshner still work for the | 01:48:02 |
| 20 | NTG firm? | 01:48:08 |
| 21 | A     She does. | 01:48:08 |
| 22 | Q     And when did she first start with NTG? | 01:48:09 |
| 23 | A     My best estimate is around | 01:48:17 |
| 24 | [unintelligible] -- | 01:48:19 |
| 25 | (Reporter clarification) | 01:48:23 |

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | THE WITNESS:   2012. | 01:48:24 |
| 2 | BY MR. ARHANGELSKY: | 01:48:25 |
| 3 | Q    And who is Mandy Jung? | 01:48:30 |
| 4 | A    She is a secretary and paralegal at PTA. | 01:48:34 |
| 5 | Q    And when did she start working for NTG? | 01:48:40 |
| 6 | A    My best estimate is the 2015. | 01:48:50 |
| 7 | Q    Is she still employed with NTG? | 01:48:53 |
| 8 | A    She is. | 01:48:56 |
| 9 | Q    Do you know somebody by the name of Steve | 01:49:00 |
| 10 | Ferrell? | 01:49:02 |
| 11 | A    I believe that I have a cousin named Steve | 01:49:09 |
| 12 | Ferrell or a second cousin named Steve Ferrell. | 01:49:13 |
| 13 | Q    Give me one minute to put up a document. | 01:49:18 |
| 14 | (Exhibit 565 marked) | 01:49:36 |
| 15 | BY MR. ARHANGELSKY: | 01:49:36 |
| 16 | Q    Mr. Ferrell, do you see the document that | 01:49:56 |
| 17 | I've put on screen marked as Exhibit 565? | 01:49:57 |
| 18 | A    I do. | 01:50:03 |
| 19 | Q    And is this phone record for Steve Ferrell | 01:50:06 |
| 20 | a record related to your cousin? | 01:50:12 |
| 21 | A    I don't believe so. | 01:50:20 |
| 22 | Q    Do you recognize the phone number (323) | 01:50:23 |
| 23 | 650-6667? | 01:50:24 |
| 24 | A    Not as I sit here. | 01:50:30 |
| 25 | Q    Do you have any idea how this document | 01:50:33 |

| | | |
|---|---|---|
| 1 | that we've marked Exhibit 565 is relevant to the NIC | 01:50:35 |
| 2 | v. NTG lawsuit? | 01:50:39 |
| 3 | A    I don't. | 01:50:43 |
| 4 | Q    Give me one minute to put another document | 01:51:03 |
| 5 | on the screen. | 01:51:06 |
| 6 | (Exhibit 566 marked) | 01:51:06 |
| 7 | BY MR. ARHANGELSKY: | 01:51:06 |
| 8 | Q    I have placed a document on screen, which | 01:51:06 |
| 9 | is marked as Exhibit 566.  Appears to be an e-mail | 01:51:18 |
| 10 | from May 27, 2015. | 01:51:24 |
| 11 | Mr. Ferrell, have you ever seen this | 01:51:34 |
| 12 | document before? | 01:51:35 |
| 13 | A    Not that I recall. | 01:51:40 |
| 14 | Q    Page 2 of this document, which has the | 01:51:50 |
| 15 | Bates number of NTG-69931, Katherine Kirshner writes | 01:51:56 |
| 16 | to Mandy Jung: | 01:52:05 |
| 17 | "Once you are finished with the chart | 01:52:06 |
| 18 | every Monday please send me the charts so | 01:52:09 |
| 19 | I may update SJF confidential binders for | 01:52:12 |
| 20 | the week?" | 01:52:16 |
| 21 | Do you see that on the screen? | 01:52:16 |
| 22 | A    I do. | 01:52:18 |
| 23 | Q    What confidential binders was Ms. Kirshner | 01:52:20 |
| 24 | referencing in this e-mail? | 01:52:25 |
| 25 | A    I believe they relate to the status of | 01:52:28 |

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | A   I believe so. | 02:52:29 |
| 2 | Q   Why did you pick Nevada as the home | 02:52:30 |
| 3 | jurisdiction for Quintogos? | 02:52:32 |
| 4 | A   Nevada and Delaware are widely regarded as | 02:52:39 |
| 5 | the best jurisdictions to create start-up companies | 02:52:45 |
| 6 | in because they provide friendly environments for | 02:52:50 |
| 7 | the creation and management of small companies, and | 02:52:57 |
| 8 | I chose Nevada both because it was closer than | 02:53:05 |
| 9 | Delaware as well as because I was impressed with | 02:53:11 |
| 10 | Craig's reputation for corporate formation. | 02:53:14 |
| 11 | Q   And how long have you known Mr. Etem? | 02:53:20 |
| 12 | A   Met him in 1994. | 02:53:22 |
| 13 | Q   Has Mr. Etem also assisted you with the | 02:53:33 |
| 14 | formation of Tawnsaura? | 02:53:36 |
| 15 | A   Yes. | 02:53:39 |
| 16 | Q   And did he also assist you with the | 02:53:44 |
| 17 | formation of Harcol research? | 02:53:46 |
| 18 | (Reporter clarification) | 02:53:49 |
| 19 | THE WITNESS:  I believe -- | 02:53:50 |
| 20 | MR. ARHANGELSKY:  Harcol, H-a-r-c-o-l. | 02:53:50 |
| 21 | THE WITNESS:  I believe so. | 02:54:00 |
| 22 | BY MR. ARHANGELSKY: | 02:54:00 |
| 23 | Q   Other than Tawnsaura and Harcol, has | 02:54:06 |
| 24 | Mr. Edem assisted you with the formation of any | 02:54:09 |
| 25 | other entities? | 02:54:12 |

| | | |
|---|---|---|
| 1 | A    Not that I know of as I sit here. | 02:54:21 |
| 2 | Q    Have you used Mr. Etem or Mr. Schusterman | 02:54:28 |
| 3 | as counsel to help with asset protection? | 02:54:31 |
| 4 | A    No. | 02:54:34 |
| 5 | Q    Another document. | 02:54:46 |
| 6 | (Exhibit 573 marked) | 02:54:47 |
| 7 | BY MR. ARHANGELSKY: | 02:54:47 |
| 8 | Q    All right, I've placed on screen an | 02:55:24 |
| 9 | exhibit marked 573, which has the Bates No. | 02:55:26 |
| 10 | NTG-65618.  It's a letter to Mr. Ferrell, with the | 02:55:32 |
| 11 | reference line "Independent Officer & Director | 02:55:43 |
| 12 | Services." | 02:55:45 |
| 13 | Do you recognize this document, | 02:55:46 |
| 14 | Mr. Ferrell? | 02:55:47 |
| 15 | A    I don't. | 02:56:00 |
| 16 | Q    Who is Josh Miller? | 02:56:05 |
| 17 | A    I believe that Mr. Miller is either the | 02:56:11 |
| 18 | president or a representative of one of the | 02:56:14 |
| 19 | corporate formation services companies in Nevada. | 02:56:21 |
| 20 | Q    What role did Josh Miller have with | 02:56:29 |
| 21 | Quintogos? | 02:56:33 |
| 22 | A    I believe that Craig Etem or Brian | 02:56:36 |
| 23 | Schusterman suggested that we speak to him or | 02:56:40 |
| 24 | communicate with him regarding nominee directors and | 02:56:45 |
| 25 | that someone did speak to him.  We ended up using | 02:56:56 |

| | | |
|---|---|---|
| 1 | his company. | 02:57:00 |
| 2 | Q   So Josh Miller served as a nominee manager | 02:57:04 |
| 3 | at the front of Quintogos? | 02:57:09 |
| 4 | A   I don't know whether that's the case or | 02:57:13 |
| 5 | not. | 02:57:15 |
| 6 | Q   Did Josh Miller have any authority to make | 02:57:19 |
| 7 | decisions on behalf of Quintogos? | 02:57:22 |
| 8 | A   I would have to look at the operating | 02:57:25 |
| 9 | agreement to know for sure. | 02:57:27 |
| 10 | Q   Who had authority to make decisions on | 02:57:31 |
| 11 | behalf of Quintogos? | 02:57:34 |
| 12 | A   I'd have to look at the operating | 02:57:37 |
| 13 | agreement to know what the genesis was. | 02:57:39 |
| 14 | Q   Did you have authority to make decisions | 02:57:43 |
| 15 | on behalf of Quintogos? | 02:57:46 |
| 16 | A   I think it probably depended on the | 02:57:53 |
| 17 | decision. | 02:57:56 |
| 18 | Q   Did you have authority make [sic] | 02:58:02 |
| 19 | litigation decisions on behalf of Quintogos? | 02:58:03 |
| 20 | A   I don't know whether I did or not.  I'd | 02:58:11 |
| 21 | have to look at the operating agreement and | 02:58:12 |
| 22 | subsequent communications. | 02:58:17 |
| 23 | Q   Who else could have had authority to make | 02:58:21 |
| 24 | litigation decisions on behalf of these companies? | 02:58:24 |
| 25 | A   Anyone authorized by the operating | 02:58:31 |

1  wires and the checks, I don't know whether I made          03:01:57

2  the investment from my personal account or from an         03:02:03

3  NTG holding account, without looking at it.                03:02:07

4       Q    How many accounts does NTG have?                 03:02:14

5       A    We have an operating account, a reserve          03:02:20

6  account, and a client trust account that I'm aware         03:02:27

7  of.  There may be other subsidiary accounts for            03:02:35

8  things like taxes that are due to be paid or 401(k)        03:02:42

9  payments [unintelligible] be made.                         03:02:53

10                (Reporter clarification)                    03:02:55

11             THE WITNESS:  401(k) payments to be made.      03:02:57

12 BY MR. ARHANGELSKY:                                        03:02:59

13      Q    Did you ever recover your investment in          03:03:04

14 Strataluz?                                                 03:03:07

15      A    I did not.                                       03:03:10

16      Q    And how much money did you lose?                 03:03:11

17      A    I believe that my total investment was           03:03:16

18 either 200,000 or 250,000.                                 03:03:19

19      Q    What was the percentage of your ownership        03:03:30

20 interest in Strataluz?                                     03:03:32

21      A    35 percent, I believe.                           03:03:40

22      Q    Did anybody have a greater ownership             03:03:44

23 interest than you?                                         03:03:46

24      A    Josh and Jarrod, one of them may have, but       03:03:57

25 without looking at the ownership documents, I don't        03:04:04

Atkinson Baker, a Veritext Company
www.depo.com

```
 1  know for sure.                                        03:04:08

 2      Q    Okay.  Sitting here today, then, you don't   03:04:12

 3  recall whether or not anybody -- any of the other     03:04:15

 4  owners of Strataluz had a greater interest than your  03:04:17

 5  35 percent.                                            03:04:21

 6      A    As I sit here, I know that both James         03:04:23

 7  Hardin and Dave Reid did not.  I believe they both    03:04:26

 8  had 7 1/2 percent, and I know that Josh and Jarrod     03:04:31

 9  collectively 49 percent, but I don't know how it was   03:04:42

10  split between them as I sit here.                       03:04:48

11      Q    Did Josh Weiss and/or Jarrod Bentley          03:04:51

12  invest any of their own money in Strataluz?            03:04:58

13      A    I don't believe so.                            03:05:03

14      Q    When did you first meet Jarrod Bentley?       03:05:24

15      A    I believe it was in the fall of 2013.         03:05:31

16      Q    And was Mr. Bentley working for Continuity    03:05:36

17  Products at the time?                                  03:05:41

18      A    I don't know where he was working.  It was    03:05:45

19  my understanding that he was an independent            03:05:48

20  consultant that worked for lots of different           03:05:51

21  companies.                                             03:05:54

22      Q    Was the Newport Trial Group representing      03:05:56

23  Continuity Products --                                 03:05:57

24           (Reporter clarification)                      03:06:02

25  BY MR. ARHANGELSKY:                                    03:06:03
```

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | Q    -- at the time? | 03:06:03 |
| 2 | Was the Newport Trial Group also | 03:06:03 |
| 3 | representing Continuity Products at the time? | 03:06:09 |
| 4 | A    I believe so. | 03:06:11 |
| 5 | Q    Did you meet Mr. Bentley through NTG's | 03:06:13 |
| 6 | connection with Continuity Products? | 03:06:16 |
| 7 | A    Indirectly, yes. | 03:06:19 |
| 8 | Q    And at what point did you decide to make | 03:06:22 |
| 9 | Mr. Bentley a business partner? | 03:06:26 |
| 10 | A    Mr. Bentley and Mr. Weiss approached me | 03:06:31 |
| 11 | about a business idea that they had involving | 03:06:36 |
| 12 | bringing high-quality direct-to-consumer products to | 03:06:42 |
| 13 | markets, and asked me to invest in it, and after I | 03:06:47 |
| 14 | reviewed their business plan and concluded that it | 03:06:52 |
| 15 | had a solid foundation and could be successful, I | 03:06:56 |
| 16 | decided to invest. | 03:07:04 |
| 17 | Q    And when did you first approached David | 03:07:10 |
| 18 | Reid and James Hardin about this business venture? | 03:07:12 |
| 19 | A    As I recall, at least Dave attended the | 03:07:16 |
| 20 | initial meeting where Josh and Jarrod presented | 03:07:23 |
| 21 | their business plan to us, and James Hardin might | 03:07:29 |
| 22 | have as well. | 03:07:34 |
| 23 | Q    Did Jarrod Bentley have a title in | 03:07:41 |
| 24 | Strataluz? | 03:07:44 |
| 25 | A    As I sit here, I don't know. | 03:07:49 |

Atkinson Baker, a Veritext Company
www.depo.com

```
 1      Q    Did Mr. Bentley have authority to bind        03:07:51
 2  Strataluz in contract?                                 03:07:55
 3      A    Without looking at the operating              03:07:57
 4  agreement, I don't know for sure.                      03:07:59
 5      Q    One moment, please.                           03:08:29
 6           (Exhibit 574 marked)                          03:08:31
 7  BY MR. ARHANGELSKY:                                    03:08:31
 8      Q    I've placed a document on screen that is      03:08:48
 9  marked as Exhibit 574, and has the Bates No.           03:08:50
10  NTG-67572.                                             03:08:55
11           Mr. Ferrell, do you recognize this           03:09:01
12  document?                                              03:09:01
13      A    I do.                                         03:09:06
14      Q    And what is this document?                    03:09:12
15      A    It's a delegation of authority document to    03:09:16
16  Jarrod to enable him to present credentials as a       03:09:22
17  officer of the company when entering into contracts    03:09:32
18  in the supply chain.                                   03:09:37
19      Q    And that Mr. Bentley was not permitted to     03:09:40
20  enter into any transaction or series of transactions   03:09:44
21  with more than $7,500 without your consent, is that    03:09:47
22  correct?                                               03:09:50
23      A    Having trouble reading this in the font.      03:09:54
24      Q    You should -- sorry.  You should have the     03:10:00
25  ability to enlarge it now.                             03:10:01
```

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | A   I see the reference to $7,500 there, but I | 03:10:09 |
| 2 | don't think that your description of how it applies | 03:10:12 |
| 3 | is accurate. | 03:10:17 |
| 4 | Q   What was wrong about my description? | 03:10:18 |
| 5 | A   You said that he couldn't bind the company | 03:10:21 |
| 6 | in contracts that exceeded $7,500, but as I read the | 03:10:24 |
| 7 | agreement, it gives him plenary authority excepting | 03:10:32 |
| 8 | any transaction that would involve incurring a debt | 03:10:41 |
| 9 | hypothecation encumbrance or a security interest | 03:10:51 |
| 10 | exceeding $7,500. | 03:10:55 |
| 11 | Q   Okay.  Did Mr. Bentley agree to this | 03:10:58 |
| 12 | arrangement? | 03:11:08 |
| 13 | A   I believe Mr. Bentley requested this | 03:11:12 |
| 14 | arrangement. | 03:11:14 |
| 15 | Q   Did Strataluz provide Mr. Bentley with a | 03:11:23 |
| 16 | physical office? | 03:11:25 |
| 17 | A   I don't believe so. | 03:11:26 |
| 18 | Q   What was Strataluz's business address? | 03:11:29 |
| 19 | A   I would have to look at the operative | 03:11:36 |
| 20 | documents to know for sure. | 03:11:38 |
| 21 | Q   Did Strataluz have a physical address? | 03:11:40 |
| 22 | A   I don't think that that's an easy question | 03:11:47 |
| 23 | to answer. | 03:11:48 |
| 24 | (Reporter clarification) | 03:11:52 |
| 25 | THE WITNESS:  An easy question to answer. | 03:11:53 |

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | As a start-up, I think Josh and Jarrod, | 03:11:56 |
| 2 | when they were working the operations, did it from | 03:12:00 |
| 3 | wherever they were. | 03:12:03 |
| 4 | BY MR. ARHANGELSKY: | 03:12:04 |
| 5 | Q    Did Strataluz have a home base? | 03:12:09 |
| 6 | A    Yes. | 03:12:12 |
| 7 | Q    What was that home base? | 03:12:14 |
| 8 | A    Jarrod's house. | 03:12:17 |
| 9 | Q    That was his residential property? | 03:12:20 |
| 10 | A    To my understanding. | 03:12:24 |
| 11 | Q    And was he residing in California? | 03:12:25 |
| 12 | A    I believe so. | 03:12:32 |
| 13 | Q    Did Strataluz provide Josh Weiss with a | 03:12:32 |
| 14 | physical address? | 03:12:36 |
| 15 | A    I don't believe Strataluz provided any of | 03:12:43 |
| 16 | us with a physical address.  We all had physical | 03:12:45 |
| 17 | addresses. | 03:12:49 |
| 18 | Q    What were Josh Weiss's responsibilities | 03:12:52 |
| 19 | for Strataluz? | 03:12:55 |
| 20 | A    Generally speaking, operations, contract | 03:12:59 |
| 21 | management, things of that nature. | 03:13:02 |
| 22 | Q    And did Josh Weiss perform work for | 03:13:10 |
| 23 | Strataluz? | 03:13:12 |
| 24 | A    I believe so. | 03:13:14 |
| 25 | Q    Did Strataluz have any employees? | 03:13:17 |

| | | |
|---|---|---|
| 1 | A      No. | 03:13:23 |
| 2 | Q      Did the Newport Trial Group firm use any | 03:13:30 |
| 3 | of its office resources in the operation of | 03:13:34 |
| 4 | Strataluz? | 03:13:34 |
| 5 | (Reporter clarification) | 03:13:38 |
| 6 | MR. ARHANGELSKY:  Use any of its office | 03:13:39 |
| 7 | resources in the operation of Strataluz? | 03:13:42 |
| 8 | THE WITNESS:  As I understand operations, | 03:13:51 |
| 9 | I think the answer is no.  I think what NTG was | 03:13:52 |
| 10 | provided back-office support. | 03:13:57 |
| 11 | BY MR. ARHANGELSKY: | 03:13:59 |
| 12 | Q      What back-office support did NTG provide? | 03:14:01 |
| 13 | A      Back-office support is a term of art for | 03:14:08 |
| 14 | the paperwork associated with the actual operations | 03:14:12 |
| 15 | of a company. | 03:14:18 |
| 16 | Q      Did Quintogos have its own bank accounts? | 03:14:25 |
| 17 | A      I don't know one way or the other. | 03:14:33 |
| 18 | (Exhibit 575 marked) | 03:14:35 |
| 19 | BY MR. ARHANGELSKY: | 03:14:35 |
| 20 | Q      I placed a document on the screen that | 03:15:12 |
| 21 | bears the Exhibit 575 and has the Bates No. | 03:15:14 |
| 22 | NTG-63833, which appears to be an e-mail from Sariah | 03:15:19 |
| 23 | Para to Dave Reid and others. | 03:15:25 |
| 24 | Have you ever seen this e-mail before, | 03:15:30 |
| 25 | Mr. Ferrell? | 03:15:31 |

| | | |
|---|---|---|
| 1 | BY MR. ARHANGELSKY: | 04:53:52 |
| 2 | Q    Posted a document online [sic] which I've | 04:54:28 |
| 3 | marked as Exhibit 586, and this is a Bates No. | 04:54:29 |
| 4 | NTG-66277. | 04:54:33 |
| 5 | And the one-page document, on the bottom | 04:54:35 |
| 6 | e-mail, is an e-mail from you, and you wrote: | 04:54:47 |
| 7 | ". . . once we have a male enhancement | 04:54:53 |
| 8 | pill, we can sue the competitors -- and | 04:54:56 |
| 9 | none of them like litigation or want to | 04:54:58 |
| 10 | hear from NTG." | 04:55:01 |
| 11 | Later you also wrote, "we can also force | 04:55:02 |
| 12 | the competitors to license that ingredient through | 04:55:08 |
| 13 | us as part of the settlement." | 04:55:12 |
| 14 | Do you see that? | 04:55:15 |
| 15 | A    Yes. | 04:55:17 |
| 16 | Q    Mr. Reid wrote you back in the next e-mail | 04:55:21 |
| 17 | in the sequence, and he said, "I promise that this | 04:55:24 |
| 18 | time I will not kill the old man who owns the | 04:55:30 |
| 19 | rights." | 04:55:33 |
| 20 | What was Dave Reid referring to in that | 04:55:35 |
| 21 | e-mail? | 04:55:37 |
| 22 | A    I believe that when Dave was negotiating | 04:55:44 |
| 23 | to secure ingredient rights for one of our products, | 04:55:53 |
| 24 | the owner of that company was an elderly man who | 04:56:04 |
| 25 | died right before the signature was presented to him | 04:56:13 |

| | | |
|---|---|---|
| 1 | for the license agreement, and I think that's what | 04:56:17 |
| 2 | that refers to. | 04:56:29 |
| 3 | (Exhibit 587 marked) | 04:56:30 |
| 4 | BY MR. ARHANGELSKY: | 04:56:30 |
| 5 | Q    Okay.  I have on screen another exhibit | 04:56:33 |
| 6 | marked 587, which is a series of e-mails that have | 04:57:06 |
| 7 | Bates number on the first page NTG-66354. | 04:57:12 |
| 8 | Mr. Ferrell, can you please take a look at | 04:57:18 |
| 9 | this e-mail and familiarize yourself? | 04:57:20 |
| 10 | A    Okay, I have read this document. | 04:57:43 |
| 11 | Q    On the second page, under your first | 04:57:48 |
| 12 | e-mail to members of Strataluz -- | 04:57:51 |
| 13 | A    I apologize.  I didn't realize there was a | 04:57:57 |
| 14 | second page.  Let me review that. | 04:57:59 |
| 15 | Q    Sure. | 04:58:01 |
| 16 | A    Okay, I have read it. | 04:58:30 |
| 17 | Q    What research have you specifically | 04:58:36 |
| 18 | performed to support the conclusion that the AKG | 04:58:38 |
| 19 | dietary ingredients improves male sexual | 04:58:42 |
| 20 | performance? | 04:58:45 |
| 21 | A    What ingredient -- what research had I | 04:58:49 |
| 22 | done in 2015, when I wrote this e-mail? | 04:58:53 |
| 23 | Q    Yes. | 04:58:58 |
| 24 | A    All of the research supported by the | 04:59:02 |
| 25 | patent, which, I believe, we looked at earlier but | 04:59:04 |

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | contained dozens of dense scholarly footnotes, | 04:59:09 |
| 2 | supporting what I believe is an indisputed fact. | 04:59:17 |
| 3 | Q   So your position is, the patent supports | 04:59:22 |
| 4 | the scientific premise that AKG improves male sexual | 04:59:25 |
| 5 | performance? | 04:59:30 |
| 6 | A   So I believe it's undisputed that the '364 | 04:59:35 |
| 7 | patent shows that AKG improves energy supply before, | 04:59:43 |
| 8 | during, and after physical exertion, and I believe | 04:59:52 |
| 9 | it's also indisputed that male sexual performance | 04:59:59 |
| 10 | requires energy and involves physical exertion.  Is | 05:00:08 |
| 11 | that what you're asking me? | 05:00:15 |
| 12 | Q   To the best of your recollection, does the | 05:00:17 |
| 13 | patent reference male sexual performance at any | 05:00:21 |
| 14 | place? | 05:00:24 |
| 15 | A   I'd have to look at the patent. | 05:00:31 |
| 16 | Q   Okay.  I'm going to need to find the | 05:00:34 |
| 17 | exhibit for the patent, but we'll come back to that | 05:01:41 |
| 18 | in a second. | 05:01:46 |
| 19 | Putting back on screen what was marked as | 05:01:56 |
| 20 | Exhibit 587. | 05:02:00 |
| 21 | Did you consult with any experts regarding | 05:02:03 |
| 22 | conclusion that the combination of Yohimbe, horny | 05:02:11 |
| 23 | goatweed, and AKG would improve the male erection? | 05:02:18 |
| 24 | A   Want to make sure that I understand your | 05:02:32 |
| 25 | question.  Are you asking me if I've ever consulted | 05:02:33 |

| | | |
|---|---|---|
| 1 | with an expert on erections about whether the | 05:02:38 |
| 2 | combination of Yohimbe, horny goatweed, and AKG | 05:02:45 |
| 3 | would improve the quality of erections or would | 05:02:52 |
| 4 | improve male sexual performance or some combination | 05:02:56 |
| 5 | thereof? | 05:02:59 |
| 6 | Q    Let's start with the male erection. | 05:03:01 |
| 7 | Did you ever -- prior -- prior to the day | 05:03:03 |
| 8 | when you sent this e-mail on May 21st, 2015, had you | 05:03:05 |
| 9 | consulted with any expert concerning the effect f | 05:03:08 |
| 10 | Yohimbe, horny goatweed, and AKG in combination on | 05:03:13 |
| 11 | the male erection? | 05:03:18 |
| 12 | A    I don't know whether I personally | 05:03:30 |
| 13 | consulted experts or simply reviewed the scientific | 05:03:32 |
| 14 | literature. | 05:03:36 |
| 15 | Q    You reviewed the scientific literature? | 05:03:40 |
| 16 | A    Yes. | 05:03:42 |
| 17 | Q    What scientific literature did you review? | 05:03:45 |
| 18 | A    There is a substantial amount of | 05:03:50 |
| 19 | scientific literature that relates to the component | 05:03:56 |
| 20 | ingredients of male sexual performance, which are | 05:04:06 |
| 21 | blood flow, NO2 uptake, and energy that I became | 05:04:12 |
| 22 | very familiar with when I was appointed lead counsel | 05:04:23 |
| 23 | in the Extenze litigation. | 05:04:29 |
| 24 | (Reporter clarification) | 05:04:32 |
| 25 | THE WITNESS:  Extenze, E-x-t-e-n-z-e. | 05:04:33 |

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | And so, while this was quite some time | 05:04:45 |
| 2 | ago, I know that, in that case, I became very | 05:04:49 |
| 3 | familiar with that combination of ingredients, and I | 05:04:56 |
| 4 | believe that is why the attorney from the attorney | 05:05:03 |
| 5 | general's office approached me about those cases. | 05:05:12 |
| 6 | BY MR. ARHANGELSKY: | 05:05:24 |
| 7 | Q   Did Strataluz ever conduct any clinical | 05:05:24 |
| 8 | research on its Promaxil formulation? | 05:05:27 |
| 9 | A   I don't believe that Strataluz conducted | 05:05:33 |
| 10 | clinical research on the coherent blend of its | 05:05:36 |
| 11 | formulation, but I do know that the component | 05:05:47 |
| 12 | ingredients were the subject of substantial clinical | 05:05:52 |
| 13 | research over a number of decades. | 05:05:58 |
| 14 | Q   Okay.  I think my question, though, was, | 05:06:01 |
| 15 | Did Strataluz specifically submit its Promaxil | 05:06:03 |
| 16 | formulation for clinical research?  And I believe -- | 05:06:10 |
| 17 | A   That wasn't your question. | 05:06:12 |
| 18 | Q   Well, the question I'm asking now is, Did | 05:06:14 |
| 19 | Strataluz specifically commission any clinical | 05:06:17 |
| 20 | research for its Promaxil formulation? | 05:06:22 |
| 21 | A   As I sit here, I don't know whether | 05:06:29 |
| 22 | Strataluz commissioned any clinical research | 05:06:34 |
| 23 | regarding Promaxil. | 05:06:41 |
| 24 | Q   What research did Strataluz specifically | 05:06:43 |
| 25 | pay for in regards to the Promaxil product? | 05:06:45 |

| | | |
|---|---|---|
| 1 | A    I don't understand what you mean by paying | 05:06:54 |
| 2 | for research.  It suggests some kind of wrongdoing | 05:06:58 |
| 3 | to me. | 05:07:04 |
| 4 | Q    Research costs money, doesn't it? | 05:07:07 |
| 5 | A    Not the research that I've done. | 05:07:11 |
| 6 | Q    All right. | 05:07:13 |
| 7 | A    Typically, if you want to know the | 05:07:16 |
| 8 | efficacy of any product, be it a dietary supplement | 05:07:19 |
| 9 | or something like colloidal silver, you can go to | 05:07:24 |
| 10 | the national institute for health website, look at | 05:07:28 |
| 11 | the library of tens of thousands of clinical studies | 05:07:32 |
| 12 | and distill from that reasoned opinions about the | 05:07:45 |
| 13 | efficacy of a product as well as its side effects. | 05:07:48 |
| 14 | Q    I move to strike this as narrative | 05:07:52 |
| 15 | response as unresponsive. | 05:07:54 |
| 16 | Let's ask this:  It's true, is it not, | 05:07:57 |
| 17 | that Strataluz didn't pay any money with respect to | 05:08:00 |
| 18 | the Promaxil product for clinical research? | 05:08:02 |
| 19 | A    I don't believe Strataluz paid any money | 05:08:11 |
| 20 | to commission clinical research on the blend of | 05:08:17 |
| 21 | ingredients in Promaxil other than the research that | 05:08:21 |
| 22 | had already been done on the component ingredients. | 05:08:24 |
| 23 | Q    But Strataluz didn't pay for that | 05:08:27 |
| 24 | research, right? | 05:08:31 |
| 25 | A    No.  Strataluz didn't pay for the research | 05:08:34 |

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | that had been done over the decades that support the | 05:08:38 |
| 2 | efficacy of those ingredients other than through | 05:08:42 |
| 3 | acquisition of the licenses and patent. | 05:08:47 |
| 4 | Q    And that acquisition the [sic] license and | 05:08:49 |
| 5 | patent cost Strataluz one dollar; is that right? | 05:08:51 |
| 6 | A    Are you referring specifically to the | 05:08:56 |
| 7 | patent/license that Strataluz obtained from | 05:09:01 |
| 8 | Tawnsaura? | 05:09:06 |
| 9 | Q    From Harcol, I believe, right? | 05:09:07 |
| 10 | A    It may have been Harcol, but from one of | 05:09:11 |
| 11 | them, Strataluz obtained a one-dollar perpetual | 05:09:15 |
| 12 | royalty use to document the entitlement to use the | 05:09:25 |
| 13 | patented claims. | 05:09:30 |
| 14 | Q    Did -- other than that one-dollar payment, | 05:09:33 |
| 15 | did Strataluz pay any other money to Harcol in | 05:09:36 |
| 16 | association with the AKG ingredient? | 05:09:38 |
| 17 | A    Not that I know of. | 05:09:46 |
| 18 | (Exhibit 588 marked) | 05:09:46 |
| 19 | MR. ARHANGELSKY:  All right, I've posted | 05:09:46 |
| 20 | an exhibit in front of the witness on screen marked | 05:10:23 |
| 21 | 588, and this has -- it's a document the [sic] Bates | 05:10:26 |
| 22 | number on first page NTG-70553. | 05:10:30 |
| 23 | Q    (By Mr. Arhangelsky)  Please have a look at | 05:10:35 |
| 24 | this document, Mr. Ferrell. | 05:10:40 |
| 25 | A    Okay, I have reviewed this document. | 05:11:03 |

Atkinson Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | Q    Now, Mr. Bentley, on the first page, asked | 05:11:09 |
| 2 | you whether the 300 milligrams of the AKG ingredient | 05:11:16 |
| 3 | was an effective dose.  You responded "Yep." | 05:11:20 |
| 4 | How did you determine that 300 milligrams | 05:11:26 |
| 5 | would be an effective dose? | 05:11:29 |
| 6 | A    I don't know for certain that that's what | 05:11:54 |
| 7 | my e-mail says. | 05:11:57 |
| 8 | Q    Okay, Mr. Bentley did ask you, "Is 300mg | 05:12:04 |
| 9 | an effective does [sic]," question mark. | 05:12:08 |
| 10 | And your response was "Yep." | 05:12:10 |
| 11 | MR. DARNELL:  Objection.  Misstates the | 05:12:16 |
| 12 | document. | 05:12:17 |
| 13 | THE WITNESS:  Yes, but preceding that he | 05:12:18 |
| 14 | states that he spoke with the formulation people | 05:12:20 |
| 15 | about the serving, and then says to me, "I [sic] | 05:12:23 |
| 16 | want to make sure before proceeding," and I say | 05:12:29 |
| 17 | "Yep." | 05:12:32 |
| 18 | BY MR. ARHANGELSKY: | 05:12:33 |
| 19 | Q    Okay.  So he's not consulting you with | 05:12:33 |
| 20 | respect to the effective dose of the ingredient? | 05:12:35 |
| 21 | A    I don't know whether he is or not from | 05:12:39 |
| 22 | this document, but it would be a relatively easy | 05:12:41 |
| 23 | thing for me to determine whether 300 milligrams of | 05:12:48 |
| 24 | AKG, excuse me, would have an efficacious effect on | 05:12:53 |
| 25 | male enhancement, if that's what you're asking. | 05:13:02 |

Atkinson Baker, a Veritext Company
www.depo.com

```
 1                    CERTIFICATE OF REPORTER

 2           I, Quyen N. Do, CSR No. 12447, a Certified

 3   Shorthand Reporter, hereby certify that the witness in

 4   the foregoing deposition was, by me, duly sworn to tell

 5   the truth, the whole truth, and nothing but the truth in

 6   the within-entitled cause;

 7           That said deposition was taken down in

 8   shorthand by me, a disinterested person, at the time and

 9   place therein stated, and that the testimony of the said

10   witness was thereafter reduced to typewriting, by

11   computer, under my direction and supervision;

12           That before completion of the deposition,

13   review of the transcript [ ] was [X] was not requested.

14   If requested, any changes made by the deponent (and

15   provided to the reporter) during the period allowed are

16   appended hereto.

17           I further certify that I am not of counsel or

18   attorney for either or any of the parties to the said

19   deposition, nor in any way interested in the event of

20   this cause, and that I am not related to any of the

21   parties thereto.

22

23           DATED:  April 8, 2021

24           _____

25                   Quyen N. Do, CSR No. 12447
```