# EXHIBIT 5

Atkinson-Baker, a Veritext Company
www.depo.com

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4
                                        )
5    NATURAL-IMMUNOGENICS CORP.,         )    CERTIFIED COPY
                                        )
6         Plaintiff,                     )
                                        )  Case No.
7         vs.                            )  8:15-cv-02034-JVS (JCG)
                                        )
8    NEWPORT TRIAL GROUP, et al.,        )  (JW Ref. No.:  A270221)
                                        )
9         Defendants.                    )
                                        )
10                                       )

11

12              C O N F I D E N T I A L

13

14      DEPOSITION OF 30(b)(6) SCOTT J. FERRELL

15              Santa Ana, California

16             Thursday, April 1, 2021

17

18

19

20

21   Reported by:
     RAQUEL L. BROWN
22   CSR No. 10026, RPR

23   Job No. CA 4524737

24

25   PAGES 1 - 240

```
1                 IN THE UNITED STATES DISTRICT COURT

2               FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4                                     )
5   NATURAL-IMMUNOGENICS CORP.,       )
                                      )
6          Plaintiff,                 )
                                      ) Case No.
7          vs.                        ) 8:15-cv-02034-JVS (JCG)
                                      )
8   NEWPORT TRIAL GROUP, et al.,      ) (JW Ref. No.:  A270221)
                                      )
9          Defendants.                )
                                      )
10                                    )

11

12

13

14              Deposition of SCOTT J. FERRELL,

15   taken on behalf of Plaintiff at 2700 North Main Street,

16   Suite 420, Santa Ana, California 92705, beginning at

17   9:02 a.m. and ending at 5:56 p.m. on Thursday, April 1,

18   2021, before RAQUEL L. BROWN, Certified Shorthand Reporter

19   No. 10026, Registered Professional Reporter.

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3   For Plaintiff Natural-Immunogenics Corp.:

 4          EMORD & ASSOCIATES

 5          BY:  PETER A. ARHANGELSKY, Attorney at Law

 6          BY:  JOSHUA S. FURMAN, Attorney at Law

 7          2730 South Val Vista Drive, Building 6, Suite 133

 8          Gilbert, Arizona 85295

 9          (602) 388-8899

10          parhangelsky@emord.com

11          jfurman@emord.com

12          (APPEARING REMOTELY)

13

14

15   For Defendants Ryan Ferrell, Andrew Baslow, David Reid,

16   and Victoria Knowles:

17          BREMER WHYTE BROWN & O'MEARA, LLP

18          BY:  KYLE A. RIDDLES, Attorney at Law

19          20320 S.W. Birch Street, Second Floor

20          Newport Beach, California 92660

21          (949) 211-1000

22          kriddles@bremerwhyte.com

23          (APPEARING REMOTELY)

24

25
```

Atkinson-Baker, a Veritext Company
www.depo.com

```
1   (APPEARANCES CONTINUED)

2

3   For Defendants/Counter-Claimants Newport Trial Group and

4   Scott Ferrell:

5          CALLAHAN & BLAINE

6          BY:  DAVID J. DARNELL, Attorney at Law

7          3 Hutton Centre Drive, Ninth Floor

8          Santa Ana, California 92707

9          (714) 241-4444

10         ddarnell@callahan-law.com

11

12

13  For Defendants Andrew Nilon, Giovanni Sandoval,

14  Sam Schoonover, Matthew Dronkers, Taylor Demulder, and

15  Sam Pfleg:

16         FORD & DIULIO, PC

17         BY:  BRENDAN M. FORD, Attorney at Law

18         650 Town Center Drive, Suite 760

19         Costa Mesa, California 92625

20         (714) 384-5540

21         bford@forddiulio.com

22         (APPEARING REMOTELY)

23

24  Also Present:

25  MICHAEL KELLEY, Videographer
```

1  relate to NTG's use of tester plaintiffs?

2      MR. DARNELL:  Objection, exceeds --

3      MR. ARHANGELSKY:  I'm interested in the name of the

4  document itself.

5      MR. DARNELL:  Objection, exceeds the scope.                    10:42:57

6      THE WITNESS:  I don't think there are any documents on

7  the internet that describe NTG's use of tester plaintiffs

8  as it relates to best practices.  Are you asking me which

9  of the practice guides I consult?

10 BY MR. ARHANGELSKY:                                               10:43:19

11     Q    Which of the practice guides by name do you

12 consult with respect to NTG's use of testers?

13     MR. DARNELL:  Objection, exceeds the scope.

14     THE WITNESS:  I can certainly tell you all of the ones

15 that I recall.  It would start with the publications by      10:43:35

16 CAALA and Public Justice as well as the notes published

17 about consumer litigation on Law360 and various updates as

18 it relates to the scope of approved testers, the instances

19 in which they can be properly disclosed or should be

20 disclosed as well as publications regarding our own work     10:44:15

21 advancing the law in those areas.  There is also a

22 handbook entitled Best Practices In Consumer Litigation or

23 something thereabout that I reference frequently.  I

24 believe it was published by CAALA or a similar

25 organization.                                                 10:44:56

1    BY MR. ARHANGELSKY:

2        Q    And are those documents available on-line?

3        A    Yes.

4        Q    Prior to 2016, did NTG keep any internal records

5    that identify which of its clients were testers?          10:45:14

6        MR. DARNELL:  Objection, exceeds the scope.

7        THE WITNESS:  Not that I know of.

8    BY MR. ARHANGELSKY:

9        Q    Who at the NTG firm decides whether to use tester

10   plaintiffs in litigation?                                  10:45:41

11       MR. DARNELL:  Objection, exceeds the scope.

12       THE WITNESS:  So just to be clear, you keep using the

13   phrase tester plaintiffs and I want to make sure that

14   every time you use that we agree that the definition of a

15   tester plaintiff is the one set forth in our discovery     10:46:03

16   responses and not a different definition that you may

17   have.  Are we agreed there?

18   BY MR. ARHANGELSKY:

19       Q    Your firm's the firm that has since rejected

20   tester and we'll use your definition of tester.  Based on  10:46:22

21   your understanding of what the definition of tester is,

22   I'm asking who at NTG decides to use tester plaintiffs in

23   litigation?

24       MR. DARNELL:  And respectfully I just object to the

25   preamble and the statement made by counsel, but you can    10:46:37

Atkinson-Baker, a Veritext Company
www.depo.com

1  answer the question.

2      THE WITNESS:  So ultimately it's my decision and my

3  obligation to ensure that the clients that we work with

4  are individuals who intend to act lawfully and ethically

5  to help eradicate unlawful practices that harm consumers        10:47:01

6  and the general public.

7  BY MR. ARHANGELSKY:

8      Q     And prior to 2016, which attorneys at the NTG

9  firm were aware that the firm used tester plaintiffs in

10 litigation?                                                     10:47:19

11     MR. DARNELL:  Objection, exceeds the scope.

12     MR. RIDDLES:  Objection, calls for speculation.

13     THE WITNESS:  So again incorporating by reference the

14 definition of tester, I can tell you that every attorney

15 and every employee of NTG knows that I expect that we and     10:47:42

16 our clients will act lawfully and ethically when we are

17 trying to eradicate unlawful practices that harm the

18 consumers and the general public.

19     MR. ARHANGELSKY:  Can the court reporter please read

20 back my last question to the witness.                          10:48:11

21         (WHEREUPON, THE RECORD WAS READ BY THE COURT

22     REPORTER AS FOLLOWS:

23         "Question:  And prior to 2016, which

24     attorneys at the NTG firm were aware that the firm

25     used tester plaintiffs in litigation?")                    10:47:18

1  BY MR. ARHANGELSKY:

2      Q     So is your response all of them?

3      A     My answer speaks for itself.  Do you want me to

4  restate the answer?

5      Q     I'm asking specifically which attorneys were        10:48:40

6  aware that the NTG firm used testers in litigation.

7      MR. DARNELL:  Same objections as previously noted.

8      THE WITNESS:  So you're asking me to guess as to the

9  knowledge of what attorneys knew what in 2016 as it

10  related to our obligations to act lawfully and ethically?   10:49:04

11  BY MR. ARHANGELSKY:

12     Q     Can you answer the question?

13     A     Other than the answer I gave which I -- I think

14  was thorough, I would just be guessing.

15     Q     Okay.  And to the best of your knowledge which     10:49:24

16  attorneys by name knew prior to 2016 that the NTG firm

17  used tester plaintiffs in CIPA litigation?

18     MR. DARNELL:  Objection, exceeds the scope, calls for

19  speculation.

20     THE WITNESS:  Certainly the ones I've already           10:49:43

21  identified, um, Lee Jackson, Jason Kerr, Angel Garganta --

22  BY MR. ARHANGELSKY:

23     Q     I was asking attorneys within NTG, Mr. Ferrell.

24  I don't mean to interrupt you, but I think you might have

25  misunderstood the question and I'll ask it again if it     10:50:01

Atkinson-Baker, a Veritext Company
www.depo.com

1  half an hour, but I want to be mindful of everyone else's

2  circumstances, as well.

3          The court reporter says she's good.

4     MR. ARHANGELSKY:  Let's go until your lunch arrives.

5          Now I've placed a document on screen for the          12:30:09

6  witness which we've marked as Exhibit 632.

7   (Plaintiff's Exhibit 632 was marked for identification.)

8  BY MR. ARHANGELSKY:

9     Q     Mr. Ferrell, do you recognize this document?

10    A     I'm reviewing it right now.                           12:30:22

11          Okay.  I've reviewed this document.

12    Q     Okay.  On page 2 which is -- has the

13  Bates No. NTG 66449 at the bottom and in the paragraph

14  which is numbered no. 3, you wrote as the second sentence

15  I imagine we should be sending out about 20 demand letters  12:31:49

16  a week between the ADA websites, wiretaps, and Strataluz

17  stuff and probably filing at least an average of three

18  cases per week.  Do you see that?

19    A     I do.

20    Q     Now, in this period of time did NTG hit its goal    12:32:10

21  of sending 20 demand letters per week?

22    MR. DARNELL:  Objection, mischaracterizes the

23  document, exceeds the scope.

24    THE WITNESS:  I don't think that's properly described

25  as a goal.  I think it was a reflection of the fact that    12:32:39

1   we were being overwhelmed with potential plaintiff cases

2   and we were discussing formalizing the paperwork between

3   Carla and Mandy.  If your question is did we end up

4   sending out an average of 20 demand letters per week, then

5   the answer is no.                                                12:33:23

6   BY MR. ARHANGELSKY:

7      Q     In 2015, could you approximate how many demand

8   letters per week the NTG firm was sending?

9      MR. DARNELL:  Objection, as phrased exceeds the scope.

10     THE WITNESS:  Nowhere near 20, but I can certainly          12:33:42

11  review any documents that might reflect that.

12  BY MR. ARHANGELSKY:

13     Q     NTG filed a complaint on behalf of Sam Schoonover

14  in March 2012 against Vogue International; is that right?

15     A     I know that we filed a case against Vogue in         12:34:05

16  which Mr. Schoonover was the plaintiff.  I don't know the

17  precise date.  But if you show it to me, I can confirm

18  that your date is accurate.

19     Q     Was Andrew Baslow the field representative who

20  worked with Sam Schoonover in that case?                        12:34:30

21     A     I believe so.

22     Q     NTG only had two field reps. at the time; is that

23  right?

24     A     That is correct.

25     Q     That was Mr. Baslow and your father Wynn Ferrell,     12:34:38

1   correct?

2       A     That's correct.

3       Q     Did you ask Mr. Baslow to find class

4   representatives for litigation against Vogue

5   International?                                         12:35:00

6       MR. DARNELL:  Objection.  That exceeds the scope.

7       THE WITNESS:  No.  I don't believe so.

8   BY MR. ARHANGELSKY:

9       Q     Did you ask Mr. Baslow to contact Mr. Schoonover

10  in relation to the Vogue case?                         12:35:13

11      MR. DARNELL:  Objection, exceeds the scope.

12      THE WITNESS:  I know that Andrew and I had a

13  discussion about Mr. Schoonover and the Vogue case and

14  that Mr. Schoonover had used their products repeatedly

15  believing that they were organic and had complained to   12:35:43

16  Andrew or to someone that came back to Andrew that he was

17  angry that the products were not organic and I know that

18  we had that discussion.

19  BY MR. ARHANGELSKY:

20      Q     And when exactly was that discussion you had that  12:36:06

21  with Mr. Baslow?

22      MR. DARNELL:  Objection, exceeds the scope.

23      THE WITNESS:  It was a decade ago.  I don't know the

24  precise date.

25  ///

1   BY MR. ARHANGELSKY:

2       Q     Okay.  Was that conversation with Mr. Baslow on

3   the phone?

4       MR. DARNELL:  Same objection.

5       THE WITNESS:  I don't know whether it was on the          12:36:25

6   phone, in person, or a combination of the prefatory work

7   being done in email and then having an in-person or a

8   phone conversation.

9   BY MR. ARHANGELSKY:

10      Q     And so what exactly did Mr. Baslow tell you about   12:36:42

11  Mr. Schoonover at the time?

12      MR. DARNELL:  Objection, exceeds the scope.

13      THE WITNESS:  A student named Talee Rooney had either

14  attended one of my lectures or seen one of my lectures in

15  a class and had been inspired by it and wanted to          12:37:06

16  participate in trying to make the consumer marketplace a

17  safer place for consumers.  Somehow she put us in touch or

18  put Mr. Schoonover in touch with us.  At the time

19  greenwashing or describing something as organic when it

20  really was not was very topical.  Mr. Schoonover had used  12:37:54

21  a product manufactured by Organics, a shampoo and

22  conditioner, for several years believing that it was

23  organic since its name was Organics.  And around the same

24  time we started investigating the OGX company for this

25  greenwashing, we learned that Mr. Schoonover had a         12:38:39

Atkinson-Baker, a Veritext Company
www.depo.com

1   says 8-9, 2016.

2       A     Yes.

3       Q     That you believe might be the date it was

4   printed?

5       MR. DARNELL:  Objection, lacks foundation.                    01:56:59

6       THE WITNESS:  I have no idea.

7   BY MR. ARHANGELSKY:

8       Q     So are you saying you don't know either way

9   whether this document was -- well, let me ask you a

10  different question.                                               01:57:10

11          Was this document sent to Mr. Baslow on July 17,

12  2012, at 9:24 a.m.?

13      MR. DARNELL:  Objection, lacks foundation.

14      THE WITNESS:  I have no idea.

15  BY MR. ARHANGELSKY:                                               01:57:21

16      Q     NTG asked all of its wiretap clients to send

17  confirmation emails like this; is that right?

18      MR. DARNELL:  Objection, exceeds the scope.

19      THE WITNESS:  I don't know.  I have -- this does

20  refresh my memory in some regards, but not in the way that       01:57:51

21  you've just asked that question.

22  BY MR. ARHANGELSKY:

23      Q     Well, did NTG ask any of its wiretap clients to

24  send confirmation emails after completing their wiretap

25  calls?                                                            01:58:13

1    MR. DARNELL:  Objection, exceeds the scope.

2    THE WITNESS:  So I didn't have communication with

3  those people, but I can tell you what my instructions

4  were.

5  BY MR. ARHANGELSKY:                                    01:58:26

6    Q    And by your instructions are you referring to

7  instructions you gave Mr. Baslow?

8    A    The instructions I gave Andrew and everyone else

9  at the firm who was working on the matters.

10    Q    Well, did you specifically instruct Mr. Baslow to  01:58:37

11  obtain confirmation statements from wiretap clients after

12  they completed their calls?

13    MR. DARNELL:  Objection, exceeds the scope, compound.

14    THE WITNESS:  Not in those words, but what I did tell

15  Andrew was that it had been our experience that companies  01:59:03

16  would always deny that they had received or recorded a

17  call in the first instance and so it was important for us

18  to have documented the timing of the call as well as the

19  details of the call, whether it was a initial call, a

20  confirmatory call, or an investigative call.           01:59:43

21  BY MR. ARHANGELSKY:

22    Q    Okay.  And did NTG ever submit one of these

23  confirmation emails to a court of law in support of any

24  wiretap lawsuit?

25    MR. DARNELL:  Objection, exceeds the scope.          02:00:06

1      THE WITNESS:  I don't know.

2    BY MR. ARHANGELSKY:

3      Q     Did NTG ever provide these confirmation

4    statements to opposing counsel in one of its wiretap

5    cases?                                                    02:00:22

6      MR. DARNELL:  Objection, exceeds the scope.

7      THE WITNESS:  Yes, we did.

8    BY MR. ARHANGELSKY:

9      Q     And that was for the purpose of identifying that

10   the call had been completed as alleged?                   02:00:33

11     MR. DARNELL:  Same objection.

12     THE WITNESS:  It could have a lot of different

13   purposes.  But typically at least in instances where a

14   defendant retained competent counsel, their counsel would

15   instruct the company to immediately stop committing       02:00:55

16   felonies and would reach out to us and together we would

17   try and determine the scope of the misconduct involved and

18   one of the best practices in doing that was to submit

19   either the client's summary or an abstract of the client's

20   summary to the opposing counsel.                          02:01:27

21   BY MR. ARHANGELSKY:

22     Q     Did you -- I'm sorry.

23          Did NTG ever supply these confirmation statements

24   to co-counsel after referring out a wiretap case?

25     MR. DARNELL:  Objection, exceeds the scope.             02:01:45

1    THE WITNESS:  I believe so.

2  BY MR. ARHANGELSKY:

3    Q    I'm sorry.  The purpose of providing co-counsel

4  with a confirmation statement was consistent with your

5  last response, is -- was to use that to help address the          02:02:16

6  alleged violations?

7    MR. DARNELL:  Objection, exceeds the scope.

8    THE WITNESS:  Oftentimes with co-counsel it was just a

9  matter of co-counsel doing their due diligence to ensure

10  it was a meritorious case.                                        02:02:35

11    MR. ARHANGELSKY:  I need just a second.  I'm going to

12  have to go off record just a second because I need to load

13  a document that didn't load properly.  Can I have just

14  two minutes, please?

15    MR. DARNELL:  Sure.                                             02:03:11

16    THE VIDEOGRAPHER:  This is the end of Media File

17  No. 4.  We're now going off the record.  The time is

18  2:03 p.m.

19              (BRIEF RECESS.)

20    THE VIDEOGRAPHER:  This is the beginning of Media File          02:08:48

21  No. 5.  We're now going on the record.  The time is

22  2:09 p.m.

23    MR. ARHANGELSKY:  Okay.  I have placed a document in

24  front of the witness which is marked as Exhibit 637.

25    (Plaintiff's Exhibit 637 was marked for identification.)        02:09:13

1  BY MR. ARHANGELSKY:

2      Q     And, Mr. Ferrell, have you ever seen this

3  document?

4      A     I believe so.  Let me just double-check.

5      MR. DARNELL:  Did we skip one?                          02:09:36

6      MR. ARHANGELSKY:  So I think I'm going to need to

7  clean it up.  I think there was an erroneous entry of 636

8  and I can't put a duplicate in.  I'm going to have to have

9  LiveLitigation remove that entry later and we're going to

10 have to have a blank exhibit.                               02:09:45

11     MR. DARNELL:  That's fine.  I want to make sure I

12 wasn't missing something.  Okay.  Thank you.

13     THE WITNESS:  Okay.  I have reviewed the document and

14 I recognize this document.

15 BY MR. ARHANGELSKY:                                         02:10:02

16     Q     And is this the complaint that NTG filed on

17 behalf of Mr. Schoonover against Himalaya Drug?

18     A     Yes.

19     Q     And you electronically signed this complaint

20 before filing it; is that right?                            02:10:14

21     A     Yes.

22     Q     What steps did you take to ensure this complaint

23 was accurate before it was filed?

24     A     As applied here we undertook an investigation to

25 make sure that the factual assertions in the complaint     02:10:39

1    MR. DARNELL:  Objection, exceeds the scope, lacks

2  foundation.

3    THE WITNESS:  Other than what it says here in

4  paragraph two of his declaration, I don't know.

5  BY MR. ARHANGELSKY:                                03:54:22

6    Q    Do you know what the purpose of Mr. Baslow

7  contacting Cynthia Sandoval was in October 2013?

8    MR. DARNELL:  Objection, exceeds the scope.

9    THE WITNESS:  I don't.

10 BY MR. ARHANGELSKY:                                03:54:39

11    Q    Now, was your father Wynn Ferrell the field

12 representative who assisted NTG in the Torres Nutrisystem

13 matter?

14    A    I don't know.

15    Q    Just a minute.  I'm pulling up a document.    03:55:45

16        The Torres v. Nutrisystem case was a CIPA wiretap

17 case; is that right?

18    A    Yes.

19    Q    Was Raquel Torres a tester in that CIPA case?

20    A    As I understand the phrase tester, which is a    03:56:37

21 very broad definition that we've already provided, I think

22 it's unclear.  I read her deposition transcript and I

23 don't think she perceived herself as a tester.

24    MR. ARHANGELSKY:  I placed a document on screen which

25 I've marked as Exhibit 650.                          03:57:13

Atkinson-Baker, a Veritext Company
www.depo.com

1    (Plaintiff's Exhibit 650 was marked for identification.)

2  BY MR. ARHANGELSKY:

3    Q    Mr. Ferrell, please review this document.  My

4  question will be whether this is a document that NTG has

5  produced to NIC in this case.                                03:57:24

6    A    Yes.

7    Q    Okay.  And at the top here you wrote to your

8  father Wynn Ferrell, Hi, Dad.  Thanks for handling the

9  wiretaps below.  Do you see that?

10   A    I do.                                                 03:57:53

11   Q    And does that refresh your recollection as to

12 whether Wynn Ferrell was a field representative assigned

13 to the Torres v. Nutrisystem case?

14   A    Is there a second page here?  Okay.  There is a

15 second page.                                                 03:58:18

16        Okay.  I see that.  And, yes, it does refresh my

17 memory.

18   Q    Was that the first date that Wynn Ferrell

19 communicated with Raquel Torres in any fashion?

20   MR. DARNELL:  Objection, exceeds the scope.               03:58:41

21   THE WITNESS:  As I sit here, I have no idea.

22 BY MR. ARHANGELSKY:

23   Q    You wrote at the top of this document, relating

24 to the same email to your father, As a reminder to our

25 plaintiffs, each of them will need to advise us of what     03:58:57

1  confidential information that they shared with the

2  defendant.  It will need to be completely accurate because

3  the defendants will have a recording of the calls.  Do you

4  see that?

5      A    Yes.                                          03:59:07

6      Q    Are you referring here to the confirmation

7  statements that wiretap clients would provide the firm

8  after their calls?

9      A    I believe so.

10     Q    And when did Wynn Ferrell ask Raquel Torres to   03:59:35

11  provide a confirmation statement?

12     A    I don't know.

13     Q    All right.  Do you know if he did ask

14  Raquel Torres to provide a confirmation statement?

15     MR. DARNELL:  Objection, exceeds the scope.        03:59:51

16     THE WITNESS:  I don't.

17  BY MR. ARHANGELSKY:

18     Q    Okay.  Do you know -- I'll strike that.

19          When did Raquel Torres make her call to

20  Nutrisystem?                                           04:00:09

21     A    I thought -- I was under the impression she made

22  more than one call.

23     Q    When did she make the first call to Nutrisystem?

24     A    I don't know, but there are documents from the

25  underlying case that would reflect that.              04:00:25

1    Q    And did Andrew Baslow perform an audit call to

2  Nutrisystem prior to the date when Raquel Torres called

3  Nutrisystem?

4    MR. DARNELL:  Objection, exceeds the scope.

5    THE WITNESS:  I would have to look at it.  But I                04:00:49

6  believe before Ms. Torres ever came into the picture, we

7  had been contacted by at least one other individual who

8  had seen a story about illegal recording and I think it

9  maybe tipped us off to it and so I asked Andrew to

10  investigate and perform an audit response in that regard.        04:01:21

11  And I don't know as I sit here whether Andrew performed a

12  series of calls as it related to this first individual or

13  individuals or another series as it relates to Ms. Torres

14  or some combination there.

15  BY MR. ARHANGELSKY:                                              04:01:54

16    Q    I think you're referring to Richard Richardson.

17  Is that the individual who you allege tipped Newport Trial

18  Group off?

19    A    That name is familiar.  I -- I believe there was

20  more than one person.                                            04:02:14

21    Q    Have you ever personally spoken with

22  Raquel Torres?

23    A    At least one time that I recall.

24    Q    When was that time when you personally spoke with

25  Raquel Torres?                                                   04:02:38

1     A     As I recall from looking at their declarations

2     and testimony, um, the evening of September 4th and then

3     again maybe the morning of September 5th.

4     Q     And after you received a copy of the draft on

5     September 4th, did you revise that document in any way?     04:42:39

6     A     I believe I wordsmithed it.

7     Q     Does the final version of this declaration that

8     Mr. Bobba signed contain any text that you authored?

9     A     I don't know.

10    Q     Sitting here right now you can't point to any     04:43:25

11    information in this document -- I'm sorry -- any language

12    in this document that you yourself authored?

13    A     Correct.

14    Q     Okay.  Who is Michael Velarde?

15    A     Mike was an associate at Newport Trial Group.     04:43:55

16    Q     And as of September 2010, how long had

17    Mr. Velarde been an attorney?

18    A     I would have to look at his bar information to

19    know for sure, but he was relatively new.

20    MR. ARHANGELSKY:  Okay.  I've placed another exhibit     04:44:48

21    in front of the witness which I've marked as Exhibit 655

22    and this has a document that has a Bates number on the

23    first page NTG 11604.

24     (Plaintiff's Exhibit 655 was marked for identification.)

25    ///

Atkinson-Baker, a Veritext Company
www.depo.com

| | | |
|---|---|---|
| 1 | A     As in real estate? | |
| 2 | Q     Yes. | |
| 3 | A     No. | |
| 4 | Q     Does the NTG firm lease any real estate? | |
| 5 | A     Yes. | 05:19:59 |
| 6 | Q     What real estate does it lease? | |
| 7 | A     Our office premises at 4100 Newport Drive. | |
| 8 | Q     And what is NTG's monthly expenses with respect | |
| 9 | to that property? | |
| 10 | A     I believe it's approximately ███████. | 05:20:22 |
| 11 | Q     Are NTG employees paid on a biweekly basis? | |
| 12 | A     Payroll's on the 15th and the 30th -- or the 15th | |
| 13 | and the last day of the month. | |
| 14 | Q     What is the amount of NTG's total financial | |
| 15 | obligations paid for employee compensation on a monthly | 05:21:00 |
| 16 | basis? | |
| 17 | A     Are you asking what our monthly payroll is? | |
| 18 | Q     Yes. | |
| 19 | MR. DARNELL:  Objection, vague as to time. | |
| 20 | THE WITNESS:  Right now it varies, um, between ███████ | 05:21:26 |
| 21 | ███████. | |
| 22 | BY MR. ARHANGELSKY: | |
| 23 | Q     And why would it vary between ███████? | |
| 24 | A     If we pay or when we pay year-end bonuses at the | |
| 25 | end of every year, it inflates our payroll that month. | 05:21:56 |

CONFIDENTIAL

1

2

3

4        I, the undersigned, a Certified Shorthand

5  Reporter of the State of California, do hereby certify:

6        That the foregoing proceedings were taken before

7  me at the time and place herein set forth; that any

8  witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim record

10  of the proceedings was made by me using machine shorthand

11  which was thereafter transcribed under my direction;

12  further, that the foregoing is an accurate transcription

13  thereof.

14        I further certify that I am neither financially

15  interested in the action nor a relative or employee of any

16  attorney or any of the parties.

17        IN WITNESS WHEREOF, I have this date subscribed

18  my name.

19

20  Dated:  4/8/21

21

22

23

   RAQUEL L. BROWN

24  CSR No. 10026, RPR

25

                                        Page 240