# EXHIBIT 9

Atkinson-Baker, Inc.
www.depo.com

```
 1

 2            IN THE UNITED STATES DISTRICT COURT

 3           FOR THE CENTRAL DISTRICT OF CALIFORNIA

 4
    NATURAL-IMMUNOGENICS CORP.,
 5
              Plaintiff,
 6                                    Case No.
    vs.                               8:15-cv-02034-JVS
 7                                    (JCGx)
    NEWPORT TRIAL GROUP, et al.,
 8
          Defendants.
 9  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

10

11
                 VIDEOTAPED DEPOSITION OF
12
                    RYAN MARK FERRELL
13
                     GILBERT, ARIZONA
14
                    OCTOBER 29, 2020
15
                       9 A.M.
16

17

18

19

20  ATKINSON-BAKER, INC.

21  (800)288-3376
    www.depo.com
22

23
    TRANSCRIBED BY:  SOMMER E. GREENE, RPR, CRR
24
    FILE NO: AE06E57
25
```

CERTIFIED COPY

Atkinson-Baker, Inc.
www.depo.com

```
 1  APPEARANCES OF COUNSEL

 2
            For Plaintiff:
 3
                EMORD & ASSOCIATES, PC
 4               PETER A. ARHANGELSKY, ESQ.
                3210 South Gilbert Road, Suite 4
 5              Chandler, Arizona 85286
                602.388.8899
 6              jfurman@emord.com

 7
            For Defendant Newport Trial Group and
 8          Scott Ferrell:

 9              CALLAHAN & BLAINE, PAPLC
                DAVID JEFF DARNELL, ESQ.
10              3 Hutton Centre Drive, 9th Floor
                Santa Ana, California 92707
11              714.241.4444
                ddarnell@callahan-law.com
12

13          For Defendants Victoria Knowles, David Reid,
            Ryan Ferrell, and Andrew Baslow:
14
                BREMER, WHYTE, BROWN & O'MEARA LLP
15              KYLE A. RIDDLES, ESQ.
                20320 SW Birch Street, Floor 2
16              Newport Beach, California 92660
                949.221.1000
17              kriddles@bremerwhyte.com

18
            For the non-NTG Defendants:
19
                FORD & DIULIO PC
20              BRENDAN M. FORD, ESQ. (TELEPHONICALLY)
                650 Town Center Drive, Suite 760
21               Costa Mesa, California 92626
                714.450.6830
22              bford@forddiulio.com

23
            Also Present:
24
                Samantha Elliott, Videographer
25
```

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Q.  So they would just pay you from time to | 09:54 |
| 2 | time? | 09:54 |
| 3 | A.  Yes. | 09:54 |
| 4 | Q.  And was that payment based on any metric? | 09:54 |
| 5 | A.  No. | 09:54 |
| 6 | Q.  It was a discretionary payment? | 09:54 |
| 7 | A.  Yes. | 09:55 |
| 8 | Q.  Can you approximate how much money you were | 09:55 |
| 9 | paid during your course of employment with WJF? | 09:55 |
| 10 | A.  Approximately $30,000. | 09:55 |
| 11 | Q.  Would you consider yourself to have been an | 09:55 |
| 12 | employee? | 09:55 |
| 13 | A.  I would. | 09:55 |
| 14 | Q.  Did they provide you with any benefits? | 09:55 |
| 15 | A.  I had a vehicle. | 09:55 |
| 16 | Q.  So they paid for your vehicle? | 09:55 |
| 17 | A.  Yes. | 09:55 |
| 18 | Q.  Did they give you health insurance? | 09:55 |
| 19 | A.  No. | 09:55 |
| 20 | Q.  All right.  After your time with WJF, did | 09:55 |
| 21 | you come to be employed by the Newport Trial Group? | 09:55 |
| 22 | A.  I did. | 09:55 |
| 23 | Q.  And when was that? | 09:55 |
| 24 | A.  Approximately the summer of 2010. | 09:55 |
| 25 | Q.  And was that your first place of employment | 09:55 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | after you left WJF? | 09:55 |
| 2 | A.   I hadn't left WJF. | 09:55 |
| 3 | Q.   So you were working for WJF and -- at the | 09:55 |
| 4 | time you started working for Newport Trial Group? | 09:55 |
| 5 | A.   Yes. | 09:56 |
| 6 | Q.   When, if at all, did you stop working for | 09:56 |
| 7 | WJF? | 09:56 |
| 8 | A.   I don't recall if it was 2011 or 2010. | 09:56 |
| 9 | Q.   Have you performed any work for WJF since | 09:56 |
| 10 | 2010? | 09:56 |
| 11 | A.   I'm sure I have. | 09:56 |
| 12 | Q.   For compensation? | 09:56 |
| 13 | A.   No. | 09:56 |
| 14 | Q.   You provided services because it's a family | 09:56 |
| 15 | business? | 09:56 |
| 16 | A.   Correct. | 09:56 |
| 17 | Q.   And do you know who the owners of WJF are? | 09:56 |
| 18 | A.   I believe it's Wynn Ferrell and | 09:56 |
| 19 | Ashley Rogers. | 09:56 |
| 20 | Q.   Are any of your other family members | 09:56 |
| 21 | involved as owners or investors in WJF? | 09:56 |
| 22 | A.   I don't know. | 09:56 |
| 23 | Q.   Okay.  When you started working for the | 09:56 |
| 24 | Newport Trial Group in the summer of 2010, were you | 09:56 |
| 25 | hired as an associate attorney? | 09:56 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | A.    Yes. | 09:57 |
| 2 | Q.    And you had passed the bar at that time? | 09:57 |
| 3 | A.    Yes. | 09:57 |
| 4 | Q.    And sorry, when did you pass the bar? | 09:57 |
| 5 | A.    2008 in California; 2009 in Arizona. | 09:57 |
| 6 | Q.    So when you started working for Newport | 09:57 |
| 7 | Trial Group, you were licensed in both California and | 09:57 |
| 8 | Arizona? | 09:57 |
| 9 | A.    Yes. | 09:57 |
| 10 | Q.    And were you hired by your brother, | 09:57 |
| 11 | Scott Ferrell? | 09:57 |
| 12 | A.    Yes. | 09:57 |
| 13 | Q.    Did any other members of the Newport Trial | 09:57 |
| 14 | Group have a role in your hiring process? | 09:57 |
| 15 | A.    I don't know. | 09:57 |
| 16 | Q.    Did you speak with any other attorneys in | 09:57 |
| 17 | the Newport Trial Group concerning your application | 09:57 |
| 18 | for a job? | 09:57 |
| 19 | A.    No. | 09:57 |
| 20 | Q.    How many other siblings do you have? | 09:57 |
| 21 | A.    I have five brothers and sisters. | 09:57 |
| 22 | Q.    How many brothers? | 09:57 |
| 23 | A.    Three brothers. | 09:57 |
| 24 | Q.    And is Scott Ferrell your oldest brother? | 09:57 |
| 25 | A.    No. | 09:58 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | arrived? | 02:37 |
| 2 | A.   Yes. | 02:37 |
| 3 | Q.   And how did you arrange for that meeting? | 02:37 |
| 4 | A.   I believe Wynn Ferrell arranged for the | 02:37 |
| 5 | meeting. | 02:37 |
| 6 | Q.   And you did that by phone? | 02:37 |
| 7 | A.   I don't know. | 02:37 |
| 8 | Q.   When you met with Mr. Bobba on the first | 02:37 |
| 9 | day, did you already have a declaration prepared for | 02:37 |
| 10 | him to review? | 02:37 |
| 11 | A.   No. | 02:37 |
| 12 | Q.   Did you meet him at his house? | 02:37 |
| 13 | A.   I don't know if it was his house or someone | 02:37 |
| 14 | else's. | 02:38 |
| 15 | Q.   But it was a residence? | 02:38 |
| 16 | A.   I believe so. | 02:38 |
| 17 | Q.   Were his parents home at the time? | 02:38 |
| 18 | A.   I don't know. | 02:38 |
| 19 | Q.   Do you recall speaking with his parents? | 02:38 |
| 20 | A.   I don't recall. | 02:38 |
| 21 | Q.   Was anyone else present at your meeting | 02:38 |
| 22 | with Mr. Bobba other than your father? | 02:38 |
| 23 | A.   No. | 02:38 |
| 24 | Q.   Did that meeting occur inside of his house? | 02:38 |
| 25 | A.   No. | 02:38 |

Atkinson-Baker, Inc.
www.depo.com

| | | | |
|---|---|---|---|
| 1 | Q. | Where did the meeting occur? | 02:38 |
| 2 | A. | I believe it was on his front steps. | 02:38 |
| 3 | Q. | How long did the meeting last? | 02:38 |
| 4 | A. | Probably 30 to 60 minutes. | 02:38 |
| 5 | Q. | And that was all on his front steps? | 02:38 |
| 6 | A. | I believe so. | 02:38 |
| 7 | Q. | And what -- approximately what time was | 02:38 |
| 8 | that? | | 02:38 |
| 9 | A. | Evening. | 02:38 |
| 10 | Q. | Was it light out? | 02:38 |
| 11 | A. | Light enough. | 02:38 |
| 12 | Q. | Light enough to -- for what? | 02:38 |
| 13 | A. | To see each other. | 02:39 |
| 14 | Q. | So was the sun still up? | 02:39 |
| 15 | A. | I don't recall. | 02:39 |
| 16 | Q. | Can you remember anything specific about | 02:39 |
| 17 | his house? | | 02:39 |
| 18 | A. | No. | 02:39 |
| 19 | Q. | Now, did Mr. Bobba sign a declaration | 02:39 |
| 20 | during your first meeting with him? | | 02:39 |
| 21 | A. | No. | 02:39 |
| 22 | Q. | When did Mr. Bobba sign a declaration? | 02:39 |
| 23 | A. | The next day. | 02:39 |
| 24 | Q. | And was that September 5th, 2010? | 02:39 |
| 25 | A. | That sounds about right. | 02:39 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Q.   And that was a Sunday? | 02:39 |
| 2 | A.   If September the 5th was a Sunday. | 02:39 |
| 3 | Q.   Did he sign that document in your presence? | 02:39 |
| 4 | A.   Yes. | 02:39 |
| 5 | Q.   And do you recall what time of day he | 02:39 |
| 6 | signed that declaration? | 02:39 |
| 7 | A.   The morning. | 02:39 |
| 8 | Q.   Do you know about approximately what time | 02:39 |
| 9 | in the morning? | 02:39 |
| 10 | A.   I don't. | 02:39 |
| 11 | Q.   And after he signed that declaration, did | 02:39 |
| 12 | you then travel immediately back to Arizona? | 02:40 |
| 13 | A.   I don't know how immediately but that same | 02:40 |
| 14 | day. | 02:40 |
| 15 | Q.   So -- so you departed later that day? | 02:40 |
| 16 | A.   Yes. | 02:40 |
| 17 | Q.   Okay.  And you're not sure if you hung | 02:40 |
| 18 | around in California for a few hours? | 02:40 |
| 19 | A.   I don't recall when the flight left, so I | 02:40 |
| 20 | don't know. | 02:40 |
| 21 | Q.   Okay.  But you don't recall whether or not | 02:40 |
| 22 | you went right back to the airport? | 02:40 |
| 23 | A.   I don't. | 02:40 |
| 24 | Q.   How many specific visits did you make to | 02:40 |
| 25 | Mr. Bobba's house when you were in California on that | 02:40 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | trip? | 02:40 |
| 2 | A.   Three. | 02:40 |
| 3 | Q.   And which visits were those? | 02:40 |
| 4 | A.   The first day to meet with him, the second | 02:40 |
| 5 | day to go over his declaration, and then the second | 02:40 |
| 6 | (sic) day to bring him back to his house after we had | 02:40 |
| 7 | gone back to either the hotel or to a Kinkos. | 02:40 |
| 8 | Q.   To bring him back to his house? | 02:40 |
| 9 | A.   Yes. | 02:41 |
| 10 | Q.   Okay.  And so did you take him for a ride | 02:41 |
| 11 | when you were in California? | 02:41 |
| 12 | A.   I don't know if he went with us or not. | 02:41 |
| 13 | Q.   So walk me through, then, what happens on | 02:41 |
| 14 | the second day.  You meet with him in the morning. | 02:41 |
| 15 | Correct? | 02:41 |
| 16 | A.   Correct. | 02:41 |
| 17 | Q.   And you then leave his house? | 02:41 |
| 18 | A.   Yes. | 02:41 |
| 19 | Q.   And then go back at a later time in the | 02:41 |
| 20 | morning? | 02:41 |
| 21 | A.   Yes. | 02:41 |
| 22 | Q.   And was Mr. Bobba with you when you | 02:41 |
| 23 | departed his house? | 02:41 |
| 24 | A.   I don't recall. | 02:41 |
| 25 | Q.   What was the purpose for leaving his house | 02:41 |

1    at the time?                                                02:41

2        A.   To go either back to the hotel business           02:41

3    center or to -- I believe it was a hotel business          02:41

4    center, but it might have been a Kinkos, to make           02:41

5    changes to the declaration.                                02:41

6        Q.   And those changes were made to the draft          02:41

7    declaration that you had presented him the first           02:41

8    trip?                                                      02:41

9        A.   No.  Second trip.                                 02:41

10       Q.   I'm sorry, the -- I -- yes, the second trip       02:41

11   but the first trip on the Sunday?                          02:41

12       A.   Yes.                                              02:41

13       Q.   Okay.  And what changes did Mr. Bobba ask         02:41

14   you to make?                                               02:42

15       A.   I believe he decided that he wasn't               02:42

16   emotional, he wasn't worked up, and so we removed          02:42

17   that.  He was sensitive about drinking, so we removed      02:42

18   a reference to a bar.  And I believe he added things       02:42

19   about meeting with my father.  And he may have added       02:42

20   others.  I'd have to see the two declarations.             02:42

21       Q.   Okay.                                             02:42

22            (Exhibit 556 was marked for                       02:42

23   identification.)                                           02:42

24            MR. ARHANGELSKY:  All right.  I'm                 02:42

25   placing a document in front of the witness, which is       02:42

| | |
|---|---|
| 1   marked as Exhibit 556.  It is a document entitled: | 02:42 |
| 2   "Declaration of Dan Bobba in support of Plaintiff's | 02:42 |
| 3   opposition to Defendant's motion for sanctions," | 02:42 |
| 4   pursuant to 28 USC 1927, filed as Docket 63-6 in the | 02:42 |
| 5   Dan Bobba v. Magna case. | 02:43 |
| 6       Q.   BY MR. ARHANGELSKY:  Mr. Ferrell, is this | 02:43 |
| 7   the declaration that you had Mr. Bobba sign on that | 02:43 |
| 8   Sunday? | 02:43 |
| 9       A.   Excuse me.  Let me review it. | 02:43 |
| 10       I believe so. | 02:43 |
| 11       Q.   Okay.  And did you draft the language -- | 02:43 |
| 12   Excuse me.  Strike that. | 02:44 |
| 13       Did all the language that's contained in | 02:44 |
| 14   this declaration come from Mr. Bobba? | 02:44 |
| 15       A.   Questions to Mr. Bobba. | 02:44 |
| 16       Q.   I'm sorry.  What? | 02:44 |
| 17       A.   From questions to Mr. Bobba. | 02:44 |
| 18       Q.   From questions to Mr. Bobba. | 02:44 |
| 19       All of this information was gleaned from | 02:44 |
| 20   Mr. Bobba himself? | 02:44 |
| 21       A.   Yes. | 02:44 |
| 22       Q.   And you drafted this version of the | 02:44 |
| 23   declaration? | 02:44 |
| 24       A.   I did. | 02:44 |
| 25       Q.   And so did you make sure this document was | 02:44 |

```
 1   accurate when you prepared it?                            02:44
 2        A.   Yes.                                            02:44
 3        Q.   Before you drafted this declaration, did        02:44
 4   you review a copy of Mr. Bobba's proof of purchase        02:44
 5   for his Magna product?                                    02:44
 6        A.   I don't believe so.                             02:44
 7        Q.   Were you aware that the NTG firm possessed      02:44
 8   a copy of Mr. Bobba's proof of purchase?                  02:44
 9        A.   I don't know.  The NTG firm possessed a         02:44
10   copy of the receipt.                                      02:44
11        Q.   That wasn't --  Okay.  It wasn't something      02:44
12   that was known to you at the time?                        02:44
13        A.   I don't recall.                                 02:44
14        Q.   Did anybody edit this version of the --         02:44
15   excuse me.  Strike that.  Did anybody edit                02:45
16   Mr. Bobba's draft declaration before you presented        02:45
17   him with the final?                                       02:45
18        A.   Mr. Bobba.                                      02:45
19        Q.   Scott Ferrell edit it?                          02:45
20        A.   I don't believe so.                             02:45
21        Q.   Okay.                                           02:45
22             (Exhibit 557 was marked for                     02:46
23   identification.)                                          02:46
24             MR. ARHANGELSKY:  All right.  I placed          02:46
25   a document in front of the witness we're marking as       02:46
```

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Exhibit 557, and it has a Bates number that's | 02:46 |
| 2 | NTG011593. | 02:46 |
| 3 |     Q.   BY MR. ARHANGELSKY:  So, Mr. Ferrell, have | 02:46 |
| 4 | a look at this and let me know if you've ever seen | 02:46 |
| 5 | this before. | 02:46 |
| 6 |     A.   I have. | 02:46 |
| 7 |     Q.   And what is this document? | 02:46 |
| 8 |     A.   It is the draft declaration I prepared from | 02:46 |
| 9 | speaking with Mr. Bobba. | 02:46 |
| 10 |     Q.   And this was sent to Scott Ferrell at | 02:46 |
| 11 | September -- on September 4th, 2010, at 11:09 p.m. | 02:46 |
| 12 | Is that right? | 02:46 |
| 13 |     A.   That's what the e-mail says. | 02:46 |
| 14 |     Q.   What was the purpose of you providing | 02:46 |
| 15 | Scott Ferrell with this declaration? | 02:46 |
| 16 |     A.   So that he knew what Mr. Bobba had said. | 02:46 |
| 17 |     Q.   Did Scott Ferrell put any edits into this | 02:46 |
| 18 | version of the Word document between the date of this | 02:47 |
| 19 | e-mail and the next morning? | 02:47 |
| 20 |     A.   I don't believe so. | 02:47 |
| 21 |     Q.   Did Scott Ferrell put any edits at all into | 02:47 |
| 22 | your draft declaration? | 02:47 |
| 23 |     A.   I don't believe so. | 02:47 |
| 24 |     Q.   Did you have conversation with | 02:47 |
| 25 | Scott Ferrell about the draft declaration in the | 02:47 |

Atkinson-Baker, Inc.
www.depo.com

```
 1   morning of September 5th or the evening of          02:47
 2   September 4th?                                       02:47
 3       A.   I don't believe so.  Other than this       02:47
 4   e-mail.                                              02:47
 5       Q.   Okay.  This was it?  Okay.                  02:47
 6            And, again, in this draft version, all this 02:47
 7   information came from Mr. Bobba.  Is that your       02:47
 8   position?                                            02:47
 9       A.   Yes, all this information came from         02:47
10   Mr. Bobba.                                           02:47
11       Q.   Okay.                                       02:47
12            (Exhibit 558 was marked for                 02:48
13   identification.)                                     02:48
14            MR. ARHANGELSKY:  Placed a document in      02:48
15   front of the witness we're marking as Exhibit 558.   02:48
16   It has a Bates number NTG11604.                      02:48
17       Q.   BY MR. ARHANGELSKY:  Please review this     02:49
18   document and its attachment and let me know when     02:49
19   you're up to speed.                                  02:49
20       A.   Okay.                                       02:49
21       Q.   So this e-mail contains a version of       02:49
22   Mr. Bobba's declaration.  This wasn't the version    02:49
23   that Mr. Bobba signed, though.  Right?               02:49
24       A.   I would have to go line by line.           02:49
25       Q.   Well, if it helps in paragraph 3,          02:49
```

Atkinson-Baker, Inc.
www.depo.com

```
1   Mr. Bobba -- or this version of the declaration says      02:50
2   Mr. Bobba -- he writes in paragraph 2, "Our               02:50
3   conversation was somewhat vulgar and I had been           02:50
4   drinking."                                                02:50
5          Do you see that?                                    02:50
6      A.   Yes.                                               02:50
7      Q.   Was that content removed from the final           02:50
8   declaration that he signed?                               02:50
9      A.   Any reference to alcohol or bars was              02:50
10  removed.                                                  02:50
11     Q.   Okay.  So where did this version of the          02:50
12  declaration come from?  Where -- when did this --        02:50
13  when was this circulated?                                 02:50
14     A.   I don't know.                                    02:50
15     Q.   Would that have been the morning of -- of       02:50
16  the Sunday, September 5th?                                02:50
17             MR. DARNELL:  Objection.  Lacks              02:50
18  foundation.  Calls for speculation.                       02:51
19             THE WITNESS:  I don't know.                  02:51
20     Q.   BY MR. ARHANGELSKY:  When -- when did you       02:51
21  prepare this version of the declaration?                 02:51
22             MR. DARNELL:  Objection.  Vague as to        02:51
23  "this version."                                           02:51
24             THE WITNESS:  Which version are you          02:51
25  talking about?                                            02:51
```

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Q.   BY MR. ARHANGELSKY:   I'm referring to the | 02:51 |
| 2 | version that's attached to Exhibit 558. | 02:51 |
| 3 | A.   I don't know that I prepared this version. | 02:51 |
| 4 | Q.   You know whom -- who did? | 02:51 |
| 5 | A.   I don't. | 02:51 |
| 6 | Q.   Well, would -- would this have been a | 02:51 |
| 7 | version that you presented to Mr. Bobba? | 02:51 |
| 8 | A.   I don't know. | 02:51 |
| 9 | Q.   Okay.   When you went to visit with | 02:51 |
| 10 | Mr. Bobba on Sunday, in the morning, the first visit | 02:51 |
| 11 | to his house on that day, did you have a declaration | 02:51 |
| 12 | for him to review at that time? | 02:51 |
| 13 | A.   I did. | 02:51 |
| 14 | Q.   And was this the declaration that he | 02:51 |
| 15 | reviewed? | 02:51 |
| 16 | A.   No, I think it was this one over here. | 02:51 |
| 17 | Q.   All right.   Did Scott Ferrell make changes | 02:51 |
| 18 | to the declaration and provide his version to | 02:51 |
| 19 | Michael Velarde? | 02:52 |
| 20 | MR. RIDDLES:   Objection.   Lacks | 02:52 |
| 21 | foundation.   Calls for speculation. | 02:52 |
| 22 | THE WITNESS:   I don't know. | 02:52 |
| 23 | Q.   BY MR. ARHANGELSKY:   Okay.   So your | 02:52 |
| 24 | position is you don't have any understanding as to | 02:52 |
| 25 | where this version of the Word document would have | 02:52 |

| | | |
|---|---|---|
| 1 | come from? | 02:52 |
| 2 | A.   I don't. | 02:52 |
| 3 | MR. DARNELL:  Objection.  Vague as to | 02:52 |
| 4 | "this version." | 02:52 |
| 5 | THE WITNESS:  Sorry. | 02:52 |
| 6 | MR. ARHANGELSKY:  Again, for the | 02:52 |
| 7 | record, the version we're referencing is the | 02:52 |
| 8 | attachment to Exhibit 558.  Okay. | 02:52 |
| 9 | Q.   BY MR. ARHANGELSKY:  Now, who is | 02:52 |
| 10 | Michael Velarde? | 02:52 |
| 11 | A.   He is an attorney that worked for Newport | 02:52 |
| 12 | Trial Group. | 02:52 |
| 13 | Q.   And how long did he work for the Newport | 02:52 |
| 14 | Trial Group? | 02:52 |
| 15 | A.   I don't know. | 02:52 |
| 16 | Q.   As of September 5th, 2010, do you know how | 02:52 |
| 17 | long he had been with the Newport Trial Group? | 02:52 |
| 18 | A.   Only that he'd been there longer than me. | 02:52 |
| 19 | Q.   Okay.  Do you know how long he had been an | 02:52 |
| 20 | attorney as of September 2010? | 02:52 |
| 21 | A.   I do not. | 02:53 |
| 22 | Q.   Was he a young attorney? | 02:53 |
| 23 | A.   I think he's probably my age. | 02:53 |
| 24 | Q.   Okay.  All right.  In the cover e-mail on | 02:53 |
| 25 | Exhibit 558, Scott Ferrell writes in the second | 02:53 |

| | | |
|---|---|---|
| 1 | Q.   Who's your oldest brother? | 09:58 |
| 2 | A.   Brit Ferrell, B-r-i-t. | 09:58 |
| 3 | Q.   How many years older is -- is Brit Ferrell | 09:58 |
| 4 | than you? | 09:58 |
| 5 | A.   Six approximately. | 09:58 |
| 6 | Q.   And is Scott Ferrell older than you? | 09:58 |
| 7 | A.   He is. | 09:58 |
| 8 | Q.   How many years older is he? | 09:58 |
| 9 | A.   Three approximately. | 09:58 |
| 10 | Q.   All right.  Other than your brother Scott, | 09:58 |
| 11 | have any of your other siblings performed work for | 09:58 |
| 12 | the Newport Trial Group? | 09:58 |
| 13 | A.   Yes. | 09:58 |
| 14 | Q.   Who has performed work? | 09:58 |
| 15 | A.   Brit Ferrell. | 09:58 |
| 16 | Q.   And what has he done for the Newport Trial | 09:58 |
| 17 | Group? | 09:58 |
| 18 | A.   He's been a designated expert witness. | 09:58 |
| 19 | Q.   In how many cases has he been a designated | 09:58 |
| 20 | expert witness? | 09:58 |
| 21 | A.   Not exactly sure, but I would estimate five | 09:58 |
| 22 | that I'm aware of. | 09:58 |
| 23 | Q.   And Brit Ferrell is -- what is his | 09:58 |
| 24 | profession? | 09:58 |
| 25 | A.   Brit Ferrell is a retired medical doctor. | 09:58 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Q.   And I'm sorry, when exactly was that, that | 10:18 |
| 2 | that structure changed? | 10:18 |
| 3 | A.   I couldn't give you an exact date. | 10:18 |
| 4 | Q.   Was that structure changed because of good | 10:18 |
| 5 | performance? | 10:18 |
| 6 | A.   I don't recall why it was changed. | 10:18 |
| 7 | Q.   Did you have any supervising attorneys when | 10:18 |
| 8 | you worked for the Newport Trial Group? | 10:18 |
| 9 | A.   Yeah, any of the attorneys. | 10:18 |
| 10 | Q.   Even associate attorneys? | 10:18 |
| 11 | A.   If I was working on their case. | 10:19 |
| 12 | Q.   You consider them to be your supervisors? | 10:19 |
| 13 | A.   If it was their case. | 10:19 |
| 14 | Q.   Did Scott Ferrell's supervisor work for the | 10:19 |
| 15 | firm? | 10:19 |
| 16 | A.   Sometimes. | 10:19 |
| 17 | Q.   Did Dave Reid's supervisor work for the | 10:19 |
| 18 | firm? | 10:19 |
| 19 | A.   I don't know if he reviewed the stuff or | 10:19 |
| 20 | not. | 10:19 |
| 21 | Q.   Was it the firm's practice to have a | 10:19 |
| 22 | partner-level attorney review work product? | 10:19 |
| 23 | A.   I don't know. | 10:19 |
| 24 | Q.   Did that, in fact, happen with the partner | 10:19 |
| 25 | reviewing your work product? | 10:19 |

Atkinson-Baker, Inc.
www.depo.com

1          A.    I don't know.                                        10:19

2          Q.    Did you ever send your work product to a             10:19

3    partner for purposes of having them review your work?           10:19

4          A.    I don't know if it was purpose of having            10:19

5    them review, but I've sent my work to Scott Ferrell.           10:19

6          Q.    But did the Newport Trial Group have any            10:19

7    policies in place regarding partner-level review of            10:19

8    associate work product?                                         10:19

9          A.    I don't know.                                        10:19

10         Q.    When you were hired in 2012 -- sorry, when          10:19

11   you were working for the firm in 2012, how many times          10:20

12   would you say you spoke with Scott Ferrell on a                 10:20

13   weekly basis?                                                   10:20

14         A.    Couple times a week.                                10:20

15         Q.    How many times would you say you spoke with         10:20

16   him regarding the firm's legal matters?                         10:20

17         A.    Mostly we speak of politics.                        10:20

18         Q.    When you talk about politics, you're               10:20

19   talking about matters independent of the firm's                10:20

20   business?                                                       10:20

21         A.    Yes.                                                10:20

22         Q.    Did you interact with the firm's support           10:20

23   staff, like paralegals or secretaries?                         10:20

24         A.    Have I?  Yes.                                       10:20

25         Q.    How often would you interact with those            10:20

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | support staff? | 10:20 |
| 2 | A. Daily. | 10:20 |
| 3 | Q. In 2012, how often on, let's say, a daily | 10:20 |
| 4 | basis would you interact with the paralegals and | 10:20 |
| 5 | support staff of the firm? | 10:20 |
| 6 | A. It would vary. | 10:20 |
| 7 | Q. Vary based on what? | 10:21 |
| 8 | A. It would vary based on the work that's | 10:21 |
| 9 | going on. | 10:21 |
| 10 | Q. Did the firm have paralegals? | 10:21 |
| 11 | A. I believe so. | 10:21 |
| 12 | Q. Did the firm have law clerks? | 10:21 |
| 13 | A. I don't know if the firm has ever had a law | 10:21 |
| 14 | clerk. | 10:21 |
| 15 | Q. Did the firm have secretaries? | 10:21 |
| 16 | A. I believe so. | 10:21 |
| 17 | Q. Did the firm have an account manager? | 10:21 |
| 18 | A. I don't know if they have an account | 10:21 |
| 19 | manager. | 10:21 |
| 20 | Q. You know the names of any support staff | 10:21 |
| 21 | that you interacted with as part of your cases with | 10:21 |
| 22 | the Newport Trial Group? | 10:21 |
| 23 | A. A number that I forgot, but I can recall | 10:21 |
| 24 | Linda Berger, B-e-r-g-e-r; Catherine Kirshner, | 10:21 |
| 25 | K-i-r-s-h-n-e-r; Janette Francis; Mandy Jung; | 10:21 |

| | | |
|---|---|---|
| 1 | Q.   Was Victoria Knowles a partner when you | 10:17 |
| 2 | were at the Newport Trial Group? | 10:17 |
| 3 | A.   I don't know. | 10:17 |
| 4 | Q.   Of the cases where you received a hundred | 10:17 |
| 5 | percent bonus, did your brother Scott Ferrell also | 10:17 |
| 6 | receive a percentage of those proceeds? | 10:17 |
| 7 | A.   I don't know. | 10:17 |
| 8 | Q.   Who would know? | 10:17 |
| 9 | MR. RIDDLES:   Objection.   Calls for | 10:17 |
| 10 | speculation. | 10:17 |
| 11 | THE WITNESS:   I don't know. | 10:17 |
| 12 | Q.   BY MR. ARHANGELSKY:   Did you have a staff | 10:17 |
| 13 | member at the firm that was responsible for billing? | 10:17 |
| 14 | A.   I don't know. | 10:17 |
| 15 | Q.   Did you have a payroll company that you | 10:17 |
| 16 | used at Newport Trial Group? | 10:17 |
| 17 | A.   I don't know if they had a payroll company | 10:17 |
| 18 | or not. | 10:18 |
| 19 | Q.   Did you receive checks from any specific | 10:18 |
| 20 | company for your income earned? | 10:18 |
| 21 | A.   If I remember right, the checks were from | 10:18 |
| 22 | ADP, but I'm not entirely certain on that. | 10:18 |
| 23 | Q.   Who made the decision to change your bonus | 10:18 |
| 24 | structure? | 10:18 |
| 25 | A.   To my knowledge, Scott Ferrell. | 10:18 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | support staff? | 10:20 |
| 2 | A.   Daily. | 10:20 |
| 3 | Q.   In 2012, how often on, let's say, a daily | 10:20 |
| 4 | basis would you interact with the paralegals and | 10:20 |
| 5 | support staff of the firm? | 10:20 |
| 6 | A.   It would vary. | 10:20 |
| 7 | Q.   Vary based on what? | 10:21 |
| 8 | A.   It would vary based on the work that's | 10:21 |
| 9 | going on. | 10:21 |
| 10 | Q.   Did the firm have paralegals? | 10:21 |
| 11 | A.   I believe so. | 10:21 |
| 12 | Q.   Did the firm have law clerks? | 10:21 |
| 13 | A.   I don't know if the firm has ever had a law | 10:21 |
| 14 | clerk. | 10:21 |
| 15 | Q.   Did the firm have secretaries? | 10:21 |
| 16 | A.   I believe so. | 10:21 |
| 17 | Q.   Did the firm have an account manager? | 10:21 |
| 18 | A.   I don't know if they have an account | 10:21 |
| 19 | manager. | 10:21 |
| 20 | Q.   You know the names of any support staff | 10:21 |
| 21 | that you interacted with as part of your cases with | 10:21 |
| 22 | the Newport Trial Group? | 10:21 |
| 23 | A.   A number that I forgot, but I can recall | 10:21 |
| 24 | Linda Berger, B-e-r-g-e-r; Catherine Kirshner, | 10:21 |
| 25 | K-i-r-s-h-n-e-r; Janette Francis; Mandy Jung; | 10:21 |

Ryan Mark Ferrell
October 29, 2020
71
DECLARATION OF JOSHUA S. FURMAN                    EXHIBIT 9

4360ce3c8038e5e2

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Carla Wise; Sariah Para.  Though I don't know if | 10:21 |
| 2 | that's still her last name.  And that's P-a-r-r-a | 10:22 |
| 3 | (sic). | 10:22 |
| 4 | Q.   What was Carla Wise's role at the firm? | 10:22 |
| 5 | A.   I don't know. | 10:22 |
| 6 | Q.   Did you interact with Carla Wise as part of | 10:22 |
| 7 | your matters pursuant with the NTG firm? | 10:22 |
| 8 | A.   Rarely. | 10:22 |
| 9 | Q.   When you say "rarely," can -- how often | 10:22 |
| 10 | would that be? | 10:22 |
| 11 | A.   Maybe once a month. | 10:22 |
| 12 | Q.   And what was your purpose for interacting | 10:22 |
| 13 | with Carla Wise? | 10:22 |
| 14 | A.   I don't remember a specific purpose. | 10:22 |
| 15 | Q.   And what about Sariah Para, what was her | 10:22 |
| 16 | role at the firm? | 10:22 |
| 17 | A.   I don't know what it was when I was there, | 10:22 |
| 18 | but I believe that towards the end, she was the | 10:22 |
| 19 | office manager. | 10:22 |
| 20 | Q.   Office manager. | 10:22 |
| 21 | And what was her -- what were her roles as | 10:22 |
| 22 | office manager?  What was her job description? | 10:22 |
| 23 | A.   Don't know. | 10:22 |
| 24 | Q.   Did she do anything for you in your cases? | 10:23 |
| 25 | A.   No. | 10:23 |

1     Q.   How old was Sariah Para at the time when          10:23

2   you were working for the firm in 2012?                    10:23

3     A.   I don't know.                                       10:23

4     Q.   Were you assigned to work on specific cases        10:23

5   at the NTG firm?                                           10:23

6     A.   Yes.                                                10:23

7     Q.   And how were you assigned those specific           10:23

8   cases?                                                     10:23

9     A.   I would receive an e-mail or a phone call.         10:23

10     Q.   From who?                                          10:23

11     A.   Usually from Scott Ferrell.                        10:23

12     Q.   So Scott Ferrell determined which cases           10:23

13   you'd be working on?                                      10:23

14     A.   To my knowledge.                                   10:23

15     Q.   Was there a reason for Scott Ferrell              10:23

16   putting you on specific cases?                            10:23

17              MR. RIDDLES:  Objection.  Calls for            10:23

18   speculation.                                              10:23

19              THE WITNESS:  I don't know.                    10:23

20     Q.   BY MR. ARHANGELSKY:  Did you -- did the           10:23

21   firm maintain a case list that listed the attorneys      10:23

22   that were working on specific matters?                    10:23

23     A.   Could you repeat that?                             10:23

24     Q.   Did the firm maintain a case list that            10:23

25   listed attorneys that were working on specific           10:24

| | | |
|---|---|---|
| 1 | matters? | 10:24 |
| 2 | A.  I don't know. | 10:24 |
| 3 | Q.  And what types of lawsuit -- lawsuits did | 10:24 |
| 4 | you work on with the NTG firm? | 10:24 |
| 5 | A.  Class actions and some false patent marking | 10:24 |
| 6 | and some defense. | 10:24 |
| 7 | Q.  The class actions, were those primarily | 10:24 |
| 8 | plaintiff side? | 10:24 |
| 9 | A.  Both. | 10:24 |
| 10 | Q.  Plaintiffs and defense? | 10:24 |
| 11 | A.  Mostly plaintiff. | 10:24 |
| 12 | Q.  Approximately what percentage of your class | 10:24 |
| 13 | action cases did you work on of the plaintiff's side? | 10:24 |
| 14 | A.  Greater than 90 percent. | 10:24 |
| 15 | Q.  Did you work on false advertising cases? | 10:24 |
| 16 | A.  Yes. | 10:24 |
| 17 | Q.  And were those all on the plaintiff's side? | 10:24 |
| 18 | A.  I don't know. | 10:24 |
| 19 | Q.  Could you approximate how many false | 10:25 |
| 20 | advertising cases you worked on when you were with | 10:25 |
| 21 | the Newport Trial Group? | 10:25 |
| 22 | A.  No. | 10:25 |
| 23 | Q.  Was it more than a dozen? | 10:25 |
| 24 | A.  Yes. | 10:25 |
| 25 | Q.  You think it was more than 50? | 10:25 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Carla Wise; Sariah Para.  Though I don't know if | 10:21 |
| 2 | that's still her last name.  And that's P-a-r-r-a | 10:22 |
| 3 | (sic). | 10:22 |
| 4 | Q.   What was Carla Wise's role at the firm? | 10:22 |
| 5 | A.   I don't know. | 10:22 |
| 6 | Q.   Did you interact with Carla Wise as part of | 10:22 |
| 7 | your matters pursuant with the NTG firm? | 10:22 |
| 8 | A.   Rarely. | 10:22 |
| 9 | Q.   When you say "rarely," can -- how often | 10:22 |
| 10 | would that be? | 10:22 |
| 11 | A.   Maybe once a month. | 10:22 |
| 12 | Q.   And what was your purpose for interacting | 10:22 |
| 13 | with Carla Wise? | 10:22 |
| 14 | A.   I don't remember a specific purpose. | 10:22 |
| 15 | Q.   And what about Sariah Para, what was her | 10:22 |
| 16 | role at the firm? | 10:22 |
| 17 | A.   I don't know what it was when I was there, | 10:22 |
| 18 | but I believe that towards the end, she was the | 10:22 |
| 19 | office manager. | 10:22 |
| 20 | Q.   Office manager. | 10:22 |
| 21 | And what was her -- what were her roles as | 10:22 |
| 22 | office manager?  What was her job description? | 10:22 |
| 23 | A.   Don't know. | 10:22 |
| 24 | Q.   Did she do anything for you in your cases? | 10:23 |
| 25 | A.   No. | 10:23 |

Case 8:15-cv-02034-JVS-JCG   Document 1108-8   Filed 04/27/21   Page 29 of 34   Page ID
#:74389
Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Q.   How old was Sariah Para at the time when | 10:23 |
| 2 | you were working for the firm in 2012? | 10:23 |
| 3 | A.   I don't know. | 10:23 |
| 4 | Q.   Were you assigned to work on specific cases | 10:23 |
| 5 | at the NTG firm? | 10:23 |
| 6 | A.   Yes. | 10:23 |
| 7 | Q.   And how were you assigned those specific | 10:23 |
| 8 | cases? | 10:23 |
| 9 | A.   I would receive an e-mail or a phone call. | 10:23 |
| 10 | Q.   From who? | 10:23 |
| 11 | A.   Usually from Scott Ferrell. | 10:23 |
| 12 | Q.   So Scott Ferrell determined which cases | 10:23 |
| 13 | you'd be working on? | 10:23 |
| 14 | A.   To my knowledge. | 10:23 |
| 15 | Q.   Was there a reason for Scott Ferrell | 10:23 |
| 16 | putting you on specific cases? | 10:23 |
| 17 | MR. RIDDLES:  Objection.  Calls for | 10:23 |
| 18 | speculation. | 10:23 |
| 19 | THE WITNESS:  I don't know. | 10:23 |
| 20 | Q.   BY MR. ARHANGELSKY:  Did you -- did the | 10:23 |
| 21 | firm maintain a case list that listed the attorneys | 10:23 |
| 22 | that were working on specific matters? | 10:23 |
| 23 | A.   Could you repeat that? | 10:23 |
| 24 | Q.   Did the firm maintain a case list that | 10:23 |
| 25 | listed attorneys that were working on specific | 10:24 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | matters? | 10:24 |
| 2 | A.   I don't know. | 10:24 |
| 3 | Q.   And what types of lawsuit -- lawsuits did | 10:24 |
| 4 | you work on with the NTG firm? | 10:24 |
| 5 | A.   Class actions and some false patent marking | 10:24 |
| 6 | and some defense. | 10:24 |
| 7 | Q.   The class actions, were those primarily | 10:24 |
| 8 | plaintiff side? | 10:24 |
| 9 | A.   Both. | 10:24 |
| 10 | Q.   Plaintiffs and defense? | 10:24 |
| 11 | A.   Mostly plaintiff. | 10:24 |
| 12 | Q.   Approximately what percentage of your class | 10:24 |
| 13 | action cases did you work on of the plaintiff's side? | 10:24 |
| 14 | A.   Greater than 90 percent. | 10:24 |
| 15 | Q.   Did you work on false advertising cases? | 10:24 |
| 16 | A.   Yes. | 10:24 |
| 17 | Q.   And were those all on the plaintiff's side? | 10:24 |
| 18 | A.   I don't know. | 10:24 |
| 19 | Q.   Could you approximate how many false | 10:25 |
| 20 | advertising cases you worked on when you were with | 10:25 |
| 21 | the Newport Trial Group? | 10:25 |
| 22 | A.   No. | 10:25 |
| 23 | Q.   Was it more than a dozen? | 10:25 |
| 24 | A.   Yes. | 10:25 |
| 25 | Q.   You think it was more than 50? | 10:25 |

| | | |
|---|---|---|
| 1 | A.   Yes. | 10:25 |
| 2 | Q.   Was it more than 150? | 10:25 |
| 3 | A.   I don't know. | 10:25 |
| 4 | Q.   A significant number? | 10:25 |
| 5 | A.   Depends how you define "significant." | 10:25 |
| 6 | Q.   On a monthly basis, how many false | 10:25 |
| 7 | advertising cases would you say you were working on | 10:25 |
| 8 | at any point in time? | 10:25 |
| 9 | A.   It would depend on the month and the time. | 10:25 |
| 10 | Q.   And that would include cases that were in | 10:25 |
| 11 | prelitigation and litigation? | 10:25 |
| 12 | A.   Yes. | 10:25 |
| 13 | Q.   Would you prepare demand letters in false | 10:25 |
| 14 | advertising cases? | 10:25 |
| 15 | A.   It depends on the time period. | 10:25 |
| 16 | Q.   In 2012, were you tasked with preparing | 10:25 |
| 17 | demand letters in false advertising cases? | 10:25 |
| 18 | A.   At times. | 10:26 |
| 19 | Q.   What times would those be? | 10:26 |
| 20 | A.   2012. | 10:26 |
| 21 | Q.   When you say "at times," what does that | 10:26 |
| 22 | mean? | 10:26 |
| 23 | A.   There were times in 2012 where I prepared | 10:26 |
| 24 | demand letters. | 10:26 |
| 25 | Q.   Can you estimate approximately how many | 10:26 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | agreements with outside firms regarding fee splitting | 11:26 |
| 2 | or referrals? | 11:26 |
| 3 | A.   I don't know. | 11:26 |
| 4 | Q.   Have you ever seen any of those agreements | 11:26 |
| 5 | between the Newport Trial Group --  Strike that. | 11:26 |
| 6 | Have you ever seen an agreement between the | 11:26 |
| 7 | Newport Trial Group and an outside firm regarding fee | 11:26 |
| 8 | splitting or referrals? | 11:26 |
| 9 | A.   I don't recall. | 11:26 |
| 10 | Q.   You currently worked for the Apex Trial | 11:26 |
| 11 | Group.  Is that correct? | 11:26 |
| 12 | A.   Correct. | 11:26 |
| 13 | Q.   And what is the Apex Trial Group? | 11:26 |
| 14 | A.   Apex Trial Law -- | 11:26 |
| 15 | Q.   Excuse me. | 11:26 |
| 16 | A.   -- is my law firm. | 11:26 |
| 17 | Q.   Apex Trial Law.  Thank you. | 11:26 |
| 18 | And what type of entity is Apex? | 11:26 |
| 19 | A.   I believe it's a professional corporation. | 11:26 |
| 20 | Q.   And what is your title with Apex? | 11:26 |
| 21 | A.   I don't have a specific title. | 11:26 |
| 22 | Q.   Are you the owner? | 11:26 |
| 23 | A.   Yes. | 11:26 |
| 24 | Q.   Are you the sole owner? | 11:26 |
| 25 | A.   Yes. | 11:26 |

Atkinson-Baker, Inc.
www.depo.com

1     Q.    Does anybody else have any equity interest        11:26

2   in the firm's proceeds?                                   11:27

3     A.    I suppose my wife does.                            11:27

4     Q.    No other attorney shares in the proceeds          11:27

5   from Apex Trial?                                          11:27

6     A.    I'm not sure if my wife does or not.   I          11:27

7   believe that if I died, she might inherit it, but I       11:27

8   don't know.                                               11:27

9     Q.    Your wife doesn't have -- other than what's       11:27

10  a community property interest, your wife doesn't have     11:27

11  any actual ownership in Apex Trial Law?                   11:27

12    A.    No.                                               11:27

13    Q.    And when did you incorporate Apex Trial           11:27

14  Law?                                                      11:27

15    A.    I believe it was approved or filed or             11:27

16  certified on my birthday in 2016.                         11:27

17    Q.    But the time you incorporated Apex, did --        11:27

18  had you already left the Newport Trial Group?             11:27

19    A.    I was in process.                                 11:27

20    Q.    When did you leave your position with the         11:28

21  Newport Trial Group?                                      11:28

22    A.    Approximately the end of 2015.                    11:28

23    Q.    And why did you leave your position with          11:28

24  NTG?                                                      11:28

25    A.    To form my own law firm.                          11:28

Atkinson-Baker, Inc.
www.depo.com

```
 1        Q.    Was that decision to leave NTG solely your     11:28
 2   own?                                                       11:28
 3        A.    It was an amicable split, yes.                  11:28
 4        Q.    So you left NTG on good terms?                  11:28
 5        A.    Yes.                                            11:28
 6        Q.    Did you receive any financial compensation      11:28
 7   from NTG following your departure?                         11:28
 8        A.    Yes.                                            11:28
 9        Q.    And what was financial compensation?            11:28
10        A.    I continued to work on various cases until      11:28
11   their closure.                                             11:28
12        Q.    Until what closure?                             11:28
13        A.    The closure of the case.                        11:28
14        Q.    Until the --  Okay.                             11:28
15              And which cases were you working on             11:28
16   following your departure from the Newport Trial            11:28
17   Group?                                                     11:29
18        A.    The only one I specifically remember is a       11:29
19   case that's still ongoing involving Green                  11:29
20   Pharmaceuticals.                                           11:29
21        Q.    Do you currently receive any financial          11:29
22   compensation from NTG in any form?                         11:29
23        A.    No.                                             11:29
24        Q.    Do you currently -- I should clarify.  Do       11:29
25   you currently receive any financial compensation from      11:29
```

Ryan Mark Ferrell
October 29, 2020                                    121
DECLARATION OF JOSHUA S. FURMAN            EXHIBIT 9