**FILED PUBLICLY PURSUANT TO COURT ORDER AT DOCKET NO. 1116**

Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Joshua S. Furman, Esq. (pro hac vice)
jfurman@emord.com
Eric J. Awerbuch, Esq. (pro hac vice)
eawerbuch@emord.com
Emord & Associates, P.C.
2730 S. Val Vista Dr., Bldg. 6, Suite 133
Gilbert, AZ 85295
Phone: (602) 388-8899
Fax: (602) 393-4361
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL-IMMUNOGENICS CORP., | Case No. 8:15-cv-02034-JVS (JCG) |
| Plaintiff, | **PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFF NIC'S MOTION FOR PARTIAL SUMMARY ADJUDICATION ON COUNT II (RICO, 28 U.S.C. § 1962(c))** |
| v. | |
| NEWPORT TRIAL GROUP, et al., | |
| Defendants. | Hearing Date:  June 14, 2021<br>Hearing Time: 1:30 PM<br>Courtroom:      10C<br>Judge:  Hon. James V. Selna |

1

## **<u>TABLE OF CONTENTS</u>**

STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................1

A. General Facts ...............................................................................1

B. Wiretapping Scheme ....................................................................8

  1.  Schoonover v. Himalaya Drug Co........................................12

  2.  Demulder v. Carter-Reed Co. ..............................................25

  3.  Torres v. Nutrisystem – Demonstrating Pattern, Plan, Motive,
      Intent ....................................................................................34

C. False Advertising Scheme ...........................................................40

  4.  Pfleg v. Nature's Way....................................................44

  5.  Additional False Advertising Cases that Demonstrate Pattern,
      Plan, and Intent ....................................................................55

D. Strataluz Scheme ........................................................................65

Pursuant to Local Rule 56-1, Plaintiff Natural Immunogenics, Corp., ("NIC" or "Plaintiff") hereby submit the following Statement of Undisputed Material Facts and Conclusions of Law in support of their Motion for Summary Adjudication.

## I.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. General Facts

| | UNCONTROVERTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 1. | Scott Ferrell incorporated Newport Trial Group, PC in the State of California in 2009. | EXH 1., S. Ferrell Tr. at 39-40. EXH. 2 |
| 2. | Scott Ferrell has owned 100% of the firm since its creation and through present. | EXH 1., S. Ferrell Tr. at 39 |
| 3. | Newport Trial Group has maintained its principal place of business in Orange County, California at all times since its creation. | EXH. 5, NTG 30(b)(6) Tr. at 195-96, 220 |
| 4. | In 2016, Newport Trial Group, PC formally changed its name to Pacific Trial Attorneys, PC with the California Secretary of State. | EXH 1., S. Ferrell Tr. at 82. EXH. 3 |
| 5. | The Newport Trial Group has employed attorneys, paralegals, and field representatives from 2010 to present. | EXH 1., S. Ferrell Tr. at 40-41 |
| 6. | David Reid is a licensed attorney and was hired by NTG as an attorney in 2010. | EXH 1., S. Ferrell Tr. at 40-41. EXH. 4 |

| 7. | Reid was promoted to managing partner of the firm in 2013. | EXH. 5 at 223<br>EXH. 4. |
|---|---|---|
| 8. | As of his January 31, 2021 deposition, David Reid is still the managing partner of the Newport Trial Group (now Pacific Trial Attorneys). | EXH. 4 |
| 9. | In his capacity as an attorney at Newport Trial Group, Reid has been involved in the preparation and revision of demand letters, complaints, and settlement agreements.  He has also defended depositions and negotiated settlements. | EXH. 4 |
| 10. | Reid has worked on NTG's plaintiff-side practice, including California false advertising cases, wiretapping cases, and Lanham Act cases. | EXH. 4. |
| 11. | While employed at NTG, David Reid has been directed by Scott Ferrell in his work for the firm. | EXH. 34 (NTG006161)<br>EXH. 69 (NTG069938)<br>EXH. 90 (NTG070527)<br>EXH. 88 (NTG066728)<br>EXH. 86 (NTG06634)<br>EXH. 87 (NTG066453, at NTG066454)<br>EXH. 6 at NTG006232<br>EXH. 7<br>EXH. 4 at 35-36; 46-48 |
| 12. | Victoria Knowles is a licensed attorney and was hired by NTG as an attorney in 2011. | EXH. 8 at 33. |

| 13. | Victoria Knowles was promoted to Partner in 2017 and as of her deposition on July 30, 2020, she is still employed by NTG in that position. | EXH. 8 at 47. |
|---|---|---|
| 14. | In her capacity as an attorney at NTG, Knowles has drafted demand letters and complaints in false advertising cases, wiretapping cases, and Lanham Act cases. | EXH. 8 at 46. |
| 15. | While employed at NTG, Victoria Knowles has been directed by Scott Ferrell in her work for the firm. | *See, e.g.,* EXH. 72 - NTG006177 EXH. 84 - NTG041954 EXH. 91 - NTG070767 EXH. 92 - NTG070771 EXH. 69 - NTG069938 EXH. 93 - NTG071178 EXH. 8 at 51-52 |
| 16. | Ryan Ferrell is a licensed attorney in the State of California and was hired by NTG as an attorney in 2010. | EXH. 9 at 55-56 |
| 17. | Ryan Ferrell stopped working for the Newport Trial Group in 2015. | EXH. 9 at 120 |
| 18. | Ryan Ferrell was disbarred from the State Bar of Arizona and the Ninth Circuit Court of Appeals in 2019. | EXH. 10; EXH. 11; EXH. 12 |
| 19. | While Ryan Ferrell worked at the Newport Trial Group as an attorney, he took direction from Scott Ferrell. | EXH. 9 at 69-70, 73 |
| 20. | While working for NTG, Ryan Ferrell worked on false advertising cases. | EXH. 9 at 74. |

| | | |
|---|---|---|
| 21. | Since 2010, the Newport Trial Group has employed paralegals and legal secretaries to assist the firm's attorneys in litigation and communicate with firm clients. | EXH 1., S. Ferrell Tr. at 103-106 |
| 22. | Carla Wise has worked at the firm as a paralegal for approximately 10 years and still works at the firm as of March 30, 2021. | EXH. 1, S. Ferrell Tr. at 105:1-16 |
| 23. | Katherine Kirshner has worked at the firm as a paralegal since 2012 and still works at the firm as of March 30, 2021. | EXH. 1, S. Ferrell Tr. at 105:17—106:1 |
| 24. | Mandy Jung has worked at the firm as a secretary and paralegal since 2015 and still works at the firm as of March 30, 2021. | EXH. 1, S. Ferrell Tr. at 106:3—106:8 |
| 25. | Sariah Para has worked at the firm since at least 2010 as the Office Manager and she still works at the firm as of March 30, 2021. | EXH. 1, S. Ferrell Tr. at 103:10—104:25 |
| 26. | As Office Manager, Sariah Para coordinates firm payroll and vendors, and issues settlement checks to firm clients in plaintiff litigation.  She communicates with firm clients in her capacity as Office Manager. | EXH. 1, S. Ferrell Tr. at 104:2-25 |
| 27. | Sariah Para is a joint signatory on all Newport Trial Group bank accounts. | EXH. 1, S. Ferrell Tr. at 104:8-13 |
| 28. | Since 2010, the Newport Trial Group has employed field representatives to communicate with clients, collect and provide | EXH. 1, S. Ferrell Tr. at 42-43; |

| | | |
|---|---|---|
| | client paperwork, and perform investigatory functions. | |
| 29. | From 2010 to 2017, Wynn Ferrell (Scott Ferrell's father) acted as a field representative for the Newport Trial Group. | RJN 15 - W Ferrell Decl. (Dkt. 63-5), *Magna*, at ¶2<br><br>EXH. 1, S. Ferrell Tr. at 41-42<br><br>EXH. 13 at 98-99<br><br>EXH. 70 - NTG000132<br><br>EXH. 48 - NTG017138<br><br>EXH. 75 - NTG006703<br><br>EXH. 77 - NTG007983<br><br>EXH. 49 - NTG015268<br><br>EXH. 76 - NTG006708 |
| 30. | Wynn Ferrell communicated with clients on behalf of the firm in false advertising cases and wiretapping cases. | RJN 15 - W Ferrell Decl. (Dkt. 63-5), *Magna*, at ¶2<br><br>EXH. 70 - NTG000132<br><br>EXH. 75 - NTG006703<br><br>EXH. 77 - NTG007983<br><br>EXH. 49 - NTG015268<br><br>EXH. 83 - NTG022177<br><br>EXH. 76 - NTG006708 |
| 31. | Wynn Ferrell performed work for the NTG firm at Scott Ferrell's direction. | EXH. 1, S. Ferrell Tr. at 100<br><br>EXH. 82 - NTG022175<br><br>EXH. 77 - NTG007983<br><br>EXH. 49 - NTG015268 |
| 32. | When performing work for the NTG firm, Wynn Ferrell met in | EXH. 13 at 30, 33, 36-37, 41-42 |

| | | |
|---|---|---|
| | person with clients but also spoke with them on the phone using his home phone with the number (480) 507-2222. | |
| 33. | Andrew Baslow was hired by Scott Ferrell to work as a field representative for NTG in 2011. | EXH. 1, S. Ferrell Tr. at 88-89<br><br>EXH. 14 at 211-212<br><br>EXH. 15 at 39 |
| 34. | Andrew Baslow was later promoted to "Director of Field Operations" in approximately 2013. | EXH. 1, S. Ferrell Tr. at 91<br><br>EXH. 14 at 216-217<br><br>EXH. 15 at 47-48 |
| 35. | Scott Ferrell directed Andrew Baslow in his work for the firm from the time he was hired until the present. | EXH. 14 at 290:19-24, 213-214 (Baslow spoke with Ferrell daily by phone)<br><br>EXH. 1, S. Ferrell Tr. at 91 |
| 36. | While working for the Newport Trial Group, Baslow communicated with Scott Ferrell regarding his work for the firm daily. | EXH. 14 at 214 |
| 37. | Baslow has communicated with NTG clients using cellular phone with the phone number (818) 519-0164. | EXH. 15 at 57-60, 210<br><br>EXH. 14 at. 242 |
| 38. | Scott Ferrell has directed Baslow to find class representatives for NTG lawsuits. | EXH. 14 at 219:2-9<br><br>EXH. 17<br><br>EXH. 18 (at page NTG005198) |
| 39. | Newport Trial Group operates at least three bank accounts, an operating account, a reserve account, and a client trust account. | EXH. 1, S. Ferrell Tr. at 144:4-9 |

| 40. | NTG issues payments to clients in false advertising and wiretapping litigation from its bank accounts. | EXH. 1, S. Ferrell Tr. at 104:2-25 (Sariah Para issues settlement checks to client), 144:4-9 (firm maintains a client trust account)<br><br>EXH. 110 (Ferrell instructing opposing counsel to wire the client's portion of the settlement to NTG's client trust account) |
|---|---|---|
| 41. | NTG field representatives directed individuals to call specific companies in pursuit of wiretapping litigation. | EXH. 25;<br><br>EXH 39;<br><br>EXH. 26;<br><br>EXH. 14 at 292-293 |
| 42. | NTG field representatives directed potential plaintiffs to purchase products associated with lawsuits. | EXH. 24<br><br>EXH 13 at 107-109 |
| 43. | Scott Ferrell directed corporate clients to take specific actions to improve or benefit litigation strategy. | EXH. 178<br><br>EXH. 198 - NTG066219<br><br>EXH. 154 |
| 44. | The Newport Trial Group maintained charts in false advertising, wiretapping, Lanham Act, and ADA cases. | EXH. 21<br><br>EXH. 199 - NTG069930<br><br>EXH. 140 - NTG070537<br><br>EXH. 22 at NTG066651<br><br>EXH. 22 - NTG066643 |
| 45. | Scott Ferrell and David Reid often discussed the importance of obtaining money and focusing on the most profitable lines of cases in plaintiff-side litigation. | EXH. 200 - NTG066448<br><br>EXH. 189 - NTG066923<br><br>EXH. 196 - NTG067177<br><br>EXH. 201 - NTG070742 |

| | | EXH. 3 - NTG067215 ("Like all of these, there is going to be a learning curve on what buttons to push for the best settlements.")<br><br>EXH. 203 - NTG067138<br><br>EXH. 102 - NTG066418 ("Shake dat money loose!")<br><br>EXH. 204 - NTG066543 |
|---|---|---|
| 46. | NTG often targeted companies through multiple types of cases. | EXH. 205 - NTG070172<br><br>EXH. 90 - NTG070527 |

## B. Wiretapping Scheme

| 47. | Beginning in 2012, NTG began threatening and pursuing lawsuits on behalf of individuals under the California Invasion of Privacy Act (CIPA). | RJN 1;<br><br>RJN 2;<br><br>RJN 3;<br><br>RJN 4;<br><br>EXH. 19 |
|---|---|---|
| 48. | At any given time, the NTG firm maintained more than thirty active wiretapping lawsuits. | EXH. 20;<br><br>EXH. 21;<br><br>EXH. 22 |
| 49. | The firm maintained case charts that tracked the wiretapping suits from the pre-client stage through settlement. | EXH. 21<br><br>EXH. 37 - NTG006410 ("can you update wiretap chart?")<br><br>EXH. 74 - NTG041928 ("Per Carla's chart today…")<br><br>EXH. 85 - NTG066224 (discussing use of charts to monitor cases)<br><br>EXH. 89 - NTG069926 (same) |

| | | |
|---|---|---|
| 50. | The charts often listed dozens of companies and their associated toll free numbers even though the "plaintiff" column of the chart was blank. | EXH. 21 |
| 51. | The charts identified whether the potential defendant corporation's phone line allowed a caller to bypass a recording disclosure or whether the line provided no disclosure at all. | EXH. 21 |
| 52. | Scott Ferrell directed Andrew Baslow to "audit" potential target companies by calling their toll free phone numbers and determining whether the company provided a warning that calls were recorded, whether the warning could be "bypassed" or "minimally bypassed," and whether the company recorded or monitored incoming calls. | EXH. 21 (listing abbreviations for "Minimal Bypass" etc.); EXH. 22; EXH. 27; EXH 80 (Ferrell providing argument for use in "bypass" wiretap case) |
| 53. | Andrew Baslow performed dozens of "audit" calls per day to toll free numbers from 2012 through 2014. | *See generally* Exh. 23 (Baslow Phone Records); *See also* Exh. 212 (AT&T declaration) |
| 54. | Baslow's audits were performed before the firm's client identified in the lawsuit made the phone call that undergirded the claim:<br>a. Baslow audited Nutrisystem Inc. on August 6 and 7, 2012 and Raquel Torres made her phone call on August 24, 2012. | EXH. 23 at 25 Item Nos. 2301, 2307, 2310 (Baslow phone records); *compare to* EXH. 50<br>EXH 23 at 15 (Item No. 9148) 16 (Item Nos. 8765 & 8777) (Baslow called Carter-Reed);<br>EXH 23 at 26 (Item No. 3745) (Baslow called Himalaya); *compare to* EXH. 26<br>EXH. 29 |

| | | |
|---|---|---|
| | b. Baslow audited Carter-Reed Co. on August 1, 2012 and Taylor Demulder made his phone call on September 6, 2012.<br><br>c. Baslow audited ChromaDex Inc. on January 28, 2013 and Andrew Nilon made his phone call on February February 26, 2013.<br><br>d. Baslow audited Himalaya Drug Company on July 16, 2012 and Sam Schoonover made his call on July 17, 2012 | EXH. 212 |
| 55. | The Newport Trial Group directed wiretapping plaintiffs to make phone calls to targeted companies for the purpose of bringing a lawsuit. | EXH 39<br>EXH. 24;<br>EXH. 26;<br>EXH. 14 at 282-284, 292-93 |
| 56. | The firm openly referred to the lawsuits as "wiretapping" suits when communicating with clients prior to the clients' phone calls. | EXH 39 |
| 57. | Baslow admits that he told wiretapping plaintiffs that the purpose of their calls was to see if they would be recorded without receiving a warning. | EXH. 14 at 293:9-20 |
| 58. | Scott Ferrell and David Reid believed that the provision of confidential and sensitive information by their clients on their calls would increase the potential settlement value of the case. | EXH. 4, Reid Tr. at 127-128<br>EXH. 36 - NTG06386<br>EXH. 49 - NTG015268<br>EXH. 79 - NTG015672 (at 15672-73) (discussing a strategy to seek |

| | | increased damages because of the alleged personal nature of recorded client calls) |
|---|---|---|
| 59. | Scott Ferrell knew that courts had considered the provision of personal information, like a social security number, as evidence supporting the inference that the call was expected to be confidential. | RJN 34 - NTG Memo in Opp. to Mot. to Dismiss, *Clark v. MyLife.com*, No. 2:12-cv-6889-R-PLA (C.D. Cal. 2012), Dkt. 29) |
| 60. | Andrew Baslow directed clients to share "confirmation statements" once they completed their calls. | EXH. 14 at 293:5-25; EXH. 25 EXH 39 EXH. 71; |
| 61. | Andrew Baslow directed clients in the language to use in their confirmation statements. | EXH. 14 at 293-294 EXH. 25; EXH. 41 EXH. 26 EXH. 29 EXH. 71; |
| 62. | Baslow instructed clients not to address the confirmation statement to him personally. | EXHS. 25, 41, 26, 29 (addressed generically to "To whom it may concern" or simply "Hello") |
| 63. | Baslow instructed clients not to include in their confirmation statements the fact that he directed them to make the calls or that he provided them with the phone number to call. | EXH. 25 |
| 64. | NTG sent the confirmation statements to litigation adversaries to demonstrate the legitimacy of the | EXH. 5 at 135 |

| | | |
|---|---|---|
| | claim. | |
| 65. | NTG sent the confirmation statements to co-counsel to provide them with the facts to include in their complaint. | EXH. 5 at 135; EXH 45. |

### 1. Schoonover v. Himalaya Drug Co.

| | | |
|---|---|---|
| 66. | On July 13, 2012 at 9:59 AM, Scott Ferrell emailed Baslow and said: "Baz:  Would you please 'audit' the below 800 numbers ((1) call and see if they auto-disclose that they record or monitor; (2) if they do not, ask a basic question or two of a customer service rep when you get through to one; (3) close by asking if they record or monitor; and (4) report back?" | EXH. 27 at 5983 |
| 67. | Scott Ferrell's email listed ten companies and their 800 numbers, and the first listed company was Himalaya Drug Co. at 800-869-4640. | EXH. 27 at 5983 |
| 68. | On July 16, 2012, Andrew Baslow made dozens of phone calls to toll free numbers. | EXH 212; EXH. 212; EXH. 23, at 26 |
| 69. | On July 16, 2012 at 1:15 PM, Baslow called Himalaya Drug Company's number (800-869-4640). | EXH. 212; EXH. 212; EXH. 23 at 26 (Item No. 3745) EXH 28 at ¶ 3. |
| 70. | Baslow called Himalaya Drug Company from a location in California and Himalaya Drug | EXH. 15, Baslow Depo. Tr. (Aug. 9, 2017) at 23 |

| | | | |
|---|---|---|---|
| | | Company is located in Texas. | RJN 2 at ¶ 3 |
| | 71. | On that call, Baslow followed Scott Ferrell's emailed instructions, asked the customer service representative what their best product is, and asked about the main ingredient is.<br><br>He then asked "are your calls recorded and monitored there at Himalaya?" to which the customer service representative responded "uh, yes." | Exh. 28 (Exh. C, audio recording produced by Himalaya and named "890001000005050.wav" (filed manually on Compact Disc));<br>EXH. 15, Baslow Depo. Tr. (Aug. 9, 2017) at 159-160. |
| | 72. | Less than an hour later, at 2:03 PM, Baslow emailed Scott Ferrell and confirmed that Himalaya recorded incoming calls:<br><br>"Answers to these 10 audits are below:<br><br>Himalaya Drug Co. – spoke to CS REP and asked questions about their best products.  I was never told my call was R/M until I asked at the conclusion of the conversation.  The rep then confirmed that they are R/M." | EXH. 27 |
| | 73. | As used in NTG's emails, R/M means recorded or monitored. | EXH. 5 at 90-91<br>EXH. 14, Baslow Depo. Tr. (Aug. 26, 2020) at 285:17-19. |
| | 74. | As used in NTG's emails, CS REP means customer service representative. | EXH. 5 at 125<br>EXH. 14, Baslow Depo. Tr. (Aug. 26, 2020) at 285:14-16. |
| | 75. | On July 16, 2012 at 2:19 PM, Scott Ferrell emailed Baslow in response to his audit email:<br><br>"Baz: Based on the comments below, it seems like we should | EXH. 27 |

| | | |
|---|---|---|
| | proceed with Himalaya Drug . . . [i]s that correct." Baslow responded at 2:35pm: "Correct." | |
| 76. | Less than 20 minutes later, on July 16, 2012 at 2:52 PM, Andrew Baslow sent Sam Schoonover a text message: "Hey man, I've got another case for you and have confirmation that we can use you again.  You down?" | EXH. 25 at SCHOONOVER00083 |
| 77. | Schoonover responded to Baslow and said: "Yup. Send me over the information or lemme know what I have to do" | EXH. 25 at SCHOONOVER00083 |
| 78. | Baslow responded to Schoonover and wrote: "This one is a little different.  You won't have to buy anything.  Just make a phone call, but I'll need to chat with you on the phone to tell you all the details." | EXH. 25 at SCHOONOVER00083 |
| 79. | Schoonover and Baslow agreed to speak on the phone and Baslow told Schoonover that he will "prob wanna take a couple notes, too." | EXH. 25 at SCHOONOVER00083 |
| 80. | On July 16, 2012 at 3:14 PM, Baslow and Schoonover spoke on the phone for six and a half minutes. | EXH. 212; EXH. 23 at 10 (Item Nos. 7364-65) |
| 81. | On that call, Baslow told Sam Schoonover "that [NTG is] | EXH. 14, Baslow Depo. Tr. (Aug. 26, 2020) at 293:9-20. |

| | | |
|---|---|---|
| | investigating the fact that companies could possibly be illegally recording and monitoring conversations and to let us know if that's the experience that he has, if he's ever told by anybody, being an automated greeting or whatever, that his conversation is recorded, and then report back to us." | |
| 82. | Baslow gave Schoonover the name of the company, Himalaya Drug Company, and provided him with the phone number to call. | EXH. 14, Baslow Depo. Tr. (Aug. 26, 2020) at 292:16—293:5; EXH. 26 |
| 83. | Baslow instructed Schoonover to send him a confirmation statement describing his call. | EXH. 14, Baslow Depo. Tr. (Aug. 26, 2020) at 293:5-25 |
| 84. | Baslow text messaged Schoonover telling him that he could "call tomorrow" if they are closed due to east coast hours. | EXH. 25 at SCHOONOVER00084 |
| 85. | The next morning, on July 17, 2012, at 8:58 AM, Schoonover called Himalaya Drug Company (800-869-4640) from his friend Austin Glenn's cell phone (714-396-6971). | EXH. 28 at Exhibit A<br>EXH. 26<br>EXH. 29 |
| 86. | Schoonover called Himalaya Drug Company from a location in California and Himalaya Drug Company is located in Texas. | EXH. 25 at SCHOONOVER00084 (saying he is waiting for his neighbor to get home and that he would call in the morning);<br><br>EXH. 30 at 41;<br><br>RJN 5 at ¶3 |
| 87. | On July 17, 2012 at 9:10 AM, | EXH. 26 |

| | | |
|---|---|---|
| | Schoonover emailed Baslow:<br><br>"Hello Andrew, I called Himalaya drug group at 9:05AM on July 17th with the number that you provided me on July 16th at 3PM." | |
| 88. | On July 17, 2012, Schoonover texted Baslow to let him know that he had "[j]ust sent over" the confirmation statement email. | EXH. 25 at SCHOONOVER00084 |
| 89. | On July 17, 2012 after 9:10am Baslow texted Schoonover and said:<br><br>"Hey. Got your email. Everything is good except a few things. 1.) don't address it to me nor say that I provided you with the number 2.) please include the number you called from besides your cell and the actual number I gave you to call, and 3.) make sure you mention that through all of this nobody told you that your call would be recorded/monitored." | EXH. 25 at SCHOONOVER00084-85 |
| 90. | On July 17, 2012 at 9:24 AM, Schoonover sent a revised email to Baslow that complied with his instruction | EXH. 29 |
| 91. | The revised email was not addressed to "Andrew" but simply said "Hello." | EXH. 29 |
| 92. | The revised email no longer stated that Schoonover had been given Himalaya Drug Company's phone number. | EXH. 29 |
| 93. | The revised email stated that Schoonover called from 714-396- | EXH. 29 |

| | | |
|---|---|---|
| | 6971 (his roommate Austin Glenn's phone). | |
| 94. | The revised email contained the sentence: "During the entire exchange.  No one told me that the call would be recorded/monitored. I just wanted to let someone at Trial Newport know that this was going on." | EXH. 29 |
| 95. | After sending the revised email, Schoonover told Baslow "K check that one" and Baslow responded "Excellent. I'll get back to you soon." | EXH. 25 at SCHOONOVER00085 |
| 96. | Less than an hour later, on July 17, 2012 at 9:59 AM, Scott Ferrell directed Victoria Knowles to draft a complaint against Himalaya Drug Co. on behalf of Sam Schoonover.<br><br>In that email Ferrell stated that Schoonover's call to Himalaya "was monitored and recorded but that was not disclosed to client." | EXH. 31 |
| 97. | On July 19, 2012, NTG filed a lawsuit against Himalaya Drug Co. on behalf of Sam Schoonover and a class of similarly situated persons alleging violations of the CIPA. | RJN 2 |
| 98. | Scott Ferrell signed the complaint. | RJN 2 at 11 |
| 99. | The complaint alleged:<br><br>"In the summer of 2012, [Schoonover] called Defendant's customer service telephone number (800-869-4640) to gain information about one of Defendant's organic | RJN 2 at ¶¶ 8-10. |

| | | |
|---|---|---|
| | personal care products.<br><br>…<br><br>[Schoonover] was not aware that the call was being recorded . . . [and] [Schoonover] did not give either express or implied consent to the recording.<br><br>…<br><br>After completing her call, [Schoonover] learned that Defendant makes a habit and practice of recording *every* incoming telephone call to its customer service line." | |
| 100. | Those representations were false because:<br><br>• Schoonover called at Andrew Baslow's direction and for the purpose of bringing a wiretapping lawsuit based on call recording practices.<br>• Schoonover impliedly consented to being recorded.<br>• Schoonover did not learn that Himalaya recorded every incoming call *after* he made his call. | EXH. 14, Baslow Depo. Tr. (Aug. 26, 2020) at 292-93<br><br>*Negro v. Superior Court*, 230 Cal. App. 4th 879, 892 (2014) (where a caller proceeds to use the communication device "after receiving notice that his or her communication ***may*** be intercepted," they have impliedly consented to the interception or recording as a matter of law (emphasis added)). |
| 101. | The complaint omitted the following facts:<br><br>• Sam Schoonover called Himalaya Drug Co. at the direction of the Newport Trial Group | RJN 2 |

| | | |
|---|---|---|
| | • Sam Schoonover was given the phone number by an NTG agent<br><br>• Sam Schoonover made the phone call to create a pretext for a lawsuit<br><br>• Sam Schoonover knew that Himalaya Drug Co. records incoming calls when he made his phone call and did not expect privacy when he called.<br><br>• NTG investigated the viability of a lawsuit against Himalaya Drug Company before they directed Schoonover to make his call. | |
| 102. | Scott Ferrell had knowledge that Andrew Baslow contacted Himalaya Drug prior to speaking with Sam Schoonover specifically about the upcoming Himalaya wiretap case. | EXH. 27; |
| 103. | After the complaint was filed, Scott Ferrell communicated with counsel for Himalaya Drug Company, Angel Garganta, concerning the litigation and potential resolution of same. | EXH 7 (NTG006168-6174) |
| 104. | Himalay's counsel inquired into the circumstances of NTG's investigation and Schoonover's phone call.  Himalaya was specifically interested in the number from which Schoonover made his | EXH 7 (at NTG006172) |

| | | |
|---|---|---|
| | call to Himalaya. | |
| 105. | In response to Himalaya's request for information, Scott Ferrell emailed Andrew Baslow on 8/11/12 at 10:21am and asked about the number Schoonover used to call Himalaya.  Ferrell asked, | EXH. 32 |
| | "Is there any reason not to share that with them, and do you know the background (is it a landline, who owns it, etc.)?  For example, I want to make sure it wasn't your [Baslow's] house, your cell, or anything like that where they [Himalaya] could link it back to us[.]" | |
| 106. | In an email on 8/11/2012 at 10:59am, Baslow advised Scott Ferrell not to share the number with Himalaya counsel:  "I think it is best not to share number in which he called from.  It is a cell phone of his roommate Austin Glenn." | EXH. 33 |
| 107. | Austin Glenn had also been a plaintiff in CLRA litigation that was filed in April 2012. | RJN 35; EXH. 212; EXH. 23 at  25-28 (Showing significant communication between Glenn (714-396-6971) and Baslow in March and April of 2012). |
| 108. | In response to Himalaya's inquiries, Dave Reid emailed Scott Ferrell and asked for information about the case and Schoonover's phone call. | EXH. 34 |
| 109. | In response, Scott Ferrell provided information to Reid, and advised him to "Push toward an individual | EXH. 34 |

| | | |
|---|---|---|
| | settlement" because "This is probably one our weaker cases." Ferrell nonetheless instructed Reid to inform Himalaya: "Let him know that Sam was definitely expecting privacy since he disclosed a sensitive skin condition, depression, etc." | |
| 110. | In his phone call with Himalaya Drug on July 17, 2012, Sam Schoonover never disclosed a sensitive skin condition or depression. | Exh. 28 (Exh. D, audio recording produced by Himalaya and named "7143966971.wav" (filed manually on Compact Disc)). |
| 111. | Himalaya's counsel also asked for information about the phone call placed by Baslow in July 2012: "Scott also states … that [NTG's] investigator called and was told all calls are recorded.  Can you provide the number from which the investigate called and the date?  We are trying to determine how he could possibly have been provided inaccurate information." | EXH. 35 |
| 112. | In response to that inquiry, Scott Ferrell falsely informed Dave Reid that NTG's investigator had "called on Wednesday, July 18th". | EXH. 36 |
| 113. | On October 25, 2012, Dave Reid provided Scott Ferrell with an update on litigation, including the Himalaya Drug matter.  In reference to Schoonover's case, Reid summarized a conversation that he had with Himalaya counsel: "He then read me a transcript of the Schonover's call.  I believe this is | EXH. 36 |

| | | |
|---|---|---|
| | one of the first ones we filed so the content of the conversation is not really private or personal in any way.  He just asks what their most successful product is and then nothing else is disclosed and the conversation ends." | |
| 114. | The Himalaya matter eventually settled for $17,500, with NTG's clients (including Schoonover) each receiving $2,000 and NTG keeping the remainder. | EXH. 37 |
| 115. | The settlement agreement with Himalaya Drug Company did not contain any provisions requiring changes to Himalaya's business practices or recording practices. | EXH. 28 at Exhibit E |
| 116. | Scott Ferrell and NTG never informed Himalaya Drug Company or its counsel, that:<br><br>• NTG "audited" Himalaya's phone line before Schoonover called;<br><br>• NTG directed Schoonover to call Himalaya and provided him with the phone number to call for his new "case"; | EXH 7<br>EXH. 73 - NTG0006390<br>EXH 36 (NTG006386-6387)<br>EXH. 25;<br>EXH. 35 |
| 117. | Following the Himalaya Settlement, Baslow asked Schoonover to make additional phone calls for litigation: "Hey Same did you make that call?" (Nov. 1, 2012) | EXH. 25 at SCHOONOVER 00086-87 |
| 118. | In early November 2012, Schoonover informed Baslow that he no longer wished to participate | EXH. 25 at SCHOONOVER00087-89 |

in wiretap cases, in part, because his father found those lawsuits unethical:

"I'm having an issue though. See, my dad and I are very close and we talk about everything. He's been financially helping me out with my entrepreneurial ventures and after I told him about the last case we won, he decided that he doesn't want me participating in any more phone call cases because he feels like its not as 'ethically correct' his words, not mine. I've tried today to convince him otherwise but he's unwilling to budge. I can't risk going forward without his consent for one, because he's my dad and were (sic) very close, and for two, because he would stop assisting me with my ventures which mean the world tome. So if you have any more product based cases, I'd be glad to assist you. It's not a judgment on you or your firm, just his own personal opinions. I wish it were different because that last 1500 and this forthcoming 2000 have been extremely helpful. Let me know if there are any product based cases ad (sic) I'd be glad to help you out."

| | | |
|---|---|---|
| 119. | Scott Ferrell supervised Baslow in his interactions with NTG clients. | EXH. 1, S. Ferrell Tr. at 91-92, 98-99 |
| 120. | Andrew Baslow followed Scott Ferrell's instructions when dealing with NTG wiretap clients. | EXH. 1, S. Ferrell Tr. at 99 |
| 121. | Scott Ferrell was the ultimate decision-maker in NTG regarding | EXH. 5, NTG 30(b)(6) Tr. at 59-60 |

| | | |
|---|---|---|
| | whether the firm would pursue cases on behalf of specific clients. | |
| 122. | Andrew Baslow received a promotion by Scott Ferrell to Director of Field Operations. | EXH. 14, Baslow Depo. Tr. (Aug. 26, 2020) at 47. |
| 123. | On NTG's behalf, Baslow communicated with Schoonover regarding the Himalaya settlement and receipt of Schoonover's signed settlement agreement. | EXH. 25 at SCHOONOVER00089-92 |
| 124. | At deposition, Sam Schoonover testified that he lacked memory of communications that he had with Andrew Baslow in 2012:<br><br>Q. Did you speak to Mr. Baslow at any point in time in July 2012?<br><br>A. I don't remember<br><br>(Tr. at 73)<br><br>Q. Do you recall whether you spoke to Mr. Baslow in May of 2012?<br><br>A. No.<br><br>(Tr. at 75).<br><br>Q. Did you speak with Andrew Baslow before you sued the Himalaya Drug Company?<br><br>A. I don't remember what I spoke with him about and when the lawsuit was.<br><br>(June 2 Tr. at 16).<br><br>Q. Now, your lawsuit against the Himalaya Drug Company, that related to a phone call you made to | *Compare* EXH. 30 *with* Dkt. 375-4, RJN 5 |

| | | |
|---|---|---|
| | them, correct?<br><br>A.  Yes.<br><br>Q.  Did you speak with Andrew Baslow before you made that phone call?<br><br>A.  Don't remember.<br><br>Q.  Did you learn about the Himalaya Drug Company from Andrew Baslow?<br><br>A.  I do not remember.<br><br>(*id.* at 16-17). | |
| 125. | Pursuant to the settlement agreement, Himalaya (a company with its principal place of business in Texas) wired $17,500 to the Newport Trial Group (a company with its principal place of business in California). | EXH. 28 at Exhibit E;<br><br>EXH. 38 at 16-18 |
| 126. | Sam Schoonover was sent a check containing his portion of the settlement by US Mail. | EXH 25 at SCHOONOVER0089;<br>EXH. 38 at 18 |

## 2.  Demulder v. Carter-Reed Co.

| | | |
|---|---|---|
| 127. | On June 2, 2012, Scott Ferrell sent Andrew Baslow an email asking him to locate a client for litigation against Carter-Reed:<br><br>"We would like to work with someone who has called 1-800-506-1577 to order a diet pill called Relacore, asked a few questions of a customer service rep, and not told that their call was being recorded. This one is somewhat time sensitive | EXH. 17. |

| | | |
|---|---|---|
| | and needs to be an outstanding potential client whose deposition may be taken." | |
| 128. | On August 1, 2012, Baslow completed an audit call to Carter-Reed by calling the phone number: 1-800-506-1577. | EXH. 212; EXH. 23 at 15 (Item No. 9148) |
| 129. | On August 13, 2012, Baslow also called the phone number 800-836-3177 on two separate occasions. | EXH. 212; EXH. 23 at 16 Item Nos. 8765 & 8777) |
| 130. | The number 800-836-3177 was associated with a company called "Healthy Med," which was later targeted by Demulder and NTG. | EXH. 39 |
| 131. | Baslow later contacted Taylor Demulder by text message on August 17, 2012 at 11:44am. Baslow and Demulder also spoke by phone on August 17, 2012 for nearly 13 minutes. | EXH. 212; EXH. 23 at 20 (Item No. 21053)<br><br>EXH. 212; EXH. 23 at 17 (Items 8952, 8953) |
| 132. | In total, Baslow and Demulder exchanged thirty (30) text messags on August 17, 2012. | EXH. 212; EXH. 23 at 20, 36 (Items 21053-78, 21090-92, 21095-96) |
| 133. | Demulder also called Healthy Med on August 17, 2012 at 800-836-3177. | EXH. 39 |
| 134. | On August 18, 2012, Demulder sent Baslow a confirmation email related to a wiretap investigation involving Healthy Med.  Demulder explained that:<br><br>"I spoke with Mark at Health Med (800) 836-3177… From the start of the call to the finish Mark never told me that the call was being | EXH. 39 |

| | | |
|---|---|---|
| | monitored or recorded." | |
| 135. | On August 22, 2012, Demulder and Baslow exchanged another sixteen (16) text messages.  Baslow was the party who first initiated those text messages on that day. | EXH. 212; EXH. 23 at 39 (Items 21246—21251, 21257-21258, 21260-67) |
| 136. | Demulder also communicated with Baslow by phone on August 22, 2012. | EXH. 212; EXH. 23 at 18 (Items 9078-9079) |
| 137. | Three days later, on August 25, 2012, Andrew Baslow sent a follow-up email to Demulder asking for an update on the confirmation statement for Demulder's new wiretap case.  The title of that email was "Re:  New Case – Relacore"

Baslow was in Israel at the time. He specifically wrote:

"Just wanted to check in with you as I have not seen your confirmation statement come through for the new Relacore wiretap case.  Do you still plan on making this call? If so, please send over your summary ASAP, as I will continue to check my e-mail for it while I am here in Israel." | EXH. 39 |
| 138. | Baslow emailed Demulder again on September 5, 2012:

"I am back in the US now.  Sent you a text message yesterday to follow up on your new case.  Are you still planning on participating, or should I move forward and find someone else?" | EXH. 39 |

| | | |
|---|---|---|
| 139. | On or about September 6, 2012 at 8:30 a.m. Demulder called 1-800-506-1577, which he believed at that time to be associated with Carter-Reed Company, LLC ("Carter-Reed") or one of its affiliates and spoke with a customer service representative named Melissa. | RJN 1 - *Demulder v. Carter-Reed*, No. 3:12-cv-2232-BTM-MDD (S.D. Cal.) Dkt. 6 at 9.<br><br>EXH. 97 (Transcript of Demulder's September 6, 2012 call to Carter-Reed that was attached as Exhibit C to NIC's Second Amended Complaint)<br><br>EXH. 206 at 18-19 ("Defendant made one phone call to Carter-Reed, LLC's 1-800 number in 2012. Defendant respectfully refers Plaintiff to Exhibit C to Plaintiff's Second Amended Complaint, ECF No. 92-3, for the transcript of Defendant's phone call to Carter-Reed, LLC's 1-800 number."). |
| 140. | Demulder made that call to Carter-Reed from his office phone in Las Vegas, Nevada.  Carter-Reed is a company with its principal place of business in Utah. | EXH. 40 at 74-75<br><br>EXH. 206 at 10-13<br><br>RJN 1 at ¶2 |
| 141. | During his call, Demulder provided a false last name.  He falsely claimed to have lost his job.  He falsely claimed to be overweight.  He falsely claimed to have purchased the Carter-Reed product on a prior occasion.  He sought to provide his social security number without being asked. | EXH. 97 (Transcript of Demulder's September 6, 2012 call);<br><br>EXH. 206 at 18-19 (sponsoring transcript filed here at Exhibit 97)<br><br>RJN 6 - 2:13-cv-00435-DBP Dkt. 2-2<br><br>EXH. 40 at 85:5-15 (Name)<br><br>EXH. 40 at 86:4-17 (SSN)<br><br>EXH. 40 at 86:15—87:13 (Weight)<br><br>EXH. 40 at 87:14-21 (Job loss)<br><br>EXH. 40 at 85:16-22 |
| 142. | Like Demulder, many of NTG's wiretap clients alleged that they disclosed their social security | RJN 36 - *Perea v. Humana Pharmacy, Inc.*, 8:12-cv-01881-JLS-AN (C.D. Cal. 2013), Dkt. 1 at |

| | | |
|---|---|---|
| numbers during wiretap phone calls. | | ¶ 8 (NTG alleged that Perea "spoke to a customer service representative, and had a sensitive, private and confidential discussion wherein [Perea] provided his name and social security number"); |
| | | RJN 37 - *Vamvakias v. Lincoln National Corporation d/b/a Lincoln Financial Group*, No. 5:12-cv-01776-DDP-SP (C2012), Dkt. 1 at ¶ 8 (NTG alleged that its client "connected to a customer service representative and they proceeded to have a sensitive, private and confidential discussion wherein Plaintiff first provided his name and social security number"); |
| | | RJN 38 - *Causillas v. Wellnx Life Sciences USA*, No. 12-cv-10044-JFW (C.D. Cal. 2012), Dkt. 1 at ¶ 8 (NTG alleged that its client "spoke to an employee of Defendant … and they proceeded to have a sensitive, private and confidential discussion wherein Plaintiff provided her name and social security number"); |
| | | RJN 39 - *Doucette v. Rent-A-Center, Inc.*, No. 12-cv-6886-MRP (C.D.2012), Dkt. 1 at ¶ 8 (NTG alleged that its "Plaintiff spoke to a customer service representative … and they proceeded to have a private and confidential discussion" and "Plaintiff also gave Defendant his social security number") |
| | | RJN 34 – *Clark v. MyLife*, No 2:12-cv-06889-R (C.2012), Dkt. 29 |

| | | |
|---|---|---|
| | | at 9 (NTG argued that its CIPA plaintiff "had a conversation that he considered to be private and confidential because he disclosed personal information including his social security number") |
| | | EXH. 42 |
| | | EXH. 207 - NTG058420 (Nilon demand to Chromadex alleging that "When Nilon called … he provided … his social security number") |
| 143. | NTG has used the fact that its clients disclosed social security numbers to argue in briefs that the client's calls were objectively confidential:<br><br>"The nature of such communications is inherently personal and private in nature, unlike the bare content of the communications at issue in *Hilton*, which this Court deemed to be not objectively reasonable to expect confidentiality.  Indeed, the defendants in *Hilton* pointed out that the plaintiff in that case did allege any "personal or confidential information, _such as a Social Security number._"  Here, in contrast, Plaintiff Clark disclose[d] his social security number to Defendant's customer service representative. Thus, the First Amended Complaint alleges precisely the type of confidential communication that would have met the legal standard articulated by the defendants in the | RJN 34 - NTG Memo in Opp. to Mot. to Dismiss, *Clark v. MyLife.com*, No. 2:12-cv-6889-R-PLA (C.D. Cal. 2012), Dkt. 29 |

| | | |
|---|---|---|
| | *Hilton* action." | |
| 144. | On September 6, 2012 at 8:30am, Demulder sent his confirmation email to Baslow by email, stating as follows:<br><br>"To whom this may concern:<br><br>I spoke with Melisa at Rela Core (800) 506-1577 at around 8:30 a.m. on 9/6/12 from (702) 407-0591. I told her my first name and then asked her to see if she could look up an account I may have already started. I then gave her my social security number and then she asked for my last name. She then proceeded to tell me about the diet pills they have to offer. I then began to tell her about my dissatisfaction with my weight and my social life and that I really wanted to loose weight. We then talked about how much weight I could loose if I used the diet pills. we then began to talk about the cost of the pills. I expressed to her that I recently lost my job and that I may not be able to afford the pills. From the start of the call to the finish Melisa never told me that the call was being monitored or recorded." | EXH. 41 |
| 145. | Demulder was in Nevada on Septembre 6, 2012 when he exchanged emails with Baslow, who was located in California. | EXH. 40 at 74-75<br><br>EXH. 15, Baslow Depo. Tr. (August 9, 2017) at 23:13-25. |
| 146. | About twenty minutes later, | EXH. 39 |

| | | |
|---|---|---|
| | Demulder sent Baslow an email referencing his confirmation statement:<br><br>"Hey Andrew!<br><br>I hope you had a good trip!  I sent over everything and It is pretty strong.  I hope im not too late.  Thanks again and ill talk to you soon.  Have a Great day!" | |
| 147. | Baslow responded to Demulder one minute later on September 6, 2012 at 8:52am:<br><br>"Got it all.  Not too late.  Nice work.  I'll be in touch soon." | EXH. 43 |
| 148. | Later on September 6, 2012, Baslow provided Demulder's confirmation statement to NTG employees, and Scott Ferrell indicated that Demulder's wiretap case would be referred out to Kirtland & Packard. | EXH. 44 |
| 149. | NTG would send the confirmation statements to opposing counsel and also co-counsel as a means to demonstrate the merits of its wiretap cases. | EXH. 5, NTG 30(b)(6) Tr. at 134-136;<br><br>EXH 45. |
| 150. | NTG referred the Demulder case to Kirtland & Packard LLP, but never informed K&P in writing that Demulder had already been a client of NTG, that Demulder had already performed a wiretap phone call earlier in August, or that Demulder was instructed to call Carter-Reed by NTG. | EXH. 45 |

| 151. | Demulder alleged in his Complaint that he was a resident of Las Vegas Nevada as of September 6, 2012. | RJN 6 |
|---|---|---|
| 152. | Scott Ferrell provided instructions to NTG field representatives in the Demulder matter, including instructing Wynn Ferrell and Baslow to prepare Demulder for an initial interview with Kirtland & Packard. | EXH. 46 |
| 153. | Scott Ferrell also offered to assist Kirtland & Packard in communicating with wiretap clients:  "Can I do anything to help put you in touch with everyone, get signatures, etc.?" | EXH. 47 |
| 154. | Despite having called Carter-Reed specifically for his "new Relacore wiretap case," in his Complaint filed against Carter-Reed, Demulder alleged that he "was not aware that the call was being recorded" and that he "did not give either express or implied consent to the recording." | RJN 6 at ¶9. |
| 155. | Demulder alleged that "[a]fter completing his call," he learned that Carter-Reed recorded the conversation.  He also alleged that he thought his conversation was "confidential" because "such communications are carried on under circumstances that reasonably indicate that the customer-party to the communication desires it to be confined to them and Defendant." | RJN 6 at ¶10. |

| 156. | Demulder alleged that he had "suffered an injury in fact" from his Carter-Reed phone call. | RJN 6 at ¶38. |

### 3. Torres v. Nutrisystem – Demonstrating Pattern, Plan, Motive, Intent

| 157. | NTG filed a wiretap complaint against Nutrisystem in 2012 on behalf of Raquel Torres. | RJN 8 |
| 158. | In that complaint, NTG and Torres represented to Nutrisystem, Inc. that: (1) Torres made a call to Nutrisystem on August 24, 2012 that conveyed sensitive, private, and confidential information; (2) Torres did not know the call was being recorded; (3) Torres did not give express or implied consent to the recording; and (4) Torres only learned Nutrisystem recorded her conversation *after* that call. | RJN 8 at ¶¶8-13 |
| 159. | Before Torres's August 24, 2012 call to Nutrisystem, NTG's Director of Field Operations, Andrew Baslow, called Nutrisystem to determine whether Nutrisystem "recorded calls and if they provided [a recording] disclosure." Baslow testified at deposition that he performed that task at the direction of NTG attorneys. | EXH 208 at Tr. 19:9—21:21, 34:8—35:14, 49:16—50:8; 66:3-25.<br>EXH. 212; EXH. 23 at 25 Item Nos. 2301, 2307, 2310 (Baslow phone records). |
| 160. | Baslow called Nutrisystem five times on August 6 and 7, 2012. | EXH. 212; EXH. 23 at 35-36 |

| 161. | Nutrisystem's call center announced to callers that incoming calls were recorded as part of the initial automated greeting. | RJN 40 at ¶ 7 (emphasis added); |
| --- | --- | --- |
| 162. | In his five phone calls, Baslow learned that by pressing "1" within the first eight seconds of a call, he could bypass the automated notice of recording and reach a live Nutrisystem representative. | EXH. 208 at 73-78; RJN 40 at ¶¶ 7, 10-13 (explaining how a caller could bypass the disclosure); see also Exh. 4 (recording of Nutrisystem warning). EXH. 94, Deposition of Nutrisystem 30(b)(6) Tr. at 113-117, 185-186. |
| 163. | NTG's case charts for wiretap cases indicated which companies used disclosures that could be bypassed by using the tag "minimal bypass" or MB on those charts. | EXH. 21 EXH. 22 |
| 164. | About two weeks after Baslow contacted Nutrisystem and discovered a dialing method that evaded the recording notice, on August 22, 2012 Torres began her attempts to contact Nutrisystem, but she apparently had the number wrong. | EXH. 50 at 244 (Item Nos. 4628, 4629, 4630) and 248-49 (Item Nos. 4696-4708) (repeatedly calling 1-800-435-449**7** instead of 1-800-435-449**0** on August 22 and August 24 from 12:10 pm to 12:15pm) |
| 165. | Three hours before completing her call to Nutrisystem, on August 24, 2012 at 12:17pm, Torres's phone records show a phone call to the number associated with Wynn Ferrell, one of two NTG field representatives at the time. | *See* Exh. 50 at 249 (Item No. 4712, calling at 12:17 p.m.) EXH 5 (NTG 30(b)(6)) at Tr. 116-117 (NTG had two field representatives) |
| 166. | Wynn Ferrell was the NTG field | EXH 49 |

| | | representative who assisted NTG in the Torres v. Nutrisystem matter. | EXH 5 (NTG 30(b)(6)) at Tr. 187:11—188:16; |
|---|---|---|---|
| | 167. | In an email on February 4, 2013, Baslow stated that Raquel Torres was "one of Wynn's people[.]" | EXH. 48 |
| | 168. | On August 27, 2012, Scott Ferrell sent Wynn Ferrell an email thanking him for assisting with wiretap cases and reminding him of the need to have clients disclose confidential information: "As a reminder to our plaintiffs, each of them will need to advise us of what confidential information that they shared with the defendant. It will need to be completely accurate because the defendants will have a recording of the calls." | EXH. 49 |
| | 169. | Several hours after connecting with the phone number associated with Wynn Ferrell, Torres dialed Nutrisystem (1-800-435-4490) and completed her call to Nutrisystem which ultimately supported her complaint. | EXH. 50 at 251 (Item No. 4745) |
| | 170. | The phone number at Nutrisystem that Torres called was not a phone number that Nutrisystem "actively marketed" to consumers at the time. | EXH. 94 at 76 |
| | 171. | Torres specifically pressed "1" within the first six seconds of her call to Nutrisystem on August 24, 2012, which routed her around the Nutrisystem Disclosure, and which mirrored Andrew Baslow's August | *See* RJN 40 at  ¶¶ 20, 41;  EXH 94 (Nutrisystem 30(b)(6)) Tr. at 68 |

| | | |
|---|---|---|
| | 7, 2012 phone calls to Nutrisystem. | |
| 172. | Torres gratuitously disclosed her Social Security Number when calling Nutrisystem. | EXH. 223 (Torres phone recording, Manually Filed) |
| 173. | Nutrisystem's Manager of Business Information Services testified that Raquel Torres's call pattern was extraordinary and inconsistent with the overwhelming majority of calls Nutrisystem received. | *See* RJN 40 at 7<br><br>EXH 94 (Nutrisystem 30(b)(6)) Tr. at 92-93 |
| 174. | On January 23, 2013, NTG filed a motion to certify class in the Nutrisystem matter. *Torres v. Nutrisystem Inc.*, No. 8:12-cv-01854, Dkt. 17 (C.D. Cal.). | *Torres*, No. 8:12-cv-01854, Dkt. 17 (C.D. Cal.) |
| 175. | On March 8, 2013, Nutrisystem filed an Opposition to NTG's Motion to Certify a Class. In that brief, Nutrisystem argued that Torres' case appeared to be an attorney-drive set-up because NTG "retained an investigator to find out exactly how to bypass the Disclosure, then found a Plaintiff who intentionally bypassed the Disclosure in the same way." | RJN 41 at 27-28 (Docket pagination). |
| 176. | In response to Nutrisystem's allegations, NTG filed a brief acknowledging that Nutrisystem's allegations of attorney-driven litigation involved "foul play":<br><br>"If the Court credits Defendant's completely unsupported allegations of foul-play, it would have to conclude that Plaintiff, Mr. Baslow, and Mr. Richardson have all lied." | RJN 42 at 19-20 (Docket pagination). |

| 177. | Raquel Torres was scheduled for deposition in the *Nutrisystem* case for February 2013. On February 3, 2013, Scott Ferrell sent an email instructing his employees to prepare Raquel Torres "and make sure she is absolutely ice cold[.]" | EXH. 48 (at NTG017139) |
|------|---|---|
| 178. | In response, Victoria Knowles inquired as to whether the NTG firm had used Torres in other cases: "Have we filed any other suits with Ms. Torres in the past?" | EXH 48 |
| 179. | In preparation for Torres' deposition, on February 3, 2013, Scott Ferrell sent instructions to his subordinate attorney to prepare Torres in response to certain deposition questions. | EXH. 51 |
| 180. | In his 2/3/2013 email, Ferrell provided answers to anticipated questions that Torres might encounter at deposition. | EXH. 51 |
| 181. | Ferrell instructed Knowles to prepare Torres to testify that:<br><br>• She did not speak to anyone about a potential lawsuit against Nutrisystem before calling;<br><br>• She did not speak to anyone at NTG before calling;<br><br>• The lawsuit was "not a 'set-up' or 'gotcha' of any kind. She had no intention of suing anyone until her final call, when she realized it was recorded; and | EXH. 51 |

| | | |
|---|---|---|
| | • She had not been in contact with any lawyer until after she learned that her call was secretly recorded. | |
| 182. | Prior to sending his email on Feb. 3, 2013, Scott Ferrell had never communicated with Raquel Torres about the substance or circumstances of her case. | EXH. 5 at 189-190 |
| 183. | Raquel Torres was deposed in the Nutrisystem matter on February 22, 2013. | EXH. 52 at 8:12-18 |
| 184. | Consistent with Ferrell's instructions in NTG017134, Torres testified falsely at deposition regarding the first time she communicated with NTG:<br><br>Q. Do you remember who from the firm you contacted?<br><br>A. I don't know who answered the phone, but I ultimately talked to Ryan Ferrell.<br><br>Q. And was that the first time you'd ever spoken to anyone from the Newport Trial Group?<br><br>A. Yes.<br><br>Q. And do you remember when that was?<br><br>A. Early September, about then. | EXH. 52 at 19-20 |
| 185. | The settlement agreement in the Nutrisystem matter, signed by Scott Ferrell, did not include any provisions that would require Nutrisystem to change its business practices or recording practices. | EXH. 53 |

1

2

## C. False Advertising Scheme

| 186. | By at least 2010, NTG had begun pursuing lawsuits on behalf of individuals under California's false advertising laws. | RJN 9; RJN 10; RJN 11; RJN 12; RJN 13 |
|---|---|---|
| 187. | Those cases were pursued under the CLRA, FAL, and UCL. | RJN 9; RJN 10; RJN 11; RJN 12; RJN 13 |
| 188. | NTG did not act as litigation counsel in every case, but often referred clients to other law firms in exchange for a referral fee. | EXH. 16 - NTG014605 ("We have an arrangement with Kirtland Packard on the green-washing complaints whereby we send the CLRA letters and prep the complaints for Kirtland's filing.") EXH. 38 at 16-18 (NTG received a $5,138.05 referral fee from Kirtland & Packard in *Dronkers*) |
| 189. | NTG obtained false advertising clients through direct solicitation and referrals from other clients, not through advertising. | EXH. 24 at SCHOONOVER69-70; EXH. 1 at 95-98 (No advertising for plaintiffs) |
| 190. | NTG requested that clients provide the contact information for other individuals that would be willing to be plaintiffs in pre-identified legal matters. | EXH. 24 at SCHOONOVER69-70 |

| 191. | NTG solicited clients to participate in litigation against companies that NTG had already identified or sued. | RJN 13 (Filed on January 20, 2012); *and compare to* EXH. 24 (Directing Schoonover to buy Organix Shampoo and Conditioner already at issue in Vogue matter to add him to the case);

EXH. 54 (December demand letter to NIC); *compare to* RJN 14 (stating that Scott Ferrell understood he needed a new client by January 2012);

RJN 16, Nilon Declaration at ¶2, *compare with* EXH. 101 (Ferrell instructing Knowles to prepare CLRA letter on 12/25/2011);

EXH. 209 - NILON ADMISSION 8/24/2015

EXH. 55 *compare to* EXH. 67; *and* EXH. 56

RJN 9; *compare to* EXH. 57 (June 24, 2010); EXH 58 at 32-34 |
| 192. | NTG directed clients to purchase specific products for false advertising litigation. | EXH. 24 |
| 193. | NTG would collect the product receipt following the directed purchase as a means of proving the individual had been injured under the law. | EXH 24 ("POP" means proof of purchase which is your receipt)

EXH. 1 at 61-62 (POP means Proof of Purchase) |
| 194. | NTG threatened lawsuits under the false advertising laws through demand letters. | EXH. 59;

EXH. 60;

EXH. 61;

EXH. 62

EXH. 63 |

| 195. | NTG filed lawsuits, directly or through co-counsel for a referral fee, alleging that the defendants' false advertising plaintiff had bought the product based on its advertising, the product did not work as advertised, and that the plaintiff would not have bought the product but-for the advertising representations. | RJN 9; RJN 10; RJN 11; RJN 12; RJN 13 |
|---|---|---|
| 196. | NTG knew those representations were false because NTG had directed the clients to make the purchases for litigation. | EXH. 24; EXH. 209 - NILON ADMISSION 8/24/2015; RJN 18 - Magna Dkt. 61-1 (Bobba Donkdown Post); EXH. 58 (Bobba Depo Tr.) at 32-35 |
| 197. | At least two NTG clients in false advertising cases have written statements claiming that they purchased the products at the firm's direction and did not do so based on the product advertising or labeling. | RJN 18 - Magna Dkt. 61-1 (Bobba Donkdown Post); EXH. 209 – NILON ADMISSION 8/24/2015; |
| 198. | One client has admitted under oath that he was driven to the store by an NTG agent, given cash, directed to buy a specific product, and then provided his receipt. | EXH. 58 (Bobba Depo Tr.) at 32-35 |
| 199. | NTG obtained financial payments from CLRA litigation defendants. | EXH. 38 at 16-18 (Settlements with Nature's Way Products, Kiss My Face LLC, and Magna RX+) EXH. 210 at 6-10 (NTG settled with Vogue International for $70,000) |

| 200. | NTG would pay the clients $1,000 to $2,000 out of the settlement proceeds and keep the entire remainder. | EXH. 38 at 18 (Pfleg received $2,000 and NTG received $60,500) |
|---|---|---|
| | | EXH. 38 at 18 (Dronkers received $1,500 and NTG received $5,138.05) |
| | | EXH. 38 at 18 (Schoonover received $2,000 and NTG kept the remaining $13,500) |
| | | EXH. 210 at 6-10 (Schoonover received $1,500 in the *Vogue* matter out of the $70,000 settlement) |
| 201. | NTG's clients were motivated by the desire to obtain financial compensation through the manufactured false advertising suits. | EXH. 25 |
| | | EXH. 209 - NILON ADMISSION 8/24/2015; |
| | | RJN 18 - Magna Dkt. 61-1 (Bobba Donkdown Post); |
| 202. | A plaintiff does not have a valid claim under California's false advertising laws if they purchased the product for the purpose of bringing a lawsuit. | *Buckland v. Threshold Enterprises, Ltd.*, 155 Cal. App. 4th 798, 807, 66 Cal. Rptr. 3d 543, 549 (2007), *as modified* (Oct. 22, 2007), and *disapproved of on other grounds by Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 246 P.3d 877 (2011); |
| | | *In re 5-hour ENERGY Mktg. & Sales Practices Litig.*, No. 13-2438 PSG (PLAX), 2017 WL 385042, at *7 (C.D. Cal. Jan. 24, 2017) |
| 203. | Scott Ferrell knew that a false advertising plaintiff who purchased product for litigation did not have a valid claim under California law. | RJN 43 at 16-18 (Scott Ferrell calls accusation that his firm manufactured the Bobba claim "inflammatory" and an accusation of impropriety) |

| 204. | NTG is known in the legal community as a "CLRA shop" that brings volume litigation under the false advertising laws based on a "matrix" of products. | EXH. 103 - Nature'sWay_000228-229 |

### 1. Pfleg v. Nature's Way

| 205. | On January 2, 2012, Ryan Ferrell sent a demand letter on NTG letterhead to Nature's Way Products on behalf of a "California Consumer" alleging violations of California's false advertising laws. | EXH. 62 |
| 206. | On February 1, 2012, Amy Lally (counsel for Nature's Way) sent a response letter questioning the veracity of the allegations and whether NTG's client truly bought the product in reliance on the advertising. | EXH. 64 |
| 207. | On March 13, 2012 at 3:11 PM, Scott Ferrell emailed Victoria Knowles regarding "Boericke & Tafel – New homeopathy investigation" and instructed Knowles as follows:<br><br>"Will you begin drafting a CLRA and complaint – I'll send you specific product info and plaintiff info in the next day or so."<br><br>Scott Ferrell also provided a link to vitamineshoppe.com. | EXH. 18 (at page NTG005199) |
| 208. | Boericke & Tafel is a Nature's Way products brand. | RJN 11 (NTG alleged that Boericke & Tafel is a Nature's Way brand) |

| | | |
|---|---|---|
| 209. | Approximately 30 minutes later, Carla Wise informed Scott Ferrell that Nature's Way is already on Ryan Ferrell's case list, the client is Theresa Martinez, and a demand letter was sent on January 2, 2012. | EXH. 18 (at page NTG005199) |
| 210. | Scott Ferrell replied: "Even better – let's just file the complaint tomorrow.  Vic: Plead it to include all of their homeopathic products." | EXH. 18 (at page NTG005198) |
| 211. | On March 14, 2012 at 7:37 AM, Victoria Knowles told Scott Ferrell that she would begin preparing the complaint once she received a copy of Ryan Ferrell's January 2012 CLRA letter. | EXH. 18 (at page NTG005198) |
| 212. | 2 hours later, at 9:46 AM, Scott Ferrell forwarded the email chain regarding the Nature's Way matter to Andrew Baslow and said: "Bas: Can you go ahead and move forward on this?  I have concerns about the person who originally retained us." | EXH. 18 (at page NTG005198) |
| 213. | Baslow testified that he understood Scott Ferrell's email to mean that he needed to find a class representative for a case related to the Nature's Way product. | EXH. 14 at 330:14—331:7 |
| 214. | Approximately one and a half hours later, at 11:19 AM on March 14, 2012, Baslow sent a text message to Andrew Nilon, Sam Pfleg's close friend and co-worker. | EXH. 212; EXH. 23 at 19 (Item No. 14633)<br><br>EXH. 115 at 14:8, 14:13, 26:23-27:4, 29:6-7 |

| 215. | Andrew Nilon provided Andrew Baslow with contact information for his friends who might be interested in pursuing lawsuits with NTG. | EXH. 24 |
|---|---|---|
| 216. | Five hours later, at 4:18 pm on March 14, 2012, Sam Pfleg purchased six Boericke & Tafel Nature's Way products at Vitamin Shoppe.<br><br>Pfleg purchased: Arniflora Arnica GE; Triflora Arthritis; Florasone Cream; Sciatic Aide; Nighttime Cough/BR; Cough & Bronchial; Jacked Lemon Lime; and Braintoniq | EXH. 65 at NTG005127;<br><br>EXH. 56 (Pfleg Receipt) |
| 217. | The Vitamin Shoppe store was fifteen to twenty minutes by motor vehicle from Pfleg's residential address at the time. | EXH. 65 at NTG005127;<br><br>EXH. 56 (Pfleg Receipt) (store address 110 N. El Camino Real, Encinitas, CA 92024);<br><br>EXH. 66 (2907 Rancho Cortes, Carlsbad, CA)<br><br>CITE RJN (SHOWING MAP DIRECTIONS) |
| 218. | Just three minutes after completing his purchase, at 4:21 PM, Sam Pfleg calls Andrew Nilon and they speak for six minutes. | EXH. 212; EXH. 23 at 26 (Item No. 6655) |
| 219. | Just 40 minutes after Pfleg and Nilon end their call, Andrew Baslow sends Pfleg two text messages at 5:07 PM. | EXH. 212;<br><br>EXH. 211 at 534 (Items 19039 and 19040). |
| 220. | Approximately three hours later, at 8:20 PM, Sam Pfleg emails his Vitamin Shoppe receipt to | EXH. 65 |

| | | Baslow's direct email address at the Newport Trial Group. | |
|---|---|---|---|
| 221. | | Baslow then forwarded the receipt to Scott Ferrell and other NTG employees. | EXH. 65 |
| 222. | | At 8:31 PM, Baslow emailed Scott Ferrell and Knowles stating that he has a "new client who purchased half a dozen Boericke & Tafel Homeopathy products at the Vitamin Shoppe, is dissatisfied, has [proof of purchase] and would like to move forward." | EXH. 67; EXH. 18 |
| 223. | | Notably, on the same day that Pfleg purchased the Nature's Way products after Baslow was directed to find a client, Baslow contacted Sam Schoonover based on Nilon's referral and directed him to buy a product for litigation. | EXH. 24 |
| 224. | | Baslow also requested that Schoonover provide him with the names of individuals that would be interested in serving as class representatives on cases NTG already had. | EXH. 24 |
| 225. | | Similarly, Baslow contacted Nilon shortly after he was asked to find a client and Pfleg called Nilon minutes after he purchased the Boericke & Tafel products. | EXH. 212; EXH. 23 at 19 (Item No. 14633)<br><br>EXH. 212; EXH. 23 at 26 (Item No. 6655) |
| 226. | | Pfleg sent the receipt directly to Baslow's firm email address even though they had never met in- | EXH. 65<br>EXH 38 at 11-14<br>EXH. 212; EXH. 23 |

| | | |
|---|---|---|
| | person or communicated with each other prior. | |
| 227. | On March 15, 2012, Baslow sends Pfleg retention documents, including a retainer agreement and NTG's "Duties of a Class Representative" document. Baslow also send Pfleg various venue declarations for signature. | EXH. 213 – (ENTRY PFLEG00066-77) |
| 228. | That same day, Pfleg signs and returns the retainer agreement, Duties of a Class Representative document, and the various venue declarations. | EXH. 213 - (ENTRY NTG005177-96) <br> EXH. 66 |
| 229. | Although the retainer agreement was styled as a contingency fee agreement, the agreement contained no provision delineating the terms of the contingency arrangement in the event of recovery (i.e., the percentage recovery for the client versus the firm). | EXH. 66 |
| 230. | On March 15, 2012, Knowles drafts a new demand letter to Nature's Way based on Pfleg's purchase, Scott Ferrell reviews the demand letter, and the demand letter is sent to Nature's Way Products. | EXH. 18; <br> EXH. 68 |
| 231. | The March 15, 2012 demand letter that Scott Ferrell sent to Nature's Way Product was sent by Certified US Mail from California to Utah. | EXH. 68 |
| 232. | The March 15, 2012 demand letter represented that "[Nature's Way | EXH. 68 |

| | | |
|---|---|---|
| | Products'] misleading marketing and advertising of [Arnica Montana 30C], and similar products, caused [Sam Pfleg] to purchase this product but she(sic) did not experience any of the promised benefits.  In fact, the product was completely useless to her." | |
| 233. | Those representations were false because: <br><br>• Sam Pfleg did not purchase Arnica Montana 30C; <br><br>• Pfleg purchased the products that he did buy only 46 minutes before he was in contact with Baslow and NTG and could not have used them or determined their efficacy; and <br><br>• Pfleg purchased the product to bring litigation after Scott Ferrell directed Baslow to find a new client and Baslow reached out to Nilon to recruit his friend, Pfleg. | EXH. 65 at NTG005127; <br> EXH. 56 <br> EXH. 65; <br> EXH. 18; <br> EXH. 212; EXH. 23 at 19 (Item No. 14633); <br> EXH. 212; EXH. 23 at 27 Item No. 6655; <br> EXH. 212; EXH. 211 - (Items 19039 and 19040). <br> EXH. 24 |
| 234. | On March 15, 2012, Knowles also drafted a complaint against Nature's Way Products on behalf of Sam Pfleg. | EXH. 18 |
| 235. | Knowles sent the draft complaint to Scott Ferrell for his review. | EXH. 18 |
| 236. | On March 16, 2012, NTG filed the complaint against Nature's Way Products and Scott Ferrell signed the complaint as the filer. | RJN 11- COMPLAINT. |

| | | |
|---|---|---|
| 237. | NTG served the complaint on Nature's Way Products using Beehive Attorney Service which provides nationwide courier and legal process services. | EXH. 104 - NTG003505;<br><br>*See also* https://beehiveattorney.com/process-service (last accessed 4/25/2021) |
| 238. | The complaint against Nature's Way made the following representations to Nature's Way Products and the Court:<br><br>• Pfleg purchased several Nature's Way Boericke & Tafel products and "relied on [Nature's Way's] representations regarding the efficacy of the products . . . and but for those representations, [Pfleg] would not have purchased or paid as much for the Products."<br><br>• "Pfleg used the products as directed, but they did not work as advertised and did not provide any of the promised benefits."<br><br>• Pfleg's experience and injury were representative of the class who purchased the product as consumers and relied on Nature's Way's advertising. | RJN 11¶¶ 1, 21, 22, 32, 41, 50, 58. |
| 239. | Those representations were false because:<br><br>• Pfleg purchased the products only 46 minutes before he was in contact with the firm | EXH. 65 - NTG005127;<br>EXH. 56 - PFLEG00001(Pfleg Receipt);<br>EXH. 18; |

| | | and could not have used them as directed or determined their efficacy;<br><br>• Pfleg purchased the product to bring litigation after Scott Ferrell directed Baslow to find a new client and Baslow reached out to Nilon to recruit his friend, Pfleg;<br><br>• Pfleg's experience as an individual directed to buy the products was not at all representative of the class members' experiences and he did not make his purchase based on Nature's Way's advertising. | EXH. 212; EXH. 23 at 19 (Item No. 14633);<br><br>EXH. 212; EXH. 23 at 27 (Item No. 6655);<br><br>EXH. 212; EXH. 211 at Items 19039 and 19040.<br><br>EXH. 24<br><br>EXH. 25 |
| 240. | Scott Ferrell knew that Sam Pfleg had not purchased Arnica Montana 30C because he had been provided a copy of his receipt before revising and sending the letter. | EXH. 65 - NTG005127;<br><br>EXH. 56 - PFLEG00001(Pfleg Receipt); |
| 241. | Scott Ferrell knew that Sam Pfleg had purchased the product without any opportunity to use them as advertised or evaluate their efficacy because he received a copy of the receipt just four hours after the time of purchase shown on the receipt. | EXH. 65;<br><br>EXH. 65 - NTG005127;<br><br>EXH. 56 - PFLEG00001(Pfleg Receipt); |
| 242. | Scott Ferrell knew that Pfleg had purchased the same products (B&T homeopathic products) from the same store (VitaminShoppe) that Scott Ferrell had identified in his emails to Knowles and Baslow and that Pfleg had made his purchase | EXH. 18<br><br>EXH. 65 - NTG005127;<br><br>EXH. 56 - PFLEG00001(Pfleg Receipt); |

| | | |
|---|---|---|
| | *after* Scott Ferrell directed Baslow to obtain a new client. | |
| 243. | There is no evidence that Pfleg ever purchased Boericke & Tafel products at any time other than on March 14, 2012 from Vitamin Shoppe. | EXH. 65 - NTG005127;<br><br>EXH. 56 - PFLEG00001(Pfleg Receipt); |
| 244. | Nature's Way Products engaged in settlement negotiations with NTG and at no point during those negotiations did NTG inform counsel for Nature's Way that Sam Pfleg had purchased the product at issue at NTG's direction. | EXH. 105 - NTG005061 (offering $50,000 to settle the claim);<br><br>EXH. 106 - Nature'sWay000104;<br><br>EXH. 107 - Nature'sWay_000025;<br><br>EXH. 67 at NTG005130 |
| 245. | On June 28, 2012 at 3:10 PM, Scott Ferrell represented to Nature's Way's counsel that he spoke to his clients and they authorized him to make a settlement offer including a payment by Nature's Way Products of $62,500. | EXH. 106 - Nature'sWay000104;<br><br>EXH. 107 - Nature'sWay_000025;<br><br>EXH. 67 at NTG005130. |
| 246. | Scott Ferrell never communicated with Sam Pfleg and the only person at NTG who ever had was Andrew Baslow. | EXH. 113 at 13-14 (No attorney ever spoke with Pfleg)<br><br>EXH 38 at 11-14 (No in-person meetings)<br><br>PFLEG ROGS at 11-15 (only Baslow communicated with Pfleg) |
| 247. | Sam Pfleg and Andrew Baslow did not communicate at any time in June prior to Scott Ferrell's June 28, 2012 email to Amy Lally at 3:10pm | EXH. 212; EXH. 211. |

| | | |
|---|---|---|
| 248. | On June 28, 2012 at 3:12 PM, Scott Ferrell directs Baslow to contact Sam Pfleg and get his consent to settle the case on terms where Pfleg would receive $2,000. | EXH. 108 at NTG005781 |
| 249. | Three minutes later, at 3:15 PM, Baslow contacted Sam Pfleg for the first time since March 2012. | EXH. 212; EXH. 23 at 28 (Item Nos. 6681-84) |
| 250. | Scott Ferrell knew his representation to Nature's Way that he had communicated with his client prior to making a settlement offer was false because he did not communicate with his client, ever and because he only directed Andrew Baslow to contact the client *after* he sent the email.  In fact, Scott Ferrell did not even know Sam Pfleg's gender at the time. | EXH 113 at 13-14 (No attorney ever spoke with Pfleg) <br><br> EXH 38 at 11-14 (No in-person meetings) <br><br> EXH. 108 at NTG005781 (asking if Sam is a "male or female" after he told Nature's Way he had spoken with him). |
| 251. | On June 30, 2012, Sam Pfleg agreed to receive $2,000 to settle his claim. | EXH. 108 at NTG005781 |
| 252. | On July 6, 2012, Sam Pfleg signs the settlement agreement after receiving it from Andrew Baslow. | EXH. 109 at Nature'sWay_000007 |
| 253. | Scott Ferrell executed the Nature's Way Settlement Agreement on July 6, 2012 | EXH. 109 at Nature'sWay_000009 |
| 254. | Nature's Way executed the settlement agreement on July 10, 2012 | EXH. 109 at Nature'sWay_000008 |
| 255. | The settlement agreement required Nature's Way to wire $62,500 to NTG within ten days. | EXH. 109 at Nature'sWay_000002 |

| | | |
|---|---|---|
| 256. | Scott Ferrell directed Nature's Way to wire $60,500 to the firm's Bank of America account with "Scott Ferrell/Newport Trial Group" as the beneficiary and to wire $2,000 to the firm's trust account "REF: PFLEG." | EXH. 110 - Nature'sWay_000045-46;<br><br>EXH. 38 at 16-18 (Pfleg received $2,000). |
| 257. | Nature's Way Products is a company with its principal place of business in the State of Utah. | RJN 11 at ¶2 |
| 258. | Scott Ferrell, NTG, and his bank accounts that received the wire payments are located in the State of California. | EXH. 110 - Nature'sWay_000045-46. |
| 259. | NTG received the wired funds from Nature's Way Products. | EXH 38 at 18. |
| 260. | The wire payments from Nature's Way Products to NTG thus traveled interstate. | EXH. 110 - Nature'sWay_000045-46.<br><br>RJN 11 at ¶2<br><br>EXH 38 at 18 |
| 261. | Nature's Way's counsel expressed confusion over whether Pfleg was the only NTG client in the Nature's Way false advertising matter because they had received multiple demand letters. | EXH. 107 - Nature'sWay_000025 |
| 262. | Scott Ferrell assured Nature's Way's counsel that the "agreement encompasses all claims" and they do not have any other clients regarding Nature's Way. | EXH. 107 - Nature'sWay_000025 |
| 263. | That representation was false as Theresa Martinez, on whose behalf | EXH. 108 - NTG005780 |

| | | |
|---|---|---|
| | the January 2, 2012 letter was sent, had retained the firm. | |
| 264. | After the settlement was executed, Scott Ferrell writes internally to staff at the firm: "Let my dad know that we actually had two people on this but that we'll work with Ms. Martinez on another appropriate case" | EXH. 108 - NTG005780 |
| 265. | Thus, Theresa Martinez was not told that NTG abandoned her claims and settled with Nature's Way on behalf of Pfleg until after they had completed the settlement. | EXH. 108 - NTG005780 |
| 266. | Pfleg pursued four additional lawsuits through the Newport Trial Group, including two wiretapping matters in the summer of 2012. | EXH. 114 at 9 |

## 2. **Additional False Advertising Cases that Demonstrate Pattern, Plan, and Intent**

| | | |
|---|---|---|
| 268. | In March 2012, NTG filed false advertising lawsuits on behalf of Sam Schoonover, Andrew Nilon, Sam Pfleg, and Matthew Dronkers. | RJN 10 (Nilon v NIC)<br>RJN 11 (Pfleg v. Nature's Way)<br>RJN 12 (Dronkers v. KMF)<br>RJN 13<br>RJN 19 |
| 269. | Nilon, Schoonover, Dronkers, and Pfleg were friends and business associates. | EXH. 15, Nilon Depo (June 7, 2017) at Tr. 14:8, 14:13, 26:23-27:4, 29:6-7 |
| 270. | Nilon, Dronkers, and Schoonover were roommates at the time. | EXH 24 at SCHOONOVER00067 (Loring Street address) |

| | | EXH. 78 - NTG014703 (Loring Street address) EXH. 95 - NILON ROG RESP. at 11-12 (Loring Street Address) |
|---|---|---|
| 271. | Nilon first communicated with NTG through Andrew Baslow in October 2011. | EXH. 214; EXH. 95 - NILON ROGS at 20-21 |
| 272. | NTG filed a false advertising suit on behalf of Nilon on March 5, 2012.  The complaint alleged false advertising in relation to NIC's Sovereign Silver product. | RJN 10 (Nilon v NIC) |
| 273. | NTG sent a false advertising demand letter to NIC on December 27, 2011. | RJN 10 at 19-20 (December 27, 2011 Demand Letter) |
| 274. | In January 2012, Scott Ferrell determined that the individual on whose behalf he had purportedly sent the original letter was not suitable to be a class representative. | RJN 8 - Dkt. 812-1 at ¶14. |
| 275. | Scott Ferrell inquired to his father, Wynn Ferrell, about potential replacement clients in January 2012. | EXH. 82 - NTG022175 EXH. 111 - NTG022173 |
| 276. | As of January 31, 2012, NTG did not have client information for its case against NIC's Sovereign Silver product. | EXH. 112 - NTG022179 |
| 277. | On February 24, 2012, Andrew Baslow called Andrew Nilon. | EXH. 212; EXH. 23 at 3 (Item No. 3439) |

| | | |
|---|---|---|
| 278. | Nilon claims he purchased the Sovereign Silver product in "early 2012," after he connected with NTG in late 2011 and after NTG had already identified NIC's Sovereign Silver product as a litigation target. | RJN 16 - NILON DECL., DKT. 21-2, *Nilon v. NIC*, at ¶2<br><br>EXH. 214;<br><br>EXH. 95 - NILON ROGS at 20-21<br><br>RJN 10 at 19-20 (December 27, 2011 Demand Letter) |
| 279. | Similarly, Nilon's roommate, Sam Schoonover, purchased the products associated with his false advertising lawsuit at NTG's direction and after NTG had already identified Vogue International as a litigation target. | EXH. 22 - SCHOONOVER000066<br><br>EXH. 100 - SCHOONOVER00023 (Vogue Receipt);<br><br>*But see* RJN 13 (filed on Jan. 30, 2012) |
| 280. | On March 14, 2012, Andrew Baslow sent Sam Schoonover the following text message:<br><br>"Hey Sam, it's Andrew Baslow.  I got your contact information from Andrew Nilon as he mentioned you would like to participate in a class action.  I have a case for you, but it is very urgent and you would have to move quickly.  I need you to pick up a bottle of 'Organix' shampoo and conditioner sold at CVS.  Also, throw a couple household items on there that you need at the moment so it isn't just the shampoo.  Can you do that today and the proof of purchase (POP) over to me?" | EXH. 22 - SCHOONOVER000066 |
| 281. | Baslow sent that text message on the very same day that Sam Pfleg purchased his product from Vitamin Shoppe after Scott Ferrell | EXH. 22 -  SCHOONOVER000066<br>*See* EXH 18 |

| | | |
|---|---|---|
| | directed Andrew Baslow to find a new client. | |
| 282. | On March 20, 2012, Baslow sent Schoonover the following text:<br><br>"Hey dude.  Good to see you on Saturday.  Thanks for coming. Do you happen to have any other contacts available who would like to benefit the public?  They have to have a clean record, very reliable, and can communicate well." | EXH. 22 - SCHOONOVER000066 (at 69) |
| 283. | Schoonover responded and said "[f]or sure man! Just emailed you contact information for two great contacts." | EXH. 22 - SCHOONOVER000066 (at 70) |
| 284. | Baslow wrote Schoonover back and said:<br><br>"I already have Matt signed up. Just got him on one." | EXH. 22 - SCHOONOVER000066 (at 70) |
| 285. | The day before that exchange, Matthew Dronkers had purchased Kiss My Face products and he later pursued a false advertising case against that company with NTG set to receive a referral fee from his litigation counsel. | EXH. 98 - DRONKERS00001 (Receipt);<br><br>RJN 12 (Dronkers v. KMF)<br><br>EXH. 215 (Referral arrangement)<br><br>EXH. 38 at 18 (Pfleg settlement receipts) |
| 286. | After learning that Matt was already signed up for an NTG case, Schoonover pledged to get Baslow "another [referral] in the next day or so." | EXH. 22 - SCHOONOVER000066 (at 70) |
| 287. | Baslow responded and said:<br><br>"Great. As soon as you talk to them send info my way.  I have some | EXH. 22 - SCHOONOVER000066 (at 70) |

| | | |
|---|---|---|
| | potentially very good cases on deck right." | |
| 288. | Schoonover then inquired as to what law firm the cases were for and Baslow responded "Newport Trial Group." | EXH. 22 - SCHOONOVER000066 (at 70) |
| 289. | When Schoonover informed Baslow that he would email "a couple friends about it," Baslow instructed him to "stay away from e-mail" and to communicate "[i]n person or over the phone" because the "process is very confidential and e-mails can translate to other things very quickly." | EXH. 22 - SCHOONOVER000066 (at 71) |
| 290. | On April 13, 2012, Baslow asked Schoonover if he had "anyone else [he] can refer to [Baslow]." | EXH. 22 - SCHOONOVER000066 (at 72) |
| 291. | Schoonover received $1,500 in a settlement with Vogue. | EXH. 22 - SCHOONOVER000066 (at 72) <br><br> EXH. 216 at 9 |
| 292. | After Schoonover's Vogue case settled, Baslow told Schoonover that he could "get [Schoonover] going on another case if [he] wish[ed]" and that NTG "ha[d] one ready." | EXH. 22 - SCHOONOVER000066 (at 80) |
| 293. | In August 2015, Andrew Nilon sent an email describing his experience with NTG wherein he explained that he, Sam Pfleg, Matthew Dronkers, and Sam Schoonover pursued false advertising cases through NTG at | EXH. 209 |

| | | |
|---|---|---|
| | the same time and that they were told to buy products for litigation. | |
| 294. | Giovanni Sandoval also purchased NIC's Sovereign Silver product after NTG had already targeted NIC in litigation, needed a new class representative, and after the firm met with Giovanni Sandoval. | RJN 20 - *Nilon v. NIC*, Dkt. 117 at 4-5 (court explaining it would have dismissed the suit if it had known NTG did not have a viable replacement plaintiff)<br><br>RJN 17 (Quinto Declaration proving that Sandoval's purchase could not have occurred before April 2014)<br><br>EXH. 99 at 3-4 (disclosing meeting with Sandoval "in January 2014" to discuss NIC's product)<br><br>EXH. 116 - NILON00051 (Nilon explaining in May 2014 that "I am just not interested in any part of this anymore") |
| 295. | In January 2014, Giovanni Sandoval met with Ryan Ferrell to discuss the lawsuit against NIC. | EXH. 99 at 3-4.<br><br>RJN 20, *Nilon v. NIC*, Dkt. 117 at 2-3 |
| 296. | Sandoval was substituted into *Nilon v. NIC* case as a replacement class representative for Nilon, who no longer wished to be part of the case. | EXH. 116 - NILON00051 (Nilon explaining in May 2014 that "I am just not interested in any part of this anymore") |
| 297. | Sandoval testified numerous times that he bought Sovereign Silver in November 2013, before he met with NTG in January 2014. | RJN 21 - *Nilon v. NIC*, Dkt. 63 at ¶ 5 (alleging a purchase in November 2013)<br><br>RJN 22 - *Nilon v. NIC*, Dkt. 51-3 at ¶2 |
| 298. | Sandoval produced an image of the Sovereign Silver bottle he claims to have bought from Sprouts in November 2013. | EXH. 117 - SANDOVAL00001 (Image of bottle Sandoval produced)<br><br>EXH. 159 - Sandoval ROG Resp. at 19. |

| 299. | Yet, that bottle was not manufactured until February 2014. | RJN 23 - Quinto Decl., Dkt. 291-4 at ¶¶ 6-17 |
|---|---|---|
| 300. | The bottle could not have appeared on a store shelf at a Sprouts, given shipping times, until April 2014. | RJN 23 - Quinto Decl., Dkt. 291-4 at ¶¶ 6-17 |
| 301. | Sandoval therefore testified falsely about buying the product in November 2013 and he actually bought the product *after* meeting with Ryan Ferrell in January 2014. | RJN 23 - Quinto Decl., Dkt. 291-4 at ¶¶ 6-17<br>EXH. 118, R. Ferrell ROG Resp. at 3-4<br>EXH. 119, Sandoval Depo. (Apr. 20, 2015) at Tr. 65 (testifying that Sandoval purchased NIC's product "just once") |
| 302. | Sandoval also had family members who had pursued lawsuits through NTG before he met with the firm and before he made his purchase. | RJN 24 - *Franco v. Probar, LLC*, No. 3:13-cv-02488-BTM-NLS (S.D. Cal. 2013), Dkt. 1-1<br>RJN 25 - Baslow Decl., Dkt. 140 at ¶2. |
| 303. | Despite that, Sandoval testified that he learned of NTG's suit against NIC through a website. | EXH. 119 at 28-29 |
| 304. | Sandoval did not remember any details about the purported website. | EXH 119 at 27-28 |
| 305. | But NTG does not advertise for clients online and Sandoval's sister and mother both pursued NTG lawsuits only a few months before Sandoval met with Ryan Ferrell in January 2014. | EXH. 1 at 96-97.<br>RJN 24 - *Franco v. Probar, LLC*, No. 3:13-cv-02488-BTM-NLS (S.D. Cal. 2013), Dkt. 1-1<br>RJN 25 - Baslow Decl., Dkt. 140 at ¶2 (identifying representation re Sandoval's sister, Cinthia Sandoval) |
| 306. | Sandoval was later determined by the Court to be an inadequate class representative, the Court found that | RJN 20 - *Nilon v. NIC*, Dkt. 117. |

| | | |
|---|---|---|
| | NTG's conduct had fallen below Rule 11 standards, and the Court explained that the *Nilon v. NIC* matter would have been dismissed if the Court had known that Sandoval was not an adequate representative to replace Nilon. | |
| 307. | Dan Bobba was also directed to purchase products by NTG agents for use in a lawsuit. | EXH. 58 at 32-40. |
| 308. | Dan Bobba was substituted into the *Morales v. Magna* lawsuit after NTG "lost track" of their plaintiff. | RJN 26 - *Morales v. Magna, Inc., et al.*, Dkt. 43, |
| 309. | NTG's false advertising suit against Magna Rx was at risk of dismissal for improper venue and, at hearing, on June 22, 2010, NTG attorney Michael Velarde told the Court that NTG had two new clients who met the venue requirements. | RJN 26 - *Morales v. Magna, Inc., et al.*, Dkt. 43<br><br>RJN 27 - *Morales v. Magna, Inc., et al.*, Dkt. 37 ("unless Plaintiff can satisfactorily amend his complaint, Defendants' motion to dismiss or transfer for improper venue will be granted.") |
| 310. | NTG substituted Chris Rhodes and Daniel Bobba into the case as class representatives to prevent dismissal. | RJN 9 - *Morales v. Magna, Inc., et al.*, Dkt. 38. |
| 311. | However, Dan Bobba purchased his Magna Rx product *after* the June 22, 2010 hearing where NTG represented that it had two new clients. | EXH. 119 - NTG011063 (June 24, 2010 purchase date) |
| 312. | His June 24, 2010 purchase was the only time that Bobba ever purchased Magna Rx+ or any male enhancement product. | EXH. 58 at 39:10-23 |

| | | |
|---|---|---|
| 313. | On July 8, 2010, Bobba publicly posted the following statement:<br><br>"So my friend called me up the other day with a great opportunity. I'm all ears as he explains how his girlfriend's brother is a class action lawsuit attorney in need of clients. I go buy this stuff called magna rx plus which is supposed to permanently increase your penis size. Everyone knows that s**t doesn't work, but I go drop 40 on it. anyway (sic) the lawyer comes over twice and has me sign some documents for this suit saying i (sic) took it, it doesn't work, and that the company is false advertising. Long story short it's supposed to pay between 2-10k once settled and these guys have a 90% winrate so I'm hopeful!" | RJN 18 - Dkt. 61-1. |
| 314. | In this case, Bobba testified under oath at deposition that his case was staged, that he was driven to the store by an NTG representative, that he was given cash, he was told to buy the Magna product, and he provided his receipt to the individual that drove him. | EXH. 58 at 32-40 (Bobba Tr.) |
| 315. | After seeing Bobba's internet post, Magna moved for sanctions against NTG, in part, because NTG solicited plaintiffs to purchase Magna RX+ and then serve as class representatives. | RJN 28 - *Morales v. Magna, Inc.*, Dkt. 59, at 2. |
| 316. | Ryan Ferrell and Scott Ferrell prepared a declaration for Bobba's | EXH. 9, R. Ferrell Depo. Tr. at 226-35 |

| | | |
|---|---|---|
| | signature to be used in opposition to Magna's sanctions motion. | EXH. 224 at 5 (S. Ferrell drafted Bobba declaration)<br><br>EXH. 5, NTG 30(b)(6) Tr. at 205 (Scott Ferrell testified that he "wordsmithed" the Bobba declaration) |
| 317. | The declaration that Ryan Ferrell had Bobba sign claimed that Bobba purchased the Magna RX+ product in 2009 (before the case was ever filed and before NTG knew it needed a new client to prevent dismissal). | RJN 29 at ¶ 5 |
| 318. | Bobba testified that the declaration NTG prepared for him and had him sign was false and that he did not revise or review it before he signed. | EXH. 58 at 57-65 (Bobba Tr.) |
| 319. | Like Bobba, the original plaintiff in the *Morales v. Magna* case, Felipe Morales, purchased the Magna Rx+ product *after* Scott Ferrell represented to Magna's counsel that he had a client and after NTG had already threatened to bring claims in federal court against Magna. | RJN 28 - *Morales v. Magna, Inc., et al.,* Case No. 3:10-cv-01601-EDL Dkt. 59 at ¶ 2.<br><br>RJN 30 (State Court complaint already filed against Magna on behalf of Kevin Vaughn) |
| 320. | In November of 2009, Scott Ferrell filed a false advertising lawsuit in state court against Magna RX on behalf of Kevin Vaughn. | RJN 30 |
| 321. | On April 7, 2010, Scott Ferrell emailed counsel for Magna RX and said that NTG had a new client on whose behalf the firm will be filing a federal complaint. | RJN 28 - *Morales v. Magna, Inc., et al.,* Case No. 3:10-cv-01601-EDL Dkt. 59 at ¶ 2 |

| | | |
|---|---|---|
| 322. | Also on April 7, 2010, Scott Ferrell directed his father, Wynn Ferrell, to investigate claims against Magna. | EXH. 77 - NTG007983 |
| 323. | In response, Wynn Ferrell emailed Scott Ferrell and provided information for a person named Felipe Morales and said he would be meeting with Morales the following evening, April 8, 2010. | EXH. 77 - NTG007983 (email sent on Wednesday, April 7, 2010) |
| 324. | The next evening, on April 8, 2010, Felipe Morales purchased the Magna Rx+ product from Walmart at 20:51. | EXH. 120 (dated April 8, 2010 at 8:51 p.m.) |
| 325. | Thus, Morales purchased his Magna RX+ product after NTG had already identified Magna Inc. as a litigation target and told Magna's counsel that they had a new client for litigation. | *Morales v. Magna, Inc., et al.,* Case No. 3:10-cv-01601-EDL Dkt. 59 at ¶ 2;<br>EXH. 120 (dated April 8, 2010 at 8:51 p.m.) |
| 326. | Morales' purchase also occurred the very same evening that he had a meeting with Wynn Ferrell. | EXH. 77 - NTG007983 (Wynn Ferrell was flying to California to meet with Morales on the evening of April 8, 2010); *compare to* EXH. 120 (dated April 8, 2010 at 8:51 p.m.). |

**D. Strataluz Scheme**

| | | |
|---|---|---|
| 327. | On December 20, 2013, Scott Ferrell emailed Jarrod Bentley, Joshua Weiss, Dave Reid, and James Hardin and expressed interest in forming a company with them but expressed a desire to "incorporate in a jurisdiction with maximum privacy to prevent public | EXH. 121 - NTG063580 |

| | | |
|---|---|---|
| | disclosure of the shareholders beyond our registered agent for service of process." | |
| 328. | Scott Ferrell also stated that he "envision[ed] that [he] will own 51% of the company, and that James and Dave ("the NTG side") will participate in profits through my ownership." | EXH. 121 - NTG063580 |
| 329. | Scott Ferrell explained that "[a] second key to our success will be our immunity from litigation costs. Jarrod, this means that we can push the envelope in terms of our efficacy claims.  It also means that we can sue our competitors if they make claims that we believe are hurting us." | EXH. 121 - NTG063580 |
| 330. | The new company was going to "handle set-up and accounting issues through the NTG back-office, the way that [Scott Ferrell] d[id] with Tawnsaura and Harcol." | EXH. 121 - NTG063580 |
| 331. | In December of 2013, Scott Ferrell sought the assistance of Craig Etem, a corporate formation lawyer in Nevada, and Etem's associate, Brian Schusterman. | EXH. 122 - NTG067652 (at 67653-54)<br><br>EXH. 1  - S. Ferrell Tr. at 138:15-23 |
| 332. | On December 23, 2013, Scott Ferrell emailed Brian Schusterman and Craig Etem seeking their assistance in forming a new company. | EXH. 122 - NTG067652 (at 67653-54) ("I am writing with a question about forming a new company") |
| 333. | In that email, Scott Ferrell wrote: "I want to form a new company that is nearly identical to Tawnsaura (a | EXH. 122 - NTG067652 (at 67653-54) |

| | | |
|---|---|---|
| | company in which I own 51% of the shares and have a couple minority shareholders).  The only difference is that we want to completely cloak the identity of the shareholders – it is going to be a company that is involved in significant litigation, and I would like to avoid having the shareholders deposed." | |
| 334. | In that same email, Scott Ferrell asked:<br><br>"What is your recommendation as to how to proceed with this? Should we incorporate in a jurisdiction that will ignore U.S. subpoenas? Or, should we incorporate in a jurisdiction where we only have to identify a single officer, and then have the company owned by a foreign corporation?" | EXH. 122 - NTG067652 (at 67653-54) |
| 335. | On December 23, 2012 at 12:58 PM, Craig Etem responded to Scott Ferrell and explained that "[t]here are companies in Nevada that will provide nominee officers and directors for listing on the Nevada Secretary of State's website" but "if the company were requested in discovery to reveal the names of its shareholders, so long as the request was otherwise proper, I would think the officers and directors would have to provide those names." | EXH. 122 - NTG067652 (at 67653-54) |
| 336. | Scott Ferrell responded to Etem's email and said:<br><br>"I think that the best way to go may be as follows: | EXH. 122 - NTG067652 |

| | | |
|---|---|---|
| | 1. Incorporate the company that will be the plaintiff in the anticipated litigation, in Nevada, and utilize a nominee officer/director.<br><br>2. Have ownership of the first company held by a second company (that will not be a plaintiff in any litigation), utilizing another nominee officer/director.<br><br>I believe this will satisfy us.  One of my concerns is that, in federal court, a party must file a 'Certificate of Interested Parties' that shows ownership of the company.  As such, company one (the plaintiff) will be required to show that it is owned by company two, but the chain stops there." | |
| 337. | Craig Etem responded to Ferrell at 4:44 PM on December 23, 2013 and provided him the information for "Joshua Miller, one of the owners of the Keystate Company" which "provide[d] corporate services, including nominee directors and officers." | EXH. 122 - NTG067652 |
| 338. | On December 26, 2013, Scott Ferrell forwarded his December 23, 2013 email chain to David Reid and stated that "I have asked David Reid – who is a partner at Newport Trial Group as well as the new venture – to reach out to Josh Miller." | EXH. 122 - NTG067652 |
| 339. | On January 8, 2014, Scott Ferrell emailed Etem and Schusterman and wrote: | EXH. 123 - NTG067900 (at 67901-02) |

| | | |
|---|---|---|
| | "In a nutshell, we would like to set up for(sic) Nevada corporations utilizing nominee directors and officer from Keystate Corporation. The structure should be: | |
| | 1. The "bottom" corporation will be named 'Quintogos.'  Ownership percentages will follow soon and will be among five people: Scott Ferrell, James Hardin, David Reid, Josh Weiss, and Jarrodd Bentley. | |
| | 2. The 100% owner of Strataluz will be a corporation that we describe as 'Blocker 1' that will have nominee owners and directors from Keystate. | |
| | 3. The 100% owners of 'Blocker 1' will be 'Blocker 2' that will have nominee owners and directors from Keystate. | |
| | 4. The 'top' corporation – which will be the operating company that is the face of the business – will be 'Strataluz Corporation' – and will be the 100% owner of 'Blocker 2.' It will also be staffed with nominee owners and dirctors from Keystate. | |
| | . . . | |
| | "Sariah: As soon as we have the corporations formed and the taxpayer I.D. number, please open an account at Wells Fargo for 'Strataluz' that will be operated just like Tawnsaura and Harcol.  I'll fund it with an initial $125,000." | |
| 340. | On January 8, 2014 at 2:16 PM, Scott Ferrell emailed Schusterman and Etem and said: | EXH. 124 - NTG067915 |

| | | |
|---|---|---|
| | "In a nutshell, this enterprise will have similar dynamics to Tawnsaura and Harcol, so I'd like to them set up the same way – with the majority shareholder (which will be me) having maximum control." | |
| 341. | Tawnsaura LLC and Harcol LLC were companies that filed, through NTG, more than one hundred patent lawsuits. | *See e.g.*, *The Tawnsaura Group, LLC v. Physician Formulas, Inc.,* No. 8:12-cv-01352 (C.D. Cal. filed on Aug. 21, 2012); *The Tawnsaura Group, LLC v. Maximum Human Performance, LLC, et al.,* No. 2:12-cv-07189 (C.D. Cal. filed on Aug. 21, 2012); *The Tawnsaura Group, LLC v. Beautyfit, Inc.,* No. 8:12-cv-01354 (C.D. Cal. filed on Aug. 21, 2012); *The Tawnsaura Group, LLC v. Gaspari Nutrition, Inc.*, No. 8:12-cv-01353 (C.D. Cal. filed on Aug. 21, 2012); *The Tawnsaura Group, LLC v. Serious Nutrition Solutions, LLC*, No. 8:12-cv-01396 (C.D. Cal. filed on Aug. 28, 2012) *See also e.g.*, EXH. 217; EXH. 218 |
| 342. | In August 2012, the Central District of California held that Tawnsaura's patents were invalid and unenforceable. | *See Tawnsaura Group, LLC v. Maximum Human Performance, LLC*, No. 2:12-cv-07189 (C.D. Cal. filed Aug. 21, 2012), Dkt. 281 |
| 343. | Scott Ferrell was the majority shareholder in both Tawnsaura LLC and Harcol LLC. | EXH. 124 - NTG067915; EXH. 1, S. Ferrell Depo. at Tr. 153:18-20, 160:11 |
| 344. | The next day, on January 9, 2014, Joshua Weiss emailed Scott Ferrell and asked him "[i]n reviewing the below, what does Quintogos own?" | EXH. 123 - NTG067900 (at 67901) |

| | | |
|---|---|---|
| 345. | Scott Ferrell responded and stated that:<br><br>"I think quintogos is the company that owns all of our stuff – as though the other companies only exist [to] prevent people from finding out who owns quintogos." | EXH. 123 - NTG067900 (at 67901) |
| 346. | On January 10, 2014, Joshua Weiss inquired about whether the corporate structure had any tax consequences to which Scott Ferrell replied:<br><br>"HAHAHAHA.  He told me that the tax consequences were 'nil' – that these will all be pass throughs and that the only tax liability will be on our personal W2s for any pass through income." | EXH. 123 - NTG067900 |
| 347. | On January 15, 2014, Schusterman emailed Josh Miller (copying Scott Ferrell) and provided him with a copy of the draft operating agreement for Quintogos, LLC "for [his] review and comment." | EXH. 125 - NTG067585 (at 67591) |
| 348. | On January 16, 2014 at 11:55 AM, Josh Miller provided feedback to Scott Ferrell and Schusterman regarding the Quintogos, LLC operating agreement. | EXH. 125 - NTG067585 (at 67590) |
| 349. | Josh Miller inquired:<br><br>"I know there are multiple entities contemplated.  Will any of them utilize our address in Nevada, rather than this Newport address.  I know that other clients have structured | EXH. 125 - NTG067585 (at 67590) |

| | | |
|---|---|---|
| | this way so that the ownership can't be traced back." | |
| 350. | On January 16, 2014 at 2:01 PM, Scott Ferrell responded to Josh Miller's email by writing "[his] comments in ALLCAPS" directly into the body of Miller's email. | EXH. 125 - NTG067585 (at 67589-90) |
| 351. | Scott Ferrell wrote in "ALLCAPS" in response to the inquiry about using Miller's Nevada address rather than the Newport address affiliated with Ferrell:<br><br>"IT IS IMPERITIVE THAT THEY ALL USE YOUR ADDRESS IN NEVADA SO THEY CAN'T BE TRACED BACK TO US." | EXH. 125 - NTG067585 (at 67589-90) |
| 352. | On January 16, 2014 at 4:57 PM, Schusterman circulated the draft operating agreements for the other three entities associated with the new company: International Brandery, LLC, Binary Resource Management, LLC, and Strataluz, LLC. | EXH. 125 - NTG067585 (at 67588-89) |
| 353. | Schusterman explained that "for each of these entities, I have listed the address of the manager as the address Josh provided." | EXH. 125 - NTG067585 (at 67589) |
| 354. | On January 28, 2014, the Operating Agreement for Quintogos LLC was executed by Scott Ferrell, James Hardin, David Reid, Jarrod Bentley, and Joshua Weiss. | EXH. 126 - NTG062923 |
| 355. | The company's initial capitalization came from three loans: (1) a $180,000 loan from Scott Ferrell; | EXH. 126 - NTG062923 |

| | | |
|---|---|---|
| | (2) a $35,000 loan from David Reid; and (3) a $35,000 loan from James Hardin. | |
| 356. | The ownership percentages of the Quintogos LLC's members were:<br><br>Scott Ferrell – 37%<br><br>David Reid – 7%<br><br>James Hardin – 7%<br><br>Joshua Weiss – 20%<br><br>Jarrod Bentley – 29% | EXH. 126 - NTG062923 (at 062928);<br><br>*see also* EXH. 127 - NTG067119 |
| 357. | On January 29, 2014, the Operating Agreements for International Brandery, LLC, Binary Resource Management, LLC, and Strataluz, LLC were executed by Scott Ferrell. | EXH. 128 - NTG067534;<br><br>EXH. 129 - NTG062968;<br><br>EXH. 130 - NTG067526 |
| 358. | Under the executed operating agreements: (1) Quintogos LLC was the sole member of International Brandery, LLC; (2) International Brandery, LLC was the sole member of Binary Resource Management, LLC; and (3) Binary Resource Management, LLC was the sole member of Strataluz, LLC. | EXH. 128 - NTG067534;<br><br>EXH. 129 - NTG062968;<br><br>EXH. 130 - NTG067526 |
| 359. | The Articles of Organization for the four entities each listed an address of 101 Convention Center Dr., Suite 850, Las Vegas, Nevada 89109. | RJN 31 - ARTICLES OF ORGANIZATION |
| 360. | The Articles of Organization did not identify Scott Ferrell, David Reid, James Hardin, Joshua Weiss, or Jarrod Bentley, but instead simply | RJN 31 - ARTICLES OF ORGANIZATION |

| | | |
|---|---|---|
| | named the "blocker" companies or the nominee manager, Josh Miller. | |
| 361. | Josh Miller was hired to be the nominee manager of Quintogos, LLC and he was indemnified to the fullest extent of the law through an indemnification agreement executed by Scott Ferrell. | EXH. 131 - NTG067515;<br><br>EXH. 132 - NTG067597 (noting that Josh Miller is the manager of Quintogos); |
| 362. | Quintogos agreed to pay Josh Miller $5,000 per year for his role as a nominee manager. | EXH. 219 – Keystone Agreement |
| 363. | Scott Ferrell's, David Reid's, and James Hardin's ownership percentages in the Strataluz Entities[1] totaled a controlling 51% interest. | EXH. 127 - NTG067119;<br><br>EXH. 133 - NTG067882 |
| 364. | On January 14, 2014, Scott Ferrell responded to an email from Craig Etem by providing answers to Etem's questions "in ALLCAPS" directly into Etem's email. Ferrell wrote:<br><br>"DAVE REID AND JAMES HARDIN ARE MY LAW PARTNERS, AND WE WILL ACT US(sic) ONE VOICE WITH RESPECT TO THE 51 PERCENT WE OWN." | EXH. 133 - NTG067882 (at 067883) |
| 365. | On January 29, 2014, Scott Ferrell executed a "Written Consent of the Manager of Strataluz, LLC" which designated Jarrod Bentley as the President of Strataluz LLC but | EXH. 134 - NTG065684 |

[1] NIC hereinafter refers to the companies Quintogos LLC, Binary Resource Management LLC, International Brandery LLC, and Strataluz LLC as the "Strataluz Entities."

| | | |
|---|---|---|
| | limited his ability to "enter into any transaction or series of transactions on behalf of the Company involving the incurrence of any indebtedness or the hypothecation, encumbrance, or granting of a security interest or lien upon any Company property, which, in the aggregate amount, exceeds $7,500, without the express consent of the Manager." | |
| 366. | On January 31, 2014, Sariah Para emailed Scott Ferrell and David Reid and said:<br><br>"I am working on getting the EIN's and bank accounts for Quintogos and the associated companies which is taking longer than expected because of the extra measures we are taking to protect NTG/You from being associated with it." | EXH. 135 - NTG067483 |
| 367. | The Strataluz Entities had no office or principal place of business. | EXH. 1, S. Ferrell Tr. at 149:5-17;<br><br>EXH. 137, J. Bentley Tr. at 50:20—51:5 |
| 368. | Jarrod Bentley, the President of Strataluz LLC, received no salary or financial compensation as part of his role. | EXH. 137, J. Bentley Tr. at 53:5:12 |
| 369. | On May 4, 2015, Jarrod Bentley emailed Scott Ferrell, Reid, Weiss, and Hardin to explain that he was in the process of developing a commercial for EverSilk (a cellulite product) and he had been running test advertisements. | EXH. 136 - NTG066214 (at 066214-15) |
| 370. | Bentley noted that: | EXH. 136 - NTG066214 (at 066215) |

| | | |
|---|---|---|
| | "[B]ecause the commercial is so aggressive and makes claims about cellulite and weight loss, most of the stations won't run it. That will require doing another test that is somewhat watered down. Sadly, to get any kind of clearance we need to remove most of the 'eliminates cellulite' type of language as well as the no diet and exercise claims. It stands to reason that this will weaken response but hopefully it will still be strong enough to run and make a profit." | |
| 371. | Scott Ferrell responded to Bentley's email and said:<br><br>"I have two thoughts re ever silk:<br><br>1. Let's keep the claims as aggressive as possible.  If we get sued, we have a shield from litigation costs through NTG.<br><br>2. what about the idea of having quintogos sue a few companies who are litigation averse and who are selling cellulite products? we could model it after what fiber research is doing to ORI.  If no one strenuously objects to this.  I will research and identify a few targets.  Anyone have any suggestions offhand?" | EXH. 136 - NTG066214 (Bentley responds, "[w]e love the idea of going after other companies.  Josh and I will start putting together some names that might be good candidates") |
| 372. | On May 4, 2015, Scott Ferrell directed Katherine Kirshner, a firm paralegal, to "research [] potential targets" for the cellulite lawsuits. | EXH. 138 - NTG070517;<br><br>EXH. 90 - NTG070527 ("Once Kat gets me the list of initial products. . .") |
| 373. | That evening, Scott Ferrell emailed Bentley, Reid, Weiss, and Hardin | EXH. 198 - NTG066219 |

| | | |
|---|---|---|
| | about the plan to sue companies selling cellulite products.  He wrote: | |
| | "I have a few strategy thoughts upon which I would like your input: | |
| | 1. Have we trademarked Eversilk yet? If not, we should do so immediately.  It will make our suits stronger. | |
| | 2. Jarrod, can you tell me something that is unique about Eversilk as compared to other products? We'll use that as our 'competitive advantage' in the allegations. | |
| | 3. In terms of a fee agreement, here is what I propose: a contingency where NTG fronts the costs for Quintogos with NTG receiving 50% of the proceeds.  Of the remaining 50%, half go to Quintogos to fund the company and the other half get distributed between the five of us as owners in proportion to our percentages. | |
| | 4. we will have a couple of these cases ready to go by Friday. As to some companies that I know are litigation averse, we will send a demand letter and let them negotiate peace with Dave.  As to others, we will simply file immediately." | |
| 374. | James Hardin responded on May 4, 2015 and expressed skepticism on the validity of the cases:<br><br>"Scott, I am not sure what the damage theory is in these cases.  I think the defendants are likely to dig in and fight, like ORI." | NTG066220 |

| | | |
|---|---|---|
| 375. | On May 5, 2015, Jarrod Bentley responded to Scott Ferrell and explained that the formula for Eversilk "is fairly generic" and the "ingredients are common among many other cellulite creams." Bentley explained that "the main ingredient (not unique to us) is called PRO-SVETYL." | EXH. 150 - NTG6794 |
| 376. | Bentley explained that he had specifically elected not to obtain a custom formula that could substantiate aggressive claims because the start up costs were higher. | EXH. 150 - NTG6794 |
| 377. | On May 6, 2015, David Reid wrote an email responding to Scott Ferrell's strategy email about brinding lawsuits against cellulite companies.  Reid wrote:<br><br>"We are sending out letters on these [cellulite] matter first, right?  I think it will be good to get a sense of the value of these matters before getting some on file.  I'm quite sure I can get some decent settlements from these guys." | EXH. 190 - NTG070527 |
| 378. | On May 8, 2015, Scott Ferrell responded to David Reid's inquiry about sending demand letters to gauge the profitability of the cellulite lawsuits.  Scott Ferrell wrote:<br><br>"1. We should send letters on some, but not all.  There are some companies that I know from past experience have no appetite for | EXH. 90 - NTG070527 |

| | | |
|---|---|---|
| | litigation, and some that will file a DJ action against us if they get a letter from us.<br><br>. . .<br><br>3. There is money to be had here, but I believe that the dynamics are different than with class actions or patents.  The thing that will make these companies settle are the things that made Iovate write Basic research a check for $2M in response to a single letter: fear that we will use discovery to learn about their sales figures, product formulations, etc.  Add that to the knowledge that we have an active class action practice and can hit an offending target in two different ways, and companies should be willing to pay for peace.<br><br>Once Kat gets me the list of initial products, I can give my thoughts about which ones to start with." | |
| 379. | On May 8, 2015, Jarrod Bentley sent Scott Ferrell, Joshua Weiss, and David Reid an email with the subject "Re: Eversilk First Cellulite Demand Letter." Bentley said:<br><br>"In the event of a potential counter-claim, our commercial won't stand up to much/any scrutiny.  It has several claims that simply can't be substantiated.<br><br>. . .<br><br>"Of more concern than the claims on the commercial, are the testimonials with accompanying before and after pictures.  For lack | EXH. 139 - NTG066239 |

| | | |
|---|---|---|
| | of a better phrase, these are totally bogus.  The testimonials were never on the product and the pictures are from google images.  While we are working on getting real testimonials and pictures – this is still a couple of months away.  In the meantime, would you have us run the existing commercial or should we wait on getting real people?<br><br>. . .<br><br>As for PRO-SVETYL, we don't have an agreement with the maker of this ingredient (Silab -Company out of France) for use in our cream – we simply get it from our manufacturer. . .  However, I have no idea what the actual arrangement is between our manufacturer and Silab.  If this is an issue, I do have an older formula cellulite cream. . . [i]t's probably a more effective cream and has some patented ingredients too.  Also, it's actually a custom formula.  We didn't use it for EverSilk as the cost proved a little high for the small quantities that we needed." | |
| 380. | On May 7, 2015, Scott Ferrell directed Katerine Kirshner to "prepare and maintain a report that gets updated and added to the list of reports that you give me each week."  He explained that the report will "track the status of our cellulite lawsuits, similar to how the charts tack the status of our ada and wiretap lawsuits." | EXH. 140 - NTG070537 |

| | | |
|---|---|---|
| 381. | Scott Ferrell directed Victoria Knowles to "work with Kat to ensure that she gets updated as to any progress from each target." | EXH. 140 - NTG070537 |
| 382. | Scott Ferrell informed Katherine Kirshner (Kat) that NTG "will be sending demand letters, to go out [May 8, 2015] by FedEx, to the following companies on the chart you prepared: bliss, mio, osmotic a, skintight, celluscript, nuve, and lipoconquer." | EXH. 140 - NTG070537 |
| 383. | In response, Knowles inquired whether Scott Ferrell "only want[ed] letters on the targets listed [in Scott Ferrell's email]." | EXH. 140 - NTG070537 |
| 384. | Scott Ferrell responded, "yes," and then directed Knowles to "[d]raft the first complaint for nip fab, which we will simply file and not send a letter." | EXH. 140 - NTG070537 |
| 385. | Victoria Knowles then inquired if she should only draft a letter for "Fat Girl Slim" and Scott Ferrell responded, "[y]es, for now . . . [t]hey tend to pay out." | EXH. 140 - NTG070537; <br><br> *See also* EXH. 93 - NTG071178 (Scott Ferrell directed Victoria Knowles to "prepare the first draft letter and accompanying complaint for 'fat girl slim' cellulite treatment. . . [t]hey have no appetite for litigation…") |
| 386. | Victoria Knowles drafted a demand letter to send to companies selling cellulite products on behalf of Strataluz alleging Lanham Act violations. | EXH. 142 - NTG071179 |

| | | |
|---|---|---|
| 387. | On May 7, 205, Victoria Knowles sent the draft demand letter regarding cellulite products to Scott Ferrell for his feedback. | EXH. 142 - NTG071179 ("Here's a draft of the demand. Let me know your thoughts.") |
| 388. | On May 11, 2015, NTG sent demand letters via Federal Express on behalf of Strataluz alleging violations of the Lanham Act against cellulite product companies to the following companies:<br><br>• Bliss Direct, Inc.<br>• Dermelect Cosmeceuticals<br>• Mio Skincare<br>• Osmotics Corporation | EXH. 141 - NTG066296 (at 066297) (Katherine Kirshner listing the demand letters that went out and the dates they were mail via FedEx)<br><br>*See* Letters, EXHS. 143, 144, 145, 146 |
| 389. | On May 13, 2015, NTG sent demand letters via Federal Express on behalf of Strataluz alleging violations of the Lanham Act against cellulite product companies to the following companies:<br><br>• LIERAC Service International<br>• Nuxe, Inc.<br>• Prtty Peaushun | EXH. 141 NTG066296 (at 066297) (Katherine Kirshner listing the demand letters that went out and the dates they were mail via FedEx)<br><br>*See* Letters, EXHS. 147, 148, 149 |
| 390. | The cellulite demand letters sent on May 11, 2015 and May 13, 2015 were signed by Scott Ferrell. | EXH. 143;<br>EXH. 144;<br>EXH. 145;<br>EXH. 146;<br>EXH. 147;<br>EXH. 148;<br>EXH. 149. |

| 391. | The cellulite demand letters sent on May 11 and 13, 2015 made the following representations: | EXH. 143; |
| | | EXH. 144; |
| | • Strataluz has confirmed through analysis that the recipient's product "is not an equivalent cellulite reducing product" to Strataluz's EverSilk product. | EXH. 145; |
| | | EXH. 146; |
| | | EXH. 147; |
| | | EXH. 148; |
| | | EXH. 149. |
| | • As a result, Strataluz has suffered "significant" damages. | |
| | • Strataluz "has invested a significant amount of money researching, formulating, developing and clinically studying its PRO-SVELTYL® product." | |
| | • The recipient is unfairly competing with Strataluz "which has commercially damaged Strataluz LLC's sales of their superior and scientifically validated product." | |
| 392. | In truth, Strataluz never performed any clinical testing on its EverSilk product. | EXH. 1, S. Ferrell Tr. at 198:7—200:3; |
| | | EXH. 137, Bentley Tr. at 52:13-20 |
| 393. | In truth, Strataluz acquired the EverSilk product through a supplier in a formula that was generic and did not involve any financial investment in research, formulation, or development. | EXH. 139 - NTG066239 (explaining that the formula they are using is not "custom" like the more expensive one they decided not to use) |
| | | EXH. 150 - NTG6794 (Eversilk "is fairly generic," the "ingredients are common among many other |

| | | cellulite creams,"and "the main ingredient (not unique to us) is called PRO-SVETYL.") |
|---|---|---|
| 394. | In truth, Strataluz was still testing the advertising for the EverSilk product and it had not yet been launched. | EXH. 136 - NTG066214 (at 066214-15) |
| 395. | In truth, Strataluz and NTG had done no clinical testing or analysis on the comparative efficacy of the EverSilk product versus the demand letter recipients' products. | EXH. 1, S. Ferrell Tr. at 198 (no clinical trials) |
| 396. | Scott Ferrell knew that Strataluz and NTG had done no clinical testing on the EverSilk product. | EXH. 1, S. Ferrell Tr. at 198 (no clinical trials) |
| 397. | Scott Ferrell knew that the EverSilk product was generic, contained no unique ingredients, and that Strataluz had not invested significant resources in research, formulation, or development. | EXH. 139 - NTG066239 (Email sent to Scott Ferrell)<br><br>EXH. 150 - NTG6794 (Email sent to Scott Ferrell) |
| 398. | Scott Ferrell knew that Strataluz was still testing the advertising for the EverSilk product and it had not yet been launched. | EXH. 136 - NTG066214 (at 066214-15) (email to Scott Ferrell) |
| 399. | The cellulite demand letters sent on May 11 and 13, 2015 did not inform the recipient that 51% of Strataluz LLC's shares were owned by NTG attorneys. | EXH. 143;<br><br>EXH. 144;<br><br>EXH. 145;<br><br>EXH. 146;<br><br>EXH. 147;<br><br>EXH. 148;<br><br>EXH. 149. |

| | | |
|---|---|---|
| 400. | On May 12, 2015, NTG filed a lawsuit in the Central District of California against Nip+Fab Limited alleging violations of the Lanham Act on behalf of Strataluz LLC related to Nip+Fab's product "Cellulite Fix." | RJN 32 |
| 401. | NTG filed a corporate disclosure statement in that matter that falsely claimed that "Strataluz d[id] not have a parent company" when, in reality, Strataluz was wholly owned by a chain of companies that led to Quintogos LLC. | RJN 32 - Strataluz LLC v. Nip+Fab Limited, No. 8:15-cv-749-JVS (C.D. Cal. 2015), Dkt. 6. |
| 402. | On May 14, 2015, Scott Ferrell emailed David Reid, Joshua Weiss, and Jarrod Bentley: "Guys, Had a thought – once we have a male enhancement pill, we can sue the competitors – and none of them like litigation or want to hear from NTG. Jarrod, if there is some unique or esoteric ingredient to which we can secure exclusive rights to in the US, we can also force the competitors to license that ingredient through us as part of the settlement. Ditto goes for who we sue on cellulite – we should force them to licesne our special ingredient from us." | EXH. 151 - NTG06728 |
| 403. | On May 14, 2015, Scott Ferrell wrote to David Reid, Jarrod Bentley, and Joshua Weiss: "Take a look at a few of these products and let me know if you | EXH. 152 - NTG067126 |

| | | |
|---|---|---|
| | guys think that any of them deserve a demand letter or lawsuit. . . | |
| | I was thinking that one avenue to monetize these (and the cellulite cases) would be to sue a competitor and retailer in each case.  We could then settle with the competitor for money and with the retailer for an agreement to sell our products." | |
| 404. | In response, David Reid wrote: | EXH. 152 - NTG067126 |
| | "I really like it.  I'm pretty certain I can shake loose some coin on these. :)" | |
| 405. | On May 21, 2015, Scott Ferrell emailed Joshua Weiss, David Reid, and Jarrod Bentley, stating: | EXH. 153 - NTG070634 |
| | "Guys, I have an idea upon which I would like your input: | |
| | 1. My company owns U.s.(sic) Patent No. 5,817,364, which relates to the uee(sic) of alpha-ketoglutarate (AKG) to improve "energy supply composition before, during and after physical exertion | |
| | 2. It is a pretty easy leap of logic to conclude that AKG would improve male sexual performance. | |
| | 3. We can have my company exclusively license some AKG blend that we will call "Ghetto Balls" (placeholder name, lol) to Strataluz for the use in the sale of male enhancement products in the U.S. | |
| | 4. We can then threaten suit and/or sue any male enhancement companies under the Lanham Act as | |

| | | |
|---|---|---|
| | to any products that don't contain AKG, which should be just about all of them.<br><br>5. The key point is for us to have a product that we are advertising and arguably trying to sell.  How long until we can make that happen? | |
| 406. | In response, Jarrod Bentley explained that he could have a website and commercial prepared in 7-8 days, but he made no mention of when he would have a product ready for sale. | EXH. 153 - NTG066354 (at 066354-55) |
| 407. | Jarrod Bentley also inquired about Scott Ferrell's thoughts on formulation.  He asked whether the AKG would be a stand alone ingredient or if it should be combined with other potential ingredients.  Bentley noted that it "[d]oesn't really matter, [he was] just curious." | EXH. 153 - NTG066354 |
| 408. | Scott Ferrell responded that he would like the formulation to include the AKG and the other two ingredients that Bentley had already contemplated because the "claims against the competitors would be much stronger if we had a combination of yohimbe, horny goat weed, AND AKG." | EXH. 153 - NTG066354 |
| 409. | On May 22, 2015, Scott Ferrell emailed attorneys and staff at NTG:<br><br>"Team, I am pleased to report that I convinced a company named Harcol Research (which owns a patent on AKG) to grant an | EXH. 154 - NTG070678;<br><br>*See also* EXH. 155 - NTG070661 |

| | | |
|---|---|---|
| | exclusive license for the use of AKG in male enhancement products to our client Strataluz. (If anyone does not understand this inside joke, just ask. . . )<br><br>. . .<br><br>Kat is currently researching our competitors and preparing templates on each like the attached, and we should have our first round of target letters to send out within two weeks." | |
| 410. | Harcol Research, a company that Scott Ferrell owned, licensed the AKG patent to Strataluz LLC, a company that Scott Ferrell owned, for $1. | EXH. 156 - NTG070041 (Harcol license agreement);<br><br>*See also* EXH. 155 - NTG070661 |
| 411. | On May 26, 2015, Scott Ferrell drafted the male enhancement product demand letters that NTG would send on behalf of Strataluz. | EXH. 157 - NTG066420 ("Can you send me the operative language of the cellulite demand letter, and I will adjust the template for the male enhancement?");<br><br>EXH. 158 - NTG066446. |
| 412. | On May 27, 2015, Jarrod Bentley and Joshua Weiss created the name "ProMaxal" for the Strataluz male enhancement product and received Scott Ferrell's approval for the name. | EXH. 158 - NTG066446 |
| 413. | On May 27, 2015, Scott Ferrell circulated the draft demand letter regarding the ProMaxal product to Reid, Knowles, and Hikida.  Ferrell explained that:<br><br>"From past experience litigating against male enhancement | EXH. 160 - NTG070691 |

| | | |
|---|---|---|
| | companies, I know that they will be most concerned about an injunction – which would be costly to oppose, require them to provide substantiation that they lack, and could catch the attention of the FTC or another regulatory body.  As such, I think our model will be best-served by offering them a license to our proprietary technology in return for a one-time fee, and filing suit against those who decline the license – and promptly seeking a preliminary injunction in those suits." | |
| 414. | Shortly after sending that email, Scott Ferrell emailed David Reid directly and said "I think we can wrangle six figures out of these defendants with a combination of the letter, draft complaint, threatened injunction, and the 'crazy cop blue eyes' routine." | EXH. 160 - NTG070691<br><br>*See also* EXH. 161 - NTG067133 (Reid responded "Sounds great to me!") |
| 415. | ProMaxal was not formulated as of May 27, 2015. | EXH. 158 - NTG066446 (at NTG066447) ("As for the blend, our formulation guy should have it to us within the next couple days") |
| 416. | On May 27, 2015, Scott Ferrell emailed Victoria Knowles, David Reid, and Mandy Jung with the email subject: "Strataluz Male Enhancement Demand Letters." He wrote:<br><br>"Team, These are the first ten targets in the male enhancement demand letters.  We need to both prepare and proof them very carefullt to ensure that all of the | EXH. 162 - NTG069940 |

| | | |
|---|---|---|
| | variables match (i.e., we don't want to send a demand letter to the wrong company, identify the wrong product, or identify efficacy claims that they do not make).<br><br>1. Nutrex Libido Booster<br><br>2. Enzyte<br><br>3. Virmax<br><br>4. Twinlab<br><br>5. M-Drive<br><br>6. Amidren<br><br>7. Vitalast new vigor<br><br>8. Prolongz<br><br>9. Libido-Max<br><br>10. Ageless Male | |
| 417. | Also on May 27, 2015, Scott Ferrell added two more "targets" for "male enhancement demand letters" and asked Mandy Jung to update the male enhancement case chart. | EXH. 69 - NTG069938;<br><br>EXH. 163 - NTG066373 (Scott Ferrell explains to Mandy Jung that "[t]here are going to be a whole list of male enhancement product demands similar to the cellulite demands")<br><br>EXH. 22 at NTG066654 (Male enhancement case chart) |
| 418. | Scott Ferrell directed NTG attorneys and staff regarding the ProMaxal lawsuits and pre-suit demands. | EXH. 164 - NTG070211;<br><br>EXH. 162 - NTG069940;<br><br>EXH. 165 - NTG068854. |
| 419. | On May 28, 2015, Jarrod Bentley emailed Scott Ferrell regarding formulation of the ProMaxal product and asked if "300mg [of AKG is] an effective dose."  Scott | EXH. 166 - NTG070533 |

| | | |
|---|---|---|
| | Ferrell responded less than an hour later, "Yep." | |
| 420. | On June 3, 2015, Scott Ferrell sent Ryan Ferrell an email with the subject line "Male Enhancement Demands," and asked:<br><br>"Would you share these with Doug and see if he has any additional targets that he thinks we should go after?  We should make clear to him that we are only interested in going after people who we can force to license our ingredients and pay us, not just people that he doesn't like." | EXH. 167 - NTG07172 (at NTG07173) |
| 421. | Scott Ferrell created a form letter with fill-in-the-blank variables to send to companies that sold male enhancement products. | EXH. 168 - NTG070209;<br><br>EXH. 169 - NTG066425;<br><br>EXH. 162 - NTG069940<br><br>(instructing staff to make sure the variables matched on each letter) |
| 422. | On June 2, 2015, NTG sent demand letters via Federal Express on behalf of Strataluz alleging violations of the Lanham Act against male enhancement companies to the following companies:<br><br>• Natural Product Solutions, LLC re VirMax<br><br>• Nutrex Research, Inc. re Vitrix<br><br>• Twinlab Corp. re Horny Goat Weed<br><br>Pristine Bay, LLC re Enzyte | EXH. 170 - NTG068999 (Knowles wrote to Scott Ferrell: "Here are the first four letters that went out.")<br><br>EXH. 171 - NTG071004 (Kirshner wrote to Knowles on June 3, 2015: "Attached are the letters that were sent out yesterday.")<br><br>*See* Letters, EXHS. 172, 173, 174, 175. |

| | | |
|---|---|---|
| 423. | The male enhancement demand letters sent on June 2, 2015 made the following representations:<br><br>• ProMaxal is "sold in the United States"<br>• That Strataluz's formula is a proven technology<br>• That Strataluz has invested a significant amount of resources in researching, formulating, developing, and obtaining the exclusive rights to the Patented LIFTGATE Technology for male enhancement purposes.<br><br>Strataluz has substantial monetary damages. | *See* Letters, EXHS. 172, 173, 174, 175. |
| 424. | The male enhancement demand letters sent on June 2, 2015 demanded a one-time payment of $200,000 to resolve the claims. | *See* Letters, EXHS. 172, 173, 174, 175. |
| 425. | The male enhancement demand letters sent on June 2, 2015 threatened to "file suit against [the recipient] and any retailers that independently promote or advertise [the product], wherein Strataluz will promptly seek a preliminary injunction and permanent injunction to enjoin [the recipient] mfrom making further false or misleading claims about [the product], as well as substantial monetary damages." | *See* Letters, EXHS. 172, 173, 174, 175. |
| 426. | Scott Ferrell signed each of the June 2, 2015 demand letters that were sent via Federal Express. | *See* Letters, EXHS. 172, 173, 174, 175. |

| | | |
|---|---|---|
| 427. | On June 1, 2015, Scott Ferrell emailed Victoria Knowles, David Reid, and Mandy Jung and explained that he would like to file a Lanham Act complaint against Viaxus regarding their male enhancment product without first serving a demand letter because "[he] know[s] this company from past litigation and it will make our negotiations with other defendants stronger once they see we have already filed one complaint." | EXH. 176 - NTG066529 (at 066531) |
| 428. | Victoria Knowles drafted a complaint on behalf of Strataluz LLC against TruDerma alleging Lanham Act violations related to TruDerma's male enhancement product (Viaxus) | EXH. 176 - NTG066529 (at 066530) (Knowles sent a draft complaint to Scott Ferrell for his review on June 2, 2015) |
| 429. | Scott Ferrell revised the draft complaint against TruDerma and sent it back to Knowles requesting that she "insert pictures of the label." | EXH. 176 - NTG066529 (at 066530) |
| 430. | Knowles responded and asked Scott Ferrell to send her "the pics" because "[she] only ha[d] the commercial and can't find anything for them online since I assume the product isn't on the market yet." | EXH. 177 - NTG070216 |
| 431. | Scott Ferrell responded and explained that he "meant the pictures of Viaxus, not of our product." | EXH. 177 - NTG070216 |
| 432. | On June 3, 2015, Scott Ferrell approved the draft complaint for filing and directed NTG staff to file | EXH. 176 - NTG066529 |

| | | |
|---|---|---|
| | a complaint in federal court on behalf of Strataluz LLC against TruDerma alleging Lanham Act violations related to TruDerma's male enhancement product (Viaxus). | |
| 433. | The complaint, signed by Scott Ferrell, alleged:<br><br>• Strataluz "owns, markets, and sella the ProMAXAL male enhancement pill;"<br><br>• Defendant's products "divert sales away from products such as Plaintiff's ProMAXAL;"<br><br>• ProMAXAL "contains active ingredients with a proven ability to aid in erectile dysfunction and enhance male performance;"<br><br>• ProMAXAL's main ingredient, AKG, "is a patented performance enhancer" that has "clinical, scientific evidence supporting its ability to increase penis size, strength, and endurance;"<br><br>• "Plaintiff has invested a significant amount of money researching, formulating, developing and clinically studying its [AKG] product that can actually provide the results that Defendant misleadingly claims its | RJN 33 - *Strataluz LLC v. TruDERMA LLC,* No. 3:15-cv-01248-JM-RBB (S.D. Cal., Filed June 3, 2015), Dkt. 1, ¶¶ 4, 12, 13, 18. |

| | | |
|---|---|---|
| | 'Viaxus' product can provide."<br><br>Twinlab's claims "have diverted, do divert . . . sales to 'Viaxus' at the expense of Plaintiff's ProMAXAL products . . ." | |
| 434. | In truth, Strataluz never manufactured or sold a single unit of ProMaxal. | EXH. 137, Bentley Tr. at 46:20-25 (Strataluz never had any physical inventory for ProMAXAL), 47:4-7 (Strataluz never sold or manufactured ProMAXAL), 56:1—57:8. |
| 435. | In truth, Strataluz never developed packaging for the purported ProMAXAL product, had no source for ingredients, and had not identified a supplier. | EXH. 137, Bentley Tr. at 63:14-22 (Strataluz developed a "mock-up" of what the "eventual product would look like" so that the test commercial could display a product image); Tr. at 52:22—53:4 (Strataluz did not manufacture any packaging for ProMAXAL and did not have a source or supplier for ingredients). |
| 436. | In truth, ProMAXAL was never available for sale and the website did not contain a functioning e-commerce engine. | EXH. 137, Bentley Tr. at 53:17—54:5 (Strataluz only ran a test commercial for ProMAXAL); 56:1—57:8, 60:11-61:1 (ProMAXAL website had no e-commerce engine and was not designed to make sales) |
| 437. | In truth, Strataluz never performed any product testing or clinical trials on ProMAXAL. | EXH. 137, Bentley Tr. at 52:13-20;<br><br>EXH. 1, S. Ferrell Tr. at 198:14—200:3 (No clinical trials) |
| 438. | As of the date that Scott Ferrell sent the June 2, 2015 demand letters and filed the June 3, 2015 complaint, he knew that ProMAXAL was not | EXH. 178 - NTG070875 (June 5, 2015 email asking Bentley to get "ProMAXAL available for sale asap" because he has a defendant |

| | | available for sale, had never sold a single unit, did not have a functioning e-commerce portal, and had performed no clinical testing. | that is ready to settle but is "wondering why he can't find anything about us online."); <br><br> EXH. 1, S. Ferrell Tr. at 198:14—200:3(Strataluz never performed any clinical testing); <br><br> EXH. 177 - NTG070216 (June 1 emails where Knowles acknowledges to Scott Ferrell that ProMAXAL isn't "on the market yet") |
|---|---|---|---|
| 439. | | Scott Ferrell knew that Strataluz had only spent $1 to obtain the "patented" ingredient and that the company had not invested in testing or research. | EXH. 156 - NTG070041 (Harcol license agreement); <br><br> EXH. 155 - NTG070661; <br><br> EXH. 1, S. Ferrell Tr. at 198:14—200:3 (Strataluz never performed any clinical testing) |
| 440. | | Scott Ferrell and NTG did not disclose that he and other NTG attorneys owned Strataluz LLC in any of the male enhancement demand letters or the TruDerma complaint. | *See* Letters, EXHS. 172, 173, 174, 175; <br><br> RJN 33, *Strataluz LLC v. TruDERMA LLC,* No. 3:15-cv-01248-JM-RBB (S.D. Cal., Filed June 3, 2015), Dkt. 1. |
| 441. | | Companies that received demand letters related to the ProMAXAL product and the EverSilk product responded with skepticism about the validity of the claims. | EXH. 220 - NTG065735 (ProMAXAL); <br><br> EXH. 179; <br><br> EXH. 180; <br><br> EXH. 181; <br><br> EXH. 182 <br><br> EXH. 183 - NTG070398 <br><br> EXH. 184 - NTG067272. |
| 442. | | On June 5, 2015, Scott Ferrell emailed Jarrod Bentley and said: | EXH. 178 - NTG070875 |

| | | |
|---|---|---|
| | "Can we get the Promaxal available for sale asap?  I have a defendant who wants to license from/settle with us, but he is wondering why he can't find anything about us online." | |
| 443. | In response, Jarrod Bentley wrote to Scott Ferrell:<br><br>"I can have the website up very quickly – by Monday at the latest.  However, getting inventory will take 4-5 weeks.<br><br>I can put something up that takes a person all the way through the shopping experience – but then have a page that says we're temporarily out of stock.<br><br>Let me know what you need and I'll make it happen." | EXH. 178 - NTG070875 |
| 444. | Scott Ferrell responded:<br><br>"Let's do that – get it up, take someone through the experience, and then say we are on back order.  I'm okay taking six weeks to fill if we actually get orders before we get product." | EXH. 178 - NTG070875 |
| 445. | On June 10, 2015, Scott Ferrell emailed David Reid and Richard Hikida and wrote:<br><br>"1. In general, it may turn out that the Strataluz cases are not a profitable line.  That is why I sent the e-mail earlier today saying to hold off on future demand letters.  If that's the case, I'd rather pivot | EXH. 185 - NTG066587;<br><br>*See also* EXH. 186 - NTG066584 ("Guys, Let's hold off on future [Strataluz] demand letters until further notice.") |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | | |
|---|---|---|
| | out of them sooner rather than later." | |
| 446. | On June 24, 2015, Scott Ferrell sent a letter to Nip+Fab Limited's counsel and demanded that Nip+Fab pay Strataluz $100,000 to settle Strataluz's threatened Lanham Act claims regarding EverSilk. | EXH. 187 - NTG066019 (Letter) |
| 447. | On July 1, 2015, Scott Ferrell emailed Jarrod Bentley, Joshua Weiss, David Reid, and Victoria Knowles that NTG and wrote: "It looks like we will be banking our first settlement from the Strataluz cases.  Per the below, Nip/Fab has offered us $6,700, which is suspect means that their real "bottom line' is about $10k.  I think our total costs are about $1K, so that woud mean about $,500 to NTG and about $4,500 to Josh/Jarrod." | EXH. 188 - NTG066758 (Bentley responded: "I'm on board.  Still amazed at how you're able to do it – but definitely on board.") |
| 448. | On July 22, 2015, Scott Ferrell notified James Hardin, Dave Reid, Joshua Weiss, Jarrod Bentley, and Sariah Para that "[they] settled [the Strataluz v. Nip/Fab lawsuit] for $20K" and the "money should land in August" to be wired "between the five owners . . .  per [their] ownership(sic) percentages." | EXH. 189 - NTG066923 |
| 449. | James Hardin responded with excitement over receiving his portion of the settlement, exclaiming "[w]here is my 12.5% baby!" | EXH. 189 - NTG066923 |

| 450. | When Scott Ferrell communicated with opposing counsel regarding Strataluz's litigation threats, he never disclosed that he or any other NTG attorney was a shareholder in the company. | *See* Dkt. Nos. 588-30, 588-31, 588-32, 588-33, 588-34, 588-35, 588-36, 588-37, 588-38, 588-39, 588-40, 588-41 (Emails between Scott Ferrell and opposing counsel) EXH. 183; EXH. 190. |
|---|---|---|
| 451. | In fact, Scott Ferrell repeatedly made statements designed to suggest that Strataluz was a truly independent client with whom he communicated before making litigation decisions or settlement offers. | *See e.g.*, EXH. 190 - NTG070572 ("I relayed Twinlab's offer to my client, which they have respectfully rejected.  They do not have a counter and have instructed me to proceed with filing. . ."); EXH. 183 - NTG070398 (at NTG070399, "I was on the phone with Strataluz's GC when I received your email and we discussed it.  I explained the situation described below and while they are sympathetic, $8K over four months will not resolve this case."; at NTG070400, "I have discussed your offer with my client, and they have rejected it.") |
| 452. | Jarrod Bentley, James Hardin, and Joshua Weiss all testified that they were not consulted regarding Strataluz's litigation strategy or settlement positions. | EXH. 138, Bentley Tr. at 57:25—58:23; EXH. 221- Weiss Tr. at 71:6—72:6; 73:20-23; EXH. 222 - Hardin Tr. at 53:20—54:24 |
| 453. | On July 10, 2015, David Reid wrote Scott Ferrell about counsel for Natural Products Solution, stating: | EXH. 191 - NTG066866 |

| | | |
|---|---|---|
| | "Little biatch certainly has changed his tone." | |
| 454. | Scott Ferrell responded and wrote:<br><br>"HAHAHAHA So true.  And I think we may want to investigate a consumer class action against them – its at least worth a CLRA letter to see if they file a dec action that we can SLAPP." | EXH. 191 - NTG066866 |
| 455. | Scott Ferrell communicated with counsel for Twinlab and demanded settlement payment to Strataluz regarding its ProMAXAL claims. | EXH. 192 - NTG064149 (at NTG064150) |
| 456. | On July 2, 2015, Scott Ferrell demanded that Twinlab pay Strataluz $144,000 to settle the claim. | EXH. 192 - NTG064149 (at NTG064150) |
| 457. | On July 24, 2015, Scott Ferrell sent a draft complaint to Dan Silverman, counsel for Twinlab, to convince Twinlab that Strataluz would pursue litigation if Twinlab did not pay money. | EXH. 193 - NTG069808 |
| 458. | On August 14, 2015, TwinLab agreed to pay Strataluz and NTG $10,000 to settle Strataluz's threatened claims regarding ProMAXAL. | EXH. 194 - NTG066995 |
| 459. | On August 21, 2015, Twinlab executed a settlement agreement with Strataluz, LLC regarding the Lanham Act claims that NTG and Strataluz threatened in the June 2, 2015 demand letter sent by Scott Ferrell and NTG. | EXH. 195 - NTG066998 |

| | | |
|---|---|---|
| 460. | The settlement required Twinlab Corporation, a company with its principal place of business in Florida, to wire $10,000 in four separate $2,500 payments to the Newport Trial Group's Wells Fargo IOLTA client trust account. | EXH. 195 - NTG066998 (setting payments to be made on or before September 15, 2015, October 15, 2015, November 15, 2015, and December 15, 2015). |
| 461. | In September of 2015, NTG received a response to a cellulite demand letter and Reid wrote Scott Ferrell: "This came in on the Nuxe matter.  This one came in after we decided to let most of these die out. Not sure if you want to do a little Brown Eyes and shake some money loose from these guys." | EXH. 196 - NTG067177 (at 67177) |
| 462. | Scott Ferrell responded and expressed an inclination to "let it die" and David Reid agreed, writing "I think that's the better option for his(sic) one.  We have more profitable matters to attend to." | EXH. 196 - NTG067177 |
| 463. | Strataluz's owners decided to wind down the company as the litigation was not profitable and the company sold almost no product. | EXH. 185 - NTG066587 (Scott Ferrell notes that the Strataluz cases may turn out to not be profitable and he would pivot out of them if that were the case) <br><br> EXH. 196 - NTG067177 (Reid and Ferrell decided to let the Strataluz cases die because they were not "profitable"); <br><br> *See* Dkt. Nos. 588-51 and 588-53 <br><br> *See* Dkt. Nos. 588-77 and 588-78CORPORATE DISSOLUTION DOCS (DKT 588 EXHIBIT 75 and 74) |

| | | |
|---|---|---|
| 464. | Like NTG did for its wiretapping, false advertising, and ADA matters, the firm maintained case charts that tracked Strataluz litigation. | EXH. 22 at NTG066654 (Male Enhancement Cases); EXH. 22 at NTG066637 (Mandy Jung email circulating the "weekly charts" for ADA cases, male enhancement cases, cellulite cases, gluten cases, and wiretap cases); EXH. 197 - NTG069923 |

## CONCLUSIONS OF LAW

1.      Summary judgment is appropriate where the record, read in a light most favorable to the nonmovant, indicates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

2.      Summary adjudication is appropriate when there is no genuine dispute as to any material fact.  Fed. R. Civ. P. 56(a).

3.      "Summary adjudication, or partial summary judgment upon all or any of a claim, is appropriate where there is no genuine dispute as to any material fact regarding that portion of the claim."  *See* Fed. R. Civ. P. 56(a)); *Lies v. Farrell Lines, Inc*., 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim[.]").

4.      A material fact is one that will "affect the outcome of the suit under the governing [substantive] law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  Facts and factual disputes that are irrelevant or unnecessary will not be considered.  *Id.*

5.      "The party moving for summary judgment bears the initial burden of

demonstrating the absence of a genuine issue of fact for trial." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

6.      "Once the moving party carries its initial burden, the adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but must provide affidavits or other sources of evidence that set forth specific facts showing that there is a genuine issue for trial." *Devereaux*, 263 F.3d at 1076 (internal quotations omitted).

7.      "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *POM Wonderful LLC v. Coca Cola Co.*, 166 F. Supp. 3d 1085, 1091 (C.D. Cal. 2016) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)).

8.      "If the evidence [proffered by the nonmovant] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

9.      "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Williams v. Casanova*, No. 117CV00917JLTPC, 2020 WL 3047783, at *3 (E.D. Cal. June 8, 2020) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

10.      If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed.  Fed. R. Civ. P. 56(e)(2).

11.      Where "the record as a whole points in one direction . . . the dispute is not genuine." *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998).

12.      The Court may grant SJ on all or part of a claim.  *See* Fed. R. Civ. P.

56(a) (judgment on "part of each claim"); *see also* Committee Notes re 2010 Amendment, Fed. R. Civ. P. 56(a).  Courts thus grant motions for partial SJ that seek resolution of elements within a claim.  *See, e.g., Albergo v. Immunosyn Corp.*, No. 09CV2653, 2012 WL 12953736, at *1 (S.D. Cal. June 19, 2012); *Greenberg Traurig, LLP v. Gale Corp.*, No. 2:07-CV-01572, 2009 WL 2390533, at *3 (E.D. Cal. Aug. 4, 2009) ("Gale's present motion seeks summary adjudication only with respect to the first two elements of the cause of action, duty and breach.")*Wiggins v. Ellis*, No. 2:12-CV-02705, 2021 WL 537274, at *27 (N.D. Ala. Feb. 12, 2021) ("Plaintiffs explain they seek partial summary judgment as to the Interest Reserve Account, with leave to prove damages at trial.  This is permissible under Rule 56.").

13.    The elements of a RICO claim under 28 U.S.C. § 1962(c) are (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Additionally, a plaintiff may only recover to the extent he has been injured in his money or property by the conduct constituting the violation.  *See Living Designs, Inc. v. E. I. Dupont de Numours and Co.*, 431 F.3d 353, 361 (9th Cir.2005).

14.    A RICO enterprise must have an ascertainable structure separate from that inherent in the racketeering activity.  *Chang v. Chen*, 80 F.3d 1293, 1298 (9th Cir. 1996).

15.    A RICO enterprise may be a formal organization with an economic purpose that was used to conduct the enterprise's affairs or it may be an associated-in-fact enterprise which persists in substantially the same form or structure over the course of the relevant time period.  *Walter v. Drayson*, 538 F.3d 1244, 1248 (9th Cir. 2008).

16.    An associated-in-fact enterprise can exist with substantially the same form or structure even if participants or entities come and go from the enterprise's affairs.  *Boyle v. United States*, 556 U.S. 938, 945, 129 S. Ct. 2237, 2244, 173 L. Ed. 2d 1265 (2009).

17.     An enterprise under RICO must have an ascertainable structure separate from that inherent in the racketeering activity; also, a conspiracy is not, in and of itself, an enterprise for purposes of RICO.  *Chang v. Chen*, 80 F.3d 1293, 1298 (9th Cir.1996)

18.     A pattern of racketeering activity exists when an enterprise commits two or more related predicate acts that have sufficient continuity so as to pose a threat of continued criminal activity.  *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 450 (9th Cir. 1991).

19.     The Section 1962(c) continuity requirement is flexible and may be established through closed- or open-ended continuity.  *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1527 (9th Cir. 1995).

20.     Closed-ended continuity involves the commission of predicate acts over a "substantial" period.  *Id*.  Courts hold that criminal activity spanning more than one year satisfies the closed-ended continuity requirement.  *Id*. at 1258 (more than 13 months held to satisfy it).

21.     Open-ended continuity is shown through "past conduct that . . . projects into the future with a threat of repetition."  *Allwaste*, 65 F.3d at 1528. Predicate acts that "become a regular way of doing business" satisfy the open-ended continuity requirement.  *Id*.

22.     Courts use a flexible approach to determine whether predicate acts are "related," including consideration of whether the alleged predicate acts have the "same or similar purposes, results participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989).

23.     "The relatedness test is not a cumbersome one for a RICO plaintiff." *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 44 (1st Cir. 1991).

24.     To establish a predicate act of mail fraud under 18 U.S.C. 1341, the plaintiff must show that the defendant (1) formed a scheme to defraud; (2) used the

United States mails to carry out the scheme; and (3) had the specific intent to defraud. *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).

25.     The Ninth Circuit defines "scheme to defraud" broadly: "a scheme reasonably calculated to deceive." *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967). "Deceitful statements of half truths or the concealment of material facts is actual fraud . . ." *Lustiger*, 386 F.2d 138.  "If the scheme is devised with the intent to defraud, and the mails are used in executing the scheme, the fact that there is no misrepresentation of a single existing fact is immaterial." *Id.*; *United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003), explains: "[S]chemes are condemned which are contrary to public policy or which fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society."

26.     "[A] scheme to defraud need not involve affirmative lies." *United States v. Hansmeier*, 988 F.3d 428, 436-37 (8th Cir. 2021).  "While nondisclosure of a relevant fact, "characterized by mere silence," is *437 not enough for fraud, active concealment—"deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter"—can form the basis of a fraudulent scheme." *Id.*

27.     To establish a predicate act of wire fraud under 18 U.S.C. 1343, the plaintiff must show that the defendant (1) formed a scheme to defraud; (2) used the interstate wires in furtherance of the scheme; and (3) had the specific intent to defraud. *Id*.

28.     To be "in furtherance," mails or wires need not be "essential element[s] of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710 (1989). "It is sufficient for the mailing to be 'incident to an essential part of the scheme' or 'a step in the plot.'" *Id.* (internal citations omitted).

29.     Each mail or wire in furtherance constitutes a separate predicate act.

*United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001).

30.    A mailing need not be interstate, but must merely be made through the U.S. Post Office or a "commercial interstate carrier." *See United States v. Fabel*, 312 F. App'x 932, 934 (9th Cir. 2009) (unpublished) (citing 18 U.S.C. § 1341). Federal Express (FedEx) is a commercial interstate carrier. *Id.*

31.    An interstate wire, by contrast, must travel interstate or internationally. *See* 18 U.S.C. § 1343; *see also Navajo Health Found. - Sage Mem'l Hosp., Inc. v. Razaghi Dev. Co., LLC*, 2020 WL 8416009, at *8 (D. Nev. Dec. 11, 2020). An interstate email or call is a "wire." *United States v. Selby*, 557 F.3d 968, 978 (9th Cir. 2009) (E-mail); *United States v. Williams*, 492 F. App'x 777, 778 (9th Cir. 2012) (same); *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 467 F. Supp. 2d 1071, 1082 (S.D. Cal. 2006) (interstate calls were wire fraud). "[T]he wire communication [need only] cross[] state lines." *United States v. Laedeke*, No. CR 16-33, 2016 WL 5390106, at *3 (D. Mont. Sept. 26, 2016) (collecting cases).

32.    Where the movant establishes a scheme to defraud, each mailing and wire in furtherance thereof is a separate offense. *Garlick*, 240 F.3d at 792.

33.    The Defendant "need not personally have mailed the letter or made the . . . call; the offense may be established where one acts with the knowledge that the prohibited actions will follow in the ordinary course of business or where the prohibited acts can reasonably be foreseen." *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992). Acts and statements of co-participants in a scheme to defraud are admissible against other participants; "knowing participants in the scheme are legally liable for their co-schemers' use of the mails or wires." *Id.* at 1263 (internal quotations omitted).

34.    Whether a scheme reveals an intent to defraud can be inferred from facts and circumstances in words, actions, and evident knowledge. *See Eclectic Properties E., LLC*, 751 F.3d at 997 ("by examining the scheme itself the court

may infer a defendant's specific intent to defraud"); *U.S. v. Green,* 745 F.2d 12015, 1207 (9th Cir. 1984).

35.     The Court can find an intent to defraud on summary judgment.  *See, e.g., Anhing Corp. v. Thuan Phong Co. Ltd.*, No. CV1305167BROMANX, 2015 WL 11018526, at *8 (C.D. Cal. Apr. 23, 2015) (collecting authorities and upholding partial summary judgment for plaintiff on the issue of fraud).  "The Court is mindful that the issue of fraudulent intent generally involves questions of fact best left to the jury.  Nevertheless, summary judgment may still be appropriate where the opposing party fails to offer evidence sufficient to raise a material dispute of fact."  *Id.*; *see also In re LLS Am., LLC*, No. 09-06194-PCW11, 2013 WL 3305393, at *4 (Bankr. E.D. Wash. July 1, 2013), *report and recommendation adopted as modified,* No. ADV 11-80299-PCW11, 2013 WL 4480667, at *4 (E.D. Wash. Aug. 19, 2013) ("To allow a defendant accused of wrongdoing to defeat summary judgment by simply denying any intent to do wrong would render summary judgment motions futile.  Intent to defraud, harm, or delay creditors may be demonstrated and typically is demonstrated by circumstantial evidence. The defendant must create a genuine issue of fact regarding the circumstantial evidence, not simply deny any intent."); *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 148 (7th Cir. 1994) ("Summary judgment will not be defeated simply because motive or intent are involved"); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) ("Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation").

36.     Where the undisputed record connotes actual knowledge of falsity or the defendant misleads by withholding material facts, "a court may infer as a matter of law that he did so with intent to defraud."  *A.B.C. Chevrolet Co. v. Kirk*, No. 85 C 10001, 1986 WL 10045, at *1–2 (N.D. Ill. Sept. 8, 1986) (citing *Suits v.*

*Little Motor Co*., 642 F.2d 883, 886 (5th Cir. 1981)); *see also Nieto v. Pence*, 578 F.2d 640, 642 (5th Cir.1978) (presuming actual knowledge to infer fraudulent intent, while accepting the sufficiency of even constructive knowledge).  Critically, where "the record as a whole point in one direction," that of fraud," there is no genuine dispute.  *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998).

37.     Actual knowledge that one's representations are false is sufficient for the Court to find intent to defraud.  *See United States v. DiRoberto*, 686 F. App'x 458, 461 (9th Cir. 2017) (unpublished) ("Intent may be inferred from misrepresentations made by the defendant[ ], and the scheme itself may be probative circumstantial evidence of an intent to defraud."); *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) (same); *Lothian*, 976 F.2d at 1267 (discussing "badges of fraud" as proof of fraudulent intent, including knowing misrepresentations); *A.B.C. Chevrolet Co. v. Kirk*, No. 85 C 10001, 1986 WL 10045, at *1–2 (N.D. Ill. Sept. 8, 1986); *Nieto*, 578 F.2d at 642.

38.     Staging injuries for the purpose of pursuing litigation is fraudulent where litigants depend on false statements and misrepresentations to maintain the claims.  *See, e.g., United States v. Hansmeier*, 988 F.3d 428, 437 (8th Cir. 2021); *U.S. v. Al-Shahin*, 474 F.3d 941, 946-47 (7th Cir. 2007) ("staged accidents"); *United States v. Marbella*, 73 F.3d 1508, 1511 (9th Cir. 1996); *United States v. Hightower*, No. 04 CR 0047, 2004 WL 897886, at *3 (N.D. Ill. Apr. 23, 2004); *People v. Singh*, 37 Cal. App. 4th 1343, 1366 (1995), *opinion modified on denial of reh'g* (Aug. 21, 1995); *CSX Transp., Inc. v. Gilkison*, 2012 WL 1598081, at *10 (N.D.W.Va. May 3, 2012).

39.     Plaintiffs seeking relief under the California UCL/CLRA must have suffered an actual injury through reasonable reliance on false advertising to have standing.  California courts have long held a plaintiff who purchases product to manufacture litigation lacks standing under UCL/CLRA.  *See, e.g., Anunziato v.*

*eMachines, Inc.*, 402 F. Supp. 2d 1133, 1138–39 (C.D. Cal. 2005) ("The California voters identified the gateway for these abuses as the 'unaffected plaintiff,' which was often the sham creation of attorneys, and expressed their intent 'to prohibit private attorneys from filing lawsuits for unfair competition where they have no client who has been injured in fact under the standing requirements of the United States Constitution.'"); *In re Tobacco II Cases*, 46 Cal. 4th 298, 316 (2009) ("The specific abuse of the UCL at which Proposition 64 was directed was its use by unscrupulous lawyers who exploited the generous standing requirement of the UCL to file 'shakedown' suits to extort money from small businesses.).

40.     The mail and wire fraud statutes do not require reliance.  *Neder v. United States*, 527 U.S. 1, 24, 25 (1999); *United States v. Williams*, 492 F. App'x 777, 778 (9th Cir. 2012) (unpublished) ("It is well-established that reliance is not a required element of wire fraud.").

41.     Under both California State Law and federal law, the knowledge of an attorney is imputed to the client as a matter of law.  *Ringgold Corp. v. Worrall*, 880 F.2d 1138, 1141–42 (9th Cir. 1989); *Caples v. City of Phoenix*, 804 F. App'x 595, 596 (9th Cir. 2020); *Otis v. Zeiss*, 175 Cal. 192, 195–96, 165 P. 524, 525 (1917); *see also Link v. Wabash R.R.*, 370 U.S. 626 (1962).

42.     "As a matter of law, [client] is considered to have notice of all facts known to her attorney."  *Keller v. United States*, No. CV-11-02345-PHX-PGR, 2017 WL 3719878, at *3 (D. Ariz. Aug. 29, 2017), *aff'd*, 788 F. App'x 543 (9th Cir. 2019) (citing *Ringgold*, 880 F.2d at 1141-42; *see also Ceja v. Scribner*, No. LACV0700606VBFKES, 2016 WL 4035665, at *6 (C.D. Cal. Mar. 3, 2016) (same).

43.     In the Ninth Circuit, knowledge of a material fact is imputed to the client as a matter of law on the date the fact was learned by the client's attorney. *Caples*, 804 F. App'x at 596.

44.     "The attorney is conclusively presumed to have informed his client of

all material facts which the attorney acquires knowledge of, and which affect the client's rights, while the attorney is acting in the course of his employment and within the scope of his authority.  The Rule is unquestioned that notice to an attorney is notice to the client employing him." *In re Locust Bldg. Co.*, 299 F. 756, 769 (2d Cir. 1924) (collecting precedent).

45.    Attorneys are ethically and legally obliged to convey known material facts to clients regarding their rights and claims.  *See, e.g., Keller v. United States*, No. CV-11-02345, 2017 WL 3719878, at *3 (D. Ariz. Aug. 29, 2017), *aff'd,* 788 F. App'x 543 (9th Cir. 2019); *Roche v. Hyde*, No. A150459, 2020 WL 3563410, at *21–24 (Cal. Ct. App. June 30, 2020).

46.    The Supreme Court has explained that imputation of the attorney's knowledge to the client is required to effectively employ "our system of representative litigation."  *Link v. Wabash*, 370 U.S. 626, 633-34 (1962).


DATED:  April 27, 2021

Respectfully submitted,

EMORD & ASSOCIATES, PC


By:    _/s/ Joshua S. Furman_____
Peter A. Arhangelsky, Esq. (SBN 291325)
Joshua S. Furman, Esq. (pro hac vice)
*Attorneys for Plaintiff Natural Immunogenics Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2021, the foregoing, **PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFF NIC'S MOTION FOR PARTIAL SUMMARY ADJUDICATION ON COUNT II (RICO, 28 U.S.C. § 1962(c))** was electronically filed using the Court's CM/ECF system and was sent via email to the following:

Brendan M. Ford [*bford@forddiulio.com*]
Kristopher P. Diulio [*kdiulio@forddiulio.com*]
Ford & Diulio PC
650 Town Center Drive, Suite 760
Costa Mesa, California 92626
Tel: (714) 450-6830
*Attorney Defendants Andrew Nilon, Giovanni Sandoval,*
*Sam Schoonover, Matthew Dronkers, Taylor Demulder, Sam Pfleg*


David J. Darnell, Esq. [*ddarnell@callahan-law.com*]
Edward Susolik, Esq. [*es@callahan-law.com*]
Callahan & Blaine
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA  92707
Tel:  (714) 241-4444
*Attorneys for Newport Trial Group and Scott Ferrell*


Nicole Whyte [*nwhyte@bremerwhyte.com*]
Benjamin Price [*bprice@bremerwhyte.com*]
Kyle A. Riddles [*kriddles@bremerwhyte.com*]
Bremer Whyte Brown & O'Meara, LLP
20320 S.W. Birch Street
Second Floor
Newport Beach, CA 92660
Tel: (949) 211-1000
*Attorneys for Defendants Ryan Ferrell, Andrew Baslow, David Reid, and Victoria Knowles*

Robert Tauler, Esq.
rtauler@taulersmith.com
Tauler Smith, LLP
626 Wilshire Blvd., Suite 510
Los Angeles, CA 90017
Tel: (310) 590-3927
*Attorney for David Reid and Victoria Knowles*


               */s/ Joshua S. Furman*
              Joshua S. Furman, Esq.