UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al | | |

Present: The Honorable **James V. Selna, U.S. District Court Judge**

| Lisa Bredahl | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** **[IN CHAMBERS] Order Regarding Plaintiff's Motion for Summary Adjudication**

  Plaintiff Natural-Immunogenics Corporation ("NIC") moved for partial summary adjudication on its second cause of action against Defendant Newport Trial Group ("NTG"), Scott Ferrell ("Ferrell"), and Andrew Baslow ("Baslow"). Dkt. No. 1107. Defendants NTG and Ferrell opposed the motion. Dkt. No. 1125. Defendant Baslow joined in the opposition, and filed his own opposition as well. Dkt. No. 1130. NIC then filed replies to both motions. Dkt. Nos. 1150 and 1153.

  NIC also filed two requests for judicial notice, Dkt. Nos. 1117 and 1152. The Court **GRANTS** the request.

  The Court invited each party to file a request for hearing after posting its Tentative Order. Neither party did so. For the following reasons, the Court **DENIES** the motion.

///
///
///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.  8:15-cv-02034-JVS-JCGx                        Date  June 23, 2021

Title  Natural-Immunogenics Corp. v. Newport Trial Group, et al

## I. BACKGROUND

### 1. Factual Background[1]

When resolving a motion for summary judgment, courts may consider only admissible evidence. Fed. R. Civ. P. 56. The Court considered only admissible evidence in resolving NIC's motion for summary judgment. When the order cites evidence to which the parties have objected, the objection is impliedly overruled. Additionally, the Court declines to rule on objections to evidence upon which it did not rely.

Further, when establishing the factual basis for this order, the Court did not weigh the evidence, make credibility determinations, or draw inferences from the facts adverse to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1149 (9th Cir. 2002) ("[O]f course, it is for the trier-of-fact, not the court deciding whether to grant summary judgment, to determine issues of credibility.").

The Court also need not address objections to evidence submitted in the NIC's statement of undisputed facts that are either legal argument or wholly unrelated to the fact

---

[1]Given the number of exhibits present before the Court, the Court adopts the following naming. Any NIC exhibit will be stylized as "NIC Ex. ___", and any NTG exhibit will be stylized as "NTG Ex. ___."

Further, the Court **GRANTS** NIC's requests for judicial notice, Dkt. Nos. 1117 and 1152. Under Federal Rule of Evidence 201, the Court may take judicial notice of matters of public record if the facts are not "subject to reasonable dispute." Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001); see Fed. R. Evid. 201(b). All of the documents in the RJNs contain facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Should the Court refer to a party's request for judicial notice, the Court will refer to the aforementioned as "RJN" instead of "Ex." The same is true for any evidence Baslow submitted ("Baslow Ex. ___.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
|---|---|---|---|

| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al |
|---|---|

alleged. "[B]oilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence." Doe v. Starbucks, Inc., No. SACV 08–0582 AG (CWx), 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009). The Court does not give merit to NTG's boilerplate objections that are devoid of relevant analysis or do not adequately dispute the facts in the SUF. See Amaretto Ranch Breedables v. Ozimals Inc., 907 F. Supp. 2d 1080, 1081 (N.D. Cal. 2012) ("This Court need not address boilerplate evidentiary objections that the parties themselves deem unworthy of development."); Cmtys. Actively Living Indep. & Free v. City of Los Angeles, No. CV 09–0287 CBM (RZx), 2011 WL 4595993, at *8 (C.D. Cal. Feb. 10, 2011) (summarily overruling boilerplate evidentiary objections when the grounds for the objections were unduly vague and overbroad).

   *I.   General Firm Background*

Scott Ferrell ("Ferrell")[2] incorporated NTG, of which he is the sole owner, in 2009. Dkt. No. 1125 ¶¶ 1-2 ("SUF"). David Reid ("Reid") has been employed at NTG since 2010 and was promoted to Managing Partner of the firm in 2013. Id. ¶¶ 6-8. Some of Reid's work was performed under the supervision and/or guidance of Ferrell. Id. ¶ 11. Victoria Knowles ("Knowles") was hired by NTG, initially as a contract attorney, and was then promoted to Partner in 2017. Id. ¶¶ 12-13, see also NTG Ex. 230 at 46:1-8. Some of Knowles' work was performed under the supervision and/or guidance of Reid. Id. ¶ 15. Another employee – Ryan Ferrell – was employed at the firm between 2010 and 2015. Id. ¶¶ 16-17.

The firm also employed the following administrative and paralegal staff: Carla Wise, Katherine Kirshner, Mandy Jung, and, Sariah Para. Id. ¶¶ 21-28. NTG also employed field representatives, Andrew Baslow ("Baslow") and Wynn Ferrell. Id. ¶ 28. Ferrell communicated with certain clients in NTG's false advertising cases and wiretapping cases. NIC Ex. 49, 70, 77, RJN 15. Baslow, the Director of Field Operations, worked under the supervision and/or guidance of Ferrell. SUF ¶ 35. Ferrell had ultimate supervisory authority over Baslow. Dkt. No. 1141 ¶ 9. Baslow, however, had no direct reports to him. Id. ¶ 6.

---

[2]There are numerous parties with the last name "Ferrell" discussed in this order. For the sake of clarity, when the order refers to "Ferrell" by last name order, it means Scott Ferrell.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No. 8:15-cv-02034-JVS-JCGx          Date   June 23, 2021

Title   Natural-Immunogenics Corp. v. Newport Trial Group, et al

The parties disagree as to whether Baslow "found" class representatives for NTG lawsuits. NIC asserts that Baslow did "find" class representatives, whereas NTG contends that he "had a role in screening individuals who wanted to work with us . . .." Compare SUF ¶ 36 with NTG Ex. 231 at 50:4-15. The parties likewise disagree as to whether NTG field representatives directed potential plaintiffs to purchase products associated with lawsuits. Compare NIC Ex. 24 and 103 at 107-109 with NTG Ex. 232 at 107:1-110:16.

    ii.    NIC

NIC labels and markets colloidal silver as providing "immune support." Dkt. No. 1141 ¶ 466. As discussed below, NTG sued NIC concerning the product, and NIC admits that the only harm it is currently claiming in this action is the litigation that arose from Nilon v. Natural-Immunogenics Corp., No. 3:12-cv-00930-LAB-BGS (S.D. Cal. 2012). Id. ¶ 467. That suit involved a claim that "colloidal silver is snake oil", and that NTG alleged NIC's advertising was false and misleading. Id. ¶ 470.

    ii.    *Wiretapping Scheme*[3]

Starting in 2012, NTG began pursuing lawsuits on behalf of clients, alleging violations of the California Invasion of Privacy Act ("CIPA"). SUF ¶ 47. The firm maintained case charts tracking the wiretapping suits from the pre-client stage through settlement, using a term, "seasoning" to describe the process of preparing suits. Id. ¶¶ 48-49. The parties disagree as to what "seasoning" means exactly. See Dkt. No. 1141 ¶ 48. The charts at times listed companies and their associated toll free numbers, but no plaintiff for the corresponding company. SUF ¶ 50.

As part of the wiretapping scheme, Ferrell directed Baslow to call target companies and determine whether they provided a warning that calls could be recorded. NIC Ex. 27. Baslow also called some of these target companies prior to the identification of possible plaintiffs. Id. ¶ 54. At times, NTG's field representatives communicated with the wiretapping plaintiffs and requested that they call the same numbers. NIC Ex. 24 and 26.

---

[3]The parties both use the term "wiretapping" to refer to surreptitious recording. Specifically, when referring to wiretapping in this order, the Court refers to NTG's alleged recording of phone calls made to various target companies.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al | | |

In at least one instance, Baslow also mentioned that the call was for the purposes of a "wiretap case." NIC Ex. 39. Baslow also directed clients to make confirmation statements once they completed their calls, and at least in one instance, he corrected a client's language in the confirmation statement. SUF ¶¶ 60-62. Further, in at least one instance, Baslow instructed a client not to include in their confirmation statement that he directed them to make the call. Id. ¶ 63.

        1.      *Schoonover v. Himalaya Drug Co. (Himalaya)*

On July 13, 2012, Ferrell emailed Baslow and requested that he audit the phone numbers in that email (the phone numbers were associated with various companies) to see if they "auto-disclose that they record or monitor" and if they do not, "ask a basic question or two of a customer service rep when you get through to one." SUF ¶ 66. One of the numbers, 800-869-4640, was for Himalaya. Id. ¶ 67. Several days later, call logs from Baslow's phone demonstrate that he made a call to Himalaya. Id. ¶ 69; see also NIC Ex. 23 (Item 7345).[4]

On that call, he asked the representative a number of questions, i.e., what their best product was, the main ingredient, and whether the calls were recorded or monitored. NIC Ex. 28, see also NIC Ex. C. Via email, he then confirmed that he "spoke to CS REP and asked questions about their best products" and that he "was never told my call was R/M until I asked at the conclusion of the conversation." NIC Ex. 27. Ferrell followed up with Baslow, noting that they should proceed with a potential suit against Himalaya and asking if that was correct, to which Baslow confirmed that it was. NIC Ex. 27.

Shortly thereafter, Baslow contacted Sam Schoonover via text message: "Hey Man, I've got another case for you and have confirmation that we can use you again. You down?" SUF ¶ 76. Schoonover replied that he was interested, asked what he had to do, and Baslow followed with instructions. "This one is a little different. You won't have to buy anything. Just make a phone call, but I'll need to chat with you on the phone to tell you all the details." Id. ¶¶ 76-78. They then discussed the details over the phone, and Baslow gave Schoonover the name of the company and provided him with a number to call. Id. ¶¶ 81-82.

---

[4] NIC incorrectly referenced that the item number was 3745.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al | | |

Schoonover called Himalaya, id. ¶ 85, and then emailed Baslow to let him know that he had done so. Id. ¶ 87. He then let Baslow know that he just sent over the confirmation statement email. Id. ¶ 88. Baslow responded to Schoonover, requesting that he not address the email to him or say that he provided Schoonover with the number, as well as providing other details. Id. ¶ 89. Schoonover revised the email accordingly, and confirmed with Baslow that it was appropriate. Id. ¶¶ 90-92, 95.

That same day, Ferrell directed Knowles to draft a complaint against Himalaya on behalf of Schoonover. The complaint was filed two days later on July 19, 2012. Id. ¶¶ 96-97. The complaint discussed how Schoonover called Himalaya about a specific product, was not aware that the call was being recorded (nor did he give consent), and later learned that it did so routinely. Id. ¶ 99. The complaint did not discuss how Baslow had messaged Schoonover, and requested that he revise his confirmation letter.

Ferrell then communicated with counsel for Himalaya concerning the resolution of the litigation, noting that the litigation would cease "if the defendant would agree to add an automated disclosure noting that incoming calls are recorded for quality assurance purposes." NIC Ex. 7. Eventually, Ferrell communicated with Reid that they should push the case towards a settlement because it was one of their "weaker cases." SUF ¶ 109. The matter eventually settled for $17,500. Id. ¶ 114. The settlement agreement did not contain any language or provisions requesting that they change their business practices. Id. ¶ 115.

Eventually, Schoonover informed Baslow that he no longer wanted to participate in these cases:

> I'm having an issue though. See, my dad and I are very close and we talk about everything. He's been financially helping me out with my entrepreneurial ventures and after I told him about the last case we won, he decided that he doesn't want me participating in any more phone call cases because he feels like its not as 'ethically correct' his words, not mine. I've tried today to convince him otherwise but he's unwilling to budge. I can't risk going forward without his consent for one, because he's my dad and were (sic) very close, and for two, because he would stop assisting me with my ventures which mean the world tome. So if you have any more product based cases, I'd be glad to assist you. It's not a judgment on you or your firm, just his own personal opinions. I wish it were different because that last

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al | | |

1500 and this forthcoming 2000 have been extremely helpful. Let me know if there are any product based cases ad (sic) I'd be glad to help you out.

SUF ¶ 118.

Throughout the Himalaya case, Baslow received some direction from Ferrell. SUF ¶¶ 119-120. The parties disagree as to the amount of supervision and whether Ferrell was Baslow's only supervisor. Dkt. No. 1141 ¶ 120.

   2.   *Demulder v. Carter-Reed Co.*

On June 2, 2012, Ferrell emailed Baslow the following: "We would like to work with someone who has called 1-800-506-1577 to order a diet pill called Relacore, asked a few questions of a customer service rep, and not told that their call was being recorded. This one is somewhat time sensitive and needs to be an outstanding potential client whose deposition may be taken." SUF ¶ 127. Records from Baslow's phone log show a call to the same number approximately two months later. Id. ¶ 128.

Baslow later contacted Taylor Demulder ("Demulder") on August 17, 2012, and then spoke with Demulder over the phone the same day. Demulder then sent Baslow a confirmation email: "I spoke with Mark at Health Med (800) 836-3177. . .. From the start of the call to the finish Mark never told me that the call was being monitored or recorded." Id. ¶ 134. Baslow and Demulder then communicated frequently throughout late August. Id. ¶¶ 135-136. Baslow also sent Demulder an email concerning Relacore: "Just wanted to check in with you as I have not seen your confirmation statement come through for the new Relacore wiretap case. Do you still plan on making this call? If so, please send over your summary ASAP. . .." Id. ¶ 137. He sent a similar follow up message via text shortly thereafter. Id. ¶ 138. Demulder ultimately called Carter-Reed. Id. ¶ 140.

Demulder then sent Baslow a confirmation email:

I spoke with Melisa at Rela Core (800) 506-1577 at around 8:30 a.m. on 9/6/12 from (702) 407-0591. I told her my first name and then asked her to see if she could look up an account I may have already started. I then gave her my social security number and then she asked for my last name. She then proceeded to tell

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.  8:15-cv-02034-JVS-JCGx   Date  June 23, 2021

Title  Natural-Immunogenics Corp. v. Newport Trial Group, et al

me about the diet pills they have to offer. I then began to tell her about my dissatisfaction with my weight and my social life and that I really wanted to loose [sic] weight. We then talked about how much weight I could loose [sic] if I used the diet pills. we then began to talk about the cost of the pills. I expressed to her that I recently lost my job and that I may not be able to afford the pills. From the start of the call to the finish Melisa never told me that the call was being monitored or recorded.

Id. ¶ 144.  Baslow responded to Demulder referencing the confirmation email, that it was "pretty strong," and that he had "Sent everything over."  Id. ¶ 146.  Then, later the same day, Baslow provided the confirmation statement to certain NTG employees, and Ferrell indicated that they would refer the case out.  Id. ¶ 148.  NTG did not inform the law firm to which it referred the case that Demulder had already been a client of or interacted with NTG or that he had already performed a wiretap call earlier.  Id. ¶ 150.  Nonetheless, Ferrell had field representatives prepare Demulder for the initial interview with the firm and also offered to assist the firm.  Id. ¶¶ 152-153.

       3.     *Torres v. Nutrisystem*

NTG also filed a wiretap complaint against Nutrisystem in 2012, on behalf of Raquel Torres ("Torres").  SUF ¶ 157.  The complaint alleged the following:

(1) Torres made a call to Nutrisystem on August 24, 2012 that conveyed sensitive, private, and confidential information;
(2) Torres did not know the call was being recorded;
(3) Torres did not give express or implied consent to the recording; and
(4) Torres only learned Nutrisystem recorded her conversation after that call.

Id. ¶ 158.  Prior to filing suit, and indeed, prior to the August 24, 2012 call, Baslow called Nutrisystem to determine whether it recorded calls.  Id. ¶ 159.  The parties dispute whether Baslow learned how to bypass an automated notice of recording and reach a live representative.  See Dkt. No. 1141 ¶ 162.

Numerous other factual disputes exist as to how Torres became a client of NTG. Some emails suggest that Wynn Ferrell played a role, id. ¶¶ 167-168, but others statements in NIC's statement of undisputed facts are not supported.  Further, factual

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al | | |

disputes exist as to whether Torres then followed Baslow's direction regarding how to bypass the notice of recording and whether she "gratuitously" disclosed her social security number. Dkt. No. 1141 ¶¶ 171-172. Nonetheless, some of Nutrisystem's argument in its case suggest that it may be the case. Id. ¶ 175.

### iii. False Advertising Scheme

By 2010, NTG began litigating claims under California's false advertising laws. NIC RJN Ex. 9. NTG did not act as litigation counsel in all cases alleging false advertising and sometimes referred these claims to outside counsel. SUF ¶ 188. In addition to obtaining clients for these types of cases through direct solicitation and referrals, id. ¶ 189, NTG also advertised the firm through lectures, achievements, and super lawyer designations. NTG Ex. 231 at 96:8-18. NTG would initially send demand letters at the outset of any potential suit. NIC Exs. 59, 60, 61, 62, 63. Factual disputes exist as to whether NTG knew that the representations it made in those demand letters, and the yet-to-come lawsuits, were false. Dkt. No. 1141 ¶ 196.

At times, NTG would ask former clients to refer friends and family for their false advertising lawsuits. NIC Ex. 24 at SCHOONOVER69-70; NTG Ex. 231 at 50:4-15; see also SUF ¶¶ 280-290. The parties dispute whether NTG solicited clients to participate in litigation against companies NTG had already identified, see NTG Ex. 24; 54, and whether they merely screened individuals who wanted to work with the firm, NTG Ex. 231 at 50:4-15. See Dkt. No. 1141 ¶ 191. The parties likewise dispute whether NTG directed clients to purchase specific products, Dkt. No. 1141 ¶ 192, but in at least one instance, NTG directed the purchase of a product, NIC Ex. 24. Factual disputes also exist as to whether these clients had purchased and/or used the product before. Dkt. No. 1141 ¶ 197.

In addition to the false advertising case discussed below, NTG filed false advertising suits on behalf of Schoonover, Andrew Nilon ("Nilon"), and Matthew Dronkers ("Dronkers"). NIC RJN 10, 11, 12. Schoonover, Nilon, and Dronkers (as well as Sam Pfleg ("Pfleg"), below) were friends. SUF ¶ 269. All except Pfleg were roommates. Id. ¶ 270.

NTG filed the Nilon Action on March 5, 2012, after having sent the demand letter to NIC on December 27, 2011. SUF ¶¶ 272-273. Nilon replaced another plaintiff, id. ¶¶

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al | | |

274-275, and was then replaced again when he no longer was interested in participating in the case, id. ¶ 296. Certain factual disputes exist as to why Nilon decided to step down from being the lead plaintiff. See e.g., Dkt. No. 1141 ¶ 473. The new named plaintiff, Giovanni Sandoval, stated that he had purchased NIC's product in November 2013, SUF ¶ 297, yet that product was not manufactured until February 2014, id. ¶ 299. Factual disputes exist as to whether Sandoval also provided false testimony. Dkt. No. 1141 ¶ 300-301. Another case involved Dan Bobba, id. ¶ 307, but numerous factual disputes exist as to his claims and how he came to be associated with NTG. Id. ¶¶ 308-315.

### 1. *Pfleg v. Nature's Way*

On January 2, 2012, Ryan Ferrell sent a demand letter to Nature's Way Products on behalf of an undisclosed consumer. SUF ¶ 205. The consumer was Theresa Martinez. Id. Counsel for the company responded, questioning the veracity of the allegations. Id. ¶ 206. Then, on March 13, 2012, Ferrell emailed Knowles regarding a Nature's Way product and instructed her to draft a CLRA complaint, noting that he would send "specific product info and plaintiff info in the next day or so." Id. ¶¶ 207-208. Shortly thereafter, Wise informed Ferrell that Nature's Way was already on a case list, that there was already a client, Ms. Martinez, and that a demand letter had been sent, to which Ferrell replied that they should just file the complaint the following day. Id. ¶¶ 209-210.

Knowles let Ferrell know that she would begin preparing the complaint once she received a copy of the January 2012 letter. Id. ¶ 211. Ferrell then forwarded the email chain to Baslow requesting that he "go ahead and move forward on this" because Ferrell had "concerns about the person who originally retained us." Id. ¶ 212.

Shortly thereafter, Baslow sent a text message to Nilon. Id. ¶ 214. Factual disputes exist as to whether Nilon provided Baslow with Sam Schoonover or Sam Pfleg's phone number. Dkt. No. 1141 ¶ 215. Nonetheless, later that day, Sam Pfleg purchased Nature's Way products at a Vitamin Shoppe. SUF ¶ 216. Later that day, Pfleg sent Baslow copies of his Vitamin Shoppe receipt. SUF ¶ 220. Baslow forwarded the same to Ferrell and others, and also emailed Ferrell and Knowles that he had a "new client who purchased half a dozen [Nature's Way products] at the Vitamin Shoppe, is dissatisfied, has [proof of purchase] and would like to move forward." Id. ¶ 222. Baslow also contacted Sam Schoonover the same day, asking him if he had any contacts "who would like to benefit the public?" NIC Ex. 24.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al | | |

Knowles sent a demand letter concerning Pfleg's purchase to Nature's Way on March 15, 2012, and revised the complaint accordingly. NIC Ex. 18. Knowles sent the draft complaint to Ferrell for review, and NTG later filed the complaint against Nature's Way on March 16, 2012. SUF ¶¶ 235-236. The letter referred to one of the products that Pfleg purchased. NIC Ex. 68; see also SUF ¶ 240. The letter also made various assertions concerning the marketing of the product and accused Nature's Way of misleading marketing and advertising of the product. Id. The complaint asserted that Pfleg purchased the product based on Nature's Way's "representations regarding the efficacy of the products," that he used the products as directed "but they did not work as advertised," and that but for the advertisements, he would not have purchased the products. SUF ¶ 232. Factual disputes exist as to whether those assertions were made knowing they were false. Dkt. No. 1141 ¶¶ 233; 239-242. Whether Pfleg had purchased the products before the suit was filed or the letter was sent is likewise disputed. Id. ¶ 243.

The parties entered negotiations regarding a settlement in June 2012. The agreement included a payment of $62,500. NIC Ex. 106. At the time of negotiations, Nature's Way also received another demand letter, asserting the same factual basis as Pfleg's complaint. NIC Ex. 106 and 107. Nature's Way's counsel expressed confusion upon receipt of the identical letter. Id. On June 28, 2012, Ferrell directed Baslow to contact Pfleg to receive his consent to the settlement on terms where Pfleg would receive $2,000. SUF ¶ 248. On June 30, 2012, Pfleg agreed to the settlement. Id. ¶ 251. He signed the same on July 6, 2012. SUF ¶¶ 252-253.

After the settlement was processed, Ferrell wrote to firm staff that "[w]e actually had two people on this but that we'll work with Ms. Martinez on another appropriate case." SUF ¶ 264.

> iv. *Strataluz Scheme*

Strataluz was a company set up, in part, by Ferrell. NIC Ex. 121. It grew out of a general business plan "to market products via television infomercials." Dkt. No. 1141 ¶ 478. In at least one email, one of its creators said that he wanted "to focus on products that have the highest potential reward." NTG Ex. 311 at 2: NTG Ex. 308 at 2-3. Some factual disputes exist concerning the exact origin of the company. See e.g., Dkt. No. 1141 ¶ 479 (noting that certain NTG members were brought in as capital investors).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al | | |

Ferrell played a key role in establishing the company. In an email regarding the formation of Strataluz to his colleagues, Ferrell suggested incorporating in a jurisdiction with maximum privacy to prevent public disclosure of the shareholders, employing strategies to immunize themselves from litigation costs, and finally, that NTG-affiliates would have part ownership of the company. NIC Ex. 121. NTG's role was limited to "funding the company, handling the back office accounting, and providing legal services." Id.

Ferrell sought the help of a corporate formation lawyer in Nevada to set up the company. SUF ¶ 331. He stated that one thing he wanted to do was "completely cloak the identity of the shareholders" because the company would be "involved in significant litigation" and he would like to "avoid having the shareholders deposed." Id. ¶ 333. He asked the lawyer how they should proceed as well. Id. ¶ 334. Ferrell and the corporate formation lawyer exchanged numerous back and forth emails concerning the formation of the company, in part relating to Ferrell's goal of cloaking the identity of the shareholders. Id. ¶¶ 335-338, 339. In subsequent emails with his colleagues, Ferrell explained the corporate structure, noting that the "companies only exist [to] prevent people from finding out who owns" the company that actually operated. Id. ¶ 345. Ferrell and his colleagues also explored the possibility of ensuring that NTG's address would not be on the incorporation documents, but factual disputes exist as to the emails that were exchanged between those individuals. Dkt. No. 1141 ¶¶ 349-353.

On January 28, 2014, the operating agreement for Quintogos LLC, one of the companies that existed under Strataluz, was executed by Ferrell, Reid, James Hardin ("Hardin"), Jarrod Bentley ("Bentley"), and Joshua Weiss ("Weiss). SUF ¶ 354. Ferrell, Reid, and Hardin loaned the company money for its initial capitalization. Id. ¶ 355. Under the operating agreement, Quintogos was the sole member of International Brandery, LLC, which in turn was the sole member of Binary Resource Management, LLC, which in turn was the sole member of Strataluz, LLC. SUF ¶ 358. The Articles of Organization listed the address for each company as 101 Convention Center Drive, Suite 850, Las Vegas, Nevada 89109. Id. ¶ 359.

On January 29, 2014, Ferrell executed a "Written Consent of the Manager of Strataluz, LLC," designating Bentley as its President, but limiting his ability to enter into any transaction on behalf of the company that would exceed $7,500 without the consent

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
|---|---|---|---|
| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al | | |

of the manager. Id. ¶ 365. Bentley did not receive a wage for his work. Id. ¶ 368.

On January 31, 2014, Sariah Para, an assistant at NTG, emailed Ferrell and Reid to inform them that she was getting the Employer Identification Numbers for Quintogos, but that it is "taking longer than expected because of the extra measures we are taking to protect NTG/You from being associated with it." Id. ¶ 366.

On May 4, 2014, Bentley emailed Ferrell, Reid, Weiss, and Hardin to inform them that he was in the process of developing a commercial for a product, EverSilk. Id. ¶ 366.[5] By July 2014, they had also began discussing a new product, specifically, a male enhancement pill, which would later be called ProMaxal. NTG Ex. 269, 271. They later began testing commercials for the product by September 2014. NTG Ex. 271.

Having considered EverSilk's development stage, Bentley and the group then exchanged emails, in particular concerning "targets" that Quintogos could sue (which were selling comparable products) and other litigation concerns and/or strategy. SUF ¶¶ 371, 373. They also discussed profit splits, including in one email in which Ferrell even proposed a contingency fee agreement in which "NTG fronts the costs for Quintogos with NTG receiving 50 % of the proceeds. Of the remaining 50 %, half [would] go to Quintogos to fund the company and the other half [] [would] [be] distributed between" the five owners in proportion to their percentages. Id. ¶ 373. Other emails exchanged between the group demonstrated a drive to use the EverSilk product as a way to drive litigation. See e.g. id. ¶¶ 378, 386. NTG did eventually draft demand letters related to the Eversilk product to some of the aforementioned target companies. Id. ¶¶ 388, 389.

On May 14, 2015, Ferrell emailed Reid, Weiss, and Bentley: "Guys, Had a thought – once we have a male enhancement pill, we can sue the competitors – and none of them like litigation or want to hear from NTG. . . Jarrod, if there is some unique or esoteric ingredient to which we can secure exclusive rights to in the US, we can also force the competitors to license that ingredient through us as part of the settlement. Ditto

---

[5]The Court briefly discusses the Eversilk product solely as it relates to the three passing mentions of it in NIC's motion. Numerous other facts – some disputed, some not – present in the statement of undisputed facts are absent from the motion, and should those facts not rise to the level of importance for that motion, the Court need not include them here. If a fact is not so important to include in a motion for summary adjudication, the Court questions its materiality.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
|---|---|---|---|

| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al |
|---|---|

goes for who we sue on cellulite . . ..." SUF ¶ 402.

On May 21, 2015, Ferrell emailed the same group concerning another idea, specifically, the use of a patent relating to the use of alpha-ketoglutarate, which they would then link to male sexual performance and have exclusively licensed to Strataluz for the aforementioned Lanham Act strategy. Id. ¶ 405. Then, on May 22, 2015, Ferrell emailed attorneys and staff at NTG: "Team, I am pleased to report that I convinced a research company named Harcol Research (which owns a patent on AKG) to grant an exclusive license for the use of AKG in mail [sic] enhancement products to our client Strataluz." Id. ¶ 409. The company licensed the product to Strataluz for $1.00. Id. ¶ 410.

On May 26, 2015, Ferrell requested that certain language be used and included in the male enhancement draft demand letters that NTG was preparing. NTG Ex. 157. The next day, on May 27, 2015, Bentley and Weiss named the product, "ProMaxal." SUF ¶ 412. Factual disputes exist as to whether ProMaxal was formulated when Strataluz both named the product and developed the draft demand letters. Dkt. No. 1141 ¶ 415. The same day, Ferrell circulated the draft demand letter and explained the following:

> From past experience litigating against mail [sic] enhancement companies, I know that they will be most concerned about an injunction – which would be costly to oppose, require them to provide substantiation that they lack, and could catch the attention of the FTC or another regulatory body. As such, I think our model will be best served by offering them a license to our proprietary technology in return for a one-time fee, and filing suit against those who decline the license – and promptly seeking a preliminary injunction in those suits.

SUF ¶ 413. Ferrell then emailed Reid directly noting that they could extract large sums of money from the potential defendants. Id. ¶ 414. Ferrell also emailed Knowles, Reid, and Mandy Jung, another NTG employee, with a list of ten companies they would send the demand letters to, noting that they need to "prepare and proof them very carefull[y] to ensure that all fo the variables match" Id. ¶ 416. He later added two more targets. Id. ¶ 417. He also requested input to see if there were any additional targets. Id. ¶ 420. Ferrell also drafted a template with fill-in-the-blank variables to send to companies that sold male enhancement letters. Dkt. No. 1111-16 at 2. In at least one instance, Ferrell proceeded with this strategy, i.e., in a demand letter, offering a competitor the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
|---|---|---|---|

| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al |
|---|---|

opportunity to proceed with licensing AKG and a complete release for past liability. SUF ¶¶ 454-458.

On June 2, 2015, NTG sent demand letters on behalf of Strataluz to four companies. SUF ¶ 422. The letter stated that ProMaxal was sold in the United States, that its formula used a proven technology, and that Strataluz had invested significant amounts of resource in developing the technology for ProMaxal. Id. ¶ 423. The letters offered a "fully paid-up, non-assignable license" for the technology for $200,000. NIC Ex. 172-175. In at least one instance, NTG filed a complaint against a competitor company on behalf of Strataluz without first serving a demand letter. SUF ¶¶ 427-428. Despite having filed these complaints and issued these demand letters, Strataluz had never manufactured or sold ProMaxal. Id. ¶ 434. They had also performed no tests on the product and had merely formulated it, but produced no actual pills. NIC Ex. 137 at 52:13-20. The parties dispute Ferrell's knowledge as to the aforementioned facts, specifically as it relates to his knowledge of the aforementioned at the time when he sent the demand letters and filed the complaint. Dkt. No. 1141 ¶ 438.

Many of the companies that received demand letters related to ProMaxal and EverSilk questioned the validity of the claims. SUF ¶ 441. In one instance, related to the responses that NTG received, Ferrell emailed Bentley: "Can we get the Promaxal [sic?] available for sale asap? I have a defendant who wants to license from/settle with us, but he is wondering why he can't find anything about us online." Id. ¶ 442. Bentley replied that he can have the website up within a week, but that getting inventory would take 4-5 weeks. SUF ¶ 442. Ferrell replied that he should "Get it up, take someone through the experience, and then say we are on back order." Id. ¶ 444.

On July 22, 2015, Strataluz/NTG received the first settlement from its EverSilk product. Id. ¶¶ 446-448. On August 21, 2015, another company executed a settlement agreement with Strataluz related to ProMaxal. Id. ¶ 459-460. While Strataluz did receive settlements as a result of the demand letters NTG sent out, at least once, Ferrell questioned the profitability of the Strataluz cases. SUF ¶ 445. Eventually, Strataluz's owners decided to wind down the company because it "wasn't making any money." Id. ¶ 463; NTG Ex. 251 at 50:14-19.

### 2. Procedural Background

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al | | |

The procedural background of the proceedings – and its docket now extending beyond one-thousand entries – is well known to the parties and the Court. Subject to the Court's reliance on certain prior decisions below, it does not recite the procedural background here.

## II. Legal Standard

Summary adjudication "on all or any part of the claim" is appropriate where there is no genuine issue of material fact as to that portion of the claim, and the moving party is entitled to judgment as a matter of law on that claim. See Fed. R. Civ. P. 56(a), (c); see also Lies v. Farrell Lines, Inc., 641 F.2d 765, 769 n.3 (9th Cir. 1981). The initial burden is on the moving party to demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets its burden, then the nonmoving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. See id. at 322-23. If the nonmoving party meets this burden, then the motion will be denied. Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc., 210 F.3d 1099, 1103 (9th Cir. 2000).

## III. Discussion

"The elements of a civil RICO claim are as follows: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361 (9th Cir. 2005) (internal quotation marks and citation omitted).[6] "[R]acketeering activity" includes, inter alia, "any act which is indictable" under the Hobbs Act, 18 U.S.C. § 1951, or "any act or threat involving . . . . extortion, . . . which is chargeable under State law." 18 U.S.C. § 1961(1)(A), (B).

As discussed below, NIC has not negated the applicability of the Noerr-Pennington doctrine nor has it established on the basis of undisputed facts several of the key elements of a RICO claim.

    A.    Noerr-Pennington.

---

[6]NIC reserves the issue of injury to money or property from the conduct constituting the violation for trial. Dkt. No. 1107-1 at 12, FN. 4.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al | | |

NTG asserts that NIC cannot prove that the Noerr-Pennington doctrine does not apply, especially given the fact intensive inquiry it requires. Dkt. No. 1135 at 9. Because all of the twelve predicate acts NIC alleges in its complaint are incidental to litigation, NIC must "meet the sham exception" and "substantively 'win' seven malicious prosecution actions on summary judgment." Id. at 10-11. Essentially, NTG argues that because NIC cannot prove that any of the suits were objectively baseless, summary judgment is inappropriate. Id. at 12.

The Court does not reach the question of whether Noerr-Pennington applies. Rather, it construes NTG's arguments here as defensive arguments against NIC's affirmative showing of whether NTG, Ferrell, and Baslow violated RICO.

      B.     The "Enterprise" Element.

The RICO statute defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In general, there is "no restriction upon the associations embraced by the definition of enterprise." United States v. Feldman, 853 F.2d 648, 655 (9th Cir. 1988) (citing United States v. Turkette, 452 U.S. 576, 580 (1981)).

Here, NIC alleges that the "[d]efendants in this action comprise an associated-in-fact enterprise which maintains a "hub-and-spoke" structure." Dkt. No. 1007 ¶ 438. An associated-in-fact enterprise has three elements: (1) a common purpose, (2) a structure or organization, and (3) longevity necessary to accomplish the purpose. Boyle v. United States, 556 U.S. 938 (2009).

      ii.    A "Structure" or "Organization" and "Longevity"

NIC argues that NTG operated as an enterprise, with the firm acting as "a facially legitimate cover for criminal activity (the threatening and filing of sham litigation)." Dkt. No. 1107 at 14. In support of this claim, NIC notes how the firm employed field representatives to solicit "shill plaintiffs" to participate in "contrived" cases. Id. Thus,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
|---|---|---|---|

| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al |
|---|---|

because the structure of the organization is clear, the claim depends in part on whether NTG engaged in RICO racketeering, which NIC asserts it indisputably did. Id.

In response, NTG asserts that material issues of fact exist as to whether an enterprise existed, and because "NIC cannot establish racketeering on summary judgment, it cannot establish an enterprise either." Dkt. No. 1135 at 29. Baslow asserts that NIC "alleged no facts from which a reasonable juror could conclude that [he] had any connection with" Strataluz, which formed a key basis of NIC's argument alleging the existence of an enterprise. Dkt. No. 1130 at 14. As to Strataluz, Baslow asserts that it operated independently and had no overall connection with Baslow, as even the undisputed facts establish that only Ferrell and Reid had connections with the company. Id. at 14-15.

The Court finds that undisputed facts demonstrate a structure or organization as well as longevity necessary to accomplish a purpose. As to the structure, regardless of the descriptive placeholder NIC or NTG gives to Baslow or its other investigators, etc., a clear structure existed: the lawyers at the firm developed legal strategy, issuing demand letters, drafting complaints, and corresponding with opposing counsel, while the investigators like Baslow communicated (although perhaps not exclusively) with clients of the firm. As to the longevity of the 'enterprise' and while still deferring whether the conduct constituted racketeering, the Court finds NTG's actions, including the alleged racketeering conduct via its CIPA, FAL, and UCL practices, span several years.

   ii. A "Common Purpose"

The common purpose element of an associated-in-fact enterprise is different from (but related to) the pattern of predicate acts. The "common purpose" does not itself have to be fraudulent. See, e.g., Odom v. Microsoft Corp., 486 F.3d 541, 552 (9th Cir. 2007) ("Defendants had the common purpose of increasing the number of people using Microsoft's Internet Service, and doing so by fraudulent means."). And an "associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise," and can be made up of parts of an otherwise legitimate business entity. Odom, 486 F.3d at 551 . However, with respect to the "common purpose" element, "[e]vidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" Boyle, 556 U.S. at 947 (quoting Turkette, 452 U.S. at 583).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al | | |

In its reply to Baslow's opposition, NIC clarifies NTG, Baslow, and Ferrell's common purpose in operating the scheme: "Together, these participants operated as a continuing unit for the purpose of bringing profitable litigation that enriched all members of the enterprise through extorted settlement payments." Dkt. No. 1153 at 19.

NIC has failed to demonstrate that no genuine or triable issue of material fact exists as to whether NTG and its attorneys, Baslow, and Ferrell, acted with a common purpose.

First, the Court declines to resolve competing inferences that NIC and NTG requests the Court draw from the various evidence before it. Doing so would run counter to prevailing circuit and district precedent concerning whether normal business affairs constitute a common purpose. Insofar as NIC requests that the Court make such determinations or draw such inferences, doing so would require that the Court ignore testimony proffered by NTG that they merely engaged in routine business practices. See e.g. Shaw v. Nissan N.A., Inc., 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016) (recognizing that courts "have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises") (internal quotation omitted); see also In re Jamster Mktg. Litig., No. 05CV0819 JM (CAB), 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009) ("[C]onduct consistent with ordinary business conduct and an ordinary business purpose" is not actionable under RICO). Put simply, whether the common purpose NIC describes extends beyond NTG's normal business operations requires that the Court exceed its role in determining a motion for summary judgment. See, e.g., In re WellPoint, Inc. Out–of–Network UCR Rates Litig., 865 F. Supp. 2d 1002, 1034–35 (C.D. Cal. 2011) (finding the existence of an associated-in-fact enterprise based on a business relationship, but concluding that "the existence of a business relationship . . . without more does not show that [Defendant] conducted the enterprise."). The Court declines to do so here.

Second, and accordingly, the Court finds that triable issues of fact exist as to whether the parties acted with a common purpose. Statements in declarations and depositions from NTG employees demonstrate that some remaining issues of fact exist (or at least would require credibility determinations). For example, triable issues of fact exist as to what the common purpose may have been. While NIC argues that, generally speaking, NTG conducted an enterprise designed to elicit quick out of court settlements with target companies (which also, were baseless and contrived by NTG), portions of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:15-cv-02034-JVS-JCGx | Date | June 23, 2021 |
| Title | Natural-Immunogenics Corp. v. Newport Trial Group, et al | | |

Ferrell's declaration, as well as other evidence, contradict that motive. See NTG Ex. 232 at 107:1-110:16 ("[W]e don't just contact clients, suitable representatives, and say, go purchase these products and you can serve as a class representative or a plaintiff in a lawsuit. We don't do that . . ."). Other triable issues of fact exist as to the prospective motivation of NTG's clients in pursuing their suits against the respective target companies. See e.g., Dkt. No. 1141 ¶ 201.

\* \* \* \* \* \* \* \*

Therefore, the Court finds that genuine or triable issues of material fact preclude a finding that NTG, Ferrell, and Baslow participated in an "enterprise." Because a genuine or triable issue of fact exists as to one element of NIC's RICO cause of action, the Court **DENIES** NIC's motion for partial summary adjudication.

### IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** the motion

 **IT IS SO ORDERED**

| | : | 0 |
|---|---|---|
| Initials of Preparer | lmb | |