# EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

EXHIBIT 9

Atkinson-Baker, a Veritext Company
www.depo.com

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4
                                    )
5    NATURAL-IMMUNOGENICS CORP.,     )
                                    )
6          Plaintiff,               )
                                    ) Case No.
7          vs.                      ) 8:15-cv-02034-JVS (JCG)
                                    )
8    NEWPORT TRIAL GROUP, et al.,    ) (JW Ref. No.:  A270221)
                                    )
9          Defendants.              )
                                    )
10                                   )

11

12               C O N F I D E N T I A L

13

14         DEPOSITION OF 30(b)(6) SCOTT J. FERRELL

15                 Santa Ana, California

16                Thursday, April 1, 2021

17

18

19

20

21   Reported by:
     RAQUEL L. BROWN
22   CSR No. 10026, RPR

23   Job No. CA 4524737

24

25   PAGES 1 - 240

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]
EXHIBIT 9

## Page 2

```
1            IN THE UNITED STATES DISTRICT COURT
2            FOR THE CENTRAL DISTRICT OF CALIFORNIA
3
4                                    )
5   NATURAL-IMMUNOGENICS CORP.,      )
                                     )
6        Plaintiff,                  )
                                     ) Case No.
7        vs.                         ) 8:15-cv-02034-JVS (JCG)
                                     )
8   NEWPORT TRIAL GROUP, et al.,     ) (JW Ref. No.:  A270221)
                                     )
9        Defendants.                 )
                                     )
10                                   )
11
12
13
14            Deposition of SCOTT J. FERRELL,
15   taken on behalf of Plaintiff at 2700 North Main Street,
16   Suite 420, Santa Ana, California 92705, beginning at
17   9:02 a.m. and ending at 5:56 p.m. on Thursday, April 1,
18   2021, before RAQUEL L. BROWN, Certified Shorthand Reporter
19   No. 10026, Registered Professional Reporter.
20
21
22
23
24
25
```

## Page 3

```
1   APPEARANCES:
2
3   For Plaintiff Natural-Immunogenics Corp.:
4       EMORD & ASSOCIATES
5       BY:  PETER A. ARHANGELSKY, Attorney at Law
6       BY:  JOSHUA S. FURMAN, Attorney at Law
7       2730 South Val Vista Drive, Building 6, Suite 133
8       Gilbert, Arizona 85295
9       (602) 388-8899
10      parhangelsky@emord.com
11      jfurman@emord.com
12      (APPEARING REMOTELY)
13
14
15  For Defendants Ryan Ferrell, Andrew Baslow, David Reid,
16  and Victoria Knowles:
17      BREMER WHYTE BROWN & O'MEARA, LLP
18      BY:  KYLE A. RIDDLES, Attorney at Law
19      20320 S.W. Birch Street, Second Floor
20      Newport Beach, California 92660
21      (949) 211-1000
22      kriddles@bremerwhyte.com
23      (APPEARING REMOTELY)
24
25
```

## Page 4

```
1   (APPEARANCES CONTINUED)
2
3   For Defendants/Counter-Claimants Newport Trial Group and
4   Scott Ferrell:
5       CALLAHAN & BLAINE
6       BY:  DAVID J. DARNELL, Attorney at Law
7       3 Hutton Centre Drive, Ninth Floor
8       Santa Ana, California 92707
9       (714) 241-4444
10      ddarnell@callahan-law.com
11
12
13  For Defendants Andrew Nilon, Giovanni Sandoval,
14  Sam Schoonover, Matthew Dronkers, Taylor Demulder, and
15  Sam Pfleg:
16      FORD & DIULIO, PC
17      BY:  BRENDAN M. FORD, Attorney at Law
18      650 Town Center Drive, Suite 760
19      Costa Mesa, California 92625
20      (714) 384-5540
21      bford@forddiulio.com
22      (APPEARING REMOTELY)
23
24  Also Present:
25  MICHAEL KELLEY, Videographer
```

## Page 5

```
1                    INDEX
2   WITNESS                          EXAMINATION
3   SCOTT J. FERRELL
4
5          BY MR. ARHANGELSKY        10
6
7
8
9            CONFIDENTIAL EXHIBITS
10  NUMBER       DESCRIPTION                     PAGE
11  Exhibit 623  Second Amended Notice Of 30(b)(6)   10
                 Deposition Of Newport Trial Group,
12               9 pgs.
13  Exhibit 624  Defendants' Reply Brief ISO Motion  30
                 To Strike First And Fourth Causes
14               Of Action, 21 pgs.
15  Exhibit 625  NTG's Supplemental Response To      36
                 NIC's Interrogatories, 1 and 2
16               (Set One), 8 pgs.
17  Exhibit 626  Email exchange, (NTG 41928), 1 pg.  66
18  Exhibit 627  Email exchange, NTG006708 -         70
                 006709, 2 pgs.
19
     Exhibit 628  Email, (NTG 66637), 1 pg.          73
20
     Exhibit 629  Newport Trial Group Male           74
21               Enhancement Cases, NTG066654 -
                 066657, 4 pgs.
22
     Exhibit 630  Newport Trial Group Wiretap Cases, 82
23               NTG066663 - 066670, 8 pgs.
24  Exhibit 631  Email exchange, NTG067124 -         98
                 067125, 2 pgs.
25  ///
```

30(b)(6) Scott J. Ferrell
April 01, 2021

2..5

EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 6

| | | (INDEX CONTINUED) | |
|---|---|---|---|
| 1 | | | |
| 2 | | CONFIDENTIAL EXHIBITS | |
| 3 | NUMBER | DESCRIPTION | PAGE |
| 4 | Exhibit 632 | Email exchange, NTG066448 - 066449, 2 pgs. | 115 |
| 5 | | | |
| | Exhibit 633 | Email exchange, (NTG005982) - 005983, 2 pgs. | 123 |
| 6 | | | |
| 7 | Exhibit 634 | Text exchange, SCHOONOVER00082 - 00092, 11 pgs. | 130 |
| 8 | | | |
| | Exhibit 635 | Email, SCHOONOVER00002, 1 pg. | 132 |
| 9 | | | |
| | Exhibit 637 | Class Action Complaint, DEMPSEY0002051 - 0002059, 9 pgs. (Initially erroneously marked as Exhibit 636) | 136 |
| 10 | | | |
| 11 | | | |
| 12 | Exhibit 638 | Email exchange, (NTG 6152), 1 pg. | 140 |
| 13 | Exhibit 639 | Class Action Complaint, 36 pgs. | 145 |
| 14 | Exhibit 640 | Email exchange, (NTG006161) - 006167, 7 pgs. | 147 |
| 15 | | | |
| 16 | Exhibit 641 | Email exchange, NTG006229 - 006235, 7 pgs. | 150 |
| 17 | Exhibit 642 | Email exchange, NTG000239 - 000240, 2 pgs. | 152 |
| 18 | | | |
| | Exhibit 643 | Email exchange, (NTG 6703), 1 pg. | 162 |
| 19 | | | |
| 20 | Exhibit 644 | December 27, 2011 letter, NTG022163 - 022164, 2 pgs. | 172 |
| 21 | Exhibit 645 | Notice Of Public Docketing Of Declaration, 49 pgs. | 175 |
| 22 | | | |
| | Exhibit 646 | Email exchange, NTG0071517 - 0071518, 2 pgs. | 178 |
| 23 | | | |
| 24 | Exhibit 647 | February 8, 2012 letter, NTG0071511 - 0071515, 5 pgs. | 180 |
| 25 | /// | | |

Page 7

| | | (INDEX CONTINUED) | |
|---|---|---|---|
| 1 | | | |
| 2 | | CONFIDENTIAL EXHIBITS | |
| 3 | NUMBER | DESCRIPTION | PAGE |
| 4 | Exhibit 648 | Email exchange, NTG022177, 1 pg. | 181 |
| 5 | Exhibit 649 | NTG Defendants' Motion To Strike Fourth Causes Of Action - Rebuttal Evidence, 28 pgs. | 184 |
| 6 | | | |
| 7 | Exhibit 650 | Email exchange, (NTG015268) - 015269, 2 pgs. | 187 |
| 8 | | | |
| | Exhibit 651 | Email exchange, 1 pg. | 193 |
| 9 | | | |
| | Exhibit 652 | Declaration Of Wynn Ferrell In Support Of Plaintiff's Opposition To Defendants' Motion For Sanctions, 5 pgs. | 196 |
| 10 | | | |
| 11 | | | |
| 12 | Exhibit 653 | Settlement Agreement and General Release, DEMPSEY0000394 - 0000402, 9 pgs. | 198 |
| 13 | | | |
| 14 | Exhibit 654 | Declaration Of Dan Bobba In Support Of Plaintiff's Opposition To Defendants' Motion For Sanctions Pursuant To 28 U.S.C. 1927, NTG007673 - 007676, 4 pgs. | 204 |
| 15 | | | |
| 16 | | | |
| 17 | Exhibit 655 | Email, NTG011604 - 011608, 5 pgs. | 205 |
| 18 | Exhibit 656 | November 9, 2010 letter, MAGNA-RX_000017 - 000021, 5 pgs. | 208 |
| 19 | | | |
| 20 | Exhibit 657 | Website landing page, 4 pgs. | 216 |
| 21 | | | |
| 22 | | | |
| 23 | | INFORMATION REQUESTED | |
| 24 | | (None) | |
| 25 | /// | | |

Page 8

1  (INDEX CONTINUED)

2

3  QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER

4  (None)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 9

1        Santa Ana, California, Thursday, April 1, 2021

2                    9:02 a.m.

3

4        THE VIDEOGRAPHER:  Good morning.  I'm Michael Kelley,

5   your videographer, and I represent Atkinson-Baker, Inc.,

6   in Glendale, California.

7            The date is April 1st, 2021, and the time is

8   9:02 a.m.  This deposition is taking place at

9   2700 North Main Street, Suite 420, Santa Ana, California

10  92705.  This is Case No. 8:15-cv-02034-JVS (JCG) entitled

11  Natural Immunogenics versus Newport Trial.  The deponent

12  is 30(b)(6) Witness Scott Ferrell.  The court reporter is

13  Raquel Brown from Atkinson-Baker.

14            Counsel, would you please introduce yourselves,

15  after which the court reporter will swear or affirm the

16  deponent.

17       MR. DARNELL:  Good morning.  This is David Darnell on

18  behalf of Scott Ferrell and Newport Trial Group.  And just

19  to clarify, while Scott Ferrell is here, the deposition

20  today is in connection with a Rule 30(b)(6) notice.

21       MR. RIDDLES:  Good morning.  This is Kyle Riddles on

22  behalf of Defendants David Reid, Victoria Knowles,

23  Andrew Baslow, and Ryan Ferrell.

24       MR. FORD:  Good morning.  My name is Brendan Ford.

25  I'm appearing on behalf of the non-NTG defendants.

30(b)(6) Scott J.  Ferrell
April 01, 2021

6..9

EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 10

1    MR. FURMAN:  Good morning.  This is Joshua Furman.
2    I'm here on behalf of Plaintiff Natural Immunogenics
3    Corporation.
4    MR. ARHANGELSKY:  Good morning.  This is
5    Peter Arhangelsky appearing on behalf of the
6    Plaintiff Natural Immunogenics.
7
8    SCOTT J. FERRELL,
9    having been administered an oath, was examined and
10   testified as follows:
11
12   MR. ARHANGELSKY:  Mr. Ferrell, I've placed an exhibit
13   in front of you on the screen which is marked as
14   Exhibit 623 entitled Second Amended Notice of Rule
15   30(b)(6) Deposition for Newport Trial Group, PC.
16   (Plaintiff's Exhibit 623 was marked for identification.)
17
18        E X A M I N A T I O N
19   BY MR. ARHANGELSKY:
20   Q    Do you see that document?
21   A    I do.
22        And just to also clarify, my counsel brought a
23   hard copy of that document this morning that he's placed
24   next to me so that I can review it without spending too
25   much time squinting at the screen.  So I have the hard

Page 11

1    copy next to me.  It's identical and that will be the
2    document that I refer to and look at when you're referring
3    to Exhibit 623.
4    Q    Okay.  I appreciate that.  Thank you.
5         And you were deposed on Tuesday; is that correct?
6    A    That is correct.  On Tuesday I was deposed in my
7    personal capacity.
8    Q    And today you're appearing as the 30(b)(6)
9    witness for the Defendant Newport Trial Group; is that
10   correct?
11   A    That is correct.
12   Q    And you have reviewed the Second Amended Notice
13   of Rule 30(b)(6) Deposition that we've displayed as
14   Exhibit 623?
15   A    I have.
16   Q    Have you had an opportunity to evaluate those
17   topics with your counsel?
18   A    I have.
19   Q    Are you the person most knowledgeable for
20   purposes of this deposition on each of the 10 topics
21   listed for examination?
22   A    After a reasonable and diligent determination, I
23   believe that I am, although it may be helpful to go
24   through each topic to discuss them specifically if you
25   would like more detail as to why I've reached that

Page 12

1    conclusion.
2    Q    Thank you.
3         You've taken an oath this morning; is that
4    correct?
5    A    I have.
6    Q    And you understand that the oath requires you to
7    tell the truth under penalty of perjury; is that right?
8    A    I think your statement is incomplete.  The oath
9    that I took requires me to tell the truth, the whole
10   truth, and nothing but the truth.  Those are three
11   distinct and tripartite qualifications.
12   Q    And that's on penalty of perjury should you
13   testify falsely.  Is that correct, Mr. Ferrell?
14   A    You can rest assured that I will be testifying
15   truthfully, Counsel.
16   Q    And you are prepared today to testify truthfully
17   as to the matters for examination listed in the amended
18   notice of deposition?
19   A    I am prepared today to testify truthfully as to
20   any matters that are properly the subject of examination.
21   Q    Can you describe for me everything you did to
22   prepare for this 30(b)(6) deposition?
23   A    Absolutely.  My preparation started well in
24   advance of receiving the seconded amended deposition
25   notice that is displayed on the screen.  In anticipation

Page 13

1    that I would likely be the testimonial designee on one or
2    more of the topics, I began my preparation almost
3    contemporaneous with commencement of litigation in
4    December 2015.  In that regard I've tried to remain
5    abreast of all of the pleadings that have been filed, the
6    orders that have been issued, the dockets in related cases
7    that have been referenced in this case, the discovery
8    responses of all parties, the depositions of all
9    witnesses, some of whom have been deposed more than once.
10        In addition to that I reviewed several best
11   practices guides regarding the appropriate manner to
12   prepare for a 30(b)(6) deposition that are published on
13   the internet.  I then reviewed the original 30(b)(6)
14   deposition notice, the briefing regarding it, the order
15   limiting it, the first amended 30(b)(6) deposition notice,
16   the correspondence and briefing regarding it, the
17   operative second amended deposition notice.  And then with
18   respect to the second amended deposition notice, I drilled
19   down at a granular level as to each of the 10 topics.
20   Specifically I reviewed the definitions and then did
21   specific preparation as it relates to each of the 10
22   topics.
23        Would you like me to relate the preparation that
24   is unique to each of the 10 topics that I did?
25   Q    I think we'll go through the topics in a moment.

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

EXHIBIT 9

Atkinson-Baker, a Veritext Company
www.depo.com

Page 14

1    Let me ask you this question:  You mentioned that
2  you reviewed best practices guides.  Can you provide the
3  names of the best practices guides that you reviewed?
4    A    Yes.  One is from the Practicing Law Institute
5  entitled The Appropriate Preparation of the 30(B)(6)
6  Witness.  The other is published by the Weil, Gotshal law
7  firm available at weil.com that describes the appropriate
8  practices for a witness to undertake in becoming a
9  30(b)(6) witness.  And the third one is a bench guide or a
10  judge's guidelines that relates to the manual for 30(b)(6)
11  depositions, objections, rulings and things of that
12  nature.
13    Q    Let's turn to Exhibit 623, which you have in
14  front of you, and I'm going to ask you to turn to what I
15  believe is page 4 of that exhibit under the heading
16  Matters For Examination.
17    Let me know when you're there.
18    A    I'm there.
19    Q    The first topic for examination reads Facts and
20  evidence related to the preparation, execution, and
21  submission of declarations filed by NTG in each of the SAC
22  cases.  What documents have you reviewed in preparation to
23  testify on that topic?
24    A    In addition to the litany of activities that I
25  just described, I reviewed each of the declarations

Page 15

1  prepared, executed, or submitted by NTG in the SAC cases.
2  And because I found an ambiguity in the conjunctive nature
3  of the description -- properly read it relates only to
4  declarations that were prepared, executed, and submitted
5  by NTG.  But I read it broadly construed to be disjunctive
6  so that I reviewed any declarations that were prepared,
7  executed, or submitted and filed by NTG as well as the
8  correspondence related to such declarations.
9    Q    Okay.  In preparing to testify in this Topic 1,
10  did you review any documents that have not been produced
11  to NIC in discovery?
12    A    Yes.
13    Q    And what documents were those?
14    A    The practice guides I previously referenced that
15  are available on the internet.
16    Q    Any others?
17    A    If you're asking if I reviewed any documents that
18  are within my possession but that have not been produced
19  or made available to NIC, the answer is no.  If you are
20  asking if I consulted public authority that is equally
21  available to both sides but not in my possession, then the
22  answer is yes.
23    Q    With respect to the latter of category that you
24  just described, other than the practice guides you've
25  identified, what other publicly available sources have you

Page 16

1  consulted in preparation for Topic 1?
2    A    They are prolix and plenary, specifically the
3  National Institutes for Health database of substantiation,
4  the number of journals regarding the technical issues
5  referenced in the underlying cases, and really a
6  cornucopia of any evidence and supporting documentation
7  that I could find from publicly available sources that
8  would enable me to give my best testimony today.
9    Q    Other than reviewing documents and those public
10  sources, did you do anything else to educate yourself on
11  Topic 1?
12    A    Yes.
13    Q    And what was that?
14    A    I met with my counsel.  I listened to the
15  deposition of Mr. Reid yesterday.  And I reviewed all of
16  the deposition transcripts that have been given in this
17  case as well as depositions that were given in the
18  underlying cases.
19    Q    Let's talk about Topic 2, Facts and evidence
20  related to deposition preparation and deposition testimony
21  given by NTG attorneys, employees, clients in SAC cases.
22  Other than what you've described for me in your
23  preparation for Topic 1, did you review any documents
24  specifically related to Topic 2 in preparation to testify
25  today?

Page 17

1    A    So it seems like in this question you've asked me
2  to incorporate by reference all of the answers I gave you
3  in response to Topic 1, which I am happy to do.  I
4  incorporate by reference in response to your question all
5  of the preparation that I undertook and which I previously
6  related to you in response to question 1.  In addition to
7  that I reviewed all of the deposition testimony given by
8  NTG attorneys, employees, and clients in the referenced
9  cases as well as all of the deposition testimony given in
10  this underlying case.  In addition to that I met with my
11  counsel to prepare.
12    Q    Did you interview any person to gain information
13  on Topic 2 in preparation to testify today?
14    A    I don't believe so.  But again given that my
15  preparation for the deposition today began back in
16  December of 2015, a broadly construed answer to that
17  question would include the interviews that I conducted at
18  the outset of the case in connection with issuing the
19  plenary document preservation letter and efforts to gather
20  and preserve all potentially responsive documents and
21  sources of responsive documents.
22    Q    And who can you recall interviewing at the time?
23    A    Certainly all of the NTG defendants, all of the
24  NTG employees, everyone who I believed might have
25  documents or potentially relevant sources of documents.

30(b)(6) Scott J.  Ferrell
April 01, 2021

14..17
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 18

1 But again this was six years ago and so there are likely
2 others.
3      Q    Can you recall interviewing any person who --
4 outside of the NTG firm who's not named a party in this
5 action?
6      MR. DARNELL:  Objection, vague.  Are you just asking
7 ever or specifically with respect to Topic 2?
8      MR. ARHANGELSKY:  In context with preparing for
9 Topic 3 -- Topic 2.
10     MR. DARNELL:  Thank you, Counsel.
11     THE WITNESS:  I don't recall having done so.  But
12 given that my preparation has been ongoing over the course
13 of six years, it is certainly possible that I did.
14 BY MR. ARHANGELSKY:
15     Q    Topic 3 is listed as Facts and evidence related
16 to NTG's retainer agreements or retention by plaintiffs in
17 SAC cases.  Again other than what you've already described
18 for me of your preparation of Topics 1 through 2, did you
19 review any specific documents in preparation for Topic 3?
20     A    Yes, I did.
21     Q    And what were those documents?
22     A    I reviewed all of the retainer agreements in the
23 underlying cases as well as all documents related to our
24 retention in those cases.  I also reviewed the facts
25 relating to the intake of Trycia Carlberg in the

Page 19

1 underlying case because her retainer agreement has not
2 been available.  In addition to that I reviewed the
3 testimony from each of the plaintiffs whose depositions
4 have been taken to gain a perspective on their
5 understanding of the retainer agreements and what the
6 client intake process was with respect to them contacting
7 Newport Trial Group.
8      Q    Okay.  Other than the individuals you referenced
9 in preparing for Topics 1 through 2, have you performed
10 any interviews of any witnesses in preparation to testify
11 on Topic 3?
12     A    Yes.
13     Q    Who have you interviewed?
14     A    At a minimum my wife, my daughter,
15 Derrick Ridenba (phonetic), Isabella Janovick, two retired
16 FBI agents who spoke to Trycia Carlberg's mother and other
17 former clients who had been contacted and threatened by
18 NIC's agent Clark Baker.
19     Q    And did you perform those interviews within the
20 last month?
21     A    With the exception of the interviews of my wife
22 and daughter, none of the other referenced interviews took
23 place in the past month.
24     Q    Topic 4, Facts and evidence related to NTG's
25 acquisition of clients in the SAC cases; i.e., how NTG

Page 20

1 obtained its clients, again other than what you've
2 described in preparation to testify on Topics 1 through 3,
3 did you review any specific documents in preparation to
4 testify on Topic 4?
5      A    I did.
6      Q    And what were those documents?
7      A    I started by wrestling with the language in
8 Topic 4 because it suggests the existence of a narrative
9 that is counterfactual to reality and suggests that NTG
10 acquired or had some sort of property interest in client
11 relationships when in reality NTG did not acquire clients
12 nor can any law firm be properly described as having
13 acquired of clients.  Broadly construing it and
14 referencing the parenthetical, i.e., how NTG obtained its
15 clients, I spent a great deal of time trying to mentally
16 diagram the standard client intake process for NTG as well
17 as how clients have come to NTG broadly construed, not
18 simply the clients in the underlying SAC cases but other
19 corporate clients, as well.  And I also reviewed several
20 sources of information available about me on the internet
21 that clients have referenced, seen when they have
22 approached our firm.
23     Q    As part of your preparation to testify on
24 Topic 4, did you review any documents that have not been
25 produced to NIC in discovery?

Page 21

1      A    Yes.
2      Q    And what were those?
3      A    The collection of publicly available documents
4 that I referenced earlier that reference my
5 accomplishments, media concerning my trial victories,
6 profiles of me, videos of my lectures and speeches and
7 other sources of information that are equally available to
8 anyone who searches for them.
9      Q    In preparation to testify on Topic 5 which reads
10 Facts and evidence related to NTG's communications with
11 defendants, potential defendants, and/or their counsel in
12 threatened or filed litigation involving Strataluz, LLC,
13 other than what you've described in preparation for
14 Topics 1 through 4, did you review any specific documents
15 in preparation to testify to Topic 5?
16     A    I did.
17     Q    What documents did you review?
18     A    I reviewed the briefing on various motions to
19 compel involving Strataluz as well as all of the
20 communication between NTG and either defendants, potential
21 defendants, or their counsel as it related to Strataluz.
22     Q    Did you review any documents that have not been
23 provided to NIC in preparation to testify on Topic 5?
24     A    No.
25     Q    With respect to Topic 6, Facts and evidence

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 22

1  concerning NTG's case management systems, slash,
2  procedures and document retention policies, other than
3  what you've described in relation to Topics 1 through 5,
4  did you review any documents specific in your preparation
5  for Topic 6?
6      A    I did.
7      Q    And what were those documents?
8      A    At a minimum the best practices case management
9  guides that I consult on the internet when establishing
10 protocol for any particular situation that arises.  In
11 addition the plenary document hold and preservation letter
12 that I issued at the outset of the case and the California
13 Rules of Professional Conduct related to document
14 retention as well as the State bar opinions that have been
15 issued relating to document retention, particularly the
16 2001 opinion.
17     Q    In preparation to testify on Topic 6, did you
18 review any documents in NTG's possession that have not
19 been produced to NIC in discovery?
20     A    Other than referencing the publicly available
21 documents that I spoke about and the plenary document
22 preservation letter that I discussed, I did not review any
23 documents in our possession that have not been produced.
24     Q    With respect to Topic 7, Facts and evidence
25 related to NTG's discovery responses and compliance with

Page 23

1  discovery in this case, and again other than anything you
2  have listed in preparation for Topics 1 through 6, did you
3  review any documents specific to your preparation on
4  Topic 7?
5      A    Yes.
6      Q    And what were those documents?
7      A    I started by reviewing all of NTG's written
8  discovery responses in this case.  I then reviewed all of
9  the discovery responses of all parties in the case and
10 broadly construed the phrase discovery responses to
11 include deposition testimony and reviewed that.  I then
12 reviewed all of the orders regarding discovery and
13 satisfied myself that NTG has complied with all of its
14 discovery obligations express and implied, broadly
15 construed in this case.
16     Q    And again with respect to Topic 7, did you review
17 any documents in NTG's possession that have not been
18 produced to NIC in discovery?
19     A    No.
20     Q    Concerning Topic 8, Facts and evidence concerning
21 NTG's, slash, PTA's revenues, assets, profits, and losses
22 from 2010 through present, other than the documents you've
23 already described in association with Topics 1 through 7,
24 did you review any documents specific to Topic 8?
25     A    I did not review any documents specific to

Page 24

1  Topic 8, but I did interview Sariah Para regarding Topic 8
2  to obtain a summary of NTG's revenues, assets, profits,
3  and losses from 2010 through 2021.
4      Q    Did you communicate with Bryce Gharring in
5  preparation for your testimony on this topic?
6      A    I did not.
7      Q    And for the record who is Bryce Gharring?
8      A    Bryce, whose last name is pronounced Gharring, is
9  my accountant and tax preparer.
10     Q    You didn't ask Mr. Gharring to provide any
11 documentation to assist in your preparation to testify on
12 Topic 8?
13     A    I did not ask him to.  It is certainly possible
14 that Sariah spoke with him in gathering the information
15 that I asked her to relate to me.
16     Q    With respect to Topic 9, Facts and evidence
17 related to NTG, slash, PTA debts, liabilities, and
18 financial obligations from 2016 to the present, other than
19 information you disclosed in relation to Topics 1 through
20 8, did you review any documents specific to this Topic 9?
21     A    Yes.
22     Q    And what documents were those?
23     A    I reviewed the complaint filed by our insurance
24 carrier relating to their claim for reimbursement in this
25 action as well as the conspiratorial declaration submitted

Page 25

1  by NIC's counsel to the insurance carrier to try to
2  prevent us from securing insurance coverage to assist with
3  the defense of this action.  I also reviewed the document
4  prepared by NIC that estimated their damages at
5  $50 million and then reviewed the subsequent stipulation
6  by NIC that admitted that their claimed damages were
7  actually less than one-tenth of one percent of what they
8  had originally asserted.
9      Q    In preparation to testify on Topic 9, did you
10 interview any individual?
11     A    I spoke to Sariah Para because the efforts to
12 gather information regarding nos. 8, 9, and 10 were
13 overlapping.
14     Q    Okay.  And, therefore, with respect to Topic 10,
15 Facts and evidence of compensation paid to NTG employees,
16 agents, and partners from 2010 to present, including but
17 not limited to salary, hourly wages, bonuses, incentives,
18 or contract terms, and the bases for determining such
19 compensation, other than the information you've already
20 disclosed in response to Topics 1 through 9, did you
21 review any documentation specific to Topic 10?
22     A    Yes.
23     Q    And what documents did you review for Topic 10?
24     A    I reviewed the compensation guides that I
25 typically consult when determining compensation, bonus,

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 26

1  salaries, and incentives.  I reviewed the contracts of any
2  individuals to the extent that they exist.  And I spoke to
3  Sariah Para regarding all of those topics and had an
4  in-depth conversation with Sariah about whether she or I
5  would be best designated as the testimonial designee as to
6  Topics 8, 9, and 10.
7       Q       What were the contracts that you reviewed in
8  relation to Topic 10?
9       A       The only one that I found was a contract between
10  NTG and James Hardin that set forth the terms of his
11  employment when he started work for us.
12       Q       And when did Mr. Hardin start work for the NTG
13  firm?
14       A       I believe it was 2010 or 2011.
15       Q       Was Mr. Hardin the only attorney working for NTG
16  that had an employment contract in writing?
17       A       I think it depends on how you define the term
18  employment contract.  All of the individuals working for
19  NTG and PTA have an employment contract.  It's the
20  standard agreement that provides that they will do work
21  and they will be compensated at an agreed rate.  But
22  Mr. Hardin's is the only one I found that was actually
23  memorialized into a written contract that was entitled
24  Employment Agreement.
25       Q       So, the other contracts you just referenced, are

Page 27

1  they all in writing?  Because my prior question only asked
2  about whether Mr. Hardin's was the only written contract.
3       A       I didn't understand your previous question to be
4  asking that.  Would you like me to ask the court reporter
5  to read it back or would you like to ask me that question
6  that I may have misunderstood so that I can provide a
7  answer to that question?
8       MR. ARHANGELSKY:  Can the reporter please read back
9  the question I had asked two questions ago.
10                (WHEREUPON, THE RECORD WAS READ BY THE COURT
11       REPORTER AS FOLLOWS:
12       "Question:  Was Mr. Hardin the only attorney
13       working for NTG that had an employment contract in
14       writing?
15       "Answer:  I think it depends on how you
16       define the term employment contract.  All of the
17       individuals working for NTG and PTA have an
18       employment contract.  It's the standard agreement
19       that provides that they will do work and they will
20       be compensated at an agreed rate.  But
21       Mr. Hardin's is the only one I found that was
22       actually memorialized into a written document that
23       was entitled Employment Agreement.")
24  BY MR. ARHANGELSKY:
25       Q       So the answer to my question there was, yes,

Page 28

1  Mr. Hardin was the only one in writing, right,
2  Mr. Ferrell?
3       A       No.  I think that my answer is the -- is the
4  complete answer.
5       MR. ARHANGELSKY:  Just for the record we'll be moving
6  to strike the narrative response as a nonresponsive
7  answer.
8       THE WITNESS:  Understood.
9  BY MR. ARHANGELSKY:
10       Q       Mr. Ferrell, you're familiar with the term
11  testers in context with plaintiff litigation, are you not?
12       A       I am.
13       Q       And isn't it true that NTG has argued in this
14  case that it used testers in wiretap litigation under the
15  CIPA?
16       A       I would have to look at the briefing that you're
17  referring to because I am not aware of any brief in which
18  NTG presented the argument we used tester plaintiffs under
19  the CIPA.
20       Q       You didn't see that in any of the discovery
21  responses that you reviewed in preparation for any of the
22  topics that we just discussed?
23       A       Well, you're clearly asking a different question.
24  Discovery responses are not argument.  Your previous
25  question was isn't it true that NTG has argued X.  And --

Page 29

1       Q       Well, I'm asking a separate question.  Can you
2  answer the question I asked, please?
3       A       Counsel, I told you this once on Tuesday.  I'm
4  going to tell you this again.  I intend to treat you with
5  the respect and decorum that this deposition requires
6  which will mean that I will not interrupt you and I again
7  ask that you not interrupt me.
8       Q       And I -- I am going to put on record right now
9  that I think your answers are narrative and nonresponsive
10  and you're intentionally obfuscating this record.  If this
11  continues, if you can't answer my questions as asked, I'm
12  going to ask the court for more time.
13       So I'll ask my question again directly.  Did you
14  see any discovery responses that NTG served in this case
15  identifying the use of tester plaintiffs in the CIPA
16  litigation?
17       A       Yes, I did.
18       Q       Okay.  And, now, have you seen any briefs
19  submitted to this board filed by your attorneys where you
20  have -- NTG has argued that they used tester plaintiffs in
21  CIPA litigation?
22       A       I don't believe it is fair to characterize any
23  briefs as presenting that argument.  I have reviewed the
24  briefs that reference tester plaintiffs and the briefing
25  regarding it.  I don't think your summary of those briefs

30(b)(6) Scott J.  Ferrell
April 01, 2021

26..29
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 30

1  is accurate.
2     MR. ARHANGELSKY:  I'm putting a document before the
3  witness which is marked as Exhibit 624.  It has the title
4  Defendants' Reply Brief In Support Of Motion To Strike
5  First And Fourth Causes Of Action In The First Amended
6  Complaint Under Cal. Civil Procedure Code Section 425.16.
7     (Plaintiff's Exhibit 624 was marked for identification.)
8  BY MR. ARHANGELSKY:
9     Q    Mr. Ferrell, have you reviewed this document?
10    A    I have but not --
11    Q    Are you familiar with --
12    A    But not since you just put it on the screen.  I
13 reviewed this document at the time it was filed, I
14 believe, back in early 2016 and again in preparation for
15 the deposition.  I haven't reviewed it since you put it on
16 the screen.
17    Q    I'm going to direct you to what is marked as
18 page 12 in this document using the CMECF (phonetic)
19 pagination at the top header and specifically directing
20 you to the argument section in the second paragraph under
21 Section D in which the brief reads Newport Trial Group
22 used testers to ferret out and enforce violations of
23 California wiretapping laws.  Is this something that your
24 counsel in this case has submitted to the court?
25    MR. DARNELL:  Objection.  This line of questioning

Page 31

1  exceeds the scope of any of the topics that I'm reading in
2  connection with the Rule 30(b)(6) deposition and I'll
3  continue to assert that objection.  If you want me to
4  restate it every time, I will; but I don't intend to
5  interrupt your questioning, but I am preserving all
6  objections to this line of questioning unless you can make
7  a offer of proof or show me which topic this relates to.
8     MR. ARHANGELSKY:  Yeah.  Thank you, Mr. Darnell.  We
9  would contend it relates to multiple topics, not the least
10 of which Topic 4, but I don't need you to restate your
11 objection for purposes of the record.
12    MR. DARNELL:  Okay.  And I may have to restate it,
13 just exceeds the scope.  I'll try to make it a narrow
14 objection so that you can continue to proceed with your
15 examination.
16    MR. ARHANGELSKY:  I understand.  Thank you.
17       Will the reporter please read back the pending
18 question.
19    (WHEREUPON, THE RECORD WAS READ BY THE COURT
20    REPORTER AS FOLLOWS:
21    "Question:  I'm going to direct you to what
22    is marked as page 12 in this document using the
23    CMECF pagination at the top header and
24    specifically directing you to the argument section
25    in the second paragraph under Section D in which

Page 32

1     the brief reads Newport Trial Group used testers
2     to ferret out and enforce violations of California
3     wiretapping laws.  Is this something that your
4     counsel in this case has submitted to the court?")
5     THE WITNESS:  I believe so.  But just to confirm can
6  you skip to the final page that shows the signature line
7  and I can confirm that?
8        Yes.
9     MR. ARHANGELSKY:  I'm displaying on screen page 19 of
10 the document which is in the CMEGF (phonetic).
11    THE WITNESS:  Yes.  Page 19 of that document reflects
12 a signature line and, now that I look at it, the top of
13 the document reflects a PACER entry showing that this
14 document was filed with the court in 2016.
15 BY MR. ARHANGELSKY:
16    Q    Other than in CIPA cases in which types of cases
17 did NTG use testers?
18    MR. DARNELL:  Objection, exceeds the scope.
19    THE WITNESS:  I'm sorry.  Are you asking about cases
20 outside of the cases referenced in the SAC?
21 BY MR. ARHANGELSKY:
22    Q    I'm just talking in general with respect to NTG's
23 practices.  Did it use testers with respect to any -- in
24 any cases other than CIPA lawsuits?
25    MR. DARNELL:  Same objection.

Page 33

1     THE WITNESS:  I must confess that this is not one of
2  the topics that I expected would be asked about and so I
3  have not done as much preparation on this topic as I have
4  the other topics.  But with that said I am happy to
5  provide you with whatever information I can recall.  I
6  just want to make sure you understand that I did not
7  understand this would be one of the topics of inquiry in
8  preparing.
9  BY MR. ARHANGELSKY:
10    Q    Can you answer the question?
11    A    I can.  It would start with the Supreme Court
12 opinion in Havens, which authorizes and embraces the use
13 of what we've described as tester plaintiffs, individuals
14 who are acting in the spirit of public good to attempt to
15 determine whether companies are violating statutory
16 obligations or independent felonies, and then the progeny
17 from Havens that embrace the use of testers in any case
18 involving the invasion of statutory rights.  I believe
19 that the Singleton case, the U.S. Supreme Court, is one of
20 the seminal cases regarding tester standing as the use of
21 testing.
22    MR. ARHANGELSKY:  We're going to move to strike this
23 as a nonresponsive answer, Mr. Ferrell.  This is not at
24 all responsive to the question that I asked specifically
25 which was what types of cases does NTG pursue use testers

30(b)(6) Scott J.  Ferrell
April 01, 2021

30..33
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 34

1  in.
2  　　MR. DARNELL: Objection, exceeds the scope.
3  　　THE WITNESS: Certainly in addition to the cases that
4  we've already identified, cases involving the Unruh Act
5  have involved testers. Cases involving the TCPA and
6  really any other invasion of a statutory right or a public
7  right where the use of the tester has been implicitly or
8  explicitly authorized is something we would consider.
9  BY MR. ARHANGELSKY:
10 　　Q　　Has the NTG used testers in CLRA cases?
11 　　MR. DARNELL: Objection, exceeds the scope.
12 　　THE WITNESS: In my opinion the definition of tester
13 embraces any individual who is willing to put themselves
14 at risk to serve the public interest as a class
15 representative. And using that broad definition of
16 tester, I think anyone who signs the document entitled
17 Duties of a Class Representative that provides that they
18 will be acting on behalf of the public good and doing
19 their best to enforce public rights could be considered a
20 tester broadly construed.
21 BY MR. ARHANGELSKY:
22 　　Q　　So your answer is, yes, you've used tester
23 plaintiffs in CLRA cases?
24 　　MR. DARNELL: Objection, misstates his testimony,
25 exceeds the scope.

Page 35

1  　　THE WITNESS: No, Counsel. I did my best to provide
2  you with a very nuanced answer to a very vague question.
3  The determination of whether someone is a tester is not at
4  all binary. It's a spectrum designation. And so what I
5  consider to be a tester you might not consider to be a
6  tester.
7  　　What the Supreme Court identified in Havens as
8  being appropriate for testing --
9  BY MR. ARHANGELSKY:
10 　　Q　　Mr. Ferrell, I'm asking a very specific question
11 and your answers run on and are nonresponsive. If we
12 continue going this way, we're going to seek the court's
13 intervention and we're going to ask for more time. Can
14 you answer my questions clearly, please?
15 　　I asked you a question. Did the NTG firm use
16 testers in CLRA cases, yes or no?
17 　　MR. DARNELL: Objection, vague and ambiguous as to the
18 term tester.
19 　　THE WITNESS: I stand by my previous answer. But if
20 you would like to work with me to ferret out the details
21 of where our understandings may differ, I would be happy
22 to do that because I think that you have a
23 misunderstanding of the phrase tester.
24 　　MR. ARHANGELSKY: I've placed a document in front of
25 the witness which is marked as Exhibit 625 entitled the

Page 36

1  Defendant Newport Trial Group's Supplemental Response to
2  Plaintiff Natural Immunogenic Corps.'s Interrogatory
3  Nos. 1 and 2 (Set One).
4  　　(Plaintiff's Exhibit 625 was marked for identification.)
5  BY MR. ARHANGELSKY:
6  　　Q　　Mr. Ferrell, is this a document you reviewed in
7  preparation for your testimony today?
8  　　A　　It is.
9  　　Q　　And I'll direct you to -- your attention to what
10 is marked pages 2 through 3 which begins with NTG
11 supplemental response to interrogatory no. 1. And is this
12 a response that you reviewed as part of your preparation
13 for testifying today?
14 　　A　　Yes, it is.
15 　　Q　　Does the NTG firm -- excuse me. Strike that.
16 　　Has the NTG firm used tester plaintiffs in CLRA
17 cases, Mr. Ferrell?
18 　　MR. DARNELL: Objection, vague and ambiguous as to the
19 term tester, also exceeds the scope of this deposition
20 notice.
21 　　THE WITNESS: So are you asking me that question
22 generally or are you asking me what is reflected in the
23 answer to supplemental response interrogatory no. 1?
24 Because those are two entirely different questions.
25 ///

Page 37

1  BY MR. ARHANGELSKY:
2  　　Q　　NTG has informed the court that it uses tester
3  plaintiffs in CIPA cases. Isn't that fair, Mr. Ferrell?
4  　　A　　I believe that the document that we just looked
5  at, the March 2016 document, identified the use of testers
6  and I believe that this interrogatory response further
7  identifies that. So I think the fair answer is yes.
8  　　Q　　Using your definition of tester has NTG used
9  tester plaintiffs in CLRA cases?
10 　　A　　So using the definition of --
11 　　Q　　It's a yes or no, Mr. Ferrell. It's a yes or no,
12 Mr. Ferrell. Can you answer the question?
13 　　A　　My answer was going to ask you, are you using the
14 definition of tester that is set forth in supplemental
15 response to interrogatory no. 1?
16 　　Q　　That's -- let's start with that, yes.
17 　　A　　Okay.
18 　　Q　　You signed that document, right, Mr. Ferrell?
19 　　A　　I did.
20 　　Q　　Okay. So under that definition does the NTG firm
21 use tester plaintiffs in CLRA litigation?
22 　　MR. DARNELL: Objection, exceeds the scope.
23 　　THE WITNESS: Doing my best to provide a specific
24 answer to a vague question, I think the answer is probably
25 no.

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 38

1  BY MR. ARHANGELSKY:
2      Q      Probably no.
3             Did you ever tell an NTG client that they were a
4  tester using that specific word?
5      A      I don't believe that we have used the descriptive
6  adjective in interacting with our clients but have used
7  rather the definition of the adjective as it tends to mean
8  more to clients.
9      Q      Prior to this case, the NIC v. NTG case which was
10  filed in December of 2015, isn't it true that there's no
11  competing that NTG filed with the court in which it
12  describes its plaintiff using the term tester?
13     MR. DARNELL:  Objection, exceeds the scope.
14     THE WITNESS:  I don't think that we filed any
15  pleadings in this case prior to the complaint being filed
16  in 2015, so I -- I'm misunderstanding something.
17  BY MR. ARHANGELSKY:
18     Q      Prior to 2015, had the NTG firm ever identified
19  its plaintiff clients as a tester in prior litigation?
20     MR. DARNELL:  Objection, exceeds the scope.
21     THE WITNESS:  I'm sorry.  Can you remind me which
22  topic this refers to?
23  BY MR. ARHANGELSKY:
24     Q      Can you answer my question?
25     A      I -- I can't.  I came prepared to answer any

Page 39

1  questions you have about these 10 topics and your last
2  question seemed specifically designed to ask for things
3  outside of that.  I'm -- I'm genuinely confused.
4      Q      Are you refusing to answer the questions because
5  they're not listed within the topic, Mr. Ferrell?
6      A      Absolutely not.  I will answer to the best of my
7  ability any questions that you ask me.  I'm just kind of
8  shocked that you didn't ask me these questions when you
9  were taking my personal deposition and that you are only
10  asking them when you're taking a deposition that is
11  limited to 10 subjects.
12     Q      Mr. Ferrell, it's true, is it not, that in none
13  of the underlying cases at issue in this lawsuit, the NIC,
14  the NTG case, did NTG ever refer in meetings, briefs, or
15  in correspondence with opposing counsel that its
16  plaintiffs were testers?
17     MR. DARNELL:  Objection, exceeds the scope.
18     THE WITNESS:  Okay.  If I understand your question
19  correctly, are you asking me whether we stated in a
20  pleading that a client was a tester or stated that in
21  communications to opposing counsel?
22     MR. ARHANGELSKY:  Yes.  In any of the underlying SAC
23  cases.
24     THE WITNESS:  I have no idea.  If you show me the
25  documents, I'd be happy to take a look.

Page 40

1  BY MR. ARHANGELSKY:
2      Q      Sitting here today you're not aware whether NTG
3  ever disclosed that its clients were testers in any of the
4  underlying SAC cases?
5      MR. DARNELL:  Objection, exceeds the scope.
6      THE WITNESS:  So now you're limiting this question to
7  the eight underlying cases.
8  BY MR. ARHANGELSKY:
9      Q      Can you answer the question?
10     A      Yes.  If you're limiting it to the eight
11  underlying cases, we have identified which of the
12  plaintiffs in those cases were testers.
13     Q      During the underlying cases themselves did you
14  ever disclose to the court or opposing parties that those
15  plaintiff clients were testers?
16     A      I have no idea whether we would or how we would
17  or if we could.  But if you show me the documents, I'm
18  happy to go through them with you and we can try and reach
19  that determination together.
20     Q      So you don't know whether you did disclose that
21  they were testers to courts or other opposing parties in
22  those cases?
23     MR. DARNELL:  Objection.  The question is compound and
24  it exceeds the scope.
25     THE WITNESS:  Let me go to the next page here.  I may

Page 41

1  be missing something.
2             Okay.  So in Nilon versus ChromaDex, yes.
3  Counsel for ChromaDex knew that Mr. Nilon was a tester as
4  we describe it above.  In Demulder versus Carter-Reed I
5  was not counsel in that matter, but I know that
6  Carter-Reed's counsel knows that Demulder was acting as a
7  tester there.  And in Schoonover versus Himalaya Drugs I
8  know specifically that Himalaya's counsel Angel Garganta
9  knew that Mr. Schoonover was acting as a tester.
10  BY MR. ARHANGELSKY:
11     Q      Let's start there.  Nilon v. ChromaDex, when did
12  you -- excuse me.
13             In Nilon v. ChromaDex when did the NTG firm
14  specifically inform opposing counsel that Mr. Nilon was
15  acting as a tester plaintiff?
16     A      It was when I spoke to Lee Jackson and one of his
17  relatives, I believe his brother-in-law who is an attorney
18  at Gillian Wade's firm, and we discussed the underlying
19  themes of these cases, the fact that they were referred to
20  us by a individual at one of the D.A.'s offices and that
21  it was a docket of cases that were appropriate for the use
22  of consumer advocates to determine the underlying
23  violations.
24     Q      I'm sorry.  Who is that you specifically had that
25  conversation with?

30(b)(6) Scott J.  Ferrell
April 01, 2021

38..41
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 42

1    A    I think it was Lee Jackson.
2    Q    And when -- what date was that conversation,
3  Mr. Ferrell?
4    A    This was, gosh, close to a decade ago.
5    Q    You don't recall a specific date?
6    A    No.  I wish you had given me the indication that
7  we would be talking about this because I could have done a
8  specific inquiry into that topic.
9    Q    You didn't provide any notice to ChromaDex's
10  counsel by -- in writing that Mr. Nilon was a tester; is
11  that right?
12    A    As I recall, the conversation was with
13  Lee Jackson on the phone.
14    Q    And Lee Jackson was representing ChromaDex at the
15  time?
16    A    This was almost a decade ago and so my memory of
17  the topic is admittedly imprecise.  But, as I recall,
18  Lee Jackson was counsel for ChromaDex.  He had a brother
19  or a brother-in-law who was an attorney at Gillian Wade's
20  firm.  They reached out.  He and I discussed the nature of
21  the statute and the underlying circumstances which
22  included our client being a consumer advocate tester.
23  That was that.
24    Q    And you were specifically referring to
25  Andrew Nilon by name?

Page 43

1    A    This was a decade ago.  I -- I don't know if I
2  specifically referred to him by name, but, um, it's hard
3  to imagine that any other conclusion would be drawn since
4  we were discussing that specific case.
5    Q    And was Gillian Wade representing ChromaDex at
6  the time?
7    A    No.  I don't believe so.
8    Q    And was her firm representing ChromaDex at the
9  time?
10    A    I don't believe so.
11    Q    And you don't have any written correspondence in
12  which you convey directly to ChromaDex's counsel that
13  Mr. Nilon was a tester.  Is that fair to say?
14    A    I don't know whether we do or not.
15    Q    You said, testified moments ago that you were
16  referring to referrals from the D.A.'s office in relation
17  to Mr. Nilon.  Is that what I understood your testimony to
18  be?
19    A    Close.  Um, the idea for the genesis of the CIPA
20  cases came to us when an attorney at one of the consumer
21  enforcement sections of one of the active D.A.s approached
22  me at a lecture and told me about the details of a rather
23  massive ongoing criminal violation.
24    Q    Okay.  And what was the office from which that
25  attorney came to you from?

Page 44

1    A    I don't remember.
2    Q    And do you remember the attorney's name that
3  approached you regarding this?
4    A    I don't.  I remember that it was a woman.
5    Q    Do you remember the lecture that this happened
6  at?
7    A    I don't.
8    Q    Was anyone else present for this conversation
9  between you and this attorney?
10    A    Probably.
11    Q    Can you recall a single person who was present
12  for this conversation that you had?
13    A    Dan Silverman might have been there because he
14  and I were lecturing partners a lot.  Bo Phillips might
15  have been there because he and I were lecture partners.
16  Ryan McNamara might have been there.
17    Q    And did any of these people witness the
18  conversation that you just had with the attorney from the
19  D.A.'s office?
20    A    To be clear you're asking me whether three people
21  who might have been with me at different lectures would
22  have witnessed a conversation that took place 10 years
23  ago?
24    Q    I'm asking you if you can answer that question.
25    A    I can't answer that question.  Or I guess the

Page 45

1  answer to that question is I don't know.
2    Q    So you don't recall whether these people were
3  actually there?
4    A    Can you ask me again with some more specificity?
5    Q    So those individuals you just identified,
6  Mr. Silverman and the others, you can't recall whether
7  they were actually there for that conversation you might
8  have had?
9    A    Well, I know that all three of them were not
10  there because they were separate lecturing partners.  You
11  asked me if anyone else might have witnessed that
12  conversation and I did my best to tell you that there were
13  three people who were my lecturing partners who could have
14  witnessed it.  And you're now asking me if it's true that
15  I can't guarantee that they witnessed this conversation
16  and of course that's right; I can't guarantee that they
17  witnessed that conversation.
18    Q    I'm specifically asking if any of those witnesses
19  did witness the conversation, Mr. Ferrell.
20    A    I don't know.  I -- I don't know.
21    MR. DARNELL:  Counsel, we've been going about an
22  hour and 10 minutes.  You want to take a break?
23    MR. ARHANGELSKY:  Yeah.  It's a good time.  Let's just
24  do five minutes.
25    THE VIDEOGRAPHER:  This is the end of Media File

30(b)(6) Scott J.  Ferrell
April 01, 2021

42..45
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 46

1    No. 1. We're now going off the record. The time is
2    10:13 a.m.
3              (BRIEF RECESS.)
4        THE VIDEOGRAPHER: This is the beginning of Media File
5    No. 2. We're now going on the record. The time is
6    10:23 a.m.
7    BY MR. ARHANGELSKY:
8        Q    Mr. Ferrell, did you specifically inform Himalaya
9    Drug's counsel that Sam Schoonover was a tester in CIPA
10   litigation?
11       A    Yes.
12       MR. DARNELL: Objection, exceeds the scope.
13   BY MR. ARHANGELSKY:
14       Q    And when exactly did you form Himalaya Drug's
15   counsel that Sam Schoonover was a tester?
16       MR. DARNELL: Same objection.
17       THE WITNESS: It was when Angel and I were lecture
18   partners at a CLE that he had invited me to lecture at.
19   BY MR. ARHANGELSKY:
20       Q    What's the specific date of that CLE?
21       A    I don't remember. It was quite some time ago.
22       Q    What was the topic for presentation at that CLE?
23       A    The CLE itself was a Bridgeport seminar. I don't
24   know what specific topic, excuse me, that I was assigned
25   to, but I know that Angel had a role in the leadership of

Page 47

1    that CLE and invited me to lecture.
2        Q    And where was the location of that CLE?
3        A    I don't remember.
4        Q    You don't recall the date of the CLE, right?
5        A    Correct.
6        Q    You don't recall the location of the CLE, right?
7        A    Correct.
8        Q    You don't recall the topic for presentation of
9    the CLE; is that right?
10       MR. DARNELL: Objection, exceeds the scope.
11       THE WITNESS: I know that my topic related to class
12   actions and trials in some context.
13   BY MR. ARHANGELSKY:
14       Q    And what -- what year was the CLE? Do you
15   remember that?
16       A    I don't.
17       Q    Okay. And you specifically during that CLE
18   informed Mr. Garganta that Sam Schoonover was a tester in
19   the Himalaya Drug CIPA case?
20       A    I don't think that's an accurate description. I
21   know that during the breaks Angel and I spoke about
22   emerging issues in class actions and he was trying to
23   develop a practice in -- in the defense of CIPA actions
24   and he asked me about it. Um, we talked about the
25   plaintiff construct and the details underlying the issues

Page 48

1    and conveyed to him that a significant percentage of our
2    clients in the underlying matters were public interest
3    advocates which we're now talking about as testers.
4        Q    So you don't believe that you specifically
5    referenced Sam Schoonover by name during that
6    conversation?
7        A    I don't recall.
8        Q    With respect to Mr. Demulder when did you
9    specifically inform Carter-Reed's counsel that
10   Mr. Demulder was a tester in CIPA litigation?
11       A    I don't recall specifically, but Carter-Reed's
12   counsel is a good friend of mine and we have spoken many
13   times, talked about being co-counsel together, um, had
14   case referrals, um, and we discussed the profiles of the
15   CIPA plaintiffs in similar context to the discussions that
16   I had with Mr. Garganta.
17       Q    All right. So did you ever specifically refer to
18   Mr. Demulder as being a tester plaintiff in the
19   Carter-Reed case that Mr. Demulder had filed in your
20   communications with Carter-Reed's counsel?
21       A    I don't know whether I used those exact words
22   that you just described.
23       Q    It's true, though, that the NTG firm never
24   informed ChromaDex's counsel that Andrew Nilon was a
25   tester in any written correspondence. Is that fair?

Page 49

1        MR. DARNELL: Objection, exceeds the scope.
2        THE WITNESS: I think you asked me that already and I
3    think that my answer was I don't know, but I'd be happy to
4    look through the written communication with you.
5    BY MR. ARHANGELSKY:
6        Q    And it's true, is it not, that NTG never informed
7    Himalaya Drug's counsel in writing that Sam Schoonover was
8    a tester?
9        MR. DARNELL: Same objection.
10       THE WITNESS: I don't know whether in addition to
11   disclosing it to him in our conversation it was further
12   referenced in writing, but I'd be happy to look through
13   the communications and -- and review them. Because I -- I
14   do know that there is communication where I tell
15   David Reid that Angel Garganta already knows a bunch of
16   stuff.
17   BY MR. ARHANGELSKY:
18       Q    You told Mr. Reid in writing that Angel Garganta
19   already knew that Sam Schoonover was a tester?
20       A    No. I told Dave Reid in writing an email that
21   was reviewed yesterday that Angel already knew the answers
22   to a bunch of the questions that Angel was asking him.
23       Q    That was in reference to what phone number
24   Mr. Schoonover had called from; is that right?
25       A    No. I don't think that's an accurate description

30(b)(6) Scott J. Ferrell
April 01, 2021

46..49
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 50

1  of it.  But if you have that document handy, we can
2  perhaps look at it and it might both refresh my memory and
3  give you a more accurate perspective of what was going on.
4      Q     Did you ever ask Andrew Baslow to help the NTG
5  firm locate tester plaintiffs for litigation?
6      A     You mean in -- in the eight SAC cases?
7      Q     In general.
8      MR. DARNELL:  Objection, exceeds the scope.
9      THE WITNESS:  I don't think it's accurate to say that
10 Andrew had a role in helping us find plaintiffs.  It's
11 more accurate to say that Andrew had a role in screening
12 individuals who wanted to work with us and then at the end
13 of the case convey to our clients that if they were
14 pleased with our work to please refer us to their friends
15 and family.
16 BY MR. ARHANGELSKY:
17     Q     So tester plaintiffs would come to Mr. Baslow?
18 Is that what would happen?
19     MR. DARNELL:  Objection, vague, exceeds the scope.
20     THE WITNESS:  So if I understand Topic No. 4 of the
21 deposition, one of the topics is how NTG obtains its
22 clients.  And I think I referenced for you earlier that I
23 tried to create a mental diagram of the process flow of
24 how clients typically came in and I think I told you that
25 when a client would contact the firm, whether it was by

Page 51

1  phone or by email or in person or through a referral, that
2  I would have that communication routed to the appropriate
3  field representative, whether it be Wynn Ferrell or
4  Andrew, to do the initial intake and screening.
5  BY MR. ARHANGELSKY:
6      Q     So in tester cases the clients always contacted
7  the NTG firm first?
8      A     I do not --
9      MR. DARNELL:  Objection, vague, exceeds the scope.
10     THE WITNESS:  I do not understand what you're asking
11 me.
12 BY MR. ARHANGELSKY:
13     Q     I'm talking about the SAC cases.  In the SAC
14 cases the clients were always the first party to contact
15 NTG and not vice versa?
16     MR. DARNELL:  Objection, compound, vague.
17     THE WITNESS:  I'm sorry.  I do not know what you're
18 asking me.
19 BY MR. ARHANGELSKY:
20     Q     Did the NTG firm ever solicit tester plaintiffs
21 for litigation?
22     MR. DARNELL:  Objection, exceeds the scope.  On which
23 cases, Counsel?  Which of the eight SAC cases are you
24 referring to here, which topic?
25 ///

Page 52

1  BY MR. ARHANGELSKY:
2      Q     In general did the NTG firm ever solicit clients
3  for tester litigation?
4      MR. DARNELL:  Objection, exceeds the scope.  Counsel,
5  if you could direct your question to a particular topic
6  that's listed in your deposition notice, I think that
7  would help streamline this deposition as well as allow you
8  to complete the deposition within the seven-hour limit
9  that you've been allotted.
10 BY MR. ARHANGELSKY:
11     Q     Can you answer the question, Mr. Ferrell?
12     A     I believe so.  So just to make sure I understand
13 the question, you're asking whether NTG ever solicited
14 tester clients outside of the eight cases that you're
15 supposed to be asking me about at today's deposition.
16     Q     Not my question.
17           My question is, has the NTG firm ever solicited a
18 client to serve as a tester in litigation?
19     MR. DARNELL:  In any case ever, right, Counsel?
20     MR. ARHANGELSKY:  That this witness can remember.
21     MR. DARNELL:  Objection, exceeds the scope so far
22 beyond the scope of the topics listed in the deposition
23 notice.  Counsel, can we make constructive use of our time
24 and ask questions about the topics?
25 ///

Page 53

1  BY MR. ARHANGELSKY:
2      Q     Can you answer the question, Mr. Ferrell?
3      A     I think so.  I'm so confused.  Are we now talking
4  about a plenary question independent of and unrelated to
5  the topics in today's deposition notice?
6      Q     Can you recall a single time where the NTG firm
7  has solicited a plaintiff to serve as a tester in
8  litigation?
9      MR. DARNELL:  Objection, exceeds the scope.
10     THE WITNESS:  As I sit here, I cannot.
11 BY MR. ARHANGELSKY:
12     Q     And has -- did the NTG firm solicit any of the
13 plaintiffs in the SAC cases to serve as testers in
14 litigation?
15     A     I have reviewed the testimony of each of the
16 plaintiffs in the SAC cases and I believe I have an
17 understanding as to how each of them came in through
18 client intake.
19     Q     Mr. Ferrell, this is a yes-or-no question.  In
20 any of the SAC cases did NTG's firm solicit the plaintiffs
21 to serve as testers in litigation, yes or no?
22     A     I don't believe so.
23     Q     Did the Newport Trial Group have any written
24 policies in place concerning the use of tester plaintiffs
25 in litigation?

30(b)(6) Scott J. Ferrell
April 01, 2021

50..53
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 54

1      A    Yes.

2      Q    **And what were those written policies?**

3      MR. DARNELL:  Objection, exceeds the scope.

4      THE WITNESS:  They are set forth in the duties of a

5  class representative document.

6  BY MR. ARHANGELSKY:

7      Q    **Other than the class duties document that you**

8  **just referenced, did the NTG firm have any other written**

9  **policies concerning its use of testers in litigation?**

10     MR. DARNELL:  Objection, exceeds the scope.

11     THE WITNESS:  The -- the document itself is fairly

12  broad and supplemented by our engagement letters.  Other

13  than those documents and the associated best practices

14  that we follow, I'm not aware of any.

15  BY MR. ARHANGELSKY:

16     Q    **What best practices do you follow that**

17  **specifically pertain to use of testers in litigation?**

18     MR. DARNELL:  Objection, exceeds the scope.

19     THE WITNESS:  Well, I --

20     MR. DARNELL:  Counsel, I'm sorry.  Counsel, what topic

21  are we on?  Can you identify the topic, please?

22     MR. ARHANGELSKY:  You know because you argued this to

23  the court that I'm not limited to asking my questions

24  solely based on issues -- on topics and I can debate which

25  topic it's relevant to.  So I don't have to --

Page 55

1      MR. DARNELL:  I'm just asking you to identify what

2  topic you're on.  That's all I'm asking you.

3      MR. ARHANGELSKY:  So you can make your objection.  Let

4  me continue my examination.

5      MR. DARNELL:  Counsel, are you going to identify a

6  topic?  I'm just asking you, can you tell me what topic

7  you're generally proceeding under?

8      MR. ARHANGELSKY:  This is -- this is relevant to

9  several topics, but it's relevant to the acquisition of

10  clients, Mr. Darnell.

11     MR. DARNELL:  So we're focused on SAC, the cases in

12  the SAC that were testers, right?  Because your

13  question --

14     MR. ARHANGELSKY:  I don't need to focus my questioning

15  to the topics that are listed there as you argued to the

16  court and the court has ruled.  So if you're going to

17  interrupt my deposition based on these demands, then we're

18  going to go to the court and we're going to seek more time

19  on this deposition --

20     MR. DARNELL:  It's your position --

21     MR. ARHANGELSKY:  -- if you won't allow me to continue

22  my examination.

23     MR. DARNELL:  Counsel, I'm asking you to ask questions

24  that are reasonably related to the topics of examination.

25     THE WITNESS:  In --

Page 56

1      MR. ARHANGELSKY:  You've made your objection.

2      THE WITNESS:  Independent of the soliloquy that the

3  two of you have had, independent of whatever limits have

4  been placed on this deposition as a witness and as a

5  30(b)(6) testimony designee, I intend to testify to the

6  best of my recollection as to any questions you properly

7  ask me whether they are inside or outside of the proper

8  scope of the deposition.  With that said, it will help

9  provide a context if you identify which topic we're

10  related to.

11          I understand that you have declined to do that,

12  so the question pending is what best practices does PTA

13  follow?

14  BY MR. ARHANGELSKY:

15     Q    **With respect to the use of testers specifically**

16  **in litigation.**

17     MR. DARNELL:  Objection, exceeds the scope.

18     THE WITNESS:  It can generally be described as, one,

19  doing proper client intake, two, ensuring that any

20  individual who contacts us has proper motives and will be

21  a reliable representative of the public good to ensure that the

22  client executes the duties of a class representative

23  document which is a document that I pioneered that goes

24  well above and beyond the minimum statutory duties that

25  might exist with respect to the pursuit of that

Page 57

1  litigation, and then to properly season any intake case so

2  that we ensure as the case proceeds that the client is

3  aware of their obligations and their roles and are

4  responsive.

5  BY MR. ARHANGELSKY:

6      Q    **Okay.  Mr. Ferrell, I had asked you before what**

7  **documents NTG possesses with respect to -- concerning**

8  **policies on testers and you've identified best practices.**

9  **And I'm asking you specifically the name, the documents**

10  **that you follow that you would characterize as the best**

11  **practices documents related to use of testers in**

12  **litigation.**

13     MR. DARNELL:  Objection, exceeds the scope.

14     THE WITNESS:  Counsel, with respect that is not the

15  question you asked.  If that's the question you're asking

16  now, I'm happy to answer.

17  BY MR. ARHANGELSKY:

18     Q    **Please answer that question.**

19     A    In addition to the duties of a class

20  representative document and the engagement letters that

21  set forth those duties as well as the various best

22  practice guides that are available on the internet that I

23  referenced, I'm not aware of any other written documents.

24     Q    **Can you name one of the best practices documents**

25  **that you referenced on the internet which specifically**

30(b)(6) Scott J.  Ferrell
April 01, 2021

54..57

EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 58

1  relate to NTG's use of tester plaintiffs?
2      MR. DARNELL:  Objection, exceeds --
3      MR. ARHANGELSKY:  I'm interested in the name of the
4  document itself.
5      MR. DARNELL:  Objection, exceeds the scope.
6      THE WITNESS:  I don't think there are any documents on
7  the internet that describe NTG's use of tester plaintiffs
8  as it relates to best practices.  Are you asking me which
9  of the practice guides I consult?
10  BY MR. ARHANGELSKY:
11     Q     Which of the practice guides by name do you
12  consult with respect to NTG's use of testers?
13     MR. DARNELL:  Objection, exceeds the scope.
14     THE WITNESS:  I can certainly tell you all of the ones
15  that I recall.  It would start with the publications by
16  CAALA and Public Justice as well as the notes published
17  about consumer litigation on Law360 and various updates as
18  it relates to the scope of approved testers, the instances
19  in which they can be properly disclosed or should be
20  disclosed as well as publications regarding our own work
21  advancing the law in those areas.  There is also a
22  handbook entitled Best Practices In Consumer Litigation or
23  something thereabout that I reference frequently.  I
24  believe it was published by CAALA or a similar
25  organization.

Page 59

1  BY MR. ARHANGELSKY:
2      Q     And are those documents available on-line?
3      A     Yes.
4      Q     Prior to 2016, did NTG keep any internal records
5  that identify which of its clients were testers?
6      MR. DARNELL:  Objection, exceeds the scope.
7      THE WITNESS:  Not that I know of.
8  BY MR. ARHANGELSKY:
9      Q     Who at the NTG firm decides whether to use tester
10  plaintiffs in litigation?
11     MR. DARNELL:  Objection, exceeds the scope.
12     THE WITNESS:  So just to be clear, you keep using the
13  phrase tester plaintiffs and I want to make sure that
14  every time you use that we agree that the definition of a
15  tester plaintiff is the one set forth in our discovery
16  responses and not a different definition that you may
17  have.  Are we agreed there?
18  BY MR. ARHANGELSKY:
19     Q     Your firm's the firm that has since rejected
20  tester and we'll use your definition of tester.  Based on
21  your understanding of what the definition of tester is,
22  I'm asking who at NTG decides to use tester plaintiffs in
23  litigation?
24     MR. DARNELL:  And respectfully I just object to the
25  preamble and the statement made by counsel, but you can

Page 60

1  answer the question.
2      THE WITNESS:  So ultimately it's my decision and my
3  obligation to ensure that the clients that we work with
4  are individuals who intend to act lawfully and ethically
5  to help eradicate unlawful practices that harm consumers
6  and the general public.
7  BY MR. ARHANGELSKY:
8      Q     And prior to 2016, which attorneys at the NTG
9  firm were aware that the firm used tester plaintiffs in
10  litigation?
11     MR. DARNELL:  Objection, exceeds the scope.
12     MR. RIDDLES:  Objection, calls for speculation.
13     THE WITNESS:  So again incorporating by reference the
14  definition of tester, I can tell you that every attorney
15  and every employee of NTG knows that I expect that we and
16  our clients will act lawfully and ethically when we are
17  trying to eradicate unlawful practices that harm the
18  consumers and the general public.
19     MR. ARHANGELSKY:  Can the court reporter please read
20  back my last question to the witness.
21     (WHEREUPON, THE RECORD WAS READ BY THE COURT
22     REPORTER AS FOLLOWS:
23     "Question:  And prior to 2016, which
24     attorneys at the NTG firm were aware that the firm
25     used tester plaintiffs in litigation?")

Page 61

1  BY MR. ARHANGELSKY:
2      Q     So is your response all of them?
3      A     My answer speaks for itself.  Do you want me to
4  restate the answer?
5      Q     I'm asking specifically which attorneys were
6  aware that the NTG firm used testers in litigation.
7      MR. DARNELL:  Same objections as previously noted.
8      THE WITNESS:  So you're asking me to guess as to the
9  knowledge of what attorneys knew what in 2016 as it
10  related to our obligations to act lawfully and ethically?
11  BY MR. ARHANGELSKY:
12     Q     Can you answer the question?
13     A     Other than the answer I gave which I -- I think
14  was thorough, I would just be guessing.
15     Q     Okay.  And to the best of your knowledge which
16  attorneys by name knew prior to 2016 that the NTG firm
17  used tester plaintiffs in CIPA litigation?
18     MR. DARNELL:  Objection, exceeds the scope, calls for
19  speculation.
20     THE WITNESS:  Certainly the ones I've already
21  identified, um, Lee Jackson, Jason Kerr, Angel Garganta --
22  BY MR. ARHANGELSKY:
23     Q     I was asking attorneys within NTG, Mr. Ferrell.
24  I don't mean to interrupt you, but I think you might have
25  misunderstood the question and I'll ask it again if it

30(b)(6) Scott J.  Ferrell
April 01, 2021

58..61
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 62

1    would be helpful.

2              Prior to 2016, which attorneys within NTG were

3    aware that the NTG firm used testers in CIPA litigation?

4         MR. RIDDLES:  Objection, calls for speculation.

5         MR. DARNELL:  Objections, exceeds the scope.

6         THE WITNESS:  I think I answered that.  But to the

7    extent that my previous answer was not clear, I'm happy to

8    try to answer it again.

9              So you have used the phrase tester plaintiff.

10   You and I have since agreed that we share the same

11   definition of tester plaintiff and that that definition

12   embraces an obligation to act lawfully and ethically when

13   working to eradicate illegal and harmful practices.  And

14   you've asked me who knows that and I'm telling you every

15   single person, whether an employee of the firm or not an

16   employee of the firm and whether or not an attorney,

17   should know that we take our duties and took our duties

18   quite seriously prior to 2016 to make sure that we were

19   acting lawfully and ethically in our efforts to eradicate

20   practices that harm consumers.

21             Did that answer your question?

22   BY MR. ARHANGELSKY:

23        Q    For the record we don't -- we haven't agreed to a

24   definition of tester.  We're using your definition for

25   tester.

Page 63

1         A    No.  You did just agree to it.

2         MR. DARNELL:  You did, Counsel.

3    BY MR. ARHANGELSKY:

4         Q    Prior to 2016 -- prior to 2016, did

5    Victoria Knowles know that the NTG firm used tester

6    plaintiffs in CIPA litigation?

7         MR. DARNELL:  Objection.  Now it's completely --

8         MR. RIDDLES:  Objection, calls for speculation.

9         MR. DARNELL:  That question's vague and ambiguous.

10   What definition of tester are you using in that question,

11   Counsel?

12        MR. ARHANGELSKY:  It's his -- he can use his

13   definition.  I'm not agreeing to his definition.  I want

14   his understanding of tester.  And using his definition of

15   tester -- let's say it that way.  Using his definition of

16   tester, prior to 2016, did Victoria Knowles know that the

17   NTG firm used testers in CIPA litigation?

18        MR. DARNELL:  Objection, exceeds the scope, calls for

19   speculation.

20        THE WITNESS:  Okay.  I'm super confused, but let's try

21   and break this down into its component parts.

22             At least for purposes of the deposition today I

23   think we've agreed on the definition of tester to be an

24   individual who lawfully and ethically takes an action or

25   actions that are motivated in whole or in part by a desire

Page 64

1    to help identify, prove, and eradicate unlawful practices

2    that harm consumers and the general public and that we've

3    answered all discovery subject to that being the

4    definition of the phrase tester.

5              So if you're now asking me whether

6    Victoria Knowles knew of that in 2016, I don't know.  I

7    would have to look at Victoria's deposition testimony and

8    see if that question was asked.  As I sit here, I don't

9    know.

10        MR. ARHANGELSKY:  I'll ask a different question.

11        Q    Prior to 2016, did you ever specifically inform

12   Victoria Knowles that the NTG firm used tester plaintiffs

13   in CIPA litigation?

14        A    So you keep using the phrase tester and I keep

15   using the definition of tester.  And it's very important

16   to give a precise answer here because I don't want you to

17   at another time try to shoehorn a different definition of

18   tester onto my answer.

19             But if we have that agreement that all of my

20   answers today reflect the definition of tester that I have

21   recited, then I believe that prior to 2016 I told

22   Victoria Knowles and every attorney at NTG who worked on

23   the consumer docket that we had an obligation to act

24   lawfully and ethically in working with plaintiffs when

25   eradicating unlawful practices that harm consumers.

Page 65

1         Q    Did you ever specifically use the word tester

2    when referring to the firm's CIPA plaintiffs when

3    communicating with Victoria Knowles prior to 2016?

4         A    I don't know.

5         Q    Did the NTG firm or any of its agents ever ask

6    clients to make phone calls to corporations for wiretap

7    cases?

8         MR. DARNELL:  Objection, exceeds the scope.

9         THE WITNESS:  So the wiretap cases are Demulder versus

10   Carter-Reed, Nilon versus ChromaDex, and Schoonover versus

11   Himalaya.  I have reviewed --

12        MR. ARHANGELSKY:  And Torres.

13        THE WITNESS:  And Torres.

14             I have reviewed the testimony of those witnesses

15   as well as the discovery responses and I believe that

16   Demulder, Nilon and ChromaDex and Schoonover and Himalaya

17   were acting as testers as we've defined it and so it would

18   be my expectation that Andrew gave them instructions prior

19   to the telephone calls.  I have --

20   BY MR. ARHANGELSKY:

21        Q    So the answer was yes to my last question?

22        A    No.

23        THE WITNESS:  No.  The answer was what I gave it and

24   you interrupted me again.  I was also going to add that

25   from review of Torres' testimony, she did not identify as

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 66

1  such.
2      MR. ARHANGELSKY:  I have placed a document in front of
3  the witness that I've marked as Exhibit 626.  This is a
4  document that has a Bates number of NTG 41928.  This is a
5  set of emails exchanged in May 2013.
6  (Plaintiff's Exhibit 626 was marked for identification.)
7  BY MR. ARHANGELSKY:
8      Q     Mr. Ferrell, did you review this document in
9  preparation of your deposition today?
10     A     I did.
11     Q     And in the second email on this page, you had
12  wrote an email saying, Andrew, Can you let me know at what
13  rate we are, quote, processing, end quote, those cases?
14  And the first sentence that I neglected to read was Per
15  Carla's chart today we have 32 cases in the, quote,
16  seasoning stage, end quote.  Do you see that part of the
17  email?
18     A     I do.
19     Q     And you put the terms seasoning stage and
20  processing in quotes, did you not?
21     A     I did.
22     Q     And do those terms have specific meaning within
23  NTG?
24     A     Seasoning stage is a term of art but I believe
25  has a specific meaning.

Page 67

1      Q     What does it mean to season a case at NTG?
2      A     To me it means to make sure that between the
3  initial contact from a client and the filing of a case
4  that all of the appropriate due diligence has been done,
5  for example, making sure that our client has signed the
6  duties of class representative documents and understands
7  them, making sure that our client has signed an engagement
8  letter, making sure that the individual who did the client
9  intake is comfortable that the client intends to abide by
10  the obligations in the duties of a class representative
11  document and will be a good partner in the case.  There
12  are likely --
13     Q     And --
14     A     I'm sorry.  There are likely --
15     Q     Finish your answer, please.
16     A     I'm sorry.  There are likely other things that
17  seasoning involves, but those are the ones that are
18  important to me.
19     Q     And at what point does this seasoning stage end
20  within NTG?
21     A     I think it depends on any particular case.
22     Q     What does it mean to process a case as used in
23  this email here to Mr. Baslow?
24     A     I don't think processing is a term of art like
25  seasoning is, but I believe that it's a question about the

Page 68

1  rate at which we are advancing all of the individual
2  components of the seasoning stage that I just described.
3      Q     And how would somebody working for NTG season a
4  case for litigation as you understand that term?
5      A     For example, it's a funneling process.  If 100
6  potential clients approach us, some will be rejected
7  because they are outside of our area of expertise.  Others
8  will be rejected because we don't believe that the case
9  has merit.  Others might be rejected because we have a
10  potential conflict.  Others could be rejected because of
11  issues unique to the case like the statute of limitations
12  being gone.  Others could be rejected because of changes
13  in the law that are unfavorable to the person's position.
14  Others could be rejected simply because of workload.  And
15  throughout that process we all play a role in seasoning
16  from the initial contact with our firm up until the time
17  that a subsection of those cases are filed as complaints.
18     Q     (Inaudible.)
19     A     We lost you.
20     Q     It should be back.  Is it back?
21     A     Yes.
22     Q     Has the NTG firm ever referred to certain clients
23  as being seasoned versus an unseasoned client?
24     A     Yes.
25     Q     What is the difference between a seasoned client

Page 69

1  versus an unseasoned client?
2      A     So it's not a seasoned client versus an
3  unseasoned client.  It's a seasoned matter versus an
4  unseasoned matter.
5      Q     Okay.  Would clients also need to be seasoned as
6  part of the process to bring a case through the seasoning
7  stage?
8      A     Certainly part of the seasoning process as I have
9  coined the term of art involves making sure that we have a
10  reliable client and that they are returning phone calls,
11  that the facts that they're giving us make sense, that
12  they understand their obligations, those sort of things.
13  And so I think it can fairly be said that as a case
14  seasons so does a representative client.
15     Q     And were you the individual at NTG who coined the
16  term seasoning to describe the firm's seasoning stage?
17     A     Yes.
18     Q     And who at the NTG firm would have primary
19  responsibility for seasoning clients?
20     A     I think you misunderstand what the seasoning
21  process is.  We don't season clients.  Matters themselves
22  season in the way that it's an intransitive verb; they
23  become ripe and they become ready.
24     Q     Who at the NTG firm was -- had primary
25  responsibility for communicating with the clients during

30(b)(6) Scott J.  Ferrell
April 01, 2021

66..69
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 70

1  the seasoning stage?
2      A     Depends on the particular client.  For example,
3  in the NIC matter I had primary responsibility with
4  Trycia Carlberg and in the other matters that we pursued
5  for her.  It depends on the client intake.
6      Q     Did the NTG firm maintain spreadsheets or charts
7  for which clients -- excuse me -- for which cases were
8  seasoned?
9      A     I believe that we maintained charts that were
10  plenary in nature, that were -- could fairly be described
11  as a database.  One of the entries on some of those
12  clients likely reflected the seasoning process.
13      MR. ARHANGELSKY:  I've placed an exhibit in front of
14  the witness on screen which is Plaintiff's Exhibit 627.
15  And this is an email from Carla Wise to Wynn Ferrell and
16  Scott Ferrell in September of 2012.  The document is
17  Bates No. NTG 6708.
18      (Plaintiff's Exhibit 627 was marked for identification.)
19  BY MR. ARHANGELSKY:
20      Q     Mr. Ferrell, have you ever seen this document
21  before?
22      A     I have.
23      Q     And did NTG maintain similar charts for all of
24  its plaintiffs' cases?
25      A     I don't know.

Page 71

1      Q     In the chart that's displayed in the middle of
2  this page, there are parentheses in the top right in the
3  top box and it says AB.  Would those be the initials for
4  Andrew Baslow?
5      A     It's possible.
6      Q     Did NTG maintain any charts here that would have
7  indicated who the field rep. was for a specific case?
8      A     It is possible that the initials AB are of that
9  designation.  Beyond that I don't know.
10      Q     Did you ask Wynn Ferrell to contact Mr. Demulder
11  regarding his Carter-Reed case?
12      A     I don't recall.
13      Q     Do you know whether Wynn Ferrell ever did speak
14  with Mr. Demulder about the Carter-Reed case?
15      A     I don't know.
16      Q     How many lawsuits did NTG plan to file against
17  Carter-Reed in 2012?
18      A     I didn't realize there was a second page here,
19  Counsel.  Let me review that.  It may provide context.
20      Okay.  Having reviewed the second page I don't
21  know that we intended to file any lawsuits against
22  Carter-Reed in 2012.
23      Q     You're familiar with the company Basic Research
24  in Utah, right?
25      A     I am.

Page 72

1      Q     And how are you familiar with Basic Research?
2      A     Um, most recently we have explored collaborating
3  together regarding a couple of products.
4      Q     Are you aware that Basic Research owned
5  Carter-Reed in 2012?
6      A     Was I aware that Basic Research owned Carter-Reed
7  in 2012 or am I aware?
8      Q     Are you now?
9      A     I know that there is some affiliation between
10  Basic Research and Carter-Reed.  I don't know whether it's
11  a direct ownership interest or not.
12      Q     Has NTG sued any other companies owned or
13  affiliated with Basic Research on behalf of any other
14  client?
15      MR. DARNELL:  Objection, exceeds the scope.
16      THE WITNESS:  I don't know as I sit here.
17  BY MR. ARHANGELSKY:
18      Q     Did NTG sue Novex Biotech, LLC, in 2013 on behalf
19  of ThermoLife International?
20      MR. DARNELL:  Objection, exceeds the scope.
21      THE WITNESS:  I don't know.
22  BY MR. ARHANGELSKY:
23      Q     Do you know whether NTG had any role in
24  litigation against Novex Biotech in 2013?
25      MR. DARNELL:  Same objection.

Page 73

1      THE WITNESS:  I don't know.
2  BY MR. ARHANGELSKY:
3      Q     Who is Tyler Woods?
4      A     Tyler is a former partner of Pacific Trial
5  Attorneys.
6      Q     And was he working as an attorney with Newport
7  Trial Group in 2013?
8      A     I believe so.
9      MR. ARHANGELSKY:  All right.  Now I've placed an
10  exhibit in front of the witness on screen which is marked
11  as Exhibit 628 and it's a document Bates No. NTG 66637.
12      (Plaintiff's Exhibit 628 was marked for identification.)
13  BY MR. ARHANGELSKY:
14      Q     Mr. Ferrell, have you ever seen this email
15  before?
16      A     I have.
17      Q     And was this an email that NTG produced to NIC in
18  discovery?
19      A     Yes.
20      Q     What are the weekly charts that Mandy Jung has
21  sent around in this email?
22      A     I don't know because it doesn't look like I
23  received them.
24      Q     Did the NTG firm keep weekly charts of cases that
25  it was pursuing?

30(b)(6) Scott J.  Ferrell
April 01, 2021

70..73
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 74

```
1    A    I believe so.  Although --
2    Q    Did NTG prepare --
3    A    I apologize.  I believe so, although I don't
4  think they would accurately be characterized as weekly
5  charts.  I think they would accurately be characterized as
6  charts that would be updated sometimes weekly.
7    Q    And did NTG maintain those charts for all of its
8  cases in litigation?
9    A    I don't know.
10   Q    Did NTG maintain those charts for CLRA cases?
11   A    I don't know.
12   MR. ARHANGELSKY:  All right.  I've now placed another
13 exhibit in front of the witness which is marked
14 Exhibit 629 and it has the Bates No. NTG 66654.
15   (Plaintiff's Exhibit 629 was marked for identification.)
16 BY MR. ARHANGELSKY:
17   Q    Mr. Ferrell, have you ever seen this document
18 before?
19   A    Not that I recall.
20   Q    Is this a document that NTG produced to NIC in
21 discovery?
22   A    It appears to be, although I don't see a Bates
23 label on it.
24   Q    You know, I -- I might be able to do that.
25   A    I do see it now.  Thank you.
```

Page 75

```
1    Q    Okay.  And this appears to be a chart of NTG's
2  male enhancement cases; is that correct?
3    A    It's labelled Male Enhancement Cases.
4    MR. DARNELL:  And I'll just object.  This exceeds the
5  scope of any topic on your notice.  But go ahead, Counsel.
6  BY MR. ARHANGELSKY:
7    Q    Did NTG maintain charts like this for wiretap
8  cases?
9    A    I don't know.
10   Q    Were you provided with charts like this on a
11 weekly basis by Mandy Jung or Katherine Kirshner?
12   MR. DARNELL:  Objection, exceeds the scope.
13   THE WITNESS:  I know that for some time I received
14 weekly charts, but I don't recall it being a chart of this
15 nature.
16 BY MR. ARHANGELSKY:
17   Q    Did NTG maintain any types of charts with respect
18 to CIPA cases?
19   MR. DARNELL:  Objection, vague.
20   THE WITNESS:  I don't know.
21 BY MR. ARHANGELSKY:
22   Q    Did it maintain any type of chart with similar
23 content to Exhibit 629 for CLRA cases?
24   MR. DARNELL:  Objection, exceeds the scope.
25   THE WITNESS:  I don't know.
```

Page 76

```
1  BY MR. ARHANGELSKY:
2    Q    And did NTG have any charts like this for its ADA
3  cases?
4    MR. DARNELL:  Objection, exceeds the scope.
5    THE WITNESS:  I don't know.
6  BY MR. ARHANGELSKY:
7    Q    So you don't know whether NTG had a chart like
8  this for any of the cases in which Andrew Nilon was
9  involved?
10   MR. DARNELL:  Objection, exceeds the scope.
11   THE WITNESS:  I don't know.
12 BY MR. ARHANGELSKY:
13   Q    And you don't know whether or not there was a
14 chart like this that would have contained information
15 about Sam Schoonover's cases?
16   MR. DARNELL:  Objection, exceeds the scope.
17   THE WITNESS:  I don't know.
18 BY MR. ARHANGELSKY:
19   Q    Looking at the chart there's a column that says
20 Product on the left.  Do you see that?
21   A    Yes.
22   Q    Is that the product that NTG was evaluating for
23 litigation?
24   MR. DARNELL:  Objection, exceeds the scope.
25   THE WITNESS:  I don't know.  It appears to me that
```

Page 77

```
1  someone may have done a data dump into a template that was
2  not well-suited for the data that was dumped into it.
3  BY MR. ARHANGELSKY:
4    Q    Okay.  There's a column on this spreadsheet that
5  is for the plaintiff.  Do you see that?
6    A    I do.
7    Q    And, in fact, underneath the NTG In-House Filed
8  Cases section towards the bottom on truDERMA, the
9  plaintiff is listed as Strataluz.  Do you see that?
10   A    I do.
11   Q    At what point would NTG input the plaintiff
12 information into a chart like this?
13   MR. DARNELL:  Objection, vague, assumes facts, exceeds
14 the scope.
15   THE WITNESS:  It seems to me that you misunderstand
16 the client intake process.  We don't input a client into a
17 matter, if that's what you're talking about.
18 BY MR. ARHANGELSKY:
19   Q    No.  Mr. Ferrell, I'm talking about the
20 spreadsheet specifically.  At what point would the NTG
21 firm update this spreadsheet to include the plaintiff's
22 information?
23   A    Okay.  That's a very different question.
24   MR. DARNELL:  Objection, exceeds the scope.
25   THE WITNESS:  And the answer is I don't know.
```

30(b)(6) Scott J.  Ferrell
April 01, 2021

74..77
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 78

1 BY MR. ARHANGELSKY:
2    Q    What was the seasoning stage in context with
3 these male enhancement cases, Mr. Ferrell?
4    A    Can you help me?  Is there a reference to
5 seasoning on this document that I should be looking at?
6    Q    On the top part of the first section it says
7 Investigation, slash, Seasoning Stage and I'm asking, what
8 was the seasoning stage for these cases?
9    A    I don't know.
10    Q    And at what point would these male enhancement
11 cases proceed from the seasoning stage to the demand
12 letter phase?
13    MR. DARNELL: Objection, exceeds the scope.
14    THE WITNESS: It looks like most of them did not.
15 BY MR. ARHANGELSKY:
16    Q    Well, my question is -- well, there are that
17 entered the demand letter phase.  You agree?
18    A    Again I'm only looking at which this chart shows,
19 but this chart shows four cases in the demand letter
20 stage.  Yes.
21    Q    Okay.  And so at what point would NTG move from
22 the seasoning stage to the demand letter phase in context
23 with the male enhancement cases?
24    MR. DARNELL: Objection, assumes facts, exceeds the
25 scope.

Page 79

1    THE WITNESS: My understanding is largely limited to
2 what this document says, but it appears that the bulk of
3 the cases were funneled out using the phrase I earlier
4 described during the investigative process.
5    MR. ARHANGELSKY: I need to take just a quick
6 five-minute break if that's all right with everyone else.
7 I think we've been going for about another hour.  So is
8 that all right?
9    MR. DARNELL: Sure.
10    THE VIDEOGRAPHER: This is the end of Media File
11 No. 2.  We're now going off the record.  The time is
12 11:24 a.m.
13            (BRIEF RECESS.)
14    THE VIDEOGRAPHER: This is the beginning of Media File
15 No. 3.  We're now going on the record.  The time is
16 11:33 a.m.
17 BY MR. ARHANGELSKY:
18    Q    Mr. Ferrell, how many lawsuits did NTG file under
19 the California CIPA act?
20    MR. DARNELL: Objection, exceeds the scope.
21    THE WITNESS: I don't know.
22 BY MR. ARHANGELSKY:
23    Q    Do you know what percentage of NTG's wiretap
24 cases were settled by NTG with a monetary payment paid by
25 the defendant?

Page 80

1    MR. DARNELL: Objection, exceeds the scope.
2    THE WITNESS: I know that every case that was settled
3 involved the defendant changing its practices to stop
4 violating the law.  I don't know what percentage also
5 contained a monetary settlement.
6 BY MR. ARHANGELSKY:
7    Q    Did the NTG firm ever certify a wiretap case as a
8 class action?
9    MR. DARNELL: Objection, exceeds the scope.
10    THE WITNESS: Yes.  I believe that we or our
11 co-counsel certified either two or three.
12 BY MR. ARHANGELSKY:
13    Q    And you achieved certification in those cases?
14    MR. DARNELL: Objection, exceeds the scope.
15    THE WITNESS: Can you help me understand what you mean
16 by achieve certification?
17 BY MR. ARHANGELSKY:
18    Q    Did the court certify a class in those cases?
19    MR. DARNELL: Same objection.
20    THE WITNESS: This was so long ago.  But, yes, I
21 believe that we had involvement in two or three classes
22 that were certified.
23 BY MR. ARHANGELSKY:
24    Q    And which cases were the CIPA cases certified?
25    MR. DARNELL: Objection, exceeds the scope.

Page 81

1    THE WITNESS: I don't remember.
2 BY MR. ARHANGELSKY:
3    Q    Do you know what year those cases were certified?
4    MR. DARNELL: Same objection.
5    THE WITNESS: I know it was quite some time ago and I
6 don't know if these were cases where we were the counsel
7 or where we had referred them to other counsel.
8 BY MR. ARHANGELSKY:
9    Q    Do you know the names of the class
10 representatives in those cases that were certified?
11    MR. DARNELL: Same objection.
12    THE WITNESS: As I sit here, I don't.
13 BY MR. ARHANGELSKY:
14    Q    Do you know which courts those cases were pending
15 before?
16    MR. DARNELL: Same objection.
17    THE WITNESS: I don't know.
18 BY MR. ARHANGELSKY:
19    Q    And did the NTG firm ever resolve a wiretap case
20 on a class wide basis?
21    MR. DARNELL: Objection, exceeds the scope.
22    THE WITNESS: I think so, but I don't know for sure.
23 BY MR. ARHANGELSKY:
24    Q    And which cases do you think were resolved on a
25 class wide basis?

30(b)(6) Scott J.  Ferrell
April 01, 2021

78..81
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 82

1    MR. DARNELL:  Objection, exceeds the scope.
2    THE WITNESS:  This was so long ago.  Without looking I
3 don't know.
4 BY MR. ARHANGELSKY:
5    Q    Did any of NTG's wiretap settlements ever result
6 in payment of money to class members other than the class
7 representative?
8    MR. DARNELL:  Objection, exceeds the scope.
9    THE WITNESS:  Certainly any class settlement would
10 have resulted in that.
11 BY MR. ARHANGELSKY:
12    Q    But I'm asking specifically whether you know
13 sitting here now whether any of NTG's wiretap settlements
14 resulted in payment of money to class members other than
15 the class representative.
16    MR. DARNELL:  Objection, exceeds the scope.
17    THE WITNESS:  This is so long ago.  As I sit here now,
18 I don't know one way or the other.
19    MR. ARHANGELSKY:  Okay.  I've placed on screen an
20 exhibit which is marked as Plaintiff's Exhibit 630 and it
21 is a document with the Bates number on the first page
22 NTG 66663.
23    (Plaintiff's Exhibit 630 was marked for identification.)
24 BY MR. ARHANGELSKY:
25    Q    Mr. Ferrell, have you ever seen this document

Page 83

1 before?
2    MR. DARNELL:  Objection, exceeds the scope.
3    THE WITNESS:  If I have seen it before, I don't recall
4 having seen it and I did not --
5 BY MR. ARHANGELSKY:
6    Q    The document -- I'm sorry.
7    A    I did not review this document in preparation for
8 my deposition today specifically.
9    Q    Is this a chart that NTG used to track its
10 wiretap cases?
11    MR. DARNELL:  Objection, exceeds the scope.
12    THE WITNESS:  Looking at the document it is titled
13 Newport Trial Group Wiretap Cases.  Beyond that I don't
14 know other than looking at the same document that you are.
15 BY MR. ARHANGELSKY:
16    Q    Okay.  At the top right of this document it
17 says -- and you may have to zoom in.  It says Rev, colon,
18 6/8/15, dash, mkj.  What does that mean?
19    MR. DARNELL:  Objection, exceeds the scope, also lacks
20 foundation as of yet to be established.
21    THE WITNESS:  I believe it means review June 8th,
22 2015, and I think mkj are Mandy Jung's initials.
23 BY MR. ARHANGELSKY:
24    Q    Isn't it true this is a spreadsheet that NTG used
25 to maintain or track its wiretap cases?

Page 84

1    MR. DARNELL:  Objection, exceeds the scope.
2    THE WITNESS:  As I indicated, this document is
3 entitled Wiretap Cases and that's what it looks like it
4 relates to me, but I don't have any independent
5 recollection of this document.
6 BY MR. ARHANGELSKY:
7    Q    Did NTG have any other systems for tracking its
8 wiretap cases in litigation?
9    MR. DARNELL:  Objection, assumes facts, no foundation
10 for what counsel has described this document to be.
11    THE WITNESS:  I don't know.
12 BY MR. ARHANGELSKY:
13    Q    Do you know who created this chart?
14    A    I don't.
15    Q    Do you know how often these charts were updated?
16    MR. DARNELL:  Objection, assumes facts, lacks
17 foundation, exceed the scope.
18    THE WITNESS:  I don't.
19 BY MR. ARHANGELSKY:
20    Q    Looking at the top of this chart, the top left,
21 there appears to be a legend that says MB equals Minimal
22 Bypass, STLH equals Straight To Live Human.  Do you see
23 that part of the document, Mr. Ferrell?
24    A    I do.
25    Q    In the column under defendant -- I'm sorry.

Page 85

1 Excuse me.
2    Scrolling down on the column where it says -- the
3 title of the column is Defendant Phone Number and under
4 each listing there appear to be those same abbreviations
5 or acronyms, right, STLH?  Do you see that?
6    A    Yes.
7    Q    So under that first heading for credit card --
8 Credit Guard of America where it says STLH, that's
9 Straight To Live Human; is that right?
10    MR. DARNELL:  Objection, lacks foundation, calls for
11 speculation, exceeds the scope of any topic listed by the
12 deposition notice at issue here today.
13    THE WITNESS:  I don't know.
14 BY MR. ARHANGELSKY:
15    Q    And scrolling to page 3 of this document under --
16 let's just go with -- it says Demand Letter Phase.  Do you
17 see that part?
18    A    I do.
19    Q    And underneath the first entry there, Bausch &
20 Lomb, it says MB.  Is that for Minimal Bypass?
21    MR. DARNELL:  Objection, lacks foundation, calls for
22 speculation, exceeds the scope of today's deposition
23 notice.
24    MR. ARHANGELSKY:  And just, you know, in response to
25 the objection, Mr. Darnell, are you contending that this

30(b)(6) Scott J.  Ferrell
April 01, 2021

82..85
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

**Atkinson-Baker, a Veritext Company**
**www.depo.com**

Page 86

1  document is not related to facts and evidence concerning
2  NTG's case management systems and procedures?
3      MR. DARNELL:  Have you established --
4      MR. ARHANGELSKY:  (Inaudible).
5      MR. DARNELL:  I'm sorry.  I missed the latter part,
6  Counsel.
7      MR. ARHANGELSKY:  I want to make sure I understand
8  your objection.  Are you asserting that this document is
9  not relevant to NTG's case management systems and
10  procedures?
11      MR. DARNELL:  I don't think I've heard that question
12  yet and I've not heard a foundation from this witness
13  establishing that this document means anything related to
14  case management systems or procedures.  And my
15  understanding --
16      MR. ARHANGELSKY:  I just want to understand --
17      MR. DARNELL:  My understanding of case management
18  systems is far different from yours especially when you
19  read the last section of Topic 6, document retention
20  policies, case management systems and procedures and
21  document retention policies.  If you want to ask this
22  witness if this document reflects a case management
23  system, please ask that question.
24      MR. ARHANGELSKY:  I think the document speaks for
25  itself, Mr. Darnell, and I think whether your witness is

Page 87

1  adequately prepared for this topic is an issue we'll have
2  to address at some other time.  But right now I just want
3  to understand your objection.
4      MR. DARNELL:  Documents do not speak for themselves,
5  so I respectfully disagree with that.  And topics do not
6  speak for themselves.  We have questions and we have
7  topics and we have interpretation of rational, reasonable
8  language.  I believe that you have yet to lay a foundation
9  and I believe that your question exceeds the scope.  That
10  was the basis of my objection.
11      THE WITNESS:  Let me weigh in here, gentlemen.  I'll
12  just tell you that independent of your dispute I intend to
13  give my best testimony and testify to the best of my
14  recollection today regardless of whether a particular
15  document or topic is inside or outside the proper scope of
16  the deposition.
17  BY MR. ARHANGELSKY:
18      Q    Mr. Ferrell, what does it mean when a call is
19  minimally bypassed by NTG?
20      A    The way you phrased the question is an
21  impossibility.
22      Q    When it says minimal bypass on this chart, what
23  does that mean?
24      MR. DARNELL:  Objection, lacks foundation, exceeds the
25  scope.

Page 88

1      THE WITNESS:  I don't know.
2  BY MR. ARHANGELSKY:
3      Q    And in the context of a CIPA case, what is
4  minimal bypass?
5      MR. DARNELL:  Objection, vague.
6      THE WITNESS:  I don't know.
7  BY MR. ARHANGELSKY:
8      Q    What does it mean when a call is designated
9  Follow Prompts To Live Human?
10      MR. DARNELL:  Objection, lacks foundation, exceeds the
11  scope.
12      THE WITNESS:  I don't know.
13  BY MR. ARHANGELSKY:
14      Q    And what is the difference between a warning that
15  can be minimally bypassed versus a warning that is just
16  bypassed?
17      MR. DARNELL:  Objection, lacks foundation, exceeds the
18  scope.
19      THE WITNESS:  I'm sorry.  Can you contextualize that
20  for me?  What are you referring to about a warning?
21  BY MR. ARHANGELSKY:
22      Q    Does the word minimally in the -- in the phrase
23  minimal bypass does the word minimal have any significance
24  to you?
25      A    Yes.  It modifies the word bypass and it's an

Page 89

1  adjective.
2      Q    So what is the difference between a bypass versus
3  a minimal bypass in context with CIPA cases that NTG
4  pursues?
5      MR. DARNELL:  Objection, exceeds the scope.
6      THE WITNESS:  Other than my understanding of ordinary
7  lexicon in which the word minimal modifies the word
8  bypass, I don't know.  But you're also referring to a
9  warning and I'm not seeing what you're referring to.
10  Excuse me.  Is there another column on here that
11  references something I should look at?  Because I am lost.
12  BY MR. ARHANGELSKY:
13      Q    This is -- I will represent this was the document
14  provided to NIC in discovery.
15      A    Okay.
16      Q    And do you know what the difference here on this
17  chart is between a Minimal Bypass call and a Follow Prompt
18  To Live Human?
19      MR. DARNELL:  Objection, lacks foundation and exceeds
20  the scope.
21      THE WITNESS:  I do not.
22  BY MR. ARHANGELSKY:
23      Q    Who at NTG determines whether it's an MB, STLH,
24  or a FPLH with the phone numbers listed here in this
25  chart?

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 90

1    MR. DARNELL:  Objection, lacks foundation, exceeds the
2  scope.
3    THE WITNESS:  I think you're misunderstanding
4  something.  I don't think anyone at NTG made those
5  determinations.  This appears to me to have been a -- a
6  data dump from a website that has some kind of
7  designations on it.
8  BY MR. ARHANGELSKY:
9    Q    So your testimony is you believe these codes FPLH
10  and whatnot -- those were not created by NTG?
11    MR. DARNELL:  Objection, lacks foundation, exceeds the
12  scope.
13    THE WITNESS:  I would just be guessing.
14  BY MR. ARHANGELSKY:
15    Q    All right.  And then -- oh, in the right-hand
16  column where it says Retainer Status, let's look at the
17  first one for Credit Guard of America.  It says 6/5
18  screening new rep.  What does that mean to you?
19    MR. DARNELL:  Objection, lacks foundation, exceeds the
20  scope.
21    THE WITNESS:  I don't know as applied here.
22  BY MR. ARHANGELSKY:
23    Q    Isn't it true that NTG's field reps. would make
24  exploratory calls known as audit calls to determine
25  whether a phone line was recorded or monitored?

Page 91

1    MR. DARNELL:  Objection, exceeds the scope.
2    THE WITNESS:  No.  That's -- that's not accurate.
3  It's close.
4  BY MR. ARHANGELSKY:
5    Q    You specifically asked field representatives to
6  audit phone numbers to determine whether they were
7  recorded or monitored; is that correct?
8    MR. DARNELL:  Objection, exceeds the scope.
9    THE WITNESS:  No.  That's not correct.  I asked Andrew
10  to audit numbers, but your question implies a
11  misunderstanding of the statute.
12  BY MR. ARHANGELSKY:
13    Q    Did Andrew Baslow call toll-free numbers for the
14  purposes of identifying CIPA violations?
15    MR. DARNELL:  Objection, exceeds the scope.
16    THE WITNESS:  I believe he did so for the purpose of
17  investigating but --
18  BY MR. ARHANGELSKY:
19    Q    So, yes, he did?
20    A    No.  I -- I don't think that a person can
21  identify a CIPA violation in that manner.
22    Q    Did Mr. -- I'm going to ask the question again
23  because I don't know if I actually had an answer to that.
24    Did Andrew Baslow call toll-free numbers for the
25  purpose of investigating or identifying CIPA violation?

Page 92

1    MR. DARNELL:  The question is disjunctive.  It's
2  impossible to answer as such and it also exceeds --
3    MR. ARHANGELSKY:  Let me rephrase it then.  Let's make
4  sure we're clear on this.
5    Q    Did Andrew Baslow call toll-free numbers for the
6  purpose of investigating CIPA violations?
7    MR. DARNELL:  Objection, exceeds the scope.
8    THE WITNESS:  I think the most accurate way to answer
9  that is that before we would ever file a lawsuit on behalf
10  of a plaintiff we would try to reach a consensus or
11  determination about whether the information that they had
12  provided to our client was true or false.  Because the
13  attorney who referred this line of cases to me, the D.A.'s
14  office, said that one of the reasons it was difficult for
15  them to pursue them was because companies were lying about
16  whether they were recording --
17    MR. ARHANGELSKY:  Okay.  I'm going to move to strike
18  this entire response as unresponsive.  This is a narrative
19  answer that is not responsive to the question,
20  Mr. Ferrell.  It was a --
21    Q    Let me ask this question:  Yes or no, did
22  Andrew Baslow call toll-free numbers for the purpose of
23  investigating CIPA violations?
24    MR. DARNELL:  Objection, exceeds the scope.
25    THE WITNESS:  I believe so.

Page 93

1  BY MR. ARHANGELSKY:
2    Q    And did Andrew Baslow make those investigatory
3  calls before speaking with class representatives in those
4  wiretap cases --
5    MR. DARNELL:  Objection --
6  BY MR. ARHANGELSKY:
7    Q    -- related to the phone numbers he called?
8    MR. DARNELL:  I'm sorry.  Objection, exceeds the
9  scope, compound.
10    MR. RIDDLES:  Objection, calls for speculation.
11    THE WITNESS:  I don't think so, if I understand your
12  question correctly.  But you're asking me about sequencing
13  of things that took place approximately a decade ago, so I
14  would need to review the documents to know for sure.
15  BY MR. ARHANGELSKY:
16    Q    Would any of the information from Andrew Baslow's
17  investigatory calls wind up in the chart that I have
18  displayed here as Exhibit 630?
19    MR. DARNELL:  Objection, lacks foundation, exceeds the
20  scope.
21    MR. RIDDLES:  Objection, vague.
22    THE WITNESS:  I don't know whether this chart has any
23  relation to Andrew or whether it relates to investigatory
24  calls that he did or not.  Andrew doesn't appear to have
25  any connection to this chart.

30(b)(6) Scott J.  Ferrell
April 01, 2021

90..93
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

**Page 94**

1  BY MR. ARHANGELSKY:
2    Q    If a warning could be bypassed by the caller,
3  would that information then be included in this chart
4  using the MB designation for minimal bypass?
5    MR. DARNELL:  Objection, lacks foundation, calls for
6  speculation, incomplete hypothetical.
7    THE WITNESS:  I'm sorry.  I do not know what you're
8  talking about.  Can you tell me about the warnings that
9  you keep referencing?
10  BY MR. ARHANGELSKY:
11    Q    Was Mr. Baslow's job in any part to help identify
12  whether call warnings on toll-free numbers -- excuse me.
13  Strike that.
14          Was Mr. Baslow ever instructed by NTG to
15  determine whether he could bypass a disclosure on a
16  toll-free number indicating that a call was recorded?
17    MR. DARNELL:  Objection, exceeds the scope.
18    THE WITNESS:  I have no idea what you're talking
19  about.
20  BY MR. ARHANGELSKY:
21    Q    Was Mr. Baslow ever asked by NTG to determine
22  whether or not a recording disclosure could be bypassed on
23  a toll-free number?
24    MR. DARNELL:  Objection, exceeds the scope, vague.
25    THE WITNESS:  I tried to give you this answer before,

**Page 95**

1  but you cut me off.  Would you like me to give it to you
2  again?
3  BY MR. ARHANGELSKY:
4    Q    I think it's a yes-or-no answer.  Was he ever
5  instructed to determine whether or not calls recording
6  disclosures could be bypassed, yes or no?
7    A   As I sit here today, I don't know.
8    Q    Did Mr. Baslow receive any instruction from NTG
9  on how to conduct audit calls for the wiretapping
10  investigations?
11    A   Yes.
12    MR. DARNELL:  Objection, exceeds the scope.
13  BY MR. ARHANGELSKY:
14    Q    And who gave him those instructions?
15    A   I did.
16    MR. DARNELL:  Same objection.
17  BY MR. ARHANGELSKY:
18    Q    And what was Mr. Baslow's instruction with
19  respect to his investigation for audit calls?
20    MR. DARNELL:  Objection.  There's no topic that
21  relates to any investigation.  In fact, that topic was
22  expressly struck down by the special master.  This
23  question and this line of question far exceeds the scope.
24    MR. ARHANGELSKY:  You can make your objection it's
25  outside the scope, otherwise, you're impeding the

**Page 96**

1  deposition.
2    MR. DARNELL:  I am not impeding the deposition.  I
3  have not instructed the witness not to answer.  I am
4  asserting objections for the record and I am being
5  specific as required under the federal rules of civil
6  procedure.  Please proceed.
7    MR. ARHANGELSKY:  We have your objection taken.
8  Please allow the witness to answer the questions,
9  Mr. Darnell.
10    THE WITNESS:  If you guys are done, I'll give you my
11  best answer.
12          When I started investigating this line of cases,
13  I sat down with Andrew and I explained to him what the
14  attorney from the D.A.'s office had told me which was that
15  there was a massive ongoing criminal violation of certain
16  companies recording consumer telephone calls illegally to
17  gather information from the customers, to data harvest,
18  and to obtain biometric information about them and that
19  California law was intended to prevent them from doing it
20  but that those companies who were knowingly violating the
21  law would never give a straight answer about whether they
22  were doing it.
23          For example, if you call and ask a company's
24  customer service representative if the call is being
25  recorded, that customer service representative's answer is

**Page 97**

1  as likely to be false as it is to be true.  Some companies
2  would claim that they only recorded calls at certain times
3  of the day.  Some companies would claim that they only
4  recorded calls when they were being disclosed.
5          And the D.A. who referred it to me told me that
6  they ultimately decided not to pursue those cases because
7  of the difficulty in trying to get to the bottom of when
8  the violations were taking place.
9    MR. ARHANGELSKY:  Mr. Ferrell, this is a narrative
10  answer that is in no way responsive to the question that
11  was posed.  We're going move to strike this answer yet
12  again.  I'm going to ask the question that I asked.
13    Q    What instructions did you give Mr. Baslow with
14  respect to his audit calls made to toll-free companies?
15    MR. DARNELL:  Objection, exceeds the scope.
16    THE WITNESS:  Counsel, I was just telling you those
17  instructions, that I sat --
18    MR. ARHANGELSKY:  You were not.
19    MR. DARNELL:  Okay.
20  BY MR. ARHANGELSKY:
21    Q    Please tell me what the instructions were that
22  you gave Mr. Baslow.
23    A   Counsel, I'm going to ask you again to not
24  interrupt me.  I've been treating you with the respect
25  that these proceedings deserve and not interrupting your

30(b)(6) Scott J.  Ferrell
April 01, 2021

94..97
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 98

1  questions.  And I understand that the truthful answers
2  that I give you are counter to the false narrative that
3  your client's been propagating, but I'm entitled to give
4  the best answers to your questions.
5     Q    Mr. Ferrell, we have a limited amount of time in
6  this deposition today which we obviously will probably be
7  moving to extend given your conduct here today.  I would
8  like straight answers to the questions and not narrative
9  responses on irrelevant content.
10         I'll ask the question again and I expect an
11  answer, please.  Thank you.
12         What instructions did you provide to Mr. Baslow
13  concerning his audit calls to toll-free numbers?
14     MR. DARNELL:  Objection, exceeds the scope.
15     THE WITNESS:  In addition to the other things I just
16  related to you, I told Andrew, as I always do, that we
17  should act in accordance with the duties that we've set
18  forth which are to act ethically and honestly at all times
19  when trying to eradicate fraud on consumers.
20     MR. ARHANGELSKY:  I've placed another exhibit in front
21  of the witness which I've marked as Exhibit 631.  This
22  document has a Bates number of NTG 67124.
23     (Plaintiff's Exhibit 631 was marked for identification.)
24  BY MR. ARHANGELSKY:
25     Q    Mr. Ferrell, do you see that exhibit?

Page 99

1     A    Okay.  I see this exhibit.
2     Q    And here I'd say about -- in the bottom third of
3  the page, there's an email from David Reid to you on
4  May 7, 2015, in which Mr. Reid asks Should we also have
5  Baz screen these companies' 800 numbers for WT violations,
6  smiley face.  Do you see that?
7     A    I do.
8     Q    And then your response on May 7th higher on this
9  page is LOL, yes, comma, yes, comma, and yes.  Great
10  minds.  Do you see that?
11     A    Are you intentionally skipping over the
12  interaction in-between that?
13     Q    I was, but if it's relevant, I mean, please
14  review that, too.
15     A    Okay.
16     Q    And I think just for the record, and you can
17  correct me if I'm wrong, the intervening email was also
18  from David Reid to you and he wrote For that matter any of
19  them that maintain physical locations or sales we should
20  run through the WAVE analysis.  Did I read that correctly?
21     A    Yes.
22     Q    And then your response -- LOL yes, yes, and yes.
23  Great minds was in response to those emails, correct?
24     A    I know that it came subsequent to these emails.
25  I don't know whether it was in response to one or both as

Page 100

1  I sit here.
2     Q    Where Mr. Reid wrote that we should have Baz
3  screen for WT violations, did you understand that to mean
4  wiretap violations?
5     MR. DARNELL:  Objection, exceeds the scope.
6     THE WITNESS:  I don't know what I understood this
7  email to mean six years ago.
8  BY MR. ARHANGELSKY:
9     Q    So his phrase, screen these companies'
10  800 numbers for WT violations, you did not interpret that
11  to mean wiretap violations?
12     MR. DARNELL:  Objection, exceeds the scope.
13     THE WITNESS:  What I said is I don't know how I
14  interpret this email from six years ago.
15  BY MR. ARHANGELSKY:
16     Q    And when Mr. Reid wrote We should run through the
17  WAVE analysis, the WAVE analysis is something NTG uses in
18  context with ADA cases; is that right?
19     MR. DARNELL:  Objection, exceeds the scope.
20     THE WITNESS:  Yes.  The WAVE analysis is a tool that
21  relates to the accessibility of on-line websites and
22  related items.
23  BY MR. ARHANGELSKY:
24     Q    And when you wrote back Yes, yes, and yes, were
25  you agreeing with Mr. Reid that the NTG firm should

Page 101

1  investigate potentially three lawsuits against these
2  companies?
3     MR. DARNELL:  Objection, exceeds the scope.
4     THE WITNESS:  I'm sorry.  What three lawsuits are you
5  suggesting exist here?
6  BY MR. ARHANGELSKY:
7     Q    I'm asking what you meant when you said Yes, yes,
8  and yes.  Maybe you could explain what that means.
9     MR. DARNELL:  Objection, asked and answered, exceeds
10  the scope.
11     THE WITNESS:  I -- other than noting that I said LOL,
12  laughing at loud, yes, yes, and yes, I don't know for
13  sure.  But it appears to be my use of the euphemism, yes,
14  yes, and yes as being very enthusiastic because I don't
15  see a reference to any three lawsuits to answer your
16  question.
17  BY MR. ARHANGELSKY:
18     Q    Okay.  On page 2 you wrote to Katherine Kirshner
19  and you talked in the third paragraph -- excuse me.  On
20  the first paragraph you're talking with Ms. Kirshner about
21  charts that track the status of cellulite lawsuits.  You
22  wrote Similar to how the charts track the status of our
23  ADA and wiretap lawsuits.  Do you see that?
24     A    Okay.  I do see that.
25     Q    So you knew at least in May of 2015 that the NTG

30(b)(6) Scott J. Ferrell
April 01, 2021

98..101
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 102

1   firm had charts that track the status of ADA and wiretap
2   lawsuits.  Is that fair?
3        A    That appears to be the case.
4        Q    How often did Baslow work on wiretap cases for
5   the firm?
6        MR. DARNELL:  Objection, exceeds the scope.
7        THE WITNESS:  I think it depended on --
8        MR. ARHANGELSKY:  Yeah.  Let me clarify, if you would,
9   and I apologize for interrupting.
10       Q    How often would Andrew Baslow work on wiretap
11  cases for the NTG firm between the years of 2012 and 2015?
12       MR. DARNELL:  Same objection.
13       THE WITNESS:  I think it depends on workload and what
14  matters our cases brought us -- matters our clients
15  brought us.
16  BY MR. ARHANGELSKY:
17       Q    So with respect to the wiretapping cases, would
18  Mr. Baslow ever investigate a potential CIPA violation
19  before the law firm had a client?
20       MR. DARNELL:  Objection, exceeds the scope.
21       THE WITNESS:  I'm sorry.  Which case are you talking
22  about?
23  BY MR. ARHANGELSKY:
24       Q    In CIPA cases generally did Mr. Baslow ever
25  investigate potential CIPA violations before NTG had

Page 103

1   clients --
2        MR. DARNELL:  Objection --
3   BY MR. ARHANGELSKY:
4        Q    -- with respect to certain companies?
5        MR. DARNELL:  I'm sorry.  I thought you paused and
6   were done, Peter.
7             Objection, exceeds the scope.
8        THE WITNESS:  Certainly before pursuing or evaluating
9   any line of cases we would investigate to determine
10  whether there were violations of the law going on and I
11  think I tried to tell you that when I was telling you
12  about the conversation I had with Andrew after learning
13  about these violations by the D.A.
14  BY MR. ARHANGELSKY:
15       Q    And it's true, is it not, that Mr. Baslow would
16  make those calls before NTG had a client retained to
17  pursue litigation with respect to the toll-free numbers
18  Baslow called?
19       A    No.  I don't think that's true.  I think you're
20  wrong.
21       MR. DARNELL:  And I'll object that question exceeds
22  the scope.
23  BY MR. ARHANGELSKY:
24       Q    Did Mr. Baslow call the Himalaya Drug Company to
25  investigate a potential CIPA violation before NTG had a

Page 104

1   client retained to sue Himalaya?
2        MR. DARNELL:  Objection, exceeds the scope.
3        THE WITNESS:  I don't think I understand your
4   question.  But can you show me the documents that you're
5   referring to that would enable me to see the process flow
6   here?
7   BY MR. ARHANGELSKY:
8        Q    I'm just asking you a question.  Did Mr. Baslow
9   contact Himalaya Drug Company to audit for CIPA violation
10  before NTG had a client retained in relation to the
11  Himalaya case?
12       MR. DARNELL:  Objection --
13  BY MR. ARHANGELSKY:
14       Q    It's a yes-or-no question.
15       MR. DARNELL:  Objection, exceeds the scope.
16       THE WITNESS:  Not that I know of.  But to clarify, I
17  believe there are documents that exist from which the
18  answer to that could be discerned.
19  BY MR. ARHANGELSKY:
20       Q    Would it have been improper for Mr. Baslow to
21  call to investigate the Himalaya Drug Company for a CIPA
22  violation before NTG had a client?
23       MR. DARNELL:  Objection, incomplete hypothetical,
24  exceeds the scope.
25       THE WITNESS:  How could that be improper to do due

Page 105

1   diligence before proceeding with a case?  I think it's
2   mandatory -- please don't interrupt me.
3        Q    Well, I --
4        A    Please do not interrupt me.
5        Q    The question's not -- the answer's not
6   responsive.  It's a yes-or-no question.
7        A    Obviously it would not be improper to research
8   cases to determine whether they had a viable basis before
9   proceeding with them.  If I'm missing something, please
10  help me.
11       Q    Did you perform that research -- did you perform
12  that research prior to having a client retained for
13  litigation?
14       MR. DARNELL:  Objection, vague as phrased, exceeds the
15  scope.
16  BY MR. ARHANGELSKY:
17       Q    With respect to the Himalaya Drug case did you
18  perform that research prior to having a client retained
19  for litigation?
20       MR. DARNELL:  Objection, vague as phrased, exceeds the
21  scope.
22       THE WITNESS:  Are you referring to my research?
23  BY MR. ARHANGELSKY:
24       Q    NTG.  Did NTG perform an investigatory audit call

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 106

1  of Himalaya prior to having a client retained for
2  litigation?
3      MR. DARNELL:  Objection, exceeds the scope.  This
4  topic has been expressly struck by the special master.
5      THE WITNESS:  Okay.  So that's an entirely different
6  question than you just asked me.  Did you withdraw the
7  prior question or do you want an answer to this question?
8      MR. ARHANGELSKY:  Why don't you answer the question I
9  just asked, please, Mr. Ferrell.
10     THE WITNESS:  Okay.  I think you're asking whether I
11  undertook any investigation prior to pursuing the CIPA
12  cases including the Himalaya wire case.  And the answer is
13  obviously yes.
14     MR. ARHANGELSKY:  No.  That's not the question,
15  Mr. Ferrell.
16         Can the reporter please read back the last
17  question I posed to the witness?
18     THE WITNESS:  Madam Court Reporter, could you
19  contextualize it?  Can you read the last two questions?
20  Because I may conflating them.
21         (WHEREUPON, THE RECORD WAS READ BY THE COURT
22  REPORTER AS FOLLOWS:
23         "Question:  With respect to the Himalaya Drug
24  case did you perform that research prior to having
25  a client retained for litigation?

Page 107

1      "MR. DARNELL:  Objection, vague as phrased,
2  exceeds the scope.
3      "THE WITNESS:  Are you referring to my
4  research?
5      "BY MR. ARHANGELSKY:
6      "Question:  NTG.  Did NTG perform an
7  investigatory audit call of Himalaya prior to
8  having a client retained for litigation?")
9      THE WITNESS:  So it looks like I tried to answer the
10  first question.  The second question --
11  BY MR. ARHANGELSKY:
12     Q    Please answer the last question that was posed to
13  you.  Yes or no?
14     A    I would have to look at the documents to know for
15  sure.
16     Q    Sitting here right now you don't know whether NTG
17  or Mr. Baslow contacted Himalaya before it had a client
18  involved with the Himalaya Drug case?
19     MR. DARNELL:  Objection, exceeds the scope.
20     THE WITNESS:  I know we did not send a demand letter
21  to Himalaya until we had a client.  Is that what you're
22  asking?
23     MR. ARHANGELSKY:  That was not the question.
24     THE WITNESS:  Okay.  If you could --
25     MR. ARHANGELSKY:  Please read back the last question,

Page 108

1  Madam Reporter.
2         (WHEREUPON, THE RECORD WAS READ BY THE COURT
3  REPORTER AS FOLLOWS:
4         "Question:  NTG.  Did NTG perform an
5  investigatory audit call of Himalaya prior to
6  having a client retained for litigation?")
7      THE WITNESS:  I don't know.  But if you show me the
8  date of our client's engagement letter and the client's
9  summary, I can probably help you reach that answer.
10  BY MR. ARHANGELSKY:
11     Q    Okay.  I am directing you back to the exhibit
12  that is marked as Plaintiff's Exhibit 630 which again has
13  Bates No. NTG 66663 and I'm specifically directing you to
14  page 5 of this exhibit which has Bates number at the
15  bottom NTG 66667 and the top -- the heading at the top is
16  Wiretap Cases-Scott Shepherd.  Do you see that,
17  Mr. Ferrell?
18     A    I do.
19     Q    And under the first heading and -- sorry.
20         The first entry for Home Shopping Network in the
21  right most column for retainer status, it says AB
22  confirmed to pursue.  Do you see that?
23     A    I do.
24     Q    Is AB the initials for Andrew Baslow?
25     MR. DARNELL:  Objection, lacks foundation for this

Page 109

1  document, exceeds the scope.
2      THE WITNESS:  Certainly Andrew Baslow's initials are
3  AB.
4  BY MR. ARHANGELSKY:
5      Q    But you don't know whether or not in this
6  document AB confirmed to pursue references Andrew Baslow's
7  investigation of wiretap cases?
8      MR. DARNELL:  Same objection.
9      THE WITNESS:  I don't.  This appears to be wiretapping
10  cases either referred to or referred by another firm.
11  BY MR. ARHANGELSKY:
12     Q    Did Andrew Baslow perform work in relation to
13  Home Shopping Network wiretapping case?
14     MR. DARNELL:  Objection, exceeds the scope, lacks
15  foundation.
16     THE WITNESS:  As I sit here, I don't know.
17  BY MR. ARHANGELSKY:
18     Q    Do you know what factors would go into the
19  determination as to whether Mr. Baslow confirmed a
20  wiretapping case to pursue?
21     MR. DARNELL:  Objection, vague, incomplete
22  hypothetical, lacks foundation to the question that is
23  being asked, and exceeds the scope.
24     THE WITNESS:  Your question betrays a misunderstanding
25  of quite a few things.  But Andrew Baslow is not the one

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 110

1  who makes a determination about whether we pursue a
2  particular case or not.
3  BY MR. ARHANGELSKY:
4       Q     Where it says AB confirmed to pursue, what does
5  that mean to you in this context in wiretapping cases?
6       MR. DARNELL:  Objection, lacks foundation as to this
7  document, exceeds the scope.
8       THE WITNESS:  This looks like a collection of cases
9  that were referred to us or from us from Scott Shepherd
10  and I don't --
11  BY MR. ARHANGELSKY:
12      Q     Were these --
13      A     I'm sorry.  Go ahead.
14      Q     Under what circumstances would the NTG firm refer
15  out a wiretap case to another attorney or firm as opposed
16  to handling that in-house?
17      A     Depends on a variety of factors.
18      Q     Well, let's talk specifically about the Demulder
19  case.  NTG referred that case out, did it not?
20      A     I believe we referred that case to Kirtland &
21  Packard.
22      Q     And what was the reason for NTG referring that
23  case to Kirtland & Packard?
24      A     It would have been an initial determination that
25  the company was in violation of the law, that the case had

Page 111

1  merit, and that Kirtland & Packard was a trusted
2  litigation partner who had asked for referrals.
3       Q     And you mentioned there had been a determination
4  that the company was in violation of law.  When did that
5  determination occur in the Demulder case?
6       MR. DARNELL:  Objection, exceeds the scope.
7       THE WITNESS:  I'm not sure.  Can you show me what
8  document you're referring to?
9  BY MR. ARHANGELSKY:
10      Q     I'm just asking you whether you know.
11      MR. DARNELL:  Objection, exceeds the scope.
12      THE WITNESS:  As I sit here, I believe it's undisputed
13  that the defendant in that case was violating the law.  I
14  believe they've admitted that.
15  BY MR. ARHANGELSKY:
16      Q     But my question was when did NTG determine that?
17      A     Conclusively?  Possibly after they admitted it.
18      Q     I didn't ask conclusively.  When did NTG first
19  determine that Carter-Reed -- I'll ask a different
20  question, so strike the last question.
21            When did NTG first determine that Carter-Reed may
22  be violating the CIPA statute?
23      MR. DARNELL:  Objection, exceeds the scope.
24      THE WITNESS:  I don't know.  I would have to look at
25  the documents that would reflect the process flow.

Page 112

1  BY MR. ARHANGELSKY:
2       Q     And who at NTG would have been responsible --
3  strike that.
4            Who at NTG was responsible for determining
5  whether Carter-Reed violated the CIPA statute?
6       A     I was.
7       MR. DARNELL:  Objection, exceeds the scope.
8  BY MR. ARHANGELSKY:
9       Q     Did Mr. Baslow have any role in that
10  investigation?
11      A     So are you referencing our investigation of
12  whether they were violating the law or my determination
13  that they were violating the law?
14      Q     Let's talk about the investigation.  Did
15  Mr. Baslow have any role in the investigation?
16      A     As I sit here, I don't know.
17      MR. DARNELL:  Objection.  That last question also
18  exceeded the scope.
19  BY MR. ARHANGELSKY:
20      Q     Who is Scott Shepherd?
21      A     Scott is one of the most prominent and
22  well-respected consumer class action attorneys in the
23  United States.
24      Q     Did NTG have a referral arrangement with
25  Mr. Shepherd concerning CIPA cases?

Page 113

1       A     I know that we had a master referral agreement
2  with Scott Shepherd and, as I sit here, I don't know
3  whether that involved CIPA cases or not.
4       Q     At the top of this document that's on screen
5  marked as Exhibit 630 and on page 5 of that exhibit which
6  I believe you should be looking at, there are -- there's a
7  line that says Referral Terms.  Do you see that?
8       A     I do.
9       Q     And it says Prefiling:  20 percent NTG, slash,
10  80 percent SFMS.  What does SFMS stand for?
11      MR. DARNELL:  Objection, lacks foundation, exceeds the
12  scope.
13      THE WITNESS:  Well, SF are my initials.  I don't know
14  what MS means, but that entry appears not to make sense
15  because there would be no referral relationship between me
16  and NTG.
17  BY MR. ARHANGELSKY:
18      Q     Right.  Could that acronym refer to a law firm
19  that Scott Shepherd was part of?
20      A     I don't know.
21      Q     Did the NTG firm have similar referral
22  arrangements with other law firms in wiretapping cases?
23      MR. DARNELL:  Objection, exceeds the scope.
24      THE WITNESS:  I know they had a similar referral --
25  master referral agreements.  I don't know which cases or

30(b)(6) Scott J.  Ferrell
April 01, 2021

110..113
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 114

1  which lines of cases they related to.
2  BY MR. ARHANGELSKY:
3      Q    You've referred clients -- I believe you
4  testified that you've referred clients to Kirtland &
5  Packard in the CIPA context.
6      A    Yes.
7      Q    Do you know how many cases NTG referred to
8  Kirtland & Packard in the CIPA context?
9      A    I don't recall.
10     Q    Did the NTG firm have referral arrangements with
11 other firms for CLRA cases?
12     A    I know we had master referral agreements, but
13 they typically did not identify particular lines of cases;
14 because we got so many inquiries based on my lecturing and
15 the lines of cases that would be referred to us that it
16 was a constantly evolving situation.
17     Q    Were those referral agreements generally reduced
18 to writing?
19     A    I believe they were always reduced to writing.
20     Q    All right.  Before I go to the next section, I
21 guess it's worth asking whether or not it makes sense to
22 break for lunch.  Is this -- would this be an appropriate
23 time?
24     A    Excuse me.  I think our lunch is expected to
25 arrive at around 1:00 p.m.  So I'm happy to go for another

Page 115

1  half an hour, but I want to be mindful of everyone else's
2  circumstances, as well.
3         The court reporter says she's good.
4      MR. ARHANGELSKY:  Let's go until your lunch arrives.
5         Now I've placed a document on screen for the
6  witness which we've marked as Exhibit 632.
7  (Plaintiff's Exhibit 632 was marked for identification.)
8  BY MR. ARHANGELSKY:
9      Q    Mr. Ferrell, do you recognize this document?
10     A    I'm reviewing it right now.
11        Okay.  I've reviewed this document.
12     Q    Okay.  On page 2 which is -- has the
13 Bates No. NTG 66449 at the bottom and in the paragraph
14 which is numbered no. 3, you wrote as the second sentence
15 I imagine we should be sending out about 20 demand letters
16 a week between the ADA websites, wiretaps, and Strataluz
17 stuff and probably filing at least an average of three
18 cases per week.  Do you see that?
19     A    I do.
20     Q    Now, in this period of time did NTG hit its goal
21 of sending 20 demand letters per week?
22     MR. DARNELL:  Objection, mischaracterizes the
23 document, exceeds the scope.
24     THE WITNESS:  I don't think that's properly described
25 as a goal.  I think it was a reflection of the fact that

Page 116

1  we were being overwhelmed with potential plaintiff cases
2  and we were discussing formalizing the paperwork between
3  Carla and Mandy.  If your question is did we end up
4  sending out an average of 20 demand letters per week, then
5  the answer is no.
6  BY MR. ARHANGELSKY:
7      Q    In 2015, could you approximate how many demand
8  letters per week the NTG firm was sending?
9      MR. DARNELL:  Objection, as phrased exceeds the scope.
10     THE WITNESS:  Nowhere near 20, but I can certainly
11 review any documents that might reflect that.
12 BY MR. ARHANGELSKY:
13     Q    NTG filed a complaint on behalf of Sam Schoonover
14 in March 2012 against Vogue International; is that right?
15     A    I know that we filed a case against Vogue in
16 which Mr. Schoonover was the plaintiff.  I don't know the
17 precise date.  But if you show it to me, I can confirm
18 that your date is accurate.
19     Q    Was Andrew Baslow the field representative who
20 worked with Sam Schoonover in that case?
21     A    I believe so.
22     Q    NTG only had two field reps. at the time; is that
23 right?
24     A    That is correct.
25     Q    That was Mr. Baslow and your father Wynn Ferrell,

Page 117

1  correct?
2      A    That's correct.
3      Q    Did you ask Mr. Baslow to find class
4  representatives for litigation against Vogue
5  International?
6      MR. DARNELL:  Objection.  That exceeds the scope.
7      THE WITNESS:  No.  I don't believe so.
8  BY MR. ARHANGELSKY:
9      Q    Did you ask Mr. Baslow to contact Mr. Schoonover
10 in relation to the Vogue case?
11     MR. DARNELL:  Objection, exceeds the scope.
12     THE WITNESS:  I know that Andrew and I had a
13 discussion about Mr. Schoonover and the Vogue case and
14 that Mr. Schoonover had used their products repeatedly
15 believing that they were organic and had complained to
16 Andrew or to someone that came back to Andrew that he was
17 angry that the products were not organic and I know that
18 we had that discussion.
19 BY MR. ARHANGELSKY:
20     Q    And when exactly was that discussion you had that
21 with Mr. Baslow?
22     MR. DARNELL:  Objection, exceeds the scope.
23     THE WITNESS:  It was a decade ago.  I don't know the
24 precise date.
25 ///

30(b)(6) Scott J.  Ferrell
April 01, 2021

114..117
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 118

1   BY MR. ARHANGELSKY:

2       Q      Okay.  Was that conversation with Mr. Baslow on

3   the phone?

4       MR. DARNELL:  Same objection.

5       THE WITNESS:  I don't know whether it was on the

6   phone, in person, or a combination of the prefatory work

7   being done in email and then having an in-person or a

8   phone conversation.

9   BY MR. ARHANGELSKY:

10      Q      And so what exactly did Mr. Baslow tell you about

11  Mr. Schoonover at the time?

12      MR. DARNELL:  Objection, exceeds the scope.

13      THE WITNESS:  A student named Talee Rooney had either

14  attended one of my lectures or seen one of my lectures in

15  a class and had been inspired by it and wanted to

16  participate in trying to make the consumer marketplace a

17  safer place for consumers.  Somehow she put us in touch or

18  put Mr. Schoonover in touch with us.  At the time

19  greenwashing or describing something as organic when it

20  really was not as very topical.  Mr. Schoonover had used

21  a product manufactured by Organics, a shampoo and

22  conditioner, for several years believing that it was

23  organic since its name was Organics.  And around the same

24  time we started investigating the OGX company for this

25  greenwashing, we learned that Mr. Schoonover had a

Page 119

1   complaint against them and would be ideally situated to

2   advance the cause of consumer justice as it relates to

3   them.

4   BY MR. ARHANGELSKY:

5       Q      And so this was information Mr. Baslow provided

6   to you about Mr. Schoonover, right?

7       A      I don't know if all this is information that

8   Mr. Baslow provided to me or if it is information that

9   I've gathered from the review of documents and the review

10  of testimony.  But some combination of that, yes.

11      Q      Is it your testimony that Talee Rooney introduced

12  Mr. Schoonover to the NTG firm or to Mr. Baslow?

13      A      So to be clear it's my understanding that

14  Ms. Rooney saw one of my lectures, attended one of my

15  lectures with an attorney, somehow was inspired and that

16  she was a connection to Mr. Schoonover.

17      Q      And who told you that information, Mr. Ferrell?

18      A      In addition and aside from excluding

19  communication I've had with counsel, I saw that in

20  deposition testimony, in contemporaneous documents, and

21  had that conversation with Andrew Baslow.

22      Q      So you were first notified of Vogue

23  International's alleged greenwashing via Sam Schoonover?

24      A      I don't think that's fair to say.

25      Q      And when did NTG first learn of Vogue

Page 120

1   International greenwashing?

2       A      As I sit here a decade later, I don't know for

3   sure.  But I suspect that there are documents that would

4   reflect the process flow in which Organics' criminal

5   activities came on to our radar screen.

6       Q      And those documents have all been produced to NIC

7   in discovery?

8       A      To the extent that those documents exist, are

9   responsive, and are in our possession, custody, or

10  control, they've been transmitted to our counsel and our

11  counsel has complied with all discovery obligations.

12      Q      What was the first date on which the NTG firm or

13  any of its agent spoke with Mr. Schoonover?

14      A      I would need to see the documents that would

15  reflect that.

16      Q      So sitting here today, you don't have any idea?

17      A      No.  Sitting here today in 2021, I don't know

18  when one of the dozen or so employees that worked for us a

19  decade ago first had communication with Sam Schoonover in

20  a past decade.

21      Q      Oh, but you did prepare for Topic 4 on -- as an

22  NGT 30(b)(6) which relates to facts and evidence related

23  to NTG's acquisition of clients in the SAC cases; is that

24  correct?

25      MR. DARNELL:  Objection.  That is an unfair question.

Page 121

1   You know the Vogue case is not one of the SAC cases,

2   Counsel.  It's improper for you to mislead a witness like

3   that and that's what I've been telling you throughout.

4   This exceeds the scope.

5       THE WITNESS:  Is the Schoonover versus OGX case one of

6   the SAC cases?

7   BY MR. ARHANGELSKY:

8       Q      I'm just asking, did you prepare on Topic 4 to

9   address how NTG acquired its clients in SAC cases?

10      A      Well, that's different.  In your previous

11  question when --

12      Q      It's a yes-or-no question.  Did you prepare on

13  this topic, Mr. Ferrell?

14      MR. DARNELL:  Counsel --

15      THE WITNESS:  Mr. Arhangelsky, I'm going to tell you

16  this one more time.  Stop interrupting me when I'm trying

17  to answer your questions.  It is unprofessional and I am

18  treating you with the respect you deserve by not

19  interrupting your questions.

20              Please ask me whenever question it is that you

21  wish to ask me.

22  BY MR. ARHANGELSKY:

23      Q      Yes-or-no question, did you prepare on Topic 4,

24  Mr. Ferrell?

25      A      You know that I did.  I related to you a great

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 122

1  deal of work that I did on Topic 4.
2      Q.    And Mr. Schoonover was a client of the NTG firm
3  in a SAC case; is that right?
4      A.    Yes.
5      Q.    What date did the NTG firm communicate with
6  Sam Schoonover?
7      A.    In one of the SAC matters?  Or ever?
8      Q.    What date -- what date did the NTG firm first
9  communicate with Sam Schoonover?
10     MR. DARNELL:  Objection, vague.  He's asking you for
11  clarification, Counsel.
12  BY MR. ARHANGELSKY:
13     Q.    Ever.
14     MR. DARNELL:  Objection, exceeds the scope.
15     THE WITNESS:  My guess is that we communicated with
16  Mr. Schoonover long before he ever became a client of our
17  firm.
18  BY MR. ARHANGELSKY:
19     Q.    When you say long before, when was that?
20     MR. DARNELL:  Objection, exceeds the scope.
21     THE WITNESS:  I don't know.  Sometime preceding the
22  time he became a client of the firm.
23          I think we may have lost the video because
24  Mr. Arhangelsky appears frozen.
25     MR. RIDDLES:  I think we should go off the record

Page 123

1  while we wait for him to reconnect.
2      THE VIDEOGRAPHER:  This is the end of Media File
3  No. 3.  We're now going off the record.  The time is
4  12:46 p.m.
5          (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)
6      THE VIDEOGRAPHER:  This is the beginning of Media File
7  No. 4.  We're now going on the record.  The time is
8  1:39 p.m.
9      MR. ARHANGELSKY:  All right.  Thank you.
10          Just for the record, the deposition just before
11  lunch was interrupted.  We had been informed by our
12  internet service provider Cox Communications that our area
13  suffered a widespread internet outage, so that limited my
14  ability to participate in the deposition.
15          As of 1:15 p.m. internet is restored and we are
16  going to advance this deposition to the best of our
17  ability under the circumstances.  This is a remote
18  deposition given the Covid-19 concerns.  Thank you all for
19  your patience as we work through this.
20          Now, Mr. Ferrell, I have placed a document in
21  front of you which I've marked as Plaintiff's Exhibit 633.
22  (Plaintiff's Exhibit 633 was marked for identification.)
23  BY MR. ARHANGELSKY:
24     Q.    Please review this email and let me know if
25  you've seen this before.

Page 124

1      A.    Okay.
2      Q.    And for the record this is document that has
3  Bates No. on page 1 NTG 5982 and I'll direct your
4  attention to the second page of this email, Mr. Ferrell,
5  which is NTG 5983.  You wrote to Mr. Baslow, I believe,
6  Would you please audit the below 800 numbers?  Do you see
7  that?
8      MR. DARNELL:  Objection, exceeds the scope.
9      THE WITNESS:  I do.
10  BY MR. ARHANGELSKY:
11     Q.    So in July 2012, the NTG firm audited Himalaya
12  Drug for a potential wiretap case; is that right?
13     MR. DARNELL:  Objection, exceeds the scope.
14     THE WITNESS:  It appears that in July of 2012, we were
15  in some sort of investigation as it relates to Himalaya
16  Drug Company's recording practices, though I don't know
17  from this email where we were in that investigation.
18  BY MR. ARHANGELSKY:
19     Q.    And you specifically asked Mr. Baslow to call and
20  see if they auto-disclose that they record -- or excuse
21  me -- that they record or monitor; if they do not, ask a
22  basic question or two of a customer service rep. when you
23  get through to one; close by asking if they record or
24  monitor; and then report back.  Did I read that correctly?
25     A.    Yes.

Page 125

1      Q.    And Baslow followed your instructions with
2  respect to the 10 numbers, did he not?
3      MR. DARNELL:  Objection, exceeds the scope.
4      THE WITNESS:  I've always known Andrew to be very
5  diligent, but I don't know from this document what
6  happened after I sent that email.
7  BY MR. ARHANGELSKY:
8      Q.    So for the purpose of -- (inaudible) -- using
9  5982, Mr. Baslow responds to you and says, Hi, Scott,
10  Answers to these 10 audits are below.  And the only line
11  that's not redacted says Himalaya Drug Company spoke to CS
12  rep. and asked questions about their best products.  I was
13  never told my call was R, slash, M until I asked at the
14  conclusion of the conversation.  The rep. then confirmed
15  that they are R, slash, M.  Did I read this correctly?
16     A.    I believe so.
17     MR. DARNELL:  Objection, exceeds the scope.
18  BY MR. ARHANGELSKY:
19     Q.    Now, when Mr. Baslow said that he spoke to CS
20  rep., did you interpret that to be customer service
21  representative?
22     MR. DARNELL:  Objection, exceeds the scope.
23     THE WITNESS:  That's my understanding of what that
24  means, yes.
25     ///

30(b)(6) Scott J. Ferrell
April 01, 2021
122..125
EXHIBIT 9
DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 126

1  BY MR. ARHANGELSKY:
2      Q     And the abbreviation R, slash, M, did you
3  understand that was recorded or monitored?
4      MR. DARNELL:  Objection, exceeds the scope.
5      THE WITNESS:  Yes.  It's my understanding that that
6  stands for recorded or monitored.
7  BY MR. ARHANGELSKY:
8      Q     What was the purpose of having Mr. Baslow ask
9  questions about the company's best products?
10     MR. DARNELL:  Objection, exceeds the scope.
11     THE WITNESS:  It had been our experience that customer
12  service representatives were more likely to tell the truth
13  about whether they were aware that the company was
14  recording or monitoring the calls if they were engaged in
15  some brief conversation.  Oftentimes if they were not
16  engaged in some brief conversations, they would either lie
17  or simply hang up.
18  BY MR. ARHANGELSKY:
19     Q     And you wrote back to Mr. Baslow towards the top
20  of this email at 2:19 p.m. on July 16th that of -- you
21  said, Baz, Based on the comments below it seems like we
22  should proceed with Himalaya Drug, and maybe two others
23  that are redacted.  Do you see that?
24     MR. DARNELL:  Objection, exceeds the scope.
25     THE WITNESS:  I do.

Page 127

1  BY MR. ARHANGELSKY:
2      Q     When you wrote that NTG should proceed, you were
3  indicating that the firm should move forward with
4  litigation?
5      MR. DARNELL:  Objection, exceeds the scope.
6      THE WITNESS:  No.  I was indicating that the cases
7  should proceed through the seasoned process wherever they
8  were at.
9  BY MR. ARHANGELSKY:
10     Q     I see.
11            And so this case would have been in the seasoning
12  stage right now?  Again by this case I mean Himalaya Drug.
13     MR. DARNELL:  Objection, exceeds the scope.
14     THE WITNESS:  I don't know looking at this.  But if
15  you show me a document that reflects it, it would likely
16  refresh my memory as to its status in the seasoning stage
17  or at least one iteration of its status.
18  BY MR. ARHANGELSKY:
19     Q     When you say, show me the document, what document
20  are you referring to?
21     MR. DARNELL:  Objection, exceeds the scope.
22     THE WITNESS:  I'm not referring to any specific
23  document.  I'm saying if there is a document that reflects
24  where the case was in the seasoning stage on July 16th,
25  2012, that it would help my recollection.

Page 128

1  BY MR. ARHANGELSKY:
2      Q     Okay.  As of 2 -- (inaudible) -- p.m. on --
3  (inaudible) -- NTG did not have a -- (inaudible) --
4  against -- (inaudible) -- is that -- (inaudible.)
5      MR. DARNELL:  Peter, we didn't hear your question.
6  You may want to restate it.
7  BY MR. ARHANGELSKY:
8      Q     Can you hear me now?
9      MR. DARNELL:  Yes.
10     THE WITNESS:  Yes.
11  BY MR. ARHANGELSKY:
12     Q     Am I there?
13     A     Yes.
14     Q     Okay.  As of July 16th, 2012, at 2:19 p.m., NTG
15  did not have a client retained for litigation against
16  Himalaya; is that right?
17     A     That would be inconsistent with my understanding
18  as I sit here, as there are probably documents that would
19  reflect that more accurately than my recollection a decade
20  later.
21     Q     Okay.  So as of 2:19 p.m. on July 16th, 2012,
22  your understanding was that NTG had obtained a client --
23  or excuse me -- a client had retained NTG for litigation
24  against Himalaya?
25     A     I think it's more accurate to say that as of

Page 129

1  July 16th, 2012, we had been contacted by someone who was
2  a potential client and it was in the seasoning stage.
3      Q     Who by name was the individual that had contacted
4  the NTG firm for litigation against Himalaya as of
5  July 16th, 2012, at 2:19 p.m.?
6      A     As I sit here, I don't know.  But my suspicion is
7  that there are documents that would identify that person
8  and reflect where in the seasoning stage the case was.
9      Q     And are you referring to the wiretap case charts
10  that NTG was maintaining?
11     A     No.  I'm referring to any documents that would
12  reflect the case intake of this matter and any iteration
13  of specific plaintiffs on this matter that might exist
14  that would refresh my memory.
15     Q     So sitting here right now are you referring to a
16  specific document or are you speculating as to whether
17  there might be documents?
18     A     The latter.  I'm -- I'm saying that a decade
19  later I don't know where in the intake process the
20  Himalaya Drug case was, who the plaintiff who had alerted
21  it to us was, where we were seasoning them, or any of that
22  without referencing the other exigent documents.
23     MR. ARHANGELSKY:  Okay.  All right.  Thank you.
24            I've placed a document on screen which I've
25  marked as Plaintiff's Exhibit 634 and this is a document

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 130

1   with a Bates number that begins SCHOONOVER00082.
2   (Plaintiff's Exhibit 634 was marked for identification.)
3   BY MR. ARHANGELSKY:
4       Q    Mr. Ferrell, have you seen this document before?
5       A    Is this an 11-page document?
6       Q    It is an 11-page document, yes.
7       A    Does this sequence start from the bottom or start
8   from the top?
9       Q    I believe that -- I don't want to make
10  representations.  You can interpret it how you will, but I
11  understand that the document is chronological starting
12  from the top.
13      A    Okay.  That's what it looks like to me, too.
14      Q    Had you reviewed this document before your
15  deposition today?
16      A    I have not.
17      Q    You didn't review this document as part of your
18  preparation as an NTG 30(b)(6)?
19      A    As I indicated earlier, I reviewed thousands of
20  pages of documents.  I don't recall reviewing this, what
21  appears to be a text exchange.
22      Q    Okay.  Okay.  On page 2, which I believe I posted
23  on the screen under the Bates No. SCHOONOVER00083, under
24  the timestamp that you see beginning towards the top, it
25  says July 16, 2012, 2:52 p.m.  There's a message that

Page 131

1   says, Hey, man, I've got another case for you and have
2   confirmation that we can use you again.  You down?  Do you
3   see that?
4       A    I do.
5       Q    Did you give Andrew Baslow confirmation that NTG
6   could use Schoonover again in litigation on July -- or in
7   July 2012?
8       A    I have no idea what this relates to.
9       Q    After communicating with you on July 16th, 2012,
10  by email, Mr. Baslow provided Schoonover with instructions
11  to call Himalaya Drug, did he not?
12      A    I don't know.
13      Q    In the afternoon of July 16, 2012, did
14  Andrew Baslow provide Sam Schoonover with Himalaya Drug's
15  phone number for purposes of a wiretap case?
16      A    I don't know.  Is it reflected --
17      MR. RIDDLES:  Objection, calls -- (inaudible.)
18  BY MR. ARHANGELSKY:
19      Q    Sorry.  What was the answer?
20      A    Sorry.  I'm seeing this for the first time.  Is
21  it reflected in this exchange that you want me to look at?
22      Q    No.  I'm just asking you a question.  You need
23  the reporter to repeat it?
24      A    No.  I -- I don't need the reporter to repeat it,
25  but I don't know what conversations the two of them may

Page 132

1   have had in July in the afternoon a decade ago.  It says
2   in here that they were going to chat.
3       Q    Okay.  And do you know if Mr. Baslow did in fact
4   speak with Mr. Schoonover in the afternoon of July 16th,
5   2012?
6       A    I don't know as I sit here.  But if it's
7   reflected in this exchange, then I can certainly try and
8   learn that.
9       Q    Well, I just -- I just want to know what your
10  recollection is.
11      A    I don't know one way or the other.
12      MR. ARHANGELSKY:  I've marked an exhibit and put it on
13  the screen marked as Exhibit 635 and this has a Bates
14  No. SCHOONOVER00002.
15      (Plaintiff's Exhibit 635 was marked for identification.)
16  BY MR. ARHANGELSKY:
17      Q    Mr. Ferrell, have you seen this email before?
18      A    Yes, I have.
19      Q    And NTG through Mr. Baslow received this email on
20  July 17, 2012, at 9:24 a.m.?
21      A    I don't know if that's the date that it was
22  received or the date that it was printed.
23      Q    Oh, you think this might have been -- well, let
24  me see if I can help.
25           Do you see the top left of this document?  It

Page 133

1   says 8-9, 2016.
2       A    Yes.
3       Q    That you believe might be the date it was
4   printed?
5       MR. DARNELL:  Objection, lacks foundation.
6       THE WITNESS:  I have no idea.
7   BY MR. ARHANGELSKY:
8       Q    So are you saying you don't know either way
9   whether this document was -- well, let me ask you a
10  different question.
11           Was this document sent to Mr. Baslow on July 17,
12  2012, at 9:24 a.m.?
13      MR. DARNELL:  Objection, lacks foundation.
14      THE WITNESS:  I have no idea.
15  BY MR. ARHANGELSKY:
16      Q    NTG asked all of its wiretap clients to send
17  confirmation emails like this; is that right?
18      MR. DARNELL:  Objection, exceeds the scope.
19      THE WITNESS:  I don't know.  I have -- this does
20  refresh my memory in some regards, but not in the way that
21  you've just asked that question.
22  BY MR. ARHANGELSKY:
23      Q    Well, did NTG ask any of its wiretap clients to
24  send confirmation emails after completing their wiretap
25  calls?

30(b)(6) Scott J.  Ferrell
April 01, 2021

130..133
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 134

1    MR. DARNELL:  Objection, exceeds the scope.
2    THE WITNESS:  So I didn't have communication with
3  those people, but I can tell you what my instructions
4  were.
5  BY MR. ARHANGELSKY:
6    Q    And by your instructions are you referring to
7  instructions you gave Mr. Baslow?
8    A    The instructions I gave Andrew and everyone else
9  at the firm who was working on the matters.
10    Q    Well, did you specifically instruct Mr. Baslow to
11  obtain confirmation statements from wiretap clients after
12  they completed their calls?
13    MR. DARNELL:  Objection, exceeds the scope, compound.
14    THE WITNESS:  Not in those words, but what I did tell
15  Andrew was that it had been our experience that companies
16  would always deny that they had received or recorded a
17  call in the first instance and so it was important for us
18  to have documented the timing of the call as well as the
19  details of the call, whether it was a initial call, a
20  confirmatory call, or an investigative call.
21  BY MR. ARHANGELSKY:
22    Q    Okay.  And did NTG ever submit one of these
23  confirmation emails to a court of law in support of any
24  wiretap lawsuit?
25    MR. DARNELL:  Objection, exceeds the scope.

Page 135

1    THE WITNESS:  I don't know.
2  BY MR. ARHANGELSKY:
3    Q    Did NTG ever provide these confirmation
4  statements to opposing counsel in one of its wiretap
5  cases?
6    MR. DARNELL:  Objection, exceeds the scope.
7    THE WITNESS:  Yes, we did.
8  BY MR. ARHANGELSKY:
9    Q    And that was for the purpose of identifying that
10  the call had been completed as alleged?
11    MR. DARNELL:  Same objection.
12    THE WITNESS:  It could have a lot of different
13  purposes.  But typically at least in instances where a
14  defendant retained competent counsel, their counsel would
15  instruct the company to immediately stop committing
16  felonies and would reach out to us and together we would
17  try and determine the scope of the misconduct involved and
18  one of the best practices in doing that was to submit
19  either the client's summary or an abstract of the client's
20  summary to the opposing counsel.
21  BY MR. ARHANGELSKY:
22    Q    Did you -- I'm sorry.
23    Did NTG ever supply these confirmation statements
24  to co-counsel after referring out a wiretap case?
25    MR. DARNELL:  Objection, exceeds the scope.

Page 136

1    THE WITNESS:  I believe so.
2  BY MR. ARHANGELSKY:
3    Q    I'm sorry.  The purpose of providing co-counsel
4  with a confirmation statement was consistent with your
5  last response, is -- was to use that to help address the
6  alleged violations?
7    MR. DARNELL:  Objection, exceeds the scope.
8    THE WITNESS:  Oftentimes with co-counsel it was just a
9  matter of co-counsel doing their due diligence to ensure
10  it was a meritorious case.
11    MR. ARHANGELSKY:  I need just a second.  I'm going to
12  have to go off record just a second because I need to load
13  a document that didn't load properly.  Can I have just
14  two minutes, please?
15    MR. DARNELL:  Sure.
16    THE VIDEOGRAPHER:  This is the end of Media File
17  No. 4.  We're now going off the record.  The time is
18  2:03 p.m.
19        (BRIEF RECESS.)
20    THE VIDEOGRAPHER:  This is the beginning of Media File
21  No. 5.  We're now going on the record.  The time is
22  2:09 p.m.
23    MR. ARHANGELSKY:  Okay.  I have placed a document in
24  front of the witness which is marked as Exhibit 637.
25    (Plaintiff's Exhibit 637 was marked for identification.)

Page 137

1  BY MR. ARHANGELSKY:
2    Q    And, Mr. Ferrell, have you ever seen this
3  document?
4    A    I believe so.  Let me just double-check.
5    MR. DARNELL:  Did we skip one?
6    MR. ARHANGELSKY:  So I think I'm going to need to
7  clean it up.  I think there was an erroneous entry of 636
8  and I can't put a duplicate in.  I'm going to have to have
9  LiveLitigation remove that entry later and we're going to
10  have to have a blank exhibit.
11    MR. DARNELL:  That's fine.  I want to make sure I
12  wasn't missing something.  Okay.  Okay.  Thank you.
13    THE WITNESS:  Okay.  I have reviewed the document and
14  I recognize this document.
15  BY MR. ARHANGELSKY:
16    Q    And is this the complaint that NTG filed on
17  behalf of Mr. Schoonover against Himalaya Drug?
18    A    Yes.
19    Q    And you electronically signed this complaint
20  before filing it; is that right?
21    A    Yes.
22    Q    What steps did you take to ensure this complaint
23  was accurate before it was filed?
24    A    As applied here we undertook an investigation to
25  make sure that the factual assertions in the complaint

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 138

1  were accurate and that the legal allegations in the
2  complaint were well-founded.
3      MR. DARNELL:  And I'll just object that last question
4  exceeds the scope.
5  BY MR. ARHANGELSKY:
6      Q    At any point prior to filing this complaint on
7  July 19th, 2012, did NTG inform Sam Schoonover that his
8  phone call to Himalaya Drug had been recorded?
9      MR. DARNELL:  Objection, exceeds the scope.
10     THE WITNESS:  Not that I know of.
11         And one -- one clarification there, at the time
12  we filed the complaint, we did not know that his -- that
13  his call had been recorded.  We had a reasonable basis to
14  believe that they were recording calls potentially
15  including his, but we did not know that for sure.
16  BY MR. ARHANGELSKY:
17     Q    At any point prior to filing this complaint on
18  July 19th, 2012, did NTG inform Sam Schoonover that
19  Himalaya Drug had told Andrew Baslow that it records its
20  incoming calls?
21     MR. DARNELL:  Objection, exceeds the scope.
22     THE WITNESS:  I don't know what specific
23  communications Andrew had with Mr. Schoonover, but I also
24  think you are misstating the communications that Andrew
25  had with Himalayan.

Page 139

1  BY MR. ARHANGELSKY:
2      Q    Now let me direct your attention to what is
3  page 3 of this document that you have marked as
4  Exhibit 567 and specifically paragraph 10 and where the
5  complaint that you drafted alleges that After completing
6  her call, plaintiff learned that defendant makes a habit
7  and practice of recording every incoming telephone call to
8  its customer service line.  Did I read that correctly?
9      MR. DARNELL:  Objection.  This line exceeds the scope,
10  this line of questioning.
11         But you can answer.
12     THE WITNESS:  Okay.  I see that.
13  BY MR. ARHANGELSKY:
14     Q    Okay.  As of July 19, 2012, what was your factual
15  basis for alleging that Mr. Schoonover had learned that
16  the defendant makes a habit and practice of recording
17  every incoming telephone call?
18     MR. DARNELL:  Objection, exceeds the scope.
19     THE WITNESS:  As I sit here, I don't know the specific
20  knowledge that Mr. Schoonover had, but I do know that the
21  preceding paragraphs note that the factual issues outside
22  of our control are made on information and belief after a
23  good faith inquiry and that we had reason to believe that
24  the defendant was illegally recording customer calls.
25  ///

Page 140

1  BY MR. ARHANGELSKY:
2      Q    And, that reason to believe that they were
3  recording calls that you just referenced, was that based
4  on Mr. Baslow's July 16, 2012 audit call to Himalaya?
5      MR. DARNELL:  Objection, exceeds the scope.
6      THE WITNESS:  It was based at least on part on that.
7  This complaint suggests that we may have originally been
8  contacted by someone else, as well.
9  BY MR. ARHANGELSKY:
10     Q    Do you know that for a fact sitting here today?
11     A    No, I don't.  I only note that the reference to
12  the word her, the pronoun, in paragraph 10 suggests the
13  existence of another female client.
14     Q    Do you know sitting here today whether you have
15  personally sent any emails referring to Sam Schoonover as
16  a female?
17     A    As I sit here, I don't know.
18     MR. ARHANGELSKY:  Okay.  I have placed in front of the
19  witness an exhibit marked Exhibit 638.  This document has
20  a Bates No., first page, NTG 6152.
21     (Plaintiff's Exhibit 638 was marked for identification.)
22  BY MR. ARHANGELSKY:
23     Q    Mr. Ferrell, please look at this email and let me
24  know if you've seen this before.
25     A    Yes.  I see that.

Page 141

1      Q    And have you reviewed this document before today?
2      A    Yes.  I saw this document in preparation for my
3  deposition.
4      Q    At the bottom of this email -- the email appears
5  to be on August 11, 2012.  You write to Baslow under the
6  word -- begins We are in the very early settlement
7  discussions in the Schoonover versus Himalaya wiretap
8  case.  Do you see part of this document?
9      A    I do.
10     Q    And in the next paragraph you said As part of
11  those discussions they've asked us to tell them the number
12  he called from which was 714-396-6971.  You ask Is there
13  any reason not to share that with them and do you know the
14  background, is it a landline, who owns it, et cetera.  For
15  example, I want to make sure it wasn't your house, your
16  cell, or anything like that where they could link it back
17  to us.  Did I read that correctly?
18     A    Yes.
19     Q    So here you were concerned that Himalaya could
20  link Schoonover's phone call back to NTG; is that right?
21     A    No.
22     Q    You thought that Schoonover might have called
23  Himalaya from Andrew Baslow's house?
24     A    No.
25     Q    If Schoonover had called from Andrew Baslow's

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 142

1  house, you wouldn't have provided that number to opposing
2  counsel; is that right?
3      MR. DARNELL:  Objection, incomplete hypothetical.
4      THE WITNESS:  I think you misunderstand the nature of
5  this communication.  I -- I -- I don't know.  I believe
6  opposing counsel here was Angel Garganta and the purpose
7  of this email was to make sure that I wasn't giving the
8  defendant a basis to challenge our ability to serve as
9  class counsel by making us a witness in the case.
10 BY MR. ARHANGELSKY:
11     Q     And why would you become a witness in the case if
12 Mr. Schoonover had called from Baslow's house?
13     A     For example, if Mr. Schoonover had called the
14 number from Mr. Baslow's house, which obviously he did not
15 but we're going with this hypothetical, then it would give
16 the defendant a basis to argue that he was an atypical
17 plaintiff or that he would not be a suitable
18 representative of the class because the circumstances
19 under which he made the call were different from other
20 members of the class.
21     Q     But as of this email right here on August 11, you
22 certainly thought it was a possibility that Mr. Schoonover
23 might have called from Andrew Baslow's house or cell
24 phone, right?
25     A     No.

Page 143

1      Q     All right.  And Mr. Baslow responded to you here
2  and said Just spoke with Sam Schoonover.  I think it is
3  best not to share that number in which he called from.  It
4  is a cell phone of his roommate Austin Glenn.  Do you see
5  that?
6      A     I do.
7      Q     Okay.  Baslow thought it might be a problem to
8  share Austin Glenn's phone number because Mr. Glenn was
9  also used as a plaintiff by NTG in litigation; is that
10 right?
11     A     I don't know --
12     MR. RIDDLES:  Objection -- (inaudible.)
13     THE WITNESS:  I don't know whether Mr. Glenn was a
14 plaintiff in litigation which we were counsel or not, but
15 that would not be a reason not to share his phone number.
16 There's nothing wrong with that.
17 BY MR. ARHANGELSKY:
18     Q     And I think you wrote back at the top I don't
19 think it's a problem, right?
20     A     Correct.
21     Q     Do you know whether or not NTG referred Mr. Glenn
22 out to another firm for litigation?
23     MR. DARNELL:  Objection, exceeds the scope.
24     THE WITNESS:  As I sit here, I don't know whether NTG
25 ever had a relationship with Mr. Glenn of any sort.

Page 144

1  BY MR. ARHANGELSKY:
2      Q     Now returning to what we had marked as
3  Exhibit 634 which we reviewed earlier and directing your
4  attention to the page of the document which I believe is
5  page 4 which has Bates No. SCHOONOVER00085.  And on
6  August -- at the very bottom of this page and we get into
7  the next page an entry under the August 11, 2012 date
8  marker -- do you see that?  It begins with Spoke with my
9  boss.  He seems to think that we will be okay.  Sorry for
10 the false alarm.  Do you see that?
11     A     Yes.
12     Q     Is this a reference to the email correspondence
13 that you exchanged with Mr. Baslow on August 11?
14     MR. DARNELL:  Objection, exceeds the scope.
15     THE WITNESS:  I have no idea what this refers to.
16 BY MR. ARHANGELSKY:
17     Q     Do you recall having any conversation with
18 Mr. Baslow in August of 2012 about using Mr. Schoonover in
19 CIPA litigation notwithstanding the fact you used
20 Austin Glenn's number?
21     MR. DARNELL:  Objection, exceeds the scope, vague.
22     THE WITNESS:  I'm sorry.  What are you asking me?
23 BY MR. ARHANGELSKY:
24     Q     Other than the email correspondence that we
25 looked at moments ago from August 11, did you have any

Page 145

1  phone conversations with Mr. Baslow about the propriety of
2  using Sam Schoonover in NIC litigation in August of 2012?
3      MR. DARNELL:  Objection, exceeds the scope.
4      THE WITNESS:  What are you -- what are you talking
5  about, an impropriety?  I don't understand what you're
6  referencing.
7  BY MR. ARHANGELSKY:
8      Q     About the propriety of using Mr. Schoonover in
9  NIC litigation.
10     A     Well, Mr. Schoonover signed the duties of a class
11 representative document.  I don't understand what you're
12 asking me.
13     Q     Did you have any conversation with Mr. Baslow
14 other than the email correspondence we have looked at here
15 today regarding the -- Mr. Schoonover's use of
16 Austin Glenn's phone number to call Himalaya Drug Company?
17     MR. DARNELL:  Objection, exceeds the scope.
18     THE WITNESS:  Other than the email exchange that we
19 just saw, I have no idea.
20     MR. ARHANGELSKY:  I just have to look for a document.
21     I've placed a document in front of the witness
22 which I've marked as Exhibit 639.
23     (Plaintiff's Exhibit 639 was marked for identification.)
24 BY MR. ARHANGELSKY:
25     Q     Mr. Ferrell, did the NTG firm ever have a

30(b)(6) Scott J.  Ferrell
April 01, 2021

142..145

EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 146

1  referral relationship with the law firm of Hiden, Rott &
2  Oertle, LLP?
3       MR. DARNELL:  Objection, exceeds the scope.  Does this
4  relate to any of the topics, Counsel?
5       THE WITNESS:  Not that I know of.
6  BY MR. ARHANGELSKY:
7       Q    Did the NTG firm ever refer Mr. Glenn out to the
8  Hiden, Rott & Oertle firm for litigation?
9       MR. DARNELL:  Objection, exceeds the scope.
10           Counsel, I'll ask you again.  Does this relate to
11  any of the topics?  We've been going for about
12  four and-a-half hours.  I think it's pretty clear that
13  you're just trying to get 14 hours of a deposition of
14  Mr. Ferrell.  I'm asking you, does this relate to any of
15  the topics?
16      MR. ARHANGELSKY:  Mr. Darnell, you know as well as
17  anyone that you are -- that I can ask these questions at
18  deposition notwithstanding whether they relate to topics
19  or not.  I do believe they do relate to topics
20  nonetheless, but I'm not going to get into a legal
21  argument with you now.  If you'd like to make your
22  objection that it's outside the scope, you can do that.
23  Please allow me to continue my deposition.
24      MR. DARNELL:  I will allow you to continue your
25  examination.  My point is that you're harassing the

Page 147

1  witness by taking a 14-hour deposition and you're using
2  that under the guise of a 30(b)(6) for topics that aren't
3  even coming up.  So I am asserting that objection for the
4  record as --
5       MR. ARHANGELSKY:  Madam Reporter --
6       MR. DARNELL:  I'm sorry.  I wasn't done, Counsel.
7       MR. ARHANGELSKY:  You're not done with your objection?
8       MR. DARNELL:  No.
9           So I am asserting that objection for the record,
10  as well.  Please proceed.
11      MR. ARHANGELSKY:  And, Madam Reporter, can you please
12  read back the pending question?
13      (WHEREUPON, THE RECORD WAS READ BY THE COURT
14      REPORTER AS FOLLOWS:
15       "Question:  Did the NTG firm ever refer
16       Mr. Glenn out to the Hiden, Rott & Oertle firm for
17       litigation?")
18      MR. DARNELL:  Same objection.
19      THE WITNESS:  Not that I know of.
20      MR. ARHANGELSKY:  I've placed a document in front of
21  the witness which I've marked as Exhibit 640.
22  (Plaintiff's Exhibit 640 was marked for identification.)
23  BY MR. ARHANGELSKY:
24      Q    Mr. Ferrell, please review this email and let me
25  know if you've seen this before.

Page 148

1       MR. DARNELL:  I'll just object that this document
2  clearly exceeds the scope.
3       THE WITNESS:  Okay.  I've seen this.
4  BY MR. ARHANGELSKY:
5       Q    Is this a document that NTG produced to NIC in
6  discovery in this case?
7       A    I believe so.
8       Q    Now, on the first page at the top email that you
9  sent to David Reid on August 23rd, 2012, in your second
10  bullet -- second numbered paragraph you wrote Let him know
11  that Sam was definitely expecting privacy since he
12  disclosed a sensitive skin condition, depression,
13  et cetera.  Do you see that?
14      MR. DARNELL:  Objection, exceeds the scope.
15      THE WITNESS:  Yes.
16  BY MR. ARHANGELSKY:
17      Q    And on what basis did you -- on what factual
18  basis did you tell David Reid that Sam had
19  disclosed a sensitive skin condition or depression?
20      MR. DARNELL:  Objection, exceeds the scope.
21      THE WITNESS:  The basis that that is true.
22  BY MR. ARHANGELSKY:
23      Q    As of August 23rd, 2012, had you reviewed an
24  audio recording of Mr. Schoonover's call to Himalaya Drug?
25      MR. DARNELL:  Objection, exceeds the scope.

Page 149

1       THE WITNESS:  Almost certainly not.
2  BY MR. ARHANGELSKY:
3       Q    So how would you know whether it's true that
4  Mr. Schoonover disclosed a sensitive skin condition on his
5  call with Himalaya?
6       MR. DARNELL:  Objection, exceeds the scope.
7       THE WITNESS:  Because paragraph 4 states that Angel
8  already knows all of this and so it appears to be that
9  paragraphs 1 through 3 are undisputed.  And when I was
10  looking through the document earlier, it looks like on
11  page 4 I provided additional information to Angel and told
12  him -- I'm sorry.  That's on pages 4 and 5 and that on
13  page 5 I told him that we weren't looking for any
14  compensation, that we simply wanted the defendant to
15  change their practices.
16  BY MR. ARHANGELSKY:
17      Q    I'm sorry.  What part of that related to
18  Mr. Schoonover's sensitive skin condition?
19      MR. DARNELL:  Objection, exceeds the scope.
20      THE WITNESS:  The first part where I said Angel
21  already knows this.
22  BY MR. ARHANGELSKY:
23      Q    But how did you know that Sam Schoonover
24  disclosed a sensitive skin condition if you never reviewed
25  his phone call?

30(b)(6) Scott J.  Ferrell
April 01, 2021

146..149
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 150

1    MR. DARNELL: Objection, exceeds the scope.
2    THE WITNESS: A couple of ways that I could have
3 known. One is in the client write-up. Second is that
4 Andrew told me. A third is that Angel told me.
5 BY MR. ARHANGELSKY:
6    Q    But you don't know sitting here right now how you
7 would have known that information?
8    MR. DARNELL: Objection, exceeds the scope.
9    THE WITNESS: That's correct. Other than knowing that
10 information is true, I don't know what the source of my
11 knowledge of that information 10 years ago was.
12    MR. ARHANGELSKY: And you've -- strike that.
13    Okay. Now I've placed an exhibit in front of
14 this witness which I've marked as Exhibit 641. This is a
15 document that's Bates No. NTG 61 -- excuse me -- 6229.
16    (Plaintiff's Exhibit 641 was marked for identification.)
17 BY MR. ARHANGELSKY:
18    Q    Mr. Ferrell, is this a document that NTG produced
19 to NIC in discovery?
20    A    Yes, it is.
21    Q    Okay. The bottom of this first page,
22 Mr. Garganta writes to David Reid he asks Can you
23 provide me the number from which the investigator called
24 and the date? We are trying to determine how he could
25 have possibly been provided inaccurate information. Do

Page 151

1 you see that?
2    A    I do.
3    Q    And then you wrote to David Reid at the very top
4 of this. You said, Dave, He called on Wednesday,
5 July 18th. Do you see that?
6    A    I do.
7    Q    And that was a reference to -- that was your
8 reference to when Mr. Baslow called Himalaya?
9    MR. DARNELL: Objection, exceeds the scope.
10    THE WITNESS: That's a reference to a date that
11 someone called Himalaya. Based on Angel's email below I'm
12 not sure which call we're referring to there.
13 BY MR. ARHANGELSKY:
14    Q    Okay. Andrew Baslow called Himalaya on
15 July 16th, 2012, didn't he?
16    MR. DARNELL: Objection, exceeds the scope.
17    THE WITNESS: Did you say July 16th?
18 BY MR. ARHANGELSKY:
19    Q    I'm asking, isn't it true that Andrew Baslow
20 called the Himalaya Drug Company on July 16th, 2012?
21    MR. DARNELL: Objection, exceeds the scope.
22    THE WITNESS: I don't independently know, but this
23 document seems to say to the contrary.
24 BY MR. ARHANGELSKY:
25    Q    All right. And Mr. Schoonover called Himalaya

Page 152

1 Drug Company on July 17th, 2012; is that right?
2    MR. DARNELL: Objection, exceeds the scope.
3    THE WITNESS: So I don't know the -- can you show me
4 the document that says where Mr. Schoonover relates his
5 call?
6    MR. ARHANGELSKY: Yes. You'll need to give me one
7 minute.
8    Okay. I've placed the exhibit which is marked
9 635 back in front of the witness.
10    THE WITNESS: Okay. So based on this document it
11 appears that at least one of Mr. Schoonover's calls took
12 place on or before Tuesday, July 17th. He just says
13 recently.
14 BY MR. ARHANGELSKY:
15    Q    Okay. You don't have -- sitting here right now
16 you don't have an awareness as to what date Mr. Schoonover
17 actually called Himalaya Drug Company?
18    MR. DARNELL: Objection, exceeds the scope.
19    THE WITNESS: I don't and apparently neither do you
20 because you've now told me he called on three different
21 dates and it keeps contradicting itself.
22 BY MR. ARHANGELSKY:
23    Q    All right. Mr. Baslow also worked on a wiretap
24 case for Mr. Demulder; is that right?
25    A    I don't know for sure, but I believe that

Page 153

1 Mr. Demulder had a wiretap case that we referred to
2 Kirtland & Packard.
3    Q    And how many wiretap cases did the NTG firm
4 pursue using Mr. Demulder as a client?
5    MR. DARNELL: Objection, exceeds the scope.
6    THE WITNESS: As I sit here, I don't know that we
7 pursued any other than the one that we just talked about
8 referring to Kirtland & Packard.
9 BY MR. ARHANGELSKY:
10    Q    Would Demulder's wiretap cases have been listed
11 on NTG's case charts in 2012?
12    MR. DARNELL: Objection, lacks foundation, exceeds the
13 scope.
14    THE WITNESS: I don't know that such charts exist; but
15 if and to the extent that such charts exist, I would
16 expect that they would be accurate. So if you show me
17 those charts, we can try and discern that information
18 together.
19 BY MR. ARHANGELSKY:
20    Q    Was the Demulder v. Carter-Reed case a wiretap
21 case that involved a minimal bypass?
22    MR. DARNELL: Objection, lacks foundation, exceeds the
23 scope, vague.
24    THE WITNESS: I don't know, but there is something
25 that could refresh my memory. Um, I believe that your

30(b)(6) Scott J. Ferrell
April 01, 2021

150..153

EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 154

1  original complaint referenced the recording of
2  Mr. Demulder's call to Carter-Reed.  So if you show me
3  that and just confirm to me that your assertion was
4  accurate there, that would refresh my memory.
5  BY MR. ARHANGELSKY:
6      Q    I'm just asking about your recollection here
7  today.  I'm not -- I can't testify so --
8      A    Well, I -- I know that I've read your summary of
9  the call that was in your complaint and I know that you
10  said in the call that someone was in the background
11  coaching Mr. Demulder and then, when I listened to it,
12  that turned out to be false.
13     Q    So let me -- let me ask this:  You're aware that
14  Carter-Reed was a deponent in this case, right?
15     A    Yes.
16     MR. DARNELL:  I'm sorry.
17  BY MR. ARHANGELSKY:
18     Q    And a representative from Carter-Reed gave
19  deposition testimony, yes?
20     A    Yes.
21     Q    Did you review that testimony in preparation for
22  your deposition today?
23     A    I did.
24     Q    And are you aware whether or not Carter-Reed
25  indicated that Mr. Demulder had bypassed a warning

Page 155

1  regarding the recording disclosure?
2      MR. DARNELL:  Objection, exceeds the scope.
3      THE WITNESS:  I am aware that there was no disclosure,
4  period.
5  BY MR. ARHANGELSKY:
6      Q    Well, but are you -- are you aware that
7  Carter-Reed testified that there was a disclosure that was
8  bypassed by Mr. Demulder?
9      A    No.  That's not consistent with my understanding.
10     MR. DARNELL:  Objection, exceeds the scope.
11     THE WITNESS:  But to the extent that there's a
12  misunderstanding about it, if you want to show me
13  Carter-Reed's testimony, I think it would be very
14  enlightening because we have had three different
15  descriptions of how this phone call went.  Yours has
16  proven to be inaccurate and the deposition of
17  Carter-Reed's testimony that you just gave I believe is
18  inaccurate.
19     MR. ARHANGELSKY:  I've placed a document in front of
20  the witness which is marked as Exhibit 642.
21     (Plaintiff's Exhibit 642 was marked for identification.)
22  BY MR. ARHANGELSKY:
23     Q    Mr. Ferrell, can you please review this document
24  and let me know if this is a document that NTG produced to
25  NIC in this case.

Page 156

1      A    Okay.
2      Q    Is this a document that NTG produced to NIC in
3  this case?
4      A    Yes.
5      Q    Now, at the bottom of this email -- this first
6  page just marked NTG 000239, Mr. Demulder -- it's an email
7  to Mr. Baslow which starts with To whom this may concern
8  and then it starts the paragraph I spoke with Mark at
9  HealthyMed around 3:30.  Do you see that part of the
10 documents?
11     A    I do.
12     Q    Have you reviewed this document in preparation
13 for your deposition here today?
14     MR. DARNELL:  Objection, exceeds the scope.
15     THE WITNESS:  I have not.
16 BY MR. ARHANGELSKY:
17     Q    Looking at that bottom email that I just -- I
18 directed your attention to, is this another circumstance
19 where Baslow asked an NTG client to send a confirmation
20 statement regarding the wiretap call?
21     MR. DARNELL:  Objection, exceeds the scope, lacks
22 foundation.
23     THE WITNESS:  It does not appear that way.
24 BY MR. ARHANGELSKY:
25     Q    Does this email from Demulder to Baslow on

Page 157

1  August 18, 2012, represent a typical confirmation
2  statement that clients would send the firm in wiretap
3  cases?
4      MR. DARNELL:  Objection, vague, objection, exceeds the
5  scope, lacks foundation.
6      THE WITNESS:  I don't know that there is any typical
7  confirmation statement or, if there is, if this would
8  typify one.
9  BY MR. ARHANGELSKY:
10     Q    And on the second page as this email ran on,
11 Mr. Demulder told Mr. Baslow From the start of the call to
12 the finish Mark never told me that the call was being
13 monitored or recorded.  Do you see that?
14     A    Yes.
15     MR. DARNELL:  Objection -- objection, exceeds the
16 scope.
17     THE WITNESS:  Yes.
18 BY MR. ARHANGELSKY:
19     Q    And did NTG serve a demand letter on HealthyMed
20 or any company associated with HealthyMed regarding a CIPA
21 violation on behalf of Mr. Demulder?
22     MR. DARNELL:  Objection, exceeds the scope.
23     THE WITNESS:  Not that I know of.
24 BY MR. ARHANGELSKY:
25     Q    Did Demulder ever receive payment in settlement

30(b)(6) Scott J.  Ferrell
April 01, 2021

154..157
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 158

1  for a CIPA case he brought against HealthyMed or any
2  company associated with HealthyMed?
3      MR. DARNELL:  Objection, exceeds the scope.
4      THE WITNESS:  Not that I know of.
5  BY MR. ARHANGELSKY:
6      Q     Did Mr. Baslow perform an audit call of
7  HealthyMed?
8      MR. DARNELL:  Objection, exceeds the scope.
9      THE WITNESS:  As I sit here, I don't know one way or
10 the other.
11 BY MR. ARHANGELSKY:
12     Q     Just above that message on August 25th, 2012,
13 Andrew writes Taylor Demulder and he says Just wanted to
14 check in with you as I have not seen your confirmation
15 statement come through for the new Relacore wiretap case.
16 Do you still plan on making this call?  If so, please send
17 over your summary ASAP as I will continue to check my
18 email for it while I am here in Israel.  Do you see that?
19     A     I do.
20     Q     Now, as of this date on August 25th, 2012,
21 Mr. Demulder had not yet called the Relacore number; is
22 that right?
23     A     No.  I don't think that's accurate.
24     MR. ARHANGELSKY:  I'm sorry.  Could the reporter read
25 back the answer?  I got cut out.

Page 159

1      (WHEREUPON, THE RECORD WAS READ BY THE COURT
2   REPORTER AS FOLLOWS:
3      "Answer:  No.  I don't think that's
4   accurate.")
5  BY MR. ARHANGELSKY:
6      Q     So you believe that Mr. Demulder had called
7  Relacore prior to August 25th, 2012?
8      A     Didn't he reference that he called them on
9  August 18th?
10     Q     I'm sorry -- (inaudible.)
11     MR. DARNELL:  Did he break up?
12         We can't hear you, Peter.
13     THE WITNESS:  Oh, it says our connection's been
14 interrupted.  So I just clicked on it again.  It says
15 Join.  Computer or phone?
16     THE VIDEOGRAPHER:  Computer.
17     THE WITNESS:  Camera?  Speakers?
18     THE VIDEOGRAPHER:  Yeah.  Camera --
19         (DISCUSSION HELD OFF RECORD.)
20     THE WITNESS:  Okay.  We're back on.  I'm not sure if
21 there's a question pending or an answer pending.
22     MR. ARHANGELSKY:  Oh, okay.  I didn't know if we had
23 gone off record.  Are we on record now?
24     THE WITNESS:  We are.
25     MR. ARHANGELSKY:  Can the reporter read back the last

Page 160

1  question and answer, please?
2      (WHEREUPON, THE RECORD WAS READ BY THE COURT
3   REPORTER AS FOLLOWS:
4      "Question:  So you believe that Mr. Demulder
5   had called Relacore prior to August 25th, 2012?
6      "Answer:  Didn't he reference that he called
7   them on August 18th?")
8      THE REPORTER:  And then we cut out.
9  BY MR. ARHANGELSKY:
10     Q     Isn't it true, Mr. Ferrell, that Mr. Demulder
11 didn't call Relacore until September 2012?
12     MR. DARNELL:  Objection, exceeds the scope.
13     THE WITNESS:  I don't know the date or dates upon
14 which Mr. Demulder called Relacore and whether it was in
15 August or September or both or some combination but --
16 BY MR. ARHANGELSKY:
17     Q     So you don't -- sitting here today you don't
18 know?
19     A     Correct.
20     Q     Okay.  Well, certainly as of August 25th, 2012,
21 Mr. Demulder had already participated in at least one
22 other wiretap case with the NTG firm.  Is that fair?
23     MR. DARNELL:  Objection, exceeds the scope, lacks
24 foundation, asked and answered.
25     THE WITNESS:  Which case are you referring to?

Page 161

1  BY MR. ARHANGELSKY:
2      Q     I'm referring to the HealthyMed matter that
3  Mr. Demulder references in his first email all the way at
4  the bottom.
5      MR. DARNELL:  Objection, assumes facts, exceed the
6  scope.
7      THE WITNESS:  I don't have any knowledge of the
8  HealthyMed matter ever proceeding.
9  BY MR. ARHANGELSKY:
10     Q     When did NTG inform Mr. Demulder that Carter-Reed
11 recorded its incoming toll-free calls?
12     MR. DARNELL:  Objection, exceeds the scope, assumes
13 facts.
14     THE WITNESS:  I don't know that there was ever a
15 conclusive determination that Carter-Reed recorded its
16 incoming calls until they admitted in the litigation that
17 they had been violating the law and instituted a change.
18 Until then it was just a suspicion.
19 BY MR. ARHANGELSKY:
20     Q     Did Mr. Baslow perform an audit call of
21 Carter-Reed's line?
22     A     I would have to see --
23     MR. DARNELL:  Objection, exceeds the scope.
24     THE WITNESS:  I would have to look at the documents to
25 know.

30(b)(6) Scott J.  Ferrell
April 01, 2021

158..161
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 162

BY MR. ARHANGELSKY:

2    Q    You don't know sitting here now whether
3  Mr. Baslow audited Carter-Reed?
4        MR. DARNELL:  Objection, exceeds the scope.
5        THE WITNESS:  Correct.  As I sit here, I don't know.
6        MR. ARHANGELSKY:  I have placed an exhibit in front of
7  the witness that we've marked as Exhibit 643 and has
8  Bates No. NTG 6703.
9    (Plaintiff's Exhibit 643 was marked for identification.)
10  BY MR. ARHANGELSKY:
11   Q    Mr. Ferrell, is this a document that NTG produced
12  to NIC in discovery?
13       A    Yes.
14   Q    And in the bottom email here on September 11,
15  2012, you wrote that, Dad and Andrew, Can we please have
16  the clients below prepared for an interview with Heather
17  and call her tomorrow, and under the redacted portion says
18  Relacore, dash, Taylor Demulder.  Do you see that?
19       A    Yes.
20   Q    When you reference Heather in this email, are you
21  referring to Heather Baker at Kirtland, Packard?
22       A    I believe so.
23   Q    And you referred Mr. Demulder's case to
24  Kirtland & Packard; is that right?
25       A    Yes.

Page 163

1    Q    Why did NTG refer this case to Kirtland, Packard
2  instead of handling it directly?
3        A    I don't know specifically, but it probably
4  involved a number of different factors.
5    Q    You don't recall accurately which factors were in
6  play for Mr. Demulder?
7        A    I do know that Mike Kelly was very eager to
8  pursue a case all the way to judgement through class
9  certification and so forth to try to extend the law in
10  this area.  And so one of the factors that we typically
11  considered in referring cases to him was if a defendant
12  seemed inclined to try to litigate the case to judgement
13  so that it would be a good fit for Mr. Kelly.
14   Q    And why was it necessary to prepare your clients
15  for the interview with Heather Baker before they spoke?
16       A    One of the things that I learned in pursuing
17  consumer cases was that oftentimes a defendant will be
18  deceitful and try to bypass the attorney/client
19  relationship by doing things like setting up false or
20  defamatory websites or hiring criminal private
21  investigators to harass a client.  And so we always tell
22  our clients that they should not speak with the case about
23  anyone -- or speak with anyone about the case unless we've
24  given them the authority to do so.  And so in order for
25  Heather or anyone else to speak to our clients, the

Page 164

1  clients would have to be prepared to know that she was an
2  ally and not someone who is going to try to deceive them.
3  BY MR. ARHANGELSKY:
4    Q    Did NTG inform Kirtland & Packard that Mr. Baslow
5  was in contact with Taylor Demulder about the Relacore
6  wiretap case before Mr. Demulder had called the Relacore
7  phone line?
8        MR. DARNELL:  Objection, exceeds the scope, assumes
9  facts, vague.
10       THE WITNESS:  Okay.  So there's a lot to unpack with
11  that question.  I think you're asking whether we disclosed
12  to Kirtland & Packard that Mr. Demulder's call may have
13  been recorded and that Mr. Baslow had done an
14  investigatory call to determine whether it was recorded.
15       MR. ARHANGELSKY:  That's not my question, Mr. Ferrell.
16   Q    Did NTG inform Kirtland & Packard that Baslow was
17  in contact with Taylor Demulder about the Relacore wiretap
18  case before Demulder had placed his call to the Relacore
19  phone line?
20       MR. DARNELL:  Objection, vague, exceeds the scope.  I
21  think you're assuming something that doesn't exist.
22       THE WITNESS:  But, regardless, other than saying we
23  made a practice of trying to disclose to our referral
24  partners all material facts, I don't know what
25  communication was disclosed or how the interview between

Page 165

1  Heather Baker and Taylor Demulder went or what they
2  discussed in that interview.
3  BY MR. ARHANGELSKY:
4    Q    Did NTG ever inform Kirtland & Packard that
5  Demulder had already pursued at least one other wiretap
6  matter with NTG weeks earlier on August 2012?
7        MR. DARNELL:  Objection, assumes facts, exceeds the
8  scope, vague as phrased.
9        THE WITNESS:  So I don't think he had pursued another
10  matter.  And if he had pursued another matter, it
11  certainly won't impact the viability of his other matter.
12  And since this a decade ago, I don't know what
13  Mr. Demulder told Ms. Baker in their call that I was not a
14  party to.
15  BY MR. ARHANGELSKY:
16   Q    Now, Carter-Reed eventually sued Mr. Demulder in
17  Utah for abuse of process; is that right?
18       MR. DARNELL:  Objection, exceeds the scope.
19       THE WITNESS:  I know there was subsequent litigation.
20  I don't know what the specific claims were.
21  BY MR. ARHANGELSKY:
22   Q    Oh, did NTG represent Mr. Demulder in that Utah
23  proceeding?
24       MR. DARNELL:  Objection, exceeds the scope.
25       THE WITNESS:  I believe we hired Utah counsel to

30(b)(6) Scott J.  Ferrell
April 01, 2021

162..165
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 166

1  represent him.
2  BY MR. ARHANGELSKY:
3      Q      Did NTG play any role in the Utah litigation?
4      MR. DARNELL:  Objection, vague as phrased, exceeds the
5  scope.
6      THE WITNESS:  I believe so.
7  BY MR. ARHANGELSKY:
8      Q      And that case settled, right?
9      MR. DARNELL:  Objection, exceeds the scope.
10     THE WITNESS:  I believe so.
11  BY MR. ARHANGELSKY:
12     Q      And as part of that settlement, did NTG pay
13  Carter-Reed $74,999?
14     MR. DARNELL:  Objection, vague as phrased.  Objection,
15  exceeds the scope.
16     THE WITNESS:  I don't know.
17  BY MR. ARHANGELSKY:
18     Q      Did NTG pay Carter-Reed as part of that
19  settlement in Utah?
20     MR. DARNELL:  Objection, exceeds the scope.
21     THE WITNESS:  As I sit here, I don't know.
22  BY MR. ARHANGELSKY:
23     Q      Do you know if Mr. Demulder paid any money to
24  Carter-Reed as part of that settlement?
25     MR. DARNELL:  Objection, exceeds the scope.

Page 167

1      THE WITNESS:  As I sit here, I don't know.
2      I do know that after that the president of Basic
3  Research and its subsidiary Carter-Reed apologized to me
4  for their actions.
5  BY MR. ARHANGELSKY:
6      Q      As part of the settlement agreement within the
7  Utah case Carter-Reed versus Demulder, did NTG or you
8  agree never to sue Basic Research again?
9      MR. DARNELL:  Objection, exceeds the scope.
10     THE WITNESS:  I would have to look at the settlement
11  agreement.
12  BY MR. ARHANGELSKY:
13     Q      At what point did NTG decide to use Andrew Nilon
14  in a wiretapping case?
15     MR. DARNELL:  Objection, assumes facts.
16     THE WITNESS:  I don't know.  Probably shortly after --
17  BY MR. ARHANGELSKY:
18     Q      At some point --
19     A      I'm sorry.  Go ahead.
20     Q      No.  Please finish your answer.
21     A      Probably sometime after he asked us to.
22     Q      And was Andrew Baslow the NTG field rep.
23  assigned to the ChromaDex case in 2013?
24     A      I believe so.
25     Q      And Andrew Baslow called the ChromaDex BluScience

Page 168

1  phone line for a wiretapping audit, did he not?
2      MR. DARNELL:  Objection, exceeds the scope.
3      THE WITNESS:  I would have to look at the documents to
4  know for sure.
5  BY MR. ARHANGELSKY:
6      Q      But sitting here right now you can't tell me when
7  or if Mr. Baslow contacted ChromaDex for an audit?
8      MR. DARNELL:  Objection, exceeds the scope.
9      THE WITNESS:  Correct.  As I sit here, I don't know.
10  But I'm happy to go through documents with you to discern
11  that.
12     Also, your next available stopping point can we
13  make a very quick restroom break?
14     MR. ARHANGELSKY:  Yeah.  Let's stop right now.  This
15  is a good time.
16     THE WITNESS:  Thank you.
17     THE VIDEOGRAPHER:  This is the end of Media File
18  No. 5.  We're now going off the record.  The time is
19  3:10 p.m.
20                    (BRIEF RECESS.)
21     THE VIDEOGRAPHER:  This is the beginning of Media File
22  No. 6.  We're now going on the record.  The time is
23  3:17 p.m.
24  BY MR. ARHANGELSKY:
25     Q      Mr. Ferrell, you're familiar with someone named

Page 169

1  Trycia Carlberg; is that right?
2      A      Did you say Trycia Carlberg?
3      Q      Yes.
4      A      Yes.
5      Q      Mrs. Carlberg had stage IV breast cancer in 2011;
6  is that right?
7      A      Sometime in 2011, her breast cancer proceeded
8  from stage III to stage IV.
9      Q      And she was hospitalized in 2011; is that right?
10     A      She was in and out of the hospital, but she
11  didn't go into her final hospice care until either late
12  March or early April of 2012.
13     Q      And was she residing in your house in
14  December 2011?
15     A      Yes.
16     Q      At any point in December 2011 did -- was she
17  admitted to the hospital?
18     A      My concern is the word admitted.  I don't believe
19  at any time in December of 2011 she spent an overnight at
20  the hospital, but she had frequent visits to hospitals for
21  her various maladies.
22     Q      Okay.  When she was not visiting the hospital,
23  was she generally residing in your house the entire month
24  of December 2011?
25     A      Yes.

30(b)(6) Scott J.  Ferrell
April 01, 2021

166..169
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Case 8:15-cv-02034-JVS-JCG   Document 1217-10   Filed 09/06/21   Page 45 of 94   Page ID #:85510

Atkinson-Baker, a Veritext Company
www.depo.com

Page 170

1    Q    And at some point you decided that
2 Trycia Carlberg might serve as a class representative in
3 litigation against Natural Immunogenics?
4    A    Yes, but there's more to the story.  But, yes,
5 that is accurate.
6    Q    Is it fair to say that you decided she could be a
7 class representative against Natural Immunogenics on
8 December 24th, 2011?
9    A    It's fair to say that on December 24th and
10 December 25th, 2011, I discerned that they definitely had
11 a basis to assert claims against both Natural Immunogenics
12 and a company called Wellnx.
13    Q    I'm sorry.  That was Well Max?
14    A    Well, W-E-L-L, N-X.
15    Q    And what type of claim did she have against
16 Wellnx?
17    A    A strong one.
18    Q    Was that a CLRA claim?
19    A    It was a claim related to her taking one of their
20 products that was supposed to help her with the bloating
21 caused by various of her cancer-related treatments.
22    Q    And what products specifically was it that Wellnx
23 sold that Ms. Carlberg was taking?
24    A    I would have to look at the demand letter to know
25 for sure.

Page 171

1    Q    And --
2    A    I believe it -- I'm sorry.  I believe it may have
3 been Wellnx NV.
4    Q    Is that a dietary supplement?
5    A    I believe it's considered a dietary supplement by
6 the FDA, yes.
7    Q    And did you conclude that she had a claim against
8 Wellnx at the same time as you concluded she had a claim
9 against Natural Immunogenics?
10    A    I don't know if I made the conclusion at an
11 identical time, but I made them very close to each other.
12    Q    And NTG served a demand letter in December 2011
13 on behalf of Ms. Carlberg; is that correct?
14    A    To NIC or to Wellnx?
15    Q    I'm sorry.  To NIC.
16    A    Yes.
17    Q    Did NIC respond to that demand letter?
18    A    I received an email from NIC's counsel
19 acknowledging receipt of the demand letter, but -- and
20 saying that NIC or their counsel would write more which I
21 expected would happen because my demand letter on behalf
22 of Trycia specifically said that if they would just stop
23 violating the law that we would consider the matter closed
24 and take no further action.  Um --
25    Q    You asked -- sorry.  You asked Victoria Knowles

Page 172

1 to draft the demand letter to NIC on December 25th, 2011;
2 is that right?
3    A    That date seems correct to me.
4    MR. ARHANGELSKY:  All right.  I've placed a document
5 on the screen in front of the witness which we've marked
6 as Exhibit 644 and the Bates number is NTG 22163.
7    (Plaintiff's Exhibit 644 was marked for identification.)
8 BY MR. ARHANGELSKY:
9    Q    Does this letter look familiar, Mr. Ferrell?
10    A    Yes.
11    Q    Is this the letter that you would serve on
12 Natural Immunogenics in December 2011?
13    MR. DARNELL:  Objection, vague.
14         Counsel, do you have a better version?
15    MR. ARHANGELSKY:  No.
16    MR. DARNELL:  I mean, maybe one that's signed or one
17 that was -- actually we know was sent?  I mean, do you
18 want to use this?
19    MR. ARHANGELSKY:  I'm not sure.
20    MR. DARNELL:  Okay.  If you want to use this --
21    MR. ARHANGELSKY:  I don't think that we could find a
22 signed version but -- it might take me a few minutes to
23 get you that and so I don't think it's necessary at this
24 point.  We'll move on.  We'll come back.
25    Q    As of December 27, 2011, you intended to file

Page 173

1 suit on behalf of Trycia Carlberg against Natural
2 Immunogenics.  Is that fair?
3    A    No.  I don't think that's fair to say.  Um, I
4 said specifically in the letter that I sent them that all
5 we wanted them to do was to stop violating the law because
6 they were encouraging people to do something that could
7 kill them, to ingest silver, which the FDA had already
8 told them not to do and which also violated California
9 law.  And I said if you'll just conform your activities to
10 comply with California law, we will take no further action
11 in this matter.  So I don't think it's fair to say that I
12 was already planning to sue them on December 27th.
13    Q    If NIC didn't respond to your demand letter at
14 all, were you prepared as of December 27, 2011, to pursue
15 litigation on behalf of Trycia Carlberg?
16    A    Yes.
17    Q    But you later determined that Ms. Carlberg wasn't
18 fit for litigation; is that fair?
19    A    No.  That's not accurate.  I concluded that she
20 would likely not be the right person to be a class
21 representative against a company like Natural Immunogenics
22 as I learned more about them.
23    Q    And when did you make that determination that she
24 might not be an adequate class representative?
25    A    It was a gradation decision.  As I learned more

30(b)(6) Scott J.  Ferrell
April 01, 2021
170..173
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 174

1  about the company and as her health deteriorated in 2012,
2  my concerns about how the litigation would play out began
3  to grow and I had concerns about exposing Trycia to the
4  kind of misconduct that I feared that they might engage
5  in.  And so I asked, I believe, both of our field
6  representatives to determine whether other suitable
7  claimants had taken the product who might be more durable
8  than Trycia.
9      Q    Okay.  And you reached that conclusion about
10  Ms. Carlberg in the middle part of January 2012; is that
11  right?
12      A    It was a gradation decision as --
13      Q    But by the middle part of January 2012, you had
14  decided that she was no longer someone who should be a
15  class representative in the lawsuit?
16      A    As I sit here today, I don't know when a final
17  decision was made, but I believe that there are documents
18  that would refresh my memory as to the date when that
19  decision was going on.
20      MR. ARHANGELSKY:  Okay.  I've placed a document in
21  front of the witness which we've marked as Exhibit 645
22  which is Docket 812 from the instant litigation.  The
23  title of the document is Notice of Public Docketing of
24  Declaration of Scott J. Ferrell Pursuant to Minute Order,
25  Docket No. 809.  This document is lengthy and -- 49 pages.

Page 175

1  But we're including it for sake of completeness.
2      (Plaintiff's Exhibit 645 was marked for identification.)
3  BY MR. ARHANGELSKY:
4      Q    Do you recognize this declaration that you filed
5  in this lawsuit?
6      A    Can you give me permission to review this right
7  now?
8      Q    Oh, absolutely.
9      A    It doesn't look like I have -- now it does.
10  Thank you.
11      Q    Yes.  And then, Mr. Ferrell, while you're
12  reviewing the document, I'll represent that I intend to
13  ask you questions regarding paragraph 14 in this
14  declaration.
15      A    Thank you.
16          Okay.
17      Q    You stated in paragraph 14 that in the middle
18  part of January 2012, you concluded that It would be
19  prudent to try to identify additional consumers of
20  Sovereign Silver who had complaints about the product who
21  may be suitable to serve as a class representative to
22  pursue potential claims through litigation against NIC.
23  Do you see that statement that you made?
24      A    I do.
25      Q    And does that refresh your recollection as to

Page 176

1  when in January 2012 you decided that Ms. Carlberg would
2  not be suitable for litigation?
3      A    It does not.
4      Q    All right.
5      A    It does identify the dates on which -- or the
6  date range on which I concluded it would be prudent to try
7  to identify additional consumers in the event that
8  Trycia's condition continued to worsen.
9      Q    Now, did you learn anything about Natural
10  Immunogenics by January 2012 that gave you concern that
11  NIC would be hostile in litigation?
12      A    Yes.
13      Q    And what did you learn?
14      A    Quite a number of things.  First, I was shocked
15  that when I sent them a letter saying all I want from you
16  is to stop violating the law that they didn't just
17  acknowledge that and say, okay, we'll stop making these
18  claims that are illegal.  When that didn't happen, I
19  investigated further and found additional troubling
20  information.
21          I learned that the company had been funded with
22  money stolen or looted from an airline and that the
23  founder had moved to Florida to prevent the funds that had
24  been looted from being taken under Florida's favorable
25  asset protection laws.  I then learned that the founder

Page 177

1  and his family had what can only be described as
2  apocalyptic tendencies, that one of his sons was a
3  convicted felon, and that two of his other sons had filed
4  sworn statements accusing federal judges of being
5  terrorists controlled by the deep state.  I learned that
6  the FDA had instructed the company to stop engaging in
7  certain false marketing and that the company had ignored
8  it.  And there were probably other things -- oh, I also
9  did a fairly deep dive into just how harmful and deadly it
10  could be to ingest silver, learned about how it can cause
11  what I believe is called argyria, which causes a person's
12  skin to turn blue, how it can -- can and has killed people
13  before who have over-ingested it and concluded that I was
14  staring into an abyss of evil.
15      Q    Okay.  And you had found all that information out
16  by January 2012?
17      A    I had found --
18      Q    Yes or no?
19      A    I had found a great deal of information out by
20  January 2012.  Since that time I found out additional
21  information that can only be described as shockingly
22  felonious.
23      Q    All right.  All right.  So how many lawsuits did
24  the NTG firm file on behalf of Ms. Carlberg?
25      MR. DARNELL:  Objection, exceeds the scope.

30(b)(6) Scott J.  Ferrell
April 01, 2021
174..177
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 178

```
 1    THE WITNESS:  I don't believe that we filed any of the
 2  lawsuits that I found out about in December of 2011.  I
 3  believe that we referred one to another firm, that we
 4  settled one at the demand letter stage.  And then, the
 5  instant lawsuit, as we discussed, as Trycia's condition
 6  worsened and I learned additional troubling facts about
 7  Natural Immunogenics, we began to search for additional,
 8  suitable claimants.
 9    MR. ARHANGELSKY:  I've placed a document in front of
10  the witness which we've marked as Exhibit 646.
11  (Plaintiff's Exhibit 646 was marked for identification.)
12  BY MR. ARHANGELSKY:
13    Q    Mr. Ferrell, is this a document that NTG's
14  produced to NIC in this case?
15    A    Yes.
16    Q    And on the first page at the very bottom you
17  wrote to Sariah Para and Ms. Carlberg and you said,
18  Sariah, Can you please -- can you bring Trycia's check
19  from the most recent settlement to dinner tomorrow?  Do
20  you see that?
21    A    Yes.
22    Q    And was this in association with Ms. Carlberg's
23  claim against Brett Titanium Bracelet?
24    A    It was either in conjunction with the settlement
25  of Brett Titanium Bracelet or her claim against Wellnx NV,
```

Page 179

```
 1  one of those two.
 2    Q    Did she recover two settlements in 2012?
 3    A    Yes.
 4    Q    So she recovered against Wellnx and Brett
 5  Titanium Bracelet?
 6    A    Yes.
 7    Q    To your knowledge did Ms. Carlberg serve any
 8  other demand letters in 2012 against any other companies
 9  other than Wellnx, titanium -- Brett Titanium Bracelet,
10  and Natural Immunogenics?
11    A    Not to my knowledge.  And I don't know if a
12  demand letter was served in the Brett Titanium Bracelet
13  case or not.
14    Q    But a complaint was filed in her name in the
15  Brett Titanium Bracelet case; is that right?
16    A    I believe so.
17    Q    And that was filed in 2012?
18    A    I would have to look at the date since it was not
19  my firm that filed it.
20    Q    Did she sign a retainer agreement with your firm
21  in February 2012?
22    A    In the Brett Titanium case?
23    Q    Yes.
24    A    I don't recall whether she signed one with us or
25  whether she signed one with Kirtland & Packard or whether
```

Page 180

```
 1  she signed with both of us, but I believe that documents
 2  exist that would reflect what the reality was.
 3    MR. ARHANGELSKY:  All right.  I've placed a document
 4  in front of the witness which is marked as Exhibit 647.
 5  (Plaintiff's Exhibit 647 was marked for identification.)
 6  BY MR. ARHANGELSKY:
 7    Q    Please take a look at this document.
 8    A    I see that.
 9    Q    Do you recognize the document?
10    A    I do.
11    Q    And what is this?
12    A    The first four pages of the document are the hard
13  copy of -- or the soft copy of the engagement letter with
14  Ms. Carlberg in the Brett Titanium Bracelet case.  The
15  final page is a picture that I took of her signature, my
16  signature and the final page and that I emailed to
17  someone.
18    Q    Okay.  So it appears, would you agree, that
19  Ms. Carlberg signed this retainer agreement on February 8,
20  2012?
21    A    Yes.
22    Q    And the Brett Titanium case was filed in her name
23  sometime after that, right?
24    A    I don't know when the Kirtland & Packard firm
25  filed that case.
```

Page 181

```
 1    MR. ARHANGELSKY:  I've put another document in front
 2  of the witness which we have marked as Exhibit 648.  This
 3  is a document with the Bates No. NTG 22177.
 4  (Plaintiff's Exhibit 648 was marked for identification.)
 5  BY MR. ARHANGELSKY:
 6    Q    Mr. Ferrell, can you review this?  And my
 7  question is, is this a document that NTG provided to NIC
 8  in discovery?
 9    A    Yes, it is.
10    Q    And here at the bottom on the first page -- it's
11  only a one-page document.  At the bottom of the page it
12  says -- this is an email that you wrote to your father
13  Wynn Ferrell -- Dad, Can you remind me who it was that
14  complained about this product?  I've got a box of it,
15  attached, but I've lost my notes on it.  Do you see that?
16    Q    All right.  Were you referring to Andrew Nilon
17  when you wrote this email to your father on January 22nd?
18    A    I don't believe so.
19    MR. DARNELL:  Peter, before you ask the next
20  question -- Peter, is there a second page to this
21  document?
22    MR. ARHANGELSKY:  I -- I don't know that there is.
23    MR. DARNELL:  I just want to make sure I'm not missing
24  something.  It looks like there might be.  But go ahead.
```

30(b)(6) Scott J. Ferrell
April 01, 2021
178..181
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 182

1   MR. ARHANGELSKY:  Well, I -- I -- the version that I
2   have here, it looks like I only have one page, but we can
3   look at a break to determine whether or not it's
4   incomplete.
5   Q    My question is, do you know who you were
6   referring to when you were asking your father, informing
7   him about the product -- I'm sorry -- the person who
8   complained about the product?
9   A    In reviewing this document for my deposition
10  today, it appears to, at least as I read it, refer to two
11  different plaintiffs who we were screening that had
12  been -- either contacted the office and had been routed to
13  my dad or who my dad had inquired about, potential
14  claimants, and brought two different people back.
15  Q    Okay.  Where does it mention two different people
16  in this document?
17  A    Well, it doesn't explicitly.  But if you put the
18  email exchange together, I'm saying -- I'm referencing a
19  conversation I had with my dad prior to January 22nd and
20  then I'm saying, dad, can you remind me and then later
21  he's saying, Scott, can you remind me.  So it seems like
22  we were talking about two different people and that
23  that -- and my dad said can you call me so we can chat
24  because I think he realized that one or both of us were
25  talking about different people.

Page 183

1   Q    Sitting here today do you recall that
2   conversation that you had with your father?
3   A    I don't.
4   Q    Sitting here today do you have the name of any
5   individual other than Mr. Nilon who might have been a
6   plaintiff in the NIC case?
7   A    Other than Ms. Carlberg and Mr. Nilon?
8   Q    Sure.
9   A    I don't.  That's why I was asking my dad.
10  Q    Okay.  NTG replaced Andrew Nilon -- excuse me.
11  Strike that.
12       NTG substituted Andrew Nilon with
13  Giovanni Sandoval as a plaintiff in the NIC litigation in
14  2014; is that right?
15  A    Yes.
16  Q    Did NTG have a field representative assigned to
17  Mr. Sandoval?
18  A    Not that I know of.
19  Q    Did any NTG field rep. communicate with
20  Mr. Sandoval at any point between 2013 and 2015?
21  A    I don't believe so.
22  Q    Was NTG in contact with someone named
23  Heidi Franco in 2013?
24  A    I don't know.
25  Q    Was Ms. Heidi Franco an NTG client at any point

Page 184

1   in 2013?
2       MR. DARNELL:  Objection, exceeds the scope.
3       THE WITNESS:  I don't know.
4   BY MR. ARHANGELSKY:
5   Q    Do you know if NTG ever served a demand letter on
6   behalf of Ms. Franco?
7       MR. DARNELL:  Objection, exceeds the scope.
8       THE WITNESS:  Not that I know of.
9   BY MR. ARHANGELSKY:
10  Q    Did NTG ever refer Ms. Heidi Franco to another
11  attorney or law firm for litigation purposes in 2012 or
12  2013?
13      MR. DARNELL:  Objection, exceeds the scope.
14      THE WITNESS:  Not that I know of.
15      MR. ARHANGELSKY:  All right.  Now I've placed a
16  document in front of the witness which will be marked as
17  Exhibit 649 and this is a document that was filed as
18  Docket 140 in the instant matter.
19  (Plaintiff's Exhibit 649 was marked for identification.)
20  BY MR. ARHANGELSKY:
21  Q    Mr. Ferrell, could you please take a look at this
22  document or collection of documents?  And specifically I'm
23  going to ask you questions about Mr. Baslow's declaration
24  which appears on page -- I believe it's page 3.
25      MR. DARNELL:  And I'll just object this exceeds the

Page 185

1   scope of the deposition notice.
2       THE WITNESS:  Okay.  And I'm looking at page 3.
3       MR. ARHANGELSKY:  Yes.
4       THE WITNESS:  Okay.
5   BY MR. ARHANGELSKY:
6   Q    Mr. Baslow testified in this case that in
7   October 2013 he attempted to contact Cynthia Sandoval by
8   dialing the phone number 619-952-9832 about her own legal
9   matter and that Ms. Sandoval was a client of Newport Trial
10  Group.  Did I read that correctly?
11      MR. DARNELL:  Objection, exceeds the scope.
12      THE WITNESS:  That's what it appears to say to me.
13  BY MR. ARHANGELSKY:
14  Q    Did the NTG firm pursue a CLRA case on behalf of
15  Cynthia Sandoval at any point in 2013?
16      MR. DARNELL:  Objection, exceeds the scope.
17      THE WITNESS:  Not that I know of.
18  BY MR. ARHANGELSKY:
19  Q    Did Cynthia Sandoval receive money in litigation
20  through a settlement in 2013 through the NTG firm?
21      MR. DARNELL:  Objection, exceeds the scope.
22      THE WITNESS:  Not that I know of.
23  BY MR. ARHANGELSKY:
24  Q    Okay.  Was Mr. Baslow an assigned NTG field rep.
25  related to Ms. Cynthia Sandoval in 2013?

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

**Page 186**

1    MR. DARNELL:  Objection, exceeds the scope, lacks
2  foundation.
3    THE WITNESS:  Other than what it says here in
4  paragraph two of his declaration, I don't know.
5  BY MR. ARHANGELSKY:
6    Q    Do you know what the purpose of Mr. Baslow
7  contacting Cynthia Sandoval was in October 2013?
8    MR. DARNELL:  Objection, exceeds the scope.
9    THE WITNESS:  I don't.
10  BY MR. ARHANGELSKY:
11    Q    Now, was your father Wynn Ferrell the field
12  representative who assisted NTG in the Torres Nutrisystem
13  matter?
14    A    I don't know.
15    Q    Just a minute.  I'm pulling up a document.
16    The Torres v. Nutrisystem case was a CIPA wiretap
17  case; is that right?
18    A    Yes.
19    Q    Was Raquel Torres a tester in that CIPA case?
20    A    As I understand the phrase tester, which is a
21  very broad definition that we've already provided, I think
22  it's unclear.  I read her deposition transcript and I
23  don't think she perceived herself as a tester.
24    MR. ARHANGELSKY:  I placed a document on screen which
25  I've marked as Exhibit 650.

**Page 187**

1  (Plaintiff's Exhibit 650 was marked for identification.)
2  BY MR. ARHANGELSKY:
3    Q    Mr. Ferrell, please review this document.  My
4  question will be whether this is a document that NTG has
5  produced to NIC in this case.
6    A    Yes.
7    Q    Okay.  And at the top here you wrote to your
8  father Wynn Ferrell, Hi, Dad.  Thanks for handling the
9  wiretaps below.  Do you see that?
10    A    I do.
11    Q    And does that refresh your recollection as to
12  whether Wynn Ferrell was a field representative assigned
13  to the Torres v. Nutrisystem case?
14    A    Is there a second page here?  Okay.  There is a
15  second page.
16    Okay.  I see that.  And, yes, it does refresh my
17  memory.
18    Q    Was that the first date that Wynn Ferrell
19  communicated with Raquel Torres in any fashion?
20    MR. DARNELL:  Objection, exceeds the scope.
21    THE WITNESS:  As I sit here, I have no idea.
22  BY MR. ARHANGELSKY:
23    Q    You wrote at the top of this document, relating
24  to the same email to your father, As a reminder to our
25  plaintiffs, each of them will need to advise us of what

**Page 188**

1  confidential information that they shared with the
2  defendant.  It will need to be completely accurate because
3  the defendants will have a recording of the calls.  Do you
4  see that?
5    A    Yes.
6    Q    Are you referring here to the confirmation
7  statements that wiretap clients would provide the firm
8  after their calls?
9    A    I believe so.
10    Q    And when did Wynn Ferrell ask Raquel Torres to
11  provide a confirmation statement?
12    A    I don't know.
13    Q    All right.  Do you know if he did ask
14  Raquel Torres to provide a confirmation statement?
15    MR. DARNELL:  Objection, exceeds the scope.
16    THE WITNESS:  I don't.
17  BY MR. ARHANGELSKY:
18    Q    Okay.  Do you know -- I'll strike that.
19    When did Raquel Torres make her call to
20  Nutrisystem?
21    A    I thought -- I was under the impression she made
22  more than one call.
23    Q    When did she make the first call to Nutrisystem?
24    A    I don't know, but there are documents from the
25  underlying case that would reflect that.

**Page 189**

1    Q    And did Andrew Baslow perform an audit call to
2  Nutrisystem prior to the date when Raquel Torres called
3  Nutrisystem?
4    MR. DARNELL:  Objection, exceeds the scope.
5    THE WITNESS:  I would have to look at it.  But I
6  believe before Ms. Torres ever came into the picture, we
7  had been contacted by at least one other individual who
8  had seen a story about illegal recording and I think it
9  maybe tipped us off to it and so I asked Andrew to
10  investigate and perform an audit response in that regard.
11  And I don't know as I sit here whether Andrew performed a
12  series of calls as it related to this first individual or
13  individuals or another series as it relates to Ms. Torres
14  or some combination there.
15  BY MR. ARHANGELSKY:
16    Q    I think you're referring to Richard Richardson.
17  Is that the individual who you allege tipped Newport Trial
18  Group off?
19    A    That name is familiar.  I -- I believe there was
20  more than one person.
21    Q    Have you ever personally spoken with
22  Raquel Torres?
23    A    At least one time that I recall.
24    Q    When was that time when you personally spoke with
25  Raquel Torres?

30(b)(6) Scott J.  Ferrell
April 01, 2021
186..189
EXHIBIT 9
DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 190

1    A    I passed her in the lobby and she was introduced
2  to me.
3    Q    In the lobby of where?
4    A    I believe it was in the lobby of our offices.
5    Q    Okay.  And how long -- did you speak with
6  Raquel Torres at the time?
7    A    As I recall, we exchanged pleasantries.  I
8  thanked her for being an avenger for consumer justice and
9  that was that.
10   Q    Okay.  Did -- other than that conversation with
11 Raquel Torres, did you have any other correspondence or
12 conversation with her directly that you can recall?
13   A    Not that I recall as I sit here.
14   MR. ARHANGELSKY:  Can we take a five-minute break,
15 please?
16   THE WITNESS:  Excellent timing.  Thank you.
17   THE VIDEOGRAPHER:  This is the end of Media File
18 No. 6.  We're now going off the record.  The time is
19 4:04 p.m.
20                (BRIEF RECESS.)
21   THE VIDEOGRAPHER:  This is the beginning of Media File
22 No. 7.  We're now going on the record.  The time is
23 4:13 p.m.
24 BY MR. ARHANGELSKY:
25   Q    Okay.  The NTG firm filed a lawsuit on behalf of

Page 191

1  Felipe Morales against a company called Magna RX in 2010.
2  Is that right, Mr. Ferrell?
3    A    I believe so.
4    Q    Did NTG have a case chart listing the Morales
5  case in 2010?
6    A    As I sit here, I don't know.
7    Q    Did NTG maintain case charts of its CLRA cases in
8  2010 or 2011?
9    A    Not that I recall.
10   Q    Was Wynn Ferrell the NTG field representative
11 assigned to that Morales case in 2010?
12   A    As I sit here, I don't know.
13   Q    And how did the NTG firm first come into contact
14 with Felipe Morales?
15   A    If Mr. Morales was a plaintiff in a Magna RX
16 case, then I believe that he and other people were
17 referred to us from an attorney at the California Attorney
18 General's Office, I believe.  But this was 11 years ago.
19   Q    But that -- so that attorney at the California
20 Attorney General's Office directly referred Mr. Morales to
21 the NTG firm?
22   A    That I don't know.
23   Q    When specifically did the attorney from the
24 Attorney General's office refer Mr. Morales to NTG?
25   A    We talked about this a little bit on Tuesday and

Page 192

1  I don't know the specific date or whether he referred them
2  specifically or put them in touch with us other than to
3  note that that was the genesis of those cases.
4    Q    And you don't recall the name of that attorney
5  from the California Attorney General's Office?
6    A    Correct.
7    Q    And you don't recall the specific dates when you
8  spoke with the California Attorney General about those
9  plaintiffs?
10   A    So to be clear, I did not speak with the
11 California Attorney General, the elected official.
12   Q    Thank you.  The attorney who worked for the
13 California Attorney General's Office.
14   A    I could discern for you that it preceded the
15 earliest Magna case because that's what brought it to our
16 attention and we can probably narrow down the dates that
17 way.  But beyond that, as I sit here, I don't know in the
18 abstract.
19   Q    Who was the first person at NTG to communicate
20 with Felipe Morales?
21   A    I don't know.
22   Q    Do you know when NTG first communicated with
23 Mr. Morales?
24   A    As I sit here, I do not.
25   Q    Does NTG have any document that memorializes

Page 193

1  Morales's first contact with the firm?
2    A    I don't know.  We might.
3    MR. ARHANGELSKY:  Okay.  I've placed a document in
4  front of the witness which is marked Exhibit 651.
5    (Plaintiff's Exhibit 651 was marked for identification.)
6  BY MR. ARHANGELSKY:
7    Q    Mr. Ferrell, please review this document.
8    A    Okay.
9    Q    And is this a document that NTG produced to NIC
10 in discovery?
11   A    Yes.
12   Q    And here in the bottom email where you wrote to
13 Wynn Ferrell where you said If the second individual
14 complained to us, and it goes on, were you asking your
15 father to help NTG investigate a class representative in
16 the Magna RX case?
17   A    Beyond what this email says and what I can
18 discern from it, I don't know.
19   Q    Now, you wrote that in discussing this particular
20 individual potential class representative that If he has
21 proof of purchase and has not been a plaintiff before, I
22 would like to investigate his claims further and determine
23 whether he would be an adequate class representative.  Do
24 you see that?
25   A    Yes.

30(b)(6) Scott J.  Ferrell
April 01, 2021

190..193
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

**Page 194**

1   Q   When you said has not been a plaintiff before,
2   were you referring to has not been a plaintiff with the
3   NTG firm?
4   A   No.  I was referring to whether he had already
5   filed a lawsuit against Magna RX.
6   Q   And your father Wynn Ferrell responded and said
7   Please email me all of the documents by 10:00 a.m.  And
8   that was an email to you and Linda Berger, right?
9   A   Yes.
10  Q   Who is Linda Berger?
11  A   She was a secretary at our firm at the time.
12  Q   Is she no longer employed with NTG?
13  A   Correct.
14  Q   And when did she stop working for NTG?
15  A   Quite some time ago.  Maybe 10 years ago.
16  Q   Do you know where Linda Berger currently works
17  today?
18  A   I don't.
19  Q   What documents was Wynn Ferrell requesting when
20  he said Please email me all of the documents by
21  10:00 a.m.?
22  A   I believe the engagement letter and the duties of
23  a class representative document.
24  Q   And he was going to meet with Felipe Morales that
25  evening -- well, that Thursday evening following this

**Page 195**

1   email; is that right?
2   A   That's what he says in the email.
3   Q   Do you know whether he did, in fact, meet with
4   Mr. Morales on that Thursday evening?
5   A   I don't know.
6   Q   And he would have taken a retainer agreement with
7   him to that meeting; is that right?
8   A   I don't know.
9   Q   All right.  When he said I will leave the
10  document, et cetera, on your desk Friday morning, was he
11  referring to the retainer agreement?
12  A   I don't know for sure, but that is a logical
13  inference from that.
14  Q   And did he, in fact, leave the retainer agreement
15  on your desk on Friday morning?
16  MR. DARNELL:  Objection, misstates the document.
17  THE WITNESS:  So he wasn't referring to my desk.  He
18  was referring to Linda's desk.
19  MR. ARHANGELSKY:  Oh.
20  THE WITNESS:  And --
21  MR. ARHANGELSKY:  Okay.  Thank you.
22  THE WITNESS:  -- I don't know what documents he left
23  on her desk on a Friday morning 11 years ago.
24  BY MR. ARHANGELSKY:
25  Q   Okay.  Linda Berger's desk, though, would have

**Page 196**

1   been located in the Newport Trial Group's office?
2   A   Correct.
3   Q   And in 2010, April 2010, where was that office?
4   A   In April 2010, I believe we were working out of
5   my house.
6   Q   Okay.  So Ms. Berger's desk was in your house at
7   the time?
8   A   Yes.
9   Q   Okay.  What was the address of your house at the
10  time?
11  A   78 South La Senda Drive in Laguna Beach,
12  California.
13  Q   Now, at some point the NTG firm lost contact with
14  Mr. Morales; is that right?
15  A   As I sit here, I don't know.
16  MR. ARHANGELSKY:  Okay.  I've placed a document in
17  front of the witness which we have marked as Exhibit 652.
18  The title of the document is Declaration of Wynn Ferrell
19  In Support Of Plaintiff's Opposition For Motion For
20  Sanctions.  I believe this is filed in the Magna v.
21  Morales case.
22  (Plaintiff's Exhibit 652 was marked for identification.)
23  BY MR. ARHANGELSKY:
24  Q   Mr. Ferrell, have you seen this document before?
25  A   I don't recall having seen this document before.

**Page 197**

1   Q   Do you know who drafted this document?
2   A   I don't.
3   Q   I'm turning your attention to paragraph 5 which
4   is on page 2 of this document and goes on to page 3.  Just
5   read that paragraph for me and let me know when you're
6   finished.
7   A   Okay.  I have read it.
8   Q   So Dear Ms. -- your father Wynn Ferrell testified
9   that As of approximately late May, slash, early June 2010,
10  after my initial contacts with him, I was unable to make
11  contact with -- I believe Felipe Morales -- despite my
12  efforts to reach him via telephone calls to him, and he
13  goes on.  Do you see that?
14  A   Yes.
15  Q   So when specifically did the NTG firm lose
16  contact with Mr. Morales in the Magna case?
17  A   From looking at this document I have no idea
18  except that it says as of late May or early June my dad
19  had been unable to reach him.
20  Q   And do you know what specific dates Wynn Ferrell
21  attempted to reach Mr. Morales in late May, early June?
22  A   Of 2010?  No, I don't.
23  Q   No?
24  Do you know what was the last time NTG was in
25  contact with Mr. Morales prior to this late May, early

30(b)(6) Scott J.  Ferrell
April 01, 2021                                    194..197
                                                  EXHIBIT 9
DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 198

1 June period?

2    A    I don't.

3    Q    And did anyone at the NTG firm other than

4 Wynn Ferrell attempt to reach Mr. Morales in this time

5 period?

6    A    I don't know.

7    Q    Did NTG make any payments to Felipe Morales as

8 part of the Magna RX lawsuit?

9    A    I'd have to look to see if he signed a settlement

10 agreement and look at the settlement agreement to know for

11 sure.

12    MR. ARHANGELSKY:  I placed a document in front of the

13 witness which we've marked as Exhibit 653.  This is a

14 document that appears to have been filed in the matter

15 no. 10-cv-1601 as Docket 28-2.

16    (Plaintiff's Exhibit 653 was marked for identification.)

17 BY MR. ARHANGELSKY:

18    Q    Mr. Ferrell, do you recognize this document?

19    A    I don't.

20    Q    Okay.  Does this refresh your recollection as to

21 whether or not there was a settlement agreement involving

22 Mr. Morales?

23    MR. DARNELL:  Objection, exceeds the scope.

24    THE WITNESS:  The document on page 2 references a

25 settlement agreement between Mr. Morales and Vitasprings.

Page 199

1 BY MR. ARHANGELSKY:

2    Q    Okay.  Did NTG issue a payment to Mr. Morales in

3 the amount of a thousand dollars --

4    MR. DARNELL:  Objection --

5 BY MR. DARNELL:

6    Q    -- in conjunction with this settlement?

7    MR. DARNELL:  Objection, exceeds the scope.

8    THE WITNESS:  I can't say as I sit here.  But if we

9 received a settlement payment of a thousand dollars, it

10 would be our practice to transmit it to the client.

11 BY MR. ARHANGELSKY:

12    Q    And would that have been by a check?

13    MR. DARNELL:  Objection, lacks foundation, calls for

14 speculation, exceeds the scope.

15    THE WITNESS:  If and to the extent a settlement

16 payment was made to Mr. Morales, it would be our practice

17 that it go by check.

18 BY MR. ARHANGELSKY:

19    Q    After losing contact with Mr. Morales sometime in

20 May or June of 2010, on what day did you then decide to

21 look for a new plaintiff in the Magna RX case?

22    A    I don't know that we did look for new plaintiffs

23 in the Magna RX case.  I know that we had multiple people

24 who had been referred to us, but I don't know what the

25 timing was of various plaintiffs.

Page 200

1    Q    When was NTG firm's first contact with

2 Daniel Bobba?

3    A    I don't recall specifically, but I know there

4 have been declarations that reflect communications that we

5 had with Mr. Bobba that might give us some additional

6 context.

7    Q    And how did the firm first communicate with him?

8 Was it by telephone or email or any other means?

9    A    As I sit here, I don't know what our first

10 communication with him was.

11    Q    But it's true, is it not, that your father

12 Wynn Ferrell met with Mr. Bobba in June of 2010 for a

13 client intake?

14    A    That's consistent with my memory as I sit here,

15 but to know for sure I would need to cross-reference my

16 dad's declaration along with Mr. Bobba's deposition

17 testimony.

18    Q    And you -- but you reviewed Mr. Bobba's testimony

19 and your father's declaration as part of your preparation

20 for your deposition today; is that right?

21    A    Yes.

22    Q    And other than your father Wynn Ferrell, did

23 anyone else from NTG meet with Dan Bobba in June 2010?

24    A    Not that I'm aware of.

25    Q    Have you ever met with Mr. Bobba in person?

Page 201

1    A    I don't believe so.

2    Q    Have you ever spoken to Mr. Bobba?

3    A    Yes.

4    Q    And when did you speak with Mr. Bobba?

5    A    I believe it was September of 2010.

6    Q    And when in September 2010 did you communicate

7 with him?

8    A    I -- I've referenced it in a declaration

9 somewhere.  Without looking at the declaration I can't be

10 sure, but I think it was around September 4th.

11    Q    And what was the substance of your communication

12 with Mr. Bobba at the time?

13    A    I called Mr. Bobba, told him that I needed his

14 complete attention to discuss something incredibly serious

15 with him, told him that Magna RX was attributing to him

16 comments that had been made on the internet that I found

17 incredibly disturbing, and I told him that I needed him to

18 be absolutely truthful with me and answer all of my

19 questions and then I proceeded to interview him about the

20 comments that had been made on the internet and the source

21 of those comments and the truth or falsity of those

22 comments.

23    Q    And that communication you had with Mr. Bobba was

24 on September 4, 2010?

25    A    I believe it was September 4th or thereabouts.

30(b)(6) Scott J.  Ferrell
April 01, 2021

198..201
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 202

```
1      Q    Is that before or after your brother Ryan had met
2   with Mr. Bobba at his residence?
3      A    His conversation with Mr. Bobba preceded Ryan
4   meeting with Mr. Bobba.
5      Q    And how did you contact Mr. Bobba?
6      A    By phone.
7      Q    Was it by cell phone or hard line?
8      A    I believe it --
9      Q    Was that cell phone?
10     A    I believe it was by the landline at my house
11  because I was reviewing with him with my hands free with
12  him on speakerphone.
13     Q    Now, Mr. Bobba signed a retainer agreement with
14  NTG in June 2010, right?
15     A    I would have to look at the retainer agreement to
16  know for sure.
17     Q    Does NTG have a copy of Mr. Bobba's retainer
18  agreement?
19     A    I believe we do and that we've produced it.
20     Q    And you reviewed that, too, as part of your
21  preparation for the deposition today?
22     A    I have.
23     Q    How did NTG come into possession of Mr. Bobba's
24  signed retainer agreement?
25     A    I don't recall.
```

Page 203

```
1      Q    Other than this phone conversation you had with
2   Mr. Bobba in 2010, did you have any other communications
3   with Mr. Bobba directly?
4      A    Not that I recall as I sit here.
5      Q    And do you have any documentary evidence that
6   memorializes your phone call with Mr. Bobba in
7   September 2010?
8      A    Yes.
9      Q    And what is that documentary evidence?
10     A    My declaration that describes the phone call.
11     Q    Okay.  So your declaration that you submitted in
12  Docket 63-3 of the Magna case reveals that you spoke to
13  Mr. Bobba on the telephone?
14     A    I don't know which declaration reflects that.
15     Q    For the record you produced a declaration in this
16  case that says you spoke with Dan Bobba?
17     MR. DARNELL:  Is that a question?
18     MR. ARHANGELSKY:  Yes.
19     MR. DARNELL:  Objection, vague as phrased.
20     THE WITNESS:  Do you mean our discovery responses?
21  BY MR. ARHANGELSKY:
22     Q    Have you produced any discovery responses in this
23  case that indicate you've spoken with Mr. Bobba?
24     MR. DARNELL:  Objection, vague as phrased.
25     THE WITNESS:  I believe our special interrogatory
```

Page 204

```
1   responses were asked to identify what witnesses we had
2   spoken to and I believe that Mr. Bobba was one of those.
3      MR. ARHANGELSKY:  All right.  I've placed a document
4   in front of the witness which is our Exhibit 654.  There's
5   another exhibit marking on there which is -- is that.  But
6   I'm directing you to the bottom right, Exhibit 654, which
7   has the NTG Bates 7673.
8      (Plaintiff's Exhibit 654 was marked for identification.)
9      THE WITNESS:  Yes.
10  BY MR. ARHANGELSKY:
11     Q    Have you seen this document before?
12     A    I believe so.
13     Q    And is this the declaration of Dan Bobba that NTG
14  submitted in the Magna lawsuit?
15     A    I believe so.
16     Q    And were you provided a copy of this declaration
17  in draft format before Mr. Bobba signed this declaration?
18     MR. DARNELL:  Objection, vague as phrased.
19     THE WITNESS:  I believe that after -- I believe the
20  short answer is that I was provided with a draft
21  declaration after Ryan met with Mr. Bobba late that
22  evening.
23  BY MR. ARHANGELSKY:
24     Q    How many times did Ryan Ferrell meet with
25  Mr. Bobba?
```

Page 205

```
1      A    As I recall from looking at their declarations
2   and testimony, um, the evening of September 4th and then
3   again maybe the morning of September 5th.
4      Q    And after you received a copy of the draft on
5   September 4th, did you revise that document in any way?
6      A    I believe I wordsmithed it.
7      Q    Does the final version of this declaration that
8   Mr. Bobba signed contain any text that you authored?
9      A    I don't know.
10     Q    Sitting here right now you can't point to any
11  information in this document -- I'm sorry -- any language
12  in this document that you yourself authored?
13     A    Correct.
14     Q    Okay.  Who is Michael Velarde?
15     A    Mike was an associate at Newport Trial Group.
16     Q    And as of September 2010, how long had
17  Mr. Velarde been an attorney?
18     A    I would have to look at his bar information to
19  know for sure, but he was relatively new.
20     MR. ARHANGELSKY:  Okay.  I've placed another exhibit
21  in front of the witness which I've marked as Exhibit 655
22  and this has a document that has a Bates number on the
23  first page NTG 11604.
24     (Plaintiff's Exhibit 655 was marked for identification.)
25     ///
```

30(b)(6) Scott J. Ferrell
April 01, 2021

202..205

EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 206

1  BY MR. ARHANGELSKY:
2      Q    Mr. Ferrell, please take a look at this document
3  and let me know if you're familiar with it.
4      A    Yes. I'm familiar with it.
5      Q    This is an email -- the first page is an email
6  that you wrote to Mr. Velarde on September 5th, 2010; is
7  that right?
8      A    Yes.
9      Q    Now, as part of the second paragraph that begins
10 with Bobba signed the attached declaration this morning,
11 do you see that paragraph?
12     A    Yes.
13     Q    You wrote I have also reviewed all of the
14 contemporaneous internal correspondence on this and our
15 own records confirm that we acted with the utmost
16 integrity and professionalism. Did I read that right?
17     A    Yes.
18     Q    What record are you specifically referencing
19 here?
20     A    As I sit here 11 years later, I don't know for
21 sure. But I do recall that when I saw that posting and
22 saw the motion that I was incredibly angry and I
23 originally believed that it had been falsely attributed to
24 him by someone associated with Magna. And I then spoke to
25 Mike, Ryan, Wynn, and everyone else who had a connection

Page 207

1  to the case and interviewed them very pointedly and very
2  aggressively and asked if there was any truth to the
3  statements that Mr. Bobba had made that might relate to
4  our firm and I remember --
5      Q    So you can't -- I'm sorry.
6      A    And I told everyone that if I learned that there
7  was a kernel of truth to what he was saying and if that
8  kernel of truth related to our firm that there would be
9  very, very severe repercussions. And --
10     Q    And --
11     A    And as part of this process I did a deep dive
12 into all of the communications and correspondence and was
13 exceptionally relieved to conclude that our firm had acted
14 with the utmost integrity and professionalism.
15     Q    And what correspondence did you review
16 specifically?
17     A    Mr. Bobba's declaration, the engagement letter,
18 duties of a class rep., proof of purchase, confirmatory
19 purchase, document flow, and a lengthy email that I wrote
20 to Ryan. And there were likely others, but that's what I
21 recall, excuse me, sitting here 11 years later at a time
22 when I was about to get married and about to start a
23 massive trial.
24     Q    I think you mentioned two documents in there.
25 You said proof of purchase and confirmatory purchase.

Page 208

1  Right? Does the NTG possess copies of two product
2  receipts that Mr. Bobba supplied to the firm?
3      A    Not that I'm aware of. The only proof of
4  purchase that I am aware of is the confirmatory purchase
5  that he made at or about the time he signed the engagement
6  papers.
7      Q    And that's the only receipt that the NTG firm has
8  with reference to Mr. Bobba?
9      A    I don't believe we have the receipts from his
10 prior purchase. But if we have them, they've been
11 produced.
12     Q    And the Magna case ended in settlement, right?
13     A    The Magna case referenced here ended in
14 settlement.
15     MR. ARHANGELSKY:  Okay. I've placed another document
16 in front of the witness which I've marked as Exhibit 656.
17     (Plaintiff's Exhibit 656 was marked for identification.)
18 BY MR. ARHANGELSKY:
19     Q    Mr. Ferrell, please review this document and let
20 me know if you're familiar with it.
21     A    Yes. I am familiar with it.
22     Q    Is this the settlement agreement entered in the
23 Magna case?
24     A    No. I believe this is an engagement letter
25 executed after the settlement of the Magna case.

Page 209

1      Q    Right. And the first paragraph -- I'm sorry.
2  The first paragraph says I'm writing to confirm that in
3  connection with the global resolution of the lawsuit
4  pending in the Superior Court, and then it references the
5  Magna case, right? So as part of the settlement --
6      A    I'm sorry. It's a very long paragraph. It
7  references a number of things, but it starts with I'm
8  writing to confirm that and ends with NTG agrees to
9  represent Magna pursuant to the terms of this agreement.
10     Q    And as part of the resolution of the Magna case,
11 NTG agreed to pay Magna $4,000; is that right?
12     MR. DARNELL:  Objection, exceeds the scope.
13     THE WITNESS:  I know that there were payments that
14 went back and forth and one of the payments was from us to
15 them and one was from them to us.
16 BY MR. ARHANGELSKY:
17     Q    Okay. On page 2 under Fees which is under
18 section 4, NTG paid 5,000 to Magna and Magna had a $1,000
19 retainer, so a net of 4,000 to Magna. Do I understand
20 that correctly?
21     A    That appears to be accurate.
22     Q    And so as part of this settlement Magna agreed to
23 retain the Newport Trial Group; is that right?
24     A    I don't think it's fair to say it was part of the
25 settlement. Magna agreed to retain us, I believe, because

30(b)(6) Scott J. Ferrell
April 01, 2021

206..209
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 210

1 Steve and I developed a good relationship and he has since
2 that time requested to engage us on various matters.
3 **Q     What was Magna retaining NTG for as part of this**
4 **retainer agreement?**
5 A     I believe it says here -- I'd have to find it,
6 but I believe this was a plenary -- yeah.  Matters upon
7 which Magna specifically seeks our assistance.
8 **Q     Did Magna ever seek your legal assistance**
9 **following this retainer?**
10 A     Yes.
11 **Q     And when was that?**
12 A     The one time that I recall was when they were
13 sued in a --
14 MR. DARNELL:  I'm sorry.  I think he's just asking
15 when.  I want to caution you because this is an engagement
16 letter.  He's asking you about -- a question relating to
17 your representation of Magna.  His question, however, is
18 very specific, when.
19 THE WITNESS:  Oh.
20 MR. DARNELL:  And I want to caution you because I
21 don't want you to inadvertently reveal a attorney/client
22 privileged communication relating to what your
23 representation was about.
24 THE WITNESS:  Okay.  I'm sorry.  So your question was
25 when Magna sought our assistance after this?

Page 211

1 MR. ARHANGELSKY:  Yes.
2 THE WITNESS:  Three separate times, I believe, between
3 2012 and 2016.
4 BY MR. ARHANGELSKY:
5 **Q     All right.  And did the Newport Trial Group ever**
6 **sue Magna again following this retainer agreement?**
7 A     Not that I'm aware of.
8 MR. ARHANGELSKY:  I think by my clock we have about
9 30 minutes remaining.  Let's go off the record for -- give
10 me just five minutes to gather some notes and then wrap up
11 the day.  Does that sound all right?
12 THE WITNESS:  Yes.
13 MR. ARHANGELSKY:  Okay.  Thank you.
14 THE VIDEOGRAPHER:  This is the end of Media File
15 No. 7.  We're now going off the record.  The time is
16 4:57 p.m.
17               (BRIEF RECESS.)
18 THE VIDEOGRAPHER:  This is the beginning of Media File
19 No. 8.  We are now going on the record.  The time is
20 5:05 p.m.
21 BY MR. ARHANGELSKY:
22 **Q     Okay.  Mr. Ferrell, do you play any role in**
23 **maintaining the corporate books and records for Newport**
24 **Trial Group?**
25 MR. DARNELL:  Objection, exceeds the scope.

Page 212

1 THE WITNESS:  I'm not sure what it means to maintain
2 the corporate books and records other than like make sure
3 that our filings are up to date.  But if there's a
4 separate term of art that you mean, then let me know.
5 BY MR. ARHANGELSKY:
6 **Q     Well, I think I'm referring to the corporate**
7 **books with respect to the entity Newport Trial Group or**
8 **Pacific Trial Attorneys in compliance with corporate law.**
9 MR. DARNELL:  Objection, vague.
10 THE WITNESS:  Other than being responsible for making
11 sure that we do what we're supposed to do, I'm not sure
12 what you're asking.
13 BY MR. ARHANGELSKY:
14 **Q     Does the NTG firm use a CPA firm to perform any**
15 **audits of them, the books, at any point in time?**
16 MR. DARNELL:  Objection, exceeds the scope.
17 THE WITNESS:  Not that I know of.
18 BY MR. ARHANGELSKY:
19 **Q     Has Mr. Gharring ever audited NTG's books at any**
20 **point in the last 10 years?**
21 MR. DARNELL:  Objection, exceeds the scope.
22 THE WITNESS:  So I'm not an accountant, but I think
23 that to prepare our taxes it involves something like that.
24 BY MR. ARHANGELSKY:
25 **Q     Okay.  But you don't know whether or not that's**

Page 213

1 ever occurred sitting here today?
2 A     Other than making sure that he has the
3 information and documents that he needs and everything's
4 properly accounted for and calculated, I don't know if --
5 if that's an audit or not.
6 **Q     Okay.  Can you describe the yearly level of NTG's**
7 **gross revenues for the period of 2010 to the present?**
8 MR. DARNELL:  Objection, compound, calls for a
9 narrative.
10 THE WITNESS:  I think I can.
11 BY MR. ARHANGELSKY:
12 **Q     Please do.**
13 A     Well, I need you to break it down by year.
14 **Q     Okay.  Well, can you describe the yearly gross**
15 **revenues for NTG in 2010?**
16 A     So your question contains an extra word, either
17 our gross revenues in 2010 or our yearly revenues, but
18 yearly gross revenues in 2010 could mean two different
19 things.  Let me ask you this:  Are you asking me what our
20 gross revenues were in 2010?
21 **Q     Let's start with that.  What were your gross**
22 **revenues in 2010?**
23 A     I believe it was about $1.5 million.
24 **Q     What were your gross revenues in 2011?**
25 A     About two and-a-half million dollars.

30(b)(6) Scott J.  Ferrell
April 01, 2021

210..213
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 214

| 1 | Q | And gross revenues in 2012? |
| 2 | A | Approximately $4 million. |
| 3 | Q | What about 2013? |
| 4 | A | Approximately $7 million. |
| 5 | Q | What about -- I'm sorry.  Did I ask about 2014? |
| 6 | A | No.  You just asked about 2013. |
| 7 | Q | Okay.  Let me ask you about 2014.  What were the |
| 8 | gross revenues? |
| 9 | A | Approximately $7 million. |
| 10 | Q | And in 2015? |
| 11 | A | Approximately $7 million. |
| 12 | Q | And in 2016? |
| 13 | MR. DARNELL:  Objection, irrelevant. |
| 14 | But go ahead and answer. |
| 15 | THE WITNESS:  I think it was just over $7 million. |
| 16 | BY MR. ARHANGELSKY: |
| 17 | Q | And in 2018? |
| 18 | MR. DARNELL:  Same objection. |
| 19 | THE WITNESS:  Approximately six and-a-half million |
| 20 | dollars. |
| 21 | BY MR. ARHANGELSKY: |
| 22 | Q | And then in 2019? |
| 23 | A | Approximately seven and-a-half million dollars. |
| 24 | Q | And in 2020? |
| 25 | A | Approximately nine and-a-half million dollars. |

Page 215

| 1 | MR. DARNELL:  Same objection to everything past 2015. |
| 2 | But go ahead, Counsel. |
| 3 | BY MR. ARHANGELSKY: |
| 4 | Q | NTG's revenues increased substantially from 2013 |
| 5 | to 2015.  Is that fair? |
| 6 | MR. DARNELL:  Objection, misstates testimony. |
| 7 | THE WITNESS:  Yeah.  I think it's fair to say that |
| 8 | that was a time when our revenues increased. |
| 9 | BY MR. ARHANGELSKY: |
| 10 | Q | Is there a reason for the revenue increase? |
| 11 | A | Yes. |
| 12 | Q | And what was that reason? |
| 13 | A | We were handling a number of very dense, hourly |
| 14 | cases that we staffed up for. |
| 15 | Q | So the increase in revenue would have been |
| 16 | attributed to hourly rates charged on the defense side? |
| 17 | A | Sitting here that's what I would primarily |
| 18 | attribute that growth to. |
| 19 | Q | Has the NTG firm ever claimed that it recovered |
| 20 | over $300 million for its plaintiff clients? |
| 21 | A | We have claimed truthfully that the attorneys who |
| 22 | founded the firm have collectively recovered over |
| 23 | $300 million for our plaintiff clients. |
| 24 | MR. ARHANGELSKY:  All right.  This is an exhibit I |
| 25 | placed in front of the witness which I marked as |

Page 216

| 1 | Exhibit 657. |
| 2 | (Plaintiff's Exhibit 657 was marked for identification.) |
| 3 | BY MR. ARHANGELSKY: |
| 4 | Q | Mr. Ferrell, do you recognize this exhibit? |
| 5 | A | Yes. |
| 6 | Q | All right.  And again here in this -- and what is |
| 7 | this exhibit? |
| 8 | A | This appears to be our landing page of our |
| 9 | website. |
| 10 | Q | Okay.  And on page 2 in this website -- or I'm |
| 11 | sorry -- this exhibit -- excuse me. |
| 12 | Towards the bottom it says In the last several |
| 13 | years the attorneys who founded Pacific Trial Attorneys |
| 14 | obtained verdicts and settlements worth over $300 million |
| 15 | and secured many defense victories through motions and |
| 16 | trial.  Did I read that correctly? |
| 17 | A | Yes. |
| 18 | Q | So have the attorneys at Newport Trial Group |
| 19 | received over 300 million in settlements and verdicts over |
| 20 | the last several years? |
| 21 | MR. DARNELL:  Objection, vague as to received. |
| 22 | THE WITNESS:  So just to be clear, don't conflate |
| 23 | obtained with received.  But, yes, we have received |
| 24 | verdicts and settlements worth over $300 million. |
| 25 | /// |

Page 217

| 1 | BY MR. ARHANGELSKY: |
| 2 | Q | And how much of that 300 million would you say |
| 3 | the firm collected? |
| 4 | MR. DARNELL:  Objection.  Assumes facts. |
| 5 | THE WITNESS:  The firm or our clients? |
| 6 | BY MR. ARHANGELSKY: |
| 7 | Q | Well, I -- let's start with the firm.  How much |
| 8 | did the firm collect out of that 300 million? |
| 9 | MR. DARNELL:  Objection, assumes facts. |
| 10 | THE WITNESS:  Approximately $200 million of those |
| 11 | verdicts and settlements were verdicts and settlements |
| 12 | that I recovered prior to forming Pacific Trial Attorneys. |
| 13 | So the answer to 200 million of that is that none of it |
| 14 | came to Pacific Trial Attorneys. |
| 15 | BY MR. ARHANGELSKY: |
| 16 | Q | Out of that 300 million -- I'm sorry. |
| 17 | A | Um, another 80 million of that was from verdicts |
| 18 | that John O'Malley obtained while he was at another firm. |
| 19 | Q | Okay.  And so of that -- what does that leave? |
| 20 | 20 million? |
| 21 | A | From a static mathematical perspective that |
| 22 | leaves 20 million, but I believe that it's important to |
| 23 | note that we obtained over 300 million. |
| 24 | Q | And of that amount of over 300 million, how much |
| 25 | money was paid directly to clients? |

30(b)(6) Scott J.  Ferrell
April 01, 2021
214..217
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 218

1  A    Over 95 percent.
2  Q    And approximately what percentage of that
3  300 million was associated with CLRA cases that the
4  attorneys may have pursued?
5    MR. DARNELL:  Objection, vague as to which attorneys
6  you're talking about and when.
7    THE WITNESS:  I can answer that for you very easily.
8  The $300 million reference is a reference to -- it's a
9  complete reference to business cases, where we had
10  received verdicts and settlements in business cases, so
11  that doesn't refer to any CLRA cases.
12  BY MR. ARHANGELSKY:
13  Q    Okay.  I'll ask specifically about those then.
14  How much money has the NTG firm made in gross receipts
15  from CLRA litigation since 2010?
16  A    I would just be guessing.
17    MR. DARNELL:  Objection, exceeds the scope.
18  BY MR. ARHANGELSKY:
19  Q    Do you have any idea how much money NTG has made
20  in gross receipts from wiretap litigation since 2010?
21    MR. DARNELL:  Objection, exceeds the scope.
22    THE WITNESS:  I would just be guessing.
23  BY MR. ARHANGELSKY:
24  Q    Do you have any idea or can you approximate how
25  many wiretap settlements the NTG firm has retained since

Page 219

1  2010?
2    MR. DARNELL:  Objection, exceeds the scope.
3    THE WITNESS:  I would just be guessing.
4  BY MR. ARHANGELSKY:
5  Q    What year did NTG first start pursuing wiretap
6  cases?
7    MR. DARNELL:  Objection, exceeds the scope.
8    THE WITNESS:  I would have to look at the documents to
9  know for sure.
10  BY MR. ARHANGELSKY:
11  Q    Do you have any approximation of when you may
12  have started filing CIPA cases?
13    MR. DARNELL:  Objection, exceeds the scope.
14    THE WITNESS:  I think I can give you an informed
15  estimate.  It was probably 2012.
16  BY MR. ARHANGELSKY:
17  Q    Does the NTG firm still file CIPA cases today?
18    MR. DARNELL:  Objection, exceeds the scope.
19    THE WITNESS:  No.
20  BY MR. ARHANGELSKY:
21  Q    And when did it stop pursuing CIPA cases?
22    MR. DARNELL:  Same objection.
23    THE WITNESS:  Several years ago.
24  BY MR. ARHANGELSKY:
25  Q    Does the NTG firm own any real property?

Page 220

1  A    As in real estate?
2  Q    Yes.
3  A    No.
4  Q    Does the NTG firm lease any real estate?
5  A    Yes.
6  Q    What real estate does it lease?
7  A    Our office premises at 4100 Newport Drive.
8  Q    And what is NTG's monthly expenses with respect
9  to that property?
10  A    I believe it's approximately $15,000 a month.
11  Q    Are NTG employees paid on a biweekly basis?
12  A    Payroll's on the 15th and the 30th -- or the 15th
13  and the last day of the month.
14  Q    What is the amount of NTG's total financial
15  obligations paid for employee compensation on a monthly
16  basis?
17  A    Are you asking what our monthly payroll is?
18  Q    Yes.
19    MR. DARNELL:  Objection, vague as to time.
20    THE WITNESS:  Right now it varies, um, between 100 and
21  $300,000 a month.
22  BY MR. ARHANGELSKY:
23  Q    And why would it vary between 1 and 300?
24  A    If we pay or when we pay year-end bonuses at the
25  end of every year, it inflates our payroll that month.

Page 221

1  Q    On an average month what would NTG's payroll be
2  excluding the bonuses?
3  A    A very rough estimate I'm going to say is
4  $150,000 a month.
5  Q    Does NTG have any debt liabilities or other
6  financial obligations currently on its books that have yet
7  to be paid off?
8  A    So because we're not a public company and we're
9  owned by just a single individual -- excuse me.  We don't,
10  quote, maintain liabilities on our books, um, but we do
11  have liabilities on an ongoing basis that we pay off every
12  month and two significant contingent liabilities.
13  Q    Okay.  And what are -- what's the average value
14  of the ongoing liabilities that you just referenced?
15  A    There's no such thing as an average value of
16  ongoing liabilities.
17  Q    Well, what are some of those liabilities that you
18  just mentioned?
19  A    Payroll, vendors, health insurance, rent,
20  computer upkeep, replacement, staff lunches.
21  Q    How much money -- I'm sorry.  How much money does
22  NTG spend on vendors, let's say, over the course of the
23  last calendar year?
24  A    Broadly construing the term vendors I would
25  estimate that 30 percent of our revenue generated goes to

30(b)(6) Scott J.  Ferrell
April 01, 2021

218..221
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 222

1 vendors.
2    Q    Has that generally been the case over the course
3 of the last five years or has it changed?
4    A    I don't know for sure, but based on my ongoing
5 review of our operations, that seems to be a pretty
6 consistent percentage.
7    Q    On January 1st, 2015, how many attorneys worked
8 for the NTG firm?
9    A    I don't know for sure, but I can estimate
10 approximately 10 or 11.
11    Q    And how many attorneys currently work for NTG?
12    A    I believe five.
13    Q    Has NTG had any attorneys listed as Of Counsel?
14    A    Yes.
15    Q    Would you include those within your numbers of
16 attorneys that I just asked about?
17    A    Right now one of our attorneys Richard Hikida's
18 title is Of Counsel.  Back in 2015, I'm not sure.
19    Q    How much in total compensation did NTG pay to
20 David Reid in 2015?
21    A    In 2015, I believe Dave's total compensation was
22 around $200,000.
23    Q    Did that include bonuses?
24    A    Yes.  That was total compensation.
25    Q    And what was his total compensation in 2020?

Page 223

1    A    In 2020, I believe his total compensation was
2 approximately 1.2 million.
3    Q    Now, Mr. Reid has seen a significant increase in
4 pay over the course of the last six years.  Is there a
5 reason for that increase?
6    A    Yes.
7    Q    And what is that reason?
8    A    He has become managing partner of the firm and
9 done by any objective account an outstanding job as
10 managing partner.
11    Q    Is his compensation tied to any specific cases or
12 any work that he's done on specific cases?
13    A    Not --
14    MR. DARNELL:  Objection, vague.
15    THE WITNESS:  Not as I construe that phrase.  It's
16 based on overall performance, his contribution, and the
17 other factors that I identified in determining
18 compensation.
19 BY MR. ARHANGELSKY:
20    Q    And how much total compensation did NTG pay to
21 Victoria Knowles in 2015?
22    A    2015, approximately $70,000.
23    Q    And what was her total compensation in 2020?
24    A    I believe it was approximately $300,000 or 350.
25    Q    How much in total compensation did NTG pay to

Page 224

1 Ryan Ferrell in 2015?
2    A    None or very little that I'm aware of.
3    Q    What about 2014?
4    A    I believe approximately 50 or $60,000.
5    Q    How much in total compensation did NTG pay to
6 Andrew Baslow in 2015?
7    A    Approximately $72,000.
8    Q    And how much in total compensation did NTG pay to
9 Andrew Baslow in 2020?
10    A    Approximately $150,000.
11    Q    Does the NTG firm own any vehicles at present?
12    A    I believe that Sariah Para has a company car, but
13 I don't believe it's owned.  I think it's leased.
14    Q    Okay.  And I believe as we discussed on Tuesday
15 NTG also owns a -- it owns a plane.  Is that right?
16    A    Yes.
17    Q    And that's consistent with your testimony on
18 Tuesday, right?
19    A    Yes.
20    Q    Does NTG own any other assets that we haven't
21 discussed?
22    A    Office equipment and I believe we discussed the
23 firm's bank accounts on Tuesday.
24    Q    What is the total balances as of today in NTG's
25 bank accounts?

Page 225

1    A    I believe it's $400,000.
2    Q    And that 400,000 represents the total value
3 across all of NTG's bank accounts?
4    A    That $400,000 represents the funds in what I call
5 our reserve account.  And as of today our -- the account
6 that I call our operating account was either zeroed out or
7 close to being zeroed out for payroll.
8    Q    Have there been any substantial deductions or
9 withdrawals from the reserve account over the course of
10 the last three years?
11    A    Yes.
12    Q    And what were those withdrawals?
13    A    Essentially to equalize cash flow.
14    Q    How many times did you have substantial
15 withdrawals from the reserve account?
16    A    Over the past three years?
17    Q    Over the course of the last three years, yes.
18    A    There have been times when we made significant
19 withdrawals from it and times when we made significant
20 deposits back into it, but the -- the reserve account has
21 varied between a balance of zero and $500,000 over that
22 time.
23    MR. ARHANGELSKY:  Let's go off record for -- I just
24 need a minute or two.  Is that all right?
25    MR. DARNELL:  Sure.

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 226

1  THE VIDEOGRAPHER:  This is the end of Media File
2  No. 8.  We're now going off the record.  The time is
3  5:33 p.m.
4            (BRIEF RECESS.)
5  THE VIDEOGRAPHER:  This is the beginning of Media File
6  No. 9.  We're now going on the record.  The time is
7  5:37 p.m.
8  MR. ARHANGELSKY:  Okay.  I am at this point concluding
9  our examination.  I'm willing to pass the witness if there
10 are any questions.
11       I will state on the record that we're concluding
12 our examination at this time with the reservation of
13 rights to seek relief as appropriate concerning the
14 witness's inability to testify in certain topics noticed,
15 most notably Topic 6 regarding case management systems and
16 procedures, along with other concerns that may address
17 during the meet and confer process which we will initiate
18 promptly.  But subject to those caveats my examination is
19 complete for today.
20 MR. DARNELL:  And I don't have any questions, but,
21 Counsel, I would invite you -- you have, I think, five or
22 six minutes left of the full allotted statutory time.  If
23 you have any other questions concerning case management
24 systems, procedures, or document retention policies for
25 this witness, please ask them.  Because I don't know if

Page 227

1  I've really heard many of those questions at all today.
2  But I invite you to please take advantage of whatever time
3  you have left and the witness, I'm sure, would be happy to
4  try to answer whatever questions you have in that respect.
5  THE WITNESS:  If there's questions on Topic 6 that I
6  did not give what you consider to be fulsome answers to,
7  I'm willing to stay as late tonight as we need to make
8  sure you get my best testimony because I spent thousands
9  of hours preparing for this deposition.
10 MR. ARHANGELSKY:  Well, I think the problem that we
11 have, Mr. Darnell, is that the witness was unprepared to
12 testify when we asked him detailed questions about NTG's
13 primary source of case management, which happens to be the
14 charts and weekly charts that were provided to him.  And I
15 do have a significant amount of questions that need to be
16 answered by somebody who is competent to answer questions.
17 And the witness has already testified that he lacked
18 knowledge with respect to the information on the documents
19 I asked him about.  And I'm not going to retread questions
20 that have already been answered.  It seems pretty clear
21 this witness was not prepared adequately with respect to
22 those topics and with respect to the documents the witness
23 provided and five minutes left at the end of the day at
24 this point is not going to cut it.
25       There's also confounding factors which are

Page 228

1  complicating factors which mutually include the witness's
2  refusal to answer questions succinctly and intentionally
3  obfuscate the record through narrative answers that were
4  nonresponsive for the most part.  We need to address this
5  and five minutes at the end of the day is not going to do
6  it at this point.
7  MR. DARNELL:  Counsel, I disagree with your
8  characterization.
9       I do have one question for the witness.  I will
10 lay a foundation which I do not think that you have done.
11       Mr. Ferrell, with respect to Topic No. 6 can you
12 please read what that is.
13 THE WITNESS:  Facts and evidence concerning NTG's case
14 management systems, procedures, and document retention
15 policies.
16 MR. DARNELL:  I believe you just may have heard
17 Mr. Arhangelsky state that the charts that he showed you
18 earlier today are the primary method by which NTG managed
19 its cases and procedures at the firm.  Do you agree with
20 that statement?
21 THE WITNESS:  No.  The charts that I reviewed today
22 have nothing or the very, very smallest amount to do with
23 our case management procedures or our systems.
24       And I would add, Counsel, to the extent that you
25 believe that my answers have been narrative and you need

Page 229

1  more time, I'm willing to stay as long as you need me to
2  tonight to make sure that you feel like you've been able
3  to conduct a fulsome examination.
4  MR. ARHANGELSKY:  I appreciate the opportunity.
5  MR. DARNELL:  So are you done for today?
6  MR. ARHANGELSKY:  No.  I was going to avail myself to
7  the opportunity to ask additional questions.  Thank you
8  very much.  I'm happy --
9  MR. DARNELL:  Go for it.
10 MR. ARHANGELSKY:  -- that the witness is compliant.
11 MR. DARNELL:  Go for it.
12       For the record can you just let me know what
13 time -- how much time has transpired?  I'd like to know
14 how much above and beyond the statutory amount we may be
15 giving Mr. Arhangelsky in this deposition.  Can you please
16 state how much time has transpired today on the record?
17 THE VIDEOGRAPHER:  We're at six hours, 55 minutes at
18 this point.
19 MR. DARNELL:  Thank you.
20 MR. ARHANGELSKY:  I placed a document back on screen
21 which we've marked.  I want to make sure I get the -- let
22 me pull up the exhibit.  Give me one minute.
23       All right.  I've placed back in front of the
24 witness what we've marked as Exhibit 630.
25 Q   Mr. Ferrell, do you recognize this document from

30(b)(6) Scott J.  Ferrell
April 01, 2021

226..229
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 230

1  earlier in the day?

2      A    I do.

3      Q    Okay.  Who drafted this document?

4      A    I believe Carla Wise did.

5      Q    Okay.  How did you know that Carla Wise drafted

6  this document?

7      A    I don't know that for sure, but I recall in

8  reviewing the document production in this case that this

9  document was appended to and emailed to me from Carla Wise

10 that sent some updating charts.

11     Q    Okay.  And when did she send this to you?

12     A    As I recall, this was sometime in 2015.

13     Q    And does this document look similar to other case

14 charts that Ms. Wise or Ms. Jung would send to you on a

15 weekly basis?

16     MR. DARNELL:  Objection, assumes facts, lacks

17 foundation.

18     THE WITNESS:  It -- you're suggesting that I get

19 charts like this on a weekly basis and I don't.

20 BY MR. ARHANGELSKY:

21     Q    Well, how often would you receive charts like

22 this?

23     A    The last time I recall receiving a chart like

24 this was in 2015.

25     Q    Did you also receive a chart of CIPA cases like

Page 231

1  this in 2012?

2      A    Not that I recall.

3      Q    What about in 2013?

4      A    Not that I recall.

5      Q    What about 2014?

6      A    I believe so.

7      Q    Now, you'll see at the top of this document

8  there's a legend that says MB on page 1.  Sorry.  I lost

9  my page 1.

10     There's a legend at the top that says MB and

11 that's minimal bypass, right?  See that language?

12     A    Well, I see that it says MB equals minimal

13 bypass.

14     Q    What does minimal bypass mean for purposes of

15 this chart?

16     MR. DARNELL:  Objection, lacks foundation, vague.  It

17 also exceeds the scope of the topics in the deposition

18 notice.

19     MR. RIDDLES:  Objection, calls for speculation.

20     THE WITNESS:  I don't know, but I know that you have

21 suggested that it has a meaning and I would invite you to

22 present what you believe it means and that may refresh my

23 memory.

24 BY MR. ARHANGELSKY:

25     Q    This is a chart that you said you were sent by

Page 232

1  your staff regarding wiretap cases; is that correct?

2      A    Yes.

3      Q    And this chart contains information that's

4  updated by your staff regarding the wiretap cases that the

5  firm was pursuing at the time, right?

6      MR. DARNELL:  Objection, lacks foundation, vague.

7      THE WITNESS:  I don't know that it was updated or

8  whether it was a single-incident event that it was sent to

9  me, but I do recall receiving this in 2015.

10 BY MR. ARHANGELSKY:

11     Q    And as the firm compiled information about its

12 wiretap cases, your staff would update this chart

13 accordingly.  Is that fair?

14     MR. DARNELL:  Objection, lacks foundation, calls for

15 speculation.

16     THE WITNESS:  I don't know whether that's the case or

17 not without looking at different iterations of this chart.

18 BY MR. ARHANGELSKY:

19     Q    And there are different iterations of this chart;

20 is that right?

21     MR. DARNELL:  Objection, lacks foundation, calls for

22 speculation.

23     THE WITNESS:  I don't know.  In preparing for this

24 deposition I only recall seeing the one chart that was

25 sent to me in 2015.

Page 233

1  BY MR. ARHANGELSKY:

2      Q    You -- in preparing for this deposition you

3  reviewed the chart that was sent to you in 2015.  That's

4  your testimony.

5      A    In preparing for this deposition I tried to put

6  eyes on every single document that we have produced in

7  this case.

8      Q    You reviewed this chart, was my question.  You

9  reviewed this chart in preparation for deposition, right?

10     A    So inclusive of every single document that we've

11 produced in this case is this document and I recall this

12 document or something similar to it being attached to an

13 email to me in 2015.

14     Q    And who did you speak with within the NTG firm

15 regarding the information contained in this chart?

16     MR. DARNELL:  Objection, assumes facts.

17     THE WITNESS:  You mean in preparation for my

18 deposition?

19 BY MR. ARHANGELSKY:

20     Q    Yes.

21     MR. DARNELL:  Objection, assumes facts.

22     THE WITNESS:  Aside from counsel I spoke to

23 Sariah Para.

24 BY MR. ARHANGELSKY:

25     Q    Okay.  And you spoke with Ms. Sariah Para about

30(b)(6) Scott J.  Ferrell
April 01, 2021

230..233
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Page 234

1  how this document was maintained within NTG?
2      A    No.  I spoke to Sariah Para to confirm and
3  determine whether I was, in fact, the person with the most
4  knowledge about various topics of documents or she was or
5  some third party was and we jointly determined that I was.
6      Q    Okay.  And did you talk to Carla Wise about her
7  charts?
8      A    So you're suggesting that this is Carla's chart
9  or are you telling me did I talk to Carla about her charts
10  in preparation for my deposition?
11      Q    No.  I believe you told me that this is her
12  chart.  So I'm asking you, did you talk to Ms. Wise about
13  her charts?
14      MR. DARNELL:  I'm sorry.  Charts, plural?  Assumes
15  facts, vague and ambiguous as described or stated.
16      THE WITNESS:  So I think what I told you was that
17  Carla Wise sent this chart to me in 2015 and in connection
18  with preparing for my deposition, I asked Sariah to speak
19  with Mandy and Carla and determine whether or not they or
20  I was better situated to be the testimonial designee and
21  it was our collective determination that I had the most
22  knowledge.
23  BY MR. ARHANGELSKY:
24      Q    You had the most knowledge within NTG regarding
25  the creation of these -- this chart specifically?

Page 235

1      MR. DARNELL:  Objection, misstates testimony.
2      THE WITNESS:  That I had the most knowledge within NTG
3  regarding each of the 10 topics upon which we were
4  instructed to prepare and that included --
5  BY MR. ARHANGELSKY:
6      Q    But did you speak with them --
7      A    I'm sorry.  That included Topic No. 6 which you
8  are saying that this relates to but which in reality Topic
9  No. 6 and this have no connection to each other.
10      Q    But did you speak with them specifically to gain
11  their knowledge regarding how this chart was compiled?
12      A    No.
13      Q    But going back to page 5 of this document which
14  was NTG 66667 and again let's look at the first line where
15  it says Home Shopping Network on this and the retainer
16  status says AB confirmed to pursue, does that mean
17  Andrew Baslow confirmed to pursue this wiretapping case?
18      A    What page are you looking at here?  But I'm --
19      Q    I'm looking at page 5.
20      A    I don't see an entry for Home Shopping Network on
21  page 5.
22      Q    Under Defendant Phone Number, underlined -- well,
23  there's a number 1 and a leftmost column and it says Home
24  Shopping Network.  Do you see that?
25      A    No.  You're mistaken.  No. 1 says Insta-slim.

Page 236

1      Q    Are we looking at different pages?  You're
2  looking at page 4.  On page 5 --
3      MR. FURMAN:  Well, just to clarify -- this is
4  Josh Furman.  Just to make it easier and streamline, the
5  numbering on the bottom of the document is different from
6  the page number at the top on the actual attachment.
7  That's probably the confusion.
8      MR. DARNELL:  Thank you for that clarification.  I was
9  confused, as well.
10      THE WITNESS:  Thank you.
11      MR. DARNELL:  All right.  So which page number from
12  which reference are we working off of?
13      THE WITNESS:  Now I --
14      MR. ARHANGELSKY:  We're looking at page 5 in the total
15  document, page 5 of 8.
16      THE WITNESS:  Now I'm looking at the entry that says
17  Home Shopping Network.
18  BY MR. ARHANGELSKY:
19      Q    Okay.  And on the right column it says Retainer
20  Status, AB confirmed to pursue.
21      A    I do.
22      Q    That means Andrew Baslow confirmed to pursue; is
23  that right?
24      MR. DARNELL:  Objection, lacks foundation, calls for
25  speculation, asked and answered.

Page 237

1      THE WITNESS:  I don't know specifically what AB refers
2  to there, but I think I can reasonably infer that the
3  reference to AB there is to Andrew Baslow.
4      MR. ARHANGELSKY:  All right.  We're not going to sit
5  here through objections on lack of foundation, otherwise
6  and we're not going to put the court reporter and everyone
7  else through this.
8          This witness was asked these same questions
9  earlier in the deposition and he apparently feigned
10  ignorance of the topics that we asked him about with
11  respect to this document and otherwise.  Either that or he
12  wholly failed to comply with his obligation to prepare
13  with respect to case management procedures and documents.
14  This document is clearly relevant to Topic 6 and we're
15  going to be taking this to the court.  We're not going to
16  be doing this on a shortened time at the end of the day.
17          So with this we're going to conclude the
18  deposition for now and we're going meet and confer with a
19  motion, Mr. Darnell.
20      MR. DARNELL:  Counsel, I respectfully disagree and
21  I'll note for the record that we've gone above and beyond
22  the statutory and court-ordered amount of time.  So that
23  being said, I think we're done here today.
24      MR. ARHANGELSKY:  Can the videographer please inform
25  us on the record how much time we are in this deposition

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Page 238

1   right now?

2       THE VIDEOGRAPHER:  Seven hours and nine minutes.

3       MR. ARHANGELSKY:  Okay.  Nine minutes over.  Thank

4   you.

5       THE WITNESS:  Let me -- let me reiterate that I

6   travelled a great deal for this deposition and prepared

7   thousands of hours for it and if there are questions that

8   you don't believe have been answered to your satisfaction,

9   I'm willing to stay as late as you are to make sure you

10  get my best testimony.

11      MR. ARHANGELSKY:  Well, thank you.  But our objection

12  is that you're not prepared for this, for these questions,

13  and you're also possibly not the proper witness, so we

14  can't do that today.

15          And with that we are done with our examination

16  for today subject to our reservation of rights.

17      THE VIDEOGRAPHER:  This is the end of Media File No. 9

18  and concludes today's videotaped deposition of

19  Scott Ferrell.  We're now going off the record.  The time

20  is 5:56 p.m.

21              (TIME NOTED:  5:56 p.m.)

22

23

24

25

Page 239

4       I, SCOTT J. FERRELL, do hereby declare under

5   penalty of perjury that I have read the foregoing

6   transcript; that I have made any corrections as appear

7   noted, in ink, initialed by me, or attached hereto; that

8   my testimony as contained herein, as corrected, is true

9   and correct.

10      EXECUTED this          day of                    ,

11  20   , at                         ,                   .

        (City)                      (State)

16                  SCOTT J. FERRELL

Page 240

4       I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby certify:

6       That the foregoing proceedings were taken before

7   me at the time and place herein set forth; that any

8   witnesses in the foregoing proceedings, prior to

9   testifying, were placed under oath; that a verbatim record

10  of the proceedings was made by me using machine shorthand

11  which was thereafter transcribed under my direction;

12  further, that the foregoing is an accurate transcription

13  thereof.

14      I further certify that I am neither financially

15  interested in the action nor a relative or employee of any

16  attorney or any of the parties.

17      IN WITNESS WHEREOF, I have this date subscribed

18  my name.

19

20  Dated:  4/8/21

21

22

23  <%16439,Signature%>
    RAQUEL L. BROWN
24  CSR No. 10026, RPR

25

30(b)(6) Scott J.  Ferrell
April 01, 2021

238..240
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

## $

**$1,000** 209:18

**$1.5** 213:23

**$15,000** 220:10

**$150,000** 221:4, 224:10

**$200** 217:10

**$200,000** 222:22

**$300** 215:20,23 216:14,24 218:8

**$300,000** 220:21 223:24

**$4** 214:2

**$4,000** 209:11

**$400,000** 225:1,4

**$50** 25:5

**$500,000** 225:21

**$60,000** 224:4

**$7** 214:4,9,11,15

**$70,000** 223:22

**$72,000** 224:7

**$74,999** 166:13

## 0

**000239** 156:6

## 1

**1** 9:1 15:9 16:1,11, 23 17:3,6 18:18 19:9 20:2 21:14 22:3 23:2,23 24:19 25:20 36:3, 11,23 37:15 46:1 124:3 149:9 220:23 231:8,9 235:23,25

**1.2** 223:2

**10** 11:20 13:19, 21,24 25:12,14,

21,23 26:6,8 39:1,11 44:22 45:22 125:2,10 139:4 140:12 150:11 194:15 212:20 222:10 235:3

**10-cv-1601** 198:15

**100** 68:5 220:20

**10:00** 194:7,21

**10:13** 46:2

**10:23** 46:6

**11** 141:5 142:21 144:7,13,25 162:14 191:18 195:23 206:20 207:21 222:10

**11-page** 130:5,6

**11604** 205:23

**11:24** 79:12

**11:33** 79:16

**12** 30:18 31:22

**12:46** 123:4

**14** 146:13 175:13, 17

**14-hour** 147:1

**140** 184:18

**15th** 220:12

**16** 130:25 131:13 140:4

**16th** 126:20 127:24 128:14,21 129:1,5 131:9 132:4 151:15,17, 20

**17** 132:20 133:11

**17th** 152:1,12

**18** 157:1

**18th** 151:5 159:9 160:7

**19** 32:9,11 139:14

**19th** 138:7,18

**1:00** 114:25

**1:15** 123:15

**1:39** 123:8

**1st** 9:7 222:7

## 2

**2** 16:19,24 17:13 18:7,9,18 19:9 36:3,10 46:5 79:11 101:18 115:12 128:2 130:22 197:4 198:24 209:17 216:10

**20** 113:9 115:15, 21 116:4,10 217:20,22

**200** 217:13

**2001** 22:16

**2010** 23:22 24:3 25:16 26:14 191:1,5,8,11 196:3,4 197:9,22 199:20 200:12,23 201:5,6,24 202:14 203:2,7 205:16 206:6 213:7,15,17,18, 20,22 218:15,20 219:1

**2011** 26:14 169:5, 7,9,14,16,19,24 170:8,10 171:12 172:1,12,25 173:14 178:2 191:8 213:24

**2012** 70:16 71:17, 22 72:5,7 102:11 116:14 124:11,14 127:25 128:14,21 129:1,5 130:25 131:7,9,13 132:5, 20 133:12 138:7, 18 139:14 140:4 141:5 144:7,18 145:2 148:9,23

**2013** 66:5 72:18, 24 73:7 167:23 183:20,23 184:1, 12 185:7,15,20, 25 186:7 214:3,6 215:4 231:3

**2014** 183:14 214:5,7 224:3 231:5

**2015** 13:4 17:16 38:10,16,18 83:22 99:4 101:25 102:11 116:7 183:20 214:10 215:1,5 222:7,18,20,21 223:21,22 224:1, 6 230:12,24 232:9,25 233:3, 13 234:17

**2016** 24:18 30:14 32:14 37:5 59:4 60:8,23 61:9,16 62:2,18 63:4,16 64:6,11,21 65:3 133:1 211:3 214:12

**2018** 214:17

**2019** 214:22

**2020** 214:24 222:25 223:1,23 224:9

**2021** 9:1,7 24:3 120:17

**22163** 172:6

**22177** 181:3

**151:15,20 152:1 153:11 157:1 158:12,20 159:7 160:5,11,20 162:15 165:6 169:12 174:1,10, 13 175:18 176:1, 10 177:16,20 179:2,8,17,21 180:20 184:11 211:3 214:1 219:15 231:1**

**22nd** 181:18 182:19

**23rd** 148:9,23

**24th** 170:8,9

**25th** 158:12,20 159:7 160:5,20 170:10 172:1

**27** 172:25 173:14

**2700** 9:9

**27th** 173:12

**28-2** 198:15

**2:03** 136:18

**2:09** 136:22

**2:19** 126:20 128:14,21 129:5

**2:52** 130:25

## 3

**3** 18:9,15,19 19:11 20:2 36:10 79:15 85:15 115:14 123:3 139:3 149:9 184:24 185:2 197:4

**30** 211:9 221:25

**30(b)(6)** 9:12,20 10:15 11:8,13 12:22 13:12,13, 15 14:5,9,10 31:2 56:5 120:22 130:18 147:2

**300** 216:19 217:2, 8,16,23,24 218:3 220:23

**30th** 220:12

**32** 66:15

**350** 223:24

**3:10** 168:19

**3:17** 168:23

**3:30** 156:9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

**4**

**4** 14:15 19:24 20:4,8,24 21:14 31:10 50:20 120:21 121:8,23 122:1 123:7 136:17 144:5 149:7,11,12 201:24 209:18 236:2

**4,000** 209:19

**400,000** 225:2

**4100** 220:7

**41928** 66:4

**420** 9:9

**425.16** 30:6

**49** 174:25

**4:04** 190:19

**4:13** 190:23

**4:57** 211:16

**4th** 201:10,25 205:2,5

**5**

**5** 21:9,15,23 22:3 108:14 113:5 136:21 149:12,13 168:18 197:3 235:13,19,21 236:2,14,15

**5,000** 209:18

**50** 224:4

**55** 229:17

**567** 139:4

**5982** 124:3 125:9

**5983** 124:5

**5:05** 211:20

**5:33** 226:3

**5:37** 226:7

**5:56** 238:20,21

**5th** 205:3 206:6

**6**

**6** 21:25 22:5,17 23:2 86:19 168:22 190:18 226:15 227:5 228:11 235:7,9 237:14

**6/5** 90:17

**6/8/15** 83:18

**61** 150:15

**6152** 140:20

**619-952-9832** 185:8

**6229** 150:15

**623** 10:14,16 11:3,14 14:13

**624** 30:3,7

**625** 35:25 36:4

**626** 66:3,6

**627** 70:14,18

**628** 73:11,12

**629** 74:14,15 75:23

**63-3** 203:12

**630** 82:20,23 93:18 108:12 113:5 229:24

**631** 98:21,23

**632** 115:6,7

**633** 123:21,22

**634** 129:25 130:2 144:3

**635** 132:13,15 152:9

**636** 137:7

**637** 136:24,25

**638** 140:19,21

**639** 145:22,23

**640** 147:21,22

**641** 150:14,16

**642** 155:20,21

**643** 162:7,9

**644** 172:6,7

**645** 174:21 175:2

**646** 178:10,11

**647** 180:4,5

**648** 181:2,4

**649** 184:17,19

**650** 186:25 187:1

**651** 193:4,5

**652** 196:17,22

**653** 198:13,16

**654** 204:4,6,8

**655** 205:21,24

**656** 208:16,17

**657** 216:1,2

**66449** 115:13

**66637** 73:11

**66654** 74:14

**66663** 82:22 108:13

**66667** 108:15 235:14

**6703** 162:8

**6708** 70:17

**67124** 98:22

**7**

**7** 22:24 23:4,16,23 99:4 190:22 211:15

**714-396-6971** 141:12

**7673** 204:7

**78** 196:11

**7th** 99:8

**8**

**8** 23:20,24 24:1, 12,20 25:12 26:6 180:19 211:19 226:2 236:15

**8-9** 133:1

**80** 113:10 217:17

**800** 99:5 100:10 124:6

**809** 174:25

**812** 174:22

**8:15-cv-02034-jvs** 9:10

**8th** 83:21

**9**

**9** 24:16,20 25:9, 12,20 26:6 226:6 238:17

**92705** 9:10

**95** 218:1

**9:02** 9:2,8

**9:24** 132:20 133:12

**A**

**a.m.** 9:2,8 46:2,6 79:12,16 132:20 133:12 194:7,21

**AB** 71:3,8 108:21, 24 109:3,6 110:4 235:16 236:20 237:1,3

**abbreviation** 126:2

**abbreviations** 85:4

**abide** 67:9

**ability** 39:7 123:14,17 142:8

**abreast** 13:5

**absolutely** 12:23 39:6 175:8 201:18

**abstract** 135:19 192:18

**abuse** 165:17

**abyss** 177:14

**accessibility** 100:21

**accomplishments** 21:5

**accordance** 98:17

**account** 223:9 225:5,6,9,15,20

**accountant** 24:9 212:22

**accounted** 213:4

**accounts** 224:23,25 225:3

**accurate** 30:1 47:20 49:25 50:3, 9,11 91:2 92:8 116:18 128:25 137:23 138:1 153:16 154:4 158:23 159:4 170:5 173:19 188:2 209:21

**accurately** 74:4, 5 128:19 163:5

**accusing** 177:4

**achieve** 80:16

**achieved** 80:13

**acknowledge** 176:17

**acknowledging** 171:19

**acquire** 20:11

30(b)(6) Scott J. Ferrell
April 01, 2021

242
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

**acquired** 20:10, 13 121:9

**acquisition** 19:25 55:9 120:23

**acronym** 113:18

**acronyms** 85:5

**act** 34:4 60:4,16 61:10 62:12 64:23 79:19 98:17,18

**acted** 206:15 207:13

**acting** 33:14 34:18 41:6,9,15 62:19 65:17

**action** 18:5 24:25 25:3 30:5 63:24 80:8 112:22 171:24 173:10

**actions** 47:12,22, 23 63:25 167:4

**active** 43:21

**activities** 14:24 120:5 173:9

**actual** 236:6

**ADA** 76:2 100:18 101:23 102:1 115:16

**add** 65:24 228:24

**addition** 13:10 14:24 17:6,10 19:2 22:11 34:3 49:10 57:19 98:15 119:18

**additional** 149:11 175:19 176:7,19 177:20 178:6,7 200:5 229:7

**address** 87:2 121:9 136:5 196:9 226:16 228:4

**adequate** 173:24 193:23

**adequately** 87:1 227:21

**adjective** 38:6,7 89:1

**administered** 10:9

**admitted** 25:6 111:14,17 161:16 169:17,18

**admittedly** 42:17

**advance** 12:24 119:2 123:16

**advancing** 58:21 68:1

**advantage** 227:2

**advise** 187:25

**advocate** 42:22

**advocates** 41:22 48:3

**affiliated** 72:13

**affiliation** 72:9

**affirm** 9:15

**afternoon** 131:13 132:1,4

**agent** 19:18 120:13

**agents** 19:16 25:16 65:5

**aggressively** 207:2

**agree** 59:14 63:1 78:17 167:8 180:18 228:19

**agreed** 26:21 27:20 59:17 62:10,23 63:23 209:11,22,25

**agreeing** 63:13 100:25

**agreement** 19:1 26:20,24 27:18, 23 64:19 113:1 167:6,11 179:20

180:19 195:6,11, 14 198:10,21,25 202:13,15,18,24 208:22 209:9 210:4 211:6

**agreements** 18:16,22 19:5 113:25 114:12,17

**agrees** 209:8

**ahead** 75:5 110:13 167:19 181:25 214:14 215:2

**airline** 176:22

**alarm** 144:10

**alerted** 129:20

**allegations** 138:1

**allege** 189:17

**alleged** 119:23 135:10 136:6

**alleges** 139:5

**alleging** 139:15

**allotted** 52:9 226:22

**ally** 164:2

**ambiguity** 15:2

**ambiguous** 35:17 36:18 63:9 234:15

**amended** 10:14 11:12 12:17,24 13:15,17,18 30:5

**America** 85:8 90:17

**amount** 98:5 199:3 217:24 220:14 227:15 228:22 229:14 237:22

**Ana** 9:1,9

**analysis** 99:20 100:17,20

**and-a-half** 146:12 213:25 214:19,23,25

**and/or** 21:11

**Andrew** 9:23 42:25 48:24 50:4, 10,11 51:4 65:18 66:12 71:4 76:8 91:9,13,24 92:5, 22 93:2,16,23,24 96:13 98:16 102:10 103:12 108:24 109:2,6, 12,25 116:19 117:12,16 119:21 125:4 131:5,14 134:8,15 138:19, 23,24 141:23,25 142:23 150:4 151:14,19 158:13 162:15 167:13, 22,25 181:17 183:10,12 189:1, 9,11 224:6,9 235:17 236:22 237:3

**Angel** 41:8 46:17, 25 47:21 49:15, 18,21,22 61:21 142:6 149:7,11, 20 150:4

**Angel's** 151:11

**angry** 117:17 206:22

**answer's** 105:6

**answers** 17:2 29:9 35:11 49:21 64:20 98:1,4,8 125:10 227:6 228:3,25

**anticipation** 12:25

**apocalyptic** 177:2

**apologize** 74:3 102:9

**apologized** 167:3

**apparently** 152:19 237:9

**appearing** 9:25 10:5 11:8

**appears** 74:22 75:1 76:25 79:2 84:21 90:5 101:13 102:3 109:9 113:14 122:24 124:14 130:21 141:4 149:8 152:11 180:18 182:10 184:24 185:12 198:14 209:21 216:8

**appended** 230:9

**applied** 90:21 137:24

**approach** 68:6

**approached** 20:22 43:21 44:3

**approved** 58:18

**approximate** 116:7 218:24

**approximately** 93:13 197:9 214:2,4,9,11,19, 23,25 217:10 218:2 220:10 222:10 223:2,22, 24 224:4,7,10

**approximation** 219:11

**April** 9:1,7 169:12 196:3,4

**area** 68:7 123:12 163:10

**areas** 58:21

**argue** 142:16

**argued** 28:13,25 29:20 54:22 55:15

**argument** 28:18, 24 29:23 30:20 31:24 146:21

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Index: argyria..average

**argyria** 177:11

**Arhangelsky** 10:4,5,12,19 18:8,14 27:8,24 28:5,9 30:2,8 31:8,16 32:9,15, 21 33:9,22 34:9, 21 35:9,24 36:5 37:1 38:1,17,23 39:22 40:1,8 41:10 45:23 46:7, 13,19 47:13 49:5, 17 50:16 51:5,12, 19 52:1,10,20 53:1,11 54:6,15, 22 55:3,8,14,21 56:1,14 57:5,17 58:3,10 59:1,8,18 60:7,19 61:1,11, 22 62:22 63:3,12 64:10 65:12,20 66:2,7 70:13,19 72:17,22 73:2,9, 13 74:12,16 75:6, 16,21 76:1,6,12, 18 77:3,18 78:1, 15 79:5,17,22 80:6,12,17,23 81:2,8,13,18,23 82:4,11,19,24 83:5,15,23 84:6, 12,19 85:14,24 86:4,7,16,24 87:17 88:2,7,13, 21 89:12,22 90:8, 14,22 91:4,12,18 92:3,17 93:1,6,15 94:1,10,20 95:3, 13,17,24 96:7 97:9,18,20 98:20, 24 100:8,15,23 101:6,17 102:8, 16,23 103:3,14, 23 104:7,13,19 105:3,17,24 106:8,14 107:5, 11,23,25 108:10 109:4,11,17 110:3,11 111:9, 15 112:1,8,19 113:17 114:2 115:4,8 116:6,12 117:8,19 118:1,9 119:4 121:7,15,

22 122:12,18,24 123:9,23 124:10, 18 125:7,18 126:1,7,18 127:1, 9,18 128:1,7,11 129:23 130:3 131:18 132:12,16 133:7,15,22 134:5,21 135:2,8, 21 136:2,11,23 137:1,6,15 138:5, 16 139:1,13 140:1,9,18,22 142:10 143:17 144:1,16,23 145:7,20,24 146:6,16 147:5,7, 11,20,23 148:4, 16,22 149:2,16, 22 150:5,12,17 151:13,18,24 152:6,14,22 153:9,19 154:5, 17 155:5,19,22 156:16,24 157:9, 18,24 158:5,11, 24 159:5,22,25 160:9,16 161:1,9, 19 162:1,6,10 164:3,15 165:3, 15,21 166:2,7,11, 17,22 167:5,12, 17 168:5,14,24 172:4,8,15,19,21 174:20 175:3 178:9,12 180:3,6 181:1,5,23 182:1 184:4,9,15,20 185:3,5,13,18,23 186:5,10,24 187:2,22 188:17 189:15 190:14,24 193:3,6 195:19, 21,24 196:16,23 198:12,17 199:1, 5,11,18 203:18, 21 204:3,10,23 205:20 206:1 208:15,18 209:16 211:1,4,8,13,21 212:5,13,18,24 213:11 214:16,21 215:3,9,24 216:3 217:1,6,15

218:12,18,23 219:4,10,16,20, 24 220:22 223:19 225:23 226:8 227:10 228:17 229:4,6,10,15,20 230:20 231:24 232:10,18 233:1, 19,24 234:23 235:5 236:14,18 237:4,24 238:3, 11

**arises** 22:10

**arrangement** 112:24

**arrangements** 113:22 114:10

**arrive** 114:25

**arrives** 115:4

**art** 66:24 67:24 69:9 212:4

**ASAP** 158:17

**asks** 99:4 150:22

**assert** 31:3 170:11

**asserted** 25:8

**asserting** 86:8 96:4 147:3,9

**assertion** 154:3

**assertions** 137:25

**asset** 176:25

**assets** 23:21 24:2 224:20

**assigned** 46:24 167:23 183:16 185:24 187:12 191:11

**assist** 24:11 25:2

**assistance** 210:7,8,25

**assisted** 186:12

**associate** 205:15

**association** 23:23 178:22

**assumes** 77:13 78:24 84:9,16 161:5,12 164:8 165:7 167:15 217:4,9 230:16 233:16,21 234:14

**assuming** 164:21

**assured** 12:14

**Atkinson-baker** 9:5,13

**attached** 181:15 206:10 233:12

**attachment** 236:6

**attempt** 33:14 198:4

**attempted** 185:7 197:21

**attended** 118:14 119:14

**attention** 36:9 124:4 139:2 144:4 156:18 192:16 197:3 201:14

**attorney** 26:15 27:12 41:17 42:19 43:20,25 44:9,18 60:14 62:16 64:22 73:6 92:13 96:14 110:15 119:15 184:11 191:17, 19,20,23,24 192:4,5,8,11,12, 13 205:17

**attorney's** 44:2

**attorney/client** 163:18 210:21

**attorneys** 16:21 17:8 29:19 60:8, 24 61:5,9,16,23 62:2 73:5 112:22 212:8 215:21

216:13,18 217:12,14 218:4, 5 222:7,11,13,16, 17

**attribute** 215:18

**attributed** 206:23 215:16

**attributing** 201:15

**atypical** 142:16

**audio** 148:24

**audit** 90:24 91:6, 10 95:9,19 97:14 98:13 104:9 105:25 107:7 108:5 124:6 140:4 158:6 161:20 168:1,7 189:1,10 213:5

**audited** 124:11 162:3 212:19

**audits** 125:10 212:15

**August** 141:5 142:21 144:6,7, 13,18,25 145:2 148:9,23 157:1 158:12,20 159:7, 9 160:5,7,15,20 165:6

**Austin** 143:4,8 144:20 145:16

**authored** 205:8, 12

**authority** 15:20 163:24

**authorized** 34:8

**authorizes** 33:12

**auto-disclose** 124:20

**avail** 229:6

**avenger** 190:8

**average** 115:17 116:4 221:1,13, 15

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

**aware** 28:17 40:2 54:14 57:3,23 60:9,24 61:6 62:3 72:4,6,7 126:13 154:13,24 155:3,6 200:24 208:3,4 211:7 224:2

**awareness** 152:16

**B**

**back** 17:15 27:5,8 30:14 31:17 60:20 68:20 100:24 106:16 107:25 108:11 117:16 124:24 126:19 141:16,20 143:18 147:12 152:9 158:25 159:20,25 172:24 182:14 209:14 222:18 225:20 229:20,23 235:13

**background** 141:14 154:10

**Baker** 19:18 162:21 163:15 165:1,13

**balance** 225:21

**balances** 224:24

**bank** 224:23,25 225:3

**bar** 22:14 205:18

**based** 54:24 55:17 59:20 114:14 126:21 140:3,6 151:11 152:10 222:4 223:16

**bases** 25:18

**basic** 71:23 72:1,4,6,10,13 124:22 167:2,8

**basis** 75:11 81:20,25 87:10 105:9 138:13

139:15 142:8,16 148:17,18,21 170:11 220:11,16 221:11 230:15,19

**Baslow** 9:23 50:4,17 67:23 71:4 91:13,24 92:5,22 93:2 94:14,21 95:8 97:13,22 98:12 102:4,10,18,24 103:15,18,24 104:8,20 107:17 108:24 109:12, 19,25 112:9,15 116:19,25 117:3, 9,21 118:2,10 119:5,8,12,21 124:5,19 125:1,9, 19 126:8,19 131:5,10,14 132:3,19 133:11 134:7,10 138:19 141:5 143:1,7 144:13,18 145:1, 13 151:8,14,19 152:23 156:7,19, 25 157:11 158:6 161:20 162:3 164:4,13,16 167:22,25 168:7 185:6,24 186:6 189:1 224:6,9 235:17 236:22 237:3

**Baslow's** 93:16 94:11 95:18 109:2,6 140:4 141:23,25 142:12,14,23 184:23

**Bates** 66:4 70:17 73:11 74:14,22 82:21 98:22 108:13,14 115:13 124:3 130:1,23 132:13 140:20 144:5 150:15 162:8 172:6 181:3 204:7 205:22

**Bausch** 85:19

**Baz** 99:5 100:2 126:21

**Beach** 196:11

**began** 13:2 17:15 174:2 178:7

**beginning** 46:4 79:14 123:6 130:24 136:20 168:21 190:21 211:18 226:5

**begins** 36:10 130:1 141:6 144:8 206:9

**behalf** 9:18,22,25 10:2,5 34:18 72:13,18 92:9 116:13 137:17 157:21 171:13,21 173:1,15 177:24 184:6 185:14 190:25

**belief** 139:22

**believed** 17:24 206:23

**believing** 117:15 118:22

**bench** 14:9

**Berger** 194:8,10, 16

**Berger's** 195:25 196:6

**betrays** 109:24

**binary** 35:4

**biometric** 96:18

**Biotech** 72:18,24

**bit** 191:25

**biweekly** 220:11

**blank** 137:10

**bloating** 170:20

**blue** 177:12

**Bluscience** 167:25

**Bo** 44:14

**board** 29:19

**Bobba** 200:2,5, 12,23,25 201:2,4, 12,13,23 202:2,3, 4,5,13 203:2,3,6, 13,16,23 204:2, 13,17,21,25 205:8 206:10 207:3 208:2,8

**Bobba's** 200:16, 18 202:17,23 207:17

**bonus** 25:25

**bonuses** 25:17 220:24 221:2 222:23

**books** 211:23 212:2,7,15,19 221:6,10

**boss** 144:9

**bottom** 77:8 97:7 99:2 108:15 115:13 130:7 141:4 144:6 150:21 156:5,17 161:4 162:14 178:16 181:10,11 193:12 204:6 216:12 236:5

**box** 71:3 181:14

**Bracelet** 178:23, 25 179:5,9,12,15 180:14

**break** 45:22 63:21 79:6 114:22 159:11 168:13 182:3 190:14 213:13

**breaks** 47:21

**breast** 169:5,7

**Brendan** 9:24

**Brett** 178:23,25 179:4,9,12,15,22 180:14,22

**Bridgeport**

46:23

**briefing** 13:14,16 21:18 28:16 29:24

**briefs** 29:18,23, 24,25 39:14

**bring** 69:6 178:18

**broad** 34:15 54:12 186:21

**broadly** 15:5 17:16 20:13,17 23:10,14 34:20 221:24

**brother** 42:18 202:1

**brother-in-law** 41:17 42:19

**brought** 10:22 102:14,15 158:1 182:14 192:15

**Brown** 9:13

**Bryce** 24:4,7,8

**bulk** 79:2

**bullet** 148:10

**bunch** 49:15,22

**business** 218:9, 10

**bypass** 84:22 85:20 87:22 88:4, 23,25 89:2,3,8,17 94:4,15 153:21 163:18 231:11, 13,14

**bypassed** 87:19 88:15,16 94:2,22 95:6 154:25 155:8

**C**

**CAALA** 58:16,24

**Cal** 30:6

**calculated** 213:4

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Index: calendar..chat

**calendar** 221:23

**California** 9:1,6, 9 22:12 30:23 32:2 79:19 96:19 173:8,10 191:17, 19 192:5,8,11,13 196:12

**call** 87:18 88:8 89:17 91:13,24 92:5,22 94:12,16 96:23,24 103:24 104:21 105:25 107:7 108:5 124:19 125:13 131:11 134:17, 18,19,20 135:10 138:8,13 139:6,7, 17 140:4 141:20 142:19 145:16 148:24 149:5,25 151:12 152:5 154:2,9,10 155:15 156:20 157:11,12 158:6, 16 160:11 161:20 162:17 164:12, 14,18 165:13 182:23 188:19, 22,23 189:1 203:6,10 225:4,6

**called** 49:24 93:7 103:18 141:12, 22,25 142:12,13, 23 143:3 150:23 151:4,8,11,14,20, 25 152:17,20 158:21 159:6,8 160:5,6,14 164:6 167:25 170:12 177:11 189:2 191:1 201:13

**caller** 94:2

**calls** 60:12 61:19 62:4 63:8,18 65:6,19 69:10 85:10,21 90:24 93:3,10,17,24 94:5 95:5,9,19 96:16 97:2,4,14 98:13 103:16 126:14 131:17 133:25 134:12

**calendar** 138:14,20 139:24 140:3 152:11 161:11,16 188:3, 8 189:12 197:12 199:13 213:8 231:19 232:14,21 236:24

**Camera** 159:17, 18

**cancer** 169:5,7

**cancer-related** 170:21

**capacity** 11:7

**car** 224:12

**card** 85:7

**care** 169:11

**Carla** 70:15 116:3 230:4,5,9 234:6, 9,17,19

**Carla's** 66:15 234:8

**Carlberg** 18:25 70:4 169:1,2,5 170:2,23 171:13 173:1,15,17 174:10 176:1 177:24 178:17 179:7 180:14,19 183:7

**Carlberg's** 19:16 178:22

**carrier** 24:24 25:1

**Carter-reed** 41:4 48:19 65:10 71:11,14,17,22 72:5,6,10 111:19, 21 112:5 153:20 154:2,14,18,24 155:7 161:10,15 162:3 165:16 166:13,18,24 167:3,7

**Carter-reed's** 41:6 48:9,11,20 155:13,17 161:21

**case** 9:10 13:7 16:17 17:10,18 19:1 22:1,8,12 23:1,8,9,15 28:14 29:14 30:24 32:4 33:17,19 38:9,15 39:14 43:4 47:19 48:14,19 50:13 52:19 57:1,2 67:1,3,11,21,22 68:4,8,11 69:6,13 71:7,11,14 80:2,7 81:19 86:2,9,14, 17,20,22 88:3 102:3,21 104:11 105:1,18 106:12, 24 107:18 109:13,20 110:2, 15,19,20,23,25 111:5,13 116:15, 20 117:10,13 121:1,5 122:3 124:12 127:11, 12,24 129:8,9,12, 20 131:1,15 135:24 136:10 141:8 142:9,11 148:6 152:24 153:1,11,20,21 154:14 155:25 156:3 158:1,15 160:22,25 162:23 163:1,8,12,22,23 164:6,18 166:8 167:7,14,23 178:14 179:13, 15,22 180:14,22, 25 183:6 185:6, 14 186:16,17,19 187:5,13 188:25 191:4,5,7,11,16 192:15 193:16 196:21 197:16 199:21,23 203:12,16,23 207:1 208:12,13, 23,25 209:5,10 222:2 226:15,23 227:13 228:13,23 230:8,13 232:16 233:7,11 235:17 237:13

**cases** 13:6 14:22 15:1 16:5,18,21

**case** 17:9 18:17,23,24 19:25 20:18 32:16,19,20,24 33:20,25 34:3,4, 5,10,23 35:16 36:17 37:3,9 39:13,23 40:4,7, 11,12,13,22 41:19,21 43:20 50:6 51:6,13,14, 23 52:14 53:13, 16,20 55:11 65:7, 9 66:13,15 68:17 70:7,24 73:24 74:8,10 75:2,3,8, 18,23 76:3,8,15 77:8 78:3,8,11, 19,23 79:3,24 80:13,18,24 81:3, 6,10,14,24 83:10, 13,25 84:3,8 89:3 92:13 93:4 96:12 97:6 100:18 102:4,11,14,17, 24 103:9 105:9 106:12 109:7,10 110:5,8 112:25 113:3,22,25 114:1,7,11,13,15 115:18 116:1 120:23 121:1,6,9 127:6 135:5 153:3,10 157:3 163:11,17 191:7 192:3 215:14 218:3,9,10,11 219:6,12,17,21 223:11,12 228:19 230:25 232:1,4, 12

**Cases-scott** 108:16

**cash** 225:13

**category** 15:23

**caused** 170:21

**caution** 210:15, 20

**caveats** 226:18

**cell** 141:16 142:23 143:4 202:7,9

**cellulite** 101:21

**certification** 80:13,16 163:9

**certified** 80:11, 22,24 81:3,10

**certify** 80:7,18

**cetera** 141:14 148:13 195:10

**challenge** 142:8

**champion** 56:21

**change** 149:15 161:17

**changed** 222:3

**changing** 80:3

**characterization** 228:8

**characterize** 29:22 57:10

**characterized** 74:4,5

**charged** 215:16

**chart** 66:15 71:1 75:1,14,22 76:7, 14,19 77:12 78:18,19 83:9 84:13,20 87:22 89:17,25 93:17, 22,25 94:3 191:4 230:23,25 231:15,25 232:3, 12,17,19,24 233:3,8,9,15 234:8,12,17,25 235:11

**charts** 70:6,9,23 71:6 73:20,24 74:5,6,7,10 75:7, 10,14,17 76:2 84:15 101:21,22 102:1 129:9 153:11,14,15,17 191:7 227:14 228:17,21 230:10,14,19,21 234:7,9,13,14

**chat** 132:2 182:23

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Index: check..complaint

**check** 158:14,17 178:18 199:12,17

**Chromadex** 41:2,3,11,13 42:14,18 43:5,8 65:10,16 167:23,25 168:7

**Chromadex's** 42:9 48:24

**Chromedex's** 43:12

**chronological** 130:11

**CIPA** 28:15,19 29:15,21 32:16,24 37:3 43:19 46:9 47:19,23 48:10,15 61:17 62:3 63:6,17 64:13 65:2 75:18 79:19 80:24 88:3 89:3 91:14,21,25 92:6,23 102:18,24,25 103:25 104:9,21 106:11 111:22 112:5,25 113:3 114:5,8 144:19 157:20 158:1 186:16,19 219:12,17,21 230:25

**circumstance** 156:18

**circumstances** 42:21 110:14 115:2 123:17 142:18

**civil** 30:6 96:5

**claim** 24:24 97:2,3 170:15,18,19 171:7,8 178:23,25

**claimants** 174:7 178:8 182:14

**claimed** 25:6 215:19,21

**claims** 165:20 170:11 175:22

176:18 193:22

**clarification** 122:11 138:11 236:8

**clarify** 9:19 10:22 102:8 104:16 236:3

**Clark** 19:18

**class** 34:14,17 47:11,22 54:5,7 56:22 57:19 67:6,10 80:8,18 81:9,20,25 82:6,9,14,15 93:3 112:22 117:3 118:15 142:9,18,20 145:10 163:8 170:2,7 173:20,24 174:15 175:21 193:15,20,23 194:23 207:18

**classes** 80:21

**CLE** 46:18,20,22,23 47:1,2,4,6,9,14,17

**clean** 137:7

**clear** 44:20 59:12 62:7 92:4 119:13 146:12 192:10 216:22 227:20

**clicked** 159:14

**client** 19:6 20:10,16 38:3 39:20 42:22 50:25 52:18 53:18 56:19,22 57:2 67:3,5,7,8,9 68:23,25 69:1,2,3,10,14 70:2,5 72:14 77:16 92:12 102:19 103:16 104:1,10,22 105:13,19 106:1,25 107:8,17,21 108:6 122:2,16,22 128:15,22,23 129:2 140:13 150:3 153:4

156:19 163:21 183:25 185:9 199:10 200:13

**client's** 98:3 108:8 135:19

**clients** 16:21 17:8 19:17,25 20:1,11,13,15,17,18,19,21 38:6,8,19 40:3,15 48:2 50:13,22,24 51:6,14 52:2,14 55:10 59:5 60:3,16 65:6 68:6,22 69:5,19,21,25 70:7,12 102:14 103:1 114:3,4 120:23 121:9 133:16,23 134:11 157:2 162:16 163:14,22,25 164:1 188:7 215:20,23 217:5,25

**clock** 211:8

**close** 42:4 43:19 91:3 124:23 171:11 225:7

**closed** 171:23

**CLRA** 34:10,23 35:16 36:16 37:9,21 74:10 75:23 114:11 170:18 185:14 191:7 218:3,11,15

**CNECF** 30:18 31:23

**CNEGF** 32:10

**co-counsel** 48:13 80:11 135:24 136:3,8,9

**coaching** 154:11

**Code** 30:6

**codes** 90:9

**coined** 69:9,15

**collaborating** 72:2

**collect** 217:8

**collected** 217:3

**collection** 21:3 110:8 184:22

**collective** 234:21

**collectively** 215:22

**colon** 83:17

**column** 76:19 77:4 84:25 85:2,3 89:10 90:16 108:21 235:23 236:19

**combination** 118:6 119:10 160:15 189:14

**comfortable** 67:9

**comma** 99:9

**commencement** 13:3

**comments** 126:21 201:16,20,21,22

**committing** 135:15

**communicate** 24:4 122:5,9 183:19 192:19 200:7 201:6

**communicated** 122:15 187:19 192:22

**communicating** 65:3 69:25 131:9

**communication** 21:20 49:4,14 51:2 119:19 120:19 134:2 142:5 164:25 200:10 201:11,23 210:22

**communications** 21:10 39:21 48:20 49:13

123:12 138:23,24 200:4 203:2 207:12

**companies** 33:15 72:12 92:15 96:16,20 97:1,3,14 101:2 103:4 134:15 179:8

**companies'** 99:5 100:9

**company** 71:23 103:24 104:9,21 110:25 111:4 118:24 125:11 126:13 135:15 145:16 151:20 152:1,17 157:20 158:2 170:12 173:21 174:1 176:21 177:6,7 191:1 221:8 224:12

**company's** 96:23 124:16 126:9

**compel** 21:19

**compensated** 26:21 27:20

**compensation** 25:15,19,24,25 149:14 220:15 222:19,21,24,25 223:1,11,18,20,23,25 224:5,8

**competent** 135:14 227:16

**competing** 38:11

**compiled** 232:11 235:11

**complained** 117:15 181:14 182:8 193:14

**complaint** 24:23 30:6 38:15 116:13 119:1 137:16,19,22,25 138:2,6,12,17

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

139:5 140:7 154:1,9 179:14

**complaints** 68:17 175:20

**complete** 28:4 52:8 201:14 218:9 226:19

**completed** 134:12 135:10

**completely** 63:7 188:2

**completeness** 175:1

**completing** 133:24 139:5

**compliance** 22:25 212:8

**compliant** 229:10

**complicating** 228:1

**complied** 23:13 120:11

**comply** 173:10 237:12

**component** 63:21

**components** 68:2

**compound** 40:23 51:16 93:9 134:13 213:8

**computer** 159:15,16 221:20

**concern** 156:7 169:18 176:10

**concerned** 141:19

**concerns** 123:18 174:2,3 226:16

**conclude** 171:7 207:13 237:17

**concluded** 171:8 173:19 175:18

176:6 177:13

**concludes** 238:18

**concluding** 226:8,11

**conclusion** 12:1 43:3 125:14 171:10 174:9

**conclusive** 161:15

**conclusively** 111:17,18

**condition** 148:12,19 149:4, 18,24 176:8 178:5

**conditioner** 118:22

**conduct** 22:13 95:9 98:7 229:3

**conducted** 17:17

**confer** 226:17 237:18

**confess** 33:1

**confidential** 188:1

**confirm** 32:5,7 116:17 154:3 206:15 209:2,8 234:2

**confirmation** 131:2,5 133:17, 24 134:11,23 135:3,23 136:4 156:19 157:1,7 158:14 188:6,11, 14

**confirmatory** 134:20 207:18,25 208:4

**confirmed** 108:22 109:6,19 110:4 125:14 235:16,17 236:20,22

**conflate** 216:22

**conflating** 106:20

**conflict** 68:10

**conform** 173:9

**confounding** 227:25

**confused** 39:3 53:3 63:20 236:9

**confusion** 236:7

**conjunction** 178:24 199:6

**conjunctive** 15:2

**connection** 9:20 17:18 31:2 93:25 119:16 206:25 209:3 234:17 235:9

**connection's** 159:13

**consensus** 92:10

**considered** 34:19 163:11 171:5

**consistent** 136:4 155:9 200:14 222:6 224:17

**conspiratorial** 24:25

**constantly** 114:16

**construct** 47:25

**constructive** 52:23

**construe** 223:15

**construed** 15:5 17:16 20:17 23:10,15 34:20

**construing** 20:13 221:24

**consult** 22:9 25:25 58:9,12

**consulted** 15:20 16:1

**consumer** 41:22 42:22 43:20 58:17,22 64:23 96:16 112:22 118:16 119:2 163:17 190:8

**consumers** 60:5,18 62:20 64:2,25 98:19 118:17 175:19 176:7

**contact** 50:25 51:14 67:3 68:16 71:10 104:9 117:9 164:5,17 183:22 185:7 191:13 193:1 196:13 197:11, 16,25 199:19 200:1 202:5

**contacted** 19:17 51:6 107:17 129:1,3 140:8 168:7 182:12 189:7

**contacting** 19:6 186:7

**contacts** 56:20 197:10

**contained** 76:14 80:5 233:15

**contemporaneous** 13:3 119:20 206:14

**contend** 31:9

**contending** 85:25

**content** 75:23 98:9

**context** 18:8 28:11 47:12 48:15 56:9 71:19 78:2,22 88:3 89:3 100:18 110:5 114:5,8 200:6

**contextualize** 88:19 106:19

**contingent** 221:12

**continue** 31:3,14 35:12 55:4,21 146:23,24 158:17

**continued** 176:8

**continues** 29:11

**contract** 25:18 26:9,16,18,19 27:2,13,16,18

**contracts** 26:1,7, 25

**contradicting** 152:21

**contrary** 151:23

**contribution** 223:16

**control** 120:10 139:22

**controlled** 177:5

**conversation** 26:4 41:25 42:2, 12 44:8,12,18,22 45:7,12,15,17,19 48:6 49:11 103:12 118:2,8 119:21 125:14 126:15 144:17 145:13 182:19 183:2 190:10,12 202:3 203:1

**conversations** 126:16 131:25 145:1

**convey** 43:12 50:13

**conveyed** 48:1

**convicted** 177:3

**copies** 208:1

**copy** 10:23 11:1 180:13 202:17 204:16 205:4

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

**cornucopia** 16:6

**corporate** 20:19 211:23 212:2,6,8

**Corporation** 10:3

**corporations** 65:6

**Corps.'s** 36:2

**correct** 11:5,6, 10,11 12:4,13 47:5,7 75:2 91:7, 9 99:17,23 116:24 117:1,2 120:24 143:20 150:9 160:19 162:5 168:9 171:13 172:3 192:6 194:13 196:2 205:13 232:1

**correctly** 39:19 93:12 99:20 124:24 125:15 139:8 141:17 185:10 209:20 216:16

**correspondence** 13:16 15:8 39:15 43:11 48:25 144:12,24 145:14 190:11 206:14 207:12,15

**counsel** 9:14 10:22 11:17 12:15 16:14 17:11 18:10 21:11,21 25:1 29:3 30:24 32:4 35:1 39:15,21 41:3,5,6,8,14 42:10,18 43:12 45:21 46:9,15 48:9,12,20,24 49:7 51:23 52:4, 19,23 54:20 55:5, 23 57:14 59:25 63:2,11 71:19 75:5 81:6,7 84:10 86:6 97:16,23 119:19 120:10,11

**counter** 98:2

**counterfactual** 20:9

**couple** 72:3 150:2

**court** 9:12,15 27:4,10 29:12 30:24 31:19 32:4, 14 33:11,19 35:7 37:2 38:11 40:14 54:23 55:16,18 60:19,21 80:18 106:18,21 108:2 115:3 134:23 147:13 159:1 160:2 209:4 237:6,15

**court's** 35:12

**court-ordered** 237:22

**courts** 40:21 81:14

**coverage** 25:2

**Covid-19** 123:18

**Cox** 123:12

**CPA** 212:14

**create** 50:23

**created** 84:13 90:10

**creation** 234:25

**credit** 85:7,8 90:17

**criminal** 43:23 96:15 120:4 163:20

**cross-reference** 200:15

**CS** 125:11,19

**custody** 120:9

**customer** 96:24, 25 124:22 125:20 126:11 139:8,24

**customers** 96:17

**cut** 95:1 158:25 160:8 227:24

**Cynthia** 185:7, 15,19,25 186:7

---

**D**

**D.A.** 97:5 103:13

**D.a.'s** 41:20 43:16 44:19 92:13 96:14

**D.a.s** 43:21

**dad** 162:15 181:13 182:13, 19,20,23 183:9 187:8 197:18

**dad's** 200:16

**damages** 25:4,6

**Dan** 44:13 200:23 203:16 204:13

**Daniel** 200:2

**Darnell** 9:17 18:6,10 30:25 31:8,12 32:18,25 34:2,11,24 35:17 36:18 37:22 38:13,20 39:17 40:5,23 45:21 46:12,16 47:10 49:1,9 50:8,19 51:9,16,22 52:4, 19,21 53:9 54:3, 10,18,20 55:1,5, 10,11,20,23 56:17 57:13 58:2, 5,13 59:6,11,24 60:11 61:7,18 62:5 63:2,7,9,18 65:8,22 72:15,20, 25 75:4,12,19,24 76:4,10,16,24

**CS** 77:13,24 78:13, 24 79:9,20 80:1, 9,14,19,25 81:4, 11,16,21 82:1,8, 16 83:2,11,19 84:1,9,16 85:10, 21,25 86:3,5,11, 17,25 87:4,24 88:5,10,17 89:5, 19 90:1,11,19 91:1,8,15 92:1,7, 24 93:5,8,19 94:5,17,24 95:12, 16,20 96:2,9 97:15,19 98:14 100:5,12,19 101:3,9 102:6,12, 20 103:2,5,21 104:2,12,15,23 105:15,21 106:3 107:1,19 108:25 109:8,14,21 110:6 111:6,11, 23 112:7,17 113:11,23 115:22 116:9 117:6,11, 22 118:4,12 120:25 121:14 122:10,14,20 124:8,13 125:3, 17,22 126:4,10, 24 127:5,13,21 128:5,9 133:5,13, 18 134:1,13,25 135:6,11,25 136:7,15 137:5, 11 138:3,9,21 139:9,18 140:5 142:3 143:23 144:14,21 145:3, 17 146:3,9,16,24 147:6,8,18 148:1, 14,20,25 149:6, 19 150:1,8 151:9, 16,21 152:2,18 153:5,12,22 154:16 155:2,10 156:14,21 157:4, 15,22 158:3,8 159:11 160:12,23 161:5,12,23 162:4 164:8,20 165:7,18,24 166:4,9,14,20,25

**Dan** 167:9,15 168:2,8 172:13,16,20 177:25 181:20,24 184:2,7,13,25 185:11,16,21 186:1,8 187:20 188:15 189:4 195:16 198:23 199:4,7,13 203:17,19,24 204:18 209:12 210:14,20 211:25 212:9,16,21 213:8 214:13,18 215:1,6 216:21 217:4,9 218:5,17, 21 219:2,7,13,18, 22 220:19 223:14 225:25 226:20 227:11 228:7,16 229:5,9,11,19 230:16 231:16 232:6,14,21 233:16,21 234:14 235:1 236:8,11, 24 237:19,20

**dash** 83:18 162:18

**data** 77:1,2 90:6 96:17

**database** 16:3 70:11

**date** 9:7 42:2,5 46:20 47:4 108:8 116:17,18 117:24 120:12 122:5,8 132:21,22 133:3 144:7 150:24 151:10 152:16 158:20 160:13 172:3 174:18 176:6 179:18 187:18 189:2 192:1 212:3

**dates** 152:21 160:13 176:5 192:7,16 197:20

**daughter** 19:14, 22

**Dave** 49:20 151:4

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

**Dave's** 222:21

**David** 9:17,22 49:15 99:3,18 148:9,18 150:22 151:3 222:20

**day** 97:3 199:20 211:11 220:13 227:23 228:5 230:1 237:16

**deadly** 177:9

**deal** 20:15 122:1 177:19 238:6

**Dear** 197:8

**debate** 54:24

**debt** 221:5

**debts** 24:17

**decade** 42:4,16 43:1 93:13 117:23 120:2,19, 20 128:19 129:18 132:1 165:12

**deceitful** 163:18

**deceive** 164:2

**December** 13:4 17:16 38:10 169:14,16,19,24 170:8,9,10 171:12 172:1,12, 25 173:12,14 178:2

**decide** 167:13 199:20

**decided** 97:6 170:1,6 174:14 176:1

**decides** 59:9,22

**decision** 60:2 173:25 174:12, 17,19

**declaration** 24:25 174:24 175:4,14 184:23 186:4 196:18 200:16,19 201:8, 9 203:10,11,14, 15 204:13,16,17,

21 205:7 206:10 207:17

**declarations** 14:21,25 15:4,6,8 200:4 205:1

**declined** 56:11

**decorum** 29:5

**deductions** 225:8

**deep** 177:5,9 207:11

**defamatory** 163:20

**defendant** 11:9 36:1 79:25 80:3 84:25 85:3 111:13 135:14 139:6,16,24 142:8,16 149:14 163:11,17 188:2 235:22

**defendants** 9:22,25 17:23 21:11,20,21 188:3

**Defendants'** 30:4

**defense** 25:3 47:23 215:16 216:15

**define** 26:17 27:16

**defined** 65:17

**definition** 34:12, 15 37:8,10,14,20 38:7 59:14,16,20, 21 60:14 62:11, 24 63:10,13,14, 15,23 64:4,15,17, 20 186:21

**definitions** 13:20

**demand** 78:11, 17,19,22 85:16 107:20 115:15,21 116:4,7 157:19 170:24 171:12, 17,19,21 172:1

173:13 178:4 179:8,12 184:5

**demands** 55:17

**Demulder** 41:4,6 48:8,10,18,19 65:9,16 71:10,14 110:18 111:5 152:24 153:1,4, 20 154:11,25 155:8 156:6,25 157:11,21,25 158:13,21 159:6 160:4,10,14,21 161:3,10 162:18 163:6 164:5,6,17, 18 165:1,5,13,16, 22 166:23 167:7

**Demulder's** 153:10 154:2 162:23 164:12

**dense** 215:13

**deny** 134:16

**depended** 102:7

**depends** 26:17 27:15 67:21 70:2, 5 102:13 110:17

**deponent** 9:11, 16 154:14

**deposed** 11:5,6 13:9

**deposition** 9:8, 19 10:15 11:13, 20 12:18,22,24 13:12,14,15,17, 18 16:15,16,20 17:7,9,15 23:11 29:5 30:15 31:2 36:19 39:9,10 50:21 52:6,7,8, 15,22 53:5 55:17, 19 56:4,8 63:22 64:7 66:9 83:8 85:12,22 87:16 96:1,2 98:6 119:20 123:10, 14,16,18 130:15 141:3 146:13,18, 23 147:1 154:19, 22 155:16 156:13

173:17 178:4 179:8,12 184:5

**detailed** 227:12

**details** 35:20 43:22 47:25 134:19

**deteriorated** 174:1

**determination** 11:22 35:3 40:19 92:11 109:19 110:1,24 111:3,5 112:12 161:15 173:23 234:21

**determinations** 90:5

**determine** 33:15 41:22 90:24 91:6 94:15,21 95:5 103:9 105:9 111:16,19,21 135:17 150:24 164:14 174:6 182:3 193:22 234:3,19

**determined** 173:17 234:5

**determines** 89:23

**determining** 25:18,25 112:4 223:17

**develop** 47:23

**developed** 210:1

**diagram** 20:16 50:23

**dialing** 185:8

**dietary** 171:4,5

**differ** 35:21

**difference** 68:25 88:14 89:2,16

**difficult** 92:14

**difficulty** 97:7

**diligence** 67:4 105:1 136:9

**diligent** 11:22

**182:9 185:1** 186:22 200:16,20 202:21 227:9 229:15 231:17 232:24 233:2,5,9, 18 234:10,18 237:9,18,25 238:6,18

**depositions** 13:8 14:11 16:17 19:3

**deposits** 225:20

**depression** 148:12,19

**Derrick** 19:15

**describe** 12:21 41:4 58:7 69:16 213:6,14

**describes** 14:7 38:12 203:10

**describing** 118:19

**description** 15:3 47:20 49:25

**descriptions** 155:15

**descriptive** 38:5

**deserve** 97:25 121:18

**designated** 26:5 88:8

**designation** 35:4 71:9 94:4

**designations** 90:7

**designed** 39:2

**designee** 13:1 26:5 56:5 234:20

**desire** 63:25

**desk** 195:10,15, 17,18,23,25 196:6

**detail** 11:25

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Index: dinner..email

125:5

**dinner** 178:19

**direct** 30:17 31:21 36:9 52:5 72:11 124:3 139:2

**directed** 156:18

**directing** 30:19 31:24 108:11,13 144:3 204:6

**directly** 29:13 43:12 163:2 190:12 191:20 203:3 217:25

**disagree** 87:5 228:7 237:20

**discern** 153:17 168:10 192:14 193:18

**discerned** 104:18 170:10

**disclose** 40:14, 20 164:23

**disclosed** 24:19 25:20 40:3 58:19, 20 97:4 148:12, 19 149:4,24 164:11,25

**disclosing** 49:11

**disclosure** 94:15,22 155:1,3, 7

**disclosures** 95:6

**discovery** 13:7 15:11 20:25 22:19,25 23:1,8, 9,10,12,14,18 28:20,24 29:14 59:15 64:3 65:15 73:18 74:21 89:14 120:7,11 148:6 150:19 162:12 181:8 193:10 203:20,22

**discuss** 11:24 201:14

**discussed** 22:22 28:22 41:18 42:20 48:14 165:2 178:5 224:14,21,22

**discussing** 43:4 116:2 193:19

**discussion** 117:13,18,20 159:19

**discussions** 48:15 141:7,11

**disjunctive** 15:5 92:1

**displayed** 11:13 12:25 71:1 93:18

**displaying** 32:9

**dispute** 87:12

**distinct** 12:11

**disturbing** 201:17

**dive** 177:9 207:11

**docket** 41:21 64:23 174:22,25 184:18 198:15 203:12

**Docketing** 174:23

**dockets** 13:6

**document** 10:20, 23 11:2 17:19 22:2,11,13,15,21 25:3 26:23 27:22 30:2,9,13,18 31:22 32:10,11, 13,14 34:16 35:24 36:6 37:4, 5,18 50:1 54:5,7, 11 56:23 57:20 58:4 66:2,4,8 67:11 70:16,20 73:11 74:17,20 78:5 79:2 82:21, 25 83:6,7,12,14, 16 84:2,5,10,23 85:15 86:1,8,13, 19,21,22,24

87:15 89:13 98:22 109:1,6 110:7 111:8 113:4 115:5,9,11, 23 123:20 124:2 125:5 127:15,19, 23 129:16,24,25 130:4,5,6,11,14, 17 132:25 133:9, 11 136:13,23 137:3,13,14 139:3 140:19 141:1,2,8 144:4 145:11,20,21 147:20 148:1,5 149:10 150:15,18 151:23 152:4,10 155:19,23,24 156:2,12 162:11 172:4 174:20,23, 25 175:12 178:9, 13 180:3,7,9,12 181:1,3,7,11,22 182:9,16 184:16, 17,22 186:15,24 187:3,4,23 192:25 193:3,7,9 194:23 195:10,16 196:16,18,24,25 197:1,4,17 198:12,14,18,24 204:3,11 205:5, 11,12,22 206:2 207:19 208:15,19 226:24 228:14 229:20,25 230:3, 6,8,9,13 231:7 233:6,10,11,12 234:1 235:13 236:5,15 237:11, 14

**documentary** 203:5,9

**documentation** 16:6 24:11 25:21

**documented** 134:18

**documents** 14:22 15:10,13, 17 16:9,23 17:20, 21,25 18:19,21, 23 20:3,6,24

21:3,14,17,22 22:4,7,18,21,23 23:3,6,17,22,24, 25 24:20,22 25:23 39:25 40:17 54:13 57:7, 9,11,23,24 58:6 59:2 67:6 87:4 93:14 104:4,17 107:14 111:25 116:11 119:9,20 120:3,6,8,14 128:18 129:7,11, 17,22 130:20 156:10 161:24 168:3,10 174:17 180:1 184:22 188:24 194:7,19, 20 195:22 207:24 213:3 219:8 227:18,22 234:4 237:13

**dollars** 199:3,9 213:25 214:20, 23,25

**double-check** 137:4

**dozen** 120:18

**draft** 172:1 204:17,20 205:4

**drafted** 139:5 197:1 230:3,5

**drawn** 43:3

**drilled** 13:18

**Drive** 196:11 220:7

**Drug** 47:19 103:24 104:9,21 105:18 106:23 107:18 124:12,16 125:11 126:22 127:12 129:20 131:11 137:17 138:8,19 145:16 148:24 151:20 152:1,17

**Drug's** 46:9,14 49:7 131:14

**Drugs** 41:7

**due** 67:4 104:25 136:9

**dump** 77:1 90:6

**dumped** 77:2

**duplicate** 137:8

**durable** 174:7

**duties** 34:17 54:4,7 56:22,24 57:19,21 62:17 67:6,10 98:17 145:10 194:22 207:18

---

**E**

**eager** 163:7

**earlier** 21:4 50:22 79:3 130:19 144:3 149:10 165:6 228:18 230:1 237:9

**earliest** 192:15

**early** 30:14 141:6 169:12 197:9,18, 21,25

**easier** 236:4

**easily** 218:7

**educate** 16:10

**efforts** 17:19 25:11 62:19 197:12

**elected** 192:11

**electronically** 137:19

**else's** 115:1

**email** 49:20 51:1 66:11,12,17 67:23 70:15 73:14,17,21 99:3, 17 100:7,14 118:7 123:24 124:4,17 125:6 126:20 131:10 132:17,19 140:23

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Index: emailed..excuse

141:4 142:7,21 144:12,24 145:14,18 147:24 148:8 151:11 156:5,6,17,25 157:10 158:18 161:3 162:14,20 171:18 181:12,18 182:18 187:24 193:12,17 194:7,8,20 195:1,2 200:8 206:5 207:19 233:13

**emailed** 180:16 230:9

**emails** 66:5 99:23,24 133:17,24 134:23 140:15

**embrace** 33:17

**embraces** 33:12 34:13 62:12

**emerging** 47:22

**employed** 194:12

**employee** 60:15 62:15,16 220:15

**employees** 16:21 17:8,24 25:15 120:18 220:11

**employment** 26:11,16,18,19,24 27:13,16,18,23

**enable** 16:8 104:5

**encouraging** 173:6

**end** 45:25 50:12 66:13,16 67:19 79:10 116:3 123:2 136:16 168:17 190:17 211:14 220:25 226:1 227:23 228:5 237:16 238:17

**ended** 208:12,13

**ends** 209:8

**enforce** 30:22 32:2 34:19

**enforcement** 43:21

**engage** 174:4 210:2

**engaged** 126:14,16

**engagement** 54:12 57:20 67:7 108:8 180:13 194:22 207:17 208:5,24 210:15

**engaging** 177:6

**enhancement** 75:2,3 78:3,10,23

**enlightening** 155:14

**ensure** 56:21 57:2 60:3 136:9 137:22

**ensuring** 56:19

**entered** 78:17 208:22

**enthusiastic** 101:14

**entire** 92:18 169:23

**entitled** 9:10 10:14 14:5 26:23 27:23 34:16 35:25 58:22 84:3 98:3

**entity** 212:7

**entries** 70:11

**entry** 32:13 85:19 108:20 113:14 137:7,9 144:7 235:20 236:16

**equalize** 225:13

**equally** 15:20 21:7

**equals** 84:21,22 231:12

**equipment** 224:22

**eradicate** 60:5,17 62:13,19 64:1 98:19

**eradicating** 64:25

**erroneous** 137:7

**Essentially** 225:13

**established** 83:20 86:3

**establishing** 22:9 86:13

**estate** 220:1,4,6

**estimate** 219:15 221:3,25 222:9

**estimated** 25:4

**ethically** 60:4,16 61:10 62:12,19 63:24 64:24 98:18

**euphemism** 101:13

**evaluate** 11:16

**evaluating** 76:22 103:8

**evening** 194:25 195:4 204:22 205:2

**event** 176:7 232:8

**eventually** 165:16

**everything's** 213:3

**evidence** 14:20 16:6,19 18:15 19:24 21:10,25 22:24 23:20 24:16 25:15 86:1 120:22 203:5,9

228:13

**evil** 177:14

**evolving** 114:16

**exact** 48:21

**examination** 11:21 12:17,20 14:16,19 31:15 55:4,22,24 146:25 226:9,12,18 229:3 238:15

**examined** 10:9

**exceed** 84:17 161:5

**exceeded** 112:18

**exceeds** 31:1,13 32:18 34:2,11,25 36:19 37:22 38:13,20 39:17 40:5,24 46:12 47:10 49:1 50:8,19 51:9,22 52:4,21 53:9 54:3,10,18 56:17 57:13 58:2,5,13 59:6,11 60:11 61:18 62:5 63:18 65:8 72:15,20 75:4,12,24 76:4,10,16,24 77:13,24 78:13,24 79:20 80:1,9,14,25 81:21 82:1,8,16 83:2,11,19 84:1 85:11,22 87:9,24 88:10,17 89:5,19 90:1,11,19 91:1,8,15 92:2,7,24 93:8,19 94:17,24 95:12,23 97:15 98:14 100:5,12,19 101:3,9 102:6,20 103:7,21 104:2,15,24 105:15,21 106:3 107:2,15 109:1,14,23 110:7 111:6,11,23 112:7 113:11,23 115:23 116:9 117:6,11,22 118:12 121:4

122:14,20 124:8,13 125:3,17,22 126:4,10,24 127:5,13,21 133:18 134:1,13,25 135:6,25 136:7 138:4,9,21 139:9,18 140:5 143:23 144:14,21 145:3,17 146:3,9 148:2,14,20,25 149:6,19 150:1,8 151:9,16,21 152:2,18 153:5,12,22 155:2,10 156:14,21 157:4,15,22 158:3,8 160:12,23 161:12,23 162:4 164:8,20 165:7,18,24 166:4,9,15,20,25 167:9 168:2,8 177:25 184:2,7,13,25 185:11,16,21 186:1,8 187:20 188:15 189:4 198:23 199:7,14 209:12 211:25 212:16,21 218:17,21 219:2,7,13,18 231:17

**Excellent** 190:16

**exception** 19:21

**exceptionally** 207:13

**exchange** 130:21 131:21 132:7 145:18 182:18

**exchanged** 66:5 144:13 190:7

**excluding** 119:18 221:2

**excuse** 36:15 41:12 46:24 70:7 85:1 89:10 94:12 101:19 114:24 124:20 128:23 150:15 183:10 207:21 216:11

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

221:9

**executed** 15:1,4, 7 208:25

**executes** 56:22

**execution** 14:20

**exhibit** 10:12,14, 16 11:3,14 14:13, 15 30:3,7 35:25 36:4 66:3,6 70:13,14,18 73:10,11,12 74:13,14,15 75:23 82:20,23 93:18 98:20,21, 23,25 99:1 108:11,12,14 113:5 115:6,7 123:21,22 129:25 130:2 132:12,13, 15 136:24,25 137:10 139:4 140:19,21 144:3 145:22,23 147:21,22 150:13,14,16 152:8 155:20,21 162:6,7,9 172:6,7 174:21 175:2 178:10,11 180:4, 5 181:2,4 184:17, 19 186:25 187:1 193:4,5 196:17, 22 198:13,16 204:4,5,6,8 205:20,21,24 208:16,17 215:24 216:1,2,4,7,11 229:22,24

**exigent** 129:22

**exist** 26:2 56:25 101:5 104:17 120:8 129:13 153:14,15 164:21 180:2

**existence** 20:8 140:13

**expect** 60:15 98:10 153:16

**expectation** 65:18

**expected** 33:2 114:24 171:21

**expecting** 148:11

**expenses** 220:8

**experience** 126:11 134:15

**expertise** 68:7

**explain** 101:8

**explained** 96:13

**explicitly** 34:8 182:17

**exploratory** 90:24

**explored** 72:2

**exposing** 174:3

**express** 23:14

**expressly** 95:22 106:4

**extend** 98:7 163:9

**extent** 26:2 62:7 120:8 153:15 155:11 199:15 228:24

**extra** 213:16

**eyes** 233:6

___

**F**

**face** 99:6

**fact** 41:19 77:7 95:21 115:25 132:3 140:10 144:19 195:3,14 234:3

**factors** 109:18 110:17 163:4,5, 10 223:17 227:25 228:1

**facts** 14:19 16:19 18:15,24 19:24 21:10,25 22:24 23:20 24:16

25:15 69:11 77:13 78:24 84:9, 16 86:1 120:22 161:5,13 164:9, 24 165:7 167:15 178:6 217:4,9 228:13 230:16 233:16,21 234:15

**factual** 137:25 139:14,21 148:17

**failed** 237:12

**fair** 29:22 37:3,7 43:13 48:25 102:2 119:24 160:22 170:6,9 173:2,3,11,18 209:24 215:5,7 232:13

**fairly** 54:11 69:13 70:10 177:9

**faith** 139:23

**false** 92:12 97:1 98:2 144:10 154:12 163:19 177:7

**falsely** 12:13 206:23

**falsity** 201:21

**familiar** 28:10 30:11 71:23 72:1 168:25 172:9 189:19 206:3,4 208:20,21

**family** 50:15 177:1

**fashion** 187:19

**father** 116:25 181:12,18 182:6 183:2 186:11 187:8,24 193:15 194:6 197:8 200:11,22

**father's** 200:19

**favorable** 176:24

**FBI** 19:16

**FDA** 171:6 173:7

177:6

**feared** 174:4

**February** 179:21 180:19

**federal** 96:5 177:4

**feel** 229:2

**Fees** 209:17

**feigned** 237:9

**Felipe** 191:1,14 192:20 194:24 197:11 198:7

**felon** 177:3

**felonies** 33:16 135:16

**felonious** 177:22

**female** 140:13,16

**Ferrell** 9:12,18, 19,23 10:8,12 12:13 28:2,10 30:9 33:23 35:10 36:6,17 37:3,11, 12,18 39:5,12 42:3 45:19 46:8 51:3 52:11 53:2, 19 57:6 61:23 66:8 70:15,16,20 71:10,13 73:14 74:17 77:19 78:3 79:18 82:25 84:23 87:18 92:20 97:9 98:5, 25 106:9,15 108:17 115:9 116:25 119:17 121:13,24 123:20 124:4 130:4 132:17 137:2 140:23 145:25 146:14 147:24 150:18 155:23 160:10 162:11 164:15 168:25 172:9 174:24 175:11 178:13 181:6,13 184:21 186:11 187:3,8, 12,18 188:10

191:2,10 193:7, 13 194:6,19 196:18,24 197:8, 20 198:4,18 200:12,22 204:24 206:2 208:19 211:22 216:4 224:1 228:11 229:25 238:19

**ferret** 30:22 32:2 35:20

**field** 51:3 71:7 90:23 91:5 116:19,22 167:22 174:5 183:16,19 185:24 186:11 187:12 191:10

**file** 45:25 46:4 71:16,21 79:10, 14,18 92:9 123:2, 6 136:16,20 168:17,21 172:25 177:24 190:17,21 211:14,18 219:17 226:1,5 238:17

**filed** 13:5 14:21 15:7 21:12 24:23 29:19 30:13 32:14 38:10,11, 14,15 48:19 68:17 77:7 116:13,15 137:16,23 138:12 175:4 177:3 178:1 179:14,17, 19 180:22,25 184:17 190:25 194:5 196:20 198:14

**filing** 67:3 115:17 137:20 138:6,17 219:12

**filings** 212:3

**final** 32:6 169:11 174:16 180:15,16 205:7

**financial** 24:18 220:14 221:6

**find** 16:7 50:10 117:3 172:21

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

210:5

**fine** 137:11

**finish** 67:15 157:12 167:20

**finished** 197:6

**firm** 14:7 18:4 20:12,22 26:13 35:15 36:15,16 37:20 38:18 41:13,18 42:20 43:8 48:23 50:5, 25 51:7,20 52:2, 17 53:6,12,20 54:8 59:9,19 60:9,24 61:6,16 62:3,15,16 63:5, 17 64:12 65:5 68:16,22 69:18, 24 70:6 73:24 77:21 80:7 81:19 100:25 102:1,5, 11,19 109:10 110:14,15 113:18,21 114:10 116:8 119:12 120:12 122:2,5,8, 17,22 124:11 127:3 129:4 134:9 143:22 145:25 146:1,7,8 147:15,16 153:3 157:2 160:22 177:24 178:3 179:19,20 180:24 184:11 185:14,20 188:7 190:25 191:13,21 193:1 194:3,11 196:13 197:15 198:3 200:7 207:4,8,13 208:2,7 212:14 215:19,22 217:3, 5,7,8,18 218:14, 25 219:17,25 220:4 222:8 223:8 224:11 228:19 232:5,11 233:14

**firm's** 59:19 65:2 69:16 200:1 224:23

**firms** 113:22 114:11

**fit** 163:13 173:18

**five-minute** 79:6 190:14

**Florida** 176:23

**Florida's** 176:24

**flow** 50:23 104:5 111:25 120:4 207:19 225:13

**focus** 55:14

**focused** 55:11

**follow** 54:14,16 56:13 57:10 88:9 89:17

**Ford** 9:24

**form** 46:14

**formalizing** 116:2

**format** 204:17

**forming** 217:12

**forward** 127:3

**found** 15:2 26:9, 22 27:21 176:19 177:15,17,19,20 178:2 201:16

**foundation** 83:20 84:9,17 85:10,21 86:12 87:8,24 88:10,17 89:19 90:1,11,19 93:19 94:5 108:25 109:15,22 110:6 113:11 133:5,13 153:12, 22 156:22 157:5 160:24 186:2 199:13 228:10 230:17 231:16 232:6,14,21 236:24 237:5

**founded** 215:22 216:13

**founder** 176:23, 25

**Fourth** 30:5

**FPLH** 89:24 90:9

**Franco** 183:23, 25 184:6,10

**fraud** 98:19

**free** 202:11

**frequent** 169:20

**frequently** 58:23

**Friday** 195:10,15, 23

**friend** 48:12

**friends** 50:14

**front** 10:13 14:14 35:24 66:2 70:13 73:10 74:13 98:20 123:21 136:24 140:18 145:21 147:20 150:13 152:9 155:19 162:6 172:5 174:21 178:9 180:4 181:1 184:16 193:4 196:17 198:12 204:4 205:21 208:16 215:25 229:23

**frozen** 122:24

**full** 226:22

**fulsome** 227:6 229:3

**funded** 176:21

**funds** 176:23 225:4

**funneled** 79:3

**funneling** 68:5

**Furman** 10:1 236:3,4

**G**

**gain** 17:12 19:4 235:10

**Garganta** 41:8 47:18 48:16 49:15,18 61:21 142:6 150:22

**gather** 17:19 25:12 96:17 211:10

**gathered** 119:9

**gathering** 24:14

**gave** 17:2 61:13 65:18,23 95:14 97:22 134:7,8 154:18 155:17 176:10

**general** 32:22 50:7 52:2 60:6,18 64:2 192:8,11

**General's** 191:18,20,24 192:5,13

**generally** 36:22 55:7 56:18 102:24 114:17 169:23 222:2

**generated** 221:25

**genesis** 43:19 192:3

**gentlemen** 87:11

**genuinely** 39:3

**Gharring** 24:4,7, 8,10 212:19

**Gillian** 41:18 42:19 43:5

**Giovanni** 183:13

**give** 16:8 50:3 64:16 87:13 94:25 95:1 96:10, 21 97:13 98:2,3 131:5 142:15 152:6 175:6 200:5 211:9 219:14 227:6 229:22

**giving** 69:11 142:7 229:15

**Glendale** 9:6

**Glenn** 143:4,8, 13,21,25 146:7 147:16

**Glenn's** 143:8 144:20 145:16

**global** 209:3

**goal** 115:20,25

**good** 9:4,17,21, 24 10:1,4 33:14 34:18 45:23 48:12 56:21 67:11 115:3 139:23 163:13 168:15 210:1

**gosh** 42:4

**Gotshal** 14:6

**gradation** 173:25 174:12

**granular** 13:19

**great** 20:15 99:9, 23 121:25 177:19 238:6

**greenwashing** 118:19,25 119:23 120:1

**gross** 213:7,14, 17,18,20,21,24 214:1,8 218:14, 20

**Group** 9:18 10:15 11:9 19:7 30:21 32:1 53:23 73:7 83:13 185:10 189:18 205:15 209:23 211:5,24 212:7 216:18

**Group's** 36:1 196:1

**grow** 174:3

**growth** 215:18

**guarantee** 45:15, 16

**Guard** 85:8 90:17

30(b)(6) Scott J. Ferrell
April 01, 2021

254
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

**guess** 44:25 61:8 114:21 122:15

**guessing** 61:14 90:13 218:16,22 219:3

**guide** 14:9,10

**guides** 13:11 14:2,3 15:14,24 22:9 25:24 57:22 58:9,11

**guise** 147:2

**guys** 96:10

**H**

**habit** 139:6,16

**half** 115:1

**handbook** 58:22

**handling** 110:16 163:2 187:8 215:13

**hands** 202:11

**handy** 50:1

**hang** 126:17

**happen** 50:18 171:21 176:18

**happened** 44:5 125:6

**happy** 17:3 33:4 35:21 39:25 40:18 49:3,12 57:16 62:7 114:25 168:10 227:3 229:8

**harass** 163:21

**harassing** 146:25

**hard** 10:23,25 43:2 180:12 202:7

**Hardin** 26:10,12, 15 27:12 28:1

**Hardin's** 26:22 27:2,21

**harm** 60:5,17 62:20 64:2,25

**harmful** 62:13 177:9

**harvest** 96:17

**Havens** 33:12,17 35:7

**header** 30:19 31:23

**heading** 14:15 85:7 108:15,19

**health** 16:3 174:1 221:19

**Healthymed** 156:9 157:19,20 158:1,2,7 161:2,8

**hear** 128:5,8 159:12

**heard** 86:11,12 227:1 228:16

**Heather** 162:16, 20,21 163:15,25 165:1

**Heidi** 183:23,25 184:10

**HELD** 159:19

**helpful** 11:23 62:1

**helping** 50:10

**Hey** 131:1

**Hiden** 146:1,8 147:16

**higher** 99:8

**Hikida's** 222:17

**Himalaya** 41:7 46:8,14 47:19 49:7 65:11,16 103:24 104:1,9, 11,21 105:18 106:1,12,23 107:7,17,18,21 108:5 124:11,15 125:11 126:22 127:12 128:16,24

**129:**4,20 131:11, 14 137:17 138:8, 19 140:4 141:7, 19,23 145:16 148:24 149:5 151:8,11,14,20, 25 152:17

**Himalaya's** 41:8

**Himalayan** 138:25

**hired** 165:25

**hiring** 163:20

**hit** 115:20

**hold** 22:11

**Home** 108:20 109:13 235:15, 20,23 236:17

**honestly** 98:18

**hospice** 169:11

**hospital** 169:10, 17,20,22

**hospitalized** 169:9

**hospitals** 169:20

**hostile** 176:11

**hour** 45:22 79:7 115:1

**hourly** 25:17 215:13,16

**hours** 146:12,13 227:9 229:17 238:2,7

**house** 141:15,23 142:1,12,14,23 169:13,23 196:5, 6,9 202:10

**Human** 84:22 85:9 88:9 89:18

**hypothetical** 94:6 104:23 109:22 142:3,15

**I**

**i.e.** 19:25 20:14

**idea** 39:24 40:16 43:19 94:18 120:16 131:8 133:6,14 144:15 145:19 187:21 197:17 218:19,24

**ideally** 119:1

**identical** 11:1 171:11

**identification** 10:16 30:7 36:4 66:6 70:18 73:12 74:15 82:23 98:23 115:7 123:22 130:2 132:15 136:25 140:21 145:23 147:22 150:16 155:21 162:9 172:7 175:2 178:11 180:5 181:4 184:19 187:1 193:5 196:22 198:16 204:8 205:24 208:17 216:2

**identified** 15:25 34:4 35:7 37:5 38:18 40:11 45:5 57:8 61:21 223:17

**identifies** 37:7

**identify** 54:21 55:1,5 56:9 59:5 64:1 65:25 91:21 94:11 114:13 129:7 175:19 176:5,7 204:1

**identifying** 29:15 91:14,25 135:9

**ignorance** 237:10

**III** 169:8

**illegal** 62:13

176:18 189:8

**illegally** 96:16 139:24

**imagine** 43:3 115:15

**immediately** 135:15

**Immunogenic** 36:2

**Immunogenics** 9:11 10:2,6 170:3,7,11 171:9 172:12 173:2,21 176:10 178:7 179:10

**impact** 165:11

**impeding** 95:25 96:2

**implicitly** 34:7

**implied** 23:14

**implies** 91:10

**important** 64:15 67:18 134:17 217:22

**impossibility** 87:21

**impossible** 92:2

**imprecise** 42:17

**impression** 188:21

**improper** 104:20,25 105:8 121:2

**impropriety** 145:5

**in-between** 99:12

**in-depth** 26:4

**in-house** 77:7 110:16

**in-person** 118:7

**inability** 226:14

30(b)(6) Scott J.  Ferrell
April 01, 2021

255
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

**inaccurate**
150:25 155:16,18

**inadvertently**
210:21

**inaudible** 68:18
86:4 125:8 128:2,
3,4 131:17
143:12 159:10

**incentives** 25:17
26:1

**inclined** 163:12

**include** 17:17
23:11 77:21
222:15,23 228:1

**included** 42:22
94:3 235:4,7

**including** 25:16
106:12 138:15
175:1

**inclusive** 233:10

**incoming** 138:20
139:7,17 161:11,
16

**incomplete** 12:8
94:6 104:23
109:21 142:3
182:4

**inconsistent**
128:17

**incorporate**
17:2,4

**incorporating**
60:13

**increase** 215:10,
15 223:3,5

**increased** 215:4,
8

**incredibly**
201:14,17 206:22

**independent**
33:16 53:4 56:2,3
84:4 87:12

**independently**
151:22

**indicating** 94:16
127:3,6

**indication** 42:6

**individual** 25:10
34:13 41:20
56:20 63:24 67:8
68:1 69:15 129:3
183:5 189:7,12,
17 193:13,20
221:9

**individuals** 19:8
26:2,18 27:17
33:13 45:5 50:12
60:4 189:13

**infer** 237:2

**inference** 195:13

**inflates** 220:25

**inform** 41:14
46:8 48:9 64:11
138:7,18 161:10
164:4,16 165:4
237:24

**information**
17:12 20:20 21:7
24:14,19 25:12,
19 33:5 76:14
77:12,22 92:11
93:16 94:3 96:17,
18 119:5,7,8,17
139:22 149:11
150:7,10,11,25
153:17 176:20
177:15,19,21
188:1 205:11,18
213:3 227:18
232:3,11 233:15

**informed** 37:2
47:18 48:24 49:6
123:11 219:14

**informing** 182:6

**ingest** 173:7
177:10

**initial** 51:4 67:3
68:16 110:24
134:19 197:10

**initials** 71:3,8
83:22 108:24
109:2 113:13

**initiate** 226:17

**input** 77:11,16

**inquired** 182:13

**inquiries** 114:14

**inquiry** 33:7 42:8
139:23

**inside** 56:7 87:15

**inspired** 118:15
119:15

**Insta-slim**
235:25

**instance** 134:17

**instances** 58:18
135:13

**instant** 174:22
178:5 184:18

**Institute** 14:4

**instituted** 161:17

**Institutes** 16:3

**instruct** 134:10
135:15

**instructed** 94:14
95:5 96:3 177:6
235:4

**instruction** 95:8,
18

**instructions**
65:18 95:14
97:13,17,21
98:12 125:1
131:10 134:3,6,7,
8

**insurance** 24:23
25:1,2 221:19

**intake** 18:25 19:6
20:16 51:4 53:18
56:19 57:1 67:9
70:5 77:16
129:12,19 200:13

**integrity** 206:16
207:14

**intend** 29:4 31:4
56:5 60:4 87:12

175:12

**intended** 71:21
96:19 172:25

**intends** 67:9

**intentionally**
29:10 99:11
228:2

**interacting** 38:6

**interaction**
99:12

**interest** 20:10
34:14 48:2 72:11

**interested** 58:3

**internal** 59:4
206:14

**International**
72:19 116:14
117:5 120:1

**International's**
119:23

**internet** 13:13
15:15 20:20 22:9
57:22,25 58:7
123:12,13,15
201:16,20

**interpret** 100:10,
14 125:20 130:10

**interpretation**
87:7

**interrogatory**
36:2,11,23 37:6,
15 203:25

**interrupt** 29:6,7
31:5 55:17 61:24
97:24 105:2,5

**interrupted**
65:24 123:11
159:14

**interrupting**
97:25 102:9
121:16,19

**intervening**
99:17

**intervention**

35:13

**interview** 17:12
24:1 25:10
162:16 163:15
164:25 165:2
201:19

**interviewed**
19:13 207:1

**interviewing**
17:22 18:3

**interviews** 17:17
19:10,19,21,22

**intransitive**
69:22

**introduce** 9:14

**introduced**
119:11 190:1

**invasion** 33:18
34:6

**investigate**
101:1 102:18,25
103:9,25 104:21
189:10 193:15,22

**investigated**
176:19

**investigating**
91:17,25 92:6,23
96:12 118:24

**investigation**
78:7 95:19,21
106:11 109:7
112:10,11,14,15
124:15,17 137:24

**investigations**
95:10

**investigative**
79:4 134:20

**investigator**
150:23

**investigators**
163:21

**investigatory**
93:2,17,23
105:25 107:7
108:5 164:14

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

**invite** 226:21 227:2 231:21

**invited** 46:18 47:1

**involved** 34:5 76:9 80:3 107:18 113:3 135:17 153:21 163:4

**involvement** 80:21

**involves** 67:17 69:9 212:23

**involving** 21:12, 19 33:18 34:4,5 198:21

**irrelevant** 98:9 214:13

**Isabella** 19:15

**Israel** 158:18

**issue** 39:13 85:12 87:1 199:2

**issued** 13:6 22:12,15

**issues** 16:4 47:22,25 54:24 68:11 139:21

**issuing** 17:18

**items** 100:22

**iteration** 127:17 129:12

**iterations** 232:17,19

**IV** 169:5,8

**J**

**Jackson** 41:16 42:1,13,14,18 61:21

**James** 26:10

**Janovick** 19:15

**January** 174:10, 13 175:18 176:1, 10 177:16,20

181:18 182:19 222:7

**Jason** 61:21

**JCG** 9:10

**job** 94:11 223:9

**John** 217:18

**Join** 159:15

**jointly** 234:5

**Josh** 236:4

**Joshua** 10:1

**journals** 16:4

**judge's** 14:10

**judgement** 163:8,12

**judges** 177:4

**July** 124:11,14 126:20 127:24 128:14,21 129:1, 5 130:25 131:6,7, 9,13 132:1,4,20 133:11 138:7,18 139:14 140:4 151:5,15,17,20 152:1,12

**June** 83:21 197:9,18,21 198:1 199:20 200:12,23 202:14

**Jung** 73:20 75:11 230:14

**Jung's** 83:22

**justice** 58:16 119:2 190:8

**K**

**Katherine** 75:11 101:18

**Kelley** 9:4

**Kelly** 163:7,13

**kernel** 207:7,8

**Kerr** 61:21

**kill** 173:7

**killed** 177:12

**kind** 39:7 90:6 174:4

**Kirshner** 75:11 101:18,20

**Kirtland** 110:20, 23 111:1 114:4,8 153:2,8 162:21, 24 163:1 164:4, 12,16 165:4 179:25 180:24

**knew** 41:3,9 49:19,21 61:9,16 64:6 101:25

**knowing** 150:9

**knowingly** 96:20

**knowledge** 61:9, 15 139:20 150:11 161:7 179:7,11 227:18 234:4,22, 24 235:2,11

**knowledgeable** 11:19

**Knowles** 9:22 63:5,16 64:6,12, 22 65:3 171:25 223:21

**Kyle** 9:21

**L**

**La** 196:11

**label** 74:23

**labelled** 75:3

**lack** 237:5

**lacked** 227:17

**lacks** 83:19 84:16 85:10,21 87:24 88:10,17 89:19 90:1,11,19 93:19 94:5 108:25 109:14,22 110:6 113:11 133:5,13 153:12,22 156:21

157:5 160:23 186:1 199:13 230:16 231:16 232:6,14,21 236:24

**Laguna** 196:11

**landing** 216:8

**landline** 141:14 202:10

**language** 20:7 87:8 205:11 231:11

**largely** 79:1

**late** 169:11 197:9, 18,21,25 204:21 227:7 238:9

**laughing** 101:12

**law** 14:4,6 20:12 58:21 68:13 80:4 96:19,21 102:19 103:10 110:25 111:4,13 112:12, 13 113:18,22 134:23 146:1 161:17 163:9 171:23 173:5,9, 10 176:16 184:11 212:8

**Law360** 58:17

**lawfully** 60:4,16 61:10 62:12,19 63:24 64:24

**laws** 30:23 32:3 176:25

**lawsuit** 39:13 92:9 134:24 174:15 175:5 178:5 190:25 194:5 198:8 204:14 209:3

**lawsuits** 32:24 71:16,21 79:18 101:1,4,15,21,23 102:2 177:23 178:2

**lay** 87:8 228:10

**leadership** 46:25

**learn** 119:25 132:8 176:9,13

**learned** 118:25 139:6,15 163:16 173:22,25 176:21,25 177:5, 10 178:6 207:6

**learning** 103:12

**lease** 220:4,6

**leased** 224:13

**leave** 195:9,14 217:19

**leaves** 217:22

**lecture** 43:22 44:5,15 46:17,18 47:1

**lectures** 21:6 44:21 118:14 119:14,15

**lecturing** 44:14 45:10,13 114:14

**Lee** 41:16 42:1, 13,14,18 61:21

**left** 76:20 84:20 132:25 195:22 226:22 227:3,23

**leftmost** 235:23

**legal** 138:1 146:20 185:8 210:8

**legend** 84:21 231:8,10

**lengthy** 174:25 207:19

**letter** 17:19 22:11,22 67:8 78:12,17,19,22 85:16 107:20 108:8 157:19 170:24 171:12, 17,19,21 172:1,9, 11 173:4,13 176:15 178:4 179:12 180:13 184:5 194:22

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

207:17 208:24 210:16

**letters** 54:12 57:20 115:15,21 116:4,8 179:8

**level** 13:19 213:6

**lexicon** 89:7

**liabilities** 24:17 221:5,10,11,12, 14,16,17

**lie** 126:16

**limit** 52:8

**limitations** 68:11

**limited** 25:17 39:11 54:23 79:1 98:5 123:13

**limiting** 13:15 40:6,10

**limits** 56:3

**Linda** 194:8,10, 16 195:25

**Linda's** 195:18

**lines** 114:1,13,15

**link** 141:16,20

**listed** 11:21 12:17 18:15 23:2 39:5 52:6,22 55:15 77:9 85:11 89:24 153:10 222:13

**listened** 16:14 154:11

**listing** 85:4 191:4

**litany** 14:24

**litigate** 163:12

**litigation** 13:3 21:12 28:11,14 29:16,21 37:21 38:19 46:10 48:10 50:5 51:21 52:3,18 53:8,14, 21,25 54:9,17 56:16 57:1,12 58:17,22 59:10,

23 60:10,25 61:6, 17 62:3 63:6,17 64:13 68:4 72:24 74:8 76:23 84:8 103:17 105:14,20 106:2,25 107:8 108:6 111:2 117:4 127:4 128:15,23 129:4 131:6 143:9,14, 22 144:19 145:2, 9 146:8 147:17 161:16 165:19 166:3 170:3 173:15,18 174:2, 22 175:22 176:2, 11 183:13 184:11 185:19 218:15,20

**Live** 84:22 85:9 88:9 89:18

**Livelitigation** 137:9

**LLC** 21:12 72:18

**LLP** 146:2

**load** 136:12,13

**lobby** 190:1,3,4

**locate** 50:5

**located** 196:1

**location** 47:2,6

**locations** 99:19

**logical** 195:12

**LOL** 99:9,22 101:11

**Lomb** 85:20

**long** 80:20 82:2, 17 122:16,19 190:5 205:16 209:6 229:1

**longer** 174:14 194:12

**looked** 37:4 144:25 145:14

**looted** 176:22,24

**lose** 197:15

**losing** 199:19

**losses** 23:21 24:3

**lost** 68:19 89:11 122:23 181:15 196:13 231:8

**lot** 44:14 135:12 164:10

**loud** 101:12

**lunch** 114:22,24 115:4 123:5,11

**lunches** 221:20

**lying** 92:15

---

**M**

**Madam** 106:18 108:1 147:5,11

**made** 15:19 56:1 59:25 90:4 97:14 139:22 142:19 164:23 171:10,11 174:17 175:23 188:21 199:16 201:16,20 207:3 208:5 218:14,19 225:18,19

**Magna** 191:1,15 192:15 193:16 194:5 196:20 197:16 198:8 199:21,23 201:15 203:12 204:14 206:24 208:12, 13,23,25 209:5,9, 10,11,18,19,22, 25 210:3,7,8,17, 25 211:6

**Main** 9:9

**maintain** 70:6,23 71:6 74:7,10 75:7,17,22 83:25 99:19 191:7 212:1 221:10

**maintained** 70:9 234:1

**maintaining** 129:10 211:23

**make** 31:6,13 33:6 52:12,23 55:3 59:13 62:18 65:6 67:2 69:11 86:7 90:23 92:3 93:2 95:24 103:16 113:14 118:16 130:9 137:11,25 141:15 142:7 146:21 168:13 173:23 181:24 188:19,23 197:10 198:7 212:2 227:7 229:2,21 236:4 238:9

**makes** 110:1 114:21 139:6,16

**making** 67:5,7,8 69:9 142:9 158:16 176:17 212:10 213:2

**maladies** 169:21

**male** 75:2,3 78:3, 10,23

**man** 131:1

**managed** 228:18

**management** 22:1,8 86:2,9,14, 17,20,22 226:15, 23 227:13 228:14,23 237:13

**managing** 223:8, 10

**mandatory** 105:2

**Mandy** 73:20 75:11 83:22 116:3 234:19

**manner** 13:11 91:21

**manual** 14:10

**manufactured** 118:21

**March** 37:5 116:14 169:12

**Mark** 156:8 157:12

**marked** 10:13,16 30:3,7,17 31:22 35:25 36:4,10 66:3,6 70:18 73:10,12 74:13, 15 82:20,23 98:21,23 108:12 113:5 115:6,7 123:21,22 129:25 130:2 132:12,13, 15 136:24,25 139:3 140:19,21 144:2 145:22,23 147:21,22 150:14,16 152:8 155:20,21 156:6 162:7,9 172:5,7 174:21 175:2 178:10,11 180:4, 5 181:2,4 184:16, 19 186:25 187:1 193:4,5 196:17, 22 198:13,16 204:8 205:21,24 208:16,17 215:25 216:2 229:21,24

**marker** 144:8

**marketing** 177:7

**marketplace** 118:16

**marking** 204:5

**married** 207:22

**massive** 43:23 96:15 207:23

**master** 95:22 106:4 113:1,25 114:12

**material** 164:24

**mathematical** 217:21

**matter** 41:5 69:3, 4 70:3 77:17 99:18 129:12,13 136:9 161:2,8

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

165:6,10,11
171:23 173:11
184:18 185:9
186:13 198:14

**matters** 12:17,20
14:16 48:2 69:21
70:4 102:14
122:7 134:9
210:2,6

**Max** 170:13

**MB** 84:21 85:20
89:23 94:4 231:8,
10,12

**Mcnamara** 44:16

**meaning** 66:22,
25 231:21

**means** 67:2
83:21 86:13
101:8 113:14
125:24 200:8
212:1 231:22
236:22

**meant** 101:7

**media** 21:5 45:25
46:4 79:10,14
123:2,6 136:16,
20 168:17,21
190:17,21
211:14,18 226:1,
5 238:17

**meet** 194:24
195:3 200:23
204:24 226:17
237:18

**meeting** 195:7
202:4

**meetings** 39:14

**members** 82:6,
14 142:20

**memorialized**
26:23 27:22

**memorializes**
192:25 203:6

**memory** 42:16
50:2 127:16
129:14 133:20
153:25 154:4

**mental** 50:23

**mentally** 20:15

**mention** 182:15

**mentioned** 14:1
111:3 207:24
221:18

**merit** 68:9 111:1

**meritorious**
136:10

**message** 130:25
158:12

**met** 16:14 17:10
200:12,25 202:1
204:21

**method** 228:18

**Michael** 9:4
205:14

**middle** 71:1
174:10,13 175:17

**Mike** 163:7
205:15 206:25

**million** 25:5
213:23,25 214:2,
4,9,11,15,19,23,
25 215:20,23
216:14,19,24
217:2,8,10,13,16,
17,20,22,23,24
218:3,8 223:2

**mindful** 115:1

**minds** 99:10,23

**mine** 48:12

**minimal** 84:21
85:20 87:22 88:4,
23 89:3,7,17 94:4
153:21 231:11,
12,14

**minimally** 87:19
88:15,22

**minimum** 19:14
22:8 56:24

**minute** 152:7
174:24 186:15
225:24 229:22

**minutes** 45:22,
24 136:14 172:22
211:9,10 226:22
227:23 228:5
229:17 238:2,3

**mischaracterizes** 115:22

**misconduct**
135:17 174:4

**mislead** 121:2

**missed** 86:5

**missing** 41:1
105:10 137:12
181:24

**misstates** 34:24
195:16 215:6
235:1

**misstating**
138:24

**mistaken** 235:25

**misunderstand**
69:20 77:15
142:4

**misunderstanding** 35:23 38:16
90:3 91:11
109:24 155:12

**misunderstood**
27:6 61:25

**mkj** 83:18,22

**modifies** 88:25
89:7

**moment** 13:25

**moments** 43:15
144:25

**monetary** 79:24
80:5

**money** 82:6,14
166:23 176:22
185:19 217:25
218:14,19 221:21

**monitor** 124:21,
24

**monitored** 90:25
91:7 126:3,6
157:13

**monitoring**
126:14

**month** 19:20,23
169:23 220:10,
13,21,25 221:1,4,
12

**monthly** 220:8,
15,17

**Morales** 191:1,4,
11,14,15,20,24
192:20,23 194:24
195:4 196:14,21
197:11,16,21,25
198:4,7,22,25
199:2,16,19

**Morales's** 193:1

**morning** 9:4,17,
21,24 10:1,4,23
12:3 195:10,15,
23 205:3 206:10

**mother** 19:16

**motion** 30:4
196:19 206:22
237:19

**motions** 21:18
216:15

**motivated** 63:25

**motives** 56:20

**move** 33:22
78:21 92:17
97:11 127:3
172:24

**moved** 176:23

**moving** 28:5 98:7

**multiple** 31:9
199:23

**mutually** 228:1

## N

**N-X** 170:14

**named** 18:4
118:13 168:25
183:22

**names** 14:3 81:9

**narrative** 20:8
28:6 29:9 92:18
97:9 98:2,8 213:9
228:3,25

**narrow** 31:13
192:16

**National** 16:3

**Natural** 9:11
10:2,6 36:2
170:3,7,11 171:9
172:12 173:1,21
176:9 178:7
179:10

**nature** 14:12 15:2
42:20 70:10
75:15 142:4

**needed** 201:13,
17

**neglected** 66:14

**net** 209:19

**Network** 108:20
109:13 235:15,
20,24 236:17

**Newport** 9:11,18
10:15 11:9 19:7
30:21 32:1 36:1
53:23 73:6 83:13
185:9 189:17
196:1 205:15
209:23 211:5,23
212:7 216:18
220:7

**NGT** 120:22

**NIC** 15:11,19
20:25 21:23
22:19 23:18 25:4,
6 38:9 39:13 70:3
73:17 74:20
89:14 120:6

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Index: Nic's..objection

145:2,9 148:5 150:19 155:25 156:2 162:12 171:14,15,17,20 172:1 173:13 175:22 176:11 178:14 181:7 183:6,13 187:5 193:9

**NIC's** 19:18 25:1 171:18

**Nilon** 41:2,3,11, 13,14 42:10,25 43:13,17 48:24 65:10,16 76:8 167:13 181:17 183:5,7,10,12

**non-ntg** 9:25

**nonetheless** 146:20

**nonresponsive** 28:6 29:9 33:23 35:11 228:4

**North** 9:9

**nos** 25:12 36:3

**notably** 226:15

**note** 139:21 140:11 192:3 217:23 237:21

**noted** 61:7 238:21

**notes** 58:16 181:15 211:10

**notice** 9:20 10:14 11:12 12:18,25 13:14,15,17,18 36:20 42:9 52:6, 23 53:5 75:5 85:12,23 174:23 185:1 231:18

**noticed** 226:14

**notified** 119:22

**noting** 101:11

**notwithstanding** 144:19 146:18

**Novex** 72:18,24

**NTG** 14:21 15:1, 5,7 16:21 17:8, 23,24 18:4 19:25 20:9,11,14,16,17 21:20 23:13 24:17 25:15 26:10,12,15,19 27:13,17 28:13, 18,25 29:14,20 32:17 33:25 34:10 35:15 36:10,15,16 37:2, 8,20 38:3,9,11,18 39:14 40:2 41:13 48:23 49:6 50:4, 21 51:7,15,20 52:2,13,17 53:6, 12 54:8 57:7 59:4,9,22 60:8, 15,24 61:6,16,23 62:2,3 63:5,17 64:12,22 65:5 66:4,23 67:1,20 68:3,22 69:15,18, 24 70:6,17,23 71:6,16 72:12,18, 23 73:11,17,24 74:2,7,10,14,20 75:7,17 76:2,7,22 77:7,11,20 78:21 79:18,24 80:7 81:19 82:22 83:9, 24 84:7 87:19 89:3,23 90:4,10 94:14,21 95:8 98:22 100:17,25 101:25 102:11,25 103:16,25 104:10,22 105:25 107:6,16 108:4, 13,15 110:14,19, 22 111:16,18,21 112:2,4,24 113:9, 16,21 114:7,10 115:13,20 116:8, 13,22 119:12,25 120:12 121:9 122:2,5,8 124:3, 5,11 127:2 128:3, 14,22,23 129:4, 10 130:18 131:5 132:19 133:16,23 134:22 135:3,23

137:16 138:7,18 140:20 141:20 143:9,21,24 145:25 146:7 147:15 148:5 150:15,18 153:3 155:24 156:2,6, 19 157:19 160:22 161:10 162:8,11 163:1 164:4,16 165:4,6,22 166:3, 12,18 167:7,13, 22 171:12 172:6 177:24 181:3,7 183:10,12,16,19, 22,25 184:5,10 185:14,20,24 186:12 187:4 190:25 191:4,7, 10,13,21,24 192:19,22,25 193:9,15 194:3, 12,14 196:13 197:15,24 198:3, 7 199:2 200:1,23 202:14,17,23 204:7,13 205:23 208:1,7 209:8,11, 18 210:3 212:14 213:15 215:19 218:14,19,25 219:5,17,25 220:4,11 221:5, 22 222:8,11,13, 19 223:20,25 224:5,8,11,15,20 228:18 233:14 234:1,24 235:2, 14

**NTG's** 18:16 19:24 21:10 22:1, 18,25 23:7,17,21 24:2 32:22 53:20 58:1,7,12 75:1 79:23 82:5,13 86:2,9 90:23 120:23 153:11 178:13 212:19 213:6 215:4 220:8,14 221:1 224:24 225:3 227:12 228:13

**nuanced** 35:2

**number** 16:4 49:23 66:4 82:21 85:3 94:16,23 98:22 108:14 130:1 131:15 141:11 142:1,14 143:3,8,15 144:20 145:16 150:23 158:21 163:4 172:6 176:14 185:8 205:22 209:7 215:13 235:22,23 236:6,11

**numbered** 115:14 148:10

**numbering** 236:5

**numbers** 89:24 91:6,10,13,24 92:5,22 93:7 94:12 98:13 99:5 100:10 103:17 124:6 125:2 222:15

**Nutrisystem** 186:12,16 187:13 188:20,23 189:2, 3

**NV** 171:3 178:25

———————

**O**

**O'MALLEY** 217:18

**oath** 10:9 12:3,6, 8

**obfuscate** 228:3

**obfuscating** 29:10

**object** 59:24 75:4 103:21 138:3 148:1 184:25

**objection** 18:6 30:25 31:3,11,14 32:18,25 34:2,11, 24 35:17 36:18 37:22 38:13,20

39:17 40:5,23 46:12,16 47:10 49:1,9 50:8,19 51:9,16,22 52:4, 21 53:9 54:3,10, 18 55:3 56:1,17 57:13 58:2,5,13 59:6,11 60:11,12 61:18 62:4 63:7, 8,18 65:8 72:15, 20,25 75:12,19, 24 76:4,10,16,24 77:13,24 78:13, 24 79:20 80:1,9, 14,19,25 81:4,11, 16,21 82:1,8,16 83:2,11,19 84:1, 9,16 85:10,21,25 86:8 87:3,10,24 88:5,10,17 89:5, 19 90:1,11,19 91:1,8,15 92:7,24 93:5,8,10,19,21 94:5,17,24 95:12, 16,20,24 96:7 97:15 98:14 100:5,12,19 101:3,9 102:6,12, 20 103:2,7 104:2, 12,15,23 105:15, 21 106:3 107:1, 19 108:25 109:8, 14,21 110:6 111:6,11,23 112:7,17 113:11, 23 115:22 116:9 117:6,11,22 118:4,12 120:25 122:10,14,20 124:8,13 125:3, 17,22 126:4,10, 24 127:5,13,21 131:17 133:5,13, 18 134:1,13,25 135:6,11,25 136:7 138:9,21 139:9,18 140:5 142:3 143:12,23 144:14,21 145:3, 17 146:3,9,22 147:3,7,9,18 148:14,20,25 149:6,19 150:1,8 151:9,16,21

EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

152:2,18 153:5, 12,22 155:2,10 156:14,21 157:4, 15,22 158:3,8 160:12,23 161:5, 12,23 162:4 164:8,20 165:7, 18,24 166:4,9,14, 20,25 167:9,15 168:2,8 172:13 177:25 184:2,7, 13 185:11,16,21 186:1,8 187:20 188:15 189:4 195:16 198:23 199:4,7,13 203:19,24 204:18 209:12 211:25 212:9,16,21 213:8 214:13,18 215:1,6 216:21 217:4,9 218:5,17, 21 219:2,7,13,18, 22 220:19 223:14 230:16 231:16,19 232:6,14,21 233:16,21 235:1 236:24 238:11

**objections** 14:11 31:6 61:7 62:5 96:4 237:5

**objective** 223:9

**obligation** 60:3 62:12 64:23 237:12

**obligations** 23:14 24:18 33:16 57:3 61:10 67:10 69:12 120:11 220:15 221:6

**obtain** 24:2 96:18 134:11

**obtained** 20:1,14 128:22 216:14,23 217:18,23

**obtains** 50:21

**occur** 111:5

**occurred** 213:1

**October** 185:7 186:7

**Oertle** 146:2,8 147:16

**offer** 31:7

**office** 43:16,24 44:19 92:14 96:14 182:12 191:18,20,24 192:5,13 196:1,3 220:7 224:22

**offices** 41:20 190:4

**official** 192:11

**oftentimes** 126:15 136:8 163:17

**OGX** 118:24 121:5

**on-line** 59:2 100:21

**one-page** 181:11

**one-tenth** 25:7

**ongoing** 18:12 43:23 96:15 221:11,14,16 222:4

**operating** 225:6

**operations** 222:5

**operative** 13:17

**opinion** 22:16 33:12 34:12

**opinions** 22:14

**opportunity** 11:16 229:4,7

**opposed** 110:15

**opposing** 39:15, 21 40:14,21 41:14 135:4,20 142:1,6

**Opposition** 196:19

**order** 13:14 163:24 174:24

**orders** 13:6 23:12

**ordinary** 89:6

**organic** 117:15, 17 118:19,23

**Organics** 118:21,23

**Organics'** 120:4

**organization** 58:25

**original** 13:13 154:1

**originally** 25:8 140:7 206:23

**outage** 123:13

**outset** 17:18 22:12

**outstanding** 223:9

**over-ingested** 177:13

**overlapping** 25:13

**overnight** 169:19

**overwhelmed** 116:1

**owned** 72:4,6,12 221:9 224:13

**ownership** 72:11

**owns** 141:14 224:15

———————

**P**

**p.m.** 114:25 123:4,8,15 126:20 128:2,14, 21 129:5 130:25 136:18,22 168:19,23 190:19,23 211:16,20 226:3,

7 238:20,21

**PACER** 32:13

**Pacific** 73:4 212:8 216:13 217:12,14

**Packard** 110:21, 23 111:1 114:5,8 153:2,8 162:21, 24 163:1 164:4, 12,16 165:4 179:25 180:24

**pages** 36:10 130:20 149:12 174:25 180:12 236:1

**pagination** 30:19 31:23

**paid** 25:15 79:24 166:23 209:18 217:25 220:11,15 221:7

**papers** 208:6

**paperwork** 116:2

**Para** 24:1 25:11 26:3 178:17 224:12 233:23,25 234:2

**paragraph** 30:20 31:25 101:19,20 115:13 139:4 140:12 141:10 148:10 149:7 156:8 175:13,17 186:4 197:3,5 206:9,11 209:1,2, 6

**paragraphs** 139:21 149:9

**parentheses** 71:2

**parenthetical** 20:14

**part** 20:23 36:12 63:25 66:16 69:6, 8 78:6 84:23 85:17 86:5 94:11 113:19 130:17

140:6 141:8,10 149:17,20 156:9 166:12,18,24 167:6 174:10,13 175:18 198:8 200:19 202:20 206:9 207:11 209:5,10,22,24 210:3 228:4

**participate** 118:16 123:14

**participated** 160:21

**parties** 13:8 23:9 40:14,21

**partner** 67:11 73:4 111:2 223:8, 10

**partners** 25:16 44:14,15 45:10, 13 46:18 164:24

**parts** 63:21

**party** 18:4 51:14 165:14 234:5

**pass** 226:9

**passed** 190:1

**past** 19:23 120:20 215:1 225:16

**patience** 123:19

**paused** 103:5

**pay** 166:12,18 209:11 220:24 221:11 222:19 223:4,20,25 224:5,8

**payment** 79:24 82:6,14 157:25 199:2,9,16

**payments** 198:7 209:13,14

**payroll** 220:17,25 221:1,19 225:7

**Payroll's** 220:12

**PC** 10:15

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

**penalty** 12:7,12

**pending** 31:17
56:12 81:14
147:12 159:21
209:4

**people** 44:17,20
45:2,13 134:3
173:6 177:12
182:14,15,22,25
191:16 199:23

**perceived**
186:23

**percent** 25:7
113:9,10 218:1
221:25

**percentage** 48:1
79:23 80:4 218:2
222:6

**perform** 19:19
105:12,19,25
106:24 107:6
108:4 109:12
158:6 161:20
189:1,10 212:14

**performance**
223:16

**performed** 19:9
189:11

**period** 115:20
155:4 198:1,5
213:7

**perjury** 12:7,12

**permission**
175:6

**person** 11:19
17:12 18:3 44:11
51:1 62:15 91:20
118:6 129:7
173:20 182:7
189:20 192:19
200:25 234:3

**person's** 68:13
177:11

**personal** 11:7
39:9

**personally**
140:15 189:21,24

**perspective** 19:4
50:3 217:21

**pertain** 54:17

**Peter** 10:5 103:6
128:5 159:12
181:20,21

**phase** 78:12,17,
22 85:16

**Phillips** 44:14

**phone** 42:13
49:23 51:1 65:6
69:10 85:3 89:24
90:25 91:6 93:7
118:3,6,8 131:15
138:8 141:20
142:24 143:4,8,
15 145:1,16
149:25 155:15
159:15 164:7,19
168:1 185:8
202:6,7,9 203:1,
6,10 235:22

**phonetic** 19:15
30:18 32:10

**phrase** 23:10
35:23 59:13 62:9
64:4,14 79:3
88:22 100:9
186:20 223:15

**phrased** 87:20
105:15,21 107:1
116:9 165:8
166:4,14 203:19,
24 204:18

**physical** 99:19

**picture** 180:15
189:6

**pioneered** 56:23

**place** 9:8 19:23
44:22 53:24
93:13 97:8
118:17 152:12

**plaintiff** 10:2,6
28:11 36:2 38:12,
19 40:15 41:15
47:25 48:18 53:7
59:15 62:9,11
77:5,9,11 92:10

116:1,16 129:20
139:6 142:17
143:9,14 183:6,
13 191:15 193:21
194:1,2 199:21
215:20,23

**plaintiff's** 10:16
30:7 36:4 66:6
70:14,18 73:12
74:15 77:21
82:20,23 98:23
108:12 115:7
123:21,22 129:25
130:2 132:15
136:25 140:21
145:23 147:22
150:16 155:21
162:9 172:7
175:2 178:11
180:5 181:4
184:19 187:1
193:5 196:19,22
198:16 204:8
205:24 208:17
216:2

**plaintiffs** 18:16
19:3 28:18 29:15,
20,24 33:13
34:23 36:16 37:3,
9,21 39:16 40:12
48:15 50:5,10,17
51:20 53:13,16,
20,24 58:1,7
59:10,13,22 60:9,
25 61:17 63:6
64:12,24 65:2
129:13 182:11
187:25 192:9
199:22,25

**plaintiffs'** 70:24

**plan** 71:16 158:16

**plane** 224:15

**planning** 173:12

**play** 68:15 163:6
166:3 174:2
211:22

**pleading** 39:20

**pleadings** 13:5
38:15

**pleasantries**
190:7

**pleased** 50:14

**plenary** 16:2
17:19 22:11,21
53:4 70:10 210:6

**plural** 234:14

**point** 67:19
77:11,20 78:10,
21 138:6,17
146:25 167:13,18
168:12 169:16
170:1 172:24
183:20,25 185:15
196:13 205:10
212:15,20 226:8
227:24 228:6
229:18

**pointedly** 207:1

**policies** 22:2
53:24 54:2,9 57:8
86:20,21 226:24
228:15

**portion** 162:17

**posed** 97:11
106:17 107:12

**position** 55:20
68:13

**possess** 208:1

**possesses** 57:7

**possession**
15:18,21 22:18,
23 23:17 120:9
202:23

**possibility**
142:22

**possibly** 111:17
150:25 238:13

**posted** 130:22

**posting** 206:21

**potential** 21:11,
20 68:6,10
102:18,25 103:25
116:1 124:12
129:2 175:22
182:13 193:20

**potentially**
17:20,25 101:1
138:14

**practice** 15:14,
24 47:23 57:22
58:9,11 139:7,16
164:23 199:10,16

**practices** 13:11
14:2,3,8 22:8
32:23 54:13,16
56:12 57:8,11,24
58:8,22 60:5,17
62:13,20 64:1,25
80:3 124:16
135:18 149:15

**Practicing** 14:4

**preamble** 59:25

**preceded** 192:14
202:3

**preceding**
122:21 139:21

**precise** 64:16
116:17 117:24

**prefatory** 118:6

**Prefiling** 113:9

**premises** 220:7

**preparation**
12:23 13:2,21,23
14:5,20,22 16:1,
20,23,24 17:5,13,
15 18:12,18,19
19:10 20:2,3,23
21:9,13,15,23
22:4,17 23:2,3
24:5,11 25:9
28:21 30:14 33:3
36:7,12 66:9 83:7
130:18 141:2
154:21 156:12
200:19 202:21
233:9,17 234:10

**prepare** 12:22
13:12 17:11 74:2
120:21 121:8,12,
23 163:14 212:23
235:4 237:12

**prepared** 12:16,
19 15:1,4,6 25:4

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

38:25 87:1 162:16 164:1 173:14 227:21 238:6,12

**preparer** 24:9

**preparing** 15:9 18:8 19:9 33:8 227:9 232:23 233:2,5 234:18

**present** 23:22 24:18 25:16 44:8, 11 213:7 224:11 231:22

**presentation** 46:22 47:8

**presented** 28:18

**presenting** 29:23

**preservation** 17:19 22:11,22

**preserve** 17:20

**preserving** 31:5

**president** 167:2

**pretty** 146:12 222:5 227:20

**prevent** 25:2 96:19 176:23

**previous** 27:3 28:24 35:19 62:7 121:10

**previously** 15:14 17:5 61:7

**primarily** 215:17

**primary** 69:18,24 70:3 227:13 228:18

**printed** 132:22 133:4

**prior** 27:1 38:9, 15,18,19 59:4 60:8,23 61:16 62:2,18 63:4,16 64:11,21 65:3,18 105:13,19 106:1, 7,11,24 107:7

108:5 138:6,17 159:7 160:5 182:19 189:2 197:25 208:10 217:12

**privacy** 148:11

**private** 163:20

**privileged** 210:22

**problem** 143:7, 19 227:10

**procedure** 30:6 96:6

**procedures** 22:2 86:2,10,14,20 226:16,24 228:14,19,23 237:13

**proceed** 31:14 78:11 96:6 126:22 127:2,7 147:10

**proceeded** 169:7 201:19

**proceeding** 55:7 105:1,10 161:8 165:23

**proceedings** 97:25

**proceeds** 57:2

**process** 19:6 20:16 50:23 67:22 68:5,15 69:6,8,21 70:12 77:16 79:4 104:5 111:25 120:4 127:7 129:19 165:17 207:11 226:17

**processing** 66:13,20 67:24

**produced** 15:10, 18 20:25 22:19, 23 23:18 73:17 74:20 120:6 148:5 150:18 155:24 156:2

162:11 178:14 187:5 193:9 202:19 203:15,22 208:11 233:6,11

**product** 76:20,22 118:21 174:7 175:20 181:14 182:7,8 208:1

**production** 230:8

**products** 72:3 117:14,17 125:12 126:9 170:20,22

**Professional** 22:13

**professionalism** 206:16 207:14

**profiles** 21:6 48:14

**profits** 23:21 24:2

**progeny** 33:16

**prolix** 16:2

**prominent** 112:21

**Prompt** 89:17

**promptly** 226:18

**Prompts** 88:9

**pronoun** 140:12

**pronounced** 24:8

**proof** 31:7 193:21 207:18,25 208:3

**propagating** 98:3

**proper** 56:7,19, 20 87:15 238:13

**properly** 12:20 15:3 20:12 56:6 57:1 58:19 115:24 136:13 213:4

**property** 20:10 219:25 220:9

**propriety** 145:1, 8

**protection** 176:25

**protocol** 22:10

**prove** 64:1

**proven** 155:16

**provide** 14:2 24:10 27:6 33:5 35:1 37:23 42:9 56:9 71:19 98:12 131:14 135:3 150:23 188:7,11, 14

**provided** 21:23 75:10 89:14 92:12 119:5,8 131:10 142:1 149:11 150:25 181:7 186:21 204:16,20 227:14,23

**provider** 123:12

**providing** 136:3

**prudent** 175:19 176:6

**PTA** 24:17 26:19 27:17 56:12

**PTA's** 23:21

**public** 15:20 16:9 33:14 34:6,14,18, 19 48:2 56:21 58:16 60:6,18 64:2 174:23 221:8

**publications** 58:15,20

**publicly** 15:25 16:7 21:3 22:20

**published** 13:12 14:6 58:16,24

**pull** 229:22

**pulling** 186:15

**purchase** 193:21 207:18,19,25

208:4,10

**purpose** 91:16, 25 92:6,22 125:8 126:8 135:9 136:3 142:6 186:6

**purposes** 11:20 31:11 63:22 91:14 131:15 135:13 184:11 231:14

**pursuant** 174:24 209:9

**pursue** 33:25 92:15 97:6 103:17 108:22 109:6,20 110:1,4 153:4 163:8 173:14 175:22 185:14 235:16,17 236:20,22

**pursued** 70:4 153:7 165:5,9,10 218:4

**pursues** 89:4

**pursuing** 73:25 103:8 106:11 163:16 219:5,21 232:5

**pursuit** 56:25

**put** 29:8 30:12,15 34:13 66:19 118:17,18 132:12 137:8 181:1 182:17 192:2 233:5 237:6

**putting** 30:2

_____

**Q**

**qualifications** 12:11

**question** 14:1 17:1,4,6,17 27:1, 3,5,7,9,12,25 28:23,25 29:1,2, 13 31:18,21 33:10,24 35:2,10,

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

15 36:21 37:12, 24 38:24 39:2,18 40:6,9,23 44:24, 25 45:1 52:5,11, 13,16,17 53:2,4, 19 55:13 56:12 57:15,18 60:1,20, 23 61:12,25 62:21 63:10 64:8, 10 65:21 67:25 77:23 78:16 86:11,23 87:9,20 91:10,22 92:1,19, 21 93:12 95:23 97:10,12 98:10 101:16 103:21 104:4,8,14 105:7 106:6,7,8,14,17, 23 107:6,10,12, 23,25 108:4 109:22,24 111:16,20 112:17 116:3 120:25 121:11,12,20,23 124:22 128:5 131:22 133:10,21 138:3 147:12,15 159:21 160:1,4 164:11,15 181:7, 21 182:5 187:4 203:17 210:16, 17,24 213:16 228:9 233:8

**question's** 63:9 105:6

**questioning** 30:25 31:5,6 55:14 139:10

**questions** 27:9 29:11 35:14 36:24 39:1,4,7,8 49:22 52:24 54:23 55:23 56:6 87:6 96:8 98:1,4, 8 106:19 121:17, 19 125:12 126:9 146:17 175:13 184:23 201:19 226:10,20,23 227:1,4,5,12,15, 16,19 228:2 229:7 237:8 238:7,12

**quick** 79:5 168:13

**quote** 66:13,15, 16 221:10

**quotes** 66:20

─────

**R**

**radar** 120:5

**ran** 157:10

**range** 176:6

**Raquel** 9:13 186:19 187:19 188:10,14,19 189:2,22,25 190:6,11

**rate** 26:21 27:20 66:13 68:1

**rates** 215:16

**rational** 87:7

**reach** 40:18 92:10 108:9 135:16 197:12, 19,21 198:4

**reached** 11:25 42:20 174:9

**read** 15:3,5 27:5, 8,10 31:17,19 60:19,21 66:14 86:19 99:20 106:16,19,21 107:25 108:2 124:24 125:15 139:8 141:17 147:12,13 154:8 158:24 159:1,25 160:2 182:10 185:10 186:22 197:5,7 206:16 216:16 228:12

**reading** 31:1

**reads** 14:19 21:9 30:21 32:1

**ready** 69:23

**real** 219:25 220:1, 4,6

**reality** 20:9,11 180:2 235:8

**realize** 71:18

**realized** 182:24

**reason** 110:22 139:23 140:2 141:13 143:15 215:10,12 223:5, 7

**reasonable** 11:22 87:7 138:13

**reasons** 92:14

**recall** 17:22 18:3, 11 33:5 42:5,12, 17 44:11 45:2,6 47:4,6,8 48:7,11 53:6 58:15 71:12 74:19 75:14 83:3 114:9 130:20 144:17 163:5 179:24 183:1 189:23 190:7,12, 13 191:9 192:4,7 196:25 200:3 202:25 203:4 205:1 206:21 207:21 210:12 230:7,12,23 231:2,4 232:9,24 233:11

**receipt** 171:19 208:7

**receipts** 208:2,9 218:14,20

**receive** 95:8 157:25 185:19 230:21,25

**received** 73:23 75:13 132:19,22 134:16 171:18 199:9 205:4 216:19,21,23 218:10

**receiving** 12:24 230:23 232:9

**recent** 178:19

**recently** 72:2 152:13

**RECESS** 46:3 79:13 123:5 136:19 168:20 190:20 211:17 226:4

**recited** 64:21

**recognize** 115:9 137:14 175:4 180:9 198:18 216:4 229:25

**recollection** 56:6 84:5 87:14 127:25 128:19 132:10 154:6 175:25 187:11 198:20

**reconnect** 123:1

**record** 24:7 27:10 28:5 29:8, 10 31:11,19 46:1, 5 60:21 62:23 79:11,15 96:4 99:16 106:21 108:2 122:25 123:3,7,10 124:2, 20,21,23 136:12, 17,21 147:4,9,13 159:1,19,23 160:2 168:18,22 190:18,22 203:15 206:18 211:9,15, 19 225:23 226:2, 6,11 228:3 229:12,16 237:21,25 238:19

**recorded** 90:25 91:7 94:16 96:25 97:2,4 126:3,6 134:16 138:8,13 157:13 161:11,15 164:13,14

**recording** 92:16 94:22 95:5 96:16 124:16 126:14 138:14 139:7,16, 24 140:3 148:24 154:1 155:1 188:3 189:8

**records** 59:4 138:19 206:15 211:23 212:2

**recover** 179:2

**recovered** 179:4 215:19,22 217:12

**redacted** 125:11 126:23 162:17

**reduced** 114:17, 19

**refer** 11:2 39:14 48:17 50:14 110:14 113:18 146:7 147:15 163:1 182:10 184:10 191:24 218:11

**reference** 17:2,4 21:4 29:24 49:23 58:23 60:13 78:4 101:15 140:11 144:12 151:7,8, 10 159:8 160:6 162:20 208:8 218:8,9 236:12 237:3

**referenced** 13:7 15:14 16:5 17:8 19:8,22 20:21 21:4 26:25 32:20 48:5 49:12 50:22 54:8 57:23,25 140:3 154:1 201:8 208:13 221:14

**references** 89:11 109:6 161:3 198:24 209:4,7

**referencing** 20:14 22:20 94:9 112:11 129:22 145:6 182:18 206:18

**referral** 51:1 112:24 113:1,7, 15,21,24,25 114:10,12,17 146:1 164:23

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Index: referrals..response

**referrals** 43:16 48:14 111:2

**referred** 41:19 43:2 68:22 81:7 92:13 97:5 109:10 110:9,19, 20 114:3,4,7,15 143:21 153:1 162:23 178:3 191:17,20 192:1 199:24

**referring** 11:2 28:17 42:24 43:16 51:24 65:2 88:20 89:8,9 104:5 105:23 107:3 110:22 111:8 127:20,22 129:9,11,15 134:6 135:24 140:15 151:12 153:8 160:25 161:2 162:21 163:11 181:17 182:6 188:6 189:16 194:2,4 195:11,17,18 212:6

**refers** 38:22 144:15 237:1

**reflect** 64:20 111:25 116:11 120:4,15 128:19 129:8,12 180:2 188:25 200:4

**reflected** 36:22 70:12 131:16,21 132:7

**reflection** 115:25

**reflects** 32:11,13 86:22 127:15,23 203:14

**refresh** 50:2 127:16 129:14 133:20 153:25 154:4 174:18 175:25 187:11,16 198:20 231:22

**refusal** 228:2

**refusing** 39:4

**regard** 13:4 189:10

**Reid** 9:22 16:15 49:15,18,20 99:3, 4,18 100:2,16,25 148:9,18 150:22 151:3 222:20 223:3

**reimbursement** 24:24

**reiterate** 238:5

**rejected** 59:19 68:6,8,9,10,12,14

**Relacore** 158:15, 21 159:7 160:5, 11,14 162:18 164:5,6,17,18

**relate** 13:23 24:15 58:1 146:4, 10,14,18,19 207:3

**related** 13:6 14:20 15:8 16:20, 24 17:6 18:15,23 19:24 21:10,21 22:13,25 24:17 47:11 55:24 56:10 57:11 61:10 86:1,13 93:7 98:16 100:22 114:1 120:22 121:25 149:17 170:19 185:25 189:12 207:8

**relates** 13:21 14:10 15:3 31:7,9 58:8,18 84:4 93:23 95:21 100:21 119:2 120:22 124:15 131:8 152:4 189:13 235:8

**relating** 18:25 22:15 24:24 187:23 210:16,22

**relation** 22:3 24:19 26:8 43:16

**relationship** 113:15 143:25 146:1 163:19 210:1

**relationships** 20:11

**relatives** 41:17

**relevant** 17:25 54:25 55:8,9 86:9 99:13 237:14

**reliable** 56:21 69:10

**relief** 226:13

**relieved** 207:13

**remain** 13:4

**remaining** 211:9

**remember** 44:1, 2,4,5 46:21 47:3, 15 52:20 81:1 207:4

**remind** 38:21 181:13 182:20,21

**reminder** 187:24

**remote** 123:17

**remove** 137:9

**rent** 221:19

**rep** 71:7 90:18 124:22 125:12, 14,20 167:22 183:19 185:24 207:18

**repeat** 131:23,24

**repeatedly** 117:14

**repercussions** 207:9

**rephrase** 92:3

**replaced** 183:10

**replacement** 221:20

**Reply** 30:4

**report** 124:24

**reporter** 9:12,15 27:4,8,11 31:17, 20 60:19,22 106:16,18,22 108:1,3 115:3 131:23,24 147:5, 11,14 158:24 159:2,25 160:3,8 237:6

**represent** 9:5 89:13 157:1 165:22 166:1 175:12 209:9

**representation** 210:17,23

**representations** 130:10

**representative** 34:15,17 51:3 54:5 56:22 57:20 67:6,10 69:14 82:7,15 96:24 116:19 125:21 142:18 145:11 154:18 170:2,7 173:21,24 174:15 175:21 183:16 186:12 187:12 191:10 193:15, 20,23 194:23

**representative's** 96:25

**representatives** 81:10 91:5 93:3 117:4 126:12 174:6

**representing** 42:14 43:5,8

**represents** 225:2,4

**reps** 90:23 116:22

**requested** 210:2

**requesting** 194:19

**required** 96:5

**requires** 12:6,9 29:5

**research** 71:23 72:1,4,6,10,13 105:8,12,13,19, 23 106:24 107:4 167:3,8

**reservation** 226:12 238:16

**reserve** 225:5,9, 15,20

**residence** 202:2

**residing** 169:13, 23

**resolution** 209:3,10

**resolve** 81:19

**resolved** 81:24

**respect** 13:18 15:23 18:7 19:6 21:25 22:24 23:16 24:16 25:14 29:5 32:22, 23 48:8 56:15,25 57:7,14 58:12 75:17 95:19 97:14,24 102:17 103:4,17 105:18 106:23 121:18 125:2 212:7 220:8 227:4,18, 21,22 228:11 237:11,13

**respectfully** 59:24 87:5 237:20

**respond** 171:17 173:13

**responded** 143:1 194:6

**responds** 125:9

**response** 17:3,4, 6 25:20 28:6 36:1,11,12,23 37:6,15 61:2 85:24 92:18 99:8,

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

22,23,25 136:5 189:10

**responses** 13:8 22:25 23:8,9,10 28:21,24 29:14 59:16 65:15 98:9 203:20,22 204:1

**responsibility** 69:19,25 70:3

**responsible** 112:2,4 212:10

**responsive** 17:20,21 33:24 57:4 92:19 97:10 105:7 120:9

**rest** 12:14

**restate** 31:4,10, 12 61:4 128:6

**restored** 123:15

**restroom** 168:13

**result** 82:5

**resulted** 82:10, 14

**retain** 209:23,25

**retained** 103:16 104:1,10 105:13, 19 106:1,25 107:8 108:6 128:15,23 135:14 218:25

**retainer** 18:16,22 19:1,5 90:16 108:21 179:20 180:19 195:6,11, 14 202:13,15,17, 24 209:19 210:4, 9 211:6 235:15 236:19

**retaining** 210:3

**retention** 18:16, 24 22:2,14,15 86:19,21 226:24 228:14

**retired** 19:15

**retread** 227:19

**returning** 69:10 144:2

**Rev** 83:17

**reveal** 210:21

**reveals** 203:12

**revenue** 215:10, 15 221:25

**revenues** 23:21 24:2 213:7,15,17, 18,20,22,24 214:1,8 215:4,8

**review** 10:24 15:10 16:23 18:19 20:3,24 21:14,17,22 22:4, 18,22 23:3,16,24, 25 24:20 25:21, 23 49:13 65:25 66:8 71:19 83:7, 21 93:14 99:14 116:11 119:9 123:24 130:17 147:24 154:21 155:23 175:6 181:6 187:3 193:7 207:15 208:19 222:5

**reviewed** 11:12 13:10,13,20 14:2, 3,22,25 15:6,17 16:15 17:7 18:22, 24 19:2 20:19 21:18 23:8,11,12 24:23 25:3,5,24 26:1,7 28:21 29:23 30:9,13,15 36:6,12 49:21 53:15 65:11,14 71:20 115:11 130:14,19 137:13 141:1 144:3 148:23 149:24 156:12 200:18 202:20 206:13 228:21 233:3,8,9

**reviewing** 16:9 23:7 115:10 130:20 175:12 182:9 202:11 230:8

**revise** 205:5

**Richard** 189:16 222:17

**Richardson** 189:16

**Riddles** 9:21 60:12 62:4 63:8 93:10,21 122:25 131:17 143:12 231:19

**Ridenba** 19:15

**right-hand** 90:15

**rights** 33:18 34:19 226:13 238:16

**ripe** 69:23

**risk** 34:14

**role** 46:25 50:10, 11 68:15 72:23 112:9,15 166:3 211:22

**roles** 57:3

**roommate** 143:4

**Rooney** 118:13 119:11,14

**Rott** 146:1,8 147:16

**rough** 221:3

**routed** 51:2 182:12

**Rule** 9:20 10:14 11:13 31:2

**ruled** 55:16

**rules** 22:13 96:5

**rulings** 14:11

**run** 35:11 99:20 100:16

**RX** 191:1,15 193:16 194:5 198:8 199:21,23 201:15

**Ryan** 9:23 44:16 202:1,3 204:21,

24 206:25 207:20 224:1

---

**S**

---

**SAC** 14:21 15:1 16:21 18:17 19:25 20:18 32:20 39:22 40:4 50:6 51:13,23 53:13,16,20 55:11,12 120:23 121:1,6,9 122:3,7

**safer** 118:17

**sake** 175:1

**salaries** 26:1

**salary** 25:17

**sales** 99:19

**Sam** 46:9,15 47:18 48:5 49:7, 19 76:15 116:13, 20 119:23 120:19 122:6,9 131:14 138:7,18 140:15 143:2 145:2 148:11,18 149:23

**Sanctions** 196:20

**Sandoval** 183:13,17,20 185:7,9,15,19,25 186:7

**Santa** 9:1,9

**Sariah** 24:1,14 25:11 26:3,4 178:17,18 224:12 233:23,25 234:2, 18

**sat** 96:13 97:17

**satisfaction** 238:8

**satisfied** 23:13

**Schoonover** 41:7,9 46:9,15 47:18 48:5 49:7, 19,24 65:10,16

116:13,16,20 117:9,13,14 118:11,18,20,25 119:6,12,16,23 120:13,19 121:5 122:2,6,9,16 131:6,10,14 132:4 137:17 138:7,18,23 139:15,20 140:15 141:7,22,25 142:12,13,22 143:2 144:18 145:2,8,10 148:18 149:4,23 151:25 152:4,16

**Schoonover's** 76:15 141:20 145:15 148:24 149:18 152:11

**SCHOONOVER0 0002** 132:14

**SCHOONOVER0 0082** 130:1

**SCHOONOVER0 0083** 130:23

**SCHOONOVER0 0085** 144:5

**scope** 31:1,13 32:18 34:2,11,25 36:19 37:22 38:13,20 39:17 40:5,24 46:12 47:10 49:1 50:8, 19 51:9,22 52:4, 21,22 53:9 54:3, 10,18 56:8,17 57:13 58:5,13,18 59:6,11 60:11 61:18 62:5 63:18 65:8 72:15,20 75:5,12,24 76:4, 10,16,24 77:14, 24 78:13,25 79:20 80:1,9,14, 25 81:21 82:1,8, 16 83:2,11,19 84:1,17 85:11,22 87:9,15,25 88:11, 18 89:5,20 90:2, 12,20 91:1,8,15

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

Index: Scott..sit

92:7,24 93:9,20 94:17,24 95:12, 23,25 97:15 98:14 100:5,12, 19 101:3,10 102:6,20 103:7, 22 104:2,15,24 105:16,22 106:3 107:2,19 109:1, 14,23 110:7 111:6,11,23 112:7,18 113:12, 23 115:23 116:9 117:6,11,22 118:12 121:4 122:14,20 124:8, 13 125:3,17,22 126:4,10,24 127:5,13,21 133:18 134:1,13, 25 135:6,17,25 136:7 138:4,9,21 139:9,18 140:5 143:23 144:14,21 145:3,17 146:3,9, 22 148:2,14,20, 25 149:6,19 150:1,8 151:9,16, 21 152:2,18 153:5,13,23 155:2,10 156:14, 21 157:5,16,22 158:3,8 160:12, 23 161:6,12,23 162:4 164:8,20 165:8,18,24 166:5,9,15,20,25 167:9 168:2,8 177:25 184:2,7, 13 185:1,11,16, 21 186:1,8 187:20 188:15 189:4 198:23 199:7,14 209:12 211:25 212:16,21 218:17,21 219:2, 7,13,18 231:17

**Scott** 9:12,18,19 10:8 70:16 110:9 112:20,21 113:2, 19 125:9 174:24 182:21 238:19

**screen** 10:13,25

12:25 30:12,16 32:9 70:14 73:10 82:19 99:5 100:3, 9 113:4 115:5 120:5 129:24 130:23 132:13 172:5 186:24 229:20

**screening** 50:11 51:4 90:18 182:11

**scrolling** 85:2,15

**search** 178:7

**searches** 21:8

**season** 57:1 67:1 68:3 69:21,22

**seasoned** 68:23, 25 69:2,3,5 70:8 127:7

**seasoning** 66:16,19,24 67:17,19,25 68:2, 15 69:6,8,16,19, 20 70:1,12 78:2, 5,7,8,11,22 127:11,16,24 129:2,8,21

**seasons** 69:14

**seconded** 12:24

**secretary** 194:11

**section** 30:6,20, 21 31:24,25 77:8 78:6 86:19 114:20 209:18

**sections** 43:21

**secured** 216:15

**securing** 25:2

**seek** 35:12 55:18 210:8 226:13

**seeks** 210:7

**seminal** 33:20

**seminar** 46:23

**send** 107:20 133:16,24 156:19

157:2 158:16 230:11,14

**Senda** 196:11

**sending** 115:15, 21 116:4,8

**sense** 69:11 113:14 114:21

**sensitive** 148:12, 19 149:4,18,24

**sentence** 66:14 115:14

**separate** 29:1 45:10 211:2 212:4

**September** 70:16 160:11,15 162:14 201:5,6, 10,24,25 203:7 205:2,3,5,16 206:6

**sequence** 130:7

**sequencing** 93:12

**series** 189:12,13

**serve** 34:14 52:18 53:7,13,21 142:8 157:19 170:2 172:11 175:21 179:7

**served** 29:14 171:12 179:12 184:5

**service** 96:24,25 123:12 124:22 125:20 126:12 139:8

**set** 26:10 36:3 37:14 54:4 57:21 59:15 66:5 98:17

**setting** 163:19

**settled** 79:24 80:2 166:8 178:4

**settlement** 80:5 82:9 141:6 157:25 166:12, 19,24 167:6,10

178:19,24 185:20 198:9,10,21,25 199:6,9,15 208:12,14,22,25 209:5,22,25

**settlements** 82:5,13 179:2 216:14,19,24 217:11 218:10,25

**seven-hour** 52:8

**severe** 207:9

**SF** 113:13

**SFMS** 113:10

**shampoo** 118:21

**share** 62:10 141:13 143:3,8, 15

**shared** 188:1

**Shepherd** 108:16 110:9 112:20,25 113:2, 19

**shocked** 39:8 176:14

**shockingly** 177:21

**shoehorn** 64:17

**Shopping** 108:20 109:13 235:15,20,24 236:17

**short** 204:20

**shortened** 237:16

**shortly** 167:16

**show** 31:7 39:24 40:17 104:4 108:7 111:7 116:17 127:15,19 152:3 153:16 154:2 155:12

**showed** 228:17

**showing** 32:13

**shows** 32:6 78:18,19

**side** 215:16

**sides** 15:21

**sign** 179:20

**signature** 32:6, 12 180:15,16

**signed** 37:18 67:5,7 137:19 145:10 172:16,22 179:24,25 180:1, 19 198:9 202:13, 24 204:17 205:8 206:10 208:5

**significance** 88:23

**significant** 48:1 221:12 223:3 225:18,19 227:15

**signs** 34:16

**silver** 173:7 175:20 177:10

**Silverman** 44:13 45:6

**similar** 48:15 58:24 70:23 75:22 101:22 113:21,24 230:13 233:12

**simply** 20:18 68:14 126:17 149:14

**single** 44:11 53:6 62:15 221:9 233:6,10

**single-incident** 232:8

**Singleton** 33:19

**sit** 53:10 64:8 72:16 81:12 82:17 95:7 100:1 109:16 111:12 112:16 113:2 120:2 128:18 129:6 132:6 139:19 140:17

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Index: sitting..student

143:24 153:6 158:9 162:5 166:21 167:1 168:9 174:16 187:21 189:11 190:13 191:6,12 192:17,24 196:15 199:8 200:9,14 203:4 206:20 237:4

**sitting** 40:2 82:13 107:16 120:16,17 129:15 140:10,14 150:6 152:15 160:17 162:2 168:6 183:1,4 205:10 207:21 213:1 215:17

**situated** 119:1 234:20

**situation** 22:10 114:16

**skin** 148:12,19 149:4,18,24 177:12

**skip** 32:6 137:5

**skipping** 99:11

**slash** 22:1 23:21 24:17 78:7 113:9 125:13,15 126:2 197:9

**smallest** 228:22

**smiley** 99:6

**soft** 180:13

**sold** 170:23

**solely** 54:24

**solicit** 51:20 52:2 53:12,20

**solicited** 52:13, 17 53:7

**soliloquy** 56:2

**sons** 177:2,3

**sort** 20:10 69:12 124:15 143:25

**sought** 210:25

**sound** 211:11

**source** 150:10 201:20 227:13

**sources** 15:25 16:7,10 17:21,25 20:20 21:7

**South** 196:11

**Sovereign** 175:20

**speak** 71:13 87:4,6 132:4 163:22,23,25 190:5 192:10 201:4 233:14 234:18 235:6,10

**speakerphone** 202:12

**Speakers** 159:17

**speaking** 93:3

**speaks** 61:3 86:24

**special** 95:22 106:4 203:25

**specific** 13:21 18:19 20:3 21:14 22:4 23:3,24,25 24:20 25:21 35:10 37:23 38:4 42:5,8 43:4 46:20,24 66:22, 25 71:7 96:5 127:22 129:13,16 138:22 139:19 165:20 192:1,7 197:20 210:18 223:11,12

**specifically** 11:24 13:20 16:2, 24 18:7 30:19 31:24 33:24 39:2 41:8,14,24 42:24 43:2 45:18 46:8 47:17 48:4,9,11, 17 54:17 56:15 57:9,25 61:5 64:11 65:1 77:20 82:12 83:8 91:5 108:13 110:18

124:19 134:10 139:4 163:3 170:22 171:22 173:4 184:22 191:23 192:2 197:15 200:3 206:18 207:16 210:7 218:13 234:25 235:10 237:1

**specificity** 45:4

**spectrum** 35:4

**speculating** 129:16

**speculation** 60:12 61:19 62:4 63:8,19 85:11,22 93:10 94:6 199:14 231:19 232:15,22 236:25

**speeches** 21:6

**spend** 221:22

**spending** 10:24

**spent** 20:15 169:19 227:8

**spirit** 33:14

**spoke** 19:16 22:21 24:14 25:11 26:2 41:16 47:21 120:13 125:11,19 143:2 144:8 156:8 163:15 189:24 192:8 203:12,16 206:24 233:22,25 234:2

**spoken** 48:12 189:21 201:2 203:23 204:2

**spreadsheet** 77:4,20,21 83:24

**spreadsheets** 70:6

**squinting** 10:25

**staff** 221:20 232:1,4,12

**staffed** 215:14

**stage** 66:16,19, 24 67:19 68:2 69:7,16 70:1 78:2,7,8,11,20,22 127:12,16,24 129:2,8 169:5,8 178:4

**stand** 35:19 113:10

**standard** 20:16 26:20 27:18

**standing** 33:20

**stands** 126:6

**staring** 177:14

**start** 26:12 33:11 37:16 41:11 58:15 130:7 157:11 207:22 213:21 217:7 219:5

**started** 12:23 20:7 23:7 26:11 96:12 118:24 219:12

**starting** 130:11

**starts** 156:7,8 209:7

**state** 22:14 177:5 226:11 228:17 229:16

**stated** 39:19,20 175:17 234:15

**statement** 12:8 59:25 136:4 156:20 157:2,7 158:15 175:23 188:11,14 228:20

**statements** 134:11 135:4,23 177:4 188:7 207:3

**states** 112:23 149:7

**static** 217:21

**status** 90:16 101:21,22 102:1 108:21 127:16,17 235:16 236:20

**statute** 42:21 68:11 91:11 111:22 112:5

**statutory** 33:15, 18 34:6 56:24 226:22 229:14 237:22

**stay** 227:7 229:1 238:9

**steps** 137:22

**Steve** 210:1

**stipulation** 25:5

**STLH** 84:22 85:5, 8 89:23

**stolen** 176:22

**stop** 80:3 121:16 135:15 168:14 171:22 173:5 176:16,17 177:6 194:14 219:21

**stopping** 168:12

**story** 170:4 189:8

**straight** 84:22 85:9 96:21 98:8

**Strataluz** 21:12, 19,21 77:9 115:16

**streamline** 52:7 236:4

**Street** 9:9

**strike** 28:6 30:4 33:22 36:15 92:17 94:13 97:11 111:20 112:3 150:12 183:11 188:18

**strong** 170:17

**struck** 95:22 106:4

**student** 118:13

268
EXHIBIT 9

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

**stuff** 49:16 115:17

**subject** 12:20 64:3 226:18 238:16

**subjects** 39:11

**submission** 14:21

**submit** 134:22 135:18

**submitted** 15:1, 4,7 24:25 29:19 30:24 32:4 203:11 204:14

**subsection** 68:17

**subsequent** 25:5 99:24 165:19

**subsidiary** 167:3

**substance** 201:11

**substantial** 225:8,14

**substantially** 215:4

**substantiation** 16:3

**substituted** 183:12

**succinctly** 228:2

**sue** 72:18 104:1 167:8 173:12 211:6

**sued** 72:12 165:16 210:13

**suffered** 123:13

**suggested** 231:21

**suggesting** 101:5 230:18 234:8

**suggests** 20:8,9 140:7,12

**suit** 173:1

**suitable** 142:17 174:6 175:21 176:2 178:8

**Suite** 9:9

**summary** 24:2 29:25 108:9 135:19,20 154:8 158:17

**super** 63:20

**Superior** 209:4

**supplement** 171:4,5

**supplemental** 36:1,11,23 37:14

**supplemented** 54:12

**supplied** 208:2

**supply** 135:23

**support** 30:4 134:23 196:19

**supporting** 16:6

**supposed** 52:15 170:20 212:11

**Supreme** 33:11, 19 35:7

**suspect** 120:3

**suspicion** 129:6 161:18

**swear** 9:15

**sworn** 177:4

**system** 86:23

**systems** 22:1 84:7 86:2,9,14, 18,20 226:15,24 228:14,23

---

**T**

**takes** 63:24

**taking** 9:8 39:9, 10 97:8 147:1 170:19,23 237:15

**Talee** 118:13 119:11

**talk** 16:19 110:18 112:14 234:6,9, 12

**talked** 47:24 48:13 101:19 153:7 191:25

**talking** 32:22 42:7 48:3 51:13 53:3 77:17,19 94:8,18 101:20 102:21 145:4 182:22,25 218:6

**tax** 24:9

**taxes** 212:23

**Taylor** 158:13 162:18 164:5,17 165:1

**TCPA** 34:5

**technical** 16:4

**telephone** 65:19 96:16 139:7,17 197:12 200:8 203:13

**telling** 62:14 97:16 103:11 121:3 234:9

**template** 77:1

**tendencies** 177:2

**term** 26:17 27:16 28:10 35:18 36:19 38:12 66:24 67:24 68:4 69:9,16 212:4 221:24

**terms** 25:18 26:10 66:19,22 113:7 209:9

**terrorists** 177:5

**tester** 28:18 29:15,20,24 33:13,20 34:7,12, 16,20,22 35:3,5, 6,18,23 36:16,19

**Talee** 118:13 119:11

37:2,8,9,14,21 38:4,12,19 39:20 41:3,7,9,15 42:10,22 43:13 46:9,15 47:18 48:10,18,25 49:8, 19 50:5,17 51:6, 20 52:3,14,18 53:7,24 58:1,7 59:9,13,15,20,21, 22 60:9,14,25 61:17 62:9,11,24, 25 63:5,10,14,15, 16,23 64:4,12,14, 15,18,20 65:1 186:19,20,23

**testers** 28:11,14 30:22 32:1,17,23 33:17,25 34:5,10 35:16 37:5 39:16 40:3,12,15,21 48:3 53:13,21 54:9,17 55:12 56:15 57:8,11 58:12,18 59:5 61:6 62:3 63:17 65:17

**testified** 10:10 43:15 114:4 155:7 185:6 197:8 227:17

**testify** 12:13,16, 19 14:23 15:9 16:24 17:13 19:10 20:2,4,23 21:9,15,23 22:17 24:11 25:9 56:5 87:13 154:7 226:14 227:12

**testifying** 12:14 36:13

**testimonial** 13:1 26:5 234:20

**testimony** 16:8, 20 17:7,9 19:3 23:11 24:5 34:24 36:7 43:17 53:15 56:5 64:7 65:14, 25 87:13 90:9 119:10,11,20 154:19,21

155:13,17 200:17,18 205:2 215:6 224:17 227:8 233:4 235:1 238:10

**testing** 33:21 35:8

**text** 130:21 205:8

**thanked** 190:8

**themes** 41:19

**thereabout** 58:23

**thereabouts** 201:25

**Thermolife** 72:19

**thing** 221:15

**things** 14:11 39:2 67:16 69:12 93:13 98:15 109:25 163:16,19 176:14 177:8 209:7 213:19

**thought** 103:5 141:22 142:22 143:7 188:21

**thousand** 199:3, 9

**thousands** 130:19 227:8 238:7

**threatened** 19:17 21:12

**Thursday** 9:1 194:25 195:4

**tied** 223:11

**time** 9:7 10:25 17:22 20:15 29:12 30:13 31:4 35:13 42:15 43:6, 9 45:23 46:1,5,21 52:23 53:6 55:18 59:14 64:17 68:16 75:13 79:11,15 81:5 87:2 98:5 114:23

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

115:20 116:22
118:11,18,24
121:16 122:22
123:3,7 131:20
136:17,21 138:11
168:15,18,22
169:19 171:8,11
177:20 189:23,24
190:6,18,22
194:11,15 196:7,
10 197:24 198:4
201:12 207:21
208:5 210:2,12
211:15,19 212:15
215:8 220:19
225:22 226:2,6,
12,22 227:2
229:1,13,16
230:23 232:5
237:16,22,25
238:19,21

**times** 48:13 97:2
98:18 204:24
211:2 225:14,18,
19

**timestamp**
130:24

**timing** 134:18
190:16 199:25

**tipped** 189:9,17

**titanium** 178:23,
25 179:5,9,12,15,
22 180:14,22

**title** 30:3 85:3
174:23 196:18
222:18

**titled** 83:12

**today** 9:20 11:8
12:16,19 16:8,25
17:13,15 36:7,13
40:2 63:22 64:20
66:9,15 83:8
85:12 87:14 95:7
98:6,7 120:16,17
130:15 140:10,14
141:1 145:15
154:7,22 156:13
160:17 174:16
182:10 183:1,4
194:17 200:20

202:21 213:1
219:17 224:24
225:5 226:19
227:1 228:18,21
229:5,16 237:23
238:14,16

**today's** 52:15
53:5 85:22
238:18

**told** 29:3 43:22
49:18,20 50:24
64:21 96:14 97:5
98:16 119:17
125:13 138:19
149:11,13 150:4
152:20 157:11,12
165:13 173:8
201:13,15,17
207:6 234:11,16

**toll-free** 91:13,24
92:5,22 94:12,16,
23 97:14 98:13
103:17 161:11

**tomorrow**
162:17 178:19

**tonight** 227:7
229:2

**tool** 100:20

**top** 30:19 31:23
32:12 71:2,3 78:6
83:16 84:20
108:15 113:4
126:19 130:8,12,
24 132:25 143:18
148:8 151:3
187:7,23 231:7,
10 236:6

**topic** 11:24
14:19,23 15:9
16:1,11,19,23,24
17:3,13 18:7,9,
15,19 19:11,24
20:4,8,24 21:9,
15,23,25 22:5,17,
24 23:4,16,20,24
24:1,5,12,16,20
25:9,14,21,23
26:8 31:7,10 33:3
38:22 39:5 42:8,
17 46:22,24 47:8,

11 50:20 51:24
52:5 54:20,21,25
55:2,6 56:9 75:5
85:11 86:19 87:1,
15 95:20,21
106:4 120:21
121:8,13,23
122:1 226:15
227:5 228:11
235:7,8 237:14

**topical** 118:20

**topics** 11:17,20
13:2,19,22,24,25
18:18 19:9 20:2
21:14 22:3 23:2,
23 24:19 25:20
26:3,6 28:22
31:1,9 33:2,4,7
39:1 50:21 52:22,
24 53:5 54:24
55:9,15,24 87:5,7
146:4,11,15,18,
19 147:2 226:14
227:22 231:17
234:4 235:3
237:10

**Torres** 65:12,13
186:12,16,19
187:13,19
188:10,14,19
189:2,6,13,22,25
190:6,11

**Torres'** 65:25

**total** 220:14
222:19,21,24,25
223:1,20,23,25
224:5,8,24 225:2
236:14

**touch** 118:17,18
192:2

**track** 83:9,25
101:21,22 102:1

**tracking** 84:7

**transcript**
186:22

**transcripts**
16:16

**transmit** 199:10

**transmitted**
120:10

**transpired**
229:13,16

**travelled** 238:6

**treat** 29:4

**treating** 97:24
121:18

**treatments**
170:21

**trial** 9:11,18
10:15 11:9 19:7
21:5 30:21 32:1
36:1 53:23 73:4,7
83:13 185:9
189:17 196:1
205:15 207:23
209:23 211:5,24
212:7,8 216:13,
16,18 217:12,14

**trials** 47:12

**tripartite** 12:11

**troubling** 176:19
178:6

**truderma** 77:8

**true** 28:13,25
38:10 39:12
45:14 48:23 49:6
83:24 90:23
92:12 97:1
103:15,19 148:21
149:3 150:10
151:19 160:10
200:11

**trusted** 111:1

**truth** 12:7,9,10
126:12 201:21
207:2,7,8

**truthful** 98:1
201:18

**truthfully** 12:15,
16,19 215:21

**Trycia** 18:25
19:16 70:4 169:1,
2 170:2 171:22
173:1,15 174:3,8

**Trycia's** 176:8
178:5,18

**Tuesday** 11:5,6
29:3 152:12
191:25 224:14,
18,23

**turn** 14:13,14
177:12

**turned** 154:12

**turning** 197:3

**Tyler** 73:3,4

**type** 75:22 170:15

**types** 32:16
33:25 75:17

**typical** 157:1,6

**typically** 25:25
50:24 114:13
135:13 163:10

**typify** 157:8

---

**U**

**U.S.** 33:19

**ultimately** 60:2
97:6

**unable** 197:10,19

**unclear** 186:22

**underlined**
235:22

**underlying** 16:5,
18 17:10 18:23
19:1 20:18 39:13,
22 40:4,7,11,13
41:18,22 42:21
47:25 48:2
188:25

**underneath** 77:7
85:19

**understand** 12:6
27:3 31:16 33:6,7
39:18 50:20
51:10 52:12
56:11 68:4 69:12
80:15 86:7,16
87:3 93:11 98:1

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF
PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF
NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com          Index: understanding..witnessed

100:3 104:3 126:3 130:11 145:5,11 186:20 209:19

**understanding** 19:5 53:17 59:21 63:14 79:1 86:15,17 89:6 119:13 125:23 126:5 128:17,22 155:9

**understandings** 35:21

**understands** 67:6

**understood** 28:8 43:17 100:6

**undertake** 14:8

**undertook** 17:5 106:11 137:24

**undisputed** 111:12 149:9

**unfair** 120:25

**unfavorable** 68:13

**unique** 13:24 68:11

**United** 112:23

**unlawful** 60:5,17 64:1,25

**unpack** 164:10

**unprepared** 227:11

**unprofessional** 121:17

**unrelated** 53:4

**unresponsive** 92:18

**Unruh** 34:4

**unseasoned** 68:23 69:1,3,4

**update** 77:21 232:12

**updated** 74:6

84:15 232:4,7

**updates** 58:17

**updating** 230:10

**upkeep** 221:20

**Utah** 71:24 165:17,22,25 166:3,19 167:7

**utmost** 206:15 207:14

---

**V**

**vague** 18:6 35:2,17 36:18 37:24 50:19 51:9,16 63:9 75:19 77:13 88:5 93:21 94:24 105:15,21 107:1 109:21 122:10 144:21 153:23 157:4 164:9,20 165:8 166:4,14 172:13 203:19,24 204:18 212:9 216:21 218:5 220:19 223:14 231:16 232:6 234:15

**varied** 225:21

**varies** 220:20

**variety** 110:17

**vary** 220:23

**vehicles** 224:11

**Velarde** 205:14,17 206:6

**vendors** 221:19,22,24 222:1

**verb** 69:22

**verdicts** 216:14,19,24 217:11,17 218:10

**versa** 51:15

**version** 172:14,22 182:1 205:7

**versus** 9:11 41:2,4,7 65:9,10 68:23 69:1,2,3 88:15 89:2 121:5 141:7 167:7

**viability** 165:11

**viable** 105:9

**vice** 51:15

**Victoria** 9:22 63:5,16 64:6,12,22 65:3 171:25 223:21

**Victoria's** 64:7

**victories** 21:5 216:15

**video** 122:23

**videos** 21:6

**violated** 112:5 173:8

**violating** 33:15 80:4 96:20 111:13,22 112:12,13 161:17 171:23 173:5 176:16

**violation** 43:23 91:21,25 96:15 102:18 103:25 104:9,22 110:25 111:4 157:21

**violations** 30:22 32:2 41:23 91:14 92:6,23 97:8 99:5 100:3,4,10,11 102:25 103:10,13 136:6

**visiting** 169:22

**visits** 169:20

**Vitasprings** 198:25

**Vogue** 116:14,15 117:4,10,13 119:22,25 121:1

---

**W**

**W-E-L-L** 170:14

**Wade** 43:5

**Wade's** 41:18 42:19

**wages** 25:17

**wait** 123:1

**wanted** 50:12 118:15 149:14 158:13 173:5

**warning** 88:14,15,20 89:9 94:2 154:25

**warnings** 94:8,12

**WAVE** 99:20 100:17,20

**ways** 150:2

**website** 90:6 216:9,10

**websites** 100:21 115:16 163:20

**Wednesday** 151:4

**week** 115:16,18,21 116:4,8

**weekly** 73:20,24 74:4,6 75:11,14 227:14 230:15,19

**weeks** 165:6

**weigh** 87:11

**Weil** 14:6

**weil.com** 14:7

**well-founded** 138:2

**well-respected** 112:22

**well-suited** 77:2

**Wellnx** 170:12,16,22 171:3,8,14 178:25 179:4,9

**whatnot** 90:10

**wholly** 237:12

**wide** 81:20,25

**widespread** 123:13

**wife** 19:14,21

**wind** 93:17

**wire** 106:12

**wiretap** 28:14 65:6,9 75:7 79:23 80:7 81:19 82:5,13 83:10,13,25 84:3,8 93:4 100:4,11 101:23 102:1,4,10 108:16 109:7 110:15 124:12 129:9 131:15 133:16,23,24 134:11,24 135:4,24 141:7 152:23 153:1,3,10,20 156:20 157:2 164:6,17 165:5 186:16 188:7 218:20,25 219:5 232:1,4,12

**wiretapping** 30:23 32:3 95:9 102:17 109:9,13,20 110:5 113:22 167:14 168:1 235:17

**wiretaps** 115:16 187:9

**Wise** 70:15 230:4,5,9,14 234:6,12,17

**withdraw** 106:6

**withdrawals** 225:9,12,15,19

**witness's** 226:14 228:1

**witnessed** 44:22 45:11,14,15,17

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]

Atkinson-Baker, a Veritext Company
www.depo.com

**witnesses** 13:9 19:10 45:18 65:14 204:1

**woman** 44:4

**Woods** 73:3

**word** 38:4 65:1 88:22,23,25 89:7 140:12 141:6 169:18 213:16

**words** 48:21 134:14

**wordsmithed** 205:6

**work** 26:11,12,20 27:19 35:20 50:12,14 58:20 60:3 102:4,10 109:12 118:6 122:1 123:19 222:11 223:12

**worked** 64:22 116:20 120:18 152:23 192:12 222:7

**working** 26:15, 18 27:13,17 62:13 64:24 68:3 73:6 134:9 194:14 196:4 236:12

**workload** 68:14 102:13

**works** 194:16

**worsen** 176:8

**worsened** 178:6

**worth** 114:21 216:14,24

**wrap** 211:10

**wrestling** 20:7

**write** 141:5 171:20

**write-up** 150:3

**writes** 150:22 158:13

**writing** 26:16 27:1,14 28:1 42:10 49:7,12,18, 20 114:18,19 209:2,8

**written** 23:7 26:23 27:2,22 43:11 48:25 49:4 53:23 54:2,8 57:23

**wrong** 99:17 103:20 143:16

**wrote** 66:12 99:18 100:2,16, 24 101:18,22 115:14 124:5 126:19 127:2 143:18 148:10 151:3 162:15 178:17 181:12,18 187:7,23 193:12, 19 206:6,13 207:19

**WT** 99:5 100:3,10

**Wynn** 51:3 70:15 71:10,13 116:25 181:13 186:11 187:8,12,18 188:10 191:10 193:13 194:6,19 196:18 197:8,20 198:4 200:12,22 206:25

**Y**

**year** 47:14 81:3 213:13 219:5 220:25 221:23

**year-end** 220:24

**yearly** 213:6,14, 17,18

**years** 18:1,13 44:22 100:7,14 102:11 118:22 150:11 191:18 194:15 195:23 206:20 207:21 212:20 216:13,20

219:23 222:3 223:4 225:10,16, 17

**yes-or-no** 53:19 95:4 104:14 105:7 121:12,23

**yesterday** 16:15 49:21

**Z**

**zeroed** 225:6,7

**zoom** 83:17

DECLARATION OF PETER A. ARHANGELSKY IN SUPPORT OF PLAINTIFF OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF NICS EXPERT DR. SEAN DEVLIN [ECF. NO. 1185]